# EXHIBIT 1

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| KEYFI, INC., | Index No. |
| Plaintiff, | Index No. Purchase: |
| v. | **SUMMONS** |
| CELSIUS NETWORK LIMITED and CELSIUS KEYFI LLC | Plaintiff designated New York County as the place of trial based upon CPLR 503 |
| Defendants. |  |

**TO THE ABOVE NAMED DEFENDANTS:** CELSIUS NETWORK LIMITED and CELSIUS KEYFI LLC

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer on the Plaintiff's attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: July 7, 2022
New York, New York

ROCHE FREEDMAN LLP

/s/ *Kyle W. Roche*
Kyle W. Roche
Daniel Stone
Peter Bach-y-Rita (*pro hac vice pending*)
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 350-0527
Facsimile: (646) 392-8842
Email: kyle@rochefreedman.com
Email: dstone@rochefreedman.com
Email: pbachyrita@rochefreedman.com

Devin (Velvel) Freedman
1 SE 3rd Ave.

Suite 1240
Miami, FL 33131
Telephone: (305) 306-9211
Facsimile: (646) 392-8842
Email: vel@rochefreedman.com

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
INDEX NO. 652367/2022
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 07/07/2022
22-01139-mg    Doc 7-3    Filed 09/22/22    Entered 09/22/22 23:48:29    Exhibit 1    Pg
4 of 76

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

KEYFI, INC.,

                              Plaintiff,

          v.                                        **COMPLAINT**

CELSIUS NETWORK LIMITED and CELSIUS KEYFI
LLC
                                                    Index No. _____
                              Defendants.

KeyFi, Inc ("KeyFi") ("Plaintiff") files their complaint against Celsius Network Limited

("Celsius") and Celsius KeyFi LLC ("Celsius KeyFi"), and allege as follows:

### INTRODUCTION

1.      This action concerns Defendants' refusal to honor its contractual obligations to pay

Plaintiff the millions of dollars it is owed pursuant to a profit-sharing agreement that was entered

into between the parties in January 2021. The dispute came to a head when Plaintiff discovered that

the Defendants had been leveraging Celsius' customer deposits to manipulate crypto-asset

markets, had failed to institute basic accounting controls which endangered those same deposits,

and had failed to carry through on promises that induced Plaintiff to undertake

various trading strategies.

2.      On June 12, 2022, these issues – which Plaintiff identified in March 2021 – have

now caused harm not only to Plaintiff, but the hundreds of thousands of people who use

Defendants' platform, as Defendants are now refusing to honor requests by its customers to

withdraw the assets they deposited and entrusted with Defendants.

3.     Defendants operate a "crypto-lending platform" that receives crypto-asset deposits from consumers seeking to earn interest on their crypto holdings. Defendants' business depends on them using this pool of assets to generate income by (1) lending those assets to others and (2) investing the funds in the crypto markets. Defendants' profits thus depend on them earning income above and beyond the amounts they need to pay to consumers for their deposits. Prior to Plaintiff coming on board, Defendants had no unified, organized, or overarching investment strategy other than lending out the consumer deposits they received. Instead, they were desperately seeking a potential investment that could earn them more than they owed to their depositors. Otherwise, they would have to use additional deposits to pay the interest owed on prior deposits, a classic "Ponzi scheme."

4.     The recent revelation that Celsius does not have the assets on hand to meet its withdrawal obligations shows that Defendants were, in fact, operating a Ponzi-scheme.

5.     Jason Stone – the CEO and founder of KeyFi, Inc. – is a pioneer in the world of modern crypto-asset deployment strategies. From August 2020 through March 2021, he managed billions of dollars in crypto-asset investments for Defendants.

6.     For most of that time, the parties operated without any formal written agreement, recognizing instead that they were engaged in an enterprise for "mutual benefit...based on mutual respect and trust." From August 2020 through March 2021, Plaintiff generated hundreds of millions of dollars in profits for the parties' mutual benefit. Those profits came in the form of transaction fees, rewards for staking tokens, and other appreciating assets. As in any investment relationship, Plaintiff and Stone were responsible for generating a profit on the funds provided to them, while Celsius was responsible for ensuring that its investment strategies would not prevent it from repaying its depositors in kind.

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM INDEX NO. 652367/2022

NYSCEF DOC. NO. 1    22-01139-mg   Doc 7-3   Filed 09/22/22   Entered 09/22/22 23:48:29   Exhibit 1   Pg   RECEIVED NYSCEF: 07/07/2022
6 of 76

7.     The parties' relationship began to break down when Stone discovered that not only did Defendants lack basic security controls to protect the billions of dollars in customers' funds they held, but that they were actively using customer funds to manipulate crypto-asset markets to their benefit. The most egregious example of this was Plaintiff's discovery that Celsius used customer bitcoin deposits to inflate its own crypto-asset called the "Celsius token" ("CEL").

8.     Stone also learned of multiple incidents where Defendants' failure to perform basic accounting endangered customer funds. One such example included Celsius improperly accounting for certain payments owed to customers, resulting in a $200 million liability the company did not even understand how or why it owed.

9.     These incredible losses meant that the billions of dollars of customer deposits could not be returned to those customers in the event that the customers sought their funds back. Celsius, for its part, was not concerned about these risks because it believed that the billions of dollars of customer deposits it manages are its property. Specifically, Celsius' terms of service, which are buried on its website, state that "all digital assets transferred to Celsius as part of the services are owned and held by Celsius for its own account." Further, the Celsius Terms of Service state that "Celsius does not hold any Digital Assets on your behalf" but instead are "owned, held and/or controlled by Celsius."

10.    When Plaintiff expressed concern regarding Celsius's use of customer funds without appropriate risk management, Celsius executives repeatedly assured Stone that the company had entered necessary hedging transactions to ensure that price fluctuations in certain crypto-assets would not materially and negatively impact the company or its ability to repay depositors. Stone and his team relied on these representations when deploying certain trading strategies.

11.     But these promises were lies. Despite its repeated assurances, Celsius failed to implement basic risk management strategies to protect against the risks of price fluctuation that were inherent in many of the deployed investment strategies. These failures not only harmed Plaintiff by negatively impacting the profit share, but have now caused Celsius to refuse to honor customer withdrawal requests.

12.     Celsius' former CFO shared Plaintiff's concerns and repeatedly raised these issues to Celsius' senior management.[1]

13.     Faced with mounting evidence of Defendants' disorganization, mismanagement, and fraud, Plaintiff concluded he could no longer work for Defendants. In March 2021, Plaintiff informed Defendants that he would be terminating the business relationship. Defendants retaliated by repeatedly refusing to recognize Stone's resignation and then refusing to pay Plaintiff their share of the profits.

14.     The unfortunate events that have publicly unfolded in recent weeks show that Plaintiff was right – Celsius grossly mismanaged its customer funds, failed to perform basic internal auditing to account for its obligations, and manipulated crypto-assets to the benefit of itself and its principals.

**PARTIES**

15.     Plaintiff KeyFi, Inc. is a Delaware corporation with a principal place of business in New York, New York. Jason Stone is the founder and CEO of KeyFi.

16.     Defendant Celsius Network Limited is a private company incorporated under the laws of England and Wales, with a principal place of business in London, England. Celsius

---

[1] The former CFO's replacement has since been arrested in Israel in connection with a different fraudulent scheme. https://www.timesofisrael.com/another-2-leading-israeli-blockchain-pioneers-named-as-suspects-in-vast-crypto-scam/

Network Limited recently announced that it is exiting the United Kingdom in order to avoid that jurisdiction's regulatory oversight.

17.     Defendant Celsius KeyFi LLC is a Delaware limited liability company with a principal place of business in Hoboken, New Jersey. At the time of its formation in 2020, Celsius KeyFi's only members were Celsius Network Limited and Jason Stone.

## JURISDICTION AND VENUE

18.     Jurisdiction is proper in this Court, and this Court has personal jurisdiction because pursuant to the KeyFi Asset Purchase Agreement, each of Celsius Network Limited and Celsius KeyFi LLC consented to the exclusive jurisdiction of the competent courts in New York County, New York. Additionally, jurisdiction is proper in this court pursuant to CPLR 302 because they transact business in New York and committed tortious acts in New York.

19.      Venue is proper pursuant to CPLR 503 because a substantial part of the events giving rise to Plaintiff's claims occurred in this county and because Plaintiff is a resident of this county.

## FACTUAL ALLEGATIONS

### A.     Crypto-assets and smart contracts

20.     Crypto-assets are digital assets that use a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify their transfer.

21.     Bitcoin is the world's first major crypto-asset. It launched in 2009, has a current market cap of approximately $390 billion, and is the most well recognized crypto-asset. But it is by no means the world's only crypto-asset. To the contrary, the total market cap of non-Bitcoin crypto assets totals more than $500 billion.

22.     Ether is another well-recognized crypto-asset with a $143 billion market cap. While Bitcoin mainly functions as a store of value or medium of exchange, Ether powers the Ethereum network which permits advanced coding to take place on the blockchain. One manifestation of this advanced coding capability is "smart contracts."

23.     At its core, a smart contract is an immutable program that allows a contract or deal to be immortalized on the blockchain, and then, ensures that this immutable contract is executed without the need for, or possibility of, further human intervention. A simple example of a smart contract would be a self-enforcing bet over whether the United States will take the most gold medals at the 2020 Olympics. Each participant locks 10 ether into a smart contract. They can no longer get their ether back. At the conclusion of the Olympics, the smart contract will check the source both parties agreed was authoritative and distribute the 20 ether to the winner.

**B.      The Rise of Decentralized Finance**

24.     Traditionally, monetary services are performed by centralized banks or brokerage houses. If an individual wanted a loan, she went to J.P Morgan Chase ("JPM") and applied for one. If an individual wanted to trade securities on the NASDAQ, she opened an account with TD Ameritrade ("TDA"). In either case, JPM or TDA completely administered the process. JPM processed the application, approved the loan, distributed the loan, and collected the interest payments as profit. TDA handled your account, executed your trades, reconciled its books, and kept the fees paid for any trade. Historically, the same was true for crypto-asset exchanges. For example, Coinbase lists crypto-assets, manages the order book, reconciles trades, and keeps fees.

25.     With the advent of smart contracts, these sort of traditional money services can now be "decentralized." In lieu of a single company administering loans or facilitating the trading of crypto-assets, individuals called "Liquidity Providers" can pool their assets into "liquidity pools" using smart contracts on the Ethereum blockchain. These smart contracts can be programmed to

6

make loans or facilitate crypto-asset swaps, which in turn allows Liquidity Providers to capture

profits in the form of interest and fees that have historically been captured by banks or brokers.

26.     This decentralization of traditional money services is called Decentralized Finance,

or "DeFi."

27.     To incentivize the use of these smart contract platforms above and beyond the fees

generated from being a Liquidity Provider, DeFi companies create their own crypto-assets called

"governance tokens" and award them to users of their platforms. This is similar to how airlines

issue "airline-miles" to people who book their flights and how credit card companies issue "points"

to people who use their cards. Some of these newly issued governance tokens trade at hundreds,

thousands, and even tens of thousands of dollars for each token– thus exponentially increasing the

value (and attraction) of engaging in DeFi activities.

### C.     Celsius' Business Model

28.     Celsius is a crypto-asset borrowing and lending platform that facilitates loans in

various crypto-assets. Celsius' business model is similar to a depository lender that accepts

monetary deposits from consumers and then uses those funds to provide liquidity to the market via

loans and investments. In Celsius' case, however, instead of fiat currency, depositors surrender

their crypto-assets to Celsius in return for a promised interest rate.

29.     Like a bank, Celsius is meant to invest those funds responsibly, earn a return, pay

the depositors the interest they earned, and keep the profit. Importantly, if Celsius fails to

profitably invest depositors' funds in investments that earn more than the interest owed, they will

operate at a loss. Central to consumer trust, however, is the promise that upon request, Celsius has

sufficient funds to return the crypto-asset deposits for each of its users.

30.     While Celsius' business model is designed to replicate traditional depository

banking, their terms of service attempt to shield them from the same responsibilities owed by

traditional depository institutions. For example, the terms of service provide that any funds deposited are not, in fact held on the customer's account, but instead become the property of Celsius to do with however it wants. And, unlike a traditional depository institution, Celsius does not maintain its own insurance against any losses of its customers' funds. Celsius effectively takes no responsibility for its customers' funds.

31.     Celsius does not make loans to consumers based on creditworthiness; it only issues loans to retail borrowers that deposit crypto-assets for use as collateral. For example, if a borrower wants to borrow $10,000 using bitcoin as collateral, it must deposit almost four times that amount in bitcoin to lock in the lowest offered interest rates.[2] Borrowers must also ensure they stay within certain loan-to-collateral ratios or Celsius will liquidate the collateral to secure the loan. This is not unlike margin calls at traditional stock brokerage houses.

32.     Like many other crypto-asset businesses, Celsius issued its own crypto-asset called the "CEL token" in March 2018. The way Celsius promotes use of its CEL token is that users who elect to receive interest payments from Celsius in the form of CEL tokens are paid higher interest rates than Celsius otherwise pays on deposits. Similarly, customers who repay loans with CEL tokens are charged lower interest rates. *Critically*, all of Celsius' accounting for purpose of its business operations is done in US dollar-based accounting. Accordingly, if the CEL token price rises, Celsius can pay its customers who are owed interest a smaller sum of total CEL tokens.

33.     As a result of the growing demand for crypto-lending platforms, the amount of deposits that Celsius custodies for its consumers has grown incredibly large. Indeed, just months prior to this filing, Celsius held more than *$20 billion* worth of crypto-asset deposits.

---

[2] Figures from https://celsius.network/borrow-dollars-using-crypto-as-collateral (last accessed on July 7, 2022).

34.     Despite this incredible sum of customer deposits, Celsius and its management have little experience trading and investing crypto-assets. This lack of expertise came to the fore as Celsius sought to become involved in DeFi, where innovative and complex strategies took off in the summer of 2020. Seeing the opportunity to use its customer funds to participate in the DeFi mania, Celsius sought to bring an expert on board who would handle customer funds to deploy in DeFi protocols.

### D.     Celsius Recruits Stone and His Team to Manage Its Customer Deposits

35.     In the summer of 2020, Celsius found and courted its crypto-asset trading team.

36.     Jason Stone is the founder and CEO of KeyFi, a technology company that specializes in decentralized finance deployments, strategies, and software. Stone and his team were highly successful in the DeFi space and accomplished at deploying lucrative DeFi strategies. Stone was also well-known to the founders of Celsius. In late 2019 through early 2020, Alex Mashinsky (the founder and CEO of Celsius) and Nuke Goldstein (co-founder and CTO of Celsius) had both invested tens of thousands of dollars in KeyFi.

37.     In 2020, Stone spoke with Mashinsky and other managers of Celsius numerous times to discuss the possibility of Celsius using KeyFi's expertise to deploy advanced strategies to make money on its customer deposits. That summer, Plaintiff and Celsius cut a handshake deal where Plaintiff would manage billions of dollars in customer crypto-deposits in return for a share of the profits generated from those crypto-deposits.

### 1.     Stone begins to manage Celsius deposits on a handshake deal

38.     On or around August 19, 2020, without a formal agreement in place, Celsius began transferring hundreds of millions of dollars in crypto-assets to Stone and his team. Celsius created a new Ethereum wallet address, referred to as the "0xb1" account and transferred nearly all the assets Stone was to deploy into that address.

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
NYSCEF DOC. NO. 1
INDEX NO. 652367/2022
RECEIVED NYSCEF: 07/07/2022

22-01139-mg    Doc 7-3    Filed 09/22/22    Entered 09/22/22 23:48:29    Exhibit 1    Pg
13 of 76

39.     At all times, Celsius maintained complete control over the 0xb1 account; indeed, for most of the time that Stone worked with Celsius, he could only access the 0xb1 account by using a VPN to login to a computer controlled by Celsius that was already logged into the 0xb1 account.

40.     Stone was provided direct access to the 0xb1 account shortly after Celsius' platform was hacked through a "DNS attack" via its service provider GoDaddy.com. During the hack, which affected all of Celsius' cloud infrastructure and environments, Celsius and KeyFi were concerned that the hackers could have complete access to all Celsius' network traffic. Thus, to protect the 0xb1 account, Celsius provided Stone with the private keys to the 0xb1 account so that he could access the account without risk of interruption.

