Mitchell P. Hurley
Dean L. Chapman Jr.
Michael Chen
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1001

*Special Litigation Counsel for Debtors and*
*Plaintiffs Celsius Network Limited and Celsius KeyFi LLC*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | Jointly Administered |
| CELSIUS NETWORK LIMITED and CELSIUS KEYFI LLC, | |
| Plaintiffs, | Adversary Proceeding No. 22-01139 (MG) |
| v. | **FIRST AMENDED COMPLAINT** |
| JASON STONE and KEYFI INC., | |
| Defendants. | |

Plaintiffs Celsius Network Limited ("CNL") and Celsius KeyFi LLC ("Celsius KeyFi,"

and together with CNL, "Plaintiffs" or "Celsius") by and through their undersigned counsel, bring

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network, Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey (07030).

this action against Defendants Jason Stone and KeyFi, Inc. ("KeyFi," and together with Stone, "Defendants") and allege as follows:

## NATURE OF THE ACTION

1.     This action arises from the Defendants' incompetence, deceit and conversion, and seeks to require Defendants to turn over valuable property they stole from Celsius (and ultimately from the whole Celsius community), and to pay damages and restitution for the substantial injuries the Defendants have caused through their flagrant breaches of duty.

2.     In 2020, in order to gain access to and control over valuable Celsius' coins, Stone falsely represented himself as a pioneer and expert in coin staking and decentralized finance ("DeFi") investments.   Unfortunately, Defendants Stone and KeyFi, Stone's majority-owned corporate vehicle, proved themselves incapable of deploying coins profitably, and appear to have lost thousands of Celsius' coins through their gross mismanagement.  But the Defendants were not just incompetent, they also were thieves.

3.     Among other things, the Defendants stole millions of dollars in coins from Celsius "wallets"—blockchain addresses where coins and other digital assets can be stored—by transferring them to wallets that, upon information and belief, are controlled by the Defendants. In addition, without any notice to or authorization from Celsius, the Defendants began to use Celsius' coins to buy hundreds of non-fungible tokens ("NFTs"), and then stole the NFTs they acquired with Celsius' coins by sending them to wallets that, upon information and belief, they own or control.  The Defendants also sold some of the purloined assets for seven figure returns (which they pocketed).  Stone and/or KeyFi also appear to have used Celsius' coins to acquire for themselves interests in numerous blockchain-related companies and platforms that they continue wrongfully to hold.

4.      To cover their tracks and hide the ultimate destination of assets taken from Celsius, Stone and KeyFi resorted to Tornado Cash, a "mixer" recently banned by the United States Treasury Department's Office of Foreign Asset Control ("OFAC") because of its frequent use to "launder[] the proceeds of cybercrimes."  Most transactions on the blockchain are transparent.  But when a transfer is made through a mixer like Tornado Cash, its ultimate destination is concealed. As discussed at length herein, upon information and belief, Stone and KeyFi laundered millions of dollars of Celsius property (or its proceeds) through Tornado Cash on dozens of occasions, and continue to hold property (and its proceeds) of great value that rightfully belong to Celsius.

5.      The Defendants' liability to Celsius is staggering.  The coins the Defendants apparently lost through their gross negligence alone are worth many tens of millions of dollars, and the assets that they converted, and the proceeds of those assets, may be worth tens of millions more.  All must be turned over to Celsius' estates for the benefit of Celsius' creditors.  The Defendants also are liable in damages for their repeated acts of conversion, fraudulent misrepresentations, gross negligence, willful and reckless misconduct and other breaches of duty. Finally, the Defendants should be required to pay punitive damages commensurate with their flagrant, and indeed, criminal, misconduct.

## PARTIES

6.      Plaintiff CNL is a private limited company incorporated under the laws of England and Wales with its principal place of business located at The Harley Building, 77-79 New Cavendish Street, London, UK W1W 6XB.

7.      Plaintiff Celsius KeyFi is a Delaware limited liability company.  Celsius KeyFi's sole member is Celsius US Holding LLC, a Delaware limited liability company whose only member is CNL.

8.      Defendant Stone is a citizen of New York.  At relevant times, Stone was the CEO and chief fiduciary of Celsius KeyFi.

9.      Defendant KeyFi is a Delaware corporation that, upon information and belief, has a principal place of business located at 99 John St., #1405, New York, NY 10038.   Upon information and belief, Defendant Stone is the majority owner of Defendant KeyFi.

## JURISDICTION AND VENUE

10.      The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of the United States District Court for the Southern District of New York (the "Southern District of New York") referring to the Bankruptcy Judges of the Southern District of New York all cases and proceedings arising under title 11 of the United States Code (the "Bankruptcy Code").   Federal subject matter jurisdiction also exists under 28 U.S.C. § 1332(a) based on complete diversity of citizenship of the parties and because the amount in controversy, exclusive of interest and costs, exceeds $75,000, and under 28 U.S.C. § 1331.

