**UNITED STATES BANKRUPTCY COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, et al.,<br><br>Debtor(s). | Bankruptcy Case No. 22-10964-MG<br><br>Adversary Proceeding No. 22-01139-MG<br><br>(Jointly Administered) |
| CELSIUS NETWORK LIMITED and CELSIUS KEYFI LLC,<br><br>Plaintiffs,<br><br>v.<br><br>JASON STONE and KEYFI INC.,<br><br>Defendants. |  |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANTS' MOTION TO DISMISS</u>

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ...................................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................................... 2

    A.    The MOU .......................................................................................................... 2

    B.    The APA and Service Agreement.................................................................... 3

    C.    Gross Mismanagement of Customer Funds .................................................. 4

    D.    Failure to Hedge.............................................................................................. 4

    E.    Stone Resigns................................................................................................... 6

LEGAL STANDARD................................................................................................................. 7

ARGUMENT .............................................................................................................................. 8

    A.    Celsius's Turnover Claim Should Be Dismissed......................................... 8

            1.    Celsius Fails to Make *Any* Allegations against KeyFi.................. 10

            2.    Celsius Improperly Recast This Contract Dispute as a Turnover Action....... 10

            3.    Celsius Fails to Plead the Elements of a Turnover Action ............................ 12

    B.    Celsius Fails to Allege Conversion................................................................ 14

    C.    Celsius Fails to Allege Fraudulent Misrepresentation ............................... 15

    D.    The Existence of a Contract Governing the Parties' Relationship Bars Plaintiffs'
Claim from Unjust Enrichment.................................................................... 17

    E.    The Parties' Contracts Also Bar Plaintiffs' Claim for Replevin.............................. 19

    F.    Accounting Is a Remedy, Not a Standalone Cause of Action. ................................ 19

CONCLUSION......................................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Cases**

*Advanced Oxygen Therapy Inc. v. Orthoserve Inc.*,
   572 F. Supp. 3d 26 (S.D.N.Y. 2021) ................................................................... 15

*Aleem v. Experience Hendrix, L.L.C.*,
   No. 16 CIV 9206(ER), 2017 WL 3105870 (S.D.N.Y. July 20, 2017)..................................... 19

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................. 7

*Bermuda Container Line Ltd. v. Int'l Longshoremen's Ass'n*,
   AFL-CIO, 192 F.3d 250 (2d Cir. 1999)................................................................... 16

*Cambridge Cap. LLC v. Ruby Has LLC*,
   No. 20-CV-11118 (LJL), 2022 WL 2292817 (S.D.N.Y. June 24, 2022) ................................ 16

*Colavito v. N. Y. Organ Donor Network, Inc.*,
   8 N.Y.3d 43 (2006) ................................................................................................. 14

*Deleon v. Charlie Auto Sales, Inc.*,
   110 N.Y.S.3d 899 (N.Y. Civ. Ct. 2018) ................................................................. 19

*Est. of Albin v. Mertz, LLC*,
   No. 05CIV3440KMWKNF, 2006 WL 8461442 (S.D.N.Y. Mar. 15, 2006) ........................... 19

*Fairmount Heights Assocs., L.P. v. Greystone Servicing Corp.*,
   No. 3:06-CV-1206 (WWE), 2008 WL 11481871 (D. Conn. July 14, 2008).......................... 15

*Homefield Ass'n of Yonkers, N.Y., v. Frank*,
   59 N.Y.S.2d 884 (N.Y. App. Div. 1946) ................................................................ 18

*In re Adelphia Commc'ns Corp.*,
   331 B.R. 93 (S.D.N.Y. 2005).................................................................................. 20

*In re All Texas Elec. Contractors, Inc. v. NSPS Metals LLC*,
   No. 20-34656, 2022 WL 162786 (Bankr. S.D. Tex. Jan. 18, 2022) ........................................ 8

*In re Dreier LLP*, 452 B.R. 391 (Bankr. S.D.N.Y. 2011)............................................................. 7

*In re Faasoa*,
   576 B.R. 631 (Bankr. S.D. Cal. 2017); ................................................................. 11

*In re Graves*,
   396 B.R. 70, (10th Cir. B.A.P. 2008), *aff'd as modified*, 609 F.3d 1153 (10th Cir. 2010)......... 9

*In re Minh Vu Hoang*,
    452 B.R. 902 (Bankr. D. Md. 2011), *aff'd*, 469 B.R. 606 (D. Md. 2012) ................................. 9

*In re Pali Holdings, Inc.*,
    488 B.R. 841 (Bankr. S.D.N.Y. 2013) .......................................................................... 8, 13, 14

*In re Seatrain Lines, Inc.*,
    198 B.R. 45 (S.D.N.Y. 1996) ......................................................................................................... 8

*In re Ticketplanet.com*,
    313 B.R. 46 (Bankr. S.D.N.Y. 2004) ..................................................................................... 10

*In re VeraSun Energy Corp.*,
    No. 08-12606 (BLS), 2013 WL 3336870 (Bankr. D. Del. June 28, 2013)............................. 11

*In re Vista Bella, Inc.*,
    No. 11-00149-MAM-7, 2012 WL 3778956 (Bankr. S.D. Ala. Aug. 30, 2012) ...................... 14

*In re Wildlife Ctr., Inc.*,
    102 B.R. 321 (Bankr. E.D.N.Y. 1989) ....................................................................................... 9

*Kantian v. Counts Bank (Switzerland) Ltd.*,
    193 F.3d 85 (2d Cir. 1999) ........................................................................................................ 15

