**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CELSIUS NETWORK LIMITED and
CELSIUS KEYFI LLC,

                          Plaintiffs,

              v.

JASON STONE and KEYFI INC.,

                          Defendant.

Adversary Proceeding
No. 22-01139 (MG)

<u>**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**</u>

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

Table of Authorities ....................................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 5

     A.  Celsius Retains Defendants to Pursue Certain Investment Strategies ......................... 5

     B.  Celsius Demands the Return of All Coins ................................................................. 6

     C.  Stone Misappropriates Celsius' Coins to Buy and Steal NFTs and other Property ..... 8

     D.  Stone Uses Tornado Cash to Secrete Celsius Assets .................................................. 10

     E.  Through Roche Freedman Founder, Stone Tacitly Admits Taking Celsius Property 12

     F.  Substantial Amounts of Celsius ETH Remain Vulnerable to Theft by Defendants... 13

     G.  The Defendants Refuse to Agree to Voluntary Injunction ......................................... 14

ARGUMENT ................................................................................................................... 15

   I.  AN INJUNCTION SHOULD BE ISSUED TO PREVENT DEFENDANTS FROM
      CARRYING OUT FURTHER ACTS OF THEFT AND SECRETION ......................... 15

     A.  Celsius Would Suffer Irreparable Harm Absent a Preliminary Injunction. .............. 16

     B.  Celsius Is Likely to Prevail on the Merits of Its Claims............................................. 18

     C.  The Equities and Public Interest Tilt Strongly in Celsius' Favor.............................. 21

  II.  NO BOND SHOULD BE REQUIRED ........................................................................ 22

NOTICE ........................................................................................................................... 23

CONCLUSION ................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*725 Eatery Corp. v. City of New York*,
    408 F. Supp. 3d 424 (S.D.N.Y. 2019) ................................................................................18

*In re Adelphia Comm'ns Corp.*,
    323 B.R. 345 (Bankr. S.D.N.Y. 2005) ..............................................................................20

*Astrove v. Doe*,
    No. 22-CV-80614-RAR, 2022 WL 2805345 (S.D. Fla. June 17, 2022) ...............................21

*Brenntag Int'l Chems., Inc. v. Bank of India*,
    175 F.3d 245 (2d Cir. 1999) .............................................................................................16

*Broker Genius, Inc. v. Volpone*,
    313 F. Supp. 3d 484 (S.D.N.Y. 2018) ................................................................................18

*Caesars Ent. Op. Co., Inc. v. BOKF, N.A.* (*In re Caesars Ent. Op. Co., Inc.*),
    561 B.R. 441 (Bankr. N.D. Ill. 2016) ...............................................................................23

*In re Calpine Corp.*,
    365 B.R. 401 (S.D.N.Y. 2007) ..........................................................................................21

*De Beers Consol. Mines v. United States*,
    325 U.S. 212 (1945) ...................................................................................................15, 17

*Dong v. Miller*,
    No. 16-cv-5836 (NGG) (JO), 2018 WL 1445573 (E.D.N.Y. Mar. 23, 2018) .............16, 17, 18

*Eng v. Smith*,
    849 F.2d 80 (2d Cir. 1988) ...............................................................................................18

*Fed. Trade Comm'n v. Dluca*,
    No. 0:18-cv-60379-RKA, 2018 WL 1830800 (S.D. Fla. Feb. 28, 2018), *report*
    *and recommendation adopted,* No. 0:18-cv-60379-KMM, 2018 WL 1811904
    (S.D. Fla. Mar. 12, 2018) .................................................................................................17

*Firemen's Ins. Co. of Newark, v. Keating*,
    753 F. Supp. 1146 (S.D.N.Y. 1990) ..................................................................................17

*Grubin v. Rattet (In re Food Mgmt. Grp, LLC)*,
    380 B.R. 677 (Bankr. S.D.N.Y. 2008) ...............................................................................22

*Gucci America, Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014) ..............................................................................................15

*Heissenberg v. Doe*,
  No. 9:21-cv-80716-RKA, 2021 WL 8154531 (S.D. Fla. Apr. 23, 2021) .........................17, 20

*Jacobo v. Doe*,
  No. 1:22-cv-00672-DAD-BAK(BAM), 2022 WL 2052637 (E.D. Cal. June 7,
  2022) ..............................................................................................................................17, 21

*Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem.
  Co.)*,
  402 B.R. 571 (Bankr. S.D.N.Y. 2009) ...................................................................................23

*In re MarketXT Holdings Corp.*,
  376 B.R. 390 (Bankr. S.D.N.Y. 2007) ...................................................................................16

*Oneida Nation of N.Y. v. Cuomo*,
  645 F.3d 154 (2d Cir. 2011)...................................................................................................18

*Rep. of Phil. v. Marcos*,
  806 F.2d 344 (2d Cir. 1986)...................................................................................................17

*Sallah for Project Invs., Inc. v. Liu*,
  No. 9:20-CV-81041, 2020 WL 13401703 (S.D. Fla. Oct. 20, 2020) ......................................21

*New York ex rel. Schneiderman v. Actavis*,
  787 F.3d 638 (2d Cir. 2015)...................................................................................................18

*Unisource Worldwide, Inc. v. S. Cent. Ala. Supply, LLC*,
  199 F. Supp. 2d 1194 (M.D. Ala. 2001) ................................................................................20

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)...................................................................................................................16

*Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*,
  No. 00 Civ. 8051(JSM), 2000 WL 1610790 (S.D.N.Y. Oct. 27, 2000) ..................................15

## Federal Statutes

11 U.S.C. § 362(a) ........................................................................................................................2, 22

11 U.S.C. § 541(a) ...........................................................................................................................22

11 U.S.C. § 541(b) ...........................................................................................................................22

## Rules

Federal Rule of Bankruptcy Procedure 7065...................................................................1, 15, 22

Federal Rule of Civil Procedure 65 .......................................................................................1, 22

**Other Authorities**

Jordan Atkins, *Kyle Roche fired as Roche Freedman forced to rebuild,* Coin
 Geek (Oct. 24, 2022), https://coingeek.com/kyle-roche-fired-as-roche-
 freedman-forced-to-rebuild ......................................................................................................3

Justin Wise, *Crypto Law Firm Co-Founder Out After Secret Recordings Leak,*
 Bloomberg Law (Oct. 19, 2022), https://news.bloomberglaw.com/business-
 and-practice/crypto-law-firm-co-founder-out-after-secret-recordings-leak .............................3

*Nifty's Announces 1ˢᵗ NFT-Focused Social Media Platform For Creators,
 Collectors And Curators With Backing of Major Investors*, Cision (Mar. 23,
 2021), https://www.prnewswire.com/news-releases/niftys-announces-1st-nft-
 focused-social-media-platform-for-creators-collectors-and-curators-with-
 backing-of-major-investors-301254192.html .........................................................................10

Press Release, U.S. Department of Treasury, *U.S. Treasury Sanctions Notorious
 Virtual Currency Mixer Tornado Cash* (Aug. 8, 2022),
 https://home.treasury.gov/news/press-releases/jy0916 .............................................................3

*Roche Firm Booted From Tether Action After Crypto Leaks Post (1)*, Bloomberg
 Law (Oct. 13, 2022), https://news.bloomberglaw.com/business-and-
 practice/roche-firm-booted-from-tether-action-after-crypto-leaks-post ..................................13

Pursuant to Federal Rule of Bankruptcy Procedure 7065 and Federal Rule of Civil Procedure 65, Plaintiffs Celsius Network Limited and Celsius KeyFi LLC (together, "Celsius") respectfully submit this memorandum of law in support of their Motion for Preliminary Injunction (the "Motion") against Defendants Jason Stone and KeyFi, Inc. (together, "Defendants").

