## **Exhibit 30**

December 31, 2020 Asset Purchase Agreement

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is effective as of December 31, 2020, by and among (i) **KEYFI, INC.**, a corporation established and existing under the laws of the State of Delaware, with its principal place of business at 99 John St., #1405, New York, NY 10038 (the "**Seller**"); (ii) **CELSIUS NETWORK LIMITED**, a private company incorporated under the laws of England and Wales, with its principal place of business at 1 Bartholomew Lane, London, England, EC2N 2AX (the "**Parent**"); and (iii) **CELSIUS KEYFI LLC**, a limited liability company organized under the laws of Delaware (the "**Buyer**", and together with the Parent, each is a "**Buyer Party**"). The Seller, the Parent, and the Buyer shall be referred to herein individually as a "**Party**", and collectively as the "**Parties**".

**WHEREAS,** the Seller has been engaged in, *inter alia*, development and provision of a product which is a unique, true self-custody implementation leveraging multi-party computation purpose-built for interconnectivity between the DeFi and CeFi world  (the "**Business**"); and

**WHEREAS,** the Seller desires to sell, and the Buyer desires to purchase, the Seller Assets; and

**WHEREAS,** at or prior to the Closing, each of the Transferring Persons shall have entered into an employment or consulting arrangement with the Buyer, together with a confidential information and invention assignment agreement, reflecting the terms set forth in <u>Section 7.7(a)</u> below (collectively, the "**Key Engagement Agreements**").

**NOW, THEREFORE,** in consideration of the mutual promises and covenants set forth herein and in consideration of the representations, warranties herein contained, and the intention to be legally bound hereby, the Parties hereby agree as follows:

1. **DEFINITIONS AND INTERPRETATION**

   1.1  <u>Definitions</u>

   The following capitalized terms shall have the following meanings for all purposes of this Agreement:

| | |
|---|---|
| "**Affiliates**" | Means, with respect to a Person, any direct or indirect subsidiary of such Person and any other Person directly or indirectly controlling, controlled by, or under common control with such Person. |
| "**Applicable Law**" | Means, with respect to either an individual or a corporation, any law existing as of the date hereof applicable to such individual or corporation or any of their respective properties and assets, officers, directors, employees, consultants or agents. |
| "**Assumed Liabilities**" | As defined in <u>Section 2.2(a)</u>. |
| "**Business**" | As defined in the Recitals to this Agreement. |

53260-5436937v5

| | |
|---|---|
| **"Business Days"** | Means a day on which commercial banks are open for business in New York. |
| **"CEL Tokens"** | Means the cryptocurrency token created by the Parent. |
| **"Closing"** | As defined in <u>Section 4.1</u>. |
| **"Encumbrance"** | Means any charge, claim, equitable interest, mortgage, lien, pledge, security interest or restriction of any kind, or any agreement to create any of the foregoing. |
| **"Excluded Liabilities"** | As defined in <u>Section 2.2(b)</u>. |
| **"Governmental Body"** | Means any government or any agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other authority or instrumentality of any government, whether local, domestic or foreign. |
| **"Intellectual Property"** | Means, collectively, the rights in, arising out of, or associated with, and all registrations, renewals, extensions, future equivalents, and restoration thereof, now or hereafter in force or effect, anywhere in the world, to: (a) patents, utility models, and applications therefor, and all reissues, divisions, re-examinations, provisionals, continuations and continuations-in-part thereof, and equivalent or similar rights in inventions, discoveries, and designs, including invention disclosures; (b) all techniques, technology, practices trade secrets and other rights in know-how and confidential or proprietary information; (c) all mask works and copyrights, and all other rights corresponding thereto (including moral rights) throughout the world; (d) all rights in World Wide Web addresses and domain names and applications and registrations therefore, and contract rights therein; (e) all trade names, logos, trademarks and service marks, trade dress and all goodwill associated therewith |

2

throughout the world; (f) rights of publicity and personality; (g) rights of attribution and integrity and other moral rights; and (h) any similar, corresponding, or equivalent rights to any of the foregoing items (a) through (g).

**"Key Engagement Agreements"**    As defined in the Recitals to this Agreement.

**"Liability"**    Means any liability, indebtedness or obligation of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on financial statements arising under any contract, Applicable Law or action, accounts payable, royalties payable, reserves, accrued bonuses, accrued vacation, expenses obligations to employees and liabilities for Taxes.

**"Purchase Price"**    As defined in <u>Section 3.1</u>.

**"Seller Assets"**    As defined in <u>Section 2.1</u>.

**"Seller Contracts"**    As defined in <u>Section 2.1(b)</u>.

**"Seller Intellectual Property"**    Means both the Seller Owned Intellectual Property and the Seller Licensed Intellectual Property.

**"Seller Licensed Intellectual Property"**    Means all Intellectual Property owned by third parties and licensed to the Seller relating to the Business.

**"Seller Owned Intellectual Property"**    Means all Intellectual Property owned or purported to be owned by the Seller relating to the Business.

**"Service Agreement"**    As defined in <u>Section 7.8(a)</u>.

**"Service Agreement Key Terms"**    As defined in <u>Section 7.8(b)</u>.

53260-5436937v5

| | |
|---|---|
| **"Source Code"** | Means the human-readable source code for any software that is part of the Seller Intellectual Property as well as any confidential or proprietary information relating to any software source code or any of the Seller Owned Intellectual Property. |
| **"Taxes"** | Means any and all taxes, charges, duties, fees, levies, imposts or other assessments, reassessments, or mandatory payments of any kind whatsoever, whether direct or indirect, imposed by or payable to or accrued to the benefit of any federal, state, local or foreign taxing authority. |
| **"Transfer Taxes"** | As defined in <u>Section 3.2</u>. |
| **"Transferring Persons"** | As defined in <u>Section 7.7(a)</u>. |
| **"Valid Withholding Certificate"** | Means a valid certificate, ruling or any other written instructions regarding withholding of Taxes, issued by a taxing authority, in form and substance reasonably satisfactory to the Buyer applicable to the Purchase Price to be paid pursuant to this Agreement. |

2. **ACQUISITION OF ASSETS**

2.1   <u>Sale and Acquisition of the Seller Assets</u>

Subject to the terms and conditions of this Agreement, at the Closing, the Seller shall sell, convey, transfer, assign and deliver to the Buyer, and the Buyer shall purchase, acquire and accept from the Seller, the Seller's right, title and interest in and to all assets related to the Business, free and clear of any and all Encumbrances, including, without limitation, the following assets (collectively, the "**Seller Assets**"):

(a)   All Seller Intellectual Property, including, without limitation:

(i)   the assets set forth in **Schedule 2.1(a)**;

(ii)   all Intellectual Property developed and owned by Seller for the Business, including all source and object codes, binaries, supplements, modifications, updates and enhancements to past and present versions, shipping versions and versions under development by Seller for any products and technologies developed by or for, or marketed by, Seller;

53260-5436937v5

    (iii)    any and all design and code documentation, methodologies, processes, trade secrets, design information, product information, algorithms, engineering specifications, technical manuals and data, inventions, know-how, programmer's notes and other works of authorship, which are related to, used in or derived from any products or services developed by or for, or marketed by, the Business; and

    (iv)    all Intellectual Property that is owned or used by the Seller or any of its Affiliates in the operation of, or related to, or derived from the Business or its products, services and assets.

