Mitchell P. Hurley
Dean L. Chapman Jr.
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1001

Elizabeth D. Scott (admitted *pro hac vice*)
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
edscott@akingump.com

*Special Litigation Counsel for Debtors and*
*Plaintiffs Celsius Network Limited and*
*Celsius KeyFi LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,<br><br>               Debtors. | Bankruptcy Case No. 22-10964 (MG) |
| CELSIUS NETWORK LIMITED and<br>CELSIUS KEYFI LLC,<br><br>               Plaintiffs,<br><br>        v.<br><br>JASON STONE and KEYFI INC.,<br><br>               Defendants. | Adversary Proceeding<br>No. 22-01139 (MG) |

<u>**PLAINTIFFS' BRIEF IN OPPOSITION**</u>
<u>**TO DEFENDANTS' MOTIONS TO DISMISS**</u>

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ........................................................................................................................3

      A.    Celsius Permits Stone and KeyFi to Deploy Celsius' Coins on
          Celsius' Behalf Before Entering into the Asset Purchase Agreement
          and Service Agreement ...............................................................................3

      B.    Celsius Repeatedly Demands and Stone Repeatedly Promises That
          He Will Return All Celsius' Coins .............................................................4

      C.    Defendants' Extra-Contractual Misconduct While Associated with
          Celsius ........................................................................................................6

      D.    Stone Brings Frivolous Claims Against Celsius .........................................6

APPLICABLE LEGAL STANDARD ........................................................................................7

ARGUMENT .............................................................................................................................9

      A.    Plaintiffs Adequately Plead a Claim for Turnover Against KeyFi
          and Stone ....................................................................................................9

          i.     Defendants Have Not and Cannot Establish a Bona Fide
                 Dispute Regarding Ownership of the Subject Property ...................9

          ii.    Celsius' Demand for Turnover of the Proceeds of Its
                 Property Wrongfully Converted by Defendants Is
                 Permissible ..................................................................................12

          iii.   Celsius Sufficiently Pleads Facts Against KeyFi ..........................15

      B.    Plaintiffs' Claim for Conversion is Not Barred by the Existence of
          a Contract .................................................................................................17

      C.    Plaintiffs Sufficiently Allege Fraudulent Misrepresentation .....................18

      D.    Plaintiffs' Claim for Unjust Enrichment May Proceed Because
          Plaintiffs Allege Misconduct that Took Place Outside the Scope of
          the Contracts ............................................................................................21

      E.    Plaintiffs' Claim for Replevin is Not Based on a Contract Dispute...........23

      F.    Plaintiffs' Claim for Accounting Against Stone is Separate from
          Claims for Damages .................................................................................24

CONCLUSION ........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Advanced Oxygen Therapy Inc. v. Orthoserve Inc.*,
     572 F. Supp. 3d 26 (S.D.N.Y. 2021)........................................................................18

*In re Aldelphia Commc'ns Corp.*,
     331 B.R. 93, 98, 100 (S.D.N.Y. 2005).....................................................................25

*Aleem v. Experience Hendrix, L.L.C.*,
     No. 16 CIV 9206 (ER), 2017 WL 3105870 (S.D.N.Y. July 20, 2017)....................24

*Allen v. Levey (In re Allen)*,
     226 B.R. 857 (Bankr. N.D. Ill. 1998) .....................................................................15

*Allen v. WestPoint–Pepperell, Inc.*,
     945 F.2d 40 (2d Cir. 1991)........................................................................................8

*Amusement Indus., Inc. v. Midland Ave. Associates, LLC*,
     820 F. Supp. 2d 510 (S.D.N.Y. 2011)......................................................................23

*In re Arnott*,
     512 B.R. 744 (Bankr. S.D.N.Y. 2014) .......................................................................8

*Ashcroft v. Iqbal*,
     556 U.S. 662 (2009)...................................................................................................8

*Bancorp Services, LLC v. Am. Gen. Life Ins. Co.*,
     No. 14-CV-9687 (VEC), 2016 WL 4916969 (S.D.N.Y. Feb. 11, 2016) ................16

*Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo*,
     346 F. Supp. 3d 432 (S.D.N.Y. 2018)......................................................................22

*Bird, II v. Crown Convenience (In re NWFX, Inc.)*,
     864 F.2d 588 (8th Cir. 1988) ...................................................................................15

*Brown v. Dellinger (In re Brown)*,
     734 F.2d 119 (2d Cir. 1984)......................................................................................14

*Chartschlaa v. Nationwide Mut. Ins. Co.*,
     538 F.3d 116 (2d Cir. 2008)......................................................................................14

*Cisco Systems, Inc. v. Synamedia Ltd.*,
     557 F. Supp. 3d 464 (S.D.N.Y. 2021)......................................................................10

*Cruz v. Rose Assocs., LLC*,
     No. 13 Civ. 0112 (JPO), 2013 WL 1387018 (S.D.N.Y. Apr. 5, 2013)....................8

*Dervan v. Gordian Group LLC*,
No. 16-CV-1694 (AJN), 2017 WL 819494 (S.D.N.Y. Feb. 28, 2017)....................................23

*Est. of Albin v. Mertz, LLC*,
No. 05 CIV 3440 (KMW)(KNF), 2006 WL 8461442 (S.D.N.Y. Mar. 15,
2006) ...........................................................................................................................................25

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
375 F.3d 168 (2d Cir. 2004).......................................................................................................19

*Faasoa v. Army & Air Force Exchange Serv. (In re Faasoa)*,
576 B.R. 631 (Bankr. S.D. Cal. 2017) .......................................................................................12

*Fuller Landau Advisory Services Inc. v. Gerber Fin. Inc.*,
333 F. Supp. 3d 307 (S.D.N.Y. 2018)........................................................................................24

*Geltzer v. Brizinova (In re Brizinova)*,
592 B.R. 442 (Bankr. E.D.N.Y. 2018)........................................................................................15

*Gomez-Kadawid v. Lee*,
No. 20CV01786 (VEC) (DF), 2022 WL 676096 (S.D.N.Y. Feb. 3, 2022),
*report and recommendation adopted*, No. 20CV1786VECDF, 2022 WL
558125 (S.D.N.Y. Feb. 24, 2022) ..............................................................................................16

*In re Grgurev v. Licul et al.*,
No. 2021-02692 (N.Y. Sup. Ct. 1st Dept Mar. 29, 2022).........................................................25

*Homefield Ass'n of Yonkers, N.Y., v. Frank*,
59 N.Y.S.2d 884 (N.Y. App. Div. 1946) ...................................................................................22

*Kendall v. Cuomo*,
No 12 Civ. 3438, 2013 WL 5425780 (S.D.N.Y. Sept. 27, 2013) ...............................................8

*Kottler v. Deutsche Bank AG*,
607 F.Supp.2d 447 (S.D.N.Y. 2009)..........................................................................................23

*Kramer v. Mahia (In re Khan)*,
No. 10-46901-ess, 2014 WL 4956676 (Bankr. E.D.N.Y. Sept. 30, 2014) ..........................9, 14

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1991).........................................................................................................9

*LaMonica v. CEVA Group PLC (In re CIL Limited)*,
582 B.R. 46 (Bankr. S.D.N.Y. 2018)......................................................................................9, 10

*In re Legal Xtranet*,
2011 WL 3236053 (Bankr. W.D. Tex. July 26, 2011) ...............................................................10

iv

*Leonard F. v. Israel Disc. Bank of New York*,
    199 F.3d 99 (2d Cir. 1999) ................................................................................8

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) .............................................................................19

*Lovald v. Falzerano (In re Falzerano)*,
    686 F.3d 885 (8th Cir. 2012) ............................................................................15

*McArdle-Bracelin v. Cong. Hotel, LLC*,
    No. 1:20-CV-861 (TJM/TWD), 2022 WL 486805 (N.D.N.Y. Feb. 17, 2022) ......................16

*Metro-Goldwyn-Mayer Entertainment, Inc. v. Ames Dept. Stores, Inc. (In re Ames
    Dept. Stores, Inc.)*,
    322 B.R. 238 (Bankr. S.D.N.Y. 2005) ...............................................................10

*In re Minh Vu Hoang*,
    452 B.R. 902 (Bankr. D. Md. 2011), *aff'd*, 469 B.R. 606 (D. Md. 2012) ..............................13

*Murphy v. Virda Netco Establishment*,
    No. 19 CIV. 5198 (JGK) (RWL), 2020 WL 1865537 (S.D.N.Y. Mar. 3, 2020),
    *report and recommendation adopted*, No. 19-CV-5198 (JGK), 2020 WL
    1862592 (S.D.N.Y. Apr. 14, 2020) ....................................................................25

*In re Nemko, Inc.*,
    143 B.R. 980 (Bankr. E.D.N.Y. 1992) ..............................................................14

