**UNITED STATES BANKRUPTCY COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, et al.,<br><br>      Debtor(s).<br><br>---<br><br>CELSIUS NETWORK LIMITED and CELSIUS KEYFI LLC,<br><br>      Plaintiffs,<br>  v.<br><br>JASON STONE and KEYFI INC.,<br><br>      Defendants. | Bankruptcy Case No. 22-10964-MG<br><br>Adversary Proceeding No. 22-01139-MG<br><br>(Jointly Administered) |

**DEFENDANTS JASON STONE AND KEYFI INC.'S
<u>OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... ii

I.    INTRODUCTION ............................................................................................................. 3

II.    FACTUAL BACKGROUND ............................................................................................ 5

    A.    Celsius Retains KeyFi and Stone To Invest Its Customers' Funds ........................... 5

    B.    Celsius Was Pleased with The Financial Performance of KeyFi and
        Authorized It to Take Payouts Earned Under the APA ............................................ 6

    C.    Stone Discovers Significant Mismanagement by Celsius and Resigns ..................... 8

    D.    Following Stone's Departure, KeyFi and Stone Attempt to Resolve This
        Dispute, but Celsius Refuses to Honor Obligations Under APA .............................. 8

    E.    Celsius Attempts to Blame Stone for Its Failure to Hedge DeFi Exposure ............. 10

III.    LEGAL STANDARD ...................................................................................................... 12

IV.    ARGUMENT ................................................................................................................... 13

    A.    Celsius Would Not Suffer Irreparable Harm Absent Injunction. ............................ 13

    B.    Celsius is Unlikely to Prevail on the Merits of Its Claims. ..................................... 15

    C.    The Equities Do Not Counsel in Favor of an Injunction. ........................................ 17

V.    CONCLUSION ................................................................................................................ 18

# TABLE OF AUTHORITIES

**Cases**

*Alcon Vision, LLC v. Lens.com, Inc.*,
  No. 18-CV-407 (NG), 2020 WL 5899879 (E.D.N.Y. Feb. 28, 2020),
  *report and recommendation adopted*, No. 18-CV-407 (NG) (RLM),
  2020 WL 3989492 (E.D.N.Y. July 15, 2020) ......................................................................... 13

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
  598 F.3d 30 (2d Cir. 2010) ................................................................................................... 12

*Citizens Comm. for Hudson Valley v. Volpe,*
  297 F. Supp. 804 (S.D.N.Y. 1969) .................................................................................. 12, 17

*Heissenberg v. Doe*,
  No. 21-CIV-80716-ALTMAN/Brannon, 2021 WL 8154531 (S.D. Fla. Apr. 23, 2021). ........ 15

*Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*,
  596 F.2d 70 (2d Cir. 1979) ................................................................................................... 14

*Jacobo v. Doe*,
  No. 1:22-cv-00672-DAD-BAK (BAM), 2022 WL 2052637 (E.D. Cal. June 7, 2022) ........... 15

*Studebaker Corp. v. Gittlin*,
  360 F.2d 692 (2d Cir. 1966) ................................................................................................. 14

*Winter v. Nat. Res. Def. Council Inc.*,
  555 U.S. 7 (2008) ................................................................................................................. 12

Defendants Jason Stone and KeyFi, Inc. (together, "Defendants") respectfully submit this memorandum of law in opposition to Plaintiffs' Celsius Network Limited and Celsius KeyFi LLC's (together, "Celsius") Motion for Preliminary Injunction (the "Motion").

## I.  INTRODUCTION

The thrust of Celsius' Motion is that Defendants have stolen tens of millions of dollars' worth of crypto-assets and that "[w]ithout prompt Court intervention," Defendants may commit further theft. Yet Celsius makes these extraordinary accusations without confronting that: (1) the core of this dispute concerns the computation of profits under the Asset Purchase Agreement (the "APA"); (2) the plain language of the APA recognized that KeyFi was owed a profit distribution, as it contemplated a payment contemporaneous with the execution of the agreement; and (3) the property they now seek to enjoin Defendants from using was paid to them by Celsius' then CEO as an advance on the profit distribution they were due prior to the formal calculation of the same. While Celsius' lawyers may dispute these facts in their Motion, tellingly, they have submitted *no* declaration from any of the numerous executives and individuals who were involved with the authorization of payments to KeyFi and who have actual knowledge of the negotiation of the contracts at the heart of this dispute.

