UNITED STATES BANKRUPTCY COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, et al.,<br><br>                   Debtor(s).<br><br>CELSIUS NETWORK LIMITED and CELSIUS KEYFI LLC,<br><br>                   Plaintiffs,<br>      v.<br><br>JASON STONE and KEYFI INC.,<br><br>                   Defendants. | Bankruptcy Case No. 22-10964-MG<br><br>Adversary Proceeding No. 22-01139-MG<br><br>(Jointly Administered) |

**AFFIDAVIT OF JASON STONE IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Jason Stone, declare under penalty of perjury:

1.      During the Summer of 2020, I formed KeyFi, Inc. ("KeyFi") to facilitate my deployment of various cryptocurrencies in decentralized finance markets ("DeFi"), as well as staking cryptocurrencies in order to generate additional cryptocurrency, often referred to as generating "yield."

2.      Both Alex Mashinsky, the then-CEO of Celsius, and Nuke Goldstein, the then-CTO of Celsius, were investors in KeyFi.

3.      Shortly after the formation of KeyFi, due to the complexity associated with deploying funds into DeFi, Celsius Network Limited ("Celsius") sought to utilize KeyFi's

services to help invest its customer deposits into DeFi in order to satisfy its need to generate revenue to pay its interest to its customers.

4. Celsius began deploying assets to KeyFi before the parties had finalized the agreements which would govern their relationship. Celsius deployed assets to KeyFi by sending them to a wallet whose first four characters were 0xb1 (the "0xb1 wallet"), which KeyFi had access to.

5. In order to facilitate KeyFi's investments on behalf of Celsius, Celsius and KeyFi negotiated an Asset Purchase Agreement (the "APA"), ECF No. 24-4, a Services Agreement, ECF No. 24-5, and an LLC Agreement for Celsius KeyFi LLC, ECF No. 24-2, the LLC that Celsius would use to acquire the assets of KeyFi. The agreements formalized the preexisting relationship of KeyFi and Celsius and included that I would be the CEO of Celsius KeyFi. These agreements also provided KeyFi with substantial additional compensation in the form of a profit share calculated in US Dollars.

6. KeyFi—and then Celsius KeyFi—managed Celsius assets continually from September 2020 through March 2021.

7. Over the course of KeyFi and Celsius KeyFi's management of assets on behalf of Celsius, they deployed nearly $2 billion dollars' worth of customer assets, an amount I understood to be approximately 10-15% of the total sum of customer deposits held by Celsius.

8. Celsius was able to easily monitor—in real time—the use and deployment of crypto-assets associated with the 0xb1 wallet through an online application called Debank.

9. I would frequently present at weekly Celsius leadership meetings, held on Tuesdays. Those meetings included then-CEO Alex Mashinsky. During those meetings, Mr. Mashinsky praised me as a trading genius and even referred to me as his protégé. Likewise,

2

during those meetings, then-CFO Harumi Urata-Thompson and Mr. Mashinsky would present the Debank screenshots to other executives and boast about the performance of the Celsius KeyFi venture, especially relative to the rest of Celsius' investment portfolio.

10. Further, Celsius continuously provided KeyFi and Celsius KeyFi with tens of millions of dollars' worth of customer deposits throughout the period of September 2020 through February 2021.

11. During the period of KeyFi and Celsius KeyFi's management of Celsius' assets, based on these statements and the continued deployment of customer funds through KeyFi and Celsius KeyFi, I understood Celsius' leadership to be very pleased with the performance of KeyFi and Celsius KeyFi's strategy of deploying crypto-assets in DeFi and earning yield.

12. Based on the results we were achieving, I also understood and expected that KeyFi would receive a large profit share payment. Further, based on Celsius' leaderships acknowledgement of the success of the Celsius KeyFi investment, I understood that Celsius agreed that KeyFi was entitled to a substantial profit share. Indeed, the first payment of that profit share was owed on December 31, 2020.

13. Yet because the computation of Net Profits under the APA had not yet been completed, Mashinsky authorized me and KeyFi to take advances on the profit share prior ahead of a formal computation.

14. Those advances, which were earned by and owed to KeyFi, were used to purchase a variety of NFTs using funds from the 0xb1 wallet. These purchases began in late 2020.

15. Celsius and its then-CEO Alex Mashinsky were well aware of these purchases of NFTs, and that they were to be treated as advances on the compensation owed under the APA. Indeed, anyone with an internet browser could view these purchases and see that the 0xb1 wallet

3

was purchasing these NFTs. Further, I created a twitter account associated with the 0xb1 wallet that publicly promoted the NFTs I was purchasing.

16. The Cryptopunk and Bullrun Babe NFTs that Celsius references in its Motion were purchased while I was still CEO of Celsius KeyFi and after the first two payments were earned under the APA (which required payment on the 15th of each month).

17. Because all transactions on a blockchain are publicly traceable, large transfers of cryptocurrencies can be tracked by anyone and malicious actors can use that information to target specific wallets and individuals. Due to this, KeyFi and I used the Tornado Cash service, which makes it more difficult to associate cryptocurrencies with specific wallets in order to protect our identity on the blockchain and to reduce the risk of malicious actors attacking our funds.

18. I later discovered that Celsius lacked basic security controls to protect its customer funds, that Celsius' internal accounting was fatally flawed, and that Celsius was using customer funds to manipulate crypto-asset prices to their benefit.

19. In particular, I learned that Celsius was utilizing customer bitcoin to purchase Celsius' proprietary "CEL Token" in order to inflate its value and create the appearance of a liquid market for CEL Tokens.

20. I also learned that Celsius's flawed accounting practices led Celsius to discovery that it had a $200 million liability for which the company had no information—including how or why it owed this amount.

