# EXHIBIT B

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

| | |
|---|---|
| KEYFI, INC.,<br><br>              Plaintiff,<br><br>    v.<br><br>CELSIUS NETWORK LIMITED and CELSIUS KEYFI LLC<br><br>              Defendants. | Index No.<br><br>Index No. Purchase:<br><br>**SUMMONS**<br><br>Plaintiff designated New York County as the place of trial based upon CPLR 503 |

**TO THE ABOVE NAMED DEFENDANTS:** CELSIUS NETWORK LIMITED and CELSIUS KEYFI LLC

      **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer on the Plaintiff's attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: July 7, 2022
      New York, New York

                    ROCHE FREEDMAN LLP

                    */s/ Kyle W. Roche*
                    Kyle W. Roche
                    Daniel Stone
                    Peter Bach-y-Rita (*pro hac vice pending*)
                    99 Park Avenue, 19th Floor
                    New York, NY 10016
                    Telephone: (646) 350-0527
                    Facsimile: (646) 392-8842
                    Email: kyle@rochefreedman.com
                    Email: dstone@rochefreedman.com
                    Email: pbachyrita@rochefreedman.com

                    Devin (Velvel) Freedman
                    1 SE 3rd Ave.

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
INDEX NO. 652367/2022

NYSCEF DOC. NO. 1

22-01139-mg    Doc 33-2    Filed 11/28/22    Entered 11/28/22 21:46:08    Exhibit B    Pg
3 of 33

RECEIVED NYSCEF: 07/07/2022

Suite 1240
Miami, FL 33131
Telephone: (305) 306-9211
Facsimile: (646) 392-8842
Email: vel@rochefreedman.com

22-01139-mg    Doc 33-2    Filed 11/28/22    Entered 11/28/22 21:46:08    Exhibit B    Pg
4 of 33

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

KEYFI, INC.,

Plaintiff,

v.

CELSIUS NETWORK LIMITED and CELSIUS KEYFI
LLC

Defendants.

**COMPLAINT**

Index No. _____

---

KeyFi, Inc ("KeyFi") ("Plaintiff") files their complaint against Celsius Network Limited ("Celsius") and Celsius KeyFi LLC ("Celsius KeyFi"), and allege as follows:

**INTRODUCTION**

1.     This action concerns Defendants' refusal to honor its contractual obligations to pay Plaintiff the millions of dollars it is owed pursuant to a profit-sharing agreement that was entered into between the parties in January 2021. The dispute came to a head when Plaintiff discovered that the Defendants had been leveraging Celsius' customer deposits to manipulate crypto-asset markets, had failed to institute basic accounting controls which endangered those same deposits, and had failed to carry through on promises that induced Plaintiff to undertake various trading strategies.

2.     On June 12, 2022, these issues – which Plaintiff identified in March 2021 – have now caused harm not only to Plaintiff, but the hundreds of thousands of people who use Defendants' platform, as Defendants are now refusing to honor requests by its customers to withdraw the assets they deposited and entrusted with Defendants.

3.      Defendants operate a "crypto-lending platform" that receives crypto-asset deposits from consumers seeking to earn interest on their crypto holdings. Defendants' business depends on them using this pool of assets to generate income by (1) lending those assets to others and (2) investing the funds in the crypto markets. Defendants' profits thus depend on them earning income above and beyond the amounts they need to pay to consumers for their deposits. Prior to Plaintiff coming on board, Defendants had no unified, organized, or overarching investment strategy other than lending out the consumer deposits they received. Instead, they were desperately seeking a potential investment that could earn them more than they owed to their depositors. Otherwise, they would have to use additional deposits to pay the interest owed on prior deposits, a classic "Ponzi scheme."

4.      The recent revelation that Celsius does not have the assets on hand to meet its withdrawal obligations shows that Defendants were, in fact, operating a Ponzi-scheme.

5.      Jason Stone – the CEO and founder of KeyFi, Inc. – is a pioneer in the world of modern crypto-asset deployment strategies. From August 2020 through March 2021, he managed billions of dollars in crypto-asset investments for Defendants.

6.      For most of that time, the parties operated without any formal written agreement, recognizing instead that they were engaged in an enterprise for "mutual benefit...based on mutual respect and trust." From August 2020 through March 2021, Plaintiff generated hundreds of millions of dollars in profits for the parties' mutual benefit. Those profits came in the form of transaction fees, rewards for staking tokens, and other appreciating assets. As in any investment relationship, Plaintiff and Stone were responsible for generating a profit on the funds provided to them, while Celsius was responsible for ensuring that its investment strategies would not prevent it from repaying its depositors in kind.

2

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
NYSCEF DOC. NO. 1

22-01139-mg    Doc 33-2    Filed 11/28/22    Entered 11/28/22 21:46:08    Exhibit B    Pg
6 of 33

INDEX NO. 652367/2022
RECEIVED NYSCEF: 07/07/2022

7.      The parties' relationship began to break down when Stone discovered that not only did Defendants lack basic security controls to protect the billions of dollars in customers' funds they held, but that they were actively using customer funds to manipulate crypto-asset markets to their benefit. The most egregious example of this was Plaintiff's discovery that Celsius used customer bitcoin deposits to inflate its own crypto-asset called the "Celsius token" ("CEL").

8.      Stone also learned of multiple incidents where Defendants' failure to perform basic accounting endangered customer funds. One such example included Celsius improperly accounting for certain payments owed to customers, resulting in a $200 million liability the company did not even understand how or why it owed.

9.      These incredible losses meant that the billions of dollars of customer deposits could not be returned to those customers in the event that the customers sought their funds back. Celsius, for its part, was not concerned about these risks because it believed that the billions of dollars of customer deposits it manages are its property. Specifically, Celsius' terms of service, which are buried on its website, state that "all digital assets transferred to Celsius as part of the services are owned and held by Celsius for its own account." Further, the Celsius Terms of Service state that "Celsius does not hold any Digital Assets on your behalf" but instead are "owned, held and/or controlled by Celsius."

10.     When Plaintiff expressed concern regarding Celsius's use of customer funds without appropriate risk management, Celsius executives repeatedly assured Stone that the company had entered necessary hedging transactions to ensure that price fluctuations in certain crypto-assets would not materially and negatively impact the company or its ability to repay depositors. Stone and his team relied on these representations when deploying certain trading strategies.

