**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------- x

In re:                                                        :         **NOT FOR PUBLICATION**
                                                              :
CELSIUS NETWORK LLC, *et al*.,                                :         Chapter 11
                                                              :
                                        Debtors.              :         Case No. 22-10964 (MG)
                                                              :
                                                              :
------------------------------------------------------------------------- x
                                                              :
CELSIUS NETWORK LIMITED                                       :
and CELSIUS KEYFI LLC,                                        :
                                                              :
                                        Plaintiffs,           :
                                                              :         Adv. Proc. No. 22-01139 (MG)
                        v.                                    :
                                                              :
                                                              :
JASON STONE and KEYFI INC,                                    :
                                                              :
                                        Defendants.           :
------------------------------------------------------------------------- x

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

*A P P E A R A N C E S :*

AKIN GUMP STRAUSS HAUER & FELD LLP
*Special Litigation Counsel for Debtors and Plaintiffs*
*Celsius Network Limited and Celsius KeyFi LLC*
One Bryant Park
New York, New York 10036
By:     Mitchell P. Hurley, Esq.
        Dean L. Chapman Jr., Esq.

2300 N. Field Street, Suite 1800
Dallas, TX 75201
By:     Elizabeth D. Scott, Esq.

KYLE ROCHE P.A.
*Counsel for Defendants Jason Stone and KeyFi Inc.*
260 Madison Ave., FL 8
New York, NY 10016
By:     Kyle W. Roche, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the motion ("MTD" or "Motion," ECF Doc. # 17-3) filed by

KeyFi Inc. ("KeyFi") and Jason Stone ("Stone," and together with KeyFi, "Defendants") to

dismiss the First Amended Complaint ("FAC," ECF Doc. # 10) filed by Celsius Network

Limited ("CNL") and Celsius KeyFi LLC ("Celsius KeyFi," and, together with CNL, "Plaintiffs"

or "Celsius") in this adversary proceeding.  The FAC states seven causes of action:

| # | Cause of Action | Against |
|---|-----------------|---------|
| 1 | Turnover under section 542 of the Bankruptcy Code | Both Defendants |
| 2 | Conversion | Both Defendants |
| 3 | Fraudulent misrepresentation | Both Defendants |
| 4 | Breach of fiduciary duty | Stone Only |
| 5 | Unjust enrichment | Stone Only |
| 6 | Replevin | Both Defendants |
| 7 | Accounting | Stone Only |

The MTD seeks to dismiss every cause of action except the fourth, breach of fiduciary

duty.  Plaintiffs filed a brief in opposition to the MTD on November 28, 2022, which was the

deadline for doing so.  ("Opposition," ECF Doc. # 31.)

For the reasons set forth below, the Motion is **DENIED** for all causes of action.

## I.    BACKGROUND

Plaintiffs filed the FAC in this adversary proceeding seeking the return of certain assets

from the Defendants that Plaintiffs claim belong to them.  Together, Defendants and Plaintiffs

are referred to as "the parties."

### A.  Celsius' Interest in Staking and DeFi

General familiarity with Celsius' business is presumed from prior opinions.  In or around

late 2019 and early 2020, Celsius began to consider additional revenue-generating investment

strategies and became interested in "staking" and "DeFi" activities.  (FAC ¶ 14.)

### 1.  Staking

Staking refers to providing cryptocurrency coins, like Ethereum coins ("ETH"), to a

third-party platform for the purpose of earning revenue, usually in the form of a coin.  (*Id.* ¶ 15.)

Staking does not involve trading one form of cryptocurrency for another, or otherwise

speculating in cryptocurrency assets.  (*Id.*)  The principal staked coins are not exchanged for

other forms of currency.  (*Id.*)  While the staked coins may in some cases be subject to an agreed

lockup period, the original staking party has the right to have the ETH or other coins it staked at

the platform returned.  (*Id.*)

### 2.  DeFi

DeFi generally refers to certain activities on a blockchain designed to provide financial

services like borrowing, lending and market-making without an institutional intermediary, often

utilizing so-called "smart contracts."  (*Id.* ¶ 16.)  Smart contracts essentially are programs stored

on a blockchain that run when predetermined conditions are met.  (*Id.*)  Smart contracts can be

used to automate the execution of an agreement so that the outcome is certain, without any

intermediary's involvement.  (*Id.*)

### B.  The Introduction of Plaintiffs and Defendants

Celsius eventually engaged with Defendants to pursue these staking and DeFi activities.

The evolution of their relationship is detailed below.

By way of background, Alex Mashinsky and Nuke Goldstein, two of the founders of

Celsius, were introduced to Jason Stone in early 2019.  (*Id.* ¶ 17.)  At the time, Stone had a

company called Battlestar Capital that focused on coin staking in which Mashinsky was an

investor.  (*Id.*)  Later, certain Battlestar assets were transferred to KeyFi, with Battlestar

investors, including Mashinsky, receiving KeyFi equity in exchange.  (*Id.*)  Around that time,

Celsius and Goldstein each made an equity investment in KeyFi. (*Id.*) Through KeyFi, Stone claimed to have expanded his focus to encompass DeFi as well as staking activities. (*Id.*)

When Celsius began to explore deploying Celsius' coins in staking and DeFi strategies in 2020, based on Stone's representations and the diligence undertaken by Mashinsky and Goldstein, Celsius believed Stone's claims that the Defendants were qualified to lead the effort. (*Id.*) By August 2020, Celsius and Stone agreed in principle that Celsius would set up a wholly owned subsidiary to acquire the assets of KeyFi and operate Celsius' staking and DeFi activities, with Stone as CEO of that subsidiary. (*Id.* ¶ 18.)

### C. Overview of Agreements and Defendants' Access to Coins

The sections below chronologically describe the parties' relationship with respect to the governing agreements that were in place during different phases of the relationship.

#### 1. August to October 2020: No Agreement in Place; But Coin Access Given

Celsius and Stone discussed the primary terms of the transaction and prepared a draft Asset Purchase Agreement ("APA"), which they exchanged in August 2020. (*Id.* ¶ 18.) Anticipating that closing on the transaction would take some time, the parties agreed that Celsius would permit Defendants to begin to deploy Celsius' coins on Celsius' behalf while the parties sought to finalize the acquisition. (*Id.*)

Celsius claims that it began making coins accessible to Stone "from time to time," solely for the purposes of staking and DeFi, subject to weekly meetings with Celsius personnel regarding deployment and prior approval from Celsius for any new platforms or investments. (*Id.* ¶ 19.) For example, on or around August 19, 2020, Celsius created a digital wallet with the address, referred to as the "0xb1" wallet,[1] and transferred 1 ETH to the 0xb1 wallet. (*Id.* ¶ 20.)

