Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10964-mg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   CELSIUS NETWORK LLC,

8            Debtor.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10  Adv. Case No. 22-01139-mg

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12  CELSIUS NETWORK LIMITED et al.,

13              Plaintiffs,

14        v.

15  STONE et al.,

16              Defendants.

17  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18  Adv. Case No. 22-01140-mg

19  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20  CELSIUS NETWORK LIMITED et al.,

21              Plaintiffs,

22        v.

23  PRIME TRUST, LLC,

24              Defendant.

25  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

1                    United States Bankruptcy Court

2                    One Bowling Green

3                    New York, NY  10004

4

5                    December 5, 2022

6                    9:57 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  FRANCES F. & KEVIN SU.

Page 3

1   HEARING re Hybrid Hearing Using Zoom for Government RE:

2   Debtor's Motion Seeking Entry of an Order (I) Permitting the

3   Sale of Stablecoin in the Ordinary Course and (II) Granting

4   Related Relief. (Doc# 832, 853, 855, 895, 90 I, 922, 925,

5   933, 936, 954, 967, 970, 1043, 1058, 1076, 1085, 1086, 1186,

6   1188, 1228, 1253, 1280, 1324to 1328, 1345, 1388, 1389, 1396,

7   1400, 1406, 1412, 1414, 1416, 1417, 1418, 1430, 1463, 1464,

8   1474, 1482, 1484- 1486, 1489- 1493, 1495 to 1499, 1502-1504,

9   1506, 1507, 1511, 1515, 1516, 1517, 1519, 1533, 1535, 1537 -

10  1540, 1547, 528)Hearing set for 12/05/2022 at 10:00 am and

11  12/06/2022 at 10:00 am

12

13  HEARING re Hearing Using Zoom for Government RE: First

14  Motion to Extend Exclusivity Period for Filing a Chapter 11

15  Plan and Disclosure Statement. (Doc# 1317, 1433, 1442, 1468,

16  1470, 1471, 1473, 1475, 1476, 1477, 1487, 1479, 1494, 1536,

17  1546)

18

19  HEARING re Hearing Using Zoom for Government RE: Debtors'

20  Amended Motion for Entry of an Order Authorizing the Debtors

21  to Redact and File Under Seal Certain Confidential

22  Information Related to the Debtors Key Employee Retention

23  Plan. (Doc## 1425, 1427 to 1429)

24

25

1   HEARING re Hearing Using Zoom for Government RE: Debtor's

2   Amended Motion for Entry of an Order (I) Approving the

3   Debtors Key Employee Retention Plan and (II) Granting

4   Related Relief. (Doc# 1426, 1429)

5

6   HEARING re Adversary proceeding: 22-01139-mg Celsius Network

7   Limited et al v. Stone et al Hearing Using Zoom for

8   Government RE: Amended Motion to Dismiss Adversary

9   Proceeding. (Doc# 7, 1 7, 18, 19)

10

11   HEARING re Adversary proceeding: 22-01140-mg Celsius Network

12   Limited et al v. Prime Trust, LLC

13   Hearing Using Zoom for Government RE: Motion to Approve

14   Settlement with Prime Trust, LLC Pursuant to Rule 9019 of

15   the Federal Rules of Bankruptcy Procedure. (Doc # 13)

16

17   HEARING re Hearing Using Zoom for Government RE: Motion to

18   Approve Settlement with Prime Trust, LLC Pursuant to Rule

19   9019 of the Federal Rules of Bankruptcy Procedure.

20   (Doc# 1352)

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

**Page 5**

```
 1   A P P E A R A N C E S :

 2

 3   AKIN GUMP STRAUSS HAUER FELD, LLP

 4        Special litigation counsel for Celsius

 5        One Bryant Park

 6        New York, NY 10036

 7

 8   BY:  MITCHELL HURLEY

 9        DEAN CHAPMAN

10

11   ROCHE FREEDMAN, LLP

12        Attorneys for KeyFi & Jason Stone

13        99 Park Avenue, Suite 1910

14        New York, NY 10016

15

16   BY:  KYLE WILLIAM ROCHE

17

18   GOODWIN PROCTER LLP

19        Attorneys for Prime Trust LLC

20        The New York Times Building

21        620 Eighth Avenue

22        New York, NY 10018

23

24   BY:  HOWARD STEEL

25
```

Page 6

```
 1   KIRKLAND & ELLIS LLP

 2         Attorneys for Celsius Network, LLC

 3         300 N. LaSalle

 4         Chicago, IL 60654

 5

 6   BY:  PATRICK JAMES NASH

 7        ROSS M. KWASTENIET

 8        CHRISTOPHER KOENIG

 9        DAN LATONA

10

11   KIRKLAND & ELLIS LLP

12         Attorneys for Celsius Network, LLC

13         601 Lexington Avenue

14         New York, NY 10022

15

16   BY:  BEN WALLACE

17        GRACE BRIER

18        ELIZABETH JONES

19

20   KIRKLAND & ELLIS LLP

21         Attorneys for Celsius Network, LLC

22         1301 Pennsylvania Avenue, N.W.

23         Washington, D.C. 20004

24

25   BY:  JUDSON BROWN
```

Page 7

```
1   WHITE & CASE LLP

2        Attorneys for Official Committee of Unsecured Creditors

3        555 South Flower Street, Suite 2700

4        Los Angeles, CA 90071

5

6   BY:  AARON COLODNY

7

8   WHITE & CASE LLP

9        Attorneys for Official Committee of Unsecured Creditors

10        1221 Avenue of the Americas

11        New York, NY 10020

12

13   BY:  KEITH WOFFORD

14

15   WHITE & CASE LLP

16        Attorneys for Official Committee of Unsecured Creditors

17        111 South Wacker Drive, Suite 5100

18        Chicago, IL 60606

19

20   BY:  GREGORY F. PESCE

21

22

23

24

25
```

1   UNITED STATES DEPARTMENT OF JUSTICE

2         Attorneys for the U.S. Trustee

3         201 Varick Street, Suite 1006

4         New York, NY 10014

5

6   BY:  SHARA CLAIRE CORNELL

7         MARK BRUH

8

9   TEXAS OFFICE OF ATTORNEY GENERAL

10        PO Box 12548

11        Austin, TX 78711

12

13  BY:  LAYLA MILLIGAN

14

15  NATL ASSN OF ATTORNEYS GENERAL

16        Attorneys for Coordinating States

17        1850 M Street, NW, 12th Floor

18        Washington, DC 20036

19

20  BY:  KAREN CORDRY

21

22

23

24

25

Page 9

1   KHANUJA KULPREET

2        Pro Se

3        21 Haran Circle

4        Millburn, NJ 07041

5

6   VENABLE LLP

7        Attorneys for Ignat Tuganov

8        1270 Avenue of the Americas, 24th Floor

9        New York, NY 10020

10

11  By:  ARIE PELED

12

13  MCELROY, DEUTSCH, MULVANEY & CARPENTER

14        Attorneys for The New Jersey Bureau of Securities

15        40 West Ridgewood Avenue

16        Ridgewood, NJ 07450

17

18  BY:  VIRGINIA T. SHEA

19

20  CAMERON CREWS

21        Pro Se

22        92 Hudson Street

23        Hoboken, NJ 07030

24

25

Page 10

1   DEBORAH FRANKEL

2        Pro Se

3        29210 Heathercliff Road

4        Malibu, CA 90265

5

6   LAWRENCE PORTER

7        Pro Se

8        770 NE 69th Street, PHE

9        Miami, FL 33138

10

11   IMMANUEL HERRMANN

12        Pro Se

13        8201 Schrider Street, Apt 6

14        Silver Spring, MD 20910

15

16   ANTHONY J. DEGIROLAMO

17        Trustee

18        3930 Fulton Drive NW, Suite 100 B

19        Canton, OH 44718

20

21   GEORGES GEORGIOU

22        Pro Se

23        Hakushima Naka Machi

24        Hiroshima, 730-0002

25

Page 11

 1   DANIEL FRISHBERG

 2        Pro Se

 3        284 Monroe Drive

 4        Mountain View, CA 94040

 5

 6   MCCARTER ENGLISH, LLP

 7        Attorneys for Certain Borrowers

 8        245 Park Avenue

 9        New York, NY 10167

10

11   BY:  DAVID ADLER

12

13   WILLIS TOWERS WATSON

14        601 Lexington Avenue

15        New York, NY 10022

16

17   BY:  JOSEPHINE GARTRELL

18

19   STATE OF VERMONT

20        Attorneys for VT Department of Financial Regulation

21        89 Main Street, Third Floor

22        Montpelier, VT 05620

23

24   BY:  JENNIFER ROOD

25

Page 12

1    WASHINGTON ATTORNEY GENERAL

2         Attorneys for Washington Department of Financial

3         Institutions

4         PO Box 40100

5         Olympia, WA 98504

6

7    BY:  STEPHEN MANNING

8

9    BERNSTEIN-BURKLEY, P.C.

10        Attorneys for Stuart McLean

11        601 Grant Street

12        Pittsburgh, PA 15219

13

14   BY:  MARK LINDSAY

15

16   MILES & STOCKBRIDGE P.C.

17        Attorneys for Josh Tornetta

18        100 Light Street

19        Baltimore, MD 21202

20

21   BY:  EMILY DEVAN

22

23

24

25

Page 13

1    MILBANK, TWEED, HADLEY & MCCLOY LLP

2         Attorneys for

3         55 Hudson Yards

4         New York, NY 10001

5

6    BY:  NELLY ALMEIDA

7

8    TOGUT SEGAL & SEGAL

9         Attorneys for Ad Hoc Group of Custodial Account Holders

10        One Penn Plaza, Suite 3335

11        New York, NY 10119

12

13   BY:  BRIAN KOTLIAR

14

15   JENNER BLOCK LLP

16        Attorneys for Fee Examiners

17        1155 Avenue of the Americas

18        New York, NY 10036

19

20   BY:  CARL WEDOFF

21

22

23

24

25

Page 14

1    TROUTMAN PEPPER HAMILTON SANDERS LLP

2         Attorneys for Ad Hoc Group of Withhold Account Holders

3         4000 Town Center, Suite 1800

4         Southfield, MI 48075

5

6    BY:   DEBORAH KOVSKY-APAP

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2

3     WITNESSES:              DIRECT:     CROSS:      REDIRECT: RECROSS:

4     CHRISTOPHER FERRARO   28           32

5     ROBERT COMPAGNA       47           55

6     OREN BLONSTEIN        66           82/86/    101

7                                        96/98/99

8

9     EXHIBITS:                                              PAGE:

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  Again, we're starting the recording for

3     Celsius Network LLC, Case Number 22-10964.  This is for the

4     hearing on December 5, 2022 at 10 a.m.  For the parties in

5     the courtroom from Kirkland, can you please give your

6     appearances -- start giving your appearances and specify who

7     is in the courtroom and who -- can you hear me?

8              MR. KOENIG:  Good morning.  Good morning.  It's

9     Chris Koenig.  We can hear you.

10             CLERK:  Okay.  Thank you, Chris.

11             MR. KOENIG:  Good morning, and for the Debtors

12    today, it will be Patrick Nash, Jr., Ross Kwasteniet, Chris

13    Koenig, Dan Latona, Judson Brown, TJ McCarrick, Ben Wallace,

14    Grace Brier, and we're all here in person.

15             CLERK:  Thank you, and are there any --

16             MR. KOENIG:  Thank you.

17             CLERK:  Thank you so much.  Are there any parties

18    from Kirkland that will be speaking on the record this

19    morning that are appearing using Zoom?  Okay.  I'm going to

20    take that as a no.  All right.  Do we have creditors

21    committee counsel?

22             MR. COLODNY:  Yes.  Hi, Deanna.  It's Aaron

23    Colodny, from White & Case, on behalf of the Official

24    Committee of Unsecured Creditors.  With me today will be my

25    partners, Greg Pesce, Sam Hershey and David Turetsky and I

Page 17

1   believe Keith Wofford is also on the Zoom.

2             CLERK:  Okay.  Thank you very much.

3             MR. WOFFORD:  That is correct.

4             CLERK:  Thank you, Keith.  Anyone from the U.S.

5   Trustee's office, if you can come to the podium and make

6   your appearance.

7             MS. CORNELL:  Good morning, Deanna.  Shara Cornell

8   and Mark Bruh on behalf of the Office of the United States

9   Trustee.

10            CLERK:  Okay.  Thank you.  Is Linda Rifkin going

11  to be joining separately using Zoom?

12            MS. CORNELL:  She may be joining via Zoom.  Yes.

13            CLERK:  Okay.  Thank you.

14            MS. CORNELL:  Thank you.

15            CLERK:  All right.  Are there any other parties in

16  the courtroom?  Come up to the podium one at a time and give

17  your appearance.  Again, any other parties in the courtroom

18  that will be speaking on the record, please come up to the

19  podium one at a time and give your appearance.

20            All right.  For the parties that are on Zoom,

21  Deborah Kovsky, are you going to be speaking on the record

22  this morning?  Again, Deborah or anyone from Troutman, are

23  you going to be speaking on the record this morning?  All

24  right.  (indiscernible) maybe one at a time, if the parties

25  can unmute and start giving their appearances if they're

1    speaking on the record.  You can use the raise hand function

2    and we'll wind you up one at a time and take your

3    appearance.  All right.  Josephine -- okay.  Sorry.  I think

4    David, David Adler, you're first.

5              MR. ADLER:  Good morning, Deanna.  Can you hear

6    me?

7              CLERK:  I can.

8              MR. ADLER:  This is David Adler, from McCarter

9    English, on behalf of certain borrowers.  I do not intend to

10   speak this morning.  But I will be speaking this afternoon.

11             CLERK:  Okay.  Thank you.

12             MR. ADLER:  Thank you.

13             CLERK:  You're welcome.  We'll take separate

14   appearances at the afternoon hearing as well.  All right.

15   Next, Josephine Gartrell.

16             MS. GARTRELL:  Good morning.  Josephine Gartrell,

17   from Willis Towers Watson, on behalf of the declarants.

18             CLERK:  Thank you.

19             MS. GARTRELL:  Thank you.

20             CLERK:  All right.  Arie Peled?

21             MR. PELED:  Good morning.  Arie Peled, of Venable,

22   LLP, on behalf of creditor, Ignat Tuganov.

23             CLERK:  Thank you.

24             MR. PELED:  Thank you.

25             CLERK:  Layla?

1              MS. MILLIGAN:  Good morning.  Layla Milligan, with

2      the Texas attorney general's office, appearing on behalf of

3      the Texas State Securities Board and Texas Department of

4      Banking.

5              CLERK:  All right.  Thank you.

6              MS. MILLIGAN:  Thank you.

7              CLERK:  All right.  Jennifer Rood?

8              MS. ROOD:  Jennifer Rood, on behalf of the Vermont

9      Department of Financial Regulation.

10             CLERK:  Okay.  Thank you.  Stephen Manning?

11             MR. MANNING:  Stephen Manning, on behalf of the

12     Washington State Department of Financial Institutions.

13             CLERK:  Thank you.  Virginia?

14             MS. SHEA:  Good morning.  Virginia Shea, from

15     McElroy, Deutsch, Mulvaney & Carpenter, on behalf of the New

16     Jersey Bureau of Securities and Nicole Leonard of my office

17     may also be appearing.

18             CLERK:  All right.  Thank you very much.  All

19     right.  Keith Wofford?

20             MR. WOFFORD:  Yes.  Good morning.  Keith Wofford,

21     from White & Case, on behalf of the committee.  As noted

22     before, my colleagues are in the courtroom.

23             CLERK:  All right.  All right.  Mark Lindsey?

24             MR. LINDSAY:  Good morning.  Yes.  Mark Lindsay,

25     Bernstein-Burkley, on behalf of several Earn accounts,

Page 20

1    customers, Stewart McClain, Keith and Jennifer Riles, Kim

2    David Flora and Brett Flora and Courtney Burkes Steadman.

3                CLERK:  Thank you.  Emily Devan?

4                MS. DEVAN:  Good morning.  This is Emily Devan, of

5    Miles & Stockbridge.  With me on the call is my colleague,

6    Joel Perrell, and we're here on behalf of creditor, Josh

7    Tornetta.

8                CLERK:  Okay.  Thank you.  All right.  Are there

9    any additional parties that have not given their appearance?

10   Rebecca, you -- Rebecca Gallagher?  Does she have a question

11   or --

12               MR. DEGIROLAMO:  Yes.  Tony DeGirolamo,

13   representing Celsius customer, Eric Wohlwend.

14               CLERK:  I'm sorry.  Can you say who you are

15   representing again?

16               MR. DEGIROLAMO:  Yes.  Eric Wohlwend, W-O-H-L-W-E-

17   N-D.

18               CLERK:  Okay.  Thank you.

19               MS. GALLAGHER:  She never unmuted me.

20               CLERK:  Yes.  Rebecca, did you need to speak?

21               MS. GALLAGHER:  Yes.  I will be speaking today as

22   a pro se.

23               CLERK:  Okay.  So Rebecca Gallagher.  Thank you.

24               MR. HERRMANN:  Immanuel Herrmann, pro se, Celsius

25   creditor.

Page 21

1          CLERK:  Thank you, Mr. Herrmann.  All right.  For

2     the parties that have joined, is there anyone that is going

3     to be speaking on the record this morning that has not given

4     their appearance yet?  If you are going to be speaking on

5     the record and have not given your appearance, please raise

6     your hand and I will ask you to unmute one at a time and

7     take your appearance.

8          All right.  The party that joined as Kirkland, can

9     you please identify yourself for the record?  Again, the

10    party that joined just as Kirkland, can you just identify

11    yourself?  If you do not identify yourself, I'll have to put

12    you back in the waiting room.  All right.  Last call.  The

13    party that joined as Kirkland, if you could please identify

14    yourself.

15          MS. JONES:  Deanna, this is -- this is Elizabeth

16    in the courtroom.  It may be a Kirkland listen-only line.

17    I'll just check with our team really fast.

18          CLERK:  Yeah.  If you could, that would be great.

19    Thank you.

20          MS. JONES:  Yeah.

21          CLERK:  All right.  Georges Georgiou?  My

22    apologies if I mispronounced your name.  Are you making an

23    appearance this morning?  Are you speaking?

24          MR. GEORGIOU:  I am.  Yes, please.  Georges

25    Georgiou, pro se creditor.

Page 22

```
 1              CLERK:  Thank you so much.  All right.  Karen

 2    Cordry?

 3              MS. CORDRY:  Yes.  Karen Cordry, National

 4    Association of Attorneys General, and I'm appearing on behaf

 5    of the coordinating states listed on my motion and I'm going

 6    to speak briefly today.

 7              CLERK:  All right.  All right.  So is there anyone

 8    here for the 2 o'clock hearing?  We're going to -- I mean, I

 9    don't know if we're going to go straight through.  I'm

10    assuming we're going to take a recess and you can rejoin for

11    2 o'clock and we'll be taking separate appearances for 2

12    o'clock.  So I just want to inform everyone of that.  Nelly

13    Almeida?

14              MS. ALMEIDA:  Good morning.  Nelly Almeida, from

15    Milbank LLP, representing certain holders of preferred

16    equity.  I don't expect to be speaking.  But I wanted to

17    make the appearance.

18              CLERK:  All right.  Thank you.  Stephen Manning?

19              MR. MANNING:  Yeah.  I entered my appearance

20    earlier.  Just to clarify, I don't plan on speaking this

21    morning.

22              CLERK:  All right.  Thank you.  All right.  Bryan

23    Kotliar?

24              MR. KOTLIAR:  Hi.  Good morning.  Bryan Kotliar,

25    of Togut, Segal & Segal, counsel to the ad hoc group of
```

1    custodial accountholders.  I don't plan on speaking today.

2              CLERK:  Thank you.  All right.  Carl Wedoff?

3              MR. WEDOFF:  Hi.  Good morning, Deanna.  This is

4    Carl Wedoff, from Jenner & Block, on behalf of the examiner.

5    We don't plan on speaking this morning either.  But I did

6    want to note my appearance.

7              CLERK:  All right.  Thank you, Carl.

8              MS. JONES:  Deanna, this is Elizabeth in the

9    courtroom again.  We were the Kirkland listen-only line, our

10   Chicago office.  Just let us know if you'd like them to

11   unmute and announce.  It's just a listen-only line.

12             CLERK:  Oh, that's fine.  I just wanted to make

13   sure.  Thank you.

14             MS. JONES:  Thank you.

15             CLERK:  All right.  For the parties that have

16   joined, if anyone is going to be speaking on the record this

17   morning, please unmute your line one at a time and just give

18   your appearance and also please use the raise hand function

19   and I'll take your appearances one at a time.

20             All right.  Any of the parties that have joined,

21   please let me know if you will be speaking on the record

22   this morning, and if you'd like to make an appearance.  If

23   so, please use the raise hand function.

24             CLERK:  All rise.

25             THE COURT:  All right.  Good morning, everyone.

Page 24

```
 1    Please be seated.

 2              CLERK:  Good morning, Judge.

 3              THE COURT:  Yes, Deanna?

 4              CLERK:  I think Mr. Frishberg wanted to make an

 5    appearance, and then would you like me to read into the

 6    record the language for the hearing?

 7              THE COURT:  Yes.  But please, I'm just

 8    reconnecting on my computer.

 9              CLERK:  Okay.  Mr. Frishberg, if you could unmute

10    and give your appearance, please.

11              MR. FRISHBERG:  Yeah.  Daniel Frishberg, pro se.

12              CLERK:  All right.  Thank you.  All right.  Please

13    pay attention to the following information.  All persons are

14    strictly prohibited from making any recording of court

15    proceedings, whether by video, audio, screenshot or

16    otherwise.  Violation of this prohibition may result in the

17    imposition of monetary and nonmonetary sanctions.

18              The clerk of the court maintains an audio

19    recording of all proceedings which constitutes the official

20    record.  Parties must state their name each time they speak

21    on the court record.  A party waiting to join with a full

22    first and last name will be admitted from the waiting room.

23    Parties that join with initials, partial name, a designation

24    such as iPhone, et cetera, will not be admitted.

25              THE COURT:  It's just going to take me another
```

Page 25

1    minute here to connect.

2              CLERK:  Sure.

3              THE COURT:  All right.  Good morning, everyone.

4    We have a long agenda today, both this morning and this

5    afternoon.  So why don't we get started.  We'll go -- the

6    second amended agenda was posted on the docket this morning.

7    It's ECF Docket Number 1595.  So let's begin.  Who's going

8    to begin for the debtors?

9              MR. NASH:  Good morning, Your Honor.  Pat Nash,

10   from Kirkland & Ellis, on behalf of the debtors.  Your Honor

11   --

12             CLERK:  Sorry, Judge.  We can't hear you.  Can you

13   hear me?

14             THE COURT:  All right.  I think the problem was

15   two connections.

16             CLERK:  Yeah.

17             THE COURT:  Go ahead, Mr. Nash.  Can you hear Mr.

18   Nash, Deanna?

19             CLERK:  Yes, I can.  Pedro is on his way down to

20   help me.

21             THE COURT:  That's okay.  We're fine, I think.  Go

22   ahead, Mr. Nash.

23             CLERK:  Okay.  Thank you.

24             MR. NASH:  Your Honor, in connection with the

25   motion, the debtors filed four declarations.  It would be

Page 26

1    our preference and intent, Your Honor, to make our

2    evidentiary case by way of the declarations and make those

3    declarants available for cross-examination.

4            THE COURT:  Yeah.  So why don't you offer the

5    declarations in evidence and, in due course, each one will

6    be available for cross-examination.

7            MR. NASH:  Your Honor --

8            THE COURT:  Identify the declarant and the ECF

9    docket number for the declaration.

10           MR. NASH:  Your Honor, if it pleases the Court, we

11   had discussed with the UCC putting each declarant on just to

12   identify themselves for the Court and a little bit about

13   their background and then move to get the declaration

14   admitted, thereby giving the declarant an opportunity to

15   warm up, so to speak.

16           THE COURT:  All right.  Do you want -- do you have

17   -- I also -- you posted a little while ago a presentation as

18   well.

19           MR. NASH:  I don't intend to open the hearing with

20   that presentation, Your Honor.

21           THE COURT:  All right.  So how do you wish to

22   proceed then, Mr. Nash?

23           MR. NASH:  I think, Judge, unless -- if Your Honor

24   thinks that you would benefit by way of opening statements,

25   we could do that, although I'm mindful that if I make an

Page 27

1   opening statement, then everybody makes an opening

2   statement.

3              THE COURT:  I've read everything.

4              MR. NASH:  I know you have, Your Honor.  So if

5   it's okay with you, Judge, I think we should get right in to

6   the evidence and --

7              THE COURT:  That's fine.

8              MR. NASH:  All right.  Thank you, sir.  I'm going

9   to turn the podium over to my partner, Mr. Brown.

10             THE COURT:  Okay.

11             MR. BROWN:  Good morning, Your Honor.  Judson

12  Brown, from Kirkland & Ellis, on behalf of the Debtors.

13  Your Honor, at this time, the debtors call Chris Ferraro to

14  the stand.

15             THE COURT:  All right.  Mr. Ferraro, if you would

16  come up and raise your right hand and you'll be sworn.

17             CLERK:  Please raise your right hand.  Do you

18  solemnly swear or affirm that the testimony you're about to

19  give this Court will be the truth --

20             MR. FERRARO:  Yes.

21             CLERK:  -- the whole truth and nothing but the

22  truth?

23             MR. FERRARO:  Yes, I do.

24             THE COURT:  All right.  Please have a seat.  Go

25  ahead, Mr. Brown.

 1                MR. BROWN:   Thank you, Your Honor.

 2                DIRECT EXAMINATION OF CHRISTOPHER FERRARO

 3       BY MR. BROWN:

 4       Q    Could you please introduce yourself to the Court?

 5       A    Hi.  My name is Christopher Ferraro.  I'm the acting

 6       chief executive officer, chief restructuring officer and

 7       chief financial officer for Celsius, the debtors.

 8       Q    When did you join Celsius, Mr. Ferraro?

 9       A    I joined March 21, 2022.

10       Q    In the approximately nine months that you've been with

11       the company, can you just give the Court a brief description

12       of the roles that you've had with Celsius?

13       A    Yes.  I started off managing financial planning and

14       analysis, so financial analysis as well as investor

15       relations.  That role that I had in that capacity up and

16       through July 11, 2022, where I was appointed the CFO right

17       before the petition.

18            I held that role, and I continue to hold that role

19       until this day.  My responsibilities widened on September

20       27th, I believe, 2022, where I was named acting chief

21       restructuring officer or, sorry, chief restructuring officer

22       and acting chief executive officer.

23       Q    Now you said you joined Celsius in March of 2022.  Can

24       you just describe for the Court what you did before joining

25       Celsius at that time?

Page 29

1   A     Yeah.  I had a long career with JP Morgan and Chase

2   where I ran financial analysis and many other kind of roles

3   within the financial organization, spent nearly two decades

4   there.

5        Then I went to Cerberus Advisory Company in which I

6   worked on a few kind of legacy positions, some banks in

7   Germany, restructuring costs, trying to improve

8   profitability, optimizing the balance sheet.  And then I

9   went on a long sabbatical.  I own a couple farms in Ecuador.

10  So I spent two to three years kind of on the ground managing

11  and developing those farm.

12  Q    So why did you decide to join the crypto sector in

13  March of this year, Mr. Ferraro?

14  A    I think it's a very exciting technology that has

15  massive kind of impact on society.  My farms are in very

16  rural areas of Ecuador, impoverished, very little

17  opportunity.

18       And the first day I'm seeing folks lined up outside the

19  banks on Fridays waiting in line for hours when they need to

20  be working to feed their family I think had an effect on me,

21  along with, you know, it's a technology space.  So there's

22  great flexibility in where I work.  My family's in Quito,

23  Ecuador.  So I spend part of the year there and I'm also

24  able to spend part of the year where I'm from in Seattle,

25  Washington.

```
1    Q    Now Mr. Ferraro, I want to turn to the reason we're

2    here today, the debtors' motion to establish ownership of

3    Earn assets and to sell certain stablecoin.  Did you file a

4    declaration in support of the debtors' motion?

5    A    Yes, sir.  I did.

6    Q    I want to take a look at that.

7              MR. BROWN:  Your Honor, may I approach?

8              THE COURT:  Yes.  Go ahead.  So your office

9    delivered a lot of large binders today.

10             MR. BROWN:  Your Honor, I have the docket number,

11   if that's helpful.

12             THE COURT:  Well, do you know -- well, if you have

13   extra copies --

14             MR. BROWN:  I do.

15             THE COURT:  All right.

16             MR. BROWN:  I absolutely do, Your Honor.

17             THE COURT:  Let's do that.

18             MR. BROWN:  May I?

19             THE COURT:  Yeah.  Please.  Thank you.

20             MR. BROWN:  Mr. Ferraro.

21   BY MR. BROWN:

22   Q    Mr. Ferraro, I've handed you a document that's marked -

23   - or sorry, that was filed on the docket at Entry 1326.  Do

24   you have that in front of you?

25   A    Yes.  I do.
```

```
1    Q     And do you recognize it?

2    A     Yes.  I do.

3    Q     What is it?

4          THE COURT:  Just hang on a second.  Whoever is

5    connecting over Zoom needs to mute their connection.  If you

6    don't, you will be disconnected.  Go ahead.

7          CLERK:  Sorry, Judge.

8          THE COURT:  Yes?

9          CLERK:  Can you see the document on your side?

10         THE COURT:  No.

11         MR. BROWN:  So actually, thank you, Deanna.  If

12   you can give my colleague, Jose Lopez, privileges to share

13   the document, we can share it on the screen.

14         THE COURT:  Okay.

15         CLERK:  Okay.  Use the -- thank you.

16         MR. BROWN:  Thank you.

17         THE COURT:  Thanks, Deanna.

18   BY MR. BROWN:

19   Q    And now, Mr. Ferraro, you have in front of you and

20   we've put on the screen the document that was filed at

21   Docket Entry 1326.  What is this document, sir?

22   A    This is my declaration in support of the motion

23   regarding ownership of Earn assets and the sale of certain

24   stablecoins.

25   Q    And Mr. Ferraro, is the testimony in here true and
```

1    accurate?

2    A    Yes, sir.

3    Q    And is that your signature at the end of the

4    declaration, sir, electronically?

5    A    Yes, sir.  It's my electronic signature.

6    Q    And do you adopt the testimony in this declaration as

7    your testimony here today, Mr. Ferraro?

8    A    Yes, I do.

9         MR. BROWN:  Your Honor, at this time, the Debtors

10   would offer Mr. Ferraro's declaration filed at Docket Entry

11   1326 into evidence as his direct examination.  He is

12   obviously here and subject to cross-examination.

13        THE COURT:  Are there any objections to the Court

14   admitted into evidence Mr. Ferraro's declaration, ECF 1326?

15   All right.  Hearing none, it's admitted into evidence.

16        MR. BROWN:  Your Honor, that's it for me at this

17   time.

18        THE COURT:  All right.  Let me ask who within the

19   courtroom, if anyone, wishes to cross-examine Mr. Ferraro.

20        Ms. Cornell?

21        So Shara Cornell, of the U.S. Trustee's office, is

22   approaching the podium.

23        MS. CORNELL:  Thank you, Your Honor.

24        THE COURT:  Good morning.

25        CROSS-EXAMINATION OF CHRISTOPHER FERRARO

Page 33

1    BY MS. CORNELL:

2    Q    Mr. Ferraro, are you familiar with the budget filed on

3    the Court docket at ECF Number 1111, on October 17, 2022?

4    A    I'm familiar with the capital budgets that have been

5    filed on the docket.  Yes.

6              MS. CORNELL:  May I approach, Your Honor?

7              THE COURT:  Certainly.

8              MS. CORNELL:  This is United States Trustee's

9    Exhibit A.

10             THE COURT:  I'm sorry?

11             MS. CORNELL:  Exhibit A.

12             THE COURT:  Thank you.

13             THE WITNESS:  Thank you.

14   BY MS. CORNELL:

15   Q    Mr. Ferraro, are you familiar with the following budget

16   that I just provided to you marked as United States

17   Trustee's Exhibit A?  This was provided to the United States

18   Trustee's office on December 3, 2022.

19   A    Yes, ma'am.

20   Q    Is the document in front of you dated November 15,

21   2022, weekly cash flow forecast, consolidated Debtors?

22   A    Yes.

23   Q    To your knowledge, has this document been filed yet?

24   A    I don't specifically know.  if it's on the docket, I

25   assume it has.

Page 34

1    Q    It has not been filed.

2    A    Oh.  Then --

3              THE COURT:  Well, then I misunderstand because you

4    identified it as ECF Document 1111.

5              MS. CORNELL:  I'm sorry, Your Honor.  This is a

6    new -- this is a new budget.  That's why I'm -- this isa

7    new budget that was only provided to the United States

8    Trustee's office.

9              THE COURT:  Okay.  So this is not ECF 1111.

10             MS. CORNELL:  This is not ECF Docket Number 1111.

11   This is a different budget dated November 15, 2022, provided

12   to the United States Trustee on December 3, 2022.

13             THE COURT:  Okay.

14   BY MS. CORNELL:

15   Q    Do you know when this document will be filed with the

16   Court?

17   A    We usually file one of these once per month along with

18   the coin report and maybe the MORs.

19   Q    Sure.  The last budget was filed on October 17, 2022.

20   Today is December 5, 2022.  Can you and your counsels commit

21   to filing an updated budget with the Court within the next

22   two days?

23             THE COURT:  Ms. Cornell, just conduct your cross-

24   examination.

25             MS. CORNELL:  Okay.

1              THE COURT:  Okay?

2              MS. CORNELL:  Okay.

3    BY MS. CORNELL:

4    Q    According to the budget that you provided to our

5    office, when will the Debtors, on a consolidated basis, need

6    an infusion of liquidity?

7    A    Late first quarter 2023.  It gets quite tight in

8    February.  And then in March, we'll need additional

9    liquidity.

10   Q    For the record, what does need an infusion of liquidity

11   mean to you?

12   A    We need (indiscernible) cash to pay our obligations,

13   namely employees, professional fees, other vendor expenses,

14   et cetera.

15   Q    So according to your testimony just now, you believe

16   that you'll need an infusion of liquidity close to the end

17   of February/early March of 2023; is that correct?

18   A    Yes.

19   Q    Will any of the individual Debtors, not on a

20   consolidated basis, require an infusion of liquidity prior

21   to that date?

22   A    We -- I believe on the docket, for the last publicly

23   filed one, had mining kind of needing liquidity in January

24   of 2023.  Subsequently, now these are internal kind of

25   forecasts, which should be posted shortly, it looks as

Page 36

1     though mining and the consolidated Debtors are kind of in

2     the same position now, really mid-March, March --

3             THE COURT:  When you say same position, what do

4     you mean?

5             THE WITNESS:  Both needing liquidity around the

6     same time in March.  This was because some of the mining

7     kind of power deposits, we originally had forecasted that

8     they would all be fixed-rate blocks.  So we'd be locking in

9     fixed hedges which come up with higher deposits.

10            We have now decided that we are going to, based

11    upon kind of the market backdrop, do variable blocks.  We

12    can fix these blocks at any point in time.  They come with

13    lower power deposits upfront.  So that kind of pushed out

14    the cash flows a little bit for mining and put us in a

15    better spot.

16    BY MS. CORNELL:

17    Q    Okay.  So just for clarification and for the record,

18    it's your testimony today that both on a consolidated basis

19    and on an individual basis for each of the Debtors, that

20    they will not need an infusion of liquidity or cash until

21    March of 2023?

22    A    That's my latest understanding.  Yes.

23    Q    On either a consolidated basis or an individual Debtor

24    basis, are the projections that you just provided taking

25    into account the Prime Trust settlement?

Page 37

1    A    It doesn't impact this.  The Prime Trust settlement

2    will be returning coins, not to my understanding.

3    Q    The DeFi payments?

4            THE COURT:  I'm sorry?  Ask your question again.

5            MS. CORNELL:  Oh, I'm sorry.

6    BY MS. CORNELL:

7    Q    On either a consolidated basis or an individual Debtor

8    basis, are the projections you just provided taking into

9    account the DeFi payments?

10   A    To pay off what we requested relief to pay off for DeFi

11   (indiscernible) around $3 million.  Yes.  That's embedded

12   in, to my understanding off memory.  Yes.  It's about $3

13   million.

14   Q    Okay.  On either a consolidated basis or on an

15   individual Debtor basis, are the projections you just

16   provided taking into account the proposed sale of GK8?

17   A    No.

18   Q    At what point would your projections include the

19   proceeds of the sale of GK8?

20   A    When we believe it's certain and likely and probable

21   that it will close and we understand the timing.  So we're

22   hopefully getting closer and closer to that point.  But

23   right now, given the backdrop, it's hard to, with certainty,

24   include that type of deal closing in the cash flows given,

25   you know, the main fear here is entering kind of

Page 38

```
 1    administrative insolvency and not being able to fund

 2    (indiscernible) obligations.

 3    Q    But to your knowledge, the company or Alvarez, in

 4    conjunction with the company, have not performed a separate

 5    cash flow budget forecast taking into account the GK8 sale.

 6    A    We know roughly what those proceeds would be if they

 7    come to the estate.  So that would give us, you know, call

 8    it another month-and-a-half to two months of runway.

 9    Q    Do the Debtors support any non-Debtor entities' ongoing

10    operations?

11    A    We have push funding (indiscernible) intercompany

12    lending to some of the non-Debtors.  The Israeli entity and

13    the UK entity have received some funding.  Yes.

14    Q    On the budget that was marked as United States

15    Trustee's Exhibit A, can you point to any line items that

16    would deal with non-Debtor disbursements?

17    A    I'm not -- I can't remember off memory if we had any

18    additional disbursements funded to the non-Debtors in this

19    forecast.  GK8 is to the tune of around $500,000 per month

20    as kind of their funding need.  And I don't have the Israeli

21    entity off the top of my mind.  So it could be an additional

22    million dollars or something that wasn't included here.  But

23    typically we would include those required fundings on the

24    Debtors, consolidated Debtors' statement.

25    Q    Okay.  As of today's date, the budget that is marked as
```

Page 39

1    United States Trustee's Exhibit A does not break out those

2    types of costs.

