Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    Adv. Case No. 22-01139-mg

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    CELSIUS NETWORK, LLC,

9

10           Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   CELSIUS NETWORK LIMITED, et al.,

13                  Plaintiff,

14           v.

15   STONE, et al.,

16                  Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18                  United States Bankruptcy Court

19                  One Bowling Green

20                  New York, NY  10004

21

22                  January 11, 2023

23                  9:00 AM

24

25

1   B E F O R E :

2   HON. MARTIN GLENN

3   U.S. BANKRUPTCY JUDGE

4

5   ECRO:   KAREN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1   Adversary Proceeding: 22-01139-mg Celsius Network Limited et

2   al v. Stone et al

3   Hybrid Evidentiary Hearing RE: Motion of Plaintiffs for

4   Preliminary Injunction Pursuant to Rule 7065 of the Federal

5   Rules of Bankruptcy Procedure. (Doc # 20 to 25, 27 to 29, 32

6   to 34, 42 to 45, 51 to 53, 57, 58) Hybrid Evidentiary

7   Hearing Scheduled for 1/11/22 at 9 AM & 1/12/22 at 9 AM.

8

9   Hearing Using Zoom for Government RE: Motion of Plaintiffs

10  for Preliminary Injunction Pursuant to Rule 7065 of the

11  Federal Rules of Bankruptcy Procedure (Doc# 1353 to 1358,

12  1361) Going Forward on 01/11/2023 at 9:00 am and 01/12/2023

13  at 9:00 am.

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Sonya Ledanski Hyde

```
1    A P P E A R A N C E S :

2

3    AKIN GUMP STRAUSS HAUER & FELD, LLP

4         Attorneys for the Plaintiffs Celsius Network Limited

5         One Bryant Park

6         Bank of America Tower

7         New York, NY 10036

8

9    BY:  MITCH HURLEY (TELEPHONICALLY)

10        DEAN CHAPMAN (TELEPHONICALLY)

11        ELIZABETH SCOTT (TELEPHONICALLY)

12        JESSICA MANNON (TELEPHONICALLY)

13

14   KYLE ROCHE P.A.

15        Attorneys for KeyFi, Inc. and Jason Stone

16        260 Madison Avenue, 8th Floor

17        New York, NY 10016

18

19   BY:  KYLE WILLIAM ROCHE (TELEPHONICALLY)

20        VEL FREEDMAN (TELEPHONICALLY)

21        DANIEL STONE (TELEPHONICALLY)

22

23   ALSO PRESENT:

24        JASON STONE (TELEPHONICALLY)

25
```

Page 5

1                         I N D E X

2                     W I T N E S S E S

3    PLAINTIFF:                    RE        RE        V.

     WITNESS         DIRECT   CROSS   DIRECT   CROSS   D.    J

4

     Alex Mashinsky  31        34

5    Patrick Holert  94        95       106

6

     DEFENDANT:                    RE        RE        V.

7    WITNESS         DIRECT   CROSS   DIRECT   CROSS   D.    J

8    Connor Nolan              124      158

     Jason Stone     175       185      287      310

9

10                        E X H I B I T S

11

12   PLAINTIFF:

13   IDENTIFICATION      DESCRIPTION                   PAGE

14   Exhibit 53      Holert declaration                95

15   Exhibit 59      Mashinsky declaration             33

16   Exhibit 60      Holert declaration                95

17   Exhibit 70      Spreadsheet                       260

18

19   DEFENDANTS:

20   IDENTIFICATION      DESCRIPTION                   PAGE

21   Exhibits 1 - 33                                   56/134

22   Exhibit 31      Stone Affidavit                   178

23   Exhibit 36      Response to Tweet                 179

24   Exhibit 40      Email Chain                       53

25

Page 6

1                    P R O C E E D I N G S

2              THE COURT:  Good morning to everybody.  So, we're

3    here on a preliminary injunction hearing in Celsius v.

4    Stone, et al., which is Judge Glenn.  Obviously, I'm not in

5    the courtroom today.  While I am free of COVID, I've been in

6    close contact with someone with COVID and under the Court's

7    COVID protocols, I'm unable to be in the courtroom.  I

8    advised counsel -- to both parties of this yesterday and the

9    decision was jointly made to go forward with the hearing

10   today.  Hard copies of all of the exhibits -- and I also

11   have all of the exhibits electronically available to me on a

12   separate computer, as well.

13             So, before we get started, I want to make a quick

14   note regarding the discipline and structure of the hearings

15   taking place today and possibly tomorrow in Celsius Network

16   Limited v. Stone, et al.  Over 200 participants registered

17   for today's hearings.  This is a public trial and as such,

18   participants other than Celsius, KeyFi and Stone and their

19   counsel, have the right to be present via Zoom and to listen

20   to the proceedings.  However, the only parties permitted to

21   speak today are those directly involved in the lawsuit,

22   namely the lawyers who've made their appearances and the

23   witnesses who will testify from the witness stand.  As I

24   say, so those parties include Celsius Network Limited, Jason

25   Stone, KeyFi, Inc. and any witness that the parties call to

Page 7

1    the stand and counsel representing those parties.

2            Other participants, including other people who are

3    observing the hearing, including pro se Celsius creditors

4    are not parties to this proceeding and may not speak at

5    today's hearing.  I will not be calling on people to speak

6    via raised hand, the Hands function, as I have in other

7    hearings.  Those who are watching the proceeding on Zoom

8    must have their Zoom line muted and their cameras turned

9    off.  If any participant who is not explicitly authorized to

10   speak unmutes themselves or attempts to speak at the

11   hearing, you will promptly be disconnected and may not

12   return to the hearing.  So, with that, let me first call on

13   Mr. Hurley.  Is there anything you want to raise before we

14   get started, Mr. Hurley?

15           MR. HURLEY:  Good morning, Your Honor.  Mitch

16   Hurley with Akin Gump Strauss Hauer & Feld, on behalf of the

17   Plaintiffs.  Nothing other than that, along with Defense

18   counsel, we agreed to 15-minute opening statements.

19           THE COURT:  All right.  Okay.  So, Mr. Freedman,

20   was there anything that you want to say to start?

21           MR. FREEDMAN:  Nothing, Your Honor.

22           THE COURT:  All right.  So, I'll listen to the

23   opening statements and then I'm going to raise some

24   questions about a group of exhibits as to which there are

25   objections and want to hear briefly with respect to those

Page 8

1    objections before we actually get into the evidence.  Mr.

2    Hurley, did you want to start with your opening statement?

3         MR. HURLEY:  Thank you, Your Honor.  Again, for

4    the record, it's Mitch Hurley with Akin Gump Strauss Hauer &

5    Feld, on behalf of the Plaintiffs.  Your Honor, it's

6    undisputed in this case that the Defendants used their

7    access to Celsius' seed phrase and private keys to access

8    Celsius wallets and take millions of coins, transfer them

9    from Celsius wallets to their own wallets, coins that are

10   worth millions of dollars, in a series of transactions that

11   numbered in the many dozens.  There is no evidence of any

12   significance that what happened is anything other than what

13   it seems, which is an example of conversion, of taking

14   property belonging to Celsius and refusing to return it

15   despite due and repeated demand for the return of that

16   property by Celsius.

17        What we're seeking, what Celsius is seeking today,

18   Your Honor, is a status quo injunction.  We're only asking

19   the Court to enter relief necessary to ensure that that

20   property that the Defendants admit they took and appears to

21   be the only property that could satisfy any judgment in this

22   case, will still be available to satisfy a judgment at the

23   end of the case.  And it's necessary, Your Honor.  The

24   evidence is going to show that not only did the Defendants

25   take enormous amounts of Celsius property, but they already

1    have squandered huge amounts of that property and are unable

2    to account for the location of much of it.  Without the

3    entry of an injunction, it is crystal clear that more of the

4    same is going to happen and that the assets that -- we know

5    he has some assets still, and after the injunction, those

6    assets are almost certain to go the way of the assets that

7    you'll hear about today that he already has either

8    squandered or doesn't know where they are.  So, it's a

9    status quo injunction, Your Honor.

10            I'm going to talk briefly about the merits.  Your

11   Honor, if I could just pause for a second.  Your camera is,

12   sort of, pointed just at your chest.  Okay.  Thank you.  So,

13   I want to talk briefly about the merits.  So, the claims

14   that Celsius asserts are supported overwhelmingly by the

15   evidence.  That includes Celsius claims for turnover, for

16   conversion, for unjust enrichment, for an accounting for

17   (Plevin?).

18            Those claims are all animated by the same central

19   facts, which are first, the undisputed facts that the

20   Defendants used their access to Celsius' private keys, to

21   take Celsius' property.  Again, that's not denied, it's

22   actually stipulated to in the PTO and there is other

23   evidence we're going to present today concerning those

24   transfers.

25            So, why are we here today if that's admitted?

Page 10

1    We're here because the Defendants assert an affirmative

2    defense, which is that, though they took the property, they

3    claim that they were authorized to do so.  Specifically,

4    they claim they were authorized to take that property by

5    Alex Mashinsky.  But their evidence for that proposition,

6    Your Honor, is almost nothing.  Their evidence for that

7    proposition is solely the unsupported and self-serving claim

8    of one of the Defendants, Mr. Stone, that Alex Mashinsky

9    told him he could take these millions and millions of

10   dollars' worth of property.  That claim is denied by Mr.

11   Mashinsky as you'll hear today.  It's denied by the supposed

12   witnesses of Mr. Stone that the Defendants identify as

13   people that may have been witnesses to the authorizations,

14   including Mr. Holert and Mr. Nolan.  They will not offer any

15   support for that claim.  The Defendants have not come

16   forward with any documentary evidence, not an email, not a

17   text message, not a WhatsApp communication, nothing.

18            The claim is contradicted by the contracts to

19   which some of the parties to this litigation were party and

20   we're going to look at those contracts today.  The claim is

21   contrary to the admitted course of conduct in 2021, which

22   includes an admission that in 2021, far from authorizing the

23   Defendants to take property, Celsius demanded the return of

24   all of its digital assets.  It did so, again, in March

25   through formal Board resolutions.  Those resolutions

Page 11

1    included a formal demand for return of the seed phrase and

2    private keys.  Those demands continued -- again, it's

3    undisputed, over the course of the summer.  And this is

4    critical, Your Honor.  Many of the transfers that we're

5    talking about, the Defendants went in with their private

6    keys and took assets from Celsius and transferred to

7    themselves, happened after Mr. Stone resigned.  They

8    happened after the Defendant set formal Board resolutions --

9    sorry, Celsius sent formal Board resolutions to Defendants

10   demanding the return of all their property and their private

11   keys.  But that didn't stop them.  The Defendants kept

12   making these transfers.

13          One example, particular egregious, I've referenced

14   it before, Your Honor.  In September of 2021, six months

15   after Mr. Stone resigned, he used his access to the private

16   keys, the same ones who he demanded the return of in March.

17   He knew there was going to be an Airdrop of 1.4 million DAI,

18   which is a stable coin, so it's $1.4 million, from a

19   platform to the OXB-1 wallet, which is Celsius' wallet.  He

20   went in a couple of days later, transferred that 1.4 million

21   DAI out, converted it to ETH and then laundered that ETH

22   through Tornado Cash, which is the application that's been

23   banned by OFAC.  This is undisputed, Your Honor.  He took

24   half of it, and he gave it to some of his people that he

25   calls his co-founders of KeyFi that he calls his co-founders

Page 12

1    of KeyFi, he kept half for himself.  He doesn't know what

2    happened to that half, $600,000-700,000, but he knows he

3    spent most of it.

4            Your Honor, all we have to show on the merits for

5    our motion is that we demonstrated that there is a serious

6    question for litigation here.  The evidence I think you'll

7    see today demonstrates far more than that.  We believe the

8    merits are crystal clear in this case in favor of Celsius.

9            I want to talk about irreparable harm, briefly.

10   There is vast evidence of prior transfers and secretions by

11   the Defendants using the speed and anonymity of the block

12   chain to make it difficult to track their transfers, make it

13   difficult to identify and recover property.  They've done it

14   again and again.

15           Many cases have recognized, particularly in the

16   block chain setting, that it's important to enter an

17   injunction to prevent that kind of transfers because it is

18   so easy to use the block chain in a way that makes it

19   difficult to recover property, to put assets out of reach of

20   the Court.  And in this case, Your Honor, the Defendants

21   promise that they're going to dissipate these assets if you

22   don't enter an injunction.  They have said that they're the

23   only assets available.  KeyFi has argued that the assets are

24   necessary for KeyFi to fund its defense and that they're

25   going to use it for that purpose without an injunction.

Page 13

```
 1              And in closing, Your Honor, I'm going to cite a
 2    series of cases, unanimous as far as I know, that when a
 3    party is alleged, on a motion for an injunction, to have
 4    taken property by illicit means, that that party is never
 5    permitted to use the assets that they took from the Movant
 6    to fund their defense costs, and certainly, it's not a
 7    reason for denying an injunction.  They complain that
 8    Celsius delayed, that we should have brought this motion
 9    sooner.  The evidence is going to show that, and the
10    Stipulation provides in our view, that the delay was
11    justified under the circumstances including, because Celsius
12    spent a substantial amount of time seeking to recover its
13    property voluntarily, believing that that was the best path
14    forward to try to recover assets for the benefit of its
15    depositors and then later, it's creditors.  There was a
16    standstill agreement in place, that was requested by the
17    Defendant's counsel, that remained in place until shortly
18    before the bankruptcy was filed.  And of course, the
19    bankruptcy Stay came down and there were many distractions
20    surrounding the bankruptcy.
21              Ultimately, after the Defendants indicated clearly
22    that they were not prepared to enter into a voluntary
23    injunction, providing, what we believe the Stay already
24    provides, which is preventing them from further secreting
25    these assets, then we made our motion.  But at the end of
```

Page 14

1   the day, Your Honor, delay in this context is only relevant

2   to the extent that it suggests that there isn't really a

3   risk of irreparable harm.  But you don't have to wonder that

4   here because the Defendants have said they're going to

5   dissipate these assets, the only assets available to satisfy

6   judgment.  They're going to dissipate them without the

7   injunction.

8           And then finally, Your Honor, on the irreparable

9   harm, balancing of the harms, we're seeking a status quo

10  injunction.  Case after case says that when the Movant faces

11  the risk of having no assets to recover if they ultimately

12  gained a judgment at the end of the case and the non-Movant

13  is merely restricted, temporarily, from accessing those

14  assets, the balance weighs in favor of the Movant, and we

15  submit it clearly does here.

16          So, finally, Your Honor, and in conclusion, it is

17  clear that without this injunction, Celsius' creditors will

18  suffer.  Without this injunction, the assets we're talking

19  about, that admittedly were taken from Celsius' platform,

20  are going to be used for purposes other than creditor

21  recoveries.  And the Defendants will only be further

22  emboldened if they are allowed to continue in this course of

23  conduct that they admit and that we're going to further

24  establish today.  Under the circumstances, Your Honor, we

25  urge the Court to enter the injunction.  Thank you.

1          THE COURT:  Thank you very much, Mr. Hurley.  Mr.

2     Roche?

3          MR. ROCHE:  Yes.  Good morning, Your Honor.  We

4     would ask -- we have a few exhibits that are not opposed we

5     would like to use in the opening, and I know we were asked

6     by Deanna if we could share via Zoom.  If you could make --

7          THE COURT:  If you would tell me, which exhibits

8     they are.  I have hard copies of the exhibits in front of

9     me.

10          MR. ROCHE:  Great.  I will get that in one second,

11     Your Honor.

12          THE COURT:  All right.

13          MR. ROCHE:  Your Honor, Exhibits 40 and 45.

14          THE COURT:  These are your exhibits or Mr.

15     Hurley's?

16          MR. ROCHE:  They're Mr. Hurley's exhibits.

17          THE COURT:  All right.

18          MR. ROCHE:  He asked.

19          THE COURT:  Okay.  I've got those.  Go ahead.

20          MR. ROCHE:  In their Amended Complaint, and in Mr.

21     Hurley's opening statement, Defendant, Celsius, attempts to

22     paint Mr. Stone and KeyFi as thieves.  He argues that the

23     reason Mr. Stone and KeyFi used a program called Tornado

24     Cash, was to conceal their theft and put stolen property

25     outside of Celsius' reach.  And while I didn't hear it

Page 16

1    mentioned in Mr. Hurley's opening this morning, in their

2    motion for Preliminary Injunction, Celsius argued that

3    Defendants would soon steal from Celsius again, arguing that

4    KeyFi could soon be capable of stealing another $35 million

5    worth of Ethereum.  The problem for Celsius?  Their

6    narrative of the dispute and their attempt to use Defendants

7    as scapegoats for their own organizational dysfunction falls

8    under the facts.

9            THE COURT:  Let me ask you, though, Mr. Roche,

10   does Stone and KeyFi have the private key for wallets

11   holding the additional $35 million that you've referred to?

12           MR. ROCHE:  They do not.

13           THE COURT:  Okay.  Go ahead.

14           MR. ROCHE:  And that has been -- as part of the

15   pre-trial stipulation that the judge so ordered, both

16   parties recognize that he did not.  The evidence the Court

17   will hear today will show three things indisputably.  That

18   (1) the Defendants never stole anything, nor did they hide

19   their purchases of the NFTs that Celsius complains that they

20   stole.  To the contrary, not only did Celsius know about

21   these purchases before Mr. Stone left, Mr. Stone himself

22   actively and publicly used his popular Twitter account to

23   broadcast and celebrate the purchases of these NFTs.

24   Second, up until Mr. Stone left his position of Celsius

25   KeyFi, everyone, including the witnesses who Celsius will

Page 17

1    have testify today, understood that KeyFi's activities were

2    highly profitable.  In fact, Mr. Mashinsky himself

3    proclaimed that KeyFi was the most profitable of Celsius'

4    partners.  And third, Celsius' efforts, at great expense to

5    creditors, to track numerous NFT purchases through block

6    chain forensics in their motion, to apparently uncover the

7    NFTs that Defendants purchased, was completely unnecessary.

8          Defendants never hid these transactions.  How do

9    we know that?  Well, first, Defendants itemized most of

10   these transactions and provided these transactions to

11   Celsius nearly a year ago.  But second, Mr. Stone himself

12   tweeted out the links to these transactions while he was

13   still employed at Celsius.

14         Now, the elephant in the room is this, how can two

15   sides be so far apart in their characterizations of what

16   actually happened?  Celsius, on one hand, is claiming that

17   Defendants stole tens of millions of dollars of assets that

18   belonged to Celsius.  KeyFi and Mr. Stone on the other hand

19   have asserted both here and in a previous lawsuit filed in

20   New York State, that is Celsius who owes them eight-figure

21   payments in the form of profit payouts.

22         At the heart of this dispute is the Asset Purchase

23   Agreement, which contemplated Celsius paying Defendants for

24   their efforts managing nearly $2 billion worth of assets

25   through, in part, a profit share.  Now, if you calculate

1    that profit share on a dollar basis, KeyFi returned more

2    than $800 million in profits.  However, if you calculate

3    KeyFi's profits in coin-based accounting, the profits

4    generated by KeyFi are far less.  Celsius doesn't address

5    this elephant in the room because they know the bargain that

6    they struck accounted for profits in dollar-based

7    accounting.  They know this because shortly before Mr. Stone

8    resigned as the CEO of Celsius KeyFi, they found out that

9    their dollar-based accounting methods put aside Celsius

10   KeyFi, for Celsius itself left a giant hole in its balance

11   sheet.  They discovered that in early 2021.  And since that

12   time, Mr. Mashinsky and other employees at Celsius have set

13   out to cover this up through fraud, lies and by using my

14   clients as scapegoats for their own ineptitude.

15          Your Honor, I want to thank you for you time and

16   attention to this important matter.  I am joined today by my

17   co-counsel, Vel Freedman, and together, we represent Jason

18   Stone and KeyFi, Inc.  Sitting with me today is the

19   Defendant, Jason Stone, who is the CEO of KeyFi.

20          I'm going to spend the rest of my time this

21   morning quickly addressing three topics.  First, the

22   timeline of events in this case, second, the witnesses you

23   will hear testify and third, the issues this Court must

24   decide.

25          On the first point, the evidence in this case can

Page 19

1    be broken down into three distinct time periods.  First,

2    July through December 2020.  This is the period of time when

3    Mr. Stone and KeyFi first began deploying customer deposits

4    on behalf of Celsius without a formal agreement in place.

5    Second, from January through March 9, 2021.  This is the

6    period after which the APA was executed and prior to Mr.

7    Stone's resignation.

8            And finally, everything that has happened since

9    then, March 9, 2021 through present.  During this period,

10   the parties attempted to resolve this dispute.  Those

11   attempts eventually failed and came to a conclusion when

12   KeyFi brought suit for breach of contract under the APA in

13   New York State and Celsius filing this adversary action

14   roughly two months later.

15           Starting with the first time period.  Celsius

16   first sent KeyFi $7.3 million in customer deposits for KeyFi

17   to deploy in August of 2020.  Celsius continued sending

18   KeyFi those customer deposits throughout August and

19   September, without any agreement in place.  In early October

20   2020, the parties entered into an MOU and what is referred

21   to as an Old Services Agreement.  These informal agreements

22   essentially provided the framework for the compensation that

23   KeyFi and Celsius would eventually agree to for KeyFi to

24   manage and deploy assets into KeyFi.  Throughout this time

25   period, from October 2020 through December 2020, Celsius

Page 20

1    sent to KeyFi more than $300 million in customer deposits in

2    weekly installments, every week.  The testimony you will

3    hear will show that all of the transactions KeyFi engaged in

4    were publicly traceable and that Celsius employees used a

5    program called DeBank to track KeyFi's positions.  You will

6    also hear that, during this time, everyone at Celsius and

7    KeyFi understood that its activities were wildly profitable.

8            But what Celsius now claims is this, that despite

9    making eight-figure deployments into KeyFi, Stone's

10   representations concerning KeyFi's investments were

11   misleading.  Yet both in its pre-Trial submissions, and in

12   the testimony you will hear today, Celsius fails to point to

13   a single piece of evidence showing that either Stone or

14   KeyFi misrepresented the transactions that it was engaged

15   it.

16           Moving to the second time period, this is when, on

17   January 11, 2021, after months of negotiations, the parties

18   entered into an Asset Purchase Agreement and Service

19   Agreement where Celsius acquired KeyFi's assets and Stone

20   agreed to, under the Service Agreement, act as the CEO of

21   Celsius-KeyFi.

22           And if we could go to Exhibit 40.  So, this is

23   Section 3 of Plaintiff's Exhibit 40.  So, the consideration

24   to KeyFi consisted of essentially three forms of payments.

25   First under A, Celsius was to pay KeyFi $65,000 around

Page 21

1    closing.  That payment occurred.  Second, Celsius was

2    supposed to pay KeyFi 350,000 cell tokens, which at the time

3    they were due was worth a little bit less than $2 million at

4    three different time intervals, at closing, six months later

5    and then a year later.  Those payments never happened.  And

6    then finally, the earn out payments quoted in Section C.

7    This represents the profit share the parties contemplated

8    since the beginning of their dealings.

9            If we could go to the next slide, please.  And

10   this is -- this is the -- this is in the Schedule to the

11   APA, which contemplates how the profit share will be

12   distributed.  And under the profit share --

13           THE COURT:  I have -- I have -- excuse me, Mr.

14   Roche.  I have the exhibit open in front of me.  Can you

15   tell me on what page of the exhibit your slide is on?

16           MR. ROCHE:  Yes.  I thought we had the page

17   numbers on there, so I apologize.  I believe it's on either

18   Page 28 or 29.

19           THE COURT:  Just give me a second.

20           MR. ROCHE:  It's Page 29, Your Honor, at the

21   bottom of the page, Section D.

22           THE COURT:  When you're referring --

23           MR. ROCHE:  And so, under that --

24           THE COURT:  I -- I'm sorry, but I don't see it.

25   Which Schedule is this?

1            MR. ROCHE:  So, this is Page 29 of Exhibit 40, and

2     the Asset Purchase Agreement --

3            THE COURT:  I -- I don't see it, no.  I have

4     Exhibit 40 opened in front of me.

5            MR. ROCHE:  It's Schedule 7.8B of the Asset

6     Purchase Agreement.

7            THE COURT:  I have that open, as well.

8            MR. ROCHE:  So, it's the second page of the Asset

9     Purchase -- it's the second page of Schedule 7.8B.

10           THE COURT:  All right.  It's on Page 30.

11           MR. ROCHE:  Okay.  My apologies --

12           THE COURT:  Page 30 of 33.  It's Paragraph 6D.  Go

13    ahead.

14           MR. ROCHE:  Under the profit share, payouts were

15    set to occur on the 15th of each month.  With the first

16    occurring on December 31, 2020.  Meaning that at the time

17    this Agreement was signed, the parties had contemplated that

18    profits were already due.

19           Now, what Celsius would have this Court believe is

20    that despite the fact that they drafted this Agreement and

21    heavily negotiated it for more than five months, they were

22    duped by Stone into believing that KeyFi's activities were

23    highly profitable.

24           For the next two months after this Agreement was

25    executed, Celsius sent an additional $140 million in

Page 23

1    customer deposits to Celsius-KeyFi for deployment.  During

2    this time, they also authorized Stone to take profit payouts

3    that were owed under the Asset Purchase Agreement in the

4    form of the NFT purchases that are at issue here today.

5    Now, towards the end of February 2021, Stone and others at

6    Celsius learned that the company was illiquid because it had

7    failed to properly account for its assets and liabilities.

8    And shortly after Mr. Stone learned of this, he resigned on

9    March 9th from KeyFi -- as the CEO of Celsius KeyFi.

10            Which leads us to the final time period, from

11   March to June 2021, Stone and the rest of the KeyFi team

12   returned wound down all their positions in DeFi and sent

13   back to Celsius roughly $1.5 billion, about $800 million

14   more than what Celsius sent to it.  And if we could go to

15   the next slide, please.  This is Plaintiff's Exhibit 46.  On

16   April 7, 2021, Celsius, for the first time, threatens to

17   hold Mr. Stone personally liable for a phenomenon in DeFi

18   called impermanent loss.

19            On this day, Mr. Hurley writes to Stone's counsel

20   stating, please make no mistake, Celsius and Celsius KeyFi

21   will hold Mr. Stone personally liable for his breaches of

22   contract, including without limitation, with respect to any

23   losses resulting from price increases in ETH."  Celsius

24   never did bring a breach of contract claim.  Why?  Because

25   it realized that under the bargain it struck with KeyFi, it

Page 24

1   owed KeyFi and eight-figure payment.  And to avoid this

2   payment, it set out on a year-long campaign to paint Stone

3   and KeyFi as thieves and to cover up for its own accounting

4   and competence.  You can take that down.

5           Now, I want to, very quickly for this Court, cover

6   the concept of impermanent loss because it is, along with

7   the Asset Purchase Agreement, really at the heart of this

8   case.  What is it?

9           THE COURT:  You ought to wrap up soon because

10  you've used your 15 minutes.

11          MR. ROCHE:  Then we'll save that for later, Your

12  Honor.  So, I want to briefly just discuss -- for a year

13  after this dispute arose, the parties attempted to resolve

14  the dispute and during this time, Stone and KeyFi moved on

15  to pursuing other projects in the NFT and DeFi space.

16  Including by leveraging their highly -- Stone's highly

17  public Twitter persona that Stone crafted while he was at

18  Celsius.  Under this persona, Stone lobbied one particular

19  DeFi protocol called "compound" to airdrop funds into the

20  OXB-1 wallet, a wallet that he shared control with Celsius.

21  As a result of that lobbying, in September 2021, the

22  compound protocol airdropped $1.4 million worth of a stable

23  coin into that OXB-1 wallet.

24          THE COURT:  Now, was that a wallet that belonged

25  to Celsius?

 1            MR. ROCHE:  That was a wallet that they shared

 2     control over.

 3            THE COURT:  But this was after he resigned, and he

 4     withdrew crypto assets from one of Celsius' wallets.  Is

 5     that correct?  He had the key, and he withdrew the funds?

 6            MR. ROCHE:  They jointly had the keys to those

 7     wallets.

 8            THE COURT:  Okay.  Well, jointly?  We'll hear

 9     about that, but it was a Celsius wallet, he had resigned

10     from Celsius, and he withdrew funds from the Celsius wallet

11     and transferred it to something else?

12            MR. ROCHE:  Your Honor, we -- Your Honor, we would

13     submit --

14            THE COURT:  Am I correct that he transferred it to

15     something that Stone controlled?

16            MR. ROCHE:  He did transfer -- he transferred,

17     along with the NFTs, he transferred the NFTs and the $1.4

18     million of DAI to himself -- to himself and to KeyFi.

19            THE COURT:  Right.

20            MR. ROCHE:  But the $1.4 million that's at issue

21     in that transaction, was not Celsius' property.  It was not

22     deposited by Celsius, it did not belong to Celsius customer

23     deposits.  Your Honor, I'll just wrap up by briefly

24     addressing the issues that the Court has to decide.  In

25     order for Celsius to prevail in its motion, Celsius must

Page 26

1    show likelihood of merits under its claims, that is likely

2    to suffer irreparable harm in the absence of --

3            THE COURT:  Mr. Roche, I know what the standard

4    preliminary injunction is.  Okay.  You've used your time up.

5            MR. ROCHE:  Understood.  And I'll just wrap with

6    this, at bottom, as the Court will see from the testimony

7    and evidence presented today, Celsius can't meet its burden

8    for extraordinary relief it's seeking.  Celsius will have

9    its opportunity to prove the merits of its case and Defense

10   look forward to the completion of discovery so that it can

11   show this Court and the rest of the parties' interests in

12   this matter the truth.  For these reasons, we respectfully

13   ask the Court to deny Celsius' motion for Preliminary

14   Injunction.  Thank you.

15           THE COURT:  All right.  Thank you very much, Mr.

16   Roche.  So, Mr. Hurley, before you start -- before you call

17   your first witness, I'm looking at the Amended Joint Pre-

18   Trial Order, the Exhibit list and some of the exhibits as to

19   which Mr. Roche has made objection, and I do want to ask you

20   about that before we get into the evidence.  Specifically,

21   Exhibits 9 and 29, which Mr. Roche had objected to on

22   hearsay grounds.

23           So, Exhibit 9 is the declaration of

24   (indiscernible).  Exhibit 10 is the declaration of

25   (indiscernible), neither of whom are being called as

Page 27

1    witnesses.  Why shouldn't I sustain the objections to those

2    on grounds of hearsay?

3             MR. HURLEY:  Your Honor, we will not offer the

4    declarations themselves into evidence based on our agreement

5    in the last several days.

6             THE COURT:  All right, and what about -- really

7    more to the point, exhibits to the (indiscernible)

8    declaration.  So, it's Exhibits 11 through 29.  They're all

9    exhibits to the (indiscernible) declaration and Mr. Roche

10   has objected on hearsay grounds to all of those.

11            MR. HURLEY:  Yeah.  I had understood that you guys

12   were withdrawing the objection to the Etherscans.

13            MR. ROCHE:  Yeah.  Based on the agreement we had

14   relating to the withdrawing of certain declarations where we

15   don't object to the Etherscans on the basis of hearsay.

16            THE COURT:  So that I have a clear record, we're

17   talking -- and Mr. Roche, I just want you to confirm this,

18   you're withdrawing your objections to Exhibits 11 through

19   29?

20            MR. ROCHE:  I'm just looking at the -- that is --

21   I believe it's 11 through -- I'm -- Your Honor, I believe

22   there are certain transactions that we've -- certain

23   exhibits to the (indiscernible) declaration that we agreed

24   would not be -- come in.  I'm just trying to find, and if

25   Mr. Hurley knows, it's the exhibits relating to the lock

Page 28

1  deed.

2  　　　　MR. HURLEY:  Right.

3  　　　　THE COURT:  You need to refer specifically to

4  exhibit numbers.

5  　　　　MR. ROCHE:  (indiscernible) help me out here.

6  　　　　MR. HURLEY:  I'm being told it's --

7  　　　　MR. ROCHE:  It looks like, based on what we've

8  already updated that in the Amended and Joint File Order.

9  So, 3236 had been removed.  So, I will withdraw --

10  Defendants withdraw their objection to Exhibits 11 through

11  29.

12  　　　　THE COURT:  Okay.  All right.  Give me a second

13  now, again.  Let me go further.  Mr. Holert is testifying

14  live, is that correct, Mr. Hurley?  I'm looking at Exhibit

15  53, which is the declaration of Mr. Holert.

16  　　　　MR. HURLEY:  That's right, Your Honor.  He's

17  testifying live.

18  　　　　THE COURT:  Okay.  What about Exhibit 54?  Mr.

19  Roche has objected on relevance.

20  　　　　MR. HURLEY:  Your Honor, that's a document that

21  we're offering not -- well, that's a document that relates

22  to the request we made on an expedited basis in advance of

23  this hearing for any information that would support this

24  claim of authorization that the Defendants are making, and

25  we want --

Page 29

1              THE COURT:  The objection is sustained.

2              MR. HURLEY:  Okay.

3              THE COURT:  What about Exhibit 55?

4              MR. HURLEY:  That is related to the same category.

5              THE COURT:  And that objection is sustained, as

6    well.  Exhibit 58, the Standstill Employment Agreement, the

7    objection is sustained.  The objection to Exhibit 59, which

8    is the Mashinsky declaration, which he will be testifying,

9    the objection is overruled.

10             MR. HURLEY:  Your Honor, may I respond on 58, the

11   Standstill Agreement?

12             THE COURT:  Go ahead, briefly.

13             MR. HURLEY:  Just, the Defendants have argued that

14   our -- that Celsius' delay is a reason to deny the motion.

15             THE COURT:  Let me put this issue right to rest

16   right now.  I don't believe the delay is a basis for denying

17   a preliminary injunction.  I think it's timely.  I'm

18   sustaining the objection.  As I say, to Exhibit 58, I just -

19   - let me simplify your arguments made thereon.  I find the

20   argument of the Injunction motion is untimely has no merit

21   and I'm overruling that.  So, I'm sustaining the objection

22   to 58.  I'm overruling the objection to 59.  With respect to

23   Exhibit 60, Mr. Holert is testifying, and he'll have -- I'm

24   going to overrule the objection -- the hearsay objection.

25   You can cross-examine him all you want.  So, that objection

Page 30

 1    is overruled.  I believe that is all of the objections with

 2    respect to Plaintiff's exhibits.  Let's see.  Okay.  I think

 3    that deals with all of them.  Is there anything else?

 4    Because I want to rule on the rest of your exhibits that are

 5    coming into evidence.

 6              MR. HURLEY:  So, there was an objection on hearsay

 7    grounds to the -- I'm sorry, which number was it, Dean?

 8              MR. CHAPMAN:  48.

 9              MR. HURLEY:  To 48, which is the U.S. Treasury

10    Department Press Release for Tornado Cash and we're not

11    offering for the truth of the matter asserted, Your Honor,

12    just that it exists.

13              THE COURT:  It's overruled.  (indiscernible)

14              MR. HURLEY:  That's it.

15              THE COURT:  All right.  So, with that, I'm

16    admitting in evidence, other than those that I've sustained

17    an objection of admitting all of the other exhibits that the

18    Plaintiff is offering in evidence.  So, why don't you call

19    your first witness?

20              MR. HURLEY:  Plaintiff, Celsius calls Alex

21    Mashinsky.  And Mr. Mashinsky is outside the courtroom, Your

22    Honor.  Counsel is going to bring him in now.

23              MR. ROCHE:  Your Honor, just so Your Honor is

24    aware, we've agreed to invoke the rule.

25              THE COURT:  Okay.  For those who are not tuned

1    into the rule, unless parties consent, anyone who is going

2    to be testifying as a witness is excluded from the courtroom

3    during other proceedings in the case.  So, Mr. Mashinsky

4    (indiscernible), I believe will enter the courtroom, he'll

5    come up to the witness stand and he will be sworn.

6            REPORTER:  You just stand there.  Raise your right

7    hand, please.  Do you solemnly swear or affirm that all the

8    testimony you're about to give before this Court is the

9    truth, the whole truth and nothing but the truth?

10           THE WITNESS:  I do.

11           THE COURT:  Please have a seat, Mr. Mashinsky.

12   Mr. Hurley, go ahead.

13             DIRECT EXAMINATION OF ALEX MASHINSKY

14   BY MR. HURLEY:

15   Q    Good morning, Mr. Mashinsky.

16   A    Good morning.

17   Q    Can you hear me, okay?

18   A    Yes.

19   Q    And Your Honor, can you hear the witness, okay?

20           THE COURT:  I can see and hear the witness very

21   well.  Thank you.

22   BY MR. HURLEY:

23   Q    Mr. Mashinsky, you're a co-founder of Plaintiff,

24   Celsius Network Limited.  Is that right?

25   A    I am.

Page 32

```
 1    Q    And the former CEO of Celsius Network Limited?

 2              MR. ROCHE:  Objection.  Leading.

 3              THE COURT:  Overruled.

 4    BY MR. HURLEY:

 5    A    That's correct.

 6    Q    Okay.  During what period of time did you act as CEO of

 7    Celsius Network Limited?

 8    A    I don't have the exact date, but it was end of 2017

 9    through September of 2022.

10    Q    You submitted a declaration in connection with Celsius'

11    motion for a Preliminary Injunction in this case, correct?

12    A    Yes.

13              MR. HURLEY:  Your Honor, may I approach the

14    witness?

15              THE COURT:  Yes, please.  Go ahead.

16    BY MR. HURLEY:

17    Q    Mr. Mashinsky, I've handed you a document that's been

18    marked Plaintiff's Exhibit 59.  Do you recognize Plaintiff's

19    Exhibit 59 as a copy of your declaration?

20    A    I do.

21    Q    On Page 1, the declaration states, "I, Alex Mashinsky,

22    declare under penalty of perjury, pursuant to 28 U.S.C.

23    1746, that the following is true and correct."  Do you see

24    that?

25    A    Yes.
```

```
 1    Q    Please turn to the next page.  Do you recognize your

 2    signature, sir?

 3    A    Yes.

 4    Q    It indicates you signed the document on December 5,

 5    2022.  Is that accurate?

 6    A    Yes.

 7    Q    Do you still declare, as of today, that the contents of

 8    PX59 are true and correct?

 9    A    I do.

10         MR. HURLEY:  Your Honor, Plaintiffs offer PX59

11    into evidence.

12         THE COURT:  All right.  It's admitted into

13    evidence.

14      (Plaintiff's Exhibit 59 is Admitted into Evidence)

15    BY MR. HURLEY:

16    Q    Mr. Mashinsky, were you served with a Trial Subpoena

17    requiring your attendance today?

18    A    No.

19    Q    So, you submitted your declaration and you're appearing

20    here today voluntarily?

21    A    I am.

22    Q    Mr. Mashinsky, your declaration is quite brief, just

23    two substantive paragraphs, correct?

24    A    Yes.

25    Q    Would you please read Paragraphs 3 and 4 aloud for the
```

Page 34

1   Court?

2   A    "I did not authorize Defendants to invest or otherwise

3   deploy Celsius' assets in any activities other than Staking

4   and DeFi.  I did not authorize Defendants to purchase non-

5   fungible tokens (NFTs).  The Defendants also were not

6   permitted to deploy to any particular proposed Staking ID

7   for platforms other than -- or other investments without

8   first obtaining the consent of Celsius.  Item #4, I did not

9   authorize Defendants to use Celsius' assets to purchase NFTs

10  for themselves or otherwise nor did I authorize Defendants

11  to take for themselves any such NFTs or to transfer any

12  coins, NFTs or other property from Celsius wallets to

13  Defendants' wallets for any reason."

14  Q    Thank you, Mr. Mashinsky.

15            MR. HURLEY:  That's all we have.

16            THE COURT:  All right.  Mr. Roche, cross-

17  examination.

18                CROSS-EXAMINATION OF ALEX MASHINSKY

19  BY MR. FREEDMAN:

20  Q    Good morning, Mr. Mashinsky.

21  A    Good morning.

22  Q    I'm Vel Freedman, counsel to the Defendants in this

23  action.  How are you today?

24  A    I'm fine.

25  Q    Mr. Mashinsky, we just looked at your declaration.  I

Page 35

1    think it's been admitted into evidence as PX59.  Are you

2    still holding it over there?

3    A    Yes.

4    Q    Celsius' lawyers drafted this declaration for you?

5    A    I don't remember.  There were several drafts, but I

6    don't remember who came up with this draft.

7    Q    Certainly you did not draft it, correct?

8    A    I don't recall who drafted what parts of it.

9    Q    Well, you just read Paragraphs 3 and 4.

10   A    Yes.

11   Q    A little bit of trouble getting through it, Mr.

12   Mashinsky.  You did not draft Paragraphs 3 and 4, correct?

13              MR. HURLEY:  Objection, Your Honor.  Asked and

14   answered.

15              THE COURT:  Sustained.

16   BY MR. FREEDMAN:

17   Q    Mr. Mashinsky, you knew Mr. Stone before he started

18   working with Celsius, correct?

19   A    Yes.

20   Q    And that's because he worked for a company that you

21   both were at called Battlestar -- sorry, he worked for a

22   company called Battlestar Capital, correct?

23   A    Yes.

24   Q    And you had invested in that company?

25   A    Yes.

1   Q    And you were involved in onboarding Jason and KeyFi

2   into Celsius, correct?

3   A    I don't know what that means.

4   Q    Were you involved in getting KeyFi involved as a

5   partner of Celsius to deploy Celsius Capital?

6   A    I was part of a team that -- yes, that created and

7   negotiated the contract for KeyFi.

8   Q    And in fact, in the end, you took over total control

9   over finalizing those contracts between Celsius and KeyFi,

10  didn't you?

11  A    That's incorrect.

12          MR. HURLEY:  Your Honor, objection.  This is

13  beyond the scope of the direct, which is quite limited.

14          THE COURT:  Overruled.  Overruled.

15          MR. FREEDMAN:  Your Honor, if I may, we're going

16  to refer you to Defense Exhibit #39.  Your Honor, may I

17  approach the witness?

18          THE COURT:  Yes, you may.

19  BY MR. FREEDMAN:

20  Q    Mr. Mashinsky, do you see what's been marked as DX39 in

21  front of you --

22  A    Yes.

23  Q    -- in the bottom right corner?  And do you recognize

24  this as an email chain between Jeremy (indiscernible) and

25  yourself being cc'd on these emails?

Page 37

1    A    Yes.

2              MR. FREEDMAN:  Your Honor, we'd offer DX39 into

3    evidence.

4              THE COURT:  Hearing no objection, it's admitted in

5    evidence.

6    BY MR. FREEDMAN:

7    Q    Mr. Mashinsky, can you take a look at the bottom of --

8    the bottom email on Tuesday, August 4, 2020, at 8:57 p.m.

9    That's an email from you.  Do you see that?

10   A    Yes.

11   Q    And the subject line of this email, Mr. Mashinsky, at

12   the top, is KeyFi, right?

13   A    Yes.

14   Q    All right, and in that email, you say, "We have too

15   many cooks in the kitchen on this deal.  Let me finish this

16   Agreement.  If Jason or anyone approaches you about KeyFi,

17   send them to me."  Is that correct?

18   A    That's what it says.

19   Q    I read that correctly?

20   A    Yes.

21   Q    "Let me finish this Agreement"?

22   A    This is an email to Nuke Goldstein who was not part of

23   the team negotiating the KeyFi Agreement.

24   Q    So, you finished the Agreements and took control over

25   the Agreements between Celsius and KeyFi, did you not, Mr.

```
 1    Mashinsky?

 2    A    I did not.

 3    Q    Mr. Mashinsky, you signed the Asset Purchase Agreement

 4    that's dated effective December 31, 2020.  Is that right?

 5    A    When it was completed, I signed it, yes.

 6    Q    And I believe that's been admitted into evidence as

 7    Plaintiff's Exhibit 40.

 8              MR. HURLEY:  It is 40, Your Honor.

 9              MR. FREEDMAN:  You admitted that into evidence

10    already, Judge?

11              THE COURT:  I did.

12              MR. FREEDMAN:  Okay.

13    BY MR. FREEDMAN:

14    Q    Mr. Mashinsky, KeyFi wasn't supposed to work for free

15    under this Agreement, were they?

16    A    KeyFi is a corporation, so I'm not sure what you mean

17    by, "KeyFi was supposed to work for free".

18    Q    Do corporations not work?

19    A    They do.

20    Q    Okay, so --

21    A    People work.

22    Q    -- was KeyFi supposed to work for free, Mr. Mashinsky?

23    A    People work.

24              MR. HURLEY:  Objection, Your Honor.  The document

25    speaks for itself as to its terms.
```

```
 1              THE COURT:  Overruled.  Ask your next -- go ahead.
 2              MR. FREEDMAN:  I'm sorry.  I didn't hear if the
 3      witness answered the question.
 4      BY MR. FREEDMAN:
 5      Q     Mr. Mashinsky, was KeyFi supposed to work for free?
 6      A     I don't know what that means.
 7      Q     Okay.  Did you expect that KeyFi would earn anything in
 8      return for its services or were they just supposed to be
 9      doing you a favor?
10      A     KeyFi was intended -- that people working at KeyFi were
11      intended to generate coin and coin returns.
12      Q     That wasn't my question, Mr. Mashinsky.  My question
13      was very simple, which is, did you expect Celsius to have
14      KeyFi work for it for free or did you expect to end up
15      paying KeyFi some amount of money for their services?
16      A     I think the Agreement states clearly how KeyFi members
17      are compensated.
18      Q     It's a yes or no question, Mr. Mashinsky.  Did you
19      expect to have Celsius pay KeyFi for its services?
20      A     I'm not sure I understand the question.
21      Q     What don't you understand about the question, Mr.
22      Mashinsky?
23      A     I think KeyFi is a majority owned by Celsius or
24      controlled by Celsius, so you're asking me if Celsius was
25      supposed to pay itself.
```

1    Q    Do you understand the distinctions between -- of

2    corporate separateness?  Do you understand that there are

3    different corporations, there's KeyFi and there's Celsius?

4    Is that a concept you're familiar with, Mr. Mashinsky?

5            MR. HURLEY:  Objection, Your Honor.  The question

6    is vague.  What's happening is, there's a confusion between

7    Celsius KeyFi and KeyFi --

8            THE COURT:  Overruled.

9    BY MR. FREEDMAN:

10   A    Can you repeat the question?

11   Q    Yeah.  Do you understand that there's a difference in

12   concept -- under the law, rather.  Do you understand there's

13   corporations, and they are entities?

14   A    Yes.

15   Q    Okay, and do you understand that KeyFi entered into an

16   Asset Purchase Agreement with Celsius?  Do you understand

17   that?

18   A    Yes.

19   Q    And do you understand that under the Asset Purchase

20   Agreement, Celsius was obligated to pay KeyFi a portion of

21   profits?

22   A    I think it's the other way around.  KeyFi was supposed

23   to pay Celsius a portion of profits.

24   Q    So, KeyFi got to keep all of the profits that it earned

25   and then it would pay Celsius a portion of those profits.

Page 41

1    Is that accurate?

2    A    I think that's how it's written, yes.

3    Q    So, you would have no issue with KeyFi keeping some of

4    its own funds that it generated as profit and then returning

5    some portion of that profit back to Celsius, correct?

6    A    Upon the approval of the Board of Directors, yes.

7    Q    Mr. Mashinsky, when KeyFi executed an Agreement with

8    Celsius, you were eager to get started with KeyFi, correct?

9    A    Yes.

10   Q    You caused Celsius to send digital assets to KeyFi

11   before there was even a formal agreement in place.

12   A    I don't think I caused Celsius to do that.

13   Q    Were you the CEO of Celsius?

14   A    Yes.

15   Q    Were you aware of its negotiations with Mr. Stone?

16   A    I was aware of the negotiations, yes.

17   Q    Were you aware of the fact that assets were being sent

18   to KeyFi for deployment?

19   A    I don't control or monitor all the transactions at

20   Celsius.

21        THE COURT:  That wasn't the question, Mr.

22   Mashinsky.  Answer the question.

23   BY MR. FREEDMAN:

24   A    Can you repeat the question?

25   Q    Were you aware that Celsius was sending digital assets

Page 42

1    to KeyFi for deployment?

2    A    I don't know when the first transfer was.  I'm aware

3    that, in general, there were transfers.  But I don't think I

4    authorized the first transfer of coins to KeyFi.

5            MR. FREEDMAN:  Can we have DX34?  Judge, Defense

6    Exhibit 34 is an Excel spreadsheet, a very large Excel

7    spreadsheet that I believe is Celsius' general ledger.  The

8    parties have agreed, for confidentiality reasons, to redact

9    portions of that general ledger to just the transactions

10   that are relevant to the hearing today.  So, we'll need

11   permission, if it's all right, Your Honor, to make Mr. Dan

12   Stone, a lawyer in my office, a co-host so he can share

13   documents.

14            REPORTER:  He is a co-host.

15   BY MR. FREEDMAN:

16   Q    Mr. Mashinsky, let's see if we can help you remember

17   what assets got sent to KeyFi, when.  Do you recognize the

18   document in front of you, Mr. Mashinsky, as Celsius' general

19   ledger?

20   A    I don't look at the Celsius general ledger, so I'm not

21   -- I don't think I've ever logged into this document.

22   Q    You've never looked at Celsius' general ledger?

23   A    Not this document.

24   Q    Is there a different general ledger you've looked at or

25   you just never looked at the general ledger of the company

Page 43

1    you --

2    A    I would sporadically look at the coin report and other

3    documents, but I don't think I've looked at this document.

4    Q    You understand that Celsius produced this document to

5    us, Mr. Mashinsky, correct?

6    A    I don't know.  I'm sure they did, yes.

7    Q    And do you have a reason to doubt the authenticity of

8    this document that was produced by the company you were the

9    former CEO of?

10   A    I'm not doubting its authenticity.  You asked me if I

11   looked at this document.

12   Q    That's fair.

13          MR. FREEDMAN:  Mr. Stone, I actually have to look

14   at this too.  Can you zoom in a little bit?  Because it's a

15   little tough for me to see.  And Judge, without any

16   disrespect to Mr. Dan Stone because the Defendant is Stone

17   and the lawyer is Stone, I'm going to refer to my associate

18   as "Dan".

19          THE COURT:  That's fine.

20          MR. FREEDMAN:  And there is no relation as far as

21   I'm aware of.  Maybe Mr. Stone, you could help me -- oh,

22   there we go.  Line 23, perfect.

23   BY MR. FREEDMAN:

24   Q    Mr. Mashinsky, do you see Line 23?  It's a line item.

25   It says, "August 2020 Net Transfers Celsius to KeyFi."  Do

Page 44

1    you see that?

2    A    Yes.

3    Q    And then do you see in Column H, the amount there?  Can

4    you read it out because actually I can't.

5              MR. HURLEY:  Your Honor, actually, we object.  We

6    object to the admission of the document into evidence and

7    asking the witness to read it onto the record will have that

8    effect.  No foundation has been laid for this document.

9              THE COURT:  You dispute it's the general ledger of

10   Celsius?

11             MR. HURLEY:  I wouldn't say we're disputing it,

12   but we also don't -- as far as I know, there's no witness

13   that is going to testify as to what this document is.  We

14   don't know.  It appears this witness doesn't know either.

15             THE COURT:  Just give me a second.

16             MR. HURLEY:  This document, by the way, Your

17   Honor, is one of the documents that was added to the Exhibit

18   List late.  But it is a document we produced on December

19   15th.

20             THE COURT:  It's a document that was produced by

21   Celsius to the (indiscernible) the case.

22             MR. HURLEY:  It was produced -- well, this version

23   was actually modified as Mr. Stone or, as counsel for Mr.

24   Stone, indicated.  But (indiscernible) documents produced by

25   Celsius.

Page 45

1        THE COURT:  (indiscernible) Is this the portion of

2   the Celsius general ledger?  Yes or no?

3        MR. HURLEY:  Your Honor, I don't know.

4        MR. FREEDMAN:  Your Honor, we're happy to use the

5   original document if they don't object to it being placed on

6   the screen.  But the Custodian, as listed for this document,

7   is listed as "Celsius".  It was produced by Celsius, it has

8   the Bates label of Celsius on top of it.  We're obviously at

9   an expedited hearing.  Your Honor is the fact finder.  I

10  would offer this document into evidence.

11       THE COURT:  The objection is overruled.  Go on.

12       MR. FREEDMAN:  Thank you, Your Honor.

13  BY MR. FREEDMAN:

14  Q   Mr. Mashinsky, can you look at Line 23, "August 2020

15  Net Transfers from Celsius to KeyFi", and can you read for

16  me the total amount of net transfers that Celsius sent to

17  KeyFi in August of 2020?

18  A   The image here is blocking the header, so I can't

19  really do that.

20  Q   You want to scroll up and show the header, Mr. -- you

21  see where it says, "Amount" in Column H?

22  A   I don't.

23       MR. FREEDMAN:  Dan, can you highlight "Amount" in

24  Column H for Mr. Mashinsky?

25  BY MR. FREEDMAN:

Page 46

1   A    Can you just make the image -- because I don't see

2   Column H on it, so -- I see the image of the Judge and --

3   Q    Oh, oh, oh, oh.  I understand.

4   A    Okay.  Now I can see it.  Thank you.

5   Q    All right.  Can you read -- can you read that amount of

6   net transfers in August for me?

7   A    Line 23 reads, $21,987, -- can you move the cursor

8   because I can't see the -- 201.94.

9   Q    Mr. Mashinsky, you understand that the Asset Purchase

10  Agreement was not yet signed in August of 2020, correct?

11  A    I don't remember when it was signed.

12           MR. FREEDMAN:  Your Honor, I'm referring back to

13  Exhibit 40, which has been admitted into evidence.

14  BY MR. FREEDMAN:

15  Q    Do you have a copy -- oh, Mr. Mashinsky, do you have a

16  copy of Exhibit 40, that's the Asset Purchase Agreement?

17  It'll be the thick packet of documents.

18  A    I don't have it.

19           REPORTER:  My apologies to interrupt.  We're

20  getting feedback in the courtroom.  If someone is -- is

21  there anyone unmuted that's -- if you shuffle papers, that

22  might be why.

23           THE COURT:  Let's go on, Deanna.  I can hear

24  clearly.

25           REPORTER:  Okay.  Thank you.

Page 47

1    MR. FREEDMAN:  Your Honor, may I approach?

2    THE COURT:  Yes, go ahead.

3    BY MR. FREEDMAN:

4    Q    Mr. Mashinsky, you're holding what's been admitted into

5    evidence as PX40, Exhibit 40 and it is a copy of the Asset

6    Purchase Agreement.  Can you take a look for me on Page 2 of

7    that Exhibit, but it's actually the first page of the Asset

8    Purchase Agreement.  And do you see that first line?  "This

9    Asset Purchase Agreement is effective as of December 31,

10   2020"?

11   A    Yes.

12   Q    Does that refresh your recollection that in August of

13   2020 when you sent $20 million over to KeyFi, this Agreement

14   was not yet in place?

15   A    I did not send $20 million.

16   Q    Mr. Mashinsky, let's look at what you did next.  In

17   September of 2020, Celsius sent over, is that $54 million,

18   over to KeyFi?

19   A    If that's what is says, then yes.

20   Q    And then, Mr. Mashinsky, you went from $20 million to

21   $54 million, and then in October of 2020, Celsius sent $81

22   million in customer assets over to KeyFi for deployment.  Is

23   that correct?

24   MR. HURLEY:  Objection.  Lack of foundation, Your

25   Honor.

```
 1              MR. FREEDMAN:  Your Honor, we're reading from a
 2     document that's in evidence.
 3              THE COURT:  Overruled.  Go on.
 4     BY MR. FREEDMAN:
 5     A     Well, I don't understand.  What's the question?
 6     Q     The question is, do you see it saying there that in
 7     October of 2020, Celsius sent KeyFi $81.5 million in
 8     customer deposits for deployment?
 9     A     That's what it says here.  I would just remark that at
10     the time when this was sent, I think the value was a
11     fraction of these numbers.  These numbers represent the
12     dollar value maybe today or whenever this was prepared, but
13     it does not represent the dollar value --
14              MR. HURLEY:  Your Honor, we object to the
15     narration and move to strike.  It's non-responsive.  It's
16     also -- the witness a second ago said he's never seen this
17     document.
18              MR. FREEDMAN:  Your Honor, the question literally
19     was about the value being transferred --
20              THE COURT:  All right, stop.  Stop.  I do not
21     permit speaking objections or (indiscernible) between
22     counsel.  You can ask your questions of the witness.  He's
23     not seen this document.  Do not argue with the witness.  You
24     cannot force him to answer a question about what this
25     document means when he had a decision to make.  The document
```

1    is in evidence.  Go on with your next question.

2    BY MR. FREEDMAN:

3    Q    Mr. Mashinsky, do you see on Line 26, it says that in

4    November of 2020, Celsius sent $107 million to KeyFi?

5    A    Again, I think these values are as of today and not as

6    of the time it was sent.

7           MR. FREEDMAN:  Your Honor, I'm going to refer you

8    to DX09, it's Defense Exhibit 9.  May I approach the

9    witness?  Your Honor, may I hand the witness a copy of the

10   exhibit?

11          THE COURT:  Yes (indiscernible).  Apparently,

12   there's an objection (indiscernible).  The objection is

13   overruled.  Go ahead.

14          MR. FREEDMAN:  Thank you, Your Honor.

15   BY MR. FREEDMAN:

16   Q    Mr. Mashinsky, you're doubting the value of the assets

17   at the time they were sent.  You are now looking at DX09,

18   which appears to be an email from you to Jason Stone with a

19   cc: to Harumi Thompson, who was the CFO of Celsius, as well

20   as Nuke Goldstein.  Do you see that?  Am I correct?

21   A    Yes.

22          MR. FREEDMAN:  Your Honor, we'd offer DX09 into

23   evidence.

24          MR. HURLEY:  I have no objection, Your Honor.

25   BY MR. FREEDMAN:

Page 50

1   Q    Mr. Mashinsky, do you see on September 2, 2020, so

2   contemporaneously, this is an email from Mr. Stone.  It

3   says, "Harumi, this is a formal request for immediate

4   increased deployment allocation today per our discussions,

5   $20 million would be immediately (indiscernible)."  Do you

6   see that?

7   A    Yes.

8   Q    So, these were the values of the assets at the time

9   that they were sent, isn't it Mr. Mashinsky?

10           THE COURT:  You can't testify -- I'm sorry, but

11  your comment is inappropriate.  You can't -- the document

12  says what it says.  You can't interpret it for the record.

13  The comment is so stricken.

14           MR. FREEDMAN:  I'm sorry, Judge.  It's -- I

15  understood that you were telling me not to ask the question

16  about --

17           THE COURT:  The Exhibit is already in evidence.

18  It says what it says, but you can't testify and interpret

19  it.

20           MR. FREEDMAN:  Your Honor, I was asking -- I was

21  asking --

22           THE COURT:  (indiscernible) Stop.  You can read

23  the document, you can ask a question, but you can't testify

24  about it.

25  BY MR. FREEDMAN:

1    Q    Mr. Mashinsky, does this help you -- does this change

2    your opinion on the value of the -- does this change your

3    opinion on what the value of the assets reflected in the

4    general ledger -- strike that.  Does this change your

5    opinion that the value of the assets reflected in the

6    general ledger are the value on the date of transfer as

7    opposed to the value today?

8    A    It does not.  Celsius did not lend KeyFi dollars.

9    Celsius lent KeyFi Ethereum.

10   Q    Mr. Mashinsky, do you deny that between August and

11   December of 2020, Celsius sent KeyFi a significant amount of

12   digital assets?

13   A    Digital assets.  I agree, yes.

14   Q    Mr. Mashinsky, you would not have allowed Celsius to

15   send those assets to KeyFi if you did not believe that KeyFi

16   was going to be profitable, correct?

17   A    KeyFi was supposed to generate a profit, yes.

18   Q    And in fact, month after month, more and more digital

19   assets were sent to KeyFi.  You only did that because you

20   believed KeyFi was actually profitable, correct?

21   A    I believed that the deployment into the protocols were

22   profitable, yes.

23   Q    Mr. Mashinsky, isn't it true that Celsius sent so many

24   digital assets to KeyFi that in early February 2021, KeyFi

25   eventually had over $1.4 billion worth of customer deposits

Page 52

1    in its possession?

2    A    Celsius sent the same number of coins that -- the coin

3    value in this document is from September.  In September,

4    from my recollection, Ethereum was at less than $500 and

5    then the date you're talking about, Ethereum was close to

6    $4,000.  So, the increase in value you're talking about is a

7    dollar increase in value.  There was no substantial increase

8    in coin count.

9    Q    Mr. Mashinsky, I asked a very simple question.  Isn't

10   it true that Celsius sent so many digital assets to KeyFi

11   that in February of 2021, KeyFi was in possession of over

12   $1.4 billion worth of digital assets that belonged to

13   Celsius?

14   A    I don't remember the total value, but in my -- when I

15   recall these things, I think about in coin terms, not in

16   dollar terms because the point was returning those coins to

17   Celsius or its customers.  That's what we focused on.

18            MR. FREEDMAN:  Your Honor, can I refer you to

19   DX40?

20            THE COURT:  Okay.

21            MR. FREEDMAN:  May I approach the witness, Your

22   Honor.

23            THE COURT:  Yes, go ahead.

24            MR. FREEDMAN:  I'm sorry, Judge.  You broke up on

25   that.

1          THE COURT:  Yes, go ahead.

2          MR. FREEDMAN:  Thank you.

3     BY MR. FREEDMAN:

4     Q    Mr. Mashinsky, you'll see here this is an email chain

5     between various folks at Celsius Network including Nuke

6     Goldstein and yourself.  If you turn to the second page,

7     you'll see an email from you on February 13, 2021,

8     discussing the assets in KeyFi.  Do you see that?

9     A    Yes.

10         MR. FREEDMAN:  Your Honor, we'd offer DX40 into

11    evidence.

12         MR. HURLEY:  No objection.

13         THE COURT:  It's admitted as evidence.

14    (Defendant's Exhibit 40 is Admitted into Evidence)

15         MR. FREEDMAN:  Your Honor -- sorry --

16    BY MR. FREEDMAN:

17    Q    Mr. Mashinsky, on February 13, 2021, at 1:43 p.m., you

18    said, and I quote, "The wallet now shows $1.4 billion in

19    assets and $600 million in borrowed funds."  Do you see

20    that?

21    A    Yes.

22    Q    Okay.  Does that help refresh your recollection that in

23    February of 2021, Celsius had sent so many digital assets to

24    KeyFi that KeyFi was now in possession of $1.4 billion worth

25    of assets?

Page 54

1    A    Celsius sent coins.  Their value increased to this.

2    This may be the dollar value, but I don't think that Celsius

3    sent more and more coins.  I think their value has

4    increased.

5    Q    And Mr. Mashinsky, my question was simply, had you sent

6    sufficient digital assets to KeyFi, that those assets were

7    now worth $1.4 billion?  Yes?

8    A    I assumed that on February 13th, the wallet was worth -

9    - was in dollars, worth $1.4 billion.

10   Q    And Celsius would not have sent those digital assets to

11   KeyFi unless it thought KeyFi was deploying those assets and

12   earning a profit, correct?

13   A    Again, during that period of time, Ethereum price

14   increased dramatically.  It was not -- we didn't control not

15   the dollar value or the return on the protocol.  So, saying

16   that we assumed that it was profitable is just incorrect.

17   Q    Mr. Mashinsky, a moment ago, you testified -- do you

18   recall a moment ago testifying that you think about these in

19   coin value, not cash value?

20   A    Yes.

21           MR. FREEDMAN:  Your Honor, can I refer you to

22   DX12?  Judge, you've disappeared from our screen.  That

23   might be the digital background, or we lost the judge?

24           REPORTER:  Judge?  Oh, there you are.

25           MR. FREEDMAN:  My big screen here, Judge, is

1   showing me that you're on mute.

2           THE COURT:  I apologize.  Deanna, I had been muted

3   and then I had difficulty unmuting and I've got two

4   computers (indiscernible) that has the camera that's showing

5   me.  I'm leaning over it, so that's going to happen again.

6   Go ahead.

7           MR. FREEDMAN:  Your Honor, may I approach the

8   witness with DX12?

9           THE COURT:  Yes, please.

10  BY MR. FREEDMAN:

11  Q   Mr. Mashinsky, do you recognize DX12 as an email chain

12  between yourself, Ms. Thompson, the CFO of Celsius and Jason

13  Stone, talking about deployment of Link, the digital asset,

14  Link?

15  A   I see the document.  I don't really remember it, but

16  (indiscernible) I'm sure I sent it.

17          MR. HURLEY:  Your Honor, we --

18          THE COURT:  Let me interrupt you a minute.  I

19  should have done this earlier, but just bear with me a

20  second.  All right.  Referring now to Defendants' Exhibits 1

21  through 33, Exhibit 9, there was a hearsay objection.  It's

22  overruled.  Exhibit 11, there was a hearsay objection.  It's

23  overruled.  Exhibit 12, a hearsay objection.  It's

24  overruled.  Exhibit 13, a hearsay objection.  It's

25  overruled.  Exhibit 14, a hearsay objection.  It's

Page 56

1    overruled.  Exhibit 16, a hearsay objection.  It's

2    overruled.  Exhibit 18, a hearsay objection.  It's

3    overruled.  So, Exhibits 1 through 24 -- 1 through 23,

4    excuse me, are all admitted into evidence.

5       (Defendant's Exhibits 1 - 33 are Admitted into Evidence)

6              With respect to the objection to Exhibits 24

7    through 31, I have your objection and I'm reserving ruling

8    as to those.  As to Exhibit 32, a hearsay objection.  It's

9    sustained.  As to Exhibit 33, DX Exhibit 33, the objection

10   is overruled, but the document is admitted, not for the

11   truth of the matter asserted.

12             So, with respect to the objections for 24 through

13   30, those are reserved.  I'll have to hear argument and try

14   to use those.  As to Exhibit 31, the Stone Affidavit, that

15   is overruled.  So, 31 is overruled, 32 is sustained, 33, as

16   I said, is overruled, but admitted not for the truth.  But

17   go ahead.  I'm sorry to interrupt.  I should have done that

18   before you started.  But --

19             MR. FREEDMAN:  No problem, Judge.  It's your

20   courtroom.  You could interrupt me whenever you want.

21   BY MR. FREEDMAN:

22   Q   Mr. Mashinsky, before we handled the (indiscernible)

23   issues we just did, I asked you if you recalled your

24   testimony that you think about these tokens in coin value.

25   So, just to refresh our memory of where we are, can you take

```
 1   a look for me -- now this document has been admitted into

 2   evidence, so you see on September 9, 2020, Mr. Stone sends

 3   an email -- excuse me, to you and Ms. Thompson saying --

 4   with a screenshot.  It's got $17.1 million portfolio

 5   balance, $129,000 worth of weekly growth and then it says,

 6   "Vaults overview, A Link .76 percent growth."  Do you see

 7   that?

 8   A    Yes.

 9   Q    And then, Ms. Thompson responds back to this

10   screenshot.  She says, "You are going to have to tell me

11   what it means to the book, please.  Thank you."  Do you see

12   that?

13   A    Yes.

14   Q    And then you respond on top of that, "Have Jason give

15   you access to Zapper.  Remember --", I'm on the second

16   paragraph -- "Remember, none of these gains are real until

17   you sell the rewards into stable coins.  We need to do daily

18   sales of all gains on DeFi."  So, the number Jason reports

19   to finance should always be the amount monetized into USDC,

20   that's U.S. Dollar Coin, stable coin issued by Circle,

21   correct, Mr. Mashinksy?

22   A    Yes.

23   Q    And USDT, which is a tether of stable coin issued by

24   Ifinex, right?

25   A    Yes.
```

Page 58

```
 1    Q    Mr. Mashinsky, you attended weekly meetings to discuss

 2    -- with KeyFi to discuss deployment strategies into DeFi,

 3    right?

 4    A    I attended some meetings, yes.

 5    Q    So, you were generally aware of KeyFi's activities like

 6    we've seen in this email?

 7    A    I attended some meetings.

 8    Q    And you knew Jason had generated a profit?  Jason Stone

 9    had generated a profit, didn't you?

10    A    Some documents I was shown.  It looked like Jason

11    generated a profit.

12    Q    In fact, you expressly admitted that Jason made gains

13    on the Celsius assets that it had sent to him, correct?

14              MR. HURLEY:  Objection, Your Honor.  Vague as to

15    time.

16              THE COURT:  Overruled.  That's cross-examination.

17    You can answer the question.

18    BY MR. FREEDMAN:

19    A    Can you repeat the question?  Sorry.

20    Q    Yeah, in fact you expressly admitted --

21              MR. FREEDMAN:  And sorry, Your Honor, before I

22    read the question, just so I understand your ruling, you

23    said you don't permit speaking objections.  So, would you

24    just prefer counsel to say, "Objection"?

25              THE COURT:  I overruled the objection.  Just ask
```

Page 59

1    your next question.  Go ahead.

2    BY MR. FREEDMAN:

3    Q    Mr. Mashinsky, you expressly admitted that Mr. Stone

4    made gains on the funds Celsius sent him, correct?

5    A    I stated that where?  Oh, I'm sorry.

6    Q    I'm asking, did you state that?

7    A    I don't recall saying that.

8         MR. FREEDMAN:  Your Honor, I'm looking at DX41.

9    When you have a minute, can you let me know if I can

10   approach the witness?

11        THE COURT:  Go ahead.

12        MR. FREEDMAN:  I'm sorry, Judge.  I don't have the

13   chart in front of me.  It's not in evidence.

14   BY MR. FREEDMAN:

15   Q    Mr. Mashinsky, do you see this as an email chain

16   between you and folks at Celsius Network, discussing Jason

17   Stone on January 18, 2021?

18   A    Yes.

19        MR. FREEDMAN:  Your Honor, we'd offer DX41 into

20   evidence.

21        MR. HURLEY:  No objection.

22        THE COURT:  In evidence.  Go ahead.

23   BY MR. FREEDMAN:

24   Q    Mr. Mashinsky, do you see on January 18, 2021, you sent

25   an email saying, "Harumi and I spoke to Jason today.  We

Page 60

1    have explained we have three priorities.  I'd like to direct

2    you to Priority #3, to do a coin audit to make sure all

3    client assets are returned and book the gains Jason

4    created."  Do you see that?

5             MR. HURLEY:  Objection

6             THE COURT:  Overruled.

7    BY MR. FREEDMAN:

8    Q    Do you see that Mr. Mashinsky?

9    A    Yes.

10   Q    Thank you.

11   A    I see it.  I don't know what it means.

12   Q    I'm sorry.  There's no question pending, Mr. Mashinsky.

13   A    Okay.  All right.

14   Q    In fact, Mr. Mashinsky, you were so sure that Jason

15   Stone had created profit for Celsius that you pressured

16   Connor Nolan to work with him, didn't you?

17   A    I did not.

18   Q    You understand that Mr. Nolan has testified that you

19   did?

20   A    I don't recall pressuring anyone to do anything, so --

21   Q    Is Mr. Nolan a liar?

22   A    I did not -- again, what's the question?  I don't

23   understand.

24   Q    Is Mr. Nolan a liar?

25   A    No.

Page 61

1  Q    He's -- so you would believe him if that's what he

2  said?

3  A    Yes.

4  Q    And Mr. Mashinsky, you understand that KeyFi was so

5  profitable that you would often direct Celsius employees to

6  deploy more assets with KeyFi, didn't you?

7  A    I don't think I directed -- we have a whole team.  They

8  do the deployments as risk involved, so I -- I rarely

9  intervened in the deployment of assets.

10 Q    Did you often direct Celsius employees to deploy more

11 assets with KeyFi?

12 A    No.

13 Q    You understand Mr. Nolan has testified that you did?

14 A    I did not direct Celsius employees to deploy assets to

15 KeyFi.

16 Q    So, Mr. Nolan is not a truth-teller?

17 A    I don't know what he testified, so I can't comment to

18 that.

19 Q    You understand, Mr. Mashinsky, that you told Celsius

20 employees that KeyFi was profitable and at the forefront of

21 DeFi.  Is that true?

22 A    I don't recall saying that.

23 Q    You understand Mr. Nolan has testified that you did?

24 A    I did not see all of Mr. Nolan's testimony.

25 Q    I'll represent to you that he said that.  Is he a

Page 62

1    truth-teller?

2              MR. HURLEY:  Objection, Your Honor.  Asked and

3    answered.

4              THE COURT:  Sustained.

5    BY MR. FREEDMAN:

6    Q    Mr. Mashinsky, you praised Jason Stone during the

7    relationship between KeyFi and Celsius, did you not?

8    A    At what time?

9    Q    At any time, Mr. Mashinsky?

10   A    I'm sure in the beginning I probably said some things

11   like that about Jason Stone.

12   Q    Things like what?  I'm sorry.

13   A    Praised Jason Stone.

14   Q    Isn't it true, Mr. Mashinsky, that you didn't think

15   KeyFi was just profitable, you actually thought that and

16   told Celsius personnel, that KeyFi was Celsius' most

17   profitable trading strategy?

18   A    I don't recall saying that.

19   Q    You're not denying it here today under oath, are you?

20   A    I don't recall saying that.

21   Q    Mr. Mashinsky, did you ever monitor KeyFi's block chain

22   activity through its OXB-1 address?

23   A    At some point, yes.

24   Q    You understand that the Ethereum block chain is

25   publicly visible, right?

Page 63

```
 1    A    Yes.

 2    Q    And that purchase transactions from a specific address

 3    are easily tracked?

 4    A    KeyFi was involved in tens of thousands of trades, so

 5    you can't just look at the block chain.  You can't just look

 6    at Ethereum and get an answer because the assets were

 7    deployed in complex third-party pools.  So, the answer is

 8    no, you cannot ascertain almost anything by just looking at

 9    the Ethereum block chain.

10    Q    I'm actually talking about purchases of NFTs, so that's

11    a good critique, Mr. Mashinsky.  Purchase of NFTs are pretty

12    easy to track, right?

13    A    No, they're not.

14    Q    Are you familiar with Etherscan, Mr. Mashinsky?

15    A    Yes.

16    Q    And are you familiar with what an ERC721 token is?

17    A    I'm vaguely familiar, yes.

18    Q    It's an NFT, right?  It's a technical term for an NFT?

19    A    There are several formats for NFTs.

20    Q    And to track an ERC721 NFT token, isn't it true, Mr.

21    Mashinsky, that Etherscan has a literal button you can press

22    to view all NFT purchases?

23              MR. HURLEY:  Objection.

24    BY MR. FREEDMAN:

25    A    I don't think the team was using Etherscan.  I think,
```

1   as per this email, the team was using Zapper and DeBank and

2   both of those did not have at the time -- did not have a tab

3   called "NFTs".

4   Q    Mr. Mashinsky, you ran one of the largest and most

5   sophisticated cryptocurrency-based finance platforms in the

6   world, right?

7   A    Yes.

8   Q    You're telling me that your team didn't even know how

9   to use Etherscan to track an address?

10  A    At the time.  Etherscan did not have --

11  Q    They did not know how to use Etherscan?

12  A    -- a tab called NFTs.

13  Q    No, it doesn't have a tab called NFTs today either, but

14  it does have one called "ERC721", which came into --

15  A    Or ERC721.

16  Q    Mr. Mashinsky, please let me finish the question.

17           THE COURT:  Stop, stop, stop.  One at a time.  All

18  right.  Mr. Freedman, you can't testify, you can ask

19  questions.  All right, and the witness will answer the

20  questions.  Ask your next question.

21  BY MR. FREEDMAN:

22  Q    Mr. Mashinsky, isn't it true that Etherscan has had a

23  tab for ERC721 token transfer transactions since 2018?

24  A    Not that I know of.

25  Q    Have you ever looked at the Etherscan address --

1   rather, have you ever pulled up OXB-1 address under

2   Etherscan?

3   A     No.  I use a different tool.

4   Q     You've never looked at it through Etherscan?

5   A     I don't think so.

6            MR. FREEDMAN:  Your Honor, if I could have one

7   minute.

8   BY MR. FREEDMAN:

9   Q     Mr. Mashinsky, are aware that the first time the OXB-1

10  wallet has purchased an ERC721 NFT token was on January 5,

11  2021?

12  A     I'm not.

13  Q     Are you aware that after that, the next purchase of

14  NFTs from OXB-1 was not until January 28, 2021?

15  A     I'm not.

16  Q     I'll represent to you that that is, in fact, the case

17  and that is --

18            THE COURT:  No, stop.  You can't testify.  You've

19  got a document that you want to put in front of the witness

20  and question him about?  I'm not going to permit you to

21  testify.  You've got to stipulate it as fact or document

22  admitted in evidence.  You can show it to the witness.

23  BY MR. FREEDMAN:

24  Q     Mr. Mashinsky, would you understand how to read

25  Etherscan if I showed you Etherscan printouts?

Page 66

```
 1    A    I vaguely know how Etherscan works, yes.

 2              MR. FREEDMAN:  Your Honor, would you object to us

 3    showing the witness Etherscan printouts?

 4              THE COURT:  Has it been marked as an exhibit?

 5              MR. FREEDMAN:  It's been marked as an exhibit.  I

 6    think DX37, but it's not been admitted into evidence yet.

 7              THE COURT:  You can put a document in front of the

 8    witness (indiscernible), but the document is not in evidence

 9    (indiscernible) the document.

10              MR. FREEDMAN:  Thank you, Judge.

11    BY MR. FREEDMAN:

12    Q    Mr. Mashinsky, do you recognize DX37 as an Etherscan

13    printout?

14    A    This is a different format than what I see on my screen

15    when I use Etherscan.  So, I'm not sure what this format it.

16    Q    Well, I mean, it's a printout of the webpage so --

17    A    Again, this is not what Etherscan shows on the screen.

18              THE COURT:  You can ask your question.  No, stop a

19    second.  You can ask your question, but you can't testify.

20    Okay?  Ask him if he knows what it is.  I think you already

21    asked that.  But another about the document.

22              MR. FREEDMAN:  Understood, Your Honor.  Sorry.

23    BY MR. FREEDMAN:

24    Q    Mr. Mashinsky, do you see -- do you see, about a third

25    of the way down, there's a tab for "Transactions, Internal
```

Page 67

1   Transactions, ERC20 Token Transactions, ERC721

2   Transactions"?

3   A     Yes.

4   Q     And if you flip with me to Page -- the third page,

5   you'll see where ERC721 transactions are highlighted.

6   A     It shows an empty page.

7   Q     Right.  I know, because you're going to have to, again,

8   printout of Etherscan, so it doesn't look the same as on a

9   computer, it's a printout.  But if you then take a look on -

10  - I'm about -- I'm sorry there's no page numbers here.  1-2-

11  3-4-5, I'm six pages in.  At the top it says, "Non-fungible

12  token transfers, ERC721."  Do you see that?

13            THE COURT:  Don't (indiscernible).  Point him to

14  the page, ask him if he understands what the information

15  contained in there is and we'll go from there.  He said he's

16  not sure what it is.  You haven't laid a foundation for this

17  document.

18            MR. FREEDMAN:  Understood, Your Honor.

19  BY MR. FREEDMAN:

20  Q     Mr. Mashinsky, you said you ran one of the most

21  profitable and sophisticated --

22            THE COURT:  Ask your next question, Mr. Freedman.

23  BY MR. FREEDMAN:

24  Q     Do you recognize this as an Etherscan printout of non-

25  fungible token transfers?

Page 68

1    A    I'm sorry.  I see here on the title, "ERC20, ERC721,

2    ERC115", so I'm not sure -- it doesn't -- it's not

3    corresponding with the titles of the first page.  So, I'm

4    not sure what you're referring to.

5    Q    You can put that aside.  Thank you, Mr. Mashinsky.  Mr.

6    Mashinsky, by January 18, 2021, KeyFi had deployed hundreds

7    of millions of dollars' worth of digital assets that

8    belonged to KeyFi -- Celsius, correct?

9    A    Yes.

10   Q    And by your admission, had made gains on those assets,

11   correct?

12   A    I never said that.

13   Q    And was therefore owed a profit share under the Asset

14   Purchase Agreement, right?

15   A    No.

16   Q    At this time, Mr. Mashinsky, on January 18th, is it

17   true that KeyFi had not been paid anything yet?

18   A    That's not true.

19   Q    They had not been paid any profit share yet.  Is that

20   correct?

21   A    I don't know what they were paid as far as profit

22   share.

23   Q    So, did you authorize payment of profit shares?

24   A    No.

25   Q    So, why do you think that they were paid profit share,

1    Mr. Mashinsky?

2    A    You asked a different question and answered it

3    differently, so --

4    Q    Okay, so by January 18, 2021, had KeyFi been paid any

5    profit share by Celsius?

6    A    Not that I know of.  No.

7    Q    You understand, Mr. Mashinsky, that Jason Stone has

8    testified that you gave him permission to purchase these

9    NFTs as an advance on his profit share?

10   A    I never gave such permission.

11   Q    But do you understand that's Mr. Stone's position?

12   A    I did not see Mr. Stone's testimony.

13   Q    It is your contention -- do you understand that Mr.

14   Stone purchased NFTs?

15   A    I'm sorry?

16   Q    Do you understand that Mr. Stone purchased NFTs?

17   A    In the ZRCB1, there were purchases of NFTs and they

18   were not authorized.

19   Q    So, it's your position that he stole those assets?

20   A    He transacted without authority, knowing that he had to

21   only transact on protocols approved by the Celsius

22   Management Team.

23   Q    Do you understand that anyone with an internet browser

24   could have seen those purchases of NFTs, right?

25   A    If you knew where to go and what tab to press and how

1    many pages down to go to, then maybe you could have seen it.

2    But the tools we use, "we", meaning Celsius, did not in any

3    easy way display any purchases of NFTs.

4    Q    Mr. Mashinsky, you're aware that KeyFi had a very

5    active Twitter account called Ofb1, right?

6    A    Yes.

7    Q    And you knew about that Twitter account on January 23,

8    2021, correct?

9    A    I don't recall when I knew about it.

10        MR. FREEDMAN:  Your Honor, can I point you to

11   DX23, which I believe is in evidence.  Your Honor, may I

12   approach the witness with a copy?

13        THE COURT:  Fine.

14   BY MR. FREEDMAN:

15   Q    Mr. Mashinsky, do you have a copy of Exhibit 23?

16   A    Yes.

17        MR. FREEDMAN:  Judge, you'll let me know when

18   you're ready?

19        THE COURT:  I'm ready.  Go ahead.  I've got it

20   opened.

21   BY MR. FREEDMAN:

22   Q    Mr. Mashinsky, you recognize this as an email from you

23   to Jason Stone dated January 23, 2021?

24   A    Yes.

25   Q    And the subject is, "Why Crypto Twitter's latest

1    anonymous sensation is so into DeFi."  Do you see that?

2    It's in the subject.  It's the second line up from the

3    bottom -- top, rather.  Down from the top, sorry.

4    A    I'm responding to something, so you don't have the full

5    back and forth here.  So, I guess this is just my response.

6    Q    Mr. Mashinsky, I just asked you if you see the subject

7    line which says, "Why Crypto Twitter's latest anonymous

8    sensation --".  Do you see that?

9    A    Yes, I do.  Yes.

10   Q    And in it, you say, "Jason, I specifically asked you to

11   take this down and stop posting on Twitter."  Do you see

12   this?

13   A    Yes.

14   Q    Does this help refresh your recollection that, in fact,

15   you knew about OXB-1 Twitter account as of January 23, 2021?

16   A    I assume so, yes.

17   Q    Okay.  Mr. Mashinsky, are you aware that after you

18   admonished him about using this Twitter account, Mr. Stone

19   continued to use that Twitter account?

20   A    Yes.

21   Q    And in fact, are you aware that OXB-1 Twitter account

22   was a fairly popular Twitter account?

23   A    I'm not familiar if it was popular or not.

24   Q    Are you aware that the OXB-1 Twitter account frequently

25   tweeted about the NFTs that you allege Jason was stealing?

Page 72

1    A    I don't have that knowledge.

2    Q    Did you ever look over a Tweet talking about NFT

3    purchases, Mr. Mashinsky?

4    A    I don't recall that.

5    Q    Are you aware that he was actually tweeting about NFTs

6    the very day you emailed him to stop talking about it on

7    Twitter?

8    A    I -- again, I don't -- I'm not aware of that.

9    Q    Is it fair to say that the day you told him to stop

10   posting on Twitter, you were on that Twitter account?

11   A    I think this header is article from the block, so I was

12   looking at the Tweet -- I assume I was looking at the Tweet

13   that was posted in the article and not on Twitter itself.

14   Q    So, you have no recollection of every going on the OXB-

15   1 Twitter account?

16   A    I am sure I -- it's in my feed, so I'm sure I -- I see

17   it once in a while, but that's -- that has nothing to do

18   with me knowing or not knowing what NFTs Jason owns or

19   bought or transacted with.

20   Q    So, you follow OXB-1?

21   A    I don't know if I follow it now, but at some point, I

22   followed OXB-1.

23         MR. FREEDMAN:  Can I see DX35?  Your Honor, I'd

24   point you to DX35 that is not in evidence.  And may I

25   approach the witness?

Page 73

```
 1              THE COURT:  Yes.
 2     BY MR. FREEDMAN:
 3     Q    Mr. Mashinsky, are you familiar with what a cryptopunk
 4     is?
 5     A    It's an NFT, yes.
 6     Q    Do you recognize this as a printout of Twitter, a
 7     popular social networking website?
 8     A    It looks like it, yes.
 9     Q    And do you see, about maybe a third of the way down the
10     page or a quarter way down the page, (indiscernible) with
11     OXB-1 and the little blue Twitter checkmark?  Do you see
12     that?
13     A    It's not in color, so I don't see colors here.
14     Q    That's a fair criticism, Mr. Mashinsky.  But I'm
15     bearing my own biases of blue into it.  Do you see the
16     checkmark next to OXB-1?
17     A    Yes.
18     Q    And can you read that Tweet there that's in response to
19     the Tweet about crytopunks and let me --
20              THE COURT:  No, he can't.  No, he can't because
21     the document is not in evidence.
22              MR. FREEDMAN:  Sorry, Judge.  I was going to say,
23     "to yourself".
24              THE COURT:  He can read it to himself if you've
25     got a question.
```

 1              MR. FREEDMAN:  Judge, sorry.  You jumped in.  I

 2     was going to ask him if he could read it to himself and let

 3     us know if he recognizes it.

 4              THE COURT:  All right.  Go ahead.  Read it to

 5     yourself.

 6     BY MR. FREEDMAN:

 7     Q    And Mr. Mashinsky, please look at the date on the

 8     bottom, January 23rd.

 9     A    Yes.

10              THE COURT:  So what is the yes.  Have you seen

11     this before?

12              THE WITNESS:  I'm sorry.  Is that a question to

13     me?

14              THE COURT:  Yes, it is.  Mr. Mashinsky, have you

15     seen the DX35 before?

16              THE WITNESS:  No, I don't think I did.

17              MR. FREEDMAN:  Can we get the DX36.  Your Honor,

18     can I point you to DX36?

19              THE COURT: Sure, go ahead.

20              MR. FREEDMAN:  Your Honor, may I approach?

21              THE COURT:  Go ahead.

22     BY MR. FREEDMAN:

23     Q    Mr. Mashinsky, without reading anything into the

24     record, can you take a look at -- do you see about halfway

25     down the OXB-1 Twitter account making a post?

```
 1   A     Yes.

 2   Q     Under a CryptoPunk's post.  Have you seen this tweet

 3   before?

 4   A     I don't think so.

 5   Q     Can you be sure?

 6   A     I cannot be sure.  I mean again there's millions of

 7   tweets.  So, you know, this may be my Twitter feed but I

 8   don't think -- I'm not an NFT aficionado. I don't collect

 9   NFTs, so I definitely did not read about NFTs.

10   Q     Can I get DX30?

11         MR. FREEDMAN:  Judge, also not in evidence yet,

12   DX30.  May I approach the witness?

13         THE COURT:  Yes.

14   BY MR. FREEDMAN:

15   Q     Right at the top of this page, Mr. Mashinsky, you'll

16   see a -- again, please don't read into the record until the

17   Judge rules, but you'll see the OXB-1 making a tweet about

18   NFTs.  Have you have you seen this tweet before?

19   A     No.

20   Q     Mr. Mashinsky, you do understand that your wife ended

21   up with two of the NFTs that KeyFi purchased, correct?

22   A     I'm not sure KeyFi purchased them or they were

23   airdropped or I don't know what the origin of those NFTs is.

24   Q     You understand that you paid your wife with two NFTs?

25   A     Celsius paid my wife for her work with two NFTs, yes.
```

Page 76

1    Q    Did she steal those NFTs?

2    A    I'm sorry?

3    Q    Did she steal those NFTs?

4    A    No.  She was paid for her work.

5    Q    By KeyFi?

6    A    I don't know what that question is means.

7    Q    That's because you gave your wife permission to keep

8    those NFTs; isn't that right?

9    A    I did not give her permission to keep them.  I asked

10   Celsius to pay her for finding thousands of NFTs that Jason

11   bought and took out of the Celsius account.

12   Q    And in return you had Celsius pay her in NFTs?

13   A    The value of those two NFTs is less than $100.

14   Q    It wasn't my question, Mr. Mashinsky.

15   A    That is my answer.

16   Q    My question to you is in return, you paid your wife in

17   NFTs, correct?

18   A    I did not pay her.  The company paid her.

19   Q    In return, Celsius -- sorry, strike that.  In return,

20   you authorized Celsius to pay her in NFTs, correct?

21   A    Yes.

22           MR. FREEDMAN:  Your Honor, can I appoint you to

23   DX6, which is in evidence and may I approach the witness?

24           THE COURT:  Go ahead.

25   BY MR. FREEDMAN:

Page 77

1   Q    I'm looking at about halfway down the page, Mr.

2   Mashinsky.  And this is an email from you to a bunch of

3   folks at Celsius.  And you say on May 27th, 2021 --

4   actually, Mr. Mashinsky, why don't you read that for the

5   record, the email at May 27th, 2021?

6   A    You want me to read the whole email?

7   Q    Just those two lines.

8   A    Which lines?

9   Q    The one from your May 27th, 2021, email.

10  A    I'm sorry, which two lines?

11          THE COURT:  Just read them yourself, Mr. Freedman,

12  let's move along.

13          MR. FREEDMAN:  No problem, Judge.

14  BY MR. FREEDMAN:

15  Q    Do you see where it says, Mr. Mashinsky, "We need to

16  move all NFTs off this wallet.  Please arrange for a new

17  dedicated wallet with Sheran.  Two NFTs go to Krissy wallet.

18  A    I'm sorry, I didn't see -- I didn't -- I forgot to put

19  my contacts in.

20          THE COURT:  Mr. Mashinsky, just stop.

21          THE WITNESS:  Yeah, sorry I didn't see that other

22  line.

23          THE COURT:  Mr. Mashinsky, just stop.  Go ahead

24  and read the lines you want to ask a question about.

25  BY MR. FREEDMAN:

1   Q    Do you see where it says "Two NFTs go to Krissy wallet

2   for the work she did on tracking down all Jason's assets.

3   Waseem has the details."  Do you see that?

4   A    Yes.

5   Q    Krissy is your wife?

6   A    Yes.

7   Q    This is the authorization of paying your wife with NFTs

8   that we just discussed?

9   A    Yes.  What's the date on this?  Sorry.  It's May 27,

10  2021.  This is months after everything with we talked about.

11          THE COURT:  Ask your next question.

12  BY MR. FREEDMAN:

13  Q    Mr. Mashinsky, you offer your declaration today under

14  penalty of perjury, correct?

15  A    Yes.

16  Q    You don't give any documentary support for your

17  statements beyond your word, correct?

18  A    I don't know what that means, the question.

19  Q    Did you attach any evidence to your declaration?

20  A    I don't remember if anything was attached to my

21  declaration.

22  Q    Do you, sitting here today, do you recall any emails

23  where that you were asked to attach to your declaration?

24  You know what?  Strike that.  It doesn't matter.  Mr.

25  Mashinsky, on May 11th, 2022, you tweeted, is it correct

1      that you tweeted "Notwithstanding the extreme market

2      volatility, Celsius has not experienced any significant

3      losses and all funds are safe"?

4      A    Again, I don't know from memory if that's correct or

5      not.

6              MR. FREEDMAN:  Your Honor, I'm going to try to

7      refresh Mr. Mashinsky's recollection about his tweet, and in

8      so doing, I'm going to direct him to DX-47.  May I approach?

9              THE COURT:  Yes, please.

10              MR. HURLEY:  Objection, Your Honor.  This does not

11      appear to be a document was marked in any of the exhibit

12      lists we've received before today, before right now.

13              MR. FREEDMAN:  Your Honor, this was either going

14      to be an impeachment exhibit or right now, we're going to

15      try to just refresh his recollection with it.

16              THE COURT:  Go ahead.

17      BY MR. FREEDMAN:

18      Q    Mr. Mashinsky, can you pay -- can you go to, do you see

19      on the top there's like a Page 1 of 6 on the front page?

20      A    Yeah.

21      Q    And then can you turn to Page 3 of 6 for me?

22      A    Yeah.

23      Q    Do you see a snapshot of your tweet there?

24      A    Yes.

25      Q    And it says "Notwithstanding extreme market,

1    volatility" -- well can you, can you read that to yourself

2    and let me know if that refreshes your recollection?

3    A    Yes.

4    Q    So you did tweet on May 11th, 2022, that

5    notwithstanding extreme market volatility, Celsius has not

6    experienced any significant losses and all funds are safe?

7    A    This was in response to the Terra Luna collapse in

8    which over $50 billion worth of funds were lost.  So it's in

9    the context of -- the thread is talking about Terra Luna.

10   Q    You made this tweet, Mr. Mashinsky?

11   A    Yes.

12   Q    And in fact, this tweet was a lie?  Celsius funds were

13   not safe, correct?

14   A    That's not true.

15   Q    On May 11th, Mr. Mashinsky, Celsius was functionally

16   insolvent; isn't that correct?

17             MR. HURLEY:  Objection.

18             MR. FREEDMAN:  Did you say no?

19             THE COURT:  What was the objection?

20             MR. HURLEY:  Objection on the question of whether

21   or not Celsius was functionally insolvent on a given date.

22   I don't think there's been any foundation laid for the

23   witness's understanding of what constitutes insolvency at

24   that point in time.

25             THE COURT:  Overruled.

```
 1    BY MR. FREEDMAN:

 2    Q    I'm sorry.  I didn't hear your answer, Mr. Mashinsky.

 3    On May 11th, Celsius was functionally insolvent; is that

 4    correct?

 5    A    That's not correct.

 6              MR. FREEDMAN:  I'm sorry, Your Honor, if I could

 7    have just one moment

 8    BY MR. FREEDMAN:

 9    Q    Let me see if I can -- have you, have you reviewed any

10    of the filings in the Celsius case, Mr. Mashinsky?

11    A    Some of them.  I don't know which one you're referring

12    to.

13    Q    Let me see if I can refresh your recollection about

14    insolvency.  Can you turn in that same document I've just

15    handed you, if you keep turning the page, you'll come across

16    a document which is 730-1.

17    A    What pages again?

18    Q    You have to keep flipping until you see on the top

19    where it says "Doc 730-1" and then it's Page 1 of 5 on the

20    top.  Let me know when you see 730-1.  Do you see it?

21    A    Yes.

22    Q    And then if you flip to 730-1, Page 4 or 5.

23    A    Yep.

24    Q    Take a look at D.  Can you read that to yourself?  Does

25    that refresh your recollection that on May 11th, 2022, when
```

Page 82

1    you made this tweet, Celsius was functionally insolvent.

2    Its assets, its liabilities exceeded its assets.

3    A    I don't know who prepared this, but I don't agree with

4    what it says.

5    Q    Mr. Mashinsky, on December 3rd, 2021, you told the

6    public, did you not, that and I quote "Regulators have

7    looked into Celsius.  They came back thumbs up.  There's no

8    problem.  We did not find anything."

9             MR. HURLEY:  Objection.

10            THE COURT:  Overruled.

11   BY MR. FREEDMAN:

12   Q    Do you recall saying that?

13   A    It's a quote from where?

14   Q    It's a quote from an interview you gave.

15   A    I don't recall that.

16            MR. FREEDMAN:  Your Honor, if we may play DX-48.

17   Mr. Dan Stone can play that for us.

18            MR. HURLEY:  Again, objection, Your Honor.  DX-48

19   is a document that we've never seen or been notified of

20   until right now.  It would only be fair for us to at least

21   see it in advance of it being published to the court.

22            THE COURT:  Absolutely, objection sustained.

23            MR. FREEDMAN:  Your Honor, these are impeachment

24   exhibits.  It's a prior inconsistent statement of the same

25   exact witness.  It's a video recording.

Page 83

1              THE COURT:  Before you can use it, you're going to

2       have to show it to Mr. Hurley to see whether there's an

3       objection and I'll rule on it.

4              MR. FREEDMAN:  How would you like us to do that,

5       Your Honor?

6              THE COURT:  Well, you'll do it during a recess

7       then.  Have you finished your examination other than that?

8              MR. FREEDMAN:  I have a few more questions that

9       all similarly require those sort of video links, Judge.  So

10      if it's convenient time for the Court, we can go off for

11      maybe 10 minutes.  I can show Mr. Hurley the various video

12      exhibits and we can come back.

13             THE COURT:  It is now 10:58.  We will take a 15-

14      minute recess until 11:13 during which I hope you'll show

15      Mr. Hurley the videos which you wish to show.

16             MR. FREEDMAN:  Thank you, Judge.

17             THE COURT:  We're in recess until 11:13.

18             (Off the record.)

19             THE COURT:  Let's go back on the record.  Mr.

20      Mashinsky, you're still under oath.

21             THE WITNESS:  Yes, Your Honor.

22             THE COURT:  Mr. Freedman, have you had an

23      opportunity to show Mr. Hurley the video you want to show?

24             MR. FREEDMAN:  We did show Mr. Hurley the videos.

25      Mr. Mashinsky attended that session over my objection

Page 84

1    because they were impeachment exhibits.  And just so the

2    Court is aware, there are five video clips.  Each video clip

3    is about an hour interview or so with Mr. Mashinsky.  We

4    excerpted out the relevant portions of those videos.

5    They're impeachment exhibits, which is why they weren't

6    included in the original exhibit list.  That would defeat

7    the purpose of having them as impeachment.

8              THE COURT:  I understand that.  Let's move on.

9              MR. FREEDMAN:  Your Honor, if it's, if it's

10   alright with you then, I can re-ask Mr. Mashinsky, now that

11   he's seen the video clips, if he's made this statement.  If

12   he says yes, I, you know.

13             THE COURT:  That's fine.  Ask him the question.

14   BY MR. FREEDMAN:

15   Q    Mr. Mashinsky, on December 3rd, 2021, you said that

16   regulators have looked into Celsius.  They came back thumbs

17   up.  There's no problem.  We did not find anything.  Do you

18   recall that?

19   A    I saw the video, yes.

20   Q    So you recall making that statement?

21   A    I think it's out of context.  It's a long interview.

22   So that excerpt, I don't think --

23             THE COURT:  Mr. Mashinsky, did you make that

24   statement?

25             THE WITNESS:  I said that.  Again, I don't have it

Page 85

1   word by word.  Yes.  If it sounds like what I saw in the

2   video.

3              THE COURT:  Mr. Mashinsky, I just watched it.  You

4   said it, answer the question directly.  All right, we'll

5   move along.

6              THE WITNESS:  Yes.

7   BY MR. FREEDMAN:

8   Q    That was a lie, Mr. Mashinsky, correct?

9   A    No.

10             MR. HURLEY:  Objection, Your Honor.

11  BY MR. FREEDMAN:

12  Q    Mr. Mashinsky, state regulators did not say thumbs up,

13  there's no problem.  Isn't that correct?

14             MR. HURLEY:  Your Honor, can I just state for the

15  record our objection to the use of this material?

16             THE COURT:  Go ahead.

17             MR. HURLEY:  So the material we're talking about

18  are excerpts seconds long.  As counsel just said, each of

19  them is from an hour plus videotape.  It's taken out of

20  context.  It was provided to us and not the whole video, of

21  course, just the few seconds that they want to use moments

22  before the hearing today.

23             MR. FREEDMAN:  Your Honor --

24             THE COURT:  There's redirect, Mr. Hurley.  It's

25  proper cross-examination, impeachment material.  Ask your

Page 86

1    next question, Mr. Freedman.

2              MR. HURLEY:  Your Honor, respectfully, we're not

3    in a position --

4              THE COURT:  Overruled.  This is cross-examination.

5    Ask the next question, please.

6    BY MR. FREEDMAN:

7    Q    Instead, Mr. Mashinsky, on September 17th, 2021, the

8    New Jersey Bureau of Securities ordered Celsius to cease and

9    desist from accepting any new earned assets from New Jersey.

10   Isn't that correct?

11   A    What date?  Sorry, which date?

12   Q    September 17th, 2021.

13   A    And this interview is from what day?

14   Q    December 3rd, 2021.

15   A    Yes.

16   Q    So it is true that about three months before your

17   interview where you said regulators gave us the thumbs up,

18   you actually received a cease and desist from New Jersey,

19   correct?

20   A    The information I was provided was that we came to an

21   agreement and that's why we launched --

22             THE COURT:  Stop.  Stop.  I couldn't -- I lost the

23   sound.  Ask your question again.

24   BY MR. FREEDMAN:

25   Q    I said three months before you said to the public that

1    Securities regulators gave you a thumbs up, you actually

2    received a cease and desist from the New Jersey Bureau of

3    Securities; isn't that correct?

4    A    Yes.

5    Q    And isn't it also correct that on September 23rd, 2021,

6    also three months before you gave that interview, the

7    Kentucky Department of Financial Institutions also ordered

8    Celsius to cease and desist from soliciting or selling any

9    securities in Kentucky?

10   A    Again, Celsius provides many services.  You're talking

11   about one specific service.

12            THE COURT:  Just answer the question, Mr.

13   Mashinsky.  Are you able to answer the question?

14            THE WITNESS:  He's asking about all the services

15   and quoting, offering securities?  That's only one subset of

16   one product.  So if he wants to talk about a specific

17   product, I'm happy to answer to that.  These states did not

18   issue a cease and desist about all the services Celsius

19   provides.

20   BY MR. FREEDMAN:

21   Q    Mr. Mashinsky, your quote is "Regulators have looked

22   into Celsius.  They came back thumbs up.  There's no

23   problem."  That was a lie, correct?

24   A    That's not correct.

25            MR. HURLEY:  Objection, Your Honor, asked and

 1   answered.

 2   BY MR. FREEDMAN:

 3   Q    Isn't it true, the New Jersey Attorney General has also

 4   recently stated that the New Jersey Attorney General never

 5   gave you a thumbs up either, Mr. Mashinsky?

 6           MR. HURLEY:  Objection.

 7           THE COURT:  Sustained.

 8   BY MR. FREEDMAN:

 9   Q    Sorry, New York Attorney General, I'm sorry for the

10   record, New York Attorney General.  Mr. Mashinsky, you were

11   just sued by the New York Attorney General for persistent

12   fraud just last week?

13   A    Yes.

14   Q    And in it, the New York Attorney General alleges that

15   you committed persistent fraud?  You do you dispute that?

16           MR. HURLEY:  Objection, Your Honor.

17           THE COURT:  Sustained.

18   BY MR. FREEDMAN:

19   Q    Mr. Mashinsky, do you recall that in May of 2022,

20   Celsius board minutes recognized that its capital sits near

21   zero?

22   A    I think it's in the minutes.  Yes.

23   Q    And isn't it true that despite that being in the May

24   minutes in a May 13th, 2022, AMA, you told your customers

25   that and I quote "Celsius is stronger than ever.  We have

1    billions of dollars in liquidity.  We continue to do what

2    Celsius does best, serve the community, protect the

3    community, make sure assets are there when they need them"?

4    A    Yes.

5    Q    That was a lie, Mr. Mashinsky, wasn't it?

6    A    That's not correct.

7    Q    A few days later, Mr. Mashinsky, on May 16th when your

8    board minutes reflect, again, that its capital sits near

9    zero, you gave an interview titled "Luna UST Aftermath on

10   Crypto Markets and Stablecoins."  And isn't it true that in

11   that interview, you said, and I quote, "Companies like

12   Celsius and others are standing strong.  Obviously, anyone

13   who is not ready for this has been taken out and I think

14   there's going to be a few more casualties.  But at Celsius,

15   we are ready at all times."

16   A    Yes.

17   Q    That was a lie.  Your capital was near zero, Mr.

18   Mashinsky, correct?  You were not standing strong.

19   A    That's not a lie.

20   Q    Mr. Mashinsky, in August 5th of 2021 during an

21   interview, you stated "Celsius paid investors" -- I quote --

22   "almost 100 times more than your bank pays you and we do

23   that without taking any risk or taking minimal risks."  Do

24   you recall making that statement?

25   A    I don't think it's a statement.  I think it's an

1    interview.

2    Q    Did you make that statement in the interview, Mr.

3    Mashinsky?

4    A    It was a hypothetical question from what I remember.

5    Q    Did you make the statement in the interview, Mr.

6    Mashinsky?

7    A    I answered a hypothetical question.

8    Q    Mr. Mashinsky, yes or no, did you make the statement?

9    A    Again, is that one of the segments you just showed me?

10   Q    I'm happy to shot it to you if you'd like?

11   A    No, I'm asking that's what I viewed outside?

12   Q    Yes.

13   A    So that was an answer to a hypothetical question.

14   Q    Mr. Mashinsky, in fact, you made poor asset deployment

15   decisions, didn't you?

16   A    I don't know.  I don't understand the question.

17   Q    Did you make poor asset deployment decisions?

18   A    I didn't, I personally do not make asset deployment

19   decisions.

20   Q    Did Celsius make poor asset deployment decisions while

21   you're at its chief executive officer?

22            MR. HURLEY:  Objection.

23            THE COURT:  Overruled.

24   BY MR. FREEDMAN:

25   A    Celsius did several poor deployments, yes.

1   Q    Mr. Mashinsky, on June 10th, 2022, you gave an AMA, in

2   fact, your last AMA, where you told customers that, I quote,

3   "Celsius has billions in liquidity and we provide immediate

4   access to everybody.  Anyone who needs access to it, to the

5   liquidity and that includes institutions and that includes

6   people who want to, you know, get their coins back."  Do you

7   remember making that statement?

8   A    Yes.

9   Q    Do you remember in that same interview, you then said

10  "When you went through several bear markets, you know what

11  to do, right?  You need to have liquidity, which we have.

12  Again, that's why anyone who wants to withdraw has no

13  problem."  Do you remember making that statement on June

14  10th, 2022?

15  A    Yes.

16  Q    And just two days later, Celsius paused withdrawals,

17  Mr. Mashinsky; isn't that right?

18  A    Yes.

19  Q    So you made those statements, you knew they were a lie,

20  didn't you?

21  A    No.  Can I answer?

22  Q    You knew Celsius wouldn't be able to honor withdrawals?

23  A    Can I answer the question?

24  Q    You did, Mr. Mashinsky, you said no.

25  A    I did not answer the question.

Page 92

1          THE COURT:  Let him answer the question.  Go

2     ahead, Mr. Mashinsky.

3     BY MR. FREEDMAN:

4     A    In April, Celsius had 24 billion in assets.  In June,

5     it had six billion in assets.  So obviously it provided

6     billions of dollars in liquidity as people withdrew their

7     assets from the platform.  So I stated the facts.

8     Q    You purposely misled people into thinking Celsius was

9     secure and that their assets could be taken off, so they

10    left their assets on Celsius to avoid a run on the bank and

11    that they continued putting assets into Celsius to sustain

12    your Ponzi?  Isn't that true, Mr. Mashinsky?

13          MR. FREEDMAN:  Objection, Your Honor.

14          THE COURT:  I'm going to sustain the objection.

15    It's a compound question.  You want to break things down?

16    You're going to be beating a dead horse here.

17          MR. FREEDMAN:  Judge, this is my last question,

18    now two because it's compound.

19    BY MR. FREEDMAN:

20    Q    Mr. Mashinsky, isn't it true that you purposely lied to

21    people to get them to leave their assets on Celsius to avoid

22    a run on the bank?

23    A    That's not true.

24    Q    And isn't it true, Mr. Mashinsky, that you purposely

25    misled people into thinking Celsius was secure, so they

1   would deposit more assets into Celsius to sustain your Ponzi

2   scheme?

3            MR. HURLEY:  Objection, Your Honor.

4            THE COURT:  Sustained.

5            MR. FREEDMAN:  No further questions.

6            THE COURT:  All right, redirect.

7            MR. HURLEY:  No to redirect, Your Honor.

8            THE COURT:  All right.  You're excused, Mr.

9   Mashinsky.  Go ahead, call your next witness.

10            MR. CHAPMAN:  Your Honor, the plaintiffs call

11   Patrick Holert as their next witness.  And Dean Chapman from

12   Akin Gump for the record.

13            THE COURT:  Thank you, Mr. Chapman.

14            MR. CHAPMAN:  We are retrieving the witness.  He

15   will be here a moment.

16            THE COURT:  Okay.

17            MR. CHAPMAN:  This screen is frozen.

18            MR. HURLEY:  Your Honor, if you can hear us,

19   you're frozen in the courtroom.

20            CLERK:  I'll contact him.  Thanks.

21            MR. CHAPMAN:  The witness is returning from the

22   restroom.

23            CLERK:  You ready, Judge?

24            THE COURT:  In just a moment.  Just bear with me a

25   second.  I apologize for the interruption.  My internet

Page 94

1    connection went unstable.  It's now back.  So Mr. Chapman,

2    why don't you proceed.  Has the witness been sworn?

3              CLERK:  No.

4              THE COURT:  Go ahead and swear in the witness.

5              CLERK:  Please raise your right hand.  Do you

6    solemnly swear or affirm that all the testimony you're about

7    to give before this court is the truth, the whole truth,

8    nothing but the truth?

9              MR. HOLERT:  Yes, I do.

10             THE COURT:  Thank you.

11             DIRECT EXAMINATION OF PATRICK HOLERT

12   BY MR. CHAPMAN:

13   Q    Mr. Holert, you've submitted to declarations in support

14   of Celsius' motion for a preliminary injunction, correct?

15   A    Correct.

16             MR. CHAPMAN:  Your Honor, permission to approach?

17             THE COURT:  Yes, go ahead.

18             MR. CHAPMAN:  For the record, Your Honor, I'm

19   removing a stack of exhibits that have been used with Mr.

20   Mashinsky that were left at the witness stand.

21             THE COURT:  Yes, that's fine.

22   BY MR. CHAPMAN:

23   Q    Mr. Holert, do you recognize the two documents,

24   Defendants -- I'm sorry Plaintiff Exhibits 53 and 60 as the

25   declarations you submitted in support of Celsius'

Page 95

1    preliminary injunction motion?

2    A    Yes, I do recognize them.

3    Q    And you understand that you submitted those documents

4    under penalty of perjury, correct?

5    A    Yes.

6    Q    And you reaffirm the truth of everything in those

7    documents today?

8    A    Yes.

9              MR. CHAPMAN:  Your Honor, Celsius would like to

10   tender both of Mr. Holert's written declarations in support

11   of Celsius' motion as his direct testimony in this matter.

12             MR. ROCHE:  Objection to certain parts of the

13   affidavit that were noted in the amended pretrial order on

14   the basis of hearsay.  Your Honor, if you would like, I can

15   read the paragraphs --

16             THE COURT:  The objections are overruled.  Do PX

17   53 and PX 60, are two Holert declarations are admitted into

18   evidence.

19             (Plaintiff's Exhibits 53 and 60 admitted into

20   evidence.)

21             THE COURT:  Go ahead.  Are you finished, Mr.

22   Chapman?

23             MR. CHAPMAN:  Yes, I'll turn the witness over for

24   cross-examination.

25             CROSS-EXAMINATION OF PATRICK HOLERT

Page 96

1   BY MR. ROCHE:

2   Q    Good morning, Mr. Holert.  My name is Kyle Roche and I

3   represent the defendants in this matter.  You submitted two

4   affidavits in connection with Celsius' motion for

5   preliminary injunction?

6   A    Correct.

7   Q    And in the second affidavit -- and do you have both of

8   those affidavits in front of you?

9   A    I do.

10  Q    I'd like to refer you to your second affidavit.  You

11  testified at Paragraph 5 that defendants returned far fewer

12  coins which would constitute a very significant loss.

13          MR. CHAPMAN:  Objection.  Can you read in the

14  whole statement?

15          MR. ROCHE:  I can.

16          THE COURT:  It's cross-examination.  Go ahead, Mr.

17  Roche.

18  BY MR. ROCHE:

19  Q    Okay.  You testified defendants returned far fewer

20  coins which would constitute a very significant loss?

21  A    Yes, that is my understanding.

22  Q    But Celsius' internal management attributed profit to

23  KeyFi's activities in 2020, did they not?

24  A    I haven't seen no records of profits that were

25  attributed to KeyFi's activities.

Page 97

1    Q    Prior to today, you've seen no documents that show

2    Celsius computed profits to KeyFi in 2020?

3    A    I have not seen anything.

4    Q    Okay.  I'd like to bring up Exhibit 34, DX-34, which

5    has previously been admitted to evidence.  And if Deanna, if

6    you can let Mr. Dan Stone present.

7            CLERK:  He is presenting.

8    BY MR. ROCHE:

9    Q    Mr. Holert, on the screen and let me know if you need

10   to zoom in, I'm showing you what's been previously marked as

11   Defendant's Exhibit 34.  If we could show the top of

12   plaintiff's, excuse me, Defendant's Exhibit 34 for the

13   witness.  Mr. Holert, let me know you recognize this

14   document.  If you need me to navigate it at all, I'm happy

15   to, but on the top it says Celsius Network Limited.  It was

16   produced to us by Celsius.  Just let me know if you

17   recognize this document or if you've seen any documents

18   similar to this.

19   A    I was -- I don't work in accounting.  I've not worked

20   in accounting.  I do not recall seeing this document.

21   Q    Have you reviewed any of Celsius general ledgers from

22   either 2020 or 2021?

23   A    I have not.

24   Q    Okay.  If we could -- I just want to ask you one

25   question about one line in this document and I understand

Page 98

1     you are unfamiliar with it.  If you could go to --

2               MR. HURLEY:  Objection, Your Honor.

3               MR. ROCHE:  Let me ask a question.

4               THE COURT:  He hasn't asked a question yet, Mr.

5     Hurley.  Ask your question.

6     BY MR. ROCHE:

7     Q    Yes.  Do you see the line saying "Accrued Expenses,

8     KeyFi Rev Sharing"?  Do you see that --

9               THE COURT:  You're on 63, is that correct?

10    BY MR. ROCHE:

11    Q    Line 63.

12    A    Okay, I see it.

13    Q    And Mr. Stone, Daniel Stone, can you please go over?

14    You see it says you see it says 10 percent accrual for KeyFi

15    profit share and it shows a number of 1.2 million?

16              THE COURT:  That's at Line 64?

17              MR. ROCHE:  Yes, Your Honor.

18    BY MR. ROCHE:

19    A    So what is, what is the date of this spreadsheet you're

20    showing me?

21    Q    Sure.  If you could scroll to the top.  It's dated

22    March to December 2020.

23    A    Okay.

24    Q    And I can -- this document was produced by Celsius.  If

25    you could scroll back down to Lines 63 and 64.  I just want

Page 99

1    to ask the witness one simple question.  Do you see the line

2    that again referring to 10 percent accrual for KeyFi revenue

3    share, and it says 1.2 million?

4    A    Yes.

5    Q    Do you have any reason to doubt the accuracy of this

6    document?

7              MR. HURLEY:  Objection.

8              THE COURT:  Overruled.

9    BY MR. ROCHE:

10   A    I don't know what that's based on.  It says 10 percent

11   accrual.  I don't know what 10 percent accrual means.  I

12   don't know what this number is based on.  I don't know what

13   this number is based on.

14   Q    Okay.  We can move on.  Mr. Stone, thank you.  If you

15   can please put the document down.  Mr. Holert, you're

16   familiar with the asset purchase agreement between Celsius

17   and KeyFi?

18   A    Yes.  I haven't read it in quite a long time, but yes.

19   Q    You helped negotiate it, correct?

20   A    No, I did not help negotiate it.

21   Q    Okay.

22   A    I helped clarify some things in it, but I did not

23   negotiate the terms.

24   Q    So you helped clarify some of the terms in the asset

25   purchase agreement?

1   A    Correct.

2   Q    Around the same time it was executed?

3   A    No.  It would have been -- I would have, I would have

4   started clarifying things a couple of couple of months

5   before it was executed, probably two or three months.

6   Q    Leading up to when it was executed?

7   A    Yeah.  Well it took some time to execute, but, yes, in

8   the, in the months before it was executed.

9   Q    Okay.  Now in your affidavit at Paragraph 6, you

10  testify that defendants specifically promised that in

11  connection with the investment activities, they would hedge

12  against risk from price movements in the coins defendants

13  deployed.  You testified to that?

14  A    I'm sorry, which document?

15          THE COURT:  The reply declaration, is that

16  correct?

17          MR. ROCHE:  I apologize, Your Honor.  Yes, that's

18  the reply declaration, Paragraph 6.

19          THE COURT:  So that's PX 60.

20  BY MR. ROCHE:

21  A    Sorry, repeat your question.

22  Q    In your affidavit, you testified that defendants

23  specifically promised that in connection with their

24  investment activities, they would hedge against risks from

25  price movements in the coins defendants deployed, correct?

Page 101

```
 1    A    In my conversations with Mr. Stone, he did say that

 2    they were engaging in hedging activities.

 3    Q    Okay.  But the asset purchase agreement doesn't place

 4    any requirement on defendants to hedge against the risk of

 5    price movements, does it?

 6    A    I haven't read this document in a long time.

 7    Q    But you were involved, you just testified that you were

 8    involved in clarifying certain terms in the document,

 9    correct?

10    A    Certain terms on performance calculations only.

11    Q    Okay.  And in your affidavit, you testified that

12    defendants promised they would hedge, but in the asset

13    purchase agreement that governed the party's relationship,

14    your testimony is -- let me strike that.  You don't know

15    sitting here today whether or not the asset purchase

16    agreement has any requirement on defendants to hedge against

17    the price movements of points?  Yes or no.

18    A    I haven't read it for some time so I don't recall.

19    Q    Okay.  Well if we can pull it up.  I believe it's

20    Plaintiff's Exhibit 40.  I know we've got a number of --

21    Your Honor, I don't know if the exhibits are already up

22    that.

23             THE COURT:  I have Plaintiff's Exhibit 40 in front

24    of me.

25             MR. ROCHE:  Okay.  Your Honor, may I approach the
```

Page 102

1    witness?

2           THE COURT:  Go ahead.

3    BY MR. ROCHE:

4    Q    Mr. Holert, do you recognize Plaintiff's Exhibit 40 as

5    the asset purchase agreement?

6    A    Well, I have to flip through it if you could give me a

7    minute.  Okay.

8    Q    Do you recognize this document as the asset purchase

9    agreement?

10   A    Yes.

11   Q    Can you point the Court to where in the asset purchase

12   agreement it specifies that it's defendants responsibility

13   to hedge against the risk of price movements?

14   A    Well this is, you know, a lengthy document.  I would

15   have to flip through it again more carefully.

16   Q    Sitting here today, do you recall  putting anything in

17   the asset purchase agreement relating to defendant's

18   responsibilities to hedge against the price movement of

19   certain coins?

20   A    Like I said, you know, this is a 33-page document and I

21   haven't looked at it for a couple of years.

22   Q    You submitted an affidavit in connection with this

23   motion, correct?

24   A    I did, but the affidavit does not, does not reference

25   the asset purchase agreement.  It references Mr. Stone's

1    conversations with me where he talked about hedging his

2    activities.

3    Q    And those conversations occurred before the asset

4    purchase agreement while he was managing Celsius' assets

5    before the asset purchase agreement, correct?

6    A    I have to think about that.  They definitely happened

7    after the asset purchase agreement was signed.

8    Q    Okay.  Are you aware, sitting here today, of any

9    agreement, written agreement, in which the defendants agreed

10   to hedge against the risk of price movements in coins that

11   they deployed?

12   A    I would have to read that purchase agreement again.

13   But at the moment, I don't recall any.

14   Q    At the moment, you don't recall any written agreement

15   where defendants agreed hedge against the price movement in

16   coins?

17   A    At the moment, I don't recall any.

18   Q    Mr. Holert, defendants, in fact, did supply you

19   information concerning their trading activities, correct?

20   A    Limited information.

21   Q    You're familiar with a program called DeBank?

22   A    I am.  DeBank does not provide a flow of activities.

23   It provides static positions on different platforms.

24   Q    It gives you a balance of the amount of assets in a

25   particular wallet, correct?

1   A     Correct.

2   Q     And you shared KeyFi's DeBank information to show

3   others at Celsius that "DeFi platforms -- to show others the

4   DeFi platforms that KeyFi was using, correct?

5   A     Correct.

6   Q     And Mr. Stone sent you the DeBank link that listed out

7   his DeFi positions, correct?

8   A     Correct.

9   Q     And the DeBank link he sent you was publicly available,

10  correct?

11  A     Yes, it's publicly available.

12  Q     Mr. Holert, you are not aware of any communications

13  from KeyFi or Mr. Stone in which they misrepresented the

14  positions they had taken in KeyFi, correct?

15  A     If you're talking about DeBank, DeBank does not

16  encompass all of KeyFi's activities.

17  Q     How much of KeyFi's activities does DeBank cover?

18  A     Offhand, I don't know.  I'm just guessing 80 percent.

19  Q     It could be more than 90 percent?

20  A     I would just be guessing.

21  Q     Okay.  And is -- are you -- you didn't assert in your

22  affidavit, any of your affidavits, that the 20 percent that

23  DeBank may have left off that there are any

24  misrepresentations about those transactions?  Did Mr. Stone

25  misrepresent any of the transactions that were unavailable

1    on DeBank?

2    A    Transactions are not available on DeBank.  It is

3    positions.

4    Q    Got it.  Mr. Stone didn't misrepresent any of the

5    positions that weren't available on DeBank, correct?

6    A    I do not know.

7    Q    Okay.  In your second affidavit, you referenced a

8    January 28th, 2021 meeting with Mr. Stone.

9    A    Okay.

10   Q    Do you recall referencing --

11           THE COURT:  Paragraph 6.

12   BY MR. ROCHE:

13   Q    Paragraph 6 of Exhibit 60?

14   A    Yes.

15   Q    You took notes of that meeting, correct?

16   A    Correct.

17   Q    You referenced those notes in your affidavit?

18   A    Correct.

19   Q    In that meeting, Mr. Mashinsky said that you should

20   always be booking profits in U.S. dollars?

21           MR. CHAPMAN:  Objection.

22           THE COURT:  Overruled.

23   BY MR. ROCHE:

24   Q    You can answer.

25   A    That that is what, that is what Jason said Mr.

Page 106

1    Mashinsky told him.  He told, Mr. Stone told me that Mr.

2    Mashinsky told him that he should book profits in

3    stablecoins.

4    Q    Did you check with Mr. -- and you're not refuting that

5    Mr. Mashinsky told him that, are you?  Are you refuting that

6    Mr. Mashinsky, in fact, told him that?

7    A    I accept,  I accept Mr. Stone's word.

8              THE COURT:  Let me ask you.  You check with Mr.

9    Mashinsky as to whether he told Mr. Stone?

10             MR. ROCHE:  That question is for you, Mr. Holert.

11             THE WITNESS:  I did not check with Mr. Mashinsky

12   that he said that with Mr. -- I did not confirm with Mr.

13   Mashinsky that he said that to Mr. Stone.

14   BY MR. ROCHE:

15   Q    And your notes reflect that Mr. Mashinsky stated that

16   Celsius KeyFi had made $30 million in profits?

17   A    No, that is not from -- that is from Mr. Stone.  That

18   was Mr. Stone's claim.  That is not Mr. Stone representing

19   something that Mr. Mashinsky said.

20   Q    One moment, Your Honor.  So it's your testimony that it

21   was Mr. Stone's misrepresent -- representation that it was

22   $30 million in profits, correct?

23   A    Yes.

24   Q    Did you check at the time with anybody to see whether

25   or not that information was accurate?

Page 107

```
 1    A     I did not.

 2               MR. ROCHE:  No further questions.

 3               THE COURT:  Redirect.

 4               REDIRECT EXAMINATION OF PATRICK HOLERT

 5    BY MR. CHAPMAN:

 6    Q     For the record, Dean Chapman, Akin Gump Strauss Hauer

 7    and Feld.  Mr. Holert, you were asked some questions about

 8    hedging defendants' DeFi investments, correct?

 9    A     Correct.

10    Q     Why was hedging defendants' DeFi investments important

11    to you?

12    A     Well, mainly to prevent substantial downsides from

13    investment activities.

14    Q     And who, in your view, was responsible for hedging?

15    A     Absolutely the KeyFi and Mr. Stone.

16    Q     Why do you say that?

17    A     The KeyFi activities were very complex and nobody had

18    any insight into what those activities were outside of

19    KeyFi.  We understood what platforms were being used, what

20    strategies were being used, but we did not have any ability

21    to follow transactions and day-to-day activities that were

22    being conducted.  Only KeyFi had that ability to monitor

23    day-to-day activities and movements of coins within

24    platforms and across platforms.  Just looking at balances,

25    we have no idea what kind of transactions led to those
```

Page 108

1    balances.

2    Q    Can you elaborate on the conversations you had with Mr.

3    Stone with respect to responsibility for hedging defendants'

4    DeFi investments?

5    A    Mr. Stone represented that they were conducting risk

6    management.  He told me that he had an employee of KeyFi,

7    John Siena, who was responsible for risk management.  We did

8    have some calls with Mr. Stone and Mr. Siena and where they

9    were addressing their risk management activities.  Mr. Stone

10   told me he was hedging Ethereum movements on the dYdX

11   platform.  And so very much we understood that KeyFi was

12   hedging their activities.  And also on the profit

13   calculations that we had laid out, KeyFi would have a

14   negative incentive for losses.  So we had, we had a loss

15   carry forward.  So they very much had an incentive to hedge

16   their activities.

17   Q    You mentioned Mr. John Siena, is that right?

18   A    Yes.

19   Q    And who did you say he was?

20   A    He was an employee of KeyFi.

21   Q    And you had conversations with him; is that correct?

22   A    We did have a couple of meetings where we had risk

23   management meetings with Jason and Jason included John in

24   some of those meetings.

25   Q    Do you recall when those meetings took place?

Page 109

1   A   They would be in the first quarter of 2021.

2   Q   Do you have an understanding from those meetings of

3   what Mr. Siena was doing with respect to hedging defendants'

4   DeFi investments?

5   A   Not all of them, not all of their hedging activities.

6   Some of the hedging activities would be setting bans on some

7   of the platforms.  So basically stop losses.  You would, you

8   would stop out positions at certain levels and they, you

9   know -- and this specifically referenced the dYdX platform

10  as a hedging platform that he used.

11  Q   And you recall when that was?

12  A   Well definitely in our meetings, in our personal

13  meetings during January of 2021.

14  Q   You testified to notes you took after January 28th,

15  2021, meeting, is that right?

16  A   Correct.

17  Q   And where did that meeting take place?

18  A   It took place at Mr. Stone's residence at the time in

19  Puerto Rico.

20  Q   And why were you in Puerto Rico meeting with Mr. Stone

21  at that time?

22  A   I was meeting with Mr. Stone because Celsius had

23  concerns about Mr. Stone's activities and we wanted to draw

24  some of the coins back in and there were concerns that he

25  would not return coins to Celsius.

1    Q    Mr. Holert, you were asked questions about the

2    calculation of profit share on cross-examination.  Right?

3    Is that correct?

4    A    Yes.

5    Q    What evidence have defendants ever provided to you

6    regarding the amount of the alleged profit share?

7    A    Personally, I have not seen anything to indicate there

8    have been any profits.

9    Q    Do you believe that defendants activities did in fact

10   generate any profits?

11            MR. ROCHE:  Objection, relevance.

12            THE COURT:  Overruled.

13   BY MR. CHAPMAN:

14   A    Collectively, I do not believe they resulted in

15   profits.

16   Q    What's the basis of that belief?

17   A    We -- at Celsius, we had weekly risk committee meetings

18   over the first quarter of 2021.  I led those risk committee

19   meetings much of the time during those meetings were

20   discussing KeyFi's activities and the Celsius concerns over

21   those activities and what was being done.  We also never,

22   you know, Mr. Stone had claimed for many months that he was

23   working on a system that would make his activities more

24   transparent, keep track of transactions, and report on

25   results.  That that program is called Wormhole.  And in, you

Page 111

1    know, weekly meetings or more frequently with Mr. Stone, we

2    would ask about the status of that program.  We were

3    repeatedly told it was close to being delivered and, to my

4    knowledge, it was never delivered.  I never saw any evidence

5    that it was delivered.  And so without having an internal

6    program from KeyFi to monitor transactions, monitor

7    activities, monitor results, it was not possible to do it

8    from outside of KeyFi.

9    Q    You were asked questions though about an application

10   called DeBank on cross-examination, right?

11   A    Correct.

12   Q    Is it your testimony that DeBank could not have been

13   used to track defendants' DeFi deployments?

14   A    DeBank can show balances only.  We cannot monitor where

15   coins are coming from, where they're going, how they're

16   being used on different platforms.  There's no way you can,

17   you can just look at balances and know what's behind the

18   balances.  There's no way to monitor the trading activities.

19   Q    You were asked questions with respect to your role in

20   negotiating the asset purchase agreement.  Is that correct?

21   Strike the question.  You testified on cross-examination you

22   had a role in connection with clarifying certain terms of

23   the APA.  Is that correct?

24   A    Correct.

25   Q    What terms?

Page 112

```
 1   A     It was the profit calculations.

 2   Q     And what is your view as to how profit was to be

 3   calculated?

 4   A     Profit is based on coins.  So if we gave a certain

 5   number of -- if we sent a certain number of coins to KeyFi,

 6   we would need to receive more coins back from KeyFi.  So if

 7   we, if we, for instance, transferred 100 coins of a certain

 8   type of KeyFi, we would need to receive more than 100 back.

 9   And the difference would be the profits.

10   Q     And are you draw -- was your answer complete?

11   A     And we specifically designed it as a function of coins

12   because we did not want KeyFi to just collect profits from

13   appreciation of coins.  And so if we deployed 100 coins to

14   KeyFi and they did nothing with them and just sat on them

15   and those coins appreciated in terms of U.S. dollars, we

16   should not be paying a profit share on that.  So we, we set

17   out the profits to be a function of the number of coins

18   generated in profits by KeyFi.

19   Q     Understood.  Mr. Holert, I'd like to read you a few

20   questions and answers from Mr. Jason Stone's deposition and

21   ask you a couple of questions about the exchange.

22             MR. ROCHE:  Objection.

23             THE COURT:  Overruled.  Go ahead.

24             MR. CHAPMAN:  Okay, thank you.

25   BY MR. CHAPMAN:
```

Page 113

1   Q    And so the counsel can follow along, I'm going to read

2   first from Page 53 of Mr. Jason Stone's deposition and Mr.

3   Hurley from Akin Gump is doing the questioning.

4            MR. ROCHE:  Could you give us a second just to

5   pull the deposition transcript up, Your Honor.

6            THE COURT:  Yes, go ahead.  Pull it up.

7            MR. HURLEY:  And actually while we have a break,

8   I'm informed that perhaps the Court has not reopened the

9   listen only line for the hearing.

10           CLERK:  I think that's right.  Unless they have a

11   problem listening.

12           MR. HURLEY:  We have some folks trying to listen

13   that have not been able to since --

14           THE COURT:  Deanna, are you able -- is the

15   listening line open?

16           CLERK:  Deanna stepped away, Judge.  This is

17   Jessica.  I'm able to hear everything.

18           THE COURT:  Okay.

19           CLERK:  You have one party in the waiting room but

20   they're not registered.

21           THE COURT:  That's fine.  Thank you very much,

22   Jessica.

23           CLERK:  You're welcome.

24           THE COURT:  Mr. Roche, let us know when you have

25   the deposition open.

Page 114

1          MR. ROCHE:  It's getting sent to me right now.

2     I'm fine with plaintiff's counsel resuming.

3          THE COURT:  Go ahead.

4     BY MR. CHAPMAN:

5     Q    Okay.  And I'm on Page 53 of the transcript, Line 4.

6     And again, this is Mr. Hurley from Akin Gump asking the

7     question.  "Anyone other than Harumi or Connor that you

8     believe witnessed any of these Mashinsky authorizations to

9     you to take properties advances on profit share?  Answer: I

10    believe Patrick Holert was present at certain times and I

11    believe Roni Pavon may have been present one or two times,

12    but I can't recall."  Mr. Holert, did you ever witness Mr.

13    Mashinsky authorized Mr. Stone to take an advance on profit

14    share?

15    A    No, I did not.

16    Q    Do you remember anything on that topic?

17    A    No.

18    Q    The transcript continues immediately from there on Page

19    53 at Line 12.  "Question: So you think Patrick Holert may

20    have been present in a conversation where Alex Mashinsky

21    authorized you to take property as an advance on profit

22    share for services rendered by KeyFi?"  There is an

23    objection and it continues.  "Answer: I would characterize

24    it as Patrick Holert was present during discussions in which

25    Alex and I openly talked about the fact that I had been and

1    was continuing to take small amounts of money that would be

2    debited against our profit share, a/k/a, yes, taking early

3    advances on profit share."  Mr. Holert, were you, in fact,

4    ever present for such conversations?

5    A    No.

6    Q    Do you have any recollection of such conversations?

7    A    No.

8    Q    I'd like to jump forward to Page 75 of the transcript.

9    Let me know when you're there.

10   A    Go ahead.

11   Q    Line 24, questioning continues.  "Question" -- and

12   again, question to Mr. Stone" -- Can you identify any

13   written communication in which anyone at Celsius ever told

14   you Celsius was hedging against impermanent loss from

15   Celsius KeyFi activities?  Answer: I can't identify a

16   specific document at this time.  Question: Do you have

17   reason to believe that such a document exists?  Answer: Yes,

18   absolutely.  Question: In what form?  Answer: Probably an

19   email or WhatsApp message.  Question:  Who it Celsius gave

20   the assurances you are referring to?  Just names, that's all

21   I'm looking for.  Answer: Patrick Holert primarily and then

22   I believe at different points in time, Alex Mashinsky

23   himself.  Connor Nolan made mentions of hedging, Waseem

24   Shabout.  I'm not sure if anyone else."  Okay, Mr. Holert,

25   are you aware of any communications, written or otherwise,

Page 116

1    in which you told Mr. Stone, Celsius was hedging against

2    impermanent loss from Celsius KeyFi activities?

3    A    No.

4    Q    The transcript continues from that point at Page 76,

5    Line 23.  "Question: I just want to be clear.  I'm not even

6    talking about people that made mention of hedging.  I'm

7    talking about people that you're saying assured you that

8    Celsius was hedging the activities that KeyFi and Celsius

9    KeyFi were undertaking with Celsius coins.  Answer:  That

10   would be specifically Patrick Holert, Alex Mashinsky, Harumi

11   Urata-Thompson and I believe Waseem Shabout."  Mr. Holert,

12   did you ever assure Mr. Stone that Celsius was hedging the

13   activities that KeyFi and Celsius KeyFi were undertaking

14   with Celsius coins?

15   A    No, absolutely not.

16   Q    You believe that was defendant's responsibility, right?

17   A    Absolutely.

18           MR. CHAPMAN:  I have nothing further.

19           THE COURT:  All right.  I have a few questions,

20   Mr. Holert and then if you have further questions, I'll

21   allow you to do that.

22           Mr. Holert, do you have your reply declaration in

23   front of you?

24           THE WITNESS:  Yes.

25           THE COURT:  I have questions about Paragraph 6.

Page 117

1              THE WITNESS:  Sorry, which document?

2              THE COURT:  The reply declaration dated --

3              THE WITNESS:  Oh, 60?

4              THE COURT:  December 1, yeah, 60.

5              THE WITNESS:  Okay, yes.

6              THE COURT:  And specifically, my questions are in

7    Paragraph 6.

8              THE WITNESS:  Okay.

9              THE COURT:  The third sentence says "Defendants

10   specifically promised that in connection with their

11   investment activities, they would hedge against risks and

12   price movements in the coins defendants deployed."  So when

13   you say "Defendants specifically promised," give me the

14   names of the people who actually -- who you say promised

15   that?

16             THE WITNESS:  Yeah.  Well Mr. Stone told us that

17   they had risk management activities and they were employing

18   hedging strategies and he identified one of his employees as

19   being involved in in those risk management activities.

20             THE COURT:  Who did he identify?

21             THE WITNESS:  He said John Siena was focused on

22   risk management activities and he was a KeyFi employee.

23             THE COURT:  Was Mr. Siena present in any of your

24   conversations with Mr. Stone about hedging?

25             THE WITNESS:  Oh, yes, we did have meetings

Page 118

1    together where he was present.

2             THE COURT:  And did either -- in the meetings when

3    Mr. Siena was present, did Mr. Stone or Mr. Siena make any

4    statements that KeyFi was hedging?

5             THE WITNESS:  They did describe hedging

6    activities.

7             THE COURT:  Well, I want to separate out.  You say

8    they.  I want to be clear on -- Did Mr. Siena say that they

9    were hedging?

10            THE WITNESS:  You know, I don't recall what he, I

11   don't recall that.  But we did have meetings where, where he

12   was present to talk about risk management and those, those

13   conversations did include hedging.

14            THE COURT:  Tell me again that same sentence,

15   defendants specifically promised that in connection with our

16   investment activities they would hedge risks, on how many

17   occasions did Mr. Stone make statements to you or in your

18   presence that KeyFi --

19            THE WITNESS:  I'm sorry, that they were hedging?

20            THE COURT:  Yes.

21            THE WITNESS:  Okay.  How many?

22            THE COURT:  Yes.  Was it once, more than once?

23            THE WITNESS:  Definitely more than once.  More

24   than, yeah, you know, more than two, three, you know.

25            THE COURT:  How often were you meeting with Mr.

```
 1    Stone?  I got a sense that you're having weekly meetings?

 2              THE WITNESS:  We had, we had weekly meetings

 3    scheduled to discuss risk and how KeyFi was managing risk

 4    for its activities.  And I can't say they happened

 5    regularly.  Well they were scheduled weekly but say they

 6    happened probably 75 percent of the time.  And so there were

 7    regularly scheduled meetings for every week for months where

 8    Mr. Stone would talk about his activities and these were on

 9    the calendar as risk meetings to discuss the KeyFi

10    activities and how Mr. Stone was addressing risk.

11              THE COURT:  Let me ask you a question.  Again in

12    Paragraph 6, the sentence for instance in an email on

13    October 18th, 2020, Stone assured Celsius personnel that

14    defendant would not would -- "would not open ourselves up in

15    impermanent loss" in connection with investing Celsius'

16    coins.  You say Stone assured Celsius personnel.  Who

17    received those assurances?  You were you were present?

18    Well, this was an email.  To whom was that email sent?

19              THE WITNESS:  I'm not sure who was on it.

20              THE COURT:  Mr. Chapman, is that email marked in

21    evidence?

22              THE WITNESS:  I don't have it in front of me.

23              THE COURT:  Mr. Chapman.  Is that an email that's

24    in evidence?

25              MR. CHAPMAN:  The email is not in evidence.  I'm
```

1    happy to offer it to refresh the witness's recollection if

2    Your Honor desires.

3              THE COURT:  No, I'll leave it to others to do.

4    What is impermanent loss?

5              THE WITNESS:  Yeah, so impermanent loss refers to,

6    it refers to investment activities using automated market-

7    making systems where two different coins are put up as

8    pairs.  So for instance, you could have a pair for Bitcoin

9    and Ethereum and so people can go on to the system and make

10   exchanges on the system.  And impermanent loss occurs when

11   there's excess demand for one of those coins and it drives

12   up the price relative to the other.  And so people that have

13   put up pairs of coins could realize a loss from a change in

14   the relative percentage of coins in -- on the system.  So

15   for instance, if you had two coins that were say of the same

16   value and you had 50 percent of Coin A and 50 percent Coin

17   B, if there was excess demand for Coin A and it drove up the

18   price of Coin A and the relative value of Coin A, as part of

19   the whole became 60 percent, increased from 50 to 60

20   percent, that would drive down the relative value of Coin B

21   to 40 percent.  And the investors who contributed coins at

22   the equal weighting of 50:50 could incur a loss from that

23   price movement.

24             THE COURT:  How would you hedge against that risk?

25             THE WITNESS:  One way to hedge would be to set

Page 121

1   bans.  So if, for instance, there was a relative movement of

2   5 percent, then you would liquidate your positions.  You

3   know that's a simple strategy.  But other than that, I don't

4   know any other strategies for hedging that.

5              THE COURT:  All right.  Mr. Roche, do you have any

6   other questions?

7              MR. ROCHE:  Just two brief questions, Your Honor.

8              THE COURT:  Go ahead.

9   BY MR. ROCHE:

10  Q    Mr. Holert, so I just want to understand your

11  testimony.  You testified that in 2020 and 2021, you,

12  Celsius, didn't have the ability to track positions in DeFi?

13  A    I think your question is a bit misleading.  So you're

14  talking about --

15  Q    Did you, did you -- my apologies, go ahead.

16  A    I said we did not have the ability to track all

17  transactions that KeyFi was doing.

18  Q    Did you have the ability to manage risk in DeFi in

19  2020?

20             MR. CHAPMAN:  Objection.

21             THE COURT:  Overruled.

22  BY MR. ROCHE:

23  A    When you're talking about managing risk, there's a

24  difference between managing risk on activities that you know

25  about and can follow and another issue of managing risk on

Page 122

1    someone else's activities that you don't know what their

2    transactions and what those activities are.  So Celsius also

3    deployed certain DeFi strategies on its own and our risk

4    mitigation was to set basically bans that we would sell

5    that.  But if you're talking about KeyFi, we could not

6    manage risk on KeyFi's activities because we did not know

7    what those activities were.  We knew what platforms were

8    being used but we did not know the transactions that were

9    being conducted on those platforms.

10   Q    You knew, and I want to understand things, so you're

11   saying Celsius managed risk on its own DeFi positions in

12   2020, correct?

13   A    On activities where we --

14   Q    It's yes or no.

15        THE COURT:  Excuse, Mr. Roche, don't interrupt the

16   witness.

17        MR. ROCHE:  Apologies.

18        THE COURT:  That was not a question that called

19   for yes or no answer.  Go ahead.

20   BY MR. ROCHE:

21   A    So on activities where we were principally engaged and

22   engaging in the transactions, we had simple risk mitigation

23   strategies of just simply liquidating when prices moved a

24   certain amount.

25   Q    And you were able to track, at least with respect to

Page 123

1    some of the positions, I think you said about 80 percent,

2    through DeBank, the positions KeyFi was taking.  My question

3    is did you ever ask Mr. Stone or anyone else at KeyFi

4    whether or not they had similar stop losses in place to

5    manage risk on those positions?

6    A    Mr. -- we did, I did discuss that and that was

7    something that Mr. Stone represented he was doing.  But, you

8    know, I didn't know, you know, it is impossible for us to

9    follow every single transaction that was being conducted on

10   the KeyFi side.

11            MR. ROCHE:  No further questions, Your Honor.

12            THE COURT:  Thank you, very much.  Mr. Chapman,

13   any last questions?

14            MR. CHAPMAN:  Nothing further, Judge.

15            THE COURT:  All right.  You're excused.  Thank you

16   very much.  Does the plaintiff rest?

17            MR. CHAPMAN:  Yes.

18            THE COURT:  All right, we're going to take our

19   lunch break.  It's now 11:21.  Let me ask you all, how long

20   do you want for lunch?  I'll give you up to an hour and a

21   half.  If you want to do shorter, we'll do shorter.

22            MR. CHAPMAN:  Shorter.

23            MR. ROCHE:  Short.

24            MR. HURLEY:  An hour is good for us.

25            THE COURT:  Erin, is that okay with you?

Page 124

```
 1              CLERK:  Yes.

 2              THE COURT:  All right, so we'll resume at 1:20.

 3     Okay.  Thank you very much.

 4              CLERK:  If the parties that are on Zoom could stay

 5     connected and just, you know, mute their line, that way I

 6     don't have to readmit them.  Thank you.

 7              (Off the record.)

 8              CLERK: All right.  It's started.

 9              THE COURT:  All right, good afternoon.  Can

10     everyone in the courtroom.  Hear me?

11              CLERK:  Yes.

12              THE COURT:  All right.  So Mr. Nolan is in the

13     witness box.  Karen, would you swear in the witness?

14              CLERK:  Please raise your right hand.  Do you

15     solemnly swear or affirm that the testimony you're about to

16     give before this court is the truth, the whole truth, and

17     nothing but the truth?

18              MR. NOLAN:  I do.

19              CLERK:  Just speak into the --

20              MR. NOLAN:  I do.

21              THE COURT:  Go ahead.

22              CROSS-EXAMINATION OF CONNOR NOLAN

23     BY MR. ROCHE:

24     Q    Good afternoon, Mr. Nolan.

25     A    Good afternoon.
```

Page 125

```
 1   Q    My name is Kyle Roche and I represent the defendants in

 2   this case.  I took your deposition on December 20th, 2022.

 3   Do you recall that deposition?

 4   A    Yes, I do.

 5   Q    Is there anything that would impair your ability to

 6   tell the truth today?

 7   A    No.

 8   Q    Have you discussed the testimony that has occurred this

 9   morning in the courtroom with anybody?

10   A    No.

11   Q    And you are the head of institutional lending at

12   Celsius?

13   A    Yes.

14   Q    In going forward, I'll -- if I use the term Celsius,

15   I'm referring to Celsius Network Limited.  That is the

16   entity you are employed at, correct?

17   A    Yes.

18         THE COURT:  Are you still employed by Celsius, Mr.

19   Nolan?

20         THE WITNESS:  Yes, I am.

21         THE COURT:  All right.  Go ahead, Mr. Roche.

22   BY MR. ROCHE:

23   Q    You began working at Celsius in March 2020?

24   A    Yes, that's correct.

25   Q    Your previous role at Celsius was head of coin
```

Page 126

1    deployment?

2    A    Yes, that was one of my previous roles.

3    Q    As head of coin deployment.  You reported to Harumi

4    Urata-Thompson?

5    A    Yes.

6    Q    Miss Thompson was Celsius' former CFO?

7    A    Yes.

8    Q    As head of coin deployment, you were involved with

9    Celsius DeFi activities?

10   A    Yes

11   Q    In this role, you managed DeFi deployments as well as

12   the movement of coins when it regarded the allocation

13   Celsius made in other DeFi deployments, correct?

14   A    Yes, I was involved in the movement of coins to the

15   other deployments.

16   Q    DeFi deployments?

17   A    Yes.

18   Q    Celsius deployed coins into DeFi through third parties,

19   correct.

20   A    Yes, that's correct.

21   Q    Celsius also deployed funds into DeFi itself, correct?

22   A    Yes, that's correct.

23   Q    And the funds that were deploying into DeFi were

24   customer deposits?

25   A    Yes, I would believe so.

Page 127

1    Q    I want to discuss your involvement with the defendants

2    in this case.  You met Jason Stone in late summer, early

3    fall of 2020?

4    A    Yes, I did.

5    Q    Most of your interactions with Mr. Stone revolved

6    around DeFi deployments?

7    A    Yes, that's correct.

8    Q    You are the individual who sent Celsius coins to Stone

9    and KeyFi for deployment?

10   A    Yes, I was one of the individuals.  I'm not sure if

11   there were others.

12   Q    You discussed with Mr. Stone strategies around coin

13   deployment into DeFi?

14   A    Yes, I did.

15   Q    You are aware that at some point in time, Celsius and

16   KeyFi entered into an agreement?

17   A    Yes.

18   Q    You are aware of that as part of that agreement, there

19   was a profit share between Celsius -- between Celsius and

20   KeyFi as part of the agreement?

21   A    Yes, I was told that there was a profit share

22   agreement.

23   Q    Miss Thompson, the CFO of Celsius oversaw Celsius'

24   deployment of coins into DeFi?

25   A    Yes, that's correct.

Page 128

1 Q Mr. Mashinsky was also involved in the deployment of

2 coins through KeyFi?

3 A Yes.

4 Q Mr. Mashinsky had knowledge of the coins being deployed

5 through KeyFi?

6 A I'm sorry, can you repeat that?

7 Q Yes, Mr. Mashinsky had knowledge of the coins being

8 deployed by Celsius through KeyFi?

9 A Yes, that I'm aware of.

10 Q Mr. Mashinsky was involved with meetings were

11 deployment strategies and coin allocations through KeyFi

12 were discussed?

13 A Yes.

14 Q Now I believe you just testified Celsius also deployed

15 coins into DeFi without using a third party.

16 A Yes.

17 Q In 2020, you were deploying Celsius coins yourself

18 directly into DeFi?

19 A Yes, I was one of the people that deployed.  Yes.

20 Q Who are the others?

21 A I believe in 2020 that I can recall, Assaf Aram, who

22 worked on the trading team, and I can't recall any others at

23 this time.

24 Q Mr. Mashinsky was involved in the discussions

25 surrounding your deployment of funds into DeFi?

Page 129

```
 1    A     Yes, he was.

 2    Q     You had weekly meetings where you discussed deployment

 3    strategies with Mashinsky?

 4    A     Yes.

 5    Q     Celsius had weekly meetings that were internal to

 6    Celsius and a weekly meeting with KeyFi team regarding

 7    deployments, correct?

 8    A     Yes.

 9    Q     There were two different, one internal, one with KeyFi?

10    A     Correct, as best as I can recall.

11    Q     At the weekly internal meetings, Miss Thompson, the

12    CFO, was present?

13    A     Yes, I believe so.

14    Q     At the weekly internal meetings, Patrick Holert was

15    present?

16    A     I believe so, but I can't recall exactly.

17    Q     You believe Patrick Holert was present at the weekly

18    meetings with KeyFi?

19    A     I believe so, but I don't remember exactly.

20    Q     What exactly what's -- can I ask why don't you recall

21    exactly?

22    A     I just can't remember offhand an exact situation but I

23    believe that he was one of the invites on that meeting.

24    Q     Okay, I want to focus on just the weekly meetings

25    between Celsius and KeyFi.  So not the internal ones for
```

Page 130

```
 1    now.  You regularly attended those meetings?

 2    A    Yes.

 3    Q    So did Mr. Stone?

 4    A    Yes.

 5    Q    Mr. Mashinsky?

 6    A    I believe so.  Yes.

 7    Q    Miss Thompson?

 8    A    Yes.

 9    Q    You spoke with Mr. Stone about KeyFi's profit share

10    prior to him leaving KeyFi, correct?

11    A    Yes, I did.

12    Q    Now in your role as the head of coin deployment, I want

13    to discuss how coins were sent by Celsius to KeyFi.  There

14    were times KeyFi and Mr. Stone would send you requests to

15    deploy funds, correct?

16    A    Yes, they would send requests for funds to be sent to

17    KeyFi.

18    Q    The usual process for that was -- to send KeyFi coins,

19    was for you to get approval from Celsius CFO, Miss Thompson?

20    A    Either direct approval or if it fell within the

21    parameters of what I understood for Celsius to be able to

22    send to KeyFi, then, yes, it could be some.

23    Q    And so okay.  So there was a credit line that KeyFi

24    had?

25    A    Yes.
```

1    Q    Mr. Patrick Holert approved the credit line to KeyFi?

2    A    If I recall correctly, I believe so.

3    Q    And you believe that credit line was over $50 million?

4    A    Yes, I believe so.

5    Q    Was it over $100 million?

6    A    I believe so, but I can't recall the exact figure of

7    the credit line.

8    Q    Was it over $200 million?

9    A    Again, I can't recall the exact figure.  But I know it

10   varied over time so I can't recall exactly.

11   Q    You recall it was over at least 100 million but you

12   don't recall the exact number?

13   A    Yes.

14   Q    If I use the term OXB-1 address, will you know what I

15   am referring to?

16   A    Yes, I will.

17   Q    That is the address most of the coins that Celsius

18   deployed to KeyFi were deployed through, correct?

19   A    I believe so.

20   Q    You deployed a variety of coins to KeyFi, correct?

21   A    Yes.

22   Q    You deployed wrapped Bitcoin to KeyFi?

23   A    Yes.

24   Q    And that's an Ethereum based version of Bitcoin,

25   correct.

Page 132

1   A    Yes, in premise, yes.

2   Q    It represents Bitcoin?

3   A    I don't know if I would use the term "represents," but

4   in deployment capabilities, it's used as a -- Celsius used

5   it as a deployment of Bitcoin.

6   Q    Okay.  You deployed Ethereum to KeyFi?

7   A    Yes.

8   Q    You deployed stablecoins to KeyFi?

9   A    Yes.

10  Q    And all of those assets came from customer deposits?

11  A    I don't know if all of them, but I believe some of them

12  were from customer deposits.

13  Q    Most of them?

14  A    I would believe so.

15  Q    The vast majority of them?

16  A    I would believe so.

17  Q    In 2020, you understood that KeyFi's activities in DeFi

18  were profitable?

19  A    Yes, that was my understanding at the time.

20  Q    Mr. Stone told you that KeyFi's activities were

21  profitable?

22  A    Yes.

23  Q    Mr. Mashinsky told you that KeyFi's activities were

24  profitable?

25  A    I believe so.

1    Q    Miss Thompson told you that KeyFi's activities were

2    profitable?

3    A    I can't recall exactly, but I believe that it was

4    discussed.  Yes.

5    Q    Miss Thompson was the CFO of Celsius?

6    A    Yes.

7    Q    In 2021, Mr. Mashinsky also told you that KeyFi's

8    activities were profitable?

9    A    I can't recall exact dates in time I was told, but I

10   would believe so.

11   Q    In 2021, Miss Thompson also told you that KeyFi's

12   activities were profitable?

13   A    I would say the same.  I don't know exact point in

14   time, but I would think that it was discussed.

15   Q    These discussions concerning KeyFi's profitability

16   happened at the KeyFi weekly meetings?

17   A    That was one avenue where it was discussed, I believe.

18   Q    Where were the other avenues?

19   A    Either on other calls or in Slack or other

20   communications, email.  I'm not sure.

21   Q    KeyFi's profitability was frequently discussed

22   throughout the time that Celsius deployed coins through

23   KeyFi?

24   A    Because the belief was that it was profitable at the

25   time.

Page 134

1   Q    Okay.  Your Honor.  I don't remember earlier if you

2   admitted into evidence, Defendant's Exhibit 3, 4 and 5.

3              THE COURT:  I believe so.

4              MR. ROCHE:  We haven't marked them.

5              THE COURT:  Mr. Hurley, do you agree?  I don't

6   have my list in front of me.

7              MR. HURLEY:  I don't think we did.

8              THE COURT:  Hold on.  Just give me a second.

9   Which exhibits, Mr. Roche?

10             MR. ROCHE:  Exhibit 3, 4, and 5.

11             THE COURT:  Okay.  There were no objections.

12  Everything -- let me just look through this, okay.  So

13  Defendant's Exhibit 1 through 23 are all admitted in

14  evidence.  I overruled the objections to those exhibits as

15  to which there were objections.  What I didn't rule on yet

16  was Exhibit 24, 30.  On 31, the objection was overruled and

17  it was admitted.  The objection to 32 was sustained and the

18  objection to 33 was overruled.  It was admitted but not for

19  the matter asserted.

20             MR. ROCHE:  That matches I think what we have as

21  well, Your Honor.  Thank you.

22  BY MR. ROCHE:

23  Q    Mr. Nolan before, you testified earlier that Mr.

24  Mashinsky  told you that KeyFi's activities were profitable?

25  A    Yes.

Page 135

1    Q    Mr. Mashinsky told you that KeyFi's activities were the

2    most profitable trading strategy?

3    A    I don't recall if he said that it was the most

4    profitable.

5    Q    It was very profitable?

6    A    I believe he referred to it as profitable.  I don't

7    know to what extent.

8    Q    Okay  I'm going to hand you exhibit -- it's been marked

9    as Defendant's Exhibit 3.

10   A    Thank you.

11   Q    Mr. Nolan, do you recognize this document?

12   A    Yes.

13   Q    What is this document?

14   A    I Believe it's a Slack communication between myself and

15   Harumi Urata-Thompson.

16   Q    The CFO of Celsius?

17   A    Yes.

18   Q    I want to go to the bottom of the first page.  Harumi

19   Urata-Thompson says -- and I'm looking at the message sent

20   on 2021 0107 at 1:40:17.  Do you see where I'm looking?

21   A    Yes, I believe so.

22   Q    Miss Thompson says "As a starter, I was never keen on

23   moving forward with KeyFi and it is these idiots who forced

24   me, no matter what kind of alarming discoveries I convey to

25   them, how many times do they do this kind of thing?"  And

1    the next line, Mr. Nolan you respond, the very next message,

2    "I disagree with not moving forward with KeyFi, but it's not

3    my call."  Do you see that line?

4    A    Yes, I do.

5    Q    You wanted to move forward with KeyFi because at this

6    time you believed KeyFi was highly profitable?

7    A    Yes.  At this point in time, I thought KeyFi was

8    profitable.

9    Q    And that understanding was based on conversations you

10   had with Mr. Mashinsky?

11   A    Conversations I had with Mr. Stone as well as things

12   that Mr. Mashinsky had communicated.

13   Q    Did Mr. Mashinsky ever pressure you to work with KeyFi?

14   A    Yes.

15   Q    He would pressure you to do more deployments through

16   KeyFi?

17   A    Yes, he often made it known that he thought that more

18   deployments should be allocated to KeyFi.

19   Q    And he pressured you to do that?

20   A    Actually, I don't know if I would use the term

21   "pressured," but it was strongly conveyed.

22   Q    Okay.  Would it surprise you if you said at your

23   deposition that he pressured you to work with KeyFi?

24   A    No, it wouldn't surprise me.

25   Q    You understood from Mr. Mashinsky that KeyFi was the

Page 137

1    most profitable trading strategy at Celsius?

2    A    Again, I'm not sure if it was most profitable but I

3    believe it was communicated as profitable.

4    Q    Do you remember testifying to something different at

5    your deposition?

6    A    No, I don't recall.

7                MR. ROCHE:  Your Honor, may I approach the witness

8    and hand him a copy of his December 20th, 2022 deposition?

9                THE COURT:  Yes.

10               MR. ROCHE:  And I have that marked.  Okay.  Do you

11   have a copy, Your Honor?

12               THE COURT:  No.

13               MR. ROCHE:  I believe it was sent to your chambers

14   under the impeachment exhibits at DX 55.

15               THE COURT:  All right.  Just give me a second and

16   I'll get it.  I have them on my computer.

17               THE WITNESS:  Thank you.

18               MAN 1: I'd like to note before we start again,

19   it's maybe a glitch with the (indiscernible).

20               MR. ROCHE:  Your Honor, would you like us to email

21   it to you?

22               CLERK:  Judge?  I think you're muted.  Let me --

23   I'm asking you to unmute.

24               THE COURT:  All right.  I'm unmuted now.  I'm

25   sorry.  My line was muted and I couldn't, it wouldn't

Page 138

1    unmute.  I have it open in front of me.  Go ahead, Mr.

2    Roche.

3    BY MR. ROCHE:

4    Q    Mr. Nolan, you have in front of you a copy of your

5    December 20th, 2022 deposition.  I'm going to you to turn to

6    Page 100.

7    A    Yes.  One moment.

8    Q    It's Page 26 of the pdf.  It's four pages per --

9    A    Got it. I have it open.

10   Q    And I want to direct your attention to Lines 24 through

11   17.  You state -- I asked you: "Were there any other

12   profitable trading strategies that Celsius was involved in

13   in 2020?  Your answer: Yes, if I recall correctly.  I asked

14   you:  Was it your understanding that KeyFi was the most

15   profitable?  Answer:  I don't recall?  Is it possible that

16   was your understanding that KeyFi was the most profitable?

17   Answer: From the information shared by Jason, yes.  What

18   about the information shared by Mr. Mashinsky?  It often

19   mirrored the same information."  Does that reflect your

20   information on whether or not Mr. Mashinsky told you that

21   KeyFi was the most profitable trading strategy at Celsius?

22   A    I don't think anything I said there's relates to most

23   profitable.  I don't recall it being discussed as most

24   profitable.

25   Q    Okay.  You can move on.  You can set that aside for

1     now.

2     A     Thank you.

3     Q     Mr. Mashinsky -- Mr. Mashinsky would bad mouth other

4     Celsius employees to prop up Mr. Stone?

5     A     Sorry, can you repeat that?

6     Q     Would Mr. Mashinsky bad mouth other employees to prop

7     up Mr. Stone?

8     A     Sometimes, yes.

9     Q     Okay.  I want to hand you what's been previously marked

10    as Defendant's Exhibit 4.

11    A     Thank you.

12    Q     Do you recognize this document?

13    A     Yes.

14    Q     What is this document?

15    A     It seems to be another Slack communication between

16    myself and Harumi Urata-Thompson.

17    Q     Okay.  If you could go to the second page of the

18    document.  And I'm looking at January 27th, 2021 at 2:55.

19    You see there's a couple of messages there.  Yes, the first

20    one that begins from Miss Thompson:  "Yes, because Jason

21    already has about 10 percent to begin with and is borrowing

22    another 150 million or so if I saw it last right.  Do you

23    see that message?

24    A     Yes, I do.

25    Q     Is your understanding that Miss Thompson is saying that

1  KeyFi is managing 10 percent of Celsius assets?

2  A    Yes, I believe so.

3  Q    Okay.  And if you scroll down to a message from 2:59

4  PM, you right -- and let me just see if there's more,

5  there's just one message.  "I understand that, but for now

6  we have millions of dollars in coins doing nothing.  AUM is

7  growing too fast for us not to send coins wherever we can

8  do."  Do you see that?

9  A    Yes, I do.

10  Q    What you're referring to here was the fact that the

11  inflows of user assets into Celsius were outpacing the rate

12  at which they could be deployed?

13  A    Yes.

14  Q    And it was necessary for you to deploy customer assets

15  quickly because Celsius needed to generate yields on those

16  assets that were being paid to users?

17  A    Yes.

18  Q    Mr. Nolan, do you know what impermanent loss is?

19  A    Yes, I do.

20  Q    Can you please describe for the court what impermanent

21  loss is?

22  A    So impermanent loss can occur predominantly during

23  deployments into liquidity pools that can cause losses to

24  occur when the price of one asset fluctuates against the

25  other price, the price of the other asset within those

Page 141

 1    pools.

 2    Q    Do you recall whether or not Celsius had any written

 3    policies confirming, concerning impermanent loss in DeFi

 4    deployments in 2020?

 5    A    I can't recall.

 6    Q    Even though Celsius was deploying hundreds of millions

 7    of dollars into DeFi in 2020?

 8    A    Well, there were, I believe, some risk parameters

 9    within place.  I just don't know if there was written,

10    expressed documentation around them.  I can't recall that.

11    Q    Okay.  Mr. Mashinsky would pressure you to do more

12    deployments though through KeyFi, correct?

13    A    As I said, I'm not sure if pressure is the term, but he

14    advocated for more deployments via KeyFi, yes.

15    Q    Did Celsius ever sell customer Bitcoin deposits?

16              MR. CHAPMAN:  Objection.

17              THE COURT:  Overruled.

18    BY MR. ROCHE:

19    A    I don't know exactly if it was within a trading

20    strategy perhaps.

21    Q    Do you recall giving a different answer at your

22    deposition?

23    A    I don't recall what my answer was.

24    Q    Okay.  Let's go to Page 124 of your deposition.  And

25    I'm looking at Lines 9 through 11.

Page 142

1    A    Yes, I see that.

2    Q    "Question: So did Celsius ever sell let's say customers

3    Bitcoin, customers customer Bitcoin?  Answer: I believe,

4    yes."  Do you have any reason to believe that wasn't

5    accurate when you testified to that?

6    A    No, I believe that's accurate.  Yes.

7    Q    Did Celsius ever sell customer Ethereum deposits?

8    A    I believe so, but not exactly sure.

9    Q    Did Celsius ever use its customers stablecoin deposits

10   to buy other cryptocurrencies?

11   A    Yes, I believe so.

12   Q    Did Celsius ever use its customer deposits to short the

13   price of Bitcoin?

14   A    That I'm not sure.

15   Q    You could go to lines -- Page 126 of your deposition.

16   A    Yep, I'm there.

17   Q    Line 6 through 8.  "Question: Did Celsius ever short

18   Bitcoin?  Answer: I can't recall exactly, but I believe so."

19   Was that answer correct?

20   A    Yes, I can't recall exactly, but I believe it may have

21   occurred.  Yes.

22   Q    You believe that Celsius may have shorted the price of

23   Bitcoin with customer assets?

24   A    Yes.

25   Q    Did Celsius ever use its customer deposits to short the

Page 143

1    price of Ethereum?

2    A    I mean, I'm not exactly sure, but I believe so.  Yes.

3    Q    Did Celsius ever use its customer deposits to buy up

4    the CEL token?

5    A    Yes.

6              MR. CHAPMAN:  Objection.

7              THE COURT:  Overruled.

8    BY MR. ROCHE:

9    Q    Did Celsius ever use its customer deposits to buy up

10   the CEL token?

11   A    Yes, I believe so.

12   Q    And in doing so, did that prop up the price of the CEL

13   token?

14   A    I believe so.  But it was part of the strategy around

15   the CEL token.

16   Q    Okay.  Did Mr. Mashinsky direct these trades?

17   A    No.  He didn't direct them.

18   Q    Did Celsius ever engage in any hedges for its trading

19   activities?

20   A    Yes.

21   Q    So Celsius was capable of hedging against price

22   movements in the cryptocurrencies it was deploying?

23   A    Well, it would depend upon the strategy and the hedge,

24   but yes.

25   Q    All right.  I want to switch gears for a second.  Did

1   anyone at Celsius ever communicate that it would use a

2   program called HedgeGuard to monitor KeyFi's activities?

3   A    Yes, I believe that was discussed.

4   Q    And Celsius implemented HedgeGuard to monitor KeyFi's

5   activities?

6   A    I don't know if it was ever implemented.  I know it was

7   being discussed for tracking of coin purposes.

8   Q    Do you remember giving a different answer at your

9   deposition?

10  A    No, I don't recall.

11  Q    If we could go to Page 135 of your deposition.  Tell me

12  when you're there.

13  A    I'm there.

14  Q    If we could go to the bottom of Page 135.  "Question:

15  Do you know if Celsius ever implemented HedgeGuard for

16  purposes of monitoring KeyFi's accounts?  Answer: I believe

17  so."  Do you have any reason to believe that answer wasn't

18  accurate when you gave it?

19  A    No.  No reason to believe so.

20          MR. CHAPMAN:  I'm sorry.  Can you just direct me

21  to what line you just read?

22          MR. ROCHE: 135, 24 through 136, 3.

23  BY MR. ROCHE:

24  Q    So with HedgeGuard, Celsius was able to monitor the

25  performance of Celsius KeyFi's DeFi wallets?

Page 145

1   A    I'm not sure.

2   Q    Okay.  Mr. Mashinsky frequently praised Mr. Stone?

3   A    Yes, I believe so.

4   Q    Mr. Mashinsky praised KeyFi for being profitable and

5   for being on the forefront of DeFi deployments?

6   A    Yes, I believe at the time.

7   Q    You're familiar with a program called DeBank.

8   A    Yes, I am.

9   Q    Mr. Mashinsky and Miss Thompson showed printouts of

10  DeBank to demonstrate profitability at team meetings,

11  correct?

12  A    I believe so if I recall correctly.

13  Q    Do you know what an NFT is?

14  A    Yes.

15  Q    Describe for the court what an NFT is.

16  A    NFT is a nonfungible token that exists on the

17  blockchain that could be related to a lot of different

18  things from pictures to art, et cetera.

19  Q    And you discussed NFT purchases with Mr. Stone?

20  A    Yes, I did.

21  Q    You discussed Mr. Stone's NFT's purchases prior to his

22  departure from Celsius?

23  A    Yes.

24  Q    And you knew that Mr. Stone created a Twitter profile

25  called OXB-1?

Page 146

1    A    Yes.  He told me about it.

2    Q    Have you ever looked at the Twitter profile?

3    A    Yes, I believe so.

4    Q    And you knew about this Twitter profile prior to Mr.

5    Stone's departure from Celsius KeyFi?

6    A    Yes, I believe so.

7    Q    You discussed the OXB-1 Twitter account with Mr. Stone?

8    A    Yes.

9    Q    You discussed the OXB-1 Twitter account with Miss

10   Thompson, the CFO?

11   A    Yes, I believe so.

12   Q    And you discussed the OXB-1 Twitter account with Mr.

13   Mashinsky?

14   A    That, I don't recall.

15   Q    Did you discuss the OXB-1 account with Patrick Holert?

16   A    That, I don't recall either.

17   Q    The OXB-1 Twitter account was a fairly popular trading

18   account in late 2020 and early 2021?

19   A    Yes, I believe so.  It was pretty popular on Crypto

20   Twitter.

21   Q    And you believe that the OXB-1 Twitter account was a

22   good thing for Celsius because it promoted engagement?

23   A    Yeah, that's what I believed at the time.

24   Q    Mr. Nolan, do you know what a CryptoPunk is?

25   A    Yes, I'm aware.

Page 147

1    Q    Can you tell the court what a CryptoPunk is?

2    A    CryptoPunk is a specific NFT, one that was pretty early

3    on and is very popular.

4    Q    And Mr. Stone and you discussed the purchase of

5    CryptoPunks prior to his departure from Celsius?

6    A    I believe so.

7    Q    You were aware that Mr. Stone purchased CryptoPunks

8    prior to his departure from Celsius?

9    A    Yes, I believe so.

10    Q    And you are aware that Mr. Stone purchased other NFTs

11    prior to his departure from Celsius?

12    A    I believe so.

13    Q    And you understood that Mr. Mashinsky sometimes paid

14    others in the form of NFTs, correct?

15    A    No, that's not something I'm aware of.

16    Q    Do you recall Mr. Mashinsky paying his wife in the form

17    of NFTs?

18    A    I knew of ascending of an NFT.  I didn't know what it

19    related to.

20    Q    And you were on calls where it was discussed that

21    certain NFTs would be deducted from the profit payout owed

22    to KeyFi?

23    A    Yes.

24    Q    And these calls occurred prior to Mr. Stone's

25    departure?

Page 148

1    A    Yes.  They were with Mr. Stone.

2    Q    And he calls with Mr. Stone, he told you that the NFT

3    purchases were part of the profit sharing agreement between

4    KeyFi and Celsius?

5    A    Yes, that's what he said.

6    Q    And again, those calls occurred prior to Mr. Stone's

7    departure from Celsius?

8    A    Yes.

9    Q    Do you recall whether or not Mr. Mashinsky was on those

10   calls?

11   A    No, I don't.

12   Q    You don't recall one way or the other?

13   A    I don't believe he was.  Those calls only occurred

14   between myself and Mr. Stone.

15   Q    Do you recall whether or not the NFT purchases were

16   discussed on the weekly calls?

17   A    No, I don't believe so, but I can't recall exactly.

18   Q    I want to discuss the circumstances leading up to Mr.

19   Stone's departure.  Shortly before Mr. Stone's departure,

20   you communicated to Mr. Stone that Celsius had uncovered a

21   hole within its balance sheet?

22           MR. CHAPMAN:  Objection.

23   BY MR. ROCHE:

24   Q    And you understand that was part of the reason for his

25   departure?

Page 149

```
 1              MR. CHAPMAN:  Objection.

 2              THE COURT:  Overruled.

 3    BY MR. ROCHE:

 4    A    Sorry.  Can you repeat the question?

 5    Q    Shortly before Mr. Stone's departure, you communicated

 6    to Mr. Stone that Celsius had uncovered a whole within its

 7    balance sheet and you understood that was part of the reason

 8    for his departure?

 9    A    Yes.

10    Q    And that was would have been early 2021?

11    A    Yes, I believe so.

12    Q    And this hole was there, the hole was there -- hold

13    one.  Let me -- give me one moment.  The hole was as a

14    result of a mismatch where the assets being held by Celsius

15    did not match the liabilities of what it owed back to the

16    community?

17    A    Yes.

18    Q    The Celsius community?

19    A    Yes.

20    Q    Meaning Celsius depositors.

21    A    The community.  I'm not sure about the term

22    "depositors."

23    Q    You were involved in uncovering this hole?

24    A    I don't believe I was involved in the exact uncovering

25    of it, but in the process of sort of piecing everything
```

Page 150

1    together after the fact, yes.

2    Q    Others at Celsius knew about this hole?

3    A    Yes.

4    Q    This hole related to an error in the manner in which

5    Celsius had been performing its accounting?

6    A    I believe so off of my understanding but I don't know

7    the exact reasoning.

8    Q    And this error was due to the fact that it was

9    performing its accounting in dollar basis as opposed to coin

10   basis?

11   A    Yeah.  I'm not sure the exact reasoning but that's a

12   possibility I guess.

13             MR. ROCHE:  Your Honor, may I approach the

14   witness?

15             THE COURT:  Yes, you may.

16   BY MR. ROCHE:

17   Q    Here you go.

18   A    Thank you.

19   Q    Mr. Nolan, I handed you what's been marked as

20   Defendant's -- what's been previously admitted as

21   Defendant's Exhibit 5.  Your Honor, let me know when you

22   have that exhibit handy.

23             THE COURT:  Yes, go ahead.

24   BY MR. ROCHE:

25   Q    Do you recognize this document?

1   A    Yes.

2   Q    What is it?

3   A    I believe it's a Slack communication between myself and

4   Harumi Urata-Thompson.

5   Q    Again, that's Celsius' CFO at the time?

6   A    Yes.  Oh, wait, sorry.  At this point in time, I

7   believe Harumi was no longer CFO but I could be wrong about

8   that.

9   Q    When do you believe Miss Harumi Urata-Thompson stopped

10  being the CFO of Celsius?

11  A    I don't know the exact date offhand.  I apologize.

12  Q    No problem.  Let's go to the bottom of the second page

13  and the top of the third page.  Miss Thompson writes "I can

14  confirm with Jason that he's all set to go."  And then on

15  the next page she writes "The rest of the calculation I will

16  have to do with the accounting and legal to figure out the

17  payout."  Do you see the message I'm referring to?

18  A    Sorry, I got a little lost because I think some of that

19  message wasn't said.  But is that the end of the message?

20  Q    The very end of the message.

21  A    Yes, I see that last sentence.

22  Q    And these messages are dated March 11th?

23  A    Yes, I believe so.

24  Q    This message was sent after Mr. Stone resigned?

25  A    I believe so.

1   Q    So your understanding is that as of the date of this

2   message, Miss Thompson believed that KeyFi was owed a profit

3   payout?

4   A    I believe, I believe so.

5   Q    Do you know whether or not Mr. Mashinsky was aware of

6   Mr. Stone's purchases of NFTs prior to Mr. Stone's

7   departure?

8   A    No, I'm not aware.

9   Q    Mr. Nolan, you testified that you had weekly meetings

10  with Mashinsky and the KeyFi team, that Mr. Stone and you

11  discussed his NFT purchases and that Mr. Stone broadcasted

12  his activity on the OXB-1 Twitter, but you can't recall

13  whether or not at any point in time prior to Mr. Stone's

14  departure, the NFT purchases were discussed with you and Mr.

15  Mashinsky?

16  A    Sorry, I think the way you phrased that, the NFTs, to

17  my recollection, were not discussed in those weekly

18  meetings.  So can you repeat the question?

19  Q    You can't recall any conversations with Mr. Mashinsky

20  present where NFTs were discussed?

21  A    Not that I can recall.

22  Q    And you don't recall any discussions concerning Stone's

23  NFT purchases on the OXB-1 account besides your

24  conversations with Mr. Stone himself?

25  A    No, I can't recall.

Page 153

1   Q    Mr. Nolan, I'd like to discuss very quickly some

2   testimony from earlier.  Celsius deployed funds into DeFi

3   itself in 2020?

4   A    Yes.

5   Q    There was one other person responsible for deploying

6   funds into DeFi in 2020?

7   A    Sorry, I'm confused.  For who?

8   Q    Deployments that Celsius did itself.

9   A    Other than myself, yes, there's one that I can recall

10  at this time.

11  Q    Who was that?

12  A    Assaf Aram.

13  Q    Now I want to focus on the amount of customer funds you

14  deployed yourself into DeFi in 2020.  You don't remember if

15  you deployed more than $10 million in customer deposits in

16  DeFi in 2020?

17  A    I believe that may have been the case but I don't

18  recall the exact figure.

19  Q    You don't remember if you deployed more than $100

20  million in customer deposits in DeFi in 2020?

21  A    Sorry.  When you say "you" here, do you mean myself or

22  do you mean Celsius?

23  Q    You.

24  A    Yeah, the answer is still I think that might be the

25  case, but I don't know the exact figure either way.

1  Q   Let's discuss 2021.  You don't remember if you deployed

2  more than $10 million in customer deposits into DeFi in

3  2021?

4  A   I would say I believe that that is the case but I don't

5  know the exact figure that was deployed offhand.

6  Q   You don't remember if you deployed more than $100

7  million in customer deposits in DeFi 2021?

8  A   I believe that more than likely that was the case that

9  more than 100 million was deployed, but I don't remember the

10  exact figure at this time.

11  Q   You can't recall if you deployed more than a billion

12  dollars in customer deposits into DeFi in 2021?

13  A   I don't know the exact figure.

14  Q   Okay.  You don't, you can't recall if it was more than

15  a billion.

16  A   Well, no, I can't recall the exact figure.

17  Q   So you're telling this court that you can't recall the

18  amount of money you deployed -- whether or not the amount of

19  money you deployed into DeFi was under 10 million or over

20  one billion?

21  A   Well, as I said, I believe it was over 10 million.  I

22  just don't know the exact figure offhand right now.

23  Q   Mr. Nolan, could you go to Page 85 of your deposition?

24  Tell me when you're there.

25         THE COURT:  Give me a second to get there.

Page 155

```
 1    BY MR. ROCHE:

 2    A    I'm at Page 85.

 3    Q    Question --

 4              THE COURT:  Go ahead.  I asked you to wait for me

 5    to get to the page.

 6              MR. ROCHE:  Apologies.

 7              THE COURT:  Go ahead.

 8    BY MR. ROCHE:

 9    Q    I'm looking at Lines 15 through 20.  "Question:  You

10    can't recall even a particular range.  You don't know if

11    it's under 10 million.  You don't know it's over a billion?

12    Answer:  No, I don't recall."

13              THE COURT:  Mr. Roche, that's not impeaching.  Go

14    ahead.

15    BY MR. ROCHE:

16    Q    Mr. Nolan, sitting here today, do you know whether or

17    not the amount of money you deployed into DeFi in 2021 was

18    over a billion or less than 10 million?

19    A    Sorry, I'm a little confused about the wording there.

20    If it was over a billion or less than 10 million?

21    Q    Correct.

22    A    I believe that it was over 10 million, but I don't have

23    the exact figure.  I'm not able to say whether it was over a

24    billion.  I don't recall.

25    Q    You said earlier that in 2021, you told Mr. Stone that
```

```
 1    you became aware that Celsius' assets didn't match its

 2    liabilities?

 3    A    Yes.

 4              MR. ROCHE:  I believe Your Honor has an objection.

 5              THE COURT:  I didn't hear it.  What was the

 6    objection?

 7              MR. CHAPMAN:  Objection, relevance.

 8              THE COURT:  Overruled.

 9    BY MR. ROCHE:

10    Q    Mr. Mashinsky made statements to the public that were

11    contrary to that, correct?

12    A    I don't know what statements you're referring to.

13    Q    Are you aware of any statements that Mr. Mashinsky made

14    to the public that were contrary to the fact that Celsius

15    didn't have enough assets on its on its books?

16    A    I don't know of any exact statements.

17    Q    Could you go to Page 172 of your deposition please?

18    Line 25.

19    A    Sorry, which page?

20    Q    Page 172.

21    A    Yeah, I'm there.

22              MR. ROCHE:  Your Honor, are you?

23              THE COURT:  I'm with you.  Go ahead.

24    BY MR. ROCHE:

25    Q    Line 25. "Question: Are you aware of Mr. Mashinsky
```

Page 157

1   making statements to the public that were contrary, to the

2   contrary?  Answer: I believe so."  Was that answer accurate

3   when you gave it?

4   A    I'm not sure offhand.  I can't recall of any exact

5   statements.

6   Q    It's your understanding that Mr. Mashinsky made false

7   statements to the public between 2021 and 2022?

8   A    I'm not sure.

9   Q    Is it possible?

10  A    Yes, it's possible.

11            THE COURT:  Don't speculate.

12            MR. ROCHE:  No further questions.  Your Honor, can

13  you give me one minute here to confirm with my co-counsel?

14            THE COURT:  Sure.

15            MR. ROCHE:  One or two last questions, Your Honor.

16            THE COURT:  Go ahead.

17  BY MR. ROCHE:

18  Q    You testified earlier that you wouldn't, you wouldn't

19  say that Mr. Mashinsky pressured you to work with Jason?

20  A    I just don't know if I would use that exact word, but

21  he was pretty forceful in wanting us to deploy more.

22  Q    Okay, could you turn to page, do you remember at your

23  deposition agreeing that Mr. Mashinsky pressured you to work

24  with Jason?

25  A    I don't recall that.

Page 158

1   Q     Could go to Page 99 of your deposition?

2   A     I'm at Page 99.

3               MR. ROCHE:  Your Honor?

4               THE COURT:  I'm there too.  What line number?

5   BY MR. ROCHE:

6   Q     Line 16 through 18.  "Did Mr. Mashinsky ever pressure

7   you to work with Jason.  Answer:  Yes."

8   A     Yes, I see that.

9   Q     Okay.  And if you go to line 100 -- the next page, Page

10  100, "And he would pressure you to do more deployment

11  through KeyFi?  Answer: Yes."  Do you see that?

12  A     Yes, I see that.

13              MR. ROCHE:  No further questions.

14              THE COURT:  All right.  Redirect examination.

15              REDIRECT EXAMINATION OF CONNOR NOLAN

16  BY MR. CHAPMAN:

17  Q     Okay, for the record, Dean Chapman, Akin, Gump,

18  Strauss, Hauer and Feld.  It's a fair bit of ground covered

19  in that cross-ex, Mr. Nolan, so bear with me if I jump

20  around from topic to topic here on redirect.  I want to

21  start with some questions that were asked towards the end --

22  by the way, redirect -- I don't know what we're calling this

23  Judge, cross-examination or redirect.

24              THE COURT:  It's redirect.  Go ahead.

25  BY MR. CHAPMAN:

Page 159

1    Q    You were asked questions, Mr. Nolan, regarding the

2    quantum of funds that Celsius deployed to its proprietary

3    DeFi investment strategy; is that correct?

4    A    Yes.

5    Q    And you couldn't remember -- if I understood your

6    testimony correctly, you thought it was in excess of $10

7    million worth of coins but above that you didn't know what

8    the number was, correct?

9    A    Yes.

10   Q    Why is it that you can't put a precise dollar figure on

11   that?

12   A    Well I would say that there are a couple of different

13   reasons, one being that it's a little bit hard without an

14   exact specific point in time.  Also when it comes to saying

15   how much was deployed in say a year if funds are moved out

16   of one strategy and into another strategy, I'm not sure how

17   that's seen, as whether that's the amount that was deployed

18   or 2X because it was shifted around strategy to strategy and

19   just offhand, I don't know the exact number.

20   Q    Okay.  Got it.  You were asking questions during cross-

21   examination, to the fact that you were supportive of Celsius

22   working with the defendants, correct?

23   A    Yes.

24   Q    When was that that you were supportive?

25   A    I believe that was in 2020 up until early 2021.

Page 160

```
 1    Q     And there came a time when that view changed?

 2    A     Yes.

 3    Q     When was that?

 4    A     When it was determined that the deployments done by

 5    KeyFi were not profitable.

 6    Q     And when was that determination made?

 7    A     I believe it was in March of 2021, but I don't know the

 8    exact dates.

 9    Q     You also testified you thought it was good for Celsius

10    that the OXB-1 Twitter was popular.  Right?

11    A     Yes, at the time.

12    Q     What time was that?

13    A     In 2020 up until 2021 when it was deemed it wasn't

14    profitable.

15    Q     You said you recall discussing the OXB-1 Twitter with

16    Miss Urata-Thompson; is that correct?

17    A     Yes, that's correct.

18    Q     And what did you and Miss Urata-Thompson discuss?

19    A     She was a bit unhappy with the Twitter account if I

20    recall correctly.

21    Q     Do you have an understanding as to why she was unhappy?

22    A     I believe she just didn't want it to become the focal

23    point or to be broadcasted around the proprietary, the

24    deployments that were being done by Celsius.

25    Q     Okay.  Got it.  Okay.  Do you recall being asked
```

Page 161

1    questions about the work you did sending coins from Celsius

2    to defendants, is that correct?

3    A    Yes, I believe so.

4    Q    And what was your responsibility in sending the coins?

5    A    So I would have access to Fireblocks, Celsius' primary

6    custodian.  And if coins were available to be deployed, they

7    would often be housed within Fireblocks and then they would

8    be sent from there to wallets that were controlled by KeyFi.

9    Q    Okay.  And from there, am I correct, that defendants

10   would deploy the coins into DeFi investment strategies?

11   A    Yes, that's correct.

12   Q    What responsibility do you have with respect to

13   defendants deployment of coins into DeFi investment

14   strategies?

15   A    No responsibilities.  I was only involved in those

16   weekly discussions around the deployments.

17   Q    Was it your responsibility to track defendants

18   deployments of coins into DeFi?

19   A    No.

20   Q    Would it have been possible for you to track defendants

21   deployment of coins into DeFi?

22   A    No.

23   Q    Why not?

24   A    Because Celsius didn't have a way to look in and see

25   all of the deployments that were being made by KeyFi and

Page 162

1    therefore track where all the coins were.

2    Q    You understood that such a program was supposed to be

3    developed at some point in time?

4    A    Yes.

5    Q    By whom?

6    A    KeyFi.

7    Q    And how do you know that?

8    A    I was told that by Mr. Stone and the KeyFi team.

9    Q    You ask questions about an application called DeBank,

10   is that correct?

11   A    Yes.

12   Q    Can you tell the court what DeBank is?

13   A    DeBank is a website or protocol where one can look up

14   an address within the Ethereum ecosystem and see some of the

15   relevant deployments that are shown there and some of the

16   other features of the wallet.

17   Q    Could you have used DeBank to track defendants

18   investments into DeFi strategies?

19   A    Yes, some of them.

20   Q    When you say some, what do you mean?

21   A    I mean that for the protocols that were supported on

22   DeBank at the time, it would show those deployments, but if

23   a protocol was not linked into the DeBank ecosystem or I'm

24   not sure exactly how it works, but some of the protocols

25   would not show up on DeBank or show the amounts that were

Page 163

1    deployed there.

2    Q    And would the DeBank allow you to understand if a

3    particular investment strategy had been profitable or not?

4    A    No.

5    Q    And why is that?

6    A    Because the bank only shows the current active balance

7    that was deployed within one of those protocols if that

8    protocol was supported by DeBank, but it wouldn't show

9    whether there was profit or loss within that deployment.  It

10   would just show a snapshot as of a point in time.

11   Q    Understood.  I want to ask you some questions now about

12   hedging.  What is your understanding as to whose

13   responsibility it was to hedge against KeyFi's centralized

14   finance positions?

15   A    It was my understanding it was KeyFi's.

16   Q    And would it have been possible for Celsius to hedge

17   against defendants DeFi positions?

18   A    No, I don't believe so.

19   Q    Why is that?

20   A    Because without insight into all of the deployments and

21   without a means to see those deployments within real time,

22   it would be impossible to properly hedge those deployments.

23   Q    You were asked questions on cross about something

24   called HedgeGuard?

25   A    Correct.

Page 164

1   Q     And what is HedgeGuard.

2   A     It's my understanding HedgeGuard was an -- excuse me --

3   an accounting software that was utilized by Celsius to show

4   their balances and be able to pull in information from --

5   excuse me, I need to take a second, apologies.  Can you ask

6   the question again?

7   Q     Sure.  What is HedgeGuard?

8   A     Yeah.  So it was my understanding that HedgeGuard was

9   an accounting tool used by Celsius in order to track where

10  assets were across a few different places from internal

11  firebox wallets to exchange wallets, et cetera.

12  Q     So to your knowledge, it was an accounting tool.  Is

13  that what you said?

14  A     As best as I can recall, yes.

15  Q     Could it be used to hedge against investment positions?

16  A     Not that I'm aware of or can recall.

17  Q     Okay.  To your knowledge, could Celsius have used the

18  HedgeGuard program to hedge against defendants DeFi's

19  investments?

20  A     I don't believe so.

21  Q     You were also asked questions on cross-examination

22  about Celsius's internal or proprietary DeFi investments?

23  A     Correct.

24  Q     And you had some responsibility for those investments?

25  A     Apologies.  Yes, I did.

Page 165

1    Q    Okay.  And I believe you testified to this, but if not,

2    please remind the court, did Celsius have risk parameters in

3    place for its proprietary DeFi investments?

4    A    Yes.  There were some risk parameters in place.

5    Q    What were those?

6    A    They varied over time, but the largest of which when it

7    came to impermanent loss was setting of bans for either

8    taking out or replacing deployments depending on the price

9    fluctuation of assets.

10   Q    And who was responsible for making sure that Celsius

11   proprietary DeFi trades complied with those bans that were

12   set?

13   A    Whoever was in charge of the specific deployment.

14   Q    Okay.  And that included you at times?

15   A    Yes.

16   Q    And why was it that the person who was in charge of the

17   particular deployment was also in charge of complying with

18   the bans that had been set?

19   A    They were the only person that would have access to the

20   deployment and real-time view to either pull out or add back

21   in that deployment.

22   Q    Okay.  I'm going to switch up topics quickly.  You

23   testified on cross-examination to your understanding that

24   defendants trading activities were profitable.  Right?

25   A    Yes.

1    Q    When in time did you believe that to be the case?

2    A    I believed that to be the case until it was determined

3    that the deployments weren't profitable in early 2021.

4    Q    Okay.  And -- withdrawn.  What was the basis for your

5    belief that the defendant's investment strategies were

6    profitable during the time when you held that belief?

7    A    It was information that came from KeyFi and some

8    others.

9    Q    Okay, so let's break that down.  When you say KeyFi,

10   who are you referring to?

11   A    I'm referring to Mr. Stone.

12   Q    Okay.  Did Mr. Stone provide you with evidence of the

13   profitability of KeyFi's trading?

14   A    No, not that I can recall, just would share like

15   screenshots or showing of certain deployments, but that

16   doesn't show profitability.

17   Q    Okay.  You said your understanding of KeyFi's

18   profitability was based on things you were told by others as

19   well?

20   A    Yes.

21   Q    And who were those others?

22   A    Mr. Mashinsky and I believe I may have had

23   conversations with Ms. Urata-Thompson about it, but I don't,

24   I don't recall.

25   Q    What is your recollection of those conversations with

Page 167

1    Miss Urata-Thompson?

2    A    I just remember that when she would refer to there

3    being profitability or I would refer to there being

4    profitability, she would say yes, but we don't have enough

5    information to know that for sure or things of that nature.

6    Q    Do you remember the time period when you had those

7    conversations?

8    A    I don't recall exactly.

9    Q    Do you recall those conversations were before or after

10   Mr. Stone resigned?

11   A    I believe they were before.

12   Q    Okay.  And you also said Mr. Mashinsky was a source of

13   your understanding at one point in time that the defendant's

14   trading activities were profitable?

15   A    Yes.

16   Q    And what did Mr. Mashinsky tell you?

17   A    He would often give similar summaries to what I heard

18   from Mr. Stone about the deployments that were being done

19   and show DeBank, DeBank information of the deployments.

20   Q    What do you mean by similar summaries?

21   A    So he would usually tell me similar information or the

22   same information that that Mr. Stone and said if I recall

23   correctly.

24   Q    So it was your understanding that when Mr. Mashinsky

25   told you that he thought defendants' DeFi investment

1    strategies were profitable, he was repeating back

2    information that was provided to him by Mr. Stone?

3           MR. ROCHE:   Objection, leading.

4           THE COURT:   Sustained.

5    BY MR. CHAPMAN:

6    Q    What is the basis for your -- what is your

7    understanding of why Mr. Mashinsky believed defendants

8    trading activities were profitable?

9    A    I believe that that information came from KeyFi and Mr.

10   Stone.

11   Q    When did you come to that belief?

12   A    I remember making note of the information that Alex

13   shared was often in line with what I had heard from Jason,

14   but I don't remember when that, when that occurred.

15   Q    Recently or?

16   A    No, that was at the time in I believe late 2020, early

17   2021.

18   Q    Are you aware of defendants ever providing

19   documentation to either Mr. Mashinsky or Miss Urata-Thompson

20   concerning the alleged profitability of defendants trading?

21   A    No, not that I'm aware.

22   Q    You were asked, I think a few different times, about

23   being pressured, about Mr. Mashinsky pressuring you to work

24   with KeyFi, correct?

25   A    Sorry, can you repeat that?

Page 169

1    Q    On cross-examination, you were asked about Mr.

2    Mashinsky allegedly pressuring you to work with KeyFi,

3    right?

4    A    Yes.

5    Q    And do you have an understanding as to why Mr.

6    Mashinsky wanted you to keep working with KeyFi?

7    A    Yes, it was my understanding that it was the perceived

8    profitability and the need to deploy coins.

9    Q    And what time frame was this?

10   A    That was in late 2020 and early 2021 I believe.

11   Q    And at some point in time, did that pressure no longer

12   be in existence?

13   A    Sorry can you repeat that?

14   Q    When -- did Mr. Mashinsky ever stop pressuring you to

15   work with defendants?

16   A    Again, I'm not 100 percent he used the word "pressure,"

17   but in the way that he was telling us to deploy with the

18   defendants, yes, it stopped when the relationship stopped.

19   Q    Do you know why the relationship stopped?

20   A    Yes.  It's my understanding that KeyFi sent a

21   resignation or ending of the relationship.

22            MR. CHAPMAN:  Judge, anything further from you?

23            THE COURT:  No.

24   BY MR. CHAPMAN:

25   Q    Mr. Nolan, you testified that you were on calls where

Page 170

1    it was discussed that certain NFT purchases would be

2    deducted from the profit payout owed to KeyFi, right?

3    A    Yes.

4    Q    And who was on those calls?

5    A    Mr. Stone.

6    Q    Anyone else?

7    A    Not that I can recall.

8    Q    Apart from those calls with Mr. Stone, did you ever

9    discuss with anyone NFTs being an advance on profit share?

10   A    I'm not sure, but not that I can recall.

11   Q    Are you aware of any communications, written or oral,

12   in which Mr. Mashinsky authorized Mr. Stone or KeyFi to take

13   an advance on profit share?

14   A    Not that I can recall.

15   Q    Are you aware of any communications, written or oral,

16   in which Alex Mashinsky authorized the purchase of NFTs by

17   defendants?

18   A    Not that I can recall.

19   Q    All right, Mr. Nolan, I'd like to read you a few

20   questions and answers from Mr. Stone's deposition and ask

21   you a few questions about the exchanges.  I will just read

22   the questions aloud.  If you have any questions,

23   misunderstanding me, let me know.

24            MR. ROCHE:  Dean, can you just wait for me to pull

25   up?

1           MR. CHAPMAN:  Absolutely.

2           MR. ROCHE:  Thank you.

3           MR. CHAPMAN:  And I'm going to start on Page 49.

4           MR. ROCHE:  Okay.  What line?

5           MR. CHAPMAN:  49, 19.

6           MR. ROCHE:  Okay, you can go.

7    BY MR. CHAPMAN:

8    Q    Okay.  And this this Q/A relates to Mr. Stone's claim

9    about Mr. Mashinsky authorizing him to take assets.  Okay.

10   "Question: And you're saying the emails you are referring to

11   were sent by Alex Mashinsky to you?  Answer: ""--

12          MR. ROCHE:  Objection, real completeness.  I don't

13   think this question and answer gives the context for what is

14   being asked.

15          MR. CHAPMAN:  I'm going to continue reading for

16   about a page.

17          THE COURT:  Go ahead.  So the objection is

18   overruled.  Go ahead and read the entire page.

19   BY MR. CHAPMAN:

20   Q    Okay.  The answer is: "I honestly can't recall.  It

21   would either be from Alex to me or for me to Alex, but it

22   also wouldn't be something specifically saying, Jason take

23   this.  It was, hey, something more like, hey, Alex, I'm

24   doing, I'm, you know, I'm doing a $50,000 transfer or some

25   odd dollar amount of transfer.  You know, please acknowledge

1     or something like that.  Question: Okay, got it.  To your

2     recollection, I know you're saying you don't have the

3     emails, but to your recollection, was there anybody copied

4     on those emails or addressed on those emails other than you

5     and Alex?  Answer: I do believe that either Connor Nolan or

6     Harumi Urata-Thompson may or may not have been CC'd on some

7     of those emails."  Mr. Nolan, do you ever recall being

8     copied on an email of the sort described by Mr. Stone?

9     A     Not that I can recall.

10    Q     And then going down on that same page of the transcript

11    going to Page 50, Line 22.  "Question: For the in person or

12    telephonic authorizations, was anyone else present when Mr.

13    Mashinsky gave the authorizations you are referring to?

14    Answer: I don't believe for the very first time, but for

15    subsequent times, a combination of Connor Nolan and/or

16    Harumi Urata-Thompson were on the phone at least one of the

17    times he authorized me to do so."  Mr. Nolan, do you recall

18    ever being involved in a conversation in which Mr. Mashinsky

19    authorized Mr. Stone to take any sort of advance on profit

20    share?

21    A     No, not that I recall.

22    Q     I'm going to move to Page 58 of the transcript,

23    starting at Line 10.  Okay.  Page 58, Line 10 "Question: By

24    March 9th, which is the date you signed your resignation

25    letter, you thought KeyFi's profits were as much as 145

Page 173

1    million.  Is that what you said?  Answer: KeyFi's profit

2    share amount.  Question:  Profit share?  Answer: Owed to

3    them.  Question: Right.  And so what does that mean in terms

4    of your understanding of how much property you are

5    authorized to take from Celsius as of March 9th, 2021?

6    Answer: 10 to 20 percent, but I said 10 to 15 percent before

7    and then never change that.  Question: 10 to 15 percent of

8    145 million?  Answer: I believe so, yes.  Question: Okay and

9    what was that authorization provided -- and was that

10   authorization provided to you in writing at any time other

11   than with respect to the one or two emails you identified

12   before?  Answer: I do believe that in WhatsApp and text

13   messages between myself and Mashinsky, between myself and

14   Roni Cohen-Pavon, between myself and Harumi Urata-Thompson,

15   and then in discussions with myself and Connor Nolan, yes."

16   Okay.  So my question Mr. Nolan, do you recall any such

17   discussions in which Mr. Stone -- with Mr. Stone regarding

18   him being advanced to take a certain portion of KeyFi's

19   alleged profit share as an advance?

20   A    Other than the ones we discussed earlier about the NFT

21   purchases, not that I recall exactly.  I do remember having

22   conversations with Mr. Stone about -- I don't remember exact

23   amounts, but his perceived thoughts on what amounts he

24   thought he owed.

25   Q    Okay.  And the last one of these I'd like to do is at

Page 174

1   Page 75 of the transcript beginning at Line 24.  "Question:

2   Can you identify any written communication in which anyone

3   at Celsius ever told you Celsius was hedging against

4   impermanent loss from Celsius KeyFi activities?  Answer: I

5   can't identify a specific document at this time.  Question:

6   Do you have reason to believe that such a document exists?

7   Answer: Yes, absolutely.  Question: In what form.  Answer:

8   Probably an email or WhatsApp message.  Question: Who at

9   Celsius gave the assurances you are referring to?  Just

10  names.  That's all I'm looking for.  Question: Patrick

11  Holert primarily.  And then I believe at different points in

12  time, Alex Mashinsky himself.  Connor Nolan made mentions of

13  hedging, Waseem Shabout.  I'm not sure if anyone else."  Mr.

14  Nolan, do you recall making mention to Mr. Stone that you or

15  anyone at Celsius was hedging against impermanent loss from

16  Celsius KeyFi activities?

17  A      No.

18          THE COURT:  Could you could you elaborate on that?

19  I'm not sure I understand the answer.

20          THE WITNESS:  No I don't recall that there were

21  any communications around Celsius hedging on behalf of

22  Celsius KeyFi.

23          THE COURT:  Thank you.

24          MR. CHAPMAN:  All right.  Nothing, nothing

25  further.

Page 175

1           THE COURT:  Very good.  Any further examination?

2           MR. ROCHE:  No further examination from the

3    defendants.

4           THE COURT:  All right.  You're excused.  Thank

5    you.

6           THE WITNESS:  Thank you.

7           THE COURT:  Thank you very much for your

8    testimony.  Mr. Roche, call you next witness.

9           MR. ROCHE:  Your Honor, may we take a 5 to 10

10   minute break to use the restroom and get the exhibits ready

11   so that we can move right into --

12          THE COURT:  Sure.  We'll resume at 20 minutes to

13   three.

14          MR. ROCHE:  Thank you, Your Honor.

15          (Off the record.)

16          CLERK:  All right.  The recording has started.

17   Yeah, Pedro, Pedro for some reason, the 0020112 line is

18   muted.

19          MR. ROCHE:  Your Honor, can you hear us?

20          THE COURT:  I can hear you, yes, I can.

21          MR. ROCHE:  When you're ready, I believe the

22   witness is ready to be sworn in.

23          CLERK:  You ready, Judge?  Please raise your right

24   hand.  Do you solemnly swear or affirm that all the

25   testimony you're about to give before this court is the

Page 176

1   truth, the whole truth, and nothing but the truth?

2           MR. STONE:  I do.

3           CLERK:  Okay.

4           THE COURT:  Good afternoon, Mr. Stone.

5           MR. STONE:  Good afternoon, Judge.

6           CLERK:  Please speak up.

7           MR. STONE:  Good afternoon, Judge.

8           DIRECT EXAMINATION OF JASON STONE

9   BY KYLE ROCHE:

10  Q    Mr. Stone, can you please state your full name?

11  A    Jason Benjamin Stone.

12  Q    Mr. Stone, what do you currently do for work?

13  A    I'm a consultant in the cryptocurrency space.

14  Q    When did you first become involved in the

15  cryptocurrency space?

16  A    2016.

17  Q    And did there ever come a time you started a company in

18  the cryptocurrency space?

19  A    Yes.

20  Q    What was the name of that company?

21  A    Battlestar Capital.

22  Q    How does Battlestar Capital relate to, if it does, to

23  KeyFi?

24  A    I would call KeyFi a successor company to Battlestar,

25  basically the IP of Battlestar was assigned to KeyFi in

Page 177

1    exchange for a 10 percent stake in KeyFi going to the cap

2    table investors of Battlestar.

3    Q    And was anybody affiliated with Celsius an investor in

4    either KeyFi or Battlestar?

5    A    Yeah, Alex Mashinsky personally was an investor in

6    Battlestar.  That investment rolled into an equity position

7    in KeyFi.  And then Celsius Network, as well as Nuke

8    Goldstein, the CTO and cofounder of Celsius also

9    subsequently invested directly into KeyFi.

10   Q    Did you submit a sworn affidavit in connection with

11   this, your opposition to plaintiff's motion?

12   A    Yes.

13            MR. ROCHE:  Your Honor, may I approach the

14   witness?

15            THE COURT:  Yes, you can.

16   BY MR. ROCHE:

17   Q    I'm handing you what's been marked as Defendant's

18   Exhibit 31.  Do you recognize this document?

19   A    Yes.

20   Q    What is this document?

21   A    My affidavit in opposition to the motion for the

22   preliminary injunction.

23   Q    Are you aware of any inaccuracies as you sit here today

24   with respect to your sworn testimony as you submitted it in

25   this affidavit?

Page 178

1    A    I don't believe so, but I haven't reread it today.

2              MR. ROCHE:  Your Honor, at this point in time, we

3    asked to move Defendant's Exhibit 31 into evidence.

4              THE COURT:  Hearing no objection, it's admitted

5    into evidence.

6              (Defendant's Exhibit 31 admitted into evidence)

7              MR. ROCHE:  Your Honor, we ask if we could, if

8    Your Honor reserved his ruling on a few of the exhibits.

9              THE COURT: I did.

10             MR. ROCHE:  We'd like to, before cross-examination

11   begins, simply move those into the into the record through

12   Mr. Stone.

13             THE COURT:  You can try.

14             MR. ROCHE:  Okay.

15   BY MR. ROCHE:

16   Q    Mr. Stone, Defendant's Exhibit --

17             THE COURT:  Just bear with me a minute because

18   these are the additional exhibits.  Right?

19             REPORTER:  Yes.

20             THE COURT:  I have to open it up on my computer.

21   All right.  I've got that document open.  Go ahead.

22   BY MR. ROCHE:

23   Q    Mr. Stone, do you recognize Defendant's Exhibit 36.

24   A    Yes.

25   Q    What is it?

1   A     It's a response to -- it's a response I made to a tweet

2   by someone else.

3   Q     What's the date of your response?

4   A     January 23rd, 2021.

5   Q     And is your response in the middle of the page, OXB-1?

6   A     Yes.

7   Q     Were you the author of that tweet?

8   A     Yes.

9               MR. ROCHE:  Your Honor.  We move to admit

10   Defendant's Exhibit 36 into evidence.

11              MR. HURLEY:  Your Honor, the defendant, the

12   plaintiffs don't have a particular objection to this

13   document coming in.

14              THE COURT:  It's admitted in evidence.

15              (Defendant's Exhibit 36 admitted into evidence)

16   BY MR. ROCHE:

17   Q    Mr. Stone, when you say, "Put it on OpenSea then send

18   link," what are you referring to?

19              MR. HURLEY:  Your Honor, the direct is supposed to

20   come in, we understood, through the affidavit, that there

21   wasn't going to be live direct.  That was our understanding

22   of Your Honor's instruction and the party's agreement.  So I

23   think it's -- the affidavit has been has been admitted and

24   would see the opportunity now to cross.

25              THE COURT:  Well, these were additional exhibits

Page 180

1    that have been provided.  We had a discussion yesterday.  I

2    said I would reserve ruling until the exhibits were offered.

3    This exhibit was offered.  No objection was made.  I will

4    permit brief examination with respect to the exhibit and

5    you'll be able to cross-examine.  Go ahead, Mr. Roche.

6    BY MR. ROCHE:

7    A    What did I mean?  I meant for this person to list this

8    item on the OpenSea marketplace so that I could potentially

9    purchase it.

10   Q    And is the item an NFT?

11   A    not exactly.  This item is a physical item that is

12   associated with an NFT.  I'm not sure if there's a, if the

13   listing that he made was the NFT plus the physical or just

14   the physical.  I guess looking at this now, it was for both

15   the physical and the digital version.

16   Q    Of the NFT?

17   A    Correct.

18   Q    You can put that document aside.

19           MR. ROCHE:  Okay.  Your Honor, may I approach the

20   witness on Defendant's Exhibit 30?

21           THE COURT:  Sure.

22           MR. ROCHE:  Okay.

23   BY MR. ROCHE:

24   Q    Mr. Stone, do you have Defendant's Exhibit 30 in front

25   of you?

Page 181

1    A    Yes.

2    Q    What is Defendant's Exhibit 30?

3    A    It's a tweet that I made on February 8th, 2021.

4    Q    Were you still employed as the CEO of Celsius KeyFi at

5    the time?

6    A    Yes.

7            MR. ROCHE:  We move to admit Defendant's Exhibit

8    30 into evidence?

9            MR. HURLEY:  Objection, relevance, hearsay.

10           THE COURT:  Sustained.

11           MR. ROCHE:  Your Honor, can I have a moment?  Can

12   I ask a few more questions to establish the relevance here?

13           THE COURT:  No.  I sustained the objection.  This

14   is hearsay.  This is sustained.  Ask your next question.

15   Not about this, the exhibit is not coming in.

16           MR. ROCHE:  Understood.  We're not offering that

17   exhibit for the truth of the matter asserted --

18           THE COURT:  Mr. Roche, maybe you didn't understand

19   what I said.  I tried to say it very clearly.  The objection

20   sustained.  Go on to your next question.

21           MR. ROCHE:  Your Honor, I'm moving on to

22   Defendant's Exhibit 37.

23   BY MR. ROCHE:

24   Q    Mr. Stone, do you recognize this document?

25   A    Yes.

Page 182

1   Q    What is this document?

2   A    I believe it's a printout of Etherscan -- of an

3   Etherscan link to the OXB-1 wallet.

4   Q    And the OXB-1 wallet is the wallet you had control of

5   which to manage the deployment through KeyFi?

6   A    That I shared control of with Celsius, yes.

7            MR. ROCHE:  Your Honor, move to admit this

8   document into evidence and then a few brief questions on it.

9            MR. HURLEY:  Objection, hearsay, and submitted

10  after the deadline.

11           THE COURT:  Well hearsay, when you say that

12  control of this was shared with Celsius, explain what you

13  mean.

14           THE WITNESS:  The OXB-1 wallet was originally

15  created by Celsius.  They gave me access to it I think the

16  day after it was created and then two months later shared

17  the private keys with me to this wallet.  And by having, by

18  both parties having the private key, that means that we both

19  have the same level of access and control over the funds in

20  that account.

21           THE COURT:  Mr. Hurley, how does this differ from

22  the series of exhibits where there really originally were

23  objections and then they were withdrawn and they were

24  admitted?  I'm looking -- I'm trying to look at them now.  I

25  think Exhibit 15, 16, 17, the whole series of them.

Page 183

1         MR. HURLEY:  Your Honor, primarily in that our

2    exhibits were timely identified and the parties met and

3    conferred and reached an agreement.

4         THE COURT:  If that's your objection, it's

5    overruled, and you agree, Mr. Hurley, that there's --

6    control of this document was shared with Celsius?

7         MR. HURLEY:  Control of this document?

8         THE COURT:  Yes.

9         MR. HURLEY:  I thought you were asking about

10   control of the wallet.  I'm sorry.  Maybe I misunderstood

11   your question, Your Honor.

12        THE COURT:  Let me ask the question again of the

13   witness.  Explain whether Celsius -- who created this

14   document?  Who had access to this document?

15        THE WITNESS:  The document is just a printout from

16   the Etherscan website, so.

17        THE COURT:  All right.

18        THE WITNESS:  I'm not sure --

19        THE COURT:  The objection is overruled.  The

20   document is admitted in evidence.  We're talking about

21   Exhibit 37.  It's in evidence.

22   BY MR. ROCHE:

23   Q    Mr. Stone, if you could go to -- give me a second to

24   navigate, page -- the sixth page of this document.  I

25   believe there's multiple printouts of different displays of

Page 184

1    the OXB-1 wallet.

2    A    Yeah.

3    Q    Are you at the page where it says non-fungible token

4    transfers at the top?

5    A    Yes.

6    Q    Okay.

7              THE COURT:  I'm not, so hold on.

8              MR. ROCHE:  It's page -- it would be Page 6 of the

9    PDF.

10             THE COURT:  Okay, I'm there.

11   BY MR. ROCHE:

12   Q    What does this page represent?

13   A    This page represents the most recent transfers of ERC-

14   721 type NRTs in or out of the OXB-1 account.

15   Q    And this information is public?

16   A    Yes.

17   Q    If you could go to the 11th page of the document?

18   Again, the top of it says non-fungible tokens, and there's a

19   series of transactions on that page, the oldest of which

20   occurred 733 days ago.

21   A    Yeah.

22             THE COURT:  I don't see --

23             MR. ROCHE:  Your Honor, let me --

24             THE COURT:  I don't see that.

25             MR. ROCHE:  Page 11 of the PDF and there's --

Page 185

1              THE COURT:  Hold on, hold on.  All right.  Go

2     ahead.

3     BY MR. ROCHE:

4     Q    What does this page represent?

5     A    This page represents a list of the first couple NFTs --

6     acquired NFTs -- or the first couple of transactions in

7     which OXB-1 acquired NFTs.

8     Q    And the first one is 733 days ago?

9     A    For this specific account, yes.

10    Q    And what -- approximately do you know what day of the

11    year that was?

12    A    I don't.

13              MR. ROCHE:  Your honor, I'd represent to the Court

14    that 733 days ago was January 5, 2021.  And there's a series

15    of additional transactions that occurred 710 days ago.  I'd

16    represent to the Court that occurred on January 28, 2021.

17    BY MR. ROCHE:

18    Q    And Mr. Stone, what do these transactions represent?

19    A    Which transactions?

20    Q    The transactions on Page 11 of the PDF.

21    A    They're the first set of incoming transfers of NFT-type

22    assets to the OXB-1 wallet.

23    Q    And this information is publicly available?

24    A    Yes.

25              MR. ROCHE:  Your Honor, no further questions at

Page 186

1    this time.

2              THE COURT:  All right.  Any further cross-

3    examination?

4              MR. HURLEY:  Yes, Your Honor.

5                   CROSS-EXAMINATION OF JASON STONE

6    BY MR. HURLEY:

7    Q    Good afternoon, Mr. Stone.  Mitch Hurley with Akin Gump

8    Strauss Hauer & Feld representing Celsius, and I'm going to

9    be asking you a few questions this afternoon.  Let me just

10   start with Exhibit 37 that you were just handed, the

11   printout, and you were asked some questions about whether

12   the information is public, right?  You have to answer

13   audibly.

14   A    Yes.

15   Q    You see there's a date in the upper left-hand corner of

16   this document?

17   A    Yes.

18   Q    And that's the print-out date for this document, right?

19   A    I believe so.

20   Q    And it says January 8, 2023, right?

21   A    Correct.

22   Q    This is not a printout from 700-plus days ago.  This is

23   a printout from January 8, 2023, correct?

24   A    I believe so.

25              MR. HURLEY:  Okay.  Your Honor, may I approach the

Page 187

1    witness?

2              THE COURT:  Yes, please, go ahead.

3              MR. ROCHE:  Can I get another copy?

4    BY MR. HURLEY:

5    Q    Mr. Stone, I've handed you a binder of documents, and

6    it's the binder of the exhibits that I planned to ask you

7    questions about this afternoon, though the first document in

8    the binder is actually just a copy of your affidavit.  You

9    can just keep that near you, and I'll tell you the exhibit

10   numbers as we get to them, and we can start going through

11   them.  Okay?

12   A    Okay.

13             MR. HURLEY:  Your Honor, I have a copy that I've

14   given to counsel for the defendants as well.  I had a copy

15   for Your Honor ready to go but obviously cannot transmit it

16   to you.  Yes, exactly.

17             THE COURT:  Are these in your exhibits that have

18   already been admitted or are these impeachment exhibits?

19             MR. HURLEY:  So, I believe these all have been

20   admitted, and as we come to them, if there's an objection,

21   obviously I'm sure Mr. Roche will not be shy.

22             MR. ROCHE:  We'll make sure they're all admitted,

23   but assuming they're not (indiscernible) objection.

24             THE COURT:  Okay, I've got both binders in front

25   of me and I've got the electronically -- exhibits opened as

Page 188

1    well.

2              MR. HURLEY:  Okay, and we need a copy of his

3    deposition as well.  Yeah.  If I could approach again, Your

4    Honor, I've got to give him a copy of the deposition as

5    well.

6              THE COURT:  Sure.  Go ahead.

7              MR. ROCHE:  Can I have a copy as well?

8    BY MR. HURLEY:

9    Q    Okay, Mr. Stone, I'd like to start by agreeing on some

10   terms so we make sure we're communicating with each other.

11   So, you're aware one of the plaintiffs in the case is

12   Celsius Network, Limited?

13   A    Yes.

14   Q    Okay.  I'm going to try to refer to Celsius Network

15   Limited as either Celsius or Celsius Network today.  Okay?

16   A    Okay.

17   Q    The other plaintiff is Celsius KeyFi, LLC, which I'm

18   going to try to refer to today as Celsius KeyFi, understood?

19   A    Yeah.

20   Q    And finally, one of the defendants is a company called

21   KeyFi, Inc., and that's the company that you're a part owner

22   of, right?

23   A    Correct.

24   Q    I'm going to try to refer to KeyFi, Inc. as either

25   KeyFi or KeyFi, Inc., okay?

1   A.   Okay.

2   Q   Could you turn to Paragraph 6 in your affidavit, sir?

3   A   Paragraph -- Page 6 or paragraph?

4   Q   Paragraph 6.  The affidavit is --

5   A   Oh, the affidavit, sorry.

6   Q   Yeah, the affidavit, exactly.

7   A   Yeah.

8   Q   Okay.  In Paragraph 6, you say that KeyFi and then

9   Celsius KeyFi managed Celsius assets continually from

10   September 2020 through March 2021.  Do you see that?

11   A   Yes.

12   Q   And by managed, you mean at least that during the

13   relevant period KeyFi and then Celsius KeyFi deployed

14   Celsius assets in staking and DeFi activities, right?

15   A   Yes.  But there was never any specific paperwork that

16   said that the assets that Celsius gave us access to or

17   partial control over were necessarily being deployed by

18   KeyFi versus myself individually versus anything else I

19   think.

20           MR. HURLEY:  Your Honor, I guess I've moved to

21   strike as nonresponsive.

22           THE COURT:  Ask your next question.

23           MR. HURLEY:  Okay.

24   BY MR. HURLEY:

25   Q   So, KeyFi, your company KeyFi, actually began to manage

Page 190

1    Celsius assets in August of 2020 not September, right?  That

2    was just a mistake in the document?

3    A    I believe so.

4    Q    Right.  And at the beginning, at the very least, it was

5    KeyFi, Inc., that was managing the assets, not Celsius

6    KeyFi, right?

7    A    Yes, Celsius KeyFi didn't exist 'til later.

8    Q    Right.  And you own 38 percent of the equity in KeyFi?

9    A    I believe that's correct.

10   Q    You're the plurality largest owner of KeyFi, right?

11   A    I believe so.

12   Q    And during the period that KeyFi was managing Celsius

13   assets, you maintained operational control of KeyFi, right?

14   A    Yes.

15   Q    And you maintain operational control of KeyFi to this

16   day, right?

17   A    I'm the -- I'm the -- no, I'm the CEO of the entity,

18   yes, but it's -- yeah.

19   Q    Yes, you maintain operational control of KeyFi to this

20   day, right, sir?

21   A    Yes.

22   Q    Now, you're not sure when KeyFi's management of Celsius

23   assets ceased and when Celsius KeyFi's management began,

24   right?

25   A    Correct.

```
 1   Q    You were the CEO of Celsius KeyFi for a period of time,

 2   thought, right?

 3   A    Yes.

 4   Q    And according to Paragraph 21 of your declaration, your

 5   affidavit, you informed Celsius that you would be resigning

 6   as CEO of Celsius KeyFi in March of 2021, right?

 7   A    Yes.

 8   Q    And the communication that you're referring to in

 9   Paragraph 21, that's an e-mail you sent on March 9, 2021,

10   right?

11   A    Correct.

12   Q    Would you turn to PX 42 in the binder, sir?  And --

13            MR. ROCHE:  I don't see it yet --

14            THE COURT:  I see PX 41 and then it goes to PX 43.

15            MR. HURLEY:  I think it's -- okay.  It may be not

16   in your binder.  We'll come back to that.

17            THE COURT:  It's in my binder.  Forty-two comes

18   after 41 and before 43.

19            MR. HURLEY:  That's helpful, thank you.  Okay.

20   May I approach, Your Honor?

21            THE COURT:  Go ahead.

22   BY MR. HURLEY:

23   Q    So, I've handed you a document marked PX 42, sir.  And

24   do you recognize PX 42 as the March 9th e-mail that you sent

25   advising Celsius that you would be resigning as CEO of
```

Page 192

1    Celsius KeyFi?

2    A    Yes.

3    Q    In Paragraph 5 of your November 28th declaration, you

4    identify certain agreements.  Right?

5    A    My November 28th declaration.

6    Q    Paragraph 5.

7    A    Yeah, okay.

8    Q    And you reference, among others, the asset purchase

9    agreement or APA.  Do you see that?

10   A    Sorry, which paragraph?

11   Q    Paragraph 5.

12   A    Yes.

13   Q    Okay.  And you were not a party to that agreement,

14   right, the APA, you, Jason Stone?

15   A    I don't recall.  I don't believe so.

16   Q    Okay.  KeyFi is a party to that agreement, right?

17   A    I believe so.  Yes.

18   Q    And that agreement closed on or around January 11,

19   2021?

20   A    Yes, I believe so.

21   Q    Okay.  You also reference a service agreement in

22   Paragraph 5, but there were two documents labeled service

23   agreement that were -- parties were -- some of the parties

24   were party to in connection with their relationship, right?

25   A    I think that one of them was called the inter-company

Page 193

1    agreement and one of them was called the services agreement.

2    Q    Well, let's take a look at PX 39, which is in your

3    binder.

4    A    Yeah.

5    Q    And PX 39 has -- is titled Celsius Network Limited

6    Services Agreement -- Service Agreement.  Do you see that?

7    A    Yes.

8    Q    And it's dated October 7, 2020.  Do you see that?

9    A    Yes.

10   Q    Please turn to the last page of the exhibit and tell me

11   if you recognize your signature on this document.

12   A    I do.

13   Q    Okay.  And you're signing on behalf of KeyFi, Inc.,

14   right?

15   A    Yes.

16   Q    And if you turn back to Page 1, please, of the exhibit,

17   I want to direct your attention to Paragraph 1, term, okay?

18   A    Yeah.

19   Q    Tell me when you're there.  You see it?

20   A    Yeah.

21   Q    Okay.  And terms says the agreement shall begin on

22   August 17, 2020 and expire as of the date prior to closing

23   as described in the MOU.  Do you see that?

24   A    Yes.

25   Q    And the MOU contemplated the possibility of an asset

Page 194

```
 1    purchase agreement, right?

 2            MR. ROCHE:  Objection, foundation.

 3            THE COURT:  Overruled.

 4            THE WITNESS:  I believe so, but I haven't seen the

 5    MOU in a long time.

 6    BY MR. HURLEY:

 7    Q    Okay.  And the asset purchase agreement as we just

 8    indicated or you just testified closed on or around January

 9    11, 2021, right?

10    A    Yes.

11    Q    Okay.  Direct your attention please to Paragraph 2.  It

12    says services, and it's -- there's a typo.  It says services

13    twice.  Paragraph 2 provides KeyFi agrees that it shall

14    provide its expertise to Celsius for all things pertaining

15    to DeFi and staking services, and that's defined as the

16    services.  Do you see that?

17    A    Yes.

18    Q    Okay.  And in Paragraph 3, it's titled compensation.

19    Do you see that?

20    A    Yes.

21    Q    Okay.  Paragraph 3 indicates what the compensation is

22    going to be.  It says in consideration for the services.  Do

23    you see that?

24    A    Yes.

25    Q    Okay.  And it provides that Celsius shall pay KeyFi a
```

Page 195

1    billed rate equal to 102,980.64 as a one-time payment for

2    services performed starting on August 17, 2020 through

3    September 30, 2020 within two business of days of this

4    agreement's effective date.  Do you see that?

5    A    Yes.

6    Q    Okay.  And that 102,980.64 was in fact paid by Celsius

7    to KeyFi, correct?

8    A    Yes.

9    Q    Okay.  It goes on.  In addition, commencing on the

10   effective date until the date of closing, Celsius shall pay

11   KeyFi a billed rate equal to $31,875 on the 15th and last

12   day of each month services are performed.  Do you see that?

13   A    Yes.

14   Q    So, that's about $63,750 per month, right?

15   A    Yes.

16   Q    We already said no -- we already identified the

17   effective date was October 7, 2020, right?

18   A    I believe so.

19   Q    Right.  And from October 7, 2020 to January 11th,

20   that's just a little over three months, right?

21   A    I believe so.

22   Q    Mm-hmm.  So, the total billed --

23         THE COURT:  You have to answer audibly yes or no

24   and not with a grunt.

25         THE WITNESS:  Sorry, yes.

Page 196

```
 1    BY MR. HURLEY:

 2    Q    So, the total billed rate amount that would have been

 3    due for that period would have been around $190,000, right?

 4    A    I believe so.

 5    Q    And Celsius in fact paid KeyFi, Inc., that amount, did

 6    it not, sir?

 7    A    It did.

 8    Q    Okay.  Now, I direct your attention to the final

 9    sentence of the same paragraph.  It says KeyFi is not

10    entitled to any further consideration for the services

11    provided to Celsius.  Do you see that?

12    A    I do.

13    Q    Can you go to -- actually, please turn to Paragraph 10.

14    Paragraph 10 is titled modification.  You there?

15    A    Yeah.

16    Q    And it says no modification of this agreement shall be

17    valid unless in writing and agreed upon by both parties.  Do

18    you see that?

19    A    Yes.

20    Q    Okay.  Can we go to Plaintiff's Exhibit 37, please?

21              MR. ROCHE:   (Indiscernible) binder.

22              MR. HURLEY:  Thirty-seven's in there.

23              MR. ROCHE:   Thirty-seven?

24              MR. HURLEY:  It's in mine.

25              MR. ROCHE:   (Indiscernible) apologies, yes.
```

Page 197

```
 1   BY MR. HURLEY:

 2   Q    Plaintiff's Exhibit 37.  Actually, hold on.  I think

 3   I've directed you to the wrong document.  Well, while we

 4   have it open, Plaintiff's Exhibit 37 is called Memorandum of

 5   Understanding.  You see that?

 6   A    Yes.

 7   Q    Okay.  And in fact it does contemplate -- the

 8   Memorandum of Understanding contemplates an API -- APA being

 9   closed by the parties, right?  You see that in Paragraph 1?

10   A    Yes.

11   Q    Okay.

12            MR. HURLEY:  Can I just have one moment, Your

13   Honor?

14   BY MR. HURLEY:

15   Q    Let's go to Plaintiff's Exhibit 41, please, sir.

16   A    Okay.

17   Q    And Plaintiff's Exhibit 41 is a document titled Service

18   Agreement and it's dated December 31, 2020.  Do you see

19   that?

20   A    Yes.

21   Q    Okay.  This is the service agreement that you

22   referenced in Paragraph 5 of your November 28th declaration,

23   right?

24   A    I'm not sure, but maybe.

25   Q    Please turn to the fourth page of the document.  It's
```

Page 198

1    the signature page.

2    A    Okay.

3    Q    Do you recognize your signature on this document, sir?

4    A    Not my typical DocuSign, but I do believe that's my

5    signature.

6    Q    Mm-hmm.  And it's signed Jason Stone as CEO of Celsius

7    KeyFi, LLC, right?

8    A    Yes.

9    Q    Okay.  Please go to the 10th page of the exhibit which

10   is the actual DocuSign information.  I think actually it's -

11   - our exhibits are numbered.  So, it's PX 41-11 on the

12   bottom right.

13   A    Okay.  I'm there.

14   Q    Okay.  And you see next to your name, it indicates that

15   the document was signed on January 12, 2021.  Do you see

16   that?  And did you in fact sign this agreement on or around

17   January 12, 2021?

18   A    I believe so.

19   Q    Okay.  Let's please go back to Page 1.  And Page 1,

20   Paragraph 3 has a -- has a -- there's a paragraph called

21   Services.  Do you see that?

22   A    Yes.

23   Q    And this paragraph defines services.  The defining term

24   services is used to describe certain services that Celsius

25   KeyFi was to provide to Celsius Network.  Right?

Page 199

1   A    I believe so.

2   Q    And those services include the deployment of coins; is

3   that right?

4   A    I believe so, yeah.

5   Q    And in Paragraph 3 still, you see where it says with

6   respect to such services, all coins deployed by KeyFi -- and

7   by the way, KeyFi in this document refers to Celsius KeyFi,

8   right?  Not your company, KeyFi, Inc.?

9   A    Yes, I believe so.

10  Q    Okay.  See where it says with respect to such services,

11  all coins deployed by KeyFi and revenues generated and/or

12  received from third parties shall be owned by and paid to

13  Celsius or an affiliate of Celsius as determined by Celsius

14  excluding KeyFi?  You see that?

15  A    Yes.

16  Q    And Celsius there is Celsius Network, right?

17  A    I believe so.

18  Q    Let's look at Paragraph 4, compensation.  Paragraph 4

19  provides as a sole and exclusive compensation for the

20  services, Celsius shall pay KeyFi the consideration set

21  forth in Schedule B.  Do you see that?

22  A    I do.

23  Q    And again, Celsius is Celsius Network and KeyFi is

24  Celsius KeyFi, right?

25  A    Yes.

Page 200

1    Q     The plaintiffs in this case, correct?

2    A     Yes.

3    Q     Turn to Page 3, please.  Actually --

4          THE COURT:  Are you -- what -- are you referring

5    to 3 of 15?  What is the page that you're --

6          MR. HURLEY:  Apologies, Your Honor.  Why don't I

7    give you the paragraph number instead?  That will probably

8    be easier to get to.

9          THE COURT:  That would be helpful, yes.

10   BY MR. HURLEY:

11   Q     It's -- please turn to Paragraph 11 of the agreement,

12   Mr. Stone.  It says waiver and modification.

13   A     I'm there.

14   Q     Okay.  And do you see where it says no waiver or

15   modification of this agreement shall be valid unless in

16   writing agreed upon by the parties?

17   A     Yes, I see that.

18   Q     Okay.  Are you aware that the parties stipulated in a

19   pre-trial order in this case that in early 2021 Celsius

20   instructed the defendants to return all of Celsius' digital

21   assets in the defendant's possession, custody or control?

22   A     I am aware of that.

23   Q     Okay, and that instruction was given to you in or

24   around January or February, right?

25   A     Of what year?

Page 201

```
 1   Q    2021.

 2   A    No.

 3   Q    When was it given to you?

 4   A    I believe in late March.

 5   Q    Certainly later in March Celsius provided a written

 6   demand for the return of its crypto assets, right?

 7   A    Yes.

 8   Q    And please go to Paragraph -- sorry, Plaintiff's

 9   Exhibit 43.

10   A    Okay.

11   Q    Okay.  Plaintiff's Exhibit 43 is a multi-page document.

12   The first page is an e-mail that is from

13   Roni@Celsius.Network to Jason Stone, and it says it was sent

14   on Friday, March 26, 2021.  Do you see that?

15   A    Yes.

16   Q    Okay  Give me one moment.  You have an e-mail address

17   at the KeyFi domain?

18   A    Yes.

19   Q    Okay.  And again, I'm talking about KeyFi, Inc., your

20   company, not Celsius KeyFi.

21   A    Yes.

22   Q    Okay.  And what's your e-mail address on the KeyFi

23   domain?

24   A    Jason@KeyFi.io.

25   Q    Okay.  And sir, did you in fact receive this e-mail
```

Page 202

1   that is the first page of Plaintiff's Exhibit 43 on or

2   around March 26, 2021?

3   A     Yes.

4   Q     Okay.  And do you know who Roni is?

5   A     Yes.

6   Q     Roni Cohen-Pavan you can see at the bottom?

7   A     Yes.  And he is a senior executive of Celsius, correct?

8   Q     Yes.

9   Q     And he was a senior executive of Celsius on March 26,

10  2021?

11  A     I believe so.

12  Q     And so, the e-mail encloses two documents, right?

13  There's a demand letter and then there's a document titled

14  Written Consent in Lieu of Meeting of the Board of Managers

15  of Celsius KeyFi, LLC.  You see those two documents?

16  A     Yes.

17  Q     Okay.  And let me refer you back to the e-mail.  And

18  let's see.  In his e-mail, Mr. Pavon directs you to cease

19  all deployment of Crypto assets owned by Celsius Network

20  Limited, crypto assets, unwind all deployed crypto assets

21  and transfer them along with all undeployed crypto assets in

22  each case together with all interest thereon to Celsius

23  KeyFi, LLC wallet as described in the board resolution.  Do

24  you see that?

25  A     Yes.

Page 203

1    A    And that direction is repeated in the demand letter

2    that's enclosed, and it's also included in the board

3    resolutions, right?

4    A    Yes.

5    Q    And I want to direct your attention to Romanette III in

6    Mr. Pavon's e-mail.  And you see Mr. Pavon also specifically

7    directs you to "provide the seed and password for the KeyFi

8    wallet to S. Daniel Leon in his capacity as Class A manager.

9    All is detailed in the attached board resolutions and letter

10   from the Class A managers."  Do you see that?

11   A    I do see that.

12   Q    And if you go to the letter, the March 26th letter,

13   that encloses the board resolutions, you can see there is a

14   definition of KeyFi wallet, right?

15   A    Yes.

16   Q    Okay.  And KeyFi wallet is the OXB-1 wallet that we've

17   talked about a fair bit in this today, right?

18   A    Yes.

19   Q    Okay.  And you are directed again to provide the seed

20   and password for the KeyFi wallet meaning the OXB-1 wallet,

21   right?

22   A    Yes.

23   Q    To S. Daniel Leon in his capacity as Class A manager of

24   the company over the telephone in a secure manner and it

25   goes on.

Page 204

```
 1    A    Yes.

 2    Q    And the OXB-1 wallet, that's the same wallet that in

 3    September of 2021 you used this seed phrase and passcode to

 4    take $1.4 million out of and transfer to yourself, right?

 5    A    No.

 6    Q    The 1.4 million DAI was in the OXB-1 wallet, correct?

 7    A    Was in there, yes.

 8    Q    And you used your access to the passcode for the OXB-1

 9    wallet to enter the wallet and transfer the 1.4 million DAI,

10    which is equivalent to $1.4 million U.S. dollars, to

11    yourself and to your colleagues, correct?

12    A    No, not the passcode.

13    Q    The seed phrase?

14    A    Yes.

15    Q    Okay.  So, you used the seed phrase which you were --

16    that Celsius demanded that you return on March 26th on

17    September -- in September of 2021 to access the Celsius

18    wallet and take the 1.4 million DAI?

19    A    I -- return implies that it was something that --

20    Q    I'm not asking you to characterize the document, sir.

21    I'm asking you what you did.  Did you use that seed phrase

22    and passcode or just the seed phrase --

23    A    You asked me if I returned the seed phrase and

24    passcode.

25    Q    In --
```

Page 205

```
 1              THE COURT:  Excuse me.  Mr. Stone, listen to the
 2    question.  Only answer the question.
 3              THE WITNESS:  Okay.
 4              THE COURT:  Ask your question again.
 5    BY MR. HURLEY:
 6    Q    Sir, you used the seed phrase, the very one that is
 7    referenced in this demand letter, on March 26, 2021 to
 8    access six months later the OXB-1 wallet and transfer 1.4
 9    million DAI to yourself and your colleagues, correct?
10    A    Yes.
11    Q    And in fact, you didn't turn over the seed and password
12    for the OXB wallet until after this Court entered an order
13    requiring you to do so on December 16, 2022, right?
14    A    I just handed over the only copy I had after ordered,
15    yes.
16    Q    Okay.  Let's look at Plaintiff's Exhibit 61, please.
17              MR. ROCHE:  Sixty-one?
18              MR. HURLEY:  Sixty-one.
19              THE WITNESS:  I'm there.
20    BY MR. HURLEY:
21    Q    Plaintiff's Exhibit 61 is a copy of the order I just
22    referenced, sir.  And could you please turn to Page 5, which
23    is a signature page?
24    A    Yes.
25    Q    And you recognize the signature block of your counsel
```

1    there?

2    A    It doesn't look to be signed by anyone, but --

3    Q    I'm just asking if you -- yeah.  Okay.  And you

4    recognize Judge Glenn's name and his slash -- slash

5    signature here, right?

6    A    Yeah.

7    Q    Okay.  Please turn to Paragraph 3.

8    A    Okay.

9    Q    Okay.  And 3 provides that you're required within 48

10   hours of the effective date to provide the plaintiffs any

11   and all documents containing the seed phrase and private

12   keys associated with any and all Celsius wallets, and it

13   goes on.  Do you see that?

14   A    Yes.

15   Q    Okay.  I want to make sure we have a clear

16   understanding of the meaning of seed phrase and private keys

17   in this context.

18   A    Sure.

19   Q    A private key is like a passcode, right?

20   A    No.  A private key is a string of letters and numbers

21   which are the mono-numeric form of the cryptography

22   associated with a blockchain wallet.

23   Q    It's a string of numbers and letters that one needs to

24   access the contents of a wallet, right?

25   A    Yes.

```
 1   Q    Okay.  And the private key -- sometimes referred to as

 2   a private key, right?

 3   A    Yeah.

 4   Q    And that allows access to digital assets that are

 5   stored in the associated account, right?

 6   A    Correct.

 7   Q    A seed phrase consists of a group of algorithmically

 8   selected words; is that right?

 9   A    I'm not sure if they're algorithmically selected, but

10   it's a group of words, yes.

11   Q    Seed phrase is sometimes referred to as a recovery

12   phrase, right?

13   A    Yes.

14   Q    And the seed -- the seed phrase allows one to recover

15   all of the private keys for accounts associated with a

16   particular wallet, right?

17   A    I'm not sure that that's the technical definition, but

18   I think that the answer to your question is yes.

19   Q    Okay.  And the OXB-1 address, that could be referred to

20   as a master address, right?

21   A    It's the first address that is -- that is generated by

22   that seed phrase.  Yes.

23   Q    I mean, you called it a master address at your

24   deposition, right?  Do you remember that?

25   A    It's something that I call a master address.  I'm not
```

Page 208

1   sure if that's the technical definition.

2   Q    Okay.  And OXB-1 address has an associated seed phrase,

3   right?

4   A    Yes.

5   Q    And there are other child addresses of OXB-1 that are

6   also linked to the same seed phrase, right?

7   A    Yes.

8   Q    So, you can have multiple accounts that can have crypto

9   stored in them that are linked to the same seed phrase,

10  correct?

11  A    Yes.

12  Q    So, I want to ask you some questions about the OXB-1

13  seed phrase.  First, you maintained the seed phrase for OXB-

14  1 in handwriting on a single piece of paper; is that right?

15  A    I actually didn't maintain it.

16  Q    We'll come to that.  I'm going to refer to the piece of

17  paper as the seed document.  Will you understand me?

18  A    Okay.

19  Q    Okay.  And the seed document consists of a series of

20  words that's handwritten on a piece of paper, right?

21  A    Yes.

22  Q    The piece of paper that is the seed document has the

23  letterhead of St. Jude Children's Research Fund; is that

24  right?

25  A    I believe so, yes.

1   Q    The seed document is smaller than letter size, right?

2   A    Yes.

3   Q    It's more like notepad size.

4   A    Yes.

5   Q    Your father created the seed document, right?

6   A    Correct.

7   Q    You called him at some point before you left Celsius

8   and read the seed phrase to him and he wrote it down on that

9   St. Jude's notepad?

10  A    Yes.

11  Q    When exactly did you place that phone call?

12  A    I'm not sure.

13  Q    Was it in 2020?

14  A    I'm not sure.

15  Q    Was it in 2021?

16  A    It was either in 2020 or 2021.

17  Q    And you can't be any more precise than that?

18  A    I'm honestly not sure.  I think that it was in 2021,

19  because there would have been no reason for me to share that

20  with my father up until I was preparing to leave.

21  Q    Why did you -- why did you call your father and give

22  him the seed phrase for the OXB-1 wallet?

23  A    Because me keeping a copy of it would have been

24  dangerous for my physical well-being.

25  Q    When you were speaking to your father and he was

Page 210

1    writing down the seed phrase --

2    A    Yes.

3    Q    -- were you reading it from somewhere?  Did you have it

4    memorized?

5    A    No, I didn't have it memorized.  I was reading it from

6    the MetaMask account that I was operating.

7    Q    Okay.  And you have since given the seed document to

8    your counsel to turn over to the plaintiffs, right?

9    A    Correct.

10   Q    And are you aware that your counsel provided the seed

11   document to Celsius on Monday, December 19, 2022?

12   A    Yeah, that sounds right.

13   Q    And again, that's more than 20 months after Celsius

14   directed you to turn over the seed phrase in March 26, 2021,

15   right?

16   A    Yes.  But Celsius had the seed phrase.

17   Q    I want to talk now about certain transfers that you

18   made while you still had access to the private keys for

19   Celsius wallets.

20   A    Okay.

21   Q    Paragraph 12 of your November 28th declaration, in that

22   paragraph, sir, you say that you understood that Celsius

23   agreed that KeyFi was entitled to a substantial profit

24   share, and you say that the first payment was owed on

25   December 31, 2020.  You see that?  Tell me when you're

Page 211

```
 1    there.

 2    A    Sorry, my affidavit?

 3    Q    Your affidavit, Paragraph 12.

 4    A    Paragraph 12.  Paragraph 12 is Celsius' former CFO

 5    shared point of concerns.

 6    Q    Paragraph --

 7              MR. ROCHE:  I think he's in the wrong affidavit.

 8    BY MR. HURLEY:

 9    Q    Go to your affidavit, Mr. Stone.  Maybe -- maybe I'm --

10    A    Sorry, I was looking at an exhibit.  Sorry, yeah.

11    Based on the results we were achieving, yeah.

12    Q    Yeah, Paragraph 12.  Exactly.  You say you understood

13    that Celsius agreed that KeyFi was entitled to a substantial

14    profit share and you say the first payment was owed on

15    December 31, 2020, right?

16    A    Yeah, I believe so.

17    Q    And you get that date, December 31, 2020, you get that

18    from the APA, right?

19    A    Yes.

20    Q    Mm-hmm.  And the APA was signed we just established on

21    January 11, 2021, right?

22    A    Yes.  But it was in final form in early December and in

23    late November, I would say.

24    Q    But the due date, whatever form it was in, you believe,

25    was -- the first due date for the first payment was December
```

1    31, 2020, right?  That's what you said in your affidavit.

2    A    For payment from Celsius to KeyFi or from Celsius KeyFi

3    to KeyFi, yes.

4    Q    Right.  But many of the payments that you started to

5    make to yourself are before December 31, 2020, correct, sir?

6    A    I would not say many.

7    Q    Okay.  Let's talk about your claim that you were

8    authorized to take Celsius property as an advance on profit

9    share.  First, you claim that authorization was provided by

10   Alex Mashinsky, correct?

11   A    Correct.

12   Q    And while you claim others at Celsius knew about the

13   authorization, it was Mashinsky and Mashinsky alone whom you

14   claim actually gave the authorization, correct?

15   A    Yes.

16   Q    You claim Mashinsky first authorized you to take

17   Celsius assets as an advance on profit share sometime in

18   late October or early November 2020.  Right?

19   A    It could have been late November, but sometime in those

20   months, yes.

21   Q    Why don't we go to your deposition, sir?  Please turn

22   to Page 46 of your deposition transcript.

23              MR. ROCHE:  Which deposition, Mr. Hurley?

24              MR. HURLEY:  Mr. Stone's deposition.

25              MR. ROCHE:  He has two depositions.

Page 213

1          MR. HURLEY:  Oh, the -- sorry, the December 22nd.

2          THE WITNESS:  Page 46, yes.

3    BY MR. HURLEY:

4    Q    Yeah, Page 46.  Okay.  And in fact, you did give a

5    deposition on December 22nd, correct, sir?

6    A    Yes.

7    Q    I took your deposition.  You remember that?

8    A    Yeah.

9    Q    Okay.  And on Page 46, I want to begin reading from

10   Line 6, and if you'd please follow along with me, sir?

11   Question:  "Did anyone other than Mashinsky authorize you to

12   take advances on profit share?"  Answer:  "I'm not sure if

13   authorized is the correct characterization.  There were

14   other executives and individuals that were Celsius employees

15   that acknowledged and are -- and were aware that I was --

16   that I had been authorized to take some early profit share

17   advance, yes."  Question:  "But the authorization itself

18   came from" -- from -- sorry -- from "Mashinsky; is that your

19   testimony?  Others knew about it but it was Mashinsky that

20   gave the authorization?"  Answer:  "To the best that I can

21   recall."  Question:  "When did Mashinsky authorize you to

22   take advances?"  Answer:  "I believe the earliest point was

23   either very late October or very early December 2020 once it

24   was decided that I would be moving to Puerto Rico on

25   Celsius' request."  "Okay.  When was the last time -- the

Page 214

1    first time was October.  I think you said late October or

2    early December," and you correct yourself.  Answer:  "Early

3    November, sorry."

4            Did I ask those questions and did you give those

5    answers, sir?

6    A    Yes.

7    Q    And did you understand that you were under oath when

8    you were giving your deposition just as you are today.

9    A    Yes.

10   Q    And the last time you claim Mashinsky gave you such

11   authorization was either the last week of February 2021 or

12   the first two days of March 2011, right?

13   A    Yes.

14   Q    And during that period of time, you claim to have had

15   communications with Mashinsky that constituted Mashinsky

16   authorizing you to take assets on at least four occasions

17   but fewer than 10 occasions, right?

18   A    I believe that sounds right.

19   Q    One of those alleged miss -- communications with

20   Mashinsky was in person.  Others were over the telephone and

21   once or twice it was via e-mail, right?

22   A    I believe so.

23   Q    Let's start with the one or two authorizations that you

24   claim took place over e-mail.  First of all, you don't have

25   copies of either of those e-mails, right?

Page 215

```
 1    A    I don't believe so.

 2    Q    And you don't know whether anyone other than you and

 3    Mashinsky was copied on the e-mails?

 4    A    On those, perhaps.  Probably not.  And the e-mails

 5    wouldn't have been Jason, I authorize you to take X amount.

 6    It would have been me saying, hey, I'm going to take X, Y,

 7    Z.  Yeah.

 8    Q    Okay.  So, you don't know if anyone was copied but you

 9    believe that if anyone was copied, it either would have been

10    Connor Nolan or Harumi Urata-Thompson, right?

11    A    On those e-mails, it wouldn't have been Connor.  It

12    would have been Harumi.

13    Q    Okay, let's go to your deposition transcript, please.

14    A    Okay.

15    Q    Go to Page 50.

16    A    Okay.

17    Q    Okay, I'm going to start at Line 9.  "Okay.  Got it.

18    To your recollection, I know you're saying you don't have

19    the e-mails, but to your recollection, was there anybody

20    copied on those e-mails or addressed on those e-mails other

21    than you and Alex?"  Answer:  "I do believe that either

22    Connor Nolan or Harumi Urata-Thompson may or may not have

23    been CC'd on some of those e-mails."  Do you see that, sir?

24    A    Yes.

25    Q    Did I read it correctly?
```

```
 1   A    Yes.

 2   Q    You understood you were oath -- under oath at your

 3   deposition just as you are today?

 4   A    I do.

 5   Q    Okay.  And you were in the courtroom today when Mr.

 6   Nolan denied any recollection of any such e-mail, right,

 7   sir?

 8   A    Yes.

 9   Q    You heard that testimony?

10   A    I did.

11   Q    Let's talk about the alleged telephonic authorization

12   provided by Mashinsky.

13   A    Okay.

14   Q    You claim that the first authorization from Mashinsky

15   was given by telephone, correct?  The very first one?

16   A    I believe so, yes.

17   Q    And that call you believe was only between you and Mr.

18   Mashinsky, right?

19   A    Yes.  It was around the time that we had decided that I

20   was going to be moving to --

21   Q    Just asking who was on the call.

22   A    Yes.

23   Q    No one else was on the call other than you and

24   Mashinsky for the first one, right?

25   A    I don't believe so.
```

1    Q    And you were in the courtroom when Mr. Mashinsky denied

2    ever giving you that authorization, correct?  You were here

3    for that?

4    A    Yes, I was.

5    Q    Let's talk about the other telephonic authorizations

6    that you claim you received from Mashinsky.  You claim that

7    after the first call, Connor Nolan or Harumi Urata-Thompson

8    was on the phone for at least one of the times that

9    Mashinsky authorized you to take assets as profit share,

10   correct?

11   A    Yes.

12   Q    And again, you were in the courtroom when Mr. Nolan

13   denied any recollection of ever being on a call like that,

14   right?  You were here for that?

15   A    I was.

16   Q    Regarding Holert, you claim that he was present during

17   discussions in which you and Mashinsky openly talked about

18   the fact that you had been taking and continued to take

19   amounts of money from Celsius as early advances on profit

20   share, right?  You claim Holert witnessed that, right?

21   A    Yes.

22   Q    And you were in the courtroom today when Mr. Holert

23   denied ever having witnessed any such conversation, right?

24   A    Yes.

25   Q    You were here for that.  Let's talk about the amount

Page 218

1    authorized.  By March 9, 2021, that's the date you sent your

2    resignation letter, right?

3    A    Yes.

4    Q    You claim the KeyFi's share of profits generated had

5    reached as much as $145 million, right?

6    A    We believe that to be the case.

7    Q    That's just KeyFi's share.  That's not the profits.

8    That's just the KeyFi's share of the profits --

9    A    Correct.

10   Q    -- according to you.  Okay.  And you claim that you

11   were authorized to take -- by Mashinsky to take 10 to 15

12   percent of that amount, right?

13   A    I believe.  Yes.

14   Q    So, you claim in other words that Mashinsky authorized

15   you to take property worth about 15 million to $20 million

16   out of Celsius wallets and transform them to your wallets,

17   right?

18   A    Up to and to KeyFi wallets, not necessarily my wallets.

19   Q    Mm-hmm.  And you don't have a single e-mail, WhatsApp

20   communication, text message, anything in writing that

21   confirms your claim that Alex Mashinsky authorized you to

22   take 15 to $20 million out of Celsius wallets, do you?

23   A    No, I don't know that to be true.

24            THE COURT:  Do you have a writing?

25            THE WITNESS:  Sorry?

Page 219

```
 1              THE COURT:  Do you have a writing that backs up
 2    that Mashinsky authorized you to take an advance on profits?
 3              THE WITNESS:  I haven't been given access to all
 4    the documents that we got in discovery.  So, I don't know.
 5              THE COURT:  Well --
 6              MR. HURLEY:  Can -- may I, Your Honor, on that
 7    point?
 8              THE COURT:  Go ahead.  Go ahead.
 9    BY MR. HURLEY:
10    Q    Mr. Stone, you said that you believe some of those
11    communications may have been over WhatsApp and text message,
12    right?  You remember telling me that?
13    A    Correct.
14    Q    Okay.  WhatsApp and text messages, those are located on
15    your phone, right?
16    A    Yes.
17    Q    Okay.  Did you look?
18    A    I did.
19    Q    You haven't come forward with any such text message or
20    WhatsApp message that memorializes the supposed
21    authorization that you get to take 15 to $20 million in
22    Celsius property, have you?
23    A    I never said that he put in writing that I could take
24    15 to $20 million.
25    Q    Okay.
```

Page 220

1          THE COURT:  Could you please answer the question?

2     That wasn't the question.

3          THE WITNESS:  I'm sorry.  Can you repeat the

4     question?

5     BY MR. HURLEY:

6     Q    Despite looking at your WhatsApp and your text

7     messages, you never found a WhatsApp message or a text

8     message or anything else that memorializes the supposed

9     agreement that Mashinsky told you, you could take 15 to $20

10    million from Celsius and transfer it to yourself?

11    A    I don't believe there was ever a written communication

12    that said 15 or $20 million.

13    Q    Okay.  All I'm asking is whether you searched for it.

14    You didn't find it, right?

15    A    I don't believe that there ever existed anything like

16    that.

17    Q    Okay.  So, you don't think there ever was a writing

18    that would memorialize this claim that you're making that

19    Alex Mashinsky said you could take up to $15 or $20 million

20    dollars?

21    A    That I could take early profit share, yes.  Not a

22    specific amount, no.

23    Q    Okay, well, have you --

24          THE COURT:  I'm sorry.  Mr. Hurley -- Mr. Hurley,

25    stop.  That answer was ambiguous.  Ask your question again.

Page 221

1    I really -- this is an important point and I want a clear

2    record on it.

3              MR. HURLEY:  Okay.

4              THE COURT:  Mr. Mashinsky, listen carefully and

5    answer the question.  Don't dance around it.

6    BY MR. HURLEY:

7    Q    Okay, so Mr. Stone, let's just come back to -- you had

8    identified --

9              THE COURT:  I said -- I meant Mr. Stone.  I'm

10   sorry.  I apologize.

11   BY MR. HURLEY:

12   Q    Mr. Stone, you certainly don't have -- have not

13   identified any document that you claim memorializes an

14   agreement that you could take 15 to $20 million of Celsius

15   assets off the platform, correct?

16   A    Correct.

17   Q    Not only have you not found it, you don't think it

18   exists, right?

19   A    Not a document that references that number, no.

20   Q    Okay.  And you said there may be documents --

21             THE COURT:  (Indiscernible) if there's such a

22   document that references any other number.  You're saying

23   there's no document that reflects that number.

24             THE WITNESS:  I don't --

25             THE COURT:  Is there a document that you know of

Page 222

1    that reflects an authorization for you to take an advance on

2    profits in any amount?

3             THE WITNESS:  I believe that there are messages

4    that authorized me or refer to me being authorized to take

5    some early profit share but not a specific amount in writing

6    I believe.

7    BY MR. HURLEY:

8    Q    But you can't identify any specific message of the kind

9    you just described, correct?

10   A    Not at this time.

11   Q    Right.  You haven't produced anything in discovery that

12   is -- fits the description that you just gave, have you?

13   A    I'm not sure.  I -- I'm not sure.

14   Q    Okay.  You mentioned that you weren't provided all your

15   e-mails.  You said that before?

16   A    Correct.

17   Q    Okay.  You're aware that the parties to this case

18   engaged in an expedited discovery in advance of this

19   hearing?

20   A    Yes, I'm aware.

21   Q    Okay.  And that your counsel provided requests to

22   Celsius for the information that your counsel believed was

23   pertinent and wanted to get in advance of the hearing.  Are

24   you aware they did that?

25   A    Yes.

Page 223

```
 1              MR. ROCHE:  Objection.  Foundation?

 2              THE COURT:  Overruled.

 3   BY MR. HURLEY:

 4   Q    And you do have some e-mails from your Celsius e-mail

 5   address, right?  Because you produced some e-mails in

 6   discovery that are Celsius.Network e-mails, right?

 7   A    Yes.

 8   Q    Right.  So, sometimes you would forward e-mails that

 9   you thought were important to yourself, right, to make sure

10   you kept them?

11   A    No, I actually backed up a copy of my inbox a couple of

12   days before sending the resignation e-mail but for some

13   reason there were a couple of months missing from 2020.

14   Q    Okay.  So, you backed up your e-mail inbox and you had

15   access at least to the backed up e-mail inbox with the

16   exception of a couple months in 2020; is that right?

17   A    Yeah.

18   Q    And you searched through that material too in looking

19   for documents that would support your claim; is that

20   correct?

21   A    Yes.

22   Q    Okay.  Okay.  Let's go back to Plaintiff's Exhibit 41

23   for a moment, please.  This is a services agreement dated

24   December 31 that we looked at before.

25   A    Okay.
```

Page 224

1    Q    And if we could go to Schedule A, which is the numbers

2    PX 41-6 on the bottom right-hand corner?

3    A    Yeah.

4    Q    Okay.  All right.  And it references to Celsius, in all

5    caps, KeyFi.  Do you see that -- those references?

6    A    Yes.

7    Q    And just again to level-set, KeyFi in this document is

8    referring to Celsius KeyFi, not your company KeyFi, right?

9    A    I believe so, yes.

10   Q    Okay.  And the third bullet provides that KeyFi --

11   Celsius KeyFi I shall retain control of its internal budget

12   and profit and loss determination in good faith.  Do you see

13   that?

14   A    Yes.

15   Q    Okay.  And you were the CEO of Celsius KeyFi, right?

16   A    Yes.

17   Q    But while you were CEO of Celsius KeyFi, you never

18   caused Celsius KeyFi to prepare a P&L, did you?

19   A    We weren't able to, no.

20   Q    Instead, you directed the Celsius KeyFi team to begin

21   developing a software program that was code named wormhole,

22   right?

23   A    Yes.  And we directed that long before this document

24   was signed.

25   Q    So, you were working on the wormhole program, you and

1    your team, so that Celsius could understand the KeyFi P&L;

2    isn't that right?

3    A    I'm not sure if it was to understand the P&L or if it

4    was for granular tracking of transactions, but I think the

5    idea was to do both.

6           THE COURT:  Mr. Hurley, let me -- let me interrupt

7    you.  Just give me a sense for how long do you think your

8    cross-examination is going to continue?  I'm not rushing

9    you.  I'm just trying to get an estimate.

10           MR. HURLEY:  Yeah.  I -- it's a little hard to

11    gauge, but I think we're moving -- making pretty good

12    progress.  Certainly at least another hour.

13           THE COURT:  All right.  Let's take a 10-minute

14    recess.  We'll take a 10-minute recess until 4:00, okay?

15           MR. HURLEY:  okay.

16           (Off the record.)

17           THE COURT:  Mr. Stone, you're still under oath.

18    BY MR. HURLEY:

19    Q    Mr. Stone, did you confer with your counsel about the

20    subject of the case while you were on the break?

21    A    No.

22    Q    So, I was directing you to some testimony in your

23    deposition.  You should actually turn to Page 106, sir.

24    A    One second, 106.

25    Q    Yeah, it's related to the wormhole, and I'm going to

1   start reading at Line 5.  Question:  "Did (indiscernible) --

2   were they involved at all in trying to develop the

3   wormhole?"  Answer:  "Not in trying to develop.  They did

4   assist in reviewing the code based on the logic of how we

5   were constructing the program to read the blockchain

6   transactions that was supposed to compute, but wormhole

7   itself was not a true accounting software.  It was -- it was

8   meant to be a tracker so that Celsius' accounting team could

9   create the final P&L.  The wormhole itself was never

10  intended to output final P&L itself."

11          Question:  "The tracker was supposed to be a tool

12  that would help in creation of the P&L ultimately?"  Answer:

13  "In fact, it would be required, I believe, to do so.

14  Question:  "Why do you say it would be required?"  Answer:

15  "Because Celsius wasn't looking for other ways to compute

16  P&L other than relying on my team's development of a program

17  that would get them that middle of the way there, and we had

18  told them from the beginning that we didn't know when it

19  would be done, and it never ended up being done."  Did I

20  read that correctly, sir?

21  A    Correct.

22  Q    And you understand you were under oath at your

23  deposition just as you are here today?

24  A    Yes.

25  Q    Okay.  And in fact, wormhole never was completed,

Page 227

```
 1    right?

 2    A    Correct.

 3    Q    And the wormhole was never delivered to Celsius in any

 4    form that would be useful to anyone, right?

 5    A    I believe so.

 6    Q    And if Celsius were to try to prepare a P&L for Celsius

 7    KeyFi, the wormhole would have been required, right?  That's

 8    what you said at your deposition, isn't it?

 9    A    If they weren't using any -- if they weren't looking

10    for anything else to use, yes.

11    Q    And you understood that they were relying on you and

12    your team to develop the wormhole in order to be able to

13    understand and prepare a P&L, right?

14    A    A final P&L, yes.

15    Q    Let's talk about the NFT purchases for a minute.  You

16    claim Mashinsky authorized you to use Celsius assets to buy

17    NFTs in his advance on profit share, right?

18    A    Yes.

19    Q    And you bought hundreds of NFTs using Celsius' assets,

20    right?

21    A    I think thousands.

22    Q    But you never provided, for example, a written report

23    to Celsius advising that consistent with your alleged

24    agreement on profit share, you had bought certain identified

25    NFTs, right?  You never sent an e-mail like that, did you?
```

Page 228

1   A     No.

2   Q     And you can't identify any document, whether e-mail or

3   otherwise, in which the purchase by you of NFTs is

4   specifically tied to your claim that you were allowed to buy

5   NFTs as profit share, right?  You can't identify any

6   document like that, can you?

7   A     I don't believe so.

8   Q     At most, you may have written an e-mail to the effect

9   of, "'Hey, I bought some more NFTs this week,' smiley face,"

10  right?

11  A     Sounds like something I would say.

12  Q     Okay, but you haven't even found the smiley face e-

13  mail, have you, sir?

14  A     I'm not sure.

15  Q     Okay.  Let's talk about the property transfers.  I want

16  to direct your attention again to Plaintiff's Exhibit 61.

17  And I want to direct you to Paragraph 2 of Exhibit 61, which

18  is this Court's order.

19  A     Okay.

20  Q     Paragraph 2 provides the defendants are required on or

21  before 12 p.m. Eastern time on December 20, 2022 to provide

22  a sworn statement specifically identifying under penalty of

23  perjury all property, including all Stone-utilized assets

24  and all subject property and its current locations.  Do you

25  see that?

Page 229

1    A    I do.

2    Q    And you see that in footnote three, Stone-utilized

3    assets is defined to refer to any assets transferred or

4    otherwise used by or at the direction of the defendants from

5    any Celsius wallet, and subject property refers to NFTs,

6    interest in blockchain-related companies and any other

7    property of any kind acquired in whole or in part with

8    Stone-utilized assets or their proceeds; do you see that?

9    A    I do.

10   Q    Okay.  And together they're defined as initial cap

11   property, right?

12   A    And -- say again?

13   Q    Property refers collectively to the Stone-utilized

14   assets and the subject property.  You see that?

15   A    Yeah, I do.

16   Q    Okay.  So, pursuant to this order, you were required to

17   provide a sworn statement with that information, right?

18   A    Yes.

19   Q    Okay.  And you in fact did provide a sworn statement

20   that -- a sworn statement in connection with Paragraph 2 of

21   the Court's order, right?

22   A    Yes.

23   Q    Can we go to Plaintiff's Exhibit 64, please?  And it's

24   titled Revised Affidavit of Jason Stone Pursuant to Joint

25   Stipulation and Agreed Order.  Tell me when you're there.

```
 1    A    Yeah.

 2    Q    You see it?

 3    A    Yeah.

 4    Q    Okay.  And it's called revised because you had provided

 5    an affidavit earlier in the day at around noon by the

 6    deadline and then revised it and sent it around -- later the

 7    evening on December 22nd, right?

 8    A    I believe so.

 9    Q    Or December 20th, I'm sorry.  Okay.  And you recognize

10    the signature on the final page?

11    A    Yes.

12    Q    And let's go to paragraph --

13               THE COURT:  It's your signature, right?

14               THE WITNESS:  Yes.

15               THE COURT:  Go ahead.

16    BY MR. HURLEY:

17    Q    And then go to paragraph -- Paragraphs 2 and 3, please.

18    A    Okay.

19    Q    Two says attached to this affidavit is Exhibit A which

20    I prepared in connection with this matter.

21    A    Yes.

22    Q    And it says Exhibit A is a spreadsheet which reflects

23    the transfers made from Celsius wallets to KeyFi, Inc. as

24    authorized payouts in advance of formal calculation of the

25    same, including transfers and uses from there.  Do you see
```

Page 231

```
 1   that?

 2   A    Yes.

 3   Q    Okay.  And I want you to -- I want to direct your

 4   attention to plaintiff's Exhibit 65, but it is a -- it's a

 5   large spreadsheet.

 6   A    Okay.

 7              MR. HURLEY:  Can we put it up on the screen?  How

 8   are we going to -- okay.  Your Honor, I'm not quite sure

 9   that these --

10              THE COURT:  I have it in front of me.

11              MR. HURLEY:  You do?  Okay.  You have the hard

12   copy?

13              THE COURT:  I have the hard copy in front of me.

14              MR. HURLEY:  Okay.  It's a little easier if we can

15   -- if you could -- I guess you -- but you can't see our

16   screen so it's okay.  All right, we'll --

17              THE COURT:  I can see your -- well, if you'd like

18   to share the screen and put it up, and you can expand the

19   size, go ahead.

20              MR. HURLEY:  Okay.  It's 60 -- yeah, 65.  Yes.

21              MAN 2:  May I have permission to share my screen?

22              THE COURT:  Deanna, can you permit him to share

23   the screen?

24              CLERK:  Jessica's on now.

25              CLERK:  I am on.  Mr. (indiscernible) has been
```

```
 1    made co-host.  You can go ahead and share your screen now.

 2                 MAN 2:  Okay, thank you.

 3                 THE COURT:  Thank you, Jessica.

 4                 MR. HURLEY:  Is it going to appear up here, too,

 5    or (indiscernible) back here?

 6                 MR. ROCHE:  I think they should appear up there.

 7    When I did it earlier, they appeared --

 8                 MR. HURLEY:  Oh, yeah, okay.

 9                 MR. ROCHE:  Maybe not.

10                 MR. HURLEY:  That's not -- (indiscernible).

11    BY MR. HURLEY:

12    Q    Okay.  So, sir, do you recognize Plaintiff's Exhibit 65

13    as the spreadsheet that was attached to your December 20th

14    affidavit as Exhibit A?  And I'm going to get to the fact

15    that you circulated another one later, but just --

16    A    Yeah.

17    Q    Okay.  And so, as of December 20, 2022, anyway, PX 64,

18    your revised affidavit and this Excel spreadsheet that is PX

19    65 comprised your sworn statement, right?

20    A    I believe so.

21    Q    Okay.  And you can see PX 65 has three workbooks.

22    We've got to make it visible so that the --

23    A    Yes, I think so.

24                 WOMAN 1:  (Indiscernible).

25                 MR. HURLEY:  Yeah, I guess the Excel that actually
```

Page 233

1    shows the workbooks so we go tab by tab.

2              WOMAN 1:  Yeah, the (indiscernible) one.

3              MR. HURLEY:  No.

4              WOMAN 1:  Just that --

5              MR. HURLEY:  Just the version that has the tab so

6    we can see the labeled tabs.  Let me keep going and

7    hopefully we'll be able to find another version of this,

8    Your Honor, but I think we can get something done while

9    we're waiting.

10   BY MR. HURLEY:

11   Q    So, the spreadsheet that was -- the original

12   spreadsheet that was attached to your revised affidavit,

13   sir, on December 20th had three tabs on the Excel, right?

14   A    Yes.

15   Q    Okay.  And you think you guys referred to them as

16   workbooks?  I've been told maybe that's not exactly the

17   right term for it in Excel, but I've been calling it

18   workbooks, too, so three workbook tabs in the Excel?

19   A    Right.

20   Q    Okay.  One of those tabs was labeled ETH transfers to

21   and from interested wallets, and one was labeled ERC 20

22   transfers to and from interested wallets, and one was

23   labeled NFT buys, right?

24   A    Yes.

25   Q    Okay.  And then on January 3rd, you delivered a revised

Page 234

1    version of Exhibit A -- of the Exhibit A to your December

2    20th revised affidavit, right?

3    A    I believe so.

4    Q    Okay.  And we really need PX 69 now and the version

5    that shows the tabs would be especially helpful.

6             MAN 1:  (Indiscernible) share that.

7             MR. HURLEY:  Okay.  Can you move it so that we can

8    see all the tabs?

9             MAN 1:  (Indiscernible).

10            MR. HURLEY:  Okay.

11   BY MR. HURLEY:

12   Q    Can you see that -- the spreadsheet on your screen

13   there, Mr. Stone?  Is there a spreadsheet that's come up

14   there?

15   A    Yeah, but it's super tiny.

16   Q    Okay.

17            MR. HURLEY:  What's that?

18            MAN 1:  I can enlarge it.  Just let me know which

19   tab.

20            MR. HURLEY:  Okay.

21   BY MR. HURLEY:

22   Q    For now, I'm just going to ask you some questions.  I

23   think you probably should be able to read even in this size.

24   A    Okay.

25   Q    Okay.  So, first of all, PX 69 which is on the screen

Page 235

```
 1    is another Excel spreadsheet.  You see that?

 2    A    Yes.

 3    Q    But this one has five workbooks instead of three

 4    workbooks, right?

 5    A    Yes.

 6    Q    Okay.  And three of the workbooks correspond to the

 7    three workbooks that were also part of the December 20th

 8    Excel plus there's two new workbooks, right?

 9    A    Yeah, I believe so.

10    Q    And so, do you recognize PX 69 as the revised Exhibit A

11    the defendants provided on January 3rd?

12    A    Yes.

13    Q    And PX 69 is intended to replace PX 65, the original

14    exhibit to your December 20th revised sworn affidavit,

15    right?

16    A    Yes, I believe so.

17    Q    Okay.  So, as of January 3rd, PX 64, the revised

18    affidavit, plus PX 69 comprised the sworn statement that

19    defendants were required to supply by the court, right?

20    A    I believe so.

21    Q    Okay.  So, let's go to PX 64, Paragraph 4, and it says

22    Exhibit A contains three workbooks.  The first workbook is

23    entitled ETH transfers to and from interested addresses.  It

24    reflects the ETH-based transfers of assets from Celsius

25    wallets to wallets controlled by defendants.  Do you see
```

Page 236

1    that?

2    A    Yes.

3    Q    Okay.  And by the term Celsius wallets, you're

4    referring to wallets that Celsius initially created or

5    addresses that are derived from the seeds of the OXB-1

6    wallet and the 43-D wallet, right?

7    A    Yes.

8    Q    First, did Celsius ever provide coins to you for

9    deployment through any addresses other than addresses

10   derived from the seeds of OXB-1 or 43-D?

11   A    Did Celsius ever -- say again?

12   Q    Provide coins to you for deployment through any

13   addresses other than addresses of 0XB1 and 43-D.

14   A    Do you mean, did they send me coins to addresses that

15   weren't part of those seeds?

16   Q    Yes.

17   A    I think maybe in one case, but I can't remember.

18   Q    Okay.  Do you have -- do you know the address or the

19   first several digits of the address?

20   A    No, no.  It would've been for a one-time thing only.

21   Q    Okay.  Approximately when?

22   A    It would've been at the very beginning of our -- of the

23   relationship.

24   Q    Do you remember the amount or type of coins?

25   A    I think that there was a Wrapped Bitcoin transaction

1    that we did something with that was on like a separate

2    wallet seed, sometime in September 2020, but I honestly

3    can't remember.  It was for like a short duration of time.

4    Q    Okay.  And at that time, you -- rough estimate of what

5    the Wrapped Bitcoin number was that was transferred to you?

6    A    I don't remember, but it -- I don't believe it was more

7    than seven figures.

8    Q    Seven figures --

9    A    U.S. dollar value.

10   Q    U.S. dollars.  Okay.  Okay.  Now in your spreadsheet,

11   in some cases, the transfer that's identified in the

12   spreadsheet is actually for the benefit of the defendants,

13   but it's being sent to a wallet that is not owned or

14   controlled by the defendants, right, on some of the

15   occasions?

16   A    For the benefit of?  Yes, I believe that's the case.

17   Q    Okay.  And in the first workbook, which is the ETH

18   transfers workbook --

19   A    Yep.

20   Q    You see that there are three rows that are highlighted

21   in yellow, Rows 14, 62, and 63?

22   A    Yes.

23   Q    Okay.  And are you aware that in their January 3rd

24   transmittal email your counsel advised that Rose highlighted

25   in yellow in this document are the transactions where

Page 238

1    defendants believe that Celsius is ultimately in possession

2    of the highlighted -- of the property in the highlighted

3    row?

4    A    Yeah, I see that.

5    Q    So that yellow highlighting, that was added by you or

6    your counsel?

7    A    Yes.

8    Q    Okay.  Let's take a look at Column C in the first book,

9    which is labeled From.  And you'll see underneath Column C,

10   there are wallet addresses.

11   A    Yeah.

12   Q    And those addresses generally are the Celsius wallets

13   that you referred to in Paragraph 4 of your sworn affidavit,

14   right, the From wallets?

15   A    I believe so, yes.

16   Q    Let's move to Column D, which is labeled To.  And again

17   under Column D are wallet addresses, and those addresses

18   under Column D generally are the wallets controlled by

19   defendants referenced in Paragraph 4 f your sworn affidavit,

20   though as I just noted, there are some examples where it's a

21   wallet that is not owned by the defendants but the transfer

22   is for the benefit of the defendants, right?

23   A    In some cases, I believe so.  Yes.

24   Q    Okay.  Column E is labeled Token Value and Column E

25   identifies the amount of ETH associated with each listed

Page 239

1   transaction?

2   A     Yes.

3   Q     The number of coins, in other words, right?

4   A     Yes.

5   Q     And Column G shows the date of the transfer from the

6   Celsius wallet to the defendant's wallet, right?

7   A     Yes.

8   Q     Okay.  And Column F indicates the U.S. dollar

9   equivalent of the ETH transferred as of the transfer date,

10  right?

11  A     Yes.

12  Q     Column H includes some information about what happened

13  to the ETH after defendants transferred it from Celsius

14  wallets to their own wallets, right?

15  A     Yes.

16  Q     So for example, in Column H you indicate that the 350

17  ETH the defendants took from Celsius on February 21st, 2021

18  was used to purchase NFTs for KeyFi, right?  Do you see

19  that?

20  A     Yes.

21             MR. HURLEY:  Are you with me, Your Honor?  Know

22  it's --

23             THE COURT:  Yes.

24             MR. HURLEY:  Okay.

25  BY MR. HURLEY:

Page 240

```
 1   Q    And now you don't identify which NFTs were purchased

 2   with the 350 ETH in the spreadsheet, right?

 3   A    Say again?

 4   Q    You say that the 350 ETH was used to purchase NFTs, but

 5   you don't identify which NFTs were purchased in this

 6   spreadsheet, correct?

 7   A    Correct.  Well, no --

 8   Q    For this particular row.

 9   A    For this particular row, no.

10   Q    Okay.  You could have found that information out,

11   right, and provided it in the spreadsheet but you didn't

12   think that was the exercise and so you didn't do it, right?

13   A    I think actually it is reflected in the NFT buys, but

14   I'm not sure.

15   Q    So you indicate that the NFTs that were purchased here

16   were either sold for ETH or transferred to the 0X50 wallet.

17   That's one of your wallets?

18   A    That's a KeyFi wallet.

19   Q    Or remain in the 0XFC wallet, which is also a KeyFi

20   wallet?

21   A    Yes.

22   Q    And you have the seed phrase and private key for 0XFC

23   and 0X50, right?

24   A    Yes.

25   Q    Okay.  And then in Cell H-2, you indicate three
```

Page 241

```
 1    possible fates for the NFTs that were purchased with the 350

 2    ETH, right, A, B, and C.  You see that?

 3    A    I think A, B, and C refers to the fate of the 350 ETH,

 4    not the NFTs, but yes.

 5    Q    And with respect to NFTs that were sold for ETH, you

 6    would be able to at least to some large extent to determine

 7    where the ETH proceeds went, right?

 8    A    To some extent.

 9    Q    But you didn't do that here, right?  You didn't think

10    that was the exercise?

11    A    I did not believe that was the exercise.

12    Q    Okay.  So H-3 indicates that that ETH was spent on

13    expenses.  See that?

14    A    Yes, I do.

15    Q    And Column I indicates this expense was a loan

16    repayment to Emil Bailey.  See that?

17    A    I don't see it, but yes.

18    Q    It's in Column I.

19    A    The Zoom thing is blocking --

20    Q    Okay --

21    A    -- Column I, but yeah.  I remember.

22    Q    So this 850 ETH that was -- that you transferred out of

23    Celsius wallets was used to repay a personal loan to you

24    from Mr. Bailey, right?

25    A    Yes.
```

Page 242

1    Q    And 850 ETH at that time was worth more than $625,000,

2    right, on the transfer date?  That's what's indicated.

3    A    Yes.

4    Q    Okay.  So -- and you transferred it to -- the wallet

5    that is the transferee wallet on this line, this row of the

6    spreadsheet is a wallet that's controlled by Mr. Bailey,

7    right?

8    A    I believe so.

9    Q    The ETH that you were repaying, the ETH that you

10   borrowed from Mr. Bailey, you used to invest in DeFi

11   activities personally, right?

12   A    Yes.

13   Q    You used those coins for activities like yield farming

14   and you believe that your activities generated a profit

15   between $500,000 and $2 million, right?

16   A    If I remember correctly.  Sounds right.

17   Q    And you can't recall whether you still have the

18   proceeds of that activity, right, the $500,000 to $2 million

19   in proceeds?

20   A    I don't -- yeah, I'm not sure if the proceeds from that

21   specific investment are available to me.

22   Q    Okay.  Let's look at Cell H-11.  By the way, the

23   workbook includes 36 rows that are labeled Spent on

24   Expenses.  Does that sound about right to you?

25   A    This workbook?  Maybe.

Page 243

1   Q     Okay.  Let's go to column -- to Cell H-11 which is one

2   of the Spent on Expenses.

3   A     Okay.

4   Q     Column I indicates this was spent on rent.

5   A     Yeah.

6   Q     That was 179 ETH plus the 1 ETH in Line 55 which you

7   used for rent on a home in Puerto Rico, right?

8   A     Correct.

9   Q     That was worth about $114,000 at the time?

10  A     Looks that way.

11  Q     That was for a year's rent on a three bedroom house in

12  Puerto Rico?

13  A     Yes.

14  Q     And the wallet in Cell 11-D is the wallet of the

15  homeowner from whom you rented, right?

16  A     I believe so, yes.

17  Q     Okay.  Some of the other rows were spent on expenses

18  and -- well, let me back up.  So there are some examples on

19  this ETH transfers worksheet of you transferring ETH and

20  using it for Jason Stone's personal benefit, right, repaying

21  the personal loan, paying your rent.  Fair?

22  A     Yes.

23  Q     Some of the other rows where it's indicated Spent on

24  Expenses, indicate that they were expenses or you believe

25  they were expenses for KeyFi, right?  Some of them.

Page 244

1    A     Yes, but also for Celsius KeyFi.

2    Q     Okay.  With respect to KeyFi, you own 38 percent of

3    that company, right?  We already established that.

4    A     I think that that's the right number.

5    Q     And as the plurality owner of KeyFi, you actually

6    consider your personal expenses and KeyFi expenses to be one

7    and the same, right?

8    A     No.

9    Q     Okay.  Let's go to Page 177 of your transcript, please.

10             THE COURT:  Are you still going to be looking at

11   the spreadsheet?

12             MR. HURLEY:  Yes.

13             THE COURT:  Okay.

14             MR. HURLEY:  For some time, Your Honor.

15   BY MR. HURLEY:

16   Q     I'll withdraw that.  Let's actually go back to the

17   spreadsheet and let's go to Column E in the ETH transfer

18   spreadsheet, Mr. stone.

19   A     Sorry?

20   Q     We're going to go back to the spreadsheet.

21   A     Okay.

22   Q     And we'll go back to -- we'll go to Column E.  And

23   that's the column that indicates the amounts of ETH

24   transferred, right?  You see that?

25   A     Yes.

1    Q    Okay.  And if that column sums up to 2,973.67 in ETH,

2    does that sound about right?

3    A    If that's what the workbook shows.

4    Q    And if you eliminate the yellow highlighted transfers,

5    the ones that you think wound up back with Celsius, it's

6    still 2,831 ETH.

7    A    Okay.

8    Q    That's worth more than $3.5 million at today's prices,

9    right?

10   A    Yes.

11   Q    And worth close to $4 million at the prices at the time

12   of the transfers, right?

13   A    I believe so.

14   Q    This workbook lists 71 separate transfers of ETH,

15   right, and 68 if you exclude the yellow highlighted ones

16   that you think went back to Celsius?

17   A    Okay.

18   Q    And you see the transfers spanned from September 9th,

19   2020 through September 13th, 2022?

20   A    I don't see that, but okay.

21   Q    Okay.  And so some of the transfers, the September 9th

22   transfer for example, that's before even you claim that you

23   were authorized to take property by Mashinsky off of the

24   platform, right?

25   A    Correct, but that wasn't the implication of this

Page 246

1    workbook at the time I was constructing it.

2    Q    Okay.  And September 13th, 2022, that's more than six

3    months after you resigned, right?

4    A    '22?

5    Q    Yes.  Sorry, it's '21.  September 13th, 2021 is the

6    last transfer of ETH on this workbook and that is six months

7    after you resigned, right?

8    A    What line?

9    Q    We'll come back to that.

10   A    Okay.

11   Q    And again, you've made 68 transfers here.  You can't

12   point to a single piece of paper in which Celsius authorizes

13   a single one of these 68 ETH transfers, right?

14   A    Celsius wasn't big on paper.

15   Q    Is the answer --

16   A    No.

17   Q    Okay.  Let's go to the next workbook.  It's labeled

18   ERC-20 Transfers To and From.  ERC-20 token are fungible

19   tokens created using the Ethereum blockchain, right?

20   A    Yes.

21   Q    For example, stable coin USDC is an ERC-20 token,

22   right?

23   A    Yes.

24   Q    As is the stable coin Dai, D-A-I?

25   A    Yes.

1    Q    Right?  So please turn to your revised affidavit which

2    again is PX-64 and go to Paragraph 5.  And Paragraph 5 says,

3    "The second workbook is entitled ERC-20 transfers to and

4    from interested addresses.  It reflects the ERC-20 token

5    that were sent from Celsius wallets to wallets controlled by

6    defendants."  Do you see that?

7    A    Yes, I do.

8    Q    Okay.  And let's just go through the columns here again

9    to make sure that we are all understanding what's being

10   presented here.  So Column B identifies the particular type

11   of the ERC-20 token in the transaction, right?

12   A    Yes.

13   Q    Column C identifies the Celsius wallet referred to in

14   Paragraph 5 of your sworn affidavit as the from wallet,

15   right?

16   A    Yes.  Upon looking at this, in Paragraph 5, I would say

17   that there is a piece that maybe is not correct here.  It

18   says sent from Celsius wallets to wallets controlled by

19   defendants, but I think it should actually be sent from

20   Celsius wallets to wallets not controlled by plaintiffs.

21   Q    Because some of the addressee wallets are wallets where

22   you're transferring assets out of the Celsius ecosystem to

23   defendants or at the direction of defendants, right?

24   A    Right.  So that would have included things that were

25   expenses related potentially to Celsius KeyFi, for instance.

Page 248

```
 1    Q      Well, we'll come back.

 2    A      Okay.

 3    Q      Okay, Column E is token value.

 4    A      Yep.

 5    Q      Number of corresponding ERC tokens, right?

 6    A      Yep.

 7    Q      And U.S. dollar value, again, that's the value of those

 8    tokens at the exchange rate prevailing at the time of the

 9    transfer, right?

10    A      Yep.

11    Q      And Column G is the date of the transaction, right?

12    A      Yes.

13    Q      So there are many items on this list, and we don't have

14    time to go through them all, so I'm just going to highlight

15    a few.

16    A      Okay.

17    Q      Row 10 is a transfer of tokens worth about $135,000.

18    Do you see that?

19    A      Yes.

20    Q      That's transferred from a Celsius wallet to defendant's

21    wallets on November 24th, 2021.  You see that?

22    A      Yes.

23    Q      Okay.  And this is more than eight months after you

24    resigned, right?

25    A      Yes.
```

Page 249

1    Q    Okay.  The description says, "Believe this was spent on

2    legal bills."

3    A    Yeah.

4    Q    So you used -- let's see, and in fact, you believe you

5    paid this amount to the Kaiser Saurborn firm, the firm that

6    represented you, I guess, two law firms before Mr. Roche?

7    A    No, I had paid -- I had paid them already.

8    Q    Who did you pay with this amount?

9    A    I paid Roche Freedman at the time a payment and I

10   believe the -- what was their name?  I'd also owed like

11   $70,000 to the law firm that was in between Kaiser and

12   Roche.

13   Q    Quinn Emanuel?

14   A    Yeah.

15   Q    Okay.  And you were paying these lawyers to represent

16   you in disputes with Celsius, right?

17   A    Yes.

18   Q    You were going into Celsius wallets taking assets and

19   using them to pay legal fees to litigate against Celsius, is

20   what you're doing right?

21   A    We weren't in litigation yet.

22   Q    Okay.  Cells I -6 to -8 reference an investment into

23   Nifty seed round.  There are transactions of $200,000 each

24   associated with the Nifty's investment here for a total of

25   $600,000; do you see that?

Page 250

```
 1    A     Yes.

 2    Q     Okay.  And this is an equity investment in Nifty's,

 3    right?

 4    A     Yes.

 5    Q     And that stake in Nifty is acquired with the $600,000?

 6    It's currently held personally in your name, right?

 7    A     Correct.

 8    Q     Originally you bought it through a company that's

 9    wholly owned by you and then you transferred it to your

10    name, right?

11    A     Correct.

12    Q     And it remains in your name to this day?

13    A     Correct.

14    Q     ERC-20 tokens in this chart are indicated as having

15    been spent on expenses in 48 of the rows on the workbook.

16    In Column I, you sometimes indicate that you believe that

17    associated ERC-20 tokens were used to pay single time

18    external developer contractor.

19    A     Yes.

20    Q     Right?  For example, Row 12 has that description with

21    respect to tokens worth about $99,897?

22    A     Yes.

23    Q     And it was transferred from Celsius wallets on February

24    2nd, 2021?

25    A     I believe so.
```

1   Q    And you believe that amount was transferred to a single

2   time contractor, but you aren't sure, right?

3   A    If I remember correctly, when I was looking at the

4   ether scan for this specific item, this was a transfer to a

5   wallet held by one of the other KeyFi employees, and that --

6   or Celsius KeyFi employees, and he was responsible for

7   paying a bunch of single time contractors that we were using

8   for different projects.

9   Q    Let's go to page -- are you sure about that?  Because I

10  do remember you testifying about that with respect to a line

11  item, but I don't think it was this one.

12  A    I'm not sure.

13  Q    Let me back up.  There certainly were contractors that

14  you transferred ETH to that sitting here today, you have no

15  idea who they are, right?

16  A    Other -- I don't know their real world identity.  Yes.

17  Q    Right.  You met them on the internet and you never knew

18  who they were, right?

19  A    Correct.

20  Q    Okay.  In a number of instances you indicate, "Believe

21  this was used to pay internal team members."

22  A    Yeah.

23  Q    Withdraw that.  So the ERC-20 worksheet includes 73

24  rows of transactions, right?

25  A    I think so.

Page 252

```
1    Q    And Row 75 sums the U.S. dollar value of the coins

2    subject to those transfers?  Do you see that?

3    A    Yes.

4    Q    And it sums it at more than $5.87 million, right?

5    A    Yes.

6    Q    Excluding the yellow highlighted rows, there's 61 ERC-

7    20 transfers, and those transfers sum to more than $5.25

8    million, right?

9    A    I believe so.

10   Q    So this worksheet indicates 73 separate transactions in

11   ERC-20 tokens, and you can't point to a single email or

12   piece of paper in which Celsius authorized you to make one

13   of those transfers, correct?

14   A    Correct.

15   Q    Let's go to the third workbook, NFT Buys.

16   A    Oh, no, sorry.  That's not correct, because some of

17   these that were spent on expenses fall under the expenses

18   that were expenditures of Celsius KeyFi, not of regular not

19   of regular -- not of KeyFi, Inc. and those ones would have

20   been authorized and are authorized by the services agreement

21   because I was allowed to spend up to $2 million on expenses

22   for Celsius KeyFi without other authorization.

23   Q    And where do you get that?  Where do you get that

24   authorization from?  Where does that come from?  Are you --

25   A    -- services agreement.
```

Page 253

```
 1    Q     You're interpreting the services agreement?  Is that

 2    what you're doing?

 3    A     I'm not interpreting it.  It literally says that.

 4    Q     Right, you're saying you think that's what the services

 5    agreement provides, right?

 6    A     It does.  It says up to $2 million of expenses, I don't

 7    need other approval for.

 8    Q     Okay.  And did you identify which of the transfers are

 9    in that category and which are not in your spreadsheet?

10    A     No, because at the time I didn't think that that was

11    the exercise, but I'd be more than happy to do that for you.

12    Q     Let's go to the NFT Buys workbook.  So this workbook

13    reflects the NFTs that were purchased from Celsius and that

14    were -- sorry, that were purchased from Celsius wallets and

15    that were transferred to KeyFi, right?

16    A     Yes, and ETH amounts here would be reflected in the

17    prior two workbooks.

18    Q     Okay.  And let me just come back to the 73 separate

19    transactions for which you initially said you don't have any

20    document you can point to that says you're authorized.

21    You're saying that there may be some of those transactions

22    that you think are authorized by the contract -- by the

23    services agreement, right?

24    A     Yes --

25    Q     That what you're claiming?
```

1   A    Because they don't --

2   Q    I'm just asking you for yes or no at this point, sir.

3   You're claiming that some of them were --

4   THE COURT:  Only one of you can -- hold on, Mr. Hurley.  You

5        can ask the question and give the witness a chance to

6    answer.  If you think he's not responsive, you can raise it

7     with me.  I think he's being responsive.  Don't interrupt

8              him when he's answering your question.

9                MR. HURLEY:  Understood, Your Honor.

10  BY MR. HURLEY:

11  A    Sorry, can you repeat?

12  Q    It's okay.  Sure.  So of those transactions, the 73

13  ERC-20 token transactions, where originally said, yeah, I

14  can't point to a piece of paper I'm authorized, it's your

15  testimony that some of those transfers you believe are

16  authorized by the services agreement, right?

17  A    Yes, because this workbook doesn't reflect just

18  transfers that were authorized early profit share versus

19  expenses.  It reflects transfers that were made out of

20  Celsius ecosystem laws.

21  Q    But you also acknowledge that some of the transfers in

22  the workbook ERC-20 are transfers that are not authorized

23  under the services agreement, right?

24  A    They're not authorized under the services agreement as

25  expenses on behalf of Celsius KeyFi, yes.

1  Q   Let's go to the NFT Buys workbook.  And Paragraph 6 of

2  you swore an affidavit again you say this reflects the NFTs

3  that were purchased from Celsius wallets that were

4  transferred to KeyFi.

5  A   Sorry, where am I looking?

6  Q   It's paragraph --

7  A   My affidavit.

8  Q   Six of your affidavit.  Yeah.

9  A   Okay.  Yes.  "It reflects the" -- yeah.  Yes.

10  Q   Did I read it correctly?  It reflects the NFTs that

11  were purchases from Celsius wallets that were transferred to

12  KeyFi?  I'm sorry --

13  A   Yes, you did read it correctly.  This was meant to

14  reflect the NFTs that were purchased with -- from Celsius

15  ecosystem wallets.  The assumption was that most of these

16  were transferred to KeyFi.  I don't know and I think I

17  marked ones that weren't transferred to KeyFi, but this

18  sheet was meant to show all of the NFT purchases that were

19  made out of, like directly from Celsius ecosystem wallets at

20  the beginning.

21  Q   That's a good clarification, right, because there were

22  some NFTs that you bought with ETH that you had transferred

23  out of the Celsius wallet to a defendant wallet and then

24  only purchased the NFT with that ETH after it arrived at the

25  defendant wallet, right?  There's some purchases in that

Page 256

```
 1    category, right?

 2    A    Yes.

 3    Q    And the NFT Buys worksheet is intended to identify the

 4    NFTs that you bought directly into the Celsius wallet and

 5    then transferred out after it was purchased, right?

 6    A    I believe so, but are there any -- can I ask a

 7    question?

 8    Q    I'll --

 9    A    Sorry.

10    Q    I'll take care of the questions, Mr. Stone.  Your

11    counsel can redirect.  Okay.  Now let's go down and look at

12    the amount spent on these NFTs.  Okay, so if you  Okay so if

13    you go down the Line 271, Column G.  That sum is the U.S.

14    dollar value of the ETH paid for the NFTs that were

15    purchased, just the NFTs purchased into Celsius wallets at

16    the rate of exchange in effect at the time of the purchase,

17    right?

18    A    Yes.

19    Q    Okay.  And it sums to a little more than, I guess, just

20    under $1.8 million?  Sound about right?

21    A    Yes.

22    Q    And some of the transactions you claim involved NFTs

23    that did not wind up or remain in the defendant's

24    possession.  So for example, 34 of the rows are highlighted

25    in yellow, right?
```

Page 257

1   A    Yes.

2   Q    And those ones you think stayed in and returned to a

3   Celsius wallet, right?

4   A    Yes.

5   Q    Okay.  And one of the rows that's highlighted in red,

6   that's the Krissy Mashinsky transfer that I think you guys

7   mentioned before?  At least, it is a transfer to Krissy

8   Mashinsky, right?  You've identified it as that, right?

9   A    And that specific NFT that I purchased, yes, ended up

10  in a wallet publicly labeled as owned by Krissy Mashinsky.

11  Q    Okay.  And then two of the rows are identified as in

12  custody of wallet beginning 0X9346?

13  A    Yes.

14  Q    And what is that wallet?  Let me just ask a different -

15  - is that a defendant owner controlled wallet?

16  A    Yes.

17  Q    Okay.  So the price paid for all these NFTs even

18  excluding all 37 of the highlighted ones I just went through

19  including 0X9346 which I guess we shouldn't have excluded,

20  is still more than $1.6 million.  Does that sound about

21  right?

22  A    Sounds about right.

23  Q    Okay.  More than 975 ETH, right?

24  A    Yep.

25  Q    The description in Column J indicates with respect to

Page 258

1    72 of the NFTs you indicate you still have them in 0X50?

2    A    I believe so.

3    Q    And that's a wallet owned or controlled by defendants,

4    right?

5    A    Correct.

6    Q    With respect to 144 of these NFTs, you indicate that

7    they were sold for ETH.

8    A    Yes.

9    Q    But you don't indicate the date of the sale right?

10   A    Correct.

11   Q    And you don't indicate the price you got for any of the

12   NFTs, right?

13   A    Correct.

14   Q    And you don't indicate what happened to the proceeds of

15   any of the NFTs that you sold, right?

16   A    I didn't believe that was the exercise.

17   Q    And you claim to have no idea the amount of the

18   proceeds that defendants received for the sale of the 144

19   NFTs, correct?

20   A    When preparing the sheet, I did see the amounts.  We

21   were under a time crunch and I didn't believe that including

22   those amounts was relevant.

23   Q    I'm sorry.  Let me ask the question again.

24   A    Okay.

25   Q    It's getting a little late in the day.  You have no

1    idea sitting here today the amount of proceeds that

2    defendants received for the sale of the 144 NFTs, right?

3    A    Sitting here today, no.

4    Q    And you didn't include it in the worksheet, obviously,

5    right?

6    A    Because I didn't believe that it was -- that was the

7    exercise.

8           MR. HURLEY:  Your Honor, we'd like to send -- use

9    a demonstrative which is the same spreadsheet, but that is

10    organized in date order rather than the order in which it

11    was supplied to us by the defendants.

12           MR. ROCHE:  No objection.

13           THE COURT:  I didn't hear.  Was there an

14    objection?

15           MR. ROCHE:  No objection.

16           THE COURT:  Okay.  Go ahead.  And a copy was

17    emailed to me.  I believe this is the demonstrative that

18    your office, Mr. Hurley, forwarded to chambers and they in

19    turn forwarded to me?

20           MR. HURLEY:  Yes.

21           THE COURT:  -- that correct.

22    BY MR. HURLEY:

23    Q    So I want to direct your attention to the screen, sir,

24    which again is a demonstrative that was prepared using your

25    spreadsheet.  We just -- the way it was sent to us, it

Page 260

```
 1   wasn't sortable by date, so we had to insert our own column

 2   that provided date in a format that allowed for sorting by

 3   date.  So it looks a little bit different, because there's

 4   an extra column because we had to add that date column.

 5   A    Okay.

 6   Q    So I'm going to ask you a few questions about this.  So

 7   turning to the ETH workbook in the sorted by date version.

 8   A    Yeah.

 9   Q    Okay.  So again, it looks like the first ETH transfer

10   in the workbook was September 9th, 2020.  Do you see that

11   now?

12           MAN 1:  We can't see -- the box is covering or --

13           MR. ROCHE:  Can you just move the Zoom box to the

14   left side?

15           MAN 1:   Don't have control of that.

16           THE COURT:  Which column do you want to be able to

17   see?

18           MR. ROCHE:  Whichever one Mitch is -- or Mr.

19   Hurley is asking about.

20           MR. HURLEY:  Yeah, it's going to be the first row.

21   That's all.  We're just looking for the first row and then I

22   guess maybe move it so you can see the numbers -- the row

23   numbers, I guess.  Yeah.

24           MR. ROCHE:  Okay.

25           MR. HURLEY:  Think you got it --
```

 1            THE COURT:  Mr. Hurley, I understand that you're

 2   using this as a demonstrative, but you should mark it as an

 3   exhibit.

 4            MR. HURLEY:  Absolutely.  What's our --

 5            WOMAN 1:  Seventy, I believe, be the next --

 6            MR. HURLEY:  Plaintiff's Exhibit 70, Your Honor.

 7            (Plaintiff's Exhibit 70 was admitted into

 8   evidence.)

 9            THE COURT:  Okay.  And just explain, it's a

10   demonstrative exhibit, adding a date -- Column H, the fixed

11   date so that you could sort in day order; am I correct about

12   that?

13            MR. HURLEY:  Exactly correct.

14            THE COURT:  All right.  Go ahead, Mr. Hurley.

15            MR. HURLEY:  Okay.

16   BY MR. HURLEY:

17   Q    So can you see now if you look at the first ETH

18   transfer in the workbook is September 9th, 2020.  See that?

19   A    Yeah.

20   Q    Okay.  And the last ETH transfer in the workbook is

21   September 13th, 2021.

22   A    Okay.

23   Q    Wait, I'm sorry, 2022.  September 13th, 2022.  See

24   that?

25   A    I do.

```
 1    Q    Okay.  And between those dates, excluding transactions

 2    highlighted in yellow, you transferred ETH out of Celsius

 3    wallets and to or for the benefit of defendant's wallets

 4    worth approximately $3.85 million.  Sound about right?

 5    A    I guess.

 6    Q    And September 13th, 2022 is 18 months after you

 7    resigned?

 8    A    Yes.

 9    Q    And you used your access to Celsius' private keys in

10    September of 2022 to take assets out of Celsius' wallet; is

11    that right?

12    A    No, I wrote unaware of this address.

13    Q    You mean you don't know who the destination address is

14    on September 22?  Sorry, in -- on September 13th, 2022?

15    A    At the time I was looking at this, I believe that

16    that's what this would indicate.

17    Q    Okay.  But just as a reminder, in your sworn affidavit,

18    you said this workbook reflects ETH based transfers of

19    assets from Celsius wallets to wallets controlled by

20    defendants.  Is it your belief that this particular transfer

21    is not consistent with Paragraph 4 of your affidavit?

22    A    Well, as I said, there's many highlights that say that

23    there were things that were returned to Celsius.  So

24    obviously this workbook includes things that weren't

25    transferred to me.
```

Page 263

1    Q    But this one isn't highlighted, right?  You think it

2    should have been?  Is that what you're saying?

3    A    No.  So the yellow highlights indicate that I know that

4    it was returned to Celsius or a Celsius ecosystem wallet

5    because of other transfers that those wallets were connected

6    to for other Celsius accounts, unaware of this address is

7    something that is more like, I don't know what this transfer

8    is.  I can't identify if it's definitely something that

9    Celsius did or not.

10   Q    So it's possible you did it.  It's possible Celsius did

11   it.  Is that what you're saying?

12   A    I don't think it's possible -- I guess that's what I'm

13   saying.

14   Q    Okay.  During the period after your resignation email

15   on March 9th, 2022, based on this spreadsheet and the

16   demonstrative, you use Celsius' private keys to make at

17   least 27 separate transfers of ETH, right?  That was after

18   you resigned from Celsius, correct?

19   A    If that's the number.

20   Q    Okay.  So of the 71 supposedly authorized transfers

21   listed in this workbook, about 40 percent of them occurred

22   after you no longer work for Celsius, right?

23   A    I don't know if I categorize them in that way but,

24   okay.

25   Q    And during the period after you resigned, you

Page 264

1    transferred about 304 ETH to defendants, which was worth

2    more than half a million dollars at the time, right?  After

3    you resigned.

4    A     That may be the case.

5    Q     That's worth more --

6              THE COURT:  Mr. Hurley, I'm looking at Column H,

7    Row 73.  The total of $3,949,803.45.  Does this sheet

8    reflect a net value if you exclude the line items that would

9    show a return to Celsius?

10             MR. HURLEY:  Your Honor, we didn't want to change

11   the spreadsheet in any way other than reorganize it by date,

12   so we did not add that.  We did the math on our own.

13             THE COURT:  Go ahead.

14             MR. HURLEY:  I mean, using the Excel obviously.

15   BY MR. HURLEY:

16   Q     Okay.  Let's go to the ERC-20 transfers workbook in the

17   demonstrative.  The transfers in this workbook you can see

18   span from September 9th, 2020 through December 17th, 2021.

19   Do you see that?

20   A     Yeah.

21   Q     Okay.  And during that period, you transferred ERC

22   tokens from Celsius wallets to or for the benefit of

23   defendant's wallets worth more than $5.25 million, if you

24   exclude the yellow highlighted.  Does that sound about

25   right?

Page 265

```
 1    A     No, because some of the expense lines would have been

 2    expenses pertaining to Celsius KeyFi LLC, not KeyFi, Inc.

 3    Q     But you didn't identify which those are in the chart,

 4    right?

 5    A     Again, I wasn't told that was the purpose of the

 6    exercise.

 7    Q     And that's not how your sworn affidavit describes what

 8    the workbook provides, either.  Right?  Let me remind you

 9    what your sworn affidavit says.  Paragraph 5.  "The second

10    workbook is entitled "ERC Transfers To and From Interested

11    Addresses.  It reflects the ERC-20 tokens that were sent

12    from Celsius wallets to wallets controlled by defendants."

13    A     Yes.

14    Q     Did I read that correctly?

15    A     And I believe 30 minutes ago I actually specifically

16    said this one probably is wrong and it should say to wallets

17    not controlled by plaintiffs.

18    Q     So your affidavit is incorrect.  That's what you're

19    saying?  It's not complete, anyway.  That what you're

20    saying?

21    A     I believe this was a mis-write.

22    Q     Okay.  December 17th, 2021, the date of the last

23    transfer listed here, that's more than nine months after you

24    resigned, right?  December 17th, 2021.

25    A     December 17th.  Yes.
```

Page 266

1    Q    And after sending your March 9th resignation letter,

2    this workbook indicates that you caused 17 separate

3    transfers from Celsius wallets and three of those you

4    contend were transfers that were ultimately returned to

5    Celsius, right, the yellow transactions?

6    A    I think it was more than three but --

7    Q    Well, your counsel advised in their cover email that

8    they identified highlighted in yellow the transfers that

9    they believe were returned to Celsius.

10   A    I believe it's three transfers after March 9th, it

11   looks like.

12   Q    Okay.  And after your March 9th resignation email, you

13   made transfers out of Celsius wallets at least 14 times, not

14   including those yellow highlighted, right?

15   A    I believe so.

16   Q    Would you be surprised to learn that the value of those

17   14 transfers made after your resignation totals more than

18   $3.5 million?

19   A    Surprised to learn -- I don't think I'd be surprised to

20   learn that.

21   Q    The total dollar value of the ERC-20 tokens transferred

22   according to your chart sums to a little over 5.8 million.

23   You see that?

24   A    Not counting the things returned to Celsius, yes.

25   Q    Okay.  Almost 65 percent of the ERC token value that

1    you transferred from Celsius wallets to defendant's wallets

2    is in respect of ERC tokens that were transferred after you

3    resigned from Celsius.  Were you aware of that?

4    A    Yes, but that includes the Dai which was not

5    transferred to me by Celsius.

6    Q    Let's go to the NFT Buys worksheet -- workbook.  Okay.

7    And there are 269 NFT purchases listed here, right?

8    A    I believe so.

9    Q    The first one is purchased on January 5th, 2021 and the

10   last one on May 4th, 2021.

11   A    Okay.

12   Q    Do you see that?

13   A    Yes.

14   Q    During that period, you used ETH worth almost 1.6

15   million to purchase NFTs that you then transferred to the

16   defendants, right, excluding the yellows?

17   A    I believe so.

18   Q    And you caused Celsius wallets to purchase 88 of the

19   NFTs on or after your March 9th resignation from Celsius,

20   right?

21   A    Yes.

22   Q    You spent almost 300 ETH on those post-resignation

23   NFTs?

24   A    If that's the number, then yes.

25   Q    Collectively worth more than $540,000?

Page 268

1   A    Sounds right.

2   Q    About one-third of the ETH that you caused to be

3   transferred out of Celsius wallets to purchase NFTs into

4   Celsius wallets -- sorry, out of Celsius wallets to purchase

5   NFTs was spent by you after you quit Celsius, right?

6   A    I'm not sure if that's the number.

7   Q    So based on these workbooks together and excluding the

8   yellow, you transferred 3.8 million worth of ETH, 5.25

9   million worth of ERC-20 tokens, and NFTs that you used

10  nearly $1.6 million in ETH to purchase.  Does that sound

11  about right?

12  A    I think that there's a little double counting when it

13  comes to the NFT buys and ETH transfers, but I think it's

14  probably 80 to 90 percent of that number.

15  Q    No, sir, we established that the NFT Buys worksheet was

16  for NFTs that were purchased into a Celsius wallet.  The ETH

17  transfers by definition are transfers of ETH out of Celsius

18  wallets to defendant's wallets which you sometimes described

19  as then having been used to buy NFTs, right?

20  A    Yes, but some of the NFTs purchases in those

21  defendant's wallets were wallets were actually sent back to

22  0XB1 and then sent out to 0X50.

23  Q    The yellow highlighted ones you're talking about?

24  A    No.

25  Q    Okay.  But ultimately they ended up at 0X50 anyway?

Page 269

1    A    I believe so.

2    Q    Okay.  So all in, between these three spreadsheets,

3    it's a total of nearly $11 million, right?

4    A    Again, I think there's a little double counting, but

5    let's call it at least 10.

6    Q    Okay.  Let's go back to PX-69 which is the non-date

7    sorted version of this chart, and I want to go to Row 2,

8    please.

9    A    Of which workbook?

10   Q    Sorry, it is the ERC-20 workbook.  Row 2 of the ERC-20

11   workbook.

12   A    Okay.

13   Q    Okay.  So you see there's a transfer from the Celsius

14   0XB1 wallet in September of 2021 of one point -- sorry,

15   1,401,662.9 Dai.  You see that?

16            THE COURT:  I don't -- where are you referring?

17   I'm sorry.  Please tell me where you're referring.

18            MR. HURLEY:  We should be -- are we back in the --

19   is it Row 2?

20            THE COURT:  Okay.

21            MR. HURLEY:  So Row 2 should be a transfer of Dai.

22   I'm sorry, Your Honor, I can't really see it from here.  Is

23   that the right row?  Oh, no.  Yeah.  Row 2.  Row 2 is what

24   we're --

25            THE COURT:  Yeah, it shows Dai.

Page 270

```
 1              MR. HURLEY:  Yeah.  Okay.

 2    BY MR. HURLEY:

 3    Q    So Row 2 indicates a transfer from the Celsius 0XB1

 4    wallet to defendant's wallets of 1,401,662.90 Dai.  You see

 5    that now?

 6    A    Yeah.

 7    Q    Okay. And Dai is a stable coin, right?

 8    A    Correct.

 9    Q    So that's equivalent to $1.4 million?

10    A    Yes.

11    Q    The date is September 21, 2021?

12    A    Yes.

13    Q    More than six months after you resigned from Celsius,

14    right?

15    A    Yes.

16    Q    And almost six months since you received Celsius' March

17    26th direction to turn over the seed phrase and password for

18    the Celsius wallets, right?  On March 26th, we looked at

19    that document, remember?

20    A    Yes, but turnover doesn't make sense.

21    Q    Okay.  And you didn't turn over the keys, right?  You

22    didn't turn them over until you were directed to pursuant to

23    this Court's order last month?

24    A    They already had the keys.

25    Q    Right, but you turned -- you did, too, right?
```

Page 271

1   A    Yes.

2   Q    Okay.  And you didn't return the seed phrase and

3   destroy the seed phrase or -- you maintained access to the

4   seed phrase and the pass code beyond the March 26th letter,

5   right?

6   A    Correct.

7   Q    Okay.  And even you -- sorry.  Back up.  And on

8   September 21st, 2021 you used your access to those, to the

9   seed phrase to access the 0XB1 wallet and take the 1.4

10  million Dai, transfer it out of the wallet, right?

11  A    Yes.

12  Q    Okay.  And even you don't characterize or wouldn't

13  characterize that transfer, the $1.4 million transfer as

14  having been authorized, right?

15  A    Authorized and not authorized transactions refer to

16  coins that were given to me by Celsius.

17  Q    Right.  You didn't give anyone at Celsius notice before

18  you used their private key to go into their wallet and take

19  $1.4 million out, right?

20          MR. ROCHE:  Objection.

21  BY MR. HURLEY:

22  Q    You did that without providing them any notice?

23          THE COURT:  Objection is overruled.

24  BY MR. HURLEY:

25  A    I didn't inform anyone that the Dai was in there before

Page 272

1    I moved it, no.

2    Q    Right.  You provided no notice to Celsius in advance

3    that you were going to use that private key and go in and

4    take that $1.4 million out of the 0XB1 wallet, correct/

5    A    I'm not sure why would have.

6    Q    I'm just asking you if you did, and I understand the

7    answer to be no, you did not.  Is that right?

8    A    Correct?

9    Q    The way you see it, right sir, you took that money as

10   an advance on the damages that you think you're entitled to

11   in this litigation, right?

12   A    No.

13   Q    Okay.  Let's go to your deposition.

14   A    What page?

15   Q    218.

16        THE COURT:  Are you still looking at the

17   spreadsheet?

18        MR. HURLEY:  We can take the spreadsheet down for

19   now, Your Honor.

20   BY MR. HURLEY:

21   Q    Okay, 218, Line 5.

22   "Q    So what you were saying, I guess, is that you believe

23   because you lobbied for the compensation to be paid to its

24   victims that you in a sense earned some part of what

25   actually was paid to redress the harm that was suffered by

Page 273

1   folks like Celsius as a result of the hack?

2   "A   No, I definitely did not -- no, definitely not.  I do

3   not.

4   "Q   You are taking an advance on the damages you think you

5   are entitled to in this dispute with Celsius?

6   "A   Correct."

7   A   I think --

8   Q   No question.

9          THE COURT:  No question.

10  BY MR. HURLEY:

11  Q   Did I read that testimony correctly, sir?

12  A   You read that line correctly.

13  Q   Okay.  And you understood that you were under oath at

14  your deposition just as you are today?

15  A   I do.

16  Q   Okay.  So after taking the 1.4 million Dai out of the

17  0XB1 wallet, you converted it into ETH, right?

18  A   Yes.

19  Q   And transferred that ETH through an on-chain mixer

20  called Tornado Cash, right?

21  A   Yes.

22  Q   You're aware that OFAC has banned Tornado Cash based on

23  its frequent use to launder the proceeds of cybercrimes?

24  A   That occurred about nine months after this event.

25  Q   And because you used Tornado Cash, the ultimate

Page 274

1  destination of the transfers of the $1.4 million worth of

2  ETH is not visible on the blockchain, right?

3  A    Correct.

4  Q    That's the point of Tornado Cash, right, to conceal the

5  destination of transfers from the blockchain so the public

6  can't know or so that the ultimate destination is known only

7  to the person sending the ETH?  I'll withdraw that question.

8  Before Tornado Cash was banned by OFAC, you used it

9  regularly, right?

10  A    I used it a bunch of times.  I don't know about if

11  regularly.

12  Q    For example, on May 23rd, 2021 you used Tornado Cash to

13  transfer 100 ETH from the defendant's 0X50DD wallet, right?

14  A    Yes.

15  Q    And on the same day, you used Tornado Cash to transfer

16  another 100 ETH the defendant's 0XFC2 wallet, right?

17  A    That may be.

18  Q    And another 100 ETH on May 25th, you transferred from

19  the 0XFC2 wallet through Tornado Cash, right?

20  A    Sounds correct.

21  Q    And on the same day, you used Tornado Cash to transfer

22  a total of 20 ETH out of the 0X50DD wallet, right?

23  A    Sounds correct.

24  Q    On October 12th, 2021 you made two separate transfers

25  of 100 ETH each from 0X50DD to Tornado Cash as well, right?

Page 275

1    A    Sounds correct.

2    Q    And you sent nearly three dozen separate transfers of

3    ETH from Tornado Cash through 0FXC2 and the 0X50DD wallet

4    between November of 2021 and January of 2022; does that

5    sound right?

6    A    I think so.  I stopped using Tornado Cash after I was

7    asked to during mediation.

8    Q    I want to come back to the 1.4 million Dai that you

9    took from Celsius and then sent through Tornado Cash.  So

10   eventually that ETH was withdrawn from Tornado Cash, right?

11   A    I believe so.

12   Q    Well, you know it because you did it, right?

13   A    Yeah.  Well, no --

14   Q    No question pending, sir.  And --

15            THE COURT:  Well -- hold.  Stop.

16            MR. HURLEY:  Okay.

17            THE COURT:  You (indiscernible) your prior answer,

18   Mr. Stone?

19            THE WITNESS:  I wasn't necessarily the one that

20   removed it from Tornado Cash for all of those transfers.

21   They were, I believe, all removed from Tornado Cash.  Some

22   of them to me, some of them to my other cofounders as

23   discussed in the deposition.

24            THE COURT:  All right.

25   BY MR. HURLEY:

1    Q    So you drew you think a little less than half of the

2    $1.4 million to wallets owned or controlled by you, right?

3    A    Yes.

4    Q    And you believe you did that in the last two weeks of

5    October through the end of December 2021, right?

6    A    I think so.

7    Q    So you withdrew about $600,000 to $700,000 worth of ETH

8    at that time for yourself, right?

9    A    Yes.

10   Q    And you know now that you don't have that $600,000 or

11   $700,000 anymore, right, but you aren't quite sure what

12   happened to it, right?

13   A    I haven't tracked that specific money as it relates to

14   any other monies that I have.

15   Q    Well, you know you spent most of it, right, you just

16   don't know what you spent it on, right?

17   A    Well, I spent it on a bunch of different things but

18   yeah.

19          THE COURT:  Let me ask you Mr. Hurley, how much

20   longer do you anticipate your cross examination?

21          MR. HURLEY:  Fifteen minutes or less.

22          THE COURT:  All right, go ahead.  We're going to

23   do -- well, go ahead with your examination.

24          MR. HURLEY:  Okay.

25   BY MR. HURLEY:

Page 277

1   Q    And the other half, the other half of the 1.4 million

2   Dai, that wound up going to three of your cofounders, right?

3   A    Correct.

4   Q    And those people are named Dennis Reichelt, Lukasz

5   Krol, and Maciej Zaleski?

6   A    Close enough.

7   Q    Okay.  And you divided the approximately $700,000

8   evenly between them?

9   A    I believe so.

10  Q    And you have no idea whether they still have any of

11  that $700,000 worth of ETH, right?

12  A    I know one of them used their share for part of a down

13  payment of a house.  Another one think bought a vehicle and

14  then something else.  And I don't know what the third one

15  did with his.

16  Q    So you withdrew the half of the 1.4 million Dai to

17  yourself, you said, between October and December of 2021,

18  right?

19  A    I believe that's correct.

20  Q    You filed a tax return for 2021, sir?

21  A    Correct.

22          MR. ROCHE:  Objection, relevance.

23          THE COURT:  Overruled.  Go ahead.

24  BY MR. HURLEY:

25  Q    Did you report that $600,000 worth of Dai as income on

1    your 2021 tax return?

2              MR. ROCHE:  Objection, relevance.  I believe under

3    New York law --

4              THE COURT:  Overruled.  Overruled.

5    BY MR. HURLEY:

6    Q    I didn't declare Dai because I didn't transfer myself

7    Dai.

8    A    Did you transfer -- did you declare on your income tax

9    return for 2021 the value of the cryptocurrency that you

10   admit you took off of the Celsius -- out of the 0XB1 for

11   yourself in the year 2021?  Did you include that on your tax

12   return?

13   A    Some of that ETH, yes.

14   Q    Some of it?

15   A    Yeah.

16   Q    So how much?

17   A    Any ETH that I sold for fiat on a -- on my Gemini

18   account, which is my one centralized exchange account that's

19   tied to my U.S. Bank accounts, I declared every dollar of.

20   Q    And how much was that?

21   A    I don't know off the top of my head.

22   Q    Okay.  And in 2020, you testified that you used Celsius

23   property to repay a loan in a similar amount, $600,000 or

24   so, right?

25   A    I actually believe it was January 1, 2021.

```
 1    Q     Okay.  Did you declaring your income taxes as income

 2    repayment of that loan in 2021?

 3    A     That would not be income.

 4    Q     So you didn't declare it?

 5    A     It's not income.

 6    Q     I'm just asking whether you included in your tax return

 7    --

 8    A     It's not something that would be declared in a tax

 9    return.

10    Q     So you didn't include it in your tax --

11    A     It's not something that would be declared on a tax

12    return.

13    Q     Okay.  Did KeyFi file a tax return for 2021?

14    A     No.

15    Q     Did it file a tax return for 2020?

16    A     Yes.

17    Q     How much income did KeyFi declare in its tax return in

18    2020?

19    A     Income?  I think zero.  (indiscernible).

20    Q     Why do you think that?

21    A     Because the expenses in 2020 were greater than its

22    revenues.  So income would've been zero or negative.

23    Q     So KeyFi was responsible for paying its own expenses,

24    correct?  That's why you would deduct them as expenses from

25    income?
```

Page 280

```
 1    A    KeyFi, Inc. was responsible for paying its own

 2    expenses.  Yes, I believe.

 3    Q    Okay.  Let's go to --

 4              MR. HURLEY:  And I'm very close to wrapping up,

 5    Your Honor.

 6    BY MR. HURLEY:

 7    Q    Let's go to Plaintiff's Exhibit 4.

 8    A    Four?

 9    Q    You know what, that doesn't sound right.

10    A    I don't know if I have a four.

11    Q    It's not in your binder, but going to bring you --

12    A    Okay.

13              MR. HURLEY:  May I approach, Your Honor?

14              THE COURT:  Yes, go ahead.

15    BY MR. HURLEY:

16    Q    Plaintiff's Exhibit 4 is a document that you helped to

17    prepare, right?

18    A    I believe so, yes.

19    Q    Dennis Reichelt, the fellow we just referenced also

20    helped prepare this document, correct?

21    A    I believe so.

22    Q    He's one of the people that got a third of the $700,000

23    worth of Dai?

24    A    Yes.

25    Q    And he's somebody you consider a cofounder of your
```

Page 281

1    company, right?

2    A    Yes.

3    Q    And you reviewed this document, Plaintiff's Exhibit 4,

4    at the time for accuracy and concluded that it was accurate

5    as of April 5, 2021, right?

6    A    To the degree that I'm able to conclude that this is

7    accurate, sure.

8    Q    And I'm going to ask you a few questions to make sure I

9    understand the information that's being presented.

10   A    Okay.

11   Q    So asset is the list of the various kinds of tokens,

12   right?

13   A    Yes.

14   Q    And the price is the price of that token as of April

15   5th?

16   A    2021, yes.

17   Q    Yep.  And tokens loose refers to individual tokens of

18   that type that were sitting in the wallet, right?

19   A    I believe so, yes.

20   Q    Tokens LP refers to the number of that type of token

21   that was then deployed in a liquidity pool, right?

22   A    Yes.

23   Q    There's a note at the bottom that says, "We are missing

24   around 30,000 to 40,000 ETH from the remaining company

25   quoted principal."

Page 282

1    A    Yes.

2    Q    You see that?  And the document indicates that the ETH

3    is missing due to swaps and permanent loss and fees.  Do you

4    see that?

5    A    The ETH is missing from the 0XB1 and associated wallet,

6    yes.

7    Q    Okay.  And at least 80 percent of that missing ETH and

8    potentially more was due to impermanent loss, right?

9    A    Perhaps, but it was to be expected.

10   Q    Can you go to Page 87 in your deposition transcript

11   please, sir?  Eighty-seven, Line 20.  Let me know when

12   you're there.

13   A    Yes, I'm here.

14   "Q    But sitting here today, can you identify of the 30,000

15   to 40,000 ETH that are referenced on this page, the amount,

16   the number that was missing due to impermanent loss as

17   opposed to the other causes that are identified?

18   "A    I would say over 80 percent was impermanent loss,

19   potentially more."

20        Did I read that correctly, sir?

21   A    Yes.

22   Q    Okay.  And you understood your deposition you were

23   under oath just as you are here today?

24   A    Yes.

25   Q    It also says in the note "DeBank, Zapper are missing

1     several platforms we have high stakes in like 20,000 ETH on

2     Unslashed, 50,000 on dYdX long positions, et cetera."  Do

3     you see that?

4     A    I do.

5     Q    And by this, it's meant that positions on those

6     identified platforms wouldn't be visible through DeBank or

7     Zapper, right?

8     A    I think so.

9     Q    And let's go to Paragraph 8 of your affidavit please.

10    A    Okay.

11    Q    Paragraph 8 in your sworn affidavit says, "Celsius was

12    able to easily monitor in real time the use and deployment

13    of crypto assets associated with the 0XB1 wallet through an

14    online application called DeBank."  Do you see that?

15    A    I do.

16    Q    DeBank -- the DeBank reference in your Paragraph 8 is

17    the same DeBank that's referenced in the note to Plaintiff's

18    Exhibit 4, correct?

19    A    Yes.

20          MR. HURLEY:  Can I have a moment to confer with my

21    colleagues, Your Honor?

22          THE COURT:  Yes, go ahead.

23    BY MR. HURLEY:

24    Q    Just quickly to follow up on the -- two quick

25    followups.  So first, you mentioned in your testimony

Page 284

1    earlier that before you left Celsius you downloaded your

2    email files from Celsius, right?

3    A    I created a backup of my inbox.

4    Q    So you downloaded all of the emails in your inbox

5    except that you think there was a couple months missing?

6    A    Yeah, because of a computer changeover at the end of

7    2020.

8    Q    Got it.  But other than those couple of months, you

9    have, at least the best of your knowledge, you have all

10   emails that were in your inbox at the time that you

11   downloaded that -- those files?

12   A    I have all of the emails that were in my Mac mail

13   application inbox, which should have been all of the ones

14   from the main Gmail, yes.

15   Q    Okay.  And what months were missing?

16   A    I think that it was some from October and November, but

17   I'm not sure.  It was only 2020, I think.

18   Q    And why do you think there -- you seem to have --

19   A    They were like two- or three-week gaps, twice, so I

20   don't know why they were there.

21   Q    Okay.  And then coming back to the question about tax

22   returns again sir.  You indicated that that you declared his

23   income some of the value that you took off -- sorry, that

24   you withdrew from Tornado Cash in 2021 but not all, right?

25   A    I'm not sure if it was Tornado Cash related.  Any ETH

Page 285

```
 1   that I ended up converting to fiat using the fiat rails that

 2   I have access to here in the United States I declared as --

 3   on my tax returns.

 4   Q    I'm sorry, I'm asking a specific question related to

 5   the approximately, you know, 700,000 -- sorry.  The half of

 6   the 1.4 million that you say you withdrew for yourself.  I'm

 7   just confining myself to that right now, okay?

 8   A    Okay.

 9   Q    And I think you said before that you declared some but

10   not all of that right?

11   A    Yes, if I remember correctly, some of that ETH I

12   transferred to Gemini to then sell for USD and then

13   transferred to my bank account and the sale of that ETH,

14   yes, I declared on my tax return.  Other ETH that I didn't

15   convert to cash, I believe that I used it on other expenses

16   and such.  So I'm not sure what which parts of it were

17   declared and which weren't.

18   Q    Okay.  You know some and you know it was less than all,

19   but you're not sure what the amounts are, right?

20   A    Correct.  I know that any amounts that I turned into

21   USD fiat on Gemini, I declared on my tax returns.

22   Q    Gemini is an exchange?

23   A    Correct.

24   Q    Okay.

25            MR. HURLEY:  Okay.  Nothing further, Your Honor.
```

Page 286

1          THE COURT:  All right.  Mr. Roche, you going to

2   have redirect?

3          MR. ROCHE:  I will.  Your Honor, I don't know how

4   late you want to go 'til.  It would be helpful if I had -- I

5   have a few exhibits I just need to find.  I think if Your

6   Honor --

7          THE COURT:  I just want -- can you give me an

8   estimate of how much time?

9          MR. ROCHE:  I think it could be up to 45 minutes.

10  I think I can -- if Your Honor would, I think I could

11  shorten that substantially if we came back tomorrow morning

12  and did that and closings.

13         THE COURT:  I really would like to finish the

14  testimony today and have closings in the morning.

15         MR. ROCHE:  Okay.  If Your Honor -- I have to dig

16  up a few exhibits.  If I can have five minutes now, I think

17  I can come back and try to get it done in under a half an

18  hour.

19         THE COURT:  All right.  We're going to do that.

20  I'm going to give you a hard stop on the examination of six

21  o'clock.  We're going to finish the testimony today by six

22  o'clock.  It's 5:18 now.  Let's resume at 5:25.  Okay

23  (indiscernible), okay?

24         MR. ROCHE:  Okay.

25         MR. HURLEY:  Oh, Your Honor?

Page 287

1              THE COURT:  Go ahead, Mr. Hurley.

2              MR. HURLEY:  Could we get an instruction to the

3     witness not to confer with counsel while --

4              MR. ROCHE:  We won't.

5              THE COURT:  The witness should not confer.  And so

6     the -- my plan is to finish the test -- well, do you have a

7     rebuttal case Mr. Hurley or are you going to rest when this

8     is finished?

9              MR. HURLEY:  We're not going to call any more

10    witnesses.  We may seek some recross, conceivably, but I

11    obviously haven't heard the --

12             THE COURT:  Well, we'll see where we are.  Let's

13    try and finish, if we can, with this witness.

14             (Off the record.)

15             THE COURT:  All right, we're back on the record.

16    Mr. Stone is still on the witness stand.  Redirect

17    examination.  Go ahead, Mr. Roche.

18             CLERK:  Judge, hold up.  This --

19             THE COURT:  Okay.

20             CLERK:  -- the delay.  We're good, we're good.

21             THE COURT:  We're good?  Okay.   Thanks --

22             CLERK:  We're good.  Thank you.

23                 REDIRECT EXAMINATION OF JASON STONE

24    BY MR. ROCHE:

25    Q    Mr. Stone, going to ask you a few questions concerning

Page 288

1    your cross examination.  I'm going to hand you what's been

2    marked and admitted into evidence as Defendant's Exhibit 15.

3    A    Go right ahead.

4    Q    Mr. Stone, do you recognize this is an email chain

5    between -- do you recognize this document?

6    A    Yes.

7    Q    What is this document, just at a high level.

8    A    It's an email chain between myself, Alex Mashinsky,

9    some of the KeyFi -- Celsius KeyFi people, some of the other

10   Celsius executives.

11   Q    Got it.  And I want to go down to your email on the

12   first page to the second email here.  You write it.  I'm

13   looking at the paragraph that says, "Does."  "Does the

14   company have a documented process sheet for how it

15   determines booking earn versus realized revenues in crypto

16   fiat such as required to produce what is being asked?"  Do

17   you see that?

18   A    Yes.

19   Q    Why did you ask for that?

20   A    Because I needed to know how Celsius made accounting

21   determinations to give them what they were asking for.

22   Q    Were you ever provided with such documentation?

23   A    I think at times I was shown or told certain things,

24   but definitely never a complete picture.

25   Q    And if you go to the paragraph above that.  "Jason, we

Page 289

```
 1    do not book revenues.  We are asking for weekly estimates,

 2    which are about 80 percent accurate of the gains you

 3    achieved on the AUM you manage."  You see that?

 4    A     Yes.

 5    Q     And that's sent from Mr. Mashinsky?

 6    A     Yes.

 7    Q     Did you provide that information to the best of your

 8    ability to Celsius during your time, first managing assets

 9    under KeyFi and later under Celsius KeyFi?

10    A     Yes.

11    Q     Okay.  And what was the format you provided that

12    information in?

13    A     Sometimes in emails, but -- or it was written in

14    emails, but other times it was just screenshots from DeBank

15    or one of the other public trappers.

16    Q     Okay.  I want to the services agreement, not the old

17    services agreement, not the old services agreement, and I

18    just need to get my bearings on -- I believe that's in the

19    Binder Mr. Hurley handed you earlier, PX-41.

20    A     Okay.

21    Q     I want to see -- point you to Paragraph 4,

22    Compensation.

23    A     Okay.

24    Q     "As sole and exclusive compensation for the services

25    Celsius shall pay KeyFi consideration set forth in Schedule
```

Page 290

1    Be attached hereto."

2    A    Yep.

3    Q    And when it says Celsius that's referring to Celsius

4    KeyFi?

5    A    I think so.

6    Q    And --

7              MR. HURLEY:  Objection, Your Honor.

8    (indiscernible) the document says.

9              THE COURT:  I'm sorry, I couldn't hear you, Mr.

10   Hurley.  What --

11             MR. HURLEY:  Sorry.  Objection.  It's not --

12   that's not how Celsius defined in the document -- define as

13   Celsius KeyFi, it's Celsius Network.

14             MR. ROCHE:  I apologize, Your Honor.

15   BY MR. ROCHE:

16   Q    If we can go to the top -- let's clarify that.  At the

17   top, says "Celsius is defined" -- Celsius Network Limited

18   refers to Celsius, correct?

19   A    Correct.

20             THE COURT:  Celsius KeyFi is defined as KeyFi.

21   Celsius Network is Celsius.

22             MR. ROCHE:  Yeah, I might have misspoke.  I

23   thought that's what I said at the beginning.

24   BY MR. ROCHE:

25   Q    Celsius Network Limited is defined as Celsius?

Page 291

```
 1              THE COURT:  Ask your --

 2    BY MR. ROCHE:

 3    A    Yeah.  Yes.

 4              THE COURT:  That's what it says.  Go ahead.

 5    BY MR. ROCHE:

 6    Q    Mr. Mashinsky the CEO of Celsius Network Limited or

 7    Celsius?

 8    A    That's what I believed, yeah.

 9    Q    Was he authorized to make decisions on behalf of

10    Celsius?

11    A    I believe so.

12    Q    Okay.  I want to go to -- give me one second to find

13    it.  If you can go to Page 6 of the services agreement.

14    A    Okay.

15    Q    And I'm looking at the third bullet down.

16    A    Okay.

17    Q    "KeyFi shall retain control of its internal budget and

18    profit and loss determination in good faith, notwithstanding

19    KeyFi shall obtain approval for any expenditures exceeding

20    50,000 or in a calendar year if recurring expenditure once

21    KeyFi costs $2 million."  You see that?

22    A    Yes.

23    Q    Is it your understanding you had permission under the

24    services -- what -- strike that.  What's your understanding

25    of this provision?
```

Page 292

1    A    My understanding is that I could make or pay expenses

2    that were related to Celsius KeyFi LLC activities in the

3    amount up to two million per calendar year without asking

4    for further approval from anyone and in individual amounts

5    up to $50,000.

6    Q    All right, I want to refer you to PX-43 which is a

7    document Mr. Hurley was asking you about before.

8    A    Okay.

9    Q    On the first page here, this is the demand email Roni

10   sent you on March 26, correct?

11   A    Okay, yes.

12   Q    Did Mr. Roni ask you to destroy your copy of the 0XB1

13   seed phrase?

14   A    He -- no, he said to provide the seed phrase.

15   Q    Are you aware of any demand prior to the one entered

16   into -- the stipulation entered to into by this Court,

17   Celsius demanded you to destroy your copy of the seed

18   phrase?

19   A    No.

20   Q    Okay.  Okay, let's go to -- believe this is Exhibit 40

21   -- PX-40.  I don't know if this is in your binder or not.

22   A    I don't have PX-40.

23   Q    You don't have PX-40?

24   A    No.

25   Q    I'll give you a copy of it.  I want to direct your

Page 293

1    attention to the 16th page of PX-40 which --

2              THE COURT:  What's the Bates --

3    BY MR. ROCHE:

4    Q    -- the asset --

5              THE COURT:  What's the Bates page at the end, the

6    last --

7              MR. ROCHE:  Forty.  PX-40, 0016.

8    BY MR. ROCHE:

9    Q    Mr. Stone, let me take a step back.  Do you recognize

10   this as the asset purchase agreement?

11   A    It looks like a page from the asset purchase agreement,

12   yes.

13   Q    Okay.  And go to the bottom of the page.  I'm looking

14   at 7.4(b)(i).

15   A    Seven point --  7.4 -- okay.

16   Q    (b)(i).  And it states -- I'm going to read it out

17   loud.  "Within the later to occur of 14 calendar days after

18   any payment by a buyer due under this agreement or 30

19   calendar days after any such scheduled payment accrued, if

20   seller is dissatisfied with the payment or if nonpayment

21   occurs, seller may invoke the audit of buyer's relevant

22   records using seller's chosen auditor who shall be a CPA."

23   Do you see that?

24   A    Yes.

25   Q    Who is the seller in the -- for the asset purchase

Page 294

```
 1    agreement?

 2    A     KeyFi.

 3    Q     Who is the buyer?

 4    A     Celsius KeyFi.

 5    Q     After you resigned -- strike that.  Are you the CEO of

 6    KeyFi?

 7    A     KeyFi Inc., yes.

 8    Q     Had you ever -- did you ever demand an audit under this

 9    provision in the asset purchase agreement?

10    A     Many times.

11    Q     When did you demand an audit?

12    A     I think the first time was in the month that I

13    resigned.

14    Q     Okay.  We'll get to that in a second.  Do you recall

15    any other times?

16    A     Numerous times throughout 2021, probably monthly.

17    Q     And has any Celsius entity ever provided you or your

18    counsel an audit?

19    A     No.

20    Q     Okay.  Has Celsius ever provided you any accounting for

21    its claim that you lost -- that Celsius KeyFi was not

22    profitable?

23    A     They provided me some documents which show certain

24    accounts that were supposed to be counted as part of our P&L

25    as being unprofitable.
```

Page 295

```
 1    Q    Did they -- did you ever receive a full accounting from
 2    Celsius?
 3    A    No.
 4    Q    Okay.  I want to go, direct your attention back to PX-
 5    40 --
 6    THE COURT:  May I ask you, Mr. Stone did you select an
 7    auditor, an accountant to do the audit?
 8    THE WITNESS:  We talked to a couple of different firms, but
 9    we were never --
10    THE COURT:  Let me ask you a different question.  Did you
11    specifically tell Celsius the auditor that you wished to use
12    to conduct the audit?
13    THE WITNESS:  No, we didn't get to that stage.  We asked for
14    an audit and they said they weren't willing to.
15    THE COURT:  Go ahead, Mr. Roche.
16    BY MR. ROCHE:
17    Q    And when did you make that demand, Mr. Stone?
18    A    I believe the first time was at the end of March.
19    Q    Okay.  So let's go to -- I believe the document you're
20    referring to, let's -- PX-43.
21    A    Okay.  I want to look at the second page of PX-43.
22    Q    Okay.  This is a (indiscernible) sent -- do you
23    recognize this email?
24    A    Yes.
25    Q    What is this email?
```

Page 296

1   A     It's an email from me to Roni and Harumi and Alex and a

2   couple other people.

3   Q     Why did you send this email?

4   A     I sent this email because I wanted to create a record

5   of the response that was appropriate, given the email that

6   was sent to me prior.

7   Q     Okay, and I'm going to read what you wrote.  "I have

8   now returned over $25 million in stables to the address 0XD2

9   since yesterday morning," and to confirm any -- to avoid any

10  doubt, what's the hyperlink there?

11  A     That is a hyperlink to the list of transactions from

12  which -- or that include the stable coins that I sent to

13  this wallet address that Celsius provided me from 0XB1.

14  Q     And you write -- I'll just read the email.  "I'm doing

15  this in good faith while we work together on the following

16  items, agreeing the total population of remaining coins and

17  interest owed back to Celsius as well as a full accounting

18  of net profits due to the KeyFi team."  Why did you write

19  that?

20  A     So I wrote that because we didn't even have all the

21  information that we needed from Celsius in order to come up

22  with or figure out and accounting ourselves.  There were a

23  number of different activities and strategies and accounts

24  that were supposed to be for Celsius KeyFi benefit or

25  Celsius KeyFi P&L that were not actually controlled or

Page 297

```
 1    retained by me, such as the purchases of, you know, ETH that
 2    Celsius did in November 2020 during the compound liquidation
 3    event as well as a number of other types of activities such
 4    as hedging and others.  And without knowing those costs, we
 5    wouldn't be able to compute a KeyFi P&L and -- or Celsius
 6    KeyFi P&L in full form without that data.
 7    Q    Did Celsius ever provide you with the full information
 8    you needed to do to perform an accounting --
 9    A    No.
10    Q    -- Celsius KeyFi?
11    A    No.
12    Q    Did you ask for it?
13    A    Yes, many times.
14    Q    And I want to go down on this email, further down on
15    this email.  You write, paragraph further, "And I state for
16    the record, if there ends up being one that doing these
17    transfers piecemeal before having final audited records has
18    already and would continue to negatively impact" -- you list
19    out -- "Celsius' profits from this experiment, Celsius' true
20    margins above customer rate hurdle," and then number three,
21    "KeyFi team and its investors' share of profits."  Why did
22    you write that?
23    A    Because I believed at the time and I still believe
24    today that doing what they were asking me to do would have
25    made it more difficult to determine the totality of all of
```

1    these three items.  Yeah.  So -- can you repeat the

2    question?  I'm sorry.

3    Q    What was --

4    A    what was the --

5    Q    What was your reason for writing that?

6    A    Because I wanted to indicate to Celsius that them

7    asking me to just, you know, blatant -- or you know,

8    blindfoldedly send back funds without, you know, properly

9    accounting for things was not the right move for any of us,

10   I thought.

11   Q    Understood.  You were in the room when Mr. Holert

12   testified earlier?

13   A    Yes.

14   Q    You heard Mr. Holert testify about conversation

15   concerning hedging, correct?

16   A    Yes.

17   Q    Did you have conversations with Mr. Holert about

18   hedging?

19   A    Yes, many.

20   Q    When were those conversations?

21   A    Started probably end of August, early September 2020

22   through to March 2021.

23   Q    Who did you understand --

24        THE COURT:  -- beyond the scope of the cross

25   examination.  You would have had an opportunity to examine

Page 299

1    the witness about another witness's testimony during his --

2    you know, before.

3            MR. ROCHE:  I understood, Your Honor, that the

4    direct, that the direct was limited to the affidavit and

5    introducing exhibits.

6            THE COURT:  Go ahead, go ahead.  Let's go.

7    BY MR. ROCHE:

8    Q    Who did you understand was responsible for hedging?

9    A    I don't know of a specific person but the same group

10   that was hedging Celsius' global activities.

11   Q    What was the basis for that understanding?

12   A    The fact that numerous people at Celsius told me that

13   HedgeGuard was the software that we used to compute what

14   hedges we needed to be entering.

15   Q    Did you ever do any hedging yourself while either --

16   during your time as CEO of Celsius KeyFi?

17   A    Yes, starting in late January after not getting any

18   information about the hedging that was supposed to be

19   happening, we did start to do some additional hedging on a

20   platform called dYdX, but it was not very efficient to do on

21   decentralized finance platforms -- or hedging is not

22   efficient to do on decentralized finance platforms.  And we

23   didn't have access to centralized exchanges to do hedging,

24   so.

25   Q    We heard testimony earlier from Mr. Holert that Celsius

Page 300

1    could not hedge KeyFi's risks.  Do you recall that

2    testimony?

3    A    I do.

4    Q    Do you agree with that testimony?

5    A    No, I do not.

6    Q    Why not?

7    A    Because he indicated that they couldn't hedge the long

8    tail activities which was never the understanding or

9    agreement between myself and Celsius MainCo.  The

10   understanding was that for the Bitcoin or Wrapped Bitcoin

11   and Ethereum that they were transferring to us, that they

12   would be hedging the price movements in totality, not

13   specifically hedges on individual liquidity pools or trades

14   and that could have been very simply done by just buying put

15   or call options on the Ethereum amount or Wrapped Bitcoin

16   amount sent to us.

17   It would have been more expensive to do it that way without

18   knowing the exact number of or ETH or Wrapped Bitcoin in

19   each liquidity pool, but I was told, the cost of hedging

20   would be -- like would hit KeyFi, Celsius KeyFi P&L.  so you

21   know what I mean we all thought we were, you know, making a

22   crazy amount of money and it was a cost that I was willing

23   to incur.

24   Q.   The cost of the hedging?

25   A    Yes.

Page 301

```
 1    Q     So I want to -- did you tweet about NFT purchases from

 2    the 0XB1 Twitter account?

 3    A     Many times.

 4    Q     Did you do so in January of 2021?

 5    A     Many times.

 6    Q     Did you ever tweet about your -- out your purchases of

 7    crypto punks from the 0XB1 wallet?

 8    A     Yes.

 9    Q     Okay.  Briefly, have you used Tornado Cash since it was

10    banned by -- I forget the department --

11    A     OFAC.

12    Q     OFAC?

13    A     No.

14    Q     Okay.  All right.  I want to discuss a few of the

15    transactions on the spreadsheet.  I want to discuss a few of

16    the transactions on the spreadsheet.  I don't think we need

17    to pull up the spreadsheet.  The first one, so you were

18    asked questions about payments to rent.  Do you recall those

19    questions?

20    A     Yes.

21    Q     Okay.  Why did you move?  Why did you move from New

22    York to Puerto Rico?

23    A     I was told sometime in either late September or early

24    October that I was going to have to leave New York State

25    because we didn't have a bit license and it wasn't -- I
```

```
 1    think it was said it wasn't legal for me to be doing what I

 2    was doing being based out of New York, so in order to comply

 3    with regulations, I needed to either move to a neighboring

 4    state or out of the country.

 5    Q    And whose request was that?

 6    A    It wasn't a request.

 7    Q    What --

 8    A    But I was told by my direct boss Harumi, and then later

 9    Alex as well, but Harumi is the one that first told me I had

10    to move.

11    Q    Okay.  I want to go to the Dai transaction.  So you

12    mentioned earlier the November liquidation event?

13    A    Yes.

14    Q    Can you describe to the Court what happened in the

15    November liquidation event?

16    A    Sure.  So on Thanksgiving Day in 2020 a malicious actor

17    attacked the compound platform by specifically attacking

18    coin base's AWS infrastructure which is what compound relied

19    on for its Dai price information.  The result was the

20    attacker changing the AWS software's perception of the price

21    of Dai from $1 to $1.30.  The net result of that was about,

22    I think it was $120 million worth of positions in total that

23    were liquidated because Dai was artificially changed in

24    terms of its price, which put all of those positions

25    underwater.
```

Page 303

1    Q    Did Celsius suffer a loss as a result of that incident?

2    A    No.

3    Q    Why not?

4    A    For two different reasons; one, because right at the

5    time that it was happening, I called Alex Mashinsky to tell

6    him that that had happened.  I didn't know at the time that

7    it was malicious attack due to the price of Dai being

8    changed.  I just knew that we had gotten liquidated and I

9    said, you know, we have to do something here.  And he said

10   yes, let's repurchase that ETH on centralized exchanges.

11   You don't have enough cash or, you know, stable coins in

12   your account to repurchase all this ETH.  He said let's get

13   Connor on the phone and over the next two hours, Connor and

14   I repurchased I think over 85 percent of the ETH -- the

15   number of ETH that were liquidated, mostly congregated on

16   centralized exchanges.  I did a little of it on

17   decentralized exchanges, and we repurchased those ETH at a

18   lower price point than they were liquidated at because ETH

19   kept going down that day.

20   Q    You performed open -- you and people at Celsius

21   performed open market operations and you were able to

22   purchase the Celsius at a lower price at which you were

23   liquidated?

24   A    Purchased the Ethereum at a lower price, yes.

25   Q    And you eventually lobbied the compound community to

Page 304

```
 1    airdrop a certain percentage of Dai back to certain wallets?

 2    A     Not to airdrop.  I lobbied the compound community to

 3    provide restitution from their insurance treasury to people

 4    affected by the Thanksgiving liquidation event, because I

 5    believe that it fell within the clauses of basically

 6    irregular protocol activity which is what their insurance

 7    module is for, and I, you know, believed that it was the

 8    right thing to do for that insurance to be used to somehow

 9    provide restitution to wallets affected by that Thanksgiving

10    liquidation event.

11    Q     When did you do that lobbying?

12    A     Started lobbying probably in January or February 2021

13    and didn't stop until the end of the summer.

14    Q     And that was after you left Celsius KeyFi?

15    A     I started lobbying before I left and continued lobbying

16    after.

17    Q     Okay.  When you took the 1.4 million Dai out of 0XB1,

18    did you believe it was Celsius' property?

19    A     No, it's not.

20    Q     Why not?

21    A     Because it was not provided to me by Celsius.

22    Q     Briefly, if you -- there was testimony earlier about

23    what is and isn't available on DeBank.  Do you recall that

24    testimony?

25    A     Yes.
```

Page 305

1   Q    Let me ask you, what information -- at the time you

2   were sharing the DeBank information with Celsius, what

3   information was on DeBank relating to 0XB1 and what

4   information was not?

5   A    I can't say specifically which names of platforms were

6   or weren't on there, but I'm pretty sure that we can safely

7   say that over 85 or 90 percent of all positions were, at any

8   given time were displayed on DeBank in terms of the total

9   AUM that Celsius had transferred to me and then the proceeds

10  thereof.

11  Q    And -- sorry.

12  A    I'm done.

13  Q    And Celsius was able to monitor those -- that

14  performance in real time?

15  A    I don't know if I'd say performance.  They were able to

16  monitor the value of the AUM in those accounts.

17  Q    And the value of different coins in those accounts?

18  A    Yeah.

19  Q    And the balance of different coins in those --

20  A    Balance.  Yes.

21  Q    So you could look at DeBank and see how much Ethereum

22  was in a particular --

23  A    Yes, and how many assets were in liquidity pools or et

24  cetera.

25  Q    You could see how much -- how many stable coins were in

Page 306

```
 1    a particular pool?  You could see the movement up and down

 2    over time of a particular asset on DeBank?

 3              MR. HURLEY:  Objection, Your Honor.  Leading.

 4              THE COURT:  Sustained.

 5    BY MR. ROCHE:

 6    Q    What other types of information could you see on

 7    DeBank?

 8    A    You could see accumulated but unclaimed rewards.  You

 9    could see NFT purchases.  You could see -- there's a couple

10    other things that you can see.  I'm not sure what's

11    relevant.

12    Q    Could you see the balance of the crypto assets at the

13    time you logged into or clicked the DeBank link?

14    A    Yes.

15    Q    And could anybody see those positions?

16    A    Yes, or the 85 to 90 percent of them that were

17    supported by DeBank.  Yes.

18    Q    Understood.  Did you ever miss -- so for the portion

19    that was not available on DeBank, did you ever misrepresent

20    any of the information relating to those transactions to

21    Celsius?

22    A    I don't believe so.

23    Q    Okay.  So I want to go to Defense Exhibit 24.  It's a

24    spreadsheet.

25              MR. ROCHE:  Your Honor, it's not -- I believe it's
```

Page 307

1    one of the exhibits that you did not admit.  I think you

2    stopped short at 23.  I don't know if Your Honor has it

3    printed out or if --

4              THE COURT:  Do not have it printed out.

5              MR. ROCHE:  So Your Honor, because it's a

6    spreadsheet, we don't have full printouts on it.  How would

7    you like us to show it to Mr. Stone so we can ask him some

8    questions to authenticate it?  I could hand him a computer -

9    - pardon?

10             THE COURT:  Do you have a copy of it?

11             MR. ROCHE:  We have a copy of it and we can share

12   it on Zoom.  We would just need Mr. Dan Stone to be made

13   host of a Zoom, so he could share it with the witness.

14             THE COURT:  There's an objection to Exhibit DX-24.

15   What is the objection?  Hearsay objection?  Mr. Hurley, you

16   want to speak to your objection?

17             MR. HURLEY:  Sorry, Your Honor.  Yeah, we do

18   object to this one, Your Honor.  It's hearsay, among other

19   things.  So we stand on our objection.

20             MR. ROCHE:  Your Honor, this was a summary

21   document created by KeyFi to show the accounting of the

22   KeyFi positions, the profits and losses, dollar -- we

23   believe it's a business record and it's exempt under --

24             THE COURT:  Underlying -- 1006 requires that you

25   have made the underlying documents available to the other

Page 308

1    side.  Did you do that?

2              MR. ROCHE:  We produced it in connection with the

3    expedited discovery.

4              THE COURT:  You produced what?  Did you provide

5    all of the underlying documents that are reflected in data

6    in Exhibit 24?

7              MR. ROCHE:  I believe all the underlying documents

8    are publicly available -- were publicly --

9              THE COURT:  That's not my question.  That's not

10   the question.

11             MR. ROCHE:  Under -- then we did not, Your Honor.

12             THE COURT:  did you provide all of the underlying

13   documents.

14             MR. ROCHE:  I'm being as direct -- the document,

15   there were no internal documents that were used to make

16   this.  All the documents -- all the information provided in

17   the spreadsheet was taken from an internet browser.  But we

18   did not provide specific --

19             THE COURT:  -- thousand -- Federal Rule of

20   Evidence 1006, which was also a basis for the objection that

21   was asserted provides that "The proponent may use a summary

22   chart or calculation to prove the content of voluminous

23   writings, recordings, or photographs that cannot be

24   conveniently examined in Court.  The proponent must make the

25   originals or duplicates available for examination or copying

Page 309

```
 1     or vote by other parties at a reasonable time and place and

 2     the Court may order the proponent to produce them in Court."

 3              Have you made all the relevant documents -- don't

 4     tell me they're public, they're available somewhere.  Did

 5     you make them available to plaintiff's counsel?  Yes or no.

 6              MR. ROCHE:  We did not provide the --

 7              THE COURT:  Objection --

 8              MR. ROCHE:  -- readout --

 9              THE COURT:  Objection sustained.

10              MR. ROCHE:  Understood.

11     BY MR. ROCHE:

12     Q    Mr. Stone, in connection with the affidavit you

13     submitted with the -- that was so ordered and that you

14     updated I believe in early January, do you recall what

15     spreadsheet I'm referring to?

16     A    Yep.

17     Q    There's a tab on that spreadsheet that identifies the

18     current location of all of KeyFi's assets.  Are you --

19     broken down into two different tabs?

20     A    Yes.

21     Q    What are you doing -- have you spent or moved any of

22     those assets since this litigation began?

23     A    Only yesterday.

24     Q    Okay.  And what did you spend it on?

25     A    I sent $100,000 to Freedman Normand.
```

Page 310

1   Q    Okay.  For legal fees?

2   A    Correct.

3   Q    Besides that transaction, have you engaged in any other

4   transactions using the asset -- KeyFi's assets?

5   A    I've not removed any other assets from those accounts,

6   no.

7            THE COURT:  What was the authority to transfer

8   money -- transfer assets yesterday?

9            THE WITNESS:  Sorry?

10           THE COURT:  What was the authority that you were

11  relying on to transfer assets yesterday?

12           THE WITNESS:  Authority?

13           THE COURT:  Yeah.

14           THE WITNESS:  I don't --

15           THE COURT:  I thought the stipulation was nothing

16  was going to be transferred.  Am I wrong?

17           MR. ROCHE:  No, the stipulation, not -- I think

18  that's what the -- that's the, what's in dispute.

19           THE COURT:  Well, I'll hear argument about it

20  tomorrow, then.  Okay.

21           MR. ROCHE:  No further questions.

22           THE COURT:  All right.  Mr. Hurley, any further

23  examination?

24           MR. HURLEY:  Just --

25           THE COURT:  -- okay if you don't.

```
 1              MR. HURLEY:  -- very briefly, Your Honor.

 2              THE COURT:  Go ahead.

 3              MR. HURLEY:  I'll be very brief.

 4              THE COURT:  Very brief.  Go ahead.  Everybody's

 5    exhausted.

 6                 RECROSS EXAMINATION OF JASON STONE

 7    BY MR. HURLEY:

 8    Q    I just want to come back to the 1.4 million Dai for a

 9    minute.  And I think you testified that Celsius wasn't

10    harmed by the hack, something to that effect?

11    A    It should not have been.

12    Q    Okay.  And I'm going to direct your attention to your

13    deposition testimony, sir.

14    A    Okay.

15    Q    Page 214.  Okay.  And I'm here to read from Line 8 to

16    23.

17    A    Yeah.

18    Q    Question.  Do me a favor and explain to me why you

19    think you had -- why you think that the 1.4 million Dai, you

20    had some claim to it?

21    A    Sure.  So the 1.4 million Dai was sent to the 0XB1

22    wallet directly from the compound treasury as a result of a

23    compound community DAO, decentralized autonomous

24    organization, vote relating to a hacking event that occurred

25    on Thanksgiving Day 2020 in which the 0XB1 address KeyFi and
```

Page 312

```
 1    Celsius KeyFi were materially affected."

 2         Do you see that?  Did I read that correctly, sir?

 3    A    Yes.

 4    Q    Okay.  And you understood you're under oath at your

 5    deposition just as you are today, right?

 6    A    I said materially.

 7    Q    I'm just asking you whether you understood your under

 8    oath, sir.

 9    A    Yeah.

10    Q    Okay.  And that airdrop was to compensate for a loss

11    that was suffered by 0XB1, the Celsius wallet, right, sir?

12    A    A loss suffered by that individual address, yes.  That

13    does not necessarily mean Celsius KeyFi or Celsius or KeyFi.

14    Q    Okay.  Let me direct your attention to Page 217 of your

15    transcript, sir.

16    A    Okay.

17    Q    Question.

18    Q    So the airdrop, though, that you are describing was to

19    compensate for a loss that was suffered by 0XB1 in

20    connection with the hack, right?"

21    A    By 0XB1 --

22    Q    Answer --

23    A    -- individual address, yes.

24    Q    Answer, "Yes."  Do you see that?

25    A    Yes.
```

Page 313

1    Q    Okay.  And I asked those questions and you gave those

2    answers at your deposition?

3    A    Yes.

4    Q    Okay.  You were paid a salary by Celsius, right, sir?

5    A    During some of the time I was with them.

6    Q    Right, including during the entirety of 2021 until

7    after you resigned, right?

8    A    Yes.

9    Q    Okay.

10             THE COURT:  This does seem to be beyond the scope

11   of Mr. Roche's examination.

12             MR. HURLEY:  Your Honor, I'll stop there.  Thank

13   you.

14             THE COURT:  Okay, thank you.  Mr. Roche, do you

15   rest?

16             MR. ROCHE:  I rest.

17             THE COURT:  All right.  Mr. Hurley, are you going

18   to call any rebuttal witnesses in the morning?

19             MR. HURLEY:  No, Your Honor.

20             THE COURT:  All right.  We'll start at nine

21   o'clock with closing arguments.

22             MR. HURLEY:  Query, Your Honor.  Is that an in-

23   person event for the lawyers tomorrow?  We're happy to do it

24   if you want us to.

25             THE COURT:  Don't you like being in the courtroom?

Page 314

```
 1              MR. HURLEY:  I'm happy to do it either way,

 2    frankly.  I live nearby, so it's not -- it doesn't really

 3    affect me that much but --

 4              MR. ROCHE:  I live nearby (indiscernible) too, so

 5    that's fine.

 6              THE COURT:  I didn't hear that comment.

 7              MR. ROCHE:  Your Honor, I just said that I live

 8    nearby for purposes of tonight, too, so tomorrow morning the

 9    courtroom is not an issue.

10              THE COURT:  I think it would be best.  I realize -

11    - you know, I feel a little badly since I'm not there, but

12    I'd like to have you both in the same room, let me put it

13    that way.  All right?

14              MR. HURLEY:  Absolutely.

15              THE WITNESS:  Do I need to come back, Your Honor.

16              THE COURT:  You can come and listen to the

17    festivities tomorrow.  Your testimony is done.  Thank you

18    very much, Mr. Stone.

19              THE WITNESS:  Okay.  For sure.

20              THE COURT:  Both sides have rested.  No rebuttal

21    case.  We'll hear closing arguments starting at nine o'clock

22    tomorrow morning.

23              MR. ROCHE:  And I believe Your Honor previously

24    said no time limit on closings?  What about --

25              THE COURT:  I did not set (indiscernible).  The
```

Page 315

1    only thing I would say is, frequently the less said the

2    better.  Okay.

3              MR. ROCHE:  Understood.

4              THE COURT:  I'm not imposing time limits on you.

5    Okay?

6              MR. ROCHE:  Thank you.

7              THE COURT:  I will see you all -- I'll see you on

8    the screen.  You'll see each other tomorrow morning at nine

9    o'clock.  Karen, thank you very much.

10             MR. HURLEY:  Thank you, Your Honor.

11             MR. ROCHE:  Thank you, Your Honor.

12             MR. HURLEY:  Thank you.

13             THE COURT:  We are adjourned for the day.

14             (Whereupon these proceedings were concluded at

15    6:06 PM)

16

17

18

19

20

21

22

23

24

25

Page 316

1                C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7    *[signature]*

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  January 17, 2023

| **&** | **1** | **1,401,662.90** | 248:17 269:5 |
|---|---|---|---|
| **&**   3:7 4:3 7:16 | **1**   5:21 11:19 | 270:4 | **100**   76:13 |
| 8:4 186:8 | 16:18 24:20,23 | **1-2**   67:10 | 89:22 112:7,8 |
| **0** | 32:21 55:20 | **1.2**   98:15 99:3 | 112:13 131:5 |
| | 56:3,3,5 62:22 | **1.30.**   302:21 | 131:11 138:6 |
| **0016**   293:7 | 65:1,9,14 | **1.4**   11:17,18,20 | 153:19 154:6,9 |
| **0020112** | 71:15,21,24 | 24:22 25:17,20 | 158:9,10 |
| 175:17 | 72:15,20,22 | 51:25 52:12 | 169:16 274:13 |
| **01/11/2023** | 73:11,16 74:25 | 53:18,24 54:7 | 274:16,18,25 |
| 3:12 | 75:17 79:19 | 54:9 204:4,6,9 | **100,000**   309:25 |
| **01/12/2023** | 81:19 117:4 | 204:10,18 | **10004**   1:20 |
| 3:12 | 131:14 134:13 | 205:8 270:9 | **10016**   4:17 |
| **0107**   135:20 | 137:18 145:25 | 271:9,13,19 | **10036**   4:7 |
| **0fxc2**   275:3 | 146:7,9,12,15 | 272:4 273:16 | **1006**   307:24 |
| **0x50**   240:16,23 | 146:17,21 | 274:1 275:8 | 308:20 |
| 258:1 268:22 | 152:12,23 | 276:2 277:1,16 | **102,980.64** |
| 268:25 | 160:10,15 | 285:6 304:17 | 195:1,6 |
| **0x50dd**   274:13 | 179:5 182:3,4 | 311:8,19,21 | **106**   5:5 225:23 |
| 274:22,25 | 182:14 184:1 | **1.5**   23:13 | 225:24 |
| 275:3 | 184:14 185:7 | **1.6**   257:20 | **107**   49:4 |
| **0x9346**   257:12 | 185:22 193:16 | 267:14 268:10 | **10:58**   83:13 |
| 257:19 | 193:17 197:9 | **1.8**   256:20 | **10th**   91:1,14 |
| **0xb1**   236:13 | 198:19,19 | **1/11/22**   3:7 | 198:9 |
| 268:22 269:14 | 203:16,20 | **1/12/22**   3:7 | **11**   1:22 20:17 |
| 270:3 271:9 | 204:2,6,8 | **10**   26:24 83:11 | 27:8,18,21 |
| 272:4 273:17 | 205:8 207:19 | 98:14 99:2,10 | 28:10 55:22 |
| 278:10 282:5 | 208:2,5,12,14 | 99:11 139:21 | 141:25 184:25 |
| 283:13 292:12 | 209:22 232:24 | 140:1 153:15 | 185:20 192:18 |
| 296:13 301:2,7 | 233:2,4 234:6 | 154:2,19,21 | 194:9 200:11 |
| 304:17 305:3 | 234:9,18 236:5 | 155:11,18,20 | 211:21 242:22 |
| 311:21,25 | 236:10 243:6 | 155:22 159:6 | 243:1,14 269:3 |
| 312:11,19,21 | 260:12,15 | 172:23,23 | **114,000**   243:9 |
| **0xd2**   296:8 | 261:5 278:25 | 173:6,6,7 | **11501**   316:23 |
| **0xfc**   240:19,22 | 302:21 | 175:9 177:1 | **11:13**   83:14,17 |
| **0xfc2**   274:16 | **1,401,662.9** | 196:13,14 | **11:21**   123:19 |
| 274:19 | 269:15 | 214:17 218:11 | **11th**   78:25 |
| | | 225:13,14 | 80:4,15 81:3 |

81:25 151:22
184:17 195:19
**12** 55:23
114:19 198:15
198:17 210:21
211:3,4,4,12
228:21 250:20
**120** 302:22
**12151** 316:7
**124** 5:8 141:24
**126** 142:15
**129,000** 57:5
**12th** 274:24
**13** 53:7,17
55:24
**135** 144:11,14
144:22
**135,000** 248:17
**1353** 3:11
**1358** 3:11
**136** 144:22
**1361** 3:12
**13th** 54:8
88:24 245:19
246:2,5 261:21
261:23 262:6
262:14
**14** 55:25
237:21 266:13
266:17 293:17
**140** 22:25
**144** 258:6,18
259:2
**145** 172:25
173:8 218:5
**15** 7:18 24:10
83:13 155:9

173:6,7 182:25
200:5 218:11
218:15,22
219:21,24
220:9,12,19
221:14 288:2
**150** 139:22
**158** 5:8
**15th** 22:15
44:19 195:11
**16** 56:1 158:6
182:25 205:13
**16th** 89:7
293:1
**17** 138:11
182:25 193:22
195:2 266:2
316:25
**17.1** 57:4
**172** 156:17,20
**1746** 32:23
**175** 5:8
**177** 244:9
**178** 5:22
**179** 5:23 243:6
**17th** 86:7,12
264:18 265:22
265:24,25
**18** 56:2 59:17
59:24 68:6
69:4 158:6
262:6
**185** 5:8
**18th** 68:16
119:13
**19** 171:5
210:11

**190,000** 196:3
**1:20** 124:2
**1:40:17** 135:20
**1:43** 53:17

**2**

**2** 17:24 21:3
47:6 50:1
194:11,13
228:17,20
229:20 230:17
231:21 232:2
240:25 242:15
242:18 252:21
253:6 269:7,10
269:19,21,23
269:23 270:3
291:21
**2,831** 245:6
**2,973.67** 245:1
**20** 3:5 47:13,15
47:20 50:5
104:22 155:9
173:6 175:12
210:13 218:15
218:22 219:21
219:24 220:9
220:12,19
221:14 228:21
232:17 233:21
246:18,18,21
247:3,4,11
250:14,17
251:23 252:7
252:11 254:13
254:22 264:16
265:11 266:21
268:9 269:10

269:10 274:22
282:11
**20,000** 283:1
**200** 6:16 131:8
**200,000** 249:23
**201.94.** 46:8
**2011** 214:12
**2016** 176:16
**2017** 32:8
**2018** 64:23
**2020** 19:2,17
19:20,25,25
22:16 37:8
38:4 43:25
45:14,17 46:10
47:10,13,17,21
48:7 49:4 50:1
51:11 57:2
96:23 97:2,22
98:22 119:13
121:11,19
122:12 125:23
127:3 128:17
128:21 132:17
138:13 141:4,7
146:18 153:3,6
153:14,16,20
159:25 160:13
168:16 169:10
189:10 190:1
193:8,22 195:2
195:3,17,19
197:18 209:13
209:16 210:25
211:15,17
212:1,5,18
213:23 223:13

**[2020 - 3]**

Page 3

| | | | |
|---|---|---|---|
| 223:16 237:2 | 194:9 198:15 | **2023**  1:22 | **24th**  248:21 |
| 245:19 260:10 | 198:17 200:19 | 186:20,23 | **25**  3:5 156:18 |
| 261:18 264:18 | 201:1,14 202:2 | 316:25 | 156:25 296:8 |
| 278:22 279:15 | 202:10 204:3 | **20th**  125:2 | **25th**  274:18 |
| 279:18,21 | 204:17 205:7 | 137:8 138:5 | **26**  49:3 138:8 |
| 284:7,17 297:2 | 209:15,16,18 | 230:9 232:13 | 201:14 202:2,9 |
| 298:21 302:16 | 210:14 211:21 | 233:13 234:2 | 205:7 210:14 |
| 311:25 | 214:11 218:1 | 235:7,14 | 292:10 |
| **2021**  10:21,22 | 239:17 246:5 | **21**  191:4,9 | **260**  4:16 5:17 |
| 11:14 18:11 | 248:21 250:24 | 246:5 270:11 | **269**  267:7 |
| 19:5,9 20:17 | 261:21 264:18 | **21,987**  46:7 | **26th**  203:12 |
| 23:5,11,16 | 265:22,24 | **214**  311:15 | 204:16 270:17 |
| 24:21 51:24 | 267:9,10 | **217**  312:14 | 270:18 271:4 |
| 52:11 53:7,17 | 269:14 270:11 | **218**  272:15,21 | **27**  3:5 78:9 |
| 53:23 59:17,24 | 271:8 274:12 | **21st**  239:17 | 263:17 |
| 65:11,14 68:6 | 274:24 275:4 | 271:8 | **271**  256:13 |
| 69:4 70:8,23 | 276:5 277:17 | **22**  172:11 | **27th**  77:3,5,9 |
| 71:15 77:3,5,9 | 277:20 278:1,9 | 246:4 262:14 | 139:18 |
| 78:10 82:5 | 278:11,25 | **22-01139**  1:4 | **28**  21:18 32:22 |
| 84:15 86:7,12 | 279:2,13 281:5 | 3:1 | 65:14 185:16 |
| 86:14 87:5 | 281:16 284:24 | **22-10964**  1:3 | **287**  5:8 |
| 89:20 97:22 | 294:16 298:22 | **22nd**  213:1,5 | **28th**  105:8 |
| 105:8 109:1,13 | 301:4 304:12 | 230:7 | 109:14 192:3,5 |
| 109:15 110:18 | 313:6 | **23**  43:22,24 | 197:22 210:21 |
| 121:11 133:7 | **2022**  32:9 33:5 | 45:14 46:7 | **29**  3:5 21:18,20 |
| 133:11 135:20 | 78:25 80:4 | 56:3 70:7,15 | 22:1 26:21 |
| 139:18 146:18 | 81:25 88:19,24 | 70:23 71:15 | 27:8,19 28:11 |
| 149:10 154:1,3 | 91:1,14 125:2 | 116:5 134:13 | **2:55**  139:18 |
| 154:7,12 | 137:8 138:5 | 307:2 311:16 | **2nd**  250:24 |
| 155:17,25 | 157:7 205:13 | **23rd**  74:8 87:5 | **2x**  159:18 |
| 157:7 159:25 | 210:11 228:21 | 179:4 274:12 | **3** |
| 160:7,13 166:3 | 232:17 245:19 | **24**  56:3,6,12 | **3**  20:23 33:25 |
| 168:17 169:10 | 246:2 261:23 | 92:4 115:11 | 35:9,12 60:2 |
| 173:5 179:4 | 261:23 262:6 | 134:16 138:10 | 79:21 134:2,10 |
| 181:3 185:14 | 262:10,14 | 144:22 174:1 | 135:9 144:22 |
| 185:16 189:10 | 263:15 275:4 | 306:23 307:14 | 194:18,21 |
| 191:6,9 192:19 | | 308:6 | 198:20 199:5 |

200:3,5 206:7
206:9 230:17
241:12
**3,949,803.45.**
264:7
**3-4-5** 67:11
**3.5** 245:8
266:18
**3.8** 268:8
**3.85** 262:4
**30** 22:10,12
56:13 106:16
106:22 134:16
180:20,24
181:2,8 195:3
265:15 293:18
**30,000** 281:24
282:14
**300** 20:1
267:22 316:22
**304** 264:1
**31** 5:4,22 22:16
38:4 47:9 56:7
56:14,15
134:16 177:18
178:3,6 197:18
210:25 211:15
211:17 212:1,5
223:24
**31,875** 195:11
**310** 5:8
**32** 3:5 56:8,15
134:17
**3236** 28:9
**33** 5:15,21
22:12 55:21
56:5,9,9,15

102:20 134:18
**330** 316:21
**34** 3:6 5:4 42:6
97:4,4,11,12
256:24
**35** 16:4,11
**350** 239:16
240:2,4 241:1
241:3
**350,000** 21:2
**36** 5:23 178:23
179:10,15
242:23
**37** 181:22
183:21 186:10
196:20 197:2,4
257:18
**38** 190:8 244:2
**39** 36:16 193:2
193:5
**3rd** 82:5 84:15
86:14 233:25
235:11,17
237:23

**4**

**4** 33:25 34:8
35:9,12 37:8
81:22 114:5
134:2,10
139:10 199:18
199:18 235:21
238:13,19
245:11 262:21
280:7,16 281:3
283:18 289:21
**4,000** 52:6

**40** 5:24 15:13
20:22,23 22:1
22:4 38:7,8
46:13,16 47:5
53:14 101:20
101:23 102:4
120:21 263:21
292:20,21,22
292:23 293:1,7
295:5
**40,000** 281:24
282:15
**41** 191:14,18
197:15,17
223:22 289:19
**41-11** 198:11
**41-6** 224:2
**42** 3:6 191:12
191:23,24
**43** 191:14,18
201:9,11 202:1
236:6,10,13
292:6 295:20
295:21
**45** 3:6 15:13
286:9
**46** 23:15
212:22 213:2,4
213:9
**47** 79:8
**48** 30:8,9 82:16
82:18 206:9
250:15
**49** 171:3,5
**4:00** 225:14
**4th** 267:10

**5**

**5** 33:4 65:10
81:19,22 96:11
121:2 134:2,10
150:21 175:9
185:14 192:3,6
192:11,22
197:22 205:22
226:1 247:2,2
247:14,16
265:9 272:21
281:5
**5.25** 252:7
264:23 268:8
**5.8** 266:22
**5.87** 252:4
**50** 80:8 120:16
120:16,19
131:3 172:11
215:15
**50,000** 171:24
283:2 291:20
292:5
**500** 52:4
**500,000** 242:15
242:18
**50:50** 120:22
**51** 3:6
**53** 3:6 5:14,24
28:15 94:24
95:17,19 113:2
114:5,19
**54** 28:18 47:17
47:21
**540,000** 267:25
**55** 29:3 137:14
243:6

**56/134**   5:21
**57**   3:6
**58**   3:6 29:6,10
   29:18,22
   172:22,23
**59**   5:15 29:7,22
   32:18,19 33:14
**5:18**   286:22
**5:25**   286:22
**5th**   89:20
   267:9 281:15

**6**

**6**   79:19,21
   100:9,18
   105:11,13
   116:25 117:7
   119:12 142:17
   184:8 189:2,3
   189:4,8 213:10
   249:22 255:1
   291:13
**60**   5:16 29:23
   94:24 95:17,19
   100:19 105:13
   117:3,4 120:19
   120:19 231:20
**600**   53:19
**600,000**   249:25
   250:5 276:7,10
   277:25 278:23
**600,000-700...**
   12:2
**61**   205:16,21
   228:16,17
   252:6
**62**   237:21

**625,000**   242:1
**63**   98:9,11,25
   237:21
**63,750**   195:14
**64**   98:16,25
   229:23 232:17
   235:17,21
   247:2
**65**   231:4,20
   232:12,19,21
   235:13 266:25
**65,000**   20:25
**68**   245:15
   246:11,13
**69**   234:4,25
   235:10,13,18
   269:6
**6:06**   315:15
**6d**   22:12

**7**

**7**   23:16 193:8
   195:17,19
**7.3**   19:16
**7.4**   293:14,15
**7.8b**   22:5
**7.8b.**   22:9
**70**   5:17 261:6,7
**70,000**   249:11
**700**   186:22
**700,000**   276:7
   276:11 277:7
   277:11 280:22
   285:5
**7065**   3:4,10
**71**   245:14
   263:20

**710**   185:15
**72**   258:1
**721**   184:14
**73**   251:23
   252:10 253:18
   254:12 264:7
**730-1**   81:16,19
   81:20,22
**733**   184:20
   185:8,14
**75**   115:8 119:6
   174:1 252:1
**76**   57:6 116:4

**8**

**8**   142:17
   186:20,23
   249:22 283:9
   283:11,16
   311:15
**80**   104:18
   123:1 268:14
   282:7,18 289:2
**800**   18:2 23:13
**81**   47:21
**81.5**   48:7
**85**   154:23
   155:2 303:14
   305:7 306:16
**850**   241:22
   242:1
**87**   282:10
**88**   267:18
**8:57**   37:8
**8th**   4:16 181:3

**9**

**9**   3:7,7 19:5,9
   26:21,23 49:8
   55:21 57:2
   141:25 191:9
   215:17 218:1
**90**   104:19
   268:14 305:7
   306:16
**94**   5:5
**95**   5:5,14,16
**975**   257:23
**99**   158:1,2
**99,897**   250:21
**9:00**   1:23 3:12
   3:13
**9th**   23:9
   172:24 173:5
   191:24 245:18
   245:21 260:10
   261:18 263:15
   264:18 266:1
   266:10,12
   267:19

**a**

**ability**   107:20
   107:22 121:12
   121:16,18
   125:5 289:8
**able**   87:13
   91:22 113:13
   113:14,17
   122:25 130:21
   144:24 155:23
   164:4 180:5
   224:19 227:12

233:7 234:23
241:6 260:16
281:6 283:12
297:5 303:21
305:13,15
**above**  159:7
288:25 297:20
**absence**  26:2
**absolutely**
82:22 107:15
115:18 116:15
116:17 171:1
174:7 261:4
314:14
**accept**  106:7,7
**accepting**  86:9
**access**  8:7,7
9:20 11:15
57:15 91:4,4
161:5 165:19
182:15,19
183:14 189:16
204:8,17 205:8
206:24 207:4
210:18 219:3
223:15 262:9
271:3,8,9
285:2 299:23
**accessing**
14:13
**account**  9:2
16:22 23:7
70:5,7 71:15
71:18,19,21,22
71:24 72:10,15
74:25 76:11
146:7,9,12,15

146:17,18,21
152:23 160:19
182:20 184:14
185:9 207:5
210:6 278:18
278:18 285:13
301:2 303:12
**accountant**
295:7
**accounted**  18:6
**accounting**
9:16 18:3,7,9
24:3 97:19,20
150:5,9 151:16
164:3,9,12
226:7,8 288:20
294:20 295:1
296:17,22
297:8 298:9
307:21
**accounts**
144:16 207:15
208:8 263:6
278:19 294:24
296:23 305:16
305:17 310:5
**accrual**  98:14
99:2,11,11
**accrued**  98:7
293:19
**accumulated**
306:8
**accuracy**  99:5
281:4
**accurate**  33:5
41:1 106:25
142:5,6 144:18

157:2 281:4,7
289:2 316:4
**achieved**  289:3
**achieving**
211:11
**acknowledge**
171:25 254:21
**acknowledged**
213:15
**acquired**  20:19
185:6,7 229:7
250:5
**act**  20:20 32:6
**action**  19:13
34:23
**active**  70:5
163:6
**actively**  16:22
**activities**  17:1
20:7 22:22
34:3 58:5
96:23,25
100:11,24
101:2 103:2,19
103:22 104:16
104:17 107:13
107:17,18,21
107:23 108:9
108:12,16
109:5,6,23
110:9,20,21,23
111:7,18
115:15 116:2,8
116:13 117:11
117:17,19,22
118:6,16 119:4
119:8,10 120:6

121:24 122:1,2
122:6,7,13,21
126:9 132:17
132:20,23
133:1,8,12
134:24 135:1
143:19 144:2,5
165:24 167:14
168:8 174:4,16
189:14 242:11
242:13,14
292:2 296:23
297:3 299:10
300:8
**activity**  62:22
152:12 242:18
304:6
**actor**  302:16
**actual**  198:10
**actually**  8:1
9:22 17:16
43:13 44:4,5
44:23 47:7
51:20 62:15
63:10 72:5
77:4 86:18
87:1 113:7
117:14 136:20
187:8 189:25
196:13 197:2
198:10 200:3
208:15 212:14
223:11 225:23
232:25 237:12
240:13 244:5
244:16 247:19
265:15 268:21

272:25 278:25
296:25
**add** 165:20
260:4 264:12
**added** 44:17
238:5
**adding** 261:10
**addition** 195:9
**additional**
16:11 22:25
178:18 179:25
185:15 299:19
**address** 18:4
62:22 63:2
64:9,25 65:1
131:14,17
162:14 201:16
201:22 207:19
207:20,21,23
207:25 208:2
223:5 236:18
236:19 262:12
262:13 263:6
296:8,13
311:25 312:12
312:23
**addressed**
172:4 215:20
**addressee**
247:21
**addresses**
208:5 235:23
236:5,9,9,13
236:13,14
238:10,12,17
238:17 247:4
265:11

**addressing**
18:21 25:24
108:9 119:10
**adjourned**
315:13
**admission**
10:22 44:6
68:10
**admit** 8:20
14:23 179:9
181:7 182:7
278:10 307:1
**admitted** 9:25
10:21 33:12,14
35:1 37:4 38:6
38:9 46:13
47:4 53:13,14
56:4,5,10,16
57:1 58:12,20
59:3 65:22
66:6 95:17,19
97:5 134:2,13
134:17,18
150:20 178:4,6
179:14,15,23
182:24 183:20
187:18,20,22
261:7 288:2
**admittedly**
14:19
**admitting**
30:16,17
**admonished**
71:18
**adv** 1:4
**advance** 28:22
69:9 82:21

114:13,21
170:9,13
172:19 173:19
212:8,17
213:17 219:2
222:1,18,23
227:17 230:24
272:2,10 273:4
**advanced**
173:18
**advances**
114:9 115:3
213:12,22
217:19
**adversary** 3:1
19:13
**advised** 6:8
237:24 266:7
**advising**
191:25 227:23
**advocated**
141:14
**affect** 314:3
**affected** 304:4
304:9 312:1
**affidavit** 5:22
56:14 95:13
96:7,10 100:9
100:22 101:11
102:22,24
104:22 105:7
105:17 177:10
177:21,25
179:20,23
187:8 189:2,4
189:5,6 191:5
211:2,3,7,9

212:1 229:24
230:5,19
232:14,18
233:12 234:2
235:14,18
238:13,19
247:1,14 255:2
255:7,8 262:17
262:21 265:7,9
265:18 283:9
283:11 299:4
309:12
**affidavits** 96:4
96:8 104:22
**affiliate** 199:13
**affiliated** 177:3
**affirm** 31:7
94:6 124:15
175:24
**affirmative**
10:1
**aficionado**
75:8
**aftermath** 89:9
**afternoon**
124:9,24,25
176:4,5,7
186:7,9 187:7
**ago** 17:11
48:16 54:17,18
184:20 185:8
185:14,15
186:22 265:15
**agree** 19:23
51:13 82:3
134:5 183:5
300:4

agreed   7:18
20:20 27:23
30:24 42:8
103:9,15
196:17 200:16
210:23 211:13
229:25
agreeing
157:23 188:9
296:16
agreement
13:16 17:23
19:4,19,21
20:18,19,20
22:2,6,17,20
22:24 23:3
24:7 27:4,13
29:6,11 37:16
37:21,23 38:3
38:15 39:16
40:16,20 41:7
41:11 46:10,16
47:6,8,9,13
68:14 86:21
99:16,25 101:3
101:13,16
102:5,9,12,17
102:25 103:4,5
103:7,9,9,12
103:14 111:20
127:16,18,20
127:22 148:3
179:22 183:3
192:9,13,16,18
192:21,23
193:1,1,6,6,21
194:1,7 196:16

197:18,21
198:16 200:11
200:15 220:9
221:14 223:23
227:24 252:20
252:25 253:1,5
253:23 254:16
254:23,24
289:16,17,17
291:13 293:10
293:11,18
294:1,9 300:9
agreement's
195:4
agreements
19:21 37:24,25
192:4
agrees   194:13
ahead   15:19
16:13 22:13
29:12 31:12
32:15 39:1
47:2 49:13
52:23 53:1
55:6 56:17
59:1,11,22
70:19 74:4,19
74:21 76:24
77:23 79:16
85:16 92:2
93:9 94:4,17
95:21 96:16
102:2 112:23
113:6 114:3
115:10 121:8
121:15 122:19
124:21 125:21

138:1 150:23
155:4,7,14
156:23 157:16
158:24 171:17
171:18 178:21
180:5 185:2
187:2 188:6
191:21 219:8,8
230:15 231:19
232:1 259:16
261:14 264:13
276:22,23
277:23 280:14
283:22 287:1
287:17 288:3
291:4 295:15
299:6,6 311:2
311:4
airdrop   11:17
24:19 304:1,2
312:10,18
airdropped
24:22 75:23
akin   4:3 7:16
8:4 93:12
107:6 113:3
114:6 158:17
186:7
al   1:12,15 3:2,2
6:4,16
alarming
135:24
alex   5:4 10:5,8
30:20 31:13
32:21 34:18
114:20,25
115:22 116:10

168:12 170:16
171:11,21,21
171:23 172:5
174:12 177:5
212:10 215:21
218:21 220:19
288:8 296:1
302:9 303:5
algorithmica...
207:7,9
allege   71:25
alleged   13:3
110:6 168:20
173:19 214:19
216:11 227:23
allegedly   169:2
alleges   88:14
allocated
136:18
allocation   50:4
126:12
allocations
128:11
allow   116:21
163:2
allowed   14:22
51:14 228:4
252:21 260:2
allows   207:4
207:14
aloud   33:25
170:22
alright   84:10
ama   88:24 91:1
91:2
ambiguous
220:25

[amended - approval]

**amended**   15:20
26:17 28:8
95:13
**america**   4:6
**amount**   13:12
39:15 44:3
45:16,21,23
46:5 51:11
57:19 103:24
110:6 122:24
153:13 154:18
154:18 155:17
159:17 171:25
173:2 196:2,5
215:5 217:25
218:12 220:22
222:2,5 236:24
238:25 249:5,8
251:1 256:12
258:17 259:1
278:23 282:15
292:3 300:15
300:16,22
**amounts**   8:25
9:1 115:1
162:25 173:23
173:23 217:19
244:23 253:16
258:20,22
285:19,20
292:4
**animated**   9:18
**anonymity**
12:11
**anonymous**
71:1,7

**answer**   41:22
48:24 58:17
63:6,7 64:19
76:15 81:2
85:4 87:12,13
87:17 90:13
91:21,23,25
92:1 105:24
112:10 114:9
114:23 115:15
115:17,18,21
116:9 122:19
138:13,15,17
141:21,23
142:3,18,19
144:8,16,17
153:24 155:12
157:2,2 158:7
158:11 171:11
171:13,20
172:5,14 173:1
173:2,6,8,12
174:4,7,7,19
186:12 195:23
205:2 207:18
213:12,20,22
214:2 215:21
220:1,25 221:5
226:3,12,14
246:15 254:6
272:7 275:17
312:22,24
**answered**
35:14 39:3
62:3 69:2 88:1
90:7

**answering**
254:8
**answers**
112:20 170:20
214:5 313:2
**anticipate**
276:20
**anybody**
106:24 125:9
172:3 177:3
215:19 306:15
**anymore**
276:11
**anyway**   232:17
265:19 268:25
**apa**   19:6,12
21:11 111:23
192:9,14 197:8
211:18,20
**apart**   17:15
170:8
**api**   197:8
**apologies**
22:11 46:19
121:15 122:17
155:6 164:5,25
196:25 200:6
**apologize**
21:17 55:2
93:25 100:17
151:11 221:10
290:14
**apparently**
17:6 49:11
**appear**   79:11
232:4,6

**appearances**
6:22
**appeared**
232:7
**appearing**
33:19
**appears**   8:20
44:14 49:18
**application**
11:22 111:9
162:9 283:14
284:13
**appoint**   76:22
**appreciated**
112:15
**appreciation**
112:13
**approach**
32:13 36:17
47:1 49:8
52:21 55:7
59:10 70:12
72:25 74:20
75:12 76:23
79:8 94:16
101:25 137:7
150:13 177:13
180:19 186:25
188:3 191:20
280:13
**approaches**
37:16
**appropriate**
296:5
**approval**   41:6
130:19,20
253:7 291:19

| | | | |
|---|---|---|---|
| 292:4 | 52:9 56:23 | **asserted** 17:19 | 53:19,23,25 |
| **approved** | 62:2 66:21 | 30:11 56:11 | 54:6,6,10,11 |
| 69:21 131:1 | 69:2 71:6,10 | 134:19 181:17 | 58:13 60:3 |
| **approximately** | 76:9 78:23 | 308:21 | 61:6,9,11,14 |
| 185:10 236:21 | 87:25 98:4 | **asserts** 9:14 | 63:6 68:7,10 |
| 262:4 277:7 | 107:7 110:1 | **asset** 17:22 | 69:19 78:2 |
| 285:5 | 111:9,19 | 20:18 22:2,5,8 | 82:2,2 86:9 |
| **april** 23:16 | 138:11,13 | 23:3 24:7 38:3 | 89:3 92:4,5,7,9 |
| 92:4 281:5,14 | 155:4 158:21 | 40:16,19 46:9 | 92:10,11,21 |
| **aram** 128:21 | 159:1 160:25 | 46:16 47:5,7,9 | 93:1 103:4,24 |
| 153:12 | 163:23 164:21 | 55:13 68:13 | 132:10 140:1 |
| **argue** 48:23 | 168:22 169:1 | 90:14,17,18,20 | 140:11,14,16 |
| **argued** 12:23 | 171:14 178:3 | 99:16,24 101:3 | 142:23 149:14 |
| 16:2 29:13 | 186:11 204:23 | 101:12,15 | 156:1,15 |
| **argues** 15:22 | 275:7 288:16 | 102:5,8,11,17 | 164:10 165:9 |
| **arguing** 16:3 | 295:13 301:18 | 102:25 103:3,5 | 171:9 185:22 |
| **argument** | 313:1 | 103:7 111:20 | 189:9,14,16 |
| 29:20 56:13 | **asking** 8:18 | 140:24,25 | 190:1,5,13,23 |
| 310:19 | 39:24 44:7 | 192:8 193:25 | 200:21 201:6 |
| **arguments** | 50:20,21 59:6 | 194:7 281:11 | 202:19,20,20 |
| 29:19 313:21 | 87:14 90:11 | 293:4,10,11,25 | 202:21 207:4 |
| 314:21 | 114:6 137:23 | 294:9 306:2 | 212:17 214:16 |
| **arose** 24:13 | 159:20 183:9 | 310:4 | 217:9 221:15 |
| **arrange** 77:16 | 186:9 204:20 | **assets** 9:4,5,6,6 | 227:16,19 |
| **arrived** 255:24 | 204:21 206:3 | 10:24 11:6 | 228:23 229:3,3 |
| **art** 145:18 | 216:21 220:13 | 12:19,21,23,23 | 229:8,14 |
| **article** 72:11 | 254:2 260:19 | 13:5,14,25 | 235:24 247:22 |
| 72:13 | 272:6 279:6 | 14:5,5,11,14 | 249:18 262:10 |
| **artificially** | 285:4 288:21 | 14:18 17:17,24 | 262:19 283:13 |
| 302:23 | 289:1 292:3,7 | 19:24 20:19 | 289:8 305:23 |
| **ascending** | 297:24 298:7 | 23:7 25:4 34:3 | 306:12 309:18 |
| 147:18 | 312:7 | 34:9 41:10,17 | 309:22 310:4,5 |
| **ascertain** 63:8 | **assaf** 128:21 | 41:25 42:17 | 310:8,11 |
| **aside** 18:9 68:5 | 153:12 | 47:22 49:16 | **assigned** |
| 138:25 180:18 | **assert** 10:1 | 50:8 51:3,5,12 | 176:25 |
| **asked** 15:5,18 | 104:21 | 51:13,15,19,24 | **assist** 226:4 |
| 35:13 43:10 | | 52:10,12 53:8 | |

associate 43:17

associated
180:12 206:12
206:22 207:5
207:15 208:2
238:25 249:24
250:17 282:5
283:13

assume 71:16
72:12

assumed 54:8
54:16

assuming
187:23

assumption
255:15

assurances
115:20 119:17
174:9

assure 116:12

assured 116:7
119:13,16

attach 78:19
78:23

attached 78:20
203:9 230:19
232:13 233:12
290:1

attack 303:7

attacked
302:17

attacker
302:20

attacking
302:17

attempt 16:6

attempted
19:10 24:13

attempts 7:10
15:21 19:11

attendance
33:17

attended 58:1
58:4,7 83:25
130:1

attention 18:16
138:10 193:17
194:11 196:8
203:5 228:16
231:4 259:23
293:1 295:4
311:12 312:14

attorney 88:3,4
88:9,10,11,14

attorneys 4:4
4:15

attributed
96:22,25

audibly 186:13
195:23

audit 60:2
293:21 294:8
294:11,18
295:7,12,14

audited 297:17

auditor 293:22
295:7,11

august 19:17
19:18 37:8
43:25 45:14,17
46:6,10 47:12
51:10 89:20
190:1 193:22

195:2 298:21

aum 140:6
289:3 305:9,16

authenticate
307:8

authenticity
43:7,10

author 179:7

authority
69:20 310:7,10
310:12

authorization
28:24 78:7
173:9,10 212:9
212:13,14
213:17,20
214:11 216:11
216:14 217:2
219:21 222:1
252:22,24

authorizations
10:13 114:8
172:12,13
214:23 217:5

authorize 34:2
34:4,9,10
68:23 213:11
213:21 215:5

authorized 7:9
10:3,4 23:2
42:4 69:18
76:20 114:13
114:21 170:12
170:16 172:17
172:19 173:5
212:8,16
213:13,16

217:9 218:1,11
218:14,21
219:2 222:4,4
227:16 230:24
245:23 252:12
252:20,20
253:20,22
254:14,16,18
254:22,24
263:20 271:14
271:15,15
291:9

authorizes
246:12

authorizing
10:22 171:9
214:16

automated
120:6

autonomous
311:23

available 6:11
8:22 12:23
14:5 104:9,11
105:2,5 161:6
185:23 242:21
304:23 306:19
307:25 308:8
308:25 309:4,5

avenue 4:16
133:17

avenues
133:18

avoid 24:1
92:10,21 296:9

aware 30:24
41:15,16,17,25

42:2 43:21
58:5 65:9,13
70:4 71:17,21
71:24 72:5,8
84:2 103:8
104:12 115:25
127:15,18
128:9 146:25
147:7,10,15
152:5,8 156:1
156:13,25
164:16 168:18
168:21 170:11
170:15 177:23
188:11 200:18
200:22 210:10
213:15 222:17
222:20,24
237:23 267:3
273:22 292:15
**aws**  302:18,20

**b**

**b**  2:1 5:10
120:17,20
199:21 241:2,3
247:10 293:14
293:16
**back**  23:13
41:5 46:12
57:9 71:5 82:7
83:12,19 84:16
87:22 91:6
94:1 98:25
109:24 112:6,8
149:15 165:20
168:1 191:16
193:16 198:19

202:17 221:7
223:22 232:5
243:18 244:16
244:20,22
245:5,16 246:9
248:1 251:13
253:18 268:21
269:6,18 271:7
275:8 284:21
286:11,17
287:15 293:9
295:4 296:17
298:8 304:1
311:8 314:15
**backed**  223:11
223:14,15
**background**
54:23
**backs**  219:1
**backup**  284:3
**bad**  139:3,6
**badly**  314:11
**bailey**  241:16
241:24 242:6
242:10
**balance**  14:14
18:10 57:5
103:24 148:21
149:7 163:6
305:19,20
306:12
**balances**
107:24 108:1
111:14,17,18
164:4
**balancing**  14:9

**bank**  4:6 89:22
92:10,22 163:6
278:19 285:13
**bankruptcy**
1:1,18 2:3 3:5
3:11 13:18,19
13:20
**banned**  11:23
273:22 274:8
301:10
**bans**  109:6
121:1 122:4
165:7,11,18
**bargain**  18:5
23:25
**base's**  302:18
**based**  18:3,6,9
27:4,13 28:7
64:5 99:10,12
99:13 112:4
131:24 136:9
166:18 211:11
226:4 235:24
262:18 263:15
268:7 273:22
302:2
**basically**  109:7
122:4 176:25
304:5
**basis**  18:1
27:15 28:22
29:16 95:14
110:16 150:9
150:10 166:4
168:6 299:11
308:20

**bates**  45:8
293:2,5
**battlestar**
35:21,22
176:21,22,24
176:25 177:2,4
177:6
**bear**  55:19
91:10 93:24
158:19 178:17
**bearing**  73:15
**bearings**
289:18
**beating**  92:16
**bedroom**
243:11
**began**  19:3
125:23 189:25
190:23 309:22
**beginning**  21:8
62:10 174:1
190:4 226:18
236:22 255:20
257:12 290:23
**begins**  139:20
178:11
**behalf**  7:16 8:5
19:4 174:21
193:13 254:25
291:9
**belief**  110:16
133:24 166:5,6
168:11 262:20
**believe**  12:7
13:23 21:17
22:19 27:21,21
29:16 30:1

| | | | |
|---|---|---|---|
| 31:4 38:6 42:7 | 165:1 166:1,22 | 254:15 256:6 | 296:24 |
| 51:15 61:1 | 167:11 168:9 | 258:2,16,21 | **benjamin** |
| 70:11 101:19 | 168:16 169:10 | 259:6,17 261:5 | 176:11 |
| 110:9,14 114:8 | 172:5,14 173:8 | 262:15 265:15 | **best**   13:13 89:2 |
| 114:10,11 | 173:12 174:6 | 265:21 266:9 | 129:10 164:14 |
| 115:17,22 | 174:11 175:21 | 266:10,15 | 213:20 284:9 |
| 116:11,16 | 178:1 182:2 | 267:8,17 269:1 | 289:7 314:10 |
| 126:25 128:14 | 183:25 186:19 | 272:22 275:11 | **better**   315:2 |
| 128:21 129:13 | 186:24 187:19 | 275:21 276:4 | **beyond**   36:13 |
| 129:16,17,19 | 190:3,9,11 | 277:9,19 278:2 | 78:17 271:4 |
| 129:23 130:6 | 192:15,17,20 | 278:25 280:2 | 298:24 313:10 |
| 131:2,3,4,6,19 | 194:4 195:18 | 280:18,21 | **biases**   73:15 |
| 132:11,14,16 | 195:21 196:4 | 281:19 285:15 | **big**   54:25 |
| 132:25 133:3 | 198:4,18 199:1 | 289:18 291:11 | 246:14 |
| 133:10,17 | 199:4,9,17 | 292:20 295:18 | **billed**   195:1,11 |
| 134:3 135:6,14 | 201:4 202:11 | 295:19 297:23 | 195:22 196:2 |
| 135:21 137:3 | 208:25 211:16 | 304:5,18 | **billion**   17:24 |
| 137:13 140:2 | 211:24 213:22 | 306:22,25 | 23:13 51:25 |
| 141:8 142:3,4 | 214:18,22 | 307:23 308:7 | 52:12 53:18,24 |
| 142:6,8,11,18 | 215:1,9,21 | 309:14 314:23 | 54:7,9 80:8 |
| 142:20,22 | 216:16,17,25 | **believed**   51:20 | 92:4,5 154:11 |
| 143:2,11,14 | 218:6,13 | 51:21 136:6 | 154:15,20 |
| 144:3,16,17,19 | 219:10 220:11 | 146:23 152:2 | 155:11,18,20 |
| 145:3,6,12 | 220:15 222:3,6 | 166:2 168:7 | 155:24 |
| 146:3,6,11,19 | 224:9 226:13 | 222:22 291:8 | **billions**   89:1 |
| 146:21 147:6,9 | 227:5 228:7 | 297:23 304:7 | 91:3 92:6 |
| 147:12 148:13 | 230:8 232:20 | **believing**   13:13 | **bills**   249:2 |
| 148:17 149:11 | 234:3 235:9,16 | 22:22 | **binder**   187:5,6 |
| 149:24 150:6 | 235:20 237:6 | **belong**   25:22 | 187:8 191:12 |
| 151:3,7,9,23 | 237:16 238:1 | **belonged**   17:18 | 191:16,17 |
| 151:25 152:4,4 | 238:15,23 | 24:24 52:12 | 193:3 196:21 |
| 153:17 154:4,8 | 241:11 242:8 | 68:8 | 280:11 289:19 |
| 154:21 155:22 | 242:14 243:16 | **belonging**   8:14 | 292:21 |
| 156:4 157:2 | 243:24 245:13 | **benefit**   13:14 | **binders**   187:24 |
| 159:25 160:7 | 249:1,4,10 | 237:12,16 | **bit**   21:3 35:11 |
| 160:22 161:3 | 250:16,25 | 238:22 243:20 | 43:14 121:13 |
| 163:18 164:20 | 251:1,20 252:9 | 262:3 264:22 | 158:18 159:13 |

160:19 203:17
260:3 301:25
**bitcoin** 120:8
131:22,24
132:2,5 141:15
142:3,3,13,18
142:23 236:25
237:5 300:10
300:10,15,18
**blatant** 298:7
**blindfoldedly**
298:8
**block** 12:11,16
12:18 17:5
62:21,24 63:5
63:9 72:11
205:25
**blockchain**
145:17 206:22
226:5 229:6
246:19 274:2,5
**blocking** 45:18
241:19
**blue** 73:11,15
**board** 10:25
11:8,9 41:6
88:20 89:8
202:14,23
203:2,9,13
**book** 57:11
60:3 106:2
238:8 289:1
**booking**
105:20 288:15
**books** 156:15
**borrowed**
53:19 242:10

**borrowing**
139:21
**boss** 302:8
**bottom** 21:21
26:6 36:23
37:7,8 71:3
74:8 135:18
144:14 151:12
198:12 202:6
224:2 281:23
293:13
**bought** 72:19
76:11 227:19
227:24 228:9
250:8 255:22
256:4 277:13
**bowling** 1:19
**box** 124:13
260:12,13
**breach** 19:12
23:24
**breaches** 23:21
**break** 92:15
113:7 123:19
166:9 175:10
225:20
**brief** 33:22
121:7 180:4
182:8 311:3,4
**briefly** 7:25
9:10,13 12:9
24:12 25:23
29:12 301:9
304:22 311:1
**bring** 23:24
30:22 97:4
280:11

**broadcast**
16:23
**broadcasted**
152:11 160:23
**broke** 52:24
**broken** 19:1
309:19
**brought** 13:8
19:12
**browser** 69:23
308:17
**bryant** 4:5
**budget** 224:11
291:17
**bullet** 224:10
291:15
**bunch** 77:2
251:7 274:10
276:17
**burden** 26:7
**bureau** 86:8
87:2
**business** 195:3
307:23
**button** 63:21
**buy** 142:10
143:3,9 227:16
228:4 268:19
**buyer** 293:18
294:3
**buyer's** 293:21
**buying** 300:14
**buys** 233:23
240:13 252:15
253:12 255:1
256:3 267:6
268:13,15

**c**

**c** 4:1 6:1 21:6
238:8,9 241:2
241:3 247:13
316:1,1
**calculate** 17:25
18:2
**calculated**
112:3
**calculation**
110:2 151:15
230:24 308:22
**calculations**
101:10 108:13
112:1
**calendar** 119:9
291:20 292:3
293:17,19
**call** 6:25 7:12
26:16 30:18
93:9,10 136:3
175:8 176:24
207:25 209:11
209:21 216:17
216:21,23
217:7,13 269:5
287:9 300:15
313:18
**called** 15:23
20:5 23:18
24:19 26:25
35:21,22 64:3
64:12,13,14
70:5 103:21
110:25 111:10
122:18 144:2
145:7,25 162:9

163:24 188:20
192:25 193:1
197:4 198:20
207:23 209:7
230:4 273:20
283:14 299:20
303:5
**calling** 7:5
158:22 233:17
**calls** 11:25,25
30:20 108:8
133:19 147:20
147:24 148:2,6
148:10,13,16
169:25 170:4,8
**camera** 9:11
55:4
**cameras** 7:8
**campaign** 24:2
**cap** 177:1
229:10
**capabilities**
132:4
**capable** 16:4
143:21
**capacity** 203:8
203:23
**capital** 35:22
36:5 88:20
89:8,17 176:21
176:22
**caps** 224:5
**care** 256:10
**carefully**
102:15 221:4
**carry** 108:15

**case** 1:3,4 8:6
8:22,23 12:8
12:20 14:10,10
14:12 18:22,25
24:8 26:9 31:3
32:11 44:21
65:16 81:10
125:2 127:2
153:17,25
154:4,8 166:1
166:2 188:11
200:1,19
202:22 218:6
222:17 225:20
236:17 237:16
264:4 287:7
314:21
**cases** 12:15
13:2 237:11
238:23
**cash** 11:22
15:24 30:10
54:19 273:20
273:22,25
274:4,8,12,15
274:19,21,25
275:3,6,9,10
275:20,21
284:24,25
285:15 301:9
303:11
**casualties**
89:14
**categorize**
263:23
**category** 29:4
253:9 256:1

**cause** 140:23
**caused** 41:10
41:12 224:18
266:2 267:18
268:2
**causes** 282:17
**cc** 49:19
**cc'd** 36:25
172:6 215:23
**cease** 86:8,18
87:2,8,18
202:18
**ceased** 190:23
**cel** 143:4,10,12
143:15
**celebrate** 16:23
**cell** 21:2
240:25 242:22
243:1,14
**cells** 249:22
**celsius** 1:8,12
3:1 4:4 6:3,15
6:18,24 7:3 8:7
8:8,9,14,16,17
8:25 9:14,15
9:20,21 10:23
11:6,9,19 12:8
13:8,11 14:17
14:19 15:21,25
16:2,3,5,19,20
16:24,25 17:3
17:4,11,13,16
17:18,20,23
18:4,8,9,10,12
19:4,13,15,17
19:23,25 20:4
20:6,8,12,19

20:21,25 21:1
22:19,25 23:1
23:6,9,13,14
23:16,20,20,23
24:18,20,25
25:4,9,10,10
25:21,22,22,25
25:25 26:7,8
26:13 29:14
30:20 31:24
32:1,7,10 34:3
34:8,9,12 35:4
35:18 36:2,5,5
36:9 37:25
39:13,19,23,24
39:24 40:3,7
40:16,20,23,25
41:5,8,10,12
41:13,20,25
42:7,18,20,22
43:4,25 44:10
44:21,25 45:2
45:7,7,8,15,16
47:17,21 48:7
49:4,19 51:8,9
51:11,14,23
52:2,10,13,17
53:5,23 54:1,2
54:10 55:12
58:13 59:4,16
60:15 61:5,10
61:14,19 62:7
62:16,16 68:8
69:5,21 70:2
75:25 76:10,11
76:12,19,20
77:3 79:2 80:5

| | | | |
|---|---|---|---|
| 80:12,15,21 | 139:4 140:1,11 | 198:24,25 | 253:13,14 |
| 81:3,10 82:1,7 | 140:15 141:2,6 | 199:7,13,13,13 | 254:20,25 |
| 84:16 86:8 | 141:15 142:2,7 | 199:16,16,20 | 255:3,11,14,19 |
| 87:8,10,18,22 | 142:9,12,17,22 | 199:23,23,24 | 255:23 256:4 |
| 88:20,25 89:2 | 142:25 143:3,9 | 200:19,20 | 256:15 257:3 |
| 89:12,14,21 | 143:18,21 | 201:5,20 202:7 | 262:2,9,10,19 |
| 90:20,25 91:3 | 144:1,4,15,24 | 202:9,15,19,22 | 262:23 263:4,4 |
| 91:16,22 92:4 | 144:25 145:22 | 204:16,17 | 263:6,9,10,16 |
| 92:8,10,11,21 | 146:5,22 147:5 | 206:12 209:7 | 263:18,22 |
| 92:25 93:1 | 147:8,11 148:4 | 210:11,13,16 | 264:9,22 265:2 |
| 94:14,25 95:9 | 148:7,20 149:6 | 210:19,22 | 265:12 266:3,5 |
| 95:11 96:4,22 | 149:14,18,20 | 211:4,13 212:2 | 266:9,13,24 |
| 97:2,15,16,21 | 150:2,5 151:5 | 212:2,8,12,17 | 267:1,3,5,18 |
| 98:24 99:16 | 151:10 153:2,8 | 213:14,25 | 267:19 268:3,4 |
| 103:4 104:3 | 153:22 156:1 | 217:19 218:16 | 268:4,5,16,17 |
| 106:16 109:22 | 156:14 159:2 | 218:22 219:22 | 269:13 270:3 |
| 109:25 110:17 | 159:21 160:9 | 220:10 221:14 | 270:13,16,18 |
| 110:20 115:13 | 160:24 161:1,5 | 222:22 223:4 | 271:16,17 |
| 115:14,15,19 | 161:24 163:16 | 224:4,8,11,15 | 272:2 273:1,5 |
| 116:1,2,8,8,9 | 164:3,9,17 | 224:17,18,20 | 275:9 278:10 |
| 116:12,13,14 | 165:2,10 173:5 | 225:1 226:8,15 | 278:22 283:11 |
| 119:13,15,16 | 174:3,3,4,9,15 | 227:3,6,6,16 | 284:1,2 288:9 |
| 121:12 122:2 | 174:16,21,22 | 227:19,23 | 288:10,20 |
| 122:11 125:12 | 177:3,7,8 | 229:5 230:23 | 289:8,9,25 |
| 125:14,15,18 | 181:4 182:6,12 | 235:24 236:3,4 | 290:3,3,12,13 |
| 125:23,25 | 182:15 183:6 | 236:8,11 238:1 | 290:13,17,17 |
| 126:6,9,13,18 | 183:13 186:8 | 238:12 239:6 | 290:18,20,21 |
| 126:21 127:8 | 188:12,14,15 | 239:13,17 | 290:21,25,25 |
| 127:15,19,19 | 188:15,17,18 | 241:23 244:1 | 291:6,7,10 |
| 127:23,23 | 189:9,9,13,14 | 245:5,16 | 292:2,17 294:4 |
| 128:8,14,17 | 189:16 190:1,5 | 246:12,14 | 294:17,20,21 |
| 129:5,6,25 | 190:7,12,22,23 | 247:5,13,18,20 | 295:2,11 |
| 130:13,19,21 | 191:1,5,6,25 | 247:22,25 | 296:13,17,21 |
| 131:17 132:4 | 192:1 193:5 | 248:20 249:16 | 296:24,25 |
| 133:5,22 | 194:14,25 | 249:18,19 | 297:2,5,7,10 |
| 135:16 137:1 | 195:6,10 196:5 | 250:23 251:6 | 297:19,19 |
| 138:12,21 | 196:11 198:6 | 252:12,18,22 | 298:6 299:10 |

299:12,16,25
300:9,20 303:1
303:20,22
304:14,18,21
305:2,9,13
306:21 311:9
312:1,11,13,13
313:4
**celsius's**
164:22
**celsius.netw...**
201:13 223:6
**central** 9:18
**centralized**
163:13 278:18
299:23 303:10
303:16
**ceo** 18:8,19
20:20 23:9
32:1,6 41:13
43:9 181:4
190:17 191:1,6
191:25 198:6
224:15,17
291:6 294:5
299:16
**certain** 9:6
27:14,22,22
95:12 101:8,10
102:19 109:8
111:22 112:4,5
112:7 114:10
122:3,24
147:21 166:15
170:1 173:18
192:4 198:24
210:17 227:24

288:23 294:23
304:1,1
**certainly** 13:6
35:7 201:5
221:12 225:12
251:13
**certified** 316:3
**cetera** 145:18
164:11 283:2
305:24
**cfo** 49:19 55:12
126:6 127:23
129:12 130:19
133:5 135:16
146:10 151:5,7
151:10 211:4
**chain** 5:24
12:12,16,18
17:6 36:24
53:4 55:11
59:15 62:21,24
63:5,9 273:19
288:4,8
**chambers**
137:13 259:18
**chance** 254:5
**change** 51:1,2
51:4 120:13
173:7 264:10
**changed** 160:1
302:23 303:8
**changeover**
284:6
**changing**
302:20
**chapman** 4:10
30:8 93:10,11

93:13,14,17,21
94:1,12,16,18
94:22 95:9,22
95:23 96:13
105:21 107:5,6
110:13 112:24
112:25 114:4
116:18 119:20
119:23,25
121:20 123:12
123:14,17,22
141:16 143:6
144:20 148:22
149:1 156:7
158:16,17,25
168:5 169:22
169:24 171:1,3
171:5,7,15,19
174:24
**characterizat...**
213:13
**characterizat...**
17:15
**characterize**
114:23 204:20
271:12,13
**charge** 165:13
165:16,17
**chart** 59:13
250:14 265:3
266:22 269:7
308:22
**check** 106:4,8
106:11,24
**checkmark**
73:11,16

**chest** 9:12
**chief** 90:21
**child** 208:5
**children's**
208:23
**chosen** 293:22
**circle** 57:20
**circulated**
232:15
**circumstances**
13:11 14:24
148:18
**cite** 13:1
**claim** 10:3,4,7
10:10,15,18,20
23:24 28:24
106:18 171:8
212:7,9,12,14
212:16 214:10
214:14,24
216:14 217:6,6
217:16,20
218:4,10,14,21
220:18 221:13
223:19 227:16
228:4 245:22
256:22 258:17
294:21 311:20
**claimed** 110:22
**claiming** 17:16
253:25 254:3
**claims** 9:13,15
9:18 20:8 26:1
**clarification**
255:21
**clarify** 99:22
99:24 290:16

**clarifying**
100:4 101:8
111:22
**class** 203:8,10
203:23
**clauses** 304:5
**clear** 9:3 12:8
14:17 27:16
116:5 118:8
206:15 221:1
**clearly** 13:21
14:15 39:16
46:24 181:19
**clerk** 93:20,23
94:3,5 97:7
113:10,16,19
113:23 124:1,4
124:8,11,14,19
137:22 175:16
175:23 176:3,6
231:24,25
287:18,20,22
**clicked** 306:13
**client** 60:3
**clients** 18:14
**clip** 84:2
**clips** 84:2,11
**close** 6:6 52:5
111:3 245:11
277:6 280:4
**closed** 192:18
194:8 197:9
**closing** 13:1
21:1,4 193:22
195:10 313:21
314:21

**closings** 286:12
286:14 314:24
**code** 224:21
226:4 271:4
**cofounder**
177:8 280:25
**cofounders**
275:22 277:2
**cohen** 173:14
202:6
**coin** 11:18 18:3
24:23 39:11,11
43:2 52:2,8,15
54:19 56:24
57:20,20,23
60:2 120:16,16
120:17,18,18
120:20 125:25
126:3,8 127:12
128:11 130:12
144:7 150:9
246:21,24
270:7 302:18
**coins** 8:8,9
34:12 42:4
52:2,16 54:1,3
57:17 91:6
96:12,20
100:12,25
102:19 103:10
103:16 107:23
109:24,25
111:15 112:4,5
112:6,7,11,13
112:13,15,17
116:9,14
117:12 119:16

120:7,11,13,14
120:15,21
126:12,14,18
127:8,24 128:2
128:4,7,15,17
130:13,18
131:17,20
133:22 140:6,7
159:7 161:1,4
161:6,10,13,18
161:21 162:1
169:8 199:2,6
199:11 236:8
236:12,14,24
239:3 242:13
252:1 271:16
296:12,16
303:11 305:17
305:19,25
**collapse** 80:7
**colleagues**
204:11 205:9
283:21
**collect** 75:8
112:12
**collectively**
110:14 229:13
267:25
**color** 73:13
**colors** 73:13
**column** 44:3
45:21,24 46:2
238:8,9,16,17
238:18,24,24
239:5,8,12,16
241:15,18,21
243:1,4 244:17

244:22,23
245:1 247:10
247:13 248:3
248:11 250:16
256:13 257:25
260:1,4,4,16
261:10 264:6
**columns** 247:8
**combination**
172:15
**come** 10:15
27:24 31:5
81:15 83:12
168:11 176:17
179:20 187:20
191:16 208:16
219:19 221:7
234:13 246:9
248:1 252:24
253:18 275:8
286:17 296:21
311:8 314:15
314:16
**comes** 159:14
191:17 268:13
**coming** 30:5
111:15 179:13
181:15 284:21
**commencing**
195:9
**comment**
50:11,13 61:17
314:6
**committed**
88:15
**committee**
110:17,18

communicate
144:1
communicated
136:12 137:3
148:20 149:5
communicati...
188:10
communicati...
10:17 115:13
135:14 139:15
151:3 174:2
191:8 218:20
220:11
communicati...
104:12 115:25
133:20 170:11
170:15 174:21
214:15,19
219:11
community
89:2,3 149:16
149:18,21
303:25 304:2
311:23
companies
89:11 229:6
company 23:6
35:20,22,24
42:25 43:8
76:18 176:17
176:20,24
188:20,21
189:25 192:25
199:8 201:20
203:24 224:8
244:3 250:8
281:1,24

288:14
compensate
312:10,19
compensated
39:17
compensation
19:22 194:18
194:21 199:18
199:19 272:23
289:22,24
competence
24:4
complain 13:7
complains
16:19
complaint
15:20
complete
112:10 265:19
288:24
completed 38:5
226:25
completely
17:7
completeness
171:12
completion
26:10
complex 63:7
107:17
complied
165:11
comply 302:2
complying
165:17
compound
24:19,22 92:15

92:18 297:2
302:17,18
303:25 304:2
311:22,23
comprised
232:19 235:18
compute 226:6
226:15 297:5
299:13
computed 97:2
computer 6:12
67:9 137:16
178:20 284:6
307:8
computers
55:4
conceal 15:24
274:4
conceivably
287:10
concept 24:6
40:4,12
concerning
9:23 20:10
103:19 133:15
141:3 152:22
168:20 287:25
298:15
concerns
109:23,24
110:20 211:5
conclude 281:6
concluded
281:4 315:14
conclusion
14:16 19:11

conduct 10:21
14:23 295:12
conducted
107:22 122:9
123:9
conducting
108:5
confer 225:19
283:20 287:3,5
conferred
183:3
confidentiality
42:8
confining
285:7
confirm 27:17
106:12 151:14
157:13 296:9
confirming
141:3
confirms
218:21
confused 153:7
155:19
confusion 40:6
congregated
303:15
connected
124:5 263:5
connection
32:10 94:1
96:4 100:11,23
102:22 111:22
117:10 118:15
119:15 177:10
192:24 229:20
230:20 308:2

309:12 312:20
connor   5:8
60:16 114:7
115:23 124:22
158:15 172:5
172:15 173:15
174:12 215:10
215:11,22
217:7 303:13
303:13
consent   31:1
34:8 202:14
consider   244:6
280:25
consideration
20:23 194:22
196:10 199:20
289:25
consisted
20:24
consistent
227:23 262:21
consists   207:7
208:19
constitute
96:12,20
constituted
214:15
constitutes
80:23
constructing
226:5 246:1
consultant
176:13
contact   6:6
93:20

contacts   77:19
contained
67:15
containing
206:11
contains
235:22
contemplate
197:7
contemplated
17:23 21:7
22:17 193:25
contemplates
21:11 197:8
contemporan...
50:2
contend   266:4
content   308:22
contention
69:13
contents   33:7
206:24
context   14:1
80:9 84:21
85:20 171:13
206:17
continually
189:9
continue   14:22
89:1 171:15
225:8 297:18
continued   11:2
19:17 71:19
92:11 217:18
304:15
continues
114:18,23

115:11 116:4
continuing
115:1
contract   19:12
23:22,24 36:7
253:22
contractor
250:18 251:2
contractors
251:7,13
contracts
10:18,20 36:9
contradicted
10:18
contrary   10:21
16:20 156:11
156:14 157:1,2
contributed
120:21
control   24:20
25:2 36:8
37:24 41:19
54:14 182:4,6
182:12,19
183:6,7,10
189:17 190:13
190:15,19
200:21 224:11
260:15 291:17
controlled
25:15 39:24
161:8 235:25
237:14 238:18
242:6 247:5,18
247:20 257:15
258:3 262:19
265:12,17

276:2 296:25
convenient
83:10
conveniently
308:24
conversation
114:20 172:18
217:23 298:14
conversations
101:1 103:1,3
108:2,21 115:4
115:6 117:24
118:13 136:9
136:11 152:19
152:24 166:23
166:25 167:7,9
173:22 298:17
298:20
conversion
8:13 9:16
convert   285:15
converted
11:21 273:17
converting
285:1
convey   135:24
conveyed
136:21
cooks   37:15
copied   172:3,8
215:3,8,9,20
copies   6:10
15:8 214:25
copy   32:19
46:15,16 47:5
49:9 70:12,15
137:8,11 138:4

187:3,8,13,14
188:2,4,7
205:14,21
209:23 223:11
231:12,13
259:16 292:12
292:17,25
307:10,11
**copying** 308:25
**corner** 36:23
186:15 224:2
**corporate** 40:2
**corporation**
38:16
**corporations**
38:18 40:3,13
**correct** 25:5,14
28:14 32:5,11
32:23 33:8,23
35:7,12,18,22
36:2 37:17
41:5,8 43:5
46:10 47:23
49:20 51:16,20
54:12 57:21
58:13 59:4
68:8,11,20
70:8 75:21
76:17,20 78:14
78:17,25 79:4
80:13,16 81:4
81:5 85:8,13
86:10,19 87:3
87:5,23,24
89:6,18 94:14
94:15 95:4
96:6 98:9

99:19 100:1,16
100:25 101:9
102:23 103:5
103:19,25
104:1,4,5,7,8
104:10,14
105:5,15,16,18
106:22 107:8,9
108:21 109:16
110:3 111:11
111:20,23,24
122:12 125:16
125:24 126:13
126:19,20,21
126:22 127:7
127:25 129:7
129:10 130:10
130:15 131:18
131:20,25
141:12 142:19
145:11 147:14
155:21 156:11
159:3,8,22
160:16,17
161:2,9,11
162:10 163:25
164:23 168:24
180:17 186:21
186:23 188:23
190:9,25
191:11 195:7
200:1 202:7
204:6,11 205:9
207:6 208:10
209:6 210:9
212:5,10,11,14
213:5,13 214:2

216:15 217:2
217:10 218:9
219:13 221:15
221:16 222:9
222:16 223:20
226:21 227:2
240:6,7 243:8
245:25 247:17
250:7,11,13
251:19 252:13
252:14,16
258:5,10,13,19
259:21 261:11
261:13 263:18
270:8 271:6
272:4,8 273:6
274:3,20,23
275:1 277:3,19
277:21 279:24
280:20 283:18
285:20,23
290:18,19
292:10 298:15
310:2
**correctly** 37:19
131:2 138:13
145:12 159:6
160:20 167:23
215:25 226:20
242:16 251:3
255:10,13
265:14 273:11
273:12 282:20
285:11 312:2
**correspond**
235:6

**corresponding**
68:3 248:5
**cost** 300:19,22
300:24
**costs** 13:6
291:21 297:4
**counsel** 6:8,19
7:1,18 13:17
18:17 23:19
30:22 34:22
44:23 48:22
58:24 85:18
113:1 114:2
157:13 187:14
205:25 210:8
210:10 222:21
222:22 225:19
237:24 238:6
256:11 266:7
287:3 294:18
309:5
**count** 52:8
**counted**
294:24
**counting**
266:24 268:12
269:4
**country** 302:4
316:21
**couple** 11:20
100:4,4 102:21
108:22 112:21
139:19 159:12
185:5,6 223:11
223:13,16
284:5,8 295:8
296:2 306:9

| | | | |
|---|---|---|---|
| **course**  10:21 | 70:13,19 73:1 | 123:12,15,18 | 218:24 219:1,5 |
| 11:3 13:18 | 73:20,24 74:4 | 123:25 124:2,9 | 219:8 220:1,24 |
| 14:22 85:21 | 74:10,14,19,21 | 124:12,16,21 | 221:4,9,21,25 |
| **court**  1:1,18 | 75:13 76:24 | 125:18,21 | 223:2 225:6,13 |
| 6:2 7:19,22 | 77:11,20,23 | 134:3,5,8,11 | 225:17 230:13 |
| 8:19 12:20 | 78:11 79:9,16 | 137:9,12,15,24 | 230:15 231:10 |
| 14:25 15:1,7 | 80:19,25 82:10 | 140:20 141:17 | 231:13,17,22 |
| 15:12,14,17,19 | 82:21,22 83:1 | 143:7 145:15 | 232:3 235:19 |
| 16:9,13,16 | 83:6,10,13,17 | 147:1 149:2 | 239:23 244:10 |
| 18:23 21:13,19 | 83:19,22 84:2 | 150:15,23 | 244:13 254:4 |
| 21:22,24 22:3 | 84:8,13,23 | 154:17,25 | 259:13,16,21 |
| 22:7,10,12,19 | 85:3,16,24 | 155:4,7,13 | 260:16 261:1,9 |
| 24:5,9,24 25:3 | 86:4,22 87:12 | 156:5,8,23 | 261:14 264:6 |
| 25:8,14,19,24 | 88:7,17 90:23 | 157:11,14,16 | 264:13 269:16 |
| 26:3,6,11,13 | 92:1,14 93:4,6 | 158:4,14,24 | 269:20,25 |
| 26:15 27:6,16 | 93:8,13,16,24 | 162:12 165:2 | 271:23 272:16 |
| 28:3,12,18 | 94:4,7,10,17 | 168:4 169:23 | 273:9 275:15 |
| 29:1,3,5,12,15 | 94:21 95:16,21 | 171:17 174:18 | 275:17,24 |
| 30:13,15,25 | 96:16 98:4,9 | 174:23 175:1,4 | 276:19,22 |
| 31:8,11,20 | 98:16 99:8 | 175:7,12,20,25 | 277:23 278:4 |
| 32:3,15 33:12 | 100:15,19 | 176:4 177:15 | 280:14 283:22 |
| 34:1,16 35:15 | 101:23 102:2 | 178:4,9,13,17 | 286:1,7,13,19 |
| 36:14,18 37:4 | 102:11 105:11 | 178:20 179:14 | 287:1,5,12,15 |
| 38:11 39:1 | 105:22 106:8 | 179:25 180:21 | 287:19,21 |
| 40:8 41:21 | 107:3 110:12 | 181:10,13,18 | 290:9,20 291:1 |
| 43:19 44:9,15 | 112:23 113:6,8 | 182:11,21 | 291:4 292:16 |
| 44:20 45:1,11 | 113:14,18,21 | 183:4,8,12,17 | 293:2,5 295:6 |
| 46:23 47:2 | 113:24 114:3 | 183:19 184:7 | 295:10,15 |
| 48:3,20 49:11 | 116:19,25 | 184:10,22,24 | 298:24 299:6 |
| 50:10,17,22 | 117:2,4,6,9,20 | 185:1,13,16 | 302:14 306:4 |
| 52:20,23 53:1 | 117:23 118:2,7 | 186:2 187:2,17 | 307:4,10,14,24 |
| 53:13 55:2,9 | 118:14,20,22 | 187:24 188:6 | 308:4,9,12,19 |
| 55:18 58:16,25 | 118:25 119:11 | 189:22 191:14 | 308:24 309:2,2 |
| 59:11,22 60:6 | 119:20,23 | 191:17,21 | 309:7,9 310:7 |
| 62:4 64:17 | 120:3,24 121:5 | 194:3 195:23 | 310:10,13,15 |
| 65:18 66:4,7 | 121:8,21 | 200:4,9 205:1 | 310:19,22,25 |
| 66:18 67:13,22 | 122:15,18 | 205:4,12 | 311:2,4 313:10 |

313:14,17,20
313:25 314:6
314:10,16,20
314:25 315:4,7
315:13
**court's** 6:6
228:18 229:21
270:23
**courtroom** 6:5
6:7 30:21 31:2
31:4 46:20
56:20 93:19
124:10 125:9
216:5 217:1,12
217:22 313:25
314:9
**cover** 18:13
24:3,5 104:17
266:7
**covered** 158:18
**covering**
260:12
**covid** 6:5,6,7
**cpa** 293:22
**crafted** 24:17
**crazy** 300:22
**create** 226:9
296:4
**created** 36:6
60:4,15 145:24
182:15,16
183:13 209:5
236:4 246:19
284:3 307:21
**creation**
226:12

**credit** 130:23
131:1,3,7
**creditor** 14:20
**creditors** 7:3
13:15 14:17
17:5
**critical** 11:4
**criticism** 73:14
**critique** 63:11
**cross** 5:3,3,7,7
29:25 34:16,18
58:16 85:25
86:4 95:24,25
96:16 110:2
111:10,21
124:22 158:19
158:23 159:20
163:23 164:21
165:23 169:1
178:10 179:24
180:5 186:2,5
225:8 276:20
288:1 298:24
**crunch** 258:21
**crypto** 25:4
70:25 71:7
89:10 146:19
201:6 202:19
202:20,20,21
208:8 283:13
288:15 301:7
306:12
**cryptocurren...**
142:10 143:22
**cryptocurrency**
64:5 176:13,15
176:18 278:9

**cryptography**
206:21
**cryptopunk**
73:3 146:24
147:1,2
**cryptopunk's**
75:2
**cryptopunks**
147:5,7
**crystal** 9:3
12:8
**crytopunks**
73:19
**cto** 177:8
**current** 163:6
228:24 309:18
**currently**
176:12 250:6
**cursor** 46:7
**custodian** 45:6
161:6
**custody** 200:21
257:12
**customer** 19:3
19:16,18 20:1
23:1 25:22
47:22 48:8
51:25 126:24
132:10,12
140:14 141:15
142:3,7,12,23
142:25 143:3,9
153:13,15,20
154:2,7,12
297:20
**customers**
52:17 88:24

91:2 142:2,3,9
**cybercrimes**
273:23

## d

**d** 5:1,3,7 6:1
21:21 81:24
236:6,10,13
238:16,17,18
243:14 246:24
**dai** 11:17,21
25:18 204:6,9
204:18 205:9
246:24 267:4
269:15,21,25
270:4,7 271:10
271:25 273:16
275:8 277:2,16
277:25 278:6,7
280:23 302:11
302:19,21,23
303:7 304:1,17
311:8,19,21
**daily** 57:17
**damages**
272:10 273:4
**dan** 42:11
43:16,18 45:23
82:17 97:6
307:12
**dance** 221:5
**dangerous**
209:24
**daniel** 4:21
98:13 203:8,23
**dao** 311:23
**data** 297:6
308:5

**date** 32:8 51:6
52:5 74:7 78:9
80:21 86:11,11
98:19 151:11
152:1 172:24
179:3 186:15
186:18 193:22
195:4,10,10,17
206:10 211:17
211:24,25
218:1 239:5,9
242:2 248:11
258:9 259:10
260:1,2,3,4,7
261:10,11
264:11 265:22
269:6 270:11
316:25
**dated** 38:4
70:23 98:21
117:2 151:22
193:8 197:18
223:23
**dates** 133:9
160:8 262:1
**day** 14:1 23:19
72:6,9 86:13
107:21,21,23
107:23 182:16
185:10 190:16
190:20 195:12
230:5 250:12
258:25 261:11
274:15,21
302:16 303:19
311:25 315:13

**days** 11:20
27:5 89:7
91:16 184:20
185:8,14,15
186:22 195:3
214:12 223:12
293:17,19
**dead** 92:16
**deadline**
182:10 230:6
**deal** 37:15
**dealings** 21:8
**deals** 30:3
**dean** 4:10 30:7
93:11 107:6
158:17 170:24
**deanna** 15:6
46:23 55:2
97:5 113:14,16
231:22
**debank** 20:5
64:1 103:21,22
104:2,6,9,15
104:15,17,23
105:1,2,5
111:10,12,14
123:2 145:7,10
162:9,12,13,17
162:22,23,25
163:2,8 167:19
167:19 282:25
283:6,14,16,16
283:17 289:14
304:23 305:2,3
305:8,21 306:2
306:7,13,17,19

**debited** 115:2
**debtor** 1:10
**december** 19:2
19:25 22:16
33:4 38:4
44:18 47:9
51:11 82:5
84:15 86:14
98:22 117:4
125:2 137:8
138:5 197:18
205:13 210:11
210:25 211:15
211:17,22,25
212:5 213:1,5
213:23 214:2
223:24 228:21
230:7,9 232:13
232:17 233:13
234:1 235:7,14
264:18 265:22
265:24,25
276:5 277:17
**decentralized**
299:21,22
303:17 311:23
**decide** 18:24
25:24
**decided** 213:24
216:19
**decision** 6:9
48:25
**decisions** 90:15
90:17,19,20
291:9
**declaration**
5:14,15,16

26:23,24 27:8
27:9,23 28:15
29:8 32:10,19
32:21 33:19,22
34:25 35:4
78:13,19,21,23
100:15,18
116:22 117:2
191:4 192:3,5
197:22 210:21
**declarations**
27:4,14 94:13
94:25 95:10,17
**declare** 32:22
33:7 278:6,8
279:4,17
**declared**
278:19 279:8
279:11 284:22
285:2,9,14,17
285:21
**declaring**
279:1
**dedicated**
77:17
**deduct** 279:24
**deducted**
147:21 170:2
**deed** 28:1
**deemed** 160:13
**defeat** 84:6
**defendant** 5:6
11:8 15:21
18:19 43:16
119:14 179:11
255:23,25
257:15

**defendant's**
13:17 53:14
56:5 97:11,12
102:17 116:16
134:2,13 135:9
139:10 150:20
150:21 166:5
167:13 177:17
178:3,6,16,23
179:10,15
180:20,24
181:2,7,22
200:21 239:6
248:20 256:23
262:3 264:23
267:1 268:18
268:21 270:4
274:13,16
288:2
**defendants**
1:16 5:19 8:6
8:20,24 9:20
10:1,8,12,15
10:23 11:5,9
11:11 12:11,20
13:21 14:4,21
16:3,6,18 17:7
17:8,9,17,23
28:10,24 29:13
34:2,4,5,9,10
34:13,22 55:20
94:24 96:3,11
96:19 100:10
100:12,22,25
101:4,12,16
102:12 103:9
103:15,18

107:8,10 108:3
109:3 110:5,9
111:13 117:9
117:12,13
118:15 125:1
127:1 159:22
161:2,9,13,17
161:20 162:17
163:17 164:18
165:24 167:25
168:7,18,20
169:15,18
170:17 175:3
187:14 188:20
200:20 228:20
229:4 235:11
235:19,25
237:12,14
238:1,19,21,22
239:13,17
247:6,19,23,23
258:3,18 259:2
259:11 262:20
264:1 265:12
267:16
**defense**  7:17
10:2 12:24
13:6 26:9
36:16 42:5
49:8 306:23
**defi**  23:12,17
24:15,19 34:4
57:18 58:2
61:21 71:1
104:3,4,7
107:8,10 108:4
109:4 111:13

121:12,18
122:3,11 126:9
126:11,13,16
126:18,21,23
127:6,13,24
128:15,18,25
132:17 141:3,7
144:25 145:5
153:2,6,14,16
153:20 154:2,7
154:12,19
155:17 159:3
161:10,13,18
161:21 162:18
163:17 164:22
165:3,11
167:25 189:14
194:15 242:10
**defi's**  164:18
**define**  290:12
**defined**  194:15
229:3,10
290:12,17,20
290:25
**defines**  198:23
**defining**
198:23
**definitely**  75:9
103:6 109:12
118:23 263:8
273:2,2 288:24
**definition**
203:14 207:17
208:1 268:17
**degree**  281:6
**delay**  13:10
14:1 29:14,16

287:20
**delayed**  13:8
**delivered**
111:3,4,5
227:3 233:25
**demand**  8:15
11:1 120:11,17
201:6 202:13
203:1 205:7
292:9,15 294:8
294:11 295:17
**demanded**
10:23 11:16
204:16 292:17
**demanding**
11:10
**demands**  11:2
**demonstrate**
145:10
**demonstrated**
12:5
**demonstrates**
12:7
**demonstrative**
259:9,17,24
261:2,10
263:16 264:17
**denied**  9:21
10:10,11 216:6
217:1,13,23
**dennis**  277:4
280:19
**deny**  26:13
29:14 51:10
**denying**  13:7
29:16 62:19

**department**
30:10 87:7
301:10
**departure**
145:22 146:5
147:5,8,11,25
148:7,19,19,25
149:5,8 152:7
152:14
**depend** 143:23
**depending**
165:8
**deploy** 19:17
19:24 34:3,6
36:5 61:6,10
61:14 130:15
140:14 157:21
161:10 169:8
169:17
**deployed** 63:7
68:6 100:13,25
103:11 112:13
117:12 122:3
126:18,21
128:4,8,14,19
131:18,18,20
131:22 132:6,8
133:22 140:12
153:2,14,15,19
154:1,5,6,9,11
154:18,19
155:17 159:2
159:15,17
161:6 163:1,7
189:13,17
199:6,11
202:20 281:21

**deploying** 19:3
54:11 126:23
128:17 141:6
143:22 153:5
**deployment**
23:1 41:18
42:1 47:22
48:8 50:4
51:21 55:13
58:2 61:9
90:14,17,18,20
126:1,3,8
127:9,13,24
128:1,11,25
129:2 130:12
132:4,5 158:10
161:13,21
163:9 165:13
165:17,20,21
182:5 199:2
202:19 236:9
236:12 283:12
**deployments**
20:9 61:8
90:25 111:13
126:11,13,15
126:16 127:6
129:7 136:15
136:18 140:23
141:4,12,14
145:5 153:8
160:4,24
161:16,18,25
162:15,22
163:20,21,22
165:8 166:3,15
167:18,19

**deposit** 93:1
**deposited**
25:22
**deposition**
112:20 113:2,5
113:25 125:2,3
136:23 137:5,8
138:5 141:22
141:24 142:15
144:9,11
154:23 156:17
157:23 158:1
170:20 188:3,4
207:24 212:21
212:22,23,24
213:5,7 214:8
215:13 216:3
225:23 226:23
227:8 272:13
273:14 275:23
282:10,22
311:13 312:5
313:2
**depositions**
212:25
**depositors**
13:15 149:20
149:22
**deposits** 19:3
19:16,18 20:1
23:1 25:23
48:8 51:25
126:24 132:10
132:12 141:15
142:7,9,12,25
143:3,9 153:15
153:20 154:2,7

154:12
**derived** 236:5
236:10
**describe** 118:5
140:20 145:15
198:24 302:14
**described**
172:8 193:23
202:23 222:9
268:18
**describes**
265:7
**describing**
312:18
**description**
5:13,20 222:12
249:1 250:20
257:25
**designed**
112:11
**desires** 120:2
**desist** 86:9,18
87:2,8,18
**despite** 8:15
20:8 22:20
88:23 220:6
**destination**
262:13 274:1,5
274:6
**destroy** 271:3
292:12,17
**detailed** 203:9
**details** 78:3
**determination**
160:6 224:12
291:18

determinations
288:21
determine
241:6 297:25
determined
160:4 166:2
199:13
determines
288:15
develop 226:2
226:3 227:12
developed
162:3
developer
250:18
developing
224:21
development
226:16
differ 182:21
difference
40:11 112:9
121:24
different 21:4
40:3 42:24
65:3 66:14
69:2 103:23
111:16 115:22
120:7 129:9
137:4 141:21
144:8 145:17
159:12 164:10
168:22 174:11
183:25 251:8
257:14 260:3
276:17 295:8
295:10 296:23

303:4 305:17
305:19 309:19
differently
69:3
difficult 12:12
12:13,19
297:25
difficulty 55:3
dig 286:15
digital 10:24
41:10,25 51:12
51:13,18,24
52:10,12 53:23
54:6,10,23
55:13 68:7
180:15 200:20
207:4
digits 236:19
direct 5:3,3,7,7
31:13 36:13
60:1 61:5,10
61:14 79:8
94:11 95:11
130:20 138:10
143:16,17
144:20 176:8
179:19,21
193:17 194:11
196:8 203:5
228:16,17
231:3 259:23
292:25 295:4
299:4,4 302:8
308:14 311:12
312:14
directed 61:7
197:3 203:19

210:14 224:20
224:23 270:22
directing
225:22
direction 203:1
229:4 247:23
270:17
directly 6:21
85:4 128:18
177:9 255:19
256:4 311:22
directors 41:6
directs 202:18
203:7
disagree 136:2
disappeared
54:22
discipline 6:14
disconnected
7:11
discovered
18:11
discoveries
135:24
discovery
26:10 219:4
222:11,18
223:6 308:3
discuss 24:12
58:1,2 119:3,9
123:6 127:1
130:13 146:15
148:18 153:1
154:1 160:18
170:9 301:14
301:15

discussed 78:8
125:8 127:12
128:12 129:2
133:4,14,17,21
138:23 144:3,7
145:19,21
146:7,9,12
147:4,20
148:16 152:11
152:14,17,20
170:1 173:20
275:23
discussing 53:8
59:16 110:20
160:15
discussion
180:1
discussions
50:4 114:24
128:24 133:15
152:22 161:16
173:15,17
217:17
display 70:3
displayed
305:8
displays
183:25
dispute 16:6
17:22 19:10
24:13,14 44:9
88:15 273:5
310:18
disputes
249:16
disputing
44:11

**disrespect**
43:16
**dissatisfied**
293:20
**dissipate** 12:21
14:5,6
**distinct** 19:1
**distinctions**
40:1
**distractions**
13:19
**distributed**
21:12
**district** 1:2
**divided** 277:7
**doc** 3:5,11
81:19
**document**
28:20,21 32:17
33:4 38:24
42:18,21,23
43:3,4,8,11
44:6,8,13,16
44:18,20 45:5
45:6,10 48:2
48:17,23,25,25
50:11,23 52:3
55:15 56:10
57:1 65:19,21
66:7,8,9,21
67:17 73:21
79:11 81:14,16
82:19 97:14,17
97:20,25 98:24
99:6,15 100:14
101:6,8 102:8
102:14,20

115:16,17
117:1 135:11
135:13 139:12
139:14,18
150:25 174:5,6
177:18,20
178:21 179:13
180:18 181:24
182:1,8 183:6
183:7,14,14,15
183:20,24
184:17 186:16
186:18 187:7
190:2 191:23
193:11 197:3
197:17,25
198:3,15 199:7
201:11 202:13
204:20 208:17
208:19,22
209:1,5 210:7
210:11 221:13
221:19,22,23
221:25 224:7
224:23 228:2,6
237:25 253:20
270:19 280:16
280:20 281:3
282:2 288:5,7
290:8,12 292:7
295:19 307:21
308:14
**documentary**
10:16 78:16
**documentation**
141:10 168:19
288:22

**documented**
288:14
**documents**
42:13 43:3
44:17,24 46:17
58:10 94:23
95:3,7 97:1,17
187:5 192:22
202:12,15
206:11 219:4
221:20 223:19
294:23 307:25
308:5,7,13,15
308:16 309:3
**docusign** 198:4
198:10
**doing** 39:9
79:8 109:3
113:3 121:17
123:7 140:6
143:12 171:24
171:24 249:20
253:2 296:14
297:16,24
302:1,2 309:21
**dollar** 18:1,6,9
48:12,13 52:7
52:16 54:2,15
57:20 150:9
159:10 171:25
237:9 239:8
248:7 252:1
256:14 266:21
278:19 307:22
**dollars** 8:10
10:10 17:17
51:8 54:9 68:7

89:1 92:6
105:20 112:15
140:6 141:7
154:12 204:10
220:20 237:10
264:2
**domain** 201:17
201:23
**double** 268:12
269:4
**doubt** 43:7
99:5 296:10
**doubting** 43:10
49:16
**downloaded**
284:1,4,11
**downsides**
107:12
**dozen** 275:2
**dozens** 8:11
**draft** 35:6,7,12
**drafted** 22:20
35:4,8
**drafts** 35:5
**dramatically**
54:14
**draw** 109:23
112:10
**drew** 276:1
**drive** 120:20
**drives** 120:11
**drove** 120:17
**due** 8:15 21:3
22:18 150:8
196:3 211:24
211:25 282:3,8
282:16 293:18

296:18 303:7
**duped**  22:22
**duplicates**
  308:25
**duration**  237:3
**dx**  56:9 79:8
  82:16,18 97:4
  137:14 307:14
**dx09**  49:8,17
  49:22
**dx12**  54:22
  55:8,11
**dx23**  70:11
**dx30**  75:10,12
**dx34**  42:5
**dx35**  72:23,24
  74:15
**dx36**  74:17,18
**dx37**  66:6,12
**dx39**  36:20
  37:2
**dx40**  52:19
  53:10
**dx41**  59:8,19
**dx6**  76:23
**dydx**  108:10
  109:9 283:2
  299:20
**dysfunction**
  16:7

  **e**

**e**  2:1,1 4:1,1
  5:1,2,2,10 6:1
  6:1 191:9,24
  201:12,16,22
  201:25 202:12
  202:17,18

203:6 214:21
214:24,25
215:3,4,11,19
215:20,20,23
216:6 218:19
222:15 223:4,4
223:5,6,8,12
223:14,15
227:25 228:2,8
228:12 238:24
238:24 244:17
244:22 248:3
316:1
**eager**  41:8
**earlier**  55:19
  134:1,23 153:2
  155:25 157:18
  173:20 230:5
  232:7 284:1
  289:19 298:12
  299:25 302:12
  304:22
**earliest**  213:22
**early**  18:11
  19:19 51:24
  115:2 127:2
  146:18 147:2
  149:10 159:25
  166:3 168:16
  169:10 200:19
  211:22 212:18
  213:16,23
  214:2,2 217:19
  220:21 222:5
  254:18 298:21
  301:23 309:14

**earn**  21:6 39:7
  288:15
**earned**  40:24
  86:9 272:24
**earning**  54:12
**easier**  200:8
  231:14
**easily**  63:3
  283:12
**eastern**  228:21
**easy**  12:18
  63:12 70:3
**ecosystem**
  162:14,23
  247:22 254:20
  255:15,19
  263:4
**ecro**  2:5
**effect**  44:8
  228:8 256:16
  311:10
**effective**  38:4
  47:9 195:4,10
  195:17 206:10
**efficient**
  299:20,22
**efforts**  17:4,24
**egregious**
  11:13
**eight**  17:20
  20:9 24:1
  248:23
**eighty**  282:11
**either**  9:7
  20:13 21:17
  44:14 64:13
  79:13 88:5

97:22 118:2
130:20 133:19
146:16 153:25
165:7,20
168:19 171:21
172:5 177:4
188:15,24
209:16 213:23
214:11,25
215:9,21
240:16 265:8
299:15 301:23
302:3 314:1
**elaborate**
  108:2 174:18
**electronically**
  6:11 187:25
**elephant**  17:14
  18:5
**eliminate**
  245:4
**elizabeth**  4:11
**else's**  122:1
**email**  5:24
  10:16 36:24
  37:8,9,11,14
  37:22 49:18
  50:2 53:4,7
  55:11 57:3
  58:6 59:15,25
  64:1 70:22
  77:2,5,6,9
  115:19 119:12
  119:18,18,20
  119:23,25
  133:20 137:20
  172:8 174:8

emailed 72:6
259:17
emails 36:25
78:22 171:10
172:3,4,4,7
173:11 284:4
284:10,12
289:13,14
emanuel
249:13
emboldened
14:22
emil 241:16
employed
17:13 125:16
125:18 181:4
employee
108:6,20
117:22
employees
18:12 20:4
61:5,10,14,20
117:18 139:4,6
213:14 251:5,6
employing
117:17
employment
29:6

237:24 252:11
263:14 266:7
266:12 284:2
288:4,8,11,12
292:9 295:23
295:25 296:1,3
296:4,5,14
297:14,15

empty 67:6
enclosed 203:2
encloses
202:12 203:13
encompass
104:16
ended 75:20
226:19 257:9
268:25 285:1
ends 297:16
engage 143:18
engaged 20:3
20:14 122:21
222:18 310:3
engagement
146:22
engaging 101:2
122:22
enlarge 234:18
enormous 8:25
enrichment
9:16
ensure 8:19
enter 8:19
12:16,22 13:22
14:25 31:4
204:9
entered 19:20
20:18 40:15
127:16 205:12
292:15,16
entering
299:14
entire 171:18
entirety 313:6
entities 40:13

entitled 196:10
210:23 211:13
235:23 247:3
265:10 272:10
273:5
entity 125:16
190:17 294:17
entry 9:3
equal 120:22
195:1,11
equity 177:6
190:8 250:2
equivalent
204:10 239:9
270:9
erc 184:13
233:21 246:18
246:18,21
247:3,4,11
248:5 250:14
250:17 251:23
252:6,11
254:13,22
264:16,21
265:10,11
266:21,25
267:2 268:9
269:10,10
erc115 68:2
erc20 67:1 68:1
erc721 63:16
63:20 64:14,15
64:23 65:10
67:1,5,12 68:1
erin 123:25
error 150:4,8

especially
234:5
essentially
19:22 20:24
establish 14:24
181:12
established
211:20 244:3
268:15
estimate 225:9
237:4 286:8
estimates
289:1
et 1:12,15 3:1,2
6:4,16 145:18
164:11 283:2
305:23
eth 11:21,21
23:23 233:20
235:23,24
237:17 238:25
239:9,13,17
240:2,4,16
241:2,3,5,7,12
241:22 242:1,9
242:9 243:6,6
243:19,19
244:17,23
245:1,6,14
246:6,13
251:14 253:16
255:22,24
256:14 257:23
258:7 260:7,9
261:17,20
262:2,18
263:17 264:1

267:14,22
268:2,8,10,13
268:16,17
273:17,19
274:2,7,13,16
274:18,22,25
275:3,10 276:7
277:11 278:13
278:17 281:24
282:2,5,7,15
283:1 284:25
285:11,13,14
297:1 300:18
303:10,12,14
303:15,17,18
**ether** 251:4
**ethereum** 16:5
51:9 52:4,5
54:13 62:24
63:6,9 108:10
120:9 131:24
132:6 142:7
143:1 162:14
246:19 300:11
300:15 303:24
305:21
**etherscan**
63:14,21,25
64:9,10,11,22
64:25 65:2,4
65:25,25 66:1
66:3,12,15,17
67:8,24 182:2
182:3 183:16
**etherscans**
27:12,15

**evening** 230:7
**evenly** 277:8
**event** 273:24
297:3 302:12
302:15 304:4
304:10 311:24
313:23
**events** 18:22
**eventually**
19:11,23 51:25
275:10 303:25
**everybody** 6:2
91:4
**everybody's**
311:4
**evidence** 8:1
8:11,24 9:15
9:23 10:5,6,16
12:6,10 13:9
16:16 18:25
20:13 26:7,20
27:4 30:5,16
30:18 33:11,13
33:14 35:1
37:3,5 38:6,9
44:6 45:10
46:13 47:5
48:2 49:1,23
50:17 53:11,13
53:14 56:4,5
57:2 59:13,20
59:22 65:22
66:6,8 70:11
72:24 73:21
75:11 76:23
78:19 95:18,20
97:5 110:5

111:4 119:21
119:24,25
134:2,14
166:12 178:3,5
178:6 179:10
179:14,15
181:8 182:8
183:20,21
261:8 288:2
308:20
**evidentiary** 3:3
3:6
**ex** 158:19
**exact** 32:8
82:25 129:22
131:6,9,12
133:9,13
149:24 150:7
150:11 151:11
153:18,25
154:5,10,13,16
154:22 155:23
156:16 157:4
157:20 159:14
159:19 160:8
173:22 300:18
**exactly** 129:16
129:19,20,21
131:10 133:3
141:19 142:8
142:18,20
143:2 148:17
162:24 167:8
173:21 180:11
187:16 189:6
209:11 211:12
233:16 261:13

**examination**
31:13 34:17,18
58:16 83:7
85:25 86:4
94:11 95:24,25
96:16 107:4
110:2 111:10
111:21 124:22
158:14,15,23
159:21 164:21
165:23 169:1
175:1,2 176:3
178:10 180:4
186:3,5 225:8
276:20,23
286:20 287:17
287:23 288:1
298:25 308:25
310:23 311:6
313:11
**examine** 29:25
180:5 298:25
**examined**
308:24
**example** 8:13
11:13 227:22
239:16 245:22
246:21 250:20
256:24 274:12
**examples**
238:20 243:18
**exceeded** 82:2
**exceeding**
291:19
**excel** 42:6,6
232:18,25
233:13,17,18

235:1,8 264:14

**except** 284:5

**exception**
223:16

**excerpt** 84:22

**excerpted** 84:4

**excerpts** 85:18

**excess** 120:11
120:17 159:6

**exchange**
112:21 164:11
177:1 248:8
256:16 278:18
285:22

**exchanges**
120:10 170:21
299:23 303:10
303:16,17

**exclude** 245:15
264:8,24

**excluded** 31:2
257:19

**excluding**
199:14 252:6
257:18 262:1
267:16 268:7

**exclusive**
199:19 289:24

**excuse** 21:13
56:4 57:3
97:12 122:15
164:2,5 205:1

**excused** 93:8
123:15 175:4

**execute** 100:7

**executed** 19:6
22:25 41:7

100:2,5,6,8

**executive**
90:21 202:7,9

**executives**
213:14 288:10

**exempt** 307:23

**exercise** 240:12
241:10,11
253:11 258:16
259:7 265:6

**exhausted**
311:5

**exhibit** 5:14,15
5:16,17,22,23
5:24 20:22,23
21:14,15 22:1
22:4 23:15
26:18,23,24
28:4,14,18
29:3,6,7,18,23
32:18,19 33:14
36:16 38:7
42:6 44:17
46:13,16 47:5
47:7 49:8,10
50:17 53:14
55:21,22,23,24
55:25 56:1,2,8
56:9,9,14 66:4
66:5 70:15
79:11,14 84:6
97:4,11,12
101:20,23
102:4 105:13
134:2,10,13,16
135:8,9 139:10
150:21,22

177:18 178:3,6
178:16,23
179:10,15
180:3,4,20,24
181:2,7,15,17
181:22 182:25
183:21 186:10
187:9 193:10
193:16 196:20
197:2,4,15,17
198:9 201:9,11
202:1 205:16
205:21 211:10
223:22 228:16
228:17 229:23
230:19,22
231:4 232:12
232:14 234:1,1
235:10,14,22
261:3,6,7,10
280:7,16 281:3
283:18 288:2
292:20 306:23
307:14 308:6

**exhibits** 5:21
6:10,11 7:24
15:4,7,8,13,14
15:16 26:18,21
27:7,8,9,18,23
27:25 28:10
30:2,4,17
55:20 56:3,5,6
82:24 83:12
84:1,5 94:19
94:24 95:19
101:21 134:9
134:14 137:14

175:10 178:8
178:18 179:25
180:2 182:22
183:2 187:6,17
187:18,25
198:11 286:5
286:16 299:5
307:1

**exist** 190:7

**existed** 220:15

**existence**
169:12

**exists** 30:12
115:17 145:16
174:6 221:18

**expand** 231:18

**expect** 39:7,13
39:14,19

**expected** 282:9

**expedited**
28:22 45:9
222:18 308:3

**expenditure**
291:20

**expenditures**
252:18 291:19

**expense** 17:4
241:15 265:1

**expenses** 98:7
241:13 242:24
243:2,17,24,24
243:25 244:6,6
247:25 250:15
252:17,17,21
253:6 254:19
254:25 265:2
279:21,23,24

280:2 285:15
292:1
**expensive**
300:17
**experienced**
79:2 80:6
**experiment**
297:19
**expertise**
194:14
**expire** 193:22
**explain** 182:12
183:13 261:9
311:18
**explained** 60:1
**explicitly** 7:9
**expressed**
141:10
**expressly**
58:12,20 59:3
**extent** 14:2
135:7 241:6,8
**external**
250:18
**extra** 260:4
**extraordinary**
26:8
**extreme** 79:1
79:25 80:5

**f**

**f** 2:1 238:19
239:8 316:1
**face** 228:9,12
**faces** 14:10
**fact** 17:2 22:20
36:8 41:17
45:9 51:18

58:12,20 60:14
65:16,21 71:14
71:21 80:12
90:14 91:2
103:18 106:6
110:9 114:25
115:3 140:10
150:1,8 156:14
159:21 195:6
196:5 197:7
198:16 201:25
205:11 213:4
217:18 226:13
226:25 229:19
232:14 249:4
299:12
**facts** 9:19,19
16:8 92:7
**failed** 19:11
23:7
**fails** 20:12
**fair** 43:12 72:9
73:14 82:20
158:18 203:17
243:21
**fairly** 71:22
146:17
**faith** 224:12
291:18 296:15
**fall** 127:3
252:17
**falls** 16:7
**false** 157:6
**familiar** 40:4
63:14,16,17
71:23 73:3
99:16 103:21

145:7
**far** 10:22 12:7
13:2 17:15
18:4 43:20
44:12 68:21
96:11,19
**farming**
242:13
**fast** 140:7
**fate** 241:3
**fates** 241:1
**father** 209:5,20
209:21,25
**favor** 12:8
14:14 39:9
311:18
**features**
162:16
**february** 23:5
51:24 52:11
53:7,17,23
54:8 181:3
200:24 214:11
239:17 250:23
304:12
**federal** 3:4,11
308:19
**feed** 72:16 75:7
**feedback** 46:20
**feel** 314:11
**fees** 249:19
282:3 310:1
**feld** 4:3 7:16
8:5 107:7
158:18 186:8
**fell** 130:20
304:5

**fellow** 280:19
**festivities**
314:17
**fewer** 96:11,19
214:17
**fiat** 278:17
285:1,1,21
288:16
**fifteen** 276:21
**figure** 17:20
20:9 24:1
131:6,9 151:16
153:18,25
154:5,10,13,16
154:22 155:23
159:10 296:22
**figures** 237:7,8
**file** 28:8 279:13
279:15
**filed** 13:18
17:19 277:20
**files** 284:2,11
**filing** 19:13
**filings** 81:10
**final** 23:10
196:8 211:22
226:9,10
227:14 230:10
297:17
**finalizing** 36:9
**finally** 14:8,16
19:8 21:6
188:20
**finance** 57:19
64:5 163:14
299:21,22

financial  87:7
find  27:24
  29:19 82:8
  84:17 220:14
  233:7 286:5
  291:12
finder  45:9
finding  76:10
fine  34:24
  43:19 70:13
  84:13 94:21
  113:21 114:2
  314:5
finish  37:15,21
  64:16 286:13
  286:21 287:6
  287:13
finished  37:24
  83:7 95:21
  287:8
fireblocks
  161:5,7
firebox  164:11
firm  249:5,5,11
firms  249:6
  295:8
first  7:12 9:19
  17:9 18:21,25
  19:1,3,15,16
  20:25 22:15
  23:16 26:17
  30:19 34:8
  42:2,4 47:7,8
  65:9 68:3
  109:1 110:18
  113:2 135:18
  139:19 172:14

176:14 185:5,6
185:8,21 187:7
201:12 202:1
207:21 208:13
210:24 211:14
211:25,25
212:9,16 214:1
214:12,24
216:14,15,24
217:7 234:25
235:22 236:8
236:19 237:17
238:8 260:9,20
260:21 261:17
267:9 283:25
288:12 289:8
292:9 294:12
295:18 301:17
302:9
fits  222:12
five  22:21 84:2
  235:3 286:16
fixed  261:10
flip  67:4 81:22
  102:6,15
flipping  81:18
floor  4:16
flow  103:22
fluctuates
  140:24
fluctuation
  165:9
focal  160:22
focus  129:24
  153:13
focused  52:17
  117:21

folks  53:5
  59:16 77:3
  113:12 273:1
follow  72:20
  72:21 107:21
  113:1 121:25
  123:9 213:10
  283:24
followed  72:22
following
  32:23 296:15
followups
  283:25
footnote  229:2
force  48:24
forced  135:23
forceful  157:21
forefront
  61:20 145:5
foregoing
  316:3
forensics  17:6
forget  301:10
forgot  77:18
form  17:21
  23:4 115:18
  147:14,16
  174:7 206:21
  211:22,24
  227:4 297:6
formal  10:25
  11:1,8,9 19:4
  41:11 50:3
  230:24
format  66:14
  66:15 260:2
  289:11

formats  63:19
former  32:1
  43:9 126:6
  211:4
forms  20:24
forth  71:5
  199:21 289:25
forty  191:17
  293:7
forward  3:12
  6:9 10:16
  13:14 26:10
  108:15 115:8
  125:14 135:23
  136:2,5 219:19
  223:8
forwarded
  259:18,19
found  18:8
  220:7 221:17
  228:12 240:10
foundation
  44:8 47:24
  67:16 80:22
  194:2 223:1
founder  31:23
founders  11:25
  11:25
four  138:8
  214:16 280:8
  280:10
fourth  197:25
fraction  48:11
frame  169:9
framework
  19:22

**frankly** 314:2
**fraud** 18:13
  88:12,15
**free** 6:5 38:14
  38:17,22 39:5
  39:14
**freedman** 4:20
  7:19,21 18:17
  34:19,22 35:16
  36:15,19 37:2
  37:6 38:9,12
  38:13 39:2,4
  40:9 41:23
  42:5,15 43:13
  43:20,23 45:4
  45:12,13,23,25
  46:12,14 47:1
  47:3 48:1,4,18
  49:2,7,14,15
  49:22,25 50:14
  50:20,25 52:18
  52:21,24 53:2
  53:3,10,15,16
  54:21,25 55:7
  55:10 56:19,21
  58:18,21 59:2
  59:8,12,14,19
  59:23 60:7
  62:5 63:24
  64:18,21 65:6
  65:8,23 66:2,5
  66:10,11,22,23
  67:18,19,22,23
  70:10,14,17,21
  72:23 73:2,22
  74:1,6,17,20
  74:22 75:11,14

76:22,25 77:11
77:13,14,25
78:12 79:6,13
79:17 80:18
81:1,6,8 82:11
82:16,23 83:4
83:8,16,22,24
84:9,14 85:7
85:11,23 86:1
86:6,24 87:20
88:2,8,18
90:24 92:3,13
92:17,19 93:5
249:9 309:25
**frequent**
  273:23
**frequently**
  71:24 111:1
  133:21 145:2
  315:1
**friday** 201:14
**front** 15:8
  21:14 22:4
  36:21 42:18
  59:13 65:19
  66:7 79:19
  96:8 101:23
  116:23 119:22
  134:6 138:1,4
  180:24 187:24
  231:10,13
**frozen** 93:17
  93:19
**full** 71:4
  176:10 295:1
  296:17 297:6,7
  307:6

**function** 7:6
  112:11,17
**functionally**
  80:15,21 81:3
  82:1
**fund** 12:24
  13:6 208:23
**funds** 24:19
  25:5,10 41:4
  53:19 59:4
  79:3 80:6,8,12
  126:21,23
  128:25 130:15
  130:16 153:2,6
  153:13 159:2
  159:15 182:19
  298:8
**fungible** 34:5
  67:11,25 184:3
  184:18 246:18
**further** 13:24
  14:21,23 28:13
  93:5 107:2
  116:18,20
  123:11,14
  157:12 158:13
  169:22 174:25
  175:1,2 185:25
  186:2 196:10
  285:25 292:4
  297:14,15
  310:21,22

|         g         |
|-------------------|

**g** 6:1 239:5
  248:11 256:13
**gained** 14:12

**gains** 57:16,18
  58:12 59:4
  60:3 68:10
  289:2
**gaps** 284:19
**gauge** 225:11
**gears** 143:25
**gemini** 278:17
  285:12,21,22
**general** 42:3,7
  42:9,18,20,22
  42:24,25 44:9
  45:2 51:4,6
  88:3,4,9,10,11
  88:14 97:21
**generally** 58:5
  238:12,18
**generate** 39:11
  51:17 110:10
  140:15
**generated** 18:4
  41:4 58:8,9,11
  112:18 199:11
  207:21 218:4
  242:14
**getting** 35:11
  36:4 46:20
  114:1 258:25
  299:17
**giant** 18:10
**give** 21:19
  28:12 31:8
  44:15 57:14
  76:9 78:16
  94:7 102:6
  113:4 117:13
  123:20 124:16

| | | | |
|---|---|---|---|
| 134:8 137:15 | 53:1 55:6 | 223:22 224:1 | 13:9 14:4,6,20 |
| 149:13 154:25 | 56:17 59:1,11 | 229:23 230:12 | 14:23 18:20 |
| 157:13 167:17 | 59:22 67:15 | 230:15,17 | 29:24 30:22 |
| 175:25 183:23 | 69:25 70:1,19 | 231:19 232:1 | 31:1 36:15 |
| 188:4 200:7 | 74:4,19,21 | 233:1 235:21 | 43:17 44:13 |
| 201:16 209:21 | 76:24 77:17,23 | 243:1 244:9,16 | 49:7 51:16 |
| 213:4 214:4 | 78:1 79:16,18 | 244:17,20,22 | 55:5 57:10 |
| 225:7 254:5 | 83:10,19 85:16 | 244:22 246:17 | 65:20 67:7 |
| 271:17 286:7 | 92:1 93:9 94:4 | 247:2,8 248:14 | 72:14 73:22 |
| 286:20 288:21 | 94:17 95:21 | 251:9 252:15 | 74:2 79:6,8,13 |
| 291:12 292:25 | 96:16 98:1,13 | 253:12 255:1 | 79:14 83:1 |
| **given**  80:21 | 102:2 112:23 | 256:11,13 | 89:14 92:14,16 |
| 187:14 200:23 | 113:6 114:3 | 259:16 261:14 | 111:15 113:1 |
| 201:3 210:7 | 115:10 120:9 | 264:13,16 | 123:18 125:14 |
| 216:15 219:3 | 121:8,15 | 267:6 269:6,7 | 135:8 138:5 |
| 271:16 296:5 | 122:19 124:21 | 271:18 272:3 | 165:22 171:3 |
| 305:8 | 125:21 135:18 | 272:13 276:22 | 171:15 172:10 |
| **gives**  103:24 | 138:1 139:17 | 276:23 277:23 | 172:11,22 |
| 171:13 | 141:24 142:15 | 280:3,7,14 | 177:1 179:21 |
| **giving**  141:21 | 144:11,14 | 282:10 283:9 | 186:8 187:10 |
| 144:8 214:8 | 150:17,23 | 283:22 286:4 | 188:14,18,24 |
| 217:2 | 151:12,14 | 287:1,17 288:3 | 194:22 208:16 |
| **glenn**  2:2 6:4 | 154:23 155:4,7 | 288:11,25 | 215:6,17 |
| **glenn's**  206:4 | 155:13 156:17 | 290:16 291:4 | 216:20 225:8 |
| **glitch**  137:19 | 156:23 157:16 | 291:12,13 | 225:25 231:8 |
| **global**  299:10 | 158:1,9,24 | 292:20 293:13 | 232:4,14 233:6 |
| **gmail**  284:14 | 171:6,17,18 | 295:4,15,19 | 234:22 244:10 |
| **go**  6:9 9:6 | 178:21 180:5 | 297:14 299:6,6 | 244:20 248:14 |
| 15:19 16:13 | 181:20 183:23 | 299:6 302:11 | 249:18 260:6 |
| 20:22 21:9 | 184:17 185:1 | 306:23 311:2,4 | 260:20 272:3 |
| 22:12 23:14 | 187:2,15 188:6 | **goes**  191:14 | 276:22 277:2 |
| 28:13 29:12 | 191:21 196:13 | 195:9 203:25 | 280:11 281:8 |
| 31:12 32:15 | 196:20 197:15 | 206:13 | 286:1,19,20,21 |
| 39:1 43:22 | 198:9,19 201:8 | **going**  3:12 7:23 | 287:7,9,25 |
| 45:11 46:23 | 203:12 211:9 | 8:24 9:4,10,23 | 288:1 293:16 |
| 47:2 48:3 49:1 | 212:21 215:13 | 10:20 11:17 | 296:7 301:24 |
| 49:13 52:23 | 215:15 219:8,8 | 12:21,25 13:1 | 303:19 310:16 |

311:12 313:17
**goldstein** 37:22
  49:20 53:6
  177:8
**good** 6:2 7:15
  15:3 31:15,16
  34:20,21 63:11
  96:2 123:24
  124:9,24,25
  146:22 160:9
  175:1 176:4,5
  176:7 186:7
  224:12 225:11
  255:21 287:20
  287:20,21,22
  291:18 296:15
**gotten** 303:8
**governed**
  101:13
**government**
  3:9
**granular** 225:4
**great** 15:10
  17:4
**greater** 279:21
**green** 1:19
**ground** 158:18
**grounds** 26:22
  27:2,10 30:7
**group** 7:24
  207:7,10 299:9
**growing** 140:7
**growth** 57:5,6
**grunt** 195:24
**guess** 71:5
  150:12 180:14
  189:20 231:15

232:25 249:6
  256:19 257:19
  260:22,23
  262:5 263:12
  272:22
**guessing**
  104:18,20
**gump** 4:3 7:16
  8:4 93:12
  107:6 113:3
  114:6 158:17
  186:7
**guys** 27:11
  233:15 257:6

**h**

**h** 5:10 44:3
  45:21,24 46:2
  239:12,16
  240:25 241:12
  242:22 243:1
  261:10 264:6
**hack** 273:1
  311:10 312:20
**hacking**
  311:24
**half** 11:24 12:1
  12:2 123:21
  264:2 276:1
  277:1,1,16
  285:5 286:17
**halfway** 74:24
  77:1
**hand** 7:6 17:16
  17:18 31:7
  49:9 94:5
  124:14 135:8
  137:8 139:9

175:24 186:15
  224:2 288:1
  307:8
**handed** 32:17
  81:15 150:19
  186:10 187:5
  191:23 205:14
  289:19
**handing**
  177:17
**handled** 56:22
**hands** 7:6
**handwriting**
  208:14
**handwritten**
  208:20
**handy** 150:22
**happen** 9:4
  55:5
**happened** 8:12
  11:7,8 12:2
  17:16 19:8
  21:5 103:6
  119:4,6 133:16
  239:12 258:14
  276:12 302:14
  303:6
**happening**
  40:6 299:19
  303:5
**happy** 45:4
  87:17 90:10
  97:14 120:1
  253:11 313:23
  314:1
**hard** 6:10 15:8
  159:13 225:10

231:11,13
  286:20
**harm** 12:9 14:3
  14:9 26:2
  272:25
**harmed** 311:10
**harms** 14:9
**harumi** 49:19
  50:3 59:25
  114:7 116:10
  126:3 135:15
  135:18 139:16
  151:4,7,9
  172:6,16
  173:14 215:10
  215:12,22
  217:7 296:1
  302:8,9
**hauer** 4:3 7:16
  8:4 107:6
  158:18 186:8
**he'll** 29:23 31:4
**head** 125:11,25
  126:3,8 130:12
  278:21
**header** 45:18
  45:20 72:11
**hear** 7:25 9:7
  10:11 15:25
  16:17 18:23
  20:3,6,12 25:8
  31:17,19,20
  39:2 46:23
  56:13 81:2
  93:18 113:17
  124:10 156:5
  175:19,20

259:13 290:9
310:19 314:6
314:21
**heard**  167:17
168:13 216:9
287:11 298:14
299:25
**hearing**  3:3,7,9
6:3,9 7:3,5,11
7:12 28:23
37:4 42:10
45:9 85:22
113:9 178:4
222:19,23
**hearings**  6:14
6:17 7:7
**hearsay**  26:22
27:2,10,15
29:24 30:6
55:21,22,23,24
55:25 56:1,2,8
95:14 181:9,14
182:9,11
307:15,18
**heart**  17:22
24:7
**heavily**  22:21
**hedge**  100:11
100:24 101:4
101:12,16
102:13,18
103:10,15
108:15 117:11
118:16 120:24
120:25 143:23
163:13,16,22
164:15,18

300:1,7
**hedgeguard**
144:2,4,15,24
163:24 164:1,2
164:7,8,18
299:13
**hedges**  143:18
299:14 300:13
**hedging**  101:2
103:1 107:8,10
107:14 108:3
108:10,12
109:3,5,6,10
115:14,23
116:1,6,8,12
117:18,24
118:4,5,9,13
118:19 121:4
143:21 163:12
174:3,13,15,21
297:4 298:15
298:18 299:8
299:10,15,18
299:19,21,23
300:12,19,24
**held**  149:14
166:6 250:6
251:5
**help**  28:5 42:16
43:21 51:1
53:22 71:14
99:20 226:12
**helped**  99:19
99:22,24
280:16,20
**helpful**  191:19
200:9 234:5

286:4
**hereto**  290:1
**hey**  171:23,23
215:6 228:9
**hid**  17:8
**hide**  16:18
**high**  283:1
288:7
**highlight**  45:23
248:14
**highlighted**
67:5 237:20,24
238:2,2 245:4
245:15 252:6
256:24 257:5
257:18 262:2
263:1 264:24
266:8,14
268:23
**highlighting**
238:5
**highlights**
262:22 263:3
**highly**  17:2
22:23 24:16,16
136:6
**hit**  300:20
**hmm**  195:22
198:6 211:20
218:19
**hold**  23:17,21
134:8 149:12
184:7 185:1,1
197:2 254:4
275:15 287:18
**holding**  16:11
35:2 47:4

**hole**  18:10
148:21 149:12
149:12,13,23
150:2,4
**holert**  5:5,14
5:16 10:14
28:13,15 29:23
93:11 94:9,11
94:13,23 95:17
95:25 96:2
97:9,13 99:15
102:4 103:18
104:12 106:10
107:4,7 110:1
112:19 114:10
114:12,19,24
115:3,21,24
116:10,11,20
116:22 121:10
129:14,17
131:1 146:15
174:11 217:16
217:20,22
298:11,14,17
299:25
**holert's**  95:10
**home**  243:7
**homeowner**
243:15
**hon**  2:2
**honestly**
171:20 209:18
237:2
**honor**  7:15,21
8:3,5,18,23 9:9
9:11 10:6 11:4
11:14,23 12:4

| | | | |
|---|---|---|---|
| 12:20 13:1 | 101:25 106:20 | **honor's** 179:22 | 53:12 55:17 |
| 14:1,8,16,24 | 113:5 120:2 | **hope** 83:14 | 58:14 59:21 |
| 15:3,11,13 | 121:7 123:11 | **hopefully** | 60:5 62:2 |
| 18:15 21:20 | 134:1,21 137:7 | 233:7 | 63:23 79:10 |
| 24:12 25:12,12 | 137:11,20 | **horse** 92:16 | 80:17,20 82:9 |
| 25:23 27:3,21 | 150:13,21 | **host** 42:12,14 | 82:18 83:2,11 |
| 28:16,20 29:10 | 156:4,22 | 232:1 307:13 | 83:15,23,24 |
| 30:11,22,23,23 | 157:12,15 | **hour** 84:3 | 85:10,14,17,24 |
| 31:19 32:13 | 158:3 175:9,14 | 85:19 123:20 | 86:2 87:25 |
| 33:10 35:13 | 175:19 177:13 | 123:24 225:12 | 88:6,16 90:22 |
| 36:12,15,16 | 178:2,7,8 | 286:18 | 93:3,7,18 98:2 |
| 37:2 38:8,24 | 179:9,11,19 | **hours** 206:10 | 98:5 99:7 |
| 40:5 42:11 | 180:19 181:11 | 303:13 | 113:3,7,12 |
| 44:5,17 45:3,4 | 181:21 182:7 | **house** 243:11 | 114:6 123:24 |
| 45:9,12 46:12 | 183:1,11 | 277:13 | 134:5,7 179:11 |
| 47:1,25 48:1 | 184:23 185:13 | **housed** 161:7 | 179:19 181:9 |
| 48:14,18 49:7 | 185:25 186:4 | **huge** 9:1 | 182:9,21 183:1 |
| 49:9,14,22,24 | 186:25 187:13 | **hundreds** 68:6 | 183:5,7,9 |
| 50:20 52:18,22 | 187:15 188:4 | 141:6 227:19 | 186:4,6,7,25 |
| 53:10,15 54:21 | 189:20 191:20 | **hurdle** 297:20 | 187:4,13,19 |
| 55:7,17 58:14 | 197:13 200:6 | **hurley** 4:9 7:13 | 188:2,8 189:20 |
| 58:21 59:8,19 | 219:6 231:8 | 7:14,15,16 8:2 | 189:23,24 |
| 62:2 65:6 66:2 | 233:8 239:21 | 8:3,4 15:1 | 191:15,19,22 |
| 66:22 67:18 | 244:14 254:9 | 23:19 26:16 | 194:6 196:1,22 |
| 70:10,11 72:23 | 259:8 261:6 | 27:3,11,25 | 196:24 197:1 |
| 74:17,20 76:22 | 264:10 269:22 | 28:2,6,14,16 | 197:12,14 |
| 79:6,10,13 | 272:19 280:5 | 28:20 29:2,4 | 200:6,10 205:5 |
| 81:6 82:16,18 | 280:13 283:21 | 29:10,13 30:6 | 205:18,20 |
| 82:23 83:5,21 | 285:25 286:3,6 | 30:9,14,20 | 211:8 212:23 |
| 84:9 85:10,14 | 286:10,15,25 | 31:12,14,22 | 212:24 213:1,3 |
| 85:23 86:2 | 290:7,14 299:3 | 32:4,13,16 | 219:6,9 220:5 |
| 87:25 88:16 | 306:3,25 307:2 | 33:10,15 34:15 | 220:24,24 |
| 91:22 92:13 | 307:5,17,18,20 | 35:13 36:12 | 221:3,6,11 |
| 93:3,7,10,18 | 308:11 311:1 | 38:8,24 40:5 | 222:7 223:3 |
| 94:16,18 95:9 | 313:12,19,22 | 44:5,11,16,22 | 225:6,10,15,18 |
| 95:14 98:2,17 | 314:7,15,23 | 45:3 47:24 | 230:16 231:7 |
| 100:17 101:21 | 315:10,11 | 48:14 49:24 | 231:11,14,20 |

232:4,8,10,11
232:25 233:3,5
233:10 234:7
234:10,11,17
234:20,21
239:21,24,25
244:12,14,15
254:4,9,10
259:8,18,20,22
260:19,20,25
261:1,4,6,13
261:14,15,16
264:6,10,14,15
269:18,21
270:1,2 271:21
271:24 272:18
272:20 273:10
275:16,25
276:19,21,24
276:25 277:24
278:5 280:4,6
280:13,15
283:20,23
285:25 286:25
287:1,2,7,9
289:19 290:7
290:10,11
292:7 306:3
307:15,17
310:22,24
311:1,3,7
313:12,17,19
313:22 314:1
314:14 315:10
315:12
**hurley's** 15:15
15:16,21 16:1

**hybrid** 3:3,6
**hyde** 3:25
316:3,8
**hyperlink**
296:10,11
**hypothetical**
90:4,7,13

**i**

**idea** 107:25
225:5 251:15
258:17 259:1
277:10
**identification**
5:13,20
**identified**
117:18 173:11
183:2 195:16
221:8,13
227:24 237:11
257:8,11 266:8
282:17 283:6
**identifies**
238:25 247:10
247:13 309:17
**identify** 10:12
12:13 115:12
115:15 117:20
174:2,5 192:4
222:8 228:2,5
240:1,5 253:8
256:3 263:8
265:3 282:14
**identifying**
228:22
**identity** 251:16
**idiots** 135:23

**ifinex** 57:24
**iii** 203:5
**illicit** 13:4
**illiquid** 23:6
**image** 45:18
46:1,2
**immediate**
50:3 91:3
**immediately**
50:5 114:18
**impact** 297:18
**impair** 125:5
**impeaching**
155:13
**impeachment**
79:14 82:23
84:1,5,7 85:25
137:14 187:18
**impermanent**
23:18 24:6
115:14 116:2
119:15 120:4,5
120:10 140:18
140:20,22
141:3 165:7
174:4,15 282:8
282:16,18
**implemented**
144:4,6,15
**implication**
245:25
**implies** 204:19
**important**
12:16 18:16
107:10 221:1
223:9

**imposing**
315:4
**impossible**
123:8 163:22
**inaccuracies**
177:23
**inappropriate**
50:11
**inbox** 223:11
223:14,15
284:3,4,10,13
**incentive**
108:14,15
**incident** 303:1
**include** 6:24
118:13 199:2
259:4 278:11
279:10 296:12
**included** 11:1
84:6 108:23
165:14 203:2
247:24 279:6
**includes** 9:15
10:22 91:5,5
239:12 242:23
251:23 262:24
267:4
**including** 7:2,3
10:14 13:11
16:25 23:22
24:16 53:5
228:23 230:25
257:19 258:21
266:14 313:6
**income** 277:25
278:8 279:1,1
279:3,5,17,19

279:22,25
284:23
**incoming**
185:21
**inconsistent**
82:24
**incorrect** 36:11
54:16 265:18
**increase** 52:6,7
52:7
**increased** 50:4
54:1,4,14
120:19
**increases** 23:23
**incur** 120:22
300:23
**indicate** 110:7
239:16 240:15
240:25 243:24
250:16 251:20
258:1,6,9,11
258:14 262:16
263:3 298:6
**indicated**
13:21 44:24
194:8 242:2
243:23 250:14
284:22 300:7
**indicates** 33:4
194:21 198:14
239:8 241:12
241:15 243:4
244:23 252:10
257:25 266:2
270:3 282:2
**indiscernible**
26:24,25 27:7

27:9,23 28:5
30:13 31:4
36:24 44:21,24
45:1 48:21
49:11,12 50:5
50:22 55:4,16
56:22 66:8,9
67:13 73:10
137:19 187:23
196:21,25
221:21 226:1
231:25 232:5
232:10,24
233:2 234:6,9
275:17 279:19
286:23 290:8
295:22 314:4
314:25
**indisputably**
16:17
**individual**
127:8 281:17
292:4 300:13
312:12,23
**individually**
189:18
**individuals**
127:10 213:14
**ineptitude**
18:14
**inflows** 140:11
**inform** 271:25
**informal** 19:21
**information**
28:23 67:14
86:20 103:19
103:20 104:2

106:25 138:17
138:18,19,20
164:4 166:7
167:5,19,21,22
168:2,9,12
184:15 185:23
186:12 198:10
222:22 229:17
239:12 240:10
281:9 289:7,12
296:21 297:7
299:18 302:19
305:1,2,3,4
306:6,20
308:16
**informed**
113:8 191:5
**infrastructure**
302:18
**initial** 229:10
**initially** 236:4
253:19
**injunction** 3:4
3:10 6:3 8:18
9:3,5,9 12:17
12:22,25 13:3
13:7,23 14:7
14:10,17,18,25
16:2 26:4,14
29:17,20 32:11
94:14 95:1
96:5 177:22
**insert** 260:1
**insight** 107:18
163:20
**insolvency**
80:23 81:14

**insolvent** 80:16
80:21 81:3
82:1
**installments**
20:2
**instance** 112:7
119:12 120:8
120:15 121:1
247:25
**instances**
251:20
**institutional**
125:11
**institutions**
87:7 91:5
**instructed**
200:20
**instruction**
179:22 200:23
287:2
**insurance**
304:3,6,8
**intended** 39:10
39:11 226:10
235:13 256:3
**inter** 192:25
**interactions**
127:5
**interest** 202:22
229:6 296:17
**interested**
233:21,22
235:23 247:4
265:10
**interests** 26:11
**internal** 66:25
96:22 111:5

129:5,9,11,14
129:25 164:10
164:22 224:11
251:21 291:17
308:15

**internet** 69:23
93:25 251:17
308:17

**interpret** 50:12
50:18

**interpreting**
253:1,3

**interrupt**
46:19 55:18
56:17,20
122:15 225:6
254:7

**interruption**
93:25

**intervals** 21:4

**intervened**
61:9

**interview**
82:14 84:3,21
86:13,17 87:6
89:9,11,21
90:1,2,5 91:9

**introducing**
299:5

**invest** 34:2
242:10

**invested** 35:24
177:9

**investing**
119:15

**investment**
100:11,24

107:13 117:11
118:16 120:6
159:3 161:10
161:13 163:3
164:15 166:5
167:25 177:6
242:21 249:22
249:24 250:2

**investments**
20:10 34:7
107:8,10 108:4
109:4 162:18
164:19,22,24
165:3

**investor** 177:3
177:5

**investors** 89:21
120:21 177:2
297:21

**invites** 129:23

**invoke** 30:24
293:21

**involved** 6:21
36:1,4,4 61:8
63:4 101:7,8
117:19 126:8
126:14 128:1
128:10,24
138:12 149:23
149:24 161:15
172:18 176:14
226:2 256:22

**involvement**
127:1

**ip** 176:25

**irregular** 304:6

**irreparable**
12:9 14:3,8
26:2

**issue** 23:4
25:20 29:15
41:3 87:18
121:25 314:9

**issued** 57:20,23

**issues** 18:23
25:24 56:23

**it'll** 46:17

**item** 34:8
43:24 180:8,10
180:11,11
251:4,11

**itemized** 17:9

**items** 248:13
264:8 296:16
298:1

**j**

**j** 5:3,7 257:25

**january** 1:22
19:5 20:17
59:17,24 65:10
65:14 68:6,16
69:4 70:7,23
71:15 74:8
105:8 109:13
109:14 139:18
179:4 185:14
185:16 186:20
186:23 192:18
194:8 195:19
198:15,17
200:24 211:21
233:25 235:11
235:17 237:23

267:9 275:4
278:25 299:17
301:4 304:12
309:14 316:25

**jason** 4:15,24
5:8 6:24 18:17
18:19 36:1
37:16 49:18
55:12 57:14,18
58:8,8,10,12
59:16,25 60:3
60:14 62:6,11
62:13 69:7
70:23 71:10,25
72:18 76:10
105:25 108:23
108:23 112:20
113:2 127:2
138:17 139:20
151:14 157:19
157:24 158:7
168:13 171:22
176:8,11 186:5
192:14 198:6
201:13,24
215:5 229:24
243:20 287:23
288:25 311:6

**jason's** 78:2

**jeremy** 36:24

**jersey** 86:8,9
86:18 87:2
88:3,4

**jessica** 4:12
113:17,22
232:3

| jessica's | k | 25:18 36:1,4,7 | 123:2,3,10 |
|---|---|---|---|
| 231:24 | | 36:9 37:12,16 | 127:9,16,20 |
| john  108:7,17 | **k**  115:2 | 37:23,25 38:14 | 128:2,5,8,11 |
| 108:23 117:21 | **kaiser**  249:5,11 | 38:16,17,22 | 129:6,9,18,25 |
| joined  18:16 | **karen**  2:5 | 39:5,7,10,10 | 130:10,13,14 |
| joint  26:17 | 124:13 315:9 | 39:14,15,16,19 | 130:17,18,22 |
| 28:8 229:24 | **keen**  135:22 | 39:23 40:3,7,7 | 130:23 131:1 |
| jointly  6:9 25:6 | **keep**  40:24 | 40:15,20,22,24 | 131:18,20,22 |
| 25:8 | 76:7,9 81:15 | 41:3,7,8,10,18 | 132:6,8 133:16 |
| jude  208:23 | 81:18 110:24 | 42:1,4,17 | 133:23 135:23 |
| jude's  209:9 | 169:6 187:9 | 43:25 45:15,17 | 136:2,5,6,7,13 |
| judge  2:3 6:4 | 233:6 | 47:13,18,22 | 136:16,18,23 |
| 16:15 38:10 | **keeping**  41:3 | 48:7 49:4 51:8 | 136:25 138:14 |
| 42:5 43:15 | 209:23 | 51:9,11,15,15 | 138:16,21 |
| 46:2 50:14 | **kentucky**  87:7 | 51:17,19,20,24 | 140:1 141:12 |
| 52:24 54:22,23 | 87:9 | 51:24 52:10,11 | 141:14 145:4 |
| 54:24,25 56:19 | **kept**  11:11 | 53:8,24,24 | 146:5 147:22 |
| 59:12 66:10 | 12:1 223:10 | 54:6,11,11 | 148:4 152:2,10 |
| 70:17 73:22 | 303:19 | 58:2 61:4,6,11 | 158:11 160:5 |
| 74:1 75:11,17 | **key**  16:10 25:5 | 61:15,20 62:7 | 161:8,25 162:6 |
| 77:13 83:9,16 | 182:18 206:19 | 62:15,16 63:4 | 162:8 166:7,9 |
| 92:17 93:23 | 206:20 207:1,2 | 68:6,8,17 69:4 | 168:9,24 169:2 |
| 113:16 123:14 | 240:22 271:18 | 70:4 75:21,22 | 169:6,20 170:2 |
| 137:22 158:23 | 272:3 | 76:5 97:2 98:8 | 170:12 174:4 |
| 169:22 175:23 | **keyfi**  4:15 6:18 | 98:14 99:2,17 | 174:16,22 |
| 176:5,7 206:4 | 6:25 11:25 | 104:4,13,14 | 176:23,24,25 |
| 287:18 | 12:1,23,24 | 106:16 107:15 | 177:1,4,7,9 |
| judgment  8:21 | 15:22,23 16:4 | 107:17,19,22 | 181:4 182:5 |
| 8:22 14:6,12 | 16:10,25 17:3 | 108:6,11,13,20 | 188:17,18,21 |
| july  19:2 | 17:18 18:1,4,8 | 111:6,8 112:5 | 188:24,25,25 |
| jump  115:8 | 18:10,18,19 | 112:6,8,12,14 | 189:8,9,13,13 |
| 158:19 | 19:3,12,16,16 | 112:18 114:22 | 189:18,25,25 |
| jumped  74:1 | 19:18,23,23,24 | 115:15 116:2,8 | 190:5,6,7,8,10 |
| june  23:11 | 20:1,3,7,9,14 | 116:9,13,13 | 190:12,13,15 |
| 91:1,13 92:4 | 20:21,24,25 | 117:22 118:4 | 190:19 191:1,6 |
| justified  13:11 | 21:2 23:1,9,9 | 118:18 119:3,9 | 192:1,16 |
| | 23:11,20,25 | 121:17 122:5 | 193:13 194:13 |
| | 24:1,3,14 | | |

| | | | |
|---|---|---|---|
| 194:25 195:7 | 312:13,13 | 69:25 70:7,9 | 124:5 131:9,14 |
| 195:11 196:5,9 | **keyfi's** 17:1 | 71:15 91:19,22 | 132:3,11 |
| 198:7,25 199:6 | 18:3 20:5,10 | 122:7,10 | 133:13 135:7 |
| 199:7,7,8,11 | 20:19 22:22 | 145:24 146:4 | 136:20 140:18 |
| 199:14,20,23 | 58:5 62:21 | 147:18 150:2 | 141:9,19 144:6 |
| 199:24 201:17 | 96:23,25 104:2 | 212:12 213:19 | 144:6,15 |
| 201:19,20,22 | 104:16,17 | 251:17 303:8 | 145:13 146:24 |
| 202:15,23 | 110:20 122:6 | **know** 9:4,8 | 147:18 150:6 |
| 203:7,14,16,20 | 130:9 132:17 | 12:1 13:2 15:5 | 150:21 151:11 |
| 210:23 211:13 | 132:20,23 | 16:20 17:9 | 152:5 153:25 |
| 212:2,2,3 | 133:1,7,11,15 | 18:5,7 26:3 | 154:5,13,22 |
| 218:18 224:5,7 | 133:21 134:24 | 36:3 39:6 42:2 | 155:10,11,16 |
| 224:8,8,10,11 | 135:1 144:2,4 | 43:6 44:12,14 | 156:12,16 |
| 224:15,17,18 | 144:16,25 | 44:14 45:3 | 157:20 158:22 |
| 224:20 225:1 | 163:13,15 | 59:9 60:11 | 159:7,19 160:7 |
| 227:7 230:23 | 166:13,17 | 61:17 64:8,11 | 162:7 167:5 |
| 239:18 240:18 | 172:25 173:1 | 64:24 66:1 | 169:19 170:23 |
| 240:19 243:25 | 173:18 190:22 | 67:7 68:21 | 171:24,25 |
| 244:1,2,5,6 | 190:23 218:4,7 | 69:6 70:17 | 172:2 185:10 |
| 247:25 251:5,6 | 218:8 300:1 | 72:21 74:3 | 202:4 215:2,8 |
| 252:18,19,22 | 309:18 310:4 | 75:7,23 76:6 | 215:18 218:23 |
| 253:15 254:25 | **keyfi.io.** 201:24 | 78:18,24 79:4 | 219:4 221:25 |
| 255:4,12,16,17 | **keys** 8:7 9:20 | 80:2 81:11,20 | 226:18 234:18 |
| 265:2,2 279:13 | 11:2,6,11,16 | 82:3 84:12 | 236:18 239:21 |
| 279:17,23 | 25:6 182:17 | 90:16 91:6,10 | 251:16 255:16 |
| 280:1 288:9,9 | 206:12,16 | 97:9,13,16 | 262:13 263:3,7 |
| 289:9,9,25 | 207:15 210:18 | 99:10,11,12,12 | 263:23 274:6 |
| 290:4,13,20,20 | 262:9 263:16 | 101:14,20,21 | 274:10 275:12 |
| 291:17,19,21 | 270:21,24 | 102:14,20 | 276:10,15,16 |
| 292:2 294:2,4 | **kind** 12:17 | 104:18 105:6 | 277:12,14 |
| 294:6,7,21 | 107:25 135:24 | 109:9 110:22 | 278:21 280:9 |
| 296:18,24,25 | 135:25 222:8 | 111:1,17 | 280:10 282:11 |
| 297:5,6,10,21 | 229:7 | 113:24 115:9 | 284:20 285:5 |
| 299:16 300:20 | **kinds** 281:11 | 118:10,24,24 | 285:18,18,20 |
| 300:20 304:14 | **kitchen** 37:15 | 121:3,4,24 | 286:3 288:20 |
| 307:21,22 | **knew** 11:17 | 122:1,6,8 | 292:21 297:1 |
| 311:25 312:1 | 35:17 58:8 | 123:8,8,8 | 298:7,7,8 |

299:2,9 300:21
300:21 303:6,9
303:11 304:7
305:15 307:2
314:11
**knowing** 69:20
72:18,18 297:4
300:18
**knowledge**
72:1 111:4
128:4,7 164:12
164:17 284:9
**known** 136:17
274:6
**knows** 12:2
27:25 66:20
**krissy** 77:17
78:1,5 257:6,7
257:10
**krol** 277:5
**kyle** 4:14,19
96:2 125:1
176:9

**l**

**label** 45:8
**labeled** 192:22
233:6,20,21,23
238:9,16,24
242:23 246:17
257:10
**lack** 47:24
**laid** 44:8 67:16
80:22 108:13
**large** 42:6
231:5 241:6
**largest** 64:4
165:6 190:10

**late** 44:18
127:2 146:18
168:16 169:10
201:4 211:23
212:18,19
213:23 214:1
258:25 286:4
299:17 301:23
**latest** 70:25
71:7
**launched**
86:21
**launder** 273:23
**laundered**
11:21
**law** 40:12
249:6,11 278:3
**laws** 254:20
**lawsuit** 6:21
17:19
**lawyer** 42:12
43:17
**lawyers** 6:22
35:4 249:15
313:23
**leading** 32:2
100:6 148:18
168:3 306:3
**leads** 23:10
**leaning** 55:5
**learn** 266:16
266:19,20
**learned** 23:6,8
**leave** 92:21
120:3 209:20
301:24

**leaving** 130:10
**led** 107:25
110:18
**ledanski** 3:25
316:3,8
**ledger** 42:7,9
42:19,20,22,24
42:25 44:9
45:2 51:4,6
**ledgers** 97:21
**left** 16:21,24
18:10 92:10
94:20 104:23
186:15 209:7
260:14 284:1
304:14,15
**legal** 151:16
249:2,19 302:1
310:1 316:20
**lend** 51:8
**lending** 125:11
**lengthy** 102:14
**lent** 51:9
**leon** 203:8,23
**letter** 172:25
202:13 203:1,9
203:12,12
205:7 209:1
218:2 266:1
271:4
**letterhead**
208:23
**letters** 206:20
206:23
**level** 182:19
224:7 288:7

**levels** 109:8
**leveraging**
24:16
**liabilities** 23:7
82:2 149:15
156:2
**liable** 23:17,21
**liar** 60:21,24
**license** 301:25
**lie** 80:12 85:8
87:23 89:5,17
89:19 91:19
**lied** 92:20
**lies** 18:13
**lieu** 202:14
**likelihood** 26:1
**likely** 26:1
154:8
**limit** 314:24
**limitation**
23:22
**limited** 1:12
3:1 4:4 6:16,24
31:24 32:1,7
36:13 97:15
103:20 125:15
188:12,15
193:5 202:20
290:17,25
291:6 299:4
**limits** 315:4
**line** 7:8 37:11
43:22,24,24
45:14 46:7
47:8 49:3 71:2
71:7 77:22
97:25 98:7,11

98:16 99:1
113:9,15 114:5
114:19 115:11
116:5 124:5
130:23 131:1,3
131:7 136:1,3
137:25 142:17
144:21 156:18
156:25 158:4,6
158:9 168:13
171:4 172:11
172:23,23
174:1 175:17
213:10 215:17
226:1 242:5
243:6 246:8
251:10 256:13
264:8 272:21
273:12 282:11
311:15
**lines** 77:7,8,10
77:24 98:25
138:10 141:25
142:15 155:9
265:1
**link** 55:13,14
57:6 104:6,9
179:18 182:3
306:13
**linked** 162:23
208:6,9
**links** 17:12
83:9
**liquidate** 121:2
**liquidated**
302:23 303:8
303:15,18,23

**liquidating**
122:23
**liquidation**
297:2 302:12
302:15 304:4
304:10
**liquidity** 89:1
91:3,5,11 92:6
140:23 281:21
300:13,19
305:23
**list** 26:18 44:18
84:6 134:6
180:7 185:5
248:13 281:11
296:11 297:18
**listed** 45:6,7
104:6 238:25
263:21 265:23
267:7
**listen** 6:19 7:22
113:9,12 205:1
221:4 314:16
**listening**
113:11,15
**listing** 180:13
**lists** 79:12
245:14
**literal** 63:21
**literally** 48:18
253:3
**litigate** 249:19
**litigation** 10:19
12:6 249:21
272:11 309:22
**little** 21:3
35:11 43:14,15

73:11 151:18
155:19 159:13
195:20 225:10
231:14 256:19
258:25 260:3
266:22 268:12
269:4 276:1
303:16 314:11
**live** 28:14,17
179:21 314:2,4
314:7
**llc** 1:8 188:17
198:7 202:15
202:23 265:2
292:2
**llp** 4:3
**loan** 241:15,23
243:21 278:23
279:2
**lobbied** 24:18
272:23 303:25
304:2
**lobbying** 24:21
304:11,12,15
304:15
**located** 219:14
**location** 9:2
309:18
**locations**
228:24
**lock** 27:25
**logged** 42:21
306:13
**logic** 226:4
**long** 24:2 84:21
85:18 99:18
101:6 123:19

194:5 224:23
225:7 283:2
300:7
**longer** 151:7
169:11 263:22
276:20
**look** 10:20
26:10 37:7
42:20 43:2,13
45:14 47:6,16
57:1 63:5,5
67:8,9 72:2
74:7,24 81:24
111:17 134:12
161:24 162:13
182:24 193:2
199:18 205:16
206:2 219:17
238:8 242:22
256:11 261:17
295:21 305:21
**looked** 34:25
42:22,24,25
43:3,11 58:10
64:25 65:4
82:7 84:16
87:21 102:21
146:2 223:24
270:18
**looking** 26:17
27:20 28:14
49:17 59:8
63:8 72:12,12
77:1 107:24
115:21 135:19
135:20 139:18
141:25 155:9

174:10 180:14
182:24 211:10
220:6 223:18
226:15 227:9
244:10 247:16
251:3 255:5
260:21 262:15
264:6 272:16
288:13 291:15
293:13
**looks**  28:7 73:8
243:10 260:3,9
266:11 293:11
**loose**  281:17
**loss**  23:18 24:6
96:12,20
108:14 115:14
116:2 119:15
120:4,5,10,13
120:22 140:18
140:21,22
141:3 163:9
165:7 174:4,15
224:12 282:3,8
282:16,18
291:18 303:1
312:10,12,19
**losses**  23:23
79:3 80:6
108:14 109:7
123:4 140:23
307:22
**lost**  54:23 80:8
86:22 151:18
294:21
**lot**  145:17

**loud**  293:17
**lower**  303:18
303:22,24
**lp**  281:20
**lukasz**  277:4
**luna**  80:7,9
89:9
**lunch**  123:19
123:20

**m**

**mac**  284:12
**maciej**  277:5
**made**  6:9,22
13:25 26:19
28:22 29:19
58:12 59:4
68:10 80:10
82:1 84:11
90:14 91:19
106:16 115:23
116:6 126:13
136:17 156:10
156:13 157:6
160:6 161:25
174:12 179:1
180:3,13 181:3
210:18 230:23
232:1 246:11
254:19 255:19
266:13,17
274:24 288:20
297:25 307:12
307:25 309:3
**madison**  4:16
**mail**  191:9,24
201:12,16,22
201:25 202:12

202:17,18
203:6 214:21
214:24 216:6
218:19 223:4
223:12,14,15
227:25 228:2,8
228:13 284:12
**mails**  214:25
215:3,4,11,19
215:20,20,23
222:15 223:4,5
223:6,8
**main**  284:14
**mainco**  300:9
**maintain**
190:15,19
208:15
**maintained**
190:13 208:13
271:3
**majority**  39:23
132:15
**make**  6:13
12:12,12 15:6
23:20 42:11
46:1 48:25
60:2 84:23
89:3 90:2,5,8
90:17,18,20
110:23 118:3
118:17 120:9
187:22 188:10
206:15 212:5
223:9 232:22
247:9 252:12
263:16 270:20
281:8 291:9

292:1 295:17
308:15,24
309:5
**makes**  12:18
**making**  11:12
20:9 28:24
74:25 75:17
84:20 89:24
91:7,13 120:7
157:1 165:10
168:12 174:14
220:18 225:11
300:21
**malicious**
302:16 303:7
**man**  137:18
231:21 232:2
234:6,9,18
260:12,15
**manage**  19:24
121:18 122:6
123:5 182:5
189:25 289:3
**managed**
122:11 126:11
189:9,12
**management**
69:22 96:22
108:6,7,9,23
117:17,19,22
118:12 190:22
190:23
**manager**  203:8
203:23
**managers**
202:14 203:10

**managing**
17:24 103:4
119:3 121:23
121:24,25
140:1 190:5,12
289:8
**manner** 150:4
203:24
**mannon** 4:12
**march** 10:24
11:16 19:5,9
23:9,11 98:22
125:23 151:22
160:7 172:24
173:5 189:10
191:6,9,24
201:4,5,14
202:2,9 203:12
204:16 205:7
210:14 214:12
218:1 263:15
266:1,10,12
267:19 270:16
270:18 271:4
292:10 295:18
298:22
**margins**
297:20
**mark** 261:2
**marked** 32:18
36:20 66:4,5
79:11 97:10
119:20 134:4
135:8 137:10
139:9 150:19
177:17 191:23
255:17 288:2

**market** 79:1,25
80:5 120:6
303:21
**marketplace**
180:8
**markets** 89:10
91:10
**martin** 2:2
**mashinksy**
57:21
**mashinsky** 5:4
5:15 10:5,8,11
17:2 18:12
29:8 30:21,21
31:3,11,13,15
31:23 32:17,21
33:16,22 34:14
34:18,20,25
35:12,17 36:20
37:7,11 38:1,3
38:14,22 39:5
39:12,18,22
40:4 41:7,22
42:16,18 43:5
43:24 45:14,24
46:9,15 47:4
47:16,20 49:3
49:16 50:1,9
51:1,10,14,23
52:9 53:4,17
54:5,17 55:11
56:22 58:1
59:3,15,24
60:8,12,14
61:4,19 62:6,9
62:14,21 63:11
63:14,21 64:4

64:16,22 65:9
65:24 66:12,24
67:20 68:5,6
68:16 69:1,7
70:4,15,22
71:6,17 72:3
73:3,14 74:7
74:14,23 75:15
75:20 76:14
77:2,4,15,20
77:23 78:13,25
79:18 80:10,15
81:2,10 82:5
83:20,25 84:3
84:10,15,23
85:3,8,12 86:7
87:13,21 88:5
88:10,19 89:5
89:7,18,20
90:3,6,8,14
91:1,17,24
92:2,12,20,24
93:9 94:20
105:19 106:1,2
106:5,6,9,11
106:13,15,19
114:8,13,20
115:22 116:10
128:1,4,7,10
128:24 129:3
130:5 132:23
133:7 134:24
135:1 136:10
136:12,13,25
138:18,20
139:3,3,6
141:11 143:16

145:2,4,9
146:13 147:13
147:16 148:9
152:5,10,15,19
156:10,13,25
157:6,19,23
158:6 166:22
167:12,16,24
168:7,19,23
169:2,6,14
170:12,16
171:9,11
172:13,18
173:13 174:12
177:5 212:10
212:13,13,16
213:11,18,19
213:21 214:10
214:15,15,20
215:3 216:12
216:14,18,24
217:1,6,9,17
218:11,14,21
219:2 220:9,19
221:4 227:16
245:23 257:6,8
257:10 288:8
289:5 291:6
303:5
**mashinsky's**
79:7
**master** 207:20
207:23,25
**match** 149:15
156:1
**matches**
134:20

| | | | |
|---|---|---|---|
| **material** 85:15 | **mediation** | **mentioned** | 25:18,20 47:13 |
| 85:17,25 | 275:7 | 16:1 108:17 | 47:15,17,20,21 |
| 223:18 | **meet** 26:7 | 222:14 257:7 | 47:22 48:7 |
| **materially** | **meeting** 105:8 | 283:25 302:12 | 49:4 50:5 |
| 312:1,6 | 105:15,19 | **mentions** | 53:19 57:4 |
| **math** 264:12 | 109:15,17,20 | 115:23 174:12 | 98:15 99:3 |
| **matter** 1:6 | 109:22 118:25 | **merely** 14:13 | 106:16,22 |
| 18:16 26:12 | 129:6,23 | **merit** 29:20 | 131:3,5,8,11 |
| 30:11 56:11 | 202:14 | **merits** 9:10,13 | 139:22 153:15 |
| 78:24 95:11 | **meetings** 58:1 | 12:4,8 26:1,9 | 153:20 154:2,7 |
| 96:3 134:19 | 58:4,7 108:22 | **message** 10:17 | 154:9,19,21 |
| 135:24 181:17 | 108:23,24,25 | 115:19 135:19 | 155:11,18,20 |
| 230:20 | 109:2,12,13 | 136:1 139:23 | 155:22 159:7 |
| **mean** 38:16 | 110:17,19,19 | 140:3,5 151:17 | 173:1,8 204:4 |
| 66:16 75:6 | 111:1 117:25 | 151:19,19,20 | 204:6,9,10,18 |
| 143:2 153:21 | 118:2,11 119:1 | 151:24 152:2 | 205:9 218:5,15 |
| 153:22 162:20 | 119:2,7,9 | 174:8 218:20 | 218:15,22 |
| 162:21 167:20 | 128:10 129:2,5 | 219:11,19,20 | 219:21,24 |
| 173:3 180:7 | 129:11,14,18 | 220:7,8 222:8 | 220:10,12,19 |
| 182:13 189:12 | 129:24 130:1 | **messages** | 221:14 242:15 |
| 207:23 236:14 | 133:16 145:10 | 139:19 151:22 | 242:18 245:8 |
| 262:13 264:14 | 152:9,18 | 173:13 219:14 | 245:11 252:4,8 |
| 300:21 312:13 | **members** | 220:7 222:3 | 252:21 253:6 |
| **meaning** 22:16 | 39:16 251:21 | **met** 127:2 | 256:20 257:20 |
| 70:2 149:20 | **memorandum** | 183:2 251:17 | 262:4 264:2,23 |
| 203:20 206:16 | 197:4,8 | **metamask** | 266:18,22 |
| **means** 13:4 | **memorialize** | 210:6 | 267:15 268:8,9 |
| 36:3 39:6 | 220:18 | **methods** 18:9 | 268:10 269:3 |
| 48:25 57:11 | **memorializes** | **mg** 1:3,4 3:1 | 270:9 271:10 |
| 60:11 76:6 | 219:20 220:8 | **middle** 179:5 | 271:13,19 |
| 78:18 99:11 | 221:13 | 226:17 | 272:4 273:16 |
| 163:21 182:18 | **memorized** | **million** 11:17 | 274:1 275:8 |
| **meant** 180:7 | 210:4,5 | 11:18,20 16:4 | 276:2 277:1,16 |
| 221:9 226:8 | **memory** 56:25 | 16:11 18:2 | 285:6 291:21 |
| 255:13,18 | 79:4 | 19:16 20:1 | 292:3 296:8 |
| 283:5 | **mention** 116:6 | 21:3 22:25 | 302:22 304:17 |
| | 174:14 | 23:13 24:22 | 311:8,19,21 |

millions   8:8,10
  10:9,9 17:17
  68:7 75:6
  140:6 141:6
mine   196:24
mineola   316:23
minimal   89:23
minute   7:18
  55:18 59:9
  65:7 83:14
  102:7 157:13
  175:10 178:17
  225:13,14
  227:15 311:9
minutes   24:10
  83:11 88:20,22
  88:24 89:8
  175:12 265:15
  276:21 286:9
  286:16
mirrored
  138:19
mis   265:21
misleading
  20:11 121:13
misled   92:8,25
mismatch
  149:14
misrepresent
  104:25 105:4
  106:21 306:19
misrepresent...
  104:24
misrepresented
  20:14 104:13
missing   223:13
  281:23 282:3,5

282:7,16,25
  284:5,15
misspoke
  290:22
mistake   23:20
  190:2
misundersta...
  170:23
misunderstood
  183:10
mitch   4:9 7:15
  8:4 186:7
  260:18
mitigation
  122:4,22
mixer   273:19
mm   195:22
  198:6 211:20
  218:19
modification
  196:14,16
  200:12,15
modified   44:23
module   304:7
moment   54:17
  54:18 81:7
  93:15,24
  103:13,14,17
  106:20 138:7
  149:13 181:11
  197:12 201:16
  223:23 283:20
moments   85:21
monday
  210:11
monetized
  57:19

money   39:15
  115:1 154:18
  154:19 155:17
  217:19 272:9
  276:13 300:22
  310:8
monies   276:14
monitor   41:19
  62:21 107:22
  111:6,6,7,14
  111:18 144:2,4
  144:24 283:12
  305:13,16
monitoring
  144:16
mono   206:21
month   22:15
  51:18,18
  195:12,14
  270:23 294:12
monthly
  294:16
months   11:14
  19:14 20:17
  21:4 22:21,24
  78:10 86:16,25
  87:6 100:4,5,8
  110:22 119:7
  182:16 195:20
  205:8 210:13
  212:20 223:13
  223:16 246:3,6
  248:23 262:6
  265:23 270:13
  270:16 273:24
  284:5,8,15

morning   6:2
  7:15 15:3 16:1
  18:21 31:15,16
  34:20,21 96:2
  125:9 286:11
  286:14 296:9
  313:18 314:8
  314:22 315:8
motion   3:3,9
  12:5 13:3,8,25
  16:2 17:6
  25:25 26:13
  29:14,20 32:11
  94:14 95:1,11
  96:4 102:23
  177:11,21
mou   19:20
  193:23,25
  194:5
mouth   139:3,6
movant   13:5
  14:10,12,14
move   46:7
  48:15 77:12,16
  84:8 85:5
  99:14 136:5
  138:25 172:22
  175:11 178:3
  178:11 179:9
  181:7 182:7
  234:7 238:16
  260:13,22
  298:9 301:21
  301:21 302:3
  302:10
moved   24:14
  122:23 159:15

189:20 272:1
309:21
**movement**
102:18 103:15
120:23 121:1
126:12,14
306:1
**movements**
100:12,25
101:5,17
102:13 103:10
107:23 108:10
117:12 143:22
300:12
**moving**  20:16
135:23 136:2
181:21 213:24
216:20 225:11
**multi**  201:11
**multiple**
183:25 208:8
**mute**  55:1
124:5
**muted**  7:8 55:2
137:22,25
175:18

**n**

**n**  4:1 5:1,2 6:1
316:1
**name**  96:2
125:1 176:10
176:20 198:14
206:4 249:10
250:6,10,12
**named**  224:21
277:4

**names**  115:20
117:14 174:10
305:5
**narration**
48:15
**narrative**  16:6
**nature**  167:5
**navigate**  97:14
183:24
**near**  88:20
89:8,17 187:9
**nearby**  314:2,4
314:8
**nearly**  17:11
17:24 268:10
269:3 275:2
**necessarily**
189:17 218:18
275:19 312:13
**necessary**  8:19
8:23 12:24
140:14
**need**  28:3
42:10 57:17
77:15 89:3
91:11 97:9,14
112:6,8 164:5
169:8 188:2
234:4 253:7
286:5 289:18
301:16 307:12
314:15
**needed**  140:15
288:20 296:21
297:8 299:14
302:3

**needs**  91:4
206:23
**negative**
108:14 279:22
**negatively**
297:18
**negotiate**
99:19,20,23
**negotiated**
22:21 36:7
**negotiating**
37:23 111:20
**negotiations**
20:17 41:15,16
**neighboring**
302:3
**neither**  26:25
**net**  43:25 45:15
45:16 46:6
264:8 296:18
302:21
**network**  1:8,12
3:1 4:4 6:15,24
31:24 32:1,7
53:5 59:16
97:15 125:15
177:7 188:12
188:14,15
193:5 198:25
202:19 290:13
290:17,21,25
291:6
**networking**
73:7
**never**  13:4
16:18 17:8

21:5 23:24
42:22,25 48:16
65:4 68:12
69:10 82:19
88:4 110:21
111:4,4 135:22
173:7 189:15
219:23 220:7
224:17 226:9
226:19,25
227:3,22,25
251:17 288:24
295:9 300:8
**new**  1:2,20 4:7
4:17 17:20
19:13 77:16
86:8,9,9,18
87:2 88:3,4,9
88:10,11,14
235:8 278:3
301:21,24
302:2
**nft**  17:5 23:4
24:15 63:18,18
63:20,22 65:10
72:2 73:5 75:8
145:13,15,16
145:19 147:2
147:18 148:2
148:15 152:11
152:14,23
170:1 173:20
180:10,12,13
180:16 185:21
227:15 233:23
240:13 252:15
253:12 255:1

255:18,24
256:3 257:9
267:6,7 268:13
268:15 301:1
306:9
**nft's**   145:21
**nfts**   16:19,23
17:7 25:17,17
34:5,9,11,12
63:10,11,19
64:3,12,13
65:14 69:9,14
69:16,17,24
70:3 71:25
72:5,18 75:9,9
75:18,21,23,24
75:25 76:1,3,8
76:10,12,13,17
76:20 77:16,17
78:1,7 147:10
147:14,17,21
152:6,16,20
170:9,16 185:5
185:6,7 227:17
227:19,25
228:3,5,9
229:5 239:18
240:1,4,5,15
241:1,4,5
253:13 255:2
255:10,14,22
256:4,12,14,15
256:22 257:17
258:1,6,12,15
258:19 259:2
267:15,19,23
268:3,5,9,16

268:19,20
**nifty**   249:23
250:5
**nifty's**   249:24
250:2
**nine**   265:23
273:24 313:20
314:21 315:8
**nolan**   5:8
10:14 60:16,18
60:21,24 61:13
61:16,23
115:23 124:12
124:18,20,22
124:24 125:19
134:23 135:11
136:1 138:4
140:18 146:24
150:19 152:9
153:1 154:23
155:16 158:15
158:19 159:1
169:25 170:19
172:5,7,15,17
173:15,16
174:12,14
215:10,22
216:6 217:7,12
**nolan's**   61:24
**non**   14:12 34:4
48:15 67:11,24
184:3,18 269:6
**nonfungible**
145:16
**nonpayment**
293:20

**nonresponsive**
189:21
**noon**   230:5
**normand**
309:25
**note**   6:14
137:18 168:12
281:23 282:25
283:17
**noted**   95:13
238:20
**notepad**   209:3
209:9
**notes**   105:15
105:17 106:15
109:14
**notice**   271:17
271:22 272:2
**notified**   82:19
**notwithstand...**
79:1,25 80:5
291:18
**november**   49:4
192:3,5 197:22
210:21 211:23
212:18,19
214:3 248:21
275:4 284:16
297:2 302:12
302:15
**nrts**   184:14
**nuke**   37:22
49:20 53:5
177:7
**number**   30:7
52:2 57:18
98:15 99:12,13

101:20 112:5,5
112:17 131:12
158:4 159:8,19
200:7 221:19
221:22,23
237:5 239:3
244:4 248:5
251:20 263:19
267:24 268:6
268:14 281:20
282:16 296:23
297:3,20
300:18 303:15
**numbered**   8:11
198:11
**numbers**   21:17
28:4 48:11,11
67:10 187:10
206:20,23
224:1 260:22
260:23
**numeric**
206:21
**numerous**   17:5
294:16 299:12
**ny**   1:20 4:7,17
316:23

**o**

**o**   2:1 6:1 316:1
**o'clock**   286:21
286:22 313:21
314:21 315:9
**oath**   62:19
83:20 214:7
216:2,2 225:17
226:22 273:13
282:23 312:4,8

**object** 27:15
44:5,6 45:5
48:14 66:2
307:18
**objected** 26:21
27:10 28:19
**objection**
26:19 27:12
28:10 29:1,5,7
29:7,9,18,21
29:22,24,24,25
30:6,17 32:2
35:13 36:12
37:4 38:24
40:5 45:11
47:24 49:12,12
49:24 53:12
55:21,22,23,24
55:25 56:1,2,6
56:7,8,9 58:14
58:24,25 59:21
60:5 62:2
63:23 79:10
80:17,19,20
82:9,18,22
83:3,25 85:10
85:15 87:25
88:6,16 90:22
92:13,14 93:3
95:12 96:13
98:2 99:7
105:21 110:11
112:22 114:23
121:20 134:16
134:17,18
141:16 143:6
148:22 149:1

156:4,6,7
168:3 171:12
171:17 178:4
179:12 180:3
181:9,13,19
182:9 183:4,19
187:20,23
194:2 223:1
259:12,14,15
271:20,23
277:22 278:2
290:7,11 306:3
307:14,15,15
307:16,19
308:20 309:7,9
**objections** 7:25
8:1 27:1,18
30:1 48:21
56:12 58:23
95:16 134:11
134:14,15
182:23
**obligated**
40:20
**observing** 7:3
**obtain** 291:19
**obtaining** 34:8
**obviously** 6:4
45:8 89:12
92:5 187:15,21
259:4 262:24
264:14 287:11
**occasions**
118:17 214:16
214:17 237:15
**occur** 22:15
140:22,24

293:17
**occurred** 21:1
103:3 125:8
142:21 147:24
148:6,13
168:14 184:20
185:15,16
263:21 273:24
311:24
**occurring**
22:16
**occurs** 120:10
293:21
**october** 19:19
19:25 47:21
48:7 119:13
193:8 195:17
195:19 212:18
213:23 214:1,1
274:24 276:5
277:17 284:16
301:24
**odd** 171:25
**ofac** 11:23
273:22 274:8
301:11,12
**ofb1** 70:5
**offer** 10:14
27:3 33:10
37:2 45:10
49:22 53:10
59:19 78:13
120:1
**offered** 180:2,3
**offering** 28:21
30:11,18 87:15
181:16

**offhand** 104:18
129:22 151:11
154:5,22 157:4
159:19
**office** 42:12
259:18
**officer** 90:21
**oh** 43:21 46:3,3
46:3,3,15
54:24 59:5
117:3,25 151:6
189:5 213:1
232:8 252:16
269:23 286:25
**okay** 7:19 9:12
15:19 16:13
22:11 25:8
26:4 28:12,18
29:2 30:2,25
31:17,19 32:6
38:12,20 39:7
40:15 46:4,25
52:20 53:22
60:13 66:20
69:4 71:17
93:16 96:19
97:4,24 98:12
98:23 99:14,21
100:9 101:3,11
101:19,25
102:7 103:8
104:21 105:7,9
112:24 113:18
114:5 115:24
117:5,8 118:21
123:25 124:3
129:24 130:23

| | | | |
|---|---|---|---|
| 132:6 134:1,11 | 201:19,22,25 | 238:24 239:8 | 280:12 281:10 |
| 134:12 135:8 | 202:4,17 | 239:24 240:10 | 282:7,22 |
| 136:22 137:10 | 203:16,19 | 240:25 241:12 | 283:10 284:15 |
| 138:25 139:9 | 204:15 205:3 | 241:20 242:4 | 284:21 285:7,8 |
| 139:17 140:3 | 205:16 206:3,7 | 242:22 243:1,3 | 285:18,24,25 |
| 141:11,24 | 206:8,9,15 | 243:17 244:2,9 | 286:15,22,23 |
| 143:16 145:2 | 207:1,19 208:2 | 244:13,21 | 286:24 287:19 |
| 154:14 157:22 | 208:18,19 | 245:1,7,17,20 | 287:21 289:11 |
| 158:9,17 | 210:7,20 212:7 | 245:21 246:2 | 289:16,20,23 |
| 159:20 160:25 | 213:4,9,25 | 246:10,17 | 291:12,14,16 |
| 160:25 161:9 | 215:8,13,14,16 | 247:8 248:2,3 | 292:8,11,20,20 |
| 164:17 165:1 | 215:17,17 | 248:16,23 | 293:13,15 |
| 165:14,22 | 216:5,13 | 249:1,15,22 | 294:14,20 |
| 166:4,9,12,17 | 218:10 219:14 | 250:2 251:20 | 295:4,19,21,22 |
| 167:12 171:4,6 | 219:17,25 | 253:8,18 | 296:7 301:9,14 |
| 171:8,9,20 | 220:13,17,23 | 254:12 255:9 | 301:21 302:11 |
| 172:1,23 173:8 | 221:3,7,20 | 256:11,12,12 | 304:17 306:23 |
| 173:16,25 | 222:14,17,21 | 256:19 257:5 | 309:24 310:1 |
| 176:3 178:14 | 223:14,22,22 | 257:11,17,23 | 310:20,25 |
| 180:19,22 | 223:25 224:4 | 258:24 259:16 | 311:12,14,15 |
| 184:6,10 | 224:10,15 | 260:5,9,24 | 312:4,10,14,16 |
| 186:25 187:11 | 225:14,15 | 261:9,15,20,22 | 313:1,4,9,14 |
| 187:12,24 | 226:25 228:12 | 262:1,17 | 314:19 315:2,5 |
| 188:2,9,14,15 | 228:15,19 | 263:14,20,24 | **old**   19:21 |
| 188:16,25 | 229:10,16,19 | 264:16,21 | 289:16,17 |
| 189:1,8,23 | 230:4,9,18 | 265:22 266:12 | 316:21 |
| 191:15,19 | 231:3,6,8,11 | 266:25 267:6 | **oldest**   184:19 |
| 192:7,13,16,21 | 231:14,16,20 | 267:11 268:25 | **onboarding** |
| 193:13,17,21 | 232:2,8,12,17 | 269:2,6,12,13 | 36:1 |
| 194:7,11,18,21 | 232:21 233:15 | 269:20 270:1,7 | **once**   72:17 |
| 194:25 195:6,9 | 233:20,25 | 270:21 271:2,7 | 118:22,22,23 |
| 196:8,20 197:7 | 234:4,7,10,16 | 271:12 272:13 | 213:23 214:21 |
| 197:11,16,21 | 234:20,24,25 | 272:21 273:13 | 291:20 |
| 198:2,9,13,14 | 235:6,17,21 | 273:16 275:16 | **ones**   11:16 |
| 198:19 199:10 | 236:3,18,21 | 276:24 277:7 | 129:25 173:20 |
| 200:14,18,23 | 237:4,10,10,17 | 278:22 279:1 | 245:5,15 |
| 201:10,11,16 | 237:23 238:8 | 279:13 280:3 | 252:19 255:17 |

257:2,18
268:23 284:13
**online** 283:14
**open** 21:14
22:7 113:15,25
119:14 138:1,9
178:20,21
197:4 303:20
303:21
**opened** 22:4
70:20 187:25
**opening** 7:18
7:23 8:2 15:5
15:21 16:1
**openly** 114:25
217:17
**opensea**
179:17 180:8
**operating**
210:6
**operational**
190:13,15,19
**operations**
303:21
**opinion** 51:2,3
51:5
**opportunity**
26:9 83:23
179:24 298:25
**opposed** 15:4
51:7 150:9
282:17
**opposition**
177:11,21
**options** 300:15
**oral** 170:11,15

**order** 25:25
26:18 28:8
95:13 164:9
200:19 205:12
205:21 227:12
228:18 229:16
229:21,25
259:10,10
261:11 270:23
296:21 302:2
309:2
**ordered** 16:15
86:8 87:7
205:14 309:13
**organization**
311:24
**organizational**
16:7
**organized**
259:10
**origin** 75:23
**original** 45:5
84:6 233:11
235:13
**originally**
182:14,22
250:8 254:13
**originals**
308:25
**ought** 24:9
**outpacing**
140:11
**output** 226:10
**outside** 15:25
30:21 90:11
107:18 111:8

**overrule** 29:24
**overruled** 29:9
30:1,13 32:3
36:14,14 39:1
40:8 45:11
48:3 49:13
55:22,23,24,25
56:1,2,3,10,15
56:15,16 58:16
58:25 60:6
80:25 82:10
86:4 90:23
95:16 99:8
105:22 110:12
112:23 121:21
134:14,16,18
141:17 143:7
149:2 156:8
171:18 183:5
183:19 194:3
223:2 271:23
277:23 278:4,4
**overruling**
29:21,22
**oversaw**
127:23
**overview** 57:6
**overwhelmin...**
9:14
**owed** 23:3 24:1
68:13 147:21
149:15 152:2
170:2 173:2,24
210:24 211:14
249:10 296:17
**owes** 17:20

**own** 8:9 16:7
18:14 24:3
41:4 73:15
122:3,11 190:8
239:14 244:2
260:1 264:12
279:23 280:1
**owned** 39:23
199:12 202:19
237:13 238:21
250:9 257:10
258:3 276:2
**owner** 188:21
190:10 244:5
257:15
**owns** 72:18
**oxb** 11:19
24:20,23 62:22
65:1,9,14
71:15,21,24
72:14,20,22
73:11,16 74:25
75:17 131:14
145:25 146:7,9
146:12,15,17
146:21 152:12
152:23 160:10
160:15 179:5
182:3,4,14
184:1,14 185:7
185:22 203:16
203:20 204:2,6
204:8 205:8,12
207:19 208:2,5
208:12,13
209:22 236:5
236:10

| p | | | |
|---|---|---|---|
| **p**  4:1,1 6:1 | 179:5 183:24 | **pair**  120:8 | 297:15 |
| **p&l**  224:18 | 183:24 184:3,8 | **pairs**  120:8,13 | **paragraphs** |
| 225:1,3 226:9 | 184:8,12,13,17 | **paper**  208:14 | 33:23,25 35:9 |
| 226:10,12,16 | 184:19,25 | 208:17,20,22 | 35:12 95:15 |
| 227:6,13,14 | 185:4,5,20 | 246:12,14 | 230:17 |
| 294:24 296:25 | 189:3 193:10 | 252:12 254:14 | **parameters** |
| 297:5,6 300:20 | 193:16 197:25 | **papers**  46:21 | 130:21 141:8 |
| **p.a.**  4:14 | 198:1,9,19,19 | **paperwork** | 165:2,4 |
| **p.m.**  37:8 | 200:3,5 201:11 | 189:15 | **pardon**  307:9 |
| 53:17 228:21 | 201:12 202:1 | **paragraph** | **park**  4:5 |
| **packet**  46:17 | 205:22,23 | 22:12 57:16 | **part**  16:14 |
| **page**  5:13,20 | 212:22 213:2,4 | 96:11 100:9,18 | 17:25 36:6 |
| 21:15,16,18,20 | 213:9 215:15 | 105:11,13 | 37:22 120:18 |
| 21:21 22:1,8,9 | 225:23 230:10 | 116:25 117:7 | 127:18,20 |
| 22:10,12 32:21 | 244:9 251:9 | 119:12 189:2,3 | 143:14 148:3 |
| 33:1 47:6,7 | 272:14 282:10 | 189:3,4,8 | 148:24 149:7 |
| 53:6 67:4,4,6 | 282:15 288:12 | 191:4,9 192:3 | 188:21 229:7 |
| 67:10,14 68:3 | 291:13 292:9 | 192:6,10,11,22 | 235:7 236:15 |
| 73:10,10 75:15 | 293:1,5,11,13 | 193:17 194:11 | 272:24 277:12 |
| 77:1 79:19,19 | 295:21 311:15 | 194:13,18,21 | 294:24 |
| 79:21 81:15,19 | 312:14 | 196:9,13,14 | **partial**  189:17 |
| 81:22 102:20 | **pages**  67:11 | 197:9,22 | **participant**  7:9 |
| 113:2 114:5,18 | 70:1 81:17 | 198:20,20,23 | **participants** |
| 115:8 116:4 | 138:8 | 199:5,18,18 | 6:16,18 7:2 |
| 135:18 138:6,8 | **paid**  68:17,19 | 200:7,11 201:8 | **particular** |
| 139:17 141:24 | 68:21,25 69:4 | 206:7 210:21 | 11:13 24:18 |
| 142:15 144:11 | 75:24,25 76:4 | 210:22 211:3,4 | 34:6 103:25 |
| 144:14 151:12 | 76:16,18 89:21 | 211:4,6,12 | 155:10 163:3 |
| 151:13,15 | 140:16 147:13 | 228:17,20 | 165:17 179:12 |
| 154:23 155:2,5 | 195:6 196:5 | 229:20 230:12 | 207:16 240:8,9 |
| 156:17,19,20 | 199:12 249:5,7 | 230:17 235:21 | 247:10 262:20 |
| 157:22 158:1,2 | 249:7,9 256:14 | 238:13,19 | 305:22 306:1,2 |
| 158:9,9 171:3 | 257:17 272:23 | 247:2,2,14,16 | **particularly** |
| 171:16,18 | 272:25 313:4 | 255:1,6 262:21 | 12:15 |
| 172:10,11,22 | **paint**  15:22 | 265:9 283:9,11 | **parties**  6:8,20 |
| 172:23 174:1 | 24:2 | 283:16 288:13 | 6:24,25 7:1,4 |
| | | 288:25 289:21 | 10:19 16:16 |

19:10,20 20:17
21:7 22:17
24:13 26:11
31:1 42:8
124:4 126:18
182:18 183:2
192:23,23
196:17 197:9
199:12 200:16
200:18 222:17
309:1
**partner** 36:5
**partners** 17:4
**parts** 35:8
95:12 285:16
**party** 10:19
13:3,4 63:7
113:19 128:15
192:13,16,24
**party's** 101:13
179:22
**pass** 271:4
**passcode** 204:3
204:8,12,22,24
206:19
**password**
203:7,20
205:11 270:17
**path** 13:13
**patrick** 5:5
93:11 94:11
95:25 107:4
114:10,19,24
115:21 116:10
129:14,17
131:1 146:15
174:10

**pause** 9:11
**paused** 91:16
**pavan** 202:6
**pavon** 114:11
173:14 202:18
203:6
**pavon's** 203:6
**pay** 20:25 21:2
39:19,25 40:20
40:23,25 76:10
76:12,18,20
79:18 194:25
195:10 199:20
249:8,19
250:17 251:21
289:25 292:1
**paying** 17:23
39:15 78:7
112:16 147:16
243:21 249:15
251:7 279:23
280:1
**payment** 21:1
24:1,2 68:23
195:1 210:24
211:14,25
212:2 249:9
277:13 293:18
293:19,20
**payments**
17:21 20:24
21:5,6 212:4
301:18
**payout** 147:21
151:17 152:3
170:2

**payouts** 17:21
22:14 23:2
230:24
**pays** 89:22
**pdf** 138:8
184:9,25
185:20
**pedro** 175:17
175:17
**penalty** 32:22
78:14 95:4
228:22
**pending** 60:12
275:14
**people** 7:2,5
10:13 11:24
38:21,23 39:10
91:6 92:6,8,21
92:25 116:6,7
117:14 120:9
120:12 128:19
277:4 280:22
288:9 296:2
299:12 303:20
304:3
**perceived**
169:7 173:23
**percent** 57:6
98:14 99:2,10
99:11 104:18
104:19,22
119:6 120:16
120:16,19,20
120:21 121:2
123:1 139:21
140:1 169:16
173:6,6,7

177:1 190:8
218:12 244:2
263:21 266:25
268:14 282:7
282:18 289:2
303:14 305:7
306:16
**percentage**
120:14 304:1
**perception**
302:20
**perfect** 43:22
**perform** 297:8
**performance**
101:10 144:25
305:14,15
**performed**
195:2,12
303:20,21
**performing**
150:5,9
**period** 19:2,6,9
19:15,25 20:16
23:10 32:6
54:13 167:6
189:13 190:12
191:1 196:3
214:14 263:14
263:25 264:21
267:14
**periods** 19:1
**perjury** 32:22
78:14 95:4
228:23
**permanent**
282:3

**permission**
42:11 69:8,10
76:7,9 94:16
231:21 291:23
**permit** 48:21
58:23 65:20
180:4 231:22
**permitted** 6:20
13:5 34:6
**persistent**
88:11,15
**person** 153:5
165:16,19
172:11 180:7
214:20 274:7
299:9 313:23
**persona** 24:17
24:18
**personal**
109:12 241:23
243:20,21
244:6
**personally**
23:17,21 90:18
110:7 177:5
242:11 250:6
**personnel**
62:16 119:13
119:16
**pertaining**
194:14 265:2
**pertinent**
222:23
**phenomenon**
23:17
**phone** 172:16
209:11 217:8

219:15 303:13
**photographs**
308:23
**phrase** 8:7
11:1 204:3,13
204:15,21,22
204:23 205:6
206:11,16
207:7,11,12,14
207:22 208:2,6
208:9,13,13
209:8,22 210:1
210:14,16
240:22 270:17
271:2,3,4,9
292:13,14,18
**phrased**
152:16
**physical**
180:11,13,14
180:15 209:24
**picture** 288:24
**pictures**
145:18
**piece** 20:13
208:14,16,20
208:22 246:12
247:17 252:12
254:14
**piecemeal**
297:17
**piecing** 149:25
**place** 6:15
13:16,17 19:4
19:19 41:11
47:14 101:3
108:25 109:17

109:18 123:4
141:9 165:3,4
209:11 214:24
309:1
**placed** 45:5
**places** 164:10
**plaintiff** 1:13
5:3,12 30:18
30:20 31:23
94:24 123:16
188:17
**plaintiff's**
20:23 23:15
30:2 32:18,18
33:14 38:7
95:19 97:12
101:20,23
102:4 114:2
177:11 196:20
197:2,4,15,17
201:8,11 202:1
205:16,21
223:22 228:16
229:23 231:4
232:12 261:6,7
280:7,16 281:3
283:17 309:5
**plaintiffs** 3:3,9
4:4 7:17 8:5
33:10 93:10
179:12 188:11
200:1 206:10
210:8 247:20
265:17
**plan** 287:6
**planned** 187:6

**platform** 11:19
14:19 92:7
108:11 109:9
109:10 221:15
245:24 299:20
302:17
**platforms** 34:7
64:5 103:23
104:3,4 107:19
107:24,24
109:7 111:16
122:7,9 283:1
283:6 299:21
299:22 305:5
**play** 82:16,17
**please** 21:9
23:15,20 31:7
31:11 32:15
33:1,25 55:9
57:11 64:16
74:7 75:16
77:16 79:9
86:5 94:5
98:13 99:15
124:14 140:20
156:17 165:2
171:25 175:23
176:6,10 187:2
193:10,16
194:11 196:13
196:20 197:15
197:25 198:9
198:19 200:3
200:11 201:8
205:16,22
206:7 212:21
213:10 215:13

220:1 223:23
229:23 230:17
244:9 247:1
269:8,17
282:11 283:9
**plevin** 9:17
**plurality**
190:10 244:5
**plus** 85:19
180:13 186:22
235:8,18 243:6
**pm** 140:4
315:15
**point** 18:25
20:12 27:7
52:16 62:23
67:13 70:10
72:21,24 74:18
80:24 102:11
116:4 127:15
133:13 136:7
151:6 152:13
159:14 160:23
162:3 163:10
167:13 169:11
178:2 209:7
211:5 213:22
219:7 221:1
246:12 252:11
253:20 254:2
254:14 269:14
274:4 289:21
293:15 303:18
**pointed** 9:12
**points** 101:17
115:22 174:11

**policies** 141:3
**ponzi** 92:12
93:1
**pool** 281:21
300:19 306:1
**pools** 63:7
140:23 141:1
300:13 305:23
**poor** 90:14,17
90:20,25
**popular** 16:22
71:22,23 73:7
146:17,19
147:3 160:10
**population**
296:16
**portfolio** 57:4
**portion** 40:20
40:23,25 41:5
45:1 173:18
306:18
**portions** 42:9
84:4
**position** 16:24
69:11,19 86:3
177:6
**positions** 20:5
23:12 103:23
104:7,14 105:3
105:5 109:8
121:2,12
122:11 123:1,2
123:5 163:14
163:17 164:15
283:2,5 302:22
302:24 305:7
306:15 307:22

**possession**
52:1,11 53:24
200:21 238:1
256:24
**possibility**
150:12 193:25
**possible** 111:7
138:15 157:9
157:10 161:20
163:16 241:1
263:10,10,12
**possibly** 6:15
**post** 74:25 75:2
267:22
**posted** 72:13
**posting** 71:11
72:10
**potentially**
180:8 247:25
282:8,19
**praised** 62:6
62:13 145:2,4
**pre** 16:15
20:11 26:17
200:19
**precise** 159:10
209:17
**predominantly**
140:22
**prefer** 58:24
**preliminary**
3:4,10 6:3 16:2
26:4,13 29:17
32:11 94:14
95:1 96:5
177:22

**premise** 132:1
**prepare** 224:18
227:6,13
280:17,20
**prepared**
13:22 48:12
82:3 230:20
259:24
**preparing**
209:20 258:20
**presence**
118:18
**present** 4:23
6:19 9:23 19:9
97:6 114:10,11
114:20,24
115:4 117:23
118:1,3,12
119:17 129:12
129:15,17
152:20 172:12
217:16
**presented** 26:7
247:10 281:9
**presenting**
97:7
**press** 30:10
63:21 69:25
**pressure**
136:13,15
141:11,13
158:6,10
169:11,16
**pressured**
60:15 136:19
136:21,23
157:19,23

168:23
**pressuring**
60:20 168:23
169:2,14
**pretrial** 95:13
**pretty** 63:11
146:19 147:2
157:21 225:11
305:6
**prevail** 25:25
**prevailing**
248:8
**prevent** 12:17
107:12
**preventing**
13:24
**previous** 17:19
125:25 126:2
**previously**
97:5,10 139:9
150:20 314:23
**price** 23:23
54:13 100:12
100:25 101:5
101:17 102:13
102:18 103:10
103:15 117:12
120:12,18,23
140:24,25,25
142:13,22
143:1,12,21
165:8 257:17
258:11 281:14
281:14 300:12
302:19,20,24
303:7,18,22,24

**prices** 122:23
245:8,11
**primarily**
115:21 174:11
183:1
**primary** 161:5
**principal**
281:25
**principally**
122:21
**print** 186:18
**printed** 307:3
307:4
**printout** 66:13
66:16 67:8,9
67:24 73:6
182:2 183:15
186:11,22,23
**printouts**
65:25 66:3
145:9 183:25
307:6
**prior** 12:10
19:6 82:24
97:1 130:10
145:21 146:4
147:5,8,11,24
148:6 152:6,13
193:22 253:17
275:17 292:15
296:6
**priorities** 60:1
**priority** 60:2
**private** 8:7
9:20 11:2,5,10
11:15 16:10
182:17,18

206:11,16,19
206:20 207:1,2
207:15 210:18
240:22 262:9
263:16 271:18
272:3
**pro** 7:3
**probably**
62:10 100:5
115:18 119:6
174:8 200:7
215:4 234:23
265:16 268:14
294:16 298:21
304:12
**problem** 16:5
56:19 77:13
82:8 84:17
85:13 87:23
91:13 113:11
151:12
**procedure** 3:5
3:11
**proceed** 94:2
**proceeding** 3:1
7:4,7
**proceedings**
6:20 31:3
315:14 316:4
**proceeds** 229:8
241:7 242:18
242:19,20
258:14,18
259:1 273:23
305:9
**process** 130:18
149:25 288:14

**proclaimed**
17:3
**produce**
288:16 309:2
**produced** 43:4
43:8 44:18,20
44:22,24 45:7
97:16 98:24
222:11 223:5
308:2,4
**product** 87:16
87:17
**profile** 145:24
146:2,4
**profit** 17:21,25
18:1 21:7,11
21:12 22:14
23:2 41:4,5
51:17 54:12
58:8,9,11
60:15 68:13,19
68:21,23,25
69:5,9 96:22
98:15 108:12
110:2,6 112:1
112:2,4,16
114:9,13,21
115:2,3 127:19
127:21 130:9
147:21 148:3
152:2 163:9
170:2,9,13
172:19 173:1,2
173:19 210:23
211:14 212:8
212:17 213:12
213:16 217:9

217:19 220:21
222:5 224:12
227:17,24
228:5 242:14
254:18 291:18
**profitability**
133:15,21
145:10 166:13
166:16,18
167:3,4 168:20
169:8
**profitable** 17:2
17:3 20:7
22:23 51:16,20
51:22 54:16
61:5,20 62:15
62:17 67:21
132:18,21,24
133:2,8,12,24
134:24 135:2,4
135:5,6 136:6
136:8 137:1,2
137:3 138:12
138:15,16,21
138:23,24
145:4 160:5,14
163:3 165:24
166:3,6 167:14
168:1,8 294:22
**profits** 18:2,3,3
18:6 22:18
40:21,23,24,25
96:24 97:2
105:20 106:2
106:16,22
110:8,10,15
112:9,12,17,18

172:25 218:4,7
218:8 219:2
222:2 296:18
297:19,21
307:22
**program** 15:23
20:5 103:21
110:25 111:2,6
144:2 145:7
162:2 164:18
224:21,25
226:5,16
**progress**
225:12
**projects** 24:15
251:8
**promise** 12:21
**promised**
100:10,23
101:12 117:10
117:13,14
118:15
**promoted**
146:22
**promptly** 7:11
**prop** 139:4,6
143:12
**proper** 85:25
**properly** 23:7
163:22 298:8
**properties**
114:9
**property** 8:14
8:16,20,21,25
9:1,21 10:2,4
10:10,23 11:10
12:13,19 13:4

13:13 15:24
25:21 34:12
114:21 173:4
212:8 218:15
219:22 228:15
228:23,24
229:5,7,11,13
229:14 238:2
245:23 278:23
304:18
**proponent**
308:21,24
309:2
**proposed** 34:6
**proposition**
10:5,7
**proprietary**
159:2 160:23
164:22 165:3
165:11
**protect** 89:2
**protocol** 24:19
24:22 54:15
162:13,23
163:8 304:6
**protocols** 6:7
51:21 69:21
162:21,24
163:7
**prove** 26:9
308:22
**provide** 91:3
103:22 166:12
194:14 198:25
203:7,19
206:10 228:21
229:17,19

236:8,12 289:7
292:14 297:7
304:3,9 308:4
308:12,18
309:6
**provided** 17:10
19:22 85:20
86:20 92:5
110:5 168:2
173:9,10 180:1
196:11 201:5
210:10 212:9
216:12 222:14
222:21 227:22
230:4 235:11
240:11 260:2
272:2 288:22
289:11 294:17
294:20,23
296:13 304:21
308:16
**provides** 13:10
13:24 87:10,19
103:23 194:13
194:25 199:19
206:9 224:10
228:20 253:5
265:8 308:21
**providing**
13:23 168:18
271:22
**provision**
291:25 294:9
**pto** 9:22
**public** 6:17
24:17 82:6
86:25 156:10

[public - question]                                               Page 62

156:14 157:1,7
184:15 186:12
274:5 289:15
309:4
**publicly**  16:22
20:4 62:25
104:9,11
185:23 257:10
308:8,8
**published**
82:21
**puerto**  109:19
109:20 213:24
243:7,12
301:22
**pull**  101:19
113:5,6 164:4
165:20 170:24
301:17
**pulled**  65:1
**punks**  301:7
**purchase**
17:22 20:18
22:2,6,9 23:3
24:7 34:4,9
38:3 40:16,19
46:9,16 47:6,8
47:9 63:2,11
65:13 68:14
69:8 99:16,25
101:3,13,15
102:5,8,11,17
102:25 103:4,5
103:7,12
111:20 147:4
170:16 180:9
192:8 194:1,7

228:3 239:18
240:4 256:16
267:15,18
268:3,4,10
293:10,11,25
294:9 303:22
**purchased**
17:7 65:10
69:14,16 75:21
75:22 147:7,10
240:1,5,15
241:1 253:13
253:14 255:3
255:14,24
256:5,15,15
257:9 267:9
268:16 303:24
**purchases**
16:19,21,23
17:5 23:4
63:10,22 69:17
69:24 70:3
72:3 145:19,21
148:3,15 152:6
152:11,14,23
170:1 173:21
227:15 255:11
255:18,25
267:7 268:20
297:1 301:1,6
306:9
**purpose**  12:25
84:7 265:5
**purposely**  92:8
92:20,24
**purposes**  14:20
144:7,16 314:8

**pursuant**  3:4
3:10 32:22
229:16,24
270:22
**pursuing**  24:15
**put**  12:19
15:24 18:9
29:15 65:19
66:7 68:5
77:18 99:15
120:7,13
159:10 179:17
180:18 219:23
231:7,18
300:14 302:24
314:12
**putting**  92:11
102:16
**px**  95:16,17
100:19 191:12
191:14,14,23
191:24 193:2,5
198:11 224:2
232:17,18,21
234:4,25
235:10,13,13
235:17,18,21
247:2 269:6
289:19 292:6
292:21,22,23
293:1,7 295:4
295:20,21
**px40**  47:5
**px59**  33:8,10
35:1

**q**

**quantum**
159:2
**quarter**  73:10
109:1 110:18
**query**  313:22
**question**  12:6
39:3,12,12,18
39:20,21 40:5
40:10 41:21,22
41:24 48:5,6
48:18,24 49:1
50:15,23 52:9
54:5 58:17,19
58:22 59:1
60:12,22 64:16
64:20 65:20
66:18,19 67:22
69:2 73:25
74:12 76:6,14
76:16 77:24
78:11,18 80:20
84:13 85:4
86:1,5,23
87:12,13 90:4
90:7,13,16
91:23,25 92:1
92:15,17 97:25
98:3,4,5 99:1
100:21 106:10
111:21 114:7
114:19 115:11
115:12,16,18
115:19 116:5
119:11 121:13
122:18 123:2
142:2,17

144:14 149:4
152:18 155:3,9
156:25 164:6
171:10,13
172:1,11,23
173:2,3,7,8,16
174:1,5,7,8,10
181:14,20
183:11,12
189:22 205:2,2
205:4 207:18
213:11,17,21
220:1,2,4,25
221:5 226:1,11
226:14 254:5,8
256:7 258:23
273:8,9 274:7
275:14 284:21
285:4 295:10
298:2 308:9,10
311:18 312:17
**questioning**
113:3 115:11
**questions**   7:24
48:22 64:19,20
83:8 93:5
107:2,7 110:1
111:9,19
112:20,21
116:19,20,25
117:6 121:6,7
123:11,13
157:12,15
158:13,21
159:1,20 161:1
162:9 163:11
163:23 164:21

170:20,21,22
170:22 181:12
182:8 185:25
186:9,11 187:7
208:12 214:4
234:22 256:10
260:6 281:8
287:25 301:18
301:19 307:8
310:21 313:1
**quick**   6:13
283:24
**quickly**   18:21
24:5 140:15
153:1 165:22
283:24
**quinn**   249:13
**quit**   268:5
**quite**   33:22
36:13 99:18
231:8 276:11
**quo**   8:18 9:9
14:9
**quote**   53:18
82:6,13,14
87:21 88:25
89:11,21 91:2
**quoted**   21:6
281:25
**quoting**   87:15

**r**

**r**   2:1 4:1 6:1
316:1
**rails**   285:1
**raise**   7:13,23
31:6 94:5
124:14 175:23

254:6
**raised**   7:6
**ran**   64:4 67:20
**range**   155:10
**rarely**   61:8
**rate**   140:11
195:1,11 196:2
248:8 256:16
297:20
**rather**   40:12
65:1 71:3
259:10
**reach**   12:19
15:25
**reached**   183:3
218:5
**read**   33:25
35:9 37:19
44:4,7 45:15
46:5,5 50:22
58:22 65:24
73:18,24 74:2
74:4 75:9,16
77:4,6,11,24
80:1 81:24
95:15 96:13
99:18 101:6,18
103:12 112:19
113:1 144:21
170:19,21
171:18 209:8
215:25 226:5
226:20 234:23
255:10,13
265:14 273:11
273:12 282:20
293:16 296:7

296:14 311:15
312:2
**reading**   48:1
74:23 171:15
210:3,5 213:9
226:1
**readmit**   124:6
**readout**   309:8
**reads**   46:7
**ready**   70:18,19
89:13,15 93:23
175:10,21,22
175:23 187:15
**reaffirm**   95:6
**real**   57:16
163:21 165:20
171:12 251:16
283:12 305:14
**realize**   120:13
314:10
**realized**   23:25
288:15
**really**   14:2
24:7 27:6
45:19 55:15
182:22 221:1
234:4 269:22
286:13 314:2
**reason**   13:7
15:23 29:14
34:13 43:7
99:5 115:17
142:4 144:17
144:19 148:24
149:7 174:6
175:17 209:19
223:13 298:5

**reasonable**
  309:1
**reasoning**
  150:7,11
**reasons**  26:12
  42:8 159:13
  303:4
**rebuttal**  287:7
  313:18 314:20
**recall**  35:8
  52:15 54:18
  59:7 60:20
  61:22 62:18,20
  70:9 72:4
  78:22 82:12,15
  84:18,20 88:19
  89:24 97:20
  101:18 102:16
  103:13,14,17
  105:10 108:25
  109:11 114:12
  118:10,11
  125:3 128:21
  128:22 129:10
  129:16,20
  131:2,6,9,10
  131:11,12
  133:3,9 135:3
  137:6 138:13
  138:15,23
  141:2,5,10,21
  141:23 142:18
  142:20 144:10
  145:12 146:14
  146:16 147:16
  148:9,12,15,17
  152:12,19,21

152:22,25
153:9,18
154:11,14,16
154:17 155:10
155:12,24
157:4,25
160:15,20,25
164:14,16
166:14,24
167:8,9,22
170:7,10,14,18
171:20 172:7,9
172:17,21
173:16,21
174:14,20
192:15 213:21
242:17 294:14
300:1 301:18
304:23 309:14
**recalled**  56:23
**receive**  112:6,8
  201:25 295:1
**received**  79:12
  86:18 87:2
  119:17 199:12
  217:6 258:18
  259:2 270:16
**recent**  184:13
**recently**  88:4
  168:15
**recess**  83:6,14
  83:17 225:14
  225:14
**recognize**
  16:16 32:18
  33:1 36:23
  42:17 55:11

66:12 67:24
70:22 73:6
94:23 95:2
97:13,17 102:4
102:8 135:11
139:12 150:25
177:18 178:23
181:24 191:24
193:11 198:3
205:25 206:4
230:9 232:12
235:10 288:4,5
293:9 295:23
**recognized**
  12:15 88:20
**recognizes**
  74:3
**recollection**
  47:12 52:4
  53:22 71:14
  72:14 79:7,15
  80:2 81:13,25
  115:6 120:1
  152:17 166:25
  172:2,3 215:18
  215:19 216:6
  217:13
**record**  8:4
  27:16 44:7
  50:12 74:24
  75:16 77:5
  83:18,19 85:15
  88:10 93:12
  94:18 107:6
  124:7 158:17
  175:15 178:11
  221:2 225:16

287:14,15
296:4 297:16
307:23 316:4
**recording**
  82:25 175:16
**recordings**
  308:23
**records**  96:24
  293:22 297:17
**recover**  12:13
  12:19 13:12,14
  14:11 207:14
**recoveries**
  14:21
**recovery**
  207:11
**recross**  287:10
  311:6
**recurring**
  291:20
**red**  257:5
**redact**  42:8
**redirect**  85:24
  93:6,7 107:3,4
  158:14,15,20
  158:22,23,24
  256:11 286:2
  287:16,23
**redress**  272:25
**refer**  28:3
  36:16 43:17
  49:7 52:18
  54:21 96:10
  167:2,3 188:14
  188:18,24
  202:17 208:16
  222:4 229:3

271:15 292:6

**reference**
102:24 192:8
192:21 249:22
283:16

**referenced**
11:13 105:7,17
109:9 197:22
205:7,22
238:19 280:19
282:15 283:17

**references**
102:25 221:19
221:22 224:4,5

**referencing**
105:10

**referred**  16:11
19:20 135:6
207:1,11,19
233:15 238:13
247:13

**referring**  21:22
46:12 55:20
68:4 81:11
99:2 115:20
125:15 131:15
140:10 151:17
156:12 166:10
166:11 171:10
172:13 174:9
179:18 191:8
200:4 224:8
236:4 269:16
269:17 290:3
295:20 309:15

**refers**  120:5,6
199:7 229:5,13

241:3 281:17
281:20 290:18

**reflect**  89:8
106:15 138:19
254:17 255:14
264:8

**reflected**  51:3
51:5 240:13
253:16 308:5

**reflects**  221:23
222:1 230:22
235:24 247:4
253:13 254:19
255:2,9,10
262:18 265:11

**refresh**  47:12
53:22 56:25
71:14 79:7,15
81:13,25 120:1

**refreshes**  80:2

**refusing**  8:14

**refuting**  106:4
106:5

**regarded**
126:12

**regarding**  6:14
110:6 129:6
159:1 173:17
217:16

**registered**  6:16
113:20

**regular**  252:18
252:19

**regularly**
119:5,7 130:1
274:9,11

**regulations**
302:3

**regulators**
82:6 84:16
85:12 86:17
87:1,21

**reichelt**  277:4
280:19

**relate**  176:22

**related**  29:4
145:17 147:19
150:4 225:25
229:6 247:25
284:25 285:4
292:2

**relates**  28:21
138:22 171:8
276:13

**relating**  27:14
27:25 102:17
305:3 306:20
311:24

**relation**  43:20

**relationship**
62:7 101:13
169:18,19,21
192:24 236:23

**relative**  120:12
120:14,18,20
121:1

**release**  30:10

**relevance**
28:19 110:11
156:7 181:9,12
277:22 278:2

**relevant**  14:1
42:10 84:4

162:15 189:13
258:22 293:21
306:11 309:3

**relied**  302:18

**relief**  8:19 26:8

**relying**  226:16
227:11 310:11

**remain**  240:19
256:23

**remained**
13:17

**remaining**
281:24 296:16

**remains**
250:12

**remark**  48:9

**remember**  35:5
35:6 42:16
46:11 52:14
55:15 57:15,16
78:20 90:4
91:7,9,13
114:16 129:19
129:22 134:1
137:4 144:8
153:14,19
154:1,6,9
157:22 159:5
167:2,6 168:12
168:14 173:21
173:22 207:24
213:7 219:12
236:17,24
237:3,6 241:21
242:16 251:3
251:10 270:19
285:11

**remind**  165:2
  265:8
**reminder**
  262:17
**removed**  28:9
  275:20,21
  310:5
**removing**
  94:19
**rendered**
  114:22
**rent**  243:4,7,11
  243:21 301:18
**rented**  243:15
**reopened**
  113:8
**reorganize**
  264:11
**repay**  241:23
  278:23
**repaying**  242:9
  243:20
**repayment**
  241:16 279:2
**repeat**  40:10
  41:24 58:19
  100:21 128:6
  139:5 149:4
  152:18 168:25
  169:13 220:3
  254:11 298:1
**repeated**  8:15
  203:1
**repeatedly**
  111:3
**repeating**
  168:1

**replace**  235:13
**replacing**
  165:8
**reply**  100:15
  100:18 116:22
  117:2
**report**  43:2
  110:24 227:22
  277:25
**reported**  126:3
**reporter**  31:6
  42:14 46:19,25
  54:24 178:19
**reports**  57:18
**represent**
  18:17 48:11,13
  61:25 65:16
  96:3 125:1
  184:12 185:4
  185:13,16,18
  249:15
**representation**
  106:21
**representations**
  20:10
**represented**
  108:5 123:7
  249:6
**representing**
  7:1 106:18
  186:8
**represents**
  21:7 132:2,3
  184:13 185:5
**repurchase**
  303:10,12

**repurchased**
  303:14,17
**request**  28:22
  50:3 213:25
  302:5,6
**requested**
  13:16
**requests**
  130:14,16
  222:21
**require**  83:9
**required**  206:9
  226:13,14
  227:7 228:20
  229:16 235:19
  288:16
**requirement**
  101:4,16
**requires**
  307:24
**requiring**
  33:17 205:13
**reread**  178:1
**research**
  208:23
**reserve**  180:2
**reserved**  56:13
  178:8
**reserving**  56:7
**residence**
  109:18
**resignation**
  19:7 169:21
  172:24 218:2
  223:12 263:14
  266:1,12,17
  267:19,22

**resigned**  11:7
  11:15 18:8
  23:8 25:3,9
  151:24 167:10
  246:3,7 248:24
  262:7 263:18
  263:25 264:3
  265:24 267:3
  270:13 294:5
  294:13 313:7
**resigning**
  191:5,25
**resolution**
  202:23
**resolutions**
  10:25,25 11:8
  11:9 203:3,9
  203:13
**resolve**  19:10
  24:13
**respect**  7:25
  23:22 29:22
  30:2 56:6,12
  108:3 109:3
  111:19 122:25
  161:12 173:11
  177:24 180:4
  199:6,10 241:5
  244:2 250:21
  251:10 257:25
  258:6 267:2
**respectfully**
  26:12 86:2
**respond**  29:10
  57:14 136:1
**responding**
  71:4

| | | | |
|---|---|---|---|
| **responds** 57:9 | **resulted** | **returns** 39:11 | 63:12,18 64:6 |
| **response** 5:23 | 110:14 | 284:22 285:3 | 64:18,19 67:7 |
| 71:5 73:18 | **resulting** 23:23 | 285:21 | 68:14 69:24 |
| 80:7 179:1,1,3 | **results** 110:25 | **rev** 98:8 | 70:5 74:4 |
| 179:5 296:5 | 111:7 211:11 | **revenue** 99:2 | 75:15 76:8 |
| **responsibiliti...** | **resume** 124:2 | **revenues** | 79:12,14 82:20 |
| 102:18 161:15 | 175:12 286:22 | 199:11 279:22 | 85:4 91:11,17 |
| **responsibility** | **resuming** | 288:15 289:1 | 93:6,8 94:5 |
| 102:12 108:3 | 114:2 | **reviewed** 81:9 | 108:17 109:15 |
| 116:16 161:4 | **retain** 224:11 | 97:21 281:3 | 110:2 111:10 |
| 161:12,17 | 291:17 | **reviewing** | 113:10 114:1 |
| 163:13 164:24 | **retained** 297:1 | 226:4 | 116:16,19 |
| **responsible** | **retrieving** | **revised** 229:24 | 121:5 123:15 |
| 107:14 108:7 | 93:14 | 230:4,6 232:18 | 123:18 124:2,8 |
| 153:5 165:10 | **return** 7:12 | 233:12,25 | 124:9,12,14 |
| 251:6 279:23 | 8:14,15 10:23 | 234:2 235:10 | 125:21 137:15 |
| 280:1 299:8 | 11:1,10,16 | 235:14,17 | 137:24 139:22 |
| **responsive** | 39:8 54:15 | 247:1 | 140:4 143:25 |
| 48:15 254:6,7 | 76:12,16,19,19 | **revolved** 127:5 | 154:22 158:14 |
| **rest** 18:20 | 109:25 200:20 | **rewards** 57:17 | 160:10 165:24 |
| 23:11 26:11 | 201:6 204:16 | 306:8 | 169:3 170:2,19 |
| 29:15 30:4 | 204:19 264:9 | **rico** 109:19,20 | 173:3 174:24 |
| 123:16 151:15 | 271:2 277:20 | 213:24 243:7 | 175:4,11,16,23 |
| 287:7 313:15 | 278:1,9,12 | 243:12 301:22 | 178:18,21 |
| 313:16 | 279:6,9,12,13 | **right** 6:19 7:19 | 183:17 185:1 |
| **rested** 314:20 | 279:15,17 | 7:22 15:12,17 | 186:2,12,18,20 |
| **restitution** | 285:14 | 22:10 25:19 | 188:22 189:14 |
| 304:3,9 | **returned** 18:1 | 26:15 27:6 | 190:1,4,6,8,10 |
| **restricted** | 23:12 60:3 | 28:2,12,16 | 190:13,16,20 |
| 14:13 | 96:11,19 | 29:15,16 30:15 | 190:24 191:2,6 |
| **restroom** 93:22 | 204:23 257:2 | 31:6,24 33:12 | 191:10 192:4 |
| 175:10 | 262:23 263:4 | 34:16 36:23 | 192:14,16,24 |
| **result** 24:21 | 266:4,9,24 | 37:12,14 38:4 | 193:14 194:1,9 |
| 149:14 273:1 | 296:8 | 42:11 46:5 | 195:14,17,19 |
| 302:19,21 | **returning** 41:4 | 48:20 55:20 | 195:20 196:3 |
| 303:1 311:22 | 52:16 93:21 | 57:24 58:3 | 197:9,23 198:7 |
| | | 60:13 62:25 | 198:12,25 |

[right - roche]                                                    Page 68

| | | | |
|---|---|---|---|
| 199:3,8,16,24 | 238:14,22 | 271:5,10,14,17 | 122:3,6,11,22 |
| 200:24 201:6 | 239:3,6,10,14 | 271:19 272:2,7 | 123:5 141:8 |
| 202:12 203:3 | 239:18 240:2 | 272:9,11 | 165:2,4 |
| 203:14,17,21 | 240:11,12,23 | 273:17,20 | **risks** 89:23 |
| 204:4 205:13 | 241:2,7,9,24 | 274:2,4,9,13 | 100:24 117:11 |
| 206:5,19,24 | 242:2,7,11,15 | 274:16,19,22 | 118:16 300:1 |
| 207:2,5,8,12 | 242:16,18,24 | 274:25 275:5 | **road** 316:21 |
| 207:16,20,24 | 243:7,15,20,25 | 275:10,12,24 | **roche** 4:14,19 |
| 208:3,6,14,20 | 244:3,4,7,24 | 276:2,5,8,11 | 15:2,3,10,13 |
| 208:24 209:1,5 | 245:2,9,12,15 | 276:12,15,16 | 15:16,18,20 |
| 210:8,12,15 | 245:24 246:3,7 | 276:22 277:2 | 16:9,12,14 |
| 211:15,18,21 | 246:13,19,22 | 277:11,18 | 21:14,16,20,23 |
| 212:1,4,18 | 247:1,11,15,23 | 278:24 280:9 | 22:1,5,8,11,14 |
| 214:12,17,18 | 247:24 248:5,9 | 280:17 281:1,5 | 24:11 25:1,6 |
| 214:21,25 | 248:11,24 | 281:12,18,21 | 25:12,16,20 |
| 215:10 216:6 | 249:16,20 | 282:8 283:7 | 26:3,5,16,19 |
| 216:18,24 | 250:3,6,10,20 | 284:2,24 285:7 | 26:21 27:9,13 |
| 217:14,20,20 | 251:2,15,17,18 | 285:10,19 | 27:17,20 28:5 |
| 217:23 218:2,5 | 251:24 252:4,8 | 286:1,19 | 28:7,19 30:23 |
| 218:12,17 | 253:4,5,15,23 | 287:15 288:3 | 32:2 34:16 |
| 219:12,15 | 254:16,23 | 292:6 298:9 | 95:12 96:1,2 |
| 220:14 221:18 | 255:21,25 | 301:14 303:4 | 96:15,17,18 |
| 222:11 223:5,6 | 256:1,5,17,20 | 304:8 310:22 | 97:8 98:3,6,10 |
| 223:8,9,16 | 256:25 257:3,8 | 312:5,11,20 | 98:17,18 99:9 |
| 224:2,4,8,15 | 257:8,21,22,23 | 313:4,6,7,17 | 100:17,20 |
| 224:22 225:2 | 258:4,9,12,15 | 313:20 314:13 | 101:25 102:3 |
| 225:13 227:1,4 | 259:2,5 261:14 | **risk** 14:3,11 | 105:12,23 |
| 227:7,13,17,20 | 262:4,11 263:1 | 61:8 89:23 | 106:10,14 |
| 227:25 228:5 | 263:17,22 | 100:12 101:4 | 107:2 110:11 |
| 228:10 229:11 | 264:2,25 265:4 | 102:13 103:10 | 112:22 113:4 |
| 229:17,21 | 265:8,24 266:5 | 108:5,7,9,22 | 113:24 114:1 |
| 230:7,13 | 266:14 267:7 | 110:17,18 | 121:5,7,9,22 |
| 231:16 232:19 | 267:16,20 | 117:17,19,22 | 122:15,17,20 |
| 233:13,17,19 | 268:1,5,11,19 | 118:12 119:3,3 | 123:11,23 |
| 233:23 234:2 | 269:3,23 270:7 | 119:9,10 | 124:23 125:1 |
| 235:4,8,15,19 | 270:14,18,21 | 120:24 121:18 | 125:21,22 |
| 236:6 237:14 | 270:25,25 | 121:23,24,25 | 134:4,9,10,20 |

134:22 137:7
137:10,13,20
138:2,3 141:18
143:8 144:22
144:23 148:23
149:3 150:13
150:16,24
155:1,6,8,13
155:15 156:4,9
156:22,24
157:12,15,17
158:3,5,13
168:3 170:24
171:2,4,6,12
175:2,8,9,14
175:19,21
176:9 177:13
177:16 178:2,7
178:10,14,15
178:22 179:9
179:16 180:5,6
180:19,22,23
181:7,11,16,18
181:21,23
182:7 183:22
184:8,11,23,25
185:3,13,17,25
187:3,21,22
188:7 191:13
194:2 196:21
196:23,25
205:17 211:7
212:23,25
223:1 232:6,9
249:6,9,12
259:12,15
260:13,18,24

271:20 277:22
278:2 286:1,3
286:9,15,24
287:4,17,24
290:14,15,22
290:24 291:2,5
293:3,7,8
295:15,16
299:3,7 306:5
306:25 307:5
307:11,20
308:2,7,11,14
309:6,8,10,11
310:17,21
313:14,16
314:4,7,23
315:3,6,11
**roche's**  313:11
**role**  111:19,22
125:25 126:11
130:12
**roles**  126:2
**rolled**  177:6
**romanette**
203:5
**roni**  114:11
173:14 201:13
202:4,6 292:9
292:12 296:1
**room**  17:14
18:5 113:19
298:11 314:12
**rose**  237:24
**rough**  237:4
**roughly**  19:14
23:13

**round**  249:23
**row**  238:3
240:8,9 242:5
248:17 250:20
252:1 260:20
260:21,22
264:7 269:7,10
269:19,21,23
269:23,23
270:3
**rows**  237:20,21
242:23 243:17
243:23 250:15
251:24 252:6
256:24 257:5
257:11
**rule**  3:4,10
30:4,24 31:1
83:3 134:15
308:19
**rules**  3:5,11
75:17
**ruling**  56:7
58:22 178:8
180:2
**run**  92:10,22
**rushing**  225:8

**s**

**s**  4:1 5:2,2,2,10
6:1 203:8,23
**safe**  79:3 80:6
80:13
**safely**  305:6
**salary**  313:4
**sale**  258:9,18
259:2 285:13

**sales**  57:18
**sat**  112:14
**satisfy**  8:21,22
14:5
**saurborn**
249:5
**save**  24:11
**saw**  84:19 85:1
111:4 139:22
**saying**  48:6
54:15 57:3
59:7,25 61:22
62:18,20 82:12
98:7 116:7
122:11 139:25
159:14 171:10
171:22 172:2
215:6,18
221:22 253:4
253:21 263:2
263:11,13
265:19,20
272:22
**says**  14:10
37:18 43:25
45:21 47:19
48:9 49:3 50:3
50:12,12,18,18
57:5,10 67:11
71:7 77:15
78:1 79:25
81:19 82:4
84:12 97:15
98:14,14 99:3
99:10 117:9
135:19,22
184:3,18

186:20 193:21
194:12,12,22
196:9,16 199:5
199:10 200:12
200:14 201:13
230:19,22
235:21 247:2
247:18 249:1
253:3,6,20
265:9 281:23
282:25 283:11
288:13 290:3,8
290:17 291:4
**scan** 251:4
**scapegoats**
16:7 18:14
**schedule** 21:10
21:25 22:5,9
199:21 224:1
289:25
**scheduled** 3:7
119:3,5,7
293:19
**scheme** 93:2
**scope** 36:13
298:24 313:10
**scott** 4:11
**screen** 45:6
54:22,25 66:14
66:17 93:17
97:9 231:7,16
231:18,21,23
232:1 234:12
234:25 259:23
315:8
**screenshot**
57:4,10

**screenshots**
166:15 289:14
**scroll** 45:20
98:21,25 140:3
**se** 7:3
**searched**
220:13 223:18
**seat** 31:11
**second** 9:11
15:10 16:24
17:11 18:22
19:5 20:16
21:1,19 22:8,9
28:12 44:15
48:16 53:6
55:20 57:15
66:19 71:2
93:25 96:7,10
105:7 113:4
134:8 137:15
139:17 143:25
151:12 154:25
164:5 183:23
225:24 247:3
265:9 288:12
291:12 294:14
295:21
**seconds** 85:18
85:21
**secreting** 13:24
**secretions**
12:10
**section** 20:23
21:6,21
**secure** 92:9,25
203:24

**securities** 86:8
87:1,3,9,15
**see** 12:7 21:24
22:3 26:6 30:2
31:20 32:23
36:20 37:9
42:16 43:15,24
44:1,3 45:21
46:1,2,4,8 47:8
48:6 49:3,20
50:1,6 53:4,7,8
53:19 55:15
57:2,6,11
59:15,24 60:4
60:8,11 61:24
66:14,24,24
67:5,12 68:1
69:12 71:1,6,8
71:11 72:16,23
73:9,11,13,15
74:24 75:16,17
77:15,18,21
78:1,3 79:18
79:23 81:9,13
81:18,20,20
82:21 83:2
98:7,8,12,14
98:14 99:1
106:24 135:20
136:3 139:19
139:23 140:4,8
142:1 151:17
151:21 158:8
158:11,12
161:24 162:14
163:21 179:24
184:22,24

186:15 189:10
191:13,14
192:9 193:6,8
193:19,23
194:16,19,23
195:4,12
196:11,18
197:5,9,18
198:14,15,21
199:5,10,14,21
200:14,17
201:14 202:6
202:15,18,24
203:6,10,11,13
206:13 210:25
215:23 224:5
224:12 228:25
229:2,8,14
230:2,25
231:15,17
232:21 233:6
234:8,12 235:1
235:25 237:20
238:4,9 239:18
241:2,13,16,17
244:24 245:18
245:20 247:6
248:18,21
249:4,25 252:2
258:20 260:10
260:12,17,22
261:17,18,23
264:17,19
266:23 267:12
269:13,15,22
270:4 272:9
282:2,4 283:3

283:14 287:12
288:17 289:3
289:21 291:21
293:23 305:21
305:25 306:1,6
306:8,9,9,10
306:12,15
312:2,24 315:7
315:7,8
**seed** 8:7 11:1
203:7,19 204:3
204:13,15,21
204:22,23
205:6,11
206:11,16
207:7,11,14,14
207:22 208:2,6
208:9,13,13,17
208:19,22
209:1,5,8,22
210:1,7,10,14
210:16 237:2
240:22 249:23
270:17 271:2,3
271:4,9 292:13
292:14,17
**seeds** 236:5,10
236:15
**seeing** 97:20
**seek** 287:10
**seeking** 8:17
8:17 13:12
14:9 26:8
**seem** 284:18
313:10
**seems** 8:13
139:15

**seen** 48:16,23
58:6 69:24
70:1 74:10,15
75:2,18 82:19
84:11 96:24
97:1,3,17
110:7 159:17
194:4
**segments** 90:9
**select** 295:6
**selected** 207:8
207:9
**self** 10:7
**sell** 57:17
122:4 141:15
142:2,7 285:12
**seller** 293:20
293:21,25
**seller's** 293:22
**selling** 87:8
**send** 37:17
41:10 47:15
51:15 130:14
130:16,18,22
140:7 179:17
236:14 259:8
296:3 298:8
**sending** 19:17
41:25 161:1,4
223:12 266:1
274:7
**sends** 57:2
**senior** 202:7,9
**sensation** 71:1
71:8
**sense** 119:1
225:7 270:20

272:24
**sent** 11:9 19:16
20:1 22:25
23:12,14 41:17
42:17 45:16
47:13,17,21
48:7,10 49:4,6
49:17 50:9
51:11,19,23
52:2,10 53:23
54:1,3,5,10
55:16 58:13
59:4,24 104:6
104:9 112:5
114:1 119:18
127:8 130:13
130:16 135:19
137:13 151:24
161:8 169:20
171:11 191:9
191:24 201:13
218:1 227:25
230:6 237:13
247:5,18,19
259:25 265:11
268:21,22
275:2,9 289:5
292:10 295:22
296:4,6,12
300:16 309:25
311:21
**sentence** 117:9
118:14 119:12
151:21 196:9
**separate** 6:12
118:7 237:1
245:14 252:10

253:18 263:17
266:2 274:24
275:2
**separateness**
40:2
**september**
11:14 19:19
24:21 32:9
47:17 50:1
52:3,3 57:2
86:7,12 87:5
189:10 190:1
195:3 204:3,17
204:17 237:2
245:18,19,21
246:2,5 260:10
261:18,21,23
262:6,10,14,14
264:18 269:14
270:11 271:8
298:21 301:23
**series** 8:10
13:2 182:22,25
184:19 185:14
208:19
**serious** 12:5
**serve** 89:2
**served** 33:16
**service** 20:18
20:20 87:11
192:21,22
193:6 197:17
197:21
**services** 19:21
39:8,15,19
87:10,14,18
114:22 193:1,6

194:12,12,15
194:16,22
195:2,12
196:10 198:21
198:23,24,24
199:2,6,10,20
223:23 252:20
252:25 253:1,4
253:23 254:16
254:23,24
289:16,17,17
289:24 291:13
291:24
**serving** 10:7
**session** 83:25
**set** 11:8 18:12
22:15 24:2
112:16 120:25
122:4 138:25
151:14 165:12
165:18 185:21
199:20 224:7
289:25 314:25
**setting** 12:16
109:6 165:7
**seven** 196:23
237:7,8 282:11
293:15
**seven's** 196:22
**seventy** 261:5
**several** 27:5
35:5 63:19
90:25 91:10
236:19 283:1
**shabout**
115:24 116:11
174:13

**share** 15:6
17:25 18:1
21:7,11,12
22:14 42:12
68:13,19,22,25
69:5,9 98:15
99:3 110:2,6
112:16 114:9
114:14,22
115:2,3 127:19
127:21 130:9
166:14 170:9
170:13 172:20
173:2,2,19
209:19 210:24
211:14 212:9
212:17 213:12
213:16 217:9
217:20 218:4,7
218:8 220:21
222:5 227:17
227:24 228:5
231:18,21,22
232:1 234:6
254:18 277:12
297:21 307:11
307:13
**shared** 24:20
25:1 104:2
138:17,18
168:13 182:6
182:12,16
183:6 211:5
**shares** 68:23
**sharing** 98:8
148:3 305:2

**sheet** 18:11
148:21 149:7
255:18 258:20
264:7 288:14
**sheran** 77:17
**shifted** 159:18
**short** 123:23
142:12,17,25
237:3 307:2
**shorted** 142:22
**shorten** 286:11
**shorter** 123:21
123:21,22
**shortly** 13:17
18:7 23:8
148:19 149:5
**shot** 90:10
**show** 8:24 12:4
13:9 16:17
20:3 26:1,11
45:20 65:22
83:2,11,14,15
83:23,23,24
97:1,11 104:2
104:3 111:14
162:22,25,25
163:8,10 164:3
166:16 167:19
255:18 264:9
294:23 307:7
307:21
**showed** 65:25
90:9 145:9
**showing** 20:13
55:1,4 66:3
97:10 98:20
166:15

**shown** 58:10
162:15 288:23
**shows** 53:18
66:17 67:6
98:15 163:6
233:1 234:5
239:5 245:3
269:25
**shuffle** 46:21
**shy** 187:21
**side** 123:10
260:14 308:1
**sides** 17:15
314:20
**siena** 108:7,8
108:17 109:3
117:21,23
118:3,3,8
**sign** 198:16
**signature** 33:2
193:11 198:1,3
198:5 205:23
205:25 206:5
230:10,13
316:7
**signed** 22:17
33:4 38:3,5
46:10,11 103:7
172:24 198:6
198:15 206:2
211:20 224:24
**significance**
8:12
**significant**
51:11 79:2
80:6 96:12,20

signing  193:13
similar  97:18
  123:4 167:17
  167:20,21
  278:23
similarly  83:9
simple  39:13
  52:9 99:1
  121:3 122:22
simplify  29:19
simply  54:5
  122:23 178:11
  300:14
single  20:13
  123:9 208:14
  218:19 246:12
  246:13 250:17
  251:1,7 252:11
sir  33:2 189:2
  190:20 191:12
  191:23 196:6
  197:15 198:3
  201:25 204:20
  205:6,22
  210:22 212:5
  212:21 213:5
  213:10 214:5
  215:23 216:7
  225:23 226:20
  228:13 232:12
  233:13 254:2
  259:23 268:15
  272:9 273:11
  275:14 277:20
  282:11,20
  284:22 311:13
  312:2,8,11,15

313:4
sit  177:23
sits  88:20 89:8
sitting  18:18
  78:22 101:15
  102:16 103:8
  155:16 251:14
  259:1,3 281:18
  282:14
situation
  129:22
six  11:14 21:4
  67:11 92:5
  205:8 246:2,6
  255:8 270:13
  270:16 286:20
  286:21
sixth  183:24
sixty  205:17,18
size  209:1,3
  231:19 234:23
slack  133:19
  135:14 139:15
  151:3
slash  206:4,4
slide  21:9,15
  23:15
small  115:1
smaller  209:1
smiley  228:9
  228:12
snapshot  79:23
  163:10
social  73:7
software  164:3
  224:21 226:7
  299:13

software's
  302:20
sold  240:16
  241:5 258:7,15
  278:17
sole  199:19
  289:24
solely  10:7
solemnly  31:7
  94:6 124:15
  175:24
soliciting  87:8
solutions
  316:20
somebody
  280:25
sonya  3:25
  316:3,8
soon  16:3,4
  24:9
sooner  13:9
sophisticated
  64:5 67:21
sorry  11:9
  21:24 30:7
  35:21 39:2
  50:10,14 52:24
  53:15 56:17
  58:19,21 59:5
  59:12 60:12
  62:12 66:22
  67:10 68:1
  69:15 71:3
  73:22 74:1,12
  76:2,19 77:10
  77:18,21 78:9
  81:2,6 86:11

88:9,9 94:24
  100:14,21
  117:1 118:19
  128:6 137:25
  139:5 144:20
  149:4 151:6,18
  152:16 153:7
  153:21 155:19
  156:19 168:25
  169:13 183:10
  189:5 192:10
  195:25 201:8
  211:2,10,10
  213:1,18 214:3
  218:25 220:3
  220:24 221:10
  230:9 244:19
  246:5 252:16
  253:14 254:11
  255:5,12 256:9
  258:23 261:23
  262:14 268:4
  269:10,14,17
  269:22 271:7
  284:23 285:4,5
  290:9,11 298:2
  305:11 307:17
  310:9
sort  9:12 83:9
  149:25 172:8
  172:19 261:11
sortable  260:1
sorted  260:7
  269:7
sorting  260:2
sound  86:23
  242:24 245:2

256:20 257:20
262:4 264:24
268:10 275:5
280:9
**sounds** 85:1
210:12 214:18
228:11 242:16
257:22 268:1
274:20,23
275:1
**source** 167:12
**southern** 1:2
**space** 24:15
176:13,15,18
**span** 264:18
**spanned**
245:18
**speak** 6:21 7:4
7:5,10,10
124:19 176:6
307:16
**speaking** 48:21
58:23 209:25
**speaks** 38:25
**specific** 63:2
87:11,16
115:16 147:2
159:14 165:13
174:5 185:9
189:15 220:22
222:5,8 242:21
251:4 257:9
276:13 285:4
299:9 308:18
**specifically**
10:3 26:20
28:3 71:10

100:10,23
109:9 112:11
116:10 117:6
117:10,13
118:15 171:22
203:6 228:4,22
265:15 295:11
300:13 302:17
305:5
**specifies**
102:12
**speculate**
157:11
**speed** 12:11
**spend** 18:20
252:21 309:24
**spent** 12:3
13:12 241:12
242:23 243:2,4
243:17,23
249:1 250:15
252:17 256:12
267:22 268:5
276:15,16,17
309:21
**spoke** 59:25
130:9
**sporadically**
43:2
**spreadsheet**
5:17 42:6,7
98:19 230:22
231:5 232:13
232:18 233:11
233:12 234:12
234:13 235:1
237:10,12

240:2,6,11
242:6 244:11
244:17,18,20
253:9 259:9,25
263:15 264:11
272:17,18
301:15,16,17
306:24 307:6
308:17 309:15
309:17
**spreadsheets**
269:2
**squandered**
9:1,8
**st** 208:23 209:9
**stable** 11:18
24:22 57:17,20
57:23 246:21
246:24 270:7
296:12 303:11
305:25
**stablecoin**
142:9
**stablecoins**
89:10 106:3
132:8
**stables** 296:8
**stack** 94:19
**stage** 295:13
**stake** 177:1
250:5
**stakes** 283:1
**staking** 34:3,6
189:14 194:15
**stand** 6:23 7:1
31:5,6 94:20
287:16 307:19

**standard** 26:3
**standing** 89:12
89:18
**standstill**
13:16 29:6,11
**start** 7:20 8:2
26:16 137:18
158:21 171:3
186:10 187:10
188:9 214:23
215:17 226:1
299:19 313:20
**started** 6:13
7:14 35:17
41:8 56:18
100:4 124:8
175:16 176:17
212:4 298:21
304:12,15
**starter** 135:22
**starting** 19:15
172:23 195:2
299:17 314:21
**state** 17:20
19:13 59:6
85:12,14
138:11 176:10
297:15 301:24
302:4
**stated** 59:5
88:4 89:21
92:7 106:15
**statement** 8:2
15:21 82:24
84:11,20,24
89:24,25 90:2
90:5,8 91:7,13

| | | | |
|---|---|---|---|
| 96:14 228:22 | **stone**   1:15 3:2 | 119:10,13,16 | 288:4 293:9 |
| 229:17,19,20 | 4:15,21,24 5:8 | 123:3,7 127:2 | 295:6,17 307:7 |
| 232:19 235:18 | 5:22 6:4,16,18 | 127:5,8,12 | 307:12 309:12 |
| **statements** | 6:25 10:8,12 | 130:3,9,14 | 311:6 314:18 |
| 7:18,23 78:17 | 11:7,15 15:22 | 132:20 136:11 | **stone's**   19:7 |
| 91:19 118:4,17 | 15:23 16:10,21 | 139:4,7 145:2 | 20:9 23:19 |
| 156:10,12,13 | 16:21,24 17:11 | 145:19,24 | 24:16 69:11,12 |
| 156:16 157:1,5 | 17:18 18:7,18 | 146:7 147:4,7 | 102:25 106:7 |
| 157:7 | 18:19 19:3 | 147:10 148:1,2 | 106:18,21 |
| **states**   1:1,18 | 20:13,19 22:22 | 148:14,20 | 109:18,23 |
| 32:21 39:16 | 23:2,5,8,11,17 | 149:6 151:24 | 112:20 113:2 |
| 87:17 285:2 | 23:21 24:2,14 | 152:10,11,24 | 145:21 146:5 |
| 293:16 | 24:17,18 25:15 | 155:25 162:8 | 147:24 148:6 |
| **static**   103:23 | 35:17 41:15 | 166:11,12 | 148:19,19 |
| **stating**   23:20 | 42:12 43:13,16 | 167:10,18,22 | 149:5 152:6,6 |
| **status**   8:18 9:9 | 43:16,17,21 | 168:2,10 170:5 | 152:13,22 |
| 14:9 111:2 | 44:23,24 49:18 | 170:8,12 172:8 | 170:20 171:8 |
| **stay**   13:19,23 | 50:2 55:13 | 172:19 173:17 | 212:24 243:20 |
| 124:4 | 56:14 57:2 | 173:17,22 | **stop**   11:11 |
| **stayed**   257:2 | 58:8 59:3,17 | 174:14 176:2,4 | 48:20,20 50:22 |
| **steal**   16:3 76:1 | 60:15 62:6,11 | 176:5,7,8,10 | 64:17,17,17 |
| 76:3 | 62:13 69:7,14 | 176:11,12 | 65:18 66:18 |
| **stealing**   16:4 | 69:16 70:23 | 178:12,16,23 | 71:11 72:6,9 |
| 71:25 | 71:18 82:17 | 179:17 180:24 | 77:20,23 86:22 |
| **step**   293:9 | 97:6 98:13,13 | 181:24 183:23 | 86:22 109:7,8 |
| **stepped**   113:16 | 99:14 101:1 | 185:18 186:5,7 | 123:4 169:14 |
| **stipulate**   65:21 | 104:6,13,24 | 187:5 188:9 | 220:25 275:15 |
| **stipulated**   9:22 | 105:4,8 106:1 | 192:14 198:6 | 286:20 304:13 |
| 200:18 | 106:9,13,17,18 | 200:12 201:13 | 313:12 |
| **stipulation** | 107:15 108:3,5 | 205:1 211:9 | **stopped**   151:9 |
| 13:10 16:15 | 108:8,9 109:20 | 219:10 221:7,9 | 169:18,18,19 |
| 229:25 292:16 | 109:22 110:22 | 221:12 225:17 | 275:6 307:2 |
| 310:15,17 | 111:1 114:13 | 225:19 228:23 | **stored**   207:5 |
| **stole**   16:18,20 | 115:12 116:1 | 229:2,8,13,24 | 208:9 |
| 17:17 69:19 | 116:12 117:16 | 234:13 244:18 | **strategies**   58:2 |
| **stolen**   15:24 | 117:24 118:3 | 256:10 275:18 | 107:20 117:18 |
| | 118:17 119:1,8 | 287:16,23,25 | 121:4 122:3,23 |

127:12 128:11
129:3 138:12
161:10,14
162:18 166:5
168:1 296:23
**strategy** 62:17
121:3 135:2
137:1 138:21
141:20 143:14
143:23 159:3
159:16,16,18
159:18 163:3
**strauss** 4:3
7:16 8:4 107:6
158:18 186:8
**stricken** 50:13
**strike** 48:15
51:4 76:19
78:24 101:14
111:21 189:21
291:24 294:5
**string** 206:20
206:23
**strong** 89:12
89:18
**stronger** 88:25
**strongly**
136:21
**struck** 18:6
23:25
**structure** 6:14
**subject** 37:11
70:25 71:2,6
225:20 228:24
229:5,14 252:2
**submissions**
20:11

**submit** 14:15
25:13 177:10
**submitted**
32:10 33:19
94:13,25 95:3
96:3 102:22
177:24 182:9
309:13
**subpoena**
33:16
**subsequent**
172:15
**subsequently**
177:9
**subset** 87:15
**substantial**
13:12 52:7
107:12 210:23
211:13
**substantially**
286:11
**substantive**
33:23
**successor**
176:24
**sued** 88:11
**suffer** 14:18
26:2 303:1
**suffered**
272:25 312:11
312:12,19
**sufficient** 54:6
**suggests** 14:2
**suit** 19:12
**suite** 316:22
**sum** 252:7
256:13

**summaries**
167:17,20
**summary**
307:20 308:21
**summer** 11:3
127:2 304:13
**sums** 245:1
252:1,4 256:19
266:22
**super** 234:15
**supplied**
259:11
**supply** 103:18
235:19
**support** 10:15
28:23 78:16
94:13,25 95:10
223:19
**supported** 9:14
162:21 163:8
306:17
**supportive**
159:21,24
**supposed**
10:11 21:2
38:14,17,22
39:5,8,25
40:22 51:17
162:2 179:19
219:20 220:8
226:6,11
294:24 296:24
299:18
**supposedly**
263:20
**sure** 38:16
39:20 43:6

55:16 60:2,14
62:10 66:15
67:16 68:2,4
72:16,16 74:19
75:5,6,22 89:3
98:21 115:24
119:19 127:10
133:20 137:2
141:13 142:8
142:14 143:2
145:1 149:21
150:11 157:4,8
157:14 159:16
162:24 164:7
165:10 167:5
170:10 174:13
174:19 175:12
180:12,21
183:18 187:21
187:22 188:6
188:10 190:22
197:24 206:15
206:18 207:9
207:17 208:1
209:12,14,18
213:12 222:13
222:13 223:9
225:3 228:14
231:8 240:14
242:20 247:9
251:2,9,12
254:12 268:6
272:5 276:11
281:7,8 284:17
284:25 285:16
285:19 302:16
305:6 306:10

311:21 314:19
**surprise**
136:22,24
**surprised**
266:16,19,19
**surrounding**
13:20 128:25
**sustain** 27:1
92:11,14 93:1
**sustained** 29:1
29:5,7 30:16
35:15 56:9,15
62:4 82:22
88:7,17 93:4
134:17 168:4
181:10,13,14
181:20 306:4
309:9
**sustaining**
29:18,21
**swaps** 282:3
**swear** 31:7
94:4,6 124:13
124:15 175:24
**switch** 143:25
165:22
**swore** 255:2
**sworn** 31:5
94:2 175:22
177:10,24
228:22 229:17
229:19,20
232:19 235:14
235:18 238:13
238:19 247:14
262:17 265:7,9
283:11

**system** 110:23
120:9,10,14
**systems** 120:7

**t**

**t** 5:2,10 316:1,1
**tab** 64:2,12,13
64:23 66:25
69:25 233:1,1
233:5 234:19
309:17
**table** 177:2
**tabs** 233:6,13
233:18,20
234:5,8 309:19
**tail** 300:8
**take** 8:8,25
9:21 10:4,9,23
23:2 24:4
34:11 37:7
47:6 56:25
67:9 71:11
74:24 81:24
83:13 109:17
114:9,13,21
115:1 123:18
164:5 170:12
171:9,22
172:19 173:5
173:18 175:9
193:2 204:4,18
212:8,16
213:12,16,22
214:16 215:5,6
217:9,18
218:11,11,15
218:22 219:2
219:21,23

220:9,19,21
221:14 222:1,4
225:13,14
238:8 245:23
256:10 262:10
271:9,18 272:4
272:18 293:9
**taken** 13:4
14:19 85:19
89:13 92:9
104:14 308:17
**talk** 9:10,13
12:9 87:16
118:12 119:8
210:17 212:7
216:11 217:5
217:25 227:15
228:15
**talked** 78:10
103:1 114:25
203:17 217:17
295:8
**talking** 11:5
14:18 27:17
52:5,6 55:13
63:10 72:2,6
80:9 85:17
87:10 104:15
116:6,7 121:14
121:23 122:5
183:20 201:19
268:23
**tax** 277:20
278:1,8,11
279:6,8,10,11
279:13,15,17
284:21 285:3

285:14,21
**taxes** 279:1
**team** 23:11
36:6 37:23
61:7 63:25
64:1,8 69:22
128:22 129:6
145:10 152:10
162:8 224:20
225:1 226:8
227:12 251:21
296:18 297:21
**team's** 226:16
**technical** 63:18
207:17 208:1
**telephone**
203:24 214:20
216:15
**telephonic**
172:12 216:11
217:5
**telephonically**
4:9,10,11,12
4:19,20,21,24
**tell** 15:7 21:15
57:10 118:14
125:6 144:11
147:1 154:24
162:12 167:16
167:21 187:9
193:10,19
210:25 229:25
269:17 295:11
303:5 309:4
**teller** 61:16
62:1

telling   50:15
  64:8 154:17
  169:17 219:12
temporarily
  14:13
tender   95:10
tens   17:17 63:4
term   63:18
  125:14 131:14
  132:3 136:20
  141:13 149:21
  193:17 198:23
  233:17 236:3
terms   38:25
  52:15,16 99:23
  99:24 101:8,10
  111:22,25
  112:15 173:3
  188:10 193:21
  302:24 305:8
terra   80:7,9
test   287:6
testified   54:17
  60:18 61:13,17
  61:23 69:8
  96:11,19
  100:13,22
  101:7,11
  109:14 111:21
  121:11 128:14
  134:23 142:5
  152:9 157:18
  160:9 165:1,23
  169:25 194:8
  278:22 298:12
  311:9

testify   6:23
  17:1 18:23
  44:13 50:10,18
  50:23 64:18
  65:18,21 66:19
  100:10 298:14
testifying
  28:13,17 29:8
  29:23 31:2
  54:18 137:4
  251:10
testimony   20:2
  20:12 26:6
  31:8 56:24
  61:24 69:12
  94:6 95:11
  101:14 106:20
  111:12 121:11
  124:15 125:8
  153:2 159:6
  175:8,25
  177:24 213:19
  216:9 225:22
  254:15 273:11
  283:25 286:14
  286:21 299:1
  299:25 300:2,4
  304:22,24
  311:13 314:17
tether   57:23
text   10:17
  173:12 218:20
  219:11,14,19
  220:6,7
thank   8:3 9:12
  14:25 15:1
  18:15 26:14,15

31:21 34:14
  45:12 46:4,25
  49:14 53:2
  57:11 60:10
  66:10 68:5
  83:16 93:13
  94:10 99:14
  112:24 113:21
  123:12,15
  124:3,6 134:21
  135:10 137:17
  139:2,11
  150:18 171:2
  174:23 175:4,6
  175:7,14
  191:19 232:2,3
  287:22 313:12
  313:14 314:17
  315:6,9,10,11
  315:12
thanks   93:20
  287:21
thanksgiving
  302:16 304:4,9
  311:25
theft   15:24
thereof   305:10
thereon   29:19
  202:22
thick   46:17
thieves   15:22
  24:3
thing   135:25
  146:22 236:20
  241:19 304:8
  315:1

things   16:17
  52:15 62:10,12
  92:15 99:22
  100:4 122:10
  136:11 145:18
  166:18 167:5
  194:14 247:24
  262:23,24
  266:24 276:17
  288:23 298:9
  306:10 307:19
think   12:6
  29:17 30:2
  35:1 39:16,23
  40:22 41:2,12
  42:3,21 43:3
  48:10 49:5
  52:15 54:2,3
  54:18 56:24
  61:7 62:14
  63:25,25 65:5
  66:6,20 68:25
  72:11 74:16
  75:4,8 80:22
  84:21,22 88:22
  89:13,25,25
  103:6 113:10
  114:19 121:13
  123:1 133:14
  134:7,20
  137:22 138:22
  151:18 152:16
  153:24 168:22
  171:13 179:23
  182:15,25
  189:19 191:15
  192:25 197:2

| | | | |
|---|---|---|---|
| 198:10 207:18 | 66:24 67:4 | **thousand** | 50:8 54:13 |
| 209:18 211:7 | 73:9 117:9 | 308:19 | 58:15 62:8,9 |
| 214:1 220:17 | 126:18 128:15 | **thousands**   63:4 | 64:2,10,17 |
| 221:17 225:4,7 | 151:13 199:12 | 76:10 227:21 | 65:9 68:16 |
| 225:11 227:21 | 224:10 252:15 | **thread**   80:9 | 80:24 83:10 |
| 232:6,23 233:8 | 268:2 277:14 | **threatens** | 99:18 100:2,7 |
| 233:15 234:23 | 280:22 291:15 | 23:16 | 101:6,18 |
| 236:17,25 | **thirty**   196:22 | **three**   16:17 | 106:24 109:18 |
| 240:12,13 | 196:23 | 18:21 19:1 | 109:21 110:19 |
| 241:3,9 244:4 | **thompson** | 20:24 21:4 | 115:16,22 |
| 245:5,16 | 49:19 55:12 | 60:1 86:16,25 | 119:6 127:15 |
| 247:19 251:11 | 57:3,9 116:11 | 87:6 100:5 | 128:23 131:10 |
| 251:25 253:4 | 126:4,6 127:23 | 118:24 175:13 | 132:19 133:9 |
| 253:10,22 | 129:11 130:7 | 195:20 229:2 | 133:14,22,25 |
| 254:6,7 255:16 | 130:19 133:1,5 | 232:21 233:13 | 136:6,7 145:6 |
| 257:2,6 260:25 | 133:11 135:15 | 233:18 235:3,6 | 146:23 151:5,6 |
| 263:1,12 266:6 | 135:19,22 | 235:7,22 | 152:13 153:10 |
| 266:19 268:12 | 139:16,20,25 | 237:20 240:25 | 154:10 159:14 |
| 268:13 269:4 | 145:9 146:10 | 243:11 266:3,6 | 160:1,11,12 |
| 272:10 273:4,7 | 151:4,9,13 | 266:10 269:2 | 162:3,22 |
| 275:6 276:1,6 | 152:2 160:16 | 275:2 277:2 | 163:10,21 |
| 277:13 279:19 | 160:18 166:23 | 284:19 297:20 | 165:6,20 166:1 |
| 279:20 283:8 | 167:1 168:19 | 298:1 | 166:6 167:6,13 |
| 284:5,16,17,18 | 172:6,16 | **thumbs**   82:7 | 168:16 169:9 |
| 285:9 286:5,9 | 173:14 215:10 | 84:16 85:12 | 169:11 172:14 |
| 286:10,10,16 | 215:22 217:7 | 86:17 87:1,22 | 173:10 174:5 |
| 288:23 290:5 | **thought**   21:16 | 88:5 | 174:12 176:17 |
| 294:12 301:16 | 54:11 62:15 | **tied**   228:4 | 178:2 181:5 |
| 302:1,22 | 136:7,17 159:6 | 278:19 | 186:1 191:1 |
| 303:14 307:1 | 160:9 167:25 | **time**   13:12 | 194:5 195:1 |
| 310:17 311:9 | 172:25 173:24 | 18:12,15,20 | 213:25 214:1 |
| 311:19,19 | 183:9 191:2 | 19:1,2,15,24 | 214:10,14 |
| 314:10 | 223:9 290:23 | 20:6,16 21:2,4 | 216:19 222:10 |
| **thinking**   92:8 | 298:10 300:21 | 22:16 23:2,10 | 228:21 236:20 |
| 92:25 | 310:15 | 23:16 24:14 | 237:3,4 242:1 |
| **third**   17:4 | **thoughts** | 26:4 32:6 | 243:9 244:14 |
| 18:23 63:7 | 173:23 | 48:10 49:6,17 | 245:11 246:1 |

248:8,14 249:9
250:17 251:2,7
253:10 256:16
258:21 262:15
264:2 276:8
281:4 283:12
284:10 286:8
289:8 294:12
295:18 297:23
299:16 303:5,6
305:1,8,14
306:2,13 309:1
313:5 314:24
315:4
**timeline** 18:22
**timely** 29:17
183:2
**times** 89:15,22
114:10,11
130:14 135:25
165:14 168:22
172:15,17
217:8 266:13
274:10 288:23
289:14 294:10
294:15,16
297:13 301:3,5
**tiny** 234:15
**title** 68:1
**titled** 89:9
193:5 194:18
196:14 197:17
202:13 229:24
**titles** 68:3
**today** 6:5,10
6:15,21 8:17
9:7,23,25

10:11,20 12:7
14:24 16:17
17:1 18:16,18
20:12 23:4
26:7 33:7,17
33:20 34:23
42:10 48:12
49:5 50:4 51:7
59:25 62:19
64:13 78:13,22
79:12 85:22
95:7 97:1
101:15 102:16
103:8 125:6
155:16 177:23
178:1 188:15
188:18 203:17
214:8 216:3,5
217:22 226:23
251:14 259:1,3
273:14 282:14
282:23 286:14
286:21 297:24
312:5
**today's** 6:17
7:5 245:8
**together** 18:17
118:1 150:1
202:22 229:10
268:7 296:15
**token** 63:16,20
64:23 65:10
67:1,12,25
143:4,10,13,15
145:16 184:3
238:24 246:18
246:21 247:4

247:11 248:3
254:13 266:25
281:14,20
**tokens** 21:2
34:5 56:24
184:18 246:19
248:5,8,17
250:14,17,21
252:11 264:22
265:11 266:21
267:2 268:9
281:11,17,17
281:20
**told** 10:9 28:6
61:19 62:16
72:9 82:5
88:24 91:2
106:1,1,1,2,5,6
106:9 108:6,10
111:3 115:13
116:1 117:16
127:21 132:20
132:23 133:1,7
133:9,11
134:24 135:1
138:20 146:1
148:2 155:25
162:8 166:18
167:25 174:3
220:9 226:18
233:16 265:5
288:23 299:12
300:19 301:23
302:8,9
**tomorrow** 6:15
286:11 310:20
313:23 314:8

314:17,22
315:8
**tonight** 314:8
**took** 8:20 10:2
11:6,23 13:5
36:8 37:24
76:11 100:7
105:15 108:25
109:14,18
125:2 213:7
214:24 239:17
272:9 275:9
278:10 284:23
304:17
**tool** 65:3 164:9
164:12 226:11
**tools** 70:2
**top** 37:12 45:8
57:14 67:11
71:3,3 75:15
79:19 81:18,20
97:11,15 98:21
151:13 184:4
184:18 278:21
290:16,17
**topic** 114:16
158:20,20
**topics** 18:21
165:22
**tornado** 11:22
15:23 30:10
273:20,22,25
274:4,8,12,15
274:19,21,25
275:3,6,9,10
275:20,21
284:24,25

301:9
total   36:8
   45:16 52:14
   195:22 196:2
   249:24 264:7
   266:21 269:3
   274:22 296:16
   302:22 305:8
totality   297:25
   300:12
totals   266:17
tough   43:15
towards   23:5
   158:21
tower   4:6
traceable   20:4
track   12:12
   17:5 20:5
   63:12,20 64:9
   110:24 111:13
   121:12,16
   122:25 161:17
   161:20 162:1
   162:17 164:9
tracked   63:3
   276:13
tracker   226:8
   226:11
tracking   78:2
   144:7 225:4
trades   63:4
   143:16 165:11
   300:13
trading   62:17
   103:19 111:18
   128:22 135:2
   137:1 138:12

138:21 141:19
143:18 146:17
165:24 166:13
167:14 168:8
168:20
transact   69:21
transacted
   69:20 72:19
transaction
   25:21 123:9
   236:25 239:1
   247:11 248:11
   302:11 310:3
transactions
   8:10 17:8,10
   17:10,12 20:3
   20:14 27:22
   41:19 42:9
   63:2 64:23
   66:25 67:1,1,2
   67:5 104:24,25
   105:2 107:21
   107:25 110:24
   111:6 121:17
   122:2,8,22
   184:19 185:6
   185:15,18,19
   185:20 225:4
   226:6 237:25
   249:23 251:24
   252:10 253:19
   253:21 254:12
   254:13 256:22
   262:1 266:5
   271:15 296:11
   301:15,16
   306:20 310:4

transcribed
   3:25
transcript
   113:5 114:5,18
   115:8 116:4
   172:10,22
   174:1 212:22
   215:13 244:9
   282:10 312:15
   316:4
transfer   8:8
   25:16 34:11
   42:2,4 51:6
   64:23 171:24
   171:25 202:21
   204:4,9 205:8
   220:10 237:11
   238:21 239:5,9
   242:2 244:17
   245:22 246:6
   248:9,17 251:4
   257:6,7 260:9
   261:18,20
   262:20 263:7
   265:23 269:13
   269:21 270:3
   271:10,13,13
   274:13,15,21
   278:6,8 310:7
   310:8,11
transferee
   242:5
transferred
   11:6,20 25:11
   25:14,16,17
   48:19 112:7
   229:3 237:5

239:9,13
240:16 241:22
242:4 244:24
248:20 250:9
250:23 251:1
251:14 253:15
255:4,11,16,17
255:22 256:5
262:2,25 264:1
264:21 266:21
267:1,2,5,15
268:3,8 273:19
274:18 285:12
285:13 305:9
310:16
transferring
   243:19 247:22
   300:11
transfers   9:24
   11:4,12 12:10
   12:12,17 42:3
   43:25 45:15,16
   46:6 67:12,25
   184:4,13
   185:21 210:17
   228:15 230:23
   230:25 233:20
   233:22 235:23
   235:24 237:18
   243:19 245:4
   245:12,14,18
   245:21 246:11
   246:13,18
   247:3 252:2,7
   252:7,13 253:8
   254:15,18,19
   254:21,22

262:18 263:5
263:17,20
264:16,17
265:10 266:3,4
266:8,10,13,17
268:13,17,17
274:1,5,24
275:2,20
297:17
**transform**
218:16
**transmit**
187:15
**transmittal**
237:24
**transparent**
110:24
**trappers**
289:15
**treasury**  30:9
304:3 311:22
**trial**  6:17 16:15
20:11 26:18
33:16 200:19
**tried**  181:19
**trouble**  35:11
**true**  32:23 33:8
51:23 52:10
61:21 62:14
63:20 64:22
68:17,18 80:14
86:16 88:3,23
89:10 92:12,20
92:23,24
218:23 226:7
297:19 316:4

**truth**  26:12
30:11 31:9,9,9
56:11,16 61:16
62:1 94:7,7,8
95:6 124:16,16
124:17 125:6
176:1,1,1
181:17
**try**  13:14 56:13
79:6,15 178:13
188:14,18,24
227:6 286:17
287:13
**trying**  27:24
113:12 182:24
225:9 226:2,3
**tuesday**  37:8
**tuned**  30:25
**turn**  33:1 53:6
79:21 81:14
95:23 138:5
157:22 189:2
191:12 193:10
193:16 196:13
197:25 200:3
200:11 205:11
205:22 206:7
210:8,14
212:21 225:23
247:1 259:19
270:17,21,22
**turned**  7:8
270:25 285:20
**turning**  81:15
260:7
**turnover**  9:15
270:20

**tweet**  5:23 72:2
72:12,12 73:18
73:19 75:2,17
75:18 79:7,23
80:4,10,12
82:1 179:1,7
181:3 301:1,6
**tweeted**  17:12
71:25 78:25
79:1
**tweeting**  72:5
**tweets**  75:7
**twice**  194:13
214:21 284:19
**twitter**  16:22
24:17 70:5,7
71:11,15,18,19
71:21,22,24
72:7,10,10,13
72:15 73:6,11
74:25 75:7
145:24 146:2,4
146:7,9,12,17
146:20,21
152:12 160:10
160:15,19
301:2
**twitter's**  70:25
71:7
**two**  17:14
19:14 22:24
33:23 55:3
75:21,24,25
76:13 77:7,10
77:17 78:1
91:16 92:18
94:23 95:17

96:3 100:5
114:11 118:24
120:7,15 121:7
129:9 157:15
173:11 182:16
191:17 192:22
195:3 202:12
202:15 212:25
214:12,23
230:19 235:8
249:6 253:17
257:11 274:24
276:4 283:24
284:19 292:3
303:4,13
309:19
**type**  112:8
184:14 185:21
236:24 247:10
281:18,20
**types**  297:3
306:6
**typical**  198:4
**typo**  194:12

| u |
| --- |

**u.s.**  2:3 30:9
57:20 105:20
112:15 204:10
237:9,10 239:8
248:7 252:1
256:13 278:19
**u.s.c.**  32:22
**ultimate**
273:25 274:6
**ultimately**
13:21 14:11
226:12 238:1

266:4 268:25
**unable**   6:7 9:1
**unanimous**
   13:2
**unavailable**
   104:25
**unaware**
   262:12 263:6
**unclaimed**
   306:8
**uncover**   17:6
**uncovered**
   148:20 149:6
**uncovering**
   149:23,24
**undeployed**
   202:21
**under**   6:6
   13:11 14:24
   16:8 19:12
   20:20,25 21:12
   21:23 22:14
   23:3,25 24:18
   26:1 32:22
   38:15 40:12,19
   62:19 65:1
   68:13 75:2
   78:13 83:20
   95:4 137:14
   154:19 155:11
   214:7 216:2
   225:17 226:22
   228:22 238:17
   238:18 252:17
   254:23,24
   256:20 258:21
   273:13 278:2

282:23 286:17
289:9,9 291:23
293:18 294:8
307:23 308:11
312:4,7
**underlying**
   307:24,25
   308:5,7,12
**underneath**
   238:9
**understand**
   39:20,21 40:1
   40:2,11,12,15
   40:16,19 43:4
   46:3,9 48:5
   58:22 60:18,23
   61:4,13,19,23
   62:24 65:24
   69:7,11,13,16
   69:23 75:20,24
   84:8 90:16
   95:3 97:25
   121:10 122:10
   140:5 148:24
   163:2 174:19
   181:18 208:17
   214:7 225:1,3
   226:22 227:13
   261:1 272:6
   281:9 298:23
   299:8
**understanding**
   80:23 96:21
   109:2 132:19
   136:9 138:14
   138:16 139:25
   150:6 152:1

157:6 160:21
163:12,15
164:2,8 165:23
166:17 167:13
167:24 168:7
169:5,7,20
173:4 179:21
197:5,8 206:16
247:9 291:23
291:24 292:1
299:11 300:8
300:10
**understands**
   67:14
**understood**
   17:1 20:7 26:5
   27:11 50:15
   66:22 67:18
   107:19 108:11
   112:19 130:21
   132:17 136:25
   147:13 149:7
   159:5 162:2
   163:11 179:20
   181:16 188:18
   210:22 211:12
   216:2 227:11
   254:9 273:13
   282:22 298:11
   299:3 306:18
   309:10 312:4,7
   315:3
**undertaking**
   116:9,13
**underwater**
   302:25

**undisputed**   8:6
   9:19 11:3,23
**unfamiliar**
   98:1
**unhappy**
   160:19,21
**united**   1:1,18
   285:2
**unjust**   9:16
**unmute**   137:23
   138:1
**unmuted**   46:21
   137:24
**unmutes**   7:10
**unmuting**   55:3
**unnecessary**
   17:7
**unprofitable**
   294:25
**unslashed**
   283:2
**unstable**   94:1
**unsupported**
   10:7
**untimely**   29:20
**unwind**   202:20
**updated**   28:8
   309:14
**upper**   186:15
**urata**   116:11
   126:4 135:15
   135:19 139:16
   151:4,9 160:16
   160:18 166:23
   167:1 168:19
   172:6,16
   173:14 215:10

| | | | |
|---|---|---|---|
| 215:22 217:7 | 241:23 242:10 | **vague** 40:6 | 233:5,7 234:1 |
| **urge** 14:25 | 242:13 243:7 | 58:14 | 234:4 260:7 |
| **usd** 285:12,21 | 249:4 250:17 | **vaguely** 63:17 | 269:7 |
| **usdc** 57:19 | 251:21 262:9 | 66:1 | **versus** 189:18 |
| 246:21 | 267:14 268:9 | **valid** 196:17 | 189:18 254:18 |
| **usdt** 57:23 | 268:19 271:8 | 200:15 | 288:15 |
| **use** 12:18,25 | 271:18 273:25 | **value** 48:10,12 | **victims** 272:24 |
| 13:5 15:5 16:6 | 274:8,10,12,15 | 48:13,19 49:16 | **video** 82:25 |
| 34:9 45:4 | 274:21 277:12 | 51:2,3,5,6,7 | 83:9,11,23 |
| 56:14 64:9,11 | 278:22 285:15 | 52:3,6,7,14 | 84:2,2,11,19 |
| 65:3 66:15 | 299:13 301:9 | 54:1,2,3,15,19 | 85:2,20 |
| 70:2 71:19 | 304:8 308:15 | 54:19 56:24 | **videos** 83:15 |
| 83:1 85:15,21 | **useful** 227:4 | 76:13 120:16 | 83:24 84:4 |
| 125:14 131:14 | **user** 140:11 | 120:18,20 | **videotape** |
| 132:3 136:20 | **users** 140:16 | 237:9 238:24 | 85:19 |
| 142:9,12,25 | **uses** 230:25 | 248:3,7,7 | **view** 13:10 |
| 143:3,9 144:1 | **using** 3:9 12:11 | 252:1 256:14 | 63:22 107:14 |
| 157:20 175:10 | 18:13 63:25 | 264:8 266:16 | 112:2 160:1 |
| 204:21 227:10 | 64:1 71:18 | 266:21,25 | 165:20 |
| 227:16 259:8 | 104:4 120:6 | 278:9 284:23 | **viewed** 90:11 |
| 263:16 272:3 | 128:15 227:9 | 305:16,17 | **visible** 62:25 |
| 273:23 283:12 | 227:19 243:20 | **values** 49:5 | 232:22 274:2 |
| 295:11 308:21 | 246:19 249:19 | 50:8 | 283:6 |
| **used** 8:6 9:20 | 251:7 259:24 | **varied** 131:10 | **volatility** 79:2 |
| 11:15 14:20 | 261:2 264:14 | 165:6 | 80:1,5 |
| 15:23 16:22 | 275:6 285:1 | **variety** 131:20 | **voluminous** |
| 20:4 24:10 | 293:22 310:4 | **various** 53:5 | 308:22 |
| 26:4 94:19 | **ust** 89:9 | 83:11 281:11 | **voluntarily** |
| 107:19,20 | **usual** 130:18 | **vast** 12:10 | 13:13 33:20 |
| 109:10 111:13 | **usually** 167:21 | 132:15 | **voluntary** |
| 111:16 122:8 | **utilized** 164:3 | **vaults** 57:6 | 13:22 |
| 132:4,4 162:17 | 228:23 229:2,8 | **vehicle** 277:13 | **vote** 309:1 |
| 164:9,15,17 | 229:13 | **vel** 4:20 18:17 | 311:24 |
| 169:16 198:24 | | 34:22 | |
| 204:3,8,15 | **v** | **veritext** 316:20 | **w** |
| 205:6 229:4 | **v** 1:14 3:2 5:3,6 | **version** 44:22 | **w** 5:2 |
| 239:18 240:4 | 6:3,16 | 131:24 180:15 | **wait** 151:6 |
| | | | 155:4 170:24 |

261:23
**waiting**   113:19
233:9
**waiver**   200:12
200:14
**wallet**   11:19,19
24:20,20,23,24
25:1,9,10
53:18 54:8
65:10 77:16,17
77:17 78:1
103:25 162:16
182:3,4,4,14
182:17 183:10
184:1 185:22
202:23 203:8
203:14,16,16
203:20,20
204:2,2,6,9,9
204:18 205:8
205:12 206:22
206:24 207:16
209:22 229:5
236:6,6 237:2
237:13 238:10
238:17,21
239:6,6 240:16
240:18,19,20
242:4,5,6
243:14,14
247:13,14
248:20 251:5
255:23,23,25
256:4 257:3,10
257:12,14,15
258:3 262:10
263:4 268:16

269:14 270:4
271:9,10,18
272:4 273:17
274:13,16,19
274:22 275:3
281:18 282:5
283:13 296:13
301:7 311:22
312:11
**wallets**   8:8,9,9
16:10 25:4,7
34:12,13
144:25 161:8
164:11,11
206:12 210:19
218:16,16,18
218:18,22
230:23 233:21
233:22 235:25
235:25 236:3,4
238:12,14,18
239:14,14
240:17 241:23
247:5,5,18,18
247:20,20,21
247:21 248:21
249:18 250:23
253:14 255:3
255:11,15,19
256:15 262:3,3
262:19,19
263:5 264:22
264:23 265:12
265:12,16
266:3,13 267:1
267:1,18 268:3
268:4,4,18,18

268:21,21
270:4,18 276:2
304:1,9
**want**   6:13 7:13
7:20,25 8:2
9:13 12:9
18:15 24:5,12
26:19 27:17
28:25 29:25
30:4 45:20
56:20 65:19
77:6,24 83:23
85:21 91:6
92:15 97:24
98:25 112:12
116:5 118:7,8
121:10 122:10
123:20,21
127:1 129:24
130:12 135:18
138:10 139:9
143:25 148:18
153:13 158:20
160:22 163:11
193:17 203:5
206:15 208:12
210:17 213:9
221:1 228:15
228:17 231:3,3
259:23 260:16
264:10 269:7
275:8 286:4,7
288:11 289:16
289:21 291:12
292:6,25 295:4
295:21 297:14
301:1,14,15

302:11 306:23
307:16 311:8
313:24
**wanted**   109:23
136:5 169:6
222:23 296:4
298:6
**wanting**
157:21
**wants**   87:16
91:12
**waseem**   78:3
115:23 116:11
174:13
**watched**   85:3
**watching**   7:7
**way**   9:6 12:18
40:22 44:16
66:25 70:3
73:9,10 111:16
111:18 120:25
124:5 148:12
152:16 153:25
158:22 161:24
169:17 199:7
226:17 242:22
243:10 259:25
263:23 264:11
272:9 300:17
314:1,13
**ways**   226:15
**we've**   27:22
28:7 30:24
58:6 79:12
82:19 101:20
203:16 232:22

| | | | |
|---|---|---|---|
| **webpage** 66:16 | **wife** 75:20,24 | 72:25 74:12,16 | **witness's** 80:23 |
| **website** 73:7 | 75:25 76:7,16 | 75:12 76:23 | 120:1 299:1 |
| 162:13 183:16 | 78:5,7 147:16 | 77:21 82:25 | **witnessed** |
| **week** 20:2 | **wildly** 20:7 | 83:21 84:25 | 114:8 217:20 |
| 88:12 119:7 | **william** 4:19 | 85:6 87:14 | 217:23 |
| 214:11 228:9 | **willing** 295:14 | 93:9,11,14,21 | **witnesses** 6:23 |
| 284:19 | 300:22 | 94:2,4,20 | 10:12,13 16:25 |
| **weekly** 20:2 | **wind** 256:23 | 95:23 97:13 | 18:22 27:1 |
| 57:5 58:1 | **wish** 83:15 | 99:1 102:1 | 287:10 313:18 |
| 110:17 111:1 | **wished** 295:11 | 106:11 114:12 | **woman** 232:24 |
| 119:1,2,5 | **withdraw** 28:9 | 116:24 117:1,3 | 233:2,4 261:5 |
| 129:2,5,6,11 | 28:10 91:12 | 117:5,8,16,21 | **wonder** 14:3 |
| 129:14,17,24 | 244:16 251:23 | 117:25 118:5 | **word** 78:17 |
| 133:16 148:16 | 274:7 | 118:10,19,21 | 85:1,1 106:7 |
| 152:9,17 | **withdrawals** | 118:23 119:2 | 157:20 169:16 |
| 161:16 289:1 | 91:16,22 | 119:19,22 | **wording** |
| **weeks** 276:4 | **withdrawing** | 120:5,25 | 155:19 |
| **weighs** 14:14 | 27:12,14,18 | 122:16 124:13 | **words** 207:8,10 |
| **weighting** | **withdrawn** | 124:13 125:20 | 208:20 218:14 |
| 120:22 | 166:4 182:23 | 137:7,17 | 239:3 |
| **welcome** | 275:10 | 150:14 174:20 | **work** 38:14,17 |
| 113:23 | **withdrew** 25:4 | 175:6,8,22 | 38:18,21,22,23 |
| **went** 11:5,20 | 25:5,10 92:6 | 177:14 180:20 | 39:5,14 60:16 |
| 47:20 91:10 | 276:7 277:16 | 182:14 183:13 | 75:25 76:4 |
| 94:1 241:7 | 284:24 285:6 | 183:15,18 | 78:2 97:19 |
| 245:16 257:18 | **witness** 5:3,7 | 187:1 194:4 | 136:13,23 |
| **whatsapp** | 6:23,25 26:17 | 195:25 205:3 | 157:19,23 |
| 10:17 115:19 | 30:19 31:2,5 | 205:19 213:2 | 158:7 161:1 |
| 173:12 174:8 | 31:10,19,20 | 218:25 219:3 | 168:23 169:2 |
| 218:19 219:11 | 32:14 36:17 | 220:3 221:24 | 169:15 176:12 |
| 219:14,20 | 39:3 44:7,12 | 222:3 230:14 | 263:22 296:15 |
| 220:6,7 | 44:14 48:16,22 | 254:5 275:19 | **workbook** |
| **whichever** | 48:23 49:9,9 | 287:3,5,13,16 | 233:18 235:22 |
| 260:18 | 52:21 55:8 | 295:8,13 299:1 | 237:17,18 |
| **who've** 6:22 | 59:10 64:19 | 307:13 310:9 | 242:23,25 |
| **wholly** 250:9 | 65:19,22 66:3 | 310:12,14 | 245:3,14 246:1 |
| | 66:8 70:12 | 314:15,19 | 246:6,17 247:3 |

250:15 252:15
253:12,12
254:17,22
255:1 260:7,10
261:18,20
262:18,24
263:21 264:16
264:17 265:8
265:10 266:2
267:6 269:9,10
269:11
**workbooks**
232:21 233:1
233:16,18
235:3,4,6,7,8
235:22 253:17
268:7
**worked** 35:20
35:21 97:19
128:22
**working** 35:18
39:10 110:23
125:23 159:22
169:6 224:25
**works** 66:1
162:24
**worksheet**
243:19 251:23
252:10 256:3
259:4 267:6
268:15
**world** 64:6
251:16
**wormhole**
110:25 224:21
224:25 225:25
226:3,6,9,25

227:3,7,12
**worth** 8:10
10:10 16:5
17:24 21:3
24:22 51:25
52:12 53:24
54:7,8,9 57:5
68:7 80:8
159:7 218:15
242:1 243:9
245:8,11
248:17 250:21
262:4 264:1,5
264:23 267:14
267:25 268:8,9
274:1 276:7
277:11,25
280:23 302:22
**would've**
236:20,22
279:22
**wound** 23:12
245:5 277:2
**wrap** 24:9
25:23 26:5
**wrapped**
131:22 236:25
237:5 300:10
300:15,18
**wrapping**
280:4
**write** 265:21
288:12 296:14
296:18 297:15
297:22
**writes** 23:19
151:13,15

**writing** 173:10
196:17 200:16
210:1 218:20
218:24 219:1
219:23 220:17
222:5 298:5
**writings**
308:23
**written** 41:2
95:10 103:9,14
115:13,25
141:2,9 170:11
170:15 174:2
201:5 202:14
220:11 227:22
228:8 289:13
**wrong** 151:7
197:3 211:7
265:16 310:16
**wrote** 209:8
262:12 296:7
296:20

| x |
| :-: |

**x** 1:5,11,17 5:1
5:10 215:5,6

| y |
| :-: |

**y** 215:6
**yeah** 27:11,13
40:11 58:20
77:21 79:20,22
100:7 117:4,16
118:24 120:5
146:23 150:11
153:24 156:21
164:8 175:17
177:5 184:2,21

188:3,19 189:6
189:7 190:18
192:7 193:4,18
193:20 196:15
199:4 206:3,6
207:3 210:12
211:10,11,12
211:16 213:4,8
215:7 223:17
224:3 225:10
225:25 229:15
230:1,3 231:20
232:8,16,25
233:2 234:15
235:9 238:4,11
241:21 242:20
243:5 249:3,14
251:22 254:13
255:8,9 260:8
260:20,23
261:19 264:20
269:23,25
270:1,6 275:13
276:18 278:15
284:6 290:22
291:3,8 298:1
305:18 307:17
310:13 311:17
312:9
**year** 17:11
21:5 24:2,12
159:15 185:11
200:25 278:11
291:20 292:3
**year's** 243:11
**years** 102:21

**yellow**  237:21
  237:25 238:5
  245:4,15 252:6
  256:25 262:2
  263:3 264:24
  266:5,8,14
  268:8,23
**yellows**  267:16
**yep**  81:23
  142:16 237:19
  248:4,6,10
  257:24 281:17
  290:2 309:16
**yesterday**  6:8
  180:1 296:9
  309:23 310:8
  310:11
**yield**  242:13
**yields**  140:15
**york**  1:2,20 4:7
  4:17 17:20
  19:13 88:9,10
  88:11,14 278:3
  301:22,24
  302:2

**z**

**z**  215:7
**zaleski**  277:5
**zapper**  57:15
  64:1 282:25
  283:7
**zero**  88:21 89:9
  89:17 279:19
  279:22
**zoom**  3:9 6:19
  7:7,8 15:6
  43:14 97:10

  124:4 241:19
  260:13 307:12
  307:13
**zrcb1**  69:17