**UNITED STATES BANKRUPTCY COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

In re:

CELSIUS NETWORK LLC, et al.,

Debtor(s).

CELSIUS NETWORK LIMITED and
CELSIUS KEYFI LLC,

Plaintiffs,

v.

JASON STONE and KEYFI INC.,

Defendants.

Bankruptcy Case No. 22-10964-MG

Adversary Proceeding No. 22-01139-MG

(Jointly Administered)

**DEFENDANTS JASON STONE AND KEYFI INC.'S
POST-TRIAL MEMORANDUM IN OPPOSITION
TO CELSIUS'S MOTION FOR PRELIMINARY INJUNCTION**

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................... ii

I.    INTRODUCTION ..................................................................... 1

II.   LEGAL STANDARD ................................................................. 3

III.  ARGUMENT ......................................................................... 4

    A.    Celsius Has Not Shown A Likelihood of Success on the Merits ................................ 4

        1.    The Evidence Shows That KeyFi Was Profitable and Owed a Profit Payout. .... 4

        2.    The Weight of the Evidence Shows That Mashinsky Authorized Stone to Take Profit Payments. ......................................................... 8

            i.    The Transactions at Issue Were Public and Transparent ............................. 9

            ii.   Celsius Refused Stone's Efforts for an Accounting Under the APA .......... 10

            iii.  Mashinsky is not a Credible Witness. ......................................... 12

        3.    KeyFi Had Authority Under the Relevant Agreements to Execute the Transactions at Issue. ......................................................... 13

            i.    Stone Had Authority Under the APA to Pay KeyFi Profits ........................ 13

            ii.   Stone Had Authority under the Services Agreement for Expenditures up to $2 Million ................................................................. 15

            iii.  Significant Fact Issues Remain Concerning When Stone's Resignation From Celsius KeyFi Was Effectuated .......................................... 15

            iv.   Evidence Shows That Celsius and KeyFi Had Joint Control Over the 0xb1 Wallet. ................................................................. 16

    B.    Celsius Will Not Suffer Irreparable Harm Absent Injunction ................................... 17

    C.    The Balance of Hardships Tips Decidedly In Favor of Defendants. .......................... 18

IV.   CONCLUSION ....................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,
  598 F.3d 30 (2d Cir. 2010)...........................................................................................................3

Citizens Comm. for Hudson Valley v. Volpe,
  297 F. Supp. 804 (S.D.N.Y. 1969) ...............................................................................................3

Shin v. ICON Found.,
  553 F. Supp. 3d 724 (N.D. Cal. 2021) ........................................................................................17

Winter v. Nat. Res. Def. Council Inc.,
  555 U.S. 7 (2008)..........................................................................................................................3

Defendants Jason Stone and KeyFi, Inc. (together, "Defendants") respectfully submit this post-trial memorandum of law in opposition to Plaintiffs Celsius Network Limited and Celsius KeyFi LLC's (together, "Celsius") Motion for Preliminary Injunction (the "Motion").

## I.    INTRODUCTION

Celsius originally brought this Motion for a preliminary injunction because it claimed that "[w]ithout prompt Court intervention," Defendants may commit further theft. They seek through this Motion an injunction to prevent Defendants from using the property KeyFi controls in any way, including to prevent Defendants from (1) engaging in any further transactions relating to yield generating activities and (2) paying attorneys' fees. Effectively, Plaintiffs are seeking to put Defendants in a position where not only are they prohibited from earning income off of the assets KeyFi owns and has in its possession, but they also seek to significantly prejudice Defendants' ability to defend itself.

Celsius's Motion should be denied because they have failed to show both a likelihood of success on the merits and that the balance of hardships tips decidedly in their favor.

On the likelihood of success on the merits, Celsius's claims rely on its assertions that KeyFi was not entitled to a profit payment under the Asset Purchase Agreement ("APA") and that the payments made by Stone to KeyFi while he was the CEO of Celsius KeyFi were unauthorized. Yet the overwhelming weight of the evidence shows that Celsius understood that the Celsius KeyFi Deployments[1] were incredibly profitable and that it was only after Stone departed and demanded an accounting that Celsius claimed that Stone's activities resulted in a net loss.

---

[1] Prior to the formation of Celsius-KeyFi and the execution of the APA, it is undisputed that Celsius deployed significant funds directly through KeyFi. For purposes of this brief, whenever the "Celsius KeyFi Deployments" are referenced, unless explicitly stated otherwise, that term shall refer collectively to all funds deployed by both KeyFi and Celsius KeyFi from the period beginning in August 2020 up through Stone's resignation as the CEO of Celsius KeyFi.

