Mitchell P. Hurley
Dean L. Chapman Jr.
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York  10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Elizabeth D. Scott (admitted *pro hac vice*)
Jessica Mannon (admitted *pro hac vice*)
2300 N. Field Street, Suite 1800
Dallas, Texas  75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

*Special Litigation Counsel for Debtors and*
*Plaintiffs Celsius Network Limited and*
*Celsius KeyFi LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,<br><br>            Debtors. | Bankruptcy Case No. 22-10964 (MG) |
| CELSIUS NETWORK LIMITED and<br>CELSIUS KEYFI LLC,<br><br>            Plaintiffs,<br><br>      v.<br><br>JASON STONE and KEYFI INC.,<br><br>            Defendants. | Adversary Proceeding<br>No. 22-01139 (MG) |

**PLAINTIFFS' POST-TRIAL BRIEF**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...........................................................................................................1

I.      The Defendants Returned Vastly Fewer Coins Than They Were Provided. ............2

II.     The Missing Coins Have Not Been Accounted For By Defendants. .......................3

III.    Far More Is At Stake In This Matter Than Defendants Admit................................4

IV.     A Categorical Injunction Is Necessary To Protect Celsius' Creditors. ...................8

V.      The Defendants Wrongfully Seized Celsius' Assets to Pay Themselves
        Advances on Phantom Profit Share. .....................................................................11

        A.      The Defendants' Appropriation of Celsius' Assets Was Wrongful
                "Self-Help." .............................................................................................11

        B.      The Agreements Did Not Authorize Defendants' Asset Seizures.............13

        C.      Stone Was Not Authorized as Celsius KeyFi's CEO to Unilaterally
                Transfer Celsius' Assets to the Defendants.................................................14

        D.      There Were No Profits to Share—Only Massive Losses. ..........................15

VI.     The Transfers Labeled By Defendants as "Expenses" Were Not
        Authorized............................................................................................................21

VII.    Stone Transferred Millions to Himself *After* Resigning from Celsius
        KeyFi.....................................................................................................................23

VIII.   The $1.4 Million DAI Stone Transferred in September 2021 Constitutes
        Rank Theft. ..........................................................................................................24

IX.     Celsius Did Not Breach Audit Provision, and Defendants Would Not Have
        Been Justified in Stealing Celsius Property Even If There Were a Breach. ..........27

X.      Use of Celsius Property to Pay Defendant Legal Fees Is Not Permitted...............29

CONCLUSION.............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adelphia Commc'ns Corp. v. Rigas*,
    2003 WL 21297258 (S.D.N.Y. June 4, 2003) ..........................................................29

*Adelphia Commc'ns. Corp. v. Rigas*,
    A.P. No. 02-8051 (Bankr. S.D.N.Y. Nov. 25, 2002) ..............................................29

*In re Ampal-Am. Israel Corp.*,
    2021 WL 666865 (Bankr. S.D.N.Y. Feb. 19, 2021) ................................................12

*Astrove v. Doe*,
    2022 WL 2805345 (S.D. Fla. June 17, 2022) ...........................................................9

*CBS Broad. Inc. v. FilmOn.com, Inc.*,
    814 F.3d 91 (2d Cir. 2016)......................................................................................10

*Charron v. Sallyport Global Holdings, Inc.*,
    2014 WL 7336463 (S.D.N.Y. Dec. 24, 2014) ........................................................12

*Chnapkova v. Koh*,
    985 F.2d 79 (2d Cir. 1993) (abrogated on other grounds) .....................................27

*ESPN, Inc. v. Office of Comm'r of Baseball*,
    76 F. Supp. 2d 383 (S.D.N.Y. 1999).......................................................................12

*FTC v. Dluca*,
    2018 WL 1830800 (S.D. Fla. Feb. 28, 2018), *report and recommendation*
    *adopted*, 2018 WL 1811904 (S.D. Fla. Mar. 12, 2018)..........................................9

*FTC v. IAB Marketing Assocs., LP*,
    2013 WL 12038955 (S.D. Fla. Sept. 16, 2013) ........................................................8

*In re Homaidan*,
    646 B.R. 550 (Bankr. E.D.N.Y. 2022).............................................................10, 11

*Jacobo v. Doe*,
    2022 WL 2052637 (E.D. Cal. June 7, 2022) ............................................................9

*Lagemann v. Spence*,
    No. 1:18-cv-12218-GBD (S.D.N.Y. Feb. 11, 2019)...............................................10

*Macrophage Therapeutics, Inc. v. Goldberg*,
    2021 WL 2582967 (Del. Ch. June 23, 2021).........................................................12

*In re MarketXT Holdings Corp.*,
  376 B.R. 390 (Bankr. S.D.N.Y. 2007) ...................................................................29

*Milbank v. McGee (In re LATCL&F, Inc.)*,
  2001 WL 984912 (N.D. Tex. Aug. 14, 2001) .........................................................30

*Preferred Fin. Servs., Inc. v. Bus. Builders for Entrepreneurs, LLC*,
  2016 WL 4537759 (Del. C.P. Aug. 30, 2016) ........................................................12

*Rockwell Automation, Inc. v Kall*,
  2004 WL 2965427 (Del. Ch. Dec. 15, 2004) ..........................................................12

*SEC v. Blockvest, LLC*,
  2018 WL 4955837 (S.D. Cal. Oct. 5, 2018) .............................................................9

*SEC v. Bremont*,
  954 F. Supp. 726 (S.D.N.Y. 1997) ........................................................................29

*SEC v. Credit Bancorp Ltd.*,
  2010 WL 768944 (S.D.N.Y. Mar. 8, 2010) ............................................................29

*SEC v. Stefan Qin*,
  No. 20-CV-10849 (LGS) (S.D.N.Y. Jan. 6, 2021) ................................................10

*Trepel v. Dippold*,
  2006 WL 3054336 (S.D.N.Y. Oct. 27, 2006) .........................................................29

*United States v. Hatfield*,
  2010 WL 1948236 (E.D.N.Y. May 12, 2010) .........................................................12

*United States v. Singer*,
  241 F.2d 717 (2d Cir. 1957)...................................................................................27

*United States v. Sullivan*,
  803 F.2d 87 (3d Cir. 1986), cert. denied, 479 U.S. 1036 (1987) ............................27

*Wickman Machine Tools Sales Ltd v L.G. Schuler AG*
  [1974] AC 235 (HL) ......................................................................................21, 25

## STATUTES

11 U.S.C.
  § 362(a) ..................................................................................................................30
  § 541(a) ..................................................................................................................30

## OTHER AUTHORITIES

*DAI Liquidation Event*, COMPOUND (Nov. 26, 2020), https://www.comp.xyz/t/dai-
  liquidation-event/642 ............................................................................................24

*DAI Liquidations*, COMPOUND, https://www.comp.xyz/t/proposal-distribute-dai-
    to-users-affected-by-dai-liquidations/2110 (last visited February 11, 2023) ..........................24

## INTRODUCTION

The potential stakes on Celsius' motion for an injunction freezing Celsius' assets (and proceeds) in the Defendants' possession, custody or control for Celsius and its creditors are enormous. It is undisputed that the Defendants failed to return tens of thousands of Ethereum (and millions of other Celsius coins) that were made available to them by Celsius for deployment in staking and decentralized finance activities authorized by Celsius.[1]  The current value of these missing Celsius-owned coins could be *as much as $100 million or more*. The Defendants now assert, at least tacitly, that most of the missing coins were lost as a result of failed investments. But the Defendants never have accounted for the coins entrusted to them in a manner that can eliminate the possibility that the Defendants simply stole, secreted, and still control, Celsius' coins.

Nor can it any longer be disputed that the Defendants transferred Celsius' property to themselves without authorization. Indeed, Defendants and their counsel expressly admitted as much at trial. Hr'g. Tr. 54:11-13 (Jan. 12, 2023) (admitting to taking coins "without the authorization of Celsius"); *id.* at 61:10-11 ("We don't disagree that there are some transfers . . . that were unauthorized."). While the Defendants try to limit the transfers at issue to just the $11 million or so that is identified in their spreadsheets, *that may be the tip of the iceberg*. Until the parties and the Court have information sufficient to determine the full scale and location of Celsius' property misappropriated by the Defendants (and all proceeds of that property), it is imperative that a comprehensive freezing injunction be entered to prevent further theft and secretion by the Defendants while this case proceeds. Again, *Celsius property worth well over $100 million has yet to be returned or accounted for by the Defendants*. The Defendants must be restrained from

---

[1]    PX 4 (Defendants indicating that "[d]ue to swaps, impermanent loss, fees[,] etc.[,] [w]e are missing around 30,000-40,000 ETH from the remaining Company-quoted principle of ~ 192,470."); Hr'g. Tr. 280:7-283:19 (Jan. 11, 2023) (Stone testifying to the validity of PX 4).

trafficking in any such property that may still be in their possession, custody or control.

