Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK, LLC,

8              Debtor.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   Adv. Case No. 22-01139-mg

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   CELSIUS NETWORK LIMITED et al.,

13                 Plaintiff,

14          v.

15   STONE et al.,

16                 Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18   Adv. Case No. 22-01179-mg

19   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20   FRISHBERG,

21                 Plaintiff,

22          v.

23   CELSIUS NETWORK LLC et al.,

24                 Defendants.

25   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Page 2

1    Adv. Case No. 22-01190-mg

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

3    SHANKS,

4                    Plaintiff,

5            v.

6    CELSIUS NETWORK LLC, et al.,

7                    Defendants.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9

10                   United States Bankruptcy Court

11                   One Bowling Green

12                   New York, NY  10004

13

14                   February 15, 2023

15                   10:14 AM

16

17

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KS

```
1    HEARING re Final Hearing Using Zoom for Government RE: (I)

2    Authorizing the GK8 Debtors to (A) Continue to Operate the

3    GK8 Cash Management System, (B) Honor Certain Prepetition

4    Obligations Related Thereto, (C) Maintain Existing GK8

5    Business Forms, and (D) Continue to Perform GK8 Intercompany

6    Transactions, (II) Granting Superpriority Administrative

7    Expense Status to Postpetition GK8 Intercompany Balances,

8    and (III) Granting Related Relief (Related Doc ## 1627,

9    1653, 1784, 1902, 1912, 1917, 1930, 2002, 2021, 2048).

10

11   HEARING re Debtor's Motion Seeking Entry of an Order (I)

12   Authorizing (A) the Sale of Bitmain Coupons and (B) the

13   Conversion of Bitmain Credits Into Mining Rigs and

14   Assignment of Rights in Such Mining Rigs, and (II) Granting

15   Related Relief. (Doc# 2022 to 2024, 2026)

16

17   HEARING re Debtors Motion for an Order (I) Approving (A)

18   Omnibus Claims Objection Procedures and Form of Notice, (B)

19   Omnibus Substantive Claims Objections, and (C) Satisfaction

20   Procedures and Form of Notice and (II) Modifying Bankruptcy

21   Rule 3007(e)(6). (Doc# 1972, 2040)

22

23

24

25
```

Page 4

1   HEARING re Second Motion to Extend Exclusivity Period for

2   Filing a Chapter 11 Plan and Disclosure Statement. (Doc##

3   1940, 1996, 2008, 2010, 2011, 2013 to 2015, 2038, 2043,

4   1645, 2043, 2046, 2047, 2048, 2052, 2058)

5

6   HEARING re Status Conference Using Zoom for Government RE:

7   Motion to Appoint a Chapter 11 Trustee. (Doc # 1975, 2018,

8   2020, 2034 to 2036, 2043, 2046, 2047, 2051, 2052, 2057)

9

10   HEARING re Motion for Order to Show Cause Why the Debtors

11   Should not Retain Willis Towers Watson.

12   (Doc## 2042 to 2044, 1392)

13

14   HEARING re Status Conference on the Custody Phase II

15   litigation held using Zoom for Government.

16   (Doc # 2025, 2039)

17

18   HEARING re Adversary proceeding: 22-01139-mg Celsius Network

19   Limited et al v. Stone et al

20   Case Management Conference Using Zoom for Government.

21   (Doc ## 20 to 22, 24 to 27, 32 to 34, 42 to 45, 51, 65, 66,

22   70, 74, 75)

23

24

25

1   HEARING re Adversary proceeding: 22-01179-mg Frishberg v.

2   Celsius Network LLC et al

3   Pretrial Conference Using Zoom for Government.

4   (Doc ## 1 to 7)

5

6   HEARING re Adversary proceeding: 22-01190-mg Shanks v.

7   Celsius Network LLC, ET AL et al

8   Pretrial Conference Using Zoom for Government.

9   (Doc ## 1, 3, 8, 9 to 11)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 6

```
 1    A P P E A R A N C E S :

 2

 3    KIRKLAND & ELLIS LLP

 4         Attorneys for the Debtor

 5         300 N. LaSalle

 6         Chicago, IL 60654

 7

 8    BY:  ROSS M. KWASTENIET

 9         CHRIS KOENIG

10         DAN LATONA

11

12    KIRKLAND & ELLIS LLP

13         Attorneys for the Debtor

14         601 Lexington Avenue

15         New York, NY 10022

16

17    BY:  ELIZABETH JONES

18

19    WILLKIE FARR GALLAGHER LLP

20         Attorneys for Global X Digital

21         787 Seventh Avenue

22         New York, NY 10019

23

24    BY:  BRIAN S. LENNON

25
```

Page 7

```
 1   MILBANK LLP

 2        Attorneys for Series B Preferred Holders

 3        1850 K Street NW

 4        Washington, DC, DC 20006

 5

 6   BY:  ANDREW LEBLANC

 7

 8   UNITED STATES DEPARTMENT OF JUSTICE

 9        Attorneys for the U.S. Trustee

10        1 Bowling Green

11        New York, NY 10004

12

13   BY:  SHARA CLAIRE CORNELL

14

15   WHITE & CASE LLP

16        Attorneys for Official Committee of Unsecured Creditors

17        1221 Avenue of the Americas

18        New York, NY 10036

19

20   BY:  KEITH WOFFORD

21

22

23

24

25
```

Page 8

1    TROUTMAN PEPPER HAMILTON SANDERS LLP

2         Attorneys for Ad Hoc Group of Withhold Account Holders

3         4000 Town Center, Suite 1800

4         Southfield, MI 48075

5

6    BY:  DEBORAH KOVSKY-APAP

7

8    NATIONAL ASSOCIATION OF ATTORNEYS GENERAL

9         Attorneys for States

10        1850 M St NW, 12th Floor

11        Washington, DC, 20036

12

13   BY:  KAREN CORDRY

14

15   STATE OF VERMONT

16        Attorneys for Department of Financial Regulation

17        89 Main Street, Third Floor

18        Montpelier, VT 05620

19

20   BY:  JENNIFER ROOD

21

22   JASON IOVINE

23        Pro Se Creditor

24        2206 Woodmont Circle

25        Sewell, NJ 08080

Page 9

```
 1   EZRA SERRUR

 2        Pro Se Creditor

 3

 4   DANIEL A. FRISHBERG

 5        Plaintiff

 6

 7   LUCY THOMSON

 8        Pro Se Creditor

 9

10   KULPREET KHANUJA

11        Pro Se Creditor

12

13   VICTOR UBIERNA DE LAS HERAS

14        Pro Se Creditor

15

16   ALSO PRESENT TELEPHONICALLY:

17

18   ARTUR ABREU

19   DAVID J. ADLER

20   YOHANNES AFEWORK

21   KATHERINE AIZPURU

22   NELLY ALMEIDA

23   RENE AMAYA

24   ALISON R. AMBEAULT

25   RICK ARCHER
```

Page 10

1   PETER ARONOFF

2   BRIAN BARNES

3   CHRIS BECIN

4   JEFFREY BERNSTEIN

5   EDWARD G. BIRCH

6   OCTAVE J. BOURGEOIS

7   JOHAN BRONGE

8   MARK BRUH

9   JOHN BUZOLITS

10   ROB CHRISTIANSEN

11   STEVEN CHURCH

12   MARVIN E. CLEMENTS

13   CHRISTOPHER COCO

14   SONDRA CORI COHEN

15   AARON COLODNY

16   MICHAEL CONLON

17   CARL J. COTE

18   CAMERON CREWS

19   CHRIS CRO

20   THOMAS DIFIORE

21   TRISTAN LUIS DIAZ

22   SCOTT DUFFY

23   DENNIS DUNNE

24   SIMON ELIMELECH

25   DANIEL EGGERMANN

1    JAMES ENGEL

2    CHRISTOPHER FAY

3    DAVID AVERY FAHEY

4    CHRIS FERRARO

5    FORREST L. FORMSMA

6    DEBORAH FRANKEL

7    ARLISHEA FULTON

8    REBECCA GALLAGHER

9    CHRISTOPHER GASTELU

10   BRADLEY GIARDIELLO

11   VINCENT GOETTEN

12   JASON GOLDWATER

13   RANIB GONZALES

14   TAMMY L. GROVER

15   ANNE HART

16   IMMANUEL HERRMANN

17   SAMUEL P. HERSHEY

18   JOHN HODSON

19   LUCAS HOLCOMB

20   JANKO JANKOVIC

21   TIM JOHNSON

22   GREG KACZKOWSKI

23   JOEL KAISER

24   DAN D. KAPLAN

25   KULPREET KHANUJA

Page 12

1   GREGORY A. KIESER

2   BRYAN KOTLIAR

3   ROSS M. KWASTENIET

4   JOSEPH LAILA

5   DAN LATONA

6   CATHY LAU

7   VINCENT EDWARD LAZAR

8   ANDREW LEBLANC

9   NICOLE A. LEONARD

10   OLEKSANDR LEONENKO

11   CHEYENNE LIGON

12   JESSE LUND

13   SARAH BETH MARONPOT

14   CHASE MARSH

15   BRIAN S. MASUMOTO

16   CAROL MAUNDER

17   KYLE MCKUHEN

18   JOSHUA MESTER

19   LAYLA MILLIGAN

20   LUCIAN MURLEY

21   PATRICK JAMES NASH

22   KEITH NOYES

23   L.A. O'CONNOR

24   ALEX ONO

25   KYLE J. ORTIZ

Page 13

1    LAWRENCE C. PORTER

2    CHRISTOPHER PAGNANELLI

3    SIDDHARTH PANDEY

4    SHAWN P. PARPART

5    BRETT PERRY

6    GREGORY F. PESCE

7    RICHARD PHILLIPS

8    SHOBA PILLAY

9    EVAN RAHEY

10   JOHN P. REDING

11   ANNEMARIE V. REILLY

12   LINDA RIFFKIN

13   MARK ROBINSON

14   ABIGAIL RYAN

15   DAVID RYAN

16   ROBERT D. RYAN

17   ARACELI SANCHEZ

18   DANA SANDEFUR

19   DAVID SCHNEIDER

20   NOAH M. SCHOTTENSTEIN

21   WILLIAM D. SCHROEDER

22   JOSHUA M. SEDORE

23   NAJEEB SIDDIQUI

24   CALIN THOMAS ST. HENRY

25   PAUL STAPLETON

Page 14

1    CATHERINE STEEGE

2    NIKHIL SURI

3    DAVID TURETSKY

4    EZRA VAZQUEZ-D'AMICO

5    TONY VEJSELI

6    CAROLINE WARREN

7    CARL N. WEDOFF

8    MELANIE WESTOVER YANEZ

9    BENNY WONG

10   MER FARUK YAZ

11   ANNE YEILDING

12   ANDREW YOON

13   JEFFREY ZATS

14   KEN ZIMAN

15

16

17

18

19

20

21

22

23

24

25

1                 P R O C E E D I N G S

2              THE COURT:  Good morning, everybody.  This is

3    Judge Glenn.  We have a long agenda for today.  Who's going

4    to begin for the Debtor?

5              MR. KWASTENIET:  Good morning, Your Honor.  It's

6    Ross Kwasteniet from Kirkland and Ellis.  Can you see me --

7              THE COURT:  Yes.

8              MR. KWASTENIET:  -- and hear me okay this morning?

9              THE COURT:  I can see you and hear you well.

10   Thank you.  Go ahead.

11             MR. KWASTENIET:  Great.  Thank you, Your Honor.

12   As has become our custom, we propose to begin with a brief

13   business update.  We're joined on the line today by the

14   Debtor's CEO Mr. Christopher Ferraro.  So if it's all right

15   with Your Honor, I'd ask Mr. Ferraro to update on a few

16   points relevant to the business since our last update.

17             THE COURT:  Thank you.  Go ahead, Mr. Ferraro.

18             MR. KWASTENIET:  Okay.  Mr. Ferraro, do you mind

19   just starting this morning with a brief update on the status

20   of the company's mining operations?

21             MR. FERRARO:  Yeah.  Good morning, Your Honor.

22   Overall, we are mining between seven to eight Bitcoin per

23   day.  The recent upturn at our sites has been around 75

24   percent.  With the price of Bitcoin at current levels, our

25   margin in EBITA have rebounded nicely since December.  In

1   January we had a margin of around 30 percent and an EBITA of

2   approximately one million.  We are currently mining at a

3   margin of around 25 percent.  It should have approximately

4   750,000 of EBITA in February holding Bitcoin prices flat to

5   today.  We also recently entered into a contract to host

6   approximately 7,000 machines.  We are currently preparing to

7   move the rigs to this locations and expect the 17,000 rigs

8   to be online and hashing by the end of March with margins

9   also around 25 percent at current market levels.

10          We are continuing the work to recover all of our

11  37,500 rigs from Core Scientific.  Overall, we are confident

12  that all the rigs will leave the Core sites by mid-March.

13  To date, we have moved nearly 6,000 rigs to our East Style

14  site in Texas with another 4,400 arriving in the next two

15  weeks.  Approximately 11,500 rigs are set for temporary

16  storage as we look for new hosting opportunities.  And we

17  are in advanced discussions with another party to host

18  nearly 15,000 additional rigs.  We expect that all the rigs

19  previously at Core will be hashing in the second quarter.

20          Additionally, we extended our liquidity runway

21  through the sale of certain rigs generating approximately

22  1.3 million.  We are not expecting any further rig sales.

23  We also sold one traunch of Bitmain coupons for 2.7 million.

24  Pursuant to our -- this was done pursuant to our de minimis

25  asset sale procedures.  The collective 4 million will

1    support our cash needs as we finalize the proprietary mining

2    sites and deploy assets through new third-party hosting

3    contracts.

4         MR. KWASTENIET:  Okay.  Thank you, Mr. Ferraro.

5    The Debtors also recently filed a notice at Docket Number

6    1958 regarding certain custody users who are entitled to an

7    immediate return of funds.  Can you give us an update on the

8    Debtor's efforts to return assets to these custody holders?

9         MR. FERRARO:  Yeah.  Absolutely.  Thanks, Ross.

10   On January 31st, the court authorized Celsius to permit

11   certain customers specified in the distribution schedule to

12   withdraw digital assets from the custody program.  As a

13   reminder, Celsius is authorized to distribute 94 percent of

14   each eligible user's custody assets less transaction fees.

15   This morning we began to notify over 22,000 eligible users

16   through email of the necessary steps to facilitate

17   withdrawals, including reverifying their identity and

18   information regarding the destination address.

19        Eligible users will also receive an in-app

20   notification to follow these steps.  In the coming days we

21   expect that eligible customers will be able to initiate the

22   withdrawal process.  We anticipate to receive a high number

23   of requests and are committed to ensuring accurate and safe

24   withdrawals off the platform.  Overall, we will do

25   everything we can to make sure the requests are processed

1    quickly.

2              THE COURT:  May I ask you --

3              MR. KWASTENIET:  Thank you.

4              THE COURT:  May I ask you this, Mr. Ferraro?  So I

5    have ECF 1958 open on my screen, and I want to make sure I

6    understand the fees that are charged.  I see that for

7    Bitcoin it has both a variable fee and then the total

8    withdrawal fee.  And for Bitcoin, the total withdrawal fee

9    is $2.25.  Explain how that works, if you would.

10             MR. FERRARO:  So for each transaction in Bitcoin

11   there will be a reduction of the net withdrawal for the gas

12   fees, which --

13             THE COURT:  Let me just assume that someone has 10

14   Bitcoin that they're entitled to withdraw.  What's the total

15   charge that will apply to them?

16             MR. FERRARO:  Yeah.  My understanding, and I don't

17   have the numbers in front of me, Your Honor, will be the

18   $2.50 that your --

19             THE COURT:  It's 2.25 for Bitcoin.  So it doesn't

20   matter how many Bitcoin they're eligible to withdraw.  They

21   pay the same $2.25 for the withdrawal.

22             MR. FERRARO:  Yes.  That's my understanding, Your

23   Honor.

24             THE COURT:  Okay.  All right.  Thank you.  Mr.

25   Kwasteniet, is there anything else you want to raise?

1            MR. KWASTENIET:  No, not for Mr. Ferraro, Your

2      Honor.  I would just note that the Debtors continue to

3      become aware of phishing scams, and that is an instance

4      where there will be a direct communication from the Debtors

5      to the eligible customers and also a process whereby they

6      can log in and verify through the app itself, which remains

7      our most secure way of communicating with our customers.  So

8      this one is legitimate, Your Honor.  If you receive the

9      notification and you're able to verify it through the app,

10     we're asking customers to go through the process that we've

11     outlined to reverify their accounts so that we can process

12     the distributions to them.

13           THE COURT:  All right.  Let me raise -- I think we

14     were advised by your office that in one of the phishing

15     efforts, an order of the court was modified, and it included

16     in whatever the phishing effort.  I haven't seen the actual

17     phishing effort.  If we find out -- if the Court finds out

18     who was involved in that, I believe that in copying or

19     modifying a court order, it's a felony.  And I assure you

20     that I will do everything I can to get the U.S. Attorney's

21     Office to prosecute any instance of anyone modifying,

22     tampering with an order of this court.  So I assure you that

23     efforts are underway to identify who is responsible for

24     what's happened so far.  It will be monitored.

25           Ms. Cornell, I see you the screen.  The U.S.

Page 20

1    Trustee I'm sure will also monitor that.  I take any

2    phishing episodes to be very serious.  And if it involves

3    any effort to mislead about what the Court has ruled, I will

4    do everything I can to make sure whoever's involved is

5    prosecuted to the fullest extent of the law.  Go ahead, Mr.

6    Kwasteniet.

7              MR. KWASTENIET:  Thank you, Your Honor.  And I

8    would note that we've been in close contact with Ms. Cornell

9    and the U.S. Trustee's Office, and have also reached out to

10   other relevant authorities, including the U.S. Attorney's

11   Office.  So it's a situation that we take extremely

12   seriously and are doing everything we can to follow up on

13   it.

14             THE COURT:  Thank you.

15             MR. KWASTENIET:  Your Honor, that's all I have for

16   Mr. Ferraro, but with Your Honor's permission, I would also

17   propose to start before we get into the rest of the agenda

18   with just a brief case status update for Your Honor and the

19   parties.