41.     All deposit and trading history associated with the 0xb1 account can be located here: https://etherscan.io/address/0xb1adceddb2941033a090dd166a462fe1c2029484.

42.     Despite the incredible value of the transferred assets and the parties' intent to share profits on the transferred assets, there was no formal written agreement between the parties. Rather, Celsius continued to transfer hundreds of millions of dollars to Stone, which Stone and his team continued to invest, all on a handshake agreement that the parties would deal with each other honestly and squarely and settle up who owed what to whom at some later date.

43.     In addition to transferring crypto-assets to Stone for investment, Celsius also engaged in certain transactions on Stone's behalf but without transferring the assets to Stone's control. The parties agreed that these transactions would be tracked and profits and losses related to these transaction of such coins would be reflected in KeyFi's own profit and loss statement for purposes of computing KeyFi and Stone's share of profits.

10

44.     This arrangement made sense because all crypto-assets deployed by Stone and his team were provided by Celsius; therefore, it did not matter if coins were actually transferred to KeyFi's control before being deployed. This arrangement also reflected the relationship between the parties was one of trust and confidence—both parties relied on each other to account for the funds being utilized for their mutual benefit.

45.     In October 2020, Celsius and Stone decided to engage in certain DeFi trading activities that required appropriate risk management and hedging to guard against price movements in certain crypto-assets. Specifically, Celsius' management told Stone that it would monitor Stone's DeFi trading activities and deploy certain hedges that would guard against price increases in ether (the crypto-asset native to the Ethereum blockchain) given that Stone was managing and placing a significant sum of ether deposits into DeFi investments likely to return non-ether-denominated assets.

### 2. The Celsius / KeyFi MOU

46.     KeyFi's investment strategies were extremely profitable. Consequently, after just over a month of KeyFi's management, on or around October 1, 2020, Celsius Network and KeyFi entered into a Memorandum of Understanding (the "MOU") in which they agreed to work towards the formation of a structure in which KeyFi would contribute intellectual property and its employees to a special purpose vehicle to be owned by Celsius Network.

47.     As set forth in the MOU, KeyFi was to deploy customer deposits into three types of investment activities: "Staking Coins," "Staking Plus Coins," and "Decentralized Finance Activities" (aka "DeFi"). MOU Art. 3 § 4.

48.     Staking is similar to Certificates of Deposit at a traditional bank. To "stake" a crypto-asset, a user commits that crypto-asset to a particular network or platform, usually for a set

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
NYSCEF DOC. NO. 1
INDEX NO. 652367/2022
RECEIVED NYSCEF: 07/07/2022

22-01139-mg    Doc 7-3    Filed 09/22/22    Entered 09/22/22 23:48:29    Exhibit 1    Pg
15 of 76

period of time during which it cannot be withdrawn. The network/platform that receives the "staked" asset will pay the depositor with a crypto-asset, otherwise known as a "coin."

49.     "Staking Plus" refers to staking activities in which the receiving network/platform pays the depositor with multiple "coins," not just one.

50.     The MOU called for KeyFi to receive 7.5% of "Net Profits" for all staking activity and 20% of Net Profits for DeFi activity, which requires both greater sophistication and a greater commitment of time. The parties envisioned that the majority of profits would be generated from DeFi activity and that KeyFi would receive 20% of these Net Profits.

51.     The MOU contains a number of provisions that are especially relevant to this dispute.

52.     *First*, the MOU memorialized the fact that the parties would continue working together until a formal agreement and structure could be put in place, stating that: "[d]uring the period starting at the date when both the parties sign this MOU until the Closing of the Definitive Agreement (the 'Transition Period'), Celsius Network may deploy and/or transfer coins with KeyFi and/or its representatives for the purpose of generating yield for Celsius Network." MOU § Art. 10.

53.     *Second*, the MOU recognized that "deploying" crypto-assets with KeyFi was different than "transferring" those crypto-assets to KeyFi – in other words, it recognized that crypto-assets could be deployed without being transferred to KeyFi. MOU § Art. 10. ("Celsius Network may deploy and/or transfer coins with KeyFi...").

54.     *Third*, the MOU memorialized the fact that KeyFi and Celsius had a special relationship of trust and confidence, and not a normal arms-length business relationship. In fact, the very first line of the MOU stated that the parties were entering into the agreement "for

enhancing mutual benefits through the cooperation of both parties based on mutual trust." MOU at 1. The MOU continues: "'Celsius Network' and 'KeyFi' shall commence strategic business arrangement in order to enhance mutual benefits by collaboration on mutual respect and trust." *Id*.

55.     The parties memorialized their special relationship of mutual respect and trust because of the highly risky and unusual circumstances of their business relationship. Celsius had already (prior to the MOU) transferred hundreds of millions of dollars to Stone and his team without a formal written agreement of any kind.

56.     For its part, KeyFi was agreeing to dedicate all of its resources, and incur significant opportunity costs, to manage Celsius' investments, all without the protection of any formal documentation. Among other things, KeyFi was relying on Celsius to deploy the necessary hedging trades necessary to complement KeyFi's investment strategy and protect KeyFi and customer deposits from loss due to price fluctuations in the relative value of traded crypto-assets. And of course, KeyFi was trusting that its new business partner, Celsius, would generally conduct its business with integrity.

### 3. The Asset Purchase Agreement and the Service Agreement

57.     Stone continued successfully managing Celsius' customer deposits. Celsius was obviously extremely happy with his management as they (1) continued to send him funds to deploy on a weekly basis and (2) move forward to formalize the agreement contemplated by the MOU. Eventually, on or around December 31, 2020, the discussions between KeyFi and Celsius were formalized into a series of two contracts that were drafted by Celsius: (1) an Asset Purchase Agreement (the "APA") (attached hereto as Exhibit A) and (2) a Service Agreement (the "Service

Agreement") (attached hereto as Exhibit B).[3] The APA and Service Agreement were executed on January 11, 2021, i.e., six months after Stone began managing Celsius' funds and three months after signing the MOU.

58.     At a high level, the APA was an agreement for Stone and KeyFi to sell certain proprietary software and trading technology to Celsius for a purchase price; and the Service Agreement was an agreement for Stone to continue managing Celsius' crypto-deposits. To effectuate the Agreements, Celsius created a special purpose vehicle (the "SPV") named Celsius KeyFi LLC which was organized as a wholly owned subsidiary of Celsius. Under the APA, KeyFi agreed to (i) contribute substantially all of its assets to the SPV and (ii) supply the SPV with staffing. Then, pursuant to the Service Agreement, Celsius agreed to transfer crypto-assets to the SPV which KeyFi's personnel would then manage and invest.

59.     An important consequence of the APA was that Celsius assumed all liabilities for the SPV and that KeyFi's liabilities ceased as of the closing date. Section 2.2 of the APA provides: "On the terms and subject to the conditions set forth in this Agreement, at the Closing, [KeyFi] will assign to [Celsius], and [Celsius] will assume and be responsible solely for, any Liability related to [KeyFi's] Assets that accrue as of and subsequent to the Closing, and do not arise from any breach committed by [KeyFi] or on its behalf on or prior to the Closing."

60.     One of the main purposes of the APA was to remove the deployed assets from KeyFi's custody and consolidate them into an SPV wholly owned and controlled by, Celsius – largely removing KeyFi from the picture. As a result, immediately after the execution of the APA and Service Agreement, KeyFi was no longer performing services for, or holding assets of, Celsius

---

[3] Initially capitalized terms used in this section and not otherwise defined in this Complaint have the meaning ascribed to them in the APA and the Service Agreement.

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
NYSCEF DOC. NO. 1

INDEX NO. 652367/2022
RECEIVED NYSCEF: 07/07/2022

22-01139-mg    Doc 7-3    Filed 09/22/22    Entered 09/22/22 23:48:29    Exhibit 1    Pg
18 of 76

and KeyFi's contractual obligations and liabilities under all agreements with Celsius were fully performed and discharged. At that point, KeyFi had no continuing liabilities or obligations but it *did* have continuing rights, in particular the right to receive payments of the "Purchase Price," as more fully explained below.

### i. The APA Purchase Price

61.     As consideration for the sale of assets under the APA, Celsius and Celsius KeyFi agreed to pay KeyFi the Purchase Price, which in pertinent part consisted of the following:

b.   $65,000 U.S. dollars at Closing. APA §3.1(a). This was paid to KeyFi shortly after closing.

c.   Certain amounts of CEL Tokens, to be paid as follows: (i) 175,000 CEL Tokens at Closing, (ii) 87,500 CEL Tokens six months after Closing, and (iii) 87,500 CEL Tokens on the first anniversary after Closing. APA §3.1(b). Celsius has failed to make any of these payments.

d.   The "Earnout Payment." APA §3.1(c). While this capitalized term is undefined, the APA states that it will be defined by the Services Agreement Key Terms and paid in accordance with the Services Agreement.

62.     The Service Agreement Key Terms is attached to the APA as Schedule 7.8(b). It also fails to define "Earnout Payment," but does set forth a detailed profit-sharing scheme. Schedule 7.8(b) is reproduced verbatim in the Services Agreement which likewise fails to define the term Earnout Payment. However, the Services Agreement does state that Schedule B to the Services Agreement constitutes the "sole and exclusive compensation for the Services." Thus, Schedule 7.8(b) of the APA and Schedule B of the Services Agreement – which are identical except for formatting differences – constitute the Earnout Payment.

### ii. Calculation of the Earnout Payment

63.     The Payment Terms provide the percent of Net Profit that Stone/KeyFi are entitled to receive from investing Celsius' customer deposits into various DeFi strategies. APA Schedule 7.8(b) §3-4. The percentages change depending on the strategies deployed:

    a.    For Staking Coins[4] and Staking Plus Coins,[5] Plaintiff was to get 50% of Net Profits through 2022. *Id.* § 3(a).

    b.    For Authorized Decentralized Finance Activities,[6] Plaintiff was to get 20% of Net Profits through 2022. *Id.* § 4.

64.    The parties provided a formula to arrive at Net Profits which was defined as the gross profits generated by Celsius KeyFi across activities in all coin types, minus expenses:

> Net Profit = Total Period Gross Profit for All activities in USD - Salaries * 2 (for initial 5 employees) - Hardware/Cloud Expenses - Cumulative losses from Previous Periods – Insurance Policy Costs - Staking Costs - Transaction Fees.

*Id.* §9 (emphasis added). As such, the parties expressly called for Net Profits to be calculated and denominated in U.S. dollars. *Id.* §9; Services Agreement Schedule B § 9 (emphasis added), consistent with the balance of the contract which treats USD as the "base currency" of the agreement, APA Schedule 7.8(b) § 6(e).

65.    Net Profits is defined in the APA and the Service Agreement as a function of Gross Profits for all Activities in USD minus certain costs and overhead expenses. In breach of the APA and the Service Agreement, Celsius has refused to provide KeyFi with an accounting of such costs and expenses. However, KeyFi estimates that Gross Profits allocable to the parties exceeds $838 million less such costs and expenses.

66.    In breach of the APA, Celsius and the SPV have refused to pay KeyFi its agreed share of these profits.

---

[4] Defined as "a type of mining through which new coins are earned through maintaining deposits of coins on a platform." APA Schedule 7.8(b) §1(h)

[5] Defined as "Staking Coins with respect to which the staking activity generates earnings of multiple types of coins." *Id.* §1(i).

[6] Defined as "any deployed coins, such as BTC, ETH, stable coins, and other assets are [sic] deployed to authorized activities which earn coins from lending, borrowing, high-frequency liquidity provisions, and other authorized DeFi activities." *Id.* § 1(c).

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
NYSCEF DOC. NO. 1
INDEX NO. 652367/2022
RECEIVED NYSCEF: 07/07/2022

22-01139-mg    Doc 7-3    Filed 09/22/22    Entered 09/22/22 23:48:29    Exhibit 1    Pg
20 of 76

### E.    Celsius' Failure to Hedge Stone's DeFi Activities

67.    Celsius, for its part disputes that KeyFi earned it any profits because Celsius failed to protect itself from the risk of crypto-asset appreciation. Celsius' customers provide it with crypto-assets, and expect to receive those assets back in the same form. Celsius provided similar assets to Stone and KeyFi to invest, but provided for profits to be evaluated in USD. This created a risk for Celsius that KeyFi might earn it a USD profit, but that, if the crypto-asset appreciated in value, it might not be able to profitably repurchase the base crypto-asset.

68.    For example, if Celsius provided KeyFi with 100 ether worth $100,000 in total (or $1,000 per token), and KeyFi's investments returned a mixture of coins comprised of 50 ether and a mix of other coins worth $150,000 in total, it cannot be disputed that that would constitute a profitable investment in USD. If, however, over the same period, ether's price rose to $1,250 per token, and Celsius needed to convert its USD investment into ether, it would have to use some of these USD profits to do so. If ether's price rose even further, it might overtake the profits and require Celsius to use its own funds to purchase the ether. This potential risk, which is a product of Celsius' relationships with its customers and need to return funds to them in the same kind as were deposited, is unaddressed in the parties' agreement and thus remained with Celsius.

69.    At all times, there existed a simple solution for this risk: futures contracts for each coin provided to Stone and KeyFi. In other words, if Celsius had purchased call options at the spot price of each token it provided to Stone and KeyFi, it would have entirely obviated the risk that the assets appreciated in ways that ate into Celsius' USD profits.

70.    Indeed, Celsius was aware of both this risk and the solution. Both before and after execution of the APA and the Service Agreement, Celsius represented to Stone that it was tracking his DeFi activity, balancing his risk through various hedging strategies, and that such trades

executed in performance of that strategy were considered an "approved activity" in accordance with the terms of the APA and the Service Agreement.

71.    Celsius' owners and managers have even boasted publicly about being savvy about managing exchange rate risks.  In DeFi investment "impermanent loss" refers to losses caused by exchange rate volatility. On May 20, 2021, Celsius CEO Alex Mashinsky wrote on Twitter that DeFi "looks easy until you get bitten or understand the impact of impermanent loss and volatility." Mashinksy's tweet then touted the sophistication of Celsius with the tagline "Unbank Yourself and let us manage these rough waters for you."

72.    Stone understood that Celsius would eventually provide Celsius KeyFi with an accounting of all transactions that were supposed to be attributed to Celsius KeyFi's balance sheet and profit and loss statement, including the hedging transactions.

73.    To date, Celsius has refused to provide Stone as CEO of KeyFi, or in his capacity as CEO of Celsius KeyFi, with a full accounting of the transactions it was attributing the Celsius KeyFi account.

74.    Critically, Celsius has failed to provide KeyFi or Stone with an accounting reflecting any of the hedging transactions it was supposed to make on Stone and Celsius KeyFi's behalf. This is because, on information and belief, Celsius lied to Stone and never engaged in these transactions.

75.    Celsius' failure to hedge was a big mistake. As Celsius well knew, Stone's DeFi strategy involved contributing large amounts of ether into liquidity pools, which has the effect of reducing the amount of ether in the pool when ether appreciates. With a proper hedge, this would not matter. But over the course of these transactions, ether appreciated considerably relative to both other crypto-assets and the dollar. Had Celsius hedged against that exact risk as the parties

agreed both before and after execution of the APA, the parties would have enjoyed substantial

additional Net Profits.

**F.      Stone Learns of Celsius' Gross Mismanagement of Its Customers' Funds**

76.      In January 2021, around the time the APA and the Service Agreement were

executed, Stone grew alarmed by Celsius' improper business practices, ultimately concluding that

its business practices were so corrupt that he and KeyFi could no longer do business with Celsius.

Three discoveries by Stone formed the basis for his decision to extricate himself from his position

as CEO of Celsius KeyFi:

77.      *First*, Stone became aware that since at least February 2020, Celsius had engaged

in a series of transactions designed to artificially inflate the price of CEL tokens. Connor Nolan,

head of coin deployment at Celsius, informed Stone that Celsius had used approximately 4,500

bitcoin, with a current value of $90 million, in customer deposits to purchase CEL on the open

market between February 2020 and November 2020 to artificially inflate the price.