11.      This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A).  In the event that this or any other appropriate Court finds any part of this adversary proceeding to be "non-core," Plaintiffs consent to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

12.      Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases commenced under the Bankruptcy Code, and pursuant to 28 U.S.C. § 1391 because all defendants are residents of New York state.   Furthermore, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## BACKGROUND

**A.    Celsius' Business, Staking, and DeFi**

13.    Celsius is one of the largest cryptocurrency based finance platforms in the world and provides financial services to institutional, corporate and retail clients across more than 100 countries.  Celsius was founded in 2017 to be one of the first crypto platforms that would allow users to transfer their digital assets and (a) earn rewards on such assets and/or (b) take loans using those transferred assets as collateral.  The rewards offered by Celsius vary by the type and amount of crypto asset transferred to the Celsius platform.  By March 2021, crypto assets then valued at more than $10 billion had been transferred onto the Celsius platform by users.

14.    The Celsius business model is centered on deploying digital assets to generate income for Celsius and its operations and growth.  Among other things, Celsius made loans of fiat currency and "stablecoins"—crypto currency pegged to fiat currencies like the U.S. dollar (USD)—to third-party retail borrowers, but only if the borrower posted collateral in the form of cryptocurrency worth multiples of the amount loaned.  In or around late 2019 and early 2020, Celsius began to consider additional revenue generating investment strategies, such as staking and DeFi activities.  These strategies are briefly explained below.

15.    Staking refers to providing cryptocurrency coins, like ETH, to a third-party platform for the purpose of earning revenue, usually in the form of a coin.  Staking does not involve trading one form of cryptocurrency for another, or otherwise speculating in cryptocurrency assets. The principal, staked coins are not exchanged for other forms of currency.  While the staked coins may in some cases be subject to an agreed lockup period, the original staking party has the right to have the ETH or other coins it staked at the platform returned.

16.     DeFi generally refers to certain activities on a blockchain designed to provide financial services like borrowing, lending and market-making without an institutional intermediary, often utilizing so-called "smart contracts."  Smart contracts essentially are programs stored on a blockchain that run when predetermined conditions are met.  Smart contracts can be used to automate the execution of an agreement so that the outcome is certain, without any intermediary's involvement.

**B.     The Parties Agree Stone Will Provide Staking and DeFi Services**

17.     Alex Mashinsky and Nuke Goldstein, two of the founders of Celsius, were introduced to Jason Stone in early 2019.  At the time, Stone had a company called Battlestar Capital that focused on coin staking in which Mashinsky was an investor. Later, certain Battlestar assets were transferred to KeyFi, with Battlestar investors, including Mashinsky, receiving KeyFi equity in exchange. Around that time, Celsius and Goldstein each made an equity investment in KeyFi. Through KeyFi, Stone claimed to have expanded his focus to encompass DeFi as well as staking activities.  When Celsius began to explore deploying Celsius' coins in staking and DeFi strategies in 2020, based on Stone's representations and the diligence undertaken by Mashinsky and Goldstein, Celsius believed Stone's claims that the Defendants were qualified to lead the effort.

18.     By August 2020, Celsius and Stone agreed in principle that Celsius would set up a wholly owned subsidiary to acquire the assets of KeyFi and operate Celsius' staking and DeFi activities, with Stone as CEO of that subsidiary.  Celsius and Stone discussed the primary terms of the transaction and prepared a draft Asset Purchase Agreement ("APA"), which they exchanged in August.  Anticipating that closing on the transaction would take some time, the parties agreed that Celsius would permit Defendants to begin to deploy Celsius' coins on Celsius' behalf while the parties sought to finalize the acquisition.

19.     In connection with deploying Celsius' coins, Stone was required to meet with Celsius' founder, CFO and risk management teams on a weekly or twice-weekly basis concerning Defendants' proposed activities.  The Defendants were not permitted to deploy coins to any activities other than staking and DeFi, and were not permitted to deploy to any particular proposed staking or DeFi platforms or other investments without first obtaining Celsius' consent.  On that basis, and subject to Stone's express assurance that he would hedge against any risk from price movements in the coins he deployed, Celsius from time to time funded coins into certain wallets accessible to Stone.

20.     For example, on or around August 19, 2020, Celsius created a digital wallet with the address 0xb1adceddb2941033a090dd166a462fe1c2029484 (the "0xb1" wallet) and transferred 1 ETH to the 0xb1 wallet.  Celsius provided to Defendants the private keys to the 0xb1 wallet and certain other Celsius-created wallets (together with the 0xb1 wallet, the "Wallets") to permit Defendants to deploy Celsius' coins solely in DeFi and staking activities expressly authorized in advance by Celsius.  The private key to a digital wallet is similar to a password for a conventional bank account, but the private key can never be changed.  Once a party has the private key, he, she or it will be able to access the associated wallet permanently.