*Kiobel v. Royal Dutch Petroleum Co.*,
    621 F.3d 111 (2d Cir. 2010) ........................................................................................................ 7

*Lee-Walker v. N.Y.C. Dep't of Educ.*,
    220 F. Supp. 3d 484 (S.D.N.Y. 2016), *aff'd*, 712 F. App'x 43 (2d Cir. 2017) ......................... 2

*New Paradigm Software Corp. v. New Era of Networks, Inc.*,
    107 F. Supp. 2d 325 (S.D.N.Y. 2000) ....................................................................................... 18

*PCS Wireless LLC v. A to Z Wireless Sols. Inc.*,
    841 F. Supp. 2d 649 (E.D.N.Y. 2012) ....................................................................................... 14

*Premium Mortg. Corp. v. Equifax, Inc.*,
    583 F.3d 103 (2d Cir. 2009) ....................................................................................................... 17

*Remede Consulting Grp. Inc. v. Hamer*,
    No. 19CV3950NGGVMS, 2021 WL 430898 (E.D.N.Y. Feb. 8, 2021) .................................. 14

*Savage & Assocs., P.C. v. Mandl (In re Teligent Inc.)*,
    325 B.R. 134 (Bankr. S.D.N.Y. 2005) ..................................................................................... 12

*Sea Star Line, LLC v. Emerald Equip. Leasing, Inc.*,
    No. CIV.A.05-245-JJF, 2006 WL 214206 (D. Del. Jan. 26, 2006) ................................... 10, 11

*Solutia Inc. v. FMC Corp.*,
    456 F. Supp. 2d 429 (S.D.N.Y. 2006) ...................................................................... 16

*Tears v. Bos. Sci. Corp.*,
    344 F. Supp. 3d 500 (S.D.N.Y. 2018) ...................................................................... 15

Usov v. Lazar,
    No. 13 Civ. 818 (RWS), 2013 WL 3199652 (S.D.N.Y. June 25, 2013) ................................. 19

*Viable Mktg. Corp. v. Intermark Commc'ns, Inc.*,
    No. 09-CV-1500 JS WDW, 2011 WL 3841417 (E.D.N.Y. Aug. 26, 2011) ........................... 17

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)................................................................................................................ 7

KeyFi Inc. ("KeyFi") and Jason Stone ("Stone," and together with KeyFi, "Defendants") respectfully submit this Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Amended Complaint.

## INTRODUCTION

Celsius seeks to distract from its gross mismanagement strategies by blaming their ex-partners KeyFi and Jason Stone for Celsius' astounding losses of client funds. Seeking to cast their bankruptcy as *anyone* else's fault, they blame KeyFi and Stone for losses of client funds for which Celsius was responsible. Yet, as Celsius knows, KeyFi was first forced to sue Celsius because KeyFi, like the rest of Celsius' customers, was bilked out of funds that Celsius promised to repay. *See* Dkt. 10 ("Celsius AC.") ¶¶ 42-43.

Instead of providing the Court with such context, however, Celsius's Amended Complaint again elides the well-pled allegations of a lawsuit previously filed by KeyFi to have the Court believe that KeyFi and Stone surreptitiously transferred funds on a public blockchain without their knowledge. Celsius in effect alleges that, despite being a *multi-billion-dollar* crypto asset management company, it was unaware of what a partner was doing with over a *billion* dollars of customer assets. KeyFi's lawsuit shows otherwise: those funds were transferred pursuant to the profit-sharing agreement that was an essential component of Celsius' purchase of KeyFi's assets. *See* Complaint, *KeyFi, Inc. v. Celsius Network Ltd. and Celsius KeyFi LLC*, No. 652367/2022 (N.Y. Sup. Ct.) ("KeyFi Compl.") attached as Ex. 1.

Celsius cannot avoid its contractual relationship with KeyFi or otherwise mis-categorize the dispute as simply concerning the debtor's estate. The dispute between Celsius and KeyFi concerns Celsius' obligation to live up to its contractual promises and provide KeyFi with the funds it is owed under the earn-out (and acknowledging that certain funds were already provided to KeyFi over a year ago). This is no "turnover" matter.

For these reasons, and the reasons set forth below, the Court should dismiss the First
(turnover), Second (conversion), Third (fraudulent misrepresentation), Fifth (unjust enrichment),
Sixth (replevin) and Seventh (accounting) causes of action.

## FACTUAL BACKGROUND

### A.    The MOU

In the summer of 2020, Celsius Network Limited ("Celsius") was holding billions of
dollars in customer deposits and was obligated to pay significant interest rates to its customer
base. Given this pressing need for revenue, the potential for profitable investments in DeFi, but
the complexity of deploying such novel and unique strategies, Celsius sought Stone's help to
invest its customer deposits into decentralized finance markets ("DeFi"). *See* KeyFi Compl.[1]
Celsius was well acquainted with Stone and KeyFi because its CEO and CTO were investors in
KeyFi. *Id.* ¶ 36; Celsius AC ¶ 17.  In June 2020, Celsius and KeyFi cut a handshake deal
whereby KeyFi would manage billions of dollars in customer crypto-deposits in return for a
share of the profits. KeyFi began receiving Celsius funds on or around August 19, 2020, and
immediately invested them into DeFi markets. KeyFi Compl. ¶ 38; Celsius AC ¶ 20.