## PRELIMINARY STATEMENT

Using private keys that Defendants obtained while engaged to deploy coins on Celsius' behalf (and that the Defendants have refused to relinquish), Stone has repeatedly accessed wallets funded by Celsius to steal Celsius assets and the proceeds of Celsius assets. The Defendants' theft continued after Stone's employment terminated and after the Defendants were directed to return all property to Celsius and turn over private keys. The Defendants made frequent use of Tornado Cash, a notorious money laundering application that was recently banned by the U.S. Treasury Department, in an effort to put stolen property outside of Celsius' reach. The property that the Defendants converted to date is valued in the tens of millions of dollars, at least, and the Defendants may soon be capable of stealing another approximately $35 million worth of Ethereum coins ("ETH") staked for the benefit of Celsius (the "Celsius Staked ETH").

Without prompt Court intervention the risk of further theft and dissipation of valuable Celsius property is high. Accordingly, Celsius moves for a preliminary injunction:

(i)    Restraining the Defendants, their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with them (collectively the "Stone Parties") from:

    a.  accessing, transferring, or otherwise disposing of the Celsius Staked ETH,

    b.  accessing for any reason any Celsius Wallets (defined below),

    c.  transferring or otherwise disposing of the Property (defined below) that they took from Celsius, and

    d.  using Tornado Cash or other means to conceal the location of property that could otherwise be available to satisfy a judgment in this case; and

(ii)   Requiring the Stone Parties to:

    a.  within five (5) calendar days of the date on which the injunction is granted, specifically identify, under penalty of perjury, all Property and its current location(s), and

    b.  within 24 hours of the granting of the injunction, relinquish the private keys associated with any and all Celsius Wallets and with the Celsius Staked ETH.

Notably, were the Defendants to engage in the conduct Celsius seeks to expressly bar through the injunction, the Defendants would plainly be in violation of the existing Section 362 automatic stay, and other laws and regulations as well. Hence, before bringing this Motion, Celsius contacted the Defendants and proposed that they agree to enter into a voluntary, so-ordered injunction, pursuant to which the Defendants would expressly acknowledge and agree to abide by these obligations, but they declined. The Defendants' refusal provides further reason to believe that they in fact intend to continue to steal and dissipate Celsius assets if given the chance, and a further basis for this Court to grant the injunctive relief Celsius seeks.

As detailed in the Amended Complaint, Celsius deposited valuable digital assets in wallets accessible to Stone and KeyFi (the "Celsius Wallets") solely to permit Defendants to deploy those coins in authorized staking and decentralized finance activities. Rather than hew to that mandate, however, the Defendants and the other Stone Parties transferred hundreds of thousands of Celsius' coins to their own wallets (the "Stone Utilized Assets"), and otherwise used Celsius digital assets and their proceeds for purposes not authorized by Celsius, such as, among other things, with the Stone Utilized Assets, the Defendants purchased non-fungible tokens ("NFTs"), interests in blockchain related companies, and other property, and brazenly stole that property (the "Subject Property," and with the Stone Utilized Assets, the "Property") from Celsius.

Upon information and belief, the Stone Utilized Assets are worth at least $10 million at recent prices, and were worth vastly more at the time of their conversion by the Defendants. The Subject Property may be worth multiples of the value of the Stone Utilized Assets. To frustrate

any effort by Celsius to recover the stolen Property, the Defendants have funneled it through Tornado Cash, an on-chain "mixer" that obscures the destination of property transferred on the blockchain and which the Office of Foreign Asset Control recently banned due to its frequent use "by illicit actors to launder funds, especially those stolen during significant heists."[1]

The evidence Celsius presents on this Motion is more than sufficient to establish a likelihood of success on the merits of Celsius' claims seeking equitable relief, including claims for turnover, conversion, replevin, unjust enrichment, and an accounting, as well as equitable remedies including disgorgement and constructive trust.  Indeed, the Defendants do not deny that they took Stone Utilized Assets from Celsius Wallets, pocketed those assets and their proceeds, including the Subject Property, and concealed their location by transferring the assets through Tornado Cash. On the contrary, after the original Complaint was filed, the Defendants and their lawyer, Kyle Roche, then of Roche Freedman, tacitly acknowledged on Twitter that the Defendants took Celsius' property from its wallets, but contended without a shred of evidence that their theft actually was "compensation . . . expressly authorized by Celsius' CEO."  Mr. Roche has apparently since been expelled from Roche Freedman.[2]

The Defendants' claim is contrary to the express terms of certain written agreements, and all but self-refuting.  Among other things, the Defendants made no "profits" but instead incurred massive losses due to their own theft and incompetence.  Moreover, the Service Agreement (defined *infra*) contradicts the Defendants' claim, providing that "all coins deployed by [the Defendants] and revenues generated and/or received from third parties ***shall be owned by and paid***

---

[1]  *See* Sabo Decl. ¶¶ 28–33; Press Release, U.S. Department of Treasury, *U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash* (Aug. 8, 2022), https://home.treasury.gov/news/press-releases/jy0916.

[2]  *See, e.g.*, Justin Wise, *Crypto Law Firm Co-Founder Out After Secret Recordings Leak*, Bloomberg Law (Oct. 19, 2022), https://news.bloomberglaw.com/business-and-practice/crypto-law-firm-co-founder-out-after-secret-recordings-leak; Jordan Atkins, *Kyle Roche fired as Roche Freedman forced to rebuild*, Coin Geek (Oct. 24, 2022), https://coingeek.com/kyle-roche-fired-as-roche-freedman-forced-to-rebuild.

*to Celsius*," and that compensation—if any—will be paid by "Celsius," not through unilateral self-help efforts by the Defendants.  Further, much of Defendants' theft occurred *after*, and in many cases *months after*, (i) Stone's employment was terminated and (ii) Celsius demanded, in writing and repeatedly, that the Defendants immediately return all Celsius' coins and other property in their possession, custody, or control.  And in emails contemporaneous with Celsius' demands, Stone claimed that he would promptly return to Celsius "100%" of Celsius' coins "plus profits," not that Celsius somehow owed him profit share, as he now claims through Roche.

Self-serving, deeply implausible claims of this kind are not sufficient to justify denial of a properly supported motion for injunctive relief.  The Defendants should be required without further delay to identify all Property and its location(s) specifically, and under oath, and should be enjoined during the course of this case from further transferring or disposing of any of that Property so that it will remain available for disposition in accordance with any judgment or other determination that this Court may reach.

The Defendants also should be enjoined from absconding with over 25,000 Celsius ETH to which they may soon gain access.  On or around November 24, 2020, Stone "staked" approximately 25,000 Celsius ETH by transferring it from Celsius' 0xb1 wallet (defined below), through another wallet, and to the Ethereum staking contract, where it remains locked, earning interest.  The "Merge," a long awaited system-wide modification to the Ethereum blockchain, recently occurred, and the Celsius Staked ETH will become unlocked and available for withdrawal on an undetermined date in the future.[3]  Because Stone caused the original transfer to the staking contract in November 2020, he retains the private keys necessary to retrieve the Celsius Staked

---

[3]    Sabo Decl. ¶¶ 34–38.

ETH when it is unlocked.  The Defendants will neither agree to relinquish the private keys nor even to forbear from taking the Celsius Staked ETH for themselves when it is unlocked.

Celsius will be irreparably harmed absent the relief it seeks.  The Defendants have the means of accessing and secreting valuable Celsius property, have demonstrated a willingness to do so repeatedly in the past, and likely will do so again if given a chance.  Courts routinely grant injunctions to prevent this kind of harm, particularly where digital assets are at issue because they pose a heightened risk of asset dissipation.  Indeed, the Defendants should be enjoined from using Tornado Cash entirely—which is prohibited by the Treasury Department in any event—or other means of concealing transfers of assets while this matter is pending.  The Defendants may have already secreted all or parts of the Property in an effort to put it out of Celsius' reach, and any assets that they continue to possess should remain available to satisfy any judgment Celsius might obtain in this action, including with respect to the Stone Utilized Assets and Subject Property.