(b)    All rights in and to the contracts set forth in **Schedule 2.1(b)** (the "**Seller Contracts**").

(c)    All tangible assets and equipment related to the Business, including the tangible assets and equipment set forth in **Schedule 2.1(c)**.

(d)    All rights in and to: (i) files and information (including all data and other information stored on any media) relating to the Seller Intellectual Property and the Seller Contracts and the customers of the Business, including the personal identification details of such customers; and (ii) any databases owned or managed by the Seller solely in connection with the Business.

(e)    All rights, causes of action and damages receivable with respect to: (i) any Seller Assets; and (ii) non-competition and confidentiality agreements which were in effect at any time prior to the execution of this Agreement; in each case, whether or not due or payable at any time, under the laws of any and all jurisdictions, including all claims for damages by reason of past, present or future infringement, misappropriation or other unauthorized use of any Seller Asset, and including, regardless of whether or not any claim or cause of action has been asserted by the Seller, the right to sue and collect the same, indemnity rights, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery possessed by the Seller, regardless of whether any such rights are currently exercisable.

2.2    <u>Liabilities</u>

(a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Seller will assign to the Buyer, and the Buyer will assume and be responsible solely for, any Liability related to the Seller Assets that accrue as of and subsequent to the Closing, and do not arise from any breach committed by the Seller or on its behalf on or prior to the Closing (the "**Assumed Liabilities**").

(b)    The Seller will retain and the Buyer will neither assume nor be responsible for (nor be deemed to have assumed or be responsible for) every other Liability of the Seller or related to the Business of any nature (whether express or implied, fixed or contingent, liquidated or unliquidated, known or unknown, accrued or due or to become due), which shall not constitute an Assumed Liability, including, without limitation, any Liability: (i) unrelated to the Seller Assets; (ii) constituting a right or benefit towards the Transferring Persons or on their behalf in respect of their employment or engagement with the Seller; (iii) for any Taxes arising from the operation of the Business or ownership of or rights in the Seller Assets; (iv) arising out of any claim against Seller or the Business or otherwise pertaining to

53260-5436937v5

the Transferring Persons or the Seller Assets pending as of the Closing; (v) arising out of any claim commenced after the Closing to the extent that any such claim arises from any act, event or omission occurring prior to the Closing; or (vi) any other Liability which the Seller owes to any third party (collectively, the "**Excluded Liabilities**").

3.  **PURCHASE PRICE AND PAYMENT**

    3.1   Purchase Price

        As the sole and exclusive consideration for the Seller's commitments under this Agreement, the Buyer shall:

        (a)   pay to the Seller at Closing, in immediately available funds by wire transfer (to a bank account specified by the Seller), a total of sixty-five thousand Dollars (USD 65,000), inclusive of any value-added tax, to the extent applicable;

        (b)   Subject to Applicable Laws and regulations:

            (i)    at the Closing, deliver to the Seller 175,000 CEL Tokens;

            (ii)   on the date which is six (6) months after the Closing, deliver to the Seller 87,500 CEL Tokens;

            (iii)  on the first (1st) anniversary of the Closing, deliver to the Seller 87,500 CEL Tokens; and

        (c)   pay, or caused to be paid, to the Seller in immediately available funds by wire transfer (to a bank account specified by the Seller), any Earnout Payment (as defined in the Service Agreement Key Terms) in accordance with the terms of the Service Agreement, within five (5) Business Days of the actual receipt of the Earnout Payment in accordance with this Agreement and the Service Agreement ((a), (b), and (c) collectively, the "**Purchase Price**").

    3.2   Taxes

        (a)   Any payments made by the Buyer to the Seller under this Agreement shall be paid less any Taxes to be withheld to the extent applicable under Section 3.3, and against an issuance of a valid tax invoice, as detailed in Section 4.2(a)(vi)(C).

        (b)   The Seller shall be liable for any and all transfer, sales, documentary, stamp, registration and other similar Taxes incurred in connection with this Agreement (including any real property transfer tax, value-added tax and any other similar Taxes) (collectively, "**Transfer Taxes**"), and the Seller shall pay all such Taxes when due. The Seller shall, at its own cost and expense, timely file any tax return or other document with respect to any Transfer Taxes, and the Buyer shall use commercially reasonable efforts to cooperate with respect thereto as necessary.

    3.3   Withholding Rights

        The Buyer shall be entitled to deduct and withhold from any payment or consideration contemplated by this Agreement all Taxes that are required to be deducted and withheld with respect to such payment or other consideration under Applicable Law, unless the Seller has provided the Buyer with a Valid Withholding Certificate at least five (5)

53260-5436937v5

Business Days prior to date hereof, in which event the deduction and withholding of any such amount shall be made in accordance with the provisions of such Valid Withholding Certificate. Taxes withheld pursuant to this <u>Section 3.3</u> by the Buyer will be: (a) remitted by the Buyer to the relevant taxing authority; and (b) treated for all purposes of this Agreement as having been paid to the Seller.

4.   **<u>CLOSING</u>**

4.1   <u>Closing</u>

Subject to the terms and conditions of this Agreement, the closing of the transaction contemplated herein (the "**Closing**") shall take place by electronic exchange of executed documents within two (2) Business Days from the date of the satisfaction of the Closing conditions set forth herein, or at such other date that is mutually agreed by the Parties.

4.2   <u>Actions at Closing</u>

At Closing, the following actions will take place, all of which shall be deemed to have occurred simultaneously and no action shall be deemed to have been completed and no document or certificate shall be deemed to have been delivered, until all actions are completed and all documents and certificates delivered as detailed in this Agreement:

(a)   The obligations of the Buyer hereunder to proceed with the Closing are subject to the satisfaction at or prior to the Closing of each of the following conditions, unless otherwise waived in writing by the Buyer:

(i)   The representations and warranties of the Seller contained in this Agreement shall be true and correct as of the Closing.

(ii)   The Seller shall have duly performed or complied with all of the covenants, acts and obligations to be performed or complied with by the Seller hereunder in all material respects.

(iii)   The Buyer shall have received copies of all consents and approvals required to be obtained from third parties for the purposes of the transactions contemplated under this Agreement.

(iv)   No proceeding challenging this Agreement or the transactions contemplated hereby or seeking to prohibit, alter, prevent or materially delay the Closing shall be pending, and no judgment, injunction, order or decree, shall have been issued by any court, arbitrator or Governmental Body preventing or delaying the Closing.

(v)   Each Transferring Person shall have executed his respective Key Engagement Agreement with the Buyer.

(vi)   The Seller shall have delivered (or caused to be delivered) to the Buyer: (A) any assignment documents required in order to assign any of the Seller Assets; (B) a certificate of a director of the Seller, attaching copies of all corporate resolutions duly adopted by the Seller's board of directors and stockholders (as applicable) authorizing the execution, delivery and performance of this Agreement and certifying that such resolutions are in full force and effect; (C) a valid tax invoice issued by the Seller to the Buyer

covering the Purchase Price payable; and (D) any media containing the Seller Assets; in each case, in the form reasonably acceptable to the Buyer.