*New Paradigm Software Corp. v. New Era of Networks, Inc.*,
    107 F. Supp. 2d 325 (S.D.N.Y. 2000) ...............................................................22

*Next Commc'ns, Inc. v. Viber Media, Inc.*,
    2016 WL 1275659 (S.D.N.Y. Mar. 30, 2016) ....................................................23

*Palin v. New York Times Co.*,
    940 F.3d 804 (2d Cir. 2019) ................................................................................9

*PCS Wireless LLC v. A to Z Wireless Sols. Inc.*,
    841 F. Supp. 2d 649 (E.D.N.Y. 2012) ...............................................................18

*Probulk Carriers Ltd. v. Peraco Chartering USA LLC*,
    No. 11 Civ. 5686 (RJS), 2012 WL 3095319 (S.D.N.Y. July 20, 2012) ...................................8

*Rana v. Islam*,
    305 F.R.D. 53 (S.D.N.Y. 2015) .........................................................................19

*Remede Consulting Grp. Inc. v. Hamer*,
    No. 19-CV-3950 (NGG) (VMS), 2021 WL 430898 (E.D.N.Y. Feb. 8, 2021) .........................18

*Robotic Vision Sys., Inc. v. Cybo Sys., Inc.*,
    833 F. Supp. 189 (E.D.N.Y. 1993) ......................................................................17

*Romain v. Seabrook*,
    No. 16 Civ. 8470, 2017 WL 6453326 (S.D.N.Y. Dec. 15, 2017) ...........................24

*Savage & Assocs., P.C. v. Mandl (In re Teligent Inc.)*,
    325 B.R. 134 (Bankr. S.D.N.Y. 2005) ................................................................14

*Sea Star Line, LLC v. Emerald Equipment Leasing, Inc.*,
    No. CIV.A.05-245-JJF, 2006 WL 214206 (D. Del. Jan. 26, 2006) ........................11

*In re Seatrain Lines, Inc.*,
    198 B.R. 45 (S.D.N.Y. 1996) ............................................................................12

*Silverman v. H.I.L. Assocs. Ltd. (In re Allou Distribs., Inc.)*,
    387 B.R. 365 (Bankr. E.D.N.Y. 2008) ................................................................23

*Singer v. Xipto Inc.*,
    852 F.Supp.2d 416 (S.D.N.Y. 2012) ...................................................................23

*Tennille v. W. Union Co.*,
    751 F. Supp. 2d 1168 (D. Colo. 2010) ................................................................23

*United States v. Whiting Pools, Inc.*,
    462 U.S. 198, 103 S. Ct. 2309, 76 L. Ed. 2d 515 (1983) .......................................14

*Usov v. Lazar*,
    No. 13 Civ. 818 (RWS), 2013 WL 3199652 (S.D.N.Y. June 25, 2013) .................24

*In re VeraSun Energy Corporation*,
    No. 08-12606 (BLS), 2013 WL 3336870 (Bankr. D. Del. June 28, 2013) .............12

*Viable Mktg. Corp. v. Intermark Commc'ns, Inc.*,
    No. 09-CV-1500 (JS) (WDW), 2011 WL 3841417 (E.D.N.Y. Aug. 26, 2011) .....22

*In re Vista Bella, Inc.*,
    No. 11-00149-MAM-7, 2012 WL 3778956 (Bankr. S.D. Ala. Aug. 30, 2012) .....14

*Wilk v. VIP Health Care Servs., Inc.*,
    No. 10 CIV.5530 (ILG) (JMA), 2012 WL 560738 (E.D.N.Y. Feb. 21, 2012) .......23

**STATUTES**

11 U.S.C.
    § 541 (a)(1) (1982) ......................................................................................9, 14

28 U.S.C.
    § 6402 .............................................................................................................12

Bankruptcy Code

    § 363.................................................................................................................9

    § 541(a)(1)......................................................................................................14

    § 542(a)..........................................................................................9, 12, 13, 15

    § 542(b).........................................................................................................12

    § 544.............................................................................................................9

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8(a) .........................................................................................16, 23

Fed. R. Civ. P. 8(a)(2).........................................................................................7

Fed. R. Civ. P. 8(a)(3)........................................................................................23

Fed. R. Civ. P. 9(b) ........................................................................................18, 19

Fed. R. Civ. P. 12(b) ...........................................................................................8

Fed. R. Civ. P. 12(b)(6)....................................................................................8, 23

## PRELIMINARY STATEMENT[1]

As detailed in the FAC, Celsius transferred valuable digital assets to Celsius-owned wallets accessible by Defendants, solely to permit Defendants to deploy those coins in authorized staking and decentralized finance activities.  Rather than hew to that mandate, however, Defendants transferred hundreds of thousands of Celsius' coins to their own wallets, used Celsius' coins to purchase non-fungible tokens ("NFTs"), interests in blockchain related companies, and other property, and brazenly stole that property by transferring it from Celsius wallets to their own wallets.

Defendants' theft continued after Stone's employment terminated and after Defendants were directed to return all property to Celsius and turn over private keys.  In an effort to put stolen property outside of Celsius' trace and reach, Defendants made frequent use of Tornado Cash, an on-chain "mixer" that obscures the destination of property transferred on the blockchain and which was recently banned by the Office of Foreign Asset Control.  Notably, Defendants do not deny that they used Celsius' private keys to take Celsius property for themselves, and admit that they failed to return millions of coins entrusted to them for deployment by Celsius.  Defendants argue, however, that their extraordinary misconduct can give rise only to claims for breach of contract, and that Celsius' well pleaded claims for turnover, conversion, fraudulent misrepresentation, unjust enrichment, replevin, and an accounting must be dismissed.

Defendants are mistaken.  As a preliminary matter, neither Defendant ever was a party to the contract relating to deployment of Celsius' coins—the Services Agreement—and much of the theft and other misconduct identified in the FAC happened long after Defendants purported to

---

[1] Plaintiffs Celsius Network Limited ("CNL") and Celsius KeyFi LLC ("Celsius KeyFi," and, together with CNL, "Plaintiffs" or "Celsius") submit this memorandum of law in opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint ("FAC"). Capitalized terms used but not defined have the definitions given in the FAC.

1

terminate their relationship with Celsius. Defendants focus on a different contract—the Asset Purchase Agreement—but Defendant Stone was never a party to that agreement either, and, as its name suggests, it governed the acquisition of Defendant KeyFi's assets, not coin deployment. But even if Defendants were both parties to both contracts, dismissal would not be warranted. The brazen, documented pattern of theft and other misconduct alleged in the FAC goes far beyond the garden-variety payment failures and other breaches of contract animating the cases upon which Defendants rely in their motion to dismiss, and easily support the torts alleged.

Nor can Defendants escape Celsius' turnover claim through their absurd contention that "Celsius officers" orally authorized Defendants to transfer Celsius property from Celsius wallets to their own wallets as a form of "profit sharing." Significantly, these so-called "facts" are not drawn from the FAC, which alleges precisely the opposite, including that there were no "profits" to share, and that no one ever authorized Defendants to take Celsius' property for themselves. Moreover, the Services Agreement expressly provides that if any profits ever were generated they would be paid *by Celsius KeyFi*, not removed from Celsius' accounts by Defendants and transferred to their own wallets. And it is worth noting that not even Defendants claim to have ever identified the amount of any profit that supposedly was generated by their activities, or to have made any request to Celsius for a specific "share" of those (phantom) profits. Defendants cannot create a bona fide dispute concerning title to the property they admit taking by resort to such deeply implausible "facts" that are expressly contradicted by the FAC.

This issue pervades Defendants' motion to dismiss. At its core, Defendants' motion simply asks the Court to reject the truth of the facts pleaded by Celsius in its detailed complaint, and to instead accept as true a different set of facts alleged by Defendants. Indeed, Defendants' submission is rife with cites not to the FAC filed by Celsius—the only pleading relevant to the

2

Motion to Dismiss—but to a complaint filed by Defendant KeyFi in state court shortly before Celsius filed for bankruptcy that contains a narrative Celsius alleges is false. It is axiomatic that such material cannot justify dismissal of a well-pleaded complaint like the FAC. Defendants' motion should be denied accordingly.

## BACKGROUND

A. **Celsius Permits Stone and KeyFi to Deploy Celsius' Coins on Celsius' Behalf Before Entering into the Asset Purchase Agreement and Service Agreement**

In 2020, Celsius engaged Defendants to conduct staking and DeFi activities on Celsius' behalf, which activities Stone would conduct through his company, KeyFi. FAC ¶¶ 17–18. To effectuate this business relationship, Celsius and Stone agreed that Celsius would set up a wholly owned subsidiary to acquire the assets of KeyFi and operate Celsius' staking and DeFi activities, with Stone as CEO of that subsidiary. FAC ¶ 18.