To be clear, Defendants have no issue with much of the relief requested by Celsius. Defendants will voluntarily enter a joint stipulation to agree that they will (a) not access, transfer, or dispose of Celsius Staked ETH[1]; (b) not access any wallets owned by Celsius; and (c) relinquish any private keys they still retain associated with any wallet owned by Celsius, so long as the parties work out a method for doing so without destroying any relevant ESI. Defendants will also not use

---

[1] While their Motion spends much time describing the history and technicalities behind the 25,000 Staked ETH, Celsius only first raised this issue with Defendants on September 13, 2022 – nearly 18 months after this dispute began. Defendants do not have any ability to access the Celsius Staked ETH, as they deleted the private keys associated with this asset after they deployed these assets on Celsius's behalf. Stone Aff. ¶¶ 34-35.

the smart contract program called Tornado Cash so long it remains a federal crime to so.[2] The *only relief* requested in the Motion that Defendants oppose is the request for a pre-judgment attachment to various "Property," including certain NFTs that Celsius claims—with unsupported invective—that Defendants stole.

As explained below, Defendants did not steal or convert the Property that Celsius claims belongs to it. Instead, as alleged in the lawsuit brought by KeyFi in New York State court, it is Celsius that owes Defendants millions of dollars under the profit-sharing arrangement at issue in the APA. *See* Complaint, *KeyFi, Inc. v. Celsius Network Ltd. and Celsius KeyFi LLC*, No. 652367/2022 (N.Y. Sup. Ct.) ("KeyFi Complaint"), Stone Aff. Ex. B. Those claims, like the claims at issue in this suit, center around the computation of "Net Profits" under the APA, and the accounting for Net Profits in U.S. dollars. *See* ECF No. 24-4, Schedule 7.8(b)(1)(d), (9).

The Court need not, however, examine the underlying merits of the Parties' claims against each other to deny Celsius' Motion because it fails for at least three fundamental legal reasons.

*First*, Celsius' motion is plainly untimely, and therefore, they have failed to make a showing of irreparable harm. Courts typically deny preliminary injunctions in the face of unexplained delays of more than two months. Here, Celsius' Motion is brought more than *two* months after the filing of this action, more than *three* months after the filing of the KeyFi Complaint, and more than *a year and a half* after Celsius first accused Defendants of misappropriating assets.

---

[2] The U.S. crypto-asset exchange Coinbase is currently funding a lawsuit brought by attorneys at Paul Weiss Paul, Weiss, Rifkind, Wharton & Garrison LLP to challenge the Department of Treasury's addition of Tornado Cash to the Specially Designated Nationals and Blocked Persons (SDN) List. *See Van Loon et al. v. Department of Treasury et al.*, Ca No. 6:22-cv-920, Amended Complaint (W.D. Texas 2022). As explained in that lawsuit, Tornado Cash is a security tool that allows individuals to protect their identity while transacting on the blockchain. Prior to its addition to the SDN, Defendants used Tornado Cash to protect their identity on the blockchain and reduce the risk of malicious attackers on their funds. Stone Aff. ¶ 17.

4

*Second*, Celsius has failed to demonstrate that is likely to prevail on its claims. In its Motion, Celsius fails to (1) confront the plain language of the APA which contemplated multiple "Payouts" prior to Stone's resignation; (2) offer any testimony that rebuts Defendants assertion that the NFT purchases at issue were authorized by Celsius' then CEO; (3) acknowledge that emails they rely on in support of their motion evidence that the Parties expected there were "profits" to share according to the APA; and (4) offer *any* accounting to show that the Celsius KeyFi joint venture was unprofitable—even though the trading records associated with most of Celsius KeyFi's trading activity are publicly available.

*Third*, the equities do not counsel in favor of a prejudgment attachment of KeyFi's assets. Celsius cannot show any injury for which a monetary award cannot be adequate compensation in the event they ultimately prevail on the merits. If, however, the Court were to enjoin KeyFi from accessing its property, KeyFi would be left without resources necessary to defend itself in this litigation and to pursue its claims against Celsius.