21. Based on these risky practices, I determined I could no longer work with Celsius. Thus, in March 2021, I informed Celsius that I would be resigning as CEO of Celsius KeyFi.

22. In the period that followed, I worked with Celsius to unwind the various positions associated with the Celsius KeyFi accounts, including the 0xb1 wallet, and return those funds to Celsius. Communications to the effect are cited by Celsius in their motion.

23. I did not, however, work to return the assets that I had purchased with the authorized advance compensation I was provided by Celsius and Mashinsky. Instead, as I was entitled to do with KeyFi's property, I transferred these assets to other accounts KeyFi and I controlled, including the 0x50dd wallet.

24. It was only after I worked with Celsius to return approximately $1.3 billion in customer funds that Celsius had provided me to deploy that Celsius began to insist that I had either stolen or lost millions of dollars in assets.

25. On April 7, 2021, KeyFi and my former counsel received a letter from an attorney with Akin Gump, Mitchell Hurley, that claimed that

> Celsius and Celsius KeyFi will hold Mr. Stone personally liable for his breaches of contract and other duties to the fullest possible extent, including, without limitation, **with respect to any losses resulting from price increases in ETH** provided by Celsius to Mr. Stone that he apparently converted without authorization into other currencies...

ECF No. 24-10.

26. This statement was confusing to me because it appeared that Celsius was effectively claiming that I was personally liable for any "impermanent loss" associated with the DeFi strategies I had successfully deployed.

27. Impermanent loss is a term for the opportunity cost associated with participating in a liquidity pool and is inherent in most DeFi Activities. For example, to earn money in DeFi as a "liquidity provider," you must deposit two different crypto-assets into a liquidity pool that permits trades between those two assets, e.g., BTC and ETH. The liquidity pool incents market participants to ensure that the US dollar value of the two assets in the pool remains the same.

5

Consequently, as the price of one asset goes up (*e.g.*, BTC), market participants will buy that asset from the pool using the trading pair asset, increasing the amount of the lower priced asset (ETH) in the pool and decreasing the amount of the higher priced asset (BTC) in the pool. This is how liquidity pools adjust price – it relies on market forces to arbitrage the lower priced asset, and as the higher-priced asset becomes scarcer in the pool, it's "price" in the pool rises to match the market.

28. In the example above, as BTC rises in price, the market will put ETH into the pool to buy the "cheap" BTC from the pool, thus increasing the amount of ETH in the pool, decreasing the amount of BTC in the pool, and increasing the "price" the pool charged for BTC. In this example, if you had put $100,000 into a $1M pool, you should still have about 10% of the pool's value when you withdraw from the pool (plus 10% of the fees). But since the market pushed ETH into the pool and extracted BTC, your 10% share of the pool's liquidity will be comprised of more ETH and less BTC then you deposited. Conversely, had you not deposited your BTC into the liquidity pool, you would have kept the same amount of BTC. And since the price of BTC went up, you may have made *more* money by simply holding the BTC. This concept of "you would have been better off if you had not provided the liquidity," is known as "impermanent loss." Put simply, impermanent loss is the *difference* in the balance of assets provided compared to the balance of assets returned by the liquidity pool in U.S. terms.

29. Celsius' owners and executive understood the nature of DeFi and the inherent risk of impermanent loss. In particular, they understood that the strategies deployed by KeyFi would expose Celsius deposits to impermanent loss because Celsius would ultimately be required to return the same mix of assets to its customers. This risk, however, was easily resolved: a simple hedging strategy that would protect against the risk of price swings would ensure that Celsius

6

could profit from DeFi while at all times being able to return customer deposits. Celsius executives assured me that Celsius was properly hedging the risk of impermanent loss from Celsius KeyFi Activities. Indeed, the importance of these hedging activities was discussed during the negotiation and drafting of the APA and Services Agreement.

30. Throughout my tenure with KeyFi and Celsius KeyFi, I was repeatedly assured that Celsius had a global risk management platform that was hedging the Celsius KeyFi investments. Unfortunately, I learned that Celsius had been lying to me and it had failed to hedge against impermanent loss.

31. The April 7, 2021, letter from Mr. Hurley was therefore confusing because during the parties' seven-month course of dealing, and as memorialized in the APA and Services Agreement, neither Celsius KeyFi nor I had any responsibility for impermanent loss, which would only be accounted for in token-based accounting. Instead, all of the accounting would be performed in US dollars, such that there would be no impermanent loss.

32. On June 18, 2021, KeyFi and my former counsel explained in correspondence to Celsius' attorneys that KeyFi and I were "entitled to compensation under the Asset Purchase Agreement [because Celsius was] required to pay Celsius KeyFi LLC a fixed percentage of the profits generated by the services Mr. Stone provided." This correspondence is attached as Exhibit A.

33. On July 7, 2022, KeyFi filed a complaint against Celsius and Celsius KeyFi seeking payment under the APA, as well as additional claims for an accounting, negligent misrepresentation, and fraud in the inducement. The Complaint in this action is attached as Exhibit B. Celsius never responded to this action, which was automatically stayed by this bankruptcy action on July 13, 2022.

34. Plaintiffs first raised concerns regarding the 25,000 Staked Eth referenced in their motion for an injunction on September 13, 2022.

35. At that time, however, neither I nor, on information and belief, anyone else associated with KeyFi, had access to the private keys associated with those Staked Eth because we had deleted the same after deploying those assets on Celsius' behalf.

36. The funds that Celsius seeks to enjoin represent the entirety of the assets available to KeyFi.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Dated: November 28, 2022

_____
Jason Stone