3

11.     But these promises were lies. Despite its repeated assurances, Celsius failed to implement basic risk management strategies to protect against the risks of price fluctuation that were inherent in many of the deployed investment strategies. These failures not only harmed Plaintiff by negatively impacting the profit share, but have now caused Celsius to refuse to honor customer withdrawal requests.

12.     Celsius' former CFO shared Plaintiff's concerns and repeatedly raised these issues to Celsius' senior management.[1]

13.     Faced with mounting evidence of Defendants' disorganization, mismanagement, and fraud, Plaintiff concluded he could no longer work for Defendants. In March 2021, Plaintiff informed Defendants that he would be terminating the business relationship. Defendants retaliated by repeatedly refusing to recognize Stone's resignation and then refusing to pay Plaintiff their share of the profits.

14.     The unfortunate events that have publicly unfolded in recent weeks show that Plaintiff was right – Celsius grossly mismanaged its customer funds, failed to perform basic internal auditing to account for its obligations, and manipulated crypto-assets to the benefit of itself and its principals.

## **PARTIES**

15.     Plaintiff KeyFi, Inc. is a Delaware corporation with a principal place of business in New York, New York. Jason Stone is the founder and CEO of KeyFi.

16.     Defendant Celsius Network Limited is a private company incorporated under the laws of England and Wales, with a principal place of business in London, England. Celsius

---

[1] The former CFO's replacement has since been arrested in Israel in connection with a different fraudulent scheme. https://www.timesofisrael.com/another-2-leading-israeli-blockchain-pioneers-named-as-suspects-in-vast-crypto-scam/

4

22-01139-mg    Doc 33-2    Filed 11/28/22    Entered 11/28/22 21:46:08    Exhibit B    Pg
8 of 33

Network Limited recently announced that it is exiting the United Kingdom in order to avoid that jurisdiction's regulatory oversight.

17.    Defendant Celsius KeyFi LLC is a Delaware limited liability company with a principal place of business in Hoboken, New Jersey. At the time of its formation in 2020, Celsius KeyFi's only members were Celsius Network Limited and Jason Stone.

## JURISDICTION AND VENUE

18.    Jurisdiction is proper in this Court, and this Court has personal jurisdiction because pursuant to the KeyFi Asset Purchase Agreement, each of Celsius Network Limited and Celsius KeyFi LLC consented to the exclusive jurisdiction of the competent courts in New York County, New York. Additionally, jurisdiction is proper in this court pursuant to CPLR 302 because they transact business in New York and committed tortious acts in New York.

19.    Venue is proper pursuant to CPLR 503 because a substantial part of the events giving rise to Plaintiff's claims occurred in this county and because Plaintiff is a resident of this county.

## FACTUAL ALLEGATIONS

### A.    Crypto-assets and smart contracts

20.    Crypto-assets are digital assets that use a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify their transfer.

21.    Bitcoin is the world's first major crypto-asset. It launched in 2009, has a current market cap of approximately $390 billion, and is the most well recognized crypto-asset. But it is by no means the world's only crypto-asset. To the contrary, the total market cap of non-Bitcoin crypto assets totals more than $500 billion.

5

22.     Ether is another well-recognized crypto-asset with a $143 billion market cap. While Bitcoin mainly functions as a store of value or medium of exchange, Ether powers the Ethereum network which permits advanced coding to take place on the blockchain. One manifestation of this advanced coding capability is "smart contracts."

23.     At its core, a smart contract is an immutable program that allows a contract or deal to be immortalized on the blockchain, and then, ensures that this immutable contract is executed without the need for, or possibility of, further human intervention. A simple example of a smart contract would be a self-enforcing bet over whether the United States will take the most gold medals at the 2020 Olympics. Each participant locks 10 ether into a smart contract. They can no longer get their ether back. At the conclusion of the Olympics, the smart contract will check the source both parties agreed was authoritative and distribute the 20 ether to the winner.

**B.    The Rise of Decentralized Finance**

24.     Traditionally, monetary services are performed by centralized banks or brokerage houses. If an individual wanted a loan, she went to J.P Morgan Chase ("JPM") and applied for one. If an individual wanted to trade securities on the NASDAQ, she opened an account with TD Ameritrade ("TDA"). In either case, JPM or TDA completely administered the process. JPM processed the application, approved the loan, distributed the loan, and collected the interest payments as profit. TDA handled your account, executed your trades, reconciled its books, and kept the fees paid for any trade. Historically, the same was true for crypto-asset exchanges. For example, Coinbase lists crypto-assets, manages the order book, reconciles trades, and keeps fees.

25.     With the advent of smart contracts, these sort of traditional money services can now be "decentralized." In lieu of a single company administering loans or facilitating the trading of crypto-assets, individuals called "Liquidity Providers" can pool their assets into "liquidity pools" using smart contracts on the Ethereum blockchain. These smart contracts can be programmed to

6

make loans or facilitate crypto-asset swaps, which in turn allows Liquidity Providers to capture profits in the form of interest and fees that have historically been captured by banks or brokers.

26.    This decentralization of traditional money services is called Decentralized Finance, or "DeFi."

27.    To incentivize the use of these smart contract platforms above and beyond the fees generated from being a Liquidity Provider, DeFi companies create their own crypto-assets called "governance tokens" and award them to users of their platforms. This is similar to how airlines issue "airline-miles" to people who book their flights and how credit card companies issue "points" to people who use their cards. Some of these newly issued governance tokens trade at hundreds, thousands, and even tens of thousands of dollars for each token– thus exponentially increasing the value (and attraction) of engaging in DeFi activities.

### C.    Celsius' Business Model

28.    Celsius is a crypto-asset borrowing and lending platform that facilitates loans in various crypto-assets. Celsius' business model is similar to a depository lender that accepts monetary deposits from consumers and then uses those funds to provide liquidity to the market via loans and investments. In Celsius' case, however, instead of fiat currency, depositors surrender their crypto-assets to Celsius in return for a promised interest rate.

29.    Like a bank, Celsius is meant to invest those funds responsibly, earn a return, pay the depositors the interest they earned, and keep the profit. Importantly, if Celsius fails to profitably invest depositors' funds in investments that earn more than the interest owed, they will operate at a loss. Central to consumer trust, however, is the promise that upon request, Celsius has sufficient funds to return the crypto-asset deposits for each of its users.