---

[1]     The full address for the wallet is: 0xb1adceddb2941033a090dd166a462fe1c2029484.

Celsius provided to Defendants the private keys to the 0xb1 wallet and certain other Celsius-created wallets (together with the 0xb1 wallet, the "Wallets") to permit Defendants to deploy Celsius' coins. (*Id.*) The private key to a digital wallet is similar to a password for a conventional bank account, but the private key can never be changed. (*Id.*) Once a party has the private key, that party will be able to access the associated wallet permanently. (*Id.*)

### 2. October 2020: MOU and Old Services Agreement

The parties entered into two formal agreements in October 2020 to govern their relationship. First, on October 1, 2020, Plaintiff Celsius Network Limited and Defendant KeyFi entered into a non-binding memorandum of understanding ("MOU"). (*Id.* ¶ 21.) Second, on October 7, 2020, Plaintiff Celsius Network Limited and Defendant KeyFi entered into a services agreement (the "Old Service Agreement"). (*Id.*) These were the operative agreements in place until execution of the APA and related agreements in early January 2021, as discussed below. The FAC does not make any specific allegations regarding coins made accessible to Defendants or related entities during this period, other than the earlier allegations regarding making coins available "from time to time." (*Id.* ¶ 19.)

### 3. January 2021: APA and Related Agreements

The parties concluded the APA negotiations at the end of 2020, and executed the following agreements on January 11, 2021:

1. <u>LLC Agreement</u>: A limited liability company agreement forming Plaintiff Celsius KeyFi, between Defendant Stone, Celsius US Holdings LLC and Celsius KeyFi.
2. <u>APA</u>: Signed by Defendant KeyFi, Plaintiff CNL and Plaintiff Celsius KeyFi.
3. <u>Services Agreement</u>: Signed by Defendant KeyFi, Plaintiff CNL and Plaintiff Celsius KeyFi.

(*Id.* ¶ 21.) Pursuant to the APA and Services Agreement, Defendant Stone was to continue deploying Celsius' coins as CEO of Celsius KeyFi to the extent authorized in advance by

Celsius.  (*Id.*)

### D.  Celsius' Original Oversight Difficulties

Celsius officers began engaging in periodic calls with Stone in early September 2020 to understand the Defendants' trading strategies and assess risk.  (*Id.* ¶ 22.)  At these meetings Stone repeatedly and consistently stated that the Defendants' deployments of Celsius' coins for authorized staking and DeFi activities were profitable.  (*Id.*)

Given the tens of thousands of transactions deployed each day and the anonymity of users associated with particular wallets, it was practically impossible for Celsius to monitor the Defendants' activities without their cooperation.  (*Id.* ¶ 23.)  To bridge the gap between Stone's weekly reports of profitability and the lack of financial information provided by the Defendants, Stone promised Celsius that he would soon deliver a "wormhole" program to track deployments and increase transparency—that never actually occurred, according to Celsius.  (*Id.*)

### E.  Celsius' Demands to Return Coins & Stone Resignation

In early 2021, troubled by Defendants' reporting failures and other issues, Celsius instructed Defendants to return the coins Celsius had made available for deployment, including so that Celsius could perform an accounting and establish enhanced security protocols.  (*Id.* ¶ 24.)  The Defendants allegedly agreed and prepared a written plan to return the coins, but by March 2021, Defendants had still not returned the coins when Stone resigned.  Stone sent a copacetic resignation email, which failed to mention anything owed to him by Celsius; this allegedly belies his claims in the MTD that he resigned due to a lack of payment from Celsius. (Opposition at 5–6 (citing FAC ¶ 34).)

With no coins returned to Celsius in the following weeks, on March 26, 2021, the Celsius KeyFi board convened and issued formal, written board resolutions commanding Defendants to return all Celsius' coins to the 0xb1 wallet, and any others containing Celsius' coins, and the

board resolutions were sent to the Defendants that day.  (FAC ¶¶ 25–26.)  Celsius recounts three

responses from Stone:

- <u>March 26</u>: Stone replied that day ensuring the "complete return of all Celsius tokens (principal + interest earned) . . . by the end of April at the latest."

- <u>March 27</u>: The following day, Stone responded to a message imploring him to return assets by saying: "that was always the plan . . . I promise you. . . . [W]e can be finished returning 100% of the coins ++ interest & profits sometime between 4/20-4/31."

- <u>March 31</u>: Stone claimed that he would provide Celsius with control over certain of the Celsius Wallets by providing Celsius with the seed codes and private keys to those wallets and then destroying the seed codes and private keys in his possession.

(*Id.* ¶¶ 26–27.)  Celsius claims that these were lies designed to conceal the fact that Stone either

had lost or stolen a substantial number of coins, as further detailed below.

### F.  Stone's Alleged Misconduct

Celsius claims that, without authorization, Stone used Celsius coins for activities other

than the staking and decentralized finance investments for which he had been engaged, namely:

1. failing to hedge against the movement of coin prices, despite Defendants' promise that deployments would be "delta neutral" and Stone's assurances that Defendants would not "open ourselves up to impermanent loss," (*Id.* ¶¶ 30–31); and
2. stealing substantial assets from Celsius, including by transferring Celsius' coins to wallets controlled exclusively by Stone and thereafter buying hundreds of non-fungible tokens ("NFTs") with Celsius' coins and using Celsius' assets to acquire interests in an entity called Nifty's and, upon information and belief, other companies, platforms and ventures, despite the agreement to engage only in staking and DeFi investments.  (*Id.* ¶¶ 32–36).

Additionally, following his departure from Celsius in March 2021, Stone transferred

Celsius' property to wallets belonging to or controlled by Defendants and used the money

laundering application, Tornado Cash, to obfuscate the origin, destination and counterparties to

his transfers.  (*Id.* ¶¶ 37–38.)  For example, on May 23, 2021 and May 25, 2021, Stone

transferred 320 ETH, all of which was property of Celsius, to Tornado Cash.  (*Id.* ¶ 38.)  Several

months later, in September 2021, Stone accessed a Celsius wallet, transferred $1.4 million worth

of DAI (a stablecoin pegged to the value of the U.S. dollar) to a public wallet, converted the

stolen DAI into ETH, and then transferred the ETH to Tornado Cash.  (*Id.* ¶¶ 39–40.)  Plaintiffs

allege that Defendants do not appear to deny any of this conduct, and point out that Tornado

Cash is a notorious money laundering application that has since been banned by the Department

of Treasury for its frequent use by illicit actors.  (*Id.* ¶ 37.)