3             THE COURT:  I don't understand your question.

4             MS. CORNELL:  I'm saying that this budget does not

5    break that out, and it's --

6             THE COURT:  Doesn't break out what?

7             MS. CORNELL:  Any payments or line items for

8    ongoing operational expenses for non-Debtor entities.

9    BY MS. CORNELL:

10   Q    Is that accurate?

11   A    Yeah.  It's not listed here in detail.  Like I said,

12   it's to the tune of around a half a million dollars a month

13   for GK8 and I think Israel is close to that as well, the

14   Israeli entity.  So maybe a million a month.  So if there

15   was a couple months' funding needed, it would be a total of

16   about $2 million, which would be included, to my

17   understanding, in the numbers.  It's just not broken out

18   separately to your point.

19   Q    If the preferred shareholders succeed in their

20   assertion that the value for GK8 and/or mining inure to the

21   preferred shareholders, do you anticipate any type of

22   recoupment of those operational funds paid during the

23   pendency of this bankruptcy case?

24   A    There's intercompany loans.  So I would assume that the

25   loans would have to be extinguished in that example that you

1    gave, Ms. Cornell.

2    Q    What about, for example, if we were considering what

3    you suggested was about a $500,000 ongoing monthly payment

4    to GK8?  If GK8, as the preferred shareholders assert, if

5    the value of GK8 actually inures to the preferred

6    shareholders, do the Debtors intend to recoup the

7    operational expenses that they're expending at this point in

8    time?

9    A    That would be my understanding.

10   Q    Okay.  Have the Debtors explored other avenues other

11   than the proposed sale of $18 million worth of stablecoin?

12   A    Yes.  We have.  You know, we looked at all of the

13   different funding stack, all of the different opportunities.

14   The cheapest is the discussion that we're having here today

15   about selling stablecoin.  It comes with really no

16   transaction costs, no borrowing costs.

17       The most expensive would be debtor-in-possession

18   financing.  This could be anywhere of 20-plus percent kind

19   of cost to the estate per year.  And, you know, then in

20   between you have kind of secured financing on DeFi

21   (indiscernible) or through centralized counterparties which

22   carries its own risk, right.  As we've all read in the

23   newspaper, these types of lending agreements would require

24   us to post collateral.  And given the backdrop, at least in

25   the cryptocurrency industry, that carries a risk there that

1    your collateral may not be returned.

2         So probably the cheapest is stablecoin, and the most

3    expensive is PIP financing, DeFi borrowings and kind of

4    centralized counterparties in the mix.

5    Q    Would the stablecoin that you're seeking to sell today

6    be used as collateral for such a debtor-in-possession loan

7    in the future?

8    A    Not to my understanding, no.

9    Q    To your understanding, could they be used?

10   A    It wouldn't make sense to pay interest to borrow

11   (indiscernible) basically something that's exchangeable for

12   (indiscernible).  We would be paying 20, 25 percent out for

13   what effectively is interchangeable currencies.

14   Q    Okay.  Would the sale of the stablecoin you seek to

15   sell today impact a potential in-kind distribution to

16   creditors?

17   A    The way I view it is it's all property of the estate.

18   So everything impacts the distribution to creditors.  The

19   more the case extends, right, the less available to them,

20   the most costs there are.  So I mean, it's not really the

21   sale of stablecoins that impacts the estate.  It's more of

22   kind of the passage of time and the expense related to the

23   case.

24   Q    To your knowledge, have the Debtors exchanged any other

25   types of cryptocurrency for stablecoins postpetition?

Page 42

1    A     Postpetition, no.  There's no coin movement.  We're not

2    allowed to exchange or trade coins or liquidate coins

3    without Court approval.

4              THE COURT:  Let me ask you a question, Mr.

5    Ferraro.  I think at the first day hearing, Mr. Nash,

6    Debtors' counsel, Mr. Nash, said that the Debtors hoped to

7    have an in-kind distribution to creditors, in-kind meaning

8    whatever type of crypto they deposited, they would receive a

9    distribution in kind.

10             If the Debtors were to sell all of the stablecoin,

11   if the Court determined it was property of the estate and

12   the Debtor sold all of that stablecoin, I think this goes to

13   Ms. Cornell's question.  How would the Debtor be able to

14   make an in-kind distribution of stablecoin to the creditors,

15   the accountholders who had deposited stablecoin?  You

16   wouldn't have it anymore.

17             THE WITNESS:  Yeah.  That's a good point.  My

18   understanding is that as we get cash in the door, we will be

19   converting that back to coin to distribute.  So cash would

20   convert back to coin for in-kind distribution.  So whether

21   it's stablecoin sold from (indiscernible) if we collect on

22   EFH, that'll go back into purchasing coin that will then be

23   returned to the estate.

24             THE COURT:  Thank you.

25             THE WITNESS:  So it's really the usage of the cash

Page 43

1   and the resources.

2            THE COURT:  Thank you.  Go ahead, Ms. Cornell.

3            MS. CORNELL:  Thank you.

4   BY MS. CORNELL:

5   Q    How was it determined that $18 million worth of

6   stablecoin should be sold?

7   A    Yeah.  So we looked at our total stablecoin holdings,

8   and I believe Robert Compagna's declaration laid this out in

9   the back, we look at what's in the main Fireblocks account

10  as well what's in the custody workspace and then we reduce

11  all of the stablecoin, what we're referring to is reserved

12  liabilities, including custody, withheld and any collateral

13  that was posted as part of the borrower's program.

14           THE COURT:  That's how you got to the $18 million?

15           THE WITNESS:  That's how we get to the $18

16  million, yeah, which is effectively the stablecoin related

17  to the (indiscernible).

18  BY MS. CORNELL:

19  Q    To your knowledge, will the Debtors seek to sell

20  additional stablecoin in the future for liquidity purposes?

21  A    No.  This is -- we need the rest in order to kind of

22  allow for the custody and withheld (indiscernible) and we're

23  holding back some due to the borrowers' kind of collateral

24  program given that that's a key kind of legal question

25  outstanding.

1            THE COURT:  Is the $18 million all of the

2     stablecoin other than withhold, custody, borrowing?

3            THE WITNESS:  That's absolutely correct, Your

4     Honor.  Yes.

5            THE COURT:  Okay.

6     BY MS. CORNELL:

7     Q    What will the proceeds of the sale of stablecoin today

8     be used to fund?

9     A    Yeah.  So it will be used to fund payroll.  It will be

10    used to fund vendor expenses, non-labor expenses.  It's used

11    to fund all of the people in the courtroom sitting here

12    today.  It's a very expensive case.  So Debtors' advisor,

13    committee advisors, ad hoc groups, U.S. Trustee, et cetera.

14    So, you know, this is a very complex and long -- it appears

15    -- it feels at least from me sitting --

16            THE COURT:  I think the ad hoc committees would

17    probably like very much that you said they would be paid by

18    the Debtors because (indiscernible) --

19            THE WITNESS:  Sorry.  Strike that.  But it's a

20    very expensive case, and it has a lot of complex items in

21    there.  So it'll largely go to fund the case and then also

22    some of the internal processes.

23    BY MS. CORNELL:

24    Q    So to confirm for the record, the proceeds from the

25    sale today will not go to the mining business?

Page 45

1   A    I mean, mining will need liquidity sometime in March.

2   So if we have to -- we'll have to find liquidity from

3   mining.  That could either be done through an intercompany

4   loan or it could be done through selling other mining

5   assets, say rigs.

6       We have some coupons for the manufacturers for credits

7   because the rig costs have come down.  So, I mean, there are

8   things that potentially we could do to raise liquidity in

9   mining.  But at some point in time, mining will need

10  additional liquidity . if that would be done, it would

11  likely be done with an intercompany loan, I would assume.

12  Q    So is it your testimony here today that the majority of

13  the proceeds of the sale of stablecoin will go to fund the

14  reorganizational expenses in this case, including Chapter 11

15  expenses and professional fees?

16  A    Yes.

17  Q    To your knowledge, can you estimate on a monthly basis

18  what that burn rate would be?

19  A    So the burn rate related to kind of advisors is between

20  $15 to $20 million per month.  As I stated before, Ms.

21  Cornell, the mining business is largely from an operational

22  standpoint cash-flow positive.  There are some kind of tail

23  end buildouts and power deposits, sales and use tax as we

24  employ rigs that still need to go out through kind of the

25  first quarter.  But in general kind of mining is self-

1  sustainable once we get through that.  And then the non-

2  mining Debtors still has a small burn rate.  But we've cut

3  expenses drastically 70 to 80 percent and that burn rate is

4  really minimized now.

5  Q   Will any of the proceeds from the sale of stablecoin

6  here today be used -- just one moment.  Will any of the

7  proceeds of sale of stablecoin today be used to pay sales

8  and use taxes?

9  A   Again, back to the mining needs, right, when I say by

10 the end of the March, we will need to fund mining, the sales

11 and use taxes are more early on in the quarter, the first

12 quarter 2023.  So we should have liquidity to pay for those

13 as those get -- as those rigs get deployed.  So I think of

14 cash as fungible within mining.  So it's hard for me to say

15 what every dollar is used for.  But in theory we should have

16 enough to pay, as we deploy rigs, the sales and use tax.

17 But in March, we will need liquidity for mining.

18              MS. CORNELL:  Okay.  Thank you.  That's all today.

19              THE COURT:  Any other cross-examination of Mr.

20 Ferraro?  You're excused.  Thank you very much.  Well, I

21 should -- any redirect?

22              MR. BROWN:  No, Your Honor.

23              THE COURT:  No?  You're excused.  Thank you very

24 much for your testimony.

25              MR. BROWN:  Your Honor, I'm going to hand the

Page 47

1   baton to my partner, Ben Wallace.

2            THE COURT:  Okay.

3            MR. WALLACE:  Your Honor, good morning.

4            THE COURT:  Good morning.

5            MR. WALLACE:  Ben Wallace, from Kirkland & Ellis,

6   on behalf of the Debtors.  The Debtors call Mr. Robert

7   Compagna to the stand.

8            THE COURT:  All right.  Mr. Compagna, come on up.

9   If you would raise your right hand, you'll be sworn.

10           CLERK:  Do you solemnly swear or affirm that the

11  testimony you're about to give this Court will be the truth,

12  the whole truth and nothing but the truth?

13           MR. COMPAGNA:  I do.

14           THE COURT:  Thank you very much.  Have a seat.

15           MR. COMPAGNA:  Thank you.

16           MR. WALLACE:  May I, Your Honor?

17           THE COURT:  Go ahead, Mr. Wallace.

18              DIRECT EXAMINATION OF ROBERT COMPAGNA

19  BY MR. WALLACE:

20  Q    Good morning, sir.

21  A    Good morning.

22  Q    Please introduce yourself to the Court.

23  A    Hi.  My name is Robert Compagna.  I'm the managing

24  director in the restructuring practice of Alvarez & Marsal.

25  Q    What is Alvarez & Marsal, sir?

1    A    Alvarez & Marsal is a multidisciplinary consulting

2    firm, with a focus -- one of the main focuses being

3    restructuring.

4    Q    And how long have you been working as a restructuring

5    advisor?

6    A    I've been at A&M for about 20 years, and I've been in

7    the restructuring space for over 25.

8    Q    Are you certified as a restructuring advisor?

9    A    I am, yes.  I'm a certified insolvency and

10   restructuring advisor.

11   Q    And other than that certification, do you have any

12   training or certifications relevant to this case?

13   A    I started my career at Arthur Anderson and trained as a

14   CPA and hold a CPA designation which I've since gone

15   inactive on.  But yeah, I have a CPA designation.

16   Q    Have you --

17            THE COURT:  Which office are you in?

18            THE WITNESS:  I'm in the New York office.

19   BY MR. WALLACE:

20   Q    Have you served as a restructuring advisor in other

21   bankruptcy cases?

22   A    Yes.  Many, many cases.

23   Q    Mr. Compagna, do you have experience projecting and

24   helping an estate managing its cash flow?

25   A    Ye.  Managing cash flow is one of the services we tend

Page 49

1    to provide in each of our cases.

2    Q    And do you have experience identifying assets that an

3    estate might want to sell to generate additional cash flow?

4    A    Part that liquidity management process, yes, that's

5    something we do.

6    Q    In this case, did you perform analysis projecting the

7    Debtors' cash flow?

8    A    We did.  Yes.

9    Q    And did you perform analysis identifying assets that

10   the Debtors might want to sell to generate additional

11   liquidity?

12   A    Yes.  We did.

13   Q    And are the findings of that analysis contained in a

14   declaration that you filed in support of this motion?

15   A    Certain of those findings, yes, are contained in the

16   declaration filed here.

17   Q    And would you recognize that declaration if I showed it

18   to you?

19   A    I would.

20          MR. WALLACE:  Your Honor, may I approach?

21          THE COURT:  Yes.  Go ahead.  Thank you, Mr.

22   Wallace.

23          MR. WALLACE:  You're welcome

24   BY MR. WALLACE:

25   Q    Mr. Compagna, what have I just handed you?

1    A    It looks like a copy of the docketed declaration I

2    filed in support of stablecoin, the stablecoin sale and Earn

3    assets.

4    Q    Do you see the docket ID at the top?

5    A    I do.  Yes.  132- --

6    Q    Could you read that into the record?  I'm sorry, sir.

7    Go ahead.

8    A    Yeah.  Docket Number 1328.

9    Q    Okay.  Could you take a look at the seventh page for

10   me?

11   A    Okay.  I'm there.

12   Q    Is that your signature?

13   A    It is.  Yes.  My electronic signature.

14   Q    And the following page after the blank one?

15   A    Yes.  I'm there.

16   Q    Is that an exhibit you filed in connection with the

17   declaration?

18   A    It is.  Yes.

19   Q    Is the declaration testimony and everything contained

20   in the exhibit true and accurate to the best of your

21   knowledge?

22   A    It is, yes.

23   Q    Mr. Compagna, do you adopt the declaration and the

24   attached exhibit as your testimony for purposes of today's

25   hearing?

Page 51

1   A    I do.

2            MR. WALLACE:  Your Honor, we move this, what has

3   been marked on the docket as Docket Number 1328, into

4   evidence.

5            THE COURT:  Any objections?  All right.  Mr.

6   Compagna's declaration dated November 11, 2022, it is ECF

7   1328, is in evidence.

8            MR. WALLACE:  And Your Honor, that's it for me,

9   unless you think it would be helpful for us to walk through

10  the math behind Exhibit A, how we got to the $18 million.

11  I'm happy to do that now.  I'm happy to do that afterwards,

12  if there are other questions.

13            THE COURT:  Why don't you do that now?

14            MR. WALLACE:  Great.  Okay.

15  BY MR. WALLACE:

16  Q    So Mr. Compagna, would you please flip to Exhibit A in

17  your declaration, please, the chart you prepared?

18  A    Okay.  I'm there.

19  Q    And I just want to walk through the math behind this

20  declaration.  So when you were trying to figure out the

21  amount of stablecoin to propose to sell, what was the first

22  step?

23  A    The first step was we identified the quantum of

24  stablecoin that the company had available.  We primarily

25  looked at what was available -- was in Fireblocks system,

Page 52

1    essentially readily available deposited funds.  We also

2    looked at those available in the custody program.

3    Q    Okay.  So you mentioned funds on Fireblocks.  Where is

4    that shown on the chart here?

5    A    The first -- under the blue box, the first two columns

6    listed as main account show the quantity for each of the 11

7    stablecoin types here and the U.S. dollars based on the

8    conversion rates, the prices you see on the left that are on

9    the main Fireblocks account.

10   Q    So let's take a concrete example.  Am I right in

11   thinking that the first row relates to a coin called USDC?

12   A    Correct.

13   Q    And what is the amount of coin, of USDC, that Celsius

14   had in its main accounts?

15   A    It had 3.1 million coins and it's pretty much $3.1

16   million because they traded at -- stablecoins by nature are

17   attempting to be pegged to the U.S. dollar, so you see 1.00

18   is the purchase price.

19   Q    And what is the amount of USDC that Celsius had in its

20   custody account?

21   A    36.1 million.

22   Q    Okay.  So once you have that 3.1 million and that 36.1

23   million, what did you do with those two figures?

24   A    So we sum those together as roughly 39 -- a little over

25   $39 million and then we moved to look at what we call here

Page 53

1    the reserve liabilities.

2    Q    And what are those?

3    A    The reserve liabilities incorporate three liabilities

4    that Mr. Ferraro went over (indiscernible) it's liabilities

5    under the custody program, so coins we owe back to

6    depositors tagged as custody.  The same for customers within

7    the withheld, withheld accounts.  And the third is

8    collateral serving -- coins serving as collateral in our

9    retail lending and institutional lending programs.

10   Q    So in this USDC row, I see 44.6.  What does that number

11   mean?

12   A    That represents the sum of those three potential

13   obligations.  So in the case of USDC, the roughly 39 million

14   of stablecoin is less than 44 million in reserve

15   liabilities.  So when you move to the far right, the net

16   current asset is zero and we're not proposing to sell any

17   USDC stablecoin.

18   Q    And can you just explain that to me?  What does that

19   mean, that the reserve liabilities are more than Celsius

20   currently holds?

21   A    It means when you look at the custody liabilities, the

22   sum of the withheld liabilities and collateral -- potential

23   collateral that needs to be returned, the company has more

24   liabilities than they hold coin of that type.

25   Q    So for a particular coin, if Celsius has more

1    liabilities than the coin they currently hold, is Celsius

2    proposing to sell any of that stablecoin?

3    A    No.  We're not.

4    Q    Is there an example where that is not the case, where

5    Celsius has more than the reserve liabilities on this

6    spreadsheet?

7    A    Yes.  The second line, USDT 20 shows, yeah, there's an

8    area where we have excess.

9    Q    And I don't want to walk through it in as much detail

10   as we did for the first one.  But can you just tell us the

11   basic math that got you to the 16.4 million coins?

12   A    Sure.  If you look at the main accounts, there's

13   roughly $17.8 million worth of coin available.  In the

14   custody program, only 1.9 million of coin.  So again,

15   approaching $20 million worth of coin held.  And the reserve

16   liabilities for that particular coin type are only $3.3

17   million.  So there's an excess of 16.4 available.

18   Q    Mr. Compagna, in total, how much stablecoin is Celsius

19   proposing to sell?

20   A    According to this page, 18.1 million.

21   Q    Thank you, sir.

22            MR. WALLACE:  Nothing further.

23            THE COURT:  All right.  Cross-examination?

24            MS. CORNELL:  Hello, again.  Shara Cornell, on

25   behalf of the Office of the United States Trustee.

Page 55

1                    CROSS-EXAMINATION OF ROBERT COMPAGNA

2     BY MS. CORNELL:

3     Q    Mr. Compagna, were you in the courtroom during the

4     testimony of Christopher Ferraro earlier today?

5              THE COURT:  Yeah.  He was sitting here.  Go ahead.

6              THE WITNESS:  Yes.

7     BY MS. CORNELL:

8     Q    Was there anything that he said that was inaccurate, to

9     the best of your knowledge?

10    A    No.  (indiscernible) reviewed all of the

11    (indiscernible).

12    Q    When will the Debtors, on a consolidated basis, need an

13    infusion of liquidity?

14    A    I think that's -- I believe that's the end of the first

15    quarter, the month of March.

16    Q    Okay.  What does an infusion of liquidity mean to you?

17    A    The company needs to raise additional funds to continue

18    paying the administrative (indiscernible) as well as the

19    operation of the counsel in the case.

20    Q    Will any of the individual Debtors not, on a

21    consolidated basis, require an infusion of liquidity prior

22    to March 2023?

23    A    Yes.  I believe so.

24    Q    Which Debtors are those?

25    A    The mining entities.  I believe the mining entities

Page 56

1    could use an infusion of liquidity late February timeframe.

2    Early March or the close -- yeah, I think they may be one

3    month earlier in February.

4    Q    So on a consolidated basis, they won't need money until

5    March.  But the mining business will need money sooner.

6    Will the proceeds from the sale of stablecoin today go to

7    fund the mining business?

8    A    The proceeds from the sale of stablecoin will go to the

9    non-mining Debtors.  From there, any further movement would

10   require either a loan facility, debtor-in-possession

11   financing from one -- from a parent to mining or something

12   along those lines.  So we're not -- we haven't really

13   thought through that far at this point other than what I

14   just laid out (indiscernible) --

15   Q    On either a consolidated basis or an individual Debtor

16   basis, are the projections you just provided taking into

17   account the forthcoming Prime Trust settlement?

18   A    No.  They're not.

19   Q    What about the DeFi payments?

20   A    I believe they do take into account the DeFi payments.

21   Q    For the record, can you explain the DeFi payments and

22   what amount of liquidity that will bring into the estate?

23   A    DeFi payments, the company had borrowings under certain

24   DeFi protocols and the collateral posted because those --

25   against those borrowings.  So we pay off the loan, we get

Page 57

1   the collateral back.  The collateral is worth in excess of

2   the amount of the DeFi borrowing.  So put it in the category

3   of good hygiene and especially in light of what we've seen

4   with some of the failures, we're just trying to bring all of

5   that collateral back to call it home, back to Fireblocks

6   where we can better safe keep it.

7           THE COURT:  It's a net benefit to the Debtors to

8   pay off --

9           THE WITNESS:  Yes.

10          THE COURT:  -- the loans and get the collateral

11  back.

12          THE WITNESS:  Correct.  The collateral is in coin,

13  various coins.  So they'll come back and be frozen.  But

14  yes, overall value-wise the Debtor will be better off.

15  BY MS. CORNELL:

16  Q    Do your projections take into account the proposed sale

17  of GK8?

18  A    They do not.

19  Q    Do you intend to create projections that include the

20  sale of GK8?

21  A    That would be a pretty simple update, just dropping in

22  the net proceeds at the appropriate time.  So we can

23  certainly -- we certainly would take that into account once

24  we have certainty on it and can do it at any time.

25  Q    To the best of your knowledge, do the Debtors support

Page 58

1    any non-Debtor entities' ongoing operations?

2    A    Yes.   There are certain non-Debtors part of the Celsius

3    organization that don't have operations but provide

4    services.   Then there's the GK8 and (indiscernible) --

5    Q    Where would we find that information?

6    A    It's included in the cash flow projection.

7              THE COURT:   Where would I find that?   So the cash

8    flow projections -- you're talking about the Trustee's

9    Exhibit A that was just marked.   You don't have a copy of

10   it?

11             MS. CORNELL:   I can give --

12             THE COURT:   Why don't you give him a copy, if you

13   would.

14             MS. CORNELL:   May I approach, Your Honor?

15             THE COURT:   Yeah.   Go ahead.   Just as sort of

16   standing, you don't have to ask permission each time you

17   approach a witness.

18             MS. CORNELL:   I'm not wearing my mask.   I don't

19   want to --

20             THE COURT:   You can just -- you can do it.

21             THE WITNESS:   Your Honor, could I just ask for

22   clarification on what actually came in as Exhibit A?

23   Because there were two versions floating around.

24             THE COURT:   I only know about one version.

25             THE WITNESS:   Okay.

1              MS. CORNELL:  It was dated November 15th.

2              THE WITNESS:  It was dated November 15th.  Okay.

3     Thank you.

4              THE COURT:  It's three pages long.

5              THE WITNESS:  Okay.  Got it.  Thank you.

6              THE COURT:  You have that, Mr. Compagna?

7              THE WITNESS:  I do, yes.  And just to be clear, it

8     starts the first week is October (indiscernible) --

9              THE COURT:  Yes.  Go ahead.  Ask your question

10    again.

11             MS. CORNELL:  Sure.

12    BY MS. CORNELL:

13    Q    What I'm looking to find on this is where payment to

14    non-Debtor entities would be disclosed.

15    A    Okay.  So we do have a more detailed version of this

16    with many more line items which would have this spelled out

17    very specifically.  I believe it's rolling up into the other

18    operating disbursements line in this presentation here.

19             THE COURT:  It's the third line under operating

20    disbursements?

21             THE WITNESS:  Correct.

22    BY MS. CORNELL:

23    Q    On that third line of other operating disbursements, it

24    looks as though come the end of December 2022, there'll be a

25    change.  Can you explain the change from 1501 to 936 and

Page 60

1    then subsequently lower and lower in the first quarter of

2    2023?

3    A    I would really need to see the detailed sheet that

4    builds up to these numbers.

5    Q    Sure.  That hasn't been provided to my office.  Okay.

6            THE COURT:  Well, when you say there's been a

7    change, but if you look at the 4 November and 11 November

8    (indiscernible) mostly below -- so I'm not quite sure of

9    your point, Ms. Cornell, because for each of the periods,

10   the amount of other operating disbursements varies.

11           MS. CORNELL:  In particular I was curious about

12   the change from December, which is 1,500, where it goes into

13   the first quarter in 350.  That seems like a dramatic

14   change.

15           THE COURT:  It's in millions.  But anyway -- or

16   thousands.

17           THE WITNESS:  Thousands.

18           MS. CORNELL:  Thousands.

19           THE COURT:  Thousands.

20           MS. CORNELL:  Yes.  I know.

21           THE WITNESS:  Yeah.  Well that other operating

22   disbursements line, I know when you're looking in the

23   December weeks (indiscernible) insurance payments related to

24   the mining business and some back taxes owed by the platform

25   business.  so that's why December is elevated and it likely

Page 61

1    also includes, like I mentioned, the funding to the Israeli

2    and GK8 entities and I think we have those tailing off

3    (indiscernible) --

4    BY MS. CORNELL:

5    Q    To the best of your knowledge, would the sale of

6    stablecoin impact the potential in-kind distribution to

7    creditors in this case?

8    A    I don't think we're at the point of fully -- having

9    fully laid out our thoughts as far as what in-kind

10   distribution looks like, whether it's coin by coin or

11   distribution of crypto in general.  The company is short on

12   many types of coin versus the deposits that were provided.

13   So this selling stablecoin obviously means we do have less

14   of those coins available to distribute.

15        But it is (indiscernible) as Mr. Ferraro had mentioned.

16   You can always -- whether you borrow 18 million in some

17   other fashion and need to repay that loan by selling

18   something, coin, other assets, plus value to distribute.  To

19   the extent we sell the coin now and have excess cash, we can

20   always rebuy the stablecoin later.  In fact that's one of

21   the reasons we're proposing to sell stablecoin in the first

22   instance is because it's just that, meant to be stable and

23   pegged to the U.S. dollar.

24        So you can trade it today, trade it tomorrow and it

25   should be 18 million for 18 million as opposed to trading

Page 62

1    bitcoin today and suddenly having it double in value and

2    it's costly to replace it, if you will.

3    Q    So based on your testimony just ow, if you were to sell

4    it in February or March, it would still be 18 million for 18

5    million.  Is that correct?

6    A    That's correct.

7    Q    Okay.  Have you done a liquidation analysis in this

8    case?

9    A    We have not.

10   Q    Has anyone at Alvarez & Marsal done a liquidation

11   analysis in this case yet?

12   A    No.  Not at this point.

13   Q    Have you performed an analysis on the expense to file a

14   plan?

15   A    Not specifically, no.  You mean just the cost of the --

16   I'm not sure I follow.

17   Q    The reorganization costs for filing a plan in this

18   case.

19   A    The restructuring activities line includes the

20   professional fees largely that would be required to do that.

21   The projections you see here go through January.  We have

22   these on a monthly basis through March at this point.  So

23   there is some component of the professional fees that would

24   be related to getting the funding together and running the

25   plan process.

Page 63

```
1    Q    If the Debtors do not sell stablecoin today, in your

2    opinion, to what detriment will the Debtors be in if they

3    were to do it in March instead?

4    A    The Debtors are incurring administrative costs that

5    they'd be in a position of not having adequate liquidity to

6    cover.  Looking forward, they'd have to take actions to

7    curtail those costs or potentially administratively

8    insolvent the case.  So it just comes down to at what point

9    do the Debtors have to take actions to avoid or minimize

10   that potential administrative insolvency (indiscernible) --

11              THE COURT:  Mr. Compagna, assuming that the Court

12   grants the authority to sell 18 million in stablecoin, is it

13   the Debtors' plan to sell it all now or use that authority

14   to sell it as and when needed since essentially it remains

15   stable?

16              THE WITNESS:  I think we would intend to sell it

17   now to put the cash balance sheet.  But, you know, it's a

18   fair point (indiscernible) --

19              MS. CORNELL:  Just one minute.

20   BY MS. CORNELL:

21   Q    Mr. Ferraro testified it earlier that he estimated the

22   professional burn rate in these cases to be approximately

23   $15 to $20 million.  And you're looking to sell

24   approximately $18 million worth of stablecoin.  If you were

25   to sell and maintain the proceeds of that $18 million, would
```

Page 64

1    that just go --

2             THE COURT:  I think he estimated $15 to $20

3    million per month.

4    BY MS. CORNELL:

5    Q    Per month.  Would the sale of stablecoin -- how much

6    runway would the sale of stablecoin provide you?

7    A    I think there's a lot in there.  I agree that the

8    professional fee burn rate is about $15 to $20 million per

9    month.  Operationally, the platform business has done a

10   really good job of managing liquidity.  It's the case to

11   date they've largely been able to break even.  The mining

12   business operationally has been break even to modestly

13   positive.  It's the capital costs.  It's largely the capital

14   costs and the professional fees that are leading to the cash

15   burn, the capital costs on the mining side and professional

16   fees for everything.

17        So, based on the professional fee burn rate, it's about

18   one month of additional liquidity runway and I presume

19   (indiscernible) through the capital spending on the mining

20   side of the business, which we should be by the time we get

21   to March.  So one way of saying it, I tend to agree that $18

22   million buys about one month of additional runway here.

23   Q    So come April, will you be looking to sell more

24   stablecoin?

25   A    It depends.  Well, first, I don't think there'd be --

Page 65

 1              THE COURT:  They don't have anything to sell.

 2              THE WITNESS:  The only way we'd be looking to sell

 3      more stablecoin is if -- the only way we could sell more

 4      stablecoin is if something happens with respect to the

 5      custody and withhold motions later this week.  But yeah, as

 6      we forecast it here, there's no more stablecoin to sell.  We

 7      also have the potential proceeds coming out of GK8 that

 8      could bolster liquidity.  So we're looking at lots of paths

 9      that bolster liquidity.

10              MS. CORNELL:  Okay.  Thank you.  That's it.

11              THE COURT:  Thank you, Ms. Cornell.  Anybody else

12      wish to cross-examine?  Any redirect?

13              MR. WALLACE:  No redirect, Your Honor.

14              THE COURT:  Thank you very much, Mr. Compagna.

15      You're excused.

16              MR. WALLACE:  Your Honor, I'm going to hand things

17      off to my colleague, Grace Brier.

18              THE COURT:  Okay.

19              MS. BRIER:   Good morning, Your Honor.  Grace

20      Brier, Kirkland & Ellis, on behalf of the Debtors.  At this

21      time, Debtors call Mr. Oren Blonstein to the stand.

22              THE COURT:  Thank you.  Mr. Blonstein, come on up.

23      If you would raise your right hand and be sworn.

24              CLERK:  Do you solemnly swear or affirm that the

25      testimony you're about to give the Court will be the truth,

1    the whole truth and nothing but the truth?

2              MR. BLONSTEIN:  I do.

3              THE COURT:  Please have a seat.

4                   DIRECT EXAMINATION OF OREN BLONSTEIN

5    BY MS. BRIER:

6    Q    Please introduce yourself to the Court.

7    A    Hi.  My name is Oren Blonstein.

8    Q    And Oren, can you tell the Court a bit about yourself?

9    A    Sure.  I'm the head of innovation and chief compliance

10   officer for Celsius Network.

11   Q    How long have you been at Celsius?

12   A    I joined the company in February 2021.

13   Q    And can you talk us through the roles that you've had

14   since you've been at Celsius?

15   A    Sure.  When I was hired, I started as head of

16   innovation, which was largely around formulating the

17   strategies for releasing new products for the company.  In

18   September of 2021, I was appointed that the chief compliance

19   officer.

20   Q    And before joining Celsius, what's your professional

21   background?

22   A    I spent a little bit over a decade working for a

23   traditional financial services provider.  The company was a

24   regulated FINRA broker-dealer.  We had international

25   businesses that were -- operated ETSs and dark pools and

Page 67

1    things like that.  In 2016, I started working part-time in

2    crypto at that same traditional financial services firm.

3    And since 2019, I've been full-time in crypto.

4    Q    And how did you first become involved with Celsius?

5    A    So in the fall of 2019, I started to become personally

6    active in decentralized finance, playing around with the

7    different decentralized finance protocols, just trying to

8    understand them, learn them.

9        In late 2019, my wife and I had our first child.  Time

10   got very precious, and I didn't have enough time to really

11   manage those activities anymore.  Earlier in 2019, when I

12   was at (indiscernible) US, we had that literal water cooler

13   moment where a bunch of employees were standing around

14   talking about what we do with our crypto.  And an employee,

15   one of my colleagues mentioned Celsius, and in the spring of

16   2020, I became a customer.

17   Q    So you were a customer before or after you joined

18   Celsius as an employee?

19   A    I was a customer before.  And with the -- the concept

20   to finish that last thought was that not having enough time

21   to manage the DeFi stuff that I was using to generate yield

22   on my crypto, Celsius looks like a simpler alternative, a

23   way for me to save time.

24   Q    Why did Celsius look like a simpler way to save time in

25   that space when you were a customer?

Page 68

1   A     It's very complicated to manage your own crypto,

2   especially using decentralized finance.  There's the wallets

3   that you use, software wallets, hardware wallets.  There's

4   the actual transactions of interfacing with the different

5   protocols approving the transactions.  It's very costly to

6   do that as an individual.  And then in general, there's also

7   like a tax consequence.

8        So every time you're making a transaction in

9   decentralized finance, that's basically a tax flow that

10  could be a taxable transaction.  And so for me, instead of

11  having to manage all of those different things, I could

12  transfer my coins to the company and earn a lower rate than

13  if I managed it myself, but a very competitive rate.

14  Q     And how did you come to understand how those tax

15  consequences would work when you were a customer of Celsius?

16  A     The only tax consequences as a customer of Celsius that

17  I was aware of was paying tax on the interest that I earned

18  for the yields, the rewards that I earned from Celsius.

19  Q     And did you review the terms of use when you were a

20  customer to help understand that concept?

21  A     I did.  Because a lot of my experience in general has

22  been around product development, one of the things,

23  especially in consumers reporting to financial services that

24  you do to try to understand a company is you can look at

25  their website and that will tell you how they're marketing

1    the service.  But if you click on the terms of use, you can

2    see what kind of licenses they hold, what partners they work

3    with, how the service is actually delivered, what your

4    agreement with the company is.  So I was used to kind of

5    clicking on those things, reading through them in detail to

6    understand them.

7         So by the time that I became a customer, I do remember

8    I certainly didn't scrutinize it the way I have the last few

9    weeks.  But I do remember looking at it and thinking about

10   the fact that I was essentially giving control of my coins

11   away to the company, because up until that point, I had been

12   managing it myself.  But again, with thinking about the

13   time, thinking about the resources, the tax implications, I

14   made the decision to transfer my coins to the company.

15   Q    And at this time, I'd like to turn to the substantive

16   testimony that you're going to offer here today.

17            MS. BRIER:  Your Honor, may I approach the witness

18   with his declarations?

19            THE COURT:  Certainly.

20   BY MS. BRIER:

21   Q    Mr. Blonstein, what have I just handed you?

22   A    So one of the documents is my original declaration on

23   the terms of use and the ownership of Earn assets and the

24   sale of stablecoin.  That's my first declaration.  And then

25   the second one is the supplemental declaration that goes

Page 70

1    into more details on the acceptance of terms of use from

2    Version 6 and on.

3    Q    Okay.  So taking those one at a time, I'd like to talk

4    first about your original declaration, which was Docket

5    Number 1327.  Do you have that one in front of you?

6    A    I do.

7    Q    And is that your signature at the end of the substance

8    of your declaration on Page 9?

9    A    Yes.  This is my electronic signature.

10   Q    And does this exhibit include the exhibits that were

11   attached to your original declaration when it was filed in

12   November 2022?

13   A    Yes.  It does.

14   Q    And is the testimony contained within your declaration

15   true and accurate, to the best of your knowledge?

16   A    It is.

17   Q    Do you adopt this document, Exhibit Document Number

18   1327, as your affirmative testimony under oath today?

19   A    I do.

20   Q    Okay.  Let's turn to your supplemental declaration,

21   Docket Number 1584.  Is this a true and accurate copy of the

22   declaration that you signed and submitted on December 2,

23   2022?

24   A    It is.

25   Q    Is that your signature on Page 9 of that document?

Page 71

1    A    Same electronic signature.

2    Q    And is the testimony contained in your supplemental

3    declaration, Docket 1584, true and accurate to the best of

4    your knowledge?

5    A    It is.

6    Q    Do you adopt the testimony within your supplemental

7    declaration as your testimony under oath today?

8    A    I do.

9           MS. BRIER:  Your Honor, at this time, we'd move

10   into evidence Docket Number 1327 and Docket Number 1584.

11          THE COURT:  Are there any objections to either

12   declaration?  Hearing none, both are admitted into evidence.

13          MS. BRIER:  And Your honor, just for purposes of

14   the record to be clear, I'd also like to admit all of the

15   exhibits contained therein to his declaration into evidence

16   as well.

17          THE COURT:  All right.  Let's take the first one

18   first.  The first declaration, ECF 1327, has a group of

19   exhibits attached.  They're in the bound copy of it.  They

20   are all part of that same ECF docket number.  Are there any

21   objections to the exhibits that are attached to Mr.