Despite these claimed "losses," Celsius failed to produce *any* documents showing that the Celsius KeyFi Deployments were unprofitable, even though it's been nearly two years since Defendants demanded an accounting. Unsurprisingly, when asked during closing arguments how the profit provisions in the APA supported Celsius's coin-based accounting theory, Celsius's counsel had no response. That's because the relevant provision of the APA makes unmistakably clear that Net Profit – the operative term for determining KeyFi's profit share – is to be calculated using the "Total Period Gross Profit for All ***activities in USD***." PX 40 at 32. There is no support in any of the agreements at issue that "impermeant loss" would impact the computation of profit payments owed to Defendants.

Celsius also failed to show that Stone was unauthorized to make the payments to KeyFi that are at issue. *First*, the testimony from Stone and Conor Nolan both show that Stone understood he had authorization from Alex Mashinsky to make the payments at issue. The only evidence presented refuting this authorization is Mashinsky's testimony, which for the reasons set forth below, should not carry significant weight. *Second*, even if Mashinsky did not authorize the profit payouts, the authority to make those payments was vested to Stone individually as the CEO of Celsius KeyFi. This is because the Celsius KeyFi operating agreement assigned to Stone as the sole officer "all powers . . . possessed by the Board" and the APA assigned to Celsius KeyFi the obligation to pay KeyFi. Accordingly, even if Stone had not sought Mashinsky's approval for the transactions (he did), he had the authority to make the transactions at issue.

On the balance of hardships, there is no real argument this factor tips in favor of Defendants. Since the outset of this litigation, Celsius has litigated this case so aggressively that the attorney fees charged to the estate are on track to surpass the total value of the crypto-assets KeyFi has in its possession. If the injunction is granted, KeyFi will be left in a position with no

resources to either defend itself in this litigation or pursue its claims against Celsius for breach of the APA. Of course, these costs to both the estate and to Defendants could have been avoided in substantial part had Celsius not ignored its contractual obligation to undergo an accounting. Celsius's strategic choices should not be rewarded in such a manner as to prejudice Defendants' ability to pursue defending itself on the merits.

Celsius's motion for a preliminary injunction should be denied. In the alternative, the Court should enter a limited order that permits Defendants to (1) manage the crypto-assets at issue for purposes of generating income and (2) pay attorneys' fees.

## II.    LEGAL STANDARD

A party seeking "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council Inc.*, 555 U.S. 7, 20 (2008). Further, the Second Circuit "has required a party seeking a preliminary injunction to show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010). "It is hornbook law that . . . the remedy itself is an extraordinary one that is not granted absent a strong showing of need by the plaintiff." *Citizens Comm. for Hudson Valley v. Volpe,* 297 F. Supp. 804, 806 (S.D.N.Y. 1969).

### III.    ARGUMENT

#### A.    Celsius Has Not Shown A Likelihood of Success on the Merits.

To succeed on their claims, Celsius must show (1) that Defendants were not owed the profit payments Stone paid to KeyFi under the APA and (2) that the Stone did not have authority to make the transactions at issue.

Celsius has failed to carry its burden to show that it is likely to succeed on the merits of its claims.[2] *First*, the evidence presented at the hearing shows that Defendants DeFi deployments were profitable and that it was owed substantial profit payments under the APA at the time of the disputed transactions. Indeed, not only did Celsius fail to offer any accounting of its own to rebut this fact, Celsius's internal accounting showed that it had computed net profits for KeyFi as early as December 2020. *Second*, the weight of the evidence shows that the Stone was authorized by Mashinsky to take advances on the profits owed to KeyFi in the form of the NFTs and Mashinsky's testimony to the contrary should not be given significant weight given his credibility issues. *Finally*, even if Stone did not receive express authority from Mashinsky (he did), as the CEO of Celsius KeyFi, Stone had authority under the APA and Celsius KeyFi's operating agreement to make the vast majority of the transactions that Celsius has put at issue.

#### 1.    The Evidence Shows That KeyFi Was Profitable and Owed a Profit Payout.

The evidence presented at the hearing overwhelming demonstrates that Celsius understood, and that the Parties agreed, that the Celsius KeyFi Deployments were highly profitable. This understanding changed only after Stone informed Celsius of his intent to resign from his position

---

[2] Defendants concede that, given the significant unresolved fact issues relating to the accounting of KeyFi's profit share, there are "questions going to the merits to make them a fair ground for litigation." However, for the reasons set forth in Part III, the balance of the hardships tips decidedly in favor of Defendants.

and the parties' relationship deteriorated. And despite Celsius's claims that the only information they had to rely on was information from Stone, Celsius has not asserted – nor did any of its witnesses testify – that Stone ever misrepresented transactions relating to the Celsius KeyFi Deployments.