Celsius will not repeat the legal and factual arguments made in its prior submissions and at trial, all of which are expressly incorporated by reference. Instead, Celsius confines itself to answering specific questions raised by the Court at the trial, including relating to (i) the volume of Celsius' coins unreturned by the Defendants, (ii) the Defendants' responsibility (and failure) to account for their activities with Celsius' property, (iii) the true stakes in this litigation, which are far greater than Defendants suggest, (iv) the Defendants' inability to point to anything in any of the contracts that could possibly justify their rampant acts of "self-help" in seizing Celsius' property to pay themselves phantom "profits," (v) the overwhelming evidence that the Defendants' activities resulted in nothing but massive losses for Celsius and its creditors, (vi) legal authority for the categorical freezing injunction sought by Celsius, and (vii) the Defendants' request to use Celsius property to fund their defense in this litigation.

## I.    The Defendants Returned Vastly Fewer Coins Than They Were Provided.

The Court asked Celsius to identify in this submission the coins Celsius provided to the Defendants, versus the coins the Defendants returned. Hr'g Tr. 137:14-19 (Jan. 12, 2023). Celsius certainly provided to the Defendants many tens of thousands more ETH and other coins and tokens than the Defendants returned. Indeed, it appears the missing ETH tokens by themselves are worth in excess of $100 million. Celsius has suffered significant turnover among its personnel, and discovery is far from complete. However, Celsius' counsel has retained a consultant to help determine with precision the number and types of missing coins at issue, and can update the Court with detailed information when available. In the meantime, it is worth noting that the Defendants' own documents tell the same story. For example, a spreadsheet the Defendants prepared indicates that Celsius provided Defendants about 86,000 more ETH than Defendants returned, and that on

a net basis the current U.S. Dollar value of all of the coins provided to, but not returned by, the

Defendants is approximately $120 million.[2]

## II.    The Missing Coins Have Not Been Accounted For By Defendants.

So what happened to the fortune in Celsius' property that Defendants admit they possessed,

and admit they never returned?  The Defendants apparently contend that the great majority of the

missing coins were simply lost through poor investment decisions.[3]  But the Defendants have

refused to provide an accounting of their activities with Celsius' coins.  Hence, it is entirely

possible that Defendants have secreted Celsius property worth $100 million or more.

There can be no doubt that calculating profits (or losses) associated with the Defendants'

activities in coins was the responsibility of Stone, first as CEO of Defendant KeyFi, and later as

CEO of Celsius KeyFi.  Indeed, the testimony was unanimous that Celsius was incapable of doing

so, given the frequency, number and complexity of the transactions Defendants Stone and KeyFi

were undertaking with Celsius' coins.[4]  The parties therefore assigned the responsibility for

accounting for Stone's activities with Celsius' coins to the Defendants.  For example, as CEO of

Celsius KeyFi, Stone was required to ensure that Celsius KeyFi's "accounting . . . remain separate

and [be] administered independently" from Celsius Network's accounting, and Celsius Network

had "the right to verify, audit and confirm all accounting and financial records, books, statements

prepared by [Celsius] KeyFi . . . [and Celsius] KeyFi will act in good faith to prepare and provide

these documents in a timely manner."[5]

---

[2]    The spreadsheet, offered at trial by Defendants as DX 24, was not admitted into evidence and is not adopted by Celsius.  It is notable, however, that according to both sides, the Defendants returned vastly fewer Celsius coins than Celsius provided to them.

[3]    *See* Defs. Jason Stone and KeyFi Inc.'s Opp. to Mot. for Prelim. Inj. [ECF No. 32] at 10-11; *see also* PX 4 (Defendants indicating they are missing Ethereum). Stone admits that Celsius KeyFi "deployed nearly $2 billion dollars' worth of customer assets," DX 31 ¶ 7, and "return[ed] approximately $1.3 billion in customer funds that Celsius had provided [it] to deploy," *id*. ¶ 24.  Thus, Stone's deployments at Celsius KeyFi and activities had a net loss of $700 million.

[4]    *See, e.g.*, Hr'g Tr. at 225:22-227:14 (Jan. 11, 2023).

[5]    PX 41, Sch. A.

The Service Agreement also required Stone to cause Celsius KeyFi to "retain control of its internal budget and profit & loss determination in good faith."[6] But Stone admitted at trial that he never caused Celsius KeyFi to calculate its profits and losses, much less provide an accounting or other detailed financial information to Celsius Network.[7] Before the parties entered into the Service Agreement in January 11, 2021, the Defendants agreed to prepare a so-called wormhole program to track their activities.[8] Stone admitted that Celsius could not determine (at any time) whether the Defendants' activities resulted in profits or losses without the wormhole,[9] a fact confirmed by multiple witnesses.[10] Stone also admitted that the Defendants never finished, much less delivered to Celsius, the wormhole program in a form that would be useful to anyone.[11]

### III.    Far More Is At Stake In This Matter Than Defendants Admit.

As a consequence of Defendants' failure to account for their activities with Celsius' coins, Celsius and the Court cannot yet confirm that the $100 million-plus in missing Celsius' coins were lost to bad investments,[12] as Defendants apparently claim, rather than stolen, like the DAI Stone

---

[6]    *Id.*

[7]    *See* Hr'g Tr. 90:16-21 (Jan. 12, 2023) (Freedman closing argument) ("Q: And you agree . . . that Celsius KeyFi never produced a profit and loss statement that would be used for determining what distribution is required, correct? A: I do agree with that, Judge."); Hr'g Tr. 224:10-19 (Stone admitting he never caused Celsius KeyFi to prepare a P&L).

[8]    *See* Hr'g Tr. 110:21-111:5 (Jan. 11, 2023) (testimony of Patrick Holert); *Id.* at 224:20-225:5 (testimony of Jason Stone).

[9]    *Id.* at 226:1-227:14.

[10]   *See* PX 60, Holert Decl. [ECF No. 45] ¶ 7 ("While the DeBank application may have allowed Celsius to identify some of the positions in which the Defendants were engaged, tracking his numerous and complex deployments, and the performance of those deployments, would not have been manageable by anyone other than Defendants themselves."); *see also* Hr'g Tr. 107:17-108:1 (Jan. 11, 2023) (Holert testimony) ("The [Celsius] KeyFi activities were very complex and nobody had any insight into what those activities were outside of [Celsius] KeyFi. We understood what platforms were being used, what strategies were being used, but we did not have any ability to follow transactions and day-to-day activities that were being conducted. Only KeyFi had that ability to monitor day-to-day activities and movements of coins within platforms and across platforms. Just looking at balances, we have no idea what kind of transactions led to those balances."); *id.* at 161:20-163:10 (Nolan testimony) ("Q: Would it have been possible for you to track defendants' deployments of coins into DeFi? A: No. Q: Why not. A: Because Celsius didn't have a way to look in and see all of the deployments that were being made by KeyFi and therefore track where all the coins were. Q: You understood that such a program was supposed to be developed at some point in time? A: Yes. Q: By whom? A: KeyFi.").

[11]   *Id.* at 225:22-227:5 (Stone admitting that the "wormhole" program was never delivered).

[12]   Hr'g Tr. 227:6-14 (Jan. 11, 2023) (Stone acknowledging that Celsius could not have prepared a final P&L without the promised "wormhole" program).

admits taking from Celsius' 0xb1 wallet six months after he resigned.[13] Until a full tracing and accounting of Defendants activities with Celsius coins can be completed, it would be a mistake to assume the missing coins are not still in Defendants' possession custody or control.

This is particularly so given the Defendants' admitted track record of seizing Celsius' property through wrongful "self-help," and their established use of Tornado Cash and other means to cover their on-chain activities. Indeed, the evidence shows that the Defendants resorted to the OFAC-banned money laundering application Tornado Cash at least 45 times between May 2021 and January 2022.[14] It also appears that the Defendants transferred Celsius' coins worth more than $50 million to the Binance in March and April 2021, with the ultimate destination of those coins, and their proceeds, still unknown.

The Court should not accept the Defendants' claim that only the property identified in their spreadsheet is at issue in this litigation. Indeed, the Defendants' most recent representations concerning their misappropriation and use of Celsius' assets is at odds with disclosures they made concerning the same topics just months before Celsius filed for bankruptcy in these cases. In PX 6, an April 7, 2022 email from Defendants' counsel that was admitted into evidence without objection on January 11, 2023, the Defendants purported to identify the Stone Utilized Assets (i.e., Celsius' coins that they took off the platform), and the Subject Property (i.e., the property they claimed to have acquired with the Stone Utilized Assets).[15] At that time, Defendants identified the Stone Utilized Assets as including 5000 ETH, 3 million USDC, and 25 WBTC, which then was worth approximately $20,241,738.[16] According to the January 3 Spreadsheet, in contrast, the

---

[13]   *See* Am. PTO, Joint Stipulated Facts ¶¶ 30-31, 34; Hr'g Tr. 205:6-10 (Jan. 11, 2023) (Stone testimony) ("Q: Sir, you used the seed phrase, the very one that is referenced in the demand letter, on March 2021 to access six months later the 0xb1 Wallet and transfer 1.4 million DAI to yourself and your colleagues, correct?  A:  Yes.").

[14]   PX 22, Sabo Decl., Exhibit 12, Tornado Cash Transfer Spreadsheet [ECF No. 27-12].

[15]   Capitalized terms used but not defined herein have the meaning given them in the *Amended Joint Pre-Trial Order* [ECF No. 58] (the "Am. PTO").

[16]   PX 6.