20             THE COURT:  Please go ahead.

21             MR. KWASTENIET:  Thank you, Your Honor.  First, I

22   am pleased to report that since were last before you we have

23   reached a settlement with the ad hoc custody group.  My

24   colleague Mr. Koenig will provide more details when we get

25   to the custody status conference, which is listed at -- I

Page 21

1    believe it's Item 9 on today's agenda.  But suffice it to

2    say this has been a big focus of ours, and we view it as a

3    very, very positive development for moving these cases

4    forward.

5              Second, Your Honor, the Debtors have entered into

6    a stipulation with the Creditors' Committee regarding

7    assignment of claims against Alex Mashinsky and other former

8    officers and the related entities.  This was filed yesterday

9    by the Committee at Docket Number 2054, and I believe that

10   stipulation will be up for our next omnibus hearing.  Third,

11   Your Honor, we are in advanced negotiations with the ad hoc

12   committee to borrow --

13             THE COURT:  May I just stop you?  I haven't seen

14   it.  Is it only claims against Mr. Mashinsky or against

15   others as well?

16             MR. KWASTENIET:  It's others as well, Your Honor.

17   It's -- the Committee attached a draft complaint to the

18   motion where they identified a number of claims and causes

19   of action Mr. Mashinsky, Mr. Leone, who was a co-founder of

20   Celsius, as well as numerous other former executives, and

21   then various entities that we believe are family trusts and

22   other entities and vehicles associated with those

23   individuals, Your Honor.  And we have agreed that those

24   claims identified in that complaint will be assigned to a

25   litigation trust or similar vehicle under our plan.

1              And we've also agreed, Your Honor, to continue to

2      coordinate with the Committee on the identification of any

3      other claims against any other individuals that may be

4      appropriate to also assign to a litigation.  We also noted

5      in the stipulation, Your Honor, that it's our intention and

6      expectation that the plan will provide for the funding to

7      complete the investigation of and pursuit of these claims on

8      behalf of the customers.

9              THE COURT:  Go ahead.

10             MR. KWASTENIET:  Thank you.  Your Honor, as I was

11     beginning to note, we are also in advanced negotiations with

12     the ad hoc Committee of borrow customers and are optimistic

13     that we will reach a settlement with the retail loan

14     customers that can be included in the Debtor's Chapter 11

15     plan.  Mr. Adler's on the line, and I'm sure that he'll

16     speak for himself when I conclude my remarks, but we are

17     cautiously optimistic and encouraged by the progress that

18     we've made to-date with Mr. Adler and his group.

19             Your Honor, finally after an extensive marketing

20     process that began last year, and after weeks of intensive

21     negotiations, last night at Docket Number 2066 the Debtors

22     filed a summary of their proposed Chapter 11 plan.  This

23     transaction was negotiated with and has the support of the

24     Creditors' Committee.  And it's a very detailed

25     presentation, and a lot of people contributed to it and

1    reviewed it, so I don't plan to read it go through all of

2    the substance of it today.  But I did want to highlight a

3    few key features of the plan construct for Your Honor and

4    for the parties on the line.

5              THE COURT:  Why don't you hold off for just a

6    second?  I'm going to open it on my -- I'm sorry, what was

7    the number that it was filed under?

8              MR. KWASTENIET:  It was 2066 filed shortly after

9    midnight last night, Your Honor.

10             THE COURT:  Just give me a second.

11             MR. KWASTENIET:  There's a notice and then an

12   approximately 20-page PowerPoint attached to the notice.

13             THE COURT:  All right.  Go ahead.  I have it open

14   on the screen.

15             MR. KWASTENIET:  Very good, Your Honor.  The first

16   key feature of the plan is that it provides for the

17   immediate return of the vast majority of the Debtor's liquid

18   cryptocurrency assets.  As we -- as I indicated at our last

19   hearing on the 24th of January, there will be a convenience

20   class feature wherein customers with claims valued at $5,000

21   or less will get a one-time distribution of 70 percent of

22   the amount of cryptocurrency they deposited.  And this

23   distribution will be in the form of liquid cryptocurrency.

24             Your Honor, we expect that more than 85 percent of

25   the Debtor's total customer base will fall into this

Page 24

1    convenience class.  So meaning 85 percent of our customers

2    we expect will get a 70 percent distribution of liquid

3    cryptocurrency on or shortly after the plan's effective

4    date.  Your Honor, large earn customers will also receive a

5    very substantial upfront distribution of liquid

6    cryptocurrency.  We're in discussions with the Creditors'

7    Committee about exactly how much we'll be able to distribute

8    and how much needs to stay back for purposes of working

9    capital at the NewCo.  But we expect a very substantial

10   distribution of liquid cryptocurrency to the larger earn

11   customers as well.

12          The large earn customers are also going to receive

13   ownership interests in a NewCo, which is the next key

14   feature of the plan that I want to talk about.  The second

15   key feature of the plan, Your Honor, is that there will be a

16   professional management of the Debtor's illiquid assets.  As

17   I noted at our last hearing, one of the challenges in this

18   case is we have illiquid assets that, after an extensive

19   marketing period, we've determined now is not the right time

20   to simply sell those.  We're going to need to hold onto

21   them, manage them, and hopefully deliver a lot more value to

22   customers as market conditions improve.

23          The Debtors and the Committee, after a rigorous

24   process, have selected a digital asset investment and

25   development firm called NovaWulf to manage the Debtors'

Page 25

1    illiquid assets.  NovaWulf was founded by and is led by

2    Jason New, who's formerly of Onyx Capital and Blackstone,

3    and Michael Abbate, formerly of King Street.  Jason and Mike

4    have decades of experience managing billions of dollars in

5    assets, and have assembled a world class team.  And we are

6    very much looking forward to and excited about Mike and

7    Jason getting out in front of the customer community

8    explaining their background, their vision for the future of

9    the NewCo, and we're confident that customers will be as

10   excited about that future as we and the Committee are.

11         Your Honor, NovaWulf is going to manage a NewCo

12   that will hold the Debtors' illiquid assets, which again

13   include the mining business, the illiquid cryptocurrency,

14   the loan platforms, and other miscellaneous assets.  NewCo

15   is going to be owned by the larger earn customers.  So in

16   addition to getting a distribution -- a meaningful

17   distribution of liquid crypto, the larger earn customers who

18   are not in the convenience class will also get ownership of

19   the NewCo.  The -- we expect that the ownership interests in

20   NewCo are going to be freely tradeable, and that NewCo will

21   be fully licensed and will comply with all relevant

22   regulations.

23         Your Honor, the third key feature of the plan is

24   that we believe there is the potential for the future growth

25   and development of NewCo.  Certainly one of its core

Page 26

1    functions is going to be manage and maximize the value of

2    the Debtors' illiquid assets for a return to customers.

3    NovaWulf is also going to be investing 45 to $55 million

4    into NewCo and has plans to grow the NewCo platform over

5    time.  There's going to be a lot more discussions about what

6    this means.  There will be discussions with regulators along

7    the way, but we believe that NewCo under NovaWulf's

8    leadership has the potential to transform the cryptocurrency

9    industry in a way that is fully licensed and compliant with

10   regulations, and thereby to drive very substantial value for

11   our customers, who, again, are going to own the equity in

12   the NewCo.  Your Honor, in terms of next steps --

13            THE COURT:  Can I ask you this, Mr. Kwasteniet?

14   I'm opened to page 4 of the slide deck, and there's a

15   demonstrative of key plan highlights.  And number 9 is

16   litigation claims where we vigorously pursued for the

17   benefit of general earned Creditors.  You had, I think,

18   mentioned a litigation trust.  Is the litigation -- how are

19   the -- well, let me back up a second because you talked

20   about the one-time payments to earn account holders with

21   less -- with $5,000 or less on deposit.  Will they stand to

22   benefit from any distributions from any litigation claims?

23            MR. KWASTENIET:  Your Honor, the way that we're

24   presently envisioning setting up that litigation trust, and

25   whether it's a trust, whether the claims simply remain in a

Page 27

1    Debtor entity that remains around, we're going to do this in

2    the most tax-efficient way possible, and tax plays into the

3    structuring.  But what we were envisioning, Your Honor, is

4    that the litigation claims will be treated like other

5    illiquid assets.  It's an asset that's going to require

6    significant investment, significant time to develop, and

7    would go to those larger earn customers who are going to be,

8    you know, investing time, energy, resources into the NewCo.

9           The idea with the convenience class for several

10   reasons, Your Honor, is to make a premium distribution, if

11   you will, that is in part compensation for the fact that

12   they're not going to be participating in the illiquid

13   assets, which would include the litigation proceeds.  And

14   part of this is just a logistical reality, Your Honor, when

15   we're looking at, you know, hundreds of thousands of

16   customers who have, you know, small claims less than $5,000.

17   Making distributions to them in the future just may not be

18   feasible or practical.  And you may end up depleting

19   essentially most of what the value you'd have to distribute

20   through the gas fees, transaction fees, administration fees

21   for even trying to make the distribution.

22           THE COURT:  I just wanted to have --

23           MR. KWASTENIET:  (indiscernible) --

24           THE COURT:  I just wanted to have some clarity

25   about it.

1          MR. KWASTENIET:  Yeah.

2          THE COURT:  Go ahead.

3          MR. KWASTENIET:  Yeah.  So the idea with the

4     convenience class is they get an upfront premium, and it's a

5     one-time distribution.  And they can take their liquid

6     cryptocurrency and move on with their life and have no

7     further involvement in or need to wait for subsequent

8     distributions from the Celsius estate.

9          Your Honor, as next steps, the Debtors and the

10    Committee are going to continue to work with NovaWulf with

11    the goal of filing a binding term sheet by the end of this

12    month, and a plan and disclosure statement next month.  Your

13    Honor, we still have important details to work out, but

14    we're targeting confirmation of our plan and starting to

15    return cryptocurrency and NewCo interests to our customers

16    by as early as June of this year.

17          We read social media speculation about the timing

18    of distributions likely being years and years into the

19    future.  We've got a lot of work to do to get there by June,

20    Your Honor, including claims reconciliation, and that's a

21    topic we're going to get into in greater detail later at

22    today's hearing and we'll feature prominently in future

23    hearings.  But it is our intention to do everything we can

24    to be in a position to start to make distributions, returns

25    to customers as soon as possible as early as June of this

Page 29

1    year.

2              Your Honor, that concludes my introductory

3    remarks.  And again, I would just note for everybody's

4    benefit the document we filed at 2066, which contains more

5    detail about the plan process.  And there will be certainly

6    more detail to come in the coming days and weeks.

7              THE COURT:  All right.  Let me -- does somebody

8    from the Committee want to address, and then I -- Mr. Adler,

9    I will call on you.  First I'm going to call on the

10   Committee, and then I know we're moving on from the agenda,

11   but let me -- does anybody from the Committee want to add

12   something?

13             MR. COLODNY:  Your Honor, this is Aaron Colodny

14   from White and Case.  Can you hear me?

15             THE COURT:  Good morning, Mr. Colodny.

16             MR. COLODNY:  Good morning, Your Honor.  I agree

17   with Mr. Kwasteniet's description.  I think this is a good

18   result.  And when we were before Your Honor on exclusivity

19   the first time in December, you know, we set a target of

20   today for the parties to determine the path forward.  And we

21   needed to know the Debtor's proposed path out of the Chapter

22   11, or we said we would ask Your Honor to allow us to

23   propose our own.  The Debtors listened, and over the past

24   two months we've worked together to develop the proposed

25   plan that's in that deck.  And I can sit here saying that

                                                              Page 30

1      that plan is the product of hard-fought negotiations between

2      the Debtors and the Committee and NovaWulf.

3              And I want to talk about a couple of priorities

4      that we had when negotiating that plan, but at a high level,

5      our goal was to provide account holders with as much liquid

6      crypto as possible while preserving the long-term value of

7      the Debtors' illiquid assets.  Because the one thing the

8      sale process showed us is if you're to sell those illiquid

9      assets now, we would return, you know, pennies on the dollar

10     compared to what we think they're worth.

11             And so we were focused on -- I have eight

12     elements.  I think some were touched on by Mr. Kwasteniet,

13     so I won't repeat them, but you know, the first one is to

14     return as much liquid crypto as we possibly could to account

15     holders.  I think that comes through the convenience class

16     that Mr. Kwasteniet talked about.  It also comes through in

17     upfront distribution to earn Creditors.  And one of the

18     items that you mentioned, Your Honor, about the convenience

19     class not participating in litigation trust, it's our

20     intention that if you have a claim over $1,000 you can elect

21     to opt into the earned treatment.

22             So if you really like the concept of NewCo, if you

23     really want a piece of those litigation trust interests, you

24     can elect to receive that.  You know, we've approached this

25     as giving people options to pick currency that they prefer

Page 31

1        over other currency.

2                The second, as Mr. Kwasteniet said, we were very

3        focused on ensuring that Creditors own 100 percent of the

4        Debtors' illiquid assets, which will happen through an

5        equity share token in the new company.  Third, we wanted to

6        ensure that the new company and the Debtors' liquid assets

7        were managed by experienced and qualified professionals.

8        We've spent a lot of time with NovaWulf, Jason and Michael,

9        and you know, we're very excited about their vision and what

10       they have in store for the new company.

11               Fourth, we think it's incredibly important for the

12       new company to be regulatory compliant to file public

13       reports, 10Ks, 10Qs to show its balance sheet to its public,

14       and be a fully disclosed company,  In that regard, and

15       fifth, we're focused on making sure the company has strong

16       governance with qualified board of five to seven.  It's

17       seven seats total.  Five of the seven are going to be

18       appointed by Creditors.

19               Sixth, we needed to find a solution for the

20       Debtors' loan portfolio, and that included a regulatory

21       compliance servicer.  There is a slide in the deck on figure

22       who is a licensed loan servicer who will be providing those

23       services to the new company.  Seventh, we were very focused

24       to ensure that the managers at NovaWulf and their interests

25       were aligned with the interests of the token holders.  We

Page 32

1    think that the management share token, which will also be

2    issued to earn Creditors, and we'll give them a dividend of

3    50 basis points off the net asset value of the company.

4    We'll ensure that alignment.  And also, we've worked with

5    NovaWulf to structure their fee to make it so that that will

6    align interest, and that they will have a vested interest in

7    making sure those equity share tokens trade and reflect the

8    value of the assets in the company.

9            And then finally, as Mr. Kwasteniet mentioned, the

10   Committee is focused on ensuring that claims and causes of

11   action against former directors and officers of the company

12   that participated in wrongdoing are preserved and litigated

13   to the benefit of Creditors.  As Mr. Kwasteniet mentioned,

14   we filed a motion to approve a stipulation, which is not up

15   for hearing today, but the Debtors, and specifically the

16   Special Committee, have agreed to contribute those causes of

17   actions to a litigation trust and to work with the Committee

18   to identify other potential actions that may be contributed

19   to that trust as well.

20           So with that, Your Honor, you know, I think we've

21   come a long way.  We've got a framework in front of us now

22   that I think provides a path forward and a path out of these

23   Chapter 11 cases, and we're very appreciative of the Debtors

24   and NovaWulf for working with the Committee tirelessly to

25   make sure that could happen.

Page 33

1              THE COURT:  Let me ask Mr. Kwasteniet.  You

2     indicated that you -- call it a convenient class for this

3     purpose, the claims of $5,000 or less will receive the one-

4     time distribution.  You said it would be in liquid

5     cryptocurrency.  Let's -- in what -- so assume that someone

6     had deposited $3,000 worth of Bitcoin.  In what

7     cryptocurrency will you be distributing it to them?  I mean,

8     I already authorized the sale.  (indiscernible) was unclear

9     whether there would be a shortfall by coin type.  Have you

10    contemplated how that will work?

11             MR. KWASTENIET:  Yes, Your Honor.  And for those

12    who have studied the detailed coin reports that we filed

13    periodically on a monthly basis throughout these cases, you

14    will note that there is a real mismatch between the coins

15    that the company received on deposit and owes back to

16    customers and the coins that the company presently has.

17    Some of those coin types were more readily investable than

18    others.  And one of the things that Celsius did historically

19    was to swap or sell less investable coin types and trade

20    them for others that were more investable.

21             And so what we are contemplating, Your Honor, is

22    regardless of the type of cryptocurrency those convenience

23    class customers deposited, the return will be in Bitcoin,

24    Ethereum, or USDC, which is one of the leading stable coins.

25    We have to work with a Committee on the exact allocation and

Page 34

1    whether or not people are going to have an ability to

2    express a preference on it.  But those three are relatively

3    easy for us to transact in.  They're widely available.

4    They're very liquid, and so that would be the form.

5            So in your hypothetical, somebody who deposited

6    Bitcoin, they may get the -- just the return in Bitcoin.

7    Somebody who deposited some other coin, a Sushi coin or a

8    Solana coin or what have you, we're proposing that the

9    return to those customers be in some combination of Bitcoin,

10   Ethereum, and USDC.

11           THE COURT:  And how are CEL tokens going to be

12   treated in this?

13           MR. KWASTENIET:  Your Honor, that's been the

14   subject of a lot of discussion and debate with the

15   Committee.  I don't think we've reached a 100 percent final

16   conclusion there.  But given the fact that the examiner

17   report reveals in great detail how the price of CEL token

18   was manipulated, we've really struggled with how to treat

19   CEL token and what's a fair value to ascribe to it.

20           So one thing I'll note off the top with respect to

21   CEL token is it's our intention to suppress or subordinate

22   the CEL token claims of insiders who were involved in the

23   manipulation of the CEL token price.  So some of the

24   insiders who were implicated in the examiner report are also

25   some of the largest holders of CEL token on the Debtor's

Page 35

1    platform.  And it's our intention that they would not

2    receive any recovery or distribution on account of the CEL

3    token.

4            Your Honor, one of the things that we're looking

5    at and discussing with the Committee is what was the initial

6    coin offering price of the CEL token, right?  What did we

7    sell it for before the alleged price manipulation entered

8    the picture?  And maybe we ascribe I believe that was .20

9    cents, Your Honor, per CEL token.  And so there's the

10   thought that maybe we ascribe a .20 cent valuation to the

11   CEL token.

12           Obviously whatever value -- we don't have enough

13   coins to go around to return to all the customers.  And we

14   earlier in the case filed a cryptocurrency conversion table

15   in part at Your Honor's suggestion.  It was a resolution of

16   an early motion filed by the Series B holders.  We filed

17   that at Docket Number 1420, Your Honor.  That gives a

18   conversion ratio as of the petition date for the various

19   types of cryptocurrency.  We believe that the trading price

20   of CEL token as of the petition date was likely artificially

21   inflated.