78.      The purpose of this scheme was both fraudulent and illegal: Celsius induced

customers to be paid in CEL tokens by providing them with higher interest rates. Then by

purposefully and artificially inflating the price of the CEL token, Celsius was able pay customers

who had elected to receive their interest payments in the form of the CEL token even less of the

crypto-asset.

79.      In addition, by artificially increasing the price of the CEL token, Mashinsky – who

personally owned hundreds of millions of dollars' worth in CEL token at its height – was able to

enrich himself considerably.

80.      This scheme also made it appear that there was substantial demand for, and volume

of trading in, CEL tokens. Celsius used this artificial demand to convince lenders that the CEL

tokens it held in its treasury were a liquid, market-viable asset which could be used as collateral

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
INDEX NO. 652367/2022
NYSCEF DOC. NO. 1
22-01139-mg    Doc 7-3    Filed 09/22/22    Entered 09/22/22 23:48:29    Exhibit 1    Pg
RECEIVED NYSCEF: 07/07/2022
23 of 76

for loans to Celsius. Celsius utilized these loans to pay customers their interest and to provide customers with loans backed by crypto-currency collateral. Because Celsius was still struggling to develop its own profits, these loans were essential to Celsius' continuing operations. Essentially, Celsius was manipulating the market for CEL tokens so that it could borrow against its sizable treasury to create the appearance it was generating yields in excess of the amounts owed to clients, when in fact it was not.

81.    *Second*, Stone became aware that Celsius had deceived him about the existence of hedging transactions designed to hedge against the authorized DeFi transactions Stone was performing. Celsius' failure to implement the promised hedging transactions harmed not just Stone and KeyFi. Stone learned that Celsius had exposed other customer deposits (*i.e.*, not managed by the SPV) to potentially billions of dollars in losses by failing to properly hedge against all its profit seeking activities.

82.    *Third,* Stone learned of further financial mismanagement that threatened to plunge Celsius into insolvency. As mentioned above, Celsius paid a portion of interest on deposits in CEL tokens and a portion of interest in other crypto-assets such as bitcoin and ether. With respect to consumers who chose to be paid in the crypto-asset they deposited (rather than CEL tokens), Celsius logged those liabilities on its books in a U.S. dollar denominated basis from 2018 through 2020 despite the fact that it paid its customers out in the underlying token. It then failed to mark-to-market those assets in its internal ledger as those crypto-assets appreciated, creating a substantial hole in its accounting.

83.    Throughout 2020 and 2021, crypto-assets such as bitcoin and ether substantially appreciated compared to the dollar. Yet Celsius failed to update its ledger in order reflect the increased dollar value of its liabilities at least at any time before 2021. The accounting error

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
NYSCEF DOC. NO. 1

INDEX NO. 652367/2022

RECEIVED NYSCEF: 07/07/2022

22-01139-mg    Doc 7-3    Filed 09/22/22    Entered 09/22/22 23:48:29    Exhibit 1    Pg
24 of 76

masked hundreds of millions of dollars in liabilities that Celsius was not prepared to pay out. When Jason Stone left Celsius, Celsius had a $100-$200 million hole on its balance sheet that it could not fully explain or resolve. Despite this balance sheet insolvency, Celsius continues to take on more customer assets, which means it continues to accrue considerable liabilities to the detriment of its current creditors.

### G.    The Celsius Ponzi Scheme

84.    In January 2021, the crypto-markets began a bull cycle which caused Celsius (who had recklessly and fraudulently failed to hedge its investments) to suffer severe exchange rate losses.

85.    In January 2021, the price of ether increased over 50% in just a couple of days and continued to climb over the next few weeks, going from a low of 0.24 BTC per ether on January 1 to a high of 0.45 BTC per ether token on February 4.

86.    Celsius had massive liabilities to depositors denominated in ether but had not maintained ETH holdings equal to those liabilities. Instead, Celsius had authorized DeFi strategies that resulted in the shifting of assets from ether to other cryptocurrencies and (inexplicably) had failed to hedge against this well-known risk.

87.    As customers sought to withdraw their ether deposits, Celsius was forced to buy ether in the open market at historically high prices, suffering heavy losses. Faced with a liquidity crisis, Celsius began to offer double-digit interest rates in order to lure new depositors, whose funds were used to repay earlier depositors and creditors. Thus, while Celsius continued to market itself as a transparent and well capitalized business, in reality, it had become a Ponzi scheme.

## H.     Jason Stone Resigns; Celsius Refuses to Pay

88.     By March 2021, it was clear to KeyFi that Celsius was lying about having hedging in place, a mistake that could be financially ruinous for Celsius and its consumers. It could also irreparably damage KeyFi's reputation.

89.     At that point, Celsius had already missed the first payment ("Earnout payment") due to KeyFi within 15 days of December 31, 2020 and had never paid out any profits owed to KeyFi or the SPV. Moreover, Defendants showed no intention of making the required payments of profits under the MOU, the APA, and the Service Agreement. While Stone had been authorized to purchase NFTs ("non-fungible tokens") as pre-payment of the profit share under the MOU, the APA, and the Service Agreement, Celsius failed to provide a specific accounting of the total profit share.

90.     On March 9, 2021, Stone informed Celsius that he would not continue to serve as the CEO of Celsius KeyFi.

91.     After Stone left Celsius KeyFi, Celsius maintained access and control of the 0xb1 wallet. Celsius' CEO, Alex Mashinsky, used that control for his own personal benefit. In one example, Celsius' CEO transferred valuable NFTs from the 0xb1 accounts to his wife's wallet.

92.     On information and belief, since Stone resigned, Celsius has not found other accretive acquisitions that can cover the high interest rates it offers to its depositors. Because its business model depends on offering depositors more money than they put it, Celsius must consistently take in new capital to pay its obligations to its current depositors. In other words, Celsius is a Ponzi scheme.

93.     For example, in order to cover its increasing obligations, Celsius was required to take a loan of approximately $1 billion from Tether. While Celsius pays Tether 5-6% in interest

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
INDEX NO. 652367/2022
NYSCEF DOC. NO. 1
22-01139-mg    Doc 7-3    Filed 09/22/22    Entered 09/22/22 23:48:29    Exhibit 1    Pg
26 of 76
RECEIVED NYSCEF: 07/07/2022

on this billion-dollar loan, it owes its clients significantly more on many of the popular coin it

accepts as deposits:

| Coin Name | | Accredited Investor In-CEL Reward Rate (APY) at Platinum level* | In-kind Reward Rate (APY) |
|---|---|---|---|
|  | TUSD ⌃ | 9.32% | 7.10% |
|  | GUSD ⌃ | 9.32% | 7.10% |
|  | PAX ⌃ | 9.32% | 7.10% |
|  | USDC ⌃ | 9.32% | 7.10% |
|  | USDT ⌃ | 9.32% | 7.10% |

23

| Coin Name | Accredited Investor In–CEL Reward Rate (APY) at Platinum level* | In–kind Reward Rate (APY) |
|---|---|---|
| SNX ^ | 18.63% | 14.05% |
| DOT ^ | 11.87% | 9.02% |
| AVAX ^ | 10.92% | 8.30% |
| MATIC ^ | 9.52% | 7.25% |

[7]

94.     The Tether loan, alongside other Celsius deposits, has been used to cover up the fact that Celsius is, in fact, balance sheet insolvent, with less money in its coffers than it owes its depositors. Even in light of this, up until it recently when it halted customer withdrawals, Celsius continued promoting its high-interest-rate deposits in order to induce new depositors to provide it with more capital to pay back earlier depositors.

**I.     Demand for Audit and Accounting**

95.     Section 7.1(b)(i) of the APA provides KeyFi with the right to an audit, as against Celsius KeyFi, as follows:

> Within the later to occur of fourteen (14) calendar days after any payment by Buyer due under this Agreement (the "Obligation"), or thirty (30) calendar days after any such scheduled payment accrued, if Seller is dissatisfied with the payment, or if non payment occurs, Seller may invoke an audit (the "Audit") of Buyer's relevant records using Seller's chosen Auditor, who shall be a nationally-licensed Certified Public Accountant (CPA).

---

[7] Celsius Weekly Reward Rates, https://celsius.network/earn-rewards-on-your-crypto (accessed March 6, 2022). Celsius has since revised these reward rates to reflect that they are "up" the noted percentages above. *See* Celsius Weekly Reward Rates, https://celsius.network/earn (last accessed July 7, 2022).

96.     On September 1, 2021, Kyle Roche, as attorney for Stone and KeyFi, again emailed Mr. Hurley demanding that Celsius make the earnout payment, or else commit to paying for an accounting and agree to mediation. Celsius refused.

97.     After receiving the Audit Demand Letter, Celsius KeyFi refused to provide any information, or to comply with the audit provisions of Section 7.1(b)(i) of the APA.

98.     Subsequently, KeyFi has repeatedly requested that Defendants engage in an accounting to determine how much they are owed and Defendants have repeatedly rejected KeyFi's requests.

### J.     As A Result Of Gross Mismanagement, Celsius Halts Customer Withdrawals

99.     On June 12, 2022, Celsius announced that:

> Due to extreme market conditions, today we are announcing that Celsius is pausing all withdrawals, Swap, and transfers between accounts. We are taking this action today to put Celsius in a better position to honor, over time, its withdrawal obligations.

100.    Celsius took this drastic action because it did not (and *still* does not) have enough crypto-assets on hand to balance the obligations it owes to its clients.

101.    Just days prior to this announcement, on June 7, 2022, Celsius claimed that it "has the reserves (and more than enough ETH) to meet obligations, as dictated by our comprehensive liquidity risk management framework."

102.    This turned out to be a lie. This lie was also consistent with the representations (described above) Celsius made to Plaintiff concerning its risk management.

103.    It is now reported that Goldman Sachs is looking to purchase Celsius' assets (valued at around $11.8 billion in customer deposits as of May 17, 2022) for the fire sale price of $2 billion. To be clear, under the Celsius terms of service, Celsius asserts that these assets, which were

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
NYSCEF DOC. NO. 1

22-01139-mg   Doc 7-3   Filed 09/22/22   Entered 09/22/22 23:48:29   Exhibit 1   Pg
29 of 76

INDEX NO. 652367/2022
RECEIVED NYSCEF: 07/07/2022

provided to it by regular consumers, are its property, and not held on behalf of any customer. Thus, it is entirely possible that any such asset purchase would wipe-out customer deposits in order to pay of Celsius' own lenders.

104. Plaintiff brings this action now seeking to hold Celsius accountable for its gross mismanagement of customer deposits and the breaches of the contractual duties it owes to Plaintiff.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Breach of Contract – APA (Against All Defendants)**

105. Plaintiff repeats and realleges the allegations contained in all prior paragraphs as if set forth fully herein.

106. The APA is a valid and enforceable contract between KeyFi, Celsius, and Celsius KeyFi, which by its terms is governed and construed in accordance with the laws of New York.

107. Plaintiff substantially performed its obligations under the terms of the APA including giving notice of their claims.

108. Defendants breached the APA by refusing to pay Celsius KeyFi and KeyFi the amounts required to be paid under Section 3.1(b) of the APA and the earnout payments required to be made under Section 3.1(c) of the APA, Schedule 7.8(b) to the same.

109. By reason of the foregoing, KeyFi suffered damages in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
**Negligent Misrepresentation Inducing KeyFi to (a) Provide DeFi and Staking Services for Celsius Beginning in August 2020 and (b) Enter into the APA (Against Celsius)**

110. Plaintiff repeats and realleges the allegations contained in all prior paragraphs as if set forth fully herein.

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
NYSCEF DOC. NO. 1

INDEX NO. 652367/2022

RECEIVED NYSCEF: 07/07/2022

22-01139-mg   Doc 7-3   Filed 09/22/22   Entered 09/22/22 23:48:29   Exhibit 1   Pg
30 of 76

111.    Celsius had a duty to KeyFi, as a result of their "mutual collaboration" based on "mutual respect and trust" to give correct information to KeyFi.

112.    As alleged hereinabove, to induce KeyFi to provide DeFi and staking services to Celsius and to enter into the APA, Celsius made materially misleading statements and omissions, calculated to lead Plaintiff to believe that Celsius was a legitimate business with proper security and risk controls and truthful disclosures to its customers. Celsius concealed the fact that it lacked basic security oversight and controls. Celsius also falsely represented that it had entered into, or would enter into, critical hedging transactions. Celsius had no reasonable grounds upon which to believe the statements were true when made to Plaintiff.

113.    Celsius knew that the information it supplied to KeyFi was desired by KeyFi in order to ascertain whether to provide DeFi and staking services to Celsius and to enter into the APA.

114.    KeyFi reasonably relied upon Celsius' knowing misrepresentations and omissions in agreeing to provide DeFi and staking services to Celsius and to enter into the APA. Had KeyFi known that Celsius' representations were false and fraudulent, KeyFi never would have agreed to provide DeFi and staking services to Celsius or to enter into the APA.

115.    As a result of the Celsius' knowingly false and fraudulent misrepresentations and KeyFi's reliance thereupon, KeyFi has suffered damages.

116.    By reason of the foregoing, KeyFi has been injured in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**Fraud in the Inducement, Inducing KeyFi to (a) Provide DeFi and Staking Services for Celsius Beginning in August 2020 and (b) Enter into the APA (Against Celsius)**

117.    Plaintiff repeats and realleges the allegations contained in all prior paragraphs as if set forth fully herein.

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
NYSCEF DOC. NO. 1

INDEX NO. 652367/2022

RECEIVED NYSCEF: 07/07/2022

22-01139-mg    Doc 7-3    Filed 09/22/22    Entered 09/22/22 23:48:29    Exhibit 1    Pg
31 of 76

118.    As alleged hereinabove, to induce Plaintiff to provide DeFi and staking services and to enter into the APA, Celsius made materially misleading statements and omissions, calculated to lead Plaintiff to believe that Celsius was a legitimate business with proper security and truthful disclosures to its customers. Celsius concealed the fact that Celsius lacked basic security oversight and controls, and that Celsius failed to keep proper accounts of its customers deposits and failed to engage in meaningful diligence regarding the risks they exposed customer deposits to. Celsius also falsely represented that it had entered into, or intended to enter into, hedging transactions.

119.    At the time it made these false representations to Plaintiff, Celsius knew them to be false; indeed, Celsius made these false representations to Plaintiff to defraud Plaintiff and lure them into providing DeFi and staking services, entering into the APA and transferring valuable intellectual property to Celsius KeyFi.

120.    Plaintiff reasonably relied upon Celsius' knowing (mis)representations in agreeing to enter into the APA.

121.    Had Plaintiff known that Celsius' representations were false and fraudulent, Plaintiff never would have agreed to provide DeFi and staking services or to enter into the APA.

122.    As a result of Celsius' knowingly false and fraudulent misrepresentations and Plaintiff's reliance thereupon, Plaintiff has suffered damages.

123.    By reason of the foregoing, KeyFi has been injured in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
#### Breach of Contract – APA (Against Celsius KeyFi)

124.    Plaintiff KeyFi repeats and reallege the allegations contained in all prior paragraphs as if set forth fully herein.

125.    The APA is a valid and enforceable contract between KeyFi and Celsius KeyFi, which by its terms is governed and construed in accordance with the laws of New York.

126.    KeyFi substantially performed its obligations under the terms of the APA.

127.    KeyFi validly invoked, and KeyFi breached the APA by refusing to perform its obligations under, Section 7.1(b)(i) of the APA.

128.    By reason of the foregoing, KeyFi suffered damages.

## FIFTH CAUSE OF ACTION
### Accounting (Against Celsius and Celsius KeyFi as Fiduciary)

129.    Plaintiff repeats and realleges the allegations contained in all prior paragraphs as if set forth fully herein.

130.    Celsius and Celsius KeyFi had fiduciary duties of care, loyalty, disclosure, and good faith and fair dealing to Plaintiff, as a result of their pattern and practice of working for their mutual benefit. Indeed, the MOU reflects that Celsius and KeyFi would operate with "mutual collaboration" based on "mutual respect and trust."

131.    As a result of this trust-based relationship between Plaintiff and Defendants, Plaintiff is entitled to an accounting with respect to Defendants.