21.     On October 1, 2020, Plaintiff CNL and Defendant KeyFi signed a non-binding memorandum of understanding ("MOU") concerning deployment of Celsius' coins that also anticipated an APA.  On October 7, 2020, the same parties entered into a services agreement pursuant to which KeyFi agreed to "provide its expertise to Celsius for all things pertaining to DeFi and Staking Services."  The APA ultimately closed several months later.  Plaintiff Celsius KeyFi was formed pursuant to a limited liability company agreement signed on or around January 11, 2021 (the "LLC Agreement") between Defendant Stone, Celsius US Holdings LLC and Celsius

KeyFi.[2]  Defendant KeyFi, Plaintiff CNL and Plaintiff Celsius KeyFi also signed the APA and services agreement, both dated December 31, 2020 but signed on January 11, 2021 ("Services Agreement").  Pursuant to the APA and Services Agreement, Defendant Stone was to continue deploying Celsius' coins as CEO of Celsius KeyFi to the extent authorized in advance by Celsius.

## C.    Celsius Demands Return of All of Its Coins; Defendants Promise Repeatedly To Do So, But Leave a Substantial Gap

22.    It did not take long before Celsius lost confidence in Defendants and demanded the return of Celsius' coins.  During the fall of 2020, Stone and Celsius personnel, including Alex Mashinsky, held meetings on an approximately weekly basis to discuss Stone's deployment of Celsius' coins.  At these meetings Stone repeatedly and consistently stated that the Defendants' deployments of Celsius' coins for authorized staking and DeFi activities were profitable.

23.    Given the tens of thousands of transactions deployed each day and the anonymity of users associated with particular wallets, it was practically impossible for Celsius to monitor the Defendants' activities without their cooperation. To bridge the gap between Stone's weekly reports of profitability and the lack of financial information provided by the Defendants, Defendants agreed to build a so-called "wormhole" program that would offer transparency into the Defendants' activities. Throughout the fall of 2020, Stone promised that his team was designing and would soon deliver the "wormhole" program that would automatically track the Defendants' deployments to provide greater transparency to Celsius concerning the Defendants' activities, but he did not deliver on his promise.

24.    In early 2021, troubled by Defendants' reporting failures and other issues, Celsius instructed Defendants to return the coins Celsius had made available for deployment, including to ensure the coins were accounted for and subject to improved security measures.  The Defendants

---

[2] Defendant Stone was removed as a member of Celsius KeyFi by amendment dated June 14, 2022.

agreed, and Stone and his affiliates prepared a written plan for unwinding positions Defendants had taken and swiftly returning Celsius' coins.  But Defendants did not execute on the plan, and by March 24, 2021, Defendants had not returned the coins in their control as promised.

25.     Accordingly, on March 26, 2021, Celsius KeyFi's board convened and issued formal, written board resolutions commanding Stone, as CEO of Celsius KeyFi, to return all Celsius' coins to the 0xb1 wallet.  The board resolutions were unequivocal in directing Stone:

> to immediately . . . unwind all deployed Crypto Assets and transfer them, along with all un-deployed Crypto Assets, in each case together with all interest thereon, to the [0xb1 wallet and] . . . to provide the seed and password for the [0xb1 wallet to Celsius and] . . . disclose . . . all codes, keys and other information concerning access and control of any wallet in which Crypto Assets belonging to Celsius are, have been, or may be held, or that were opened or used for the purpose of or in connection with any Company affairs, including without limitation, holding or deploying any Crypto Assets.

26.     The board provided a copy of the resolutions and a direction letter to Defendants on March 26, 2021.  Stone again responded by promising that Defendants could, and would, follow Celsius' instruction promptly.  For example, after receiving the board resolutions on March 26, 2021, Stone emailed Celsius to advise that "the KeyFi team is hard at work" and would ensure the "***complete return of all Celsius tokens (principal + interest earned) managed by KeyFi by the end of April at the latest.***"

27.     Although Stone would later (much later) invent a claim that Celsius somehow owes Defendants money, in his March 26, 2021 email, Stone promised Defendants would return not just Celsius' coins with interest, but also "***Celsius due profit share***."  Similarly, in a March 27, 2021 WhatsApp exchange, a Celsius employee urged Stone to carry out "the asset transfer process in a transparent way and in sync.  Let's complete this positively, respectfully and strong."  Stone quickly replied: "that was always the plan . . . ***I promise you. . . . We can be finished returning 100% of the coins ++ interest and profits sometime between 4/20-4/31.***"

28.     Celsius succeeded in recovering the majority of its coins from Stone voluntarily, over a period of weeks, but a substantial gap remained.  Nevertheless, encouraged by the return of most of its coins, and laser-focused on recovering the balance for the benefit of its customers, Celsius continued to press Stone to provide an accounting of all his activities with Celsius' coins, voluntarily unwind positions and return control of all coins to Celsius, and Stone continued to promise he could and would do so.

**D.      Defendants Lose or Steal Thousands of Celsius' Coins**

29.     As Celsius only later would learn, Stone's repeated assurances that he could, and would, return *all* of Celsius' coins (plus "profits" due to Celsius) were lies designed to conceal the fact that he either had lost or stolen a substantial number of coins.