KeyFi's investment strategies were extremely profitable. KeyFi Compl. ¶¶ 46, 65.
Consequently, after just over a month of KeyFi's management, on October 1, 2020, the parties
entered into a Memorandum of Understanding ("MOU"). *Id.* ¶ 46. Under the MOU, KeyFi

---

[1] Celsius' complaint avoids all details regarding either KeyFi's prior action against it or the
contracts that governed the parties relationship, but the KeyFi Complaint and its exhibits provide
essential context. Documents such as the KeyFi Complaint and the agreements it attaches as
exhibits are properly considered in a motion to dismiss. *See Lee-Walker v. N.Y.C. Dep't of Educ.*,
220 F. Supp. 3d 484, 487 (S.D.N.Y. 2016), *aff'd*, 712 F. App'x 43 (2d Cir. 2017) ("When
presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents
that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and
that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or
matters of which judicial notice may be taken."). Indeed, in its pleading, Celsius references the
KeyFi Complaint, APA, and MOU. *See* Celsius AC ¶¶ 21, 41-42.

would continue deploying Celsius' crypto-assets while the parties worked toward reaching two final agreements: an Asset Purchase Agreement ("APA") and a Service Agreement.

According to Celsius' Amended Complaint, "in order to gain access to and control over valuable Celsius coins, Stone falsely represented himself as a pioneer and expert in coin staking and decentralized finance . . . investments." Celsius AC ¶ 2. This allegation strains credibility. As Celsius also alleges, its management—including its CEO Alex Mashinsky and CTO Nuke Goldstein—had invested in a prior Stone business, Battlestar Capital, and had been working with him since March 2019. *Id.* ¶ 17. Accordingly, Celsius' CEO and CTO had been working with Stone for eighteen months before acquiring Stone's DeFi venture, KeyFi. *Id.* ¶¶ 17-18.  The idea that Stone duped Mashinsky is one of the many fantastical and self-serving narratives in the Amended Complaint that simply does not add up.

### B.    The APA and Service Agreement

The APA and Service Agreement were executed on or around January 11, 2021, i.e., seven months after Stone began managing Celsius' funds and three months after signing the MOU. KeyFi Compl. ¶ 57, Exs. A, & B. Under the APA, KeyFi agreed to (i) contribute substantially all of its assets to an SPV wholly owned by Celsius called Celsius KeyFi LLC ("Celsius KeyFi") and (ii) supply the SPV with staffing. *Id.* ¶ 58. Under the Service Agreement, Celsius agreed to transfer to the SPV crypto-assets that KeyFi's personnel would then manage and invest. *Id.*

Importantly, as part of the consideration for the purchase of KeyFi's assets, the APA includes a profit-sharing mechanism for KeyFi, whereby KeyFi would receive 50% of Net Profits of Staking Coins and would receive 20% of Net Profits of Authorized Decentralized Finance Activities. *Id.* ¶ 63 (citing Ex. A, APA Schedule 7.8(b) §§ 3-4). The Net Profits

calculations are to be performed in U.S. dollars ("USD"), which KeyFi estimates to be in the hundreds of millions of dollars. *Id.* ¶ 65.

### C.    Gross Mismanagement of Customer Funds

Celsius admits that it "provided to Defendants the private keys to the 0xb1 wallet and certain other Celsius-created wallets," which, according to Celsius, gave Defendants unrestricted access to customers deposits, without any controls or second signature requirements. Celsius AC ¶ 20. In other words, by Celsius' own admission, Stone could have absconded with billions of dollars of dollars in deposits, never to be seen again—which he did not do.

The fact that Celsius and Mashinsky handed over billions of dollars to Stone, without any controls or second signature requirements, underscores two important facts about this case: First, Celsius and Mashinsky obviously had good reasons to trust Stone, as they essentially handed him over $1 billion of their customer assets without *any* meaningful controls. Second, while Celsius makes unfounded accusations about Stone's supposed lack of competence, the Amended Complaint concedes Celsius' astonishing disregard for security of its customer funds. Luckily for both Celsius and its customers, KeyFi and Stone were responsible stewards of these funds, only ever seeking the compensation to which the parties had agreed.

### D.    Failure to Hedge

As Celsius understood, KeyFi's DeFi investment activities involved trading and investing crypto-assets, sometimes generating different crypto-assets as a return. KeyFi Compl. ¶¶ 56, 63. While this could easily create a USD profit, it could also create a paper loss in the original crypto-asset (a form of opportunity cost called "impermanent loss"). *Id.* ¶¶ 68, 71. As more thoroughly explained in the KeyFi Complaint:

> For example, if Celsius provided KeyFi with 100 ether worth
> $100,000 in total (or $1,000 per token), and KeyFi's investments
> returned a mixture of coins comprised of 50 ether and a mix of other

> coins worth $150,000 in total, it cannot be disputed that that would constitute a profitable investment in USD. If, however, over the same period, ether's price rose to $1,250 per token, and Celsius needed to convert its USD investment into ether, it would have to use some of these USD profits to do so. If ether's price rose even further, it might overtake the profits and require Celsius to use its own funds to purchase the ether. This potential risk, which is a product of Celsius' relationships with its customers and need to return funds to them in the same kind as were deposited, is unaddressed in the parties' agreement and thus remained with Celsius.