**STATEMENT OF FACTS**

**A.    <u>Celsius Retains Defendants to Pursue Certain Investment Strategies</u>**

Celsius retained Defendants to provide their "expertise to Celsius for all things pertaining to DeFi and Staking services."  *See* Hurley Decl. Ex. 29 ¶¶ 1–2.  Initially, the relationship among Celsius and Defendants was governed by (i) a non-binding memorandum of understanding ("<u>MOU</u>") between Plaintiff Celsius Network Limited and Defendant KeyFi and (ii) a services agreement (the "<u>Old Service Agreement</u>") between Plaintiff Celsius Network Limited and Defendant KeyFi.  *See id.*, Exs. 27 and 29, respectively.

To facilitate Defendants' provision of services, on or around August 19, 2020, Celsius created a Celsius Wallet with the address 0xb1adceddb2941033a090dd166a462fe1c2029484 (the "<u>0xb1</u>" wallet) and transferred 1 ETH to the 0xb1 wallet.  *See* Kleiderman Decl. ¶ 2.  Celsius later transferred substantial ETH into the 0xb1 wallet and certain other Celsius Wallets.  *See id.*

5

Eventually, Celsius gave Defendants the private keys to the 0xb1 wallet and certain other Celsius Wallets to permit Defendants to deploy Celsius' coins as expressly authorized in advance by Celsius. *See id.* In particular, Defendants were not permitted to deploy coins to any activities other than staking and DeFi. *See* Hurley Decl. Ex. 27 at 7 (listing "Approved Strategies" as Staking and DeFi).

Plaintiff Celsius KeyFi was formed pursuant to a limited liability company agreement signed on or around January 11, 2021 (the "<u>LLC Agreement</u>") between Defendant Stone, Celsius US Holdings LLC and Celsius KeyFi. *See id.*, Ex. 28. At that time, Defendant KeyFi and Plaintiffs Celsius Network Limited and Celsius KeyFi also signed an Asset Purchase Agreement on January 11, 2021 (the "<u>APA</u>") pursuant to which Celsius KeyFi acquired the KeyFi business. *See id.*, Ex. 30. Plaintiffs Celsius Network Limited and Celsius KeyFi also signed a service agreement the same day (the "<u>Service Agreement</u>"). *See id.*, Ex. 31. Pursuant to the Service Agreement, Defendant Stone was to continue deploying Celsius' coins as CEO of Celsius KeyFi to the extent authorized in advance by Celsius. *See id.*, Ex. 31, Schedule A.[4] The Service Agreement re-affirmed that KeyFi was not permitted to deploy coins to any activities other than staking and DeFi, and also required KeyFi to meet with Celsius' CIO, Risk Officer, and/or CEO on a periodic basis to review KeyFi's deployment of assets and disclose and approve all strategies and issues related thereto. *See id.*, Ex. 31, Schedule A and Schedule B ¶ 6.6.

### B.    Celsius Demands the Return of All Coins

It did not take long before Celsius lost confidence in Stone and KeyFi and demanded the return of Celsius' coins. Beginning around September 3, 2020, Celsius' officers engaged in periodic calls with Stone during which they sought to understand and assess Stone and KeyFi's

---

[4]    Both the MOU and the Old Service Agreement expired upon the execution of the LLC Agreement, APA, and Service Agreement. *See* Hurley Decl. Ex. 27 ¶¶ 6, 10, Ex. 29 ¶ 1.

trading strategies and assess risk.  *See* Holert Decl. ¶ 4.  Significantly, Stone and KeyFi's reporting

practices were unsatisfactory, and not consistent with the underlying agreements.  *See id.*  Stone

promised that his team was designing and would soon deliver a so-called "wormhole" program

that would automatically track Stone and KeyFi's deployments to provide greater transparency to

Celsius concerning Stone and KeyFi's activities, but he did not deliver on his promise.  *See id.*

In early 2021, Celsius instructed Stone and KeyFi to return the coins Celsius had made

available for deployment, including so that Celsius could perform an accounting and establish

enhanced security protocols.  *See id.* ¶ 5.  But by late March 2021, Stone and KeyFi still had not

returned the coins in their control as promised.  *See id.*

Accordingly, on March 26, 2021, Celsius KeyFi's board convened and issued formal,

written board resolutions commanding Stone, as CEO of Celsius KeyFi, to return all Celsius' coins

to the 0xb1 wallet.  *See* Hurley Decl. Ex. 33.  The board resolutions were unequivocal in directing

Stone:

> to immediately . . . unwind all deployed Crypto Assets and transfer them, along
> with all un-deployed Crypto Assets, in each case together with all interest thereon,
> to the [0xb1 wallet and] . . . [to] provide the seed and password for the [0xb1 wallet
> to Celsius and] . . . disclose . . . all codes, keys and other information concerning
> access and control of any wallet in which Crypto Assets belonging to Celsius
> Network [Limited] are, have been, or may be held, or that were opened or used for
> the purpose of or in connection with any Company affairs, including without
> limitation, holding or deploying any Celsius Crypto Assets.

*See id.*  The board provided a copy of the resolutions and a direction letter to Stone and KeyFi on

March 26, 2021.  *See id.*

Although Stone now claims that he was entitled to payment *from Celsius* of "profit share,"

that is not what he said at the time.  Rather, Stone replied almost immediately to the March 26

direction by promising that he and KeyFi could, and would, follow Celsius' instruction promptly,

advising that "the KeyFi team is hard at work" and would ensure the "***complete return of all***

***Celsius tokens (principal + interest earned) . . . by the end of April at the latest.***" *See id.*, Ex. 34 (emphasis added). The next day, in response to a Whatsapp message from Celsius imploring Stone to carry out "the asset return process in a transparent way and in sync. Let's complete this positively, respectfully and strong," Stone quickly replied: "that was always the plan . . . ***I promise you. . . . [W]e can be finished returning 100% of the coins ++ interest & profits sometime between 4/20-4/31.***" *See id.*, Ex. 35 (emphasis added). And on March 31, 2021, Stone claimed that he would provide Celsius with control over certain of the Celsius Wallets by providing Celsius with the seed codes and private keys to those wallets and then destroying the seed codes and private keys in his possession. *See* Kleiderman Decl. ¶ 5.

As Celsius only later would learn, Stone's repeated assurances that he could, and would, return all of Celsius' coins (plus "profits" due to Celsius) were lies designed to conceal the fact that he either had lost or stolen a substantial number of coins.

C.     **Stone Misappropriates Celsius' Coins to Buy and Steal NFTs and other Property**

Without authorization, Stone began to use Celsius' coins for activities other than the staking and decentralized finance investments for which he had been engaged, including by simply stealing Celsius' coins, and by using Celsius' coins to acquire NFTs and other property, which he also stole. *See* Sabo Decl. ¶¶ 12–33; Kleiderman Decl. ¶¶ 3–4. Unfortunately, because the Defendants have refused Celsius' requests for an accounting, and have taken great pains to cover their tracks on the blockchain, including through Tornado Cash, Celsius cannot identify, or confirm the location of, all of the Stone Utilized Assets. Nor can Celsius identify, or confirm the location of, all of the Subject Property that Defendants wrongfully obtained with Stone Utilized Assets.