(b)     The obligations of the Seller hereunder to proceed with the Closing are subject to the satisfaction at or prior to the Closing of each of the following conditions, unless otherwise waived in writing by the Seller:

(i)      The representations and warranties of the Buyer contained in this Agreement shall be true and correct as of the Closing.

(ii)     The Buyer shall have duly performed or complied with all of the covenants, acts and obligations to be performed or complied with by the Buyer hereunder in all material respects.

(iii)    The Buyer shall have executed each Key Engagement Agreement.

(iv)    The Purchase Price shall have been paid in accordance with Section 3.

(a)     The obligations of all Parties hereunder to proceed with the Closing are subject to the entering into the Services Agreement by the Buyer and the Parent.

## 5.    REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to each Buyer Party, and acknowledges that each Buyer Party is entering into this Agreement in reliance thereon, that the representations set forth in this Section 5 are true and complete as of immediately prior to the Closing.

### 5.1    Organization and Existence

The Seller is a private company duly organized and validly existing under the laws of the State of Delaware, and has all requisite corporate power and authority to own, lease and operate its properties and assets, and to carry on its businesses as now being conducted. The Seller is duly qualified to do business in any jurisdiction in which it conducts or operates its business (to the extent such qualification is necessary in such jurisdiction).

### 5.2    Authority and Enforceability

(a)     The Seller has all necessary corporate power and authority to execute and deliver this Agreement and all other transactions and agreements contemplated herein to which the Seller is a party, and to perform its obligations hereunder and thereunder.

(b)     The execution, delivery and performance of this Agreement and all other agreements contemplated hereby to which Seller is a party have been duly and validly authorized by all necessary corporate action on the part of the Seller. No other corporate proceedings on the part of the Seller are necessary to authorize this Agreement and all other agreements contemplated hereby.

(c)     This Agreement and all other transactions and agreements contemplated herein to which the Seller is a party are duly and validly executed and delivered by the Seller and, assuming the due authorization, execution and delivery of each Buyer

8

Party, constitute the valid, legal and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms.

5.3    No Conflicts and No Required Consents

(a)    The execution, delivery and performance by the Seller of this Agreement and all other agreements contemplated hereby to which Seller is a party, do not: (i) conflict with or violate the articles of association, certificate of incorporation or other equivalent organizational documents of the Seller; (ii) conflict with or violate any Applicable Law; or (iii) result in any breach of any contract to which the Seller is a party, including any Seller Contract.

(b)    The execution, delivery and performance by the Seller of this Agreement and all other transactions and agreements contemplated herein to which the Seller is a party, do not, and the performance of this Agreement and all other agreements contemplated hereby by the Seller will not, require any: (i) consent, approval, authorization, clearance, or permit of, or filing or registration with, or notification to, any Governmental Body or otherwise, for such performance or in order to prevent the termination of any right, privilege, license or qualification of the Seller; or (ii) consent of any third party under a Seller Contract.

5.4    Taxes

(a)    All Taxes that relate to the activity which utilized or otherwise involved the Seller Assets required to be paid on or prior to the date hereof have been fully and timely paid, and the Seller has no liability for such Taxes with respect to such period in excess of the amount so paid.

(b)    There is no pending dispute with any taxing authority in relation to the Seller Assets or any activity which utilized or otherwise involved the Seller Assets, nor are there any proceedings, investigations, audits or claims now pending or threatened against the Seller in respect of any Taxes. The Seller is not aware of any circumstances in connection with the transactions contemplated herein which will give rise to any dispute with any relevant taxing authority in relation to the Seller Assets.

5.5    Seller Assets

(a)    The Seller has good and valid title to, is the exclusive legal and equitable owner of, and has the unrestricted power and right to sell, assign and deliver the Seller Assets. The Seller Assets are free and clear of all Encumbrances of any kind or nature. Upon the Closing, the Buyer will acquire exclusive, good and valid title to the Seller Assets, and, immediately following the Closing have been recorded, free and clear of all Encumbrances.

(b)    All the Seller Assets are in a condition and suitable for the Buyer to use in substantially the manner in which the Seller has used such Seller Assets prior to the date hereof. No licenses or consents from, or payments to, any other Person are necessary for the Buyer to use any of the Seller Assets in substantially the manner in which the Seller has used such Seller Assets prior to the date hereof. No restrictions will exist on the Buyer's rights to sell, resell, license, or sublicense any of the Seller Assets as a consequence of the transactions contemplated herein,

53260-5436937v5

other than any such restrictions resulting solely as a result of the Buyer or its Affiliates.

(c)     The Seller Intellectual Property set forth in **Schedule 2.1(a)** includes all Seller Owned Intellectual Property that is subject to issuances and registrations, and all such registrations are valid, enforceable, subsisting, in full force and effect, and unchallenged by any third party.

(d)     Other than the Seller Contracts, there is no contract to which the Seller is a party pursuant to which any other Person is granted any license, authorization, covenant not-to-sue, release, immunity or other rights with respect to any Seller Intellectual Property.

(e)     The Seller exclusively owns, possesses, controls and has good and marketable title to all Seller Owned Intellectual Property, without Encumbrances and any payment obligations, and the Seller possesses adequate rights in Seller Licensed Intellectual Property material to the current operation of the Business, without Encumbrances and any payment obligations, other than payment obligations relating to the time period after the Closing.

(f)     Neither: (i) the exercise of rights in Seller Owned Intellectual Property; (ii) the operation of the Business; nor (iii) the exploitation of the Seller Owned Intellectual Property; infringes or misappropriates any rights to Intellectual Property of any Person, or constitutes unfair competition or unfair trade practice under the laws of the applicable jurisdiction. The Seller has not instituted, asserted or threatened any action against any third Person with respect to the infringement, misappropriation, use or disclosure without authorization, or other violation of, any Seller Owned Intellectual Property and no third Person is infringing, misappropriating, using or disclosing without authorization any Seller Owned Intellectual Property.

(g)     No Person: (i) has received copies of, or been granted access to, any Source Code, other than employees and consultants engaged in development activities for Seller in the ordinary course of business who are subject to confidentiality and assignment of inventions provisions; and (ii) possesses any current or contingent rights of any kind granted by the Seller to any Source Code. The Seller has not entered into any escrow arrangement (or any contract that contemplates any escrow arrangement) with respect to any such Source Code.

(h)     The Seller is and has been in compliance in all material respects with all Applicable Laws and contractual obligations governing the collection, interception, storage, receipt, purchase, sale, transfer, processing, retention, and use of all data or information constituting the personal information of any natural person, including employees of the Seller, that has been collected or otherwise obtained by the Seller. No Seller Assets include any data or information constituting the personal information of any natural Person, including employees, that has been collected or otherwise obtained by the Seller.

(i)     No funding, facilities or personnel of any Governmental Body, university, college, or other educational institution or research center were used to develop or create, in whole or in part, any Seller Owned Intellectual Property.

53260-5436937v5

(j)    None of the Seller Intellectual Property: (i) contains any "back door", "drop dead device", "time bomb", "Trojan horse", "virus" or "worm" (as such terms are commonly understood in the information technology industry) or any other code or circuit designed or intended to have, or capable of performing, any: (A) disrupting, disabling, harming, or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed, or on which such circuit is implemented; (B) damaging or destroying any data or file without the user's consent; or (C) otherwise interfering with the operation of such software; (ii) contains any bug, defect, or error (including any bug, defect, or error relating to or resulting from the display, manipulation, processing, storage, transmission, or use of date data) that materially and adversely affects the use, functionality, or performance of such software, or any product or system containing or used in conjunction with such software; or (iii) fails in any material respect to comply with any applicable warranty or other contractual commitment relating to the use, functionality, or performance of such software.