In August 2020, while the parties sought to finalize the acquisition of KeyFi, they agreed that Celsius would permit Stone and KeyFi to deploy Celsius' coins on Celsius' behalf, ***before*** the parties finalized the KeyFi acquisition. FAC ¶ 18. The parties agreed, among other things, that (i) Stone was to meet with Celsius' founder, CFO and risk management teams on a weekly or twice-weekly basis concerning his and KeyFi's proposed activities and (ii) neither Stone nor KeyFi were permitted to deploy coins to any activities other than staking and DeFi or deploy to any particular proposed staking or DeFi platforms or other investments without first obtaining Celsius' consent. FAC ¶ 19. On that basis, and subject to Stone's assurance that he would hedge against any risk from price movements in the coins he deployed, on or around August 19, 2020, Celsius began funding coins into certain wallets accessible to Stone and KeyFi. FAC ¶¶ 19–20.

On October 1, 2020, Plaintiff CNL and Defendant KeyFi signed a non-binding memorandum of understanding ("MOU") concerning deployment of Celsius' coins. FAC ¶ 21.

On October 7, 2020, Plaintiff CNL and Defendant KeyFi entered into a service agreement (the "Old Service Agreement"), whereby Defendant KeyFi agreed "to provide its expertise to Celsius for all things pertaining to DeFi and Staking Services." FAC ¶ 21. Defendant Stone was not a party to either the MOU or the Old Service Agreement.

Plaintiffs and Defendant KeyFi signed an Asset Purchase Agreement on January 11, 2021 (the "APA"), pursuant to which Celsius KeyFi acquired the KeyFi business. FAC ¶ 21. The APA provides expressly that "deployment of coins" shall be governed by "the Services Agreement." APA 3.1(c) & 7.8(a); *see also* MTD at 6 (acknowledging that any putative profit share (if any) would be due "under the Services Agreement"). Plaintiffs CNL and Celsius KeyFi also signed the integrated Service Agreement on January 11, 2022 (the "Service Agreement"), which provides unequivocally that "all coins deployed . . . and revenues generated and/or received from third parties **shall be owned by and paid to Celsius**." FAC ¶ 21; *Declaration of Mitchell P. Hurley in Support of Celsius' Motion for a Preliminary Injunction* [ECF No. 24] ("Hurley Decl."), Ex. 31 at § 3. Plaintiff Celsius KeyFi was formed pursuant to a limited liability company agreement signed on or around January 11, 2021 (the "LLC Agreement") between Defendant Stone, Celsius US Holdings LLC and Celsius KeyFi. FAC ¶ 21. The LLC Agreement was the only contract between Plaintiffs and Defendant Stone.

### B.    Celsius Repeatedly Demands and Stone Repeatedly Promises That He Will Return All Celsius' Coins

Defendants never documented or detailed any claim that their activities resulted in any profits, and Celsius specifically alleges that they generated only losses. FAC ¶¶ 22–23. Recognizing that the complexity of deployment activities made them impossible for anyone other than Defendants to meaningfully track, the parties agreed that Defendants would build a "wormhole" program that would automatically track Defendants' deployments. Although Celsius

paid substantial sums for the wormhole, it was never delivered by Defendants.  FAC ¶ 23.  Troubled

by the lack of transparency and other issues (discussed immediately below), Celsius instructed

Defendants on numerous occasions beginning in early 2021 to return the coins Celsius had made

available for deployment.  FAC ¶¶ 24–25.

Defendants prepared a written plan to swiftly return Celsius' coins, but never executed on

that plan.  FAC ¶ 24.  When Defendants failed to return the coins as promised by March 24, 2021,

Plaintiffs again demanded the immediate return of their property in Defendants' possession.  FAC

¶ 25.  On March 26, 2021, Celsius KeyFi's board issued formal, written board resolutions

commanding Stone, as CEO of Celsius KeyFi, to return all of Celsius' coins to the 0xb1 wallet.

FAC ¶ 25.  On the same day, Stone responded in an email that KeyFi was working hard to ensure

a "***complete return of all Celsius tokens (principal + interest earned) managed by KeyFi by the

end of April at the latest***."  FAC ¶ 26.  The next day, in a WhatsApp exchange with a Celsius

employee, Stone said the plan was always to complete the asset transfer process in a transparent

way and again promised that KeyFi could "***be finished returning 100% of the coins ++ interest

and profits sometime between 4/20-4/31***."  FAC ¶ 27.

Stone claims to have resigned from Celsius in March 2021 (MTD at 6) and Defendants

never fulfilled their promise to return "100% of the coins++interest and profits."  FAC ¶¶ 28–29,

41.  Stone now contends that he resigned as CEO on March 9, 2021 because by then he knew

Celsius had been "lying" to him, and supposedly failed to pay him due profit share.  MTD at 6.

But in his actual March 9, 2021 departure email, Stone identified no putative amounts outstanding

from Celsius, and expressed gratitude "for the opportunity to learn, grow, and work alongside

Celsius during the most pivotal and tremendous time in its history.  We have been able to

accomplish far more than I ever believed we would in this industry, together; we owe this largely

to you, and the faith you put in us this past year." FAC ¶ 34; *see also* Hurley Decl. Ex. 32.

### C.    Defendants' Extra-Contractual Misconduct While Associated with Celsius

Plaintiffs allege that, during his tenure with Celsius, Defendant Stone, while acting through

his company KeyFi, committed substantial misconduct, including the following:

- failing to hedge against the movement of coin prices, despite Defendants' promise that deployments would be "delta neutral" and Stone's assurances that Defendants would not "open ourselves up to impermanent loss," (FAC ¶¶ 30–31); and

- stealing substantial assets from Celsius, including by transferring Celsius' coins to wallets controlled exclusively by Stone and thereafter buying hundreds of NFTs with Celsius' coins and using Celsius' assets to acquire interests in Nifty's and, upon information and belief, other companies, platforms and ventures, despite the agreement to engage only in staking and DeFi investments. (FAC ¶¶ 32–36).

Additionally, following his departure from Celsius in March 2021, Stone transferred

Celsius' property to wallets belonging to or controlled by Defendants and used the money

laundering application, Tornado Cash, to obfuscate the origin, destination and counterparties to his

transfers. FAC ¶¶ 37–38. For example, on May 23, 2021 and May 25, 2021, Stone transferred

320 ETH, all of which was property of Celsius, to Tornado Cash. FAC ¶ 38. Several months later,

in September 2021, Stone accessed a Celsius wallet, transferred $1.4 million worth of DAI to a

public wallet, converted the stolen DAI into ETH, and then transferred the ETH to Tornado Cash.

FAC ¶¶ 39–40. Defendants do not appear to deny any of this conduct, which constitutes brazen

theft involving a notorious money laundering application that has since been banned by the

Department of Treasury for its frequent use by illicit actors.

### D.    Stone Brings Frivolous Claims Against Celsius

Though Stone repeatedly assured Celsius that he would return Celsius' coins (FAC ¶¶ 24–

27), in September 2021, his third set of lawyers delivered to Celsius a complaint (the "KeyFi

Complaint") in which Stone claimed it actually was Celsius that owes coins to KeyFi based on the

parties' profit-sharing agreement. FAC ¶ 41; MTD at 3–4. By KeyFi's account, Celsius had agreed

to shadow Stone's activities, guess at the risks created by those activities, and then unilaterally

hedge against them. FAC ¶ 41. According to Stone, had Celsius done so, his substantial losses

would have turned into profits, and, thus, Celsius' failure to share those phantom returns with Stone

is a breach of the Asset Purchase Agreement. *See id.*

Not only do Plaintiffs allege that the complaint filed by Stone is a baseless, fantasy

concocted for purposes of litigation (FAC ¶¶ 41–43), but Defendants' belated argument is directly

contradicted by their own real-time, contemporaneous admissions that they would return all coins

to Celsius without reference to any sort of entitlement to retain certain coins as purported "profits."

*See supra* Background § B. Furthermore, Plaintiffs' factual allegations totally undermine Stone's

account. Namely, Plaintiffs allege the agreement was for Stone himself to hedge against risk and

that he repeatedly assured Celsius he would do so (FAC ¶¶ 19, 30) and that, without the promised

"wormhole" program, it was practically impossible for anyone other than Defendants to track

Defendants' investments and hedge and prevent impermanent loss (FAC ¶ 30).

In any event, much of Defendants' theft occurred *after*, and in many cases *months after*, (i)

Stone's employment was terminated, (ii) Celsius demanded, in writing and repeatedly, that

Defendants immediately return all Celsius' coins and other property in their possession, custody,

or control, and (iii) Stone provided repeated assurances he would do so. FAC ¶¶ 24, 26, 27.