For these reasons, and the reasons set forth below, the Court should deny Celsius' Motion.

## II.     FACTUAL BACKGROUND

### A.     Celsius Retains KeyFi and Stone To Invest Its Customers' Funds

In the summer of 2020, Celsius Network Limited ("Celsius") was holding billions of dollars in customer deposits and was obligated to pay significant interest rates to its customer base. Given this pressing need for revenue, the potential for profitable investments in DeFi, but the complexity of deploying such novel and unique strategies, Celsius sought KeyFi and Stone's help to invest its customer deposits into decentralized finance markets ("DeFi").[3] Stone Aff. ¶ 3. Celsius

---

[3] The APA defines the term "Authorized Decentralized Finance Activities" to mean "any deployed coins, such as BTC, ETH, stable coins, and other assets are deployed to authorized activities which earn coins from lending, borrowing, high-frequency liquidity provisions, and other authorized DeFi activities." ECF No. 24-4 at Schedule 7.8(b)(1)(b).

5

was well acquainted with Stone and KeyFi because its then-CEO and CTO were investors in KeyFi. Stone Aff. ¶ 2.

As set forth in Celsius' Motion (at 5-6), the parties negotiated and executed a series of agreements between August 2020 and January 2021. These negotiations culminated in the creation of Celsius KeyFi pursuant to the LLC Agreement (ECF No. 24-2) and the simultaneous execution of the APA (ECF No. 24-4) and Services Agreement (ECF No. 24-5). These agreements, which essentially formalized the pre-existing relationship between KeyFi and Celsius, promoted Stone to the position of CEO of Celsius KeyFi and provided both KeyFi and Stone substantial compensation—including in the form of a profit share—in exchange for their expert deployment and management of nearly $2 billion dollars' worth of customers assets—approximately 10-15% of the total sum of customer deposits held by Celsius. Stone Aff. ¶ 7. Specifically, the APA included a profit-sharing mechanism for KeyFi, whereby KeyFi would receive 50% of Net Profits of Staking Coins and would receive 20% of Net Profits of Authorized Decentralized Finance Activities. ECF No. 24-4 at Schedule 7.8(b)(3).

**B.    Celsius Was Pleased with The Financial Performance of KeyFi and Authorized It to Take Payouts Earned Under the APA**

Celsius claims (at 6-7) that "[i]t did not take long before Celsius lost confidence in Stone and KeyFi" is fiction. To the contrary, Celsius was quite pleased with KeyFi's performance earning yield through DeFi and continually monitored the performance of the 0xb1 wallet through an online application called Debank which allows anyone to monitor—in real time—the balance associated with a particular crypto-asset wallet. Stone Aff. ¶ 8. From September 2020 up through the week prior to Stone resigning, Celsius sent KeyFi and Stone tens of millions of dollars of customer deposits per week to deploy. Stone Aff. ¶¶ 4, 10. Each of these transactions is publicly verifiable. Stone Aff. ¶ 8.

6

Celsius' leadership frequently conveyed its satisfaction with KeyFi and Stone's performance deploying its crypto-assets. Stone Aff. ¶¶ 9, 11-12. During weekly executive meetings (held on Tuesdays), Celsius CEO Alexander Mashinsky praised Jason as a trading genius and kindly referred to him as his protégé. Stone Aff. ¶ 9. During these meetings, Mashinsky showed Debank screenshots to the other executives and boasted about how well the Celsius KeyFi venture was performing relative to the rest of Celsius' various investment strategies. Stone. Aff. ¶ 9. As such, the parties understood that under the APA, substantial profits were owed pursuant to the APA's profit share. Stone Aff. ¶¶ 11-12.

Indeed, under the APA, KeyFi and Stone earned their first Payout by December 31, 2020 the day the APA was signed. ECF No. 24-4 at Schedule 7.8(b)(6)(d) (the "first payout date will be 12/31/2020, and subsequent ones will be on the 15th of each month . . . immediately following the month in which activities attributable to the Payouts occur"). But because the parties to the APA had not yet finalized the responsible parties for performing the accounting contemplated by the APA, Mashinsky authorized Stone and KeyFi to take advances on the payouts they were owed under the APA. Stone Aff. ¶ 13.