30.    While Celsius' business model is designed to replicate traditional depository banking, their terms of service attempt to shield them from the same responsibilities owed by

traditional depository institutions. For example, the terms of service provide that any funds deposited are not, in fact held on the customer's account, but instead become the property of Celsius to do with however it wants. And, unlike a traditional depository institution, Celsius does not maintain its own insurance against any losses of its customers' funds. Celsius effectively takes no responsibility for its customers' funds.

31.    Celsius does not make loans to consumers based on creditworthiness; it only issues loans to retail borrowers that deposit crypto-assets for use as collateral. For example, if a borrower wants to borrow $10,000 using bitcoin as collateral, it must deposit almost four times that amount in bitcoin to lock in the lowest offered interest rates.[2] Borrowers must also ensure they stay within certain loan-to-collateral ratios or Celsius will liquidate the collateral to secure the loan. This is not unlike margin calls at traditional stock brokerage houses.

32.    Like many other crypto-asset businesses, Celsius issued its own crypto-asset called the "CEL token" in March 2018. The way Celsius promotes use of its CEL token is that users who elect to receive interest payments from Celsius in the form of CEL tokens are paid higher interest rates than Celsius otherwise pays on deposits. Similarly, customers who repay loans with CEL tokens are charged lower interest rates. *Critically*, all of Celsius' accounting for purpose of its business operations is done in US dollar-based accounting. Accordingly, if the CEL token price rises, Celsius can pay its customers who are owed interest a smaller sum of total CEL tokens.

33.    As a result of the growing demand for crypto-lending platforms, the amount of deposits that Celsius custodies for its consumers has grown incredibly large. Indeed, just months prior to this filing, Celsius held more than *$20 billion* worth of crypto-asset deposits.

---

[2] Figures from https://celsius.network/borrow-dollars-using-crypto-as-collateral (last accessed on July 7, 2022).

34.     Despite this incredible sum of customer deposits, Celsius and its management have little experience trading and investing crypto-assets. This lack of expertise came to the fore as Celsius sought to become involved in DeFi, where innovative and complex strategies took off in the summer of 2020. Seeing the opportunity to use its customer funds to participate in the DeFi mania, Celsius sought to bring an expert on board who would handle customer funds to deploy in DeFi protocols.

**D.    Celsius Recruits Stone and His Team to Manage Its Customer Deposits**

35.     In the summer of 2020, Celsius found and courted its crypto-asset trading team.

36.     Jason Stone is the founder and CEO of KeyFi, a technology company that specializes in decentralized finance deployments, strategies, and software. Stone and his team were highly successful in the DeFi space and accomplished at deploying lucrative DeFi strategies. Stone was also well-known to the founders of Celsius. In late 2019 through early 2020, Alex Mashinsky (the founder and CEO of Celsius) and Nuke Goldstein (co-founder and CTO of Celsius) had both invested tens of thousands of dollars in KeyFi.

37.     In 2020, Stone spoke with Mashinsky and other managers of Celsius numerous times to discuss the possibility of Celsius using KeyFi's expertise to deploy advanced strategies to make money on its customer deposits. That summer, Plaintiff and Celsius cut a handshake deal where Plaintiff would manage billions of dollars in customer crypto-deposits in return for a share of the profits generated from those crypto-deposits.

1.     Stone begins to manage Celsius deposits on a handshake deal

38.     On or around August 19, 2020, without a formal agreement in place, Celsius began transferring hundreds of millions of dollars in crypto-assets to Stone and his team. Celsius created a new Ethereum wallet address, referred to as the "0xb1" account and transferred nearly all the assets Stone was to deploy into that address.

9

39.     At all times, Celsius maintained complete control over the 0xb1 account; indeed, for most of the time that Stone worked with Celsius, he could only access the 0xb1 account by using a VPN to login to a computer controlled by Celsius that was already logged into the 0xb1 account.

40.     Stone was provided direct access to the 0xb1 account shortly after Celsius' platform was hacked through a "DNS attack" via its service provider GoDaddy.com. During the hack, which affected all of Celsius' cloud infrastructure and environments, Celsius and KeyFi were concerned that the hackers could have complete access to all Celsius' network traffic. Thus, to protect the 0xb1 account, Celsius provided Stone with the private keys to the 0xb1 account so that he could access the account without risk of interruption.

41.     All deposit and trading history associated with the 0xb1 account can be located here: https://etherscan.io/address/0xb1adceddb2941033a090dd166a462fe1c2029484.

42.     Despite the incredible value of the transferred assets and the parties' intent to share profits on the transferred assets, there was no formal written agreement between the parties. Rather, Celsius continued to transfer hundreds of millions of dollars to Stone, which Stone and his team continued to invest, all on a handshake agreement that the parties would deal with each other honestly and squarely and settle up who owed what to whom at some later date.

43.     In addition to transferring crypto-assets to Stone for investment, Celsius also engaged in certain transactions on Stone's behalf but without transferring the assets to Stone's control. The parties agreed that these transactions would be tracked and profits and losses related to these transaction of such coins would be reflected in KeyFi's own profit and loss statement for purposes of computing KeyFi and Stone's share of profits.

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
NYSCEF DOC. NO. 1

22-01139-mg    Doc 33-2    Filed 11/28/22    Entered 11/28/22 21:46:08    Exhibit B    Pg
14 of 33

INDEX NO. 652367/2022
RECEIVED NYSCEF: 07/07/2022

44.    This arrangement made sense because all crypto-assets deployed by Stone and his team were provided by Celsius; therefore, it did not matter if coins were actually transferred to KeyFi's control before being deployed. This arrangement also reflected the relationship between the parties was one of trust and confidence—both parties relied on each other to account for the funds being utilized for their mutual benefit.

45.    In October 2020, Celsius and Stone decided to engage in certain DeFi trading activities that required appropriate risk management and hedging to guard against price movements in certain crypto-assets. Specifically, Celsius' management told Stone that it would monitor Stone's DeFi trading activities and deploy certain hedges that would guard against price increases in ether (the crypto-asset native to the Ethereum blockchain) given that Stone was managing and placing a significant sum of ether deposits into DeFi investments likely to return non-ether-denominated assets.

### 2.   The Celsius / KeyFi MOU

46.    KeyFi's investment strategies were extremely profitable. Consequently, after just over a month of KeyFi's management, on or around October 1, 2020, Celsius Network and KeyFi entered into a Memorandum of Understanding (the "MOU") in which they agreed to work towards the formation of a structure in which KeyFi would contribute intellectual property and its employees to a special purpose vehicle to be owned by Celsius Network.