### G.  Stone's Lawsuit Against Celsius

In September 2021, Stone's lawyers sent Celsius a complaint (the "KeyFi Complaint") in

which Stone claimed it was actually Celsius that owed coins to KeyFi based on the parties'

profit-sharing agreement.  (*Id.* ¶ 41; MTD at 3–4.)  By KeyFi's account, Celsius had agreed to

shadow Stone's activities, guess at the risks created by those activities, and then unilaterally

hedge against them.  (FAC ¶ 41.)  According to Stone, had Celsius done so, his substantial losses

would have turned into profits, and, thus, Celsius' failure to share those phantom returns with

Stone is a breach of the APA.  (*Id.*)

Celsius contends that the KeyFi Complaint is baseless, and contradicted by Defendants'

own real-time, contemporaneous admissions that they would return all coins to Celsius without

reference to any sort of entitlement to retain certain coins as purported "profits."  Plaintiffs claim

that their allegations undermine Stone's, particularly in alleging that the agreement was for Stone

himself to hedge against risk and that he repeatedly assured Celsius he would do so, (*id.* ¶ 19,

30), and that, without the promised "wormhole" program, it was practically impossible for

anyone other than Defendants to track Defendants' investments and hedge and prevent

impermanent loss.  (*Id.* ¶ 30.)

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the

claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  Except for

Plaintiffs' claim for fraudulent misrepresentation, the standard for which is recounted *infra*, every claim discussed in the FAC is subject to this standard. The Court must "accept as true all of the factual allegations contained in the complaint, drawing all inferences in the light most favorable to the non-moving party's favor." *Cruz v. Rose Assocs., LLC*, No. 13 Civ. 0112 (JPO), 2013 WL 1387018, at *2 (S.D.N.Y. Apr. 5, 2013) (internal quotations and citations omitted); *see also Probulk Carriers Ltd. v. Peraco Chartering USA LLC*, No. 11 Civ. 5686 (RJS), 2012 WL 3095319, at *4 (S.D.N.Y. July 20, 2012). To meet the familiar standard of "plausibility," a complaint must include sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The pleadings must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).

"Therefore, on a motion to dismiss, the appropriate inquiry is not whether a plaintiff is likely to prevail, but whether he is entitled to offer evidence to support his claims. Dismissal for failure to state a claim on which relief could be granted is proper only when it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Kendall v. Cuomo*, No. 12 Civ. 3438, 2013 WL 5425780, at *3 (S.D.N.Y. Sept. 27, 2013) (internal quotations and citations omitted).

When ruling on a motion to dismiss, the Court "must confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'" *Leonard F. v. Israel Disc. Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999) (quoting *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)). It is well-established that "factual allegations in

memoranda or legal briefs are treated as matters outside the pleading for purposes of Federal

Rule of Civil Procedure 12(b)." *In re Arnott*, 512 B.R. 744, 756 (Bankr. S.D.N.Y. 2014).

Accordingly, on a Rule 12(b)(6) motion to dismiss, the Court cannot credit any allegations

contained in the KeyFi Complaint. Rather, the Court must accept as true the well-pleaded

allegations in the FAC, including Plaintiffs' own allegations about the KeyFi Complaint. *See*

*Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (stating that while courts may

"take judicial notice of documents filed in other courts" they may not do so "for the truth of the

matters asserted in the other litigation").

### III.    **DISCUSSION**

The issue addressed in each subsection is whether the Plaintiffs have successfully stated a

claim according to the elements of each of the individual causes of action.

#### A.  Cause 1: Turnover

Plaintiffs' first cause of action is for turnover pursuant to section 542(a) of the

Bankruptcy Code which states that:

> Except as provided in subsection (c) or (d) of this section, an entity, other
> than a custodian, in possession, custody, or control, during the case, of
> property that the trustee may use, sell, or lease under section 363 of this
> title, or that the debtor may exempt under section 522 of this title, shall
> deliver to the trustee, and account for, such property or the value of such
> property, unless such property is of inconsequential value or benefit to the
> estate.

11 U.S.C. § 542(a). "Pursuant to § 542(a), property of the estate not abandoned by the trustee or

exempted by statute must be turned over to the trustee for administration." *Nisselson v.*

*Fasarakis (In re Fasarakis)*, 423 B.R. 34, 37 (Bankr. E.D.N.Y. 2010). In turn, section 541

defines property of the estate as "includ[ing] all legal or equitable interests of the debtor in

property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

The Defendants make three arguments against Plaintiffs' having stated a claim under section 542(a) that will be addressed in turn below.  In sum, none of them warrant dismissal.

### 1.  Bona Fide Dispute

The Defendants first argue that the turnover claim is improperly being used to litigate a contract dispute and/or recover property whose title is disputed.  (*See* MTD at 8 ("It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute.") (quoting *In re Seatrain Lines, Inc.*, 198 B.R. 45, 50 n. 7 (S.D.N.Y. 1996)).)  The *Seatrain* proposition is true, but the allegations on the face of the FAC do not show that Plaintiffs are litigating a contract dispute or that title to the property in question is actually disputed.

The Court must take all allegations in the Complaint as true.  *Cruz*, 2013 WL 1387018 at *2.  But even at the outset, three facts about the beginning of the parties' relationship do not appear to be disputed: (1) Defendants were given control or access to Celsius' property (in the form of coins); (2) use of that property was governed by a series of agreements, some of which only certain Defendants were parties to; and (3) Defendants retained certain of the property in its original form (coins), and other property that was in fact obtained with the coins.

At bottom, Celsius' argument is that the original coins never stopped being Celsius' property, and Celsius held title in any property that was obtained with Celsius' coins. Defendants' argument is that following the events above, at some point in time, both forms of property (coins, and property obtained with coins) became Defendants' property—or at a minimum, there is a dispute to their title, dooming the turnover claim.

The initial problem with Defendants' arguments is that they rely entirely on allegations outside the FAC to manufacture a dispute over title.  This is clearly impermissible.  *See Israel*

*Disc. Bank of New York*, 199 F.3d at 107. What's more is that Defendants' allegations are not just in *addition* to those in the FAC, but directly contradict the facts alleged in the FAC; namely, whether there were ever any profits at all (Plaintiffs allege there weren't), and whether Defendants were authorized to make certain transactions (Plaintiffs allege they weren't). (Opposition, at 11 n.4.)