22   Blonstein's first declaration?  All right.  Hearing none,

23   those are in evidence.  And again, with respect to the

24   second declaration, they're part of the same ECF docket

25   number.  Are there any objections to the exhibits to Mr.

1    Blonstein's declaration?  Hearing none, there in evidence as

2    well.

3              MS. BRIER:  Thank you.  And I'd like to approach

4    the witness with one more exhibit.

5              THE COURT:  Yeah.

6              MS. BRIER:  It's a big binder.  I have an extra

7    one that I can bring up as well.

8              THE COURT:  I've got a lot of binders up here.  Do

9    I have -- do I have that yet?

10             MS. BRIER:  You actually do not.  So I will bring

11   this one up.

12             THE COURT:  Okay.

13             MS. BRIER:  Sorry.  Thank you.

14   BY MS. BRIER:

15   Q    Mr. Blonstein, is what I just handed you Exhibits A-1

16   through A-8 and redlines from Exhibits A-1 through A-8 that

17   were attached to Mashinsky declaration?

18   A    Yes.

19             THE COURT:  I'm sorry.  They were attached to

20   what?  Mashinsky's declaration?

21             MS. BRIER:  They were.

22             THE COURT:  Yeah.  Okay.

23   BY MS. BRIER:

24   Q    And Mr. Blonstein, are these the same exhibits that you

25   described reviewing in your declaration, your original

1    declaration on Page 3, Paragraphs 4 through 11?

2    A    Yeah.  I mean, without checking all the pages, but

3    yeah, it appears.  Yes.

4              MS. BRIER:  And Your Honor, we'd --

5              THE COURT:  Let me -- just so I understand, I had

6    entered an order early in the case requiring the Debtors to

7    file on ECF each version of the terms of use that were in

8    effect -- I don't remember what the earliest date I used.

9    But in response to that order, the Mashinsky declaration,

10   ECF Document Number 393 was filed that attached what was

11   described as each version of the terms of use.  Is that what

12   you put before me?  Not the Mashinsky declaration, but the

13   exhibits that were attached to that Mashinsky declaration?

14             MS. BRIER:  That's exactly right, Your Honor.

15   They're the exhibits that were attached to the Mashinsky

16   declaration that Mr. Blonstein reviewed as part of his own

17   declaration process.

18             THE COURT:  is that correct, Mr. Blonstein?  You

19   reviewed these exhibits, A-1 through A-8, that had the

20   different versions of the terms of use?  Is that correct?

21             THE WITNESS:  I did.

22             THE COURT:  Okay.

23             MS. BRIER:  And Your Honor, at this time, we'd

24   move to admit these exhibits into evidence.

25             THE COURT:  Well, when you say you're moving to

1    admit in evidence ECF Docket Number 393, Exhibits A-1

2    through A-8, which are pages within the ECF docket number,

3    they're Pages 14 through 679.

4              MS. BRIER:  That's exactly right, Your Honor.

5              THE COURT:  The actual attachments to the

6    Mashinsky declaration went through Page 1126.

7              MS. BRIER:  Yes.

8              THE COURT:  What was 680 through 1126?

9              MS. BRIER:  They were other documents, Your Honor,

10   that Mr. Blonstein did not review as part of his declaration

11   process.  So there were other types of terms of use that

12   were included there that are not the original terms of use,

13   A-1 through A-8, that are included in this excerpt from his

14   declaration.

15             THE COURT:  I mean, I can open it and look.  But

16   are you able to describe to me generally what Pages 680 to

17   1126, what exhibits those comprised?

18             MS. BRIER:  So some of those are versions of the

19   terms of use folks would have signed if they signed up for a

20   different program or a different part of the process.  The

21   ones that we're submitting are just the standard terms of

22   use that every customer had to sign before they signed up

23   for the platform.

24             THE COURT:  And you're offering these in evidence?

25             MS. BRIER:  Yes, Your Honor.

Page 75

1              THE COURT:  Are there any objections?

2              MS. CORNELL:  Your Honor, I'm sorry.  This is

3      Shara Cornell, again, on behalf of the Office of the United

4      States Trustee.  I don't have a copy.  Are they looking at

5      the evidence the Mashinsky declaration or the attachments?

6              THE COURT:  The attachments.  And then, just to be

7      clear, it's not all of the attachments to the Mashinsky

8      Declaration.  As I pointed out, these exhibits that they're

9      offering are Pages 14 through 679.  The actual attachments

10     to the Mashinsky declaration went through Page 1126.

11             MS. CORNELL:  But the declaration itself is not

12     included in there?

13             THE COURT:  The declaration is not itself there.

14             MS. BRIER:  That's correct.

15             MS. CORNELL:  Okay.  Thank you.  Then no

16     objection, Your Honor.

17             THE COURT:  All right.  Then the Court is

18     admitting into evidence the -- in a binder, it's ECF Docket

19     Number 393, Pages 14 through 679 of that ECF filing.  Okay.

20     That's admitted into evidence.

21             MS. BRIER:  And Your Honor, at this time, with Mr.

22     Blonstein's affirmative testimony that's accepted and

23     adopted under oath, I'm happy to pass a witness, or I can

24     put some affirmative testimony into the record now or on

25     redirect, whenever Your Honor would prefer.

```
 1              THE COURT:  Well, what is it that you want?  I
 2     mean, his two declarations are in evidence.  Is there
 3     anything beyond that?  You've asked about his background and
 4     that's all in.  Is there something else you wanted to cover
 5     now?
 6              MS. BRIER:  Your Honor, I'm happy to cover any of
 7     it on redirect as necessary.
 8              THE COURT:  Okay.  All right.  I do have a couple
 9     of questions before cross-examination.  What is your
10     background in compliance?
11              THE WITNESS:  So most of my professional career
12     was around product development operations, general
13     management.  The company that I've worked for, for 12 years,
14     the traditional financial services provider, like I said,
15     was a regulated broker-dealer.  So we underwent audits and
16     examinations by different regulators.
17              Prior to working full-time in cryptocurrency, that
18     was kind of the extent of me touching regulations or
19     compliance.  When in 2019, when I started working full-time
20     in cryptocurrency, I became the CEO of an exchange, a
21     cryptocurrency exchange.  And how I explain this is that as
22     I was signing the documents to become the CEO and control
23     person of the company --
24              THE COURT:  It helps to knows what it's about.
25              THE WITNESS:  Exactly.  So that was exactly my
```

1    thought process is although I had -- I was learning very

2    quickly what it meant to be a counterparty to trades in

3    cryptocurrency and the rules that applied, I felt like I did

4    not have sufficient knowledge at that time.  So I hired a

5    compliance advisory that I basically spent the next six

6    months or so getting up to speed, very rapid, I would say

7    very rapidly.  In that timeframe, from around mid-June '21,

8    I did a couple of things which I think really --

9              THE COURT:  Well, I wrote down a note that you

10   became chief compliance officer in February 2021.  Is that

11   correct?

12             THE WITNESS:  February 2021 was when I was hired

13   for Celsius.

14             THE COURT:  Okay.

15             THE WITNESS:  September 2021 was when I became the

16   interim -- the chief compliance officer.  What I was just

17   talking about before was I became the CEO and interim chief

18   compliance officer for that other cryptocurrency exchange.

19             THE COURT:  Who was the chief compliance officer

20   for Celsius before you became the chief compliance officer?

21             THE WITNESS:  A gentleman named Jeremie Beaudry.

22   He was the general counsel and chief compliance officer.

23             THE COURT:  Is he still with the company?

24             THE WITNESS:  No.

25             THE COURT:  Did he leave the company when you

1    became the chief compliance officer?

2            THE WITNESS:  He was in the process of -- I think

3    he was actually gone by the time I became the chief

4    compliance officer.  I knew enough about compliance

5    obligations under the Bank Secrecy Act to --

6            THE COURT:  Tell me what your responsibilities are

7    as chief compliance officer of Celsius.

8            THE WITNESS:  Our primary regulator is FinCEN, the

9    Financial Crimes Enforcement Network, Department of the

10   Treasury.  We're required as a (indiscernible) to comply

11   with the Bank Secrecy Act, and also OFAC sanctions laws

12   generally.  I saw that as my primary obligation to make sure

13   that the company was in full compliance there.

14           And that's what I spent the vast majority of my

15   time.  And I can appreciate -- I mentioned this in my

16   deposition, that a lot of people might say chief compliance

17   officer should be responsible for a lot of different things.

18   That's not what I was doing in that role.  And then that was

19   clear to my managers and I'd say throughout the firm that I

20   wasn't covering other areas that some chief compliance

21   officers might --

22           THE COURT:  Tell me again what were the areas that

23   you were covering as chief -- well, still are, as chief

24   compliance officer and if they've changed since September

25   2021, tell me that.

1              THE WITNESS:  All aspects of compliance with the

2     Bank Secrecy Act as a mining services business.  So that

3     meant making sure that we have the SAML program, that we had

4     a team that was adequately staffed.  When I joined -- or I

5     ended up tripling the size of the team when I joined, just

6     based on the workload that we have, making sure that we have

7     the right -- so customer identification program, VSAML,

8     training program for our staff, making sure that we're in

9     compliance with the Bank Secrecy Act reporting, the account

10    sanctions reporting that we need to do, that we need to do.

11    Responding to regulators like FinCEN.  We had a Title 31

12    exam.  We had an OFAC exam.

13             So those are kind of the -- there's a tremendous

14    amount of work that goes into making sure that the

15    technology infrastructure to support the compliance

16    operations is working properly, and obviously lots of checks

17    that the actual procedures and policies that we have in

18    place are being carried out.

19             THE COURT:  Have you read the examiner's interim

20    report?

21             THE WITNESS:  I read parts of it.

22             THE COURT:  So one of the issues that the

23    examiner's interim report raises and certainly may be

24    relevant to the custody and withhold during later this week,

25    it is Celsius's recordkeeping with respect to the movement

Page 80

1    of coins into custody, whether it was a shortfall or what --

2    was that an area of your responsibility?

3                THE WITNESS:  It was definitely not.  So the

4    movement of coins was absolutely not an area.  That's not

5    something that the bank -- you know, movements of money

6    inside the company generally were not something that I was

7    supervising at all.  I'm aware of it.  I have a little bit

8    more exposure to the custody project because of my role in

9    innovation, because custody was kind of a starting point for

10   a lot of the new products and services we were planning on

11   offering.

12               But yeah, I remember the section, I think, that

13   you might be referring to where it was kind of stated as a

14   surprise.  How could the chief compliance officer not be

15   aware of the amounts of money between accounts inside the

16   company?  And I would say, I mean, how many job descriptions

17   of the chief compliance officer has that person as the

18   examiner written, right?  I mean, I've written several as

19   CEO to companies, and I've performed the job function.

20               I don't know many CCOs who supervise coin

21   movements between accounts internally at the company.

22   There's a treasurer for that.  There's a finance department.

23   There are other people.  So I didn't agree with that

24   conclusion or their assertion.

25               THE COURT:  You didn't agree that Celsius -- you

1    believe Celsius did keep accurate track of the movement of

2    coins?

3              THE WITNESS:  No, I didn't -- I didn't agree.

4              THE COURT:  When you say you disagree, you're not

5    disagreeing with her conclusion that Celsius did not keep

6    accurate track of the movement of coins.

7              THE WITNESS:  One hundred percent, I agree with

8    that --

9              THE COURT:  Okay.  All right.

10             THE WITNESS:  I disagree with the assertion that I

11   had some obligation there.

12             THE COURT:  Okay.  All right.  Cross-examination?

13   You're excused.  Thank you very much.

14             MS. MILLIGAN:  Your Honor, this is Layla Milligan.

15   May I ask the witness a few questions?

16             THE COURT:  Oh, yes.

17             MS. MILLIGAN:  I apologize.  I was waiting for Ms.

18   Cornell to stand up.

19             THE COURT:  That's fine.

20             MS. MILLIGAN:  I just --

21             THE COURT:  So introduce yourself, Ms. Milligan,

22   so that Mr. Blonstein knows -- he may know who you are

23   already.  I don't know.  Maybe you questioned during his

24   deposition.  But go ahead.

25             MS. MILLIGAN:  Thank you, Your Honor.  Layla

Page 82

1    Milligan, with the Texas Attorney General's Office,

2    appearing on behalf of the Texas State Securities Board and

3    the Texas Department of Banking.

4                CROSS-EXAMINATION OF OREN BLONSTEIN

5    BY MS. MILLIGAN:

6    Q    Good morning, Mr. Blonstein.

7    A    Nice to meet you.

8    Q    I have a few just follow-up questions.  You are not a

9    licensed attorney.  Is that correct?

10   A    That is correct.

11   Q    Did you personally play any role in the drafting of any

12   of the versions of terms of use?

13   A    I did not personally play a role in any of the terms of

14   use.

15   Q    Did you -- I'm sorry to interrupt.

16   A    Yeah.  I was going to say there may be cases where I

17   provided input on certain sections not as the chief

18   compliance officer, but as the head of innovation.  For

19   example, we launched two new products, two products from the

20   innovation and product team.  One was the swap product.  One

21   was the buy coins product.

22        For those products, I was consulted about terms of use,

23   mostly in terms of flow funds and things like that, but not

24   in my compliance capacity.  And I wasn't answering any

25   questions.  Nobody was coming to me with questions about

1  legal or regulatory questions.  It was more to understand

2  the product and service offering.

3  Q    Okay.  So just to be clear, regarding the swap

4  transactions or projects that you just mentioned, people

5  were coming to you about the terms of use, but not for

6  compliance or regulatory role, but just for information

7  about the product.  Is that what you just said?

8  A    That's correct.  Yeah.  In those two cases.  And we

9  were in the process of doing something similar for the

10 credit card that we were planing to launch.

11 Q    Did you have any or play any personal role in obtaining

12 customer consents to the terms of use in effect at different

13 times?

14 A    I didn't -- sorry, I did not.

15 Q    It is your understanding that the company has the

16 ability to track which terms of use individual or industrial

17 consumers, participants signed or clicked agree to?

18 A    Yes.  We have software that was internally developed

19 called Back Office.  We call it internally our Back Office

20 system.  That system tracks essentially all user activity,

21 all customer activity on the platform, including the

22 acceptance of the terms of use.

23 Q    Has that information been produced to any party in this

24 case?

25 A    My understanding is yes.  It was in my original

Page 84

1    declaration.  We provided (indiscernible) information in an

2    aggregate form and some of the tables in my original

3    declaration.  So we showed --

4              THE COURT:  Hold on.  Anybody who is connected

5    over Zoom, other than Ms. Milligan, needs to mute their line

6    so as not to interrupt the hearing.  Go ahead, Ms. Milligan.

7              MS. MILLIGAN:  Thank you, Your Honor.

8    BY MS. MILLIGAN:

9    Q    Is it your testimony, Mr. Blonstein, that the

10   documentation of which terms of use the individual investors

11   clicked, that information, not in aggregate form, but the

12   specific information for each investor and the terms of use

13   they clicked or assented to has been produced to any party

14   in this case?

15   A    I'm not aware.  If that has been provided, I'm not

16   aware of it.  I may be missing it.  I may have missed that

17   detail.  But I know about the aggregated summaries, and I've

18   seen the data firsthand myself, the underlying data.

19   Q    Did you play any role in gathering that data

20   personally?

21   A    I worked with the data team.  I mean, I was on the

22   email threads.  I did work with the data team on it.  There

23   were other individuals that were also working with the data

24   team to request this information.  So subsequently I talked

25   to them about how they gathered it to get an understanding

Page 85

1    of, like, the queries that they wrote to extract the data,

2    just to make sure that what they gathered would line up with

3    me, with my understanding of how they would get that

4    information.

5    Q    Okay.  So you worked with a team of individuals who

6    actually gathered the data, and you got the information from

7    them.  You didn't personally play a role in the gathering of

8    that data.

9    A    That's correct.  Yeah.  (indiscernible) like SQL

10   queries.

11   Q    Okay.  In your role as chief compliance officer, to

12   your knowledge, at any point was Celsius in compliance with

13   state or federal securities law?

14   A    That was not my area.  So, I mean, like I was

15   mentioning just before, I focused on our obligations as a

16   money services business, and the serious matters were not in

17   my wheelhouse.

18   Q    To your knowledge, as chief compliance officer, was

19   Celsius at any point in compliance with state or federal

20   money transmissions laws?

21   A    This was -- I mean, this was definitely discussed with

22   counsel.  So I'm not sure if --

23   Q    I'm not asking for your -- I'm not asking, just to

24   clarify, your communications with counsel.  I'm asking for

25   your understanding.  To your knowledge, as chief compliance

1    officer, was the business ever in compliance with money

2    transmissions laws?

3             MS. BRIER:  Your Honor, I'd caution the witness

4    that if his knowledge is based on discussions with counsel

5    or --

6             THE COURT:  He can answer.  The question did not

7    call for attorney-client privilege.  He can answer the

8    question.

9             MS. BRIER:  Thank you, Your Honor.

10            THE WITNESS:  My understanding, based on

11   discussions, was that we were in compliance.

12   BY MS. MILLIGAN:

13   Q    With money transmissions laws?  Just to be clear.

14   A    Yes.

15   Q    Okay.  But you are not aware of whether the company was

16   in compliance with state or federal securities laws?

17   A    That's correct.

18            MS. MILLIGAN:  Okay.  Your Honor, I have no

19   further questions.  Thank you.

20            THE COURT:  Thank you.  Ms. Milligan.  Any other

21   cross-examination?

22            MS. CORDRY:  Yes, Your Honor.

23            THE COURT:  Yes.  Ms. Cordry?

24            MS. CORDRY:  Yes.  Karen Cordry.  I'm bankruptcy

25   counsel for the National Association of Attorneys General.

Page 87

1    Thank you, Your Honor, for being able to appear this

2    morning.

3                    CROSS-EXAMINATION OF OREN BLONSTEIN

4    BY MS. CORDRY:

5    Q    I just have a few very short questions for you, Mr.

6    Blonstein, which I think are matters that I think I've

7    gathered from what you said, but I just really want to

8    clarify that these are correct.

9         First of all, you have introduced the various terms of

10   uses and that they were posted on the website.  When they

11   were posted, were they posted just as a clean version, each

12   one a new, complete, clean version?

13   A    To my knowledge, yes.

14   Q    Okay.  Was a blackline ever posted on the website at

15   the same time.

16   A    Just to clarify?  Blackline --

17             THE COURT:  Showing the changes from --

18   BY MS. CORDRY:

19   Q    One that shows the changes --

20   A    Okay.  I refer to those as redlines.

21   Q    Okay.  Redlines, blacklines, whatever color --

22             THE COURT:  Well, you know, when you print them

23   out on a black and white printer, they look black.  If you

24   look at them on a screen, they could be colored.  But --

25   BY MS. CORDRY:

1   Q    Whatever color they are, were there any ones that

2   showed the editing, an edited version that showed what

3   changes had been made?

4   A    Not to my knowledge.  I do know that on multiple

5   occasions of these updates, we tried to post some of the key

6   changes to the terms on the main screen that we presented to

7   users.

8   Q    And those changes are part of the attachment to your

9   supplemental declaration, are they not?  They're shown

10  there?

11  A    That -- sorry.  That's correct.

12  Q    Did any of those actually point out to anybody that

13  changes were being made in the ownership, in the terms of

14  use relating to the ownership of those assets?

15  A    I don't remember those being called out.  Then I would

16  say that that's correct because from my perspective as a

17  customer, there's been no material change in the

18  relationship between the company and its customers as far as

19  the ownership of the assets that they sent to the company.

20          THE COURT:  Let me -- I'm not sure I understand

21  your answer.  Did the updated terms of use point out changes

22  with respect to ownership or title of crypto assets, yes or

23  no?

24          THE WITNESS:  No.  That was not called out.

25          THE COURT:  Okay.  Ms. Cordry, ask your next

1    question.

2              MS. CORDRY:  Sure.

3    BY MS. CORDRY:

4    Q    Were the prior versions left on the website if someone

5    wanted to compare between version six and version seven,

6    let's say.

7    A    Not to my knowledge.

8    Q    Okay.  So if someone tries to actually determine what

9    changes have been made, they would have to try to remember

10   in their own head what the prior document said and then read

11   a 55-page document and try to figure out what changes were

12   made.  Would that be fair to say?

13   A    Yes.  That is fair to say.

14   Q    Okay.  Was there ever any attempt to reconcile what was

15   being said in the terms of use, the written terms of use

16   document with what Mr. Mashinsky was saying on his

17   broadcasts?

18   A    I was not involved in any kind of reconciliation of

19   those things.  That was more matter for our in-house

20   counsel, what we call our legal and regulatory team.

21   Q    Have they put any information into the record in this

22   case as to what Mr. Mashinsky was saying on those broadcasts

23   at the same time these terms of uses were being changed?

24   A    We have so many requests from different parties about

25   related to the AMAs and other kind of marketing statements.

1    I'm not sure whether those are part of the Chapter 11, this

2    case, or just regulator inquiries.  So I'm not sure.

3    Someone else may know about what's been submitted.  I mean,

4    the things that I'm the most familiar with about this case

5    are my declarations.

6    Q    Do you expect that every customer actually read the

7    entire terms of use every time they were changed?

8    A    It's difficult for me -- it's difficult for me to guess

9    about that.  As a customer, there are some services where

10   when it's a material -- when it's important, I make sure to

11   read it in the new terms of service.  When I think it's less

12   important, I don't.

13        And so each user, each customer, each person has to

14   make that decision on their own.  And so I'm not -- you

15   know, I would expect some customers -- some customers may

16   not have read it thoroughly.  But what I can tell you is

17   that every single one of our customers checked that box that

18   said they agreed to the terms of use, and if they didn't, we

19   wouldn't have allowed them to use the services.

20   Q    Right.  So to be able to access their coins, they had

21   to check that box, whether or not they read all 55 pages or

22   not, correct?

23   A    That's correct.

24   Q    Did you read all 55 pages every time the terms of use

25   changed?

Page 91

1    A     Definitely not.

2    Q     And you said you might read it if it was something

3    important changing.  Would there be a way the customer would

4    know what was being changed and whether it would be of

5    importance to them or not?

6    A     We called out -- in terms of the exhibits, you know,

7    show what we thought were the most consequential changes to

8    the terms of use.

9    Q     Okay.  So we can look at those changes, and those are

10   the only ones that a customer would be aware of as being

11   what you viewed as significant changes to the document, you

12   meaning Celsius.

13   A     They could be -- so if your question is would they be

14   aware of the changes between the versions, yeah, I agree.

15   We called out what we thought was the most consequential

16   changes.

17   Q     And I think in listening to your deposition, both

18   originally and in the supplemental deposition that was taken

19   last week, you were repeatedly asked to give your

20   interpretation of certain provisions of the terms of use.

21   Is that correct?

22   A     Yes.

23   Q     And would it be fair that you repeatedly said you're

24   not a lawyer, you didn't draft them, it's hard for you to

25   really be able to give a definitive interpretation?

Page 92

1   A     That's correct.

2   Q     Is it also fair to say that these lay customers were in

3   the same position?  They aren't lawyers.  They didn't have

4   anything to do with drafting those documents.

5   A     I mean, I'm sure we had some customers that were

6   lawyers.  But yeah, generally I don't expect all of our

7   customers to be attorneys.

8   Q     So if you had difficulty with deciding how to interpret

9   them, would you assume that those lay customers who were in

10  the same position or worse than you were would have also

11  difficulty in interpreting those terms of use?

12  A     I think when you sign up for a service and you agree to

13  the terms of service, it's not really fair after the fact to

14  say, oh, I didn't read that, or I'm going to focus on this

15  part in terms of service versus another part.  When you

16  click that box, you accept the terms of service and --

17  Q     Yes.  But my question is not did you read the whole

18  terms.  My question is, having read them, if there was

19  difficulty in interpreting them, which you yourself said in

20  your deposition you had difficulties, would that not be

21  equally applicable to the customers having difficulties

22  understanding what those terms of use meant?

23  A     I think if I said that verbatim, what I was trying to

24  convey was that -- was maybe one of two things.  One was

25  that I may have had a difficult time understanding the point

Page 93

1     the person was making or the question the person was asking.

2     The second thing is that it can be difficult to review just

3     different snippets from the terms of use versus viewing the

4     document in its entirety.  So without review, when I'm asked

5     to review one sentence here, one sentence there, and then

6     construct some kind of overarching view on the terms of

7     views, I think that's challenging for anyone.

8     Q    If in the same sentence it says, I'm loaning you my

9     assets and I'm also transferring my assets to you, would you

10    consider that a confusing sentence?

11    A    No.

12    Q    You don't consider that there's any confusion between

13    loaning somebody something and transferring it to them in

14    the sense that you all are asserting that this is a full

15    transfer of ownership?

16    A    I mean, from my view, when I read those statements,

17    when I view the entirety of those statements and the

18    agreement, they seem to be in sync.

19    Q    Why did Celsius continue to use the phrase that you are

20    loaning us the assets in numerous places throughout the

21    document, if, in fact, your position is that they were

22    transferring them to you in their totality?

23    A    I wasn't involved in the drafting of that.  So I don't

24    know what the basis for making that decision was.

25    Q    So if a customer read over and over again that they

Page 94

1    were loaning their documents, they would have no reason to

2    know also any more than you why then it would say that they

3    were transferring their assets?

4    A    I'm sorry.  Can you say that question again?

5    Q    Okay.  When you said you don't know why it continues to

6    say in the terms of use that they're loaning their assets to

7    Celsius.  It says that on several occasions, does it not?

8    A    I believe so.

9    Q    Okay.  And you don't know why it continues to say that,

10   even while you're now arguing that, in fact, there was a

11   full transfer of ownership, correct?

12   A    I'm saying that there were attorneys that were --

13   multiple attorneys inside and outside the company that were

14   involved in drafting that.  I relied on them to come up with

15   the reasoning for why that language was added.  That wasn't

16   something -- I had a lot of other stuff on my plate.  So

17   that wasn't something that I was trying to figure out.

18   Q    If any of the borrowers were confused about these

19   written terms of use, do you think they would listen to Mr.

20   Mashinsky's broadcast to try to understand better what was

21   going on with their assets?

22   A    That's reasonable.

23   Q    So it would be reasonable to also look at what he said

24   in context with the terms of use to try to understand what

25   customers actually understood and appreciated when they were

Page 95

1    making these transfers, correct?

2    A    I agree.  Although from personal experience, like, if

3    you're buying a car, you don't just listen to the salesman.

4    You know, you read the contract.

5    Q    But I would hope the salesman would say something that

6    was consistent with the contract, would I not?

7    A    Yeah.  I would hope so too.

8    Q    And I guess it's my last question here.  You talked

9    about that one of the reasons you started investing with

10   Celsius was because you had to deal with various financial

11   tax consequences if you were making your own trades with

12   your investments.  Is that correct?

13   A    That's correct.

14   Q    When you transferred your assets to Celsius under these

15   terms of use, was that a taxable event?  Was that reported

16   to the IRS?

17   A    So I do remember in the terms of use, there was a

18   section that talked about what the tax obligations were, and

19   it primarily revolved around reporting the interest paid to

20   me, not related to the transfer.

21   Q    So in that respect, this would be different than if you

22   were selling these to a third party when you would have had

23   to make that kind of report to the IRS, correct?

24   A    I'm not a tax expert, but I think you're right.

25            MS. CORDRY:  Okay.  All right.  I have no further

Page 96

1    questions.

2              THE COURT:  Thank you very much, Ms. Cordry.  Any

3    other cross-examination?  Any redirect?

4              MR. HERRMANN:  Yes.  This is Immanuel Herrmann.  I

5    can -- I have some brief questions.

6              THE COURT:  Go ahead, Mr. Herrmann.

7                CROSS-EXAMINATION OF OREN BLONSTEIN:

8    BY MR. HERRMANN:

9    Q    All right.  So I just had a few follow-up brief

10   questions for you, Mr. Blonstein.  One is that you joined as

11   a customer in the spring of 2020, correct?

12   A    That's correct.

13   Q    And at your first deposition, you said you reviewed the

14   initial terms of service at that time and that you were

15   giving up ownership, correct?

16   A    Correct.

17   Q    Until September 20th, the terms of service didn't

18   mention change of ownership.  So I just wanted to confirm in

19   court that you read the terms of service, version four, when

20   you signed up and that you read it as giving up title to

21   your assets.

22   A    I did.  I mean, I can confirm that I did, and I believe

23   it is in version -- in both version one and two of the terms

24   of use that were in effect.  I can go through and try to

25   find the relevant session if you'd like.

Page 97

```
 1              THE COURT:  Just answer the questions.

 2              THE WITNESS:  Okay.

 3              THE COURT:  Go ahead, Mr. Herrmann.

 4   BY MR. HERRMANN:

 5   Q    All right.  Is Earn a security?

 6              THE COURT:  I'm sorry.  I didn't understand your

 7   question, Mr. Herrmann?

 8   BY MR. HERRMANN:

 9   Q    Is Earn a security?  Are Earn deposits a security?  Are

10   they something resembling a trade or a purchase for a

11   security?

12   A    I'm not an attorney.  I've already explained my

13   background as chief compliance officer.  That's not the area

14   that I focus on.  That's not something I have any kind of

15   specific knowledge of.  So I'm not in a position to answer

16   that question.

17   Q    Okay.  When somebody takes out a loan, what are they

18   borrowing against?

19              THE COURT:  Mr. Herrmann?

20              MR. HERRMANN:  Yes?

21              THE COURT:  Confine your cross-examination to the

22   direct testimony that Mr. Blonstein has given.

23              MR. HERRMANN:  All right.  I think he did in the

24   depositions, but I can move on.

25              THE COURT:  Well, this is an evidentiary hearing
```

Page 98

1    in court.  Your cross-examination ought to be limited.  I'm

2    going to limit it.  Go ahead.

3              MR. HERRMANN:  All right.  I think that basically

4    was my questions then.

5              THE COURT:  Thank you very much, Mr. Herrmann.

6    Anybody else wish to have any cross-examination?

7              MR. FRISHBERG:  Yes, Your Honor.  Daniel

8    Frishberg.

9              THE COURT:  Mr. Frishberg, go ahead.

10             CROSS-EXAMINATION OF OREN BLONSTEIN

11   BY MR. FRISHBERG:

12   Q    In your deposition on Friday, you stated that you were

13   aware of postposition transfers by Celsius to outside

14   parties, such as DeFi to pay off loans.  The transfers that

15   were conducted on, I believe, July 10th were roughly

16   $160,000,000.  Did the funds ever return to Celsius?

17   Because blockchain data shows that they did not.

18             MS. BRIER:  Objection, Your Honor.  This is

19   outside the scope of --

20             THE COURT:  Sustained.  Confine your questioning

21   to the scope of the direct examination.  This is not a

22   deposition.

23             MR. FRISHBERG:  Thank you.  I have no further

24   questions.

25             THE COURT:  All right.  Thank you.  Anybody else

Page 99

```
1    have any cross-examination?

2              MR. DEGIROLAMO:  Yes, Your Honor.  Tony

3    DeGirolamo.

4              THE COURT:  Go ahead.

5              MR. DEGIROLAMO:  Thank you.  On behalf of

6    customer, Eric Wohlwend.

7                   CROSS-EXAMINATION OF OREN BLONSTEIN

8    BY MR. DEGIROLAMO:

9    Q     Mr. Blonstein, do you recall testifying on direct that

10   when you were a customer of Celsius, that you believed you

11   were giving control of your digital assets to Celsius?  Do

12   you recall that testimony?

13   A     I do.

14   Q     Okay.  And do you also recall in your testimony to

15   cross-examination with Attorney Cordry that you felt that

16   there was no change in the relationship between yourself as

17   a customer of Celsius and Celsius with respect to your

18   digital assets?

19   A     No material change from my perspective as a customer.

20   That's right.

21   Q     Okay.  At no time in your testimony did you say you

22   actually conveyed your ownership of digital assets to

23   Celsius.  And so my question is, what do you actually

24   believe?  Do you believe that you were merely giving control

25   of your digital assets as you testified, or do you believe
```

1    you actually gave title of your digital assets to Celsius?

2    Because you're testifying both ways.

3    A    Yeah.  I thought that -- again, I may be using

4    imprecise terminology and I know --

5            THE COURT:  Just answer the question.  Go ahead.

6            THE WITNESS:  I believe I transferred ownership.

7    I think I actually -- in the deposition, I mentioned

8    transferred title.

9    BY MR. DEGIROLAMO:

10   Q    Well, I'm not interested in -- I'm not interested in

11   your --

12           THE COURT:  Don't interrupt him.  He's in the

13   middle of answering your question.  Do not interrupt him.

14           MR. DEGIROLAMO:  Thank you, Your Honor.

15           THE WITNESS:  So yeah, if I said control, what I

16   mean by that is I'm giving my coins to the company.  That

17   was the consequential decision that I made as a customer

18   before being an employee.  And it was a consequence.  It was

19   consequential.  I mean, I thought hard about it because

20   prior to that point, I held the keys to my crypto myself.

21           MR. DEGIROLAMO:  Nothing further, Your Honor.

22   Thank you.

23           THE COURT:  Thank you very much.  Any further

24   cross-examination?  Any redirect?

25           MS. BRIER:  Briefly, Your Honor.

                                                              Page 101

1           THE COURT:  Go ahead.  When you start, state your

2    name for the record again so we have a clear --

3           MS. BRIER:  Thank you, Your Honor.  Grace Brier,

4    Kirkland & Ellis, on behalf of the Debtors.

5           THE COURT:  Go ahead.

6           REDIRECT EXAMINATION OF OREN BLONSTEIN

7    BY MS. BRIER:

8    Q    Mr. Blonstein, you were asked some questions on cross-

9    examination about whether Celsius identified in its

10   communications to customers changes to ownership based on

11   changes to the terms of use.  Do you recall those questions?

12   A    Yes.

13   Q    And did Celsius communicate the changes to ownership,

14   any changes to ownership in its communications to customers

15   about changes to the terms of use?

16   A    Yeah.  You're right.  That is a good -- or I understand

17   the idea that -- so the terms of use, version eight,

18   included a release of our custody feature, which we clearly

19   -- where we clearly described the customers retaining

20   ownership of their assets that they send to the company.

21   Also, terms of use, version six and seven, talked about the

22   transfer of -- the transfer and the customer relationship

23   from Celsius Network Limited, the UK company, to the Celsius

24   Network LLC, the U.S. company.  So there's a change of --

25   and also there's text there that says including change of

Page 102

1    ownership to the U.S. company.

2    Q    And as it relates to the ownership of the assets that

3    users were committing to the Earn program, were there any

4    substantial changes to those terms of use across version

5    six, seven or eight?

6    A    So I think I'm probably reducing it as a layperson.  I

7    just viewed this as you either keep your coins or you give

8    them to someone.  And so in this case, I viewed the terms of

9    use from when I joined up until now as if you send your

10   coins in to be used to earn yield, you're giving them to the

11   company.  If you don't want to do that, don't send them to

12   the company and enroll them in the Earn program.

13        So from my perspective, I don't really see any material

14   change.  Some of the wording may have changed where the loan

15   was introduced.  I don't know the reason for why that was

16   done exactly.  From my perspective, I think that there has

17   been no material changes.

18   Q    And Mr. Blonstein, how many versions are there of the

19   terms of use?

20   A    Eight.

21   Q    And can Celsius determine what the latest version of

22   the terms of use that a user signed is?

23   A    Yes.

24   Q    And did Celsius do that?

25   A    Yes.

Page 103

1    Q    And how many users, account holders, on a percentage

2    basis, signed version six or later?

3    A    Six or later.  So by count of customers, I think it's

4    over 90 percent and in terms of asset values, because we

5    have a lot of customers that may have accepted but never

6    sent coins on the platform, I think it's 99 percent of the

7    asset value.

8             MS. BRIER:  All right.  No further questions at

9    this time.

10            THE COURT:  All right.  Thank you.

11            MS. BRIER:  Thank you, Your Honor.

12            THE COURT:  All right.  You're excused.  Thank you

13   very much.

14            THE WITNESS:  Thank you.

15            THE COURT:  Mr. Nash?

16            MR. NASH:  So Your Honor, that concludes the

17   evidentiary portion of the hearing.

18            THE COURT:  Do you rest?

19            MR. NASH:  We rest, Judge.

20            THE COURT:  All right.  Do any of the objectors

21   wish to offer evidence in support of their objections?  The

22   Court has read all the objections.  Hearing no response, the

23   Court determines that the objectors have rested as well.  We

24   can proceed with the argument then.  Why don't we take -- so

25   it's 11:42.  Let's take a ten-minute recess, and then are

Page 104

1    you going to make the argument, Mr. Nash?

2              MR. NASH:  I will, Judge.  Should we do that at

3    noon just to be -- or I'd hate to --

4              THE COURT:  Sure.  We'll come back at noon.

5              MR. NASH:  Perfect.

6              THE COURT:  Okay.

7              MR. NASH:  Thank you, Your Honor.

8              THE COURT:  All right.  Thank you.

9              (Recess)

10             THE COURT:  Please be seated.  All right, Mr.

11   Nash.

12             MR. NASH:  For the record, Pat Nash from Kirkland

13   and Ellis on behalf of the Debtors.  So Your Honor, the

14   issue before you is whether or not there is an enforceable

15   contract between the Earned depositors and Celsius, and if

16   there is, do the unambiguous terms of that agreement provide

17   that upon depositing coins onto the platform, individuals

18   transferred title to their digital assets such that those

19   digital assets are property of the estate.