While evidence showing the profitability of Celsius KeyFi Deployments is not dispositive for purposes of this dispute, it does provide important context for supporting Defendants version of events that: (1) Celsius's owners and managers understood the nature of DeFi and the inherent risk of impermanent loss (DX 31 ¶ 29); (2) the parties understood that the APA contemplated profits in U.S. dollar-based accounting and did not shift the risk of impermanent loss onto Defendants (*id.* ¶¶ 25-31); and (3) Celsius attempted to place the blame for its own accounting failures on Defendants after Stone resigned as the CEO of Celsius KeyFi and demanded an accounting (*id.*; PX 43 at 2 (Stone demanding on March 24, 2021 "a full accounting of net profits owed to the KeyFi team").

Each of Celsius's witnesses confirmed that – for the entirety of the Celsius KeyFi Deployments – they understood there to be substantial profits.

Mashinsky, Celsius's then CEO, understood the Celsius KeyFi Deployments were profitable. Jan. 11, 2023 Hearing Tr. at 51:18-21 ("I believed that the [KeyFi] deployment into the protocols were profitable, yes"); *see also id.* at 58:8-11 ("some documents I was shown. It looked like Jason generated a profit."); *id* at 132:23-25; 1133:7-10 (Nolan testifying that Mashinsky told him that KeyFi's activities were profitable).

Connor Nolan, Celsius's Head of Institutional Lending, also confirmed that he understood KeyFi's activates were profitable. *Id.* at 132:17-133:10 (confirming that he understood from both Mashinsky and Stone that the Celsius KeyFi Deployments were profitable throughout 2020 and

2021). Nolan further confirmed that Celsius was highly incentivized to place customer funds into the Celsius KeyFi Deployments because the "inflows of user assets into Celsius were outpacing the rate at which they could be deployed" and "Celsius needed to generate yields on those assets that were being paid to users." *Id.* at 140:10-17.

Nolan also testified that Harumi Urata-Thompson, Celsius's former CFO, also told others at Celsius that KeyFi's activities were profitable. *Id.* at 133:1-6, 133:11-14. Nolan confirmed that Urata-Thompson understood that as of the date that Stone first informed Celsius he intended to resign as KeyFi's CEO, Celsius and Urata-Thompson believed KeyFi was owed a profit payout. *Id.* at 151:12-152:4; DX5 at 2-3 (Urata-Thompson telling Nolan that she will have to figure out with "accounting and legal" the amount of the payout owed to KeyFi). Nolan further testified that, during the negotiations over the APA, he told Urata-Thompson that Celsius should move forward with KeyFi because he understood KeyFi's activities were "highly profitable." Jan. 11 Hearing Tr. at 135:22-136:8.

Patrick Holert, a CFA who was employed as Celsius's risk officer, also confirmed that he understood KeyFi's positions were profitable. Holert testified that Stone provided him with information about KeyFi's positions through a program called DeBank. *Id.* at 104:2-8. Holert testified that Stone reported to him in a January 28, 2021 meeting that Celsius KeyFi had made $30 million in profits. *Id.* at 104:17-18; 106:20-23. Holert testified that he did not check at the time to see whether that information was accurate. *Id.* at 106:20-107:1. Yet, Holert failed to provide any evidence at the hearing that any of the documents or information that Stone provided to him were false or misleading. And despite claiming that "Defendants never provided evidence" of profits (PX 60 ¶ 5), he failed to produce any documents at the hearing showing that the Celsius KeyFi Deployments resulted in a loss.

6

Proof that the Celsius KeyFi Deployments were profitable is further shown by Celsius's own internal documents and communications. For example, chat messages between Nolan and Urata-Thompson show that by the end of January 2021, Celsius-KeyFi was managing 10% of Celsius customer deposits. DX 4 at 2; Jan. 11 Hearing Tr. at 139:17-140:2. Celsius's internal general ledger showed that, as of December 2020, KeyFi was owed approximately $1.2 million:

| 10% Accrual for KeyFi Revenue Share | | 1,258,557.00 | 1,258,557.00 |
|---|---|---|---|
| | $ | 1,258,557.00 | |

DX 34 at line 7234. And on January 18, 2021, Mashinsky told Celsius leadership that it needed to "book the gains Jason created" and that Urata-Thompson would lead a "coin count and 'audit'" of the Celsius KeyFi Deployments. DX 41.