Defendants admit to taking only 2,973.67 ETH, about 1,215,645.14 USDC, and only 4.88 WBTC.[17]

The variance in identified Subject Property is even more stark. PX 6 identifies many dozens of NFTs that appear nowhere in the January 3 Spreadsheet. And according to PX 6, the NFTs Stone acquired with assets he took from Celsius Wallets collectively were then worth between 8,800 and 15,400 ETH, or about $13.5 million to $24 million at recent U.S. dollar exchange rates. The Defendants also admit in PX 6 to using Celsius' assets to acquire equity stakes in six companies or platforms, but in their January 3 Spreadsheet, identify only one such company: Nifty's. According to PX 6, Stone acquired interests in Nifty using $600,000 in Celsius' property, and as of April 7, 2022, the value of that investment had increased to somewhere between $6 million and $12 million, with interests in the other five companies then valued at another approximately $1.2 million. In other words, in April 2022, Stone admitted he then still possessed property acquired using Celsius' assets worth (at today's ETH prices) between about $21 million and $37 million.

The Defendants also appear to have reaped substantial wrongful profits selling assets that they acquired using Celsius coins. For example, as set forth in Paragraph 18 of the Joint Pre-Trial Order, Defendants sold at least four of the Cryptopunks they acquired using Celsius assets. In total, the four Cryptopunks were sold for 1,071 ETH (including a single Cryptopunk, No. 8472, which sold for 700 ETH), which was worth around $2.7 million as of the dates of the sales, and worth about $1.3 million at recent ETH prices. And as its investigation continues, Celsius expects to uncover many other such sales. For example, Celsius has already learned that on or about August 5, 2021, the 0x50 Wallet – controlled at all times by Stone and funded by Celsius assets –

---

[17]    PX 69 (the "January 3 Spreadsheet").

purchased "Bored Ape" NFT #5235 for 40 ETH.  On December 28, 2021, the owner of an anonymous Binance account deposited 999 ETH into a wallet with address beginning 0xb4AF (the "0xb4 Wallet").  The 0xb4 Wallet used the 999 ETH to acquire the "M3 Serum" NFT the next day.  On February 22, 2022, both the Bored Ape NFT and the M3 Serum NFT were transferred into a new wallet, at which time the Bored Ape NFT "drank" the M3 Serum NFT, thereby creating an entirely new NFT called the "Mega Trippy" NFT.  On August 9, 2022, the Mega Trippy NFT was reportedly sold for ETH worth a staggering $3,900,000 (approximately 2300 ETH at then-current exchange rates).  Upon information and belief, Defendant Stone was behind all of these transactions – indeed, he actively promoted the creation of the Mega Trippy on his 0xb1 Twitter account and is widely reported to have orchestrated the event  – and pocketed millions in profits, in whole or in part derived from funds which can be traced to Celsius.

Moreover, the Defendants continue to hold valuable NFT assets.  For example, the NFTs listed on the Defendants' asset spreadsheet each have a "floor price" associated with them that is publicly available.  The sum of the floor prices for all such NFTs is at least $3.8 million.  This is a conservative "floor" estimate, and the actual value is likely much higher.  And this valuation applies only to the NFTs that Defendants have disclosed.   While its analysis remains at a preliminary stage, Celsius has already uncovered NFTs acquired by Defendants with assets traceable to Celsius that Defendants did not identify on the asset spreadsheet.  For example, on or about August 29, 2021, the 0x50 Wallet – controlled at all times by Stone and funded by Celsius assets – purchased a "Mega Demon" NFT for 350 wrapped ETH ($1.13 million at the then-current exchange rate).  The 0x50 Wallet subsequently transferred the Mega Demon NFT to another wallet with address beginning 0x3bf408 where it still resides.  While Celsius cannot say for certain that the 0x3bf408 wallet is owned by Stone, that is a fair inference given that the Mega Demon NFT

7

was transferred to this wallet with no on-chain activity to reflect a financial transaction related to

the transfer, and the Mega Demon NFT is currently being used as 0xb1's Twitter account profile

pic.  Notably, Defendants failed to list the Mega Demon NFT on the asset spreadsheet that they

submitted under penalty of perjury.  Upon information and belief, Stone continues to hold this

NFT which Celsius believes, based on a conservative preliminary analysis, has a current estimated

value of approximately 300 ETH (i.e., approximately $500,000).

In addition, the January 3 Spreadsheet is vague, and manifestly incomplete.  For example,

the ETH spreadsheet indicates Celsius assets were used to purchase NFTs, which "were either (a)

sold for ETH; (b) transferred to the 0x50 address; or (c) remain in the 0xFC address.  The ETH

proceeds [of NFT sales] either remained with this address, or were sent to Stone via Tornado

Cash."  *E.g.* PX 69, "ETH transfers to and from inter" Tab, Cells H2, H8.  Defendants do not

identify the date or sale price of any of the NFTs they purchased using Celsius assets and later

sold, much less specifically identify where the proceeds of the sales went.  And based even on the

limited information provided in the spreadsheet there were at least 144 such sales for which

proceeds are utterly unaccounted.  PX 69, "NFT Buys" Tab, Column J ("sold for ETH").

## IV.    A Categorical Injunction Is Necessary To Protect Celsius' Creditors.

A freezing injunction can properly be "implemented through definitions that are general

and character and thus apply to categories of property."  *See FTC v. IAB Marketing Assocs., LP*,

2013 WL 12038955, *2 (S.D. Fla. Sept. 16, 2013).  A categorical injunction is imperative here

because, as discussed above, substantial work remains to be done in discovery, and by the Debtors

in complying with the Court's existing disclosure order, to identify individually all of the property

Defendants took from Celsius, and the proceeds of that property.

The need for a categorical injunction is particularly urgent here because digital assets

"circulated through a decentralized computer network, without relying on traditional banking

institutions or other clearinghouses," pose a "heightened risk of asset dissipation." *See FTC v. Dluca*, 2018 WL 1830800, at *2 (S.D. Fla. Feb. 28, 2018), *report and recommendation adopted*, 2018 WL 1811904 (S.D. Fla. Mar. 12, 2018). This "makes it difficult for law enforcement to trace or freeze cryptocurrencies in the event of fraud or theft." *Id.* Given the "speed with which cryptocurrency transactions are made, and the anonymity of those transactions," courts have found it "imperative to freeze" crypto assets through preliminary injunctions and temporary restraining orders ("<u>TROs</u>") to "maintain the *status quo* and avoid dissipation of the money illegally taken" from plaintiffs. *Astrove v. Doe*, 2022 WL 2805345, at *4 (S.D. Fla. June 17, 2022).[18]

Indeed, numerous courts have granted categorical injunctions and temporary restraining orders encompassing crypto assets, even where the precise locations and controllers of the assets may be unknown, including the following:

- Preliminary injunction freezing "assets currently held in: (1) the Assets Under Claim in the Destination Addresses; (2) any account at any other financial institution, bank, trading exchange, or investment firm; and (3) any cryptocurrency wallet or cryptocurrency trading account they maintain or control anywhere other than in the Destination Addresses."[19]

- Temporary restraining order covering assets held in wallets identified in the plaintiff's complaint and "[a]ny cryptocurrency wallet or cryptocurrency trading account [defendant and co-conspirators] maintain or control anywhere other than" those identified by plaintiff.[20]

- Preliminary injunction freezing "[a]ll monies and assets (including all digital assets and cryptocurrencies) in all accounts at any bank, financial institution, brokerage firm, or digital asset trading platform, or exchange, and other funds or assets, held in the name of, for the benefit of, or over which account authority is held by, or managed or controlled by, Defendants" or investment funds controlled by Defendants, as well as "monies and assets (including all digital assets and cryptocurrencies) that constitute or are derived from the proceeds of, or are otherwise related to, the activities set forth in the Complaint in accounts at any bank, financial institution or brokerage firm, or digital asset trading platform, or exchange, all certificates of deposit, and other funds or assets, including real or personal

---

[18]   *See also SEC v. Blockvest, LLC*, 2018 WL 4955837, at *7  (S.D. Cal. Oct. 5, 2018) (TRO necessary because "digital assets . . . can be transferred or secreted instantly and are difficult to trace").
[19]   *Astrove*, 2022 WL 2805345, at *5.
[20]   *Jacobo v. Doe*, 2022 WL 2052637, at *6 (E.D. Cal. June 7, 2022).

property, held in the name of, for the benefit of, or managed or controlled or over which account authority is held by, Defendants."[21]

- Preliminary injunction and asset freeze extending to "any cryptocurrency wallet or cryptocurrency trading account" maintained by the defendant.[22]

As stated in the Amended Pretrial Order, Celsius has requested that the Court restrain and enjoin the Stone Parties from:

> (i) transferring or otherwise disposing of any Property, including any Stone Utilized Assets and any Subject Property; or
>
> (ii) concealing the location of property that could otherwise be available to satisfy a judgment in this case, including by use of Tornado Cash or any other "mixer" or similar such application.

Am. PTO § XI. This is more than sufficient to put the Stone Parties on notice as to "precisely what acts are forbidden." *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016). Indeed, the Defendants negotiated and agreed to TRO including precisely this language, without objection. *Temporary Restraining Order* [ECF No. 76].