22           And if we were to ascribe that value to the CEL,

23   it may take away value from -- or it just means that there's

24   less value to go to the holders of other cryptocurrencies.

25   So we're still finalizing our approach on that, Your Honor.

Page 36

1    we do recognize that many of our customers took rewards,

2    elected to take rewards in CEL token.  Maybe could have

3    taken rewards in other cryptocurrency, and so we think that

4    there needs to be some reflection of that in calculating

5    customers' claims.  But we are struggling with the fact that

6    the price of CEL token appears to have been meaningfully

7    manipulated over time, and then therefore, what's the proper

8    value to ascribe to that.  So I think more to come, Your

9    Honor, we envision that the plan will include a settlement

10   of the CEL token related claims, and we'll propose, you

11   know, a distribution calculation conversion calculation for

12   the CEL token.

13           THE COURT:  Thank you, Mr. Kwasteniet.  Anything

14   else you want to add before I call on -- I'm going to call

15   on Mr. Adler next, but anything you want to add, Mr.

16   Kwasteniet?

17           MR. KWASTENIET:  No, not unless Your Honor has

18   other questions for me.

19           THE COURT:  I don't.  Mr. Adler?

20           MR. ADLER:  Good morning, Your Honor.  David Adler

21   from McCarter and English on behalf of the Ad Hoc Group of

22   Borrowers.  I just raised my hand maybe to take issue a

23   little with what Mr. Kwasteniet said about advanced

24   negotiations.  We received the proposal on Friday, and we're

25   reviewing it right now.  Obviously we're speaking to, you

Page 37

1     know, the ad hoc group members, but it's a framework, and

2     that's something that we haven't seen, obviously, for the

3     first seven months of this case.  And obviously we do like

4     the idea of preserving the loans and minimizing tax

5     consequences.  I do think there are a lot of details that

6     need to be worked out as we go through this process, but we

7     were encouraged when we saw it, but we think that there is a

8     fair amount of negotiation that has to go into this process

9     to make sure all the I's are dotted and the Ts are crossed.

10              And that's really all I wanted to say, Your Honor.

11     I mean, I had filed, I guess it was last Tuesday, a

12     complaint on behalf of the Ad Hoc Group Borrowers alleging a

13     variety of causes of action.  That was done in part because

14     of the fact that we weren't having discussions with the

15     Debtors, and I wanted to prompt them.  But obviously, we

16     look forward to, you know, continuing this process and

17     resolving and hopefully negotiating some of these points

18     that are still open issues for my group.

19              Just as a final point, Your Honor, we thought it

20     would be best for the plan sponsor to be unveiled so that we

21     could have -- you know, if we are giving our points to the

22     Debtor and the UCC, they're conveying them to the plan

23     sponsor.  From our perspective, in terms of efficiency, we

24     thought it might make sense that we're all together when

25     we're discussing such issues as 3630.  We have

Page 38

1    understandings about the solvency of the plan sponsor and

2    stuff like that so that we can, you know, not have to go

3    through an intermediary to get the -- you know, the issues

4    that we're concerned about addressed.

5            So that's really my main point, Your Honor.  But I

6    will say that I thought it was a framework that we can work

7    from.  It has to be tweaked.  There are points of

8    negotiation, but it is something that we were encouraged to

9    see.  Thank you.

10           THE COURT:  Thank you very much.

11           MR. LEBLANC:  Yes, Your Honor.  Andrew Leblanc,

12   Milbank.  Can you hear me okay, Your Honor?

13           THE COURT:  I can, yes.

14           MR. LEBLANC:  And Your Honor, I'll be very, very

15   brief.  We saw the framework that Mr. Kwasteniet and Mr.

16   Colodny just discussed for the first time this morning when

17   it was filed overnight.  As best we can tell from our quick

18   review of it, it doesn't -- it seems to just ignore the

19   existence of the issues that we have been litigating and

20   expect will have to be continued to be litigated over the

21   coming weeks and months.  And so from that perspective we

22   were disappointed.  I think unlike Mr. Adler where there's a

23   framework at least in place in a context for them to have a

24   discussion of a resolution of that.

25           It either presumes an outcome of our disputes or

1    just ignores their existence entirely.  And so we'll

2    obviously take issue with that.  I know today is not the

3    time to do it, but I wanted to make clear to Your Honor that

4    it certainly is not something that we view as satisfactory

5    and doesn't -- frankly doesn't have any room for those

6    issues to be resolved as best we can tell from a quick

7    review of it.

8              THE COURT:  Thank you.

9              MR. LEBLANC:  So we'll be dealing with those

10   issues.

11             THE COURT:  Okay.  Thank you, Mr. Leblanc.  Mr.

12   Iovine was another hand raised.  Go ahead.

13             MR. IOVINE:  Good morning, Judge.  This is Jason

14   Iovine, a pro se Creditor.  In regards to the evaluation of

15   CEL token, I would just hope that (indiscernible) and White

16   and Case take into consideration that a lot of retail users

17   did not buy at .20 cents.  We bought at all-time highs all

18   the way down.  And it's just more punishment on the retail

19   user, insiders 100 percent agree with you all.  Should be

20   zeroed out on them and everything but needs more

21   consideration than .20 cents.  At the filing date it was .81

22   cents.

23             THE COURT:  All right.  Thank you, Mr. Iovine.

24             MR. IOVINE:  Thank you, sir.  Thank you, Your

25   Honor.

1           THE COURT:  Mr. Lennon, briefly.  I want to move

2    onto the agenda.  This was mostly informational, so there's

3    nothing that's going to be decided today, but go ahead, Mr.

4    Lennon.

5           MR. LENNON:  Good morning, Your Honor.  Brian

6    Lennon of Willkie Farr and Gallagher.  We represent Global X

7    Digital, which is one of the bidders in the Debtors'

8    process.  I stand today for the limited purpose of just

9    letting the Court know that Global X is disappointed to see

10   the statement this morning, especially the part about the

11   auction being potentially canceled.  We continue to believe

12   that we can present the estates with the value-maximizing

13   proposal for the Debtors' mining business and potentially

14   more.

15          We would note that the (indiscernible) proposal

16   has not been finalized.  And as Mr. Kwasteniet acknowledged,

17   here's a lot of work to do and we're a long way from June.

18   And we would ask and urge the Debtors and the UCC to

19   continue discuss the merits of our proposal and allow the

20   negotiating process to continue to play out as it should in

21   any Chapter 11 case.  Thank you.

22          THE COURT:  Thank you.  Mr. Frishberg, very

23   briefly.

24          MR. FRISHBERG:  I'll be as brief as I can.

25   Effectively, the price of CEL token at .20 cents, when they

1    had the ICO, most of the CEL token did not actually sell at

2    that price.  And something to counter Mr. Iovine's point,

3    something like only five percent of CEL token holders are

4    account holders.  Sorry.  Only five percent of account

5    holders hold significant amounts of CEL token over $5 or

6    something like that.  So I don't have the (indiscernible).

7    3.5.  Something like that.  Anyways, just take that into

8    consideration, please.  Thank you so much.

9              THE COURT:  Thank you very much, Mr. Frishberg.

10   All right.  Mr. Kwasteniet, move on with the agenda if you

11   would.

12             MR. KWASTENIET:  Thank you, Your Honor.  I believe

13   the next item on the agenda is an update from the Consumer

14   Privacy Ombudsman, so I will yield the floor.

15             THE COURT:  All right.  Ms. Thomson, go ahead.

16             MS. THOMSON:  Good morning, Your Honor.  My name

17   is Lucy Thomson.  I'm the Consumer Privacy Ombudsman.  I

18   filed my report on January 27th at Docket Number 1948.  With

19   Your Honor's permission, I would like to speak very briefly

20   about next steps for privacy and highlight two important

21   issues that should be on the Court's radar as discussions

22   about the new company go forward.

23             THE COURT:  Go ahead.

24             MS. THOMSON:  The direction that the Debtors are

25   taking may provide opportunities for protecting the privacy

Page 42

1    of the consumer data.  Their plans look promising.  There's

2    still further work to be done to identify the privacy rights

3    of the active account users and develop a plan to dispose of

4    the personal data of investors with inactive accounts.  And

5    I noted from the PowerPoint that the Debtors have no privacy

6    information on their PowerPoint slide number 12 about

7    governance and oversight, and I look forward to working with

8    them on that issue.

9            I direct the Court's attention to my report on

10   page 7 where there's a table that shows Your Honor and the

11   parties who the investors are and how they can be grouped

12   according to the status of their accounts and where they

13   live.  It's not obvious who these people are.  So this table

14   shows that there's 1.7 million total account holders.  More

15   than 600,000 of these individuals have active accounts, and

16   1.1 million have accounts that are inactive.

17           And you'll note from the table that Celsius

18   account holders reside in all 50 states and U.S.

19   territories, 370 of the active 1,000 active users reside in

20   200 countries around the globe, including all 27 European

21   Union countries.  So there's laws passed by these various

22   entities that govern some of the transactions and privacy

23   protections that these people will need to receive.  And as

24   an example, the Celsius privacy policy actually provides

25   quite different privacy protections for residents of

Page 43

1    California as well as residents of the EU countries.

2            So I want to address briefly the active account

3    holders' privacy issues separate from the inactive accounts.

4    The Debtors have indicated they intend to migrate the

5    accounts of approximately 600,000 investors with active

6    accounts to the new company.  And has been mentioned

7    earlier, due diligence should be conducted about the

8    leadership of the new company and the plan sponsor to ensure

9    that they'll protect the personal privacy of these account

10   holders.  This is the purpose of bankruptcy courts having

11   applied the qualified buyer criteria in many prior

12   bankruptcy cases as I explained on pages 37 to 39 of my

13   report.

14           In addition, the new company should provide an

15   opportunity to develop a new privacy policy that strikes an

16   appropriate balance between the legitimate business

17   interests of the company and the privacy rights of

18   investors.  The new privacy policy should be formulated

19   before any new company is approved.

20           And then the second issue is what to do about the

21   personal date of the inactive account holders.  The Debtors

22   have advised me that they do not plan to sell the data of

23   individuals with inactive accounts.  This is a very good

24   decision from a privacy perspective.  If that data is not

25   sold, that data -- that decision will protect the privacy of

Page 44

1   more than 1,100,000 Celsius account holders.  But a plan for

2   retention and disposal of the personal data of the inactive

3   account holders must be developed promptly.  There's a huge

4   amount of personal and financial data on these inactive

5   account holders, including biometric data, geolocation data,

6   and other highly sensitive data.

7            This data must be retained for five to seven years

8   to comply with IRS and other banking requirements, bank

9   secrecy acts, state data disposal laws, and GDPR and country

10  laws.  Decisions must be made concerning how this data will

11  be retained and how it will be disposed of during the data

12  -- once the data retention period has expired.  This has

13  been a problem for bankruptcy courts in prior cases because

14  retention and protection of this data requires a designated

15  entity and resources to protect and process the data.

16           So one option would be for the new company to take

17  on the job of protecting this data.  And the sale order

18  should say that this data cannot be sold at any point in the

19  future.  So I look forward to working with the Debtors and,

20  Your Honor, the other parties to develop the details of

21  these important issues.

22           And finally, I want to say that we shouldn't

23  underestimate the importance of the need to protect the

24  privacy of these active and inactive account holders.  I set

25  forward in my report on pages 31 to 36 details of the

1    significant risks that cryptocurrency investors are facing.

2    In fact, the FBI and other law enforcement agencies have

3    pointed out that cryptocurrency companies have been the

4    target of numerous hacker attacks.  And it's interesting

5    that the joint statement on crypto asset risks to banking

6    organizations that I included for Your Honor's review at

7    Appendix B observes that many retail investors and consumers

8    have been harmed during the past year because of their

9    involvement with cryptocurrency companies.

10           The FBI has issued unprecedented warnings

11   concerning the potential exposure of cryptocurrency customer

12   account information to cybersecurity risks, and you could

13   see that it's highly unusual for the FBI to issue such

14   warnings, there's four or five of them, with such frequency

15   and specificity.

16           So, in conclusion, I'm available to work on these

17   issues with the Debtors and the parties and Your Honor to

18   protect this important data and develop a privacy policy for

19   the new company, determine how to protect the data of

20   investors with closed accounts, and develop a plan for how

21   the company can comply with the many state and country laws

22   and GDPR that will govern some of the rights of these

23   investors.  So I'm pleased to answer any questions you may

24   have.

25           THE COURT:  Let me ask you, Ms. Thomson -- thank

Page 46

1    you very much for your report.  I didn't read your entire

2    report.  It's 86 pages long.  I've skimmed through some of

3    it.  I have it up on my screen right now, in fact, as you've

4    been talking about different sections.  Do you have specific

5    contacts at both Kirkland and Ellis, and White and Case with

6    whom you've been dealing?  If you don't, what I -- Mr.

7    Kwasteniet I think and Mr. Colodny, I want to be sure that

8    these privacy issues are dealt with as you're moving forward

9    to put the details of the plan structure together.  So are

10   you able to tell me, Ms. Thomson, are -- do you have points

11   of contact that you've dealt with?

12           MS. THOMSON:  Oh, I do, yes.  I've been working

13   with Mr. Kwasteniet and Mr. Latona and Ms. Goldman and many

14   people in Celsius.  They've been --

15           THE COURT:  Okay.

16           MS. THOMSON:  -- very helpful.  And I've spoken

17   with the Committee lawyers from time to time, but there's

18   many details.  As you know, devil's in the details here.

19   And these are some issues that tend to be somewhat

20   complicated, they're all totally solvable.

21           THE COURT:  All right.  Thank you very much.  All

22   right.  Who's going to proceed for the Debtors now?

23           MR. LATONA:  Good morning, Your Honor.  Dan Latona

24   of Kirkland and Ellis on behalf of the Debtors.

25           THE COURT:  Thank you, Mr. Latona.

Page 47

1              MR. LATONA:  The next item on the agenda -- good

2      morning.  The next item on the agenda is the final GK8 cash

3      management order.  The Debtors filed a declaration in

4      support of that at Docket Number 2021.  That's the

5      declaration of Robert Campagna, managing director at Alvarez

6      and Marsal, the Debtors' financial advisor.  We also filed a

7      revised proposed order this morning at Docket Number 2070

8      that cleans up the interim order to the final order.

9              Your Honor, the last remaining issue on the cash

10     management order is the 345(b) waiver.  We've been in

11     discussions with the U.S. Trustee's Office on working with

12     Bank Hapoalim in the Israeli branch and the Herzliya branch

13     where those GK bank accounts are housed to execute a uniform

14     depository agreement.  Unfortunately, to this date we

15     haven't been able to do that.  However, we do believe that a

16     waiver is appropriate in these cases.

17             Bank Hapoalim is one of the largest banks in

18     Israel.  And based on current conversion rates has

19     approximately $189 billion in assets and approximately $152

20     billion in deposits.  It's traded on the Israeli stock

21     exchange and has a market capitalization of approximately

22     $11 billion.  It publicly discloses its financials and

23     assesses its capital adequacy based on the Basel III

24     directives, which were implemented and created in the wake

25     of the banking crisis.

Page 48

```
 1          I don't believe Ms. Cornell has a formal

 2    objection, but I'll certainly allow her to speak for

 3    herself.  Otherwise, unless Your Honor has any questions, we

 4    would request entry of the order on a final basis at Docket

 5    Number 2070.

 6          THE COURT:  Ms. Cornell?

 7          MS. CORNELL:  Thank you, Your Honor.  Shara

 8    Cornell on behalf of the Office of the United States

 9    Trustee.  That is correct.  Debtors were unable to obtain a

10    uniform depository agreement with Bank Hapoalim and they

11    have submitted a statement in support of 345(b) waiver.

12    However, it is the Court's province to grant a 345(b)

13    waiver, not the United States Trustee.

14          THE COURT:  And do you object to the waiver being

15    granted here?  It is my decision, but I'd like to know what

16    your position is.

17          MS. CORNELL:  I have no objection at this time,

18    Your Honor.

19          THE COURT:  All right.  Then the waiver is

20    granted.  Mr. Latona, you can submit the order and it'll be

21    entered, okay?

22          MR. LATONA:  Thank you, Your Honor.  Next --

23          THE COURT:  Thank you very much, Ms. Cornell.

24          MR. LATONA:  Your Honor, the next item on the

25    agenda is the Debtors' sale motion of Bitcoin or Bitmain
```

Page 49

1    coupons and credits.  As part of the Debtors' ordinary

2    course mining operations, the Debtors purchase mining rigs

3    from various third-party vendors, and specifically for the

4    purposes of this motion from Bitmain Technologies.  And as

5    an incentive for the Debtors and other mining operators to

6    purchase additional mining rigs in the future, Bitmain

7    provides certain incentives.  First, the issuance of coupons

8    at no cost.  These coupons are typically applied toward

9    future purchases in increments from 10 to 30 percent of the

10   total price.

11        The Debtors hold approximately 37 million in

12   aggregate of these Bitmain coupons.  They do begin to expire

13   beginning in March, Your Honor, so selling them and working

14   with third-party purchasers is of the essence.  And as these

15   coupons inch closer to the expiration date, they do lose

16   significant value.  And so coupled with that and the

17   secondary market of purchasers, the availability of the

18   particular type of mining rigs that the coupons are eligible

19   to purchase, they do fluctuate in value.  So it is

20   imperative that the Debtors quickly work with third parties

21   to monetize these coupons.

22        In addition, Your Honor, as part of purchasing

23   rigs and the fluctuation of the value of these rigs, Bitmain

24   will issue credits to mining operators to be allocated

25   toward future purchases.  So for example, if the initial

Page 50

1    contract value for mining rigs is 100 million, an initial

2    purchase or initial installment payment of 25 million is

3    made.  Six months later a second installment payment of $35

4    million is made.  And then at the time of final payment,

5    Bitmain calculates the fair market value of the rates at

6    that time.  So in this example, if the fair market value is

7    $50 million, the Debtors have already paid $10 million.