132.    Plaintiff has previously demanded such an accounting from Defendants.

133.    Defendants have failed to and/or refused to provide such accounting.

134.    Plaintiff has no adequate remedy at law. The complexity of the trading strategies employed by the parties makes it difficult to determine their respective rights to the trading profits at issue in the absence of an accounting.

135.    The accounting is applicable to each of the Defendants for each month during the period of time that KeyFi provided crypto-asset trading services and/or advice for Defendants.

## PRAYER FOR RELIEF

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
NYSCEF DOC. NO. 1

INDEX NO. 652367/2022

RECEIVED NYSCEF: 07/07/2022

22-01139-mg    Doc 7-3    Filed 09/22/22    Entered 09/22/22 23:48:29    Exhibit 1    Pg
33 of 76

WHEREFORE, Plaintiff respectfully prays for relief as follows:

    a.   An accounting for all moneys and crypto-assets received by Defendants related to services and/or advice provided by KeyFi or for KeyFi's and Defendants' mutual benefit.

    b.   An award of damages in an amount to be determined at trial.

    c.   An award of punitive damages in an amount to be determined at trial.

    d.   An award of pre- and post- judgment interest.

    e.   Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demand a trial by jury for all claims.

Dated:      July 7, 2022

Respectfully Submitted,

**ROCHE FREEDMAN LLP**

*/s/ Kyle W. Roche*
Kyle W. Roche
Daniel Stone
Peter Bach-y-Rita (*pro hac vice pending*)
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 350-0527
Facsimile: (646) 392-8842
Email: kyle@rochefreedman.com
Email: dstone@rochefreedman.com
Email: pbachyrita@rochefreedman.com

Devin (Velvel) Freedman
1 SE 3rd Ave.
Suite 1240
Miami, FL 33131
Telephone: (305) 306-9211
Facsimile: (646) 392-8842
Email: vel@rochefreedman.com

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
INDEX NO. 652367/2022

NYSCEF DOC. NO. 2
22-01139-mg    Doc 7-3    Filed 09/22/22    Entered 09/22/22 23:48:29    Exhibit 1    Pg
34 of 76
RECEIVED NYSCEF: 07/07/2022

# EXHIBIT A

<u>**ASSET PURCHASE AGREEMENT**</u>

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is effective as of December 31, 2020, by and among (i) **KEYFI, INC.**, a corporation established and existing under the laws of the State of Delaware, with its principal place of business at 99 John St., #1405, New York, NY 10038 (the "**Seller**"); (ii) **CELSIUS NETWORK LIMITED**, a private company incorporated under the laws of England and Wales, with its principal place of business at 1 Bartholomew Lane, London, England, EC2N 2AX (the "**Parent**"); and (iii) **CELSIUS KEYFI LLC**, a limited liability company organized under the laws of Delaware (the "**Buyer**", and together with the Parent, each is a "**Buyer Party**"). The Seller, the Parent, and the Buyer shall be referred to herein individually as a "**Party**", and collectively as the "**Parties**".

**WHEREAS,** the Seller has been engaged in, *inter alia*, development and provision of a product which is a unique, true self-custody implementation leveraging multi-party computation purpose-built for interconnectivity between the DeFi and CeFi world  (the "**Business**"); and

**WHEREAS,** the Seller desires to sell, and the Buyer desires to purchase, the Seller Assets; and

**WHEREAS,** at or prior to the Closing, each of the Transferring Persons shall have entered into an employment or consulting arrangement with the Buyer, together with a confidential information and invention assignment agreement, reflecting the terms set forth in <u>Section 7.7(a)</u> below (collectively, the "**Key Engagement Agreements**").

**NOW, THEREFORE,** in consideration of the mutual promises and covenants set forth herein and in consideration of the representations, warranties herein contained, and the intention to be legally bound hereby, the Parties hereby agree as follows:

1.   **<u>DEFINITIONS AND INTERPRETATION</u>**

   1.1   <u>Definitions</u>

   The following capitalized terms shall have the following meanings for all purposes of this Agreement:

| | |
|---|---|
| "**Affiliates**" | Means, with respect to a Person, any direct or indirect subsidiary of such Person and any other Person directly or indirectly controlling, controlled by, or under common control with such Person. |
| "**Applicable Law**" | Means, with respect to either an individual or a corporation, any law existing as of the date hereof applicable to such individual or corporation or any of their respective properties and assets, officers, directors, employees, consultants or agents. |
| "**Assumed Liabilities**" | As defined in <u>Section 2.2(a)</u>. |
| "**Business**" | As defined in the Recitals to this Agreement. |

1

23-01113-shl    Doc 23    Filed 09/22/22    Entered 09/22/22 23:48:29    Exhibit 1    Pg
36 of 76
DocuSign Envelope ID: 9F4B9217-A4D5-4664-A05E-8FCB290A6A22

| "**Business Days**" | Means a day on which commercial banks are open for business in New York. |
|---|---|
| "**CEL Tokens**" | Means the cryptocurrency token created by the Parent. |
| "**Closing**" | As defined in <u>Section 4.1</u>. |
| "**Encumbrance**" | Means any charge, claim, equitable interest, mortgage, lien, pledge, security interest or restriction of any kind, or any agreement to create any of the foregoing. |
| "**Excluded Liabilities**" | As defined in <u>Section 2.2(b)</u>. |
| "**Governmental Body**" | Means any government or any agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other authority or instrumentality of any government, whether local, domestic or foreign. |
| "**Intellectual Property**" | Means, collectively, the rights in, arising out of, or associated with, and all registrations, renewals, extensions, future equivalents, and restoration thereof, now or hereafter in force or effect, anywhere in the world, to: (a) patents, utility models, and applications therefor, and all reissues, divisions, re-examinations, provisionals, continuations and continuations-in-part thereof, and equivalent or similar rights in inventions, discoveries, and designs, including invention disclosures; (b) all techniques, technology, practices trade secrets and other rights in know-how and confidential or proprietary information; (c) all mask works and copyrights, and all other rights corresponding thereto (including moral rights) throughout the world; (d) all rights in World Wide Web addresses and domain names and applications and registrations therefore, and contract rights therein; (e) all trade names, logos, trademarks and service marks, trade dress and all goodwill associated therewith |

53260-5436937v5

| | |
|---|---|
| **"Key Engagement Agreements"** | As defined in the Recitals to this Agreement. |
| **"Liability"** | Means any liability, indebtedness or obligation of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on financial statements arising under any contract, Applicable Law or action, accounts payable, royalties payable, reserves, accrued bonuses, accrued vacation, expenses obligations to employees and liabilities for Taxes. |
| **"Purchase Price"** | As defined in <u>Section 3.1</u>. |
| **"Seller Assets"** | As defined in <u>Section 2.1</u>. |
| **"Seller Contracts"** | As defined in <u>Section 2.1(b)</u>. |
| **"Seller Intellectual Property"** | Means both the Seller Owned Intellectual Property and the Seller Licensed Intellectual Property. |
| **"Seller Licensed Intellectual Property"** | Means all Intellectual Property owned by third parties and licensed to the Seller relating to the Business. |
| **"Seller Owned Intellectual Property"** | Means all Intellectual Property owned or purported to be owned by the Seller relating to the Business. |
| **"Service Agreement"** | As defined in <u>Section 7.8(a)</u>. |
| **"Service Agreement Key Terms"** | As defined in <u>Section 7.8(b)</u>. |

3

| "**Source Code**" | Means the human-readable source code for any software that is part of the Seller Intellectual Property as well as any confidential or proprietary information relating to any software source code or any of the Seller Owned Intellectual Property. |
| --- | --- |
| "**Taxes**" | Means any and all taxes, charges, duties, fees, levies, imposts or other assessments, reassessments, or mandatory payments of any kind whatsoever, whether direct or indirect, imposed by or payable to or accrued to the benefit of any federal, state, local or foreign taxing authority. |
| "**Transfer Taxes**" | As defined in <u>Section 3.2</u>. |
| "**Transferring Persons**" | As defined in <u>Section 7.7(a)</u>. |
| "**Valid Withholding Certificate**" | Means a valid certificate, ruling or any other written instructions regarding withholding of Taxes, issued by a taxing authority, in form and substance reasonably satisfactory to the Buyer applicable to the Purchase Price to be paid pursuant to this Agreement. |

2.   **ACQUISITION OF ASSETS**

2.1   <u>Sale and Acquisition of the Seller Assets</u>

Subject to the terms and conditions of this Agreement, at the Closing, the Seller shall sell, convey, transfer, assign and deliver to the Buyer, and the Buyer shall purchase, acquire and accept from the Seller, the Seller's right, title and interest in and to all assets related to the Business, free and clear of any and all Encumbrances, including, without limitation, the following assets (collectively, the "**Seller Assets**"):

(a)   All Seller Intellectual Property, including, without limitation:

(i)   the assets set forth in **Schedule 2.1(a)**;

(ii)   all Intellectual Property developed and owned by Seller for the Business, including all source and object codes, binaries, supplements, modifications, updates and enhancements to past and present versions, shipping versions and versions under development by Seller for any products and technologies developed by or for, or marketed by, Seller;

4

53260-5436937v5

(iii) any and all design and code documentation, methodologies, processes, trade secrets, design information, product information, algorithms, engineering specifications, technical manuals and data, inventions, know-how, programmer's notes and other works of authorship, which are related to, used in or derived from any products or services developed by or for, or marketed by, the Business; and

(iv) all Intellectual Property that is owned or used by the Seller or any of its Affiliates in the operation of, or related to, or derived from the Business or its products, services and assets.

(b) All rights in and to the contracts set forth in **Schedule 2.1(b)** (the "**Seller Contracts**").

(c) All tangible assets and equipment related to the Business, including the tangible assets and equipment set forth in **Schedule 2.1(c)**.

(d) All rights in and to: (i) files and information (including all data and other information stored on any media) relating to the Seller Intellectual Property and the Seller Contracts and the customers of the Business, including the personal identification details of such customers; and (ii) any databases owned or managed by the Seller solely in connection with the Business.

(e) All rights, causes of action and damages receivable with respect to: (i) any Seller Assets; and (ii) non-competition and confidentiality agreements which were in effect at any time prior to the execution of this Agreement; in each case, whether or not due or payable at any time, under the laws of any and all jurisdictions, including all claims for damages by reason of past, present or future infringement, misappropriation or other unauthorized use of any Seller Asset, and including, regardless of whether or not any claim or cause of action has been asserted by the Seller, the right to sue and collect the same, indemnity rights, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery possessed by the Seller, regardless of whether any such rights are currently exercisable.

2.2    Liabilities

(a) On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Seller will assign to the Buyer, and the Buyer will assume and be responsible solely for, any Liability related to the Seller Assets that accrue as of and subsequent to the Closing, and do not arise from any breach committed by the Seller or on its behalf on or prior to the Closing (the "**Assumed Liabilities**").

(b) The Seller will retain and the Buyer will neither assume nor be responsible for (nor be deemed to have assumed or be responsible for) every other Liability of the Seller or related to the Business of any nature (whether express or implied, fixed or contingent, liquidated or unliquidated, known or unknown, accrued or due or to become due), which shall not constitute an Assumed Liability, including, without limitation, any Liability: (i) unrelated to the Seller Assets; (ii) constituting a right or benefit towards the Transferring Persons or on their behalf in respect of their employment or engagement with the Seller; (iii) for any Taxes arising from the operation of the Business or ownership of or rights in the Seller Assets; (iv) arising out of any claim against Seller or the Business or otherwise pertaining to

5

the Transferring Persons or the Seller Assets pending as of the Closing; (v) arising out of any claim commenced after the Closing to the extent that any such claim arises from any act, event or omission occurring prior to the Closing; or (vi) any other Liability which the Seller owes to any third party (collectively, the "**Excluded Liabilities**").

3.  **PURCHASE PRICE AND PAYMENT**

    3.1  Purchase Price

    As the sole and exclusive consideration for the Seller's commitments under this Agreement, the Buyer shall:

    (a)  pay to the Seller at Closing, in immediately available funds by wire transfer (to a bank account specified by the Seller), a total of sixty-five thousand Dollars (USD 65,000), inclusive of any value-added tax, to the extent applicable;

    (b)  Subject to Applicable Laws and regulations:

        (i)  at the Closing, deliver to the Seller 175,000 CEL Tokens;

        (ii)  on the date which is six (6) months after the Closing, deliver to the Seller 87,500 CEL Tokens;

        (iii)  on the first (1st) anniversary of the Closing, deliver to the Seller 87,500 CEL Tokens; and

    (c)  pay, or caused to be paid, to the Seller in immediately available funds by wire transfer (to a bank account specified by the Seller), any Earnout Payment (as defined in the Service Agreement Key Terms) in accordance with the terms of the Service Agreement, within five (5) Business Days of the actual receipt of the Earnout Payment in accordance with this Agreement and the Service Agreement ((a), (b), and (c) collectively, the "**Purchase Price**").

    3.2  Taxes

    (a)  Any payments made by the Buyer to the Seller under this Agreement shall be paid less any Taxes to be withheld to the extent applicable under Section 3.3, and against an issuance of a valid tax invoice, as detailed in Section 4.2(a)(vi)(C).

    (b)  The Seller shall be liable for any and all transfer, sales, documentary, stamp, registration and other similar Taxes incurred in connection with this Agreement (including any real property transfer tax, value-added tax and any other similar Taxes) (collectively, "**Transfer Taxes**"), and the Seller shall pay all such Taxes when due. The Seller shall, at its own cost and expense, timely file any tax return or other document with respect to any Transfer Taxes, and the Buyer shall use commercially reasonable efforts to cooperate with respect thereto as necessary.

    3.3  Withholding Rights

    The Buyer shall be entitled to deduct and withhold from any payment or consideration contemplated by this Agreement all Taxes that are required to be deducted and withheld with respect to such payment or other consideration under Applicable Law, unless the Seller has provided the Buyer with a Valid Withholding Certificate at least five (5)

53260-5436937v5

Business Days prior to date hereof, in which event the deduction and withholding of any such amount shall be made in accordance with the provisions of such Valid Withholding Certificate. Taxes withheld pursuant to this Section 3.3 by the Buyer will be: (a) remitted by the Buyer to the relevant taxing authority; and (b) treated for all purposes of this Agreement as having been paid to the Seller.

## 4. CLOSING

### 4.1 Closing

Subject to the terms and conditions of this Agreement, the closing of the transaction contemplated herein (the "**Closing**") shall take place by electronic exchange of executed documents within two (2) Business Days from the date of the satisfaction of the Closing conditions set forth herein, or at such other date that is mutually agreed by the Parties.

### 4.2 Actions at Closing

At Closing, the following actions will take place, all of which shall be deemed to have occurred simultaneously and no action shall be deemed to have been completed and no document or certificate shall be deemed to have been delivered, until all actions are completed and all documents and certificates delivered as detailed in this Agreement:

(a)     The obligations of the Buyer hereunder to proceed with the Closing are subject to the satisfaction at or prior to the Closing of each of the following conditions, unless otherwise waived in writing by the Buyer:

   (i)     The representations and warranties of the Seller contained in this Agreement shall be true and correct as of the Closing.

   (ii)     The Seller shall have duly performed or complied with all of the covenants, acts and obligations to be performed or complied with by the Seller hereunder in all material respects.

   (iii)     The Buyer shall have received copies of all consents and approvals required to be obtained from third parties for the purposes of the transactions contemplated under this Agreement.

   (iv)     No proceeding challenging this Agreement or the transactions contemplated hereby or seeking to prohibit, alter, prevent or materially delay the Closing shall be pending, and no judgment, injunction, order or decree, shall have been issued by any court, arbitrator or Governmental Body preventing or delaying the Closing.

   (v)     Each Transferring Person shall have executed his respective Key Engagement Agreement with the Buyer.

   (vi)     The Seller shall have delivered (or caused to be delivered) to the Buyer: (A) any assignment documents required in order to assign any of the Seller Assets; (B) a certificate of a director of the Seller, attaching copies of all corporate resolutions duly adopted by the Seller's board of directors and stockholders (as applicable) authorizing the execution, delivery and performance of this Agreement and certifying that such resolutions are in full force and effect; (C) a valid tax invoice issued by the Seller to the Buyer

7

covering the Purchase Price payable; and (D) any media containing the Seller Assets; in each case, in the form reasonably acceptable to the Buyer.