30.     As a preliminary matter, the Defendants turned out to be extraordinarily inept at the investment strategies they were undertaking.  For example, Stone apparently placed a significant sum of Celsius ETH deposits into DeFi investments like automatic market makers ("AMMs") that are likely to return a mix of coins different than the mix deposited.  For example, if the price of ETH increases during the deployment, the AMM smart contract likely will return to the investor fewer ETH than the investor deployed.  As noted, the Defendants promised Celsius that they would hedge against such risks and that their deployments would be "delta neutral."  For instance, in an email on August 18, 2020, from Stone to Alex Mashinsky and other Celsius personnel, Stone reassured the Celsius personnel that Defendants would not "open ourselves up to impermanent loss" in connection with investing Celsius' coins.  Later, on January 28, 2021, Stone told Patrick Holert, then the Financial Risk Officer at Celsius, that the Defendants were using a platform called dYdX to hedge. Without the promised "wormhole" program, it was practically impossible for anyone other than the Defendants to hedge and prevent impermanent loss.

31.     Apparently, however, Stone and KeyFi failed to hedge against these and other risks created by their deployments.  As a result, Celsius was exposed to swings in prices of the coins deployed by Defendants in certain kinds of investments.  If the Defendants are to be believed, their incompetence resulted in a loss of thousands of Celsius ETH and other coins as a result of the Defendants' failure to guard against the movement of coin prices, which were dramatic during the relevant period. However, Celsius cannot rule out the possibility that the missing coins simply were stolen in light of Defendants' record of theft and deceit (discussed below and elsewhere in this complaint), and their refusal to provide an accounting of their activities.

32.     Indeed, it is now clear that Stone and KeyFi stole substantial assets from Celsius. Perhaps recognizing that he lacked the knowledge and skill necessary to succeed at the investment strategies for which he had been authorized, Stone went rogue and began to speculate wildly in the NFT market.  At the time, the third-party blockchain application Celsius used to view its Wallets was only able to show fungible coins native to the relevant blockchain (e.g., BTC and ETH) and so-called ERC-20, fungible tokens issued on the Ethereum blockchain, not NFTs. Aware that transfers of NFTs in and out of the Wallets would not be visible to Celsius through the operative dashboards, and despite his agreement to engage only in staking and DeFi investments, Stone began to buy hundreds of NFTs with Celsius' coins.

33.     On February 1, 2021, for example, Stone used assets from the 0xb1 wallet to buy a series of NFTs called "Cryptopunks"—8 bit images of cartoon figures supposedly inspired by the London punk music scene—eventually buying a dozen or more Cryptopunks with more than 600 Celsius ETH.   Later, on February 19, 2021, Stone transferred 300 Celsius ETH to 0x1cEb38874B44E2B3a87B2d1204BC2b989529Ed14, an external wallet that, on information and belief, Stone owns or controls (the "0x1c" wallet).  On the same day, the 0x1c wallet purchased

dozens of NFTs, including "Bullrun Babes." Bullrun Babes have been described as "digital collectibles that showcase female characters based on popular products or people within the blockchain space." On February 27, 2021, Stone transferred another 150 ETH from the Celsius 0xb1 wallet to his 0x1c wallet, and that wallet purchased additional NFTs and otherwise transferred ETH originating in the Celsius 0xb1 wallet to addresses not associated with Celsius. Using Celsius' coins, Stone bought hundreds of NFTs in addition to the Cryptopunks and Bullrun Babes as well.

34.     Stone knew he was not authorized to convert Celsius' coins into NFTs. Certainly, Stone knew he was not allowed to steal from Celsius, but that is exactly what he did. For example, by March 6, 2021, Stone began secreting large numbers of NFTs out of Celsius' 0xb1 wallet and to a wallet with the address 0x50dd57f50a17d57304e7a4f262da30beb31c2e87 (the "0x50dd" wallet) which, upon information and belief, is controlled by Stone and/or KeyFi. On March 9, 2021, Stone emailed Celsius that he planned to start his own investment management company, which he said he had named "0x Management." Stone assured Celsius, however, that Celsius could continue "to depend on us," and that "we do not take our responsibilities to Celsius lightly."

35.     The very next day, however, on March 10, 2021, Stone used the private keys for the Celsius 0xb1 wallet to steal 20 Celsius ETH by transferring it to Stone's 0x50dd wallet. On March 16, 2021—seven days after assuring Celsius that it could "depend on us" and that "we do not take our responsibilities to Celsius lightly"—Stone began transferring the NFTs he had purchased with Celsius ETH to his 0x50dd wallet, including a number of Cryptopunks. Stone proceeded to funnel two more Cryptopunks through 0x50dd to yet another wallet that, upon information and belief, is owned or controlled by Defendants or their associates. The stolen NFTs had substantial value at the time they were misappropriated by Stone. For example, on or around

August 5, 2021, Stone sold crypto punk 8472, one of the punks he bought with Celsius ETH and then transferred from the 0xb1 wallet to the 0x50dd wallet, for 700 ETH, which was equal to more than $1.7 million at the time.  Stone sold three additional punks transferred from the 0xb1 wallet to the 0x50dd wallet for a total of 371 ETH, or about $1.03 million at then-prevailing exchange rates.