*Id.* ¶ 68. Celsius' owners and managers understood the nature of DeFi and the inherent risk of impermanent loss. On May 20, 2021, for example, CEO Alex Mashinsky wrote on Twitter that DeFi "looks easy until you get bitten or understand the impact of impermanent loss and volatility":



When Mashinsky boasted that Celsius was capable of "manag[ing] the rough waters" of DeFi risk and impermanent loss, he meant that Celsius had the ability to hedge against the risk of impermanent loss. Celsius, however, did *not* hedge against the risk of impermanent loss, and now seeks to blame Stone and KeyFi for its own irresponsibility. Celsius AC ¶ 19. As KeyFi has explained, the risk associated with Celsius' need to return specific tokens to its customers "is unaddressed in the parties' agreement and thus remained with Celsius." KeyFi Compl. ¶ 68.

### E.    Stone Resigns

By March 2021, it was clear to Stone and KeyFi that Celsius was lying about having hedging in place, a mistake that could be financially ruinous for Celsius, its consumers, and KeyFi's own reputation. KeyFi Compl. ¶¶ 81, 88. In addition, Celsius had failed to make any formal earnout (that is, profit-sharing) payments due to KeyFi under the Service Agreement, other than allowing KeyFi to take certain small investments as early earn-out payments. *Id.* ¶ 89. Accordingly, on March 9, 2021, Stone informed Celsius that he would not continue to serve as the CEO of Celsius KeyFi. *Id.* ¶ 90.

Section 7.1(b)(i) of the APA provides KeyFi with the right to an audit, as against Celsius KeyFi, as follows:

> Within the later to occur of fourteen (14) calendar days after any payment by Buyer due under this Agreement (the "Obligation"), or thirty (30) calendar days after any such scheduled payment accrued, if Seller is dissatisfied with the payment, or if non payment occurs, Seller may invoke an audit (the "Audit") of Buyer's relevant records using Seller's chosen Auditor, who shall be a nationally-licensed Certified Public Accountant (CPA).

Keyfi Compl., Ex. A. Stone's and KeyFi's trading activities on behalf of Celsius KeyFi generated significant profits. *See* Celsius AC ¶ 27; KeyFi Compl. ¶ 65. Stone and KeyFi have repeatedly conveyed their eagerness for Celsius to engage in this accounting—which is Celsius's contractual duty—so that profits can be divided up. Celsius refused to do so, necessitating Stone's and KeyFi's legal action in New York state court.[2]

---

[2] The Celsius Complaint inexplicably and improperly outlines the parties' failed efforts to settle this dispute without litigation. Celsius AC ¶¶ 41-43. While the parties did attempt to resolve the matter without litigation, their failure does not impugn KeyFi or Stone (although Celsius' attempt to misuse their settlement talks may frustrate the parties' ability to engage in future settlement discussions).

## **LEGAL STANDARD**

Defendants move to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6), which is made applicable to this adversary proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure. Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Dreier LLP*, 452 B.R. 391, 406 (Bankr. S.D.N.Y. 2011) (internal quotations omitted). Courts must use a two-prong approach when considering a motion to dismiss.

"First, the court must accept all factual allegations as true," but only after "discounting legal conclusions clothed in the factual garb." *Id.* at 407 (*citing Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010)). In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court explained that "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. Legal conclusions "must be supported by factual allegations." *Id*. at 679 "[B]are assertions . . . [that are] nothing more than a 'formulaic recitation of the elements' of a . . . claim, . . . are conclusory and not entitled to be assumed true." *Id*. at 681 (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 544-45 (2007)).

Second, the court "must determine if these well-pleaded factual allegations state a 'plausible claim for relief.'" *In re Dreier LLP*, 452 B.R. at 407 (*quoting Iqbal*, 556 U.S. at 679). "Courts do not make plausibility determinations in a vacuum; it is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id*. (*quoting Iqbal*, 556 U.S. at 679). Accordingly, "plausibility" requires "more than a sheer possibility that a defendant has acted unlawfully." *Id*. at 406 (quoting *Iqbal*, 556 U.S. at 678); *see also id*. at 407 ("The pleadings must create the possibility of a right to relief that is more than speculative.").

## ARGUMENT

### A.    Celsius's Turnover Claim Should Be Dismissed

Celsius's turnover claim should be dismissed because it is an inappropriate attempt to

recast a contract dispute concerning the APA into a turnover claim. "It is settled law that the

debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand

assets whose title is in dispute." *In re Seatrain Lines, Inc*., 198 B.R. 45, 50 n. 7 (S.D.N.Y. 1996)

(quotations omitted). "[T]he turnover power can be improperly invoked, especially when it is

used as a Trojan Horse for bringing garden variety contract claims; when the property in

question is not already property of the estate; or when the turnover statute is used to recover

assets with disputed title when the estate's claim of ownership is legitimately debatable." *In re

Pali Holdings, Inc.*, 488 B.R. 841, 852 n.39 (Bankr. S.D.N.Y. 2013).

Celsius fails to specify whether the turnover action is brought under § 542(a) or (b) of the

Bankruptcy Code. The key difference is that § 542(a) relates to an entity in possession while

§ 542(b) relates to an entity that is not in possession but owes an undisputed debt. *In re All Texas

Elec. Contractors, Inc. v. NSPS Metals LLC*, No. 20-34656, 2022 WL 162786, at *5 (Bankr. S.D.

Tex. Jan. 18, 2022). Celsius contends that "at all times" it "had legal ownership and right to

possession over the 0xb1 wallet and all . . . property acquired, directly or indirectly, using such

coins or the proceeds, rents or profits thereof." Celsius AC ¶ 45. In addition, the Amended

Complaint does not attach either the APA or the Service Agreement, which would be the basis

for any contractual debt. Stone and KeyFi take this to mean that Celsius asserts a claim only for

turnover of property under § 542(a), quoted below:[3]

---

[3] To the extent Celsius contends that it seeks turnover under § 542(b), despite the allegations that
it has right, title and ownership of the disputed property, and despite Celsius' lack of reliance on
the APA or the Service Agreement, Defendants move in the alternative for a more definite
statement.

> Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

Under § 542(a), the Trustee may bring an action for turnover of property that was "in the possession, custody, or control of the estate during the case. Property of the estate includes all legal or equitable interests of the debtor in property as of the commencement of the case. § 541(a)(1)." *In re Wildlife Ctr., Inc.,* 102 B.R. 321, 325 (Bankr. E.D.N.Y. 1989) (cleaned up). However, "[t]he Bankruptcy Code does not expand the debtor's interests against others, 'and, if those interests were limited [when the petition was filed], the trustee's rights to possession are similarly limited.'" *In re Graves*, 396 B.R. 70, 75 (10th Cir. B.A.P. 2008), *aff'd as modified*, 609 F.3d 1153 (10th Cir. 2010).

Property is in the estate's possession, custody, or control "during the case" if the property was in the estate's possession, custody or control when the bankruptcy petition was filed or acquired by the estate post-petition, but not where an entity receives and dissipates the debtor's property pre-petition. *See In re Minh Vu Hoang*, 452 B.R. 902, 907 (Bankr. D. Md. 2011), *aff'd*, 469 B.R. 606 (D. Md. 2012). "Where an entity is in possession of debtor's property pre-petition and transfers it pre-petition (i.e., is never in possession 'during the case'), the entity is not in possession of 'property of the estate' but was only in possession of property that would be property of the estate if the case had been filed while the entity was in possession." *Id*. A turnover action therefore cannot be brought to recover "property or the value of such property" that ceased to be property of the debtor prepetition.

1.      Celsius Fails to Make *Any* Allegations against KeyFi

The turnover claim must be dismissed as to KeyFi. Celsius' Amended Complaint

contains only *one* sentence about any alleged estate property potentially held by KeyFi, in

paragraph 34: "Stone proceeded to funnel two more Cryptopunks through 0x50dd to yet another

wallet that, upon information and belief, is owned or controlled by Defendants or their

associates." This specifies neither what Cryptopunk is supposedly controlled by KeyFi nor what

KeyFi wallet is at issue. Celsius' vague allegations are insufficient to state a turnover claim

against KeyFi. *In re Ticketplanet.com*, 313 B.R. 46, 67 (Bankr. S.D.N.Y. 2004) ("The Court is

left to guess as to which property the Trustee specifically seeks, although there is an allegation

the Defendants are improperly holding monies received from the sale of the Debtor's antique

car.").

2.      Celsius Improperly Recast This Contract Dispute as a Turnover Action

"Settled and controlling law holds that the presence of an active dispute over the amount

owed takes the action out of the turnover area; one cannot shortcut a breach of contract action

with a turnover demand." *Sea Star Line, LLC v. Emerald Equip. Leasing, Inc*., No. CIV.A.05-

245-JJF, 2006 WL 214206, at *7 (D. Del. Jan. 26, 2006) (*quoting In re Nat'l Audit Defense

Network*, 332 B.R. 896 (Bankr. D. Nev.2005)).

Shortcutting a breach of contract dispute is exactly what Celsius improperly seeks to do

in this adversary action. On July 7, 2022, after months of failed negotiations, Defendants filed a

lawsuit against Celsius in New York state court asserting claims for breach of contract. Celsius

AC ¶ 43. At the heart of that dispute (and this one) is a question concerning the interpretation of

the earnout clause under the parties' APA. *See* KeyFi Compl. ¶¶ 61-66. Specifically, it is

KeyFi's position that profit under the APA was denominated in USD and therefore must be

calculated without regard to exchange rate risk between crypto asset categories. *Id*. If so, then

KeyFi is entitled to substantial profit sharing, including the property Celsius seeks to require KeyFi to turn over. Also at issue is a factual dispute about which party was required to hedge against exchange rate risk, *i.e.*, impermanent loss. Celsius does not dispute that there might have been substantial profits if hedging was put in place. Celsius AC ¶ 41. If Stone and KeyFi are right concerning their interpretation of the APA, then Celsius is entitled to nothing, and compensation is owed to Defendants.

The presence of this "active contract dispute" takes this case out of being a proper turnover action—even on the assumption that the NFTs, stock, security and investments described in the Amended Complaint were at some time Celsius property (which they were not). *Star Line,* 2006 WL 214206, at *7. Celsius's avoidance of the contract governing the parties' relationship reveals the fundamental weakness of their alternative theories. As the Amended Complaint makes clear, Celsius rejects its profit-sharing obligations under the Service Agreement and refuses to provide any accounting to Defendants. KeyFi was therefore entitled to retain that property in offset against the debt that Celsius refused to pay. Assuming that the NFTs, stock, security, and investments described in the Amended Complaint were ever Celsius property, they became Defendants' property pre-petition—or at the very least, there is a *bona fide* contractual dispute about that. It follows that "this is not a proper turnover action since [KeyFi] disputes . . . whether a rightful setoff took place." *In re Faasoa*, 576 B.R. 631, 646 (Bankr. S.D. Cal. 2017); *see also In re VeraSun Energy Corp.*, No. 08-12606 (BLS), 2013 WL 3336870, at *4 (Bankr. D. Del. June 28, 2013) ("Home Depot's denial of liability and assertion of setoff and recoupment rights was enough to render the debt disputed."). Celsius cannot ignore the APA to twist this dispute into a turnover action.