But even with the limited information available, the evidence of the Defendants' misappropriation is staggering. *See generally* Sabo Decl.; Kleiderman Decl. Among other things,

without notice to Celsius, and contrary to the underlying agreements, Stone began to use Celsius' coins to acquire hundreds of NFTs.  *See* Sabo Decl. ¶¶ 14–24; Kleiderman Decl. ¶¶ 3–4.

For example, on February 1, 2021, Stone used assets from the 0xb1 wallet to buy a series of NFTs called "Cryptopunks"—8 bit images of cartoon figures supposedly inspired by the London punk music scene—eventually buying 15 Cryptopunks with more than 600 Celsius ETH. *See* Sabo Decl. ¶¶ 14–16; Kleiderman Decl. ¶¶ 3–4.  Later, on February 19, 2021, Stone transferred 300 Celsius ETH to 0x1ceb38874b44e2b3a87b2d1204bc2b989529ed14, an external wallet that, on information and belief, Stone owns or controls (the "0x1c" wallet).  *See* Sabo Decl. ¶ 19; Kleiderman Decl. ¶¶ 3–4.  On the same day, the 0x1c wallet purchased dozens of NFTs, including "Bullrun Babes."  *See* Sabo Decl. ¶¶ 19–21; Kleiderman Decl. ¶¶ 3–4.  Bullrun Babes have been described as "digital collectibles that showcase female characters based on popular products or people within the blockchain space."  *See* Sabo Decl. ¶ 19.  On February 27, 2021, Stone transferred another 150 ETH from the Celsius 0xb1 wallet to his 0x1c wallet, and that wallet purchased additional NFTs and otherwise transferred ETH originating in the Celsius 0xb1 wallet to addresses not associated with Celsius.  *See* Sabo Decl. ¶¶ 22, 25, 26; Kleiderman Decl. ¶¶ 3–4. Using Celsius' coins, Stone bought hundreds of NFTs in addition to the Cryptopunks and Bullrun Babes as well.  Sabo Decl. ¶ 24; Kleiderman Decl. ¶¶ 3–4.

Beginning on March 16, 2021, Stone began secreting NFTs out of Celsius' 0xb1 wallet and to a wallet with the address 0x50dd57f50a17d57304e7a4f262da30beb31c2e87 (the "0x50dd" wallet) which, upon information and belief, is controlled by Stone and/or KeyFi.  *See* Sabo Decl. ¶ 17; Kleiderman Decl. ¶¶ 3–4.  A week earlier, on March 9, 2021, Stone had emailed Celsius that he planned to start his own investment management company, which he said he had named "0x Management."  Hurley Decl. Ex. 32.

9

Stone assured Celsius, however, that Celsius could continue to "depend[] on us," and that "[w]e do not take our responsibilities to Celsius lightly." *Id.* But the very next day, on March 10, 2021, Stone used the private keys for the Celsius 0xb1 wallet to steal 20 Celsius ETH by transferring it to Stone's 0x50dd wallet. *See* Sabo Decl. ¶ 26; Kleiderman Decl. ¶¶ 3–4. On March 16, 2021—seven days after assuring Celsius that it could "depend on us" and "we do not take our responsibilities to Celsius lightly"—Stone began transferring the Cryptopunks he had purchased with Celsius ETH to his 0x50dd wallet. *See* Sabo Decl. ¶ 17; Kleiderman Decl. ¶¶ 3–4.

The stolen NFTs had substantial value at the time they were misappropriated by Stone. For example, on or around August 5, 2021, Stone sold CryptoPunk 8472, one of the punks he bought with Celsius ETH and then transferred from the 0xb1 wallet to the 0x50dd wallet, for 700 ETH, which was equal to more than $1.7 million at the time. *See* Sabo Decl. ¶ 18; Kleiderman Decl. ¶¶ 3–4. Stone sold three other punks transferred from the 0xb1 wallet to the 0x50dd wallet for a total of 371 ETH, or about $1 million at then-prevailing exchange rates. *See* Sabo Decl. ¶ 18; Kleiderman Decl. ¶¶ 3–4. Upon information and belief, Stone also used Celsius assets to acquire other forms of property, including equity and other interests in blockchain related platforms and companies.[5]

### D.      Stone Uses Tornado Cash to Secrete Celsius Assets

To cover his tracks, and in an effort to move Celsius assets beyond its reach, Stone began to make regular use of Tornado Cash. *See* Sabo Decl. ¶¶ 27–33; Kleiderman Decl. ¶¶ 3–4. Tornado Cash is a privacy protocol "mixer" that masks the path of cryptocurrency that is

---

[5]     *See, e.g., Nifty's Announces 1ˢᵗ NFT-Focused Social Media Platform For Creators, Collectors And Curators With Backing of Major Investors*, CISION (Mar. 23, 2021), https://www.prnewswire.com/news-releases/niftys-announces-1st-nft-focused-social-media-platform-for-creators-collectors-and-curators-with-backing-of-major-investors-301254192.html ("Nifty's has  secured financial backing in a pre-seed round from high-profile technology and blockchain investors including . . . the secretive DeFi investor and NFT 'whale' known solely as 0xb1.").

transferred from a sender to a receiver on the blockchain. *See Sabo Decl. ¶ 28.* Among other things, a user can deposit cryptocurrency to Tornado Cash and then withdraw the cryptocurrency through a wallet with a different public key, or address, thus obscuring the final destination of the transaction on the blockchain. *See id.* On August 8, 2022, the U.S. Department of Treasury announced that the Office of Foreign Assets Control (OFAC) has placed Tornado Cash on its SDN List, and that "[a]ll transactions by U.S. persons or within (or transiting) the United States" with Tornado Cash are prohibited. *See id.*; Hurley Decl. Ex. 38. According to Treasury, this severe sanction was warranted because Tornado Cash is "commonly used by illicit actors to launder funds, especially those stolen during significant heists." Hurley Decl. Ex. 38; Sabo Decl. ¶ 28.

That is just how Stone used Tornado cash here. For example, on May 23, 2021, after Celsius property worth millions was transferred to the 0x50dd wallet (and other wallets belonging to or controlled by Stone), 100 ETH was transferred to Tornado Cash from the 0x50dd wallet. *See Sabo Decl. ¶ 29; Kleiderman Decl. ¶¶ 3–4.* On the same day, another transfer of 100 ETH was made to Tornado Cash from another wallet 0xfc2a616d48a8681250aaaf590404e20812e96cfa (the "0xfc" wallet) that, upon information and belief, is owned or controlled by Stone, with that same wallet transferring 100 ETH again to Tornado Cash on May 25, 2021. *See Sabo Decl. ¶ 29; Kleiderman Decl. ¶¶ 3–4.* Also on May 25, 2021, transfers totaling 20 ETH were made from 0x50dd to Tornado Cash, and a transfer of 100 ETH was made from the 0xfc wallet to Tornado Cash. *See Sabo Decl. ¶ 29; Kleiderman Decl. ¶¶ 3–4.* Upon information and belief, the Tornado Cash transfers were of property belonging to Celsius, or the proceeds of such property, and were directed to wallets under Stone's control.

In September 2021, Stone accessed Celsius' 0xb1 wallet, stole coins worth $1.4 million, and then funneled them through Tornado Cash. *See Sabo Decl. ¶¶ 30–33; Kleiderman Decl. ¶ 6.*

11

As explained in the Amended Complaint, the private key for a wallet can never be changed, so once a party has that key, it has access to the wallet permanently. Am. Compl. ¶ 20, ECF No. 10. Hence, after Stone's departure from Celsius became effective in the spring of 2021, Celsius sought to transfer all assets it recognized as valuable out of the Wallets. *See* Kleiderman Decl. ¶ 5. But in September 2021, an airdrop related to a Stone deployment of Celsius' coins in November of 2020 was made into the 0xb1 wallet of 1.4 million DAI, a stablecoin pegged to the value of the U.S. dollar. *See* Sabo Decl. ¶ 30; Kleiderman Decl. ¶ 6. The airdrop was made without notice to Celsius, but apparently had been anticipated by Stone. *See* Kleiderman Decl. ¶ 6.