5.6    Insider Interests

No shareholder, director, officer, employee or consultant of the Seller has any interest in any Seller Asset. Neither the Seller nor any of its shareholders, directors, officers, employees, consultants or Affiliates have any interest, either directly or indirectly, in any Person (whether as an employee, officer, manager, partner, agent, independent contractor, security holder, creditor, consultant or otherwise) that: (a) engages in any activity that competes with the Business as conducted by the Seller; or (b) is a supplier, customer or creditor of the Seller.

5.7    Claims and Orders

(a)    The Seller has not received notice of any written claim which is pending, nor are there any such claims threatened, against the Seller before any Governmental Body concerning the Business or the Seller Assets, and there are no pending disagreements or disputes that are reasonably likely to lead to the assertion of any such claims.

(b)    There are no outstanding or unsatisfied judgments, orders, decrees or stipulations to which the Seller is a party or by which the Seller Assets are bound.

5.8    Compliance with Laws

(a)    The Seller has at all times been in material compliance with Applicable Law related to the ownership of the Seller Assets and the conduct of the Business.

(b)    No event has occurred or circumstance exists that (with or without notice or lapse of time) would: (i) reasonably constitute or result in a violation by the Seller, or a failure on the part of the Seller to comply with any Applicable Law related to the ownership of the Seller Assets; or (ii) would give rise to any obligation on the part of the Seller to undertake, or to bear all or any portion of the cost of, any remedial action related to the Seller's conduct of the Business or the ownership of the Seller Assets as at the Closing Date.

53260-5436937v5

5.9    <u>Labor and Employment Matters</u>

    (a)    All of the Seller's former and current employees have an executed agreement of confidentiality, non-competition, non-solicitation, and assignment of inventions undertaking, which includes: (i) valid assignments to the Seller of all right, title and interest that such Persons may have or hereafter acquire in any Seller Owned Intellectual Property created, developed or discovered by them during the course of their engagement by the Seller; (ii) valid and enforceable waivers of any and all moral rights that any such Persons may have in any copyright or work of authorship forming part of the Seller Owned Intellectual Property created by them during the course of their employment or engagement by the Seller; and (iii) an express waiver of any rights to receive compensation in connection with inventions created or discovered by them during the course of their engagement by the Seller.

    (b)    There are no disputes pending or threatened between the Seller and any of its current or former employees, or current or former independent service contractors, or any trade or labor union, works council or similar body, which disputes have resulted in, or could reasonably be expected to result in, a claim before any Governmental Body, court, or tribunal.

    (c)    To Seller's knowledge, no Transferring Person is or has, in the past, been in violation of any term of her or his engagement with the Seller, non-competition, confidentiality, intellectual property agreement, or any restrictive covenant with a former employer relating to the right of any such Transferring Person to be engaged by the Seller because of the nature of the business conducted by the Seller, work performed by the Transferring Person, or use of trade secrets or proprietary information of others.

    (d)    Since the incorporation of the Seller (or any predecessor entities, if applicable), the Seller is and has been in compliance with all Applicable Laws with respect to employment, employment practices, worker classification, Taxes, prohibited discrimination, equal employment, fair employment practices, immigration status, and any other terms and conditions of employment.

5.10    <u>Solvency</u>

    (a)    The Seller is solvent (as defined and interpreted under Applicable law) and immediately after giving effect to the Closing, the Seller will be solvent.

    (b)    No Order has been made or petition presented, or resolution passed for the winding-up or liquidation of the Seller or any of its subsidiaries, and there is no outstanding: (i) petition or order for the winding-up or administration of the Seller or any of its subsidiaries; (ii) any appointment of a receiver over the whole or part of the assets of the Seller or any of its subsidiaries; (iii) any assignment by the Seller or any of its subsidiaries for the benefit of its creditors; (iv) any distress or execution or other process levied in respect of the Seller or any of its subsidiaries which remains undischarged; or (v) any unfulfilled or unsatisfied order against the Seller or any of its subsidiaries.

    (c)    Neither Seller nor any of its subsidiaries have been deemed unable to pay their debts within the meaning of Applicable Law.

53260-5436937v5

(d)  There are no current or past creditors of the Seller or any of its subsidiaries to whom any Applicable Law requires the delivery of notice or from whom any form of consent is required in conjunction with this Agreement or any other transaction or agreement contemplated hereunder to which Seller or any of its subsidiaries is a party.

### 5.11  Broker or Finders

The Seller does not have, nor will it have, directly or indirectly, any Liability for brokerage or finders' fees or any similar charges in connection with this Agreement or any transaction contemplated hereby.

### 5.12  Full Disclosure

Neither this Agreement nor any certificates made or delivered by the Seller in connection herewith contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not misleading, in view of the circumstances in which they were made.

## 6.  **REPRESENTATIONS AND WARRANTIES OF BUYER**

Each Buyer Party, severally and not jointly, hereby represents and warrants to the Seller, and acknowledges that the Seller is entering into this Agreement in reliance thereon, that the representations set forth in this Section 6 shall be true and complete as of immediately prior to the Closing.

### 6.1  Organization and Existence

Such Buyer Party is a company duly organized and validly existing under the laws of the jurisdiction of its incorporation or organization, and has all requisite corporate power and authority to own, lease and operate its properties and assets, and to carry on its businesses as now being conducted. Such Buyer Party is duly qualified to do business in any jurisdiction in which it conducts or operates its business (to the extent such qualification is necessary in such jurisdiction).

### 6.2  Authority and Enforceability

(a)  Such Buyer Party has all necessary corporate power and authority to execute and deliver this Agreement and all other agreements contemplated hereby to which such Buyer Party is a party, and to perform its obligations hereunder and thereunder.

(b)  The execution, delivery and performance of this Agreement and all other agreements contemplated hereby to which such Buyer Party is a party have been duly and validly authorized by all necessary corporate action on the part of such Buyer Party. No other corporate proceedings on the part of such Buyer Party are necessary to authorize this Agreement and all other agreements contemplated hereby.

(c)  This Agreement and all other agreements contemplated hereby to which such Buyer Party is a party are duly and validly executed and delivered by such Buyer Party and, assuming the due authorization, execution and delivery of the Seller and any other parties thereto, constitute the valid, legal and binding obligations of

13

the such Buyer Party, enforceable against such Buyer Party in accordance with their respective terms.

6.3     No Conflicts and No Required Consents

(a)     The execution, delivery and performance by such Buyer Party of this Agreement and all other agreements contemplated hereby to which such Buyer Party is a party, do not: (i) conflict with or violate the articles of association, certificate of incorporation or other equivalent organizational documents of such Buyer Party; (ii) conflict with or violate any Applicable Law; or (iii) result in any breach of any contract to which such Buyer Party is a party.