### APPLICABLE LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the

claim showing that the pleader is entitled to relief." With the exception of Plaintiffs' claim for

fraudulent misrepresentation, every claim discussed in the FAC is subject to this standard. The

Court must "accept as true all of the factual allegations contained in the complaint, drawing all

inferences in the light most favorable to the non-moving party's favor." *Cruz v. Rose Assocs., LLC,*

No. 13 Civ. 0112 (JPO), 2013 WL 1387018, at *2 (S.D.N.Y. Apr. 5, 2013) (internal quotations and

citations omitted); *see also Probulk Carriers Ltd. v. Peraco Chartering USA LLC*, No. 11 Civ.

5686 (RJS), 2012 WL 3095319, at *4 (S.D.N.Y. July 20, 2012).  To meet the familiar standard of

"plausibility," a complaint must include sufficient "factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged," and raise that

potential for relief "above the speculative level."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Therefore, on a motion to dismiss, the appropriate inquiry is not whether a plaintiff is likely to

prevail, but whether he is entitled to offer evidence to support his claims.  Dismissal for failure to

state a claim on which relief could be granted is proper only when it appears beyond doubt that the

plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief."

*Kendall v. Cuomo*, No 12 Civ. 3438, 2013 WL 5425780, at *3 (S.D.N.Y. Sept. 27, 2013) (internal

quotations and citations omitted).

When ruling on a motion to dismiss, the Court "must confine its consideration 'to facts

stated on the face of the complaint, in documents appended to the complaint or incorporated in the

complaint by reference, and to matters of which judicial notice may be taken.'" *Leonard F. v. Israel

Disc. Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999) (quoting *Allen v. WestPoint–Pepperell,

Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)).  It is well-established that "factual allegations in memoranda

or legal briefs are treated as matters outside the pleading for purposes of Federal Rule of Civil

Procedure 12(b)."  *In re Arnott*, 512 B.R. 744, 756 (Bankr. S.D.N.Y. 2014).  Accordingly, on a

Rule 12(b)(6) motion to dismiss, the Court cannot credit any allegations contained in the KeyFi

Complaint.  Rather, the Court must accept as true the well-plead allegations in the FAC, including

Plaintiff's allegation that the KeyFi Complaint is a sham.  *See supra* Background § D; *see also

Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (while courts may "take judicial

notice of documents filed in other courts" they may not do so "for the truth of the matters asserted in the other litigation").[2]

## ARGUMENT

As discussed below, Plaintiffs have adequately pled claims for turnover, conversion, fraudulent misrepresentation, unjust enrichment, replevin and accounting.

### A.    Plaintiffs Adequately Plead a Claim for Turnover Against KeyFi and Stone

#### i.    Defendants Have Not and Cannot Establish a Bona Fide Dispute Regarding Ownership of the Subject Property

To plead a claim for turnover, a plaintiff must show four elements: (1) the property is in the possession, custody or control of a noncustodial third party; (2) the property constitutes property of the estate; (3) the property is of the type that the trustee could use, sell or lease pursuant to section 363 or that the debtor could exempt under section 544; and (4) the property is not of inconsequential value or benefit to the estate. *See Kramer v. Mahia (In re Khan)*, No. 10-46901-ess, 2014 WL 4956676, at *22 (Bankr. E.D.N.Y. Sept. 30, 2014). Defendants challenge Plaintiffs' turnover claim on the basis of this second element by arguing that title to the subject property is in dispute. MTD at 8.[3]

Defendants do not identify any bona fide dispute, and their motion must be denied accordingly. *See LaMonica v. CEVA Group PLC*, 582 B.R. 46, 118 (Bankr. S.D.N.Y. 2018) ("*CEVA*") (denying motion to dismiss turnover action where defendants failed to establish a "bona

---

[2] The Court may also consider material that is "integral" to the complaint "when the complaint relies heavily upon its terms and effect." *See Palin v. New York Times Co*., 940 F.3d 804, 811 (2d Cir. 2019) (quotation marks omitted) ("Typically, an integral matter is a contract, agreement, or other document essential to the litigation."). *Id.* But the KeyFi Complaint is not integral to the FAC. Plaintiffs refer to the KeyFi Complaint in the FAC only to acknowledge its filing and set forth Plaintiffs' strongly-held view that the claims and allegations contained therein are entirely false, and indeed frivolous.

[3] Defendants are correct that Section 542(a) of the Bankruptcy Code permits an action for turnover of property that was "in the possession, custody, or control of the estate during the case," where "[p]roperty of the estate includes all legal or equitable interests of the debtor in property as of the commencement of the case." § 541(a)(1).

fide" dispute over right to subject property) (citing *In re Legal Xtranet*, 2011 WL 3236053, *1 n.1 (Bankr. W.D. Tex. July 26, 2011) (refusing to dismiss plaintiff's turnover claim and noting that "simply resisting recovery is not enough to create a legitimate dispute")).  As a preliminary matter, none of the facts on which Defendants rely to dispute ownership of the property are found in the FAC, and thus all are outside the permissible scope of this motion to dismiss.  *CEVA* is instructive. There, the Court refused to consider documentary evidence cited by the defendants in support of the claim that ownership of property was disputed because it was outside the scope of the record for deciding the motion to dismiss, even though (unlike here) that material, if considered, would have put the subject property in dispute.  *Id.* at 117–18.

In their motion to dismiss, Stone and KeyFi go far beyond Plaintiffs' well-pleaded allegations, and improperly seek to graft on their own allegations contained in the separate KeyFi Complaint in a vain attempt to establish an active dispute over Celsius' stolen property.  But even if those allegations could demonstrate a bone fide dispute—and they cannot—the Court should not consider them for purposes of resolving the motion to dismiss in this case. *See id.* at 118; *Cisco Systems, Inc. v. Synamedia Ltd.*, 557 F. Supp. 3d 464, 474–75, n.8 (S.D.N.Y. 2021) (denying motion to dismiss after specifically refusing to consider facts not pled in complaint); *Metro-Goldwyn-Mayer Entertainment, Inc. v. Ames Dept. Stores, Inc. (In re Ames Dept. Stores, Inc.)*, 322 B.R. 238, 241 (Bankr. S.D.N.Y. 2005) (same).  Without those allegations, Defendants are left with "nothing more" than a "mere denial" of Plaintiffs' turnover allegations, which "does not provide grounds for dismissing" the turnover claim.  *See CEVA*, 582 B.R. at 118.

Moreover, even the KeyFi Complaint concedes that Defendants took property belonging to Celsius.  Indeed, it is undisputed (and indisputable) that Celsius provided to Defendants millions of coins that never were returned, and that at least some of those coins were transferred by

Defendants to their own wallets from Celsius wallets, or converted into NFTs and then transferred from Celsius wallets to wallets owned or controlled by Defendants. Celsius' turnover action is aimed at recovering that property.[4]

Defendants' reliance on *Sea Star Line, LLC v. Emerald Equipment Leasing, Inc.*, No. CIV.A.05-245-JJF, 2006 WL 214206 (D. Del. Jan. 26, 2006), is accordingly misplaced and, indeed, self-defeating. There, the court granted plaintiff's motion to dismiss a counterclaim for turnover of "rent" allegedly due for certain equipment owned by the defendant, but denied the motion to dismiss the claim for turnover of the equipment itself. According to the *Sea Star Line* court, whether rent was due was a question of contract interpretation, but there could be no doubt that the debtor-defendant was entitled to turnover of the equipment it had provided to the plaintiff. *Id*. at 8 (equipment rental contract made clear that equipment belonged solely to debtor). A materially similar situation obtains here: Celsius seeks turnover of property it indisputably provided to Defendants to deploy in DeFi activities that never were returned, at least some of which Defendants simply stole. To the extent Stone converted Celsius' stolen property to other forms of property, Celsius seeks its turnover as well. Just as in *Sea Star Lines,* the relevant contract specifically provides that the property Celsius entrusted to Defendants belongs exclusively to Celsius. FAC 21; D.N. 24, Ex. 31 § 3 (Services Agreement providing that "all coins deployed … and revenues generated and/or received from third parties ***shall be owned by and paid to Celsius***"). Celsius' turnover claim does not seek "rent" owed by Defendants for their use of Celsius' property, *but the*

---

[4] Defendants' allegation that "Celsius executives" orally authorized Defendants to take property as "compensation" for "profit share" (MTD at 13) is expressly contradicted by the FAC, is contrary to the Services Agreement (which expressly provides that any payment for services, including putative "profit share" will be made solely by Celsius KeyFi, not by Defendants), and cannot create a "bona fide" dispute regarding ownership of that property sufficient to justify dismissal of Celsius' turnover claim.

*Celsius property itself.*  Under the teaching of *Sea Star Line,* Celsius' turnover claim cannot be dismissed.