To effectuate these advances, KeyFi purchased a variety of NFTs (non-fungible tokens) by using funds in the 0xb1 account – the main account that Celsius KeyFi used to deploy funds into DeFi related activities. Stone Aff. ¶¶ 4, 14. As Celsius acknowledges in its Motion (at 9), these purchases began before Stone resigned. Stone Aff. ¶ 14. Celsius was both aware of these purchases and that they were to be treated as compensation for the payouts KeyFi was owed under the APA. Stone Aff. ¶ 15. And contrary to Celsius' insinuation that these purchases were secret and unauthorized, many of these purchases were publicly promoted by Stone on social media contemporaneous with their purchase. *Id.*

7

### C. Stone Discovers Significant Mismanagement by Celsius and Resigns

The parties' relationship began to break down when Stone discovered that not only did Celsius lack basic security controls to protect the billions of dollars in customers' funds they held, but that they were actively using customer funds to manipulate crypto-asset markets to their benefit. Stone Aff ¶ 18. The most egregious example of this was Stone's discovery that Celsius was using customer bitcoin deposits to inflate its own crypto-asset called the "Celsius token" ("CEL"). Stone Aff ¶ 19. Stone also learned of multiple incidents where Celsius' failure to perform basic accounting endangered its solvency and customer funds. Stone Aff. ¶ 20. One such example included Celsius improperly accounting for certain payments owed to customers, resulting in a $200 million liability the company did not even understand how or why it owed. *Id.* Celsius' issues concerning the tracking of its customers funds were highlighted by the report the Court's appointed examiner recently issued. Interim Report of Shoba Pilay, Examiner, *In re Celsius Network, LLC*, 22-10964 (MG) ECF No. 1411 (Bankr. S.D.N.Y. Nov. 19, 2022).

Faced with mounting evidence of Celsius' disorganization, mismanagement, and fraud, Stone concluded he could no longer work with Celsius. Stone Aff ¶ 21. In March 2021, Stone informed Celsius that he would be stepping down as the CEO of Celsius KeyFi. *Id.*

### D. Following Stone's Departure, KeyFi and Stone Attempt to Resolve This Dispute, but Celsius Refuses to Honor Obligations Under APA

After Stone resigned as the CEO of Celsius KeyFi, but before Celsius accepted his resignation, Stone transferred many of the assets that he was previously authorized to purchase and keep as compensation under the APA to KeyFi's control. Stone Aff. ¶ 23. These transfers include the various transfers to the 0x50dd wallet described in Celsius' Motion (at 8-10). *Id.*

During the weeks following his resignation, Stone and the KeyFi team worked to unwind the various positions associated with the Celsius KeyFi accounts, including those associated with

8

the 0xb1 wallet, and returned these funds to Celsius. Stone Aff. ¶ 22. The communications cited by Celsius (at 7-8) evidence Stone's efforts to return Celsius the funds that Celsius KeyFi had deployed.

After Stone returned approximately $1.3 billion in customer funds, Celsius—for the first time—began to insist that Stone had lost or stolen millions of dollars in assets. Stone Aff. ¶ 24. Celsius did so by claiming ignorance to the strategies that Stone had deployed. This new tactic was first revealed in an April 7, 2021, letter from Mitchell Hurley to KeyFi's former counsel, in which Hurley wrote:

> Celsius and Celsius KeyFi will hold Mr. Stone personally liable for his breaches of contract and other duties to the fullest possible extent, including, without limitation, **with respect to any losses resulting from price increases in ETH** provided by Celsius to Mr. Stone that he apparently converted without authorization into other currencies…

ECF No. 24-10. (emphasis added). Essentially, Celsius was now claiming that Stone would be "personally liable" for "impermanent loss" associated with the Celsius KeyFi investments (explained *infra* Section II(E)). This position, first asserted by Celsius' lawyer after Stone resigned, was inconsistent with the APA, the Services Agreement, and the parties' course of dealings over the seven-month period Stone deployed billions of dollars for Celsius. Stone Aff. ¶ 31.