47.    As set forth in the MOU, KeyFi was to deploy customer deposits into three types of investment activities: "Staking Coins," "Staking Plus Coins," and "Decentralized Finance Activities" (aka "DeFi"). MOU Art. 3 § 4.

48.    Staking is similar to Certificates of Deposit at a traditional bank. To "stake" a crypto-asset, a user commits that crypto-asset to a particular network or platform, usually for a set

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
NYSCEF DOC. NO. 1

22-01139-mg    Doc 33-2    Filed 11/28/22    Entered 11/28/22 21:46:08    Exhibit B    Pg
15 of 33

INDEX NO. 652367/2022

RECEIVED NYSCEF: 07/07/2022

period of time during which it cannot be withdrawn. The network/platform that receives the "staked" asset will pay the depositor with a crypto-asset, otherwise known as a "coin."

49. "Staking Plus" refers to staking activities in which the receiving network/platform pays the depositor with multiple "coins," not just one.

50. The MOU called for KeyFi to receive 7.5% of "Net Profits" for all staking activity and 20% of Net Profits for DeFi activity, which requires both greater sophistication and a greater commitment of time. The parties envisioned that the majority of profits would be generated from DeFi activity and that KeyFi would receive 20% of these Net Profits.

51. The MOU contains a number of provisions that are especially relevant to this dispute.

52. *First*, the MOU memorialized the fact that the parties would continue working together until a formal agreement and structure could be put in place, stating that: "[d]uring the period starting at the date when both the parties sign this MOU until the Closing of the Definitive Agreement (the 'Transition Period'), Celsius Network may deploy and/or transfer coins with KeyFi and/or its representatives for the purpose of generating yield for Celsius Network." MOU § Art. 10.

53. *Second*, the MOU recognized that "deploying" crypto-assets with KeyFi was different than "transferring" those crypto-assets to KeyFi – in other words, it recognized that crypto-assets could be deployed without being transferred to KeyFi. MOU § Art. 10. ("Celsius Network may deploy and/or transfer coins with KeyFi...").

54. *Third*, the MOU memorialized the fact that KeyFi and Celsius had a special relationship of trust and confidence, and not a normal arms-length business relationship. In fact, the very first line of the MOU stated that the parties were entering into the agreement "for

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
NYSCEF DOC. NO. 1
INDEX NO. 652367/2022
RECEIVED NYSCEF: 07/07/2022
22-01139-mg    Doc 33-2    Filed 11/28/22    Entered 11/28/22 21:46:08    Exhibit B    Pg
16 of 33

enhancing mutual benefits through the cooperation of both parties based on mutual trust." MOU at 1. The MOU continues: "'Celsius Network' and 'KeyFi' shall commence strategic business arrangement in order to enhance mutual benefits by collaboration on mutual respect and trust." *Id*.

55.     The parties memorialized their special relationship of mutual respect and trust because of the highly risky and unusual circumstances of their business relationship. Celsius had already (prior to the MOU) transferred hundreds of millions of dollars to Stone and his team without a formal written agreement of any kind.

56.     For its part, KeyFi was agreeing to dedicate all of its resources, and incur significant opportunity costs, to manage Celsius' investments, all without the protection of any formal documentation. Among other things, KeyFi was relying on Celsius to deploy the necessary hedging trades necessary to complement KeyFi's investment strategy and protect KeyFi and customer deposits from loss due to price fluctuations in the relative value of traded crypto-assets. And of course, KeyFi was trusting that its new business partner, Celsius, would generally conduct its business with integrity.

### 3.   The Asset Purchase Agreement and the Service Agreement

57.     Stone continued successfully managing Celsius' customer deposits. Celsius was obviously extremely happy with his management as they (1) continued to send him funds to deploy on a weekly basis and (2) move forward to formalize the agreement contemplated by the MOU. Eventually, on or around December 31, 2020, the discussions between KeyFi and Celsius were formalized into a series of two contracts that were drafted by Celsius: (1) an Asset Purchase Agreement (the "APA") (attached hereto as Exhibit A) and (2) a Service Agreement (the "Service

Agreement") (attached hereto as Exhibit B).[3] The APA and Service Agreement were executed on

January 11, 2021, i.e., six months after Stone began managing Celsius' funds and three months

after signing the MOU.

58.     At a high level, the APA was an agreement for Stone and KeyFi to sell certain

proprietary software and trading technology to Celsius for a purchase price; and the Service

Agreement was an agreement for Stone to continue managing Celsius' crypto-deposits. To

effectuate the Agreements, Celsius created a special purpose vehicle (the "SPV") named Celsius

KeyFi LLC which was organized as a wholly owned subsidiary of Celsius. Under the APA, KeyFi

agreed to (i) contribute substantially all of its assets to the SPV and (ii) supply the SPV with

staffing. Then, pursuant to the Service Agreement, Celsius agreed to transfer crypto-assets to the

SPV which KeyFi's personnel would then manage and invest.

59.     An important consequence of the APA was that Celsius assumed all liabilities for

the SPV and that KeyFi's liabilities ceased as of the closing date. Section 2.2 of the APA provides:

"On the terms and subject to the conditions set forth in this Agreement, at the Closing, [KeyFi]

will assign to [Celsius], and [Celsius] will assume and be responsible solely for, any Liability

related to [KeyFi's] Assets that accrue as of and subsequent to the Closing, and do not arise from

any breach committed by [KeyFi] or on its behalf on or prior to the Closing."

60.     One of the main purposes of the APA was to remove the deployed assets from

KeyFi's custody and consolidate them into an SPV wholly owned and controlled by, Celsius –

largely removing KeyFi from the picture. As a result, immediately after the execution of the APA

and Service Agreement, KeyFi was no longer performing services for, or holding assets of, Celsius

---

[3] Initially capitalized terms used in this section and not otherwise defined in this Complaint have
the meaning ascribed to them in the APA and the Service Agreement.

and KeyFi's contractual obligations and liabilities under all agreements with Celsius were fully

performed and discharged. At that point, KeyFi had no continuing liabilities or obligations but it

*did* have continuing rights, in particular the right to receive payments of the "Purchase Price," as

more fully explained below.