Even more on-point, Plaintiffs also cite to a case in this district where a court refused to review documentary evidence outside the pleadings at the motion to dismiss stage to determine whether there was a bona fide dispute precluding a section 542 claim.[2] *See LaMonica v. CEVA Group PLC*, 582 B.R. 46, 118 (Bankr. S.D.N.Y. 2018) (citing *In re Legal Xtranet*, 2011 WL 3236053, *1 n.1 (Bankr. W.D. Tex. July 26, 2011) (refusing to dismiss plaintiff's turnover claim and noting that "simply resisting recovery is not enough to create a legitimate dispute")).

Plaintiffs also meaningfully distinguish Defendants' cases cited as examples of bona fide disputes. To synthesize, the Defendants' cases all involved instances where the section 542 claimants, by their own pleadings or admissions, would be required to prove that property originally held by others *became* property of the estate by operation of contract or law.[3] In other words, the face of the claimants' pleadings showed that there was a prerequisite legal dispute to

---

[2]    Note that Plaintiffs quote, but do not attach to the FAC, certain of the agreements with the Defendants and related entities, like the Services Agreement. Even if considered with the pleadings by incorporation, there is no support for the proposition that a contract alone could provide the basis for a bona fide dispute insofar as its provisions could lead to hypothetical defenses. Moreover, reading the agreements alongside the FAC, nothing in the FAC can be viewed as arguably changing title based on the provisions of the agreements. The Service Agreement provides unequivocally that "all coins deployed . . . and revenues generated and/or received from third parties shall be owned by and paid to Celsius." (FAC ¶ 21; Declaration of Mitchell P. Hurley in Support of Celsius' Motion for a Preliminary Injunction, ECF Doc. # 24, Ex. 31 at § 3.)

[3]    *Sea Star Line, LLC v. Emerald Equipment Leasing, Inc.*, No. CIV.A.05-245-JJF, 2006 WL 214206 at *8 (D. Del. Jan. 26, 2006) (dismissing turnover claim for rent owed under lease); *In re VeraSun Energy Corporation*, No. 08-12606 (BLS), 2013 WL 3336870 at *4 (Bankr. D. Del. June 28, 2013) (dismissing turnover claim for receivable allegedly due pursuant to a contract); *Faasoa v. Army & Air Force Exchange Serv. (In re Faasoa)*, 576 B.R. 631, 644–46 (Bankr. S.D. Cal. 2017) (dismissing turnover claim for IRS tax payment refund, where debtor also conceded the amount he owed to IRS was greater than refund, barring his eligibility to the refund under 28 U.S.C. § 6402).

establishing that certain property was ever property of the estate in the first place. But the situation here is flipped—the allegations state the property was always property of the estate, and it is the Defendants who insert arguments with facts outside the pleadings to argue that resolving a legal dispute will show that property was *removed from* the estate.

As Plaintiffs aptly observe, Defendants' citation to *Sea Star Line, LLC v. Emerald Equipment Leasing, Inc.*, No. CIV.A.05-245-JJF, 2006 WL 214206 (D. Del. Jan. 26, 2006) teaches the distinction in *Plaintiffs' favor*. In *Sea Star*, the Court was faced with a motion to dismiss a turnover claim for two types of property—equipment owned by a debtor-lessor (and possessed by a lessee) and rent allegedly owed to the debtor-lessor under the lease. *Id.* at *8. The Court dismissed the latter, concluding that the rent was simply a breach of contract claim; however, the Court refused to dismiss the former, as the rental agreement was clear that that the debtor-lessor was the owner of the equipment. *Id.* Thus, the Court drew a line between claims that require resolution of a contract dispute by the claimants' own allegations, and those that do not. Adopting the reasoning of the *Sea Star* court puts Plaintiffs' claims here in the group that do not.

These cases are all consistent with (and likely a product of) the fact that defendants simply cannot insert their own factual allegations at the motion to dismiss stage to create a dispute. And even setting aside the application of the Federal Rules, there is further good reason for this result, as adopting Defendants' arguments would provide an easy-out for any party defending a section 542 claim. Indeed, if Defendants' rule were adopted, defendants to section 542 claims could assert legal and factual defenses, which would create a "dispute" that could disqualify the section 542 claims from being heard in a bankruptcy court, regardless of merit.

### 2.   Property of the Estate During the Case

Defendants' second argument is that they were not in "possession, custody, or control" of estate property "during the case."  (MTD, at 12.)  While Defendants explain in detail with respect to four types of property,[4] their entire argument boils down to two propositions: (1) Defendants exchanged Plaintiffs' original property (coins) for other forms of "new" property (NFTs, equity interests) pre-petition, and was not in possession of the original property when the bankruptcy case was filed; (2) at the time the petition was filed, Defendants were in possession of certain new property, but they were entitled to it as compensation, meaning that it was not property of the estate.

Dealing with these arguments in reverse order, the Defendants' argument regarding their entitlement to the property (regardless of the property's form) fails for the same reason that Defendants' attempts to create a bona fide dispute fail—they rely on facts outside the FAC to do so and ask the Court to interpret and construe the agreements between the parties in Defendants' favor.  And again, in doing so, they depend on *controverting* facts in the FAC—namely whether there were ever any profits at all, and whether Defendants were authorized to make certain transactions.  This is impermissible for the reasons discussed above.

Next is Defendants' argument that certain of Celsius' property never became property of the estate because, before the petition was filed, Defendants exchanged it for other types of property.  Without Defendants' companion argument regarding their legal entitlement to the property, this proposition is incredible; as Plaintiffs point out: "such an absurd result would

---

[4]      The four types of lost property are: (1) Lost property; (2) ETH used to purchase NFTs; (3) NFTs; and (4) Equity in a company called Nifty's.  (*See* MTD, at 12-14.)  As described above, (1) and (2) were the original property, while (3) and (4) were the "new" property for purposes of Defendants' arguments.

reward bad behavior and encourage pre-petition conversion of estate property." (Opposition, at 14.)[5]

Plaintiffs support their position by first arguing that limiting the recoverable property as Defendants suggest would contradict the broad definition of property of the estate under sections 541 and 542. Plaintiffs provide numerous reliable citations for that general proposition. *See, e.g.*, *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–205 (1983) (noting that the House and Senate Reports on the Bankruptcy Code indicate that "§ 541(a)(1)'s scope is broad"); *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008) (stating that "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of [section] 541") (citation omitted). More specifically, Plaintiffs then cite to cases supporting the proposition that property of the estate includes proceeds of estate property.[6]

Unsurprisingly, Defendants cite to no cases to directly support the remarkable proposition that exchanging estate (or future estate) property for other types of property extinguishes an estate's interest in the new replacement property. Plaintiffs meaningfully distinguish Defendants' cited cases, showing that they are all inapposite and provide minimal indirect support, if any.[7]

---

[5]       This absurdity is especially borne out by Plaintiffs' correction that they are seeking turnover of both property in its original form (coins) and "new" form (NFTs, equity, etc.). (*See* Opposition at 13 n.7.)  Even if Defendants acted with authorization in making the exchanges for new property, adopting Defendants' argument would fortuitously entitle them to the property by operation of the Bankruptcy Code.  Never mind that doing so without authorization would, as Plaintiffs point out, allow a party in possession of another's property to convert it into another form to gain title on the eve of the true owner's bankruptcy.