20             And of course if we're talking about whether or

21   not we have an enforceable contract, Judge, we're talking

22   about offer, acceptance, and consideration.  The terms of

23   use, Judge, that was the offer from Celsius and from the

24   evidence in the record we know that there were eight

25   versions of the terms of use.  From the evidence that's in

```
1    the record we know that the terms of use were accepted by

2    90.06 percent of account holders and those holders, their

3    coin deposits represent 99.86 percent of the Earn

4    liabilities, Judge.

5            We know from Mr. Blonstein's testimony that

6    approximately 55 percent of account holders first accepted

7    terms of use Version 5 or earlier.  We also know from Mr.

8    Blonstein's testimony that all of those users, all of those

9    55 percent were required to accept terms of use Version 6 in

10   order to maintain access to their accounts.

11           THE COURT:  So Mr. Nash, having gone through all

12   of the versions, Versions 1 through 5 are less clear to me

13   on the issue of owners.  Version 6 forward was clearer.  The

14   screenshot of the update in terms of service for Version 6

15   listed, I think, three major changes, significant changes.

16   Is there a screenshot for the changes between Versions 4 and

17   5?  I don't remember seeing that.

18           MR. NASH:  There's not, Your Honor.

19           THE COURT:  And that's -- it is the change from

20   Version 4 to Version 5.  I thank the Debtor -- I thank the

21   Committee for its limited objection that it filed because it

22   went through each of the versions you did not in your

23   papers.  You simply said, look at the exhibits.  And it does

24   seem to me that arguably -- I haven't made up my mind.

25   There was a more significant change between Versions 4 and
```

Page 106

1    Version 5 that were not highlighted to customers.  I sort of

2    take Ms. Cordry's point in her cross examination about it.

3            The objectors did not put in any evidence of any

4    of Mr. Mashinsky's videos or anything else that he's

5    allegedly said.  It's not in the record.  The record is

6    closed.  And so if objectors had evidence they wanted to

7    offer, they had their chance and they didn't.  So I don't

8    know what Mr. Mashinsky said or didn't say or whatever.  And

9    I certainly -- again I haven't made up my mind about it, but

10   I do note it does seem to me that there was -- the language

11   changed between Versions 4 and 5; 6 comes along and

12   highlights some changes.  Not saying they weren't important,

13   but nothing that that bears on the ownership issue.

14           Let me just see.  So the percentage of the account

15   holders who became account holders, Version 6 and after, was

16   a pretty high percentage.

17           MR. NASH:  Forty-five percent, Judge.

18           THE COURT:  Okay.

19           MR. NASH:  And if I may, Your Honor, I will argue

20   that it is of legal significance that everybody who

21   initially signed up for Versions 1 through 5 also clicked

22   acceptance.

23           THE COURT:  Oh, I understand that.  They -- yeah,

24   I got that.

25           MR. NASH:  With respective to Version 6.  Thank

1    you.

2              THE COURT:  I got that point.  But I suppose that

3    Ms. Cordry's point is that -- and you may disagree with me,

4    that there was, the language changed in any important way

5    between Versions 4 and Version 5.  It did seem to me that it

6    did.  And I guess Ms. Cordry's point is come on, you got 40

7    pages of terms of use.  Do you really think people read it

8    and no one highlighted for them that maybe there was an

9    important change?  I know the position of the Debtor and I

10   think that there's support for it in the language that from

11   Version 1 on, ownership was in the Debtor.  Not so clear.

12   Not as clear, let's put it that way.

13             MR. NASH:  You know, one thing I'd highlight, Your

14   Honor, it's interesting because we certainly have a lot of

15   objections to this motion, plus or minus 40, I suppose.  I

16   don't have the agenda in front of me.  But as an actuarial

17   matter, Your Honor, as a percentage of 600,000 depositors, I

18   would submit that as an actuarial matter, why do we only

19   have -- well, why do we only have 40 objections?

20             As an actuarial matter, because a number of people

21   don't have the time, the interest, the inclination, can't

22   afford to divert themselves from their day job, can't afford

23   to hire a lawyer.  But when you're talking about 600,000

24   depositors, Judge, I think it's fair to say that as an

25   actuarial matter, there are probably a number of people who

Page 108

1    understood what it is they were signing up for.

2              From the very first version of the terms of use,

3    Version No. 1, every version starting with Version No. 1

4    said that the terms of use clearly state that Celsius has

5    the right for its own account to pledge and re-pledge from

6    time to time digital assets transferred to them.  That was

7    the price for admission, Your Honor, in order to earn

8    rewards.  Terms of use Version 2 and every version onward

9    explicitly states that the Debtors had all attendant rights

10   of ownership to such assets.  Now it wasn't until later that

11   it was clearly spelled out -- clearly spelled out -- that

12   putting your coins on the platform expressly constituted a

13   transfer of title.

14             I will submit that they -- that language, that

15   concept was made more clear but it doesn't mean that the

16   earlier versions of the terms of use don't provide for a

17   transfer of title when you consider what it is that people

18   were putting their coin on the platform for Celsius to do,

19   to loan it, to pledge it, to sell it, to do whatever Celsius

20   wants to do with it in order to generate yield.

21             And it is -- and you heard Mr. Blonstein say and

22   it's, you know, it was part of his testimony.  I believe it

23   came out in cross examination.  He didn't think that the

24   change was material -- now he's just one customer, also an

25   employee -- because he believes and he believed himself that

Page 109

1    when he accessed the Celsius platform pursuant to one of the

2    earlier versions of the terms of use, he understood what he

3    was doing and the legal effect or the practical effect of

4    putting his coins on the platform.

5              So you know, our position, Judge, is that we have

6    offer, we have acceptance through the clickwrap.  A ton of

7    caselaw, Your Honor, about how that is a valid manifestation

8    of acceptance.  It isn't fair to all the other depositors.

9    Presumably some people read the terms of use and understood

10   what they were doing.  Now we have a very vocal minority of

11   our customers who have objected, many of whom have objected

12   to all sorts of pleadings, which is perfectly fair.  It's

13   their right.  But we have a whole host of, as I said,

14   customers who haven't objected and in addition to what I

15   think is the clear legal argument around offer, acceptance,

16   and consideration, this is bankruptcy court, a court of

17   equity.

18             We have practical considerations.  We have

19   equitable considerations.  Many of the objectors, you know,

20   the -- what they're asking for is something that we are not

21   going to be able to do.  We do not have enough coin to give

22   everybody their coin back in kind.  We don't have enough

23   coin to establish 600,000 constructive trusts to give

24   everybody their coin back.  We have a universe of coin that

25   we're working very closely with the UCC and we're getting a

Page 110

1    lot closer to moving these cases forward as you'll hear in

2    connection with the exclusivity extension.

3           You know, there is a light at the end of the

4    tunnel but in order to maximize the recovery of all of the

5    Earn customers, we're going to have to do this collectively.

6    We -- you know, and Your Honor, as is clear in the coin

7    reports, I don't know that it's part of the evidence, but

8    nobody disputes.  We've got lots of some kinds of coins.  We

9    have very few of other kinds of coins.  We don't have the

10   ability to trace individual people's coins.

11          And so on the one hand, it's our strong view that

12   we have offer, acceptance, consideration.  But then as a

13   practical matter, if that's not the outcome, I don't know

14   where we go from --

15          THE COURT:  Let me ask you -- move to a different

16   question.  In the proposed order that you've submitted, I

17   don't know whether there have been any further changes to

18   it.  I think it was indicated this was something that was

19   agreed upon with the Committee's counsel.

20          On Page 3 in No. 3, it reads in part, "The amended

21   motion will not seek findings with respect to, one,

22   ownership of assets in the Debtor's borrow program or

23   custody service or withhold accounts; or two, whether any

24   account holder has valid defenses to the reported contract

25   between account holders and the Debtors under the terms of

Page 111

1    use and all parties' rights are reserved with respect to

2    each of the foregoing," and it goes on with provided.

3              So what are the -- was there, is there a

4    background to the discussion of this carveout for valid

5    defenses to the reported contract?

6              MR. NASH:  Yeah, that was heavily negotiated with

7    the UCC, Judge.  And so your next question might be, well,

8    what does that mean.

9              THE COURT:  Yeah, that's the next question.

10             MR. NASH:  I understand.  So at a minimum, Your

11   Honor, what we seek here is the general rule as to what the

12   terms of use provide.  And I suppose it's possible in

13   connection with the claims resolution procedure, in

14   connection with a claims objection from a customer, in

15   connection with an affirmative pleading from a customer,

16   it's possible that a customer might petition the Court or

17   make the argument, a very personalized individual argument,

18   as to why for some reason they should be excepted from the

19   terms of use.

20             THE COURT:  Well --

21             MR. NASH:  For example, I can't -- is there a

22   customer out there -- Mr. Mashinsky went to lots of trade

23   conferences and whatnot.  Is there a customer out there

24   who's going to be able to come in front of Your Honor and

25   say that he had -- he or she had specific conversations with

Page 112

1    specific Celsius management that caused them to think the

2    terms of use didn't -- I don't know what those would be,

3    Your Honor.  Because I don't think it's going to be at the

4    end of the day, folks who, you know, watched the Mashinsky

5    videos.

6              Because again, with 600,000 customers, I think,

7    you know, tens of thousands, if not hundreds of thousands of

8    our customers watched the AMAs, the "Ask Mashinsky Anything"

9    videos.  And so I'll be surprised if we have personalized,

10   you know, unique defenses.

11             THE COURT:  Let me ask this question.  What about

12   arguments about rescission and restitution for fraud?  A lot

13   -- you know, reading pro se objections, lots of people said

14   they think there was fraud.  One thing to say; another thing

15   to prove it, but --

16             MR. NASH:  Perhaps we'll have pro se or other

17   creditors who will bring a motion or pleading to that

18   effect.  Nothing in this order would prohibit them from

19   doing that.  But in order to move the case forward --

20             THE COURT:  Well, you know, I mean, part of my

21   concern, I approved a bidding procedures motion.  And I

22   asked myself, what is someone bidding on.

23             MR. NASH:  Correct.

24             THE COURT:  And what have you -- what have you

25   bought if there's an express carveout or defenses to

Page 113

1    purported contract between account holders and the Debtor

2    under the terms of use?  I don't -- I'm sitting.  I'm

3    reading this stuff over the weekend.  I was saying --

4              MR. NASH:  Yeah, we're -- we can manage that,

5    Judge.  We're managing that with the bidders.  We're in

6    discussions with the bidders.  They're following the hearing

7    closely, the hearings and the proceedings.  It's very

8    important, Your Honor, that we establish the general

9    baseline as to the legal effect of the terms of use, and the

10   legal effect, I submit and expect that will be, you know,

11   binding on the vast majority, all very rare exception

12   potentially, should someone seek it or bring it.

13             There's nothing in this order that forever cuts

14   off somebody's right to file some type of pleading with Your

15   Honor to seek to bring to Your Honor's attention their own

16   individual circumstances, and if they do, we'll deal with

17   it.

18             THE COURT:  In terms of percentage of value of

19   account holders, how many are Version 6, you know, first

20   logged on Version 6 or after?

21             MR. NASH:  So --

22             THE COURT:  Forty-four percent?

23             MR. NASH:  Forty-five percent in terms of the

24   percentage of the liabilities on the platform.

25             THE COURT:  Yeah.

Page 114

1          MR. NASH:  I don't have that at my fingertips, but

2     probably by the time -- it's probably here somewhere and

3     we'll seek to get it for you.

4          THE COURT:  Okay.  All right, go ahead you're your

5     -- you know, I've read all these papers.

6          MR. NASH:  Yeah, so I'll move from the Earn to the

7     selling of the Stablecoin.

8          THE COURT:  Sure.

9          MR. NASH:  If you conclude that the Stablecoin is

10    our property.

11          THE COURT:  Let me cut this a little shorter.  In

12    my own mind, and Ms. Cornell can argue to the contrary about

13    it, but frankly I don't have to decide whether this is

14    ordinary course of business or not, because you argue and it

15    seems to carry some persuasive weight with me that even if

16    it's not ordinary course of business and the Committee

17    certainly argues this, it's the best interests of the

18    Debtors.  It's the proper exercise of business judgment.

19          And frankly, you know, Ms. Cornell is going to

20    take issue with this, but whether the sale, if I approve it,

21    whether it happens next week or next month or in stages as

22    needed, yeah, I mean, the Debtors can only use the assets.

23    You know, they can't use it in a slot machine in Monte Carlo

24    but they can pay salaries and administrative expenses and

25    all that.

1              So I, you know, at least my mindset right now is

2      if I conclude that everything in the Earn accounts is

3      property of the estate, which I'm not there yet -- take it

4      under submission -- Stablecoin is no different than anything

5      else in Earn accounts.  And I agree with the Committee, it's

6      not ordinary course of business.  You don't have an ordinary

7      course of business at this point.

8              MR. NASH:  That's why in the alternative, Your

9      Honor --

10             THE COURT:  Look, it doesn't -- that's why I say,

11     it doesn't -- frankly, it seems to be an appropriate

12     exercise of business judgment to sell Stablecoin, have that

13     liquidity ramp.  If you -- no one better go to Las Vegas and

14     gamble it.  You're not deploying the assets the way you were

15     before.  So you know, that's -- my mindset at this point is

16     if it's property of the estate, showing good business

17     judgment to sell it.

18             MR. NASH:  Unless you have any other questions for

19     me., Your Honor --

20             THE COURT:  I don't.

21             MR. NASH:  Thank you, sir.

22             THE COURT:  Let me hear from the Committee.

23             MR. COLODNY:  Good afternoon, Your Honor.  Aaron

24     Colodny from White and Case on behalf of the Committee.  I

25     have a number of pages that I'm guessing I'm not going to

Page 116

1    get through.  I'll start --

2             THE COURT:  I would like to eat lunch before we go

3    on Zoom for the afternoon calendar.

4             MR. COLODNY:  That's true.

5             THE COURT:  Well chosen.

6             MR. COLODNY:  I'll start by noting that the

7    Committee understands why account holders who feel that

8    they've been misled and mistreated would be upset with the

9    finding that digital assets they have transferred to Celsius

10   are Celsius' property.

11            THE COURT:  Yeah, some of them are upset at the

12   Committee and its counsel, too.

13            MR. COLODNY:  I think we had 397 of them.

14            THE COURT:  Yeah.

15            MR. COLODNY:  But the Committee's first obligation

16   is to, when faced with his hard question, is to get the

17   correct answer.  And we believe that this answer is both

18   right on the law and it best serves the interests of account

19   holders and creditors, and I think this goes to the

20   equitable concerns that Mr. Nash read.  The Debtors have $16

21   million of available Stablecoin and a billion dollars' worth

22   of Stable --

23            THE COURT:  Though it was $18 million.

24            MR. COLODNY:  Eighteen.  Apologies.  And a billion

25   dollars' worth of Stablecoin obligations.  That's a less

Page 117

1    than 1 percent recovery.  And if you say, I deposited

2    Stablecoin with the Debtors and that Stablecoin is my

3    property, then you have a very hard claim to say, I have an

4    interest in other assets of the Debtors.  Personally, I

5    don't think it's fair that people that deposited money with

6    the Debtors and had no control over what was lost or

7    otherwise squandered, get 1 percent versus others get 60 to

8    80 percent.

9              THE COURT:  Look, I've written before that a

10   fundamental tenet of our bankruptcy system is equality of

11   distribution.  And I commented in earlier hearings in this

12   case that to the extent that any account holders are able to

13   establish that what they deposit is their property, not the

14   estate's property, it's that much less available for

15   distributions to the creditor body at large.  That's sort of

16   fundamental premise, but it doesn't decide the ownership

17   interest.

18             MR. COLODNY:  It doesn't decide the ownership

19   issues.  And a couple of questions that you asked Mr. Nash

20   were about the click back mechanism, and the disclosure that

21   was given to account holders.  I think the Uber case is very

22   relevant.  There the Second Circuit Court of Appeals was

23   looking at California law, but it noted that New York law

24   was extremely similar and it was looking at a decision of

25   the District Court that said that a -- I think it was

Page 118

1      someone using the ride hailing app didn't have notice of the

2      arbitration provisions and the District Court found that it

3      wasn't proper inquiry notice because the arbitration

4      provision was, you know, deep within the terms of use.

5              And the District Court said, or the Second Circuit

6      said, as long as the notice is clear that when you click

7      accept you're accepting the terms of use and the terms of

8      use are available to the person, then that is a proffer,

9      offer, and acceptance of those terms of use.

10             THE COURT:  Yeah, the ALI has been -- I don't know

11     where the current, this issue currently stands.  They

12     debated whether to start a project on consumer clickwrap

13     contracts because the reality is most -- you get your credit

14     card agreement.  You know, even in paper, you don't read the

15     whole thing.  Clickwrap contract, who's going to read the --

16     how many people really read the 40 pages?  \But you check

17     the box and Celsius says, unless you check the box, you

18     can't, we won't give you access to your capital.  Set a

19     deadline.  I understand all that, but it's the reality of

20     modern business, frankly, and it's a dilemma and it's an

21     issue, but the law is developing the way it's developing.

22             MR. COLODNY:  Well, I guess I have a lot here

23     about how --

24             THE COURT:  Let me ask you specifically, and I

25     really, I derive this from your brief and maybe you disagree

Page 119

1    with me.  But it seems to me that the most significant

2    change in language, I won't use the word material, okay.

3    The most significant change in language about ownership

4    happened between Versions 4 and 5 and those changes weren't

5    -- there's no screenshot showing that it highlighted the

6    change in that language.  Do you agree or disagree with

7    that?

8              MR. COLODNY:  We're aware of no screenshot that

9    highlighted that change in language.  But I --

10             THE COURT:  Do you think that was a material

11   change?  You didn't think it was a significant change?  Drop

12   the word material.  Material has legal connotations I'm not

13   trying to put on it.

14             MR. COLODNY:  So when I look back at the versions

15   of the terms of use, the first version has a representation

16   and warranty that says that you agree that Celsius can

17   pledge and re-pledge all of your assets.  And in the second

18   version it gets clearer and it says Celsius can pledge, re-

19   pledge, re-hypothecate, sell -- someone took a list of every

20   transaction they could think of, put it there.  And it says

21   with all attendant rights of ownership.

22             THE COURT:  It does, it -- right at the end of it

23   there.  It says with attendant rights of ownership.  Those

24   are the words that are --

25             MR. COLODNY:  That's right.  And I'm not sure how

Page 120

1    you can give attendant rights of ownership if you don't have

2    attendant rights of ownership.  And I know that it got

3    clearer where it says, you transfer all right, title, and

4    interest later on.  But I think that second term of use

5    which was signed up by 96 percent of the account holders did

6    say you're giving your stuff to Celsius and Celsius can sell

7    it to whoever it wants without notice to you with all

8    attendant rights of ownership.

9            So it may have gotten clearer, but I think it's

10   there from at least the second version.  And I believe the

11   first one as well.

12           THE COURT:  Okay.

13           MR. COLODNY:  With respect to the defenses --

14           THE COURT:  I don't know what -- I mean, I --

15           MR. COLODNY:  I saw with the Debtors' counsel and

16   tried to bang my head against the wall.  We had a hearing on

17   December 5th and I think we had 20 days over Thanksgiving

18   holiday with a lot of people that wanted to take a lot of

19   discovery.  We have been taking a lot of discovery and I was

20   not confident that we could get it done in the time period

21   that we had.  By reserving defenses, I believe that we

22   preserved an element of due process that otherwise people

23   would have complained perhaps rightly about and I think that

24   we preserved those for a later date.  I think --

25           THE COURT:  Why -- you just tell me why the chief

1    revenue officer refused to appear for a deposition?  You

2    wanted his deposition.  This is -- I'm reading Footnote 20

3    of your --

4              MR. COLODNY:  We did not ask for a deposition

5    because before the opponents were identified, we agreed that

6    we would only use their declarants.  The point of that

7    footnote was to say that Mr. Blonstein testified that he

8    wasn't directly involved with the solicitation.  He also

9    testified at his deposition that Mr. Cohen-Pavon was

10   involved.  The Debtors didn't produce him and we didn't have

11   a chance to talk to him.  We've sought to serve him with

12   Rule 2004 requests and he has resisted and said this was --

13             THE COURT:  Just tell me what your view is.  I

14   mean, he's a current employee?

15             MR. COLODNY:  He is.

16             THE COURT:  Why do you need a subpoena?  I don't

17   think you need a subpoena for him.  I mean, you served a

18   notice of deposition for him.  If they didn't produce them,

19   I deal with it.

20             MR. COLODNY:  Point taken.

21             THE COURT:  You know, you talk about that he

22   wanted to be served under the Hague.  He's an employee of a

23   Debtor.  Rule 2004, you want to take his deposition, take

24   his deposition.  He doesn't want to show up, we'll deal with

25   it.

```
 1              MR. COLODNY:  Okay.

 2              THE COURT:  All right, anything else you want to

 3    add?

 4              MR. COLODNY:  I guess I would like to talk a

 5    little bit about the plain language of the terms of use.

 6              THE COURT:  Go ahead.

 7              MR. COLODNY:  And specifically, I think a lot of

 8    people have raised this concept of a loan in a transfer of

 9    title.  And when I was thinking about that, I looked at

10    Section 4 of the most recent version of the terms of use

11    where it says, in all bold, "If our Earn service is

12    available to you, upon your election you will lend your

13    digital assets to Celsius and grant Celsius all right and

14    title to such digital assets for Celsius to use in its sole

15    discretion while using the Earn service."

16              I don't know how you read that to say you will

17    lend your assets to -- eligible digital assets to Celsius

18    and grant Celsius all right, title to such digital assets to

19    conflict.  You would have to strike the last part of the

20    sentence.  And that's not how we're supposed to write --

21    read contracts.  The same is true for Section 13, which the

22    Debtors site as their long sentence giving title.  And I

23    think it's key that the Debtors didn't have an obligation to

24    give you back your exact crypto asset.  They had an

25    obligation to give you back a like kind crypto asset.
```

Page 123

1          Crypto is fungible like money.  If you get a loan

2     of dollars, you have to give dollars back, but not the exact

3     same dollars.  And I don't think that they -- that that

4     indicates that there was an ownership in a potential -- in a

5     particular asset that the Debtor was holding.

6          You noted some reservations we had in an order

7     about the sale of Stablecoin.  I think the Debtor has agreed

8     to those, notice to use them only for ordinary course

9     business reasons, to use them only when the Debtors reach

10    their minimum liquidity threshold is responsible operation

11    of the business.

12          And I guess just lastly, Your Honor, I want to --

13    I know you said this earlier, but I think it's very

14    important that that everybody understand that just because

15    Celsius has the property and the property may be property of

16    Celsius does not mean it's not going to be distributed to

17    account holders.  It doesn't mean Celsius can do whatever it

18    wants with it.

19          When you are a Debtor in bankruptcy, Celsius has

20    to come to Your Honor and ask to do anything outside of the

21    ordinary course of business.  If it wants to confirm a plan,

22    all account holders then get to vote on that plan.  If it

23    wants to sell its assets as part of the bidding procedures,

24    it has to prove to Your Honor that that's in its business

25    judgment and one of the key elements of that is going to be

Page 124

1    if it's in the best interests of the account holders.

2            And so this is not people giving their money to

3    Celsius and Celsius taking it and saying it's mine now, you

4    don't get it back.  Celsius has an obligation to each

5    account holder to pay them back.  They don't have enough to

6    pay everybody back.  It's very important to the Committee

7    that we reach a fair distribution of assets that recognizes

8    people's -- what people signed up for and distributes things

9    fairly based on what happens.  It wasn't the fault of

10   anybody who got themselves into this mess.  But it is

11   important that it be sent fairly and efficiently, because

12   one thing we've all heard today is these cases cost a lot of

13   money and we need to be making movement towards the exit so

14   that we can cut that off and get as much back to people as

15   we can as soon as possible.

16            THE COURT:  Okay, thank you.

17            MR. COLODNY:  Thank you.

18            THE COURT:  All right.  Ms. Cornell, do you want

19   to be heard?

20            MS. CORNELL:  Good morning again, Your Honor.

21   Shara Cornell on behalf of the Office of the United States

22   Trustee.

23            THE COURT:  Good afternoon.  That clock is wrong.

24   It's not as bad as that, but we're at the end.  Go ahead.

25            MS. CORNELL:  Close.  The United States Trustee

Page 125

1    filed objections to the Debtors' motions to sell Stablecoin

2    at ECF Docket No. 933 and 1489.  As discussing these

3    objections, there are two distinct issues today and I just

4    want to keep it brief.

5            The first is whether the Debtors have authority to

6    sell the subject Stablecoin and the second is whether

7    assuming the Debtors can sell the Stablecoin, if they should

8    sell that Stablecoin.  And it really is questionable whether

9    the Debtor should, as of today, sell $18 million worth of

10   Stablecoin.

11           By the admission of the Debtors' professionals and

12   employees, the Debtors do not currently need the money and

13   won't need the money until March.  The Debtors have relied

14   on their business judgment as to why Stablecoin should be

15   sold, but business judgment is not unfettered and at a bare

16   minimum, the Debtors must create an evidentiary basis why

17   they're selling what they're selling, including the

18   quantity, and why it needs to be sold now instead of at a

19   later date and what the proceeds of the sale will fund.

20           The Debtors have admitted that they can sell at

21   any time.  Moreover, a liquidation analysis, not even been

22   done yet.  Regardless of how the parties try to divert

23   attention in this case to other issues, there is no way that

24   the sale of these coins will not impact a later distribution

25   to creditors.  If the parties are going to sell the Debtors'

Page 126

1    business as a going concern --

2              THE COURT:  Why is that?

3              MS. CORNELL:  I'm sorry?

4              THE COURT:  Why will it not -- why will it not

5    affect later distributions?  I mean I asked the question as

6    well and they -- well, they can buy more Stablecoin if

7    there's other liquidity they can -- you know, and then

8    they're not going to face the vast market swings that the

9    other crypto has if they commit to distributing Stablecoin

10   to those who deposited Stablecoin.  They may not have it

11   now, but they can get it later.

12             MS. CORNELL:  I haven't heard that commitment to

13   date, Your Honor.

14             THE COURT:  They said it today.  You heard that?

15   That was -- I asked the question that you know how much is -

16   - they're not selling.  At this point, they're not seeking

17   authority to sell anything connected with custody or

18   withhold or the collateral for loans and that's how they get

19   to the $18 million.  Okay.  And I suppose, you know, we'll

20   get to some point where we'll resolve the issues of custody

21   and withhold and -- but what, you know, they can convert

22   fiat currency into Stablecoin at any point if they're going

23   to have a plan.  Agreed?

24             MS. CORNELL:  I don't see why not, but we haven't

25   gotten to that point yet where we've seen anything --

Page 127

1          THE COURT:  I know, so what --

2          MS. CORNELL:  -- from the Debtors.

3          THE COURT:  But I don't --I truly am mystified

4    about what the real -- assume for a moment, okay, that it's

5    property of the estate,  Okay.  If it's not property of the

6    estate, they can't.  Okay.  Assume it's property of the

7    estate.  I don't understand what your real objection to

8    their selling the Stablecoin, converting it into fiat

9    currency, they have to use the proceeds in ordinary course

10   of business, administrative expenses, including salaries and

11   all that.  They can't go to Las Vegas.  Frankly, the dollars

12   are going to -- in my view, safer than crypto and we had

13   lots of, you know, effort in this case dealing with 345 and

14   all that.

15          I'm frankly more comfortable if it's in fiat

16   currency.  So I'm really, I'm somewhat mystified about what

17   your real objection is.

18          MS. CORNELL:  At this point, my objection is based

19   solely on that the Debtors just haven't provided an

20   evidentiary basis for what they're going to use the proceeds

21   for.  We've heard today that they are currently funding non-

22   Debtor entities to the tune of $500,000 at least.  They

23   couldn't point to the budget that was provided to the

24   parties to explain that and they want to convert $18 million

25   worth of cryptocurrency to fiat and it's unclear to at least

Page 128

1    me as to what that money is going to be for.

2              THE COURT:  So let me ask you this.  If the Court

3    determined that the Stablecoin is property of the estate,

4    what prevents them from transferring Stablecoin to one of

5    these other entities, Debtor or non-Debtor entities?  I

6    mean, they better -- you know, they're going to need my

7    approval, but whether it's Stablecoin or fiat, they're going

8    to need the same approval.  I'm sure the Committee is going

9    to be screaming bloody murder if they try and use the funds

10   to fund non-Debtor activities that there are inadequately,

11   you know, not collateralized and all that.  True?

12             MS. CORNELL:  It's possibly true, but we do know,

13   we know right now that they are making those types of

14   payments to non-Debtor entities.

15             THE COURT:  So object to it.

16             MS. CORNELL:  We're in the process of gathering as

17   much information because we weren't aware of those based on

18   the budgets that were provided.

19             THE COURT:  Come on, Ms. Cornell.  I asked at the

20   first day hearing, first or second day, I asked because I

21   always ask about, are funds being used, transferred to non-

22   Debtors, non-Debtor affiliates.

23             MR. NASH:  Your Honor --

24             THE COURT:  No, don't interrupt, Mr. Nash.

25             MR. NASH:  Sorry, Judge.

Page 129

1              MS. CORNELL:  I mean, that's all at this time,

2     Your Honor.  We were just looking for their evidentiary --

3              THE COURT:  You have a position on whether crypto

4     assets including Stablecoin are property of the estate?

5              MS. CORNELL:  No, Your Honor, not at this time.

6              THE COURT:  Okay, thank you.

7              MS. CORNELL:  Thank you.

8              THE COURT:  All right.  Who else wants to be

9     heard?

10             Go ahead.  Ms. Milligan, you want to be heard?

11    You're on the screen.

12             MS. MILLIGAN:  Yes, Your Honor, thank you.  Layla

13    Milligan on behalf of the Texas State Securities Board and

14    Texas Department of Banking and we also filed an objection

15    to the amended Earn and Stablecoin motion at Docket 1496,

16    which I'm sure this Court has read, and thank you for your

17    time.

18             One of the issues that we are concerned with in

19    this case because we are looking at this from a regulatory

20    standpoint, it's our understanding that the Debtor has never

21    been regulatorily compliant.  Mr. Blonstein, who is the

22    chief compliance officer, could not attest whether they were

23    ever registered as a securities broker dealer, any sort of

24    securities regulation.  We have serious concerns about --

25             THE COURT:  Let me just -- let me stop you there.

Page 130

1   Okay.  Let's assume for our discussion, they have not

2   complied with state securities regulations.  How does that

3   deal with whether or not, A, it's property of the estate or

4   B, whether I should permit them to sell the Stablecoin and

5   use it in connection with the case?  That's the issue for

6   today.

7            MS. MILLIGAN:  Because the concern is that the

8   contract was an illegal contract and that makes the contract

9   void and unenforceable.  And that issue was carved out --

10           THE COURT:  I'm not so --

11           MS. MILLIGAN:  -- between --

12           THE COURT:  I'm not sure about that because, you

13  know, then we get in issues about 510 in the Bankruptcy Code

14  and subordination and you treat the securities law claims.

15  Basically, they're treated the same way.  They'd be -- here,

16  they'd be treated as unsecured claims.  I mean, so -- I

17  mean, the Bankruptcy Code deals with it in Section 510.

18  There've got to be a dozen Lehman Brothers decisions that

19  deal with 510.  I had MF Global.  I've got decisions in MF

20  Global about it.  So if they violated the securities laws --

21           MS. MILLIGAN:  Yes.

22           THE COURT:  -- they violated -- you know, you'll

23  get your pound of flesh against them.  The important -- from

24  my standpoint, I want the creditors to get their recoveries,

25  okay.

Page 131

1           MS. MILLIGAN:  The State of Texas wants the

2     individual investors to get made as right as possible.  That

3     is the point and one of the --

4           THE COURT:  We agree.

5           MS. MILLIGAN:  -- carveouts -- yes, absolutely.

6     And one of the carveouts between the Committee and the

7     Debtor was to not discuss any of these defenses and not

8     produce any discovery on these defenses.  And I will tell

9     you, while the Debtor continues to say they are working with

10    the Committee to formulate a plan, they are not working with

11    the regulators.  And this company is severely regulatorily

12    deficient and has been and built its business on the back of

13    innocent investors.  And that is who we're looking at.

14           If a contract is void and unenforceable, then it's

15    not just offer and acceptance and let's move on and sell

16    things.  It's a matter of all of the elements.  And one of

17    the issues is Rule 7001 provides for a way to go through,

18    not a long, painful process.  The Court can keep it as short

19    as possible.

20           But what the Debtor has done is filed a motion, an

21    amended motion, scheduled three depositions over two days,

22    provided incomplete written deposition answers, assumed no

23    one else has an interest except the Committee, and is

24    (indiscernible) towards this judgment today as to that -- as

25    the assets of the estate without considering any defenses in

1    any contracts.

2          And yes, there are 600,000 investors.  There were

3    probably over 9,000 in Texas alone, and we have serious

4    concerns about the process.  The Earn investors are the low

5    hanging fruit in this case and the Debtors are aware of this

6    and are seeking to monetize those assets and that is our

7    concern.  There hasn't been --

8          THE COURT:  May I ask you a question?  Would you

9    prefer that the company just liquidated tomorrow?

10          MS. MILLIGAN:  I don't know what option they have.

11   We don't know what other option they have because no Version

12   2.0 has been presented that is viable and regulatorily

13   compliant.  We have no information as to what -- I would

14   prefer that the customers get made right.  However that

15   happens, whether through liquidation or reorganization,

16   that's what we're trying to focus on.  But at this point, it

17   seems like everyone is running towards the goal without

18   knowing the rules of the road and that's our concern.

19          The examiner has a report coming out in

20   approximately a month that further examines what is going on

21   and what happened in this case.  That is not being

22   considered.  I just think this is a situation that the Court

23   could place on even an expedited timeline with proper

24   adjudication of all the facts and allow the parties to have

25   an opportunity to be heard and due process to happen.

Page 133

1              THE COURT:  From early, from the very first days

2      in this case, the ownership of Earn assets was identified

3      as, you know, a gating issue.  So what I strongly disagree

4      with, Ms. Milligan, is that somehow -- you make it sound

5      like they sprung this on you.  From right at the start of

6      this case, the -- in their, you know, in their first brief

7      they filed, they identified a range of issues that are going

8      to have to be resolved.  I've known about it since day one

9      and I think you have, too, so they didn't just spring this

10     on anybody.  If an exit strategy is going to be pursued with

11     a 363 sale, the buyer has got to know what they're bidding

12     on.

13              It's crucial to know this in order to do that.

14     Any buyer is going to have to comply with state and federal

15     regulations going forward.  I've commented on that before as

16     well, you know.  It may well be that this Debtor failed to

17     comply with multiple state regulations and federal

18     regulations.  That's for another day and maybe for another

19     Court.  But the point is the issues that are being addressed

20     today were identified as in day one of this case and the

21     real issue is how we can cut this enormous administrative

22     expense and get this case to the goal line to get an exit

23     and whether it's a standalone plan or 363 sale.  You know,

24     I'll put this off for another six months or a year and

25     there'll be a corpse left.  Any other points you want to

Page 134

1   make, Ms. Milligan?

2           MS. MILLIGAN:  No, Your Honor.  I think we just

3   stand with the arguments in our pleading and I --

4           THE COURT:  Okay.

5           MS. MILLIGAN:  -- appreciate the Court's time.

6           THE COURT:  Thank you.  All right, anybody else

7   wish to be heard?  Ms. Cordry.

8           MS. CORDRY:  Yes, Your Honor.

9           THE COURT:  Go ahead.

10          MS. CORDRY:  Okay.  This is Karen Cordry again,

11  bankruptcy counsel for the National Association of Attorneys

12  General.  And -- get my notes back up here.  One second.  I

13  think in some respects, I would agree that I -- with Mr.

14  Blonstein and the Committee that the Debtor certainly has

15  been trying to transfer -- create a transfer of ownership to

16  itself.  I think the language they have done continues to

17  remain ambiguous.

18          I think the statement that, well, if I say I'm

19  loaning to you and therefore I'm transferring ownership,

20  that if I treat that as being ambiguous, I'm dropping off

21  the second half of the sentence, well, it also means that if

22  you don't treat it as ambiguous, you're dropping off the

23  first half of the sentence.

24          I don't think we've ever had an explanation as to

25  why they continue to use the loan terminology throughout the

1    terms of use.  Perhaps it's a matter dealing with the

2    securities laws, the fact that this company is almost

3    certainly operating unlawfully in terms of whether or not

4    it's compliant with the securities law.  We certainly don't

5    have any assurance yet that they're doing anything to bring

6    themselves into compliance because they still have not

7    identified, apparently, anyone who's actually working on

8    those issues as Mr. Blonstein is not yet doing those.

9            I think the notion that people understood what was

10    being done with all of these subsequent terms of uses and

11    these claims about transferring ownership and so forth, I

12    think that's really a very highly debatable point, even

13    without the confusions from Mr. Mashinsky's terms of his

14    discussions and perhaps at a later hearing with some of the

15    other issues that may come in some more.  We weren't party

16    to those and I didn't really think about --

17            THE COURT:  Let's deal --

18            MS. CORDRY:  -- trying to get evidence.

19            THE COURT:  Ms. Cordry, let's deal with the

20    evidence in the record today.

21            MS. CORDRY:  Yes, and I am.

22            THE COURT:  Nobody put any evidence in the record

23    about what Mr. Mashinsky did or didn't say.

24            MS. CORDRY:  I understand.  I understand that, but

25    I think even without that, I think the terms of use that are

Page 136

1    there in the main remain extremely confusing, ambiguous.

2    Quite clearly, if they had been trying to pull these out and

3    make these really clear that people would understand there

4    were a lot simpler ways they could have written these

5    documents,  Now, and I do think you can entrust your assets

6    to someone and give them a full authority to sell it,

7    including transferring the ownership of it, and still retain

8    my own right of ownership.  I think that's entirely possible

9    to do.

10          All of that said, the one thing I would agree with

11    the Committee and Mr. Blonstein and the Debtor on is that

12    from the earliest days of these documents, people did say

13    you can sell my assets in order to carry out the Earn

14    Program.  I mean, that's really the essence of the Earn

15    Program.  I have to give you some degree of authority to use

16    my assets and to sell them in order to make the company work

17    and to operate and to be able -- that's what they were

18    paying --

19          THE COURT:  They had -- they were in -- it was a

20    lending platform.  They had to deploy the assets --

21          MS. CORDRY:  Correct.

22          THE COURT:  To be able to earn something they

23    could share with account holders.