Celsius's only response to this evidence is to claim that all the information concerning the profitability of Celsius-KeyFi came directly from Stone. They assert, without any accounting or documentary support, that it wasn't until after Stone resigned that they discovered that the Celsius KeyFi Deployments resulted in a massive loss. This isn't credible because, as set forth in below, the transactions at issue were all public and available to Celsius. Holert himself testified that the DeBank information shown to him by Stone provided information for 80 percent of the Celsius KeyFi Deployments. Jan. 11 Hearing Tr. at 104:17-18. He further testified that – for the information DeBank did not show – he is unaware of any misrepresentations made by Stone concerning those DeFi positions. *Id.* at 105:4-6. It simply belies reason to accept that Celsius deployed 10% of its customer deposits into the Celsius KeyFi Deployments for a period spanning at least six months without realizing those investments were losing money, *especially* because Celsius itself managed other positions in DeFi during the same period of time. *Id.* at 122:10-24.

2.    The Weight of the Evidence Shows That Mashinsky Authorized Stone to Take
Profit Payments.

The evidence presented at hearing strongly indicates that Stone was authorized Mashinsky

to pay a portion of the profit payouts to KeyFi.[3] The *only* evidence presented by Celsius to rebut

that assertion is the bald assertions by Mashinsky. For the reasons set forth below, the Court should

not rely on those statements to grant Celsius the relief it seeks.

As explained above, there is no serious dispute that, prior to Stone's departure from Celsius

KeyFi, Celsius was pleased with the performance of the Celsius KeyFi Deployments. Celsius

offered no testimony rebutting Stone's assertions that:

- Celsius' leadership frequently conveyed its satisfaction with the Celsius KeyFi
  Deployments. Ex.31 ¶¶ 9, 11-12.

- Mashinsky praised Jason as a trading genius and kindly referred to him as his
  protégé. *Id.* ¶ 9.

- Mashinsky showed Debank screenshots to the other executives and boasted about
  how well the Celsius KeyFi venture was performing relative to the rest of Celsius'
  various investment strategies. *Id.* ¶ 9.

- Defendants never misrepresented any of the transaction information relevant for
  the computation of profits under the APA. Jan. 11 Hearing Tr. at 306:18-22.

Celsius's assertions that, in spite of these facts, Mashinsky never authorized Stone to take profit

payments are belied by: (a) the public nature and transparency of the transactions at issue; (b)

---

[3] A number of the transactions at issue were not authorized. However, as explained below (*see* Section III(A)(3)(a)), the amount of transactions that were unauthorized is a fraction of what Celsius has claimed Defendants stole.

Stone's demand and Celsius's refusal to perform an accounting; and (c) Mashinsky's lack of credibility.

i.   The Transactions at Issue Were Public and Transparent

The assertions that Defendants made the NFT purchases without authority are belied by the public nature of the transactions. The Ethereum blockchain associated with the 0xb1 address shows each of the NFT purchases made by Defendants starting on January 5, 2021. DX 37 at 11; Jan. 11 Hearing Tr. at 184:12-185:24. Further, Stone discussed his NFT purchases with his followers on Twitter, where he openly solicited owners of certain Cryptopunk NFTs to sell to him:



DX36. The public nature of these purchases and communications belies Celsius's assertions that he was "stealing" these same assets.

Further, the evidence shows that Mashinsky was or should have been aware of these purchases. Mashinsky admitted that he attended weekly meetings to discuss the Celsius KeyFi Deployments. Jan. 11 Hearing Tr. at 58:1-7. He admitted that he monitored KeyFi's blockchain activity through the 0xb1 address. *Id.* at 62:21-23. And he admitted he was aware of Stone's active Twitter account at least by January 2021, before Stone made many of the NFT purchases at issue. *Id.* at 70:4-6, 71:10-16; DX 23 (email from Mashinsky to Stone on January 23, 2021 scolding him for his public Twitter posts). Mashinsky's authorization of NFT purchases is also consistent with payments he made to his wife, confirming that it was within his practice while CEO of Celsius to authorize payment in the form of NFTs. Jan. 11 Hearing Tr. at 75:24-76:21; DX 6 (email confirming payment to Mashinsky's wife in the form of NFTs).