In *In re Homaidan*, the court rejected lenders' arguments that an order enjoining acts to collect on certain unspecified student loans did not meet Rule 65's specificity requirements. 646 B.R. 550, 599 (Bankr. E.D.N.Y. 2022). The lenders argued that the preliminary injunction was not sufficiently specific because it did not list the loans for which the lenders could no longer collect nor identify any specific borrowers from whom the lenders were restrained from collecting, thus forcing the lenders "under threat of contempt – to locate and review" "tens of thousands of loan records" and "to guess whether [the lenders were] interpreting them consistent with the Court's view." *Id.* at 598. The court rejected the lenders' vagueness challenge, explaining:

> [T]he Court finds that Navient's arguments that it somehow cannot discern which loans come within the scope of the Preliminary Injunction are not persuasive. There can be no doubt that as a significant participant in the student loan marketplace, Navient is familiar with its portfolio of student loans,

---

[21]   *SEC v. Stefan Qin*, No. 20-CV-10849 (LGS) (S.D.N.Y. Jan. 6, 2021), ECF No. 27 at 3-4.
[22]   *Lagemann v. Spence*, No. 1:18-cv-12218-GBD, (S.D.N.Y. Feb. 11, 2019), ECF No. 47 at 5.

including the loans that have been the subject of this adversary proceeding for
more than five years.

*Id*. at 599.

## V.    **The Defendants Wrongfully Seized Celsius' Assets to Pay Themselves Advances on Phantom Profit Share.**

As the Defendants acknowledge, they used their access to Celsius' private keys to access

Celsius Wallets and transfer Celsius' property to themselves.[23]  Defendants even admit that they

transferred some of these assets without Celsius' authorization,[24] and, in fact, none of the transfers

were authorized.   The Defendants try to justify this rank theft by claiming that the parties'

agreements gave them the right to seize Celsius' assets in order to pay themselves a share of so-

called "profits."[25]  Defendants are mistaken.

### A.    **The Defendants' Appropriation of Celsius' Assets Was Wrongful "Self-Help."**

Even if there were "profits" to share – and there were only massive losses, as discussed

below – the Defendants' seizure of Celsius' assets to pay themselves disputed profit share would

have been wrongful.  The Court identified this exact issue at the trial:  "[T]his is not a breach of

contract action.  [Stone] made unauthorized transfers.  You dispute how much of those were

unauthorized.  He doesn't get to make unauthorized transfers and then argue that … somehow

self-help is permissible because he'd have a set-off claim," regardless of whether Stone

"believed he was entitled to money." Hr'g Tr. 55:9-14, 80:14-16 (Jan. 12, 2023).

Indeed, it is axiomatic that recourse to self-help is strictly forbidden, even in the context of

---

[23]    *See, e.g.*, Hr'g Tr. 271:17-272:8 (Jan. 11, 2023)  (Stone testimony) ("Q:  You didn't give anyone at Celsius notice before you used their private key to go into their wallet and take $1.4 million out, right? . . . You did that without providing them any notice? . . . A:  I didn't inform anyone that the DAI was in there before I moved it, no.  Q: Right.  You provided no notice to Celsius in advance that you were going to use that private key and go in and take that private key and go in and take that $1.4 million out of the 0xb1 wallet, correct?  A:  I'm not sure why would have.  Q:  I'm just asking you if you did, and I understand the answer to be no, you did not.  Is that right? A:  Correct.").
[24]    Hr'g Tr. 54:11-13, 94:12-15 (Jan. 12, 2023).
[25]    Hr'g Tr. 54:13-24 (Jan. 12, 2023).

an alleged breach of contract. *See, e.g.*, *Macrophage Therapeutics, Inc. v. Goldberg*, 2021 WL 2582967, at *1 (Del. Ch. June 23, 2021) ("In instances where one party believes the other has breached the contract, that party can acquiesce, stop performing and sue for total breach or continue performing and sue for partial breach. ***What he cannot do, however, is engage in extra-contractual self-help.***") (emphasis added); *In re Ampal-Am. Israel Corp.*, 2021 WL 666865, at *3 (Bankr. S.D.N.Y. Feb. 19, 2021) (similar); *Preferred Fin. Servs., Inc. v. Bus. Builders for Entrepreneurs, LLC*, 2016 WL 4537759, at *3 (Del. C.P. Aug. 30, 2016) (refusing "to sanction self-help action by parties who claim to be aggrieved under a contract"); *Rockwell Automation, Inc. v Kall*, 2004 WL 2965427, at *3 (Del. Ch. Dec. 15, 2004) (party "may not avoid his contractual obligations . . . through self-help"); *ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 383, 397-98 (S.D.N.Y. 1999) (holding that allegedly non-breaching party can terminate the contract and sue, or continue the contract and sue, but there is "no third option allowing the party claiming a breach to invoke 'self-help' and only perform those obligations it wishes to perform") (internal quotation marks and citations omitted).

> Likewise, to the extent Stone claims he or KeyFi was owed a debt,
>
> his proper remedy was to litigate in Delaware or New York courts.  He was not entitled to 'self-help' in the form of unauthorized [transfers to himself and KeyFi]. By analogy, if an employer wrongfully deprives an employee of overtime pay, the employee can commence suit . . . .   But the employee cannot simply remove his overtime 'pay' from the register while the boss is out to lunch.

*See United States v. Hatfield*, 2010 WL 1948236, *3 (E.D.N.Y. May 12, 2010).  Here, Defendants were owed nothing; but even if they were, their use of self-help to pay themselves disputed amounts constitutes nothing more than conversion.  *See Charron v. Sallyport Global Holdings, Inc.*, 2014 WL 7336463, *23 (S.D.N.Y. Dec. 24, 2014) (holding that self-help by CEO writing company checks to himself shortly before his departure to satisfy debts the company allegedly owed him was "beyond the pale and constitutes a conversion and unjust enrichment").

12

**B.    The Agreements Did Not Authorize Defendants' Asset Seizures.**

At trial, the Defendants claimed that the parties' agreements authorized Stone to transfer Celsius' assets to himself and Defendant KeyFi, but the exact opposite is true.  The only agreement that contemplates and defines profit share, the Service Agreement, expressly provides that "all coins deployed by [Celsius] KeyFi and revenues generated and/or received from third parties *shall be owned by and paid to Celsius or an Affiliate of Celsius (as determined by Celsius)*."  PX 41 § 3. The Service Agreement likewise provides that as "sole and exclusive compensation" for the DeFi and staking services, "*Celsius* shall pay [Celsius] KeyFi the consideration set forth in Schedule B."  *Id*. § 4.  Nothing in the agreement authorizes *Stone* to anything to anyone in connection with the Services.

As the Defendants point out, the APA purports to require Celsius KeyFi to pay KeyFi an "Earnout Payment . . . in accordance with the terms of the Service Agreement."  Hr'g Tr. (Jan. 12, 2023) at 89:3-18; *see also* PX 40 § 3.1(c).  But neither the APA nor the Service Agreement supplies a definition for the term "Earnout Payment."   The Service Agreement *does* include a detailed schedule defining how to calculate gross and net profits (if any) generated by Celsius KeyFi's activities, and also requires that any resulting consideration be paid by *Celsius* to *Celsius KeyFi*. PX 41 § 4 & Schedule B.  As the CEO of Celsius KeyFi, it was up to Stone to prepare a "profit and loss determination in good faith" to justify any amounts supposedly owed by Celsius to Celsius KeyFi.  *Id*. Schedule A (Celsius KeyFi "shall retain control of its internal budget and profit & loss determination in good faith").

But as Stone and his counsel admitted again and again, Stone never caused Celsius KeyFi to calculate the profits and losses to which Celsius KeyFi allegedly was due.  *See, e.g.*, Hr'g Tr. 224:17-19 (Jan. 11, 2023); Hr'g Tr. 66:9-20 (Jan. 12, 2023).  Celsius submits that is because the Defendants' activities resulted in massive losses, not profits.  Whatever the reason, it is undisputed

13

that no Celsius KeyFi profit calculation was ever undertaken, much less presented to Celsius for

payment in accordance with Schedule B of the Service Agreement.  Since Defendant KeyFi only

was entitled to receive payment of profits "from the portion payable to [Celsius KeyFi]," and since

Stone never caused Celsius KeyFi to calculate its own alleged profits, Defendant KeyFi was due

nothing under the Service Agreement.  PX 41,  Sch. B § 3.1-3.2 (notably, "Buyer" refers to Celsius

KeyFi, "Seller" refers to Defendant KeyFi and "Parent" refers to Celsius).

### C.      Stone Was Not Authorized as Celsius KeyFi's CEO to Unilaterally Transfer Celsius' Assets to the Defendants.

The Defendants argue that, as CEO of Celsius KeyFi, Stone was authorized unilaterally to

transfer Celsius assets to himself and the Defendants because Stone was the "CEO of a company

that had a contractual obligation" to pay profit share.[26]  As just explained, however, Celsius KeyFi

never calculated even its own alleged profit share, and therefore no amount ever could have been

due to Defendant KeyFi.  Nor did Stone have the right to transfer Celsius assets "willy nilly" as

even the Defendants acknowledge.  *Id.*  Under the Celsius KeyFi LLC Agreement, any payments

by Celsius KeyFi to the Defendants would have to be approved by a majority of a three-member

board of managers (the "Board") upon notice and a vote.[27]  During the relevant period, the Celsius

KeyFi Board consisted of three members:  Alex Mashinsky, Jason Stone, and S. Daniel Leon.[28]

Any authorization to pay Celsius assets to the Defendants for any purpose would have required, at

minimum, two of the three Board members to sign a written consent.  By Stone's own admission,

this did not happen.[29]  Also by Stone's admission, no one ever purported to calculate any supposed

profits due in connection with the Defendants activities, and neither Stone nor the Board could

---

[26]  *See, e.g.*, Hr'g Tr. 97: 1-14 (Jan. 12, 2023).