8    Bitmain will issue a credit that can be used toward the

9    future purchase of additional mining rigs.

10            THE COURT:  But as I understand it, the credits

11    are not assignable.  Celsius would have to issue the

12    purchase order --

13            MR. LATONA:  That's right.

14            THE COURT:  -- in order to take advantage of it.

15            MR. LATONA:  That's right.  So Your Honor, what

16    the Debtors would propose to do in this instance is enter

17    into a contract with Bitmain and then assign their rights to

18    a third party under that purchase agreement.  As part of

19    that, they would execute the agreement using the credits,

20    and also certain coupons that are not going to be monetized

21    as part of the sale process.  They're going to be monetized

22    as part of the credit monetization process.  So Your Honor

23    --

24            THE COURT:  Let me ask you a couple of questions

25    first.  So as I understand it, you want to be able to sell

Page 51

1    the Bitmain coupons in a private sale without any actual

2    auction.  And I understand the urgency because of expiration

3    dates.  I have -- I want to hear what the Committee and what

4    the U.S. Trustee has to say about it.  No objections were

5    filed to this motion.  My question, Mr. Latona, are

6    primarily about the Bitmain credits.  And one question I

7    have is in Bitmain refused to accept purchase orders from

8    Celsius without adequate assurance of future performance.

9           MR. LATONA:  Your Honor, I believe the Debtors

10   would, you know, make sure that whatever assignment we make

11   to third parties would contain that.  We consider the --

12          THE COURT:  Let me tell you I've got a couple of

13   problems, and let me get them all on the table, okay?  So I

14   had -- the first issue was whether Bitmain can assist on

15   adequate assurance of future performance and what form that

16   would be given.  I don't know whether there have been --

17   whether Celsius has actually been in negotiations with

18   Bitmain about how to deal with this and whether this issue's

19   been addressed.

20          The bigger problem I have, and it's not addressed

21   in any of the papers, is what happens if Celsius enters into

22   a purchase order?  Essentially, it's committed to buy.  If

23   it doesn't perform, it arguably is an administrative claim.

24   And what happens if Celsius orders rigs and its proposed

25   counterparty assignee defaults?  Is Celsius going to be on

Page 52

1    the hook for an administrative claim for the purchase of

2    rigs it really doesn't want?

3              MR. LATONA:  Your Honor --

4              THE COURT:  I'm concerned -- look, the entire

5    crypto industry and mining have been in such turmoil.  What

6    protections or assurances are there that -- as to the

7    creditworthiness of the assignee?  The one thing I don't

8    want to find out is that Celsius has entered into a purchase

9    order to purchase rigs.  Yes, they'll have coupons to apply

10   for part of the price, but commit to a price, and then have

11   its assignee walk away leaving you holding the bag.

12             MR. LATONA:  Yes, absolutely, Your Honor.

13   Understood your concern.  So what I will say in this

14   instance is, one, there would be no cash leaving the estate.

15   It would be the application of credits and coupons.

16   Secondly, we have been in consistent discussions with the

17   Committee regarding these coupons and credits.  They do have

18   consent rights.  So what we would do is we would make sure

19   that the Committee is comfortable with the third-party

20   purchaser, that that purchaser has the capacity to execute

21   on the contract.  What also --

22             THE COURT:  I haven't seen -- what you're

23   describing now I haven't seen in writing anywhere.  And

24   you're asking me to approve the Debtor entering into

25   transactions for Bitcoin -- Bitmain credits that would

Page 53

```
1    require the Debtor to commit to the purchase of rigs without

2    me seeing what protections or assurances are there that the

3    assignee is creditworthy, and it'll perform.  You say that

4    the Committee has approval rights, but I'm -- that's what my

5    concern is.  So I need to hear more about it.

6            MR. LATONA:  Yes, Your Honor.  We can, you know,

7    work with the Committee on a revised form of order that

8    addresses these concerns.  We can, you know, fund the

9    coupons and credits into escrow so that if the third-party

10   purchaser cannot execute on the agreement, that comes back

11   into the Debtors' estate and we can work with another third

12   party to, you know, apply those credits and --

13           THE COURT:  The coupons didn't, I don't think,

14   raise that issue because you're just looking to sell them.

15           MR. LATONA:  That's right.

16           THE COURT:  It's the credits that I was

17   uncomfortable about.

18           MR. LATONA:  That's right, Your Honor.  There is a

19   subset of coupons that we are not having to sell, but we are

20   looking to use in connection with this monetization process.

21   So those would come back into the estate, not the coupons

22   that we're looking to sell.

23           THE COURT:  Well, let me hear from the Committee

24   with respect to the coupons.

25           MR. WOFFORD:  Yes.  Your Honor, Keith Wofford from
```

Page 54

1    White and Case on behalf of the Committee.  As the Debtor's

2    counsel noted, this motion has been the subject of

3    continuing dialogue with respect to the mining business.

4    And the Committee, like the Debtors, were concerned about

5    the expiring nature of the coupons.  They are effectively a

6    melting ice cube.  And thus, with the Committee consent

7    mechanic that was in the revised order, the Committee

8    supports the relief requested.  With respect to --

9              THE COURT:  I don't have the same problem about

10   the coupons.  I understand that because they'll hopefully

11   find a buyer and you'll -- they'll get the price for it.

12   It's the credits that gave me some heartburn.

13             MR. WOFFORD:  Understood, Your Honor.  I -- we

14   heard your commentary loud and clear.  I think as part of

15   our consent mechanism, number one, we do have the concern

16   with the credits that there is an active market, and we have

17   to do things opportunistically in that market.  And I think

18   what we should probably do, Your Honor, is, although the

19   Committee contemplated this in the first place, I think we

20   should either have a mechanism where we get releases

21   effectively from Bitmain in the nature of an ovation, or

22   alternatively adequate credit assurances to protect the

23   Debtors.

24             THE COURT:  All right.  So Ms. Cornell, do you

25   want to be heard on this?

1          MS. CORNELL:  Your Honor, we take no position on

2     (indiscernible) --

3          THE COURT:  All right.

4          MS. CORNELL:  -- at this time.  Thank you.

5          THE COURT:  I'll approve the motion to the extent

6     of the sale of the Bitcoin -- Bitmain coupons, excuse me.

7     Bitmain coupons and permit the private sale of those.  But I

8     want to see more information about the credit.  The credits

9     don't expire as I understand.  Is that correct?

10         MR. LATONA:  Your Honor, Dan Latona of Kirkland

11    and Ellis.  They do expire in December of 2024.  They expire

12    two years after the final delivery of the rigs.

13         THE COURT:  Okay.  So there isn't the same timing

14    urgency with respect to the credits that there was with

15    respect to the coupons.  And --

16         MR. LATONA:  The only --

17         THE COURT:  Go ahead.

18         MR. LATONA:  I'm sorry, Your Honor.  The only

19    timing urgency is, Your Honor, is that Bitmain can change

20    the terms of credit sales.  For example, a few weeks ago,

21    credits were freely assignable to third parties.  Bitmain

22    changed its terms on that.

23         THE COURT:  Well, so give me assurance.  You

24    haven't -- you didn't file anything in your papers about

25    this.  And I see credit -- I see risk for the Debtors with

1    respect to the credits.  You'll put your purchase orders in,

2    and then in theory that's an administrative claim.  And if

3    your counterparty doesn't perform, good, you've got a

4    lawsuit, you know?  And how do I know that it isn't a

5    company that's on the verge of its own insolvency

6    proceedings and rejects the contract?

7              MR. LATONA:  Understood, Your Honor.

8              THE COURT:  I'm very uncomfortable.  You haven't

9    -- put it this way.  Nothing in the papers gave me the

10   comfort that I need to be able to approve this.  So I'm open

11   to doing it if you can satisfy me that between the Committee

12   -- and I am somewhat comforted that the Committee has

13   approval rights on this, but I don't think either of you

14   want to have egg on your face when suddenly Celsius winds up

15   on the hook for a large administrative claim, and then can

16   go take a counterparty who probably will -- you know, will

17   assert various defenses to the assignments.  But you haven't

18   given me any comfort about any of that.

19             MR. LATONA:  Thank you, Your Honor.  Understood.

20   We'll work with the Committee what we would propose, and we

21   can build this into a revised form of orders that the pre-

22   payment has to be funded in escrow before a contract can be

23   executed.  But --

24             THE COURT:  Okay.

25             MR. LATONA:  -- we take Your Honor's comments

Page 57

1    seriously, and we'll work with the Committee on a revised

2    order.

3              THE COURT:  Thank you.  All right.  Let's go on,

4    on the agenda.

5              MR. LATONA:  Thank you, Your Honor.  At this time,

6    I'm ceding the virtual lectern over to my colleague Ms.

7    Jones.

8              MS. JONES:  Good morning, Your Honor.  Elizabeth

9    Jones of Kirkland Ellis on behalf of the Debtors.  Can you

10   hear me okay?

11             THE COURT:  I can, Ms. Jones.  Go ahead.

12             MS. JONES:  Thank you.  Your Honor, the next item

13   on the agenda is the Debtor's motion seeking an order

14   approving omnibus claims objection procedures and form of

15   notice approving notice of satisfaction and approving the

16   omnibus substantive claims objections in addition to those

17   already enumerated in Bankruptcy Rule 3007(d).  In addition,

18   Your Honor, we are seeking a modification of Bankruptcy Rule

19   3007(e)(6) to increase the limit from 100 claims objections

20   in one motion to 250.

21             Your Honor, we filed the motion at Docket Number

22   1972.  And since filing the motion, we've received one

23   limited objection filed at Docket Number 2040.  And late

24   last night we filed a replay at Docket Number 2064 and a

25   revised proposed form of order at Docket Number 2065.  Your

Page 58

1    Honor, with respect to the modification of Bankruptcy Rule

2    3007(e)(6), the reason we're seeking that here is today

3    we're still reconciling our claims register since the end of

4    the bar date, but we've had approximately 23,000 claims

5    filed.  And so we're seeking a slight increase to continue

6    to move this along effectively and efficiently.

7            In addition, Your Honor, if I may take a moment in

8    discussions with the Committee, we took some of their

9    comments in their revised proposed form of order, but we

10   also had discussions with them.  And we thought it might be

11   helpful if, in seeking approval of the motion today, we can

12   just explain to the Creditors and those on the line what

13   we're seeking to do here to hopefully ease some of their

14   concerns about objections that may be filed in the future

15   and hopefully address the concern that their claim may be

16   expunged in its entirety.

17           THE COURT:  All right.  And Mr. Ubierna filed a

18   limited objection at 2040.  And am I correct that the

19   language that you proposed in the amended order is intended

20   to deal with issues that Mr. Ubierna has raised?

21           MS. JONES:  Yes, that's correct, Your Honor.

22           THE COURT:  All right.  So go on and give your

23   explanation.  I think it would be helpful to everybody.

24           MS. JONES:  Thank you, Your Honor.  First and

25   foremost, as you heard earlier today, we're hopefully and

1   cautiously optimistic that we're moving forward towards

2   solicitation of a plan.  And part of that is making sure

3   that the voting process is both fair and effective.  So with

4   respect to that, some of the first claims objections that

5   we're likely going to need to clean up here is when we filed

6   our schedules and statements, we filed every single account

7   listed.  Since that time, the Debtors have been working very

8   hard to reconcile that information to identify any

9   individuals who may have more than one account on the

10   platform and identify whether or not that is in violation of

11   the terms of use.

12         So for example, if someone has seven accounts on

13   the platform, that may have been done in violation of the

14   requirement to only have one account.  And with respect to

15   that, we would likely file a claim objection to reduce their

16   claim just so it's with one account, one amount so they're

17   only getting to vote one time instead of seven times.

18         Second, Your Honor, and this is probably where

19   there may be some of the most concern with respect to pro se

20   Creditors, is in the event a pro se Creditor or other

21   Creditor filed a proof of claim that does not match what we

22   have in our schedules and statements, and the documentation

23   that they have provided in their claim does not demonstrate

24   that they should have this alternative amount, we would

25   likely seek to file an objection to reduce and allow but not

Page 60

1    to expunge their claim in the entirety, but to match it to

2    what we have on the schedules and statements, which should

3    match exactly what's in their account.  I think one example

4    of this is you may have seen in a footnote that there was an

5    accidental claim filed in 117 quadrillion.  We recounted

6    that.  It was --

7                THE COURT:  Are you sure it was accidental?

8                MS. JONES:  Well, so I will say this.  The

9    evidence that was attached to the proof of claim includes a

10   screen shot of the type and amount of digital assets in the

11   Celsius account for that user.  We cross-referenced that

12   with the schedules and statements, and it matches down the

13   decimal exactly how we scheduled it.  So it may not have

14   been accidental, but with respect to that claim and similar

15   claims like that, we would file an omnibus claim objection

16   seeking to reduce and allow in the amount scheduled so that,

17   for example, if someone either misses the notice or chooses

18   not to respond because they're okay with that approach,

19   they're not disenfranchised from voting.  Their claim isn't

20   being wiped entirely, and we're not seeking to remove or

21   penalize anyone for doing their best to file a proof of

22   claim and to preserve their rights only to make sure that

23   individuals are voting in the appropriate amount.

24                Finally, Your Honor, this is one that is

25   enumerated in Rule 3007(d), but pro se Creditors may not be

Page 61

1    as familiar with, that throughout the bar date, if you file

2    multiple claims, it's usually the last filed claim that we

3    deem as what is allowed or admissible or what you are filing

4    as what you think your claim is worth.  If you have filed 1,

5    2, 3, 4, we would need to go in and seek approval to expunge

6    claims 1 through 3 so that 4 stands.  Again, that's typical

7    of a clean-it-up.  It's going to help us when we go through

8    the solicitation and voting process to make sure that we are

9    accurately counting votes and that individuals are getting

10   the correct amount of votes.

11         So with that, I will reiterate that our goal here

12   is not to disenfranchise Creditors, but really to clean up

13   the claims register to make sure that voting is fair and

14   equitable.  And as Your Honor noted earlier, with respect to

15   that, we appreciate and respect Mr. Ubierna de las Heras'

16   objection, and we hope that the language that we've provided

17   resolves that for him, which I can walk through the brief,

18   and I'm happy to reiterate into the record if that's

19   helpful.

20         But we've added in both the proposed claims

21   objection procedures and claims objection form of notice

22   that any Claimant who has received an omnibus objection, if

23   they choose to file a response, in that response they can

24   also seek discovery.  The way that it would go is they would

25   identify in their response that they want discovery.  They

Page 62

1     would notice that.  We would come to the Court for the next

2     hearing with respect to their claim.  It would be treated as

3     a status conference to determine whether or not discovery is

4     necessary, and if so, set the appropriate schedule.  So we

5     want to make sure that Creditors are aware of their rights

6     and have an equal opportunity to participate.

7                    THE COURT:  Let me ask you a couple of questions.

8     That -- your proposed order also included proposed

9     satisfaction procedures?

10                   MS. JONES:  That's correct.

11                   THE COURT:  And I'll describe it as a mismatch,

12    but you do not require a minimum number of calendar days

13    after a notice of satisfaction has been served when the

14    hearing can actually occur.  You treat notices of

15    satisfaction and any disputes about that differently than

16    claims objections.  Can you address that?

17                   MS. JONES:  Yes.  Your Honor, our goal there is

18    that if we believe a claim has been satisfied is to send

19    that notice.  We've added a third request to the Committee.

20    They would see that before it went out, so they would have

21    that opportunity, and that we would only schedule a hearing

22    if we get a response.  I understand that the way that the

23    timing works isn't as clear.  So we're happy to adjust and

24    mirror the 30 days just to keep it consistent and not to

25    confuse Creditors there.

1          THE COURT:  I would prefer if it was consistent

2     between.  Because in theory, you could wind up, if there was

3     a hearing next week, you'd send the notice and you'd put it

4     on for the hearing next week, and the Creditor may never

5     even realize what's happening.  And so I think that I do

6     want this to be efficient, and it may be that the longer

7     period isn't really required for the satisfaction

8     procedures, but the order covers both.  I would be more

9     comfortable if the same time periods were included with

10    respect to both the proposed objection procedures and the

11    satisfaction procedures.

12         MS. JONES:  Absolutely, Your Honor.  We'll make

13    that change and submit a further revised proposed order to

14    chambers.

15         THE COURT:  All right.  Mr. Ubierna, do you wish

16    to be heard?

17         MR. UBIERNA DE LA HERAS:  Your Honor, Victor

18    Ubierna de las Heras, pro se Creditor.  The proposed revised

19    order defined by the Debtors reserves my objection.  Thank

20    you.

21         THE COURT:  All right.  Thank you very much.  And

22    I appreciated your objection.  I think it was well-taken.

23    I'm glad the Debtor was able to resolve it.  Okay.  Does

24    anybody else wish to be heard with respect to the omnibus

25    claims objection and claim satisfaction procedures?  All

Page 64

1    right.  It's approved, Ms. Jones.  Thank you.

2              MS. JONES:  Thank you.

3              THE COURT:  I did have a very brief opportunity to

4    look at the changes that you made.  That's fine.

5              MS. JONES:  Thank you, Your Honor.

6              THE COURT:  All right.  So you'll fix the timing,

7    and subject to the last review by the Court, it will be

8    entered, okay?

9              MS. JONES:  Yes.  Thank you, Your Honor.

10             THE COURT:  Thank you very much, Ms. Jones.

11             MS. JONES:  With that, I'd like to cede the

12   lectern to my colleague Mr. Koenig.

13             MR. KOENIG:  Good morning, Your Honor.  Chris

14   Koenig of Kirkland and Ellis for Celsius.  I'm going to

15   address the next several items on the agenda.  First up is

16   the exclusivity motion.  That's Agenda Number 6.  We filed a

17   revised proposed order late last night at 2068.  We filed a

18   reply to certain objections that we had received at Docket

19   Number 2067.

20             As we discussed at the start of the hearing,

21   following our month-long bid process, we've now selected the

22   NovaWulf plan sponsor transaction in order to maximize the

23   value of Celsius' assets and distribute that value to our

24   stakeholders.  We're seeking a second extension of our

25   exclusive periods to file and solicit a plan to give us

Page 65

1 sufficient time to finalize the documentation with NovaWulf

2 from the Committee and file the Chapter 11 plan that

3 embodies the transaction that we're all contemplating.