(b)   The obligations of the Seller hereunder to proceed with the Closing are subject to the satisfaction at or prior to the Closing of each of the following conditions, unless otherwise waived in writing by the Seller:

    (i)   The representations and warranties of the Buyer contained in this Agreement shall be true and correct as of the Closing.

    (ii)   The Buyer shall have duly performed or complied with all of the covenants, acts and obligations to be performed or complied with by the Buyer hereunder in all material respects.

    (iii)   The Buyer shall have executed each Key Engagement Agreement.

    (iv)   The Purchase Price shall have been paid in accordance with <u>Section 3</u>.

(a)   The obligations of all Parties hereunder to proceed with the Closing are subject to the entering into the Services Agreement by the Buyer and the Parent.

5.   **<u>REPRESENTATIONS AND WARRANTIES OF THE SELLER</u>**

The Seller hereby represents and warrants to each Buyer Party, and acknowledges that each Buyer Party is entering into this Agreement in reliance thereon, that the representations set forth in this <u>Section 5</u> are true and complete as of immediately prior to the Closing.

5.1   <u>Organization and Existence</u>

The Seller is a private company duly organized and validly existing under the laws of the State of Delaware, and has all requisite corporate power and authority to own, lease and operate its properties and assets, and to carry on its businesses as now being conducted. The Seller is duly qualified to do business in any jurisdiction in which it conducts or operates its business (to the extent such qualification is necessary in such jurisdiction).

5.2   <u>Authority and Enforceability</u>

(a)   The Seller has all necessary corporate power and authority to execute and deliver this Agreement and all other transactions and agreements contemplated herein to which the Seller is a party, and to perform its obligations hereunder and thereunder.

(b)   The execution, delivery and performance of this Agreement and all other agreements contemplated hereby to which Seller is a party have been duly and validly authorized by all necessary corporate action on the part of the Seller. No other corporate proceedings on the part of the Seller are necessary to authorize this Agreement and all other agreements contemplated hereby.

(c)   This Agreement and all other transactions and agreements contemplated herein to which the Seller is a party are duly and validly executed and delivered by the Seller and, assuming the due authorization, execution and delivery of each Buyer

53260-5436937v5

Party, constitute the valid, legal and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms.

5.3    No Conflicts and No Required Consents

(a)    The execution, delivery and performance by the Seller of this Agreement and all other agreements contemplated hereby to which Seller is a party, do not: (i) conflict with or violate the articles of association, certificate of incorporation or other equivalent organizational documents of the Seller; (ii) conflict with or violate any Applicable Law; or (iii) result in any breach of any contract to which the Seller is a party, including any Seller Contract.

(b)    The execution, delivery and performance by the Seller of this Agreement and all other transactions and agreements contemplated herein to which the Seller is a party, do not, and the performance of this Agreement and all other agreements contemplated hereby by the Seller will not, require any: (i) consent, approval, authorization, clearance, or permit of, or filing or registration with, or notification to, any Governmental Body or otherwise, for such performance or in order to prevent the termination of any right, privilege, license or qualification of the Seller; or (ii) consent of any third party under a Seller Contract.

5.4    Taxes

(a)    All Taxes that relate to the activity which utilized or otherwise involved the Seller Assets required to be paid on or prior to the date hereof have been fully and timely paid, and the Seller has no liability for such Taxes with respect to such period in excess of the amount so paid.

(b)    There is no pending dispute with any taxing authority in relation to the Seller Assets or any activity which utilized or otherwise involved the Seller Assets, nor are there any proceedings, investigations, audits or claims now pending or threatened against the Seller in respect of any Taxes. The Seller is not aware of any circumstances in connection with the transactions contemplated herein which will give rise to any dispute with any relevant taxing authority in relation to the Seller Assets.

5.5    Seller Assets

(a)    The Seller has good and valid title to, is the exclusive legal and equitable owner of, and has the unrestricted power and right to sell, assign and deliver the Seller Assets. The Seller Assets are free and clear of all Encumbrances of any kind or nature. Upon the Closing, the Buyer will acquire exclusive, good and valid title to the Seller Assets, and, immediately following the Closing have been recorded, free and clear of all Encumbrances.

(b)    All the Seller Assets are in a condition and suitable for the Buyer to use in substantially the manner in which the Seller has used such Seller Assets prior to the date hereof. No licenses or consents from, or payments to, any other Person are necessary for the Buyer to use any of the Seller Assets in substantially the manner in which the Seller has used such Seller Assets prior to the date hereof. No restrictions will exist on the Buyer's rights to sell, resell, license, or sublicense any of the Seller Assets as a consequence of the transactions contemplated herein,

9

other than any such restrictions resulting solely as a result of the Buyer or its Affiliates.

(c)    The Seller Intellectual Property set forth in **Schedule 2.1(a)** includes all Seller Owned Intellectual Property that is subject to issuances and registrations, and all such registrations are valid, enforceable, subsisting, in full force and effect, and unchallenged by any third party.

(d)    Other than the Seller Contracts, there is no contract to which the Seller is a party pursuant to which any other Person is granted any license, authorization, covenant not-to-sue, release, immunity or other rights with respect to any Seller Intellectual Property.

(e)    The Seller exclusively owns, possesses, controls and has good and marketable title to all Seller Owned Intellectual Property, without Encumbrances and any payment obligations, and the Seller possesses adequate rights in Seller Licensed Intellectual Property material to the current operation of the Business, without Encumbrances and any payment obligations, other than payment obligations relating to the time period after the Closing.

(f)    Neither: (i) the exercise of rights in Seller Owned Intellectual Property; (ii) the operation of the Business; nor (iii) the exploitation of the Seller Owned Intellectual Property; infringes or misappropriates any rights to Intellectual Property of any Person, or constitutes unfair competition or unfair trade practice under the laws of the applicable jurisdiction. The Seller has not instituted, asserted or threatened any action against any third Person with respect to the infringement, misappropriation, use or disclosure without authorization, or other violation of, any Seller Owned Intellectual Property and no third Person is infringing, misappropriating, using or disclosing without authorization any Seller Owned Intellectual Property.

(g)    No Person: (i) has received copies of, or been granted access to, any Source Code, other than employees and consultants engaged in development activities for Seller in the ordinary course of business who are subject to confidentiality and assignment of inventions provisions; and (ii) possesses any current or contingent rights of any kind granted by the Seller to any Source Code. The Seller has not entered into any escrow arrangement (or any contract that contemplates any escrow arrangement) with respect to any such Source Code.

(h)    The Seller is and has been in compliance in all material respects with all Applicable Laws and contractual obligations governing the collection, interception, storage, receipt, purchase, sale, transfer, processing, retention, and use of all data or information constituting the personal information of any natural person, including employees of the Seller, that has been collected or otherwise obtained by the Seller. No Seller Assets include any data or information constituting the personal information of any natural Person, including employees, that has been collected or otherwise obtained by the Seller.

(i)    No funding, facilities or personnel of any Governmental Body, university, college, or other educational institution or research center were used to develop or create, in whole or in part, any Seller Owned Intellectual Property.

10

(j)     None of the Seller Intellectual Property: (i) contains any "back door", "drop dead device", "time bomb", "Trojan horse", "virus" or "worm" (as such terms are commonly understood in the information technology industry) or any other code or circuit designed or intended to have, or capable of performing, any: (A) disrupting, disabling, harming, or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed, or on which such circuit is implemented; (B) damaging or destroying any data or file without the user's consent; or (C) otherwise interfering with the operation of such software; (ii) contains any bug, defect, or error (including any bug, defect, or error relating to or resulting from the display, manipulation, processing, storage, transmission, or use of date data) that materially and adversely affects the use, functionality, or performance of such software, or any product or system containing or used in conjunction with such software; or (iii) fails in any material respect to comply with any applicable warranty or other contractual commitment relating to the use, functionality, or performance of such software.

5.6     Insider Interests

No shareholder, director, officer, employee or consultant of the Seller has any interest in any Seller Asset. Neither the Seller nor any of its shareholders, directors, officers, employees, consultants or Affiliates have any interest, either directly or indirectly, in any Person (whether as an employee, officer, manager, partner, agent, independent contractor, security holder, creditor, consultant or otherwise) that: (a) engages in any activity that competes with the Business as conducted by the Seller; or (b) is a supplier, customer or creditor of the Seller.

5.7     Claims and Orders

(a)     The Seller has not received notice of any written claim which is pending, nor are there any such claims threatened, against the Seller before any Governmental Body concerning the Business or the Seller Assets, and there are no pending disagreements or disputes that are reasonably likely to lead to the assertion of any such claims.

(b)     There are no outstanding or unsatisfied judgments, orders, decrees or stipulations to which the Seller is a party or by which the Seller Assets are bound.

5.8     Compliance with Laws

(a)     The Seller has at all times been in material compliance with Applicable Law related to the ownership of the Seller Assets and the conduct of the Business.

(b)     No event has occurred or circumstance exists that (with or without notice or lapse of time) would: (i) reasonably constitute or result in a violation by the Seller, or a failure on the part of the Seller to comply with any Applicable Law related to the ownership of the Seller Assets; or (ii) would give rise to any obligation on the part of the Seller to undertake, or to bear all or any portion of the cost of, any remedial action related to the Seller's conduct of the Business or the ownership of the Seller Assets as at the Closing Date.

11

5.9    Labor and Employment Matters

(a)    All of the Seller's former and current employees have an executed agreement of confidentiality, non-competition, non-solicitation, and assignment of inventions undertaking, which includes: (i) valid assignments to the Seller of all right, title and interest that such Persons may have or hereafter acquire in any Seller Owned Intellectual Property created, developed or discovered by them during the course of their engagement by the Seller; (ii) valid and enforceable waivers of any and all moral rights that any such Persons may have in any copyright or work of authorship forming part of the Seller Owned Intellectual Property created by them during the course of their employment or engagement by the Seller; and (iii) an express waiver of any rights to receive compensation in connection with inventions created or discovered by them during the course of their engagement by the Seller.

(b)    There are no disputes pending or threatened between the Seller and any of its current or former employees, or current or former independent service contractors, or any trade or labor union, works council or similar body, which disputes have resulted in, or could reasonably be expected to result in, a claim before any Governmental Body, court, or tribunal.

(c)    To Seller's knowledge, no Transferring Person is or has, in the past, been in violation of any term of her or his engagement with the Seller, non-competition, confidentiality, intellectual property agreement, or any restrictive covenant with a former employer relating to the right of any such Transferring Person to be engaged by the Seller because of the nature of the business conducted by the Seller, work performed by the Transferring Person, or use of trade secrets or proprietary information of others.

(d)    Since the incorporation of the Seller (or any predecessor entities, if applicable), the Seller is and has been in compliance with all Applicable Laws with respect to employment, employment practices, worker classification, Taxes, prohibited discrimination, equal employment, fair employment practices, immigration status, and any other terms and conditions of employment.

5.10    Solvency

(a)    The Seller is solvent (as defined and interpreted under Applicable law) and immediately after giving effect to the Closing, the Seller will be solvent.

(b)    No Order has been made or petition presented, or resolution passed for the winding-up or liquidation of the Seller or any of its subsidiaries, and there is no outstanding: (i) petition or order for the winding-up or administration of the Seller or any of its subsidiaries; (ii) any appointment of a receiver over the whole or part of the assets of the Seller or any of its subsidiaries; (iii) any assignment by the Seller or any of its subsidiaries for the benefit of its creditors; (iv) any distress or execution or other process levied in respect of the Seller or any of its subsidiaries which remains undischarged; or (v) any unfulfilled or unsatisfied order against the Seller or any of its subsidiaries.

(c)    Neither Seller nor any of its subsidiaries have been deemed unable to pay their debts within the meaning of Applicable Law.

12

Exhibit 1 Pg
47 of 76

(d)  There are no current or past creditors of the Seller or any of its subsidiaries to whom any Applicable Law requires the delivery of notice or from whom any form of consent is required in conjunction with this Agreement or any other transaction or agreement contemplated hereunder to which Seller or any of its subsidiaries is a party.

5.11  Broker or Finders

The Seller does not have, nor will it have, directly or indirectly, any Liability for brokerage or finders' fees or any similar charges in connection with this Agreement or any transaction contemplated hereby.

5.12  Full Disclosure

Neither this Agreement nor any certificates made or delivered by the Seller in connection herewith contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not misleading, in view of the circumstances in which they were made.

6.  **REPRESENTATIONS AND WARRANTIES OF BUYER**

Each Buyer Party, severally and not jointly, hereby represents and warrants to the Seller, and acknowledges that the Seller is entering into this Agreement in reliance thereon, that the representations set forth in this Section 6 shall be true and complete as of immediately prior to the Closing.

6.1  Organization and Existence

Such Buyer Party is a company duly organized and validly existing under the laws of the jurisdiction of its incorporation or organization, and has all requisite corporate power and authority to own, lease and operate its properties and assets, and to carry on its businesses as now being conducted. Such Buyer Party is duly qualified to do business in any jurisdiction in which it conducts or operates its business (to the extent such qualification is necessary in such jurisdiction).

6.2  Authority and Enforceability

(a)  Such Buyer Party has all necessary corporate power and authority to execute and deliver this Agreement and all other agreements contemplated hereby to which such Buyer Party is a party, and to perform its obligations hereunder and thereunder.

(b)  The execution, delivery and performance of this Agreement and all other agreements contemplated hereby to which such Buyer Party is a party have been duly and validly authorized by all necessary corporate action on the part of such Buyer Party. No other corporate proceedings on the part of such Buyer Party are necessary to authorize this Agreement and all other agreements contemplated hereby.

(c)  This Agreement and all other agreements contemplated hereby to which such Buyer Party is a party are duly and validly executed and delivered by such Buyer Party and, assuming the due authorization, execution and delivery of the Seller and any other parties thereto, constitute the valid, legal and binding obligations of

13

the such Buyer Party, enforceable against such Buyer Party in accordance with their respective terms.

6.3   No Conflicts and No Required Consents

(a)   The execution, delivery and performance by such Buyer Party of this Agreement and all other agreements contemplated hereby to which such Buyer Party is a party, do not: (i) conflict with or violate the articles of association, certificate of incorporation or other equivalent organizational documents of such Buyer Party; (ii) conflict with or violate any Applicable Law; or (iii) result in any breach of any contract to which such Buyer Party is a party.

(b)   The execution, delivery and performance by such Buyer Party of this Agreement and all other agreements contemplated hereby to which such Buyer Party is a party, do not, and the performance of this Agreement and all other agreements contemplated hereby by such Buyer Party will not, require any consent, approval, authorization, clearance, or permit of, or filing or registration with, or notification to, any Governmental Body or otherwise, for such performance or in order to prevent the termination of any right, privilege, license or qualification of such Buyer Party.

6.4   Broker or Finders

Such Buyer Party does not have, nor will it have, directly or indirectly, any Liability for brokerage or finders' fees or any similar charges in connection with this Agreement or any transaction contemplated hereby.

7.   **COVENANTS**

7.1   Confidentiality

(a)   The Seller shall not, and shall cause its representatives not to, directly or indirectly, disclose, reveal, divulge or communicate to any person any confidential information with respect to the Seller Assets, other than information that: (i) is in the public domain at the time of the Closing or at the time of disclosure by a Buyer Party, or subsequently becomes so through no fault of the Seller; (ii) is furnished to the Seller or its respective representatives by a third party having a lawful right to do so; or (iii) was explicitly approved for release by written authorization of each Buyer Party (collectively, the "**Confidential Information**").

(b)   The Seller and its representatives shall be permitted to disclose Confidential Information if such disclosure is in response to a valid order of a Governmental Body, but only to the extent of and for the purposes of such order; *provided*, however, that such representative shall first notify each Buyer Party in writing of the order, and permit each Buyer Party to seek an appropriate protective order.

7.2   Additional Assets

If following the Closing, any asset that was owned by the Seller or any of its Affiliates as of the Closing (including any unfiled patent applications and any inventions conceived by any employees or consultants of the Seller before Closing whether or not reduced to practice or writing) is discovered that is considered to be or otherwise required for the operation of the Seller Assets, and which was not disclosed or otherwise not transferred to the Buyer on or prior to the Closing, then such asset will be

53260-5436937v5

transferred by the Seller to the Buyer promptly upon such discovery, for no additional consideration, and will be deemed to form part of the Seller Assets for all purposes. The Seller agrees to assign and does hereby assign to the Buyer all rights, title and interests in and to any such assets, including any Intellectual Property Rights relating thereto.