36.    In or around March 23, 2021, again without authorization from or notice to Celsius, upon information and belief, Stone used Celsius assets to acquire interests in a company called "Nifty's" by investing in a "pre-seed" round.  According to reports, Nifty's is an NFT-focused social media platform bringing together "premium publishers, brands and creators with collectors, curators and the communities of fans that will emerge around them."  Upon information and belief, Stone also used Celsius property directly or indirectly to acquire interests in other companies, platforms and ventures.  Any such interests rightfully belong, and must be turned over, to Celsius.

## G.    Stone Uses Money Laundering App to Mask Destinations of Transfers

37.    Stone also began regularly to use a notorious money laundering application called Tornado Cash to obfuscate the origin, destination and counterparties to his transfers.  Tornado Cash is a privacy protocol "mixer" that masks the path of ETH that is transferred from a sender to a receiver on the blockchain.  Among other things, a user can deposit ETH to Tornado Cash and then withdraw the ETH through a wallet with a different public key, or address, thus obscuring the final destination of the transaction on the blockchain.  On August 8, 2022, the U.S. Department of Treasury announced that OFAC has placed Tornado Cash on its SDN List, and that "all transactions by U.S. persons or within (or transiting) the United States" with Tornado Cash are prohibited.  According to Treasury, this severe sanction was warranted because Tornado Cash is "commonly used by illicit actors to launder funds, especially those stolen during significant heists."

38.     That is just how Stone used Tornado cash here.  For example, on May 23, 2021, after Celsius property worth millions was transferred to the 0x50dd wallet (and other wallets belonging to or controlled by Stone), 100 ETH was transferred to Tornado Cash from the 0x50dd wallet.  On the same day, another transfer of 100 ETH was made to Tornado Cash from another wallet that, upon information and belief, is owned or controlled by Stone, with that same wallet transferring 100 ETH again to Tornado Cash on May 25, 2021.[3]  Also on May 25, 2021, transfers totaling 20 ETH were made from 0x50dd to Tornado Cash.  Upon information and belief, the Tornado Cash transfers were of property belonging to Celsius, or the proceeds of such property, and were directed to wallets under Stone's control

39.     In perhaps his most brazen theft from Celsius, in September 2021, Stone accessed Celsius' 0xb1 wallet, stole coins worth $1.4 million, and then funneled them through Tornado Cash.  As noted, the private key for a wallet can never be changed, so once a party has that key, it has access to the wallet permanently.  Hence, after Stone's departure from Celsius became effective in the spring of 2021, Celsius sought to transfer all assets it recognized as valuable out of the Wallets.  But in September 2021, an airdrop related to a Stone deployment of Celsius' coins in November of 2020 was made into the 0xb1 wallet of 1.4 million DAI, a stablecoin pegged to the value of the U.S. dollar.  The airdrop was made without notice to Celsius but apparently had been anticipated by Stone.

40.     On September 21, 2021, upon information and belief, Stone accessed the 0xb1 wallet and transferred the $1.4 million worth of DAI to a wallet with the public key 0x8cc24e59e29a0f9b46f1746b392eaf2483d75096 (the "0x8cc" wallet).  On the same day, in three transactions, the 0x8cc wallet converted the stolen DAI into 486 ETH, an amount of ETH which

---

[3] The public key for that wallet is 0xfc2a616d48a8681250aaaf590404e20812e96cfa.

14

was then worth approximately $1.4 million.  Then, in seventeen separate transfers beginning on September 22, 2021, and concluding on October 12, 2021, the 0x8cc wallet transferred a total of 485 ETH to the money laundering application Tornado Cash.  Upon information and belief, Stone stole the $1.4 million on September 21, 2021, and transferred it to wallets he owns or controls using Tornado Cash.

**H.      On His Third Set of Lawyers, Stone Cooks Up Frivolous Claims Against Celsius**

41.     As discussed above, Stone had long promised that he would return all of Celsius' coins.  But Stone later changed his tune.  After two other sets of lawyers had been hired and fired (or quit) in connection with his dispute with Celsius, on September 1, 2021, Stone's third set of lawyers delivered to Celsius a draft complaint.  In the draft, Stone claimed it was actually Celsius that owes coins to Stone, not the other way around, disclosing for the first time that Stone had failed to keep his DeFi investments delta neutral as he had promised.  Absurdly, and without citing a shred of evidence, Stone claimed that Celsius had agreed to shadow his activities, guess at the risks created by those activities (risks and activities that Stone did not report to Celsius), and then unilaterally hedge against them.  According to Stone, had Celsius done so, his substantial losses would have turned into profits, and Celsius must share those phantom returns with Stone.  Stone's fantastical (and new) interpretation of the parties' agreements could not survive scrutiny in any circumstances, and certainly not against the backdrop of his prior admissions, and his documented, and in some cases criminal, misconduct.

42.     Notably, Stone did not immediately file his complaint.  Instead, he asked Celsius to enter into a tolling and standstill agreement, and to engage in mediation, in an effort to reach a settlement.  Still focused on negotiating a return of its property, and unaware of Stone's most egregious misconduct, Celsius agreed.  The tolling and standstill agreement was renewed and extended multiple times and remained in place until shortly before Celsius filed for bankruptcy.