3.    Celsius Fails to Plead the Elements of a Turnover Action

Celsius demands turnover for four kinds of property: (1) lost property; (2) ethereum or "ETH"; (3) non-fungible tokens; and (4) equity in a company called Nifty's. For each of these categories of property, Celsius fails to allege Stone's or KeyFi's "possession, custody, or control" of estate property "during the case."

Allegedly "Lost" Property: Celsius alleges that KeyFi and/or Stone has "lost or stolen a substantial number of coins." Celsius AC ¶ 29. As to coins that Stone has allegedly lost, those coins are not in Stone's "possession, custody, or control during the case." Those coins are not subject to a turnover action.

ETH Used to Purchase NFTs: The Amended Complaint alleges that "[o]n February 1, 2021, … Stone used assets from the 0xb1 wallet to buy a series of NFTs called 'Cryptopunks'— 8 bit images of cartoon figures supposedly inspired by the London punk music scene— eventually buying a dozen or more Cryptopunks with more than 600 Celsius ETH." Celsius AC ¶ 33.

According to Celsius, the 600 Celsius ETH were transferred away by Stone in exchange for the NFT's. It follows that, as of February 1, 2021, Stone and KeyFi did not possess or control the underlying Celsius' ETH. Therefore, once again, the ETH in question was not in Stone's "possession, custody, or control during the case." Accordingly, this ETH is not subject to a turnover action. *See Savage & Assocs., P.C. v. Mandl (In re Teligent Inc.),* 325 B.R. 134, 137 (Bankr. S.D.N.Y. 2005) ("[P]roperty that has been fraudulently or preferentially transferred does not become property of the estate until it has been recovered.").

NFTs: According to Celsius, "Defendants began to use Celsius coins to buy hundreds of non-fungible tokens." Celsius AC ¶ 3. However, property that Stone and KeyFi allegedly acquired *prepetition* with Celsius ETH is not Celsius property, for two separate reasons.

12

*First*, under Section 3 of the Service Agreement, only "coins deployed by KEYFI" and "revenues" (*i.e.*, money and arguably crypto) are owned by Celsius. NFT's, stock, security, or investment interests derived from Celsius crypto were not property of Celsius—and therefore did not become property of the estate. Moreover, there is no extra-contractual basis for treating the NFTs as Celsius property or property of the estate.

*Second*, as the KeyFi Complaint makes clear, KeyFi's interest in these NFTs was freely given by Celsius during the time they worked together, and thus was (and remains) property of KeyFi. *See* KeyFi Compl. ¶ 89. In effect, the "turnover" claim against KeyFi and Stone amounts to Celsius attempting to claw back earnings that it provided KeyFi and Stone many months pre-petition. *See Pali Holdings*, 488 B.R. at 852 n.39 ("[T]he turnover power can be improperly invoked, especially when it is used as a Trojan Horse for bringing garden variety contract claims; when the property in question is not already property of the estate; or when the turnover statute is used to recover assets with disputed title when the estate's claim of ownership is legitimately debatable."). Further, as explained in the KeyFi Complaint, the NFTs at issue in this case constitute consideration paid to Stone and KeyFi for services rendered under the APA and the Service Agreement. Title to those assets is at the very least "legitimately debatable" and therefore not the proper subject of a turnover action.

Equity in Nifty's: The Amended Complaint alleges that "Stone used Celsius assets to acquire an equity interest in a company called "Nifty's" and that "Stone also used Celsius property directly or indirectly to acquire interests in other companies, platforms and ventures." Celsius AC ¶ 36. As with the NFTs, even assuming that Stone used Celsius assets to pay the purchase price for company stock, title to that stock does not automatically pass to Celsius. Title is held by Stone and is not subject to "turnover" just because Celsius alleges that it is traceable to

former Celsius property. *See In re Vista Bella, Inc*., No. 11-00149-MAM-7, 2012 WL 3778956

(Bankr. S.D. Ala. Aug. 30, 2012) (to the extent property might arguably be subject to a

constructive trust it is not yet property of the estate).

In sum, the Amended Complaint fails to allege that Stone or KeyFi held any property, as

of the commencement of this adversary case, in which Celsius had any legal or equitable interest.

Instead, the turnover claim amounts to no more than a "Trojan Horse for bringing garden variety

contract claims" and must be dismissed with prejudice. *Pali Holdings*, 488 B.R. at 852 n.39

### B.    Celsius Fails to Allege Conversion

The key elements of conversion are (1) plaintiff's possessory right or interest in the

property and (2) defendant's dominion over the property or interference with it, in derogation of

plaintiff's rights. *Colavito v. N. Y. Organ Donor Network, Inc*., 8 N.Y.3d 43, 50 (2006). As with

the turnover claim, the Amended Complaint fails to make any allegations with respect to KeyFi

(as opposed to Stone). This count must be dismissed as to KeyFi.

Furthermore, to the extent that Celsius had made allegations as to KeyFi, that claim must

be dismissed because the complaint improperly twists a basic contract dispute into a tort. Under

New York law, "a claim of conversion cannot be predicated on a mere breach of contract and

where there are no independent facts alleged arising to a tort claim." *PCS Wireless LLC v. A to Z*

*Wireless Sols. Inc*., 841 F. Supp. 2d 649, 653 (E.D.N.Y. 2012). "[T]he court must dismiss

any conversion claim that is 'predicated on a mere breach of contract' absent 'independent facts

sufficient to give rise to tort liability.'" *Remede Consulting Grp. Inc. v. Hamer*, No.