On September 21, 2021, upon information and belief, Stone accessed the 0xb1 wallet and transferred the $1.4 million worth of DAI to a wallet with the public key 0x8cc24e59e29a0f9b46f1746b392eaf2483d75096 (the "0x8cc" wallet). *See* Sabo Decl. ¶ 31; Kleiderman Decl. ¶ 6. On the same day, in three transactions, the 0x8cc wallet converted the stolen DAI into 485 ETH, then worth approximately $1.4 million. *See* Sabo Decl. ¶ 32; Kleiderman Decl. ¶ 6. Then, in seventeen separate transfers beginning on September 22, 2021 and concluding on October 12, 2021, the 0x8cc wallet transferred a total of 485 ETH to the money laundering application Tornado Cash. *See* Sabo Decl. ¶ 33; Kleiderman Decl. ¶ 6.

### E.    Through Roche Freedman Founder, Stone Tacitly Admits Taking Celsius Property

On August 23, 2022, after Celsius filed its original complaint in this action, Stone "re-tweeted" a twitter post from his counsel, Kyle Roche. *See* Hurley Decl. Ex. 39. In his tweet, Roche did not deny that the Defendants took Celsius property; on the contrary, he acknowledged it, but claimed that Celsius' CEO Alexander Mashinsky "expressly authorized" the Defendants to abscond with Celsius property, "including in the form of NFTs." As already noted, Roche's claim is directly contradicted by the terms of the governing Service Agreement, Celsius' written

demands, and his clients' own words, among other things. Mr. Roche since has been removed from the firm he founded (which apparently has changed its name to Freedman Normand Friedland) based on a series of on-camera statements by Mr. Roche recorded and published by a whistleblower site called "Crypto Leaks," and amidst allegations that the firm used litigation tactics improperly to target competitors of a crypto company in which Mr. Roche holds or held a large stake.[6]

**F.**    **Substantial Amounts of Celsius ETH Remain Vulnerable to Theft by Defendants**

On or around November 24, 2020, while Stone still was authorized to deploy Celsius' coins, he transferred 25,000 Celsius ETH to a wallet he created with the address 0x3fb9d44bc83d0da2902e6230aed42fc219f8a426 (the "0x3fb9" wallet). *See* Sabo Decl. ¶ 34; Kleiderman Decl. ¶ 8. Hours later, Stone transferred 24,960 ETH (the "Celsius Staked ETH") to an Ethereum staking deposit smart contract. *See* Sabo Decl. ¶ 34; Kleiderman Decl. ¶ 8. Of the remaining ETH in the 0x3fb9 wallet, Stone stole 37.4 ETH by transferring the ETH through a different wallet and then into a Binance account, which he apparently stole; transferred 2 ETH to another wallet; and returned the remaining .6 ETH to the 0xb1 wallet. *See* Sabo Decl. ¶ 38.

With interest, Celsius estimates that the Celsius Staked ETH now totals approximately 27,500 ETH, which remains locked in the Staking Contract for now and continues to accrue interest. *See* Sabo Decl. ¶ 34. █████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[6]    *See* Justin Wise, *Roche Firm Booted From Tether Action After Crypto Leaks Post (1)*, BLOOMBERG LAW (Oct. 13, 2022), https://news.bloomberglaw.com/business-and-practice/roche-firm-booted-from-tether-action-after-crypto-leaks-post; *see also* Atkins, *supra* note 4.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

The Celsius Staked ETH will remain locked and unavailable for withdrawal until the Ethereum network is upgraded to support withdrawals of staked ETH (the "Upgrade"). *See id.* ¶ 36. This process is underway. *See id.* Ultimately, no one knows, or can know, exactly when the Upgrade will be complete, or exactly when the Celsius Staked ETH will be unlocked. *See id.* While it is unlikely that the Celsius Staked ETH will imminently be unlocked and available for withdrawal, the exact timing cannot be known and certainly the possibility of Celsius Staked ETH becoming unlocked in the first quarter of 2023 cannot be ruled out. *See id.*

After the Upgrade is complete and Celsius Staked ETH is unlocked, anyone with the associated seed code and private keys will be capable of transferring the Celsius Staked ETH to any address on the blockchain ██████████████████████████████████████ ████████████ *See id.* ████ Celsius, ████████, and Stone are the only parties that possess the seed code and private keys to the Staking Contract. *See* Kleiderman Decl. ¶ ██. Thus, Stone will be capable of transferring the Celsius Staked ETH to any wallet he chooses if he gets to it first once it is unlocked. *See id.* █████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

### G.    The Defendants Refuse to Agree to Voluntary Injunction

Before filing this motion, Celsius contacted the Defendants' counsel and proposed entry into a temporary voluntary injunction (i) requiring the Defendants to specifically identify all Property, (ii) forbidding Defendants from further transferring or dissipating that Property during

the pendency of the case, (iii) forbidding the Defendants from retrieving the Celsius Staked ETH

or accessing an Celsius Wallets, and (iv) prohibiting the Defendants from using Tornado Cash or

other money laundering applications.  *See id.*, Exs. 40 and 42.  Celsius also demanded that the

Defendants relinquish and destroy any seed phrases and private keys that provide them access to

Celsius Wallets and/or to the Celsius Staked ETH when it is unlocked.  *See id.*  Through Roche

Freedman, the Defendants refused.  *See id.*, Ex. 41.

## ARGUMENT

As discussed below, entry of a preliminary injunction is called for here, including because

(i) the Amended Complaint includes claims seeking equitable relief, (ii) the Defendants are likely

to secrete or abscond with assets at issue, (iii) there is a likelihood of success on the merits, and

(iv) the equities weigh overwhelmingly in favor of Celsius.  Finally, consistent with Fed. R. Bankr.

P. 7065, the requested relief should be entered without requiring Celsius to post a bond.

## I.  AN INJUNCTION SHOULD BE ISSUED TO PREVENT DEFENDANTS FROM CARRYING OUT FURTHER ACTS OF THEFT AND SECRETION

The Defendants' history of conversion and deceit with respect to Celsius' property presents

a textbook case of the need for injunctive relief to preserve the Property in dispute here and avoid

irreparable harm to Celsius and its creditors.  This Court has "inherent equitable authority" to issue

preliminary injunctive relief where, as here, the plaintiff is "pursuing a claim for final equitable

relief and the preliminary injunction is ancillary to the final relief."  *Gucci America, Inc. v. Weixing

Li*, 768 F.3d 122, 130–31 (2d Cir. 2014) (citation omitted) (citing *De Beers Consol. Mines v. United

States,* 325 U.S. 212, 219–20 (1945)).  Moreover, as here, "where the particular funds sought to

be frozen are also the funds at issue in the suit, a preliminary injunction is proper," *Wishnatzki &

Nathel, Inc. v. H.P. Island-Wide, Inc.*, No. 00 Civ. 8051(JSM), 2000 WL 1610790, at *1 (S.D.N.Y.

Oct. 27, 2000), provided that the plaintiff "establish[es] [i] that he is likely to succeed on the merits,

[ii] that he is likely to suffer irreparable harm in the absence of preliminary relief, [iii] that the balance of equities tips in his favor, and [iv] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Dong v. Miller*, No. 16-cv-5836 (NGG) (JO), 2018 WL 1445573, at *5 (E.D.N.Y. Mar. 23, 2018). All of these factors are present here.