(b)     The execution, delivery and performance by such Buyer Party of this Agreement and all other agreements contemplated hereby to which such Buyer Party is a party, do not, and the performance of this Agreement and all other agreements contemplated hereby by such Buyer Party will not, require any consent, approval, authorization, clearance, or permit of, or filing or registration with, or notification to, any Governmental Body or otherwise, for such performance or in order to prevent the termination of any right, privilege, license or qualification of such Buyer Party.

6.4     Broker or Finders

Such Buyer Party does not have, nor will it have, directly or indirectly, any Liability for brokerage or finders' fees or any similar charges in connection with this Agreement or any transaction contemplated hereby.

7.     **COVENANTS**

7.1     Confidentiality

(a)     The Seller shall not, and shall cause its representatives not to, directly or indirectly, disclose, reveal, divulge or communicate to any person any confidential information with respect to the Seller Assets, other than information that: (i) is in the public domain at the time of the Closing or at the time of disclosure by a Buyer Party, or subsequently becomes so through no fault of the Seller; (ii) is furnished to the Seller or its respective representatives by a third party having a lawful right to do so; or (iii) was explicitly approved for release by written authorization of each Buyer Party (collectively, the "**Confidential Information**").

(b)     The Seller and its representatives shall be permitted to disclose Confidential Information if such disclosure is in response to a valid order of a Governmental Body, but only to the extent of and for the purposes of such order; *provided*, however, that such representative shall first notify each Buyer Party in writing of the order, and permit each Buyer Party to seek an appropriate protective order.

7.2     Additional Assets

If following the Closing, any asset that was owned by the Seller or any of its Affiliates as of the Closing (including any unfiled patent applications and any inventions conceived by any employees or consultants of the Seller before Closing whether or not reduced to practice or writing) is discovered that is considered to be or otherwise required for the operation of the Seller Assets, and which was not disclosed or otherwise not transferred to the Buyer on or prior to the Closing, then such asset will be

14

transferred by the Seller to the Buyer promptly upon such discovery, for no additional consideration, and will be deemed to form part of the Seller Assets for all purposes. The Seller agrees to assign and does hereby assign to the Buyer all rights, title and interests in and to any such assets, including any Intellectual Property Rights relating thereto.

7.3    Further Assurances

Following Closing, the Seller shall execute and deliver such other documents, and take such other action, as the requesting party may reasonably request to consummate more effectively the transactions contemplated by this Agreement, including executing and delivering any assignment agreements or other documents reasonably necessary to transfer all registered Seller Owned Intellectual Property Assets to the Buyer in all applicable intellectual property offices.

7.4    Post-Closing Information Cooperation

(a)    Subject to compliance with obligations under Applicable Law, following the Closing, the Seller will afford to the Buyer and its designated representatives, reasonable access (including the ability to make copies in electronic or paper format) during normal business hours non-privileged records within the possession or control of the Seller relating to the Seller Assets prior to the Closing, including insofar as such access is reasonably required by the Buyer, records reasonably necessary for: (i) financial reporting, Taxes and accounting matters (including for purposes of the filing of any Taxes or information return, the preparation for any audit by any taxing authority, and the response to any inquiry by a taxing authority, the mailing or filing of any notice); and (ii) defense or prosecution of any claim, actual or potential.

(b)    Subject to compliance with obligations under Applicable Law, following the Closing, the Buyer will afford to the Seller and its designated representatives, reasonable access (including the ability to make copies in electronic or paper format) during normal business hours records within the possession or control of the Buyer (including, for this term, Parent, as applicable) relating to the continuing Purchase Price obligations, including, but not limited to, the obligations of Section 7.8 and Schedule 7.8(b) hereto, and including, insofar as such access is reasonably required by the Buyer, records reasonably necessary for: (i) reckoning and verifying Buyer's obligations hereunder, (ii) financial reporting, Taxes and accounting matters (including for purposes of the filing of any Taxes or information return, the preparation for any audit by any taxing authority, and the response to any inquiry by a taxing authority, the mailing or filing of any notice); and (iii) defense or prosecution of any claim, actual or potential.  The review, copying and/or disclosure of any Buyer information by Seller under this term shall be subject to a confidentiality obligation on same terms as Section 7.1 hereof. The audit procedure shall be as follows:

(i)    Within the later to occur of fourteen (14) calendar days after any payment by Buyer due under this Agreement  (the "Obligation"), or thirty (30) calendar days after any such scheduled payment accrued, if Seller is dissatisfied with the payment, or if non-payment occurs, Seller may invoke an audit (the "Audit") of Buyer's relevant records using Seller's chosen Auditor, who shall be a nationally-licensed Certified Public Accountant (CPA).

15

(ii)    If Seller disputes the results of Auditor, Seller may choose a Second Auditor, who must also be a licensed CPA, to independently produce a Second Audit.  Otherwise, the Audit shall be the Final Audit.

(iii)    If the Second Audit differs from the Audit by more than .5%, the auditors will in good faith attempt to reconcile the difference. If the difference is reconciled, the reconciliation shall be the Final Audit.  If the difference was .5% or less, the midpoint of the Audit and Second Audit shall be deemed the Final Audit.

(iv)    If a greater-than-.5% difference cannot be reconciled, the parties may choose to either (a) accept the midpoint of the Audit and Second Audit as the Final Audit amount, or (b) appeal to the American Arbitration Association (AAA) for a Third Auditor, whose audit shall be the Final Audit and shall be conclusive and binding on the parties.

(v)    If the Final Audit differs from the initial payment by 5% or more, the cost of all audits shall be borne by the party bearing the burden of the adjustment. If the Obligation was not paid during the period set forth above, the Buyer shall bear the cost of all audits.  If the Final Audit produces an adjustment between .5% and 5%, the parties shall bear the respective costs of their own auditors, but the party bearing the burden of the adjustment shall pay for the Third Auditor (if any).  If the Final Audit produces an adjustment of .5% or less, the parties shall bear the costs of their own appointed auditors, and split the cost of the Third Auditor auditor (if any).

7.5    Satisfaction of Liabilities

The Seller agrees that, following the Closing, it shall not pay or distribute any portion of the Purchase Price to the Seller's security holders in their capacity as such unless and until it has provided the Buyer with evidence demonstrating that all Liabilities of the Seller and each of its Affiliates in connection with the Seller Assets and the Transferring Persons until the Closing have been repaid, released, discharged or satisfied in full, including an executed waiver and release letter from each Transferring Person in the form reasonably acceptable to the Buyer referring to their engagement period with the Seller and its termination and the waiver of any outstanding entitlement arising in connection therewith.

7.6    Non-Compete

In furtherance of the sale of the Seller Assets to the Buyer hereunder by virtue of the transactions contemplated hereby and more effectively to protect the value and goodwill of the Seller Assets so sold, the Seller covenants and agrees that, for a period from and after the Closing and until the first (1st) anniversary of the Closing, neither the Seller nor any of its Affiliates or anyone on their behalf will:

(a)    directly or indirectly (whether as principal, agent, employee, consultant, independent contractor, partner or otherwise) own, manage, operate, control, participate in, or otherwise carry on, personal trading activities or a business similar to or competitive with the Business anywhere in the world (it being understood by the parties hereto that the Business is not limited to any particular region of the world and that such Business may be engaged effectively from any location in the world);

(b)    induce or attempt to persuade any agent, supplier of a Buyer Party or any of their Affiliates who was an agent or supplier of the Seller or its Affiliates, as of the Closing to terminate such agency or business relationship with a Buyer Party or any of their Affiliates in order to enter into any such relationship on behalf of any other business organization; or

(c)    encourage, induce, attempt to induce, solicit or attempt to solicit any individual who is an employee or contractor of a Buyer Party on the date of this Agreement, or any Transferring Person, to leave his, her or its employment or engagement with a Buyer Party or their Affiliates.