Defendants' reliance on *In re VeraSun Energy Corporation*, No. 08-12606 (BLS), 2013 WL 3336870 (Bankr. D. Del. June 28, 2013) similarly fails.  The *VeraSun* debtor sought to recover under Section 542(b) a receivable allegedly due pursuant to a contract with the defendant.  But the defendant denied that the parties entered into an agreement, thus creating a "bona fide dispute" as to whether a debt cognizable under Section 542(b) existed in the first place.  In this case, Celsius seeks recovery of coins and other property under Section 542(a), and Defendants do not deny either that Celsius provided to them the property in question, or that they failed to return that property.[5] Finally*, Faasoa v. Army & Air Force Exchange Serv. (In re Faasoa)*, 576 B.R. 631 (Bankr. S.D. Cal. 2017), also is inapposite.  There, the court dismissed the debtor's action against a federal agency for turnover of a tax overpayment that the IRS supposedly was required to refund to the debtor.  Under 28 U.S.C. § 6402, however, a tax overpayment is not property of a debtor unless the amount exceeds any liability due from the debtor.  Because the debtor conceded that he owed more than the amount of the overpayment to the agency, he never became entitled to any refund, which therefore never became estate property.  No such statutory exception is operative here, and the property that Defendants stole from Celsius remains estate property subject to turnover.

**ii.    Celsius' Demand for Turnover of the Proceeds of Its Property Wrongfully Converted by Defendants Is Permissible**

Defendants' next argument is temporal in nature.  Defendants concede that the coins provided to them by Celsius were Celsius' property, but argue that the assets such as NFTs and

---

[5] Defendants reliance on *In re Seatrain Lines, Inc.*, 198 B.R. 45 (S.D.N.Y. 1996) is similarly misplaced.  In *Seatrain*, the defendant insurance companies refused plaintiff's demand for coverage under pre-petition insurance policies and plaintiff accordingly sought turnover of those insurance proceeds.  As described herein, Plaintiffs turnover claim is not duplicative of any purported contract claim.

equity interests in "Nifty's" and other companies Defendants acquired pre-petition using Celsius' coins are not because Defendants supposedly took them from Celsius as "consideration" earned under the profit-sharing mechanism set forth in the APA.  MTD at 12–13.  As such, Defendants argue they did not possess property of the estate "during the case," as is required by section 542(a). MTD at 12.[6]  This argument fails for two reasons.

First, as with Defendants' argument regarding whether the property is subject to "dispute," Defendants' argument requires the Court to set aside the well-plead facts in the FAC in favor of Defendants' competing narrative in the KeyFi Complaint.  Indeed, the FAC specifically contradicts the allegations in the KeyFi Complaint upon which Defendants rely.  For example, Plaintiffs allege in the FAC that (i) there were no profits to share, only losses (FAC ¶¶ 31, 41, 54); (ii) Defendant Stone repeatedly promised in real time to return all subject property (FAC ¶¶ 23–27), which undermines his belated claim that he somehow was entitled to profits; and (iii) Defendants were never authorized to use Celsius' coins to acquire NFTs and other such interests (*see* FAC ¶¶ 34–35 (alleging that the NFTs purchased with Celsius' coins by Stone originally were in Celsius' wallet until Stone "began secreting large numbers of NFTs out of Celsius' 0xb1 wallet" and to wallets belonging to Defendants)).[7]

---

[6] With respect to Celsius' ETH that Plaintiffs allege have been "lost" by Defendants, Plaintiffs recognize they may not be in Defendants' "possession, custody or control during the case."  But, to the extent Defendants remain in possession of coins they took from Celsius (as Plaintiffs have also alleged), those assets are subject to a turnover action, and Defendants do not seem to dispute this.

[7] Inexplicably, Defendants cite *In re Minh Vu Hoang*, 452 B.R. 902 (Bankr. D. Md. 2011), *aff'd*, 469 B.R. 606 (D. Md. 2012), for the proposition that, where the defendant no longer possesses estate property as of the petition date, the property cannot be subject to turnover. MTD at 9.  *Minh* involved property acquired by the defendant *post-petition*, and *Minh's* brief reference to the treatment of property acquired by the defendant and transferred to a third party *pre-petition* is *dicta*.  In any case, that is not the situation here.  Celsius specifically alleges in this case that Defendants possessed coins, NFTs and other estate property *at the time that Celsius filed for bankruptcy*, and continues to possess estate property.  Celsius alleges that at least some of that stolen property remains in Defendants' possession to this day, in exactly the form it was in at the time of the theft.  While Defendants may have converted some of that property into other forms pre-petition (by, for example, using Celsius' coins to buy NFTs, or exchanging NFTs belonging to Celsius for ETH or other coins) Celsius alleges that Defendants continued to hold the proceeds of Celsius' property at all relevant times, including as of the petition date.

13

Second, Defendants' position is contrary to established law broadly defining property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541 (a)(1) (1982). This provision has been construed expansively, *see e.g.*, *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204, 103 S. Ct. 2309, 2313, 76 L. Ed. 2d 515 (1983) (noting that the House and Senate Reports on the Bankruptcy Code indicate that "§ 541(a)(1)'s scope is broad"); *In re Nemko, Inc.*, 143 B.R. 980, 985 (Bankr. E.D.N.Y. 1992) (quoting *Brown v. Dellinger (In re Brown)*, 734 F.2d 119, 123 (2d Cir. 1984)) ("This definition of property has been given 'the broadest possible interpretation.'"), and "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of [section] 541." *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008).

In arguing that Defendants did not possess estate property "during the case,"[8] Defendants effectively argue that, by converting Celsius' coins to other forms of property pre-petition, they effectively shielded themselves from any turnover claims against that property.[9] But such an absurd result would reward bad behavior and encourage pre-petition conversion of estate property.

---

[8] Bankruptcy courts routinely have held, and Defendants do not dispute, that proceeds of estate property may be subject to turnover. *See, e.g.*, *Kramer v. Mahia (In re Khan)*, No. 1-46901-ess, 2014 WL 4956676, at *23 (Bankr. E.D.N.Y. Sept. 30, 2014) (granting trustee's motion for summary judgment on turnover claim and directing defendant to turn over proceeds from prepetition mortgage and sale of home in which the debtor and defendant shared title).

[9] Defendants cite *Savage & Assocs., P.C. v. Mandl (In re Teligent Inc.)*, 325 B.R. 134, 137 (Bankr. S.D.N.Y. 2005), for the proposition that "property that has been fraudulently or preferentially transferred does not become property of the estate until it has been recovered," and, as such, the ETH used by Stone to acquire NFTs cannot be subject to a turnover action. But Plaintiffs do not assert any claims for fraudulent transfer. Indeed, Plaintiffs allege that the ETH was transferred to wallets accessible by Stone in order for him to deploy for staking and DeFi activities, but he instead used the ETH to acquire NFTs. Accordingly, Plaintiffs do not seek to claw back the ETH as fraudulent transfers, but rather seek turnover of the NFTs, which Plaintiffs argue are the proceeds of Defendants' disposition of ETH. Defendants similarly argue that the equity interests in Nifty's and other companies are not subject to turnover because "title to that stock does not automatically pass to Celsius." MTD at 13. In support of this argument, defendants cite to *In re Vista Bella, Inc.*, No. 11-00149-MAM-7, 2012 WL 3778956 (Bankr. S.D. Ala. Aug. 30, 2012), to argue that "to the extent property might arguably be subject to a constructive trust it is not yet property of the estate." But that case did not even involve a claim for turnover, nor are Plaintiffs here arguing that the property at issue is estate property simply because it is subject to a constructive trust. For the reasons stated herein, Plaintiffs argue the equity interests acquired with Celsius' coins are subject to turnover as estate property that was in Defendants' possession as of the Petition Date.

14

Indeed, all that has happened here is that undisputed property of the estate has changed from one form—coins—to another—NFTs, equity and potentially other kinds of interests acquired with those coins. *See Geltzer v. Brizinova (In re Brizinova)*, 592 B.R. 442, 462 (Bankr. E.D.N.Y. 2018) (noting that "[i]t is beyond doubt that where a debtor owns the shares of a corporation, a sale of those shares for cash or other consideration results in 'proceeds.' In such a transaction, all that has occurred is that property of the estate has changed from one form—shares of stock—to another form—cash or other consideration"). The property is still controlled by Defendants, merely in another form. Thus, Defendants' argument, which is wholly inconsistent with the broad reading of "estate property" and Congress' intent to bring "anything of value" into the *estate* should be rejected. *See Allen v. Levey (In re Allen)*, 226 B.R. 857, 862 (Bankr. N.D. Ill. 1998); *see also Bird, II v. Crown Convenience (In re NWFX, Inc.)*, 864 F.2d 588, 591–92 (8th Cir. 1988) (holding that plaintiff has equitable ownership interest in value derived from defendant's use of plaintiff assets where defendant would otherwise be unjustly enriched, and that such value "is subject to turnover under 11 U.S.C. § 542(a).") (internal citation omitted); *Lovald v. Falzerano (In re Falzerano)*, 686 F.3d 885, 888 (8th Cir. 2012) (holding that a "debtor's interest in unremitted proceeds is an equitable interest in property of the bankruptcy estate that is subject to a 542(a) turnover action").