Over the course of 2021, the parties exchanged extensive correspondence. On June 18, 2021, Stone's former counsel explained that Stone and KeyFi were "entitled to compensation under the Asset Purchase Agreement [because Celsius was] required to pay Celsius KeyFi LLC a fixed percentage of the profits generated by the services Mr. Stone provided." Stone Aff. Ex. A. Months later, after Celsius denied its obligations to pay KeyFi and Stone, KeyFi's counsel emailed counsel for Celsius, attaching a draft of the complaint that was eventually filed in New York State court after discussions concerning settlement broke down. Roche Aff. Ex. C. As part of that same correspondence, KeyFi invoked the Audit Provisions of Section 7.4 of the APA. *Id.* Specifically,

9

under Section 7.4(b)(i) of the APA, KeyFi (the "Seller") can demand Celsius KeyFi (the "Buyer") to perform an Audit in the event that non-payment of a payment obligation occurs:

> Within the later to occur of fourteen (14) calendar days after any payment by Buyer due under this Agreement (the "Obligation"), or thirty (30) calendar days after any such scheduled payment accrued, if Seller is dissatisfied with the payment, or if non payment occurs, Seller may invoke an audit (the "Audit") of Buyer's relevant records using Seller's chosen Auditor, who shall be a nationally-licensed Certified Public Accountant (CPA).

To date, Celsius has refused this demand for an accounting despite its clear contractual obligation to perform one at the request of KeyFi.

Accordingly, and contrary to its claim (at 8) that "Defendants have refused Celsius' requests for an accounting," it is Celsius that has an obligation to and has refused to take part in any accounting necessary to settle the Parties' contractual disputes. After more than a year's worth of attempts were made to settle this dispute, and after Celsius refused to have a CPA review the "relevant records" as required under the APA, KeyFi filed suit against Celsius on July 7, 2022.

        **E.**        **Celsius Attempts to Blame Stone for Its Failure to Hedge DeFi Exposure**

As explained above, in April 2021, Celsius' lawyers threatened to hold Stone "personally liable" for "any losses resulting from price increases in ETH" caused by his deployment of crypto-assets in DeFi. ECF No. 24-10. This was an attempt by Celsius to pass off blame for price volatility inherent in crypto-assets onto Stone and obscure its own financial mismanagements by exploiting a phenomena called "impermanent loss."

Impermanent loss is a term for the opportunity cost associated with participating in a liquidity pool and is inherent in most DeFi activities. Stone Aff. ¶ 27. For example, to earn money in DeFi as a "liquidity provider," you must deposit two different crypto-assets into a liquidity pool that permits trades between those two assets, *e.g.*, BTC for ETH and vice versa. *Id.* The liquidity pool incents market participants to ensure that the US dollar value of the two assets in the pool

remains the same. Consequently, as the price of one asset goes up (*e.g.*, BTC), market participants will buy that underpriced asset from the pool, increasing the amount of the lower priced asset (ETH) in the pool and decreasing the amount of the higher priced asset (BTC) in the pool. *Id.* This is how a liquidity pool adjusts price: it relies on market forces to arbitrage the lower priced asset, and as the asset becomes scarcer in the pool, it's "price" in the pool rises to match the market. *Id.*

In the example above, as BTC rises in price, the market will put ETH into the pool to buy the "cheap" BTC from the pool, thus increasing the amount of ETH in the pool, decreasing the amount of BTC in the pool, and increasing the "price" the pool charged for BTC. Stone Aff. ¶ 28. In this example, if you had put $100,000 into a $1M pool, you should still have about 10% of the pool's value when you withdraw from the pool (plus 10% of the fees). *Id.* But since the market pushed ETH into the pool and extracted BTC, your 10% share of the pool's liquidity will be comprised of more ETH and less BTC then you deposited. *Id.* Conversely, had you not deposited your BTC into the liquidity pool, you would have kept the same amount of BTC. *Id.* And since the price of BTC went up, you would have made more money by simply holding the BTC. *Id.* This concept of "you would have been better off if you had not provided the liquidity," is known as "impermanent loss." *Id.* Put simply, impermanent loss is the *difference* in the balance of assets provided vs. the balance of assets returned by the liquidity pool in U.S. dollar terms. *Id.*