### i. The APA Purchase Price

61.     As consideration for the sale of assets under the APA, Celsius and Celsius KeyFi

agreed to pay KeyFi the Purchase Price, which in pertinent part consisted of the following:

b.  $65,000 U.S. dollars at Closing. APA §3.1(a). This was paid to KeyFi shortly after
    closing.

c.  Certain amounts of CEL Tokens, to be paid as follows: (i) 175,000 CEL Tokens at
    Closing, (ii) 87,500 CEL Tokens six months after Closing, and (iii) 87,500 CEL
    Tokens on the first anniversary after Closing. APA §3.1(b). Celsius has failed to
    make any of these payments.

d.  The "Earnout Payment." APA §3.1(c). While this capitalized term is undefined, the
    APA states that it will be defined by the Services Agreement Key Terms and paid
    in accordance with the Services Agreement.

62.     The Service Agreement Key Terms is attached to the APA as Schedule 7.8(b). It

also fails to define "Earnout Payment," but does set forth a detailed profit-sharing scheme.

Schedule 7.8(b) is reproduced verbatim in the Services Agreement which likewise fails to define

the term Earnout Payment. However, the Services Agreement does state that Schedule B to the

Services Agreement constitutes the "sole and exclusive compensation for the Services." Thus,

Schedule 7.8(b) of the APA and Schedule B of the Services Agreement – which are identical

except for formatting differences – constitute the Earnout Payment.

### ii. Calculation of the Earnout Payment

63.     The Payment Terms provide the percent of Net Profit that Stone/KeyFi are entitled

to receive from investing Celsius' customer deposits into various DeFi strategies. APA Schedule

7.8(b) §3-4. The percentages change depending on the strategies deployed:

15

22-01139-mg    Doc 33-2    Filed 11/28/22    Entered 11/28/22 21:46:08    Exhibit B    Pg
19 of 33

    a.   For Staking Coins[4] and Staking Plus Coins,[5] Plaintiff was to get 50% of Net Profits through 2022. *Id.* § 3(a).

    b.   For Authorized Decentralized Finance Activities,[6] Plaintiff was to get 20% of Net Profits through 2022. *Id.* § 4.

64.    The parties provided a formula to arrive at Net Profits which was defined as the gross profits generated by Celsius KeyFi across activities in all coin types, minus expenses:

> Net Profit = Total Period Gross Profit for All activities in USD - Salaries * 2 (for initial 5 employees) - Hardware/Cloud Expenses - Cumulative losses from Previous Periods – Insurance Policy Costs - Staking Costs - Transaction Fees.

*Id.* §9 (emphasis added). As such, the parties expressly called for Net Profits to be calculated and denominated in U.S. dollars. *Id.* §9; Services Agreement Schedule B § 9 (emphasis added), consistent with the balance of the contract which treats USD as the "base currency" of the agreement, APA Schedule 7.8(b) § 6(e).

65.    Net Profits is defined in the APA and the Service Agreement as a function of Gross Profits for all Activities in USD minus certain costs and overhead expenses. In breach of the APA and the Service Agreement, Celsius has refused to provide KeyFi with an accounting of such costs and expenses. However, KeyFi estimates that Gross Profits allocable to the parties exceeds $838 million less such costs and expenses.

66.    In breach of the APA, Celsius and the SPV have refused to pay KeyFi its agreed share of these profits.

---

[4] Defined as "a type of mining through which new coins are earned through maintaining deposits of coins on a platform." APA Schedule 7.8(b) §1(h)

[5] Defined as "Staking Coins with respect to which the staking activity generates earnings of multiple types of coins." *Id.* §1(i).

[6] Defined as "any deployed coins, such as BTC, ETH, stable coins, and other assets are [sic] deployed to authorized activities which earn coins from lending, borrowing, high-frequency liquidity provisions, and other authorized DeFi activities." *Id.* § 1(c).

16

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
NYSCEF DOC. NO. 1
INDEX NO. 652367/2022
RECEIVED NYSCEF: 07/07/2022
22-01139-mg    Doc 33-2    Filed 11/28/22    Entered 11/28/22 21:46:08    Exhibit B    Pg
20 of 33

### E.     Celsius' Failure to Hedge Stone's DeFi Activities

67.     Celsius, for its part disputes that KeyFi earned it any profits because Celsius failed to protect itself from the risk of crypto-asset appreciation. Celsius' customers provide it with crypto-assets, and expect to receive those assets back in the same form. Celsius provided similar assets to Stone and KeyFi to invest, but provided for profits to be evaluated in USD. This created a risk for Celsius that KeyFi might earn it a USD profit, but that, if the crypto-asset appreciated in value, it might not be able to profitably repurchase the base crypto-asset.

68.     For example, if Celsius provided KeyFi with 100 ether worth $100,000 in total (or $1,000 per token), and KeyFi's investments returned a mixture of coins comprised of 50 ether and a mix of other coins worth $150,000 in total, it cannot be disputed that that would constitute a profitable investment in USD. If, however, over the same period, ether's price rose to $1,250 per token, and Celsius needed to convert its USD investment into ether, it would have to use some of these USD profits to do so. If ether's price rose even further, it might overtake the profits and require Celsius to use its own funds to purchase the ether. This potential risk, which is a product of Celsius' relationships with its customers and need to return funds to them in the same kind as were deposited, is unaddressed in the parties' agreement and thus remained with Celsius.

69.     At all times, there existed a simple solution for this risk: futures contracts for each coin provided to Stone and KeyFi. In other words, if Celsius had purchased call options at the spot price of each token it provided to Stone and KeyFi, it would have entirely obviated the risk that the assets appreciated in ways that ate into Celsius' USD profits.

70.     Indeed, Celsius was aware of both this risk and the solution. Both before and after execution of the APA and the Service Agreement, Celsius represented to Stone that it was tracking his DeFi activity, balancing his risk through various hedging strategies, and that such trades

executed in performance of that strategy were considered an "approved activity" in accordance with the terms of the APA and the Service Agreement.

71.     Celsius' owners and managers have even boasted publicly about being savvy about managing exchange rate risks. In DeFi investment "impermanent loss" refers to losses caused by exchange rate volatility. On May 20, 2021, Celsius CEO Alex Mashinsky wrote on Twitter that DeFi "looks easy until you get bitten or understand the impact of impermanent loss and volatility." Mashinksy's tweet then touted the sophistication of Celsius with the tagline "Unbank Yourself and let us manage these rough waters for you."

72.     Stone understood that Celsius would eventually provide Celsius KeyFi with an accounting of all transactions that were supposed to be attributed to Celsius KeyFi's balance sheet and profit and loss statement, including the hedging transactions.