[6]       *See Geltzer v. Brizinova (In re Brizinova)*, 592 B.R. 442, 462 (Bankr. E.D.N.Y. 2018) (noting that "[i]t is beyond doubt that where a debtor owns the shares of a corporation, a sale of those shares for cash or other consideration results in 'proceeds.'  In such a transaction, all that has occurred is that property of the estate has changed from one form—shares of stock—to another form—cash or other consideration"); *see also Allen v. Levey (In re Allen)*, 226 B.R. 857, 862 (Bankr. N.D. Ill. 1998); *see also Bird, II v. Crown Convenience (In re NWFX, Inc.)*, 864 F.2d 588, 591–92 (8th Cir. 1988) (holding that plaintiff has equitable ownership interest in value derived from defendant's use of plaintiff assets where defendant would otherwise be unjustly enriched, and that such value "is subject to turnover under 11 U.S.C. § 542(a)") (internal citation omitted).

[7]       *In re Minh Vu Hoang*, 452 B.R. 902 (Bankr. D. Md. 2011), aff'd, 469 B.R. 606 (D. Md. 2012) (solely addressing *post-petition* transfers of property, with *dicta* discussing pre-petition transfers for purposes of comparison

While Plaintiffs have the better argument, it is also curious that they were only able to
cite to one case where a third party held estate assets pre-petition, converted those assets to
another form, and was subject to turnover claims post-petition.  *See In re NWFX, Inc.*, 864 F.2d
at 591–92.  The Court found only one additional case.[8]  The lack of caselaw is not considered to
be an indication that the position is incorrect, however, as this may ultimately be a practical
byproduct of the uncommon fact pattern here (a party making allegedly unauthorized transfers of
a debtor's assets that are not better targeted as preferential or fraudulent) and the near-
frivolousness of the Defendants' argument when it is divorced from the companion argument
that Defendants were legally entitled to the proceeds themselves.

### 3.  Lack of Allegations Regarding KeyFi

Defendants also make one brief argument that the claim against Defendant KeyFi must
be dismissed, not due to any particular element of the section 542 claim, but because the FAC
"contains only one sentence about any alleged estate property potentially held by KeyFi."  (MTD
at 10.)  Defendants make an overly technical and incorrect argument.  First, they cite to a case
regarding vagueness in allegations regarding the property held by a party defending a turnover
claim.  In that case, however, the complaint only stated that the defendant "failed to account for
the proceeds of the software and other assets," and it was dismissed in part due to the fact that
the claim was brought pursuant to section 542(b) but did not specify a debt.  *See In re
Ticketplanet.com*, 313 B.R. 46, 67 (Bankr. S.D.N.Y. 2004).  Here, the subject of the claim (assets

---

in interpreting "during the case," without considering the issue of proceeds from such a transfer); *Savage & Assocs.,
P.C. v. Mandl (In re Teligent Inc.)*, 325 B.R. 134, 137 (Bankr. S.D.N.Y. 2005) (simply stating that fraudulently or
preferentially transferred property is not property of the estate until it is recovered for purposes of turnover, neither
of which are alleged here); *In re Vista Bella, Inc.*, No. 11-00149-MAM-7, 2012 WL 3778956 (Bankr. S.D. Ala.
Aug. 30, 2012) (involving no application of turnover claims whatsoever and discussing legal interaction of property
of the estate and constructive trusts).

[8]     *See Comu v. King Louie Min. LLC*, 534 B.R. 689, 691 (N.D. Tex. 2015) (rejecting appeal to bankruptcy
court determination that entity that held chapter 7 debtor's shares of stock prepetition and sold them for cash was
subject to turnover cash to trustee pursuant to section 542(a)).

and proceeds of assets) matches the statutory section on which it is premised, section 542(a), and the allegations refer to two distinct assets (or their proceeds) that moved through a particular wallet during a particular time frame. Defendants cited caselaw is not useful to their argument.

Moreover, with respect to allegations pertaining to KeyFi, Plaintiffs point to caselaw in this Circuit which states that "[i]n initiating the litigation, a plaintiff is not required to plead specific details as to which entity did what during the alleged course of misconduct," but may instead "collectively refer[] to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant." *McArdle-Bracelin v. Cong. Hotel, LLC*, No. 120CV861TJMTWD, 2022 WL 486805, at *7 (N.D.N.Y. Feb. 17, 2022) (citations and internal quotation marks omitted). This proposition seems uncontroversial, simply given the number of multi-defendant cases filed around the country in federal courts, and that there are no explicit authorities that would require particularity in the manner suggested by Defendants. Moreover, Plaintiffs walk through the FAC and illustrate exactly which collective references include KeyFi (*see* Opposition, at 16); these are more than sufficient to make out a claim for turnover against KeyFi.

For those reasons, the Plaintiffs have sufficiently stated a claim for turnover.

### B. Cause 2: Conversion

The key elements of conversion are (1) "plaintiff's possessory right or interest in the property"; and (2) "defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Colavito v. N. Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50 (2006).

Defendants do not take issue with either element, but like their turnover defense, argue that Plaintiffs fail to state any facts beyond those for a breach of contract claim that would give rise to an independent cause of action for conversion. Defendants are generally correct that conversion allegations that are entirely duplicative of a claim for breach of contract do not

adequately state a conversion claim.  *See PCS Wireless LLC v. A to Z Wireless Sols. Inc.*, 841 F.

Supp. 2d 649, 653 (E.D.N.Y. 2012) (stating that "a claim of conversion cannot be predicated on

a mere breach of contract and where there are no independent facts alleged arising to a tort

claim").  But that is not what Plaintiffs have alleged here.

    First, Plaintiffs correctly point out that the cases cited by Defendants involved claims

where the contract covered "precisely the conduct described" in the conversion allegations.