24          MS. CORDRY:  Correct, and that, I think is

25    something that far predates all of these claims about

1    transferring ownership.  It is this point that I can lend

2    you my asset and I can tell you, you can use it, sell it,

3    pledge it, whatever, and when I want it back, you're going

4    to give it back to me.  That was -- that is part of the

5    bargain that I was striking with you that yes, I am --

6    whatever kind of transfer I'm making it to you, it is within

7    the context that you will give me back my asset whenever I

8    ask for it.

9              THE COURT:  No, they would give back --

10             MS. CORDRY:  -- timetable.

11             THE COURT:  Not the.  There was no commitment to

12   give back the same Stablecoin that somebody -- you would get

13   a distribution, you'd be repaid in kind.

14             MS. CORDRY:  Exactly.  I was not meaning that you

15   would get back the exact, but that I would get back my

16   assets.

17             THE COURT:  Isn't that significant that there was

18   no commitment to pay back the specific assets?  If you

19   continue to have ownership of the assets and you deposit it

20   and was there something in there that says you got to give

21   me back exactly what I -- you know, the same Bitcoin, the

22   same Stablecoin?  No.  You're going to pay us back in kind.

23             MS. CORDRY:  I agree, but I don't think that's

24   inconsistent with saying that I'm still retaining rights in

25   what I transfer to you.  But there is rights to sell and

Page 138

1    that's, I guess, where I'm --

2              THE COURT:  They retained a contract right.  They

3    retained a contract right to receive back in kind whatever

4    form of crypto they deposited.  That's all well and good

5    until they go bust.

6              MS. CORDRY:  Right.  But, and I think that's part

7    of what they're saying here is we want the right to sell but

8    we're not -- we don't want to acknowledge the fact that that

9    right to sell was given in the context of you had to give me

10   back what -- the kind of coin I deposited with you.  But my

11   bottom line is, I guess I would agree that I think they

12   probably can sell this within that context of that original

13   authority.

14             What I would hope the Court would do is make the

15   narrowest possible decision it can because I think it

16   doesn't necessarily have to decide the ownership in the

17   context of this motion, because I think that right to sell

18   stands of its own authority apart from the transfer of

19   ownership because they were selling that long before they

20   put all this language in there about transferring ownership

21   and control and so forth.

22             In terms of whether they should do it at this

23   point, I have a number of the same concerns that the Trustee

24   does.  The liquidity -- they said at the end of October,

25   they had $172 million.  At a $20 million rate -- burn rate,

Page 139

1   that's still $72 million at the end of March.  We have the

2   GK8 sale that's going to go through presumably in a very

3   short order; gives them another month-and-a-half to two

4   months of liquidity.

5           To the extent -- I know a number of my clients

6   were concerned that perhaps there should be a sale now to

7   deal with any potential fallout from all the turmoil in the

8   crypto market, but it sounds like they're very confident

9   that there will be no issue with being able to sell this at

10  any point they want to and re-buy it at the same point,

11  which in fact kind of makes you really wonder why should I

12  sell it if I'm going to re-buy it again to make this plan

13  work?

14          Our motion or our position in the objection stated

15  was if there was really a need to sell it and if there's

16  some valid basis to sell it at this moment, as opposed to

17  some later point when there actually is a liquidity crunch,

18  it should at least be held in escrow in order to make sure

19  that if there are further developments with other issues in

20  the case that would throw more light on this when the

21  examiner's report comes out in full, you know, and so forth

22  that --

23          THE COURT:  May I ask you this, Ms. Cordry?

24          MS. CORDRY:  Yes.  Sure.

25          THE COURT:  If the Court determines that the Ear

Page 140

1      assets including Stablecoin are property of the estate,

2      could you point me to any authority or cases that say no,

3      let's separate this and put this pot in escrow?  I mean,

4      it's -- it becomes, you know, at that point the assets of

5      the estate becomes somewhat fungible and certainly to the

6      extent there in fiat currency, it's fungible.  Yes, there

7      are limits and restrictions on what a Debtor in a Chapter 11

8      proceeding can do with it.  It's not as if they get this $18

9      million and they're off to Las Vegas or Monte Carlo with it.

10             MS. CORDRY:  I understand.

11             THE COURT:  That's the ticket to jail.

12             MS. CORDRY:  For sure.  I think the Court has its

13     general 105 authority, which we've been told is the best

14     authority in the world to hold these funds if only because

15     if there was --

16             THE COURT:  Boy, I bet you've argued plenty of

17     times that that 105 doesn't give a bankruptcy judge a lot of

18     authority to do anything.

19             MS. CORDRY:  And I've generally been overruled on

20     that, Your Honor.  I have been told, as I say, that I think

21     it's the best authority in the world is that Section 105

22     authority.  I think that certainly gives you the power to

23     hold it there just to ensure that if there are further

24     developments, if there are --

25             THE COURT:  I'm really not trying to cut you off,

1      but do you have any last points you want to make?

2              MS. CORDRY:  I think that's really it, because I

3      think, you know, the other point is really would just like

4      to see where this case is going and that's part of the

5      development as well.

6              THE COURT:  Me, too.

7              MS. CORDRY:  If there really is going to be an

8      operating company that can comply with securities laws, then

9      we'd like to see that and that would make us a lot more

10     confident about having this money being spent.  Thank you.

11             THE COURT:  And the sooner that happens, the

12     better off everybody will be.

13             MS. CORDRY:  Exactly, because we --

14             THE COURT:  And I think Kirkland and the Debtors

15     agree with that as well.  I mean, it's not -- and that's

16     what strongly counsels against putting this off for months

17     before a decision is made.  We've got to move forward, in my

18     view.  I made this point to Ms. Cornell.  There's been

19     plenty of notice -- to Ms. Milligan, I made this point.

20     There's been plenty of notice from day one that these were

21     gating issues.  Anything else, Ms. Cordry?

22             MS. CORDRY:  I think -- on the same basis, though,

23     it's been clear from day one that whether this Debtor is

24     going to come into compliance with the securities law is

25     another gating issue and that has not come to the fore at

Page 142

```
 1    all yet.  We have not commenced those discussions.

 2            THE COURT:  Frankly, they're not taking any

 3    deposits or lending any money or deploying assets.  I'm not

 4    --

 5            MS. CORDRY:  Presumably -- yes.  Presumably they

 6    will be.

 7            THE COURT:  All right.

 8            MS. CORDRY:  -- they reorganize.

 9            THE COURT:  Somebody will be, either a buyer or

10    where the Debtor going forward will have to be in compliance

11    with all state regulation.  Thank you very much, Ms. Cordry.

12            MS. CORDRY:  Anyone else want to be heard?

13            MR. KHANUJA:  Your Honor, this is Kulpreet

14    Khanuja.  I'm a pro se creditor.  I'm not sure if I'm

15    allowed to speak, but it --

16            THE COURT:  Yes, you can.  Go ahead.  Please.

17            MR. KHANUJA:  Thank you, Your Honor.  So Your

18    Honor, I do not want to comment anything on the sale of the

19    assets themselves, but rather I want to make a comment on

20    the ownership of assets as mentioned by Mr. Nash.  Now Your

21    Honor, some of these arguments I'm going to make are already

22    in my Docket 1346 with a hearing scheduled on the 20th of

23    December.

24            Now, Mr. Nash mentioned the legal effects of the

25    terms of use of the binding nature of contracts and how 55
```

1    percent of people signed up terms of use Version 1 to 5 and

2    the remaining for terms of 6 (audio drops).  Now, Your

3    Honor, with regards to the terms of use Version 1 through 5,

4    even Celsius itself was not being compliant with its own

5    terms of use.

6            Now, the terms of use wasn't Version 1 states that

7    in Paragraph 31 if there is any changes, any significant

8    addition, deletion, subtraction to the terms of use it will

9    provide the customers proper notice and details as to what

10   specifically has been changed or altered.  But then between

11   1 through 5, there was no notification provided to the

12   customers.

13           THE COURT:  Let me ask you this.  May I ask you

14   this?  Because I'm looking at Version 2 and it included --

15   I'll read only a portion of the language.  "You grant

16   Celsius the right subject to applicable law without further

17   notice to you to hold the digital assets available in your

18   account in Celsius' name or in another name and to pledge,

19   re-pledge, hypothecate, re-hypothecate, sell, lend or

20   otherwise transfer or use any amount of such digital assets

21   separately or together with other property" -- and then this

22   is the key -- "with all attendant rights of ownership."

23           MR. KHANUJA:  Your Honor --

24           THE COURT:  That's Version 2 and that language

25   seems to say, we own it.  We, Celsius, own it.

1          MR. KHANUJA:  Yeah, so Your Honor, if I may answer

2     that.  So between Version 1 and 2, this is a material

3     change.  And first of all, based on Version 1, where they

4     say they are supposed to inform the customers, they didn't

5     do that.  That's one.

6          The second thing is, you also read that it says to

7     hold all assets, to hold customers' assets and pursuant to

8     earning rewards, they're saying they can pledge and re-

9     hypothecate and all of those things, but this is similar to

10     our securities lending with Fidelity or eTrade.  It's not

11     granting total and complete ownership of the assets.  That's

12     one.

13          But again, it specifically says to hold your

14     assets, and in the subsequent versions, Version 5 and 6, it

15     says transfer of rights of your assets or claim to ownership

16     -- claim to ownership of your assets.  So there's a very

17     significant difference in the language.

18          THE COURT:  All right, thank you very much.

19          MR. KHANUJA:  Your Honor, I would also want to

20     take two more minutes.  The --

21          THE COURT:  Okay.

22          MR. KHANUJA:  Mr. Nash also mentioned, pointed out

23     that out of 600k (audio drops) only 40 people have objected.

24     Mr. Nash mentioned that they're spending around $15, $16

25     million a month.  Most of those have (audio drops) have than

1    10,000 of that amount to be (audio drops) to file

2    objections.  Many have (audio drops) supporting the

3    objections, but not (audio drops).

4            THE COURT:  Let me just say, I'm clear, very

5    clear, that there are many pro se creditors objecting, so I

6    don't put weight that it's -- is it only 40?  I don't think

7    so, but that's -- okay.  I have that point for sure.

8            MR. KHANUJA:  Finally, both Mr. Borenstein -- I'm

9    sorry, Blonstein and Mr. Ferraro in their depositions, they

10   admitted that in their depositions that certain (audio

11   drops) sections of the terms of service were unclear and

12   ambiguous.  Now, Mr. Ferraro claimed ignorance on a bunch of

13   items and Mr. Blonstein also claimed he wasn't involved in

14   the terms of service, so he should have been as part of

15   (indiscernible).  Mr. Ferraro in response to my line (audio

16   drops) mentioned that he actually viewed the loan language

17   and terms of service as kind of a lien on (audio drops)

18   assets.

19           But Your Honor, a lien actually works against --

20   doesn't work against a creditor.  In fact, a lien -- a

21   creditor has a lien on the assets, not the other way around.

22   Secondly, even if it was a lien, it doesn't transfer

23   ownership.  Similarly, Mr. Blonstein accepted that the terms

24   were unclear to him, having read it again, and he can

25   understand the customer viewpoint.  But -- so there's a lot

Page 146

1    of lot of ambiguity and secondly regarding ownership of

2    assets, they both admitted that yes, they can see the view -

3    - the point of view of the customer.

4            THE COURT:  Okay, thank you very much.  Are there

5    other people who wish to be heard in support of the

6    objections?

7            MR. PELED:  Yes, Your Honor.  This is Arie Peled

8    of Venable LLP on behalf of creditor Ignat Tuganov.  Thank

9    you, Your Honor.  Our client is an Earn customer with

10   Stablecoin holdings and our objection is filed under Docket

11   No. 1495.  The position that we've advanced has been

12   somewhat touched upon by the regulators but our position is

13   pretty straightforward, which is that the Debtors' claim to

14   ownership of the Earn assets as we've heard here today is

15   based solely on the terms of use.

16           And the examiner is currently tasked with

17   investigating facts that would help with parties'

18   determination whether or not a potential Ponzi scheme was

19   done by the Debtors and the Debtors asked the Court to

20   essentially assess their terms of use in a vacuum before the

21   parties have a benefit of that report.

22           Now, originally the two bases for that -- and I

23   think I heard Your Honor discussing today was essentially

24   the liquidity issue and the sale issue.  And we've just

25   heard that liquidity is likely not a concern until March,

Page 147

1   which is long after, two months after the examiner's report

2   is scheduled to come out.  And in addition we just saw

3   notice of the GK8 sale, which should provide a couple of

4   more months of potential liquidity so that the liquidity

5   issue should not be a reason not to wait a few weeks to see

6   what the examiner's --

7                 THE COURT:  Mr. Peled, I'm going ahead and

8   deciding who does it belong to, is the property of the

9   estate or not.  It has been a gating issue in this case from

10  day one.  I don't believe that that's an issue that the

11  examiner is addressing.  It's not within the scope of the

12  examination.  I understand Ms. Cornell, Ms. Cordry, you

13  saying, well they don't have to sell it now.  Now I will

14  deal with the issue of whether to approve the sale, but the

15  gating issue, I am going to decide now.  It's ripe.  It's

16  been every -- on everybody's table right from day one, is

17  property the estate.  Do you have anything you want to add

18  on that issue?

19                 MR. PELED:  Yes, thank you, Your Honor.  I just

20  wanted to touch on the fact that the determination of

21  whether or not it is property of the estate, and that's what

22  I'm getting at, is based on the terms of use and the Ponzi

23  investigation will -- may determine that the terms of use

24  are not enforceable, not valid.

25                 THE COURT:  Are you saying that -- are you saying

Page 148

1    it's been a Ponzi scheme from day one, Mr. Peled?

2         MR. PELED:  No, I'm saying we don't know.  That's

3    what I'm saying.  I'm saying we may find out in three weeks

4    or in a month, not in an indefinite time, but actually --

5         THE COURT:  I have that point.

6         MR. PELED:  -- short time.  Okay.

7         THE COURT:  Are there any other -- are there any

8    other points you want to make?

9         MR. PELED:  The only point we wanted to make that

10   -- if the case is determined to be a Ponzi scheme which Your

11   Honor already has, it would have a substantial effect on the

12   rest of this case and that's why we ask Your Honor to wait

13   until the examiner's report, but I understand Your Honor

14   already has that point.

15        THE COURT:  Okay.  All right.  Is there anybody

16   else who wishes to be heard in support of their objection?

17        MS. SHEA:  This is Virginia Shea on behalf of the

18   New Jersey Bureau of Securities, from the law firm of

19   McElroy, Deutsch and I just wish to correct the record.  The

20   Bureau submitted a response at Docket No. 1498.  Thereafter,

21   the Debtors submitted a reply at Docket No. 1578.  And

22   attached to that reply is an Exhibit A which summarizes all

23   of the various objections that have been filed and there's

24   just two incorrect summaries within that exhibit as to the

25   Bureau's filing.

1          First, the Debtor stated that the Bureau took no

2    position as to ownership of Earn assets.  That is not

3    correct.  In the Bureau's response, it stated, "The Bureau

4    currently takes the position that the Earn assets are

5    customer property."

6          And the second correction is that the -- they

7    purport that the Bureau asserted that the Earn Program was

8    operated after the cease and desist order that had been

9    issued by the Bureau, but the Bureau did not assert this in

10   the response.  Rather, the Bureau simply stated "The Debtors

11   operated and marketed the Earn Program while violating New

12   Jersey's securities law."

13          THE COURT:  Ms. Shea, can you just give me the ECF

14   docket number of your filing?

15          MS. SHEA:  Yes.  Our filing ECF is 1498.

16          THE COURT:  Okay, thank you very much.  Is there

17   anything else you want to add?

18          MS. SHEA:  Just that we join with the State of

19   Texas' position.

20          THE COURT:  Thank you, Ms. Shea.  Anybody else who

21   wishes to be heard in support of an objection?

22          MR. CREWS:  Yes, Your Honor.  Can you hear me?

23          THE COURT:  Yes.

24          MR. CREWS:  My name is Cameron Crews, pro se

25   creditor, and in order for ownership of our assets to be

Page 150

1    surrendered, what we received in consideration was the

2    opportunity to earn yield.  But what the Debtors did not

3    disclose to us was that they were not earning yield with the

4    resources provided to them.  They were a failed venture.

5    They did not disclose that to us; therefore, we never had

6    the opportunity to actually earn.

7             We now sit here today having lost half of our

8    assets that we entrusted to them and Your Honor has said

9    that they would go to jail if they were to spend the

10   approved assets in Vegas.  I would say that would be a

11   better use of our assets because we at least have a chance

12   of winning.  This company has never been profitable.

13   They've never established any reliable streams of revenue.

14   They've just lost money entrusted to them.  And the fact

15   that they have not produced a plan now five-and-a-half

16   months later is indicative that they don't have reliable

17   revenue streams and we the creditors have entrusted our

18   funds to them.

19             They have lost all resources entrusted to them

20   except for the remaining creditor funds.  We just want

21   what's left back in an equitable way and we believe the UCC

22   for administrative expediency has taken the position that

23   the Debtor has ownership of our assets.  We vehemently

24   object to that, but if it's what's needed to protect our

25   interests, then fine.  But we feel at least in terms of a

Page 151

1    procedural sense, it would be a terrible precedent if

2    ownership of our assets was taken away from us but we've

3    received nothing in return.  Thank you, Your Honor.

4            THE COURT:  Thank you, Mr. Crews.  Anybody else

5    want to be heard in support of their objections?

6            MS. FRANKEL:  Can I be heard?  This is Deborah

7    Frankel.  I'm a creditor.

8            THE COURT:  Sure, go ahead, Ms. Frankel.

9            MS. FRANKEL:  Hi.  I just want to say that, you

10   know, I can't even believe that nobody submitted all the

11   videos of the AMAs, where Alex was saying there are coins,

12   there are coins, there are coins at every time and everybody

13   submitted tons of those videos at the beginning of this

14   bankruptcy.  I would have thought that you would have read

15   them or you know, listened to them and watched them and seen

16   what's really been going on here.  It's not just 40 people

17   objecting.  I don't even know how to make an objection.

18            I have a ton of money in there and this whole

19   thing is just unbelievable.  And that technicality that

20   nobody submitted those videos right at this time, when -- is

21   amazing.  I mean, I'm surprised that nobody did, but I

22   didn't know that rule and I saw tons of them going through

23   there.  I thought you were aware of them.  I thought this

24   was a slam dunk case of, you know, the Earn stuff belongs to

25   us because some little thing in the terms and conditions on

Page 152

1   the 39th page, you know, said something where (audio drops)

2   every week to us that they were our coins.

3           I just needed to say that among the other things,

4   and there are hundreds of thousands of us that are

5   incredibly upset about this whole thing, you know.  So --

6           THE COURT:  Thank you, Ms. Frankel.  Anybody else

7   wish to be heard?

8           MR. PORTER:  I would, Your Honor, if it's all

9   right.

10          THE COURT:  Go ahead, Mr. Porter.

11          MR. PORTER:  Good day.  You know, I hear loud and

12  clear that the terms of service were a checkmark for all of

13  us to do and the changes were certainly not apparent to

14  anybody.  And if I could go to another industry where you

15  buy cigarettes and there's warnings on the box, the

16  president, the CEO, the head of Philip Morris doesn't come

17  out and say, oh, ignore what's on the side of the box and

18  basically for all intents and purposes this is what this

19  company was doing every week on a weekly basis, right up

20  until the day of the filing, sir.

21          They were soliciting funds to the day of the

22  filing, the CEO of this company.  Thank you very much, Your

23  Honor.

24          THE COURT:  Thank you, Mr. Porter.  Anybody else?

25  Mr. Herrmann, I saw you briefly on the screen.  Do you wish

1    to speak?

2              MR. HERRMANN:  Yes, Your Honor.  This is Immanuel

3    Herrmann, pro se creditor.  So I'll start out by just

4    respectfully asking if you would consider reopening the

5    opportunity to submit evidence.  Many of us have submitted

6    declarations, sworn declarations.  There's a lot in the

7    record.  We only had essentially 30 seconds to submit

8    anything into the record.

9              THE COURT:  I'm not reopening the record, Mr.

10   Herrmann.  That's what this hearing was about.  I understand

11   that you're a pro se creditor and there are many other pro

12   se creditors.  But I follow the rules.  Evidence was

13   submitted in support and that's where we are.  Anything you

14   want to add?

15             MR. HERRMANN:  Yes, I have things about my

16   objection that are, you know, just from the filing itself

17   and the contract itself.  So, you know, one, I just wanted

18   to note that all of the -- I would say pretty much every pro

19   se creditor knows there aren't enough coins there.  We

20   differ with the UCC or at least I do.  You know, I differ

21   with the UCC on the idea that, you know, it guarantees us

22   maximum recovery to be property of the estate because

23   fundamentally we don't trust the Debtor nor the UCC to drive

24   a process that will maximize value for creditors.

25             And so part of this has been trying to ensure that

Page 154

1    value is maximized for creditors.  Nobody -- there's a lot

2    of implications in these filings that creditors somehow

3    believe they're going to get 100 percent back if our coins

4    are not property of the estate.  Nobody thinks that.  What

5    we do think is that it's profoundly unfair for some groups

6    to fight for 100 percent back and specifically, there's many

7    cases -- we were talking earlier in this hearing about, you

8    know, situations about contractual defenses and all that.

9    There's many people where there's a label of Earn on their

10   account, which may have been completely in violation of the

11   plain contract terms, for example, and that are similar to

12   withhold.

13          So any kind of sweeping ruling that would limit

14   any kind of those defenses, if we go down the property

15   rights rabbit hole, which, you know, I was hoping we

16   wouldn't do it this way, but I feel like it's going to be

17   difficult no matter how the ruling goes because if it is

18   property of the estate, I don't think there can be a

19   sweeping determination based on the contracts that every

20   user, you know, is similarly situated.

21          There are many, many claims, suspended accounts,

22   my claim for return to collateral, et cetera.  That's a

23   whole rabbit hole.  So that's coming, if we get a ruling

24   that the coins are generally property of the estate.  So

25   that's one thing I wanted to note.

1            You know, another thing, a point I made in my

2      argument, in my filing, is that the Debtor had a sale and

3      repurchase agreement or a repo agreement in the United

4      Kingdom.  So they were familiar with that sort of agreement.

5      They cannot argue that they couldn't have structured it that

6      way.  They were intimately -- their counsel clearly was

7      familiar with it.  They made a choice to call it a loan,

8      distinct from a repo agreement.

9            And so there's a lot of complicated technical

10     arguments I saw about whether you can have a loan.  You

11     know, they were saying maybe in a securities context, maybe

12     in some others, but I wanted to correct the record around my

13     arguments around a car.  They mischaracterized in their

14     reply, you know, car -- you know, my argument around it's,

15     you know, like loaning your car.  What I have said is, look,

16     the only way to do this with a car would be a repo agreement

17     and generally cryptocurrency, particularly Bitcoin, is

18     property.

19            So they decided to call it a loan and not do a

20     repo agreement.  I don't know why.  Maybe it was for tax

21     purposes or whatever, but it created ambiguity.  There's

22     lots of ambiguities that have come up.  That's just one

23     example of ambiguity.  I agree with Ms. Mulligan, Ms.

24     Cordry.  I fully join in all of their arguments just for the

25     record that a creditor does.  You know, and I think there's

1    -- you know, there's also just, I think that there's

2    potentially issues with ipso facto clauses here that were

3    mischaracterized as individual defenses.

4         I don't see how a creditor as an individual

5    defense could raise something like an ipso facto clause in

6    the contract.  That seems to me a global defense for the

7    entire contract.  So I just think there's a lot of

8    corrections that probably need to be made to the response

9    that the Debtor filed.  And yeah, I mean, you know, I just

10   also want to note that, you know, the timeline here was just

11   extraordinarily rushed.  I mean, we're all doing our best,

12   but there's a lot that we were not able to get into our

13   filings or to ask the Debtor about and even just based on

14   the contract itself it's not, you know, in my view clear and

15   unambiguous.  Like that's -- period, bottom line.

16        And you know, one other thing I'll state is that

17   I'm really stunned that regulators are not in touch with the

18   Debtor and I will be filing a motion for the appointment of

19   a Chapter 11 mediator today, so when we have a recess or

20   something, I'll get that in and serve it and email it to

21   chambers.  But I think that, you know, I think that

22   regardless of how you rule it will not quell my dissent or

23   creditor dissent and grave concerns about this process.

24        THE COURT:  Thank you, Mr. Herrmann.  Anybody else

25   wish to be heard?

Page 157

1              MR. DeGIROLAMO:  Yes, Your Honor, Tony DeGirolamo,

2      just briefly please.

3              THE COURT:  I only allow somebody to speak once

4      during this, so I've already heard from you.

5              MR. DeGIROLAMO:  And I questioned a witness.  I

6      didn't close, Your Honor.

7              THE COURT:  All right.  Go ahead, Mr. DeGirolamo.

8      Go ahead.

9              MR. DeGIROLAMO:  Thank you, Your Honor.  I mean, I

10     obviously know that you've read all the briefs.  I'm not

11     going to rehash the whole ambiguous contract argument that

12     I've made on behalf of my client.  And I also don't want to

13     rehash, you know, all of the arguments about the use of the

14     funds and whether or not they're going to be able to

15     repurchase Stablecoin at some point in the future.

16             THE COURT:  So rather than telling me what you're

17     not going to repeat, tell me what you want to tell me that I

18     haven't heard already.

19             MR. DeGIROLAMO:  That's fine, Your Honor.  The one

20     thing that I haven't heard and I appreciate Your Honor's

21     desire for an equitable distribution in this case.  That is

22     the basis for bankruptcy.  And I understand that this is a

23     gateway to plan confirmation, but the one thing I haven't

24     heard anyone speak to is the deficiencies in the Debtors'

25     operation identified by the examiner, the move --

Page 158

1    indiscriminate moving of coin from one wallet to another to

2    cover shortfalls or if there are overages, move it from one

3    wallet to another.

4          And it seems to me that if there's going to be

5    anything for this Debtor to sell or anything for this Debtor

6    to reorganize around, that deficiency must be remedied.

7    They can't continue to operate the way they did before

8    bankruptcy case was filed.  And so to me that's supposed --

9          THE COURT:  Mr. DeGirolamo --

10          MR. DeGIROLAMO:  -- no one spoke to.

11          THE COURT:  Mr. DeGirolamo.

12          MR. DeGIROLAMO:  Yes, sir.

13          THE COURT:  This is a hearing to determine the

14   ownership of the Earn assets.  There may be another time to

15   address the deficiency in their operations.

16          MR. DeGIROLAMO:  That's fine, Your Honor.  As I

17   said, there was as much testimony about what the money was

18   going to be used for as whether or not it was owned by the

19   Debtor, so it appeared to me that these issues were fair

20   game for today.  With that, I don't have any other comments.

21          THE COURT:  All right.  Anybody else wish to be

22   heard?

23          MR. GEORGIOU:  Yes, Your Honor.  May I speak?

24          THE COURT:  And who is that?

25          MR. GEORGIOU:  This is George Georgiou, pro se

Page 159

1    creditor.

2             THE COURT:  Yes, please, go ahead.

3             MR. GEORGIOU:  Thank you very much.  I have a

4    Docket No. 1517.  I want to ask, if the Court determines

5    today that the terms of use are adequate to be used, then I

6    have a case where I withdrew my (indiscernible) pre-pause

7    and pre-filing of Chapter 11, passed all the KYC, I passed

8    all the verifications.  I've got emails from Celsius saying

9    that my withdrawal was initiated.  This was all done under

10   Section 11 of the terms of use where I basically exercised

11   my call option to withdraw my funds.  At that time, I

12   stopped receiving any earn and I was put on -- in a pending

13   situation until October 6th where they canceled me back into

14   Earn.

15            I was only in Earn for five hours for the entire

16   four months and I didn't receive but $3 of earn on a million

17   dollars of assets.  So how -- am I going to be now in Earn

18   or am I part of the estate?  I don't know how the Debtor is

19   going to treat me.  Following the terms of use, am I part of

20   the estate or not?

21            THE COURT:  May I ask you this?

22            MR. GEORGIOU:  Sure.

23            THE COURT:  Are you listed in the schedules as a

24   creditor?  And if so, in what amount?

25            MR. GEORGIOU:  I'm listed in Earn for the amount

Page 160

```
 1    of about 26.5 Bitcoins.
 2              THE COURT:  Okay, I can't -- I'm not sure that I -
 3    - there's no response that I can give.  I understand --
 4              MR. GEORGIOU:  Right.
 5              THE COURT:  -- the issues you're raising.
 6              MR. GEORGIOU:  I mean --
 7              THE COURT:  Is there anything else you'd like to
 8    add?
 9              MR. GEORGIOU:  No, I just want to put it there and
10    I just reserve my right later to like file an objection or,
11    I don't know, some kind of motion.
12              THE COURT:  Okay.
13              MR. GEORGIOU:  Thank you very much.
14              THE COURT:  Thank you very much.  Anybody else who
15    wishes to be heard?
16              MR. FRISHBERG:  Yeah, Daniel Frishberg, pro se.
17              THE COURT:  Go ahead, Mr. Frishberg.
18              MR. FRISHBERG:  I agree with everything that the
19    regulators have stated.  I believe this is an improper
20    attempt to claim all of Earn assets and I do -- as Mr.
21    Herrmann mentioned, I do have some serious concerns about
22    the whole very rushed timeline for the depositions and the
23    discovery process.  I do not believe there was sufficient
24    discovery to rule on Earn as I believe Mr. Ignat Tuganov's
25    attorney stated, there is potential that Celsius is a Ponzi
```

Page 161

1   scheme and I do believe that it is worth investigating

2   because if it was a Ponzi scheme, the contract is

3   unenforceable and illegal.

4          And in that case, I believe that would not be

5   property of the estate, and to preemptively rule it is not

6   good, especially for a sale of assets because nobody wants

7   to buy the sale of assets with the potential for a clawback

8   due to a Ponzi.  I do not think it's in creditors' best

9   interest to rush this.  While costs are a major concern, it

10  may be a bit better to just wait a month for the examiner's

11  report which we already paid approximately $10 million for

12  to come out so we can determine what exactly went on at

13  Celsius and if it is even a Ponzi scheme or if it's not a

14  Ponzi scheme.

15         I do believe that the proper method for attaining

16  Earn assets for everyone to determine if Earn assets are

17  property of the state is a adversary proceeding.  I believe

18  it's Rule 7000 something.  Regulators mentioned that.

19  Custody and withhold for much smaller amounts, I believe

20  like 15 million and like 50 million or whatever are having

21  adversary proceedings while roughly a billion and a half

22  dollars in Earn assets is being rushed through some very

23  (audio drops) lack of deposition process on a short timeline

24  that is basically trying to just shove it in under the wire,

25  which in my opinion is a major due process issue.  Thank

Page 162

```
 1    you.  That is all.

 2              THE COURT:  Thank you, Mr. Frishberg.  Anybody

 3    else wish to be heard?

 4              MS. GALLAGHER:  Yes, I would wish to be heard.

 5              THE COURT:  Go ahead.

 6              MS. GALLAGHER:  Okay, so my name is Rebecca

 7    Gallagher and I'm a pro se creditor.  You mentioned, Judge,

 8    that you've never listened to any of Mashinsky's videos, so

 9    I have one queued up here to play to you which will just

10    give you --

11              THE COURT:  I'm sorry -- no.  Ms. Gallagher, the

12    evidence is closed.  I'm not reopening the evidence.  There

13    may be some other issue in this case where that becomes

14    relevant, but I deal with the record that's made.

15              MS. GALLAGHER:  This is --

16              THE COURT:  Ms. Gallagher.

17              MS. GALLAGHER:  Right, this is on --

18              THE COURT:  Ms. Gallagher, do not --

19              MS. GALLAGHER:  Yes?

20              THE COURT:  -- play the video.

21              MS. GALLAGHER:  Okay, Your Honor.

22              THE COURT:  You will be cut off.  You will be cut

23    off from the Zoom if you do.

24              MS. GALLAGHER:  Okay, Your Honor.  It is on a

25    docket, though, Docket 1559.
```

Page 163

1              THE COURT:  What is 1659?

2              MS. GALLAGHER:  Sorry, the video is at the --

3              THE COURT:  Okay.

4              MS. GALLAGHER:  -- end of docket --

5              THE COURT:  It wasn't introduced into evidence

6    today during this hearing.  If there's any points you want

7    to make about the evidence that came in or the arguments

8    that have been made, now is the time to do it.  The

9    evidence, the record is closed and I'm not going to hear any

10   additional evidence.

11             MS. GALLAGHER:  Okay, Your Honor.

12             THE COURT:  Does anybody else wish to be heard?

13             MR. LINDSAY:  Yes, Your Honor.  Your Honor, Mark

14   Lindsay for several Earn account holders, Stuart McLean,

15   Keith and Jennifer Riles.  Your Honor, I've obviously heard

16   all the other objectors' arguments and I will do my best not

17   to rehash anything and will rest on our pleadings in that

18   regard for arguments, but I did want to point out, Your

19   Honor, that I found it surprising that to me, my

20   understanding was the main gate keeping issue for today's

21   hearing was a determination of whether or not these terms of

22   use were clear and unambiguous.

23             And the Debtor set this hearing up to be based on

24   that finding, and quite frankly, unless I'm mistaken, I

25   heard very little about that issue today.  The Debtors argue

Page 164

1    and the evidence that they put on today was basically

2    regarding the acceptance of the terms of use, who accepted

3    what version, how many people accepted the versions.  What

4    they don't talk about is, so what was accepted.

5            THE COURT:  I think they did --

6            MR. LINDSAY:  And there's no record.

7            THE COURT:  Excuse me, Mr. Lindsay.  There was

8    what is ECF Docket No. 393, the Exhibits A-1 through A-8, is

9    a binder with all of the terms of use.  They were all filed

10   as an exhibit to a Mashinsky declaration which was ECF

11   Docket No. 393.

12           MR. LINSDAY:  Yes, Your Honor.

13           THE COURT:  And so part of the evidentiary record

14   today is each and every version of the terms of use or Earn

15   accounts that was introduced in evidence today, I have that.

16   The briefs are addressed to the issue of what -- issues

17   whether the terms of use were clear and unambiguous.  I'm

18   taking the matter under submission.  I'm not deciding the

19   matter from the bench today, but all of that is in evidence

20   and that was the main thrust of both the Debtors' brief, the

21   Committee's was styled as a limited objection, and so that

22   is the central focus of what I've been being asked to

23   decide.

24           MR. LINSDAY:  Understood, Your Honor, and I'm

25   aware that all of the terms of use are of record, including

Page 165

1    red lines.  The point I was making is that although it was

2    brought up today that there's -- that there is in fact, and

3    it's been pled at length by the objectors, conflicting

4    language in those terms of use, there was no attempt to

5    reconcile by the Debtors, you know, why that, despite that

6    conflicting language, why those terms are still clear and

7    unambiguous in each, regardless of which terms of use or

8    which version is adhered to, why all of the Earn account

9    users should be held to their version of it, given the

10   distinctly different language and interpretations that can

11   come from that very language.

12          THE COURT:  The Debtors --

13          MR. LINSDAY:  And I'll leave it at that.

14          THE COURT:  The Debtors' position is that each of

15   the account holders, current account holders are subject to

16   Version 8, the last version and that each of the terms, each

17   version indicated that it could be updated.  That's not the

18   exact language, but their argument is that eight -- Version

19   8 is the applicable version.  Obviously there's been a lot

20   of discussion, briefing, and evidence about what have been

21   the changes in the language of each successive version.  I

22   asked some questions about that myself.  So thank you, Mr.

23   Lindsay.

24          Anybody else wish to be heard?  All right, hearing

25   no one, does the Debtor wish to reply, respond?

Page 166

1              MR. NASH:  Pat Nash from Kirkland and Ellis for

2     the Debtors.  Not unless Your Honor has any questions.

3              THE COURT:  No, I don't.  Mr. Colodny?

4              MR. COLODNY:  Not unless you have any questions,

5     Your Honor.

6              THE COURT:  The Court is going to take the matter

7     under submission.  We've got a busy week, so it won't be

8     this week, I don't think, when the Court rules on it, but I

9     have in mind the issues and the arguments.  Thank you very

10    much.  The Court is in recess for a half hour.

11             MR. NASH:  Your Honor, is it okay for those of us

12    who --

13             THE COURT:  Yeah, we're doing -- it's Zoom.  Go

14    ahead, Mr. Nash.  I cut you off.  Are you going to stay here

15    for --

16             MR. NASH:  It'll be a lot easier for us.

17             THE COURT:  You absolutely can.

18             MR. NASH:    Thank you, Judge.

19             MR. COLODNY:  Thank you, Your Honor.

20             THE COURT:  Okay.  All right.

21             (Recess)

22             CLERK:  All right.  Starting the recording again

23    for December 5, 2022 at 2 p.m. calling the following cases.

24    Celsius Network LLC case number 22-10964; Celsius Network

25    Limited, et al v. Stone, et al, case number 22-1139; and

Page 167

1    Celsius Network Limited, et al v. Prime Trust, LLC, case

2    number 22-1140.  All right.  Are any of the -- we'll just

3    keep the appearances for this morning's hearing.  Are there

4    any parties that are here for either of the adversary

5    proceedings?

6              MR. ROCHE:  Yes, Kyle Roche on behalf of

7    Defendants KeyFi and Jason Stone.

8              CLERK:  Okay.  Thank you, Kyle.  Anyone else

9    that's making an appearance for this afternoon's hearing and

10   did not make an appearance this morning?

11             MAN:  Good afternoon.

12             WOMAN:  Yes, my name is --

13             CLERK:  Okay.  Let's do it this way.  If you could

14   raise your hand one at a time, and I'll just take each

15   appearance in turn.  All right.  Mr. Adler, are you

16   appearing also for this afternoon's hearing?

17             MR. ADLER:  Yes, Deanna.  I'm appearing.  David

18   Adler on behalf of certain borrowers from McCarter and

19   English.  And I will be speaking briefly with respect to

20   exclusivity.