Celsius's theories of theft are further belied by his discussions with Nolan. Nolan testified that, prior to Stone's departure, the two of them discussed: (1) the NFT purchases at issue in this dispute (Jan. 11 Hearing at 145:19-23); (2) Stone's understanding that the NFT purchases would be deducted from the profit payout owed to KeyFi (*id.* at 147:20-148:8); (3) Stone's 0xb1 Twitter profile (*id.* at 145:24-146:11); and (4) Stone's purchase of Cryptopunks, the NFTs Celsius focused on in its Motion (*compare id.* at 147:1-12 *with* ECF No. 21 at 10 (describing the Cryptopunk NFTs as "stolen"). Accordingly, in order for Mashinsky's testimony concerning his lack of authorization on the NFT purchases to be true, they would have to show that Stone misrepresented those facts to Nolan months before he resigned as the Celsius KeyFi CEO. Yet Celsius failed to present contemporaneous evidence showing that it did not become aware of the NFT purchases at issue until after Stone's resignation.

ii.  Celsius Refused Stone's Efforts for an Accounting Under the APA

Celsius's insinuations of bad faith on behalf of Defendants are belied by its refusal to agree to undergo an accounting for any profit-share owed to KeyFi. The APA states:

> Within the later to occur of fourteen (14) calendar days after any payment
> by [Celsius-KeyFi] due under this Agreement (the "Obligation''), or thirty
> (30) calendar days after any such scheduled payment accrued, if [KeyFi] is
> dissatisfied with the payment, or if non-payment occurs, [KeyFi]may
> invoke an audit (the "Audit") of [Celsius-KeyFi]'s relevant records using
> [KeyFi]'s chosen Auditor, who shall be a nationally-licensed Certified
> Public Accountant (CPA).

PX 40 at -0016. KeyFi demanded the Audit contemplated by the APA numerous times

throughout 2021, including in the first month after Stone provided his notice of resignation to

Celsius. Jan. 11 Hearing Tr. at 294:11-295:14; *see also* PX-43 at 2 (Stone writing Celsius that he

is returning crypto-assets "in good faith while we work together on the following items . . .

[including] *a full accounting of net profits due to the KeyFi Team*." Yet Celsius breached its

contractual obligations to KeyFi by never agreeing to perform the Audit contemplated by the

APA. *Id.*[4]

Defendants' efforts to invoke the audit protections of the APA cannot be reconciled with

Celsius's assertions that their actions constituted theft. If Celsius had agreed to an audit, then the

Parties would be in position to follow the procedures set forth in the APA to determine binding

profit computations. If that amount was less than the amounts paid out as advances to KeyFi,

then KeyFi would owe those amounts back to Celsius. Celsius's breach of those obligations

shows that it believes that an audit may actually prove that, under the APA, KeyFi is owed

substantially more than what it has already been paid. The Court should weigh Celsius's strategic

---

[4] When this point was raised during closing arguments, questions were asked regarding Stone's
obligations to prepare a profit and loss statement. Jan. 12, 2023 Hearing Tr. at 66:5-67:1. Stone
*could not* have performed an accounting for Celsius KeyFi because certain information relevant
to that accounting was in the sole possession of Celsius and Stone never had access to that
information. *Id.* at 297:7-13. But more importantly, the Services Agreement does not require the
preparation of an actual profit and loss statement before any payments are made. Instead, it
imposes an obligation on Celsius KeyFi to "retain control of its . . . profit and loss determination
*in good faith*." PX 41 at 6 (emphasis added). Given all relevant parties understood the Celsius
KeyFi Deployments were profitable, the payment of some portion of the expected Earnout
Payment under the APA was certainly in good faith.

choice to pursue costly litigation rather than comply with the audit procedures governing the APA against Celsius's arguments for enjoining the assets at issue.

iii.  <u>Mashinsky is not a Credible Witness.</u>

The only evidence Celsius offers to show that the NFT purchases at issue were "thefts" is the bald assertion of Mashinsky that – contrary to Stone's testimony – the NFT purchases were not authorized by him. PX59 ¶¶ 3-4. These statements should be given little evidentiary weight for at least three reasons.

*First,* Mashinsky testimony concerning his role and involvement in the KeyFi deployments was not credible. Mashinsky testified that he "rarely intervened in the deployment of assets." Jan. 11 Hearing Tr. at 61:4-9. He testified that "he did not direct Celsius employees to deploy assets to KeyFi." *Id.* 61:13-15. He testified that he did not pressure Nolan to work with KeyFi and Stone. *Id.* at 60:18-17.

Yet Nolan confirmed the opposite was true. Nolan testified that "Mr. Mashinsky was involved with meetings w[h]ere deployment strategies and coin allocations through KeyFi were discussed." *Id.* at 128:10-13. He testified that Mashinsky pressured him to work with KeyFi. *Id.* at 136:13-18. And he testified that Mashinsky frequently praised Stone for being profitable and for being on the forefront of DeFi deployments. *Id.* at 145:2-6.