[27]  *Id*. § 9.

[28]  *Id*. § 9(b).

[29]  Hr'g Tr. 215:4-7 (Jan. 11, 2023).  Notably, the Service Agreement actually required Celsius KeyFi to obtain CNL's "approval for any expenditures exceeding $50,000."  The notion that Stone was required to seek authority for expenditures above $50,000, but could transfer millions in property to himself is not credible.

have authorized "profit share" payments to Defendants consistent with the parties' contracts or their fiduciary duties.

### D.    There Were No Profits to Share—Only Massive Losses.

Not only did Defendants' conduct constitute wrongful self-help, Defendants also failed utterly to prove that their activities ever resulted in profits in the first place.  Indeed, the sole evidence Defendants offered concerning their supposed profits was a spreadsheet that the Court refused to admit into evidence.  The Defendants' contention that their activities resulted in any profits at all—an essential predicate for their affirmative defense—is wholly unsupported in the record, and can be rejected for that reason alone.[30]

In any case, the Defendants actually admit that they returned vastly fewer coins than Celsius provided them to invest.  On a net basis, those missing coins are worth high tens of millions, even at today's rates of exchange.  Defendants nevertheless contend that they earned a profit because the market value of cryptocurrency increased exponentially during the period of his engagement by Celsius.[31]  This defies common sense and the terms of the parties' agreement.

The Service Agreement provides for calculation of any profits based on *coin revenues generated by the Defendants*, not based on an increase in the U.S. dollar value of coins supplied to Defendants by Celsius.  The touchstone for calculation of profits is the "Service Agreement Key Terms."  These terms are attached as both Schedule 7.8(b) to the APA and Schedule B to the Service Agreement.[32]  Schedule B expressly provides for the calculation of profits on a "per coin"

---

[30]   The Defendants characterized DX 34 as Celsius' "general ledger," and claimed that it includes a reference to Defendants having earned a profit because it includes an accrual line for KeyFi profit share.  Hr'g Tr. 99:1-3 (Jan. 11, 2023).  But Defendants declined the opportunity to take discovery concerning this document, and presented no evidence at trial that it constitutes a "general ledger" at all, much less that it was accurate and final, what the referenced entry means, or how it was arrived at.  But even if this evidenced a small profit, it would not justify self-help, much less Defendants' appropriation of property worth multiples of the entry amount.

[31]   *See, e.g.*, Hr'g Tr. (Jan. 12, 2023) at 63:18-22.

[32]   PX 40; PX 41.  There are certain inconsistencies among defined terms throughout the APA, the Service Agreement, and the Service Agreement Key Terms.  For example, the APA indicates that KeyFi Inc. is entitled to payment of "any Earnout Payment (as defined in the Service Agreement Key Terms) in accordance with the

basis.  For example, Schedule B defines "Profit Sharing Percentage for activity" as "a **profit share for coins attributed to each activity**."[33]  Schedule B further requires that "Net Profits for **each coin** across all activities be computed each week from Friday to Friday, and a running total of such Gross Profits **for each coin** across all activities be **recorded in the number of tokens** and in USD value."[34]  As discussed below, profits on a coin-by-coin basis were only later converted to a USD value for the purpose of determining the total profitability across all coins and subtracting expenses, such as salaries, which were paid in USD.

Section 7 of Schedule B of the Service Agreement sets forth the step-by-step calculation of profit share.  The steps of the calculation are explained below, and Celsius submits herewith a demonstrative worksheet attached as Exhibit A to this Brief to illustrate a sample calculation.

**Step 1 – Sch. B § 7.1(a).**  The first step in the profit calculation is to identify the number of coins CNL provided to Celsius KeyFi for authorized activities.[35]  The worksheet identifies seven such hypothetical coins at row 5:  1 million of Coin(1), 1.5 million of Coin(2), and so on.

**Step 2 – Sch. B § 7.1(b).**  Next, the requisite number of coins to reserve in order to fund the deployment of coins to Celsius KeyFi had to be identified, so that coins would be available to satisfy withdrawals by CNL's customers.  Each coin (ETH, BTC, CEL, etc.) had a different reserve rate, and CNL used the equation set forth in section 7.1(b) to determine how many coins it needed to collect from depositors to provide Celsius KeyFi with a given number of coins for an activity.

---

terms of the Service Agreement," but the term Earnout Payment never appears in either the Service Agreement Key Terms or Service Agreement itself (nor, for that matter, is it defined in the APA).  At Trial, Defendants argued that the "Earnout Payment" means the "profit share" calculation set forth in Schedule B to the Service Agreement.  Plaintiffs do not concede this point which will need to be examined at greater length in discovery.

[33]   PX 41, Sch. B § 1.5.

[34]   *Id*. Sch. B § 6.2.  Celsius' customers were not paid in USD; Customers received more coins, not dollars, for depositing coins to Celsius. *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions,* ¶ 47 [No. 22-10964 (MG), ECF No. 23] (the "Mashinsky First Day Declaration") ("Through the Company's "Earn" program, users who transfer certain cryptocurrencies to Celsius earn 'rewards' in the form of payment-in-kind interest . . . or CEL Tokens on their assets.").

[35]   PX 41, Sch. B § 7.1(a).

For instance, for the illustrative coins in the worksheet, as set forth in row 6, Coins (1), (3a), and (4) have a reserve rate of 10%; Coins (2) and (5) have a reserve rate of 12%; and Coins (3b) and (7) have a reserve rate of 15%.  In other words, if CNL wanted to allocate 100 Coin (1)s to Celsius KeyFi, CNL would need 110 Coins (1)s from depositors, while deployment of 100 Coins (2) would require 112 Coins (2) deposits from customers.[36]  These figures are set forth in row 7 of the worksheet for each of Coins (1)-(7).

**Step 3 – Sch. B § 7.1(c) and 7.1(d).**  The next step involved calculating the return on each of Celsius KeyFi's investment strategies, i.e., the "Earned Coins."  Under section 7.1(c), Earned Coins equals "coins earned from all sources as Rewards from coins allocated to [an investment] activity."[37]  As noted in section 7.1(d), Earned Coins were intended to be "recorded for each coin within each activity."[38]  Thus, if a given investment strategy involving the deployment of a coin resulted in the return of a different coin (or multiple types of coins), these Earned Coins would be reported separately for each such coin.

The "Earned Coins" calculation is shown at rows 8 and 9 of the worksheet.  Row 8 contains a series of hypothetical yields on the various investment deployments.  For example, in the worksheet, deployments of Coin (1) earn a 20% annual yield, while deployments of Coin (2) earn a 15% annual yield.  To calculate Earned Coins on a weekly basis, row 9 multiplies the coins allocated to the activity by the annual yield and divides by 52 weeks in a year.  So for example, Coin (1) would earn a return of 200,000 coins (1,000,000 coins allocated times 20% return) over a year, divided by 52 weeks, for a weekly gain of 3,846.2 coins (200,000 divided by 52).

---

[36]   $110 = 100 * (1 + .10)$.
[37]   PX 41, Sch. B § 7.1(c).
[38]   *Id.* Sch. B § 7.1(d).

The worksheet also includes a calculation for "Earned Coins" deployed to an "automated market maker" (AMM) DeFi investment in which two different types of coins are deposited into a single liquidity pool.  Such an investment will result in the return of different quantities of the coins deployed (more coins in the case of one of the coins, and fewer coins in the case of the other).  In this example, Coins (3a) and (3b) are deployed into the liquidity pool, with Coin (3a) returning a negative ten percent yield and Coin (3b) returning a positive ten percent yield.

**Step 4 – Sch. B § 7.2(a).**  The next step in the calculation involves determining the cost basis of the Earned Coins.  It is critical to recall that CNL was paying fixed rewards to its customers on their coin deposits.  Thus, an investment would only be profitable to the extent it returned more coins than the fixed reward amounts that CNL was obligated to pay to its customers on their deposits.  Hence, the need to calculate the cost basis.  Section 7.2(a) and (b) breaks this calculation out into two steps.

First, Section 7.2(a) set forth a formula to allow CNL to calculate the rewards it pays to customers, which is referred to as the "Rewards APY Rate."[39]  Customers could be paid rewards in one of two ways for the coins they deposited:  payments-in-kind (i.e., if ETH was deposited, customers would be paid rewards in ETH) or in CEL.[40]  If a depositor elected to earn rewards in CEL, the reward rate would typically be greater.  The worksheet evidences how this would work in practice.  In the hypothetical, Coin (1) earns 7% annually in rewards paid-in-kind (row 11) and 8% annually in rewards paid in CEL (row 13).  In the hypothetical, of the $1,100,000 million in customer deposits at issue, 70% were entitled to receive rewards in kind (row 12) and 30% were entitled to receive rewards in CEL (row 14).  Based on this information, a weighted average

---

[39]   *Id*. Sch. B § 7.2(a).
[40]   *Id*. Sch. B § 7.2(c); *see also* Hr'g Tr. (Jan. 11, 2023) at 52:14-17 (Mashinsky testimony) ("[T]he point [of Celsius' business] was returning those coins to Celsius or its customers."); Mashinsky First Day Declaration ¶ 47.

rewards deposit rate is calculated (row 15). In the case of Coin (1), the calculation is 7%*70%+8%*30%, i.e., 7.3%.