4 We're seeking an additional month and a half of the plan

5 filing deadline that's through March 31st, and an additional

6 three months after March 31st to solicit the plan.  That's

7 through June 30th.

8    We're of course hoping to move faster than that,

9 but we ask for these periods to give us a little bit more

10 time to the extent it becomes necessary as we finalize the

11 documentation and ultimately solicit the plan.  We've agreed

12 to the Committee's request to include incremental milestones

13 in the exclusivity order.  Specifically we've agreed to file

14 a term sheet contemplating the NovaWulf transaction on the

15 docket by February 28th or such later date as we agree with

16 the Committee.  And we will file both a plan and a

17 disclosure statement by March 31st or such later date as is

18 agreed with the Committee.

19    With this agreement on the interim milestones and

20 with the other progress we've made in the case, with

21 securing the agreement and principle with NovaWulf, we

22 understood that that resolves the Committee's objection to

23 exclusivity.  In addition to the Committee, we've been

24 building a coalition of other supporting parties as well.

25 As Mr. Kwasteniet mentioned, we have an agreement in

1   principle with the Ad Hoc Group of Custody Holders, which

2   we'll describe a couple of agenda items down.  And we've

3   been, you know, also making progress with other

4   constituents.  You know, Mr. Adler, we've made significant

5   progress with him.  He can speak for himself, but we

6   understand that he doesn't intend to pursue his objection to

7   exclusivity given the constructive dialogues that we've had.

8            To be sure, Your Honor, there is more work to do.

9   We have other stakeholders.  We have 600,000 account

10  holders, most of which are not represented by counsel.  So

11  we have plenty of public outreach and explanation that needs

12  to take place in the coming days and weeks, and we intend to

13  do just that, and today is the first day of that process.

14  We don't have a resolution with the withhold group yet.  We

15  either need to come to a consensual resolution with them or

16  litigate the issues surrounding the withhold accounts.  And

17  of course the regulators are critically important as well.

18           We've had initial conversations with certain

19  federal and state regulators, answered some additional

20  questions, provided some additional diligence, but we need

21  to continue those conversations, and we will.  But we've

22  made very significant progress since the exclusivity was

23  last extended in December.  We now have the Court's

24  (indiscernible) ruling, which is the basis for the Chapter

25  11 plan.  We've briefed and argued the Series B preferred

Page 67

1      issue last week.  We have identified the NovaWulf deal as

2      the transaction that provides the best path forward out of

3      Chapter 11, and that transaction is supported by the

4      Committee.

5              We have a settlement with the custody holders.

6      We're having constructive dialogues with other stakeholders

7      as well.  And we've also done all of that while dealing with

8      other critical workstreams in these Chapter 11 cases,

9      including the GK8 sale, complying with the examiner's

10     diligence request and interviews, finding new hosting deals

11     for the mining business, reopening the platform to allow for

12     withdrawals for custody holders, de minimis asset sales to

13     maximize value, along with all the other administrative

14     burden of Chapter 11 cases.  You know, we have Chapter 11

15     reporting, you know, monthly operating reports, schedules,

16     and statements, and all the rest of it.

17             Put simply, given the unprecedented legal issues

18     in this case and the challenges across the cryptocurrency

19     industry, the fact that we're standing here today with a

20     framework for a volume-maximizing path forward that is

21     supported by the Committee and one ad hoc group, and we have

22     discussions with several of the other ad hoc groups, that's

23     the definition of the Chapter 11 process working as intended

24     for force the Debtor to engage with different stakeholders

25     to negotiate.

Page 68

1            The exclusive period is intended to require a

2    Debtor to make incremental progress towards a plan in order

3    for there to be cause for the Court to continue to extend

4    the exclusive periods.  We've done exactly that here with

5    all the progress that we've made today, including most

6    notably our selection of the NovaWulf transaction.  And

7    we've put forth a very viable timeline for the plan to be

8    proposed, the disclosure statement to be approved,

9    solicitation to occur, and for confirmation to occur.

10           At the end of the deck that Mr. Kwasteniet

11   referenced at the top of the hearing, there's an

12   illustrative timeline for all of those milestones that

13   includes a confirmation hearing hopefully in June.  So Your

14   Honor, I'll pause there.  You know, we filed a reply.  I

15   know that there are some objections that remain outstanding.

16   I don't know exactly who intends to impress their objections

17   today but let me pause there.  I don't know if the Committee

18   wants to speak or some of the objecting parties, and then I

19   can reply.

20           THE COURT:  Well, I want to speak first.

21           MR. KOENIG:  Great.  Thank you.

22           THE COURT:  So the Debtor's motion is at ECF 1940.

23   Objections were filed by Mr. Ubierna de las Heras at ECF

24   1996, the ad hoc group of withhold account holders at ECF

25   1940, Emmanuel Herman at ECF 2015, the U.S. Trustee at 2010.

1    The Ad Hoc Borrowers Group joined the objection of the U.S.

2    Trustee at ECF 2013.  Mr. Frishberg filed his objection at

3    ECF 2014.  I perhaps have left out some.  I thought some of

4    the state regulators also opposed, but it -- so Mr. Koenig,

5    the first time that I had an opportunity to glance -- and

6    that's all it was, it was a glance -- at the proposed plan

7    structure, the outline, was while we were having this

8    hearing.  I had it open on a separate screen in front of me.

9              I think that -- I'll certainly give others a

10   chance to speak now, but I think that every party who filed

11   an objection to the extension of exclusivity is entitled to

12   an opportunity to review what was just filed.  I greatly

13   appreciate the work of the Debtors and the Committee in

14   particular.  The Committee certainly previewed that they

15   were still hopeful.  They filed their objection but were

16   still hopeful that by the time of the hearing there would be

17   further progress.  Well, there is.

18             And by what I would -- I do want to hear from

19   anyone else who wants to speak to this issue.  My

20   inclination is to, to the extent necessary, give you a

21   bridge order on exclusivity to the next hearing, but give

22   those who did file objections an opportunity to review

23   information that was provided today, information in the, you

24   know, the slide deck that was attached.  I just, as I say,

25   only had the briefest opportunity to look at it as this

1    hearing was going.  But -- so I'm certainly pleased.  I do

2    consider this -- on the face of it, it appears to be good

3    progress.

4           I think, you know, Mr. Kwasteniet has indicated

5    there's a lot of work to be done.  Well, that's -- that is

6    part of the normal process.  So first let me hear from the

7    Committee and see whether they want to be heard on this.

8    Mr. Colodny, do you want to be heard on this?

9           MR. COLODNY:  Dan Colodny from White and Case on

10   behalf of the Committee.  I agree with Mr. Koenig, and I

11   think we -- as you noted, we previewed in our objection that

12   we were working hard, and we were working hard up until the

13   last minute.  What was negotiated with the Debtors as part

14   of exclusivity were -- I would call them check-ins.  You

15   know, milestones where we have to have a plan term sheet,

16   where we have to have a disclosure statement on file, which

17   I think is going to be a big list here based off the nature

18   of the assets.

19          The financials of the Debtor, projections to the

20   new company, new disclosure statements can be very important

21   to everybody understanding what the plan proposes.  So while

22   those milestones are set (indiscernible), we can come in on

23   an expedited basis if they're not hit to request Your Honor

24   to lift that exclusivity.  Obviously everyone would reserve

25   all of their rights with respect to any such motion, but our

Page 71

1   intention was that those would not be paper tigers but would

2   instead be (indiscernible) milestones to hit and

3   consequences that occur if they don't.  With that, Your

4   Honor, our objection is resolved.  We think that we're

5   making good progress, and we think that the Debtors'

6   proposed timeline makes sense.

7           THE COURT:  Ms. Cornell?

8           MS. CORNELL:  Thank you, Your Honor.  Shara

9   Cornell on behalf of the Office of the United States

10  Trustee.  While we appreciate allegedly that some progress

11  has been made in this case, there's still a long way to go

12  before what's being described today becomes a plan.  And I

13  mean that with a big P.  There are a lot of issues with the

14  proposals, and we are, as Your Honor said, still evaluating.

15  But for example, the proposal references selling preference

16  claims in order to get votes for the plan.  We have a lot of

17  questions about the regulation regarding the Debtors'

18  proposal and whether it is or could ever be feasible under

19  current laws.

20          Moreover, we have seen no discussion of how the

21  Debtors are going to get there, for example, with licensing.

22  And at the same time, a lot of these questions are the same

23  questions we have from the last hearing.

24          THE COURT:  May I ask you this, Ms. Cornell?

25          MS. CORNELL:  Sure.

1          THE COURT:  Would you rather exclusivity end and

2     get 600,000 plans proposed?

3          MS. CORNELL:  No, Your Honor.  But I just want to

4     say I'll give you a little preface.  You know, we've been

5     talking about --

6          THE COURT:  I -- look, I do not underestimate the

7     difficult path ahead assuming that this proposed plan

8     structure moves forward.  You raise -- and certainly an

9     exclusivity hearing is not the time to deal with disclosure

10    statement objections or plan objections.  So all rights are

11    reserved on that but come back to the issue of -- I'm not

12    going -- put it this way.  I'm not going to simply grant the

13    motion or extend exclusivity.  I think everyone who has

14    filed objections is entitled to an opportunity to read and

15    review everything that got filed overnight and take that

16    into account.

17         Hopefully there will be able to be consensus to

18    allow this short runway of time to move forward.  A -- I

19    don't think it's in anybody's interest for there to be a

20    free-for-all.  And in theory that -- I mean, what the

21    Committee argued is they could be permitted if exclusivity

22    would end not at -- only as to them.  I think before we get

23    there, let's see -- I want to give people an opportunity to

24    sort of digest.  And if they want to file something, fine.

25    Express why they still think exclusivity should be

Page 73

1    terminated, okay?

2            MS. CORNELL:  I understand, Your Honor.  What I

3    was going to say was that our suggestion -- and I think we

4    spoke with the Debtors about it yesterday was exactly Your

5    Honor's suggestion was to bridge this to the March 8th

6    hearing.  Because as I understand it, they were also

7    discussing continuing the motions for a trustee until that

8    date.  So that's why I wanted to give Your Honor a little

9    bit of background about where our office was going with our

10   investigation.  But I can save that for later if Your Honor

11   prefers.

12           THE COURT:  No, that's fine.  Let me give other

13   people a chance to speak to this, okay?

14           MS. CORNELL:  Thank you.

15           THE COURT:  Who else wants to be heard?  Ms.

16   Cordry?

17           MS. CORDRY:  Yes, Your Honor.  Thank you.  I agree

18   with you.  I actually read this motion very briefly a little

19   earlier this morning at about 7:15 when my cat woke me up,

20   and looked at my computer, and I said oh, my goodness.  A

21   whole lot of new filings.  So I've had a couple of hours to

22   look at it, and again --

23           THE COURT:  It's a funny thing when hearings like

24   this are on the calendar.  Sometimes what could be described

25   as progress immediately before the hearing.

1           MS. CORDRY:  Right.  And I will say I'm impressed

2     at the work ethic of the parties here.  When I was working

3     on the GM case back in 2009, I thought it was impressive

4     that I was still dealing -- negotiating at 11:00 at night.

5     But I see these being filed at 1:30 in the morning, so that

6     is commendable.  I would agree, again, that I think that the

7     bridge order would be helpful, especially if by that time

8     some of these milestones have started to be put into place.

9           We do still have a concern with the length of

10    time, the three months after a plan is put on the table.  It

11    does seem a bit long to us.  And we have one or two

12    substantive concerns with the particular order there.

13    There's a provision in there about reservation of rights to

14    the SEC to challenge the treatment of crypto tokens.  We

15    think that should include the state governments as well.

16           I think though the other piece of this that we

17    would just like to emphasize, and I think again, the point

18    about exclusivity only the bridge order, there is a lot to

19    be done to be regulatory compliant.  We very much appreciate

20    the numerous statements that have been made on the record

21    about the parties' intentions to do that and to become

22    compliant.  There's a lot of work on that, and it's not

23    something that there's been a whole lot of discussion with

24    us.  I won't say there's been no discussion between

25    ourselves and the Debtors, but it's not been anything

Page 75

1    intensive at this point.  It's not been really working

2    towards where this should go.

3              This morning was the first time we heard who the

4    plan sponsor would be and where they're going with this.  So

5    we do think those are discussions that are going to need to

6    become intensive between the Debtor and our parties as well

7    to see if this is going to be a regulatory compliant and

8    feasible plan by the time they get to it.  But we filed a

9    statement as opposed to an objection because when we first

10   were reading this, we did appreciate what the UCC was

11   essentially saying, which is it was time to fish or cut

12   bait.  And it seems that they're trying to fish at this

13   point, so we hope that they will actually be able to pull a

14   plan out of the water in the next few weeks.

15             THE COURT:  Okay.  Thank you, Ms. Cordry.  Ms.

16   Kovsky.

17             MS. KOVSKY-APAP:  Thank you, Your Honor.  Like you

18   I have not had much of an opportunity to review the Debtor's

19   presentation as to what a potential future plan might maybe

20   look like if lots of different things fall into place over

21   some future period of time subject, of course, to their

22   ability to request further extensions.  And I certainly have

23   not had an opportunity to discuss this with my client group.

24   I will say at a glance I have very serious concerns about

25   what the Debtors are proposing.  I understand that there's

Page 76

1    going to be lots of further discussions, and you know, they

2    at this point don't even have a binding term sheet with the

3    proposed plan sponsor.

4         I was a little surprised at the Committee's last

5    filing on this at the first exclusivity extension was that

6    to the extent that the Debtors do not file an acceptable

7    plan by February 15th, the Committee was going to be

8    prepared to go forward and do so.  So I am honestly a little

9    surprised and disappointed that we're here looking at, you

10   know, a further long road ahead of us.

11        THE COURT:  Ms. Kovsky, would you prefer a free-

12   for-all?

13        MS. KOVSKY-APAP:  Your Honor, what we had

14   suggested in our proposed -- in our objection to exclusivity

15   was that it should be modified to permit the Committee and

16   any ad hoc committee represented by counsel in the case to

17   file an alternative plan.  I don't think that any of the ad

18   hoc committees in this case have behaved in an irresponsible

19   manner or in anything that would be approaching a free-for-

20   all.

21        THE COURT:  All right.  I think -- well, we'll

22   leave that.  I think we're headed towards a bridge order to

23   get us to the March hearing, but let me -- Ms. Rood?

24        MS. ROOD:  Thank you, Your Honor.  Jennifer Rood

25   from Vermont Department of Financial Regulation.  I'd echo

Page 77

1    all of the comments of Ms. Cordry and just point out that

2    there hasn't been, despite what the UCC said, there's been

3    one phone call several months ago and no outreach at all to

4    regulators to give us a chance to -- you know, we have the

5    understanding that they would tell us in confidential terms

6    who the counterparty was going to be, and that never

7    happened.

8            The process of either securities registration or

9    money transmission registration, licensure, takes months.

10   It's not something that happens fast.  So, they really need

11   to fit factor that into their planning.  I think exclusivity

12   -- I mean a bridge order sounds good, but exclusivity,

13   beyond that, should be very limited.  We're reaching the

14   point where, you know, they either need to get this done or

15   we need to liquidate.  I don't want a free for all, but

16   we're just driving along, burning a lot of money.

17           And the other thing that hasn't really been

18   addressed, is the fact the Debtors, back at the last

19   hearing, or one of the last hearings, may have had to do

20   with the stablecoin.  They indicated they have enough

21   liquidity to get through, maybe, March.  And they're

22   proposing now to keep this case running through June, and

23   that's assuming that there aren't any further extensions,

24   which is not an assumption we can make.

25           So, I don't understand how this case continues to

1    move forward just on the, running itself on liquidity for

2    the time that they're proposing to keep going.

3              THE COURT:  All right.  Mr. Adler?  I'm going down

4    the names on the -- with hands raised, in the order.  They

5    may not be the same on your screen, but I'm going in the

6    order in which I'm seeing hands raised.  Mr. Adler?

7              MR. ADLER:  Good morning.  Again, Your Honor,

8    David Adler on behalf of the Ad Hoc Group of Bars.  As I

9    stated earlier, we received a framework for a resolution

10   from the Debtors last week, with a lot of issues that need

11   to be ironed out, but we are in favor or bridge order.  We

12   think that makes the most amount of sense, because it will

13   allow us to vet these issues with the group, and interact

14   with the plan sponsor, as I mentioned earlier.  And I think

15   that Your Honor's suggestion about a bridge order until the

16   next hearing, is agreeable to the Ad Hoc Committee.

17             THE COURT:  Thank you, Mr. Adler.  Ms. Milligan?

18             MS. MILLIGAN:  Hi, good morning, Your Honor.  Can

19   you hear me?

20             THE COURT:  Yes, I can.

21             MS. MILLIGAN:  Thank you for allowing me to speak

22   this morning.  I echo the comments from Ms. Cordry and Ms.

23   Rood.  Texas regulators filed a joinder.  One suggestion,

24   because I don't want to repeat everything; we do have

25   concerns with liquidity.  We have had minimal contact from

1    the Debtor and the Committee about this plan.  We're

2    learning all of this today.  So, we do agree with the Court

3    a far as a bridge order to March 8.

4            My suggestion, respectfully, would be that in the

5    interim, Debtor and the Committee reach out to the

6    regulators and have discussions about what they're

7    proposing, because we're all leaning about this today.  And

8    as Ms. Rood said, these things take time.  And we want to be

9    able to have a position on where this goes, if it can go

10   forward.  So, thank you, Your Honor.

11           THE COURT:  Thank you, Ms. Milligan.  One

12   additional comment I'd make is, you know, in many of my

13   cases, I see a proposed plan and disclosure statement filed

14   before exclusivity expires.  And frankly, it's a

15   placeholder.  In any complex case, there's lots of issues

16   that are going to have to be negotiated in a plan that,

17   hopefully, ultimately, will be confirmed; may bear only a

18   passing resemblance to the placeholder that was filed.  So,

19   we don't have a plan; we have an outline, essentially, in a

20   series of slides.  It's progress.  How much progress, that's

21   not for me to say at this stage.  I think that the

22   alternatives are not particularly attractive to me.  I think

23   what the Committee proposed is exclusivity, be terminated to

24   permit the Committee and only the Committee to file a

25   proposed plan.  And they talked a little bit in their

1    opposition about what that might be, a liquidation plan.