7.3   <u>Further Assurances</u>

Following Closing, the Seller shall execute and deliver such other documents, and take such other action, as the requesting party may reasonably request to consummate more effectively the transactions contemplated by this Agreement, including executing and delivering any assignment agreements or other documents reasonably necessary to transfer all registered Seller Owned Intellectual Property Assets to the Buyer in all applicable intellectual property offices.

7.4   <u>Post-Closing Information Cooperation</u>

(a)   Subject to compliance with obligations under Applicable Law, following the Closing, the Seller will afford to the Buyer and its designated representatives, reasonable access (including the ability to make copies in electronic or paper format) during normal business hours non-privileged records within the possession or control of the Seller relating to the Seller Assets prior to the Closing, including insofar as such access is reasonably required by the Buyer, records reasonably necessary for: (i) financial reporting, Taxes and accounting matters (including for purposes of the filing of any Taxes or information return, the preparation for any audit by any taxing authority, and the response to any inquiry by a taxing authority, the mailing or filing of any notice); and (ii) defense or prosecution of any claim, actual or potential.

(b)   Subject to compliance with obligations under Applicable Law, following the Closing, the Buyer will afford to the Seller and its designated representatives, reasonable access (including the ability to make copies in electronic or paper format) during normal business hours records within the possession or control of the Buyer (including, for this term, Parent, as applicable) relating to the continuing Purchase Price obligations, including, but not limited to, the obligations of Section 7.8 and Schedule 7.8(b) hereto, and including, insofar as such access is reasonably required by the Buyer, records reasonably necessary for: (i) reckoning and verifying Buyer's obligations hereunder, (ii) financial reporting, Taxes and accounting matters (including for purposes of the filing of any Taxes or information return, the preparation for any audit by any taxing authority, and the response to any inquiry by a taxing authority, the mailing or filing of any notice); and (iii) defense or prosecution of any claim, actual or potential.  The review, copying and/or disclosure of any Buyer information by Seller under this term shall be subject to a confidentiality obligation on same terms as Section 7.1 hereof. The audit procedure shall be as follows:

(i)   Within the later to occur of fourteen (14) calendar days after any payment by Buyer due under this Agreement  (the "Obligation"), or thirty (30) calendar days after any such scheduled payment accrued, if Seller is dissatisfied with the payment, or if non-payment occurs, Seller may invoke an audit (the "Audit") of Buyer's relevant records using Seller's chosen Auditor, who shall be a nationally-licensed Certified Public Accountant (CPA).

15

(ii)   If Seller disputes the results of Auditor, Seller may choose a Second Auditor, who must also be a licensed CPA, to independently produce a Second Audit.  Otherwise, the Audit shall be the Final Audit.

(iii)   If the Second Audit differs from the Audit by more than .5%, the auditors will in good faith attempt to reconcile the difference. If the difference is reconciled, the reconciliation shall be the Final Audit.  If the difference was .5% or less, the midpoint of the Audit and Second Audit shall be deemed the Final Audit.

(iv)   If a greater-than-.5% difference cannot be reconciled, the parties may choose to either (a) accept the midpoint of the Audit and Second Audit as the Final Audit amount, or (b) appeal to the American Arbitration Association (AAA) for a Third Auditor, whose audit shall be the Final Audit and shall be conclusive and binding on the parties.

(v)   If the Final Audit differs from the initial payment by 5% or more, the cost of all audits shall be borne by the party bearing the burden of the adjustment. If the Obligation was not paid during the period set forth above, the Buyer shall bear the cost of all audits.  If the Final Audit produces an adjustment between .5% and 5%, the parties shall bear the respective costs of their own auditors, but the party bearing the burden of the adjustment shall pay for the Third Auditor (if any).  If the Final Audit produces an adjustment of .5% or less, the parties shall bear the costs of their own appointed auditors, and split the cost of the Third Auditor auditor (if any).

7.5   <u>Satisfaction of Liabilities</u>

The Seller agrees that, following the Closing, it shall not pay or distribute any portion of the Purchase Price to the Seller's security holders in their capacity as such unless and until it has provided the Buyer with evidence demonstrating that all Liabilities of the Seller and each of its Affiliates in connection with the Seller Assets and the Transferring Persons until the Closing have been repaid, released, discharged or satisfied in full, including an executed waiver and release letter from each Transferring Person in the form reasonably acceptable to the Buyer referring to their engagement period with the Seller and its termination and the waiver of any outstanding entitlement arising in connection therewith.

7.6   <u>Non-Compete</u>

In furtherance of the sale of the Seller Assets to the Buyer hereunder by virtue of the transactions contemplated hereby and more effectively to protect the value and goodwill of the Seller Assets so sold, the Seller covenants and agrees that, for a period from and after the Closing and until the first (1st) anniversary of the Closing, neither the Seller nor any of its Affiliates or anyone on their behalf will:

(a)   directly or indirectly (whether as principal, agent, employee, consultant, independent contractor, partner or otherwise) own, manage, operate, control, participate in, or otherwise carry on, personal trading activities or a business similar to or competitive with the Business anywhere in the world (it being understood by the parties hereto that the Business is not limited to any particular region of the world and that such Business may be engaged effectively from any location in the world);

53260-5436937v5

(b) induce or attempt to persuade any agent, supplier of a Buyer Party or any of their Affiliates who was an agent or supplier of the Seller or its Affiliates, as of the Closing to terminate such agency or business relationship with a Buyer Party or any of their Affiliates in order to enter into any such relationship on behalf of any other business organization; or

(c) encourage, induce, attempt to induce, solicit or attempt to solicit any individual who is an employee or contractor of a Buyer Party on the date of this Agreement, or any Transferring Person, to leave his, her or its employment or engagement with a Buyer Party or their Affiliates.

7.7 Key Engagement Agreements

(a) On or prior to the Closing and subject to Closing, the Buyer shall have made offers of engagement to each employee or contractor of the Seller listed in **Schedule 7.7(a)** (the "**Transferring Persons**"), with payments the aggregate to be paid by such entity or entities to all Transferring Persons in consideration for their employment or services (as applicable) to be in accordance with the breakdown set forth in **Schedule 7.7(a)**. All taxes payable on any payments to the Transferring Persons as contemplated hereunder shall be made subject to any taxes to be paid or withheld, as shall be set forth in each agreement with such Transferring Person.

(b) The Seller shall cooperate with the Buyer, by providing all information reasonably requested by the Buyer in respect of the Transferring Persons, including the personnel records of the Transferring Persons as is reasonably necessary for the Buyer to transition such persons into the Buyer's records, and the Seller shall have obtained all necessary consents to make available such personnel records, subject to any restrictions, procedures, and required consents under the Applicable Law and contracts.

(c) Nothing in this Section 7.7 shall obligate the Buyer to offer engagement with any Transferring Person for a minimal period of time.

(d) The Seller's termination of engagement of Transferring Persons shall be effective as of the day prior to the Closing. The Seller and the Buyer shall cooperate to ensure an orderly transition of the Transferring Persons.

(e) The Seller shall be fully responsible for all payments payable (by operation of law, contract or otherwise) to any Transferring Person upon the termination of her or his engagement with the Seller (including any and all severance pay, notice periods and any other benefits). In connection with such termination, subject and in compliance with Applicable Law, the Seller will deliver to each Transferring Person the applicable termination of notice and release as required under Applicable Law.

(f) Neither the Buyer nor the Seller intends this Section 7.7 to create any rights or interest, except as between the Buyer and the Seller, and no present or future employees of any party (or any dependents of such employees) to this Agreement will be treated as third party beneficiaries in or under this Agreement.

7.8 Service Agreement

53260-5436937v5

DocuSign Envelope ID: 5A6AD217-AA95-4664-0A05E-6F4EA9806A2A    Entered 09/22/22 23:48:29    Exhibit 1    Pg
52 of 76

(a)    The Buyer shall provide certain services to the Parent and certain other Affiliates, including the deployment of coins, in accordance with the terms of an intercompany service agreement to be agreed between the Parent and the Buyer (the "**Service Agreement**").

(b)    The Buyer and the Parent undertake that the Service Agreement will not be amended in a way that may harm the rights of the Seller under this Agreement in any way.

(a)    A summary of the key terms of the Service Agreement is attached hereto as **Schedule 7.8(b)** (the "**Service Agreement Key Terms**").

7.9    Continued Existence of the Seller

The Seller agrees that it shall not commence any winding-up process with respect to itself until the final expiration of the period for claims.

8.    **INDEMNIFICATION**

8.1    Indemnification

Subject to the limitations in this Section 8, the Seller will defend, indemnify, and hold the Parent and the Buyer, and each of their respective Affiliates, directors, officers and employees (collectively, the "**Buyer Indemnified Parties**") harmless from and against, and reimburse the Buyer Indemnified Parties with respect to any and all claims, losses, Liabilities, damages, injuries, royalties, awards, judgments, settlements, demands, fines, deficiencies, penalties, Taxes, interest, fees, costs and expenses, including reasonable costs of investigation and defense and fees and expenses of counsel, experts and other professionals (collectively, "**Losses**") paid, incurred, suffered or sustained by any Buyer Indemnified Party, directly or indirectly, whether or not due to a claim by a third party, in each case, arising out of, resulting from, relating to or in connection with:

(a)    any breach of or inaccuracy in any representation or warranty made by the Seller in this Agreement or any other agreement contemplated herein to which the Seller is a party;

(b)    any claim by a third party alleging facts or circumstances that, if accurate, would entitle a Buyer Indemnified Party to recovery under Section 8.1(a);

(c)    any Excluded Liabilities;

(d)    any Transfer Taxes;

(e)    any breach of any covenant or agreement required to be performed by or on behalf of the Seller under this Agreement or any other agreement contemplated herein to which the Seller is a party;

(f)    any claims or threatened claims by or purportedly on behalf of any current or former securityholder of the Seller or rights or purported rights to acquire the Seller's securities or other equity interests in the Seller (or the economic value thereof), or in connection with the transactions contemplated herein; or

18

(g)    in the case of fraud, intentional misrepresentation or willful breach by the Seller, any of its Affiliates, or any of their respective representatives (whether or not acting in their capacity as such).

8.2    <u>Limitations</u>

Other than in case of fraud or willful misrepresentation, the maximum aggregate amount that the Buyer Indemnified Parties shall be entitled to recover pursuant to <u>Section 8.1</u> from the Seller is an amount equal to the amounts paid by the Buyer to the Seller pursuant to this Agreement, including the Purchase Price.

8.3    <u>Claims Process</u>

In the event that a Buyer Indemnified Party shall sustain or incur any Losses, it shall assert a claim for indemnification by giving written notice thereof to the Seller (a "**Claims Notice**") which shall describe the facts and circumstances upon which the asserted claim for indemnification is based and shall thereafter keep the Seller informed with respect thereto. If any claim, suit, action or other proceeding to which the indemnity set forth herein applies is brought against a Buyer Indemnified Party (a "**Claim**"), such Buyer Indemnified Party shall give the Seller prompt notice of same. The Seller shall promptly assume, conduct and control the defense of such Buyer Indemnified Party, compromise or settle the Claim, with one counsel reasonably satisfactory to such Buyer Indemnified Party, and the fees and expenses of such counsel shall be at the sole cost and expense of the Seller, provided that such Buyer Indemnified Party may also cooperate in such defense at its sole discretion. Notwithstanding the above, the Seller shall not be entitled to settle the Claim if such settlement shall impose liabilities or blame upon such Buyer Indemnified Party.

8.4    <u>Right of Setoff</u>

The Parties expressly agree that each of the Parent and the Buyer may set off all amounts to which it may be entitled under <u>Section 8.1</u> against any amount owed by the Parent or the Buyer (as applicable) to the Seller, including under and pursuant to this Agreement. For greater certainty, if setoff against this Agreement is insufficient to fully pay any amounts under <u>Section 8.1</u>, then the Seller must fully pay any missing portion of such amounts to the Parent or to the Buyer (as applicable).

9.    **MISCELLANEOUS**

9.1    <u>Successors and Assigns</u>

The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement.

9.2    <u>Assignment</u>

This Agreement shall not be assigned by operation of law or otherwise, provided that each Buyer Party may assign any of its rights or obligations herein to any of its Affiliates.

53260-5436937v5

DocuSign Envelope ID: 547AB217-ADD6-4634-A05E-8FCE890A42A2 Filed 09/22/22 Entered 09/22/22 23:48:29 Exhibit 1 Pg 54 of 76

9.3     Governing Law

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, excluding that body of law pertaining to conflict of law, regardless of the laws that might otherwise govern under applicable principles of conflicts of law, and the Parties do hereby consent and submit to the exclusive jurisdiction of the competent courts in New York County, New York, with respect to any dispute or controversy arising out of, or in connection with, this Agreement.

9.4     Counterparts; Facsimile or Electronic Signature

This Agreement may be executed and delivered by facsimile or electronic signature and in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.5     Notices

(a)     All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of: (i) personal delivery to the party to be notified; (ii) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next Business Day; (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) three (3) Business Days after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt.

(b)     All communications shall be sent to a Party at its address as set forth below its signature on the signature page of this Agreement, or to such electronic mail address or address as subsequently modified by written notice given in accordance with this Section 9.5; *provided* that:

(i)     a copy of any notice given to the Seller shall also be sent to Jason Stone, CEO of KeyFi, for the attention of Jason, e-mail: jason@keyfi.io; and

(ii)     a copy of any notice given to the Parent or to the Buyer shall also be sent to Herzog, Fox & Neeman, Asia House, 4 Weizmann Street, Tel Aviv 6423904, Israel, for the attention of Yuval Zilber, Adv., e-mail: zilbery@herzog.co.il.

9.6     Expenses

Each Party will bear its own fees and expenses in connection with the transactions contemplated hereby, whether or not such transactions shall be consummated. In addition, if any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

9.7     Entire Agreement

This Agreement and the other documents delivered pursuant hereto at a Closing constitute the full and entire understanding and agreement between the Parties hereto with regard to the subjects hereof and thereof.

53260-5436937v5

Exhibit 1 Pg
55 of 76

9.8 Amendments and Waivers

Any term of this Agreement may be amended, terminated or waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Seller, the Parent and the Buyer. A waiver by a Party in respect of a breach by another Party of its obligations: (a) shall be in writing; (b) shall not be construed as a justification or excuse for a further breach of its obligations; (c) shall not affect any other enforcement of the same or any other right; and (d) shall be confined to the specific circumstances in which it is given.

9.9 Severability

The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision.

9.10 Delays or Omissions

No delay or omission to exercise any right, power or remedy accruing to any Party under this Agreement, upon any breach or default of any other Party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting Party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. All remedies, either under this Agreement or by law or otherwise afforded to any Party, shall be cumulative and not alternative.

9.11 Entire Agreement

This Agreement (together with the Recitals and Schedules attached hereto, and any other deliverables hereunder) contains the entire understanding of the Parties with respect to its subject matter and all prior negotiations, discussions, agreements, representations, warranties, commitments and understandings between them with respect thereto (including previous drafts of this Agreement) shall be null and void in their entirety, effective immediately with no further action required. The Term Sheet MOU signed by the Parties on September 25, 2020, with respect to the transactions contemplated herein, is hereby terminated and of no further force and effect and shall not be used in order to interpret any of the provisions of this Agreement.

9.12 Further Actions

At any time and from time to time, each Party agrees, without further consideration, to take such actions and to execute and deliver such documents as may be reasonably necessary to effectuate the purposes of this Agreement.

9.13 Third-Party Beneficiaries

Nothing in this Agreement shall create or confer upon any Person, other than the Parties, any rights, remedies, obligations or liabilities, with the exception of the legal successors and permitted assigns of the Parties and except as expressly provided herein, including Sections 8 (*Indemnification*).

*[Rest of Page Intentionally Left Blank]*

21

**IN WITNESS WHEREOF**, the Parties have executed this Asset Purchase Agreement as of the date and year first written above.