Celsius cannot disclose the details of its confidential mediation with Stone, which began in December 2021, nor the parties' settlement discussions that continued until shortly before Celsius filed for bankruptcy.  Celsius believed, however, that it was near a resolution that would have been satisfactory under the circumstances.  Ultimately, however, the parties did not reach agreement.

43.     Presumably anticipating Celsius' bankruptcy, and hoping to score a public relations victory before his extraordinary misconduct could be exposed, Stone caused KeyFi to file a version of the draft complaint on July 7, 2022.  Simultaneously, Stone posted on Twitter a link to the complaint, along with a "thread" repeating many of the false claims contained in the complaint. As Stone clearly intended, the complaint and Twitter thread generated sensational media reports amplifying his false narrative.  But the story spun by KeyFi in its complaint and by Stone on Twitter is a fantasy.  In reality, and as Celsius can readily prove, Defendants are liable to Celsius in staggering sums based on their incompetence, conversion, false representations and other breaches of duty.

## FIRST CAUSE OF ACTION
### (Turnover Against Both Defendants)

44.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 43 as if fully set forth herein.

45.     At all times, Celsius had legal ownership and right to possession over the 0xb1 wallet and all other Wallets, and over all of the digital assets transferred to and/or stored in those Wallets, and all of the proceeds, rents or profits thereof, including without limitation, all coins transferred by Celsius to the Wallets, and all property acquired, directly or indirectly, using such coins or the proceeds, rents or profits thereof, and all such coins and property transferred by Defendants to their control (collectively, the "Subject Property").

46.     Despite due and repeated demands by Celsius for return of the Subject Property, Defendants have not turned over a subset of the Subject Property (the "Withheld Property").  Upon information and belief, Defendants had possession, custody or control of the Withheld Property or its proceeds at the time Celsius filed its chapter 11 petition on July 14, 2022, and continue to have possession, custody and control of the Withheld Property or its proceeds currently.

47.     The Withheld Property is property that the Debtor could use, sell, or lease under section 363 of the Bankruptcy Code, and is not of inconsequential value or benefit to the Debtors' estates.  On the contrary, the Withheld Property is worth tens of millions of dollars, at least.

48.     Pursuant to section 542 of the Bankruptcy Code, Defendants should be directed to turn over the Withheld Property, and all proceeds, rents or profits thereof, or the value thereof, with interest, to the Debtors.

49.     It is possible that certain Subject Property may come into the Defendants' possession, custody or control in the future, including, without limitation, as the result of automated smart contract transfers associated with deployments of Subject Property.  Celsius therefore requests that the turnover judgment be continuing in nature, requiring the turnover of any such Subject Property that may come into the Defendants' possession, custody or control in the future.

## SECOND CAUSE OF ACTION
### (Conversion Against Both Defendants)

50.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 49 as if fully set forth herein.

51.     At all times, Celsius had legal ownership and right to possession over the 0xb1 wallet and all other Wallets, and over all of the digital assets transferred to or stored in those Wallets, including the coins that Celsius transferred into the Wallets for deployment by

Defendants, as well as any property of any kind acquired, directly or indirectly, with such assets or the proceeds of such assets.

52.     Defendants' actions of, among other things, knowingly and wrongfully (i) disposing of those assets in a manner not authorized by Celsius, (ii) converting Celsius' assets into other forms of property, including NFTs and interests in other blockchain related companies and platforms, (iii) transferring Celsius assets (including Celsius' coins and assets acquired with Celsius' coins or their proceeds) to wallets controlled by Defendants and/or other non-Celsius persons or entities, (iv) selling Celsius assets (including Celsius assets acquired with Celsius' coins or their proceeds) and (v) refusing to cause the return of Celsius assets (including Celsius' coins and assets acquired with Celsius' coins or their proceeds) as required resulted in Defendants wrongfully exercising dominion and control over Celsius' assets contrary to Celsius' express instructions and has interfered with Celsius' right of possession of those assets.

53.     Defendants also knowingly and wrongfully exercised dominion and control over Celsius' assets (including Celsius' coins and assets acquired with Celsius' coins or their proceeds) and interfered with Celsius' right of possession of those assets by refusing to follow lawful instructions concerning Celsius assets.  For example, in April 2021, concerned that the price of ETH would soon rally, and with a substantial portion of the ETH supplied to Stone by Celsius still unaccounted for, Celsius instructed Stone to use other Celsius' coins in Stone's possession to purchase ETH.  On April 10, 2021, Celsius sent Stone an email stating that "we see you hold on behalf of Celsius a position of 50,163,723 USDC . . . [and w]e instruct you to immediately purchase with it ETH via OTC markets to close a portion of your shortfall of ETH."

54.     Celsius emphasized in the email that it would "hold [Stone] personally responsible and liable for any and all losses that may be incurred by Celsius in connection with

any . . . failure . . . to comply with the foregoing instructions, including resulting from anticipated volatility in ETH associated with the upcoming Coinbase IPO listing and general market momentum." Stone flouted Celsius' instructions, and Celsius' prediction regarding ETH price appreciation came true. On April 10, 2021, the price for ETH was $2,134.03. One month later, ETH had rallied to $3,928, and soon reached a high of nearly $4,900.