19CV3950NGGVMS, 2021 WL 430898, at *5 (E.D.N.Y. Feb. 8, 2021) (*quoting Fesseha v. TD*

*Waterhouse Inv'r Servs., Inc*., 305 A.D.2d 268, 269 (1st Dep't 2003)). "[A] tort claim will not

arise 'where plaintiff is essentially seeking enforcement of the bargain.'" *Advanced Oxygen*

*Therapy Inc. v. Orthoserve Inc.*, 572 F. Supp. 3d 26, 38 (S.D.N.Y. 2021) (*quoting In re Chateaugay Corp.*, 10 F.3d 944, 958 (2d Cir. 1993)).

As explained above, this case rises and falls on the rights articulated in the APA. Relevant to that dispute is whether KeyFi validly retained crypto assets under the earnout clause of APA and the Service Agreement, with the knowledge and agreement of Celsius officers such as Mashinsky. But the disputed rights governing all transfers at issue in this litigation all rise and fall from the APA.

Celsius knows full well that this is a contract dispute. That is why Celsius went out of its way *not* to plead breach of contract. But Celsius' failure to plead the correct cause of action does not transform this into a tort or turnover action. For this additional reason, the conversion claim must be dismissed.

### C.    Celsius Fails to Allege Fraudulent Misrepresentation

On a claim for fraudulent misrepresentation, the plaintiff must allege facts illustrating "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Tears v. Bos. Sci. Corp.*, 344 F. Supp. 3d 500, 514 (S.D.N.Y. 2018) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178 (2011)). A claim for fraudulent misrepresentation is subject to the heightened pleading standard requirement of Federal Rule of Civil Procedure 9(b). *Fairmount Heights Assocs., L.P. v. Greystone Servicing Corp.*, No. 3:06-CV-1206 (WWE), 2008 WL 11481871, at *2 (D. Conn. July 14, 2008). "In order to satisfy Rule 9(b), a complaint must: 1) specify the statements that the plaintiff contends were fraudulent; 2) identify the speaker; 3) state where and when the statements were made; and 4) explain why the statements were fraudulent." *Kantian v. Counts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999).

The Amended Complaint does not come close to meeting the standards of Rule 9(b). It

only generally pleads that KeyFi and Stone "concealed their actual activities." Celsius AC ¶ 59.

Noticeably absent from the complaint are any allegations of:

- specific statements that Celsius contends were fraudulent;

- where and when the statements were made; or

- why the statements were fraudulent.

For example, Celsius alleges that Stone made "express assurances that he would hedge against

any risk from price movements." *Id.* ¶ 19. But Celsius fails to allege what Stone actually said,

much less where and when the statement was made. Celsius also alleges that Stone "falsely

represented himself as a pioneer and expert in coin staking and decentralized finance

investments." *Id.* ¶ 2. But calling oneself a "pioneer" is not the sort of factual assertion upon

which fraud can be based. *See Cambridge Cap. LLC v. Ruby Has LLC*, No. 20-CV-11118 (LJL),

2022 WL 2292817, at *5 (S.D.N.Y. June 24, 2022) (noting that vague adjectives are mere

puffery which cannot form the basis of a fraud claim).[4]

---

[4] To the extent Celsius contends that Defendants committed fraud by *omission*, rather than by
fraudulent misrepresentation, the Amended Complaint is improperly pled. "[F]raudulent
inducement, fraudulent misrepresentation and fraudulent concealment . . . are 'different causes of
action and demand different elements of proof.'"  *Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d
429, 449 (S.D.N.Y. 2006) (*quoting Lazard Freres & Co. v. Protective Life Ins.* Co., 108 F.3d
1531, 1542 (2d Cir. 1997)). Plaintiffs have only pled a claim for fraudulent misrepresentation
here, and this Motion responds to the Amended Complaint as it is pled. In any event, any claim
for fraudulent concealment would also fail because they have failed to allege causation between
anything that Defendants allegedly failed to disclose and any damage to them. *Bermuda
Container Line Ltd. v. Int'l Longshoremen's Ass'n*, AFL-CIO, 192 F.3d 250, 258 (2d Cir. 1999)
("To state a claim for fraudulent concealment a plaintiff must show: (1) that the defendant failed
to disclose material information that he had a duty to disclose, (citation); "(2) the defendant
intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the
representation, and (4) the plaintiff suffered damage as a result of such reliance.") (*quoting
Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d
Cir.1995)).

Celsius also fails to allege the basis for its "justifiable reliance" on any allegedly false statements by Stone or KeyFi beyond a single conclusory allegation that it "reasonably relied on Defendants' representations in supplying coins to Defendants and in failing to recall coins already supplied." Celsius AC ¶ 59. But this bare legal conclusion is entitled no weight. *Premium Mortg. Corp. v. Equifax, Inc*., 583 F.3d 103, 108 (2d Cir. 2009) ("[T]he complaint provides no basis to support an inference of justifiable reliance. Allegations that are conclusory or unsupported by factual assertions are insufficient.") (cleaned up).

Furthermore, the evidence cuts sharply *against* any justifiable reliance. The Amended Complaint itself describes Mashinsky and Goldstein's 18-month relationship with Stone and a company he founded prior to KeyFi. Furthermore, all of KeyFi's investment activities were readily trackable on the public blockchain, such that Celsius did not need to rely on any statements of KeyFi or Stone to track the investments. Instead, Celsius could see them on the public blockchain—and indeed could exercise control over the investments to the extent Celsius maintained access and control over the 0xb1 address. *See* Celsius AC ¶ 20 (noting that Celsius created the 0xb1 wallet for KeyFi to use and then provided access to the wallet, though it maintained the private keys). For this additional reason, the Court should dismiss Plaintiffs' claim for fraudulent misrepresentation.