## A.   Celsius Would Suffer Irreparable Harm Absent a Preliminary Injunction.

As detailed above, the Defendants in the past have taken advantage of their access to Celsius wallets to brazenly steal assets of great value, including by siphoning coins and other property out of those wallets long after Stone's employment was terminated, and after receiving numerous written demands instructing the Defendants to return all Celsius assets in their possession. *See generally* Sabo Decl. ¶¶ 12–38; Kleiderman Decl. ¶¶ 3–8. By their frequent use of Tornado Cash and other methods, the Defendants have already demonstrated an intention, willingness and ability to obscure their on-chain transfers, and place property outside of Celsius' reach. *See* Sabo Decl. ¶¶ 12–38; Kleiderman Decl. ¶¶ 3–8.

Absent the relief sought here, the risk is overwhelming that the Defendants will continue their pattern of theft and deceit by purloining still more Celsius assets, and laundering Celsius' Property through a mixer like Tornado Cash, which would subject Celsius to irreparable harm and therefore warrants entry of injunctive relief. Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999); *see also In re MarketXT Holdings Corp.*, 376 B.R. 390, 425 (Bankr. S.D.N.Y. 2007) (observing that courts have authority to use preliminary injunctive relief to preserve assets for equitable relief). Hence, "'where a non-movant's assets may be dissipated before final relief can be granted, or where the non-movant threatens to remove its assets from the court's jurisdiction, such that an award of monetary relief would be meaningless'"

16

irreparable harm exists warranting issuance of a preliminary injunction. *Dong*, 2018 WL 1445573, at *11 (quoting *Firemen's Ins. Co. of Newark, v. Keating*, 753 F. Supp. 1146, 1153 (S.D.N.Y. 1990)). And a "'preliminary injunction is always appropriate'" where, as here, it grants "'intermediate relief of the same character as that which may be granted finally.'" *Rep. of Phil. v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986) (quoting *De Beers Consol. Mines*, 325 U.S. at 220).

Moreover, courts have recognized that digital assets pose a "heightened risk of asset dissipation" that often justifies entry of pre-judgment freezing injunctions. *See Fed. Trade Comm'n v. Dluca*, No. 0:18-cv-60379-RKA, 2018 WL 1830800, at *2–3 (S.D. Fla. Feb. 28, 2018), *report and recommendation adopted*, No. 0:18-cv-60379-KMM, 2018 WL 1811904 (S.D. Fla. Mar. 12, 2018). Because digital assets "are circulated through a decentralized computer network, without relying on traditional banking institutions or other clearinghouses" it is difficult to "trace or freeze cryptocurrencies in the event of fraud or theft." *See id.* at *2; *accord Jacobo v. Doe*, No. 1:22-cv-00672-DAD-BAK(BAM), 2022 WL 2052637, at *3 (E.D. Cal. June 7, 2022). Indeed, where digital assets are at issue, "it is a simple matter" for the defendant "to transfer . . . cryptocurrency to unidentified recipients outside the traditional banking system and effectively place the assets at issue in this matter beyond the reach of the court." *Jacobo*, 2022 WL 2052637, at *5 (citation and internal quotation marks omitted).

It is therefore particularly critical to freeze digital assets before they can be dissipated in a manner that cannot be traced or remedied. *See, e.g.*, *Heissenberg v. Doe*, No. 9:21-cv-80716-RKA, 2021 WL 8154531, at *2 (S.D. Fla. Apr. 23, 2021) (concluding that irreparable harm was likely due to the "speed and potential anonymity of cryptocurrency transactions" and that plaintiff had "good reason to believe the [d]efendant [would] hide or transfer his ill-gotten gains beyond the jurisdiction of [the c]ourt unless those assets are restrained"). The risk presented here involves not

only the substantial Property the Defendants already have stolen, but also the nearly $35 million worth of Celsius Staked ETH to which the Defendants may soon gain access. Unless restrained, the Defendants easily could take advantage of the "anonymity of cryptocurrency transactions" and applications like Tornado Cash to place those valuable assets outside of Celsius' reach, and make them permanently unavailable for distribution to Celsius' creditors.

**B.    Celsius Is Likely to Prevail on the Merits of Its Claims.**

To establish a likelihood of success on the merits, a movant "'need not show that success is an absolute certainty.'" *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)). On the contrary, a preliminary injunction may issue even if the movant's likelihood of success on the merits is unclear, *Dong*, 2018 WL 1445573, at *5, provided that the movant demonstrates the existence of "'serious questions going to the merits of its claims to make them fair ground for litigation.'" *New York ex rel. Schneiderman v. Actavis*, 787 F.3d 638, 650 (2d Cir. 2015) (quoting *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011)). Nor must the movant demonstrate a likelihood of success on the merits of every one of its claims; just one will do. *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) (holding that movant need only "show a likelihood of success on the merits of at least one of [their] claims" to obtain an injunction) (internal quotation marks and citation omitted; alteration in original).

Even under a far more exacting standard, an injunction would be warranted here. Celsius' claims seeking equitable relief, including claims for turnover, conversion, replevin, unjust enrichment, and an accounting, along with the remedies of constructive trust and disgorgement of the Defendants' unlawful gains, are based on the Defendants' unauthorized transfer and use of Celsius' Property. *See* Am. Compl. ¶¶ 22–40, ECF No. 10. Remarkably, the Defendants in this case do not deny that they in fact took the Celsius Property at issue, including by using private

keys Stone obtained while still employed at Celsius to enter Celsius Wallets and remove Celsius property long after Celsius directed Defendants in writing to return all property, and in many cases, long after Stone's employment at Celsius was terminated.  *See generally* Defendants' Motion to Dismiss Celsius' Amended Complaint [ECF No. 17] (the "MTD").

Stone and KeyFi's "defense" to these claims is their naked, contradictory assertion that they were authorized to remove Celsius Property and transfer it to their own wallets as "profit share."  *See* MTD, Ex. 1, ¶ 89; Hurley Decl. Ex. 39.  This obviously false claim cannot withstand even modest scrutiny.  First, there was no "profit" to share.  Indeed, the Defendants admit that they returned far fewer coins to Celsius than were supplied by Celsius to the Defendants for deployment, and admit that the missing Celsius' coins are worth tens or hundreds of millions of dollars.  That is a loss, not a profit.  Second, this claim contradicts the written Service Agreement, which provides that "all coins deployed by [the Defendants] and revenues generated and/or received from third parties ***shall be owned by and paid to Celsius,***" and that compensation—if any—will be paid by "Celsius," not by the Defendants.  Hurley Decl. Ex. 31 ¶¶ 3–4, Schedule B.

Third, when Celsius demanded the return of its assets in the first quarter of 2021, the Defendants did not respond by claiming Celsius owed them "profit share," nor did they claim (as they nonsensically do now) that Celsius was responsible for calculating the profits and losses associated with the Defendants' activities.  In fact, Stone said exactly the opposite.  In his March 26, 2021 email, Stone promised to "put together a proposed timeline for the return of all Celsius tokens & interest, ***as well as Celsius due profit share***," and that "[t]he Keyfi team is hard at work on completing a full accounting."  *Id.*, Ex. 34.  And just the next day, Stone again "promise[d]" to send to Celsius "100%" of Celsius' coins, plus "profits sometime between 4/20 and 4/31 [2021]."

*See id.*, Ex. 35.  These emails cannot be squared with the Defendants' current claim that it was Celsius that owed them digital assets, rather than the other way around.