7.7    <u>Key Engagement Agreements</u>

(a)    On or prior to the Closing and subject to Closing, the Buyer shall have made offers of engagement to each employee or contractor of the Seller listed in **<u>Schedule 7.7(a)</u>** (the "**Transferring Persons**"), with payments the aggregate to be paid by such entity or entities to all Transferring Persons in consideration for their employment or services (as applicable) to be in accordance with the breakdown set forth in **<u>Schedule 7.7(a)</u>**. All taxes payable on any payments to the Transferring Persons as contemplated hereunder shall be made subject to any taxes to be paid or withheld, as shall be set forth in each agreement with such Transferring Person.

(b)    The Seller shall cooperate with the Buyer, by providing all information reasonably requested by the Buyer in respect of the Transferring Persons, including the personnel records of the Transferring Persons as is reasonably necessary for the Buyer to transition such persons into the Buyer's records, and the Seller shall have obtained all necessary consents to make available such personnel records, subject to any restrictions, procedures, and required consents under the Applicable Law and contracts.

(c)    Nothing in this <u>Section 7.7</u> shall obligate the Buyer to offer engagement with any Transferring Person for a minimal period of time.

(d)    The Seller's termination of engagement of Transferring Persons shall be effective as of the day prior to the Closing. The Seller and the Buyer shall cooperate to ensure an orderly transition of the Transferring Persons.

(e)    The Seller shall be fully responsible for all payments payable (by operation of law, contract or otherwise) to any Transferring Person upon the termination of her or his engagement with the Seller (including any and all severance pay, notice periods and any other benefits). In connection with such termination, subject and in compliance with Applicable Law, the Seller will deliver to each Transferring Person the applicable termination of notice and release as required under Applicable Law.

(f)    Neither the Buyer nor the Seller intends this <u>Section 7.7</u> to create any rights or interest, except as between the Buyer and the Seller, and no present or future employees of any party (or any dependents of such employees) to this Agreement will be treated as third party beneficiaries in or under this Agreement.

7.8    <u>Service Agreement</u>

(a)   The Buyer shall provide certain services to the Parent and certain other Affiliates, including the deployment of coins, in accordance with the terms of an intercompany service agreement to be agreed between the Parent and the Buyer (the "**Service Agreement**").

(b)   The Buyer and the Parent undertake that the Service Agreement will not be amended in a way that may harm the rights of the Seller under this Agreement in any way.

(a)   A summary of the key terms of the Service Agreement is attached hereto as **Schedule 7.8(b)** (the "**Service Agreement Key Terms**").

7.9   Continued Existence of the Seller

The Seller agrees that it shall not commence any winding-up process with respect to itself until the final expiration of the period for claims.

8.   **INDEMNIFICATION**

8.1   Indemnification

Subject to the limitations in this Section 8, the Seller will defend, indemnify, and hold the Parent and the Buyer, and each of their respective Affiliates, directors, officers and employees (collectively, the "**Buyer Indemnified Parties**") harmless from and against, and reimburse the Buyer Indemnified Parties with respect to any and all claims, losses, Liabilities, damages, injuries, royalties, awards, judgments, settlements, demands, fines, deficiencies, penalties, Taxes, interest, fees, costs and expenses, including reasonable costs of investigation and defense and fees and expenses of counsel, experts and other professionals (collectively, "**Losses**") paid, incurred, suffered or sustained by any Buyer Indemnified Party, directly or indirectly, whether or not due to a claim by a third party, in each case, arising out of, resulting from, relating to or in connection with:

(a)   any breach of or inaccuracy in any representation or warranty made by the Seller in this Agreement or any other agreement contemplated herein to which the Seller is a party;

(b)   any claim by a third party alleging facts or circumstances that, if accurate, would entitle a Buyer Indemnified Party to recovery under Section 8.1(a);

(c)   any Excluded Liabilities;

(d)   any Transfer Taxes;

(e)   any breach of any covenant or agreement required to be performed by or on behalf of the Seller under this Agreement or any other agreement contemplated herein to which the Seller is a party;

(f)   any claims or threatened claims by or purportedly on behalf of any current or former securityholder of the Seller or rights or purported rights to acquire the Seller's securities or other equity interests in the Seller (or the economic value thereof), or in connection with the transactions contemplated herein; or

(g)    in the case of fraud, intentional misrepresentation or willful breach by the Seller, any of its Affiliates, or any of their respective representatives (whether or not acting in their capacity as such).

### 8.2    Limitations

Other than in case of fraud or willful misrepresentation, the maximum aggregate amount that the Buyer Indemnified Parties shall be entitled to recover pursuant to Section 8.1 from the Seller is an amount equal to the amounts paid by the Buyer to the Seller pursuant to this Agreement, including the Purchase Price.

### 8.3    Claims Process

In the event that a Buyer Indemnified Party shall sustain or incur any Losses, it shall assert a claim for indemnification by giving written notice thereof to the Seller (a "**Claims Notice**") which shall describe the facts and circumstances upon which the asserted claim for indemnification is based and shall thereafter keep the Seller informed with respect thereto. If any claim, suit, action or other proceeding to which the indemnity set forth herein applies is brought against a Buyer Indemnified Party (a "**Claim**"), such Buyer Indemnified Party shall give the Seller prompt notice of same. The Seller shall promptly assume, conduct and control the defense of such Buyer Indemnified Party, compromise or settle the Claim, with one counsel reasonably satisfactory to such Buyer Indemnified Party, and the fees and expenses of such counsel shall be at the sole cost and expense of the Seller, provided that such Buyer Indemnified Party may also cooperate in such defense at its sole discretion. Notwithstanding the above, the Seller shall not be entitled to settle the Claim if such settlement shall impose liabilities or blame upon such Buyer Indemnified Party.

### 8.4    Right of Setoff

The Parties expressly agree that each of the Parent and the Buyer may set off all amounts to which it may be entitled under Section 8.1 against any amount owed by the Parent or the Buyer (as applicable) to the Seller, including under and pursuant to this Agreement. For greater certainty, if setoff against this Agreement is insufficient to fully pay any amounts under Section 8.1, then the Seller must fully pay any missing portion of such amounts to the Parent or to the Buyer (as applicable).

## 9.    **MISCELLANEOUS**

### 9.1    Successors and Assigns

The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement.

### 9.2    Assignment

This Agreement shall not be assigned by operation of law or otherwise, provided that each Buyer Party may assign any of its rights or obligations herein to any of its Affiliates.

19

9.3    <u>Governing Law</u>

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, excluding that body of law pertaining to conflict of law, regardless of the laws that might otherwise govern under applicable principles of conflicts of law, and the Parties do hereby consent and submit to the exclusive jurisdiction of the competent courts in New York County, New York, with respect to any dispute or controversy arising out of, or in connection with, this Agreement.