### iii.    Celsius Sufficiently Pleads Facts Against KeyFi

Defendants argue that Plaintiffs' turnover claim against KeyFi must be dismissed because the FAC "contains only *one* sentence about any alleged estate property potentially held by KeyFi." MTD at 10. This is false. Many of Celsius' allegations are directed to misconduct carried out by "the Defendants," which of course includes KeyFi. *See, e.g.*, FAC ¶¶ 19, 24–26. "In initiating the litigation, a plaintiff is not required to plead specific details as to which entity did what during the alleged course of misconduct," but may instead "collectively refer[] to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant."

15

*McArdle-Bracelin v. Cong. Hotel, LLC*, No. 120CV861TJMTWD, 2022 WL 486805, at *7 (N.D.N.Y. Feb. 17, 2022) (internal quotation marks omitted).[10]

Thus, the FAC includes numerous allegations against KeyFi.  For example, as set forth in the FAC, starting in August of 2020, Plaintiffs deposited coins to certain wallets for KeyFi to use for authorized staking and DeFi activities.  FAC ¶¶ 18–20.  KeyFi then deployed those coins for a variety of purposes.  FAC ¶ 23.  When Celsius complained of the lack of financial information being made available to track KeyFi's deployments, KeyFi agreed to build the so-called "wormhole" program, which it then failed to do.  FAC ¶ 23.  In early 2021, Plaintiffs instructed KeyFi to return the coins Celsius made available for employment.  FAC ¶ 24.  Defendants agreed to unwind positions Defendants had taken with Celsius' assets and to return to Celsius the assets in KeyFi's possession.  FAC ¶ 24.  "[B]y March 24, 2021, Defendants had not returned the coins in their control as promised."  FAC ¶ 24.  On March 26, 2021, Celsius KeyFi's board passed a resolution commanding the return of all of Celsius' coins, and a copy of the resolutions and a direction letter was provided to Defendants on the same day.  FAC ¶¶ 25–26.  Stone responded, on the same day, that "the KeyFi team is hard at work" to ensure the "***complete return of all Celsius tokens (principal + interest earned) managed by KeyFi by the end of April at the latest.***"  FAC ¶ 26.  While most of Celsius' coins were voluntarily returned over a few weeks, a substantial gap

---

[10] "Rule 8(a) sets a lenient standard. Dismissal under Rule 8(a) is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Bancorp Services, LLC v. Am. Gen. Life Ins. Co.*, No. 14-CV-9687 (VEC), 2016 WL 4916969, at *5 (S.D.N.Y. Feb. 11, 2016) (cleaned up); *see also Gomez-Kadawid v. Lee*, No. 20CV01786 (VEC) (DF), 2022 WL 676096, at *7 (S.D.N.Y. Feb. 3, 2022), *report and recommendation adopted*, No. 20CV1786VECDF, 2022 WL 558125 (S.D.N.Y. Feb. 24, 2022) (noting that "a motion to dismiss for group pleading may fail when, even though the plaintiff refers to defendants generally rather than a particular defendant individually, it is sufficiently clear that in the particular factual context of the case the complaint furnishes adequate notice for initial pleading purposes of plaintiff's claim of wrongdoing. Thus, a complaint may satisfy Rule 8(a)'s notice requirement, even when defendants are referred to collectively when, given the specific circumstances of the case and drawing all reasonable inferences in the plaintiff's favor, there is an understandable explanation for why the complaint was not more particularized.") (cleaned up).

16

between coins provided and returned remained at the end of April.  FAC ¶ 28.  Coins deployed to KeyFi are still missing as of the filing of this case.

Defendants do not deny that KeyFi is in "possession, custody or control" of the property subject to Plaintiffs' turnover claims, rather they dispute ownership of that property.  *See* MTD at 10, 15 (arguing that the issue is not whether KeyFi holds Celsius' assets, but "whether KeyFi *validly retained* crypto assets") (emphasis added).  To the extent that KeyFi remains in "possession, custody or control" of Celsius' assets, it is obliged to turn them over.[11]

## B.    Plaintiffs' Claim for Conversion is Not Barred by the Existence of a Contract

Defendants argue that Plaintiffs' claim for conversion against Defendants must be dismissed because, supposedly, the facts alleged in the FAC only could give rise to a claim for breach of contract, and not a tort.  MTD at 14–15.  In fact, the FAC is rife with allegations of fact demonstrating that Defendants engaged in outright theft, including by using their access to Celsius private keys to transfer Celsius property from Celsius wallets to their own wallets, and through the money-laundering application Tornado Cash.  This and other conduct alleged in the FAC plainly constitutes conversion, and not a mere breach of contract.  *See Robotic Vision Sys., Inc. v. Cybo Sys., Inc.*, 833 F. Supp. 189, 192 (E.D.N.Y. 1993) (permitting a plaintiff to bring *both* an action for breach of contract and conversion or replevin where the breach of contract results in a wrong that is "separately actionable").  Indeed, as noted above, neither Defendant even was a party to the Services Agreement, and many of the acts of conversion alleged in the FAC took place after Stone and KeyFi claim they ended their relationship with Celsius.  *Id.*  In contrast, the cases cited by

---

[11] Plaintiffs cannot identify with certainty which of Celsius' assets are in KeyFi's possession because, despite repeated requests in the spring of 2021, Defendants never provided an accounting of their deployment of Celsius' coins.  Nevertheless, Plaintiffs sufficiently allege that, upon information and belief, Defendants—including KeyFi— continue to hold property that rightfully belong to Celsius, and the proceeds flowing therefrom.  FAC ¶¶ 3–4, 27–28, 32, 35.  Such allegations are sufficient to bring a claim against KeyFi for turnover and also support Plaintiffs' claim for an accounting.

Defendants involve a mere failure to pay amounts allegedly due under a contract, or other alleged conduct wholly duplicative of a contract to which the moving party was bound.[12]

Defendants also argue that the FAC lacks any allegations against KeyFi with respect to the claim for conversion,[13] but as set forth in the FAC and described herein, *see supra* at 17, coins deployed to KeyFi are still missing and Plaintiffs allege they are still in KeyFi's control or possession. As explained herein, Defendants do not deny that KeyFi still retains certain assets acquired during Defendants' relationship with Plaintiffs. To the extent Defendant KeyFi continues to exercise control over Celsius' assets, it is interfering with Plaintiffs' possessory interest in those assets, which possessory interest Defendants acknowledged when Defendants repeatedly promised they would return to Plaintiffs all Celsius' coins and proceeds therefrom. FAC ¶¶ 24, 26–27.

### C. Plaintiffs Sufficiently Allege Fraudulent Misrepresentation

Defendants argue that Plaintiffs' claim for fraudulent misrepresentation cannot meet the heightened pleading standard requirement of Federal Rule of Civil Procedure 9(b). MTD at 15–16. In reaching this conclusion, Defendants blatantly ignore the detailed allegations of fraudulent misrepresentation in the FAC.[14]

Under New York law, to prevail on a fraudulent misrepresentation claim "a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the

---

[12] *See PCS Wireless LLC v. A to Z Wireless Sols. Inc.*, 841 F. Supp. 2d 649 (E.D.N.Y. 2012) (defendant failed to render full payment due under contract for goods shipped by plaintiff); *Remede Consulting Grp. Inc. v. Hamer*, No. 19-CV-3950 (NGG) (VMS), 2021 WL 430898 (E.D.N.Y. Feb. 8, 2021) (contract with defendant-employee covered "precisely the conduct described" in complaint as basis for conversion claim against employee); *Advanced Oxygen Therapy Inc. v. Orthoserve Inc.*, 572 F. Supp. 3d 26 (S.D.N.Y. 2021) (plaintiff alleged no "acts that were wrongful or unlawful as opposed to mere violations of contractual rights" where defendant contended that contractual conditions for payment of escrowed amounts had not been met).

[13] *See supra* at 16 (noting that the requirements for group pleading are sufficiently established in the FAC).