Celsius' owners and managers understood the nature of DeFi and the inherent risk of impermanent loss. Stone Aff. ¶ 29. They also understood that the strategies deployed by Stone and KeyFi exposed customer funds to risk of impermanent loss. Stone Aff. ¶ 29. Accordingly, Celsius executives assured Stone that it was properly hedging the risk of impermanent loss on the Celsius KeyFi activities. Stone Aff. ¶ 29. Indeed, the importance of these hedging activities were discussed when negotiating and forming the APA and Services Agreement. Stone Aff. ¶ 29.

Throughout 2020, Celsius' then CFO told Mr. Stone that the hedging of the Celsius KeyFi activities were done centrally, as part of the company's global risk management, a representation that Mr. Stone reasonably relied on, because Celsius' business model depended on it. Stone Aff. ¶ 30. Before and during KeyFi's management of Celsius crypto assets, Celsius repeatedly assured KeyFi that the requisite hedging transactions were being entered into. *Id.* Unfortunately, as KeyFi continued doing business with Celsius, and Celsius began desperately seeking liquidity to repay its customers, Stone realized that Celsius had been lying to him, and had failed to hedge against impermanent loss. *Id.*

This Motion—which seeks to deprive KeyFi of compensation lawfully earned under the APA—is consistent with Celsius' nearly two-year long effort to leverage the complexities of DeFi and impermanent loss to blame Stone and KeyFi for Celsius' own mismanagement of its customers' funds and to avoid paying out according to its contractual obligations.

### III. LEGAL STANDARD

A party seeking "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council Inc.*, 555 U.S. 7, 20 (2008). Further, the Second Circuit "has required a party seeking a preliminary injunction to show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010). "It is hornbook law that . . . the remedy itself is an extraordinary one that is not granted absent a strong showing of need by the plaintiff." *Citizens Comm. for Hudson Valley v. Volpe,* 297 F. Supp. 804, 806 (S.D.N.Y. 1969).

12

## IV.    ARGUMENT

As articulated above, Defendants have no issue with much of the relief requested by Celsius. The *only relief* requested in the Motion that Defendants oppose is the request for a pre-judgment attachment to various "Property." For the reasons set forth below, Celsius is not entitled to this relief.

### A.    Celsius Would Not Suffer Irreparable Harm Absent Injunction.

"It is well established that an unreasonable delay in seeking injunctive relief can undermine an allegation of irreparable harm." *Alcon Vision, LLC v. Lens.com, Inc.*, No. 18-CV-407 (NG), 2020 WL 5899879, at *9 (E.D.N.Y. Feb. 28, 2020), *report and recommendation adopted*, No. 18-CV-407 (NG) (RLM), 2020 WL 3989492 (E.D.N.Y. July 15, 2020). "The need to show irreparable harm in order to merit a preliminary injunction derives from the notion that 'there is an urgent need for speedy action to protect the plaintiffs' rights.'" *Id*. (*quoting Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). "Accordingly, an unreasonable delay in seeking a preliminary injunction may preclude a finding of irreparable harm because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief." *Id*. (cleaned up). "Courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Id*. (*quoting Vantone Grp. Ltd. Liab. Co. v. Yangpu NGT Indus. Co., Ltd*., 13CV7639-LTS-MHD, 2015 WL 1055933, at *4 (S.D.N.Y. Mar. 11, 2015).

Here, Celsius' Motion is brought more than two months after the filing of this action, more than three months after the filing of the KeyFi Complaint, and more than a year and a half after Celsius first accused Defendants of misappropriating assets. Accordingly, Celsius' claim of irreparable harm absent pre-judgment attachment is incompatible with this inexplicable delay. If Celsius truly believed that Defendants were actively *stealing* customer funds, why did they wait more than a year and half to seek relief and only take such action after it initiated bankruptcy

13

proceedings? The aim of Celsius' Motion, which seeks to enjoin the use of a broad and undefined scope of "Property" belonging to Defendants, instead appears to be aimed at depriving Defendants of funds necessary to defend themselves (and prosecute their affirmative claims) in order to gain undue advantage in this litigation.