73.     To date, Celsius has refused to provide Stone as CEO of KeyFi, or in his capacity as CEO of Celsius KeyFi, with a full accounting of the transactions it was attributing the Celsius KeyFi account.

74.     Critically, Celsius has failed to provide KeyFi or Stone with an accounting reflecting any of the hedging transactions it was supposed to make on Stone and Celsius KeyFi's behalf. This is because, on information and belief, Celsius lied to Stone and never engaged in these transactions.

75.     Celsius' failure to hedge was a big mistake. As Celsius well knew, Stone's DeFi strategy involved contributing large amounts of ether into liquidity pools, which has the effect of reducing the amount of ether in the pool when ether appreciates. With a proper hedge, this would not matter. But over the course of these transactions, ether appreciated considerably relative to both other crypto-assets and the dollar. Had Celsius hedged against that exact risk as the parties

18

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
NYSCEF DOC. NO. 1
INDEX NO. 652367/2022
RECEIVED NYSCEF: 07/07/2022
22-01139-mg    Doc 33-2    Filed 11/28/22    Entered 11/28/22 21:46:08    Exhibit B    Pg
22 of 33

agreed both before and after execution of the APA, the parties would have enjoyed substantial additional Net Profits.

**F.      Stone Learns of Celsius' Gross Mismanagement of Its Customers' Funds**

76.      In January 2021, around the time the APA and the Service Agreement were executed, Stone grew alarmed by Celsius' improper business practices, ultimately concluding that its business practices were so corrupt that he and KeyFi could no longer do business with Celsius. Three discoveries by Stone formed the basis for his decision to extricate himself from his position as CEO of Celsius KeyFi:

77.      *First*, Stone became aware that since at least February 2020, Celsius had engaged in a series of transactions designed to artificially inflate the price of CEL tokens. Connor Nolan, head of coin deployment at Celsius, informed Stone that Celsius had used approximately 4,500 bitcoin, with a current value of $90 million, in customer deposits to purchase CEL on the open market between February 2020 and November 2020 to artificially inflate the price.

78.      The purpose of this scheme was both fraudulent and illegal: Celsius induced customers to be paid in CEL tokens by providing them with higher interest rates. Then by purposefully and artificially inflating the price of the CEL token, Celsius was able pay customers who had elected to receive their interest payments in the form of the CEL token even less of the crypto-asset.

79.      In addition, by artificially increasing the price of the CEL token, Mashinsky – who personally owned hundreds of millions of dollars' worth in CEL token at its height – was able to enrich himself considerably.

80.      This scheme also made it appear that there was substantial demand for, and volume of trading in, CEL tokens. Celsius used this artificial demand to convince lenders that the CEL tokens it held in its treasury were a liquid, market-viable asset which could be used as collateral

for loans to Celsius. Celsius utilized these loans to pay customers their interest and to provide customers with loans backed by crypto-currency collateral. Because Celsius was still struggling to develop its own profits, these loans were essential to Celsius' continuing operations. Essentially, Celsius was manipulating the market for CEL tokens so that it could borrow against its sizable treasury to create the appearance it was generating yields in excess of the amounts owed to clients, when in fact it was not.

81.    *Second*, Stone became aware that Celsius had deceived him about the existence of hedging transactions designed to hedge against the authorized DeFi transactions Stone was performing. Celsius' failure to implement the promised hedging transactions harmed not just Stone and KeyFi. Stone learned that Celsius had exposed other customer deposits (*i.e.*, not managed by the SPV) to potentially billions of dollars in losses by failing to properly hedge against all its profit seeking activities.

82.    *Third,* Stone learned of further financial mismanagement that threatened to plunge Celsius into insolvency. As mentioned above, Celsius paid a portion of interest on deposits in CEL tokens and a portion of interest in other crypto-assets such as bitcoin and ether. With respect to consumers who chose to be paid in the crypto-asset they deposited (rather than CEL tokens), Celsius logged those liabilities on its books in a U.S. dollar denominated basis from 2018 through 2020 despite the fact that it paid its customers out in the underlying token. It then failed to mark-to-market those assets in its internal ledger as those crypto-assets appreciated, creating a substantial hole in its accounting.

83.    Throughout 2020 and 2021, crypto-assets such as bitcoin and ether substantially appreciated compared to the dollar. Yet Celsius failed to update its ledger in order reflect the increased dollar value of its liabilities at least at any time before 2021. The accounting error

20

masked hundreds of millions of dollars in liabilities that Celsius was not prepared to pay out. When Jason Stone left Celsius, Celsius had a $100-$200 million hole on its balance sheet that it could not fully explain or resolve. Despite this balance sheet insolvency, Celsius continues to take on more customer assets, which means it continues to accrue considerable liabilities to the detriment of its current creditors.

### G.    The Celsius Ponzi Scheme

84.    In January 2021, the crypto-markets began a bull cycle which caused Celsius (who had recklessly and fraudulently failed to hedge its investments) to suffer severe exchange rate losses.

85.    In January 2021, the price of ether increased over 50% in just a couple of days and continued to climb over the next few weeks, going from a low of 0.24 BTC per ether on January 1 to a high of 0.45 BTC per ether token on February 4.

86.    Celsius had massive liabilities to depositors denominated in ether but had not maintained ETH holdings equal to those liabilities. Instead, Celsius had authorized DeFi strategies that resulted in the shifting of assets from ether to other cryptocurrencies and (inexplicably) had failed to hedge against this well-known risk.

87.    As customers sought to withdraw their ether deposits, Celsius was forced to buy ether in the open market at historically high prices, suffering heavy losses. Faced with a liquidity crisis, Celsius began to offer double-digit interest rates in order to lure new depositors, whose funds were used to repay earlier depositors and creditors. Thus, while Celsius continued to market itself as a transparent and well capitalized business, in reality, it had become a Ponzi scheme.

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
INDEX NO. 652367/2022
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 07/07/2022

22-01139-mg    Doc 33-2    Filed 11/28/22    Entered 11/28/22 21:46:08    Exhibit B    Pg
25 of 33

## H.    Jason Stone Resigns; Celsius Refuses to Pay

88.    By March 2021, it was clear to KeyFi that Celsius was lying about having hedging in place, a mistake that could be financially ruinous for Celsius and its consumers. It could also irreparably damage KeyFi's reputation.