*Remede Consulting Grp. Inc. v. Hamer*, No. 19-CV-3950 (NGG) (VMS), 2021 WL 430898

(E.D.N.Y. Feb. 8, 2021).  Despite whatever payment dispute Defendants claim exists, Plaintiffs

are plainly not bringing a claim to enforce an obligation contemplated by the contracts.  Indeed,

Defendants' cited cases involved "conversion" allegations that sought nothing more than

payments specified by the relevant contracts.[9]  But Plaintiffs allege that Defendants have simply

kept assets that do not belong to them, outside the scope of any other duties of performance owed

under the contracts.  And Plaintiffs correctly observe that conversion allegations are not simply

duplicative of breach of contract claims because the property in question is also the general

subject of a contract, where the wrong is "separately actionable."  *See Robotic Vision Sys., Inc. v.

Cybo Sys., Inc.*, 833 F. Supp. 189, 192 (E.D.N.Y. 1993) (permitting a plaintiff to bring both an

action for breach of contract and conversion and replevin where both related to goods to be

delivered/returned under a contract, because whether they were "separately actionable" was a

mixed question of fact and law not appropriate for resolution on a motion to dismiss).

---

[9]    *See Advanced Oxygen Therapy Inc. v. Orthoserve Inc.*, 572 F. Supp. 3d 26 (S.D.N.Y. 2021) (plaintiff
alleged no "acts that were wrongful or unlawful as opposed to mere violations of contractual rights" where
defendant contended that contractual conditions for payment of escrowed amounts had not been met); *PCS Wireless
LLC v. A to Z Wireless Sols. Inc.*, 841 F. Supp. 2d 649 (E.D.N.Y. 2012) (defendant failed to render full payment due
under contract for goods shipped by plaintiff).

Furthermore, Plaintiffs' allegations show that, factually, the claims could not be entirely duplicative of contract claims: (1) certain Defendants were not parties[10] to the Services Agreement (which is critical to Defendants' theory regarding existence of a "contract" claim); and (2) many of the acts of conversion alleged in the FAC took place after Stone and KeyFi claim they ended their relationship with Celsius.

Finally, Defendants argue that Plaintiffs do not make any allegations regarding KeyFi itself. That is incorrect, first for the reasons discussed in the subsection above in response to similar arguments regarding KeyFi and the turnover allegations. More specifically, it is also incorrect as Plaintiffs allege that the coins deployed to KeyFi are still missing, KeyFi acknowledged they belonged to Plaintiffs, and that they are still in KeyFi's control or possession—thus stating allegations that KeyFi is interfering with Plaintiffs' possessory rights to make out a claim for conversion.

For those reasons, the Plaintiffs have sufficiently stated a claim for conversion.

### C. Cause 3: Fraudulent Misrepresentations

Under New York law, to prevail on a fraudulent misrepresentation claim "a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Rana v. Islam*, 305 F.R.D. 53, 58 (S.D.N.Y. 2015) (quoting *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186–87 (2d Cir. 2004)) (internal quotation marks omitted). Pursuant to Federal Rule of Civil Procedure 9(b), these elements must be pled with particularity, specifying the

---

[10]    Confusingly, Plaintiffs argue that "neither Defendant" was a party to the services agreement (Opposition, at 17), but the FAC states that Defendant KeyFi was a party to both services agreements. (FAC ¶ 21.) Either way, the argument has force against Stone.

statements that were fraudulent, identifying the speaker, stating where and when the statements were made, and explaining why the statements were fraudulent. *Id.* (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006)) (internal quotation marks omitted).

Defendants raise two arguments—one pertaining to the first element, and another pertaining to the third.

### 1. Defendants' Arguments Regarding the Misrepresentations

The Defendants argue that Plaintiffs fail to make specific, particular allegations regarding the fraudulent misstatements in question. Unsurprisingly, Defendants do so by targeting the general narrative snippets from the FAC. (*See, e.g.*, FAC ¶ 19 (alleging that Stone made "express assurances that he would hedge against any risk from price movements")). As the Plaintiffs point out, Defendants do not engage with Plaintiffs' allegations about specific representations made by Stone regarding Defendants' conduct with respect to hedging, profitability, visibility, and return of coins. (Opposition, at 19–20.) Some of these allegations contain specific dates and quotes, and in any event, they provide sufficiently detailed information and a time period to "apprise a defendant of the general time period of any alleged misstatements to meet the requirements of Rule 9(b)." *Rana v. Islam*, 305 F.R.D. 53, 58 (S.D.N.Y. 2015) (finding three-month period to be sufficient time range to meet particularity requirement) (citation and internal quotation marks omitted).

In their reply brief, Defendants do take aim at one specific statement made by Stone related to hedging on August 18, 2020, and instead of taking issue with particularity, take aim at Plaintiffs' pleading of the knowledge element instead. They claim that none of the allegations show that Stone knew the statements were false when they were made, and at most, allege that he "overpromised."

Setting aside that this argument was made for the first time in reply, the argument does not negate the adequacy of the fraud pleading for multiple reasons. First, as already discussed, this does not address the timeline of subsequent allegations regarding misrepresentations that allegedly induced Plaintiffs to allow Defendants to access their coins. Second, each of the bulleted paragraphs in the Opposition Brief cites to allegations regarding why all of the representations were false.[11]

Finally, Defendants attack certain statements (e.g., the August 18 Stone statement) as being promissory, rather than factual misrepresentations of present facts, but many of the other allegations are directed at Stone's representations about the Defendants' conduct and progress regarding hedging, visibility, and return of coins, at the time the representations were made. Given the evolution of the parties' relationship, Plaintiffs make allegations showing that statements which may have been promissory at a certain point in time were also made at later points as statements of present fact. (*See, e.g.*, FAC ¶ 23 (alleging that "Defendants agreed to build a so-called 'wormhole' program" and "[t]hroughout the fall of 2020, Stone promised that his team *was designing* and would soon deliver the 'wormhole' program") (emphasis added).) This was all during the timeline that Plaintiffs alleged they were being induced to provide coins to Defendants, and such present statements of fact may create a cause of action for fraud even where there are related future promises made between the parties. *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007) ("[A] misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract)

---

[11]      It is unnecessary to consider whether the other statements Defendants argue constitute puffery are actionable, as Defendants' arguments that "vague adjectives" are non-actionable clearly do not apply to the specific representations regarding actions being taken by the Defendants discussed above. (*See* MTD Brief at 16.) Similarly, it is also unnecessary to consider whether Plaintiffs have (or could) make out claims for fraud by omission, and whether there are separate fraud claims that they have failed to plead here. (*See id.* at 16 n. 4.)

and therefore involves a separate breach of duty.") (quoting *First Bank of the Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 690 N.Y.S.2d 17, 21 (1st Dep't 1999)).