21             CLERK:  Okay.  Thank you.  Ms. Gallagher, are you

22   appearing for the afternoon hearing as well?

23             MS. GALLAGHER:  I am just listening.

24             CLERK:  Okay.  All right.  Thank you.  All right.

25   Mr. Leblanc?

Page 168

1          MR. LEBLANC:  Yes.  Good afternoon.  Andrew

2  Leblanc of Milbank on behalf of certain Series B preferred

3  holders, including Community First.  And I may speak at this

4  afternoon's hearing.

5          CLERK:  Okay.  Thank you.  Trudy Smith?

6          MS. SMITH:  Hi.  Yes.  Sorry.  My video's not

7  working.  But yes, I am here on behalf of the Committee and

8  the Prime Trust adversary.

9          CLERK:  Okay.  Thank you.  Mr. Steel?

10          MR. STEEL:  Hey, good afternoon.  Howard Steel,

11  Goodwin, on behalf of Prime Trust.

12          CLERK:  Okay.  Thank you.  Deborah Kovsky?

13          MS. KOVSKY:  Good afternoon.  Deb Kovsky, Troutman

14  Pepper on behalf of the Ad Hoc Group of Withhold Account

15  Holders.  I'm just speaking on the exclusivity motion.

16          THE COURT:  Okay.  Thank you.  Mr. Dean Chapman?

17          MR. CHAPMAN:  Yeah.  Good afternoon.  Dean Chapman

18  from Akin Gump Strauss Hauer and Feld on behalf of the

19  Debtors in the adversary proceedings.

20          CLERK:  Okay.  Thank you.  Mr. De Las Heras?

21          MR. DE LAS HERAS:  (Indiscernible) De Las Heras,

22  pro se creator.  I'll be speaking on the (indiscernible)

23  motion.

24          CLERK:  Okay.  Elizabeth Scott?

25          MS. SCOTT:  Good afternoon.  Elizabeth Scott with

Page 169

1    Akin Gump on behalf of the Celsius Plaintiffs in the two

2    adversary proceedings.

3              CLERK:  Okay.  All right.  Catherine?

4              MS. STADLER:  Yes.  Katherine Stadler of Godfrey

5    and Kahn appearing on behalf of the fee examiner.

6              CLERK:  Okay.  Thank you.  And I see Mr. Lazar is

7    on as well.

8              MS. STADLER:  Mr. Lazar represents the examiner.

9              CLERK:  Oh, I'm sorry.  Yes.  Okay.  Sorry to go

10   out of order.  You know what?  Mr. Lazar, go ahead and make

11   your appearance.

12             MR. LAZAR:  Thank you.  Vincent Lazar, Jenner and

13   Block on behalf of the examiner.  I believe that the

14   examiner is (indiscernible).

15             CLERK:  I'm sorry.  I had to mute the courtroom.

16   Go ahead, please.

17             MR. LAZAR:  Vincent Lazar, Jenner and Block on

18   behalf of the examiner, who is also on.

19             CLERK:  Okay.  Thank you.  And then, Ms. Pillay, I

20   think I see you there.

21             MS. PILLAY:  Yes.  Good afternoon.  Shoba Pillay,

22   the examiner from Jenner and Block.  Thank you.

23             CLERK:  All right.  Thank you.  Mr. Herrmann?

24             MR. HERRMANN:  Yes, sorry.  I was muted.  Immanuel

25   Herrmann, pro se Creditor.  I will be speaking on

Page 170

1    exclusivity.

2              CLERK:  All right.  Thank you.  All right.  Callie

3    Swolier?  Is that correct?

4              MS. SWOLIER:  It's Swolier.  I'm just listening.

5              CLERK:  Okay.  Thank you.  All right.  Mitch

6    Hurley?

7              MR. HURLEY:  Yeah.  Good afternoon.  Mitch Hurley

8    with Akin Gump on behalf of Celsius.

9              CLERK:  Okay.  Chris?

10             MR. SONTCHI:  Hi, Chris Sontchi, fee examiner.

11             CLERK:  Okay.  Thank you.  James Lathrop?

12             MR. LATHROP:  Good afternoon.  James Lathrop also

13   counsel for Prime Trust.

14             CLERK:  All right.  Thank you.  Is that everyone

15   that's on the phone?  Is there anyone else on the phone

16   that's going to be appearing at this afternoon's hearing and

17   has not given their appearance?

18             MR. COOK:  No, this is Lafayette Cook.  I just

19   will be listening.

20             CLERK:  Okay.  That's fine.  Thank you.  All

21   right.  Are the parties back in --

22             MS. BARR:  Hi, this is --

23             CLERK:  Yes, go ahead.

24             MS. BARR:  I'm sorry.  This is Christina Barr on

25   behalf of Celsius for Lathman Watkins, and I will just be

Page 171

```
 1   listening.
 2           CLERK:  Okay.  That's fine.  If you're listening,
 3   there's no need to identify yourself.
 4           MS. BARR:  Oh, my apologies.
 5           CLERK:  It's just --
 6           MS. BARR:  Thank you.
 7           CLERK:  No, no reason to apologize.  I know it's
 8   very confusing.  Just if you're going to be speaking on the
 9   record this afternoon.  All right.  For the parties that
10   have joined on Zoom, please one at a time please raise your
11   hands if you're going to be speaking on the record this
12   afternoon.  Kyle Roche.  All right.  I see you lowered your
13   hands.  And are you going to be speaking on the record this
14   afternoon?
15           MR. ROCHE:  Yes.
16           CLERK:  Okay.  Just identify your -- state your
17   appearance for the record.
18           MR. ROCHE:  Yes.  Kyle Roche on behalf of
19   Defendants KeyFi and Jason Stone.
20           CLERK:  Okay.  Thank you.  Josephine Gartrell?
21           MS. GARTRELL:  Hello.  It's Josephine Gartrell,
22   Willis Towers Watson.  I entered my appearance this morning
23   but wasn't clear if I still needed to do it again this
24   afternoon, but I will be speaking on the record.
25           CLERK:  All right.  Thank you.
```

Page 172

1          MS. GARTRELL:  Thank you.

2          CLERK:  All right.  Katherine?

3          MS. STADLER:  Yes, Katherine Stadler, Godfrey and

4    Kahn on behalf of the fee examiner.  I will speak only if

5    the judge has questions on uncontested matter number 5.

6          CLERK:  Okay.  Thank you.  All right.  Any

7    additional parties that have joined the hearing and are

8    speaking on the record this afternoon and have not given

9    their appearance?  Please raise your hand.  Okay.  Are the

10   parties in the courtroom back?  All right.  I'm going to

11   pause the recording for now.  If anyone is going to be

12   speaking this afternoon and has not given their appearance

13   yet, please raise your hands and I'll take your appearance

14   one at a time.

15         MR. FRISHBERG:  Daniel Frishberg, pro se.

16         CLERK:  Thank you.  Is there anyone else?

17         MS. MILLIGAN:  This is Layla Milligan.  I don't

18   have argument for this afternoon.  I just wanted to note my

19   appearance on the record.

20         CLERK:  Okay.  Thank you.

21         MS. MILLIGAN:  Thank you.

22         MR. FRISHBERG:  Daniel Frishberg again.  I have a

23   quick question.  On the agenda, it says that we're going to

24   be having the current motion first and then the motion to

25   shortened notice on the current motion afterwards.

Page 173

1   Shouldn't we be having the shortened notice motion first?

2              CLERK:  Well, that's the judge's call as to what

3   order he wants to go in.

4              MR. FRISHBERG:  Okay.  Thank you.

5              CLERK:  I am not certain of that.  Hi.  Can the

6   parties hear me in the courtroom?

7              MAN:  (Indiscernible).

8              CLERK:  Oh, you have to go accept.  Can the

9   parties hear me now in the courtroom?

10             MR. KWASTENIET:  Yes, this is Ross Kwasteniet from

11  Kirkland.  Can you hear me?

12             CLERK:  Yes, I can, Ross.  Do we have the same

13  appearances from this morning, or do we have additional

14  appearances in the courtroom?  If the parties can come up

15  and just give their appearances.

16             MR. KWASTENIET:  Yes.  I wanted to note Patrick

17  Nash and Ross Kwasteniet from Kirkland and Ellis as

18  presenters for the 2:00 hearing.

19             CLERK:  Okay.  Thank you.

20             MR. KWASTENIET:  Also, Your Honor, Mr. TJ

21  McCarrick from Kirkland may present if we need to put on

22  witnesses and the same witness Grace Brier.

23             CLERK:  Okay.  So TJ McCarrick is the party that I

24  need to make a co-host?  Is that correct?  To present

25  something.

Page 174

1            MR. KWASTENIET:  No, I think that we don't need to

2      present.  We don't plan to use the screen, so I don't --

3            CLERK:  Okay.

4            MR. KWASTENIET:  -- think we need co-host

5      privileges, but thank you.

6            CLERK:  Thank you.  All right.  Any additional

7      parties in the courtroom that need to make an appearance?

8      All right.  Last call for appearances.  Anyone else need to

9      make an appearance, please do so at this time.  We're going

10     to get started.  All right.  I am going to assume that we

11     are ready to go.

12            Please keep it -- please listen to the following

13     announcements.  All parties are strictly prohibited from

14     making any recording of court proceedings whether by video,

15     audio, screenshot or otherwise.  Violation of this

16     prohibition may result in the imposition of monetary and

17     non-monetary sanctions.  CLERK of the court maintains an

18     audio recording of all proceedings, which constitutes the

19     official record.  Parties must state their name each time

20     they speak on the court record.  A party must join with a

21     full first and last name to be admitted from the waiting

22     room.  Parties that join with initials, a partial name, a

23     designation of iPhone, etcetera, will not be admitted.

24            THE BAILIFF:  All rise.

25            THE COURT:  Please be seated.  All right.  Good

Page 175

1     afternoon.  I know that this hearing was intended initially

2     to be entirely by Zoom, but we didn't get finished with the

3     morning very early so we'll go forward with it.  The agenda

4     for this afternoon, the second amended agenda for the

5     hearing to be held at 2:00 is filed as ECF Docket Number

6     1596.

7              MR. KWASTENIET:  Good afternoon, Your Honor.  For

8     the record, it's Ross Kwasteniet from Kirkland and Ellis on

9     behalf of the Debtors.  We appreciate you accommodating the

10    use of your courtroom this afternoon.  I think many of us

11    would've still been probably on the subway trying to get

12    back to our offices, so appreciate that.

13             Your Honor, before I jump into the agenda, if I

14    may, I just have one announcement to make, and it goes in

15    the nature of a public service announcement.  But the

16    Debtors have become aware of a sophisticated phishing scam

17    that appears to be targeting Celsius customers.  At this

18    point, we're not aware of any customers having fallen a

19    victim to this scam, but if that is your situation, we would

20    like to hear from you.

21             We did file a notice, Your Honor, at Docket Number

22    1527 that includes details about the scam and the two known

23    or confirms forms of email that these fraudsters appear to

24    be using to target customers.  We've been in very active

25    dialogue with the Office of the United States Trustee, and

Page 176

1    we appreciate their responsiveness.  And they've also

2    referred us to and put us in touch with the United States

3    Attorney's Office for the Southern District, and we are

4    collectively investigating and are in touch.

5           So to the extent there are additional developments

6    on that front, Your Honor, we will let you know.  But the

7    important thing to get out, and we included this message

8    within the notice that we filed, is, you know, all

9    customers, we'd like them all to hear that neither the

10   Debtors or their advisors will contact customers directly by

11   phone, email, or otherwise and ask them to provide personal

12   information or account information.

13          We may ask that people log into their app.  That

14   would be a secure method of communication, but we are not

15   going to be asking you to verify or provide account details

16   or personal information.  And customers should be on notice

17   that people are out there seeking that information, and it's

18   illicit, and it's not coming from the Debtor.  So I just

19   wanted -- for whoever's been listening, Your Honor, I wanted

20   to start with that.

21          THE COURT:  I appreciate you putting that on the

22   record, and we have a lot of people signed in today to hear,

23   so...

24          MR. KWASTENIET:  Great.  Your Honor, turning to

25   the first set of motions on the agenda, they relate to the

1    Debtor's key employee retention plan.  There were three

2    motions specifically, a motion to shorten notice, a motion

3    to seal, and then an amended motion to approve the KERP.

4    The amended motion was filed at Docket Number 1426, Your

5    Honor, and it supplements and amends an original order filed

6    back on October 11 of this year at Docket Number 1021.

7            Your Honor, I will note that as a gating matter,

8    one of the objections, the Mr. Frishberg objection, as I

9    read it, Your Honor, doesn't relate to the substance of the

10   KERP so much as it does to the timing and the request to

11   expedite.  And as he made his appearance, he asked or

12   suggested that maybe the Motion to Expedite be taken up

13   first as a gating matter, which I'm happy to follow Your

14   Honor's preference.  I'm certainly happy to make a few

15   remarks on the Motion to Expedite.

16           THE COURT:  That's unnecessary because I invited

17   an expedite hearing on the KERP.  It was specifically at my

18   urging that that was done.  So the motion to shorten time,

19   ECF 1429 is granted.

20           MR. KWASTENIET:  Thank you, Your Honor.

21           THE COURT:  So let me ask Ms. Cornell with respect

22   to the ceiling motion, do you have an objection to the

23   ceiling motion?  The ceiling motion is Number 2 on the

24   agenda.  It's ECF 1425.  There were no responses that were

25   filed, but I just --

1      MS. CORNELL:  Only insofar as the redactions

2   pertained to our objection and the information on the

3   evidentiary record.

4          THE COURT:  I don't understand what you just said

5   -- told me.  Why don't you go up to the microphone if you

6   would?

7          MS. CORNELL:  Good morning, Your Honor.  Shara

8   Cornell on behalf of the Office of the United States

9   Trustee.  We filed our objection to the KERP ad filed at

10   1426 and the motion to file under CLF 1425 in this case.  I

11   don't think I need to repeat what's in the objection, but

12   insofar as the evidentiary basis provided by the Debtors

13   today is insufficient because of those redactions.  The

14   United States Trustee objects to the motion to seal.

15          THE COURT:  Okay.

16          MS. CORNELL:  Thank you.

17          THE COURT:  All right.  The objection to the

18   motion to seal is overruled.  There were -- and so the

19   motion to seal is granted.

20          MS. CORNELL:  Thank you, Your Honor.

21          THE COURT:  All right.  Thank you.

22          MR. KWASTENIET:  Thank you, Your Honor.  I think

23   that leaves us with two objections to the revised KERP

24   motion.  The U.S. Trustee's objection relates primarily to

25   the adequacy of the record that we've made.  And Your Honor,

Page 179

1    one of the U.S. Trustee's objections, which was filed at

2    Docket 1551, is that there is simply not enough information

3    to tell what each participant does or what division of the

4    company they are in.

5           And that may be true with respect to this -- the

6    body of the motion itself, which speaks in some

7    generalities.  But there was an exhibit to the motion, Your

8    Honor, that was specifically incorporated in the amended

9    declaration of Mr. Ferraro that goes through on an employee-

10   by-employee basis, what exactly their function is at the

11   company, and what division of the company they work in.

12          And so, Your Honor, this might be a good time for

13   me to move into evidence the two declarations that we have

14   filed in support of the motion, and those are the

15   supplemental declaration of Mr. Ferraro, who's in the

16   courtroom today, which is filed at Docket Number 1427, and

17   the supplemental declaration of Ms. Josephine Gartrell,

18   who's from the Willis Towers Watson firm, which was filed at

19   Docket Number 1428.  She is on the line and available to the

20   extent that anybody has cross-examination questions for

21   either one of them.

22          THE COURT:  All right.  Let me ask are there any

23   objections to the supplemental Ferraro declaration ECF 1427.

24   Hearing no objection, it's admitted in evidence.  Are there

25   any objections to the Gartrell declaration ECF 1428?

Page 180

1    Hearing none, it's admitted in evidence as well.

2              MR. KWASTENIET:  Thank you very much, Your Honor.

3    So I'll continue walking through our response to the

4    objections.  The U.S. Trustee's first objection about not

5    being able to tell what people do and what division we're in

6    we think is wholly satisfied by the information provided in

7    Exhibit B to the motion as incorporated into the Ferraro

8    declaration.  Ms. Cornell also says that she can't really

9    tell if participants are insiders because we redact salary

10   information.  I would note, Your Honor, we do provide salary

11   information albeit not the precise amount, but in a narrow

12   --

13             THE COURT:  Yeah, and I had urged that --

14             MR. KWASTENIET:  Exactly that, yes.

15             THE COURT:  -- ranges be included.  I understood

16   that the names, the exact salary information was in my view

17   confidential commercial information, but to assure that the

18   public record has sufficient information for people to

19   consider, evaluate the revised KERP.  I was satisfied if it

20   provided salary information in ranges more description about

21   what their job responsibilities are.  That's been done.  And

22   so I'm satisfied with how that was done.

23             MR. KWASTENIET:  Great.  Thank you, Your Honor.

24   And in addition to providing the salary information and what

25   departments people work in, the supplemental Ferraro

1    declaration also does provide further evidence that the

2    proposed participants are not insiders.  And specifically,

3    Mr. Ferraro attests that none of the proposed KERP

4    participants sits on or reports to the Debtor's board, was

5    appointed by the board, exercises control over the Debtor's

6    operations, directs overall policy, maintains substantial

7    independent decision-making authority, or sets the terms of

8    their own compensation.

9            Your Honor, we believe that those are the factors,

10   relevant factors to determine when somebody as a functional

11   matter, you know, has the qualities of an insider or not.

12   And we would rest on the Ferraro declaration to address Ms.

13   Cornell's objection.  And Mr. Ubirna De Las Heras also

14   raises a question about whether people are insiders.  We

15   think that the record very clearly establishes that the

16   proposed KERP participants are not insiders.

17           THE COURT:  All right.  I will -- well, go on with

18   your presentation and then I'm going to give Ms. Cornell an

19   opportunity to argue her objections.

20           MR. KWASTENIET:  Great.  So that leaves us really

21   with the objection for Mr. Ubirna De Las Heras.  He raised

22   several points about insiders and the like which I think

23   I've already covered.  But he also raised a question about,

24   well, without knowing the exact names of the employees, how

25   do we know if people may have taken cryptocurrency off the

Page 182

1    Debtor's system.  And in response to that, Your Honor, we

2    thought that that was a fair point.  In retrospect, maybe

3    something that I wish I had thought of a few weeks ago.

4              But in any event, the Debtors are agreeing, and we

5    will submit a revised form of order if Your Honor's inclined

6    to grant the KERP motion in the next several days.  That

7    will exclude from the initial list of approved KERP

8    participants any employee who transferred crypto off the

9    system within the 90 days before filing, or who transferred

10   crypto from another program into the custody program thereby

11   arguably improving their position.

12             THE COURT:  So as I understand it, this revised

13   KERP is limited to 59 employees.  Are any of those -- am I

14   correct about the 59?  That was --

15             MR. KWASTENIET:  That is correct, Your Honor.

16             THE COURT:  Are any being excluded, or you don't

17   know yet?

18             MR. KWASTENIET:  We're still looking into that,

19   Your Honor, and we would propose to submit a revised form of

20   order in the next few days once we've determined whether and

21   who might need to be excluded based on our agreement that we

22   won't give an initial KERP award.  Now, I will say, Your

23   Honor, for the benefit of employees, you know, who may have

24   withdrawn some small amount of crypto three months ago,

25   three months before the filing or something.  It's our

Page 183

1    intention to conduct an investigation.  And if we determine

2    in discussion with U.S. Trustee and the Creditors Committee

3    that somebody's transaction history is not on the basis of

4    inside information, we have a mechanism built into the KERP

5    to propose adding people into it on notice with an

6    opportunity to -- for a hearing if somebody objects.

7             And so I think it's entirely possible that we may

8    exclude somebody initially because the raw data shows there

9    was a transaction, but then we also plan to look into it and

10   determine whether we think there was --

11            THE COURT:  I think in fairness no inference will

12   be drawn from the fact that you've excluded --

13            MR. KWASTENIET:  Yes.

14            THE COURT:  -- anybody in the first instance.  And

15   if you're able to work out -- assuming that I approve the

16   KERP, assuming that there's no objection to putting them

17   back in, that's an acceptable approach.  But let's see where

18   we get to.

19            MR. KWASTENIET:  That's great.  We appreciate

20   that, Your Honor.  And so that brings us just to the

21   summation of the evidence in the declarations.  First of

22   all, the Gartrell declaration based on a study of comparable

23   companies concludes that the KERP is reasonable and based on

24   market comparables.  The awards given to the participants on

25   average range between the 25th and 50th percentile, so this

Page 184

1    is certainly not an overly generous KERP in that regard.

2    Mr. Ferraro also provides great evidence about the need to

3    retain people and the significant attrition that's been

4    facing the company.

5              THE COURT:  What's the head count currently?

6              MR. KWASTENIET:  The head count, I believe, Your

7    Honor, the last I saw was approximately 170.  Was it 160 --

8              MAN 2:  170 employees that have not tendered their

9    resignation.  Some take a while to get --

10             THE COURT:  Why don't you just put that number on

11   the record?  I'm not (indiscernible) --

12             MR. KWASTENIET:  Yes, Your Honor.  The number is

13   170 employees.  There are a few who have tendered their

14   resignation and are in the process of giving their sort of

15   two weeks' notice who are still there, but there is a core

16   group of 170.  As we sit here today, 190 people may have

17   shown up for work, but 20 of those are on their way out

18   transitioning out.  So it's -- we're down to a group of 170

19   people, Your Honor, which is about 100 lower than when we

20   first filed the KERP motion back in -- the initial KERP

21   motion back in the beginning of October.

22             So we think that the record is very clear that we

23   need to do this to retain people.  We are getting really

24   down to the nub of what we would need in order to continue

25   to function, answer diligence requests, put together the go-

Page 185

1    forward plan.  Whether that's a sale or whether that's a

2    standalone, we're working hard on both of those.  We think

3    that the KERP program -- at this point, we really are

4    focused on getting people to stick around through the end of

5    the reorganization.  This is a one-year KERP program, so we

6    think the KERP is designed well to match with our goal,

7    which is to get key people to --

8           THE COURT:  I think the goal is less than a year,

9    but --

10          MR. KWASTENIET:  It's less than a year and the

11   comp is front-weighted.  It's definitely less than a year,

12   Your Honor.  But based on that, we think that the record's

13   clear that the KERP is needed and it's reasonable, and we'd

14   ask Your Honor to approve the KERP motion.

15          THE COURT:  All right.  Ms. Cornell, do you want

16   to be heard?

17          MS. CORNELL:  Thank you again, Your Honor.  Shara

18   Cornell on behalf of the Office of United States Trustee.  I

19   know that Your Honor's already read our objection filed at

20   Docket 1551.  So if Your Honor has any questions for me,

21   otherwise, we'll just rest on the papers today.

22          THE COURT:  Thank you, Ms. Cornell.

23          MS. CORNELL:  Thank you.

24          THE COURT:  All right.  Does anybody else wish to

25   be heard in opposition to the amended motion for entry of

Page 186

1    the -- of an order approving the KERP?  All right.  Not

2    having -- hearing anyone, I'll go ahead and rule from the

3    bench.

4              CLERK:  Sorry, Judge.  Someone's raising their

5    hands.

6              THE COURT:  Okay.  I can't see that.  So who is

7    raising their hand?

8              CLERK:  Mr. De Las Heras.

9              THE COURT:  Okay.  Go ahead.

10             MR. DE LAS HERAS:  I am, Your Honor.  May I be

11   very brief today?  Thank you.  I assume it is --

12             THE COURT:  That's fine.

13             MR. DE LAS HERAS:  -- fine.  An objection with

14   Docket Number 1544.  If Debtors are going to address my

15   concern, there is nothing I can say, but I rest in what is

16   in my objection Docket 1544.  Thank you.

17             THE COURT:  Okay.  Thank you very much.  Does

18   anybody else wish to be heard?  Deanna, I can't see if

19   anybody's raising their hand, so I'll just depend on you to

20   call them out.

21             CLERK:  I see no additional raised hands, Judge.

22             THE COURT:  All right.  So what I'm going to do is

23   read my ruling into the record.  I would ask that the Debtor

24   have a transcript of the ruling prepared so that -- what

25   I've been -- tried to be very cautious about in this case is

Page 187

1    when I rule, I've been trying to rule in written opinions.

2    I want to be sure that there's no misunderstanding about

3    what I have ruled.  But here on this motion, I'll go ahead

4    and just read my ruling into the record.  A transcript can

5    be prepared, and it will be on ECF -- on the ECF Docket.  I

6    suppose it'll be on the claims agent's docket as well and so

7    that people can see precisely what I've ruled.

8              So first, let me deal with the general legal

9    framework for approving KERPs.  Section 363(b) of the

10   Bankruptcy Code provides that a Debtor, after notice and a

11   hearing, may use, sell, or lease other than in the ordinary

12   course of business property of the estate.  That's Section

13   363(b)(1).  To approve the use of estate property under

14   Section 363(b)(1) of the Bankruptcy Code, a Debtor must show

15   that the decision to use the property outside of the

16   ordinary course of business was based on the Debtor's

17   business judgment.  See In re Chateaugay Corp., 973 F.2d 141

18   at 143 (2nd Cir. 1992) holding that a judge determining a

19   Section 363(b) application must find a good business reason

20   to grant such application.

21             Section 503 governs the allowance of

22   administrative expenses "for actual necessary costs and

23   expenses of preserving a Debtor's estate".  That's Section

24   503(b)(1)(A).  The two general overriding policies of

25   Section 503 of the Bankruptcy Code -- excuse me -- are to

Page 188

1    preserve the value of the estate for the benefit of its

2    Creditors and to prevent the unjust enrichment of insiders

3    of the estate at the expense of its Creditors.  See In re

4    Journal Register Co., 407 B.R. 520 at page 535 (Bankr.

5    S.D.N.Y. 2009).  It cites the Second Circuit's McFarland's

6    decision, which is at 789 F.2d 98 at page 101 (2d Cir.

7    1960).

8              So with respect to payments to insiders, Section

9    503(c)(1) prohibits the transfers to insiders unless certain

10   strict requirements are met.  A, the transferer obligation

11   is essential to retention of the person because the

12   individual has a bona fide job offer from another business

13   at the same or greater rate of compensation; B, the services

14   provided by the person are essential to the survival of the

15   business; and C, either the amount of the transfer made to

16   or obligation incurred for the benefit of the person is not

17   greater than an amount equal to ten times the amount of the

18   mean transfer or obligation of a similar kind given to non-

19   management employees for any purpose during the calendar

20   year in which the transfer's made or obligation is incurred.

21             Or if no such similar transfers were made to or

22   obligations were incurred for the benefit of such non-

23   management employees during such calendar year, the amount

24   of the transfer or obligation is not greater than an amount

25   equal to 25 percent of the amount of any similar transfer or

Page 189

1    obligation made to or incurred for the benefit of such

2    insider for any purpose during the calendar year before the

3    year in which such transfer is made or obligation is

4    incurred.  That's Section 503(c)(1).

5           Section 101(31)(B) defines an insider in the

6    context of a corporation as including a director of the

7    corporation, officer of the corporation, person in control

8    of the Debtor, partnership in which the Debtor is a general

9    partner, general partner of the Debtor, or relative of a

10   general partner, director, officer, or person in control of

11   the Debtor.

12          With respect to payments to non-insiders, if an

13   employee is not an insider, Section 503(c)(3) of the

14   Bankruptcy Code permits payments to the Debtor's employees

15   outside the ordinary course of business if such payments are

16   justified by "the facts and circumstances of the case".

17   Importantly, Section 503(c)(3)'s "facts and circumstances"

18   justification test "creates a standard no different than the

19   business judgment standard under Section 363(b) of the

20   Bankruptcy Code."  See In re Velo Holding, Inc., 472 B.R.

21   201 at page 209 (Bankr. S.D.N.Y. 2012).  That's one of my

22   opinions.  See also Borders Group, 453 B.R. at pages 473 and

23   74 evaluating the Debtor's KERP under a business judgment

24   rule.  That's also one of my opinions.

25          In re Dana Corp., 358 B.R. 567 at 576 and 77

Page 190

1    (Bankr. S.D.N.Y. 2006) describing six factors that courts

2    may consider when determining whether the structure of a

3    compensation proposal meets the "sound business judgment

4    test" in accordance with Section 503(c)(3) of the Bankruptcy

5    Code.

6            All right.  I've already indicated I granted the

7    motion to shorten time, and I granted the ceiling motion.  I

8    believe they're entirely appropriate in these circumstances.

9    I invited the shortening of time, and the ceiling seems

10   entirely appropriate consistent with comments I made

11   earlier.

12           All right.  So with respect to the KERP, whether

13   the KERP participants are insiders, the question of whether

14   participants are insiders is vital because it determines

15   whether the Debtors will be required to meet the strict

16   standards of Section 503(c)(1) or whether their KERP will be

17   evaluated under the more lenient business judgment standard.

18   Under Section 101(31) of the Bankruptcy Code where a Debtor

19   is a corporation, insiders may include any "(i) director of

20   the Debtor; (ii) officer of the Debtor; (iii) person in

21   control of the Debtor; or (iv) relative of a director,

22   officer, or person in control of the Debtor".

23           Courts have also considered -- I've also concluded

24   that an employee may be an insider if such employee has at

25   least a controlling interest in the Debtor or exercises

1    sufficient authority over the Debtor so as to unqualifiedly

2    dictate corporate policy and the disposition of corporate

3    assets.  See Velo Holdings, 472 B.R. at 208.  An

4    individual's title by itself is insufficient to establish

5    that an individual is a director or officer.  See In re

6    Longview Aluminum, LLC, 419 B.R. 351 at page 355 (Bankr.

7    N.D. Ill. 2009).  There are other cases that reach that same

8    proposition.  I won't burden the record further.

9              In Public Access Technologies, for example, the

10   court found that an executive vice president was not an

11   officer of the Debtor because there was no evidence such as

12   affidavits, articles of incorporation, corporate minutes,

13   resolutions, or any other document proving that the

14   executive vice president was an officer under Section

15   101(31)(b), 307 B.R. at 506.

16             Here I'm satisfied that the participants are not

17   insiders.  In their exhibits, the Debtors have provided

18   detailed information about the participants' duties, salary,

19   and position within the reporting structure.  The Debtors

20   have provided a declaration attesting that though some of

21   the employees have titles such as "head", "director", "vice

22   president", or "chief", none of the participants have

23   discretionary control over substantial budgetary amounts or

24   significant control with respect to the Debtor's corporate

25   policies or governance.  See the Ferraro declaration,

Page 192

1    Paragraph 19.

2          Moreover, each of the participants' roles are

3    limited in scope.  None made company wide or strategic

4    decisions, and none exercised sufficient authority over the

5    Debtor as to unqualifiedly dictate corporate policy.  See

6    the motion in Paragraph 39.  It cites In re Global Aviation,

7    478 B.R. at 140 and 150.  None of the participants were

8    appointed by the board to sit on the board or directly

9    report to the board.  See In re LSC Communications, 631 B.R.

10   818 at page 827 (S.D.N.Y. 2021) finding that the employees

11   who were appointed by the board and would be deemed officers

12   of the Delaware Corporate Law should "weigh heavily in

13   concluding that the employees are officers for bankruptcy

14   code purposes."

15         So whether the KERP should be approved, given that

16   the participants are not insiders, the KERP should be

17   evaluated under Section 503(c)(3) of the Bankruptcy Code to

18   ensure that it is "justified by the facts and circumstances

19   of the case."  See In re Borders Group, 453 B.R. at page

20   470.  On balance, in described in more detail below with the

21   details of the unredacted information, I am satisfied the

22   Debtors have met their burden of showing that the KERP is

23   justified in a reasonable exercise of their business

24   judgment.  So then with respect to whether this KERP is

25   justified by the facts and circumstances of the case,

Page 193

1    although the Court should be satisfied that the KERP

2    employees are not insiders under Section 101(31), the KERP

3    must still be analyzed under Section 503(c)(3) because it is

4    not an ordinary course transaction.  See In re Nellson

5    Nutraceutical, Inc., 369 B.R. 787 at pages 803 and 804

6    (Bankr. D. Del. 2007).

7              In the context of approving compensation programs,

8    courts in the Second Circuit have considered the factors

9    identified in In re Dana Corp., which I cited earlier, when

10   determining if a compensation proposal and the process for

11   developing it meet the sound business judgment test.  Those

12   issues are, A, is there a reasonable relationship between

13   the plan proposed and the results to be obtained?  I.e.,

14   will the key employees stay for as long as it takes for the

15   Debtor to reorganize or market its assets?

16             B, is the cost of the plan reasonable in the

17   context of the Debtor's assets, liabilities, and earning

18   potential?  C, is the scope of the plan fair and reasonable?

19   Does it apply to all employees?  Or if not, does it

20   discriminate unfairly?  And D, is the plan or proposal

21   consistent with industry standards?  E, what were the due

22   diligence efforts of the Debtor in investigating the need

23   for a plan analyzing which key employees need to be

24   incentivized?  What is available?  And what is generally

25   applicable in a particular industry?  And F, did the Debtor

1    receive independent counsel in performing due diligence and

2    in creating and authorizing the incentive compensation.  See

3    In re Dana Corp., 358 B.R. at pages 576 and 77.

4         So the relationship between this plan, the plan

5    proposed, and the results obtained.  The reasonable

6    relationship exists between the plans proposed and the

7    results to be obtained.  See 358 B.R. at 566 and 57.  The

8    Debtors have noted that the goal of their KERP is to have

9    appropriate staff on hand to facilitate a reorganization of

10   sale.  See the motion at Paragraph 29.  The proposed KERP is

11   narrowly tailored to that goal.  The Debtors have chosen 59

12   out of 167 employees at the time of this writing -- the time

13   of the writing of the motion, who the Debtors believe have

14   "institutional and technical knowledge crucial to the

15   Debtor's ability to maximize value."  See the Ferraro

16   declaration at Paragraph 15.

17        Further, the payments are paid in increments and

18   are tied to the participants remaining at the Debtors for a

19   year, which is aligned the Debtor's goal of keeping the

20   participants on staff through the restructuring and sale

21   process.  See the motion at Paragraph 29.  The Debtors have

22   also tailored the payment amounts so that the employees that

23   are more critical and more difficult to replace get higher

24   bonuses.  See the motion at Paragraph 19.  There is already

25   evidence that the employees are strained by the Chapter 11

Page 195

1    responsibilities.  As the examiner noted in her report that

2    there were delays in the Debtor's production of documents

3    due to the "reduction in Celsius' workforce.".  See ECF

4    Docket Number 1411 at page 11.

5             Accordingly, it is evident to the Court that given

6    the pace of attrition here, the Debtors could continue to

7    lose staff at an unsustainable rate if employees are not

8    incentivized to stay.  I would note I've had other cases

9    where, as a result of attrition, the Debtors have wound up

10   having to hire more expensive consultants than the employees

11   who are filling those tasks now.

12            All right.  Next, the cost of the proposed plans.

13   The cost of the proposed KERP is reasonable in light of the

14   Debtor's financial situation.  The cost of the KERP bonuses

15   is approximately $2.84 million.  According to the analysis

16   performed by Gartrell, which compares the Debtor's KERP to

17   26 similarly sized companies, the cost per participant is

18   positioned between the 25th percentile and median of the

19   market.  The total cost of the program, approximately 2.84

20   million, is on the higher end between the 75th and 90th

21   percentiles, but the cost as a percentage of assets is on

22   the low end below the 25th percentile.

23            On balance, Gartrell attests that the KERP are

24   "reasonable and appropriate in light of competitive

25   practice."  Given that on average the various program

1    metrics fall around the median of the market, I agree with

2    respect to unfair discrimination.  The Debtors have also

3    shown that the proposed KERP does not discriminate unfairly.

4    See In re Eaglepicher Holdings, Inc., 2005 W.L. 4030132 at

5    star 4 (Bankr. S.D. Ohio Aug. 26, 2005).  In that case, in

6    Eaglepicher, the court found that the Debtor's proposed

7    retention plan did not unfairly discriminate against its

8    employees.  There the plan only covered "a small minority of

9    employees".  However, it was broad enough so that it did not

10   include only senior management.

11          The Court observed that a small group of employees

12   could benefit from the retention plan to the exclusion of

13   others because not every employee is similarly situated in

14   terms of their employment to the reorganization process.

15   Here the Debtors have carefully selected a small pool of

16   employees that are critical in the restructuring process.

17   "The participants are critical to the continued maintenance

18   of customer accounts and that a platform more generally by

19   among other things performing essential security functions

20   and building enhanced features and functionality for the

21   Debtor's system and assets."  See the supplemental Ferraro

22   declaration at Paragraph 19.

23          The Debtors have also attested and shown evidence

24   that these employees have been forced to shoulder additional

25   burdens related to the Chapter 11 such that they are

Page 197

1    deserving of bonuses.  Finally, there is also no evidence in

2    the record that the Debtors have unfairly excluded

3    employees.

4            And then with respect to comportment with industry

5    standards, the proposed KERP comports with industry

6    standards as discussed above.  The Debtors have submitted a

7    declaration from a compensation expert that indicates that

8    the terms, cost, and structure of the KERP comport and

9    structure -- comport with the structure of the industry.

10           The propriety of the diligence.  The Debtors have

11   exercised proper due diligence in formulating the proposed

12   KERP.  In In re Brooklyn Hospital Center, 341 B.R. 405 at

13   page 412 (Bankr. E.D.N.Y. 2006), the court found that due

14   care was exhibited by the Debtor in the formulation of a

15   KERP because, among other things, "the board consulted with

16   its counsel and financial advisors, formulated several

17   proposals, reduced the amount to be paid pursuant to the

18   KERP, and after negotiations with the committee, broadened

19   the scope of employees."