*Second*, Mashinsky's testimony concerning Celsius's operations further undermines his credibility. Mashinsky made numerous public representations that "all funds are safe," even though Celsius had a significant mismatch of liabilities since at least early 2021 – a fact that other Celsius employees, including Nolan, were aware. *Compare id.* at 80:4-82:4 *with id.* 149:5-9; 150:2-12. Mashinsky misrepresented certain governmental investigations to customers when he said that regulators had looked into Celsius and came back with a "thumbs up," and then asserted at the hearing, without any explanation, that the statement was "out of context." *Id.* at

12

84:15-85:9; 86:7-87:4.[5] And just two days before Celsius halted withdrawals, when its board minutes reflected that capital sat near zero, Mashinsky falsely reassured customers that "anyone who wants to withdraw has no problem." *Id.* at 91:9-18.

*Third*, Mashinsky is incentivized to deny the authorizations he made to Stone and KeyFi regarding advancements on the profit payouts. Mashinsky is under intense scrutiny for his conduct while acting as the CEO for Celsius. He was recently sued by the New York Attorney General for defrauding hundreds of thousands of investors. He faces potential claims by creditors given his alleged mismanagement of their funds. Indeed, the recent release of Examiner's Report confirms that "Celsius's practice of 'using customer stable coins' and 'growing short in customer coins' to buy CEL as 'very *ponzi like.*'" *In re Celsius Network LLC*, 22-10964-mg ECF No. 1956 at 308 (Bankr. S.D.N.Y.). Nolan confirmed this at his deposition, testifying that Celsius used customer deposits to buy up the CEL token to prop up its price. Jan. 11 Hearing Tr. at 143:3-11.

At bottom, given his previous public misrepresentations, his untruthfulness at the hearing, and his incentives to lie about authorizing payments to KeyFi, Mashinsky's affidavit should be given little – if any – evidentiary weight.

      3.      <u>KeyFi Had Authority Under the Relevant Agreements to Execute the Transactions at Issue.</u>

          i.     <u>Stone Had Authority Under the APA to Pay KeyFi Profits</u>

Even if there was no evidence that Mashinsky authorized the payments to KeyFi (there is), the APA (PX 40) and the Celsius KeyFi Operating Agreement (PX38) obligated Celsius

---

[5] Counsel for Celsius also asserted that the video statements at issue were "taken out of context," to which the Court responded "[t]here's redirect" to address that concern. *Id.* at 85:17-86:5. Tellingly, counsel for Celsius did not ask any questions of Mashinsky on redirect.

KeyFi to pay Keyfi a profit share and then assigned to Stone (as CEO of Celsius KeyFi) the

right and responsibility to make Earnout Payments to Celsius KeyFi.

There are three parties to the APA: KeyFi (the "Seller), Celsius KeyFi (the "Buyer"), and

Celsius Network Limited (the "Parent"). PX 40 at 1. Under the APA's payment provision,

Celsius KeyFi was contractually required to pay KeyFi the Earnout Payments:

3.1 <u>Purchase Price</u>

> As the sole and exclusive consideration for the Seller's commitments
> under this Agreement, **the Buyer shall . . . pay, or caused to be paid, to
> the Seller** in immediately available funds by wire transfer (to a bank
> account specified by the Seller), **any Earnout Payment** (as defined in the
> Service Agreement Key Terms) in accordance with the terms of the
> Service Agreement, within five (5) Business Days of the actual receipt of
> the Earnout Payment in accordance with this Agreement and the Service
> Agreement.

PX 40 at 7 (emphasis added).

Further, under the Celsius KeyFi Operating Agreement, all powers of the board

of directors were vested in Stone as the sole officer of Celsius KeyFi:

> **The officers of the Company (the "Officers ") appointed by the Board
> shall have the power to do any and all acts necessary or convenient to**,
> or for the furtherance of, the purposes described herein, **including all
> powers**, statutory or otherwise, **possessed by the Board** under the laws of
> the State of Delaware and, to the extent the Board has delegated such power
> to officers, employees and other agents of the Company, such officers,
> employees and other agents shall have such power, for the avoidance of
> doubt, as is customary according to their title unless otherwise expressly set
> forth by the Board.