**Step 5 – Sch. B § 7.2(b).** The next step is to calculate the Rewards Costs, i.e., the amount that CNL paid customers for depositing their coins. *See* PX 41, Sch. B § 1. This is a relatively simple step, in which the total amount of coins deposited is multiplied by the weighted average rewards deposit rate, and then divided by 52 in order to calculate the weekly rate. The calculation in the case of Coin (1) as shown in row 18 is 1,100,000*7.3%/52, or 1,544.2 coins.

**Step 6 – Sch. B § 7.3(a).** Profits for Celsius KeyFi are calculated under section 7.3(a). This calculation "is performed for each coin within each activity." To determine gross profits, the Rewards Costs (in coins) is subtracted from the Earned Coins. In the Coin (1) example, the Gross Profit would equal 2,301.9 coins (i.e., 3,846.2 Earned Coins less 1,544.2 in Rewards Costs). And, again, this step would need to be conducted for each coin type (BTC, ETH, CEL, etc.) within each activity to determine total profits. This is exactly what the worksheet does – showing how Gross Profits would be calculated separately for the hypothetical returns on the seven coins at issue.

**Step 7 – Sch. B § 7.4.** As is now presumably obvious, all profits are calculated based on coins, not USD. If the "Earned Coins" calculated under Section 7.1 are less than the "Reward Costs" calculated under Section 7.2, then there simply is no profit. To the contrary, there would be a loss to be netted against any profits from other trading activities in other coins. A conversion to USD nevertheless is required in order to determine total profits across multiple coins in multiple investment deployments and deduct expenses (most notably, salaries).[41] To wit, Section 7.4 requires the calculation of "Gross Profits for Activities in USD."[42] Converting the Gross Profits attributed to an activity in coins to USD requires a simple multiplication of the number of "Gross

---

[41] PX 41, Sch. B § 9.
[42] *Id*. Sch. B § 7.4.

Profit" coins by the then-current exchange rate.[43]  In the case of Coin(1) on the worksheet, the

exchange rate is $20 per Coin(1) (row 20), meaning the weekly gross profit of 2,301.9 coins is

$46,038.50 (row 21).

**Step 8 – Sch. B § 7.5.**  Steps 1 through 7 would be repeated for each investment activity,

i.e., each DeFi or staking strategy, and as necessary, each coin involved in each investment activity.

Then, under section 7.5, the Gross Profits for each activity – which profits were initially calculated

in coins and then subsequently converted to USD – would be added together to give the total gross

profit for all activities.[44]  This is evidenced at row 21 of the spreadsheet in which the Gross Profits

in USD attributable to the trading strategy of Coins(1)-(7) is calculated, together with row 23 which

sets forth the total Gross Profits.  The total Gross Profit for all activities was to be calculated each

week and month, while the payout period was to be each month.[45]

**Step 9 – Sch. B § 9.**  The next step is to deduct the expenses incurred in earning the Gross

Profit for the given week in order to generate a "Net Profit."  The Net Profit formula is as follows:

> *Net Profit = Total Period Gross Profit for All activities in USD – Salaries \* 2 (for
> the initial five employees, and multiplied by a factor of one for all other
> employees) – Hardware/Cloud Expenses – Cumulative losses from Previous
> Periods – Insurance Policy Costs – Staking Costs – Transaction Fees*[46]

Importantly, losses from prior performance periods would accumulate and be subtracted from

profits for the current performance period.[47]  Thus, if Celsius KeyFi's deployments had previously

been negative (i.e., at a loss), Celsius KeyFi could not earn a profit without first overcoming those

losses.  In the case of the hypothetical worksheet, the Net Profit calculation is illustrated by

subtracting total expenses for the week in question and prior period losses (shown in rows 27-33

---

[43]  *Id*. Sch. B § 6.5.
[44]  *Id*. Sch. B § 7.5(c) ("Summation refers to adding Gross Profits Attributed to each activity across all coins.").
[45]  *Id*. Sch. B § 9.
[46]  *Id*. Sch. B § 9.
[47]  *Id*. Sch. B § 6.4 ("[A]ny losses incurred are reflected as expenses in the running totals of Net Profits and will
impact subsequent payouts.").

and summed in row 34) from total Gross Profits (row 24).  Because the worksheet calculates deployments into both DeFi and staking, it further allocates the Gross Profits by both DeFi and staking activities because the subsequent profit share calculation differs as between the two (rows 38-42) as follows:[48]

|  | DeFi | Staking |
|---|---|---|
| **2020-22** | 16% to Celsius KeyFi; 4% to KeyFi; 80% to CNL | 40% to Celsius KeyFi; 10% to KeyFi; 50% to CNL |
| **2023+** | 20% to Celsius KeyFi; 80% to CNL | 20% to Celsius KeyFi; 80% to CNL |

The Service Agreement thus illustrates that the number of coins Celsius KeyFi deployed must increase in order for there to be a profit, regardless of whether the coins increased in USD value.[49]  After all, under the Service Agreement, profits in USD were not calculated until after the increase or loss of coins was first determined.[50]  The Defendants' alternative argument – that Celsius engaged Defendants to hold Celsius' coins and share in their appreciation – is not only contrary to the terms of the parties' agreement, it is patently absurd, which is another reason it should be rejected.  *See Wickman Machine Tools Sales Ltd v L.G. Schuler AG* [1974] AC 235 (HL) (appeal taken from Eng.) ("The fact that a particular construction leads to a very unreasonable result must be a relevant consideration.  The more unreasonable the result, the more unlikely it is that the parties can have intended it, and if they do intend it the more necessary it is that they shall make their intention abundantly clear.").

## VI.    The Transfers Labeled By Defendants as "Expenses" Were Not Authorized.

At trial, the Court asked Celsius to consider whether the transfers identified in the Defendants' January 23 spreadsheet (PX 69) and labeled "Expenses" were authorized under the

---

[48]    *See id.* Sch. B §§ 3, 4.
[49]    Hr'g Tr. (Jan. 11, 2023) at 112:4-18 (Holert testimony) (explaining why "[p]rofit is based on coins" under the Service Agreement).
[50]    *See* Parts V, B-C *supra*; *see also* Hr'g Tr. (Jan. 11, 2023) at 39:10-11 (Mashinsky testimony) ("[T]he people working at [Celsius] KeyFi were intended to generate coin and coin returns.").

Service Agreement. Schedule A to the Service Agreement allowed advances for "reasonable costs reasonably necessitated in delivering the Services," but specifically required Celsius KeyFi to "obtain [Celsius] approval for any expenditures exceeding $50,000 individually" or to exceed a total of "$2 million" in expenditures "in a calendar year."[51]

The Court should not accept the Defendants' unsupported claim that any of the items they labeled "expenses" actually were authorized by Schedule A of the Service Agreement. First, the Defendants have not shown any were "reasonable costs reasonably necessitated in delivering the Services."[52] The Defendants did not provide detail sufficient even to identify the nature of most of these so-called expenses, much less produce receipts or other documentation establishing that the payments were made for a legitimate purpose. In fact, in nearly all cases, the Defendants admit they are speculating about the reason for the alleged expense payment. In a particularly egregious example, Defendants identify a transfer on March 23, 2021—***after Stone's March 9, 2021 resignation***—of Celsius' tokens then ***worth nearly $1.37 million***, and say only "*Unsure* but believe it was spent on expenses."[53] Similarly, vague examples of the Defendants' expense claims abound.[54]

Moreover, at least 18 of the transfers labeled as "expenses" were made ***before*** the Service Agreement even was signed (on January 11, 2021). *See* PX 69. Obviously, none of those transfers, which according to the Defendants were of property then worth approximately $833,345.44, could have been authorized by the as-yet unsigned, and ineffective Service Agreement. The agreement in effect prior to the January 11, 2021 Service Agreement did not permit payment of expenses out

---

[51] PX 41, Sch. A § I.

[52] *See id.*

[53] PX 69, Tab titled "ETH transfers to and from inter," at Row 3 (emphasis added).

[54] *See e.g.*, *id.* at Rows 2, 21-24, 26, 42, 45, 47, Column J ("Believe this was used to pay internal team members"); *id.* at Rows 11, 15, 18, 20, 27, 32, 37, 40-41, 46, 48-52, 54-62, 66, Column J ("Believe this was used to single time external developer contractor").

of Celsius' assets under any circumstances.  Rather, Defendant KeyFi was paid a monthly flat rate and expressly was "not entitled to any further consideration for the [S]ervices provided to Celsius." PX 39 § 3.  Indeed, Stone expressly admitted at trial that Defendant KeyFi was "responsible for paying its own expenses."[55]  Hence, no "expense" transfers prior to January 11, 2021 were, or could have been, authorized.  In addition, a huge number (and value) of the so-called expense transfers were in amounts that required separate approval from CNL even to the extent they were made during the course of the Service Agreement and (for the sake of argument) otherwise were legitimate.  Specifically, 11 of the transfers identified as "expenses" were in amounts in excess of $50,000 (aggregating to a total of $4,477,193.30), and 21 of the transfers were made after expenses for the calendar year in the aggregate had exceeded $2 million.  *See* PX 69.