2          But I think, for today, I think I'm going to give

3    anybody else with their hand raised a chance to speak to it.

4    But what I'm inclined to do is, as I've said, is I'll set

5    another deadline for supplemental objections or support but

6    put this over to the March 8 hearing.  But let me hear from

7    Mr. Mendelson, you're next on my screen.

8          MR. MENDELSON:  Thank you, Your Honor, thank you

9    for the Court's time.  At the start -- first of all, a US

10   citizen, a resident of the state of Florida -- at the start

11   of this process, on day one, you said that the Court's major

12   responsibility is to be fair, is to treat everyone fair

13   during this process; which I certainly appreciate.

14         Today, I guess within the first two minutes of the

15   Court, there was a mention of a custody settlement and other

16   settlements.  These settlements --

17         THE COURT:  There's no settlement until I approve

18   a settlement, Mr. Mendelson.

19         MR. MENDELSON:  Good to hear, Your Honor.

20         THE COURT:  I'll just say, the usual process is to

21   try and get consensual resolution of issues like that.  But

22   it still requires Court approval and it gives parties an

23   interest and opportunity to object.  So, if, when you see

24   it, if you have issues you're going to raise with it, you'll

25   have an opportunity to do that.  I don't know whether that

1    raises, that addresses your concern, but I didn't mean to

2    interrupt you.  Go ahead.

3              MR. MENDELSON:  No worries, and I don't mind your

4    interruption, of course.  I want to kind of like reiterate

5    what Ms. Cornell said, which is that these settlements,

6    whether it's custody or other, seems to be contingent upon

7    the settlement classes not being a part of a potential

8    equity in the new company, or in potential litigation claims

9    in the future.  I just don't see how that would be a fair or

10   equitable settlement or decision, without us knowing the

11   exact amount that -- I guess it's the estate, or the UCC, is

12   going to pursue against retail clawbacks.  That has been the

13   elephant in the room this morning.  And I haven't heard any

14   mention of, what is the minimum threshold for retail

15   clawbacks.  So, can we get some resolution on that today?

16   What is the minimum threshold?

17             THE COURT:  Today is not the time to get a

18   resolution to that; this has got to move forward.  Fair

19   questions that you're asking, though, okay.

20             MR. MENDELSON:  Appreciate it.  Thank you for your

21   time.

22             THE COURT:  Mr. Herman?

23             MR. HERMAN:  Thank you, Your Honor.  Emanuel

24   Herman, pro se.  I commend the professionals at Kirkland for

25   pulling another late night, and their work ethic.  That

Page 82

1    said, I've been digesting the outline that was submitted.

2    And like others, I could use more time to review what the

3    Debtors submitted.  So, a bridge order would be good, and it

4    would resolve my objection on exclusivity.  After a quick

5    review, I'm cautiously optimistic that the plan put forward,

6    or the outline, as you said, Your Honor, can be a starting

7    point, with lots of changes for getting out of chapter 11.

8           Mr. Frishberg and I met with the UCC this morning.

9    We had a productive conversation.  But I'm still digesting

10   anything.  I wouldn't prefer a free-for-all.  I think, I do

11   think, you know, ultimately, permitting the Committee and Ad

12   Hoc Committees to file alternative plans, and having,

13   potentially, a choice between two or three plans makes

14   sense.  I think if earn customers wanted to put forward a

15   plan, we could hire a lawyer to do that.  Obviously, we're

16   not going to put forward viable plans if there's, you know,

17   hundreds of plans filed.

18           But in any case, I don't strongly object to

19   addressing this on March 8, versus today.

20           THE COURT:  Thank you, Mr. Herman.  Mr. Bernstein?

21           MR. BERNSTEIN:  Good morning, Your Honor, Jeffrey

22   Bernstein, McElroy Deutsch Mulvaney & Carpenter for the New

23   Jersey Bureau of Securities.  We think that the March 8

24   bridge order concept is sensible approach, given the

25   information filed overnight.  And we hope that this period

1   of time will be met with a robust engagement, so that we can

2   get to an endpoint, and so that we can serve the function of

3   providing the best outcome for the accountholders, the

4   creditors here.  And that's what the process, in large

5   measure, is about.  And we look forward to that opportunity,

6   and to get to an endpoint that does as much as possible to

7   contain the ongoing costs, so that the holders, the

8   accountholders, can do as best as possible.  Thank you, Your

9   Honor.

10          THE COURT:  Thank you, Mr. Bernstein.  Mr.

11   Frishberg.

12          MR. FRISHBERG:  Thank you, Your Honor.  Daniel

13   Frishberg, pro se.  I do have a lot of the same concerns

14   everybody else voiced, so I will not voice the again.

15          A short-term bridge order is a good idea.  Again,

16   reserve all rights.  But I do have concerns that the Debtors

17   may attempt to use this bridge order and then, potentially,

18   further bridge orders with -- I think it was described as a

19   fish-and-bait, to drag this out for a while.  I don't think

20   anyone has been advocating for a free for all, and I don't

21   think anybody wants a free for all.  And I do have major

22   concerns about waiving clawbacks as part of a settlement.

23   Thank you, Your Honor.

24          THE COURT:  Thank you, Mr. Frishberg.  Does

25   anybody else wish to be heard before we move on?  All right,

Page 84

```
 1    I'm going to … we're going to put this on the calendar.

 2    I'll enter a bridge order, submit an appropriate bridge

 3    order; vet the form of the order with the Committee and the

 4    US Trustee; it's not complicated.  We'll put it on the

 5    calendar for Wednesday, March 8.  I'm going to set an

 6    objection response deadline of 5:00 PM, March 1, so that

 7    will give people a time to review what's been filed so far,

 8    for the lawyers to talk with your constituencies, your

 9    clients.  And let's see where we get to.  So, I'm going to

10    set 5:00 PM, Wednesday, March 8, one week before the hearing

11    on March 8, as the deadline for any further submissions.

12    All right?

13         Ezra Serrur, I see your hand raised.  Do you wish

14    to be heard.

15         MR. SERRUR:  Yes, hi.  Thanks Your Honor.  I just

16    had a very quick question related to the custody asset

17    withdrawal process that began this morning.  It just relates

18    to four pure custody accounts that were listed on the

19    schedule.  For those that were transferred according to, you

20    know, Rule 3001, to another party, such as a fund, how will

21    the KYC process work in that context?  The filing on the

22    docket wasn't entirely clear on that point.  And I think it

23    would be helpful if there was some clarity on, you know, how

24    that would work in the context of a transferred claim and

25    whether the new owner of that claim can, you know, engage in
```

Page 85

1     the KYC process.

2              THE COURT:  Anybody -- the Debtor want to address

3     that?

4              MR. KOENIG:  Your Honor, Chris Koenig, yes, I can

5     address that.

6              THE COURT:  Go ahead, Mr. Koenig.

7              MR. KOENIG:  The relationship between Celsius and

8     the customers, the original holder of the claim, we have all

9     the data on that; that person has the app login, has the

10    account, has the password.  What's going to happen is the

11    original account holder should complete the KYC, should

12    complete the white listing, should withdraw, and then should

13    take the, you know -- then it's between the seller of the

14    claim and the buyer of the claim to transfer the proceeds.

15    Celsius doesn't have a relationship with the buyer.  The

16    Claimant, frankly, doesn't have a method to, you know,

17    establish a new relationship at this point.

18              So, what we said in the notice is, you know, while

19    we recognize that there were some 3001(e)s that were filed,

20    that the original claim holder should complete the KYC,

21    should withdraw the claim and then, you know, in accordance

22    with their purchase agreement, presumably pay that amount

23    over to the claims buyer.

24              THE COURT:  Thank you, Mr. Koenig.  All right,

25    let's move on, on the agenda.  The next item on the Agenda,

1    number seven, is the motion to appoint a chapter 11 trustee,

2    filed by Mr. Herman and Mr. Frishberg.  It's ECF Docket No.

3    1975.  Mr. Herman or MR. Frishberg, do one of you want to be

4    heard, or both of you, frankly?

5              MR. FRISHBERG:  Yes.  Hello, Your Honor.  Daniel

6    Frishberg, pro se again.

7              THE COURT:  Go ahead.

8              MR. FRISHBERG:  If it's all right, I'd like to

9    take a moment to explain the motion and why we filed it, and

10   what we are hoping to accomplish with it.  And then, Mr.

11   Herman will have a few points of his own to make and will

12   discuss the discovery issues that led to the status

13   conference instead of it being an actual motion.  Is that

14   okay?

15             THE COURT:  Yes, go ahead, Mr. Frishberg.

16             MR. FRISHBERG:  Thank you.  I appreciate there has

17   been some progress made, but there are still some very major

18   concerns that we have about governance at Celsius and how

19   these governance issues impact winning the best interest of

20   creditors.  I hope to find consensual resolution to this

21   motion, but we are not ready at this time to withdraw the

22   motion.  Mr. Herman and I filed this motion for a chapter 11

23   trustee, because there are serious grounds for a trustee.

24   There are some major questions about who appointed the

25   committee members, as well as other members of the current

Page 87

1   management (indiscernible) Ferraro.

2           I am concerned about what it will mean to the

3   details of any final plan, such as potential releases.

4   David Barse, who was presumably appointed by, potentially,

5   Alex Mashinsky, still has a veto power and major influence

6   over any final plan, and what will be varied in the final

7   plan details, such (indiscernible).  As the ombudsman said,

8   the devil is in the details.  Over 350 creditors so far have

9   signed a letter in favor of a chapter 11 trustee.

10          We have not filed this letter yet, since the

11  motion is now scheduled to be heard on March 8.  It's not

12  quite as many as who signed the exclusivity letter, but

13  we've only been circulating it for a short amount of time.

14  This shows we are not alone in having the great concerns

15  around the Debtors.  We hope that the Debtors will finally

16  have a town hall and actually interact with creditors and

17  involve creditors in the restructuring, as well as claims

18  such as the ones that had been laid out in the UCC's motion,

19  or (indiscernible) motion, and address beyond that instead

20  of just those, I believe, eight individuals and their shell

21  companies.  And it will hopefully address the massive

22  conflict of interest within the special committee and the

23  releases for insiders and other members of the management,

24  beyond what is addressed in the complaint filed with the

25  UCC.

Page 88

1           Thank you, Your Honor.  I will now hand over the

2      virtual podium to Mr. Herman.

3           THE COURT:  Mr. Herman, go ahead.

4           MR. HERMAN:  Thank you, Your Honor.  For the

5      record, this is Emanuel Herman, pro se, Celsius creditor.  I

6      just wanted to add a few more context points, and then I'll

7      move onto the discovery issues.  So, you know, obviously, we

8      didn't know exactly what would be proposed at the time we

9      filed the motion, in terms of a plan.  And then, frankly,

10     they aren't really very relevant.  So, whether there are

11     grounds for a trustee, what is relevant and --

12          THE COURT:  Mr. Herman, do you have any idea of

13     what happens if a chapter 11 trustee is appointed now, to

14     this process?  You may be sometime next year when there's

15     actual progress in this case.  So, I may overstate it a

16     little bit, but not by much.  The appointment of a chapter

17     11 trustee will set this case back to about day one or two.

18          MR. HERMAN:  Yes, Your Honor.

19          THE COURT:  That doesn't mean you shouldn't make

20     your motion; you've made your motion.  But I just, you know,

21     I'm not sure that you fully understand what the consequences

22     would be of a chapter 11 trustee being appointed now.

23          MR. HERMAN:  Thank you, Your Honor.  I appreciate

24     that, and I hear that.  And you know, we understand that

25     it's an extreme remedy, and certainly, at the time we filed

1    the motion, it made sense.  I think it still makes sense to

2    continue discussing this motion and pursuing it for the time

3    being.  You know, there are still some unresolved issues

4    around maximizing recoveries for customers and ensuring --

5    really, like we did not -- I just want to be totally clear;

6    we didn't file this, you know, because we didn't like a

7    plan, or something like that.  The concern is around

8    maximizing recoveries for customers and ensuring that

9    conflicts of interest have minimal to no influence on any

10   final plan.

11          So, in particular, with a two-seat special

12   committee, David Barse, who I've been told is a long-time

13   friend of Alex Mashinsky, has veto power over any

14   restructuring proposal; I assume both votes are needed, in

15   the final points that go into any plan.  So, it was great to

16   see a start to the accountability yesterday, with the UCC's

17   filing.  I'm cautiously optimistic progress is being made.

18          THE COURT:  Mr. Herman, Mr. Barse, whether under

19   the existing structure he would have veto or not, if the

20   Committee were permitted to file a plan, Mr. Barse would

21   have no veto power whatsoever.  What I still would hope is

22   that the Committee and the Debtors would continue their work

23   and come up with a plan that would be proposed, by the

24   Committee and the Debtor.  It is certainly possible for the

25   Court to permit the Committee to file a plan.  And that

Page 90

 1    won't give anybody in management a veto.  So, I think -- I

 2    understand your concern.  I have no reason to believe that

 3    Mr. Barse or anyone else is conflicted.  I understand that

 4    statements have been made about his long-time friendship

 5    with Mashinsky.  If it was that, I'll assume that to be true

 6    for now.  But that would not alter -- you know, he has a

 7    fiduciary duty in terms of the management of the company.

 8    And there is a Committee which, I know some creditors have

 9    questioned the activity of the counsel for the Committee.  I

10    think they've been performing admirably, frankly.  But

11    that's not for today either.

12            So, I guess the only point I would make, Mr.

13    Herman, is we're either going to get to a plan that's

14    jointly proposed; if there can't be, I would have been ready

15    to rule on the exclusivity motion today.  We're going to

16    move forward.  I view the -- we'll call it a plan outline.

17    I'm not quite sure what to call it.  I haven't had a chance

18    to study it completely.  I'm sure, I doubt whether you or

19    your colleagues have had a chance to really study it

20    correctly.  It's not the final word.  It's typical when a

21    plan is proposed in a complex case, there is plan

22    negotiation and adjustments made.  And what's filed as a

23    plan, the first day one filed, is not necessarily what we

24    end up with at the end.

25            I have said from the start, I mean my goal here is

1    an outcome, whatever form it takes, that will maximize the

2    recovery for all of the creditors.  But I interrupted you.

3    Go ahead, Mr. Herman.

4          MR. HERMAN:  No, please.  Thank you, Your Honor.

5    I appreciate the context and the background.  And I guess I

6    can, you know, I can move onto discovery while saying,

7    again, just reiterating, we really would like to resolve

8    this consensually.  And, you know, we understand -- like I

9    understand that it would not be -- that there are … it would

10   not be ideal if, you know, if there's a way to get a plan

11   passed that doesn't -- that deals with these issues in

12   another way.  Like, for example, Your Honor, you pointed out

13   that the UCC could propose a plan if the Special Committee

14   were to stand in the way of -- you know, if there were

15   issues around, say, releases or other things that the Debtor

16   and the UCC and other parties couldn't resolve.

17         So, again, I'm hoping for a consensual resolution.

18   That said, on discovery, I'll move onto that.

19         THE COURT:  Go ahead.

20         MR. HERMAN:  We tried to consolidate our discovery

21   requests all in one place and our proposed witness and

22   evidence list.  I think we could probably further narrow

23   that.  We listed some of the documents that we would enter

24   into evidence.  Some of them we don't have, you know, to

25   start one limited request is to get corporate records and

Page 92

1    other information about -- and this was actually mentioned -

2    - there's a good filing by the states, that you referenced

3    earlier in this hearing.  It's mentioned in that filing as

4    well, that one limited request is to get corporate records

5    about who appointed Mr. Barse, Mr. Carr and Mr. Ferraro to

6    their current roles.

7              Then, another request is if, you know, well,

8    that's relevant to 1104(e), I suppose, in any case.  And

9    then another request is documents that were already used in

10   the examiner's report, which I don't think would cost the

11   estate much, or any net money.  Because we contacted the

12   Examiner's Office and were told they were aiming to

13   eventually release these documents anyway, but they're not

14   ready to do so yet.  So, presumably, Kirkland will be

15   reviewing these for eventual publication.  They're

16   referenced in the Examiner Report, you know, which I

17   understand is hearsay.  So, then we were asking for some of

18   the primary course.

19             THE COURT:  Well, they would still be hearsay.  It

20   doesn't become not hearsay when you get them from the

21   Examiner.  The Examiner didn't -- Examiner conducted

22   interviews; it's all hearsay.  The documents have to be

23   authenticated.  It doesn't create admissible evidence just

24   because the Examiner turns them over to you.

25             MR. HERMAN:  Understood.  So, then we would need,

Page 93

1   essentially, declarations from like Kirkland or something to

2   go with them, is what you're saying.

3           THE COURT:  Well, that wouldn't necessarily do it

4   either, but …

5           MR. HERMAN:  Okay.

6           THE COURT:  Anything else you want to say on

7   discovery?

8           MR. HERMAN:  You know, finally, we ask for some

9   depositions.  I think at this point, David Barse is who we'd

10  want to hear from.  I understand, you know, the other

11  Special Committee member, Mr. Carr, filed a declaration.  I

12  don't think Daniel or I are actually questioning his

13  qualifications or his bankruptcy experience or anything.

14  Nor do we believe that he had any kind of relationship with

15  Alex Mashinsky.  So, that's not really an issue that we had;

16  it was with Mr. Barse.

17          THE COURT:  Mr. Koenig, do you want to be heard?

18          MR. KOENIG:  I do, Your Honor.  Thank you.  Chris

19  Koenig.  First, before getting to discovery, I need to take

20  a moment, because there's base speculation by the Movants

21  about the independence of the Special Committee, and the

22  actual evidence in the record that was submitted as part of

23  -- we found two declarations: one of Mr. Ferraro at Docket

24  2046; one of Mr. Carr, one of the Special Committee members,

25  at 2047.  All of the evidence makes clear the integrity and

Page 94

1    the robust -- the integrity of the Special Committee

2    members, the robustness of our process.  Both of the Special

3    Committee members have a long experience serving on boards

4    in the restructuring capacity.  They served on many other

5    distressed companies; currently serve on other distressed

6    companies.  They are individuals of the greatest integrity

7    and have cooperated through these cases with the Committee

8    and have worked to maximize value for all constituents.