**SELLER**

**KEYFI, INC.**

By:

6B37865642A149C

Name: Jason Stone

Title: Ceo

Address for Notices:

Keyfi Inc

99 John St

New, York 10038

Attn: Jason Stone

Email: Jason@keyfi.io

*[Signature Page – Asset Purchase Agreement]*

**IN WITNESS WHEREOF**, the Parties have executed this Asset Purchase Agreement as of the date and year first written above.

### PARENT

| | |
|---|---|
| Address for Notices: | 1 Bartholomew Lane, London, England, EC2N 2AX |
| | |
| Attn: | legal |
| Email: | legal@celsius.network |

### BUYER

**CELSIUS KEYFI LLC**

**By:   Celsius   Network   Limited,   the incorporator**

By:  _Alex Mashinsky_

Name: Alex Mashinsky

Title: CEO

| | |
|---|---|
| | 221 River Street, |
| Address for Notices: | 9th Floor, Suite 9129 |
| | Hoboken NJ 07030 |
| | |
| Attn | legal |
| Email: | legal@celsius.network |

**SCHEDULE 2.1(a)**

**Seller Intellectual Property**

[***NTD****: Please list the Seller Intellectual Property.*]

**SCHEDULE** 2.1(b)

**Seller Contracts**

[<mark>**NTD**: *Please list the Seller Contracts.*</mark>]

## SCHEDULE 2.1(c)

## Tangible Assets and Equipment

[**NTD**: *Please list any tangible assets and equipment related to the Business.*]

Case 23-01138-MG    Doc 63    Filed 09/22/22    Entered 09/22/22 23:48:29    Exhibit 1    Pg
61 of 76

**SCHEDULE** 7.7(a)

**Transferring Persons**

[**NTD**: *Please include the names of each Transferring Person and the salary entitlement.*]

| Name | Annual Gross Consideration for Employment or Services (as applicable) |
|---|---|
| [●] | USD [●] |
| [●] | USD [●] |
| [●] | USD [●] |
| [●] | USD [●] |
| [●] | USD [●] |
| [●] | USD [●] |
| **Total:** | **USD _____.** |

[*Schedule* 7.7(a) – Transferring Persons]

**SCHEDULE** 7.8(**b**)

**Service Agreement Key Terms**

1.  In this Schedule:

    a.  "**APY**" means the annualized rate of return for coins earned from deploying coins on a platform or rewards paid for deposits;

    b.  "**Authorized Decentralized Finance Activities**" means any deployed coins, such as BTC, ETH, stable coins, and other assets are deployed to authorized activities which earn coins from lending, borrowing, high-frequency liquidity provisions, and other authorized DeFi activities;

    c.  "**Insurance Policy Cost**" means the lowest of up to 1% of total AUM deployed by the Buyer, or the actual cost of such policy purchased by Celsius.

    d.  "**Net Profit**" means the Net Profits as calculated in accordance with Section 9 below (as applicable);"**Profit Sharing Percentage for activity**" means a profit share for coins attributed to each activity as described herein;

    e.  "**Reserve Rate**" means the percentage of holdings in a coin that are reserved by Parent or its Affiliates (excluding the Buyer) ("**Celsius**") for withdrawals. The reserve rate used for each coin will be determined on a weekly basis as displayed through Celsius' Instilend platform;

    f.  "**Rewards APY**" means the annualized rate of rewards paid to depositors of coins as a percentage of their deposited coins;

    g.  "**Payout Date**" has the meaning given to that term herein;

    h.  "**Staking Coins**" means a type of mining through which new coins are earned through maintaining deposits of coins on a platform;

    i.  "**Staking Plus Coins**" means Staking Coins with respect to which the staking activity generates earnings of multiple types of coins;

    j.  "**Start Date**" means August 17, 2020.

2.  The Buyer shall provide certain services to the Parent, including the deployment of coins (the "**Services**"). With respect to such Services, all revenues received from third parties shall be paid to the Parent or an Affiliate.

3.  With respect to **Staking Coins and Staking Plus Coins**, the Net Profits (as described in section 10), as calculated in accordance with the Trading Activities and Performance Calculations set forth below, with no double counting, shall be allocated as follows:

    a.  From the Start Date until the end of 2022: (i) fifty percent (50%) of the Net Profits will be allocated to the Buyer, ; and (ii) from the portion payable to the

Buyer, 20% shall be paid to the Seller as consideration for the Services, and (iii) the balance of the Net Profits will be allocated to and retained by the Parent.

b.    From the beginning of 2023 and continuing into perpetuity, the allocation shall be (i) fifty percent (20%) of the Net Profits will be allocated to the Buyer, and (iii) the balance of the Net Profits will be allocated to and retained by the Parent.

4.    With respect to **Authorized Decentralized Finance Activities**, on and from the Start Date and thereafter until the end of 2022, of the Net Profits (as described in section 10), calculated in accordance with the Trading activities and Performance Calculations set forth below, with no double counting: (a) twenty percent (20%) shall be attributed to the Buyer, and (b) of the Buyer's portion, 20% shall be further attributed and payable to the Seller, and (c) eighty percent (80%) shall be allocated to and retained by the Parent.

a.    From the beginning of 2023 and continuing into perpetuity, the allocation shall remain as above with the modification that the portion attributed and payable to Seller shall revert to Buyer.

5.    For the avoidance of doubt, unless explicitly agreed in writing by Parent, the Buyer shall not be entitled to any other compensation other than the compensation explicitly set forth herein, including, without limitation, for any other services performed by the Buyer or any of its employees or service providers for the benefit of Celsius.

6.    Trading activities and Performance Calculations

a.    The following are approved activities  and methods of calculating performance fees under this agreement. Additional activities and/or changes to methods of calculating performance fees need to be submitted to and approved by the Chief Financial Officer and the Financial Risk Officer of the Parent.

b.    Net Profits for each coin across all activities will be computed each week from Friday to Friday, and a running total of such Gross Profits for each coin across all activities will be recorded in the number of tokens and in USD value.

c.    Payouts of Net Profits will be made only for positive accumulated Net Profits across all coin types and activities at Payout Dates. For clarity, payouts are not made for individual performance of specific coins within particular activities but are based on performance across all coins and activities.

d.    Payouts will be made within 15 days of each Payout Date. The first payout date will be 12/31/2020, and subsequent ones will be on the 15th of each month (or the first business day thereafter, if occurring on a weekend or national holiday) immediately following the month in which activities attributable to the Payouts occur. Payouts may be made in USD, or at the election of the payee, in tokens earned, up to 50% the amount of Net Profits for each token type. The token Gross Profits in USD shall be calculated per Subsection (e) hereof.  Payouts of specific tokens cannot exceed the net profits generated in that token.  Payouts are subject to a high water mark, such that any losses incurred are reflected as

*[**Schedule** 7.8(**b**) (cont.) – Service Agreement Key Terms]*

expenses in the running totals of Net Profits and will impact subsequent payouts.

e. Where called for, 7-day and monthly weighted averages are used for each weekly and monthly performance calculation, respectively, for both token prices in USD (or other applicable base currency, as mutually-agreed) as well as for all APYs and Rates described in the agreement.

f. Approved activities include Staking Coins, Staking Plus Coins and Authorized Decentralized Finance Activities.

7. Weekly and Monthly Performance Calculation for Activities

On a weekly and monthly basis, the following performance calculations will be performed for each coin that is allocated to the approved activities:

a. Revenues for activity in Coins

    i. Coins Allocated to activity = Coins that the Parent makes available for an activity

    ii. Coins Deposited = Coins Allocated to activity * (1 + Reserve Rate)

    iii. Earned Coins = Coins Earned from All Sources as Rewards from Coins Allocated to activity

    iv. Note: Earned coins are recorded for each coin within each activity.

b. Costs for activity in Coins [are calculated separately for each token type]

    i. Weekly or Monthly Rewards APY Rate for activity in Coin = [(Rewards APY for Coin) * (Percentage Earning Interest in Native Coin) + (Rewards APY for CEL tokens) * (Percentage of Deposits in Native Coin Earning Interest in CEL)] / Number of Periods.

    Number of Periods = 52 for Weekly and 12 for Monthly Rewards

    ii. Rewards Costs = Coins Deposited * Weekly or Monthly Rewards APY for activity in Coin

    iii. Note: Weekly or Monthly Deposit APY Rate reflects that rewards to retail depositors can be paid in the coin deposited, or in CEL tokens.

c. Gross Profits for activity in Coins

    i. Gross Profits Attributed to activity in Coins = (Earned Coins – Rewards Costs)

    ii. Note: This is performed for each coin within each activity.

d. Gross Profits for Activities in USD

    i. Gross Profits Attributed to activity in USD = Gross Profits Attributed

[*Schedule* 7.8(*b*) *(cont.) – Service Agreement Key Terms*]

to activity in Coins * USD Rate for Coins in activity

    ii.  Note: This is performed for each coin within each activity.

    iii.  Note: If the context requires, the USD Rate will be taken as a multiday weighted average (per Section 6(e) hereof or otherwise).

  e.  Total Gross Profits for All activities in Coins

    i.  Total Gross Profit for All activities in Coins = Summation [ Gross Profits Attributed to activity in Coins]

    ii.  Total Gross Profit for All activities in USD = Summation [ Gross Profits Attributed to activity in USD]

    iii.  Note: Summation refers to adding Gross Profits Attributed to each activity across all coins.

**8.**    Total Gross Profits for **Sale of Software/Subscriptions**

  a.  Profits from the sales of Software Licenses / Subscriptions to third parties (MPC software modules, accounting systems, etc), will be split equally (fifty percent to each party) as between Parent and Buyer until the end of 2022. Buyer in turn will share 20% of its share with Seller during the foregoing period.

  b.  From the beginning of 2023 and continuing into perpetuity, the profit share shall remain as above with the modification that the portion attributed and payable to Seller shall revert to Buyer.

  c.  Any development must be approved by the Parent's Chief Technology Officer ("CTO") or Chief Executive Officer ("CEO"), in writing, after it has been determined that it is needed for the activity performed by Buyer; and any such sale should be approved by the Chief Revenue Officer or CEO, based on the group's needs and activity.

9.    Payout Period and Net Profits  Calculations

Running totals of Total Gross Profit for All activities in Coins and Total Profit for All activities in USD will be calculated each week and month.  The following calculations will be performed at the end of each payout period. With the exception of the first Payout, the Payout period shall be one month.

Total Period Gross Profit for All activities in USD = Summation [Total Gross Profit for All activities in USD]

Note: Summation refers to summing all monthly gross profits for all attributable activities across coins for the payout period.

Net Profit = Total Period Gross Profit for All activities in USD - Salaries * 2 (for initial 5 employees)[1]- Hardware/Cloud Expenses - Cumulative losses from Previous

---

[1] Note: Any additional hires will come out at 1x    salary. In addition, all additional hires shall be approved by the CTO or CEO.

[*Schedule* 7.8(*b*) *(cont.) – Service Agreement Key Terms*]

DocuSign Envelope ID: 23D113BF-6AD2-4617-ADE6-463CA05E8FCB89DA0AA2

Periods - Insurance Policy Costs - Staking Costs - Transaction Fees.

10. Division of Net Profit by Activity for Payout Period

Net Profit for Staking Coins and Staking Plus Coins = Net Profit * Total Period Gross Profit for all Staking Activities in USD / Total Period Gross Profit for all activities in USD

Net Profit for Decentralized Finance Activities = Net Profit * Total Period Gross Profit for all Defi Activities in USD / Total Period Gross Profit for all activities in USD

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
INDEX NO. 652367/2022
NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 07/07/2022

22-01139-mg    Doc 7-3    Filed 09/22/22    Entered 09/22/22 23:48:29    Exhibit 1    Pg
67 of 76

# EXHIBIT B

22-01139-mg    Doc 7-3    Filed 09/22/22    Entered 09/22/22 23:48:29    Exhibit 1    Pg
68 of 76

## Service Agreement

This Service Agreement (the "**Agreement**"), dated December 31, 2020 ("**Effective Date**"), states the terms and conditions that govern the contractual agreement between **CELSIUS KEYFI LLC**, organized and existing under the laws of the State of Delaware, with its principal place of business at 221 River Street Suite 9129, Hoboken, New Jersey 07030 ("**KEYFI**") and **CELSIUS NETWORK LIMITED**, a private company incorporated under the laws of England and Wales, with its principal place of business at 1 Bartholomew Lane, London, England, EC2N 2AX ("**Celsius**"). Each of KEYFI and Celsius shall be referred to herein as a "**Party**", and together, the "**Parties**".

**WHEREAS,** KEYFI offers financial services in the field of cryptocurrency; and

**WHEREAS,** Celsius desires to retain the services of KEYFI to render certain financial services according to the terms and conditions herein; and

**NOW, THEREFORE,** In consideration of the mutual covenants and promises made by the parties hereto, the parties covenant and agree as follows:

1.    **Interpretation & Definitions**

(a)    The preamble to this Agreement constitutes an integral part hereof. The headings of the sections and subsections of this Agreement are for convenience of reference only and are not to be considered in interpreting this Agreement.

(b)    In this Agreement, unless the context otherwise requires, "Intellectual Property" means all patents, registered copyrights, and trademarks, and, without limitation, any and all inventions, improvements, designs, ideas, concepts, innovations, original works of authorship, formulas, concepts, techniques, know how, methods, systems, processes, compositions of matter, computer software programs, databases, mask works, and trade secrets; each of the foregoing works, in which rights may subsist, whether or not patentable, copyrightable or protectable as trade secrets, irrespective of whether such has been registered in a patent, copyright, trademark or other form, and irrespective of whether it constitutes a commercial or professional secret.

2.    **Term & Termination**

This Agreement is effective and shall commence as of the date first above-written and shall continue to be in effect until terminated by either Party by providing the other Party with a thirty (30) days prior written notice.

3.    **Services**

KEYFI shall provide certain services to Celsius, including the deployment of coins, as is further provided in **Schedule A** (the "**Services**"). The relationship of the parties with respect to the provision of the Services shall further be governed by any express stipulations provided in **Schedule A**. With respect to such Services, all coins deployed by KEYFI and revenues generated and/or received from third parties shall be owned by and paid to Celsius or an Affiliate of Celsius (as determined by Celsius), excluding KEYFI. "**Affiliate**" means any direct or indirect subsidiary of Celsius and any other entity directly or indirectly controlling, controlled by, or under common control with Celsius.

4.    **Compensation**

As a sole and exclusive compensation for the Services, Celsius shall pay KEYFI the consideration set forth in **Schedule B** attached hereto.

Case 1:20-cv-01539-mjg   Doc 7-3   Filed 09/22/22   Entered 09/22/22 23:48:29   Exhibit 1   Pg
69 of 76
RECEIVED NYSCEF: 07/07/2022

**5. Intellectual Property Rights**

(a) The Parties acknowledge and agree that KEYFI will hold all new intellectual property, unless agreed upon in writing by both parties, rights in any work product resulting from the Services including, but not limited to, strategies, copyright and trademark rights (the "**Resulting Works**"). Celsius agrees not to claim any intellectual property ownership in the Resulting Works at any time prior to or after the completion and delivery of the Resulting Works to Celsius, except to the extent the Resulting Works are or contain the Original IP, other pre-existing IP of Celsius.

**6. Independent Contractor**

The parties hereto understand and agree that KEYFI shall perform Services for Celsius pursuant to this Agreement as an independent contractor. Nothing in this Agreement shall be construed to create the relationship of employer and employee or of general agency between the parties. The parties hereto further acknowledge and agree that this Agreement does not create a partnership or joint venture between the Parties, and is exclusively a contract for service.

**7. Confidentiality**

The Parties acknowledge that, from time to time, Celsius may disclose to KEYFI either directly or indirectly in writing, orally or by inspection of tangible objects information which is proprietary or confidential or which would, under the circumstances, be understood by a reasonable person to be proprietary and nonpublic, including without limitation, the terms of this Agreement, non-public information and all unpublished marketing manuals, service manuals, information, data, reports and other similar materials or records provided by Celsius and/or its Affiliates to KEYFI pursuant to this Agreement or otherwise, as well as all work products of the Services and related notes, files, and documents ("**Confidential Information**"). KEYFI shall use such Confidential Information solely for fulfilling its responsibilities and obligations under this Agreement and for no other purpose. KEYFI shall retain such Confidential Information in confidence and shall not disclose it to any third party without Celsius' prior written consent. KEYFI shall use at least the same procedures and degree of care which it uses to protect its own Confidential Information of like importance, and in no event less than reasonable care, and shall be responsible and liable for any use or disclosure of the Confidential Information by its employees, agents or subcontractors in violation of this Agreement. KEYFI shall immediately notify Celsius of any unauthorized use or disclosure, or suspected unauthorized use or disclosure, of the Confidential Information.