55.     Defendants' repeated and ongoing interference with Celsius' property, their efforts to conceal Celsius' assets and frustrate any attempts to recover them, and positive acts of conversion they have taken, including in the unlawful disposition of Celsius property, have resulted in damages to Celsius in an amount to be proven at trial.

56.     The Court should order a constructive trust compelling Defendants to disgorge to Plaintiffs all assets Defendants unjustly retained that should have been paid or returned to the Plaintiffs and all unlawful and inequitable proceeds Defendants obtained on account of such assets.

### THIRD CAUSE OF ACTION
### (Fraudulent Misrepresentation Against Both Defendants)

57.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 56 as if fully set forth herein.

58.     Defendants had a duty to use reasonable care not to conceal material information from Celsius and Celsius KeyFi, and instead to provide correct information concerning, among other things, how Defendants were deploying Celsius' coins.

59.     In breach of their duty, among other things, Defendants concealed their actual activities from Celsius to induce Celsius to supply coins to Defendants, enter into agreements and forbear from recalling coins already supplied. Defendants repeatedly claimed that they were using Celsius' coins for staking and DeFi activities only, that Defendants had employed appropriate hedges to protect Celsius' coins from price-based losses, and that on a net basis Defendants'

staking and DeFi activities were profitable. Plaintiffs reasonably relied on Defendants' representations in supplying coins to Defendants and in failing to recall coins already supplied. In reality, Defendants apparently had not hedged their investments appropriately, were losing (and stealing) Celsius' coins, and were engaged in activities never authorized by Celsius.

60.     Defendants continued to lie to Celsius after Celsius demanded that Defendants return all Celsius property in early 2021. In an effort to cause Celsius to forbear from taking additional action against them, Defendants falsely claimed that they were following Celsius' instructions, including by unwinding staking and DeFi positions in order to return to Celsius all of the coins Celsius had supplied to Defendants "++interest and profits." In fact, Defendants were not seeking to unwind and return all Celsius assets, but instead were using Celsius property to acquire NFTs, fund unauthorized wallets and for other unauthorized purposes, including by acquiring equity and other interests for themselves using Celsius' stolen property.

61.     As a result of Defendants' misrepresentations, Celsius has lost tens of millions of dollars or more. Defendants' actions were intentional, willful, in bad faith, and made with actual malice. By reason of the foregoing, Celsius and Celsius KeyFi are entitled to damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty Against Stone)

62.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 61 as if fully set forth herein.

63.     At relevant times, Stone owed fiduciary duties of care and good faith to Celsius, including based on his role as CEO and chief fiduciary of Celsius KeyFi.

64.     Stone breached his fiduciary duties by, among other things (i) in bad faith coopting and converting Celsius' coins for purposes outside those authorized by Celsius—including the

purchase of NFTs and other property, (ii) ignoring lawful directions from Celsius and Celsius KeyFi, (iii) intentionally and repeatedly misrepresenting material facts to Celsius and (iv) engaging in staking and DeFi activities using Celsius-owned coins in a grossly negligent manner, including by failing to hedge against the risk of loss in connection with AMM liquidity pools and other deployments, and failing to take action to protect Celsius assets posted as collateral for Stone-initiated loans.

65.     Stone's breaches of fiduciary duty include his failure to notify Celsius of a substantial loss in February 2021.  Stone apparently had borrowed a substantial amount of stable coins using Celsius-owned ETH as collateral.  On February 23, 2021, after a sharp fall in the price of ETH, the smart contract to which the loan was subject liquidated thousands of Celsius ETH worth tens of millions of dollars.  Unlike a prior liquidation event in November 2020, Stone did not provide notice to Celsius about the February 23 liquidation, effectively leaving Celsius with a nearly 30,000 ETH short position of which it had no notice.  Celsius also suffered a substantial liquidation penalty.

66.     Stone's breaches of fiduciary were intentional, willful, and committed in bad faith, and have caused direct injury to Celsius and Celsius KeyFi.  By reason of the foregoing, Celsius and Celsius KeyFi have been damaged in an amount to be proven at trial.

67.     Plaintiffs are entitled to the remedy of a constructive trust in view of Stone's breach of fiduciary duties, as referenced herein. The Court should order a constructive trust compelling Defendants to disgorge to Plaintiffs all assets Defendants unjustly retained that should have been

paid or returned to the Plaintiffs and all unlawful and inequitable proceeds Defendants obtained on account of such assets.

### FIFTH CAUSE OF ACTION
**(Unjust Enrichment Against Stone)**

68.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 67 as if fully set forth herein.

69.     Stone wrongfully used property owned by Celsius, and the proceeds of such property, for unauthorized purposes and for his own illicit gain.  Among other things, Stone unjustly enriched himself by using Celsius property and its proceeds to acquire NFTs without authorization, transferred such NFTs and other Celsius property away from Celsius, and used Celsius property and its proceeds to develop what Stone sometimes refers to as an "investment company," and, upon information and belief, to acquire other interests, investments, businesses and property, including interests in Nifty's, the FODL platform and numerous other assets, companies, platforms and businesses.