### D.    The Existence of a Contract Governing the Parties' Relationship Bars Plaintiffs' Claim from Unjust Enrichment.

"The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery [for unjust enrichment] for events arising out of the same subject matter." *Viable Mktg. Corp. v. Intermark Commc'ns, Inc*., No. 09-CV-1500 JS WDW, 2011 WL 3841417, at *2 (E.D.N.Y. Aug. 26, 2011) (quoting *Am. Med. Assoc. v. United Healthcare Corp.,* No. 00–CV–2800, 2007 WL 683974, at *9 (S.D.N.Y. Mar. 5, 2007)). "This

doctrine clearly bars unjust enrichment claims when both parties to the lawsuit are also parties to

the contract itself." *Id.* Plaintiffs concede that they, and the Defendants, are parties to the MOU,

the Services Agreement, and the APA. Celsius AC ¶ 21. Every single act alleged in the Amended

Complaint would, to the extent it is actionable, give rise to a claim for breach of contract under

one of those agreements. Celsius cannot elide its agreements by invoking equitable remedies

when a valid contract governs all of the parties' relationships. Therefore, the claim for unjust

enrichment must be dismissed with prejudice.

Additionally, the claim for unjust enrichment should be dismissed because Plaintiffs fail

to credibly allege that they have no adequate remedy at law. Plaintiffs' conclusory allegation that

they have no adequate remedy at law, Celsius AC ¶ 73, is entitled to no weight. *New Paradigm*

*Software Corp. v. New Era of Networks, Inc.*, 107 F. Supp. 2d 325, 330 (S.D.N.Y. 2000)

(granting motion to dismiss rescission claim and rejecting plaintiff's contention that "whether

Plaintiff has an adequate remedy at law is an issue [for trial]"); *Homefield Ass'n of Yonkers, N.Y.,*

*v. Frank*, 59 N.Y.S.2d 884, 885 (N.Y. App. Div. 1946) ("The allegations of the complaint that …

that plaintiffs have no adequate remedy at law are conclusory. Facts should be pleaded upon

which the conclusions are based.").

This conclusory allegation is also unhinged from reality. There were agreements here—

the APA and the Service Agreement that governed how coins would be deployed and how

profits would be divided between Celsius and KeyFi. *See* Ex. A. If Stone "misappropriated

gains," as Celsius alleges, then that would be a breach of both agreements. Celsius has a remedy

at law in the form of a suit for breach of contract. It is worth asking why Celsius continues to

omit that cause of action from its Amended Complaint.

### E.    The Parties' Contracts Also Bar Plaintiffs' Claim for Replevin.

Plaintiffs label their sixth cause of action a claim for replevin. "To establish a claim for replevin, the plaintiff must prove two elements: (1) that plaintiff has a possessory right superior to that of the defendant; and (2) that plaintiff is entitled to the immediate possession of that property." *Deleon v. Charlie Auto Sales, Inc.*, 110 N.Y.S.3d 899 (N.Y. Civ. Ct. 2018).

As with the turnover and conversion claims, the Amended Complaint fails to make any allegations that KeyFi (as opposed to Stone) is in possession of Celsius property, and therefore must be dismissed as to KeyFi.

Further, as with Plaintiffs' turnover, conversion and unjust enrichment counts, the claim for replevin should be dismissed in its entirety because "[u]nder New York law, an action for conversion and replevin should proceed under a contract theory when the plaintiff is essentially seeking enforcement of a contractual duty." *Aleem v. Experience Hendrix, L.L.C.*, No. 16 CIV 9206(ER), 2017 WL 3105870, at *5 (S.D.N.Y. July 20, 2017); Usov v. Lazar, No. 13 Civ. 818 (RWS), 2013 WL 3199652, at *7 (S.D.N.Y. June 25, 2013) (dismissing plaintiff's claims for conversion and replevin because they arose only from allegations that defendant did not return an object in violation of a contract). Plaintiffs, if they have a claim, have a claim for breach of contract.

### F.    Accounting Is a Remedy, Not a Standalone Cause of Action.

"Courts in this judicial district have held that claims that pertain only to remedies are not independent causes of action and should be dismissed." *Est. of Albin v. Mertz, LLC*, No. 05CIV3440KMWKNF, 2006 WL 8461442, at *10 (S.D.N.Y. Mar. 15, 2006) (citations omitted). In circumstances like this, courts have found claims for "accounting" to be "remedies and not claims" because if the Plaintiff "ultimately prevails, he will be entitled to damages and a damages calculation will have to be performed" but that fact does not support an accounting as a

standalone claim. *In re Adelphia Commc'ns Corp.*, 331 B.R. 93, 100 (S.D.N.Y. 2005). This cause

of action must also be dismissed with prejudice.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the First (turnover), Second

(conversion), Third (fraudulent misrepresentation), Fifth (unjust enrichment), Sixth (replevin)

and Seventh (accounting) causes of action as to all Defendants.


Dated: October 27, 2022

*/s/ Kyle W. Roche*
Kyle W. Roche
260 Madison Ave. FL. 8
New York, NY 10016
kyle@kyleroche.law

*Counsel for Defendants*