Fourth, and crucially, while Defendants have not produced a scrap of paper in support of their claim that Celsius authorized them to take its Property, Celsius can point to numerous written communications beginning in early 2021 demonstrating that Celsius did not.  Indeed, beginning in March 2021—the same month that Stone claims his employment at Celsius terminated—Celsius wrote Defendants and their counsel to repeatedly and unequivocally demand that the Defendants cease deploying Celsius assets immediately and return all Celsius Property at once.  *See id.*, Exs. 33, 36, and 37.  And yet the Defendants apparently maintain that on September 21, 2021—more than five months after Celsius demanded the return of all Property and Stone's employment was terminated—Stone was "authorized" by Celsius to use Celsius' private keys to access the 0xb1 wallet, transfer $1.4 million in DAI to a wallet he controls, and from there transfer that value through the money laundering application Tornado Cash to destinations unknown.  Sabo Decl. ¶¶ 30–33; Kleiderman Decl. ¶ 6.  The Court is not required to credit these kinds of deeply implausible, self-serving and contradictory claims in opposition to a motion for a preliminary injunction.  *See, e.g.*, *Unisource Worldwide, Inc. v. S. Cent. Ala. Supply, LLC*, 199 F. Supp. 2d 1194, 1206 (M.D. Ala. 2001) (analyzing likelihood of success on the merits of claim and noting that defendant's "self-serving statement[s]" were insufficient "to withstand a preliminary injunction").

Undoubtedly, Celsius' claims raise at least "sufficiently serious questions going to the merits to make them a fair ground for litigation."  Nothing more is required to establish a sufficient likelihood of success on the merits to warrant entry of an injunction.  *See, e.g.*, *In re Adelphia Comm'ns Corp.*, 323 B.R. 345, 373 (Bankr. S.D.N.Y. 2005); *see also, e.g.*, *Heissenberg*, 2021 WL 8154531, at *2 ("The Plaintiff was victimized by the theft of her cryptocurrency assets, and it

appears from the record that JOHN DOE has no right to claim either possession or ownership of the Plaintiff's stolen assets. Therefore, there is a high likelihood Plaintiff will succeed on her claims."); *Sallah for Project Invs., Inc. v. Liu*, No. 9:20-CV-81041, 2020 WL 13401703, at *4 (S.D. Fla. Oct. 20, 2020) (granting injunction based on substantial evidence that cryptocurrency was stolen and transferred "to accounts owned and/or controlled by Defendant").

### C.   The Equities and Public Interest Tilt Strongly in Celsius' Favor.

The equities strongly support Celsius' requested relief.  Celsius primarily seeks to preserve the *status quo* by preventing the Defendants from further secreting any Stone Utilized Assets or Subject Property during the course of the case, and from stealing the Celsius Staked ETH when it unlocks.  Safeguarding assets from theft and dissipation so that they can be available for the benefit of Celsius' creditors is manifestly equitable, and in the public interest.  *See, e.g.*, *In re Calpine Corp.*, 365 B.R. 401, 413 (S.D.N.Y. 2007).  For their part, Defendants would suffer no cognizable harm from an injunction freezing assets that rightly belong to Celsius.  *See, e.g., Jacobo*, 2022 WL 2052637, at *6 (granting injunction and freezing of assets to prevent continued unauthorized transfer of cryptocurrency and noting "[a] delay in defendant's ability to transfer the assets only minimally prejudices defendant, whereas withholding injunctive relief would severely prejudice plaintiff by providing defendant time to transfer the allegedly purloined assets into other accounts beyond the reach of this court"); *Sallah for Project Invs., Inc.*, 2020 WL 13401703, at *5 (freeze of crypto assets "[does] not affect Defendant LIU in any detrimental manner").  Moreover, there is no hardship in being enjoined from committing a crime.  *Cf., e.g.*, *Astrove v. Doe*, No. 22-CV-80614-RAR, 2022 WL 2805345, at *4 (S.D. Fla. June 17, 2022) (granting injunction and noting, "[w]hile Plaintiff would be severely prejudiced if the stolen cryptocurrency were transferred and lost, Defendant JOHN DOE faces no such prejudice").

There can be no legitimate basis for the Defendants to insist on proceeding with any of the conduct that Celsius seeks to bar through entry of the preliminary injunction. In fact, much of that conduct already is barred by the automatic stay provided under Section 362 of the bankruptcy code. The automatic stay enjoins all persons from taking any action to obtain possession of property of the estate, or of property from the estate, or to exercise control over property of the estate. 11 U.S.C. § 362(a). Section 541(a) of the Bankruptcy Code defines "property of the estate" broadly to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). This includes every conceivable interest of the debtor except for items specifically excluded from property of the estate under section 541(b). *See* 11 U.S.C. § 541(b); *Grubin v. Rattet (In re Food Mgmt. Grp, LLC)*, 380 B.R. 677, 692 (Bankr. S.D.N.Y. 2008). Section 541(b) excludes various kinds of property that are not at issue here.

The Stone Utilized Assets, the Subject Property, and the Celsius Staked ETH manifestly qualify as "property of the estate" subject to the automatic stay. Thus, as Celsius explained to the Defendants before filing this motion, "the Voluntary Injunction proposed by Celsius primarily would require the Defendants to simply acknowledge, and commit to discharging, obligations that the Defendants and their affiliates already have pursuant to the automatic stay." *See* Hurley Decl. Ex. 42. The Defendants refusal to do so only heightens Celsius' concern that, absent further relief from this Court, the Defendants will secrete and/or steal even more Celsius assets, which will not be available for distribution to creditors following any judgment this Court may enter.

## II.    <u>NO BOND SHOULD BE REQUIRED</u>

Bankruptcy Rule 7065 provides that "a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c)." Fed. R. Bankr. P. 7065. Under this provision, courts have explained that the "general rule" is that debtors need not post a bond to obtain preliminary injunctive relief

absent some enhanced risk of injury to the enjoined parties. *See Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 595 (Bankr. S.D.N.Y. 2009) (issuing injunction and finding "no reason . . . to depart from the general rule" that debtors need not post a bond to obtain an injunction given the "remote" risk of injury to enjoined parties); *see also Caesars Ent. Op. Co., Inc. v. BOKF, N.A. (In re Caesars Ent. Op. Co., Inc.)*, 561 B.R. 441, 456–57 (Bankr. N.D. Ill. 2016) (issuing preliminary injunction without requiring bond because the enjoined parties' remote risk of injury left "no reason to 'depart from the general rule' in bankruptcy cases that a bond is unnecessary when a debtor in possession is granted preliminary injunctive relief" (quoting *Lyondell*, 402 B.R. at 595)). Accordingly, here, the Court can and should grant the Motion without requiring Celsius to post a bond given, as discussed above, Defendants will not suffer any injury due to the requested injunctive relief, which merely maintains the status quo pending a decision on the merits.

## NOTICE

Notice of this Motion will be provided in accordance with the procedures set forth in the *Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [ECF No. 1181]. Celsius respectfully submits that no further notice is required. No prior request for the relief sought in this Motion has been made to this or any other court.

## CONCLUSION

For the foregoing reasons, Celsius respectfully requests that the Court (i) enter an order substantially in the form attached hereto as Exhibit A and (ii) grant such other and further relief as the Court may deem proper.