9.4    <u>Counterparts; Facsimile or Electronic Signature</u>

This Agreement may be executed and delivered by facsimile or electronic signature and in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.5    <u>Notices</u>

(a)    All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of: (i) personal delivery to the party to be notified; (ii) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next Business Day; (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) three (3) Business Days after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt.

(b)    All communications shall be sent to a Party at its address as set forth below its signature on the signature page of this Agreement, or to such electronic mail address or address as subsequently modified by written notice given in accordance with this <u>Section 9.5</u>; *provided* that:

(i)    a copy of any notice given to the Seller shall also be sent to Jason Stone, CEO of KeyFi, for the attention of Jason, e-mail: jason@keyfi.io; and

(ii)    a copy of any notice given to the Parent or to the Buyer shall also be sent to Herzog, Fox & Neeman, Asia House, 4 Weizmann Street, Tel Aviv 6423904, Israel, for the attention of Yuval Zilber, Adv., e-mail: zilbery@herzog.co.il.

9.6    <u>Expenses</u>

Each Party will bear its own fees and expenses in connection with the transactions contemplated hereby, whether or not such transactions shall be consummated. In addition, if any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

9.7    <u>Entire Agreement</u>

This Agreement and the other documents delivered pursuant hereto at a Closing constitute the full and entire understanding and agreement between the Parties hereto with regard to the subjects hereof and thereof.

20

9.8    <u>Amendments and Waivers</u>

Any term of this Agreement may be amended, terminated or waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Seller, the Parent and the Buyer. A waiver by a Party in respect of a breach by another Party of its obligations: (a) shall be in writing; (b) shall not be construed as a justification or excuse for a further breach of its obligations; (c) shall not affect any other enforcement of the same or any other right; and (d) shall be confined to the specific circumstances in which it is given.

9.9    <u>Severability</u>

The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision.

9.10    <u>Delays or Omissions</u>

No delay or omission to exercise any right, power or remedy accruing to any Party under this Agreement, upon any breach or default of any other Party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting Party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. All remedies, either under this Agreement or by law or otherwise afforded to any Party, shall be cumulative and not alternative.

9.11    <u>Entire Agreement</u>

This Agreement (together with the Recitals and Schedules attached hereto, and any other deliverables hereunder) contains the entire understanding of the Parties with respect to its subject matter and all prior negotiations, discussions, agreements, representations, warranties, commitments and understandings between them with respect thereto (including previous drafts of this Agreement) shall be null and void in their entirety, effective immediately with no further action required. The Term Sheet MOU signed by the Parties on September 25, 2020, with respect to the transactions contemplated herein, is hereby terminated and of no further force and effect and shall not be used in order to interpret any of the provisions of this Agreement.

9.12    <u>Further Actions</u>

At any time and from time to time, each Party agrees, without further consideration, to take such actions and to execute and deliver such documents as may be reasonably necessary to effectuate the purposes of this Agreement.

9.13    <u>Third-Party Beneficiaries</u>

Nothing in this Agreement shall create or confer upon any Person, other than the Parties, any rights, remedies, obligations or liabilities, with the exception of the legal successors and permitted assigns of the Parties and except as expressly provided herein, including <u>Sections 8</u> (*Indemnification*).

***[Rest of Page Intentionally Left Blank]***

**IN WITNESS WHEREOF**, the Parties have executed this Asset Purchase Agreement as of the date and year first written above.

**SELLER**

**KEYFI, INC.**

By:

Name:

Title:     Ceo

Address for Notices:     Keyfi Inc
99 John St

New, York 10038

Attn:     Jason Stone

Email:     Jason@keyfi.io

*[Signature Page – Asset Purchase Agreement]*

**IN WITNESS WHEREOF**, the Parties have executed this Asset Purchase Agreement as of the date and year first written above.

## PARENT

| | |
|---|---|
| Address for Notices: | 1 Bartholomew Lane, London, England, EC2N 2AX |
| | |
| Attn: | legal |
| Email: | legal@celsius.network |

## BUYER

**CELSIUS KEYFI LLC**

**By: Celsius Network Limited, the incorporator**

By: *Alex Mashinsky*
DocuSigned by:
2ADC7A9BFB844C9...

Name: Alex Mashinsky

Title: CEO

| | |
|---|---|
| Address for Notices: | 221 River Street, 9th Floor, Suite 9129 Hoboken NJ 07030 |
| | |
| Attn | legal |
| Email: | legal@celsius.network |

# SCHEDULE 2.1(a)

## Seller Intellectual Property

[**NTD**: *Please list the Seller Intellectual Property.*]

## SCHEDULE 2.1(b)

### Seller Contracts

[***NTD****: Please list the Seller Contracts.*]

## SCHEDULE 2.1(c)

### Tangible Assets and Equipment

[*NTD: Please list any tangible assets and equipment related to the Business.*]

**SCHEDULE** 7.7(a)

**Transferring Persons**

[**NTD**: *Please include the names of each Transferring Person and the salary entitlement.*]

| Name | Annual Gross Consideration for Employment or Services (as applicable) |
|---|---|
| [●] | USD [●] |
| [●] | USD [●] |
| [●] | USD [●] |
| [●] | USD [●] |
| [●] | USD [●] |
| [●] | USD [●] |
| **Total:** | **USD _____.** |

**SCHEDULE** 7.8(**b**)

**Service Agreement Key Terms**

1.    In this Schedule:

a.    "**APY**" means the annualized rate of return for coins earned from deploying coins on a platform or rewards paid for deposits;

b.    "**Authorized Decentralized Finance Activities**" means any deployed coins, such as BTC, ETH, stable coins, and other assets are deployed to authorized activities which earn coins from lending, borrowing, high-frequency liquidity provisions, and other authorized DeFi activities;

c.    "**Insurance Policy Cost**" means the lowest of up to 1% of total AUM deployed by the Buyer, or the actual cost of such policy purchased by Celsius.

d.    "**Net Profit**" means the Net Profits as calculated in accordance with Section 9 below (as applicable);"**Profit Sharing Percentage for activity**" means a profit share for coins attributed to each activity as described herein;

e.    "**Reserve Rate**" means the percentage of holdings in a coin that are reserved by Parent or its Affiliates (excluding the Buyer) ("**Celsius**") for withdrawals. The reserve rate used for each coin will be determined on a weekly basis as displayed through Celsius' Instilend platform;

f.    "**Rewards APY**" means the annualized rate of rewards paid to depositors of coins as a percentage of their deposited coins;

g.    "**Payout Date**" has the meaning given to that term herein;

h.    "**Staking Coins**" means a type of mining through which new coins are earned through maintaining deposits of coins on a platform;

i.    "**Staking Plus Coins**" means Staking Coins with respect to which the staking activity generates earnings of multiple types of coins;

j.    "**Start Date**" means August 17, 2020.

2.    The Buyer shall provide certain services to the Parent, including the deployment of coins (the "**Services**"). With respect to such Services, all revenues received from third parties shall be paid to the Parent or an Affiliate.