[14] Defendants argue that the FAC is improperly pled, suggesting that perhaps Plaintiffs contend that fraud was committed by omission, rather than misrepresentation. MTD at 16 fn. 4. Contrary to Defendants' argument, Plaintiffs sufficiently allege a fraudulent misrepresentation claim—not a claim for omission—with the requisite level of detail.

plaintiff suffered damage as a result of such reliance." *Rana v. Islam*, 305 F.R.D. 53, 58 (S.D.N.Y. 2015) (quoting *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186–87 (2d Cir. 2004)) (internal quotation marks omitted). Pursuant to Rule 9(b), these elements must be pled with particularity, specifying the statements that were fraudulent, identifying the speaker, stating where and when the statements were made, and explaining why the statements were fraudulent. *Id.* (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006)) (citation and internal quotation marks omitted). This particularity requirement does not require absolute precision, however, but only requires enough to "apprise a defendant of the general time period of any alleged misstatements to meet the requirements of Rule 9(b)." *Id.* (citation and internal quotation marks omitted). Courts have found the required specificity to be met when plaintiffs pointed to a three-month period in which the alleged misrepresentation was made. *Id.*

Plaintiffs certainly meet this standard by alleging the following three types of fraudulent misrepresentations:

- **Hedging**. In August 2020, Stone expressly assured Celsius that he would hedge against any risk from price movements in the coins he deployed and, based on this assurance, Celsius began funding coins into certain wallets accessible to Stone for KeyFi to deploy (FAC ¶¶ 18–20). For instance, in an email on August 18, 2020, Stone reassured Celsius personnel that Defendants "would not open ourselves up to impermanent loss" in connection with investing Celsius' coins (FAC ¶ 30). Later, on January 28, Stone told Celsius' Financial Risk Officer that Defendants were using a platform called dYdX to hedge (FAC ¶ 30). Stone later revealed that KeyFi, under his direction, had failed to hedge or keep his DeFi investments "delta neutral" as promised (FAC ¶ 41);

- **Profitability and Visibility**. At meetings held on an approximately weekly basis in the fall of 2020, Defendants repeatedly and consistently stated that Defendants' deployments of Celsius' coins for authorized staking and DeFi activities were profitable and that they were designing and would soon deliver a "wormhole" program that would automatically track Defendants' deployments to provide greater transparency to Celsius concerning Defendants' activities. (FAC ¶¶ 22–23). Based on those assertions, Plaintiffs continued to fund coins into the wallets accessible to Defendants and moved forward with the APA and Service Agreement (FAC ¶¶ 21–22). In reality, all the while, KeyFi's deployments suffered substantial losses (FAC ¶ 41); and

- **Return of Coins**.  In the spring of 2021, Stone prepared a written plan for unwinding all staking and DeFi positions to return to Celsius all of the coins Celsius had supplied to Defendants, and, on March 26, 2021, emailed Celsius to advise that "the KeyFi team is hard at work" and would ensure the "***complete return of all Celsius tokens (principal + interest earned) managed by KeyFi by the end of April at the latest***," and in a separate email on the same day, Stone promised to return not just Celsius' coins with interest, but also "***Celsius due profit share***" (FAC ¶¶ 24–28).  Again, in a March 27, 2021 WhatsApp exchange with a Celsius employee, Stone assured the employee that the plan was to always complete the asset transfer process in a transparent manner, and Stone again promised that KeyFi would be "***finished returning 100% of the coins ++ interest and profits sometime between 4/20-4/31***" (FAC ¶ 27).  Based on these promises, Plaintiffs did not pursue legal action, which gave Defendants the opportunity to fund unauthorized wallets for unauthorized purposes, to steal additional assets from Celsius, and to utilize Tornado Cash to conceal their theft (FAC ¶¶ 28–37).

Defendants are obviously mistaken in claiming that "[n]oticeably absent from the complaint are any allegations" of when and where specific fraudulent misrepresentations were made, who made the misrepresentations, and why such statements were fraudulent.  MTD at 16.

Defendants also argue that Plaintiffs could not have justifiably relied on Defendants' misrepresentations concerning staking and DeFi because "all of KeyFi's investment activities were readily trackable on the public blockchain." MTD at 17.  But Defendants do not acknowledge— much less deny—Plaintiffs' allegation that Defendants used Tornado Cash to conceal transactions. *See generally* MTD; FAC ¶ 37–41 (describing Defendants' use of Tornado Cash).  Furthermore, "the third-party blockchain application Celsius used to view its Wallets was only able to show fungible coins native to the relevant blockchain (e.g., BTC and ETH) and so-called ERC-20, fungible tokens issued on the Ethereum blockchain, not NFTs." FAC ¶ 32.  Moreover, Celsius has alleged repeatedly (and accurately) that "[g]iven the tens of thousands of transactions deployed each day and the anonymity of users associated with particular wallets, it was practically impossible for Celsius to monitor Defendants' activities without their cooperation."  FAC ¶ 23. Indeed, Defendants' acknowledged that Plaintiffs needed a way to monitor Defendants' activities and thus agreed to develop the so-called "wormhole" program to provide transparency to Plaintiffs.

FAC ¶ 23.  It defies reason that the wormhole program would be needed, and invested in at great

expense, if Defendants' activities were so "readily trackable."  MTD at 17.

The one accusation of fraudulent misrepresentation Defendants do reference in the MTD

concerns hedging.[15] MTD at 16.  Defendants state that Plaintiffs "fail[] to allege what Stone

actually said, much less, where and when the statement" regarding Defendants' duty to hedge was

made (MTD at 16), completely ignoring the specific allegations made in the FAC outlined above.

Defendants' fraudulent misrepresentations described herein resulted in material harm to

Plaintiffs because the misrepresentations induced Celsius to commence and continue working with

Defendants in connection with what Celsius reasonably believed were DeFi related activities, and

allowed Defendants time to steal Plaintiffs' assets and the proceeds of such assets.  *See* FAC ¶ 29–

41.  Defendants made the misrepresentations knowing that Plaintiffs had to rely on them due to a

lack of visibility described herein.  As a result, Plaintiffs lost tens of millions of dollars.  FAC ¶

61.  Defendants' motion to dismiss the fraudulent misrepresentation claim should be denied.

### D. <u>Plaintiffs' Claim for Unjust Enrichment May Proceed Because Plaintiffs Allege Misconduct that Took Place Outside the Scope of the Contracts</u>

As alleged in the FAC, Defendants obtained tens of millions of dollars through their theft

and misconduct, and their continued retention of those proceeds is patently unjust and inequitable.

Defendants argue that Plaintiffs cannot recover on their unjust enrichment claims because

the subject matter of their unjust enrichment claim is purportedly governed by contracts.  MTD at

17–18.  This argument fails because Plaintiffs allege that no operative contract governed the

conduct of the parties.  *See supra* Background § C.  Where the parties "do not agree that a single,

enforceable contract governs their dispute," an unjust enrichment claim survives a motion to

---

[15] Defendants' incorrectly allege that Plaintiffs are arguing Defendants' representations as a pioneer and expert in staking and DeFi investments were fraudulent misrepresentations. MTD at 16.  Plaintiffs are not in fact making that argument.  *See* FAC ¶¶ 57–61.

dismiss.  *Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo*, 346 F.
Supp. 3d 432, 465–66 (S.D.N.Y. 2018).

Here, Plaintiffs allege a host of misconduct by Defendants—such as the theft of property,
unauthorized conversion of property, and use of Tornado Cash to prevent the recovery of
property—that does not arise under any contract.  *See supra* Background § C.  Moreover, Plaintiffs
allege that much of the misconduct that gives rise to the unjust enrichment claim occurred *after*
the contracts were terminated in March 2021.  *Id.*  And, as noted above, the only operative contract
to which either Defendant (KeyFi) is a party is the APA, which governed the acquisition of KeyFi
by Celsius and, thus, is inapplicable to Plaintiffs' claims.  *See supra* Background § A.

Defendants also argue that Plaintiffs fail to credibly allege that they have no adequate
remedy at law because "there were agreements here."  MTD at 18.[16]  Defendants cite to *Viable*
*Marketing*, where plaintiff not only acknowledged the existence and validity of applicable
contracts, but also brought claims arising out of those contracts.  *See Viable Mktg. Corp. v.*
*Intermark Commc'ns, Inc.*, No. 09-CV-1500 (JS) (WDW), 2011 WL 3841417, at *3 (E.D.N.Y.
Aug. 26, 2011).  Differently here, Plaintiffs allege that there is no contract governing the extra-
contractual misconduct at issue, much of which took place after the time when the contracts cited
by Defendants were enforceable.  And even if Plaintiffs were asserting claims arising out of the
contracts cited by Defendants, "[w]hile a party generally may not simultaneously recover upon a
breach of contract and unjust enrichment claim arising from the same facts, it is still permissible

---

[16] In support of their argument that Plaintiffs allegation they have no adequate remedy at law is conclusory,
Defendants cite to *New Paradigm Software Corp. v. New Era of Networks, Inc.*, 107 F. Supp. 2d 325, 330 (S.D.N.Y.
2000), where the court held that the remedy of rescission was inappropriate where plaintiff failed to assert why
damages for plaintiff's breach of contract would not be an adequate remedy.  This case is inapposite where, here,
Plaintiffs do not bring claims for breach of contract, nor rescission, and, thus, have no claim for damages pursuant to
breach of contract such that would require a specific pleading as to why those damages are insufficient.  Defendants'
cite to *Homefield Ass'n of Yonkers, N.Y., v. Frank*, 59 N.Y.S.2d 884 (N.Y. App. Div. 1946), is inapplicable for the
same reason.

to plead such claims as alternative theories." *Singer v. Xipto Inc.*, 852 F.Supp.2d 416, 426 (S.D.N.Y. 2012). If "it remains unsettled whether an enforceable contract in fact governs the dispute at hand, . . . the [c]ourt sees no reason not to permit [the plaintiff] to proceed with the unjust enrichment theory of liability." *Dervan v. Gordian Group LLC*, No. 16-CV-1694 (AJN), 2017 WL 819494, at *12 (S.D.N.Y. Feb. 28, 2017); *see also Wilk v. VIP Health Care Servs.*, *Inc.*, No. 10 CIV.5530 (ILG) (JMA), 2012 WL 560738, at *5 (E.D.N.Y. Feb. 21, 2012) (noting that "while it is true that a claim for quantum meruit or unjust enrichment is precluded when a valid contract governing the same subject matter exists between the parties . . . a quantum meruit claim may be alleged alongside a breach of contract claim."); *see also Kottler v. Deutsche Bank AG*, 607 F.Supp.2d 447, 468 (S.D.N.Y. 2009) (noting that "where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue, a court should not dismiss a claim of unjust enrichment at the motion-to-dismiss stage") (internal citation and quotations omitted).[17] Thus, Defendants' motion to dismiss the unjust enrichment claim fails.