Celsius' claim (at 16) that "the risk is overwhelming" that "theft" will continue therefore rings hollow in the face of this delay. As articulated above, Defendants will consent to a stipulation to not access Celsius Staked ETH—to which they do not have access—and relinquish any private keys associated with Celsius owned wallets so long as the Parties work out by agreement a method to so without destroying relevant ESI.

As to the Property at issue in this matter, Celsius' claim (at 14) that Defendants refused to specifically identify certain relevant property is *false*. In fact, on April 7, 2022, in the context of Defendants efforts to settle the matter, Defendants provided Celsius a list and description of the NFT purchases that KeyFi and Stone purchased, as authorized by Celsius, as part of the Net Profit payments they were owed. Roche Aff. ¶ 4. Further, Defendants have already agreed to provide all documents and transaction information for all payments made to KeyFi and Stone. Roche Aff. ¶ 5.

To the extent that Celsius claims the pre-judgment attachment to various crypto-assets is appropriate because it may suffer further monetary harm, such argument cannot serve as a basis for an irreparable harm. *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (citing *Studebaker Corp. v. Gittlin*, 360 F.2d 692, 698 (2d Cir. 1966) ("[I]t has always been true that irreparable injury means injury for which a monetary award cannot be adequate compensation and that where money damages is adequate compensation a preliminary injunction will not issue."). Celsius' citations (at 17) to various cases concerning anonymous cyber thefts are

14

inapposite. Those cases concerned *ex parte* motions to freeze crypto-assets from John Doe defendants who fraudulently stole crypto-assets from the plaintiffs in those cases. *See, e.g.*, *Jacobo v. Doe*, No. 1:22-cv-00672-DAD-BAK (BAM), 2022 WL 2052637, at *1 (E.D. Cal. June 7, 2022); *Heissenberg v. Doe*, No. 21-CIV-80716-ALTMAN/Brannon, 2021 WL 8154531, at *1 (S.D. Fla. Apr. 23, 2021). Because Defendants are actively participating in these proceedings, present within this Court's jurisdiction, and have not threatened to remove assets from this Court's jurisdiction, there can be no showing of irreparable harm.

Accordingly, the Motion should be denied.

**B.     Celsius is Unlikely to Prevail on the Merits of Its Claims.**

Much like its Amended Complaint, Celsius' Motion completely avoids addressing the language of the APA and Defendants' clear entitlement to profits from that agreement. Because Celsius has failed to put forth any evidence to show that the NFT purchases at issue were not authorized by Celsius' former CEO Alexander Mashinsky and that the value of the Property at issue exceeds all counterclaims known to Celsius (*i.e.*, the claims outlined in the KeyFi Complaint), Celsius has not met its burden.

*First,* Celsius' naked assertion (at 19) that "there was no 'profit' to share" is belied by the plan language of the contract. Under the plain language of the APA, the Parties recognized that KeyFi and Stone had already earned a payout based on their performance. ECF No. 24-4 at Schedule 7.8(b)(6) (the "first payout date will be 12/31/2020, and subsequent ones will be on the 15th of each month . . . immediately following the month in which activities attributable to the Payouts occur"). If, as Celsius claims, no profit was ever earned, why would it have signed a contract recognizing Defendants *past* entitlement to a profit payment?

Celsius' claim that Stone and KeyFi did not return significant profits is further belied by the fact that, after the execution of the APA, Celsius continued to send tens of millions of dollars

15

to Stone for him to deploy in DeFi per the APA and Services Agreement. Stone Aff. ¶ 10. In fact, Celsius continued to send these funds to Stone through just prior to Stone resigning and *after* two additional payouts were earned under the APA. Stone Aff. ¶ 10. And if Celsius truly did not believe that KeyFi and Stone were entitled to any Payout under the APA, then they simply could have complied with the Audit Provisions under Section 7.4(b)(i) of the APA when KeyFi demanded such audit. Roche Aff. Ex. C. Had Celsius complied with its contractual obligations under Section 7.4(b)(i), both this litigation and the KeyFi Complaint could have been avoided as the Auditor would have determined the respective amounts owed to KeyFi by Celsius.