89.    At that point, Celsius had already missed the first payment ("Earnout payment") due to KeyFi within 15 days of December 31, 2020 and had never paid out any profits owed to KeyFi or the SPV. Moreover, Defendants showed no intention of making the required payments of profits under the MOU, the APA, and the Service Agreement. While Stone had been authorized to purchase NFTs ("non-fungible tokens") as pre-payment of the profit share under the MOU, the APA, and the Service Agreement, Celsius failed to provide a specific accounting of the total profit share.

90.    On March 9, 2021, Stone informed Celsius that he would not continue to serve as the CEO of Celsius KeyFi.

91.    After Stone left Celsius KeyFi, Celsius maintained access and control of the 0xb1 wallet. Celsius' CEO, Alex Mashinsky, used that control for his own personal benefit. In one example, Celsius' CEO transferred valuable NFTs from the 0xb1 accounts to his wife's wallet.

92.    On information and belief, since Stone resigned, Celsius has not found other accretive acquisitions that can cover the high interest rates it offers to its depositors. Because its business model depends on offering depositors more money than they put it, Celsius must consistently take in new capital to pay its obligations to its current depositors. In other words, Celsius is a Ponzi scheme.

93.    For example, in order to cover its increasing obligations, Celsius was required to take a loan of approximately $1 billion from Tether. While Celsius pays Tether 5-6% in interest

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
INDEX NO. 652367/2022
NYSCEF DOC. NO. 1
22-01139-mg   Doc 33-2   Filed 11/28/22   Entered 11/28/22 21:46:08   Exhibit B   Pg
26 of 33
RECEIVED NYSCEF: 07/07/2022

on this billion-dollar loan, it owes its clients significantly more on many of the popular coin it

accepts as deposits:

| Coin Name | Accredited Investor In-CEL Reward Rate (APY) at Platinum level* | In-kind Reward Rate (APY) |
|---|---|---|
| TUSD ∧ | 9.32% | 7.10% |
| GUSD ∧ | 9.32% | 7.10% |
| PAX ∧ | 9.32% | 7.10% |
| USDC ∧ | 9.32% | 7.10% |
| USDT ∧ | 9.32% | 7.10% |

23

FILED: NEW YORK COUNTY CLERK 07/07/2022 04:50 PM
INDEX NO. 652367/2022
NYSCEF DOC. NO. 1
22-01139-mg    Doc 33-2    Filed 11/28/22    Entered 11/28/22 21:46:08    Exhibit B    Pg
RECEIVED NYSCEF: 07/07/2022
27 of 33

| Coin Name | | Accredited Investor In-CEL Reward Rate (APY) at Platinum level* | In-kind Reward Rate (APY) |
|---|---|---|---|
| | SNX ∧ | 18.63% | 14.05% |
| | DOT ∧ | 11.87% | 9.02% |
| | AVAX ∧ | 10.92% | 8.30% |
| | MATIC ∧ | 9.52% | 7.25% |

[7]

94.     The Tether loan, alongside other Celsius deposits, has been used to cover up the fact that Celsius is, in fact, balance sheet insolvent, with less money in its coffers than it owes its depositors. Even in light of this, up until it recently when it halted customer withdrawals, Celsius continued promoting its high-interest-rate deposits in order to induce new depositors to provide it with more capital to pay back earlier depositors.

I.     **Demand for Audit and Accounting**

95.     Section 7.1(b)(i) of the APA provides KeyFi with the right to an audit, as against Celsius KeyFi, as follows:

> Within the later to occur of fourteen (14) calendar days after any payment by Buyer due under this Agreement (the "Obligation"), or thirty (30) calendar days after any such scheduled payment accrued, if Seller is dissatisfied with the payment, or if non payment occurs, Seller may invoke an audit (the "Audit") of Buyer's relevant records using Seller's chosen Auditor, who shall be a nationally-licensed Certified Public Accountant (CPA).

---

[7] Celsius Weekly Reward Rates, https://celsius.network/earn-rewards-on-your-crypto (accessed March 6, 2022). Celsius has since revised these reward rates to reflect that they are "up" the noted percentages above. *See* Celsius Weekly Reward Rates, https://celsius.network/earn (last accessed July 7, 2022).

96.     On September 1, 2021, Kyle Roche, as attorney for Stone and KeyFi, again emailed Mr. Hurley demanding that Celsius make the earnout payment, or else commit to paying for an accounting and agree to mediation. Celsius refused.

97.     After receiving the Audit Demand Letter, Celsius KeyFi refused to provide any information, or to comply with the audit provisions of Section 7.1(b)(i) of the APA.

98.     Subsequently, KeyFi has repeatedly requested that Defendants engage in an accounting to determine how much they are owed and Defendants have repeatedly rejected KeyFi's requests.

## J.     As A Result Of Gross Mismanagement, Celsius Halts Customer Withdrawals

99.     On June 12, 2022, Celsius announced that:

> Due to extreme market conditions, today we are announcing that Celsius is pausing all withdrawals, Swap, and transfers between accounts. We are taking this action today to put Celsius in a better position to honor, over time, its withdrawal obligations.

100.    Celsius took this drastic action because it did not (and *still* does not) have enough crypto-assets on hand to balance the obligations it owes to its clients.

101.    Just days prior to this announcement, on June 7, 2022, Celsius claimed that it "has the reserves (and more than enough ETH) to meet obligations, as dictated by our comprehensive liquidity risk management framework."

102.    This turned out to be a lie. This lie was also consistent with the representations (described above) Celsius made to Plaintiff concerning its risk management.

103.    It is now reported that Goldman Sachs is looking to purchase Celsius' assets (valued at around $11.8 billion in customer deposits as of May 17, 2022) for the fire sale price of $2 billion. To be clear, under the Celsius terms of service, Celsius asserts that these assets, which were

provided to it by regular consumers, are its property, and not held on behalf of any customer. Thus, it is entirely possible that any such asset purchase would wipe-out customer deposits in order to pay of Celsius' own lenders.

104.    Plaintiff brings this action now seeking to hold Celsius accountable for its gross mismanagement of customer deposits and the breaches of the contractual duties it owes to Plaintiff.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Breach of Contract – APA (Against All Defendants)

105.    Plaintiff repeats and realleges the allegations contained in all prior paragraphs as if set forth fully herein.

106.    The APA is a valid and enforceable contract between KeyFi, Celsius, and Celsius KeyFi, which by its terms is governed and construed in accordance with the laws of New York.

107.    Plaintiff substantially performed its obligations under the terms of the APA including giving notice of their claims.