### 2. Defendants' Arguments Regarding Justifiable Reliance

The Defendants next argue that Plaintiffs did not justifiable rely on the Defendants' representations, because the FAC contains a single conclusory allegation that Plaintiffs relied on representations above "in supplying coins to Defendants and in failing to recall coins already supplied." (FAC ¶ 59.) Factually, the Defendants argue that Celsius' prior relationship with Stone, continued control over its own wallets, and visibility of transactions on the public blockchain cut against justifiable reliance. (MTD, at 17.) Plaintiffs respond to the latter two points by arguing that: (1) the application they used to view wallets would not show NFTs (FAC ¶ 32); (2) the number of transactions and anonymity made it impossible to track transactions without Defendants' cooperation, necessitating the need for the "wormhole" program Defendants agreed to build (*id.* ¶ 23) and (3) in any event, the Defendants used Tornado Cash to obfuscate transactions. (*Id.* ¶¶ 37–41).

First, the parties appear to both frame the issue of justifiable reliance as depending on the visibility in-fact of the transactions at issue. Defendants argue that greater visibility means less justifiable reliance, while Plaintiffs argue that less visibility means more justifiable reliance.[12] But to the extent that this framing is the proper way to contextualize reliance on the misrepresentations, the Plaintiffs allege specific facts (enumerated above), which if taken as true, properly establish that Plaintiffs' reliance was justifiable. In other words, Plaintiffs adequately allege that they did not have knowledge of actual misconduct or reason to suspect future misconduct that would render their reliance on the misstatements unjustifiable.

---

[12]    Neither party cites any caselaw on the reliance element.

Defendants do not engage with those facts at all or draw any other successful inferences from the facts alleged by Plaintiffs.  Instead, Defendants' factual arguments regarding Celsius' continued control over its own wallets and prior relationship with Stone seem entirely inapposite (or possibly even supportive to Plaintiffs) to the issue of whether Plaintiffs were justified in relying on Stone's representations regarding hedging and visibility measures.

Second, the issues regarding reliance are extremely fact-dependent with respect to the timing of representations, access provided to coins, and Celsius' visibility.  Considering that there were multiple intertwined material events related to each over a period of months, it may be possible that reliance was justified at one point in time but became unjustified at a later point. The issue becomes particularly important when considering that the FAC alleges that transparency was lacking since September 2020 and never improved, but Celsius nevertheless executed additional agreements (and possibly provided additional funds) to engage with Defendants in January 2021.  Relatedly, while the parties fail to do so in their briefs, it is possible that the issues related to visibility in-fact are not actually ones of reliance but are better characterized as relating to election of remedies,[13] or ratification, affirmance, and waiver,[14] which may affect recoverable damages following the discovery of fraud.

Nevertheless, to the extent that Celsius has adequately stated claims for justifiable reliance on misrepresentations earlier in the relationship, the point at which reliance became

---

[13]     "Setting a fraudulent bargain aside is, however, an alternative right given on equitable principles to the injured party, and, therefore, if this remedy is desired, it must be sought with reasonable promptness after the fraud has been discovered.  Reasonable time is generally considered a question of fact to be determined by the jury."  14 WILLISTON ON CONTRACTS § 69:58 (4th ed. 2022) (discussing election of remedies) (footnotes omitted).

[14]     "The mere acceptance of benefits under a contract induced by fraud is not, as a rule, sufficient to prevent the wronged party from claiming and recovering such damages as may have been suffered as a result of the fraud. Generally, though, the acceptance of benefits under a contract induced by fraud with knowledge of the wrong constitutes a waiver thereof insofar as the right of rescission is concerned."  60A N.Y. JUR. 2D FRAUD AND DECEIT § 226 (2d ed. 2022).

unjustifiable or the fraud itself was discovered, and the extent of related damages incurred in either event are factual issues not proper to resolve on a motion to dismiss.

For those reasons, the Plaintiffs have sufficiently stated a claim for fraudulent misrepresentation.

### D.  Cause 5: Unjust Enrichment[15]

To prevail on a claim of unjust enrichment under New York law, a plaintiff must demonstrate that the "1) defendant was enriched; 2) defendant's enrichment came at plaintiff's expense; and 3) circumstances were such that in equity and good conscience defendant should compensate plaintiff." *Shamrock Power Sales, LLC v. Scherer*, 2015 WL 5730339, at *31 (S.D.N.Y. Sept. 30, 2015) (alterations, quotations, and citations omitted).

Defendants make two arguments, both of which effectively posit that the existence of contract(s) between the parties precludes the unjust enrichment claim.

First, Defendants argue, much like they do for the conversion claim (and to a lesser extent, the turnover claim), that the existence of the contracts here between the parties precludes Plaintiffs' unjust enrichment claim.  (*See* MTD, at 17 ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery [for unjust enrichment] for events arising out of the same subject matter.") (quoting *Viable Mktg. Corp. v. Intermark Commc'ns, Inc.*, No. 09-CV-1500 JS WDW, 2011 WL 3841417, at *2 (E.D.N.Y. Aug. 26, 2011)).  Second, Defendants argue that Plaintiffs fail to allege they lack an adequate remedy at law, for much the same reason—because the claims are actually for breach of contract.

Plaintiffs first respond (as they have for the other claims) that the conduct at issue— stealing and concealing assets—was not the subject of the contracts and did not necessarily

---

[15]    Cause of Action 4 in the FAC is for breach of fiduciary duty; Defendants have not moved to dismiss this claim.

create a cause of action for breach.  They support this with the same factual arguments as they do for conversion (i.e., certain actions took place after contracts were terminated, and Defendants were not parties to certain contracts).  Moreover, Plaintiffs cite caselaw in support of the proposition that an unjust enrichment claim may proceed where the parties "do not agree that a single, enforceable contract governs their dispute."  *Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo*, 346 F. Supp. 3d 432, 465–66 (S.D.N.Y. 2018).  Finally, with respect to the "adequate remedy at law" argument, Plaintiffs distinguish Defendants' cited case *Viable Mktg.*, as one in which the plaintiff recognized the applicability of the contract by bringing a parallel breach of contract claim in the same action.  *See* 2011 WL 3841417, at *3.