20           Here the Debtors engaged and retained WTW to

21   provide independent compensation advice, and the Debtor's

22   special committee undertook a deliberative process convening

23   with the Debtor's various advisors.  See the Ferraro

24   declaration at Paragraph 17.  The Debtors also conferred

25   with the U.S. Trustee on November 2, 2022 and based on the

Page 198

1    results of the conversation, the Debtors revised the KERP

2    participant list.  And see the amended motion in Paragraph

3    5.  Accordingly, I am satisfied that the Debtors have

4    undertaken sufficient diligence.

5            And then with respect to adequacy of counsel, in

6    the last -- lastly, the Debtors' counsel from a highly

7    competent and experienced independent compensation

8    consultant, their counsel and their highly experienced

9    independent consultation with WTW, see our trial declaration

10   at Paragraph 7, together with the input that the Debtors

11   received from other advisors, I'm satisfied that the Debtors

12   received sufficient counsel.

13           For all of those foregoing reasons, the Court

14   grants the amended KERP motion.  I understand before an

15   order will be entered you'll go back and review the

16   participant list to satisfy that, at least initially,

17   looking at it that none had withdrawn substantial funds in

18   the 90 days before.  They can still be included in that

19   subsequently if that's appropriately.

20           MR. KWASTENIET:  That's right, Your Honor.  And we

21   expect that'll take a few days --

22           THE COURT:  That's fine.

23           MR. KWASTENIET:  -- to sort out that analysis.

24   And then once we've concluded that, we'll present the

25   revised form of order to the U.S. Trustee and the committee

Page 199

1    and submit to chambers, Your Honor.

2              THE COURT:  All right.  Thank you very much.

3              MR. KWASTENIET:  Thank you very much.

4              THE COURT:  All right.  Hopefully the transcript

5    will be readable.  It saved me from having to do one more --

6    still one more opinion.  Okay.

7              MR. NASH:  Good afternoon -- pardon me.  Good

8    afternoon, Your Honor.

9              THE COURT:  You get to speak again, Mr. Nash.

10             MR. NASH:  I do.  Good afternoon, Your Honor.  Pat

11   Nash for the Debtors.  Next on the agenda is the Debtor's

12   motion to -- for entry of an order extending the Debtor's

13   exclusive periods to file a Chapter 11 plan and solicit

14   acceptances of that plan.

15             THE COURT:  All right.  Just give me a second to

16   find my relevant notes for that.

17             MR. NASH:  And that's Docket Number 1317, Your

18   Honor.

19             THE COURT:  Yes.

20             MR. NASH:  Also relevant, Your Honor, we have

21   filed a revised form of order at Docket Number 1588.  That

22   reflects resolution or avoidance, I will say, of resolution

23   with the UCC, avoidance of an objection from the UCC.  The

24   UCC did file a statement in connection with the extension of

25   the exclusive periods.  That's found at Docket Number 1536.

Page 200

1   Your Honor, we had four timely filed objections to the

2   motion.   Two of those have been resolved.

3           There was an objection, limited objection from

4   certain Celsius borrowers, customers who were part of the

5   borrower program at Docket Number 1475.  It's my

6   understanding that that objection is resolved by the changes

7   to the order and the shortened exclusive periods as compared

8   to the time we sought when we filed the motion.  We've also,

9   Your Honor, for similar reasons and a similar basis

10  withdrawn -- resolved, pardon me, the objection of the ad

11  hoc group of withhold account holders, which is found at

12  Docket Number 1494.

13          We have been unable to resolve or the changes that

14  we've made to the order, Your Honor, I'm -- it was my

15  understanding do not resolve the objection of Mr. De Las

16  Heras, which is found at Docket Number 1476.  And similarly,

17  it is our understanding that the objection of Irena Ducan at

18  Docket Number 1477 remains unresolved.

19          Last thing I'll note from a procedural point of

20  view, Your Honor, at Docket Number 1553, Mr. Immanuel

21  Herrmann filed on behalf of himself and apparently 375 other

22  Celsius earned customers, and maybe customers of other

23  programs -- it's not clear to me -- filed a joinder to the

24  objection that was filed by the borrower customers, which we

25  have resolved.  So with that, Your Honor, I'll talk a little

Page 201

1    bit about, you know, what we've accomplished, where we're

2    going, and the back and forth a little bit that led to us

3    agreeing to the shortened period.

4              So Your Honor, when we filed the motion, we sought

5    an extension of our exclusive period to file a plan through

6    the end of March.  We met with a lot of pushback from

7    represented and unrepresented -- represented Creditors,

8    unrepresented Creditors, the official committee, the ad hoc

9    committee that the amount of time that we sought was too

10   long, wanted us to be, you know, on a shorter leash.  In

11   many respects, Your Honor, those Creditors were pushing

12   through an open door.  It is definitely time, and this week

13   is a big part of that.  It is time to be moving these cases

14   forward.

15             In consultation with the UCC, what we've agreed

16   and what you see in the revised order is an extension of the

17   Debtor's exclusive periods not only to file, but also to

18   solicit a plan through February 15th.  We've also --

19             THE COURT:  And how are you going to accomplish

20   that?

21             MR. NASH:  Well, we're going to -- in all

22   likelihood, Your Honor, at a minimum be seeking an extension

23   of the solicitation period in advance of February 15th.

24   That will be easier to do and easier for people to digest to

25   the extent that we have a plan on file.

1          THE COURT:  Well, to the extent you have a plan on

2     file, I think that would probably go a long way to at least,

3     you know, easing at least some of the concerns and

4     objections that have been expressed.

5          MR. NASH:  Understood, Your Honor, and one of the

6     reasons why -- we understand those concerns.  We understand

7     that perspective, and it's why, as I said, I believe that

8     the UCC and others were pushing through an open door, at

9     least as it came to shortening the requested extension of

10    the exclusive periods.

11         A lot of -- so, Your Honor, big picture.  We're in

12    the midst of a marketing process.  We have -- of course the

13    GK8 sale will be in front of Your Honor later this week.  We

14    are in the midst of a marketing process with respect to the

15    remainder of the Debtor's assets.  The initial bid deadline

16    was two or so weeks ago, maybe three weeks ago now.  We have

17    final bid deadline of December 12th.  That marketing process

18    is being done in close coordination with the UCC as is

19    everything that we do in these cases.

20         We are also on a parallel path working very hard

21    with the UCC on a potential standalone reorganization.  And

22    Mr. Ferraro and the individual members of the committee, in

23    particular the two co-chairs, they speak regularly.  There

24    is a lot of work that is, you know, under -- being

25    undertaken in that regard.  And as you saw from the UCC's

Page 203

1    limited objection or statement, however you want to

2    characterize it, we agree with them.  I mean, it is time to

3    be moving these cases forward.

4            The level of frustration in the community is

5    palpable.  And the only way that we're going to get past it

6    -- I don't know that we'll ever get past it, but the only

7    way that we'll deal with it is if we start moving these

8    cases forward in a concrete fashion, and that is what we

9    intend to do.  You know, you hear a lot, Your Honor, from

10   certain pro se Creditors and from the regulators that, you

11   know, we don't speak with them enough.  There's a limit to

12   the number of people that we can speak with.

13           And as it relates to the regulators, Your Honor, a

14   reorganized standalone Celsius is going to have to be

15   regulatory compliant.  We are working with the UCC to

16   understand what it is we think we can and can't do in order

17   to be regulatory compliant.  We don't have anything to talk

18   to the regulators about yet.  But when we do, we will.  And

19   so unless Your Honor has any questions for me, I think Mr.

20   Pesce or one of the White and Case lawyers may want to

21   address Your Honor.  But otherwise, we think that this, you

22   know, relatively limited (indiscernible) a bit necessary.

23   To say it would be a free-for-all if we lost exclusivity is

24   probably the understatement of the century, Judge.  So

25   unless you have any questions, Your Honor, I'll --

Page 204

1              THE COURT:  Let me hear from Mr. Pesce.

2              MR. NASH:  Thank you, sir.

3              MR. PESCE:  Thank you, Your Honor.  For the

4    record, Gregory Pesce, White and Case on behalf of the

5    Creditors committee.  If you'll indulge me for just, you

6    know, two or three minutes, I wanted to provide some context

7    and to amplify some of the things we put in our statement.

8    But as I've seen during the course of this hearing, there's

9    a lot of community -- a lot of the community watching today,

10   so I just want to make a few points very crystal clear.

11              So since the outset of this case, the committee

12   has sought to maximize value.  In other words, we've tried

13   to make he pie bigger.  At the same time, we've also been

14   focused on max -- in addition to maximizing value,

15   equalizing treatment among Creditors.  It's very problematic

16   for a variety of reasons to think that one Celsius user will

17   get a higher recovery based on very attenuated, perhaps

18   unknowable circumstances of how they put coins on --

19              THE COURT:  They'll just have a different

20   extremely vocal group if that were to happen.

21              MR. PESCE:  Correct.  It would -- you know, it's

22   something we thought about at the beginning of the case is

23   the possibility of splintering many, many committees and

24   many different people here eating up value, delaying time.

25   So we've really focused on how to equalize treatment to the

Page 205

1    extent possible among Creditors.  As you've heard today,

2    that's very challenging for two big reasons.  One is -- and

3    the committee shares this goal.  Our members are very

4    committed to providing some kind of in-kind recovery in some

5    type of crypto to the constituents to the greatest extent

6    possible.

7            The second big challenge is we have a fundamental

8    math problem.  There's about $5.5 billion of customer

9    obligations.  There are, you know, two billion and change of

10   coins.  So depending on the trading price of coins, which

11   varies daily and is very volatile right now, you're looking

12   at something like a 50 percent hole on some days for the

13   Creditors.  So from the outset --

14           THE COURT:  And you haven't included mining.

15           MR. PESCE:  Well, yeah, and that's what I'm going

16   to get to.  So from the outset -- and this is what

17   distinguishes this case perhaps from Voyager, which is also

18   in the Southern District before Judge Wiles, we've tried to

19   figure out a way to supplement the coin recovery.  And here

20   we have a couple of pockets of value that might make that

21   possible.  As was mentioned, there's the GK8 asset.  The

22   committee worked closely with the Debtors on that process.

23   It was a tough call, but at the end of the day we determined

24   that there was very little, perhaps any value to that

25   business without the founders being on board with the sale.

Page 206

```
 1           The founders were adamant that they wanted out of

 2    Celsius.  So we had to decide for GK8 do we let the value go

 3    potentially to zero, or do we take the bird in the hand

 4    today.  There'll be more about that later in the week with

 5    the other filings the Debtor will be making I'm sure.

 6    Second, we have the mining business, something that none of

 7    these other crypto exchange bankruptcies have.  The value of

 8    that business could be significant, but we also need to take

 9    our time looking at it.  It has a counterparty as you've

10    heard, Core, which has its own challenges.  There's lots of

11    other internal things going on.

12           And then finally, the third pocket of value is the

13    litigation recovery that we expect will be a significant

14    portion of what Creditors get here.  So with that said,

15    going into the exclusivity objection, and we literally

16    received thousands of emails, calls, text messages, tweets,

17    Reddit messages, we seriously considered seeking to

18    terminate exclusivity.  But that begged the question of to

19    what end.  As Your Honor knows, we've had some differences

20    of opinion with the examiner.

21           That said, we supported the appointment of the

22    examiner and the work that she is doing with her team.  That

23    report, though, which is not due until January 17th, that

24    report is going to cost a lot of money.  It's taking up a

25    lot of time of the committee and the people at the company.
```

Page 207

```
 1   We would like to understand at least some of what is in that

 2   report before moving forward.

 3            Second, as Mr. Nash noted, the bids, we've

 4   received indicative bids, but the final bids aren't due

 5   until December the 12th.  And then finally, GK8, you know,

 6   depending on how long that process takes in Israel, could

 7   take something like 30 to 60 days to close.  So with all

 8   that said, you know, at the same --

 9            THE COURT:  What's the range of recovery from GK8?

10            MR. PESCE:  You know, the headline price is $44

11   million.  There's a couple of setoffs for taxes and some

12   other things, but I think it's in the high 30s.  We'll have

13   to check with the Debtors.  You know, but all that being

14   said, the extension that was sought was too long.  We

15   thought we challenged liquidity too much, and we worked to

16   keep the Debtors' feet to the fire.

17            I want to just highlight a few aspects of this

18   deal, which might be very apparent to the bankruptcy nerds

19   in the room but might not be to some folks listening in at

20   home.  So there's a hearing on February the 15th.  That's an

21   omnibus hearing.  Our deal is that that's when exclusivity

22   ends.  We would expect that if the Debtor seeks a further

23   extension, for whatever reason that might be, it'll be heard

24   at that hearing.  Second, there -- the local bridge order,

25   which permits an extension of a deadline as long as --
```

Page 208

1          THE COURT:  That's done away with the filing.

2          MR. PESCE:  It will be done away with, and then

3     finally, on the solicitation, they can't just file a plan

4     the day before and keep the benefit of that.  So what are we

5     going to do during this period before Valentine's Day?  As

6     Mr. Nash noted, we're looking at the new co-concept.  Our

7     co-chairs speak regularly with Mr. Ferraro.  We're trying to

8     see if that is -- that works from a regulatory perspective

9     and if it can get customers to trust it.

10          Second, we insisted on a bidding process.  That

11     process is going on.  We've received several promising bids,

12     and we're working very closely with those bidders.  We've

13     had in-person and Zoom meetings with several bidders,

14     including members of our committee.  Those -- the bids that

15     we have gotten to-date are all very interesting to us and we

16     think have significant promise.  But candidly, the bids are

17     not ready for prime time just yet.  They have financing

18     needs.  They will need to have a conversation with Ms.

19     Milligan and other regulators.  And that said, though, we

20     expect that those issues will be resolved quickly.

21          Finally, at the same time, the committee is

22     unwilling to put all its eggs in the basket of either the

23     new co or these bidders coming forward.  So at the same time

24     as all of those are happening, we're working on our own

25     fallback plan that we will be ready to file ahead of

Page 209

1    Valentine's Day if these other options need more time to

2    work out or if they are not feasible.  So that one way or

3    the other, we can ensure the account holders get the value

4    of the mining business, get the value of GK8, get the

5    valuation of the litigation trust we expect will be set up,

6    and the crypto value one way or the other.

7            Just one final -- two final points before I close,

8    Your Honor.  I note that today's proceedings in particular

9    have been very challenging for many of the account holders

10   to listen to and to understand the perspective of the

11   committee.  We are deep -- we work for the customers first

12   and foremost.  We are their fiduciary.  We take that very

13   seriously.  In particular, we've spent -- we were tallying

14   it up this morning, White and Case alone has spent something

15   like over 1,000 hours speaking to customers, including many

16   of the people who spoke today.  We're going to continue to

17   do that, and everyone -- we're on Twitter.  They have our

18   emails.  We have a website.  If people want to speak to us

19   and share their perspectives, we're more than willing to

20   hear it.

21           And second, on the regulators, it is true we have

22   not presented a proposal to the regulators yet.  That said,

23   that -- we view that as a necessary part of this.  We

24   negotiated for special information and participation rights

25   in the bidding procedures.  We expect those will get made to

Page 210

1    you soon.

2              So, in closing, this was a difficult choice for

3    the committee.  We do think that the process will have

4    benefited by having an exclusivity extension, but we really

5    view this as presumably the only one that we would support.

6    Based on what we see now, we need to work hard.  We're going

7    to work hard with all the constituents, including the

8    Debtor, to get it done.  So I appreciate Your Honor giving

9    me the luxury to explain and amplify some of these points

10   today.

11             THE COURT:  Thank you, Mr. Pesce.  Ms. Cornell or

12   Mr. (Indiscernible)?

13             MS. CORNELL:  Good afternoon again, Your Honor.

14   Shara Cornell on behalf of the Office of the United States

15   Trustee.  The United States Trustee communicated informally

16   with the Debtors regarding their request to extent

17   exclusivity.  I can report that the Debtors took our

18   requests seriously and implemented them into the proposed

19   order.  And we are in agreement on the extension requested

20   today.  Thank you.

21             THE COURT:  All right.  Does anybody else wish to

22   be heard?  Ms. Kovsky, you're on the screen.  Do you want to

23   be heard?

24             MS. KOVSKY:  Thank you, Your Honor.  We had filed

25   a limited objection seeking to terminate the Debtor's

Page 211

1    exclusivity after January 31st if they didn't get a plan on

2    file.  We're comfortable given the logistics as explained by

3    Mr. Pesce that this proposed order effectively does the same

4    thing that we are requesting that the Debtors want to have

5    an extension of exclusivity to solicit their fund.  They've

6    really got to get it on file more or less by January 31st,

7    hopefully even sooner.

8              Our preference would have been to actually put in

9    something now to modify exclusivity to allow the committee

10   to file something promptly after that if the Debtors don't

11   get a plan on file timely.  But since the committee is

12   comfortable with this proposed plan, the withhold group will

13   live with it as well.

14             THE COURT:  Thank you, Ms. Kovsky.  Anybody else

15   wish to be heard?

16             MR. ADLER:  Your Honor, can you hear me?  This is

17   David Adler.

18             THE COURT:  Yes, I can hear you, Mr. Adler.

19             MR. ADLER:  Good afternoon, Your Honor.  David

20   Adler from McCarter and English on behalf of certain

21   borrowers, now the ad hoc group of borrowers, which was

22   filed earlier today.  We filed a limited objection, Your

23   Honor, with respect to the time that was sought by the

24   Debtors of 141 days.  We thought 60 days was more

25   appropriate.  After discussions with Kirkland, we agreed

Page 212

1    with the schedule that they proposed.

2            We did also raise issues, concerns that we have in

3    this case regarding lack of communication, and it goes to

4    the -- some very important issues in this case, Your Honor,

5    with respect to the bidding process.  If a bidder is coming

6    in and wanting to buy assets, the bidder has to obviously

7    place a value on those assets.  And having discussions with

8    the constituents might assist the bidder in coming up with a

9    value, particularly with respect to the borrowers who have

10   certain rights under 363(o).

11           So I've spoken with Kirkland about that issue in

12   particular, and we're trying to work it out.  I'm optimistic

13   that we will work it out.  And based on that, Your Honor, I

14   am -- the time period proposed in the revised proposed form

15   of order is acceptable to me.

16           THE COURT:  Thank you, Mr. Adler.  Does anybody

17   else wish to be heard?

18           MR. HERRMANN:  Yes, this is Immanuel Herrmann, pro

19   se Creditor.  So I in my personal capacity, along with 374

20   other pro ses in their personal capacity --

21           THE COURT:  Wait, wait, wait.  You can speak for

22   yourself.  You can't speak for 374 other people.

23           MR. HERRMANN:  I -- absolutely, Your Honor.  I

24   wanted to make clear, actually, at the beginning that I'm

25   only speaking for myself.  So, I agree with the filing that

Page 213

1    David Adler made.  I'm in -- I also agree that there needs

2    to be more communication with (Indiscernible) as well.  And

3    I have spoken with the Debtor about this as well, and I'm

4    optimistic that we can make progress.  There's a lot of

5    creative ideas for maximizing value, and it's a pretty

6    broadly held belief as far as I have seen that we can

7    maximize value by making sure that bidders are in

8    communication with Creditors and that they'll actually go

9    along with a plan.

10            And it's the same with any kind of standalone

11   reorganization plan as well.  So I did support this

12   compromise proposal as the joinder shows.  And you know,

13   this meets those concerns.  And that said, I think there

14   needs to be a lot more open communication with customers in

15   the next 60 days.

16            THE COURT:  Thank you very much, Mr. Herrmann.

17   Anybody else wish to be heard?  Not hearing anyone else, Mr.

18   Nash?

19            MR. NASH:  Nothing more from me, Judge, unless you

20   have any questions.

21            THE COURT:  All right.  I'm going to do what I did

22   with the KERP.  I'm going to rule from the bench.  I would

23   ask again that a transcript be prepared so there's no

24   misunderstandings about what the Court's ruling is.

25            First, the legal standard.  Under Section 1121(b)

Page 214

1    of the Bankruptcy Code, a debtor has the exclusive right to

2    propose a Chapter 11 plan during the first 120 days after an

3    order granting relief.  Section 1121(c)(3) extends the

4    period of exclusivity for an additional 60 days to a maximum

5    of 180 days where the Debtor has filed a Chapter 11 plan and

6    is soliciting votes on such plan.  Of course, that hasn't

7    happened at this point.

8              The point of exclusivity is to promote an

9    environment in which the Debtor's business may be

10   rehabilitated and a consensual plan may be negotiated.  See

11   In re Burns and Roe Enterprises, Inc., 2005 W.L. 6289213 at

12   star 4 (D.N.J. Nov. 2, 2005).  Section 1121(d)(1) permits a

13   court to extend a Debtor's exclusivity for cause.

14   Specifically, 1121(d) provides that "on request of a party

15   in interest and after notice and a hearing, the court may

16   for cause reduce or increase 120-day period or the 100-day

17   period referred to in this section."  However, the 120-day

18   period --

19             MAN:  Can you guys hear?

20             THE COURT:  Please don't interrupt.  Do not

21   interrupt.

22             However, the 120-day period cannot be extended

23   beyond 18 months after the order for relief date and the

24   180-day period cannot be extended beyond 20 months after the

25   order for relief date.  That's 1121(d)(2)(A) and (B).  The

Page 215

1   determination of cause under Section 1121(d) is a fact-

2   specific inquiry, and the Court has broad discretion in

3   extending or terminating exclusivity.  See In re Adelphia

4   Communications Corp., 352 B.R. 578 at 586 (Bankr. S.D.N.Y.

5   2006).

6          A quote from that case, "A decision to extend or

7   terminate exclusivity for cause is within the discretion of

8   the bankruptcy court and is fact-specific."  See also In re

9   Lehigh Valley Professional Sports Club, Inc., 2000 W.L.

10  290187 at star 2 (Bankr. E.D. Pa., March 14, 2000).  Relief

11  under Section 1121(d) is committed to the sound discretion

12  of the bankruptcy judge.  There are other cases.  It's a

13  long line of authority.

14         The Court's examined a number of factors to

15  determine whether there is cause for extension of

16  exclusivity periods.  See In re Borders Group, Inc., 460

17  B.R. 818 at 822 (Bankr. S.D.N.Y. 2011).  Again, there are

18  lots of other cases that do that.  The factors include, A,

19  the size and complexity of the case; B, the necessity of

20  sufficient time to negotiate a plan of reorganization and

21  prepare adequate information to allow a Creditor to

22  determine whether to accept such plan; C, the existence of

23  good faith progress toward reorganization; D, whether the

24  Debtor is paying his debts as they become due; E, whether

25  the Debtor has demonstrated reasonable prospects for filing

Page 216

1    a viable plan; F, whether the Debtor has made progress

2    negotiating with Creditors; G, the amount of time which has

3    elapsed in the case; H, whether the Debtor is seeking an

4    extension to pressure Creditors; and I, whether an

5    unresolved contingency exists.

6          Not every factor is relevant to each case, and

7    factors themselves might not be determinate overall.  See

8    Adelphia Communications, 336 B.R. at 590.  Rather, the key

9    inquiry is whether extending or terminating exclusivity

10   would move the case forward materially.  So that's the legal

11   standard.  Then my analysis.

12         I agree with the comment that lifting exclusivity

13   now would lead to a freefall.  I mean, it would just be

14   totally chaotic.  I think this is a case where the Debtors

15   and the committee and its professionals have cooperated

16   extensively.  An examiner was appointed.  I think that was

17   important in this case.  It obviously is expensive and time-

18   consuming, but certainly the examiner really delivered in

19   terms of the interim report, and it's been very helpful to

20   the Court.

21         There are a lot of moving parts in this case.

22   Whether there's been substantial progress is hard for me to

23   see.  I hear what counsels say, and for now, at least, I'll

24   certainly take them at their word.  There was agreement

25   between the committee and the Debtor early on to pursue dual

Page 217

1    tracks with the standalone reorganization plan and a

2    possible 363 sale.  Bidding procedures have already been

3    approved on that.  We have a hearing later this week on the

4    sale of the GK8 assets.

5             The Debtors, from all appearances to me and what

6    the examiner said, the Debtors have worked collaboratively

7    with the examiner.  As the staffing and the Debtor has

8    declined, it's made it that much harder to produce

9    information and documents that not only the examiner, but

10   the committee and others have wanted to see.  The hearings

11   this week, while I know that some Creditors and some

12   regulators wanted to push off a decision from day one, it's

13   been clear to the Court that these are gating issues and

14   that need to be decided if possible for progress really to

15   be made.

16            There's been briefing on those.  We had the

17   hearing earlier this morning on ownership of the

18   (indiscernible) assets, the sale of stable coin.  The

19   objections raise reasonable frustrations of the pro se

20   Creditors and others about the pace of the case.  And I'm

21   mindful of all that, but really none of them have cited any

22   legal authority that a failure to file a plan within four

23   months constitutes a lack of substantial progress.  I have

24   to say in any of the larger cases I've had, I haven't had --

25   other that pre-packs, I don't think I've had really, you

1    know, plans proposed within that timeframe.  And here

2    there's been a commitment to move forward with it.

3            You know, the fact that the Debtors in Voyager are

4    also represented by Kirkland and filed the plan on the

5    petition date, they had a pre-pack and things haven't turned

6    out quite the way they expected it would either.  The

7    industry as a whole is in turmoil.  I think the

8    professionals are doing a commendable job in keeping this

9    case from being a total freefall and keeping this case

10   moving forward.

11           I'm certainly very mindful of the concerns

12   expressed by the regulators, Ms. Milligan this morning, Ms.

13   (Indiscernible).  I share those concerns.  It's clear -- and

14   the U.S. Trustee.  Ms. Cornell, I didn't mean to leave you

15   out of that.  Okay.  I mean, it's clear to me whether it's a

16   standalone or a 363 sale, any ongoing enterprise is going to

17   have to satisfy regulatory requirements.  And I think that's

18   clear to everybody in this room.  You know, one additional

19   regulation of congress, if they settle on any, is going to

20   adopt.  I mean, there's going to be something.  I mean,

21   there's just -- the market's in complete turmoil.

22           So it's going to be difficult.  I don't

23   underestimate that.  I am fully committed to see this case

24   move forward as quickly as it possibly can.  The costs are

25   enormous.  I haven't had fee applications yet, but they are

Page 219

1    going to be extremely substantial.  But I don't see the

2    alternative to it.  The number of objections that have been

3    raised, serious objections by pro se Creditors, which I

4    think I commend the Debtors have responded to.  Pro se

5    Creditors may not always appreciate the response they get,

6    but they've responded to.

7            I've been reading these pro se objections and

8    comments that have come up all along the way.  And I -- you

9    know, I'm very moved by the problems that the collapse of

10   Celsius has presented in the marketplace to pro se

11   Creditors, Creditors represented large and small.  So I

12   agree with the Debtors that extending the exclusivity

13   periods will benefit the Debtor's estates, their Creditors

14   and all other key parties in interest, especially when, as

15   here, all stakeholders are working toward a consensual

16   volume-maximizing restructuring.

17           Being required to dual-track negotiations across

18   multiple plans could give rise to destructive uncertainty

19   if, you know, exclusivity were ended.  It would give rise to

20   destructive uncertainty to the detriment of all

21   stakeholders.  I could cause substantial disruptions to the

22   regulatory approval process.  Though it's possible that

23   additional extensions of the exclusivity period could

24   prejudice Creditors if there is not substantial progress

25   made at this juncture, the Creditors will benefit from the

Page 220

1    Debtors being able to continue negotiations regarding

2    restructuring transactions.

3              Again, the objectors' frustrations, they're

4    reasonable given the amount of professional fees being

5    expended on this case.  But at this juncture of the case,

6    the Debtors need more time to hammer out the details of a

7    plan or a potential sale.  With the new dates that have been

8    negotiated with the committee and largely accepted I'm told

9    today by many of the different constituencies, I think this

10   is clearly a motion that should and is being granted.

11             You know, today we had ownership of

12   (Indiscernible).  Later this week we have custody and

13   withhold.  The Debtors have identified other issues, such as

14   whether customers have claims against old Debtors and other

15   issues.  I'm moving as fast as I can to resolve these

16   matters.  It's a crushing load on my chambers.  This is not

17   the only case on my docket, but I'm committed to moving this

18   case forward.

19             The Debtors are still paying all their bills as

20   they come due.  They pay vendors in the ordinary course of

21   business or otherwise provided for by orders of the Court.

22   All that weighs in favor of granting the motion.  There is

23   no evidence that I'm -- that I've seen that the Debtors are

24   seeking to extend exclusivity to pressure Creditors.  To the

25   contrary, I think the Debtors realize that the only path to

Page 221

1    success in this case is large Creditor support.  The case is

2    really less than four months old.  You know, it comes --

3    this request for extension of exclusivity comes less than

4    four months after the petition date.

5              Given the complexity of the case, the number of

6    stakeholders, the crucial issues that have to get resolved,

7    whatever the plan is going forward, all of these favor the

8    extension of exclusivity.  So the motion is granted on the

9    terms that were described earlier on the record.

10             MR. NASH:  Thank you, Judge.

11             THE COURT:  Okay.  Let's move on (indiscernible).

12   The uncontested matter of the fee examiners, the notice of

13   presentment of opposed amended interim compensation and fee

14   examiner orders filed as ECF Docket 1445.  The objection

15   deadline was December 4th at 2 p.m.  No responses were

16   received.  That motion is granted.

17             All right.  Let's go forward with the arguments in

18   -- on the motion to dismiss in Celsius Network v. Stone.

19   It's Adversary Proceeding Number 22-01139.  The Debtor's

20   motion to dismiss is ECF -- in that case is ECF 17.  There

21   had been a reply to the -- an opposition to the motion and a

22   reply that had been filed.

23             MR. HURLEY:  Good afternoon, Your Honor.  Mitch

24   Hurley on behalf of the Debtors.  I'm sorry.  Actually, I

25   didn't catch are we -- are you ready to hear the motion to

 1    dismiss?  Did I (indiscernible)?

 2             THE COURT:  I am.

 3             MR. HURLEY:  So Your Honor, there are two

 4    adversary --

 5             THE COURT:  Let me get the appearance -- hold on,

 6    Mr. Hurley.  Let me get the appearance for Stone and KeyFi.

 7             MR. ROCHE:  Good morning, Your Honor.  Kyle Roche

 8    on behalf of KeyFi and Jason Stone.

 9             THE COURT:  Thanks very much, Mr. Roche.

10             All right, Mr. Hurley.  Go ahead.

11             MR. HURLEY:  Your Honor, I was going to make a

12    suggestion actually, which is that there are two adversary

13    matters on today.  One of them is Prime Trust and it

14    involves a settlement.

15             THE COURT:  Okay.

16             MR. HURLEY:  I suspect --

17             THE COURT:  We can do that first.

18             MR. HURLEY:  Yeah, I suspect it will go much more

19    quickly.

20             THE COURT:  Okay.  All right.  I agree, Mr.

21    Hurley.  And that is -- it's the seventh item on the agenda

22    for this afternoon.  Celsius Network Limited, et al v. Prime

23    Trust, LLC.  It's adversary proceeding Number 22-01140, the

24    motion to approve the settlement with Prime Trust, LLC

25    pursuant to Rule 9019 in the Federal Rules of Bankruptcy

Page 223

1    Procedure.  It's filed as ECF Docket Number 13 in that

2    adversary proceeding.  No responses have been received.  Go

3    ahead, Mr. Hurley.

4           MR. HURLEY:  Thank you, Your Honor.  Again, Mitch

5    Hurley with Akin Gump Strauss Hauer and Feld, special

6    litigation counsel for Celsius.  So we're here today, Your

7    Honor, on the motion to approve Celsius' settlement with

8    Prime Trust, LLC, which is embodied in the stipulation and

9    order that was filed on November 13th.

10          THE COURT:  Let me just stop you for a second.  Is

11   an appearance being made this afternoon for Prime Trust?

12          MR. STEEL:  Good afternoon, Your Honor.  Howard

13   Steel of Goodwin Proctor on behalf of Prime Trust.

14          THE COURT:  Thanks, Mr. Steel.  Okay.

15          I'm sorry.  Go ahead, Mr. Hurley.

16          MR. HURLEY:  Thank you.  So the stipulation --

17   sorry, the settlement is embodied in stipulation and order

18   that was filed with the court on November 14, 2022 with a

19   revised version filed on November 30, 2022.

20          The stipulation represents a significant

21   achievement in the cases, Your Honor.  It provides Celsius

22   with virtually all of the relief that was sought in the

23   complaint, including the return of coins that are worth

24   approximately $15.2 million at recent prices.

25          The deadline to object to the motion for most

Page 224

1    parties was November 28th.  And as our review of the docket

2    this morning indicates, we're not aware of any objections

3    being filed.

4              At the UCC's request, we extended their objection

5    deadline twice to November 30th, so that we and Prime Trust

6    could exhibit the proposed changes to the stipulation.  We

7    did make modifications based on the UCC's requests.  And we

8    filed a modified stipulation and those changes are reflected

9    in the version that was filed on November 30th.

10             The UCC also asked us --

11             THE COURT:  Let me ask you this (indiscernible).

12   Just briefly outline what the agreement provides for, just

13   the material terms of the agreement.  Let's get them on the

14   record.

15             MR. HURLEY:  Certainly, Your Honor.  So, by the

16   stipulation, Prime Trust agrees to transfer to Celsius all

17   property in Prime Trust's possession, custody or control

18   that was transferred to Prime Trust at any time by any

19   Celsius user's.  That's Paragraph 8 of the stipulation.

20             The stipulation provides that within five business

21   days of entry of an order by the Court approving the terms

22   of the stipulation, Prime Trust will transfer that subject

23   property to Celsius designated wallets, for which only

24   Celsius holds the private keys.

25             The Celsius designated wallets set up to receive

Page 225

1    the Prime Trust transfer were established in accordance with

2    the joint stipulation and agreed order between the Debtors

3    and the Committee with respect to cryptocurrency security.

4    That's ECF Number 813 -- and will be stored by the Debtors

5    in a frozen workspace at Fireblocks Inc. and subject to the

6    same security and transfer standards set forth in the

7    cryptocurrency security stipulation with the UCC.

8            Upon Celsius' written confirmation of receipt of

9    the transfer, the stipulation provides that Celsius and

10   Prime Trust will mutually release each other for all past or

11   present claims related to the subject property, as qualified

12   in the stipulation.

13           Prime Trust will be exculpated from claims arising

14   from its compliance with the stipulation as to users who

15   received notice of the 9019 motion and did not object.  And

16   the users' custody account agreements with Prime Trust

17   related to the subject property will be terminated as to

18   users who received notice of the 9019 motion and did not

19   object.  This does not affect and is without prejudice to

20   the users' rights under any agreements in which the user is

21   a party with Celsius, and those agreements remain in full

22   force and effect.

23           Within five business days of the transfer by Prime

24   Trust, Celsius will then voluntarily dismiss with prejudice

25   all the claims asserted in the adversary proceeding.

1              Because there is no way to rule out the

2     possibility that a user could transfer property to Prime

3     Trust in the future, and this is because, I think, as Your

4     Honor probably is aware by now, in the crypto blockchain

5     world, once there is an address that's been established, you

6     can't really stop transfers from being made to it, so we

7     have to accommodate the possibility that user's may continue

8     to transfer assets to Prime Trust, though it maybe wouldn't

9     be particularly sensible to do so.

10             So, under the stipulation, starting on March 31,

11    2023 and until the effective date of a plan, Prime Trust

12    will provide Celsius with quarterly reporting of any

13    property that may be deposited by Celsius users after the

14    initial transfer.  And at Celsius' request, Prime Trust will

15    transfer any such future deposits to the Celsius designated

16    wallets, with Celsius paying the reasonable and necessary

17    network fees for any future transfers.

18             The stipulation provides further that tracking and

19    reporting related to any property that may be deposited with

20    Prime Trust by users after the effective date will be

21    determined by further agreement of the parties or by order

22    of the Court.

23             The stipulation makes clear that upon receipt of

24    the subject property, Celsius will not use, access,

25    transfer, pledge or distribute the subject property, except

Page 227

1    pursuant to further order of the Court.

2          The stipulation confirms the Prime Trust transfer

3    of the subject property to the Celsius designated wallets is

4    without prejudice to the right of any party, including any

5    user, to assert any interest, including an ownership or

6    other interest in any of the subject property, and that the

7    transfer does not constitute an admission or acknowledgment

8    by the parties in the stipulation that the subject property

9    is or is not property of the estate.

10          That summarizes the main terms of the stipulation.

11    If you would like, I could summarize the notice that we gave

12    of the stipulation briefly, Your Honor?

13          THE COURT:  No.  I've reviewed that and

14    unsatisfied that's been done.  I just wanted to make sure on

15    the record there was a discussion of what the terms of the

16    settlement were.

17          MR. HURLEY:  Okay.

18          THE COURT:  Let me ask Mr. Steel whether you have

19    any comments that you want to make.

20          MR. STEEL:  Howard Steel, Goodwin, on behalf of

21    Prime Trust.  Nothing further, Your Honor, if you're

22    satisfied with the notice.

23          THE COURT:  I am.  Okay.  So, Mr. Hurley, I'm

24    prepared to go ahead and rule at this point.

25          So, before me is this 9019 motion, ECF Docket

Page 228

1    Number 13, in Celsius v. Prime Trust adversary proceeding.

2    The Court concludes that notice of the proposed settlement

3    was proper and no objections to the settlement have been

4    received.

5              In all such instances, the Court evaluates the

6    merits of the settlement, essentially applying the seven

7    nonexclusive factors set forth by the Second Circuit in In

8    re Iridium Operating Systems.  Since no objection to the

9    settlement has been filed, I will not go through each of the

10   Iridium factors, other than to say that the Court has

11   considered each factor to the extent applicable in the

12   circumstances.

13             The Court is satisfied that the settlement is

14   fair, reasonable and in the best interests of the Debtors'

15   estate.  Absent the settlement, it could have resulted in

16   expensive and protracted, prolonged litigation.