PX 38 at 2.[6] Accordingly, under the governing agreements, the transfers Stone authorized from

Celsius KeyFi to KeyFi, that Celsius now claims are theft, were in fact valid payments authorized

---

[6] Indeed, Mashinsky, who led the negotiation efforts between Celsius and KeyFi (*see* DX 39), confirmed that this
mechanism is consistent with his understanding of the agreements. Jan. 11 Hearing Tr. at 40:19- 41:3-6.

by Stone under his express authority to exercise the Board's power to meet Celsius KeyFi's payment obligations to KeyFi.[7]

### ii. Stone Had Authority under the Services Agreement for Expenditures up to $2 Million

Under the Services Agreement, Celsius KeyFi also had authority for expenditures under $50,000 so long as those expenditures did not exceed $2 million in aggregate in a calendar year, exclusive of employee costs. PX 41 at 6. At least $600,000 of the transactions identified are covered under this provision of the Services Agreement. *See generally* PX 70.

### iii. Significant Fact Issues Remain Concerning When Stone's Resignation From Celsius KeyFi Was Effectuated.

Further discovery is needed to determine the effective date of Stone's resignation as the CEO of Celsius KeyFi to show when his authority under the Operating Agreement was terminated.

The evidence presented at the hearing showed:

- Stone's March 9, 2021, in which he first communicated his intent to resign as CEO of Celsius KeyFi, contemplated a "transition" where KeyFi would return coins and the parties would potentially negotiate a different structure to a "more standard GP/LP relationship." PX42.

- On March 26, 2021, Celsius communicated to Stone that "while we are open to discussing in good faith issues concerning your departure from Celsius KeyFi, *we will not do so* while you continue to hold company property." PX 43 at 1 (emphasis added).

- On May 17, 2021, Celsius's counsel wrote to Stone's counsel that it had "no record" of him resigning from his position. PX 47 at 4.

---

[7] *See supra* n4 for why an actual profit and loss statement wasn't prepared in connection with these payments.

This timeline is important, because the effective date of Stone's resignation has a significant impact on reducing the amount of unauthorized transfers out of the 0xb1 wallet given that, as stated above, as long as Stone was CEO of Celsius KeyFi he was entitled to make such payments.

If the resignation was effective as of the March 26 board resolution (PX42), then excluding the September DAI transaction (discussed below), the amount of transfers that occurred after Stone's departure was $524,589.31. S*ee* PX 70. If the relevant date is May 17, 2021, the date that counsel for Celsius communicated it had no record of his resignation, then the amount of transfers that occurred after that date (excluding the DAI transaction) was $139,997.47. *Id.*

Given the factual disputes related to the timing of Stone's departure and the extent of his authorization for transfers under the relevant agreements, Celsius cannot show at this time a likelihood on prevailing on its underlying claims in an amount sufficient to justify enjoining all of KeyFi's assets.

  iv. <u>Evidence Shows That Celsius and KeyFi Had Joint Control Over the 0xb1 Wallet.</u>

Celsius has not shown that it was legally entitled to the $1.4 million worth of DAI that the 0xb1 address received in September 2021. The transaction at issue was the result of a liquidation event that occurred approximately a year prior on Thanksgiving Day 2020. Jan. 11 Hearing Tr. 302:11-303:25. However, because of the open market operations Celsius performed immediately after the liquidation event, Celsius did not suffer a loss. *Id.* at 303:1-24.

The $1.4 million in DAI was sent to the 0xb1 wallet because Stone personally lobbied Compound – the decentralized protocol where the liquidations occurred – to pay funds to wallets affected by the liquidation event. *Id.* at 303:25-304:13. He continued those lobbying efforts *even after* he stepped down as the CEO of Celsius KeyFi. *Id.* at 304:14-14-16. Accordingly, because those funds were not provided by Celsius and because Celsius did not suffer a loss as a result of

the transaction at issue, the funds did not constitute Celsius's property. *Id.* at 304:17-21; *see Shin v. ICON Found.*, 553 F. Supp. 3d 724, 731 (N.D. Cal. 2021) (finding that plaintiff plausibly claimed a "stronger claim to possession" to crypto-assets that were created as a result of a minting bug because the plaintiff "minted, created, and staked a claim to the [crypto-assets] on the blockchain"). Like the plaintiff in *Shin*, Defendants are the ones with the superior claim to possession because they put in the effort and work to have the decentralized Compound protocol issue the underlying crypto-assets.

### B.    Celsius Will Not Suffer Irreparable Harm Absent Injunction

In its motion, Celsius seeks to enjoin Defendants from engaging in any transactions related to the management of the crypto-assets at issue, including by enjoining Defendants from paying for attorney's fees with the funds. Celsius's argument hinges on its assertion that Defendants have demonstrated an intent to frustrate a potential money judgment. Celsius's argument fail for at least three reasons.