## VII.    Stone Transferred Millions to Himself *After* Resigning from Celsius KeyFi.

At trial, Celsius pointed out that Stone's unauthorized appropriation of Celsius' property continued even after he resigned his position as CEO of Celsius KeyFi on March 9, 2021.  For the avoidance of doubt, ***none of the Defendants' transfers of Celsius' property were authorized***, whether made before or after Stone's resignation.  Celsius submits, however, that Stone's claim that he was ***still*** authorized to transfer Celsius' assets to himself and his associates months after his resignation is manifestly incredible, and should be considered in assessing the credibility of Stone's claim that he was ***ever*** authorized to take Celsius' assets.  Nonetheless, consistent with the Court's request, Celsius created a version of Defendants' January 3 Spreadsheet that is sortable by date (the version prepared by the Defendants could not be organized by date order).  *See* PX 70. According to the Defendants' spreadsheet, of the approximately $11 million dollars in transfers of

---

[55]    Hr'g Tr. (Jan. 11, 2023) at 279:23-280:2.

Celsius' property identified on their spreadsheet, about $4.6 million was transferred *after* Stone resigned.[56]

## VIII.    The 1.4 Million DAI Stone Transferred in September 2021 Constitutes Rank Theft.

Stone's attempts to excuse his flagrant theft of $1.4 million worth of DAI from CNL's 0xb1 Wallet in September 2021—six months after he quit his job!—are meritless.  According to Stone, CNL's 0xb1 Wallet suffered a material loss when "a malicious actor attacked the [C]ompound platform," resulting in the liquidation of "$120 million worth of positions in total."[57] At the time, certain of Celsius' coins were deployed on Compound through the CNL 0xb1 Wallet, and Celsius' position was among those liquidated in connection with the hack.[58]  Stone admits that the airdrop "was to compensate for a loss that was suffered by 0xb1 in connection with the hack."[59] Indeed, that is why the 1.4 million DAI was deposited into the CNL 0xb1 Wallet, rather than, for example, one of Stone's own wallets.[60]  Nevertheless, Stone admits he used his continuing access to Celsius' private keys to enter 0xb1 Wallet and take the 1.4 million DAI.

Stone claims that Celsius was not harmed by the liquidation because Celsius repurchased

---

[56]    The approximately $11 million excludes transfers that Defendants claim—without evidence— were returned to Celsius.  Defendants reported 27 transfers of ETH after March 9, 2021, valued at $540,541.31 at the time of the transfers.  There were also 14 transfers of erc20 tokens after March 9, 2021, equaling $3,537,854.73 at the time of the transfer.  In addition, 83 NFTs were purchased after March 9, 2021 for a total purchase price equal to $490,986.37 at the time.  Collectively, these transfers total **$4,569,382.41**.  PX 69, 70.

[57]    Hr'g Tr. (Jan. 11, 2023) at 302:16-25.

[58]    *Id.* at 311:12-312:12.

[59]    *Id.* at 312:10-313:3.

[60]    The resolution for which Stone claims to have "lobbied" is described publicly on the Compound website.  It indicates that, on or about September 17, 2021, certain parties voted in favor of a resolution "to compensate **users**" – users like Celsius, in other words – "affected by the unexpected increase" in the price of DAI due to the hack. *Distribute DAI to Users Affected in the DAI Liquidations*, COMPOUND, https://www.comp.xyz/t/proposal-distribute-dai-to-users-affected-by-dai-liquidations/2110 (last visited February 11, 2023) (emphasis added).  The affected users are all listed in a spreadsheet published on Compound which indicates that 17,520,100 DAI was liquidated from the 0xb1 Wallet, an amount that was 20.56% of the total DAI liquidated in the November event.  Thus, the 1,401,608 million DAI airdropped to the 0xb1 Wallet on September 17, 2021 (which is equivalent to 20.56% of the total 6,817,798 DAI distributed as compensation to affected users) was distributed on account of the loss of assets from the 0xb1 account, i.e., **Celsius'** assets, and not as a reward to Stone for his lobbying work.  The referenced spreadsheet is accessible by clicking the hyperlink to the "list of addresses liquidated during the event," in this write up of the liquidation event.  Rleshner, *DAI Liquidation Event*, COMPOUND (Nov. 26, 2020), https://www.comp.xyz/t/dai-liquidation-event/642.

the liquidated coins promptly after the hack occurred. That is nonsense. For one thing, regardless of whether the price of ETH continued to drop after the hack, Celsius still had to fund the repurchase of the ETH that was lost. Stone offers no evidence concerning how much Celsius paid to do so, or whether the replacement cost for the lost ETH was more, or less, than the 1.4 million DAI that Compound airdropped into the 0xb1 Wallet as compensation for the hack. Stone's claim that Celsius was not harmed by the hack, in other words, is without any evidentiary basis. In any case, Compound airdropped compensation to the 0xb1 Wallet and other affected wallets regardless of whether those wallets later engaged in successful ETH trades. Stone had no right to enter Celsius' wallet and take that compensation for himself.

Stone also suggests that the 0xb1 Wallet was not actually a "Celsius" wallet, but instead belonged to "Celsius KeyFi," and that, therefore, Stone somehow was justified in absconding with 0xb1 assets. Stone is incorrect on both counts. CNL created the 0xb1 wallet long before Celsius KeyFi even was formed, and 0xb1 always was the main wallet through which CNL gave Stone access to Celsius' coins for deployment in authorized activities. In the Amended Joint Pretrial Order, the parties stipulated that "on or around August 19, 2020"—months before Celsius KeyFi was formed—"[Celsius Network Limited] created . . . the '0xb1 Wallet'" Am. PTO, Stipulated Facts ¶ 6. After creating the 0xb1 Wallet, Celsius "transferred additional digital assets into the 0xb1 Wallet [and] provided to Defendants the private keys to the 0xb1 Wallet . . . to permit Defendants to deploy Celsius' coins solely in authorized DeFi and staking activities." *Id.* There can be no doubt that the 0xb1 Wallet, and the coins in the 0xb1 Wallet, are and always were the property of CNL. *Id.*; *see also* PX 41 § 3 (providing that "all coins deployed by [Celsius] KeyFi and revenues generated and/or received from third parties shall be owned by and paid to [CNL] . . . excluding [Celsius KeyFi].").

But even if the 0xb1 Wallet were a "Celsius KeyFi" wallet, Stone would not have been

justified in taking assets from the wallet.  As discussed above, Stone **never** was authorized to

transfer Celsius coins or other property to himself and Defendant KeyFi, and certainly not in

September 2021, *six months after he resigned as Celsius KeyFi's CEO*.  At trial, Stone suggested

that he somehow "earned" the 1.4 million DAI through his Compound lobbying efforts, but he

could not escape his deposition testimony, in which he admitted that he actually took the $1.4

million in DAI as an "advance" on the "damages" he claims he is entitled to as a result of this very

litigation.[61]  In this country, however, a plaintiff who thinks he is owed damages for a breach of

duty does not get to raid the defendant's property as extra-judicial compensation, and doing so is

nothing short of theft.  And Stone was well aware that taking the $1.4 million in DAI was wrongful.

There could be no better evidence of his "guilty mind" than the fact that he immediately sought to

launder the purloined property through Tornado Cash.[62]

In a further blow to Stone's credibility, he also appears to have engaged in tax fraud in

connection with the DAI transactions.  According to Stone, he did not report on his 2021 tax return

the DAI that he transferred to himself in September 2021, nor did he report all of the ETH that he

withdrew from Tornado Cash in connection with the DAI theft. Instead, on cross-examination

Stone revealed that he declared as income only the portion of ETH that he later "sold for fiat."[63]

He could not identify how much of the $700,000 worth of ETH fell into that category, but knows

it was less than all of it.[64]

---

[61]   Hr'g Tr. 272:22-273:6 (Jan. 11, 2023).
[62]   *Id.* 11:13-12:3; *see also id.*  271:17-272:8 (Stone Cross-Examination) ("Q:  You didn't give anyone at Celsius notice before you used their private key to go into their wallet and take $1.4 million out, right? . . . You did that without providing them any notice? . . . A:  I didn't inform anyone that the DAI was in there before I moved it, no.  Q:  Right.  You provided no notice to Celsius in advance that you were going to use that private key and go in and take that private key and go in and take that $1.4 million out of the 0xb1 wallet, correct?  A:  I'm not sure why would have.  Q:  I'm just asking you if you did, and I understand the answer to be no, you did not.  Is that right?  A:  Correct.").
[63]   *Id.* 285:9-24.
[64]   *Id.*

This is a clear violation of Federal tax law.  When a taxpayer like Stone claims to have received virtual currency in exchange for performing services, he must report as "ordinary income" the "fair market value of the virtual currency, in U.S. dollars, when received."[65]  Evidence elicited on cross examination that "a witness has made false statements in a tax return is obviously a matter which affects the witness's credibility," and is another reason for the Court to reject the myriad claims Defendants make that are supported solely by Stone's self-serving testimony.  *See, e.g.*, *Chnapkova v. Koh*, 985 F.2d 79, 82 (2d Cir. 1993) (abrogated on other grounds) (citing *United States v. Sullivan*, 803 F.2d 87, 90–91 (3d Cir. 1986), cert. denied, 479 U.S. 1036 (1987)) (finding that failure to file tax returns for eight years was admissible on a witness's issue of her truthfulness); *see also United States v. Singer*, 241 F.2d 717, 717 (2d Cir. 1957) (holding, before the advent of the Federal Rules of Evidence, that the "use [of a tax return], for the purpose of impeachment, was proper.").