9            And just two very quick points:  The Movants

10   suggest that Mr. Barse has a relationship with Mr.

11   Mashinsky.  The Special Committee authorized the termination

12   of Mr. Mashinsky back in September, which we explained in

13   the declaration of Mr. Carr.  The Special Committee recently

14   signed off on the stipulation that you heard about at the

15   beginning of this hearing, which assigned claims against Mr.

16   Mashinsky, to a litigation trust that will be pursued by

17   appointees of the Creditors Committee.

18           So, just to be clear, all of the evidence in the

19   record makes clear that these two individuals are of the

20   highest integrity, have absolutely no conflicts of interest

21   with Mr. Mashinsky, and you know, we'll certainly comply

22   with proper discovery requests and go through the process.

23   But all of the facts, the actual facts, the actual evidence,

24   make clear that there is no issue here, and we'll certainly

25   let the facts bear that out over time.  But I needed to say

Page 95

1    that for the record, given the comments that were made.

2              THE COURT:  All right.  Have you considered filing

3    a declaration for Mr. Barse as well?

4              MR. KOENIG:  Your Honor, we'd certain consider it,

5    given the comments that were made this morning.  We need to

6    speak to our client.

7              THE COURT:  Speak to your client about it, okay.

8    All right.  Does anybody from the Committee want to be

9    heard?  Mr. Colodny?  You're muted.

10             MR. COLODNY:  Sorry.  Muted on my phone and now on

11   the video.  Your Honor, as part of the first exclusivity, we

12   conducted some discovery into the Special Committee and how

13   they were handling the case.  I think that discovery came

14   away with a clean bill of health at this time.  I think that

15   we agree with Mr. Koenig that their actions thus far have

16   spoken for themselves.  They have read the contract.  I

17   think they've fully -- at least in our view; I'm sure not in

18   the preferred equity's view -- faithfully observed them and

19   taken positions that we believe are consistent with the

20   plain language of the contract.  We've been meeting with

21   them, we've moved forward.  We don't have any reason, at

22   this time, to question their integrity.  Other than that,

23   you know, I would just note that the stipulation between the

24   Committee and the Debtors provide: one, for the public

25   disclosure of our complaint, which was filed yesterday, and

Page 96

1    also provides that if the order is entered by the Court, a

2    litigation trust will be set up; those causes of action and

3    any other causes of action against the Defendant, and other

4    causes of action against other prospective defendants that

5    are agreed to by the Committee and the Debtors, will go into

6    that trust.  And if we have any disputes about that, we'll

7    come before Your Honor and have those disputes in a public

8    forum.

9            To me, that's how bankruptcy is supposed to work.

10   We have gotten a long ways in this case.  I think that our

11   objection to the trustee motion was aimed at exactly what

12   Your Honor pointed out; if the trustee were appointed at

13   this time, we think it would undo all of the progress that

14   has been made; it would have an extreme negative effect on

15   the recovery for creditors, and that's not something that

16   neither me or my constituency are interested in at this

17   time.

18           THE COURT:  All right, thank you, Mr. Colodny.

19   There's one more hand raised, Mr. Khanuja?

20           MR. KHANUJA:  Thank you, Your Honor.  Can you hear

21   me fine?

22           THE COURT:  Yes, I can.

23           MR. KHANUJA:  Your Honor, I've made a declaration

24   in support of the Trustee motion.  So, I've made many of the

25   points that I'm not going to repeat them here.  But in light

Page 97

1    of the plan that has come forward, and in light of what you

2    mentioned earlier today, like, you know, appointment of a

3    trustee, how it can potentially bring it to day one or two.

4    You know, our understanding was different.  We thought a

5    seamless transition of knowledge may happen, the trustee

6    appointment, so it won't go back to day one or two.  But if

7    that's the case, then we will withdraw support.

8           Having said that, with regards to the plan, and

9    with regards to some of the concerns that were raised by

10   Daniel Frishberg and Emanuel Herman, and in my support

11   letter as well, (indiscernible).  David Barse, for example,

12   has an equity stake in Celsius, which hasn't been pointed

13   out.  Now, all of these create a conflict of interest, which

14   we have already seen in many of the scenarios in this.

15          For example, the Debtors' plan which was proposed

16   today, there is a possibility that preserving some value for

17   Celsius (indiscernible), and for equity holders, was a

18   primary consideration (indiscernible) current plan.  We

19   don't know whether the current plan is better, or how it

20   compares against liquidation or some of the other plans that

21   were submitted months back.  So, all of these must be

22   brought to light, I would say.

23          THE COURT:  Thank you very much, Mr. Khanuja.  All

24   right, let me say this.  For those of you who've read the

25   legal briefs that were filed in connection with this motion,

Page 98

1    there were references to one of my prior decisions in, In re

2    1031 Tax Group.  And the whole history was not laid out

3    there.  The initial motion for the appointment of a chapter

4    11 trustee, I denied without prejudice.  Perhaps a month or

5    six weeks later, when the situation and the case had

6    changed, and there was a renewed motion for the appointment

7    of a trustee, I granted the motion, as in the interest of

8    creditors in the estate.

9             I'm going to deny the chapter 11 trustee motion,

10   which is filed as ECF document 1975, without prejudice.  I

11   think with the developments that, at least carry us forward

12   to the March 8, March 7 hearing -- March 8, I guess, March 8

13   hearing, it's progress.  There's a long way to go.  I

14   commend the Debtors' counsel and the Committee's counsel in

15   their efforts to reach out with a proposed plan sponsor to

16   manage the NewCo.  It's progress.  There's a lot to be done.

17            So, one of the things, Mr. Herman, that I try to

18   focus on -- you know, the Examiner's Report is hearsay.  The

19   documents the Examiner has, for the most part, will be

20   hearsay.  But I've sort of asked myself the question, if

21   everything is reported in the Examiner's Report were

22   established in a non-hearsay fashion, as evidence in the

23   case, would that support justify the appointment of a

24   trustee under 1104(a)(1)?  And my answer to that was no.

25            The Examiner's Report is extremely thorough, and I

Page 99

1    think she really did an excellent job.  It's obviously very

2    lengthy.  There clearly were a lot of problems at Celsius.

3    It will be for a litigation trust, and perhaps the US

4    Attorney's Office, to deal with issues of misconduct that

5    went on.  But the issue for today is whether or not a new

6    fiduciary, a chapter 11 trustee, should be appointed.

7            My conclusion is, on the record today, the answer

8    to that is no.  So, I'm denying the motion without

9    prejudice.  Things could change, Mr. Herman, that would lead

10   me to change my view as to whether or not a trustee would be

11   in the best interest of the estate.  I think here, I'm

12   hopeful that the Debtors and the Committee, with a lot of

13   input from other ad hoc committees and individuals, will be

14   able to come up with a consensual form of the plan.

15           I take Ms. Cordy and Ms. Milligan's comments, and

16   Ms. Rood's comments; there clearly is a lot of work, and

17   I've said this before at other hearings, a lot of that has

18   to be done with the regulators, to assure that whatever the

19   structure is going forward, is regulatory compliant.  I

20   consider that to be very important.

21           So, for today at least, the chapter 11 trustee

22   motion is denied without prejudice.  In my view, it moots

23   the issue of the discovery requests that are made for now.

24   I do think Mr. Koenig, it would be helpful, but I'm not

25   ordering it, that a declaration from Mr. Barse also be filed

Page 100

1    on a record.  It would, hopefully, help clear some of the

2    air, okay.

3              MR. KOENIG:  Understood, Your Honor.  Thank you.

4              THE COURT:  All right.

5              MR. HERMAN:  Thank you, Your Honor.

6              THE COURT:  Let's move onto the next item on the

7    agenda, and that is the issue of whether the US Trustee

8    ought to have the Court enter an order to show cause, and

9    why the Debtors could not retain Willis Towers Watson.  I

10   wanted to have a discussion today about what are the issues

11   regarding the retention, and if necessary, work out a

12   schedule for a motion.  Ms. Cornell, do you want to start?

13             MS. CORNELL:  Thank you, Your Honor.  Shara

14   Cornell for the Office of the United States Trustee.  I

15   should let Your Honor know that myself and the counsel for

16   the Debtors did have a meet and confer yesterday regarding a

17   scheduling.

18             THE COURT:  Okay.

19             MS. CORNELL:  If you'd like us to share that with

20   you --

21             THE COURT:  Yeah, go ahead, please.  Well, go

22   ahead and share it for the record, for everybody.

23             MS. CORNELL:  We've decided that the order can be

24   entered, but that responses would be due on March 1, with a

25   hearing date on March 8, and if we have a reply on March 7.

Page 101

1      And Mr. Koenig can correct me if I'm wrong.

2              MR. KOENIG:  Your Honor, Chris Koenig.  Ms.

3      Cornell is representing accurately.  We discussed yesterday,

4      after she filed a motion, we're going to continue to discuss

5      with her office, but we'll file whatever we file by March 1.

6              THE COURT:  Educate me why, because I've had

7      numerous cases with KEIPs and KERPs and I don't know whether

8      Willis Tower was the professional engaged, but in every one

9      of those cases, there was a retention application that was

10     approved.  Why no retention application here?

11             MR. KOENIG:  Your Honor, again, Chris Koenig.  So,

12     actually, maybe your experience has been different, but we

13     searched our records and searched Willis Towers in

14     particular.  We found one case in the Ninth Circuit where

15     the KERP advisor or the KIEP advisor was retained.  The

16     position has been that they're not a professional within the

17     meaning of Section 327.  They're more like an expert

18     witness, Your Honor.  Certainly, that's the way that we've

19     been proceeding through these cases, consistent with our

20     practice in other matters.  Again, after Ms. Cornell raised

21     the issue, we search our records to make sure that what we

22     were doing was consistent with practice elsewhere.

23             THE COURT:  Are there any reported decisions that

24     support that, that I could look at?

25             MR. KOENIG:  Your Honor, I don't think that the

Page 102

1    issue has been squarely presented, of whether the KERP

2    advisor, or the employee compensation advisor is a

3    professional within the meaning of section 327, but we'll

4    continue to look at it.

5            THE COURT:  Maybe you prevail in the end of the

6    day, and I conclude that they don't have to be retained.

7    But you may not.  Why don't you just file a … why are you or

8    they unwilling to file a -- to try and resolve this through

9    a retention application, that usually gets negotiated out

10   with the US Trustee, and becomes a nonissue.

11           MR. KOENIG:  Your Honor, we're certainly amenable

12   to having those conversations --

13           THE COURT:  Have you had that conversation?  I

14   mean, it's late in the day already.  I can just tell you, if

15   you and Willis loses this issue, this far into the case, I

16   have at least one case where I required an attorney to

17   disgorge all the fees that he had received, because he

18   hadn't been retained.  So, the stakes are more than just

19   whether they can go forward or not.  If I conclude that they

20   were required to be retained -- and maybe I'm wrong, okay.

21   That's why I asked were there any reported decisions.  The

22   consequences -- I was surprised when I read the briefing

23   about how much money they had been paid post-petition, for

24   this work.  And do they want to be in a position where they

25   might have to disgorge all of that?  But you can decide.

Page 103

1    I'm not deciding the issue, okay.  I was just surprised that

2    it's gotten to this point.

3              MR. KOENIG:  We understand, Your Honor, and I'm

4    joined by counsel to Willis Towers Watson, who's on the

5    phone, in case he wants to make any remarks as well.

6              MR. MURLEY:  Good afternoon, Your Honor, Luke

7    Murley, of Saul Ewing, on behalf of Willis Towers Watson.

8    In answer to Your Honor's question, we think we do need to

9    have a discussion with both the Debtors and the US Trustee,

10   about what the filing will be, and on all the issues.  But

11   to give Your Honor some context, earlier in the case, the US

12   Trustee sought 2004 discovery.  We've produced voluntarily,

13   but we haven't yet had a discussion with the US Trustee

14   regarding their recent filing, but we intend to.

15             THE COURT:  Your Honor, Mr. Murley, all I can say,

16   there are so many issues in this Celsius case, I can't

17   believe this is one that you all want to press.  If you do,

18   fine, okay.  So, submit a revised order and I'll sign it.

19   You've agreed on the schedule.  That's fine.  Perhaps you

20   could resolve this without the necessity of going forward,

21   with the hearing on March 8.

22             MR. MURLEY:  Thank you, Your Honor.

23             MR. KOENIG:  Thank you.

24             THE COURT:  All right.  Mr. Koenig, what else do

25   we have for today?

Page 104

1            MR. KOENIG:   Your Honor, up next is the status

2      conference on the custody withhold, phase two litigation.

3      So, let me start the status conference with some good news;

4      that we've reached an agreement in principal with the ad hoc

5      group of custodial account holders.  We need to turn that

6      into a formal settlement motion, pursuant to bankruptcy rule

7      9019, file it on the docket, notice it for a hearing, allow

8      people time to review and object and have a hearing.  But

9      just wanted to outline the deal, just very quickly, in

10     principle.  And of course, you know, the binding terms will

11     be set forth in a 9019 motion.

12            The agreement would allow each and every custody

13     account holder the option to elect to participate in the

14     settlement, or not.  If they elect to participate in the

15     settlement and settle the outstanding preference claims that

16     the estate has against the custody holder, they will receive

17     a total of 72.5 percent of their allowed custody claims over

18     time.  I'll come back to the overtime part in a moment.  And

19     if they settle, it resolves all claims between the parties

20     relating to the custody claims; the estate's claims against

21     the custodial accountholders for the preference, for the

22     transfer from earn into custody, and whatever claims the

23     custodial accountholders have against the Debtors, for

24     repayment of the entire account balance that's due.

25            If they don't choose to settle, then an amount

Page 105

1    will be set aside under the plan for non-settling custodial

2    accountholders to continue to litigate these issues.  They

3    can, you know, litigate and seek more than 72.5 percent of

4    their claim back, and the estate or the litigation trustee

5    can sue them for a preference.  So, this gives folks an

6    option.  If they want to, you know, put an end to the

7    litigation that we've had for many months in these cases,

8    each and every holder will have that option.  And if they

9    want to continue to try to press their rights, they can

10   continue to do so, subject, of course, to the estate and the

11   litigation trustee continuing to pursue their rights.  So,

12   it gives folks an option.

13          I mentioned earlier that we overtime.  What we're

14   contemplating is a two-step process.  One is, when we file

15   the 9019, once the 9019 is approved, there would be a first

16   payment of half the amount and again, this is lawyer math,

17   which I referenced at last week's hearing, so it's a little

18   -- just to make sure I have the number right, it's 36.25,

19   half of the 72.5, would be paid upon approval of the

20   settlement and the remainder would be paid upon the

21   effective date of the Plan once the Plan is confirmed.  So,

22   that -- we're very pleased to have been ale to reach this --

23   this settlement in principal with the custodial account

24   holders.  I'll turn to withhold in a moment, but that's the

25   update on custody and I'm happy for Mr. Ortiz to speak if

1    you would like.

2              THE COURT:  Mr. Ortiz?

3              MR. ORTIZ:  Good afternoon, Your Honor.  So, Your

4    Honor, I think like any good settlement, I think all the

5    parties are just a little unhappy, which I think means that

6    we've hit the sweet spot and it's an appropriate settlement.

7    But critically, you know, should Your Honor approve the

8    settlement, it's going to start getting coins back to

9    holders right away and will dissolve the parties of the

10   uncertainty and expense of Phase 2, which we think is

11   important.  That's ultimately -- we believe it's a very

12   positive outcome for our custody clients, for those

13   similarly situated and for the Chapter 11 cases and we will

14   certainly, during this process, be encouraging all custody

15   account holders, whether they're clients or not, to accept

16   because we do think it's a good outcome.  And I'd just

17   note, you know, there's still some work to get it approved,

18   but we do appreciate the efforts of the Debtors and the

19   Committee to get to a consensual resolution that has us all

20   appropriately (indiscernible) and happy, Your Honor.

21             THE COURT:  Let me ask you, Mr. Ortiz.  So, you

22   represent the Ad Hoc Committee, you don't represent all of

23   the custody account holders.  How is it contemplated that

24   this is going to work?

25             MR. ORTIZ:  Well, I think the way it's

Page 107

1    contemplated is that ultimately, every custody account

2    holder would have the option to opt in.  One of the things

3    that's very helpful to the Debtors of having our group is,

4    they have a pretty good sense of, you know, what percentage

5    of people they're going to get.  And I think, you know, what

6    we can do to be helpful, obviously, in the process, is in

7    the communications that will go out to be supportive and

8    help people understand why, at least from the perspective of

9    the custody account group, which again, isn't everybody, but

10   of that group, which is a fairly large percentage of it, why

11   we ultimately determined it was a good outcome.

12          THE COURT:  Is it an opt-in procedure that's

13   anticipated?

14          MR. ORTIZ:  That's correct, Your Honor.

15          THE COURT:  Okay.  All right.  Mr. Koenig, go

16   ahead.

17          MR. KOENIG:  Yeah, and just really briefly, it's a

18   good segue.  So, the custody ad Hoc Group will agree with

19   standstill of the Phase 2 litigation as part of this

20   settlement as that we're not going to proceed with Phase 2

21   as the custody pending approval of the 9019, and then

22   pending approval of the Chapter 11 Plan.  So, that segues

23   pretty well into withhold.  We've had conversations with the

24   withhold holders.  We, obviously, don't have an agreement

25   yet.  We want to continue to talk and see if there's a

Page 108

1     resolution of Phase 2 with respect to the withhold holders -

2     - say that ten times fast -- that could be beneficial to all

3     parties or, like Mr. Ortiz said, you know, just the right

4     amount of upset.  If we're not able to reach that

5     resolution, we need to figure out what to do with Phase 2

6     with withhold, given that custody is no longer part of Phase

7     2.  The Debtor's position is that, you know, Phase 2 was

8     premised on there being a ruling of the Court that custody

9     and withhold were not property of the estate because, of

10    course, there's only a preference if withhold is not

11    property of the estate.  If withhold is property of the

12    estate, there's no preference, there's no transfer of the

13    Debtor's interest in property.

14          So, given that custody is out of the picture, if

15    we do go forward with the litigation and don't reach a

16    settlement with the withhold people, we think that there

17    needs to first be a determination of the Court as to the

18    Phase 1 issue with respect to withhold.  Back in December,

19    Your Honor said, you know, "I hope that withhold goes

20    forward with Phase 2."  That made all the sense in the

21    world.  Phase 2 was going forward with respect to custody

22    anyways.  But our position is that, if we're going forward

23    with just withhold, there's sort of a predicate issue, which

24    is the resolution of the Phase 1 issue that we argued in

25    December.  So, that's the update on withhold from the

Page 109

1    Debtor's perspective.

2            THE COURT:  Just -- I'll turn to Ms. Kovsky in a

3    minute, but could you remind me whether the withhold assets

4    were co-mingled with all of the earned assets?