7.1 <u>Exceptions</u>. The obligations set forth in this Section 7 shall not apply to information that KEYFI is able to demonstrate, though clear and convincing evidence:

(a)     was generally available to the public at the time of its disclosure to KEYFI hereunder;

(b)     became generally available to the public after its disclosure other than through an act or omission of KEYFI in breach of this Agreement; or

(c)     was subsequently, lawfully and independently disclosed to KEYFI by a person other than Celsius, not in violation of the confidentiality agreement, arrangement or understanding with such person.

7.2     <u>Required Disclosures</u>. In the event that any disclosure of the Confidential Information by KEYFI is required pursuant to applicable law, KEYFI shall provide Celsius reasonable notice and opportunity to contest the need for such disclosure, or to seek a protective order therefor. If Celsius fails to obtain a protective order, KEYFI will disclose only that portion of the Confidential Information that is legally so required to be disclosed, provided that any Confidential Information so disclosed shall maintain its confidentiality protection for all purposes other than such legally required disclosure.

22-01139-mg    Doc 7-3    Filed 09/22/22    Entered 09/22/22 23:48:29    Exhibit 1    Pg
70 of 76

**8.    Indemnification**

KEYFI will defend, indemnify, and hold Celsius, its Affiliates, and their respective directors, officers, and employees (collectively, the "**Celsius Indemnified Parties**") harmless from and against, and reimburse Celsius Indemnified Parties with respect to any and all claims, losses, liabilities, damages, injuries, royalties, awards, judgments, settlements, demands, fines, deficiencies, penalties, taxes, interest, fees, costs, and expenses, including reasonable costs of investigation and defense and fees and expenses of counsel, experts and other professionals (collectively, "**Losses**") paid, incurred, suffered or sustained by any Celsius Indemnified Party, directly or indirectly, whether or not due to a claim by a third party, in each case, arising out of, resulting from, relating to or in connection with:

(a)      any breach of any covenant or agreement required to be performed by or on behalf of KEYFI under this Agreement or any other agreement contemplated herein to which KEYFI is a party;

(b)      any claims or threatened claims by or purportedly on behalf of any current or former security holder of KEYFI or rights or purported rights to acquire KEYFI's securities or other equity interests in the KEYFI (or the economic value thereof), or in connection with the transactions contemplated herein; or

(c)      fraud, intentional misrepresentation, or willful breach by the KEYFI, any of its affiliates, or any of their respective representatives (whether or not acting in their capacity as such).

**9.      Notices**

All effective notices hereunder shall be in writing and deemed given and received when delivered in person, by email, facsimile, or by commercial air courier service. Notices shall be addressed to each party at its address set forth herein, or such other address as the recipient may have specified by earlier notice to the sender. Any notice shall be effective and be deemed to have been served, if personally delivered or sent by email or facsimile, on the next business day, and if by courier, on the second business day thereafter.

**10.    Assignment**

This Agreement shall not be assigned by operation of law or otherwise, provided that Celsius may assign any of its rights or obligations herein to any of its Affiliates with reasonable advance written notice to KEYFI.

**11.      Waiver & Modification**

No waiver or modification of this Agreement shall be valid unless in writing and agreed upon by both Parties. Any consent by any party to, or waiver of, a breach or condition of this Agreement by the other, whether express or implied, shall not constitute consent to, waiver of, or excuse for any other different or subsequent breach or suspension or variation from any condition or obligation hereof.

**12.      Entire Agreement**

This Agreement, along with its exhibits, schedules, annexes, and all other agreements referenced (which are hereby incorporated by reference), is executed and delivered with the understanding that it embodies the entire Agreement between the Parties and that there are no prior representations, warranties, or agreements relating to the subject matter of this Agreement.

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
NYSCEF DOC. NO. 13

### 13.    Applicable Law

This Agreement shall be governed by, and construed in accordance with, the laws England and Wales, excluding that body of law pertaining to conflict of law, regardless of the laws that might otherwise govern under applicable principles of conflicts of law, and the Parties do hereby consent and submit to the exclusive jurisdiction of the competent courts in London, England, with respect to any dispute or controversy arising out of, or in connection with, this Agreement.

**IN WITNESS WHEREOF,** each of the Parties has executed this Agreement, both Parties by its respective duly authorized officer, as of the date and year first above written.

**Celsius Network Limited**

Signature: _Alex Maslinsky_

Printed Name: Alex Mashinsky

Title: Ceo

Email for notices: alex@celsius.network

**Celsius KeyFi LLC**

Signature: _[signature]_
4E476B730140488...

Printed Name: Jason Stone

Title: CEO

Email for notices: jason.stone@celsius.network

22-01139-mg    Doc 7-3    Filed 09/22/22    Entered 09/22/22 23:48:29    Exhibit 1    Pg
22 of 76

Schedule A

## I. Material Service & Relationship Terms.

- Celsius shall perform coin staking exclusively through KEYFI for the duration of and pursuant to the terms of this Agreement, unless Celsius has a more profitable strategy (based on gross revenue) to coin staking, either independently or through a third party. Celsius will notify KEYFI and the exclusivity provision will be waived.

- Celsius and KEYFI accounting shall remain separate and administered independently by the respective parties, unless for the purpose of auditing or valuing the entire Celsius group or for taxation, reporting or any other request or compliance requirement derived from applicable regulation.

- KEYFI shall retain control of its internal budget and profit & loss determination in good faith, notwithstanding,
  - o KEYFI shall obtain Celsius approval for any expenditures exceeding $50,000 individually, or in aggregate in a calendar year if a recurring expenditure, once KEYFI costs exceed $2 million in a calendar year (exclusive of employee costs), and
  - o Celsius shall pay (including by way of advancement or reimbursement, as applicable) any reasonable costs reasonably-necessitated in delivering the Services as and when requested by KEYFI. For the avoidance of doubt, all such costs will be considered as cost deducted from gross revenues under section II below.

- KEYFI shall provide financials to Celsius on a weekly basis on a date chosen by the Celsius' CFO. Additionally, financials must be provided within 24 business hours if requested by the Celsius' CFO, CEO and/or CIO.

- Celsius has the right to verify, audit and confirm all accounting and financial records, books,statements prepared by KEYFI or any other information requested by it, at its sole discretion.. KEYFI will act in good faith to prepare and provide these documents in a timely manner.

- KEYFI shall meet with Celsius' CIO,Risk Officer and/or CEO on a periodic basis to review KEYFI assets and performance and disclose and approve all strategies and related issues applied to the deployment of all coins.

22-01139-mg   Doc 7-3   Filed 09/22/22   Entered 09/22/22 23:48:29   Exhibit 1   Pg
73 of 76

Schedule II

## II. Service Agreement Key Terms

1.   In this Schedule:

1.2   "**APY**" means the annualized rate of return for coins earned from deploying coins on a platform or rewards paid for deposits;

1.3   "**Authorized Decentralized Finance Activities**" means any deployed coins, such as BTC, ETH, stable coins, and other assets are deployed to authorized activities which earn coins from lending, borrowing, high-frequency liquidity provisions, and other authorized DeFi activities;

1.4   "**Insurance Policy Cost**" means the lowest of up to 1% of total AUM deployed by the Buyer, or the actual cost of such policy purchased by Celsius.

1.5   "**Net Profit**" means the Net Profits as calculated in accordance with Section 9 below (as applicable);"**Profit Sharing Percentage for activity**" means a profit share for coins attributed to each activity as described herein;

1.6   "**Reserve Rate**" means the percentage of holdings in a coin that are reserved by Parent or its Affiliates (excluding the Buyer) ("**Celsius**") for withdrawals. The reserve rate used for each coin will be determined on a weekly basis as displayed through Celsius' Instilend platform;

1.7   "**Rewards APY**" means the annualized rate of rewards paid to depositors of coins as a percentage of their deposited coins;

1.8   "**Payout Date**" has the meaning given to that term herein;

1.9   "**Staking Coins**" means a type of mining through which new coins are earned through maintaining deposits of coins on a platform;

1.10  "**Staking Plus Coins**" means Staking Coins with respect to which the staking activity generates earnings of multiple types of coins;

1.11  "**Start Date**" means August 17, 2020.

2.   The Buyer shall provide certain services to the Parent, including the deployment of coins (the "**Services**"). With respect to such Services, all revenues received from third parties shall be paid to the Parent or an Affiliate.

3.   With respect to **Staking Coins and Staking Plus Coins**, the Net Profits (as described in section 10), as calculated in accordance with the Trading Activities and Performance Calculations set forth below, with no double counting, shall be allocated as follows:

3.1   From the Start Date until the end of 2022: (i) fifty percent (50%) of the Net Profits will be allocated to the Buyer, ; and (ii) from the portion payable to the Buyer, 20% shall be paid to the Seller as consideration for the Services, and (iii) the balance of the Net Profits will be allocated to and retained by the Parent.

22-01139-mg   Doc 7-3   Filed 09/22/22   Entered 09/22/22 23:48:29   Exhibit 1   Pg
74 of 76

3.2   From the beginning of 2023 and continuing in perpetuity, the allocation shall be (i) fifty percent (20%) of the Net Profits will be allocated to the Buyer, and (iii) the balance of the Net Profits will be allocated to and retained by the Parent.

4.   With respect to **Authorized Decentralized Finance Activities**, on and from the Start Date and thereafter until the end of 2022, of the Net Profits (as described in section 10), calculated in accordance with the Trading activities and Performance Calculations set forth below, with no double counting: (a) twenty percent (20%) shall be attributed to the Buyer, and (b) of the Buyer's portion, 20% shall be further attributed and payable to the Seller, and (c) eighty percent (80%) shall be allocated to and retained by the Parent.

   a.   From the beginning of 2023 and continuing into perpetuity, the allocation shall remain as above with the modification that the portion attributed and payable to Seller shall revert to Buyer.

5.   For the avoidance of doubt, unless explicitly agreed in writing by Parent, the Buyer shall not be entitled to any other compensation other than the compensation explicitly set forth herein, including, without limitation, for any other services performed by the Buyer or any of its employees or service providers for the benefit of Celsius.

6.   Trading activities and Performance Calculations

   6.1   The following are approved activities  and methods of calculating performance fees under this agreement. Additional activities and/or changes to methods of calculating performance fees need to be submitted to and approved by the Chief Financial Officer and the Financial Risk Officer of the Parent.

   6.2   Net Profits for each coin across all activities will be computed each week from Friday to Friday, and a running total of such Gross Profits for each coin across all activities will be recorded in the number of tokens and in USD value.

   6.3   Payouts of Net Profits will be made only for positive accumulated Net Profits across all coin types and activities at Payout Dates. For clarity, payouts are not made for individual performance of specific coins within particular activities but are based on performance across all coins and activities.

   6.4   Payouts will be made within 15 days of each Payout Date. The first payout date will be 12/31/2020, and subsequent ones will be on the 15th of each month (or the first business day thereafter, if occurring on a weekend or national holiday) immediately following the month in which activities attributable to the Payouts occur. Payouts may be made in USD, or at the election of the payee, in tokens earned, up to 50% the amount of Net Profits for each token type. The token Gross Profits in USD shall be calculated per Subsection (e) hereof.  Payouts of specific tokens cannot exceed the net profits generated in that token.  Payouts are subject to a high water mark, such that any losses incurred are reflected as expenses in the running totals of Net Profits and will impact subsequent payouts.

   6.5   Where called for, 7-day and monthly weighted averages are used for each weekly and monthly performance calculation, respectively, for both token prices in USD (or other applicable base currency, as mutually-agreed) as well as for all APYs and Rates described in the agreement.

6.6   Approved activities include Staking Coins, Staking Plus Coins and Authorized Decentralized Finance Activities.

7.   Weekly and Monthly Performance Calculation for Activities

On a weekly and monthly basis, the following performance calculations will be performed for each coin that is allocated to the approved activities:

7.1   Revenues for activity in Coins

(a)   Coins Allocated to activity = Coins that the Parent makes available for an activity

(b)   Coins Deposited = Coins Allocated to activity * (1 + Reserve Rate)

(c)   Earned Coins = Coins Earned from All Sources as Rewards from Coins Allocated to activity

(d)   Note: Earned coins are recorded for each coin within each activity.

7.2   Costs for activity in Coins [are calculated separately for each token type]

(a)   Weekly or Monthly Rewards APY Rate for activity in Coin = [(Rewards APY for Coin) * (Percentage Earning Interest in Native Coin) + (Rewards APY for CEL tokens) * (Percentage of Deposits in Native Coin Earning Interest in CEL)] / Number of Periods.

Number of Periods = 52 for Weekly and 12 for Monthly Rewards

(b)   Rewards Costs = Coins Deposited * Weekly or Monthly Rewards APY for activity in Coin

(c)   Note: Weekly or Monthly Deposit APY Rate reflects that rewards to retail depositors can be paid in the coin deposited, or in CEL tokens.

7.3   Gross Profits for activity in Coins

(a)   Gross Profits Attributed to activity in Coins = (Earned Coins – Rewards Costs)

(b)   Note: This is performed for each coin within each activity.

7.4   Gross Profits for Activities in USD

(a)   Gross Profits Attributed to activity in USD = Gross Profits Attributed to activity in Coins * USD Rate for Coins in activity

(b)   Note: This is performed for each coin within each activity.

(c)   Note: If the context requires, the USD Rate will be taken as a multiday weighted average (per Section 6(e) hereof or otherwise).

7.5   Total Gross Profits for All activities in Coins

(a)   Total Gross Profit for All activities in Coins = Summation [ Gross Profits

22-01139-mg   Doc 7-3   Filed 09/22/22   Entered 09/22/22 23:48:29   Exhibit 1   Pg
76 of 76

(b)   Total Gross Profit for All activities in USD = Summation [ Gross Profits Attributed to activity in USD]

(c)   Note: Summation refers to adding Gross Profits Attributed to each activity across all coins.

8.   Total Gross Profits for Sale of Software/Subscriptions

a.   Profits from the sales of Software Licenses / Subscriptions to third parties (MPC software modules, accounting systems, etc), will be split equally (fifty percent to each party) as between Parent and Buyer until the end of 2022. Buyer in turn will share 20% of its share with Seller during the foregoing period.

b.   From the beginning of 2023 and continuing into perpetuity, the profit share shall remain as above with the modification that the portion attributed and payable to Seller shall revert to Buyer.

c.   Any development must be approved by the Parent's Chief Technology Officer ("CTO") or Chief Executive Officer ("CEO"), in writing, after it has been determined that it is needed for the activity performed by Buyer; and any such sale should be approved by the Chief Revenue Officer or CEO, based on the group's needs and activity.

9.   Payout Period and Net Profits  Calculations

Running totals of Total Gross Profit for All activities in Coins and Total Profit for All activities in USD will be calculated each week and month.  The following calculations will be performed at the end of each payout period. With the exception of the first Payout, the Payout period shall be one month.

Total Period Gross Profit for All activities in USD = Summation [Total Gross Profit for All activities in USD]

Note: Summation refers to summing all monthly gross profits for all attributable activities across coins for the payout period.

Net Profit = Total Period Gross Profit for All activities in USD - Salaries * 2 (for initial 5 employees)[1]- Hardware/Cloud Expenses - Cumulative losses from Previous Periods - Insurance Policy Costs - Staking Costs - Transaction Fees.

10.   Division of Net Profit by Activity for Payout Period

Net Profit for Staking Coins and Staking Plus Coins = Net Profit * Total Period Gross Profit for all Staking Activities in USD / Total Period Gross Profit for all activities in USD

Net Profit for Decentralized Finance Activities = Net Profit * Total Period Gross Profit for all Defi Activities in USD / Total Period Gross Profit for all activities in USD

---

[1] Note: Any additional hires will come out at 1x      salary. In addition, all additional hires shall be approved by the CTO or CEO.