70.     Stone has been unjustly enriched at Celsius' expense, as described herein.

71.     Equity and good conscience militates against permitting Stone to retain such interests, all of which must be disgorged and returned to Celsius.

72.     Accordingly, Celsius is entitled to disgorgement and restitution in an amount to be proven at trial.

73.     Plaintiffs have no adequate remedy at law for many of Stone's misappropriated gains. The Court should order a constructive trust compelling Defendants to disgorge to Plaintiffs all assets Defendants unjustly retained that should have been paid or returned to the Plaintiffs and all unlawful and inequitable proceeds Defendants obtained on account of such assets.

## SIXTH CAUSE OF ACTION
### (Replevin Against Both Defendants)

74.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 73 as if fully set forth herein.

75.    At all times, Celsius had legal ownership and right to possession over the Subject Property, as explicitly stated in the Services Agreement, and the Defendants were permitted to deploy Celsius' coins for authorized staking, staking plus, and DeFi activities only.

76.    Nevertheless, the Defendants, unbeknownst to Plaintiffs at the time, mismanaged, misappropriated, and stole substantial assets from Celsius, including Defendants' unauthorized conversion of Celsius' coins into NFTs.  Defendants continue to hold and control all such Withheld Property.

77.    The Defendants have no right to possession of the Withheld Property or its proceeds.

78.    As the rightful owners, Plaintiffs are entitled to immediate possession of the Withheld Property and its proceeds.

79.    Plaintiffs made repeated demands to the Defendants for the return of Celsius' coins made available for deployment, interest owed, and Celsius' due profit. Despite repeated promises to return Celsius' coins, with the interests and profits owed, the Defendants did not return the Withheld Property.

80.    The Defendants are therefore in unlawful and wrongful possession of Plaintiffs' property.

81.    By reason of the foregoing, Celsius has a possessory right in the Withheld Property that is superior to the Defendants' interest, and is entitled to replevin of the Withheld Property or its proceeds.

82.     The Court should order a constructive trust compelling Defendants to disgorge to Plaintiffs all assets Defendants unjustly retained that should have been paid or returned to the Plaintiffs and all unlawful and inequitable proceeds Defendants obtained on account of such assets.

### SEVENTH CAUSE OF ACTION
**(Accounting Against Stone)**

83.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 82 as if fully set forth herein.

84.     At relevant times, Stone owed fiduciary duties of care and good faith to Celsius, including based on his role as CEO and chief fiduciary of Celsius KeyFi.

85.     Pursuant to those duties, Stone, in his role as CEO and chief fiduciary of Celsius KeyFi, was entrusted with Celsius' coins to be managed, deployed and returned as authorized in the Services Agreement.

86.      Accordingly, Stone is obligated to provide a complete accounting to Celsius of all coins Celsius provided to the Defendants at any time, of the proceeds of any such coins, and of all activities in which the Defendants engaged in connection with their possession and control of such coins and proceeds.

87.     Plaintiffs have no adequate remedy at law in lieu of an accounting due to the unique and non-fungible nature of certain of the assets Stone managed and deployed and/or the assets or interests Stone purchased with Celsius' coins or the proceeds of Celsius' coins, the complexity of the trading strategies Stone employed, and Stone's use of cryptocurrency mixers like Tornado Cash to mask his transactions and the ultimate destination of Celsius' coins or the proceeds of Celsius' coins.

88.     The Defendants have failed and refused to provide an accounting, despite repeated demands by Celsius, and should be required to do so without further delay.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request as follows:

(a)     Judgment in favor of Plaintiffs and against Defendants;

(b)     Directing Defendants to turn over the Withheld Property to the Debtors, and any other Subject Property that may come into the Defendants' possession, custody or control in the future;

(c)     Awarding Plaintiffs actual damages in an amount to be determined at trial;

(d)     Awarding Plaintiffs punitive damages against Defendants for their tortious, willful and malicious conduct;

(e)     Awarding Plaintiffs pre- and post-judgment interest at the maximum amount permitted by law;

(f)     Imposing a constructive trust upon all Withheld Property or its proceeds in favor of Plaintiffs to remedy Stone's breaches of fiduciary duties and otherwise wrongful conduct, resulting in his unjust enrichment;

(g)     Awarding Plaintiffs disgorgement from Defendants of any and all proceeds and profits generated from Plaintiffs' property;

(h)     Requiring the Defendants to provide an accounting; and

(i)     Awarding such other and further relief as this Court deems just and proper.


Dated:          October 13, 2022
                New York, New York


                                AKIN GUMP STRAUSS HAUER & FELD LLP


                                By:    _/s/ Mitchell P. Hurley_____

25

Mitchell P. Hurley
Dean L. Chapman Jr.
Michael Chen
One Bryant Park
New York, New York 10036
(212) 872-1000

*Special Litigation Counsel
for Debtors and Plaintiffs
Celsius Network Limited and
Celsius KeyFi LLC*