Dated:          November 14, 2022

New York, New York

AKIN, GUMP, STRAUSS, HAUER & FELD LLP

By:    /s/ Mitchell P. Hurley
       Mitchell P. Hurley
       Dean L. Chapman Jr.
       One Bryant Park
       New York, New York 10036
       Telephone: (212) 872-1000
       Facsimile: (212) 872-1002
       mhurley@akingump.com
       dchapman@akingump.com

       Elizabeth D. Scott (admitted *pro hac vice*)
       2300 N. Field Street, Suite 1800
       Dallas, TX 75201
       Telephone: (214) 969-2800
       Facsimile: (214) 969-4343
       edscott@akingump.com

       *Special Litigation Counsel for Debtors and*
       *Plaintiffs Celsius Network Limited and*
       *Celsius KeyFi LLC*

| TABLE OF EXHIBITS | |
|---|---|
| Exhibit A | [Proposed] Order Granting Preliminary Injunction |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CELSIUS NETWORK LIMITED and<br>CELSIUS KEYFI LLC,<br><br>           Plaintiffs,<br><br>v.<br><br>JASON STONE and KEYFI INC.,<br><br>           Defendants. | Adversary Proceeding<br>No. 22-01139 (MG) |

### [PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION

This matter coming before the Court on the motion (the "Motion") filed by Celsius Network Limited and Celsius KeyFi, LLC (together, the "Plaintiffs" or "Celsius") seeking a preliminary injunction against Jason Stone and KeyFi, Inc. (together, the "Defendants"); the Court having reviewed the Motion's supporting materials, including the accompanying memorandum of law, the declarations of Patrick Holert, Mitchell Hurley, Esq., Shiran Kleiderman, and Ron Sabo (collectively, the "Declarations"), and the amended adversary complaint filed by the Plaintiffs in the above-captioned adversary proceeding (the "Amended Complaint"); and the Court having held a hearing on December 5, 2022, at 2:00 p.m., prevailing Eastern Standard Time, to consider the relief requested in the Motion (the "Hearing"); and upon the record of the Hearing, and upon all of the proceedings had before the Court; and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. 1334; (b) due and proper notice of the Motion having been given in accordance with the Case Management Order [Case No. 22-10964, ECF No. 528] (the "CMO"); (c) service of the Motion having been proper under Federal Rule of Civil Procedure 5 as made applicable by Bankruptcy Rule 7005 and the CMO; and (d) the Court having

determined that the legal and factual bases set forth in the Motion and supporting materials establish just cause for the relief granted herein;

**IT IS HEREBY FOUND AND DETERMINED THAT:**[1]

A.      A preliminary injunction preventing the dissipation of the assets sought to be recovered by the Plaintiffs in the above-captioned adversary proceeding is appropriate under Federal Rule of Civil Procedure 65 as made applicable by Bankruptcy Rule 7065.

B.      There is a substantial likelihood that the Debtors' bankruptcy estates will suffer irreparable harm if the Defendants are not enjoined from dissipating the assets the Plaintiffs seek to recover from the Defendants in the Plaintiffs' Amended Complaint in the above-captioned adversary proceeding.  Unless a preliminary injunction issues, there is a material risk (especially given the Defendants' alleged prepetition conduct) that the Defendants will dissipate the funds at issue in the Complaint.  Any such dissipation would likely frustrate the Plaintiffs' efforts to collect on any judgment obtained against Defendants, which in turn would frustrate the administration of the Debtors' bankruptcy estates and dilute the ultimate distribution to the Debtors' creditors.

C.      The Plaintiffs have demonstrated a likelihood of success on the merits on the causes of action asserted in the Complaint.  Based on the facts asserted in the Amended Complaint and in the Declarations, it appears the Defendants converted or stole a substantial amount of valuable cryptocurrency assets that rightly belong to Celsius.  The Defendants have further sought to put those assets beyond the reach of Plaintiffs by funneling them through a notorious on-chain "mixer" that obscures the destination of property transferred on the blockchain and which the Office of

---

[1]     The findings and conclusions set forth herein and in the record of the hearing on the Motion constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rules 7052 and 9014.  To the extent any of the findings of fact herein constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law herein constitute findings of fact, they are adopted as such.

Foreign Asset Control recently banned due to its frequent use "by illicit actors to launder funds, especially those stolen during significant heists."

D.      In the alternative, the Plaintiffs have, at a minimum, raised sufficiently serious questions going to the merits of the claims asserted in the Complaint.

E.      The balance of hardships decidedly tips in the Plaintiffs' favor.  As found above, the Debtors' bankruptcy estates will likely suffer harm if an injunction is not issued.  On the other hand, granting the injunction preventing the Defendants from dissipating the assets the Plaintiffs seek to recover will not place an undue burden on Defendants.  Indeed, this conduct is already largely barred by the automatic stay applicable under section 362 of the Bankruptcy Code.  Moreover, given the nature of the claims asserted by the Plaintiffs, any hardship to the Defendants is more than outweighed by the benefits to the Debtors' bankruptcy estates.

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED THAT:**

1.      Beginning on the date of this Order and continuing until otherwise ordered by this Court, the Defendants, and the Defendants' officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with the Defendants or any of the Defendants' officers, agents, servants, employees, and attorneys, during the course of this action, are restrained and enjoined from (a) accessing, transferring, or otherwise disposing of the Celsius Staked ETH;[2] (b) accessing for any reason any Celsius Wallets;[3] (c) transferring or otherwise

---

[2]   "Celsius Staked ETH" refers to the 24,960 ETH transferred from the Celsius Wallet with the address 0xb1adceddb2941033a090dd166a462fe1c2029484 through a smart contract with the address 0x39dc6a99209b5e6b81dc8540c86ff10981ebda29 and deposited to the Ethereum staking deposit smart contract with the address 0x00000000219ab540356cBB839Cbe05303d7705Fa and all interest or other rewards earned thereon.

[3]   "Celsius Wallets" are the blockchain wallets in which Celsius deposited digital assets for deployment in authorized staking and decentralized finance activities by the Defendants, and to which Celsius supplied the seed phrase and/or private keys to the Defendants.  "Stone Utilized Assets" refers to any assets removed or otherwise used by, or at the direction of, the Defendants from any Celsius Wallet.  "Subject Property" refers to NFTs,

disposing of any Property, including any Stone Utilized Assets and any Subject Property, that they took from any Celsius Wallet; and (d) using Tornado Cash or other means to conceal the location of property that could otherwise be available to satisfy a judgment in this case.[4]

2.      Furthermore, (a) the Defendants are required within five calendar days of the date of this Order, to specifically identify, under penalty of perjury, all Property, including all Stone Utilized Assets and all Subject Property, and its current location(s); and (b) the Defendants, and the Defendants' officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with the Defendants or any of the Defendants' officers, agents, servants, employees, and attorneys, are required within 24 hours of the date of this Order, to relinquish the seed phrases and private keys associated with any and all Celsius Wallets and with the Celsius Staked ETH.

3.      Any party or entity served with a copy of this Order that holds any funds or property of any of the Defendants shall, within five days of receiving the Order, serve upon the Plaintiffs' counsel (but not file) a response describing with particularity the funds or property so held.

4.      Any party or entity subject to this Order may seek a hearing in this Court upon five days' notice seeking to modify this Order as to such party or entity, or clarifying their obligations under this Order.

5.      The Plaintiffs may provide written clarification to any party or entity subject to this Order concerning their obligations hereunder.  The Plaintiffs are authorized to release in writing any funds or property held by such party or entity pursuant to this Order.

---

interests in blockchain related companies, and any other property of any kind acquired in whole or in part with Stone Utilized Assets or their proceeds.  "Property" refers collectively to the Stone Utilized Assets and the Subject Property.

[4]   "Tornado Cash" refers to the virtual currency mixer sanctioned by the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) on August 8, 2022.

6.      Pursuant to Federal Rule of Civil Procedure 65(b), made applicable to this adversary proceeding pursuant to Bankruptcy Rule 7065, no additional notice to any person is required prior to entry and issuance of this Order.

7.      Pursuant to Bankruptcy Rule 7065, the security provisions of Federal Rule of Civil Procedure 65(c) are waived.

8.      Plaintiffs are authorized and empowered to take such action as may be necessary to implement and effectuate this Order.

9.      The terms of this Order shall be immediately effective and enforceable upon its entry.

10.      This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.


DONE AND ORDERED in Chambers at New York, New York, this _____ day of _____, 2022.


_____
THE HONORABLE MARTIN GLENN
United States Bankruptcy Judge