3.    With respect to **Staking Coins and Staking Plus Coins**, the Net Profits (as described in section 10), as calculated in accordance with the Trading Activities and Performance Calculations set forth below, with no double counting, shall be allocated as follows:

a.    From the Start Date until the end of 2022: (i) fifty percent (50%) of the Net Profits will be allocated to the Buyer, ; and (ii) from the portion payable to the

Buyer, 20% shall be paid to the Seller as consideration for the Services, and (iii) the balance of the Net Profits will be allocated to and retained by the Parent.

b.    From the beginning of 2023 and continuing into perpetuity, the allocation shall be (i) fifty percent (20%) of the Net Profits will be allocated to the Buyer, and (iii) the balance of the Net Profits will be allocated to and retained by the Parent.

4.    With respect to **Authorized Decentralized Finance Activities**, on and from the Start Date and thereafter until the end of 2022, of the Net Profits (as described in section 10), calculated in accordance with the Trading activities and Performance Calculations set forth below, with no double counting: (a) twenty percent (20%) shall be attributed to the Buyer, and (b) of the Buyer's portion, 20% shall be further attributed and payable to the Seller, and (c) eighty percent (80%) shall be allocated to and retained by the Parent.

a.    From the beginning of 2023 and continuing into perpetuity, the allocation shall remain as above with the modification that the portion attributed and payable to Seller shall revert to Buyer.

5.    For the avoidance of doubt, unless explicitly agreed in writing by Parent, the Buyer shall not be entitled to any other compensation other than the compensation explicitly set forth herein, including, without limitation, for any other services performed by the Buyer or any of its employees or service providers for the benefit of Celsius.

6.    Trading activities and Performance Calculations

a.    The following are approved activities  and methods of calculating performance fees under this agreement. Additional activities and/or changes to methods of calculating performance fees need to be submitted to and approved by the Chief Financial Officer and the Financial Risk Officer of the Parent.

b.    Net Profits for each coin across all activities will be computed each week from Friday to Friday, and a running total of such Gross Profits for each coin across all activities will be recorded in the number of tokens and in USD value.

c.    Payouts of Net Profits will be made only for positive accumulated Net Profits across all coin types and activities at Payout Dates. For clarity, payouts are not made for individual performance of specific coins within particular activities but are based on performance across all coins and activities.

d.    Payouts will be made within 15 days of each Payout Date. The first payout date will be 12/31/2020, and subsequent ones will be on the 15th of each month (or the first business day thereafter, if occurring on a weekend or national holiday) immediately following the month in which activities attributable to the Payouts occur. Payouts may be made in USD, or at the election of the payee, in tokens earned, up to 50% the amount of Net Profits for each token type. The token Gross Profits in USD shall be calculated per Subsection (e) hereof.  Payouts of specific tokens cannot exceed the net profits generated in that token. Payouts are subject to a high water mark, such that any losses incurred are reflected as

expenses in the running totals of Net Profits and will impact subsequent payouts.

    e.    Where called for, 7-day and monthly weighted averages are used for each weekly and monthly performance calculation, respectively, for both token prices in USD (or other applicable base currency, as mutually-agreed) as well as for all APYs and Rates described in the agreement.

    f.    Approved activities include Staking Coins, Staking Plus Coins and Authorized Decentralized Finance Activities.

7.    Weekly and Monthly Performance Calculation for Activities

On a weekly and monthly basis, the following performance calculations will be performed for each coin that is allocated to the approved activities:

    a.    Revenues for activity in Coins

        i.    Coins Allocated to activity = Coins that the Parent makes available for an activity

        ii.    Coins Deposited = Coins Allocated to activity * (1 + Reserve Rate)

        iii.    Earned Coins = Coins Earned from All Sources as Rewards from Coins Allocated to activity

        iv.    Note: Earned coins are recorded for each coin within each activity.

    b.    Costs for activity in Coins [are calculated separately for each token type]

        i.    Weekly or Monthly Rewards APY Rate for activity in Coin = [(Rewards APY for Coin) * (Percentage Earning Interest in Native Coin) + (Rewards APY for CEL tokens) * (Percentage of Deposits in Native Coin Earning Interest in CEL)] / Number of Periods.

            Number of Periods = 52 for Weekly and 12 for Monthly Rewards

        ii.    Rewards Costs = Coins Deposited * Weekly or Monthly Rewards APY for activity in Coin

        iii.    Note: Weekly or Monthly Deposit APY Rate reflects that rewards to retail depositors can be paid in the coin deposited, or in CEL tokens.

    c.    Gross Profits for activity in Coins

        i.    Gross Profits Attributed to activity in Coins = (Earned Coins – Rewards Costs)

        ii.    Note: This is performed for each coin within each activity.

    d.    Gross Profits for Activities in USD

        i.    Gross Profits Attributed to activity in USD = Gross Profits Attributed

[*Schedule* 7.8(*b*) *(cont.) – Service Agreement Key Terms*]

to activity in Coins * USD Rate for Coins in activity

    ii.  Note: This is performed for each coin within each activity.

    iii. Note: If the context requires, the USD Rate will be taken as a multiday weighted average (per Section 6(e) hereof or otherwise).

  e.  Total Gross Profits for All activities in Coins

    i.  Total Gross Profit for All activities in Coins = Summation [ Gross Profits Attributed to activity in Coins]

    ii.  Total Gross Profit for All activities in USD = Summation [ Gross Profits Attributed to activity in USD]

    iii. Note: Summation refers to adding Gross Profits Attributed to each activity across all coins.

**8.**   Total Gross Profits for **Sale of Software/Subscriptions**

  a.  Profits from the sales of Software Licenses / Subscriptions to third parties (MPC software modules, accounting systems, etc), will be split equally (fifty percent to each party) as between Parent and Buyer until the end of 2022. Buyer in turn will share 20% of its share with Seller during the foregoing period.

  b.  From the beginning of 2023 and continuing into perpetuity, the profit share shall remain as above with the modification that the portion attributed and payable to Seller shall revert to Buyer.

  c.  Any development must be approved by the Parent's Chief Technology Officer ("CTO") or Chief Executive Officer ("CEO"), in writing, after it has been determined that it is needed for the activity performed by Buyer; and any such sale should be approved by the Chief Revenue Officer or CEO, based on the group's needs and activity.

9.   Payout Period and Net Profits  Calculations

    Running totals of Total Gross Profit for All activities in Coins and Total Profit for All activities in USD will be calculated each week and month.  The following calculations will be performed at the end of each payout period. With the exception of the first Payout, the Payout period shall be one month.

    Total Period Gross Profit for All activities in USD = Summation [Total Gross Profit for All activities in USD]

    Note: Summation refers to summing all monthly gross profits for all attributable activities across coins for the payout period.

    Net Profit = Total Period Gross Profit for All activities in USD - Salaries * 2 (for initial 5 employees)[1]- Hardware/Cloud Expenses - Cumulative losses from Previous

---

[1] Note: Any additional hires will come out at 1x      salary. In addition, all additional hires shall be approved by the CTO or CEO.

**[*Schedule* 7.8(*b*) (*cont.*) – *Service Agreement Key Terms*]**

Periods - Insurance Policy Costs - Staking Costs - Transaction Fees.

10. Division of Net Profit by Activity for Payout Period

Net Profit for Staking Coins and Staking Plus Coins = Net Profit * Total Period Gross Profit for all Staking Activities in USD / Total Period Gross Profit for all activities in USD

Net Profit for Decentralized Finance Activities = Net Profit * Total Period Gross Profit for all Defi Activities in USD / Total Period Gross Profit for all activities in USD