### E.   <u>Plaintiffs' Claim for Replevin is Not Based on a Contract Dispute</u>

Defendants similarly argue that Plaintiffs' claim for replevin must be dismissed because Plaintiffs are essentially seeking to enforce a contractual duty. MTD at 19. And again, Defendants

---

[17] Furthermore, it is well-established that a plaintiff may plead an unjust enrichment claim in the alternative to claims seeking a legal remedy. Rule 8(a) provides that "[r]elief in the alternative or of several different types may be demanded," Fed. R. Civ. P. 8(a)(3). In fact, "courts in this district have routinely allowed plaintiffs to advance past the pleading stage on an alternate theory of unjust enrichment." *Dervan*, 2017 WL 819494, at *12 (citing *Next Commc'ns, Inc. v. Viber Media, Inc.*, 2016 WL 1275659, at *8 (S.D.N.Y. Mar. 30, 2016)); *see also Silverman v. H.I.L. Assocs. Ltd. (In re Allou Distribs., Inc.)*, 387 B.R. 365, 412 (Bankr. E.D.N.Y. 2008) ("While there can be no doubt that the Trustee would not be entitled to duplicative relief, there similarly is no doubt that at the pleadings stage, a plaintiff is not required to elect a single theory upon which to proceed."). Thus, Plaintiffs are permitted to seek damages under claims for conversion and fraudulent misrepresentation, while simultaneously pleading a claim for unjust enrichment. *See, e.g.*, *Amusement Indus., Inc. v. Midland Ave. Associates, LLC*, 820 F. Supp. 2d 510, 540 (S.D.N.Y. 2011) (allowing claims for unjust enrichment and conversion to advance past the pleading stage); *see also Tennille v. W. Union Co.*, 751 F. Supp. 2d 1168, 1173 (D. Colo. 2010) ("The remedy for the alleged conversion, as with the unjust enrichment claim, is for restitution or disgorgement. Viewed this way, Plaintiffs' unjust enrichment and conversion claims are substantively the same, and are simply pled in the alternative. Because Plaintiffs' unjust enrichment claims survive dismissal under a Rule 12(b)(6) standard, so do their claims for conversion.").

cite to cases in which plaintiffs asserted claims both for replevin **and** breach of contract. *Id.* (citing *Aleem v. Experience Hendrix, L.L.C.*, No. 16 CIV 9206 (ER), 2017 WL 3105870, at *5 (S.D.N.Y. July 20, 2017); *Usov v. Lazar*, No. 13 Civ. 818 (RWS), 2013 WL 3199652, at *7 (S.D.N.Y. June 25, 2013)). Here, Plaintiffs are not seeking enforcement of a contractual duty. Indeed, Plaintiffs do not bring any claims for breach of contract. Instead, Plaintiffs allege that Defendants' misconduct was outside the scope of the contracts and/or post-dated any relevant contracts, and Defendant Stone was not party to the APA and neither Defendant Stone nor Defendant KeyFi were parties to the Service Agreement. In other words, Plaintiffs have adequately alleged that defendants "violated a legal duty independent from any contractual obligations." *Aleem* at 5.

F.    **Plaintiffs' Claim for Accounting Against Stone is Separate from Claims for Damages**

"Under New York law, there are four elements to a claim for equitable accounting: (1) a fiduciary relationship, (2) entrustment of money or property, (3) no other remedy and (4) a demand and refusal of an accounting." *Fuller Landau Advisory Services Inc. v. Gerber Fin. Inc.*, 333 F. Supp. 3d 307, 315 (S.D.N.Y. 2018) (quoting *Romain v. Seabrook*, No. 16 Civ. 8470, 2017 WL 6453326, at *6 n.8 (S.D.N.Y. Dec. 15, 2017). Plaintiffs sufficiently plead a standalone claim for accounting against Defendant Stone by alleging that (1) Stone owed fiduciary duties to Celsius, based on his role as CEO and chief fiduciary of Celsius KeyFi (FAC ¶ 84); (2) Stone was entrusted with Celsius' coins to be managed, deployed and returned (FAC ¶ 85); (3) Plaintiffs have no other remedy at law due to the unique nature of the assets managed and purchased by Stone, the complexity of the trading strategies Stone employed, and Stone's use of cryptocurrency mixers like Tornado Cash (FAC ¶ 87); and (4) Defendants failed and refused to provide an accounting, despite repeated demands by Celsius (FAC ¶¶ 28, 31, 88).

An equitable accounting is appropriate where, as here, a defendant is alleged to have concealed financial information only it had access to (*see In re Grgurev v. Licul et al.*, No. 2021-02692 (N.Y. Sup. Ct. 1st Dept Mar. 29, 2022)) and where, as here, without an accounting a plaintiff is "unable to verify the extent [of] assets" held by a defendant and "the history of disposition or acquisition of any such assets." *Murphy v. Virda Netco Establishment*, No. 19 CIV. 5198 (JGK) (RWL), 2020 WL 1865537, at *4 (S.D.N.Y. Mar. 3, 2020), *report and recommendation adopted*, No. 19-CV-5198 (JGK), 2020 WL 1862592 (S.D.N.Y. Apr. 14, 2020).   Celsius entrusted Defendants with vast quantities of its customers' assets.  Celsius is now in bankruptcy and engaged in an extensive effort to identify and recover assets for the benefit of its estates.  As part of this process, it needs to understand how exactly Defendants deployed the substantial assets entrusted to them and where those assets are today.  As such, even if Plaintiffs were to fail on every other cause of action asserted, this accounting would still be beneficial to the Debtors' estates.  An accounting is clearly warranted.[18]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Motion to Dismiss in its entirety and grant such other and further relief as the Court deems just and proper.

---

[18] Defendant Stone argues that Plaintiffs' claim for an accounting against him should be dismissed because accounting is a remedy, not a claim.  MTD at 19–20.  Defendant Stone cites *In re Aldelphia Commc'ns Corp.*, where the court, applying Massachusetts law, denied a standalone claim for accounting "in the context [of the case]" because a fiduciary relationship between the plaintiff and defendants did not exist and damages were readily calculable under the applicable contract, which was the subject of a breach of contract claim. 331 B.R. 93, 98, 100 (S.D.N.Y. 2005).  Stone similarly cites to *Est. of Albin v. Mertz, LLC*, where a breach of contract claim was asserted, which would entitle plaintiff to an accounting for damages. *See* No. 05 CIV 3440 (KMW)(KNF), 2006 WL 8461442, at *9–10 (S.D.N.Y. Mar. 15, 2006).  These cases are distinguishable from the present case, where Plaintiffs plead that Defendant Stone owed fiduciary duties to Celsius, including in his role as CEO and chief fiduciary of Celsius KeyFi (FAC ¶¶ 17–18, 21, 63), and, for the reasons explained herein, Plaintiffs argue there is no contract governing the extra-contractual misconduct alleged in the FAC and, thus, no claim for breach of contract.

Dated:        November 28, 2022
              New York, New York

AKIN, GUMP, STRAUSS, HAUER & FELD LLP

By:     /s/ Mitchell P. Hurley
        Mitchell P. Hurley
        Dean L. Chapman Jr.
        One Bryant Park
        New York, New York 10036
        Telephone: (212) 872-1000
        Facsimile: (212) 872-1001
        mhurley@akingump.com
        dchapman@akingump.com

        Elizabeth D. Scott (admitted *pro hac vice*)
        2300 N. Field Street, Suite 1800
        Dallas, TX 75201
        Telephone: (214) 969-2800
        Facsimile: (214) 969-4343
        edscott@akingump.com

        *Special Litigation Counsel for Debtors and*
        *Plaintiffs Celsius Network Limited and*
        *Celsius KeyFi LLC*

26