*Second*, contrary to Celsius' claim, the Services Agreement does not contradict Defendants' assertion that the purchase of certain NFTs were authorized by Mashinsky. In fact, as CEO of Celsius, Mashinsky would have been the most natural person to have authorized an advance on the Payouts owed to Defendants under the APA and Services Agreement. Notably, Celsius has submitted no testimony from Mashinsky or others present at the weekly meetings where the authorization of the NFT purchases took place.

*Third*, Celsius' assertions (at 19) concerning the emails evidencing Stone's efforts to return crypto-assets to Celsius after he resigned are confusing at best. Stone's claim that he was returning Celsius' "profit share" is of course consistent with Defendants claim that they were entitled part of those profits. As made clear in both the APA and the Services Agreement, any Net Profits earned would be apportioned *between* KeyFi, Celsius KeyFi, and Celsius. ECF No. 24-4 at Section 7.8(b)(3). Accordingly, Stone's admission that there were in fact profits necessitates the conclusion that KeyFi was owed part of those profits.

*Finally,* Celsius' claim that Defendants have not yet produced any evidence *from* Celsius evidencing the authorization of the transactions ignores both that (1) it is their burden to

16

demonstrate a likelihood of success on the merits and (2) their failure to offer any testimony to rebut the authorization. The lack of any affidavit from Mashinsky—the individual Defendants claim authorized the transactions—speaks volumes. Indeed, the purchase of the Cryptopunk and Bullrun Babe NFTs Celsius complains of were made *while* Stone was still the CEO of Celsius KeyFi and after the first two Payouts were earned under the APA. Stone Aff. ¶ 16. If Celsius seeks to rebut Defendants' claims that such payments were authorized by Mashinsky, they should, *at minimum*, put forth sworn testimony from Mashinsky to that effect. Otherwise, Celsius' motion should fail because they cannot meet their burden to show a likelihood of success on the merits.

        C.        **The Equities Do Not Counsel in Favor of an Injunction.**

As Celsius admits, with respect to most of the relief requested, Celsius' Motion is unnecessary and redundant of the automatic stay. Motion at 2. ("Were the Defendants to engage in the conduct Celsius seeks to expressly bar through the injunction, the Defendants would plainly be in violation of the existing Section 362 automatic stay.") Thus, by Celsius' own admission, nothing will change in the absence of the injunction; no irreparable harm will be faced; and therefore, the injunction should not be granted. *Citizens Comm.,* 297 F. Supp. at 806 (injunction is an extraordinary remedy "that is not granted absent a strong showing of need by the plaintiff"). While Defendants would agree to a stipulation as to most of the relief sought as outlined above, Defendants oppose any request to impose a pre-judgment attachment on their property as it would significantly prejudice their ability to defend themselves in this litigation.

As argued above (*see supra* Part A), Celsius cannot show any injury for which a monetary award cannot be adequate compensation justifying a pre-judgment attachment of Defendants' property. However, if the Court enjoins KeyFi from accessing the property it was paid under the APA, it would be left unable to pay fees necessary to defend itself in this litigation, as those funds represent the entirety of the assets available to KeyFi. Stone Aff. ¶ 36. Such an outcome would be

17

drastically inequitable, as Celsius maintains the ability to pay for its attorneys using funds that its creditors seek to recover. *See, e.g.*, Second Monthly Fee Statement of Akin Gump Strauss Hauer & Feld LLP for Professional Services Rendered and Reimbursement of Expenses Incurred as Special Litigation Counsel to The Debtors for the Period of September 1, 2022, through September 30, 2022, *In re Celsius Network LLC*, 22-10964-mg (Bankr. S.D.N.Y. Nov. 18, 2022) (ECF No. 1407) (seeking $668,447 in relation to the Stone/KeyFi matter).

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Celsius' motion for preliminary injunction in its entirety.

Dated: November 28, 2022

**KYLE ROCHE P.A.**

*/s/ Kyle W. Roche*
Kyle W. Roche
260 Madison Ave., FL 8
New York, NY 10016
kyle@kyleroche.law

*Counsel for Defendants*