108.    Defendants breached the APA by refusing to pay Celsius KeyFi and KeyFi the amounts required to be paid under Section 3.1(b) of the APA and the earnout payments required to be made under Section 3.1(c) of the APA, Schedule 7.8(b) to the same.

109.    By reason of the foregoing, KeyFi suffered damages in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
### Negligent Misrepresentation Inducing KeyFi to (a) Provide DeFi and Staking Services for Celsius Beginning in August 2020 and (b) Enter into the APA (Against Celsius)

110.    Plaintiff repeats and realleges the allegations contained in all prior paragraphs as if set forth fully herein.

26

22-01139-mg    Doc 33-2    Filed 11/28/22    Entered 11/28/22 21:46:08    Exhibit B    Pg
30 of 33

111.    Celsius had a duty to KeyFi, as a result of their "mutual collaboration" based on "mutual respect and trust" to give correct information to KeyFi.

112.    As alleged hereinabove, to induce KeyFi to provide DeFi and staking services to Celsius and to enter into the APA, Celsius made materially misleading statements and omissions, calculated to lead Plaintiff to believe that Celsius was a legitimate business with proper security and risk controls and truthful disclosures to its customers. Celsius concealed the fact that it lacked basic security oversight and controls. Celsius also falsely represented that it had entered into, or would enter into, critical hedging transactions. Celsius had no reasonable grounds upon which to believe the statements were true when made to Plaintiff.

113.    Celsius knew that the information it supplied to KeyFi was desired by KeyFi in order to ascertain whether to provide DeFi and staking services to Celsius and to enter into the APA.

114.    KeyFi reasonably relied upon Celsius' knowing misrepresentations and omissions in agreeing to provide DeFi and staking services to Celsius and to enter into the APA. Had KeyFi known that Celsius' representations were false and fraudulent, KeyFi never would have agreed to provide DeFi and staking services to Celsius or to enter into the APA.

115.    As a result of the Celsius' knowingly false and fraudulent misrepresentations and KeyFi's reliance thereupon, KeyFi has suffered damages.

116.    By reason of the foregoing, KeyFi has been injured in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**Fraud in the Inducement, Inducing KeyFi to (a) Provide DeFi and Staking Services for Celsius Beginning in August 2020 and (b) Enter into the APA (Against Celsius)**

117.    Plaintiff repeats and realleges the allegations contained in all prior paragraphs as if set forth fully herein.

27

118.    As alleged hereinabove, to induce Plaintiff to provide DeFi and staking services and to enter into the APA, Celsius made materially misleading statements and omissions, calculated to lead Plaintiff to believe that Celsius was a legitimate business with proper security and truthful disclosures to its customers. Celsius concealed the fact that Celsius lacked basic security oversight and controls, and that Celsius failed to keep proper accounts of its customers deposits and failed to engage in meaningful diligence regarding the risks they exposed customer deposits to. Celsius also falsely represented that it had entered into, or intended to enter into, hedging transactions.

119.    At the time it made these false representations to Plaintiff, Celsius knew them to be false; indeed, Celsius made these false representations to Plaintiff to defraud Plaintiff and lure them into providing DeFi and staking services, entering into the APA and transferring valuable intellectual property to Celsius KeyFi.

120.    Plaintiff reasonably relied upon Celsius' knowing (mis)representations in agreeing to enter into the APA.

121.    Had Plaintiff known that Celsius' representations were false and fraudulent, Plaintiff never would have agreed to provide DeFi and staking services or to enter into the APA.

122.    As a result of Celsius' knowingly false and fraudulent misrepresentations and Plaintiff's reliance thereupon, Plaintiff has suffered damages.

123.    By reason of the foregoing, KeyFi has been injured in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**Breach of Contract – APA (Against Celsius KeyFi)**

124.    Plaintiff KeyFi repeats and reallege the allegations contained in all prior paragraphs as if set forth fully herein.

28

125.    The APA is a valid and enforceable contract between KeyFi and Celsius KeyFi, which by its terms is governed and construed in accordance with the laws of New York.

126.    KeyFi substantially performed its obligations under the terms of the APA.

127.    KeyFi validly invoked, and KeyFi breached the APA by refusing to perform its obligations under, Section 7.1(b)(i) of the APA.

128.    By reason of the foregoing, KeyFi suffered damages.

### FIFTH CAUSE OF ACTION
**Accounting (Against Celsius and Celsius KeyFi as Fiduciary)**

129.    Plaintiff repeats and realleges the allegations contained in all prior paragraphs as if set forth fully herein.

130.    Celsius and Celsius KeyFi had fiduciary duties of care, loyalty, disclosure, and good faith and fair dealing to Plaintiff, as a result of their pattern and practice of working for their mutual benefit. Indeed, the MOU reflects that Celsius and KeyFi would operate with "mutual collaboration" based on "mutual respect and trust."

131.    As a result of this trust-based relationship between Plaintiff and Defendants, Plaintiff is entitled to an accounting with respect to Defendants.

132.    Plaintiff has previously demanded such an accounting from Defendants.

133.    Defendants have failed to and/or refused to provide such accounting.

134.    Plaintiff has no adequate remedy at law. The complexity of the trading strategies employed by the parties makes it difficult to determine their respective rights to the trading profits at issue in the absence of an accounting.

135.    The accounting is applicable to each of the Defendants for each month during the period of time that KeyFi provided crypto-asset trading services and/or advice for Defendants.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for relief as follows:

    a.   An accounting for all moneys and crypto-assets received by Defendants related to services and/or advice provided by KeyFi or for KeyFi's and Defendants' mutual benefit.

    b.   An award of damages in an amount to be determined at trial.

    c.   An award of punitive damages in an amount to be determined at trial.

    d.   An award of pre- and post- judgment interest.

    e.   Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demand a trial by jury for all claims.

Dated:      July 7, 2022

Respectfully Submitted,

**ROCHE FREEDMAN LLP**

*/s/ Kyle W. Roche*
Kyle W. Roche
Daniel Stone
Peter Bach-y-Rita (*pro hac vice pending*)
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 350-0527
Facsimile: (646) 392-8842
Email: kyle@rochefreedman.com
Email: dstone@rochefreedman.com
Email: pbachyrita@rochefreedman.com

Devin (Velvel) Freedman
1 SE 3rd Ave.
Suite 1240
Miami, FL 33131
Telephone: (305) 306-9211
Facsimile: (646) 392-8842
Email: vel@rochefreedman.com