Plaintiffs have the better argument that the unjust enrichment claim is not duplicative of a breach of contract claim.  First, Plaintiffs distinguish *Viable Mktg.*, Defendants' main case, as one where the contract undoubtedly covered the conduct of the unjust enrichment claim because the plaintiff brought a breach of contract claim, in contrast to this case.  Additionally, Plaintiffs' citation to *Palazzolo* provides direct support for the proposition that lack of an agreement covering the conduct at issue will allow an unjust enrichment claim to survive a motion to dismiss—although it is arguably distinguishable as Defendants point out, in that there was absolutely *no contract* between the parties in that case, while there are undeniably multiple here.

Nevertheless, Plaintiffs accurately recognize that the issue is neither resolved by asking whether the plaintiff brought a breach of contract action[16] or whether there was an enforceable contract between the parties.  Indeed, the narrower issue is whether, when an enforceable contract exists, but no breach of contract claim is brought, the contract still covers the conduct complained of.  *See Kottler v. Deutsche Bank AG*, 607 F.Supp.2d 447, 468 (S.D.N.Y. 2009)

---

[16]    *See* Opposition, at 23 n.17 (collecting cases stating that contract and unjust enrichment claims may be pled in the alternative).

(noting that "where there is a bona fide dispute as to the existence of a contract *or where the contract does not cover the dispute in issue*, a court should not dismiss a claim of unjust enrichment at the motion-to-dismiss stage") (emphasis added) (internal citation and quotations omitted). Thus, just as with the conversion claim, Plaintiffs' arguments regarding the factual inapplicability of the contract to the conduct complained are successful.

For those reasons, the Plaintiffs have sufficiently stated a claim for unjust enrichment.

### E.  Cause 6: Replevin

Under New York law, "[t]o establish a claim for replevin, the plaintiff must prove two elements: (1) that plaintiff has a possessory right superior to that of the defendant; and (2) that plaintiff is entitled to the immediate possession of that property." *Jamison Bus. Sys., Inc. v. Unique Software Support Corp.*, No. CV 02-4887 (ETB), 2005 WL 1262095, at *14 (E.D.N.Y. May 26, 2005).

Defendants acknowledge that their arguments for the replevin claim are a straightforward repackaging of their other arguments that: (1) allegations are insufficient in claiming that KeyFi has possession of property at issue (as for the turnover and conversion claims); and (2) allegations for both Defendants are insufficient as they seek to enforce a contractual duty (as for the turnover, conversion, and unjust enrichment claims).

Both lack merit for the reasons set forth above. Moreover, with specific focus on the replevin caselaw, the Plaintiffs correctly distinguish both of Defendants' replevin cases as involving scenarios where the plaintiffs had also brought contract claims, making the contractual applicability undeniable, at least in the alternative. *See Aleem v. Experience Hendrix, LLC*, No. 16 CIV 9206 (ER), 2017 WL 3105870, at *5–6 (S.D.N.Y. July 20, 2017); *Usov v. Lazar*, No. 13 Civ. 818 (RWS), 2013 WL 3199652, at *7 (S.D.N.Y. June 25, 2013).

For those reasons, the Plaintiffs have sufficiently stated a claim for replevin.

### F. Cause 7: Accounting.

"Under New York law, there are four elements to a claim for equitable accounting: (1) a fiduciary relationship, (2) entrustment of money or property, (3) no other remedy and (4) a demand and refusal of an accounting." *Fuller Landau Advisory Services Inc. v. Gerber Fin. Inc.*, 333 F. Supp. 3d 307, 315 (S.D.N.Y. 2018) (quoting *Romain v. Seabrook*, No. 16 Civ. 8470, 2017 WL 6453326, at *6 n.8 (S.D.N.Y. Dec. 15, 2017)).

In turn, Plaintiffs address the elements and argue that they have established a claim for accounting because (1) Stone owed fiduciary duties to Celsius, based on his role as CEO and chief fiduciary of Celsius KeyFi (FAC ¶ 84); (2) Stone was entrusted with Celsius' coins to be managed, deployed and returned (*id.* ¶ 85); (3) Plaintiffs have no other remedy at law due to the unique nature of the assets managed and purchased by Stone, the complexity of the trading strategies Stone employed, and Stone's use of cryptocurrency mixers like Tornado Cash (*id.* ¶ 87); and (4) Defendants failed and refused to provide an accounting, despite repeated demands by Celsius (*id.* ¶¶ 28, 31, 88).

Defendants do not attack the pleading of the elements but argue that the accounting claim must be dismissed because it is actually not a claim at all, and is a remedy instead. (MTD, at 19– 20 (stating that "courts have found claims for 'accounting' to be 'remedies and not claims' because if the Plaintiff 'ultimately prevails, he will be entitled to damages and a damages calculation will have to be performed'") (quoting *In re Adelphia Commc'ns Corp.*, 331 B.R. 93, 100 (S.D.N.Y. 2005)).)

Defendants' argument is not meritorious. On its face, Defendants' argument is quite curious in contrast to the more recent *Fuller Landau* and *Romain* cases cited by Plaintiffs that plainly establish accounting as a "claim" under New York law. Furthermore, Plaintiffs observe that the court in *Adelphia* was addressing accounting under Massachusetts law and had already

found that elements of the accounting remedy/claim were not met by the claimants. (*See* Opposition, at 25 n. 18 (citing *In re Adelphia Commc'ns Corp.*, 331 B.R. 93, 100 (S.D.N.Y. 2005).).  Also, the longer quote from the court's decision there reads:

> "*[I]n the context here*, these are remedies and not claims.  If [claimant] ultimately prevails, he will be entitled to damages and a damages calculation will have to be performed, but these 'claims' are not independent causes of action."

*Adelphia Commc'ns Corp.*, 331 B.R. at 100 (emphasis added).  Notably, the "context [t]here" was that the plaintiff had also stated other claims, including for breach of contract.  *Id.* at 98–99.  The same was true in the *Est. of Albin v. Mertz, LLC,* No. 05CIV3440KMWKNF, 2006 WL 8461442, at *10 (S.D.N.Y. Mar. 15, 2006), a case that Plaintiffs cite for the general proposition that claims for remedies alone should be dismissed.

Defendants' only basis for dismissal is arguing that accounting is not a claim under New York law.  Defendants do not adequately support that argument, while Plaintiffs support that accounting is a claim under New York law.

For those reasons, the Plaintiffs have sufficiently stated a claim for accounting.

## IV.    <u>CONCLUSION</u>

For the reasons discussed above, Defendants' Motion is **DENIED.**

**IT IS SO ORDERED.**

Dated:    December 8, 2022
          New York, New York

          _____
          *Martin Glenn*
          MARTIN GLENN
          Chief United States Bankruptcy Judge