17             I think this outcome is clearly appropriate, and

18   I'm very appreciative of the efforts of Celsius and of Prime

19   Trust and their counsel in reaching this settlement.  So

20   this settlement is approved --

21             MR. HURLEY:  Thank you, Your Honor.

22             THE COURT:  -- with the changes that were added in

23   the discussions between the Committee and the Debtors as

24   well.  Thank you very much, Mr. Steel.  Mr. Hurley?

25             MR. HURLEY:  So I think that brings us to the

Page 229

1    complaint against Stone, and that's actually a motion to

2    dismiss by the Defendants.  So that's --

3              THE COURT:  Yes.

4              MR. HURLEY:  -- Mr. Roche.

5              THE COURT:  Okay.  Mr. Roche?

6              MR. ROCHE:  Good afternoon.

7              THE COURT:  So, just for the record, this is

8    Celsius Network Limited v. Stone, Adversary Proceeding 22-

9    01139.  All right.  Go ahead, Mr. Stone.

10             MR. ROCHE:  Accepting all facts in the first

11   amended complaint is true, this Court should dismiss

12   Plaintiffs' claims for turnover, conversion, fraudulent

13   misrepresentation, unjust enrichment, replevin and

14   accounting.

15             Parties in this action negotiated over many

16   months, multiple agreements that would govern their business

17   relationships, the deployment of coins under those

18   agreements, and the compensation between the parties for

19   those services.  Because of this --

20             THE COURT:  Am I correct, Mr. Stone, that you have

21   not moved to dismiss Count 4, the breach of fiduciary claim?

22             MR. ROCHE:  It's Mr. Roche, Your Honor, on behalf

23   of Mr. Stone.

24             THE COURT:  I'm sorry.  I'm sorry, Mr. Roche.  I'm

25   sorry.  Apologize for that.

Page 230

1          MR. ROCHE:  Not a problem.  We are not moving to

2     dismiss at this time the Count 4.  Just --

3          THE COURT:  Okay.  Go ahead.

4          MR. ROCHE:  Because of this negotiation, the case

5     at bottom is a contract dispute concerning the asset

6     purchase agreement, the APA, as referred to in the briefing,

7     and the services agreement that are incorporated by

8     reference --

9          THE COURT:  Mr. Roche, let me stop you there.  The

10    standard that I have to apply in deciding whether to grant a

11    motion to dismiss -- we'll put aside any fraud claim that

12    Rule 9 comes into play -- is whether the complaint -- the

13    well-pleaded facts of the complaint have stated causes of

14    action.

15          I understand the narrative that your motion to

16    dismiss pursues, where this is all a breach of contract,

17    this is all a contract dispute.  But the issue before me --

18    and it may be that in a defense of the action, you will be

19    able to persuade the Court that somehow contract claims --

20    that's what this is all about.  But the issue for today is

21    whether the well-pleaded facts of the complaint has stated

22    causes of action for turnover under 542, conversion,

23    fraudulent misrepresentation, unjust enrichment, replevin

24    and accounting.

25          There's seven causes of action in the complaint.

Page 231

1    The only one that you have not moved on is the breach of

2    fiduciary duty claim.  Some of the counts are against both

3    Defendants.  The turnover, conversion, fraudulent conveyance

4    are against both Defendants.  The breach of fiduciary duty

5    is against Stone only.  The unjust enrichment is against

6    capstone only.  The replevin is against both Defendants.

7    And the accounting is against Stone only.

8             So, what you need to focus your argument before me

9    today -- and I've read all these papers -- is why this

10   complaint, on its face, does not -- the well-pleaded

11   allegations of the complaint do not allege the causes of

12   action set forth.

13            MR. ROCHE:  Yes, Your Honor.  And I believe it's

14   appropriate -- taking the complaint on its face, the asset -

15   - the APA and the services agreement still, by reference,

16   are incorporated in the complaint in Paragraph -- just

17   pulling up -- Paragraph 21 of the first amended complaint

18   states, "Pursuant to the asset purchase agreement and the

19   services agreement, Defendant Stone was to continue

20   deploying Celsius' coins as CEO of Celsius KeyFi to the

21   extent authorized in advance by Celsius."  And many of the

22   issues raised in the first amended complaint go to the

23   question of authorization under that agreement, the asset

24   purchase agreement.

25            So, when considering the legal sufficiency of the

Page 232

```
1     claims -- and I'll go through them one by one and why they
2     should be dismissed -- when considering the asset purchase
3     agreement, I do believe it's appropriate for the Court to
4     consider the APA.
5               And starting with the asset purchase agreement --
6     excuse me -- starting with the turnover claim, Plaintiffs
7     cannot plead around the existence of a bona fide dispute
8     over ownership of the property by simply asserting that the
9     Defendants' claims to that property are frivolous.  I
10    believe In re VeraSun Energy Corp. is instructive there.
11              In that case, the court was confronting a turnover
12    claim in accounts receivable, and like this matter, the
13    plaintiffs were asserting that just because an accounts
14    receivable claim is subject to litigation, doesn't make it a
15    bona fide dispute.  But the Court disagreed there, finding
16    that the denial of the existence of an agreement and the
17    existence of a dispute over the outstanding balance was
18    enough to dismiss the turnover claim because there was a
19    bona fide dispute.
20              And here, the APA was entered into by all the
21    parties to this litigation.  And accepting all the facts in
22    the first amended complaint as true, Stone and KeyFi first
23    asserted breach of contract claims against Celsius by at
24    least September 1, 2021.  That's Paragraph 41 in the first
25    amended claim.
```

Page 233

1          Paragraph 42 in the first amended complaint shows

2     that the parties engaged in settlement discussions for at

3     least 10 months.  And Paragraph 43 shows that KeyFi brought

4     suit against Celsius after those discussions broke down,

5     seeking additional damages.

6          And so we're not asking for the Court to consider

7     the KeyFi complaint.  But as Celsius in Footnote, I believe,

8     2 asks this Court to consider -- and we're fine for that

9     standard -- the mere filing of -- to take judicial notice of

10    the filing of the complaint as it relates to the existence

11    of whether or not there is a bona fide dispute and whether a

12    turnover claim has been properly pleaded.

13         And Celsius' only response to the question of

14    whether or not there is a bona fide dispute, for purposes of

15    determining the legal sufficiency of the turnover claim is -

16    - they assert that, "It is their strongly held view that the

17    claims and allegations contained in the KeyFi complaint are

18    entirely false and indeed frivolous."  The Court does not

19    need to accept that --

20         THE COURT:  But the KeyFi -- excuse me, Mr. Roche.

21    The fact that KeyFi filed a State Court complaint does not

22    mean that this complaint in this case does not include well-

23    pleaded allegations of each of the causes of action.  The

24    fact that KeyFi and Stone, for whatever its reasons, decided

25    to be the aggressor and promote its narrative in a State

Page 234

1    Court complaint doesn't mean that the face of this complaint

2    does not set forth well-pleaded facts to support each of the

3    claims that are included.

4              MR. ROCHE:  I agree.

5              THE COURT:  You can't just simply say we sued them

6    first; we said they owe us a bundle of money.  That is not a

7    defense to this action.

8              MR. ROCHE:  No.  And I completely agree with

9    respect to all the other claims except the turnover claim.

10   Under 542(a) and (b), if there is a bona fide dispute, a

11   turnover -- a claim and turnover claim, a garden variety

12   claim for contract can't be turned into a turnover claim, if

13   there is a bona fide dispute.  And --

14             THE COURT:  So, at bottom, Plaintiffs' argument is

15   that the original coins never stopped being Debtor's

16   property.  Debtor held title in any property that was

17   obtained with the Debtor's coins.  Defendants' argument is

18   that following the events that you described, at some point

19   in time both forms of property, coins and property obtained,

20   the property became Defendants' property.  Or at a minimum

21   there is a dispute to their title dooming the turnover

22   claim.  And there are a host of problems with that argument,

23   Mr. Roche.  I'm not going to go through each of them now,

24   but I think you're off-base.

25             MR. ROCHE:  Well, so, Your Honor, I think the only

Page 235

1    question the Court needs to determine for resolving the

2    motion is whether or not the first amended complaint, on its

3    face, shows that there is a bona fide dispute to that.  I

4    think the questions are -- the question is different for the

5    conversion claim and the other causes of action.  But I

6    think for at least -- and I would ask -- I believe In Vera

7    Energy Corp. is instructive there because --

8            THE COURT:  Mr. Roche, you cite LaMonica v. CEVA

9    Group PLC, 582 B.R. 46 (Bankr. S.D.N.Y. 2018).  The court in

10   that case refused to review documentary evidence outside the

11   pleadings at the motion to dismiss stage to determine

12   whether there was a bona fide dispute, including a Section

13   542 claim.  You rely on that case.  It cuts right against

14   you.

15           MR. ROCHE:  So, in CEVA, the documents that were

16   being asked to be relied upon, it wasn't a previous dispute.

17   So our distinction under CEVA is that where there is a pre-

18   existing -- as a matter of law, where there is a pre-

19   existing dispute, as a matter of law a turnover claim cannot

20   stand to that same property, because the existence of the

21   previous dispute is evidence of the existence of a bona fide

22   dispute.

23           THE COURT:  Mr. Roche, in your opposition, you

24   seem to agree that these coins belong to the Debtor and

25   you're willing to work out a stipulation to return them.

Page 236

```
 1              MR. ROCHE:  You're saying the opposition for the

 2    preliminary injunction?

 3              THE COURT:  Yeah.  Yes, you did.

 4              MR. ROCHE:  Not -- Your Honor, I believe that's

 5    not accurate.  The tokens at issue do not belong to the

 6    Debtor.  The tokens at issue belong --

 7              THE COURT:  All right.  Let's --

 8              MR. ROCHE:  (indiscernible)

 9              THE COURT:  Let's go on.  Go on to the other

10    causes of action.

11              MR. ROCHE:  Sure.  Turning to the conversion

12    claim, again, accepting their allegations as true, they've

13    alleged, one, an inappropriate use of assets.  They gave to

14    the Defendant -- that they gave to Defendant.  It was

15    Celsius' conversion claim, at bottom.  And this is Paragraph

16    -- turning to their conversion claim -- Paragraph 52 of

17    their -- of the first amended complaint alleges that at

18    bottom, Celsius gave coins to the Defendants in this

19    litigation.  And the Defendants inappropriately used those

20    assets and failed to return those assets.

21              But again, the asset purchase agreement governs

22    this conduct.  Schedule 7.8 of the asset purchase agreement

23    -- and if Your Honor has the asset purchase agreement in

24    front of them -- in front of it -- I would direct it to what

25    is Page -- it's Page 29 of the PDF and Schedule 7.8.  It
```

Page 237

1    defines what the authorized activities are.

2            And so, Citadel Management here, again is directly

3    on point.  There, there was a contracted issue where a

4    plaintiff gave to the defendant $11 million worth of assets.

5    And in return, the defendant was to make periodic interest

6    payments, assign ownership of particular properties, and

7    then give back the principal at the end of the contract at

8    issue.  But the defendant didn't do that.  The defendant

9    just instead took the $11 million and failed to perform the

10   other obligations under the agreement.

11           And that's what we have here.  We have a contract.

12   They've alleged that they gave Stone these assets, they gave

13   KeyFi and Stone these assets, and that Stone and KeyFi

14   failed to return some of these assets.  But that's conduct

15   that would be barred by the existence of the asset purchase

16   agreement.  It's not separate and independent.  Celsius has

17   not alleged any acts.  And if you look at their opposition

18   brief, they don't point to any conduct separate and part

19   that would not be a garden variety breach of contract claim.

20   And they can't point to any conduct outside of the asset

21   purchase agreement that would give rise to a cause of

22   action.  So, for those reasons, they haven't alleged an

23   independent (indiscernible) separate and apart from breach

24   of contract.

25           And moving on to the unjust enrichment, replevin

Page 238

1    and accounting claims, it's the same issue, Your Honor.

2    There is an asset purchase agreement that under Schedule 7.8

3    shows what KeyFi and Stone were supposed to be doing with

4    these assets.  It defines the centralized -- authorized and

5    central finance activities, defines how they're supposed to

6    be accounted for the net profits, and defines the scope of

7    what the parties were to be doing with the tokens, how the

8    tokens would be returned to Celsius, for the duration of the

9    performance of the activities that Mr. Stone and KeyFi were

10   doing on behalf of Celsius and Celsius KeyFi.

11          And so the unjust enrichment, replevin and

12   accounting claims fail for the same reason that the

13   conversion claims do.

14          So, first, on the unjust enrichment claim, in

15   order to plead the claim in the alternative, and plead

16   unjust enrichment alternative to a breach of contract claim,

17   there must be either a bona fide dispute concerning the

18   distance of the contract.  We don't have that here.  Celsius

19   admits that there's an asset purchase agreement and they

20   admit in Paragraph 21 that pursuant to the asset purchase

21   agreement, Stone and KeyFi were deploying coins on their

22   behalf.

23          For the second way around a breach of -- to bring

24   an unjust enrichment claim in the alternative is where the

25   contract doesn't cover the dispute.  And so that's the

Page 239

1    question of law before this Court, is does the contract

2    govern the dispute that Celsius has alleged in its first

3    amended complaint?  And it plainly does.  Section 7.8

4    defines what the Defendants in this case were entitled to do

5    and what Celsius was contracting for them to do with their

6    tokens.

7                    So, again, what their unjust enrichment claim

8    alleges is, one, that they used Celsius property and its

9    proceeds to "acquire NFTs without authorization, transferred

10    such NFTs and other Celsius property away from Celsius, and

11    used that property and its proceeds to develop what Stone

12    refers to as an investment company."

13                    But this just goes back to the Citadel case, where

14    parties had an agreement at issue.  And we're not arguing

15    that that -- I'm not arguing against the facts that they

16    have alleged.  They have alleged that Stone misappropriated

17    assets.  They've alleged KeyFi misappropriated assets.  They

18    allege that he transferred assets without authorization.

19    But that's all governed by Schedule 7.8 of the asset

20    purchase agreement, which all the parties in this case are

21    signatories to.

22                    And so that, for purposes of the legal sufficiency

23    of their unjust enrichment, replevin and accounting and

24    conversion claims, means that those claims, as a mater of

25    law, are deficient, and that this case would -- at least

Page 240

1    with respect to those claims, Your Honor, should be brought

2    as breach of contract claims, pursuant to the independent

3    Court document.

4              THE COURT:  All right.  Anything else you want to

5    add?

6              MR. ROCHE:  Just lastly, on the fraudulent

7    misrepresentation claim, they assert primarily three -- in

8    their opposition, they set out the three statements that

9    they're relying on for their fraudulent misrepresentation

10   claim.

11             So, first, in August 2020, they claim Stone and

12   KeyFi assured Celsius that he was hedging -- that Stone and

13   KeyFi were going to hedge the price movements in the crypto

14   assets that they were using to deploy -- using -- that they

15   were investing.

16             The second statement -- and this is -- I'll pull

17   it up in their opposition brief -- I'm looking at Page 19-20

18   of their opposition brief.  They outline hedging,

19   profitability and visibility and return of coin.

20             And so, at bottom, there's three statements

21   essentially.  Stone KeyFi told Celsius they were hedging.

22   Stone KeyFi told --

23             THE COURT:  So, Mr. Roche?  Mr. Roche, in --

24             MR. ROCHE:  Yes.

25             THE COURT:  -- in the Plaintiffs' opposition to

Page 241

1   your motion, you say -- first off, you say that they haven't

2   made specific -- they haven't alleged specific

3   misrepresentations and -- finding my notes -- at Pages 19

4   and 20 of the opposition, the Plaintiff points to specific

5   dates and quotes and provides details -- detailed

6   information, time periods to apprise Defendant of the

7   general time period of any misrepresent -- of the 9(b)

8   requirements.

9           So, their opposition specifically -- you say they

10  didn't, and they point out those very -- the specifics --

11          MR. ROCHE:  I --

12          THE COURT:  -- at Pages 19 and 20 of their --

13          MR. ROCHE:  I apologize.

14          THE COURT:  -- opposition.

15          MR. ROCHE:  I said they did.  I was quoting

16  exactly -- they point to three statements and I wanted to

17  walk Your Honor through why each of those statements does

18  not -- cannot stand -- doesn't satisfy the elements of

19  fraudulent misrepresentation.  First --

20          THE COURT:  Go ahead.

21          MR. ROCHE:  -- with respect to each of those three

22  statements, they do not allege in the first amended

23  complaint that Stone or KeyFi knew those statements were

24  false when they were made.  And then, so that's for -- with

25  respect to each of those statements.

Page 242

```
 1              The second -- so then with respect to the first
 2     and second statement on Page 19-20 of their opposition
 3     brief, those are the statements concerning hedging and the
 4     profitability of the investments.  Those cannot serve as
 5     misrepresentations because the conduct complained of would
 6     be governed by the scope of authorized services under the
 7     asset purchase agreement.  Again, Schedule 7.8.  Under New
 8     York Law, the reasonable reliance element of fraud is
 9     precluded when an express provision in a written contract
10     contradicts a prior alleged representation in a meaningful
11     fashion.
12              Here, what they claim is that Stone said, I'm
13     going to be hedging certain transactions and that the
14     investments are profitable.  But the contract at issue here,
15     the asset purchase agreement, outlines what Stone and what
16     KeyFi were to be doing with the coins at issue.
17              And so we're again, under New York law, where
18     there's a contract that governs -- or contradicts a prior
19     misrepresentation in a material fashion.  And Your Honor,
20     the statements on Page 19 of the opposition to the motion to
21     dismiss, those both predate the asset purchase agreement.
22     The asset purchase agreement was executed at the beginning
23     of January of 2021.  Those two statements occurred in August
24     and towards the end of 2020 and are directly refuted by the
25     language governing Stone and KeyFi's responsibilities under
```

Page 243

1    the asset purchase agreement and Section 7.8.

2              And then their last statement is essentially Stone

3    misrepresented the timing of when he was going to return the

4    coins and misrepresented that he was going to return all of

5    the coins.  And their alleged harm there is that Celsius was

6    prejudiced by that misrepresentation -- that's assume it's a

7    misrepresentation, because Celsius did not -- wasn't able to

8    timely file an action.

9              Well, again, under the weight of their own first

10   amended complaint, they knew of the alleged

11   misrepresentation by at least May of 2021.  And they knew

12   that Stone was asserting claims against them by September

13   2021.  Yet they didn't file this action until August of

14   2022.

15             So, any claim that they suffered harm from relying

16   on that statement, the statement that he was going to return

17   coins, and that they delayed pursuing litigation on reliance

18   of that statement is not plausible.

19             Unless Your Honor has any further questions at

20   this time, Defendants have nothing further.

21             THE COURT:  Okay.  Mr. Hurley?

22             MR. HURLEY:  Thank you, Your Honor.  Again, for

23   the record, Mitch Hurley, with Akin Gump Strauss Hauer &

24   Feld.  Your Honor, Celsius brings this action to recover

25   property that the Defendants stole.  And the way the

Page 244

1    Defendants stole that property was by entering digital

2    wallets that belonged to Celsius, transferring coins and

3    other digital assets that belonged to Celsius to their own

4    wallets, and laundering the proceeds of those transfers

5    through a money laundering application called Tornado Cash.

6    The stolen property is worth millions of dollars and Celsius

7    seeks to recover it for the benefit of its creditors.

8            As you noted, the Defendants seek -- make a motion

9    to dismiss all the claims except for breach of fiduciary

10   duty.  There are at least two fundamental and fatal problems

11   with the approach that the Defendants take.  Your Honor has

12   hit, I think, on both of them.  But let me reemphasize.

13           First, this is a motion to dismiss under Rule

14   12(b)(6).  It is not a summary judgment motion.  It's a pre-

15   discovery motion, and I want to emphasize that.  There has

16   not been a scrap of paper produced by the Defendants in this

17   case.  We sought discovery.  We served discovery on

18   September 28th.  Their responses were due on October 28th.

19   They promise they were going to start the rolling production

20   on November 28th.  We still don't have a page.

21           It's not to bring a premature discovery dispute

22   before Your Honor, Your Honor, just to emphasize that this

23   is the very beginning of the case.  It's a 12(b)(6) motion,

24   not a summary judgment motion.

25           On a 12(b)(6) motion, of course Your Honor has to

Page 245

1    take us through the facts that are pleaded in Celsius'

2    complaint and confine the analysis to the facts that are

3    stated in the complaint and documents appended or integral

4    to the complaint.

5            In their motion, the Defendants really do ask you

6    to do the exact opposite.  They ask you to set aside

7    Celsius' well-pleaded allegations and accept theirs instead.

8    Of course, you can't do that under a 12(b)(6) standard.

9            The second really fatal flaw of their approach,

10   Your Honor, is their really desperate attempt to try to turn

11   this into a breach of contract action.  This is not a breach

12   of contract action, Your Honor.  The complaint alleges an

13   extraordinary pattern of theft, money laundering and other

14   misconduct that I will detail in a moment, and amply

15   supports the tort and equitable claims that Celsius brings.

16           Unlike virtually all of the cases the Defendants

17   cite, in this case, Celsius doesn't allege breach of

18   contract.  Let's talk about why for a second.  So, first,

19   heard Mr. Roche refer to the asset purchase agreement, and

20   he actually -- he just said all the parties here are a party

21   to the asset purchase agreement.  First of all, that's not

22   true.  Defendant Stone is not a party to the asset purchase

23   agreement.

24           But more importantly, the terms that Mr. Roche

25   keeps referring to are in a schedule that is referred to the

Page 246

1    summary of key terms that was attached to the asset purchase

2    agreement, and that is a schedule of terms that the parties

3    contemplated would be included in a subsequent agreement

4    called the services agreement.  In fact, the services

5    agreement was entered into and it embodies some of those

6    terms, but not all, and it's an integration.

7            Neither Defendant is a party to the services

8    agreement.  So, in other words, neither Defendant is a party

9    to the agreement that contains the terms that you just heard

10   Mr. Roche rely on.

11           Celsius in this case doesn't allege breach of

12   contract, partly for the obvious reason that neither

13   Defendant is a party to that contract.  Celsius identifies

14   the services agreement and some other contracts, but it does

15   not rely on them in alleging its claims.

16           But even if the services agreement could be

17   considered on the motion, Your Honor, it wouldn't change

18   anything, because all of the Defendant's' arguments,

19   including the ones that supposedly are based on the

20   contracts, depend on material that is found nowhere in the

21   complaint and nowhere in any contract or any other document

22   that's identified in the complaint.  And again, that means

23   that a Rule 12(b)(6) motion -- there motion has to be

24   denied.

25           Okay.  So, since this is a Rule 12(b)(6) motion, I

1    thought it would make sense to briefly highlight some of the

2    key allegations that actually are alleged in the complaint,

3    Your Honor.  And with the Court's permission, I'd like to

4    put up a demonstrative with a timeline of certain of those

5    allegations.  May I do that?

6              THE COURT:  Yes, go ahead.

7              MR. HURLEY:  Okay.  Mr. Chapman, I think, is on

8    still, and I think we need to give him access to be able to

9    share his screen.

10             CLERK:  Okay.  Mr. Chapman is a co-host.

11             MR. CHAPMAN:  Thank you.

12             MR. HURLEY:  Perfect.  There he is.  He looks like

13   a deer in the headlights, but it's...  All right.  So, it's

14   been a long day, Your Honor, and you've read the papers, but

15   I do think it's important to highlight some of these

16   allegations.  So, Celsius alleges in its complaint that in

17   August 2020, Celsius engaged Defendants to conduct staking

18   and DeFi activities with Celsius coins.  That's Paragraph

19   18.

20             In or around the same time, Celsius alleges in

21   Paragraph 20, began transferring Celsius coins to a Celsius

22   wallet and provided the Defendants with a private key for

23   that wallet.  Private key to a wallet is like a passcode for

24   an ordinary account, except that it can't be changed.  Stone

25   was given the private key, solely so he could deploy coins

Page 248

1    in in authorized staking and DeFi activities.  That's

2    Paragraph 20.

3          Celsius alleges that in early 2021, it instructed

4    Defendant to return all of Celsius' property.  That's

5    Paragraph 24.  Celsius alleges that Defendants actually

6    agreed that they would return all of Celsius' property.

7    However, Celsius alleges, Defendants actually secretly

8    embarked on a series of transactions and transfers without

9    Celsius' knowledge or authorization.

10          Among other things, Celsius alleges on February 1,

11    2022, Defendants used 600 Celsius ETH to buy NFTs called

12    CryptoPunks.  Celsius alleges he was never authorized to buy

13    NFTs.  At that time, Your Honor, 600 ETH was worth about

14    $800,000.

15          On February 19th and 27th, Celsius alleges the

16    Defendants transferred a total of 450 Celsius ETH directly

17    from Celsius wallets to their own wallets.  The stolen ETH

18    at that time, Your Honor, was worth about a million dollars.

19          On March 6th, the Defendants, Celsius alleges,

20    began to transfer the NFTs they had bought with Celsius

21    coins without authorization from Celsius' wallet to

22    Defendants' wallet.

23          On March 9th, Stone claims that he resigned his

24    position as CEO of Celsius.  But the very next day, Celsius

25    alleges, Defendants transferred 20 more Celsius ETH, about

1      $40,000.

2            On March 16th, Defendants transferred more NFTs

3      that they purchased with Celsius coins from Celsius wallets

4      to Defendants' wallets.  That's Paragraph 35.  And in the

5      most probably extraordinary bit of misconduct that's alleged

6      here, Your Honor, on September 21, 2021, six months after

7      Defendant says he resigned from Celsius, Defendants used

8      their access to Celsius private keys to steal 1.4 million

9      stablecoins called DAI.  DAI, Your Honor, is a coin that's

10     pegged to the dollar.  So one stablecoin is one dollar.  So

11     that's $1.4 million dollars.

12            At that time, Celsius knew that Defendants had the

13     private keys for the Celsius wallet, but believed that

14     wallet contained nothing of value.  And in fact, at the time

15     it didn't.  But in September, a smart contract that was

16     related to a deployment the Defendants made before departing

17     Celsius deposited automatically the 1.4 million DAI in the

18     Celsius wallet, with no notice to Celsius.  But the

19     Defendants were waiting, apparently.

20            Celsius alleges that on September 21, 2021, the

21     Defendants accessed Celsius' wallet, transferred that 1.4

22     million DAI to their own wallets, and then converted that

23     DAI into ETH.  And on 17 transactions, you can see on the

24     blockchain over the next couple of months, laundered that

25     $1.4 million through Tornado Cash.  That's Tornado Cash as

Page 250

```
 1     the on-chain mixer that has been banned by OFAC because of

 2     it's frequent use to hide the proceeds of cybercrimes.

 3              And this is not Defendants' first use of Tornado

 4     Cash.  Celsius alleges multiple other uses, including in

 5     Paragraph 38.  Celsius also alleges that in addition to the

 6     thefts I just identified, Defendants never returned a large

 7     number of other coins and property that were made available

 8     to them through the wallets.  Celsius does not know what

 9     happened to those coins, Your Honor.

10              Again, there hasn't been any discovery produced

11     and the Defendants have refused to account for their

12     activities with the Celsius coins.  But Celsius alleges in

13     the complaint that those coins also may have just been

14     stolen by the Defendants.

15              So, Your Honor, these are the specific allegations

16     that are actually contained in the complaint and that

17     animate Celsius' claims.  They are more than sufficient to

18     sustain each of the tort claims and the equitable claims

19     that are alleged.  And for the most part, the Defendants

20     really don't even argue that Celsius has failed to allege

21     the elements of its claims.  Instead, what they do is they

22     rely on factual assertions outside of the complaint to argue

23     that despite Celsius having alleged those elements, the

24     claims should be dismissed.

25              Let me start with turnover.  So, basic --
```

Page 251

1          THE COURT:  Mr. Hurley, I'm going to stop you.

2     I've read all the papers.

3          MR. HURLEY:  Okay.

4          THE COURT:  Let me hear very briefly from Mr.

5     Stone -- Mr. Roche -- excuse me.  Mr. Roche, go ahead.

6          MR. ROCHE:  Just a few points I want to clarify.

7     So, KeyFi was a party to the agreement, and I believe Mr.

8     Hurley said I misspoke.  I did not misspeak.  I said all the

9     parties were signatories to the agreement.  Mr. Stone signed

10    on behalf of KeyFi the asset purchase agreement.

11         And Your Honor, I think Mr. Hurley -- what I would

12    say is, yes, we agree that absent an agreement and absent

13    the incorporation of agreement into this complaint, they

14    have, for purposes of their first amended complaint, pled

15    the elements of conversion, of turnover, of --

16         THE COURT:  Replevin, unjust enrichment.  You name

17    it; they've alleged it.

18         MR. ROCHE:  Except the existence of the asset

19    purchase agreement is critical.  And under New York law,

20    where there is a conflict, a claim for conversion, unjust

21    enrichment, replevin and accounting cannot stand.  And where

22    that contract can particularly -- excuse me -- explicitly

23    contemplates that the parties are going to be joining --

24    creating an entity to deploy coins and for Celsius to deploy

25    coins, the proper nature of their claim is one in contract

1      and not in tort.

2            THE COURT:  All right.  I'm going to stop you

3      there.  I'm telling you now that I'm going to be entering an

4      opinion denying the motion to dismiss as to each and every

5      count that you've sought to dismiss.  We have a preliminary

6      injunction hearing scheduled for January.  That's going to

7      remain on the docket with the schedule that's been agreed.

8            I don't want to hear that you're dragging your

9      feet in providing discovery.  Mr. Hurley, if there are

10     discovery issues that you feel are not being sufficiently

11     addressed, I require you meet and confer.

12           And to the extent that you need the assistance

13     from the Court, you contact my Courtroom Deputy, Deanna

14     Anderson, and hearings will be scheduled for that day or the

15     next day, or at the most, two days after.  I don't want

16     motions to compel.  We take it up and there'll be a Zoom

17     hearing.

18           If I conclude that I need any briefing, I'll

19     require short letter briefs.  But discovery is going to move

20     along rapidly.  We have a schedule for a preliminary

21     injunction hearing.  In due course, a written opinion

22     denying the motion to dismiss will be entered.

23           I did see Mr. Roche's opposition to the

24     preliminary injunction hearing.  I wanted to ask each of you

25     -- one of the issues that he raises is to whether or not

Page 253

1    there was supposed to be an accounting, and I wanted to see

2    whether the two of you have discussed trying to reach an

3    agreement to provide for a prompt accounting that might

4    narrow the issues, if at all.  Otherwise, we'll just go

5    forward with the preliminary injunction.

6            But the opposition offered to enter into a

7    stipulation to resolve most of the issues, but not all.  But

8    there was much said about whether there had been an

9    agreement for an accounting.

10           So I guess my question for the two of you is, have

11   you discussed whether you're able to reach an agreement for

12   an accounting?  Will that obviate the need for the

13   preliminary injunction hearing or shorten it, or come up

14   with a new schedule for it?  Otherwise, we'll just go

15   forward on the schedule that exists.

16           And I don't want to -- we're not going to get into

17   a discovery conference now, but I'll tell you right now, Mr.

18   Roche, if there was discovery served, which there was, and

19   an agreement to produce, and you haven't, there'd better be

20   a really good reason for it, because I'm going to insist on

21   all discovery necessary being taken in time for the

22   preliminary injunction hearing.

23           Mr. Hurley, let me ask you first.  Have you had

24   any discussions with Mr. Roche about an accounting?

25           MR. HURLEY:  Well, not an accounting specifically,

Page 254

1    Your Honor.  But the -- so the relief that we sought on the

2    motion for an injunction originally, obviously, sought the

3    freezing of the property, but in addition, some other

4    relief, including a sworn statement from Mr. Stone

5    identifying certain property that was taken and that was

6    acquired.  And that -- in the category of relief that I

7    understand Mr. Roche in his opposition to and saying he no

8    longer opposes.

9            So we provided to Mr. Roche, after reading the

10   opposition, a proposed stipulation and order that would

11   enter all of the relief, other than the relief that he says

12   he doesn't oppose.  And we sent that over to him I think on

13   Friday.  So we'll see how he responds.

14           But my expectation and hope would be that would

15   result in at least by the time we have the injunction,

16   you'll have a sworn statement that at least identifies all

17   of the property that's at issue in the injunction.

18           MR. ROCHE:  Your Honor, so just a couple points of

19   clarification.  We have engaged in sufficient discovery.

20   We've been negotiating over search terms.  We've collected

21   over 150,000 documents from the Defendants in this case.

22   And so we are planning prompt discovery.  Part --

23           THE COURT:  When are you going to produce the

24   documents?  You say you collected 150,000 documents.  What

25   are you going to produce them?

Page 255

1           MR. ROCHE:  We're going to produce them when we

2    agree on search terms.  The initial search terms that were

3    sent over included a little bit more than 40,000.  The

4    parties are, I believe -- Defendant -- or excuse me --

5    Plaintiffs have asked for Mr. Stone's deposition to go

6    forward ahead of December 23rd and to have some discovery.

7    As part of that deposition, we agreed to produce that as

8    Plaintiffs have asked, five days ahead of that deposition.

9    So that discovery is going to -- will be produced five days

10   ahead of the deposition.  And in parallel with that, we will

11   continue reviewing all the other documents, once we get a

12   set of search terms agreed to.

13           On the relief that's being requested, the main

14   relief that we oppose is the entry of a freezing order

15   concerning property -- the property that is at issue, that

16   Defendants assert, and as outlined in the New York Supreme

17   action, was paid as compensation, which Plaintiffs in this

18   action say was stolen.  That's a subject for the preliminary

19   injunction hearing.

20           As far as the other issues and accounting, we're

21   happy to engage in accounting.  The asset purchase agreement

22   and the services agreement contemplated accounting when

23   there is a dispute over the amount.  And in fact, it was the

24   Defendants in this case that initially evoked the audit

25   provision of the asset purchase agreement over a year ago.

Page 256

1          We're happy to identify the property that -- I

2     think there's going to be some definitional work that needs

3     to be worked out between the parties.  Plaintiffs sent a

4     letter over on Friday.  My grandmother passed away and so

5     I'm -- had to do some traveling for the funeral and the wake

6     this weekend.  But I plan on responding to that either late

7     tonight or early tomorrow to get some form of agreement on

8     how the parties could do an accounting.

9          Your Honor, I would point out, a simple

10    interrogatory could have been issued to identify all of the

11    assets at issue.  We would have responded to that.  And

12    during the course of the past year and a half, we did

13    identify for the Plaintiffs here --

14          THE COURT:  I don't want to hear what happened

15    over the last year and a half.  I want a resolution of the

16    discovery issues promptly.  I want -- if the two of you and

17    your clients agree to an accounting or an audit, let's get

18    that resolved.

19          Mr. Hurley, have you come up with a set of search

20    terms?

21          MR. HURLEY:  So, Mr. Chapman has been handling

22    that --

23          MR. ROCHE:  We have, yes.  We've run their search

24    terms over the 150,000 documents.  It's come down to about

25    40,000.  The parties have been going back and forth on

Page 257

```
 1    search terms, on search terms for both sides, and I expect

 2    we'll get an agreement there within the next week, week and

 3    a half.  And --

 4              THE COURT:  That's too long.  No --

 5              MR. ROCHE:  Okay.

 6              THE COURT:  Mr. Roche, that's too long.  Who are

 7    you negotiating search terms with?

 8              MR. ROCHE:  The rest of the Akin team.

 9              THE COURT:  Mr. Hurley, whoever it is on your team

10    who's doing that should meet and confer with Mr. Roche by

11    5:00 next Monday.  And this needs to get resolved.

12              MR. HURLEY:  We will intend to do that much sooner

13    than that, Your Honor.

14              THE COURT:  That -- sooner the better.  Okay.  We

15    go forward with the preliminary injunction hearing, I don't

16    want to hear from anybody, we didn't get the discovery we

17    wanted.  Everything is going to be done.  You've got a

18    schedule.  You're going to adhere to the schedule.  If you

19    can come to some agreement to avoid the necessity of the

20    preliminary injunction, fine.  Otherwise, let's just move

21    forward.

22              I wanted to let you know today that I'm denying

23    the motion to dismiss so you both know that you're charging

24    ahead with the preliminary injunction hearing if that's not

25    resolved.
```

1            MR. ROCHE:  Understood, Your Honor.  There's

2    potentially one discovery issue that if we could get some of

3    the Court's help on today, if you'd rather --

4            THE COURT:  You can't.

5            MR. ROCHE:  Okay.

6            THE COURT:  You can't get --

7            MR. ROCHE:  Understood.

8            THE COURT:  You need to meet and confer and see if

9    you can resolve it.  And if you can't, the party needing the

10   assistance of the Court contacts my Courtroom Deputy and

11   you'll get a prompt hearing on it.  We're not doing this on

12   the fly.  Okay?

13           MR. ROCHE:  Understood, Your Honor.

14           THE COURT:  All right.  Anything else for today?

15           MR. ROCHE:  Nothing for Defendants.

16           MR. HURLEY:  Not for me, Your Honor.

17           THE COURT:  Mr. Hurley?

18           MR. HURLEY:  Not for me, Your Honor.  Thank you.

19           THE COURT:  All right.  I think that concluded

20   everything on the agenda for this afternoon.  There are a

21   number of adjourned matters that are listed on the agenda,

22   but by my reckoning, we've covered everything that had to be

23   dealt with during the agenda.  Mr. Nash, is that consistent

24   with your view?

25           MR. NASH:  Yes, sir.

Page 259

1              THE COURT:  We are adjourned.

2              MR. NASH:  Thank you, sir.

3              (Whereupon these proceedings were concluded at

4    3:12 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 260

1                          I N D E X

2

3                           RULINGS

4                                              Page      Line

5    Motion to Shorten, Granted              177        18

6    Motion to Seal, Granted                 178        19

7    KERP Motion, Granted                    198        14

8    Motion to Extend Exclusivity, Granted   221         8

9    Fee Examiner Motion, Granted            221        16

10   Motion to Dismiss, Denied               252         4

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 261

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  December 7, 2022