*First*, it is undisputed that the relevant crypto-assets have been primarily segregated and managed by Defendants in a few crypto-asset related addresses and have remained there for at least eleven months. PX 69. Defendants have used those wallets to earn yield and have not sold or transferred any of the disputed NFTs since this litigation began.

*Second*, Defendants voluntarily agreed to provide substantial accounting of the assets at issue. *See* ECF No. 52. Defendants engaged in this significant undertaking during the holidays, which including reviewing and extracting data for thousands of transactions, all while preparing for the preliminary injunction hearing. *See* PX 69. It would make no sense for Defendants to have undertaken the expense and time needed to perform this accounting for Celsius if Defendants intended to eventually abscond with the crypto-assets – all of which can be traced on the blockchain.

17

*Lastly*, Celsius's emphasis on Defendants use of Tornado Cash to show that it is likely additional assets may be dissipated carries little weight. Defendants used Tornado Cash to protect their identity on the blockchain and reduce the risk of malicious attackers on their funds. DX 31 ¶ 17. After the Department of Treasury added Tornado Cash to the Specially Designated Nationals and Blocked Persons (SDN) List, the Defendants ceased using the tool. Jan. 11 Hearing Tr. at 301:9-13. And as demonstrated by the efforts to engage in an accounting of all assets KeyFi currently possesses, and its willingness to identify any future transactions it engages in while this litigation is ongoing, there is no evidence that Defendants have or will conceal the location of its assets.

### C.      The Balance of Hardships Tips Decidedly In Favor of Defendants.

The balance of hardships of Celsius's proposed injunction tips decidedly in favor of Defendants. Since the outset of this litigation, Celsius's counsel has litigated this matter aggressively and has spent an incredible sum of the estates' assets doing so. Indeed, through the month of November 2022 *alone*, Celsius has billed to the estate $2,157,371.10. *In re Celsius Network LLC*, ECF Nos. 1072, 1407, 1668, 1896. Given that December and January were even busier months given the demands on document review, depositions, and the preparation for the two-day hearing, it is likely that Celsius's counsel has billed more than $4 million to this case since its inception.

Remarkably, this figure is more than the value of the *entire* 0x50 wallet, which represents the majority of the assets that Celsius seeks to enjoin through this motion. *See* https://debank.com/profile/0x50dd57f50a17d57304e7a4f262da30beb31c2e87 (showing a ~$3.6 million value as of the date of this filing).

If these assets are enjoined, KeyFi will not have access to funds to pay for the legal expenses incurred in this litigation. Essentially, Celsius is seeking an order to prevent KeyFi

from having access to resources that are necessary to defend itself while it maintains a functionally unlimited war chest. Such a result would be manifestly unjust.

Defendants proposed an alternative joint stipulation in November 2022 that would have resulted in a far more efficient use of litigation resources in this matter. Defendants' proposal was to enter a voluntary order that would allow KeyFi to: (1) manage its crypto-assets so long as it did not remove those funds from the relevant wallets and (2) pay for legal expenses. Celsius rebuked that offer and has argued that KeyFi's intent to use the funds to pay for legal fees supports its argument for irreparable harm.

Celsius has not yet shown that it is likely to prevail on the merits of its claims. Indeed, it failed to present *any* evidence at the hearing concerning the computation of Net Profits under the APA (including how it could possibly be interpreted to provide for coin-based accounting) despite the fact that Defendants demanded such an accounting almost two years ago. Had Celsius simply agreed to such an accounting, the parties could have avoided costly litigation. And had Celsius agreed to a carve out for KeyFi to pay its attorneys while this litigation was pending, the estate would have conserved substantial resources and the parties could have focused on bringing this litigation to a conclusion sooner.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Celsius' motion for preliminary injunction in its entirety. In the alternative, the Court should direct the parties to negotiate a limited order that allows KeyFi: (1) manage the funds in its wallets so long as it did not remove those funds from the relevant wallets and (2) pay for legal expenses from the disputed funds.

Dated: February 15, 2023                    **KYLE ROCHE P.A.**

                                            */s/ Kyle W. Roche*

Kyle W. Roche
260 Madison Ave., FL 8
New York, NY 10016
kyle@kyleroche.law

Velvel (Devin) Freedman
**FREEDMAN NORMAND
FRIEDLAND LLP**
1 SE 3rd Ave., Suite 1240
Miami, FL 33131
vel@fnf.law

*Counsel for Defendants*