## IX.    Celsius Did Not Breach Audit Provision, and Defendants Would Not Have Been Justified in Stealing Celsius Property Even If There Were a Breach.

In tortured fashion, Defendants argue that (i) they invoked their right to an audit under the APA, (ii) Celsius breached the APA by refusing to comply, and (iii) Defendants therefore were justified in transferring millions in Celsius assets to themselves as advances on their (disputed) claim to profit share.  As the Court recognized, however, even if the Defendants were correct that Celsius breached the audit provision of the APA, it would not permit the Defendants to say "the heck with you, I'll just take the money."[66]  That is exactly the kind of impermissible "self-help" that the law forbids.[67]

But Celsius did not breach the audit provision.  In fact, Defendant KeyFi never even

---

[65]  *See* Frequently Asked Questions on Virtual Currency Transactions (available at https://www.irs.gov/individuals/international-taxpayers/frequently-asked-questions-on-virtual-currency-transactions), FAQ 9, 12.

[66]  Hr'g Tr. 93:25-94:10 (Jan. 12, 2023).

[67]  *See* Part V, A *supra.*

invoked the audit provision in a timely or proper manner.  Section 7.4(b)(i) of the APA provides

that "within … thirty (30) calendar days after" a challenged Purchase Price payment accrues, "if

[Defendant KeyFi] is dissatisfied with the payment, or if non-payment occurs, [Defendant KeyFi]

may invoke an audit of [Celsius KeyFi's] relevant records using [Defendant KeyFi's] chosen

auditor, who shall be a nationally licensed Certified Public Accountant."  Stone admits that at no

time did Defendant KeyFi ever select, much less identify, a CPA to carry out an audit.[68]  Moreover,

Stone claims that "the first payment of profit share was owed on December 31, 2020."  DX 31,

Stone Aff. ¶ 12 [ECF No. 33].  Hence, to invoke the audit provision, Stone would have been

required to request an audit by January 31, 2021.  But as the Defendants themselves admit,

Defendant KeyFi did not even purport to invoke "the Audit Provisions of Section 7.4 of the APA"

until September 1, 2021, long after any APA audit right expired.  *See* Defs. Opp. Br. [ECF No. 32]

at 9; *see also* Roche Aff. Ex. C [ECF No. 34-1] (September 1, 2021 email from Stone counsel

stating "my clients are ***hereby*** invoking the [a]udit provisions of Section 7.4 of the Asset Purchase

Agreement") (emphasis added).

Defendants apparently since have recognized that they invoked the audit provision too late,

with Stone claiming for the first time at trial that he invoked the audit right in "March," the "month

that I resigned."[69]  As usual, Defendant offers nothing more than his self-serving testimony, and

submits no documentary evidence of any kind supporting his last-minute claim, which is contrary

to his own brief, and his counsel's September 1, 2021 email.  And of course, Stone also expressly

admitted that he never identified an auditor.  But even if Celsius had breached the APA, Defendant

KeyFi would have nothing more than a claim for damages, not a right to access Celsius' accounts

and take money Stone claims (but never has documented) is owed to him.

---

[68]    Hr'g Tr. 295:10-13 (Jan. 11, 2023).
[69]    Hr'g Tr. 294:8-295:18 (Jan. 11, 2023)

**X.    Use of Celsius Property to Pay Defendants' Legal Fees Is Not Permitted.**

Defendants argued in their opposition papers that Celsius' motion for a freezing injunction should be denied because Defendant KeyFi supposedly cannot afford "to pay fees necessary to defend itself in this litigation" except by using Celsius property that the Defendants transferred to themselves without authorization.  Opp. Br. at 17.  Notably, Stone, who is the "plurality largest owner of KeyFi" and its CEO, does not make the same claim.  At trial, Defendant KeyFi argued there should be a carve-out from any injunction to allow KeyFi to use the Property to pay KeyFi's legal fees.  And defendants admitted they transferred $100,000 of that Property to their counsel just two days before the Court entered the TRO in this case.  Defendants also apparently sent to their counsel an NFT acquired with Celsius assets that may be worth "millions." [70]

Defendants should not be allowed to use estate Property to pay their legal fees.  Defendants have identified no civil case, and Celsius is aware of none, where a court permitted a defendant to use property allegedly appropriated from the plaintiff to pay the defendant's legal fees over the objection of the plaintiff in a civil case. [71]  And in fact the law is the opposite.  Courts deny "defendants in civil actions use of funds that are traceable to their own wrongdoing."  *See, e.g., In re MarketXT Holdings Corp.*, 376 B.R. 390, 424 (Bankr. S.D.N.Y. 2007); *see also SEC v. Credit Bancorp Ltd.*, 2010 WL 768944, at *3 (S.D.N.Y. Mar. 8, 2010) ("A defendant is not entitled to foot his legal bill with funds that are tainted by his fraud."); *SEC v. Bremont*, 954 F. Supp. 726 (S.D.N.Y. 1997) (freezing funds before trial and denying defendant access to the funds for legal expenses).

---

[70]    Hr'g Tr. 108:13-18 (Jan. 12, 2023).

[71]    Defendants cited two cases during closing arguments.  *See Adelphia Commc'ns Corp. v. Rigas*, 2003 WL 21297258, at *2 n.3 (S.D.N.Y. June 4, 2003); *see also Trepel v. Dippold*, 2006 WL 3054336, at *2 (S.D.N.Y. Oct. 27, 2006).  However, as the Court pointed out, Hr'g Tr. 106:11 (Jan. 12, 2023), the debtors in *Adelphia* **consented** to the release of "reasonable defense costs," and only "[u]pon a full accounting of all assets and income" by the defendants.  *See* Debtors' Emergency Motion for Enforcement of Automatic Stay and Prior Restraining Order, Further Restraining Order, and Related Relief ¶ 10, *Adelphia Commc'ns. Corp. v. Rigas*, A.P. No. 02-8051 (Bankr. S.D.N.Y. Nov. 25, 2002), [ECF No. 53].  Similarly, the opinion in *Trepel* lacked any analysis on the point, and did not involve a bankruptcy filing or violation of the automatic stay, and involved a simultaneous criminal prosecution.  *Trepel*, 2006 WL 3054336, at *2.

Indeed, Celsius submits that the Defendants' transfer of cash and property to his law firm post-petition constitutes a clear violation of the automatic stay, and that property should be turned over immediately. As Plaintiffs explained in the Motion, the Stone Utilized Assets and the Subject Property qualify as "property of the estate" subject to the automatic stay under Section 362 of the bankruptcy code. *See* Motion at 22; 11 U.S.C. § 362(a) (providing that automatic stay enjoins all persons from taking any action to obtain possession of property of the estate, or of property from the estate, or to exercise control over property of the estate); 11 U.S.C. § 541(a) (defining "property of the estate" broadly to include "all legal or equitable interests of the debtor in property as of the commencement of the case").

The decision in *Milbank v. McGee (In re LATCL&F, Inc.)* is instructive. 2001 WL 984912, at *1 (N.D. Tex. Aug. 14, 2001). There, the defendant collected $243,000 in receivables that debtor claimed to own. Defendant transferred that property to his counsel, and used the fund in part to pay his legal fees. The court held that this was a violation of the automatic stay, and explained, "When a party asserts ownership of disputed funds that may possibly be property of the estate, the proper practice is to ask the bankruptcy court for an adjudication of the competing interests." *Id.* at *3. The proper practice is not—as Defendants did here—to exercise control over estate property for one's personal benefit. Defendants respectfully submit that the Court should require counsel immediately to turn over all transferred Property, including the $100,000 and NFT.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Preliminary Injunction in its entirety and grant such other and further relief as the Court deems just and proper.

Dated: February 15, 2023
New York, New York

AKIN, GUMP, STRAUSS, HAUER & FELD LLP

By:    */s/ Mitchell P. Hurley*
        Mitchell P. Hurley
        Dean L. Chapman Jr.
        One Bryant Park
        New York, New York 10036
        Telephone: (212) 872-1000
        Facsimile: (212) 872-1001
        mhurley@akingump.com
        dchapman@akingump.com

        Elizabeth D. Scott (admitted *pro hac vice*)
        Jessica J. Mannon (admitted *pro hac vice*)
        2300 N. Field Street, Suite 1800
        Dallas, TX 75201
        Telephone: (214) 969-2800
        Facsimile: (214) 969-4343
        edscott@akingump.com

        *Special Litigation Counsel for Debtors and*
        *Plaintiffs Celsius Network Limited and*
        *Celsius KeyFi LLC*