5            MR. KOENIG:  They were, Your Honor.  They were in

6    the same fire blocks' workspace.

7            THE COURT:  Okay.  All right.  Ms. Kovsky?

8            MS. KOVSKY:  Thank you, Your Honor.  Deb Kovsky

9    for the Ad Hoc Group of Withhold Account Holders and the

10   other transferees.  As Mr. Koenig said, I think something

11   will need to be figured out at some point with Phase 2,

12   perhaps not today.  We have been in ongoing discussions.  I

13   understand the Debtor's position that we need to go back and

14   revisit Phase 1.  Your Honor may recall at the December 7

15   hearing, you pointed out, quite rightly, that the Debtors

16   have pretty much done a 180 on us and went from saying, "No,

17   withhold is absolutely not property of the estate", to

18   "Well, you know, we don't really know."  And you had asked

19   me at that time whether I had all of the evidence in the

20   record that I would want given that change, and my answer

21   was no.

22            So, if we have to go back and revisit, then we

23   would need a full schedule for that or we can proceed -- the

24   reality is, Your Honor, the withhold group spent a great

25   deal of time and incurred a significant amount of expense

1    preparing for Phase 2 at Your Honor's request that we move

2    forward with Phase 2.  We've gone pretty far down that road

3    and it would, I think, be detrimental to my client group to

4    be told, "Oh, actually, you know, we're not going to have a

5    Phase 2 because we first have to -- we have to do a

6    sequential process and do Phase 1 all over again first and

7    perhaps not get to Phase 2 and not get these issues

8    resolved", when we've already incurred so much expense

9    preparing for Phase 2.

10           THE COURT:  Remind me --

11           MS. KOVSKY:  That said though --

12           THE COURT:  Remind me, Ms. Kovsky, what the

13    aggregate value of the withhold accounts are.

14           MS. KOVSKY:  The entire universe, my understanding

15    is somewhere around $15 million.

16           THE COURT:  Okay.

17           MS. KOVSKY:  And the Withhold Ad Hoc Group is

18    roughly, I think, a little more than 10 percent of that.

19           THE COURT:  All right.

20           MS. KOVSKY:  So that was a very long-winded way of

21    saying, Your Honor, that we're still talking and are

22    probably going to have to come back to you at a subsequent

23    date.

24           THE COURT:  Okay.  Mr. Mendelson, you have your

25    hand raised.

Page 111

1           MR. MENDELSON:  Yes, thank you again.  It was just

2     mentioned that, you know, maybe tongue in cheek, that

3     custody is a non-issue or a dead issue at this point.  It's

4     not a dead issue to me until I understand what the retail

5     claw back minimum threshold is going to be.  And the estate

6     saying that they're going to claw back whatever financially

7     makes sense, I don't know if that's legally standing and

8     that's certainly not a definitive number for me to make my

9     decision as to whether I'm going to accept -- if Your Honor

10    accepts this Settlement Agreement.  So, again, I just want

11    to reiterate, we need to know what the retail claw back

12    threshold is going to be, sooner rather than later, before

13    making any decisions about settlements.  Thank you.

14          THE COURT:  Thank you, Mr. Mendelson.  Did anybody

15    else want to be heard?  Mr. Iovine?

16          MR. IOVINE:  Yes, Your Honor.  Jason Iovine, pro

17    se creditor.  Mine is just in reference to the assets sent

18    in after the petition date.  Is there any resolution to

19    that?

20          THE COURT:  People sending crypto in after the

21    filing?

22          MR. KOENIG:  Your Honor, I can provide an update

23    there.  So, at the last Omnibus Hearing --

24          THE COURT:  You have to identify yourself on the

25    record, Mr. Koenig, please.

1           MR. KOENIG:  Oh, I'm sorry.  Again, Chris Koenig

2     for the Debtors.  Thank you, Your Honor.  At the last

3     Omnibus Hearing, we -- Your Honor entered an Order

4     authorizing us to re-open the withdrawals of the post-

5     petition deposits.

6           THE COURT:  Right.

7           MR. KOENIG:  We're in the process of doing that,

8     just like we're in the process of opening for custody.  So,

9     there will be communications that go out.  It's going to lag

10    a little bit behind the custody just because we've been

11    working on custody for so long.  But we're working as hard

12    as we can to re-open withdrawals for those folks, as well.

13    The post-petition, sort of, the accidental deposits that

14    Your Honor authorized, we're working on that, as well.  But

15    obviously we're trying to open deposits -- we're trying to

16    open withdrawals for both custody and the post-petition

17    folks, as well.  But that's certainly continuing just along

18    with the custody withdrawals.

19          THE COURT:  Thanks very much, Mr. Koenig.  Anybody

20    else want to be heard?  Ms. Kovsky, your hand is still

21    raised or raising a new --

22          MS. KOVSKY:  Sorry.  Raised new.  I just wanted to

23    mention one other -- it's a minor issue, but I just did want

24    to flag it since it's part of the Status Conference.  Part

25    of Your Honor's Order with respect to the release of certain

Page 113

1    custody coins also included the release of certain withhold

2    coins.  My understanding from the Debtors is that they are

3    working on it.  They've run into some technological issues,

4    but my understanding is that this is something that is in

5    process.

6              THE COURT:  Mr. Koenig, can you address that?

7              MR. KOENIG:  Your Honor, Chris Koenig.  Yes, I can

8    address it.  It's proven more challenging than we had

9    initially thought to identify each and every one of the

10   withhold coins that's within the sort of, the very narrow

11   band that was authorized to be withdrawn.  It was, sort of,

12   the "Oops, we sent coins that are not, you know, possible to

13   be, you know, deployed on the Celsius platform."  Anybody

14   can create any coin on the Ethereum blockchain.  I could

15   create a Koenig coin and send it in to Celsius and, you

16   know, laugh about it.  Determining all of those individual

17   coins has proved more technologically challenging.  We are

18   working on it, but I think we all expected that this was

19   going to be a much easier issue to finalize and we're still

20   working on it.

21             THE COURT:  All right.  Mr. Herrmann?

22             MR. HERRMANN:  Yeah.  Thank you, Your Honor.

23   Immanuel Herrmann, pro se Creditor.  I just wanted to make a

24   quick point about claw backs.  There's actually a pretty --

25   we don't totally agree all retail customers -- and of

1    course, there's so many, but actually, a lot of the earned

2    customers even don't think there should be retail claw backs

3    except at a high threshold.  So, there might be some debate

4    about, should it be $100,000, a million, whatever it is.

5    But it's not -- people don't really think small accounts

6    should be gone after and there's also --

7              THE COURT:  It's not how the statute's drafted,

8    though, you know.  I deal with the law, not -- you know, I

9    hope there's a resolution, Mr. Herrmann.

10             MR. HERRMANN:  Okay.  Yeah, me too.

11             THE COURT:  Okay.  Mr. --

12             MR. (indiscernible):  Yeah.  Jeff (indiscernible),

13   pro se creditor.  I was wondering if Chris Koenig could

14   explain a little bit more about the second part of custody.

15   Are you talking about a settlement of, like, for pure

16   custody, let's say, that as an example, you're talking about

17   70 percent of the 6 percent that people won't be getting

18   back in the first installment?

19             MR. KOENIG:  Again, Chris Koenig.  You're asking

20   about how is the resolution of the 6 -- the prior Custody

21   Order allowed 94 percent of pure custody be withdrawn.  Your

22   question is, how does this settlement impact the 6 percent?

23             MR. (indiscernible):  Correct, yes.

24             MR. KOENIG:  Yeah, that's a great question and

25   something we're still working on with the parties.  We'll

Page 115

```
 1    announce it as part of the 9019 settlement.

 2              MR. (indiscernible):  Understood.  Thank you.

 3              MR. KOENIG:  Thank you.

 4              THE COURT:  Thank you both, Mr. (indiscernible)

 5    and Mr. Koenig.  All right.  Mr. Koenig, I think we've

 6    finished everything on the agenda, haven't we?

 7              MR. KOENIG:  Your Honor, I think that's -- I think

 8    that's right.  There was a Stone adversary -- a stone

 9    adversary status conference and I believe one other status

10    conference, as well.  But we've gone through the main

11    portion of the case, for sure.

12              THE COURT:  All right.  Mr. Hurley?

13              MR. HURLEY:  Thank you, Your Honor.

14              THE COURT:  This is in connection with the Stone

15    adversary proceeding.

16              MR. HURLEY:  Good afternoon, Your Honor.  Mitch

17    Hurley with Akin Gump.  I'm just looking for Mr. --

18              THE COURT:  His name is Mr. Roche.  He's on my

19    screen.

20              MR. ROCHE:  Good afternoon, Your Honor.

21              THE COURT:  Okay.

22              MR. HURLEY:  Oh, there he is.  Would you like me

23    to go ahead, Your Honor?

24              THE COURT:  Yes, I would.

25              MR. HURLEY:  Okay.  Again, Your Honor, Mitch
```

Page 116

1    Hurley with Akin Gump on behalf of the Celsius Plaintiffs.

2    Your Honor, first I just wanted to thank the Court again for

3    the time that it devoted to hearing the Objection Motion

4    last month and the Evidentiary Hearing that the parties

5    participated in and for entering the TRO yesterday.  We

6    think that this is a really important step, including the

7    entry of the TRO, both from the perspective of the

8    protection of creditors and from the perspective of giving

9    these parties some breathing room to consider whether a

10   settlement may be possible.  So, the TRO, of course, is now

11   in effect.  It will remain in effect until further Order of

12   the Court and we have had some discussions since our last

13   conference with Your Honor about a potential path for

14   settlement.  And I want to come back to that in a moment.

15          First, I just want to bring the Court up to speed,

16   at least on where the parties are in terms of discovery and

17   scheduling.  So, we and counsel for the Defendants have

18   conferred on multiple occasions, including very recently,

19   concerning the progress of discovery and the current case

20   management and Scheduling Order.  Your Honor may recall that

21   that Order calls for fact discovery to be finished by March

22   10th, expert discovery to be finished by May 24th and a pre-

23   trial Order filed by June 23rd.  So, in discovery, I think

24   both parties agree that substantial progress has been made,

25   but more work remains.  Certainly, the litigation related to

1    the TRO and injunction was time consuming and I think we

2    also agree that some additional time will be required to

3    complete discovery as compared to what's on the schedule

4    now.   There's some additional document production that's due

5    from both sides.   We expect the Court may be called on if

6    discovery resumes, to resolve some document-related

7    disputes, and there would be depositions and, of course,

8    expert discovery.

9            As I noted though, since our last conference with

10   Your Honor, the parties had some preliminary discussions

11   about a potential settlement.   The discussions have been

12   productive in that the parties appear, again, very

13   preliminarily, to at least be in the same ballpark about the

14   kind of process that might make sense for the parties to

15   engage in to try to get to a settlement.   If the parties

16   were able to agree on a process, then we think it's likely

17   that we would come back to you jointly soon, to ask for both

18   a modest extension of some of the deadlines in the existing

19   schedule, and also for a stay of the litigation and those

20   deadlines to provide the parties some time to try to work

21   through their process to see if we can get to a settlement.

22           If the parties can't agree on a process, we will

23   also advise the Court promptly, including in connection with

24   scheduling.   Either way, our objective, and I think it's one

25   shared by the Plaintiffs -- sorry, by the Defendants, is to

Page 118

1    come back to the Court next week, hopefully by the middle of

2    next week.  We are hopeful, at this point, that we're going

3    to come back with a request for a stay in addition to the

4    modification of the schedule.  But those discussions, as I

5    said, are very preliminary so we've got to continue working

6    on it.

7              THE COURT:  All right.

8              MR. HURLEY:  (indiscernible)

9              THE COURT:  I'm sorry, go ahead, Mr. Hurley.

10   Anything else you want to add, Mr. Hurley?

11             MR. HURLEY:  No, Your Honor.

12             THE COURT:  Okay.  Mr. Roche?

13             MR. ROCHE:  I think Mr. Hurley has covered it.  We

14   spoke -- we've spoken a couple of times this week and I

15   agree with Mr. Hurley's characterization of the

16   conversations.  We're hopeful we can get a joint submission

17   to Your Honor by mid-next week.  That would include a stay

18   for reasons Your Honor pointed out, in closing arguments at

19   the TRO hearing or, excuse me, at the Preliminary Injunction

20   hearing, just getting a process in place on how the parties

21   can make sure there's transparency around -- on both sides

22   around the accounting because that will, obviously, have

23   impact on the discussions regarding the settlement.

24             THE COURT:  All right.  Thank you, Mr. Roche.

25   Keep me advised, Mr. Hurley and Mr. Roche and I hope you're

Page 119

1   able to move toward the settlement.  Okay.

2          MR. ROCHE:  Understood, Your Honor.  Thank you.

3          THE COURT:  All right.  So, there were two other

4   adversary proceedings that were on the calendar for status

5   conferences.  First, Frishberg v. Celsius Ne5twork,

6   adversary proceeding 22-01179 and Shanks v. Celsius Network,

7   adversary proceeding 22-01190.  There are issues that --

8   there's an issue in each of those that have to be resolved,

9   I think, before the -- they're ripe for a status conference.

10  So, I see Mr. Shanks' hand has been raised and Mr.

11  Frishberg's hand has been raised.  I'll -- Mr. Shanks, I'll

12  hear you briefly, but I don't want to get into the details

13  of what the issue is.  I think that has to be resolved

14  before those cases are ripe to go forward.  But Mr. Shanks,

15  if you want to be heard, go ahead.

16          MR. SHANKS:  Yes.  Fred Shanks, pro se.  Your

17  Honor, I understand exactly what you're saying, and I

18  appreciate what you're saying.  I would like to bring to the

19  Court's attention that Celsius and their lack of proper

20  documentation.  And a good example is, I received 1099

21  Miscellaneous Forms, which there's a severe discrepancy in

22  regards to what's being reported to the IRS, to include the

23  1099-B.  I have reached out to Celsius on a number of

24  occasions.  I have it documented via email, and I've

25  received absolutely no response back.  This is, again, my --

Page 120

1    you know, the fundamental basis of why we're here today is

2    their lack of proper documentation.  So, I would just like

3    to bring that to the Court's attention.  And if we need to,

4    you know, in regards to the case itself, what it is that

5    needs to be resolved, I am available.  And I have reached

6    out to the Defendant's law firm on a number of occasions.

7            THE COURT:  All right.  Let me see, Mr. Latona, I

8    see you on the screen.  I don't see any of your colleagues.

9    Can you or one of your colleagues find someone who can reach

10   out to Mr. Shanks and see if we can avoid the necessity of

11   going forward with an adversary proceeding.  Perhaps there's

12   another resolution that can be reached.  So, you have the

13   misfortune, perhaps, Mr. Latona, of being the one I can see

14   on the screen.  So, I'm asking if you would do that, if you

15   would reach out to Mr. Shanks and see whether --

16           MR. LATONA:  Yes, Your Honor.

17           THE COURT:  -- you can get him the information

18   he's looking for.  Okay?

19           MR. LATONA:  Yes.  Good morning, Your Honor.  Dan

20   Latona of Kirkland & Ellis on behalf of the Debtors.  I'll

21   happily take on that burden.  We have been in contact with

22   Mr. Shanks.  We understand his concerns regarding the 1099.

23   We'll work with the Debtors to make sure he gets the

24   information that he needs.  Regarding the adversary

25   proceeding, as it stands right now, the Debtors and Mr.

Page 121

1    Shanks agreed to a stipulation which states discovery

2    pending the Debtor's responsive pleading, which due on

3    February 22nd.

4              THE COURT:  That's fine.  Okay.

5              MR. LATONA:  And then, Your Honor, with respect to

6    Mr. Frishberg's adversary --

7              THE COURT:  Yeah, and that's -- that's AP 22-

8    01179.  Let me hear from Mr. Frishberg first before I hear

9    from you, Mr. Latona.  Go ahead, Mr. Frishberg.

10             MR. FRISHBERG:  Your Honor, I was just going to

11   say, like it was -- like Mr. Latona was going to say, the

12   matter has been adjourned for today.

13             THE COURT:  Okay.  Yes, it has.  It is adjourned

14   and I think my Chambers have been communicating with you,

15   Mr. Frishberg.

16             MR. FRISHBERG:  Yes, Your Honor.

17             THE COURT:  We're trying to resolve one issue.  I

18   don't see any reason to get into that on the record today.

19   Okay?

20             MR. FRISHBERG:  I understand.  I (indiscernible)

21   and I plan to address it shortly with action.

22             THE COURT:  That's fine.  Okay.  Mr. Latona, did

23   you want to address it?

24             MR. LATONA:  No, Your Honor.

25             THE COURT:  Okay.  All right.  By my reckoning,

Page 122

```
1    that does take care of the agenda for today.

2              MR. LATONA:  Thank you, Your Honor.

3              THE COURT:  Thank you all and see you in March.

4              MR. KOENIG:  Thank you for your time, Your Honor.

5              THE COURT:  Let's hope for more progress, okay?

6    Thank you very much.

7              MR. KOENIG:  We look forward to it.  Thank you.

8              THE COURT:  We're adjourned.

9              (Whereupon these proceedings were concluded at

10   12:45 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 123

1                              I N D E X

2

3                              RULINGS

4                                              Page      Line

5    345(b) Waiver Granted                     48        20

6

7    Sale of Bitmain Coupons Approved          55        5

8

9    Omnibus Claims Objection and Claim

10   Satisfaction Procedures Granted           64        1

11

12   Chapter 11 Trustee Motion Denied          99        22

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature]*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 16, 2023